**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | |
|---|---|
| KYLE SLOAN, et. al.<br><br>Plaintiffs,<br><br>v.<br><br>MAYFLOWER TRANSIT LLC; et. al.<br><br>Defendants. | CASE NO: 2:22-cv-0076-LGW-BWC |

**DEFENDANT MAYFLOWER TRANSIT, LLC'S**
**<u>MOTION FOR RULINGS IN LIMINE, WITH SUPPORTING MEMORANDUM</u>**

This case arises from an incident on the portion of I95 running through southern Georgia, which occurred on July 1, 2022 (the Friday before the Fourth of July holiday). Defendant Mayflower moved for summary judgment based upon its lack of connection to this incident (D.E. 290)[1]—the load, the truck, and the driver were not affiliated with Mayflower.

Discovery revealed the following unambiguous facts:

- The Bill of Lading does not mention Mayflower (D.E. 291-3)
- The load was not in Mayflower's system (D.E.291-1 at 10)
- The load was booked through the third-party TMM clearing house without Mayflower's involvement and traveled under Moholland's authority (D.E. 291-12 at 67)
- Mayflower's agency relationship with the responsible party, Moholland, had already ended (D.E. 291-12 at 114, D.E. 291-9 at 20, D.E. 291-8 at 37)
- Moholland was owned by a competitor, effective months before the incident (D.E. 291-8 at 33)
- Moholland admitted that markings on the truck with Mayflower's logo and DOT number did not belong on the truck based on agency termination (D.E. 291-12 at 60)
- The party who provided the driver and handled the load, Locke, had no tie with Mayflower and worked with Moholland (D.E. 291-7 at 5)
- The driver, Burist, did not receive the assignment from Mayflower (D.E. 291-11 at 71-72; see also D.E. 291-11 at 43).

[1] As the Court did when addressing jurisdiction, references are to the <u>Sloan</u> docket entries. The Plaintiffs' responses are substantively identical.

- Mayflower confirmed with the DOT that it had no agency with Moholland (D.E. 291-4, D.E. 291-10 at 21);
- There is no evidence the Department of Transportation treated this load as Mayflower's following Mayflower's confirmation of agency termination (D.E. 291-10 at 32).

The Court denied summary judgment after concluding that a jury should assess these facts. Consequently, unlike the other Defendants, Mayflower is in this case because the truck Defendant Burist was driving for Moholland, to which Locke Relocations assigned him, still had the Mayflower markings on it (and some documents and license plates) even though Moholland should have removed them long before that date.

Documents thus show that by July 1, Moholland's relationship with Mayflower had been terminated—because Moholland was purchased by a competitor who operates as Tailored Move. Mayflower had no connection to this load operated by an entity owned by a competitor and no reason to allow a competitor to do business under Mayflower's name. During the investigation after the incident, no government agency concluded Mayflower was responsible for the accident, even though Moholland had left Mayflower's license plates on the truck and Moholland had not put the necessary paperwork in the truck cab to show it was under Moholland's control (the old papers were still there). Instead, Mayflower satisfied the Department of Transportation by providing that agency with the termination documents (showing Moholland was no longer associated with Mayflower) upon inquiry after the crash.

The police report states the carrier was Joe Moholland, Inc., and the owner of the truck was also Joe Moholland, Inc. Discovery confirmed this—Moholland's corporate representative stated this load was under Moholland's authority, during a time after it had terminated its relationship with Mayflower. Discovery has also revealed that Burist was employed—based on testimony and checks written to him—by Defendant Locke Relocations, Inc.

As to Mayflower, this case turns on whether Mayflower is responsible for Burist's criminal acts on that day. Mayflower moves for orders limiting the scope of evidence (and argument) permissible at trial to ensure the jury is not distracted, or prejudice is not created, by evidence that is either not of consequence to the central question or is unfairly prejudicial, confuses the issues (and misleads the jury, delays the case, and needlessly presents cumulative evidence).

Based on these circumstances, there are five rulings (in addition to those in other parties' motion that Mayflower has separately joined) Mayflower requests at the threshold ("in limine") before trial.

*First*, the Court should prohibit any questions of witnesses or argument discussing pretrial discovery and any alleged "missing" or "withheld" documents.

