**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

KYLE SLOAN, Individually, and as Personal Representative of the Estates of Rylie Sloan and Jamie Sloan; KYLE SLOAN as Surviving Spouse of Jamie Sloan; KYLE SLOAN as Surviving Parent of Rylie Sloan,

Plaintiffs,

v.

MAYFLOWER TRANSIT LLC; NICHOLAS BURIST,

Defendants.

CASE NO. 2:22-cv-0076-LGW-BWC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MAYFLOWER TRANSIT, LLC'S MOTION FOR RULINGS IN LIMINE**

**INTRODUCTION**

Mayflower Transit, LLC asks this Court to try the case it wishes it were defending. Its motion (D.E. 429) opens by reciting the facts it likes, closes by declaring them "unambiguous," and in between asks the Court to forbid Plaintiffs from putting on the evidence that makes those facts disputed. That is not what a motion *in limine* is for. This Court already held that a jury — not Mayflower — will decide whether Mayflower did enough to disavow Joe Moholland, Inc. before July 1, 2022. Mayflower's requests would gut that holding by excluding any proof.

The record Mayflower calls "unambiguous" includes the following, all of it from Mayflower's and UniGroup's own files:

- On March 23, 2022, UniGroup's Risk Management department wrote to Moholland about unit M2610333 and called the operator "**our driver**" — reporting that he had been

"tailgating", "speeding to pass" and "crossing the line and forcing the caller off the road while passing" — and demanded "counseling, remedial training, etc." (Exhibit 1).

- The Missouri IRP Apportioned Cab Card for the tractor in this collision, plate 59AP8M, VIN 3HSDJAPR7EN491357, was effective April 1, 2022 through March 31, 2023, lists MAYFLOWER TRANSIT LLC as registrant, and states: "**Motor Carrier Responsible for Safety — USDOT Number 0125563 — MAYFLOWER TRANSIT LLC**." D.E. 307-6 p. 2.
- The Statement of Lease Certification for that tractor, executed under 49 C.F.R. § 376.11(c)(2), runs "until one party provides thirty (30) days written notice of its intention to terminate." D.E. 112-1. Asked to produce any document terminating that lease, Mayflower's corporate representative answered: "I have not seen the document." D.E. 290-9, Jones Dep. 130:2–8.
- On June 21, 2022, four days after Burist's June 17 inspection, Mayflower's Safety Compliance Manager, Sue DeMien, told UniGroup leadership that Mayflower had "just received a roadside inspection report" on Moholland equipment showing "serious violations that could lead to a crash out on the roads." She also admitted that "both vehicles still have our Missouri base plates" and probably still carried Mayflower's brand decals, and warned that "the risk this brings to our company cannot be ignored." (Exhibit 2).[1]
- On May 19, 2022, Moholland's Vice President told UniGroup's permit coordinator, as to Mayflower's license plates: "It was agreed we could keep them and run under them until they expire in 2023, we are not returning them until then." D.E. 307-4.

[1] This email was produced by Mayflower on October 2, 2026.

- On June 28, 2022, Mayflower extended the deadline to return those plates to "this Friday 07/01" — the day of the collision. D.E. 307-8
- On June 28, 2022 — three days before the crash — UniGroup's Manager of Safety wrote internally: "**My concern is that so much can happen and come back to us the longer we keep letting them use our plates.** We have already had some tolls and as you know from Steve's dealing, a roadside inspection that wasn't good at all." Exhibit 4; D.E.309-6. Her colleague replied the same morning: "I am attempting to get ahold of Rob Garr now." (Exhibit 4).
- Mayflower's agency statements to Moholland ran through at least October 26, 2022, and reflect a $20,000.00 payment to the agent on August 8, 2022. D.E. 112-8.
- Asked whether Moholland and Trans Advantage — a wholly owned UniGroup subsidiary — were "doing business in August of 2022," Trans Advantage's own president answered: "That's how I read this." D.E. 307-14, Donovan Dep. 64:3–6.
- Mayflower offered and/or tendered several loads following this collision. D.E. 112-8,10,14; 124; 176-1-4; 307-13.

That evidence may not persuade a jury. But it is the evidence on the only question Mayflower says matters, and Mayflower is not entitled to a trial in which the jury never hears it.