*Second*, the Court should prohibit any suggestion that witnesses are lying, whether through counsel's statement or questions of witnesses on the stand.

*Third*, the Court should limit the trial presentation to evidence regarding this agency agreement and this load rather than the Moholland-Mayflower business arrangement generally, because this is a personal injury case that is not about commercial relations.

*Fourth*, the Court should prohibit discussion of Mayflower's business practices, because they are irrelevant; Plaintiffs in their complaint discuss "paper companies" and other business practices that are not relevant to the determinative issue at trial.

*Fifth*, as to the evidence regarding Burist on that day, the Court should rule that if the jury determines agency or employment exists, when deciding whether Burist was acting within the scope of such agency or employment it must presume that Burist was acting outside such scope because he committed a crime.

The evidence in discovery has revealed that the primary dispute for trial involves whether, on that day, Mayflower was responsible for the truck and driver who crashed into the Plaintiffs. Testimony has been taken. Documents have been exchanged. They show that on the date of the crash, Defendant Burist was not driving for Mayflower and had no authority to do so. However, Defendant Moholland, whose truck he was driving, had left the Mayflower logos and DOT numbers on the truck and acknowledged that was in breach of its legal obligations. By that time, Moholland had been bought by a competitor of Mayflower—Tailored Move—and was operating this load as part of that relationship. Consequently, there is no record of this load as revenue-generating or Mayflower attributable.

Notwithstanding this straightforward (and limited) issue, under the broader discovery standard of Rule 26(b)(1), which provides "Information within this scope of discovery need not be admissible in evidence to be discoverable," Plaintiffs have stretched inquiry to pursue their pre-trial theory of an "ongoing" relationship between Moholland and Mayflower. Plaintiffs have contended that this "ongoing relationship" would allow Burist and Moholland to be Mayflower agents on the date of the crash.

This wide search yielded evidence of two things: a) there were loads in progress with Moholland that were not just cut off, and allowed to stay (but not this one); and b) there were payments related to closing out the relationship that extended beyond the termination date and the date of the crash (but not for this load). While pursuit of this theory was permitted under Rule 26, at trial this pursuit must be limited because that evidence is inadmissible and the constraints of the Evidence Rules should be applied to ensure a fair trial for Mayflower. Otherwise, the jury will be sidetracked to an immaterial issue—the business relationship between Moholland and Mayflower,

and Mayflower's business generally—rather than the material issue, which is whether on that date this load was under Mayflower's authority and control.

At trial, Evidence is relevant if: **(a)** it has any tendency to make a fact more or less probable **than it would be without the evidence**; and **(b) the fact is of consequence** in determining the action." Fed. R. Evid. 401 (emphasis added). The Court has already framed the relevant issue. Earlier in the case, Mayflower moved for summary judgment on this issue. The Court determined that a jury could decide whether Mayflower had done enough to disavow Moholland. The focus was a set of communications regarding documents and license plates that Moholland had held onto—and about which Mayflower had been persistently demanding return. Moholland even sent a partial delivery of those plates, promising the rest would come before July 1. They did not. They were on the truck, and so when the truck crashed into Plaintiffs it had Mayflower's still unreturned property (and logos) on it.

This scenario is the only source of potential liability—and the only relevant evidence—as to Mayflower's role in this case. Locke Relocations, who employed Burist and subcontracted with Moholland, had no ties to Mayflower. Deliveries made under previous or separate agreements with Moholland did not crash into Plaintiff, and were not driven by Burist on that date. Rather, the only relevant issue for the jury is whether Plaintiffs can attribute this crash, on this date, to Mayflower. Mayflower has defended, based on the evidence, by explaining that they cannot. The jury at trial should not be dragged away from this central question at trial.

Plaintiffs have asserted throughout the litigation that notwithstanding the available evidence, there must additional undisclosed evidence that shows Burist was driving for Mayflower (through Moholland) on that date. There is no evidence of such an agreement—no bill of lading, contract, business record, or payment has been discovered that would show this load was under

Mayflower's authority. Moholland has testified it was driving under its own, not Mayflower's authority. Locke has testified that it did not work for Mayflower. Burist and his (unauthorized) assistants on the drive were wearing Mayflower shirts that Burist took from his home and possessed due to previous loads. No one testified that Mayflower was involved in this load, and the documents show no connection to Mayflower—the bill of lading for this load came from Moholland, not Mayflower.