## LEGAL STANDARD

A motion *in limine* is a device for excluding evidence that is clearly inadmissible for any purpose. *Armor Corr. Health Servs. v. Teal*, No. 19-cv-24656, 2022 LX 58515 (S.D. Fla. Jan. 7, 2022) It is not a vehicle for resolving disputed facts, for narrowing a plaintiff's theory of liability, or for obtaining substantive rulings on the elements of a claim. *Holcomb v. Safety Specialty Ins. Co.*, No. 2:24-cv-0181-JES-NPM, 2026 LX 73515 (M.D. Fla. Jan. 13, 2026). Evidence should be

excluded *in limine* only when it is inadmissible on all potential grounds; where admissibility turns on the context in which the evidence is offered, the sounder course is to defer ruling until trial. *Strickler v. Walmart Stores East, LP*, 2020 U.S. Dist. LEXIS 142606 (2020).

Rulings *in limine* are, in any event, provisional. *Luce v. United States*, 469 U.S. 38, 41–42 (1984) (a ruling *in limine* "is subject to change when the case unfolds," and the trial judge may "alter a previous *in limine*" ruling as the evidence develops).

Relevance under Rule 401 is a low bar: evidence is relevant if it has *any* tendency to make a fact of consequence more or less probable. Rule 403 permits exclusion only where probative value is *substantially* outweighed by the enumerated dangers, and "unfair prejudice" means a tendency to decide on an improper basis — not that the evidence is damaging.

## ARGUMENT

### A. Request One (pretrial discovery and "missing" documents) should be denied as drafted and granted only in the narrow form Plaintiffs propose.

Plaintiffs do not intend to argue to the jury that Mayflower's counsel withheld documents, to characterize the parties' discovery conduct, or to use the phrase "we don't know what we don't know" as a substitute for proof. To that extent the request is unopposed. But Mayflower's proposed order sweeps far wider than that, and in two respects it would work a serious unfairness.

First, Mayflower seeks to use the absence of records affirmatively while barring Plaintiffs from testing it. Mayflower's central defense — repeated at D.E. 429 pp. 1, 4, 5–7 — is that "the load was not in Mayflower's system," that there is "no record of this load as revenue-generating or Mayflower attributable," and that "no bill of lading, contract, business record, or payment has been discovered" connecting the load to Mayflower. Mayflower invokes Rule 803(7) for that proposition and bolds the very clause that answers it: absence-of-record evidence is admissible unless "**the opponent does not show that the possible source of the information or other**

**circumstances indicate a lack of trustworthiness**." Fed. R. Evid. 803(7)(C). The Rule gives the opponent — here, Plaintiffs — the express right to show those circumstances. Mayflower cannot invoke Rule 803(7) to prove a negative and simultaneously obtain an order forbidding Plaintiffs from making the showing the Rule contemplates.

Second, the request would bar cross-examination of Mayflower's own witnesses about their own searches. That is not argument about discovery; it is testimony about personal knowledge under Rule 602, and it goes to the weight of the very absence Mayflower asks the jury to credit. Two examples from the record:

> Trans Advantage's Rule 30(b)(6) designee testified that he searched "our system for the names, the VIN numbers, and there were zero returns" for Nicholas Burist — and was then shown Trans Advantage invoices from Mayflower's own production naming "DR-DRIVER-BURIST NICHOLAS." D.E. 307-14, Donovan Dep. 92:1–12; MAYFLOWER 070941–070942.

> Mayflower's Rule 30(b)(6) designee, Jason Jones, testified that Mayflower did not communicate with Moholland about the June 17 inspection report at any time before the July 1 collision. The only communication on that subject came "a month or so after this collision," which Jones attributed to the fact that "it takes time to work through the system." D.E. 290-9, Jones Dep. pp. 52-53.

A jury is entitled to weigh an "absence of records" defense against testimony that the search which produced that absence missed documents sitting in the producing party's own production. Barring that cross-examination would not prevent speculation; it would insulate the defense from the only method of testing it.

Third, Mayflower's reliance on the lack of any adverse government finding opens a door it cannot then close. Mayflower asserts that "no government agency concluded Mayflower was responsible" and that it "satisfied the Department of Transportation by providing that agency with the termination documents." D.E. 429 p. 2. What Mayflower omits is *how* that result was obtained.