Even if the "ongoing" relationship might somehow be of consequence, allowing it to become the feature of the trial impermissibly skews the focus from the incident and Mayflower's role. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. Evid. 402.

Further, "[t]o the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." Fed. R. Evid. 103(d). This Court denied a motion to bifurcate the agency question for Mayflower, and accordingly some other limitation must be crafted.

The need for focus on this discrete point—rather than Mayflower's business generally—is further enhanced by the evidence regarding Burist on that date. Not only was he acting for someone other than Mayflower, it has been revealed that he committed a crime when he drove that day, and that crime directly contributed to the Plaintiffs' injury—independent of any alleged relationship Mayflower may have had with Moholland and whether it operated as to this load. Burist was convicted, in a jury trial, of crimes based on his intoxication at the time of the crash. This means that he was beyond the scope of any alleged employment, and thus, even if the issue of his connection to Mayflower is explored at trial, the jury should be instructed that he was

intoxicated at the time of the offense and that it must presume that such intoxication was beyond any role he might have had as an "agent" of Mayflower. Such evidence is critical to Mayflower's defense, and proper fair presentation at trial, and Plaintiffs cannot be allowed to use other evidence to muffle it impermissibly.

Consequently, at this stage, Mayflower moves for orders limiting the scope of evidence (and argument) permissible at trial to ensure the jury is not distracted, or prejudice is not created, by evidence that is either not of consequence to the central question or is unfairly prejudicial, confuses the issues (and misleads the jury, delays the case, and needlessly presents cumulative evidence).

Based on these circumstances, the Court should issue five rulings (in addition to those in other parties' motion that Mayflower has separately joined) at the threshold ("in limine") before trial.

**A. No discussion or presentation before the jury regarding pretrial discovery and any "missing" documents.**

*First*, the Court should prohibit any questions of witnesses or argument discussing pretrial discovery and any alleged "missing" or "withheld" documents. Throughout pretrial discovery, Plaintiffs' counsel has uttered some form of the phrase "we don't know what we don't know". While such a phrase might have been useful for pretrial discovery, it is improper speculation at a jury trial where argument and testimony must be based upon evidence. Mayflower's defense that it has no record of this load should not be converted into a burden to prove a negative. The absence of evidence is for the jury to consider, not speculate as to whether that absence has been adequately proven.

At trial, a witness cannot testify to what they do not know. "A witness may testify to a matter **only if evidence is introduced sufficient to support a finding that the witness has**

**personal knowledge** of the matter." and "Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602.

Thus, a witness can testify regarding personal knowledge, including the records of the company and facts learned from such records. A witness can also testify as to the absence of records—and the reasons for such absence (i.e., the company does not keep records of transactions that do not happen). See Fed. R. Evid. 406 ("Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice."); Fed. R. Evid. 901(b)(9)("Evidence describing a process or system and showing that it produces an accurate result" can authenticate documents or records). However, a party cannot be required to prove a negative—the absence of business records is presumptively evidence that the activity regularly recorded did not occur. See, e.g., Fed. R. Evid. 803(7) (excluding from hearsay evidence that a matter is not included in a record of regularly conducted activity where "**(A)** the evidence is admitted to prove that the matter did not occur or exist; **(B)** a record was regularly kept for a matter of that kind; and **(C) the opponent does not show that the possible source of the information or other circumstances indicate a lack of trustworthiness**.")(emphasis added).

Further, Plaintiffs have no evidence of spoliation or concealment. That claim cannot support any ruling for Plaintiffs at trial. The jury cannot be misled into believing that Mayflower is hiding evidence, especially since litigation conduct is irrelevant to the merits of Plaintiffs' claims. See, e.g., Battle v. Thomas, 623 F. Supp. 3d 1312, 1325 (N.D. Ga. 2022)("To the extent that Plaintiff's summary judgment response brief makes a spoliation argument, the Court observes that Plaintiff has not filed any motion or sought any relief related to alleged spoliation"); see also Davis v. State Farm Fire & Cas. Co., No. 5:24-CV-15, 2026 WL 1648170, at *8 (S.D. Ga. June 8,

2026)("Plaintiffs also fail to explain why the parties' litigation conduct would be relevant to the conduct giving rise to the claims. The Court excludes Paragraphs 70, 71, and 72 as unhelpful to the factfinder because they are irrelevant.").