On August 2, 2022 — one month after two people died — Mayflower's own Safety Compliance Manager, identified to FMCSA as the "Validated Motor Carrier" for USDOT 125563, filed DataQs request 3622942 asking the agency to "remove this inspection from *our* Mayflower Safety profile." (Exhibit 3). On August 8, 2022, Mayflower personnel exchanged these messages: "This is approval for the removal of the Nicholas Burist roadside inspection in GA! Yay!" and "Thank you! I'll mark him off my reports." D.E. 290-6. If Mayflower intends to argue the absence of a government finding, Plaintiffs must be permitted to show the jury that the inspection sat on Mayflower's own federal safety profile until Mayflower asked the government to take it off.

Fourth, to the extent Request One is aimed at the ESI dispute, that dispute is a matter of record before this Court, not speculation. Mayflower disclosed at D.E. 271 that it did not include roughly 151,585 pages in its production; it filed at D.E. 416 the list of thirty-five agreed "within paragraph" searches it did not run; and it filed at D.E. 417 its description of thirty-five categories of withheld financial material. Plaintiffs do not ask to argue spoliation to the jury absent a ruling from this Court permitting it, and will not do so. Plaintiffs ask only that any order not be written so broadly as to foreclose impeachment with a witness's own account of his own search.

Plaintiffs reserve the right to examine witnesses about the records they searched, the records they found, prior inconsistent testimony regarding the records that exist (D.E. 8-1; 26-1). the records their employers keep in the ordinary course, and the circumstances bearing on the trustworthiness of any absence Mayflower offers under Rule 803(7).

**B. Request Two (suggestions that witnesses are lying) should be denied as unnecessary, or granted only in the form the Rules already supply.**

Plaintiffs' counsel will not state a as a personal fact that a witness is a liar. No order is needed to secure that; it is already improper and Judge Wood informed the parties of this at the October 6, 2026 pre-trial conference. What Mayflower actually asks for, however, is broader: an

order that "no questions, arguments, or statement from counsel before the jury should stray beyond Rules 607 and 608's permissible means of impeachment." D.E. 429 p. 9. Rules 607 and 608 are not the whole of impeachment. Credibility is also tested under Rule 613 by prior inconsistent statements, under Rule 611(b) on cross-examination as to any matter affecting credibility, and — most importantly here — by confronting a witness with documents and testimony that cannot be reconciled with their present testimony.

That last method is the core of Plaintiffs' case and cannot be labeled an "improper attack." Mayflower's corporate representative swore that "Mayflower's relationship with Joe Moholland, Inc. and Joe Moholland, Inc.'s driver, Nicholas Burist, ceased on April 28, 2022," and that Mayflower and Moholland "do not share any vehicles or equipment." D.E. 8-1 ¶ 11; D.E. 26-1 ¶ 16. The cab card naming Mayflower as the motor carrier responsible for safety for that tractor ran through March 31, 2023. The lease certification for that tractor required thirty days' written notice and the witness could not identify any document terminating it. Putting those documents to that witness is ordinary cross-examination, not an accusation of perjury, and the jury — not counsel and not the Court — decides what to make of the conflict.

Mayflower's single record citation on this point is a footnote to D.E. 112 at 10, in which Plaintiffs described testimony as a "sham." That was a summary judgment brief invoking the sham-affidavit doctrine — a legal standard addressed to the Court. A characterization made to a judge in a brief does not forecast argument to a jury, and does not justify a prophylactic order of the breadth Mayflower seeks. As such, Plaintiffs oppose any order limiting impeachment to Rules

607 and 608, or restricting confrontation of a witness with documents, prior statements, or his own testimony.[2]

**C. Request Three (the "ongoing relationship") should be denied. It seeks to exclude the central issue in the case.**

This is the heart of the motion, and it should be denied for four independent reasons.