Accordingly, Plaintiffs cannot hold Mayflower witnesses to a standard that does not exist—Mayflower has no burden to prove that the absence of records is not the result of concealment or destruction. Plaintiffs bear the evidentiary burden to prove their claims, and this record lacks any evidence from which they could present that question to the jury. They have only speculation and an invitation to improper prejudice, and accordingly, the Court should prohibit this tactic at trial because it will distort the record and unfairly prejudice Mayflower.

**B. No improper attacks on witnesses or Mayflower regarding alleged "lying" by witnesses, based on speculation that is not permissible impeachment.**

*Second*, the Court should prohibit any suggestion that witnesses are lying, whether through counsel's statement or questions of witnesses on the stand. Witnesses can be impeached and their credibility challenged only through the procedures allowed by the Federal Rules of Evidence. Allowing questions or statements suggesting that a witness statement under oath is false[2]—rather than any proper attempts at impeachment—is improper and prejudicial. Yet, in pretrial proceedings, Plaintiffs have repeatedly alleged that Moholland and other witnesses are misrepresenting facts—despite no evidence of such alleged lies. Accordingly, the Court should order that no questions, arguments, or statement from counsel before the jury should stray beyond Rules 607 and 608's permissible means of impeachment.

[2] See, e.g., Dkt. #112 at p. 10 (describing testimony as a "sham").

**C. No evidence or comment before the jury regarding the "ongoing relationship" theory of defense that is immaterial to the question of agency on that date.**

*Third*, the Court should limit the trial presentation to evidence regarding this agency agreement and this load. Any additional evidence regarding other contracts—beyond those contemplated as in progress in the termination papers—risks unfair prejudice and confusion of the issues. For agency, the only relevant inquiry is whether this load, which Burist was driving for Moholland, was within the authority Mayflower had granted to Moholland.

This evidence must be excluded as irrelevant and prejudicial. Plaintiffs have conceded—in response to summary judgment—that only actual agency is at issue here. Actual agency is determined by the contract and its scope, not by any subjective or extrinsic evidence. Here, there is ample evidence regarding that contract, its scope, and its termination. Unrelated transactions with Moholland are irrelevant, and even if relevant generally, would be cumulative and confusing. See, e.g., United States v. Lizon-Barias, 252 Fed. Appx. 976, 980 (11th Cir. 2007)("the district court similarly did not abuse its discretion in excluding extraneous details and additional photographs concerning Lizon–Barias's plans to expand his club" because "Such evidence would have been cumulative because Lizon–Barias's ownership of, and previous improvements to, the club had already been established" and "Moreover, in light of Lizon–Barias's testimony and additional explanation of his conduct on cross-examination, there was no "picture" remaining to be completed or unusual acts to be put in context by the additional details.").

**D. No discussion or evidence regarding Mayflower's business practices, such as the claim it (or its parent) use "paper companies" and its financial operations.**

*Fourth*, the Court should prohibit discussion of Mayflower's business practices, because they are irrelevant; Plaintiffs in their complaint discuss "paper companies" and other business practices that are not relevant. Mayflower's operations are not at issue here, as this is not a

commercial case. If such evidence is offered to impugn Mayflower generally it is impermissible character evidence. Mayflower Transit, LLC is the only named defendant here and discussions of its corporate structure, parent company, or operations, is improper irrelevant.

Plaintiffs cannot urge the jury to accept their theory of liability by attacking Mayflower's character. Suggesting improper business practices is not a mode of proof of the claim of negligence in this case. "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Evidence of alleged "paper companies" or challenges to Mayflower's business practices or operations are not proper modes of proof. See, e.g., Davis v. State Farm Fire & Cas. Co., No. 5:24-CV-15, 2026 WL 1648170, at *7 (S.D. Ga. June 8, 2026) (rejecting testimony from an expert because "Markwardt's testimony that another witness made "false and slanderous allegation[s]" is plainly about credibility, not inaccurate business records."). The Court should prohibit any reference to Mayflower's corporate structure, business practices, and financial operations in Plaintiff's case for liability, since it is irrelevant to the tort at issue (negligence) and unfairly prejudicial.