**1. It contradicts the Court's summary judgment ruling.**

Mayflower moved for summary judgment on precisely the ground it now presses — that it had no connection to this load, this truck, or this driver. Mayflower wrote and argues that, "[t]he Court determined that a jury could decide whether Mayflower had done enough to disavow Moholland." D.E. 429 p. 5. Whether Mayflower "did enough" is a question about Mayflower's conduct over time. It cannot be answered by looking only at a single bill of lading, but instead the continuous course of dealings and conduct is imperative to whether it "knew or should have known" Moholland would run under its operating authority on July 1, 2022. Furthermore, Plaintiff's expert, Brooks Rugemer, CDS, testified to these very issues without objection in his trial deposition on Wednesday, October 16, 2026. Having lost the argument that the relationship had ended as a matter of law, Mayflower may not win the same argument by excluding the evidence that it had not. D.E.354 p. 22-23.

[2] Ironically, Plaintiff raised this to the Court regarding the credibility of Mayflower's President. His deposition testimony was clearly inconsistent with his affidavit testimony. Mr. Jones testified that he had not reviewed either the Complaint or the Police Report. (Mayflower 30(b)(6) Pg. 23:12-17, D.E. 112-3). This corporate representative's earlier affidavits were in direct conflict with this testimony. D.E. 8-1; D.E. 26-1.

**2. Mayflower's own contract makes the pre-termination relationship material.**

Mayflower asserts that "[a]ctual agency is determined by the contract and its scope." D.E. 429 p. 10. Plaintiffs accept, in part, that framing, and it defeats the motion. The agency agreement provides, at ¶ 5(K)(g):

> "The termination of this Agreement shall not affect any rights or obligations under this Agreement which shall have previously accrued or shall thereafter arise with respect to any occurrence prior to termination, or any rights or obligations which this Agreement specifies shall not end upon such termination, and such rights and obligations shall continue to be governed by the terms of this Agreement. As to any Shipment that has commenced prior to the date on which this Agreement is terminated, the terms, provisions and conditions of this Agreement will continue to apply to such Shipment."(emphasis added) D.E. 112-14, JMI00011.

Moholland's Rule 30(b)(6) designee read that clause into the record, D.E. 290-12, Garr Dep. 44:7–25, and then agreed, based on his understanding of the definition, that the order for the household goods in truck 333 "commenced on April 6th, 2022." D.E. 290-12, Garr Dep. 55:18–23. April 6, 2022 precedes every termination date any defendant has advanced. Same with Mayflower's 30(b)(6) designee who testified the load "commenced on March 15th and March 2nd, 2022". D.E. 290-9, Jones Dep. Pg. 73-75. By the contract's own terms, then, the agreement's "terms, provisions and conditions" continued to apply to this shipment. Evidence of what those terms required, and of how the parties actually performed them before and after the asserted termination date, is not "unrelated" — it is the contract Mayflower says controls.

**3. Mayflower's motion concedes the facts it asks the Court to hide.**

At D.E. 429 p. 4, Mayflower acknowledges that discovery "yielded evidence of two things: a) there were loads in progress with Moholland that were not just cut off, and allowed to stay (but not this one); and b) there were payments related to closing out the relationship that extended beyond the termination date and the date of the crash (but not for this load)." Both concessions go to the heart of the disputed question. A relationship in which loads continued to run and money

continued to move after the asserted end date is evidence that the relationship had not ended. Mayflower's parenthetical — "but not this one" — is its argument on the merits, not a basis for exclusion. The jury is entitled to hear both the concession and the parenthetical and decide which it believes.

**4. The evidence is probative of agency under any theory, and of Mayflower's own conduct.**

The proof Mayflower seeks to exclude is not a collection of stray commercial transactions. It is evidence that, on and around July 1, 2022:

- Mayflower held the federal registration identifying it as the motor carrier responsible for the safety of this tractor (D.E. 307-6 p.2), and its DOT number was displayed on the door of the truck that crossed the median;
- Mayflower's equipment lease for this tractor, executed under the federal leasing regulations, had never been terminated in writing (D.E. 112-1; D.E. 290-9, Jones Dep. 130:2–8);
- Mayflower's license plates remained on the truck under an extension Mayflower itself granted through July 1, 2022, and Mayflower's safety personnel had warned three days earlier that "so much can happen and come back to us the longer we keep letting them use our plates" (D.E. 307-4; Exhibit 4);
- UniGroup's Risk Management and Safety departments had been policing a driver and equipment for months, calling him "our driver," demanding remedial training, and demanding inspection and repair records on pain of "unqualif[ying] the equipment" (Exhibit 1, 5).