**E. The jury should be informed that it is not disputed Burist committed a crime and was intoxicated while driving when he crashed into the Plaintiffs.**

*Fifth*, as to the evidence regarding Burist on that day, the Court should rule that if the jury determines agency or employment exists, when deciding whether Burist was acting within the scope of such agency or employment it must presume that Burist was acting outside such scope because he committed a crime. To attribute liability to an alleged agent, it is Plaintiffs' burden to show that the driver was acting for Mayflower, in Mayflower's interest, and at its direction. Georgia state and federal courts have required such proof to show liability, and accordingly it must be established that the tort was within the course and scope of such agency.

Burist was convicted of driving (and causing death and injury to Plaintiffs, who were crime victims) while intoxicated by alcohol and drugs. This is an intentional tort and criminal act. In such cases, the employer is not liable. For example, in Jefferson, there was no vicarious liability as to an employee who forged mammography reports "because she had become "really careless and lazy for lack of a better word," instead of transmitting the films promptly to the radiologists, she allowed her work to get "so backed up" that she "would just go into the computer like the doctor would do" and create fraudulent reports." Jefferson v. Houston Hosps., Inc., 784 S.E.2d 837, 842 (Ga. Ct. App. 2016). Getting drunk, like committing theft, is outside the employer's business and employee's duties:

> The evidence presented by Sexton did not show that stealing tires was within the scope of Brooks' employment; on the contrary, the testimony by deposition of Brocato, Sexton's former employee, stated that he wouldn't consider Brooks to be acting on behalf of Southern (when he was stealing tires) and "I am sure he wasn't getting paid by the company (Southern) to do that." It is well-settled that the mere fact that a tortious act of an employee amounts to a crime does not, per se, relieve his employer from liability. The test of liability is the same as in cases where a non-criminal act is involved; **the act must have been one authorized by the employer prior to its commission, ratified after its commission, or committed within the scope of the employment.** 53 Am.Jur.2d s 445. The evidence shows that Brooks was not acting within the scope of or in the prosecution of the business of Southern when he was stealing tires, and Southern did not ratify Brooks' actions. Sexton produced no evidence which connected the theft of tires with Southern's business or which showed that Brooks acted on behalf of Southern when he stole the tires. The several thefts involved Brooks only and did not involve the employer. "There is no liability on the part of the master arising from the mere relationship of master and servant. (Cits.) . . . There is a long line of decisions to the effect that if the servant steps aside from his employment and acts without the scope of his master's business, and commits a tort, the master is not liable. (Cits.)"

Sexton Bros. Tire Co. v. S. Burglar Alarm Co. of Georgia, Inc., 265 S.E.2d 335, 336 (Ga. Ct. App. 1980) (emphasis added).

Indeed, Georgia law has long excluded employee's illicit pleasure on the job as a basis for employer liability. Back in 1938, the Georgia Court of Appeals explained:

> The petition shows specifically that the messenger, at the time he committed the tort, was not doing anything in furtherance of his master's business, even if it could be said that he went to the house of the plaintiff on business for the master. **It is clearly shown that the plaintiff offered no objection to furnishing the messenger with a duplicate receipt for the telegram which had been delivered to her earlier that night; that she told him to wait a minute, went into the living room, and was actually in the act of writing the receipt when the messenger, who had come into the living room uninvited and was secretly standing behind her, placed his hands upon her shoulders, and then engaged in the unlawful conduct of which she complains. It would be taxing reason too much to say that his conduct had any relation to or connection with the business of his employer.** It is not a case where the conduct was resorted to for the purpose of forcing compliance with his request for a duplicate receipt, and where the *120 master would be liable whether the means adopted were appropriate or not. Manifestly the messenger, with no suggestion on the part of the plaintiff that his request for a duplicate receipt would not be granted, was at the time engaged in a personal, lascivious enterprise of his own, rather than in attempting to accomplish anything even remotely connected with the business of his employer. It is not even asserted in the petition that the original receipt had been lost. **It is merely stated that the messenger *said* that it had been lost, an utterance which, in view of his subsequent conduct, rather suggests a ruse or piece of deception on his part. Nor is it alleged that the company sent him to procure a duplicate of the receipt which he *said* had been lost. Having stepped aside from his master's business for the time being, in his tortious conduct towards the plaintiff, the master is not liable for his act.**