- Mayflower's agency statements and Trans Advantage's invoices to Moholland continued through August and October 2022. D.E. 112-8; D.E. 307-14, Donovan Dep. 64:3–6, 85:10–22).

Under 49 C.F.R. § 376.12(c)(1), a lease must provide that the authorized carrier "shall have exclusive possession, control, and use of the equipment for the duration of the lease" and "shall assume complete responsibility for the operation of the equipment for the duration of the lease." Under 49 C.F.R. § 390.21, the carrier operating a commercial motor vehicle must mark it with its own name and USDOT number.

Mayflower's position that an agency relationship is measured only by "this load" cannot be squared with a regulatory scheme that measures responsibility by the lease, the registration, and the markings — all of which remained Mayflower's on July 1, 2022. Even on a pure actual-agency theory, the existence and scope of an agency are ordinarily questions of fact determined by the parties' conduct as well as their paper. Evidence of how Mayflower and Moholland actually behaved toward one another in the months surrounding July 1, 2022 is therefore directly probative, not collateral. Furthermore, Mayflower's argument that Plaintiff allegedly admitted that only actual -agency is presented as a claim is unfounded and inaccurate. D.E. 429 p. 10.

Under apparent agency, a principal, in this case Mayflower, may be held liable for the acts of an agent (Joe Moholland, Inc. and Nicholas Burist) if the principal's conduct causes a third party to reasonably believe that the agent has authority to act on the principal's behalf. O.C.G.A. § 10-6-1; *Lynn v. Lowndes County Health Services, LLC*, 354 Ga. App. 242 (2020). The continued use of Mayflower's branding, equipment, IFTA stickers, and services, along with the lack of formal termination notices, all point to the existence of apparent authority.

Mayflower's only authority, *United States v. Lizon-Barias*, 252 F. App'x 976, 980 (11th Cir. 2007), is a criminal appeal affirming the exclusion of cumulative photographs and "extraneous details" about a defendant's plans to expand a nightclub, where the underlying fact had "already been established." The court stated that, "in light of Lizon-Barias's (Defendant's) testimony and additional explanation of his conduct on cross-examination, there was no "picture" remaining to be completed or unusual acts to be put in context by the additional details. *Id*. at 980. Here the underlying fact is the one thing that has *not* been established — it is the disputed issue the jury must resolve. *Lizon-Barias* says nothing about excluding the central evidence on a contested element.

Finally, Rule 403 does not help Mayflower. Evidence that Mayflower continued to hold the registration, the lease, the plates, the markings and the money is prejudicial to Mayflower in the ordinary sense that all probative evidence is prejudicial to the party it hurts. It is not *unfairly* prejudicial, because it invites the jury to decide the case on exactly the basis the law prescribes. And it cannot be "cumulative" of evidence Mayflower proposes to exclude in its entirety.

**D. Request Four (business practices, corporate structure, and "paper companies") should be granted in part and denied in part.**

Plaintiffs do not intend to argue without evidence that is supported by the record or witnesses. What Plaintiffs do oppose is the sweep of the request as written, which would bar "any reference to Mayflower's corporate structure." In fact, the corporate structure and organizational chart is a joint exhibit in the case. D.E. 434-1. As such, Plaintiffs are perplexed at this argument by Mayflower in its attempt to straddle its own fence. The corporate relationships in this case are not character evidence and are not offered to impugn anyone. They are the mechanism through which the control Plaintiffs must prove was actually exercised:

- "UniGroup owns Mayflower and United. There are agents of Mayflower and United." D.E. 307-14, Donovan Dep. 38:3–7.
- Trans Advantage "is a dealer that can equip the agents of UniGroup with tractors and trailers and other goods," is "a wholly-owned subsidiary" on "consolidated financials," and its president "report[s] to the CEO of UniGroup." D.E. 307-14, Donovan Dep. 38:25–39:4; 51:4–17.
- The emails disciplining a driver and equipment came from "UniGroup — Safety" and "Risk Management, UniGroup" (the wholly owned subsidiary of Mayflower). Exhibit 1,5).
- The July 11, 2022 cease-and-desist demanding that Moholland stop using "UniGroup intellectual property, signage, marks, license plates or references to United [Mayflower] operating authority" was sent by UniGroup's Senior Counsel and Director of Corporate Litigation. D.E. 110-2, p. 18.
- Moholland still holds twenty class B shares of UniGroup stock, which "were supposed to be liquidated upon termination of the agency agreement" but which "Unigroup has declined to liquidate." Moholland's First Supp. Resp. to Pls.' Second Interrogs., No. 2.