Stafford v. Postal Tel. & Cable Co., 198 S.E. 117, 119–20 (Ga. Ct. App. 1938)(emphasis added); see also Cmty. Theatres Co. v. Bentley, 76 S.E.2d 632, 634 (Ga. Ct. App. 1953)("Although agency is alleged generally in this case . .. nothing set forth raises the reasonable inference that the employer authorized or ratified his criminal acts, or that the perpetration of [illegal acts] upon children coming to the theater as the defendant's invitees was within the scope of his employment"); accord Georgia Interlocal Risk Mgmt. Agency v. Godfrey, 614 S.E.2d 201, 205 (Ga. Ct. App. 2005)("Carswell did not commit any of the acts at issue here on behalf of the City or its police department" and "Carswell acted for purely personal reasons, completely disconnected from the authorized business of his employer" because "Nothing he did accomplished " 'the ***82** ends of his employment,' "[18] which required that he "serve and protect

innocent citizens." Moreover, the City was not exercising any direction or control over him at the time he committed the acts, and he certainly was not operating within the scope of his employment as a police trainee at that time.").

Plaintiffs must show that Mayflower benefitted or was involved directly in Burist's acts. He chose to take illegal drugs and drive drunk, which is not part of his job and indeed contrary to proper performance of such a job. It exceeds mere negligence. Plaintiffs cannot meet their burden here, since the authority requires showing some benefit to Mayflower or ratification and neither are present here. Accordingly, the Court should rule that the jury must presume that, if this load is somehow within any alleged agency, that intentional torts or criminal acts are not within the course and scope of such agency.

## CONCLUSION

This case is about Burist's crash into the Plaintiffs, which was caused by his own intentional and criminal acts. He was not working for Mayflower, and Plaintiffs should not be allowed to present or discuss prejudicial and irrelevant claims to distract the jury from assessing whether Mayflower is responsible for Burist—who was driving for Moholland in a truck with Mayflower markings and property that should have been removed. Consequently, the Court should GRANT the motion for the five requested rulings in limine.

Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
*/s/ Stephen Kyle McDonald*
BRANTLEY ROWLEN
Georgia Bar No. 153031
STEPHEN KYLE MCDONALD
Georgia Bar No. 661387
Todd R. Ehrenreich
*Admitted Pro Hac Vice*
Jeffrey Geldens
*Admitted Pro Hac Vice*

600 Peachtree Street N.E.
Suite 4700
Atlanta, Georgia 30308
404-348-8585 Telephone
404-467-8845 Facsimile
Brantley.Rowlen@lewisbrisbois.com
Stephen.McDonald@lewisbrisbois.com
24 Drayton St., Suite 300
Savannah, GA 31401
Tel. (912) 525-4960

*Counsel for Mayflower Transit, LLC*

Todd.Ehrenreich@lewisbrisbois.com
Jeffrey.Geldens@lewisbrisbois.com

**Certificate of Service**

I CERTIFY that on October 1, 2026, I e-filed a true and correct copy of the foregoing via the Court's CM/ECF system which will send notification of such filing to all counsel of record.

Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**

*/s/ Stephen Kyle McDonald*
BRANTLEY ROWLEN
Georgia Bar No. 153031
STEPHEN KYLE MCDONALD
Georgia Bar No. 661387
Todd R. Ehrenreich
*Admitted Pro Hac Vice*
Jeffrey Geldens
*Admitted Pro Hac Vice*

*Counsel for Mayflower Transit, LLC*

600 Peachtree Street N.E.
Suite 4700
Atlanta, Georgia 30308
404-348-8585 Telephone
404-467-8845 Facsimile
Brantley.Rowlen@lewisbrisbois.com
Stephen.McDonald@lewisbrisbois.com

24 Drayton St., Suite 300
Savannah, GA 31401
Tel. (912) 525-4960

Todd.Ehrenreich@lewisbrisbois.com
Jeffrey.Geldens@lewisbrisbois.com