Mayflower cannot defend on the ground that it was a stranger to this truck while simultaneously obtaining an order that the jury may not hear how it and its affiliates were organized to control that truck. If Mayflower contends that UniGroup's and Trans Advantage's conduct cannot be attributed to it, that is an argument for closing — and an instruction, if one is warranted — not a basis for keeping the structure from the jury.

Plaintiffs oppose any order excluding evidence of the corporate relationships among Mayflower, UniGroup and Trans Advantage, or of the financial flows between Mayflower and

Moholland — the agency statements, the statement-deduct arrangement, and the payments — which are direct proof of the relationship Mayflower says had ended.

**E. Request Five (a presumption that Burist acted outside the scope) must be denied. It is not a ruling a motion *in limine* can give, and Mayflower's own authority forecloses it.**

Mayflower's fifth request is not an evidentiary ruling at all. It asks the Court to direct that the jury "must presume that Burist was acting outside such scope because he committed a crime." D.E. 429 p. 3. Three things are wrong with it.

**1. It is procedurally improper.**

A motion *in limine* determines the admissibility of evidence. It does not establish presumptions, allocate burdens, or instruct the jury. Requests to charge are governed by Rule 51 and by this Court's pretrial order, and Mayflower has not framed this request as one.

**2. Mayflower's own block quotation states the opposite rule.**

At D.E. 429 p. 12, Mayflower quotes *Sexton Bros. Tire Co. v. Southern Burglar Alarm Co. of Georgia, Inc.*, 265 S.E.2d 335, 336 (Ga. Ct. App. 1980), including this sentence:

> "It is well-settled that the mere fact that a tortious act of an employee amounts to a crime does not, per se, relieve his employer from liability. The test of liability is the same as in cases where a non-criminal act is involved."

That is the answer to the request. Sexton, in the same sentence goes on to state, "the act must have been one authorized by the employer prior to its commission, ratified after its commission, or committed within the scope of the employment." Id.

On June 21, 2022, four days after Burist's June 17 inspection, Mayflower's Safety Compliance Manager, told UniGroup leadership that Mayflower had "just received a roadside inspection report" on Moholland equipment showing "serious violations that could lead to a crash out on the roads." She admitted that "both vehicles still have our Missouri base plates" and warned

that "the risk this brings to our company cannot be ignored." (Exhibit 2). A week later, Moholland asked for more time on twelve tractors still running on Mayflower's plates. Safety Manager Nicole Crum passed the request along with her own warning: "so much can happen and come back to us the longer we keep letting them use our plates," citing tolls and "a roadside inspection that wasn't good at all." D.E. 329-1.

Under Georgia law, a principal who learns that someone is acting on its authority and fails to repudiate it ratifies the conduct, and the ratification relates back as if the principal had authorized it from the start. "A ratification may be express or implied from the acts or silence of the principal. A ratification once made may not be revoked." O.C.G.A. § 10-6-52. By June 28, Mayflower knew exactly what Moholland was doing: running tractors under Mayflower's plates and authority after the April 28 termination, and drawing failed inspections while doing it. Its own safety managers recognized the risk, yet Mayflower did not demand the plates back, cancel them, or tell Moholland to stop. Instead it kept "letting them use our plates," and that acquiescence ratified Moholland's operation of those trucks under Mayflower's authority through the July 1, 2022 crash. This describes just our point – that the loads were "ratified."

*Stinespring v. Fields*, 139 Ga. App. 715, 717 (1) (229 S.E.2d 495) ("Where the principal ratifies the tort of the agent after its commission, the liability of the principal is the same as if he had commanded it, provided the ratification is had with full knowledge on the part of the principal of the manner in which the tort was committed."); *Simon v. Morehouse Sch. of Med.*, 908 F. Supp. 959 (N.D. Ga. 1995) (claims of sexual harassment and sexual assault survived summary judgment by the victim showing that she reported the incidents but no remedial action was taken). Georgia law supplies no presumption that criminal conduct is outside the scope of employment; it supplies the ordinary scope-of-employment test, applied to criminal and non-criminal acts alike.

Mayflower's remaining cases illustrate the rule rather than displace it: each involves conduct bearing no relationship to the employee's job duties — a messenger's assault on a customer in her living room (*Stafford*), an employee stealing tires (*Sexton Bros.*), a radiology clerk fabricating reports (*Jefferson*), a police trainee acting "for purely personal reasons" using a police cruiser to rob someone, while not on shift (*Godfrey*), a movie theater employee sodomized a child (*Community Theaters*). None involved a driver doing the precise thing he was engaged to do — driving the tractor-trailer, with the load, down the assigned route — at the moment of the tort.

**3. Scope of employment is a jury question, and intoxication does not remove a driver from it as a matter of law.**

Under O.C.G.A. § 51-2-2, a master is liable for the torts of a servant committed "in the prosecution and within the scope of his business." Burist was not on a frolic. He was operating the tractor-trailer, carrying the shipment, on the route, when the vehicle crossed the median of Interstate 95. A driver who drives badly — even criminally badly — while driving the load is still driving the load. Mayflower's rule would immunize every motor carrier whose driver was impaired, which is precisely the opposite of the regime the Federal Motor Carrier Safety Regulations create. "A master rarely commands a servant to be negligent, or employs him with the expectation that he will commit a negligent or willful tort." *Int'l Bus. Machs., Inc. v. Bozardt*, 156 Ga. App. 794, 797, 275 S.E.2d 376, 379 (1980). See also *Jump v. Anderson*, 58 Ga. App. 126, 197 S.E. 644 (1938).

**4. The request would also be irrelevant to several of Plaintiffs' theories.**

Scope of employment under *respondeat superior* is not the only route to Mayflower's liability. Plaintiffs' Amended Complaint, and the corresponding jury charges request to charge negligent entrustment, negligent qualification and supervision, and liability flowing from the lease and placard under the federal leasing regulations do not turn on whether the driver's particular act

was within the scope of an employment relationship. *Broadnax v. Daniel Custom Constr., LLC*, 315 Ga. App. 291, 726 S.E.2d 770 (2012). A presumption of the kind Mayflower proposes would confuse rather than clarify the jury's task.

Plaintiffs and Mayflower, both, do not dispute that Burist's conduct and his conviction are admissible, and do not seek to "muffle" that evidence. D.E. 429 p. 7. Plaintiffs dispute only that the Court should tell the jury what conclusion to draw from it.

## CONCLUSION

For the reasons stated herein and which in the record, Plaintiffs respectfully request that the Court deny Defendant Mayflower Transit LLC's proposed motions *in limine.*

Respectfully submitted this 15th day of October 2026.

HODGE LAW FIRM
P.O. Box 2765
Spartanburg, SC 29306
Tel: (864) 585-3873
Fax: (864) 585-6485

/s/ Charles J. Hodge
Charles J. Hodge
Admitted Pro Hac Vice
J. Camden Hodge
Admitted Pro Hac Vice
CHodge@hodgelawfirm.com
Attorneys for Plaintiffs

HAMILTON & PADGETT, LLC
13 St. Andrews Ct.
Brunswick, Georgia 31520
P: (912) 200-2727

/s/ Joseph R. Padgett
Joseph R. Padgett
Georgia Bar No. 872672
joseph@hamiltonpadgettlaw.com
Attorney for Plaintiffs

LANGLEY LAW FIRM
229 Magnolia Street
Spartanburg, SC 29306
Tel: (864) 774-4662

/s/ T. Ryan Langley
T. Ryan Langley
Georgia State Bar No.: 692386
Matthew T. Foss
Admitted Pro Hac Vice
Ryan@thelangleylawfirm.com
Matt@thelangleylawfirm.com
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of October 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

/s/ Charles J. Hodge
Charles J. Hodge
Counsel for Plaintiffs