IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

BRUNSWICK DIVISION

* * * * * * * *

KYLE SLOAN, Individually; and*
as Personal Representative of*
the Estates of Rylie Sloan *
and Jamie Sloan; KYLE SLOAN *
as Surviving Spouse of Jamie *
Sloan; KYLE SLOAN as *
Surviving Parent of Rylie *
Sloan, *
Plaintiffs * Case No.
vs. * 2:22-cv-00076-LGW
NICHOLAS BURISH; LOCKE *
RELOCATIONS LLC; NATIONAL *
INDEMNITY COMPANY; MAYFLOWER *
TRANSIT LLC; JOE MOHALLAND, *
INC.; WESCO INSURANCE *

VIDEOTAPED DEPOSITION OF

BROOKS RUGEMER, CDS

October 14, 2026

Any reproduction of this transcript is prohibited
without authorization by the certifying agency.

* * * * * * * *

COMPANY; AND XYZ COMPANIES *
1-3, *
Defendants *

VIDEOTAPED DEPOSITION

OF

BROOKS RUGEMER, CDS, taken on behalf of the Defendant herein, pursuant to the Rules of Civil Procedure, taken before me, the undersigned, Derek Richmond, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at 2108 Ebbvale Road, Manchester, Maryland, on Wednesday, October 14, 2026 beginning at 10:50 a.m.

A P P E A R A N C E S

T. RYAN LANGLEY, ESQUIRE
MATT FOSS, ESQUIRE
Langley Law Firm
229 Magnolia Street
Spartanburg, SC 29306
COUNSEL FOR PLAINTIFFS

STEPHEN MCDONALD, ESQUIRE
Lewis Brisbois
600 Peachtree Street NE, Suite 4700
Atlanta, GA 30308
COUNSEL FOR DEFENDANT/MAYFLOWER TRANSIT LLC
(via Virtual)

JIM ELLIOTT, ESQUIRE
Elliott Blackburn, PC
3016 North Patterson Street
Valdosta, GA 31602
COUNSEL FOR DEFENDANT/LOCKE RELOCATIONS LLC
(via Virtual)

A P P E A R A N C E S

MATTHEW SESSIONS, ESQUIRE
McMickle, Kurey & Branch, LLP
217 Roswell Street, Suite 200
Alpharetta, GA 30009
COUNSEL FOR DEFENDANT/JOE MOHOLLAND, INC.
(via Virtual)

HILLIARD BURTON, ESQUIRE
Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
COUNSEL FOR DEFENDANT/ NICHOLAS BURIST
(via Virtual)

I N D E X

| | |
|---|---|
| DISCUSSION AMONG PARTIES | 9 - 11 |
| WITNESS: BROOKS RUGEMER, CDS | |
| EXAMINATION | |
| By Attorney Langley | 11 – 95 |
| EXAMINATION | |
| By Attorney McDonald | 95 – 112 |
| RE-EXAMINATION | |
| By Attorney Langley | 113 – 121 |
| DISCUSSION AMONG PARTIES | 121 - 122 |
| CERTIFICATE | 123 |

EXHIBIT PAGE

| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
| --- | --- | --- |
| Exhibit 1 | Agency Agreement | 36 |
| Exhibit 2 | Mayflower Corporate Structure | 37 |
| Exhibit 3 | Photos | 39 |
| Exhibit 4 | Correspondence – IRP | 41 |
| Exhibit 5 | IRP cab card | 43 |
| Exhibit 6 | IFTA Public Record | 48 |
| Exhibit 7 | Agency Statements | 51 |
| Exhibit 8 | Emails | 65 |
| Exhibit 9 | 7/1/22 Correspondence | 67 |
| Exhibit 10 | 6/17/22 Roadside Inspection | 75 |
| Exhibit 11 | 7/13/22 Correspondence | 82 |
| Exhibit 12 | 7/11/22 Letter | 86 |
| Exhibit 13 | Lease Agreement | 88 |
| Exhibit 14 | Operating Lease Agreement | 91 |
| Exhibit 15 | T-Shirt | 94 |

OBJECTION PAGE

| ATTORNEY | PAGE |
| --- | --- |
| McDonald | 22, 40, 57, 64, 65, 71, 75, 78, 79, 80, 83, 93, 116, 118, 119 |

S T I P U L A T I O N

-----------------------------------------------------

(It is hereby stipulated and agreed by and between counsel for the respective parties that reading, signing, sealing, certification and filing are waived.)

-----------------------------------------------------

P R O C E E D I N G S

-----------------------------------------------------

ATTORNEY LANGLEY:
Okay.  All right.
Stephen, we've just had a discussion off the record that we conducted about an hour and 20 minute discovery deposition as a courtesy to you.  And so we will operate this, the de bene esse deposition, now under the same rules that we've done for all the other de bene esse depositions.
That if there are objections, they'll be stated on the record.  So that either Counsel will have the opportunity to state the basis for the objection and try to address it on the record as if we're in trial.  And that --- that any --- any exhibits produced there will be for trial as well.
Correct?
ATTORNEY MCDONALD:

Agreed. Correct.
ATTORNEY LANGLEY:
All right.
I think we're ready to go on the video.
ON VIDEO
VIDEOGRAPHER:
We are now on the video record. My name is Chad Noel. I'm a videographer present on behalf of Esquire Deposition Solutions.
The date today is October 14, 2026 and the current time is 10:52 a.m. This trial deposition is being taken at 2108 Ebbvale Road, Manchester, Maryland, 21102. The caption of the case is In The United States District Court, Sloan versus Burist, et al., Case Number 2:22-cv-00076-LGW.
The name of the witness is Brooks Rugemer, CDS. Will the attorneys present state their names and the parties they represent?
ATTORNEY LANGLEY:
Ryan Langley, Matt Foss and Charlie Hodge on behalf of Kyle Sloan.
ATTORNEY MCDONALD:
Stephen McDonald, Counsel for Mayflower.
ATTORNEY SESSIONS:
Matt Sessions on behalf of Joe

Moholland.

ATTORNEY ELLIOTT:

Jim Elliott on behalf of Locke Relocations.

ATTORNEY BURTON:

Hilliard Burton on behalf of Nicholas Burist.

VIDEOGRAPHER:

All right.

And at this time, the court reporter may now swear in the witness and we can proceed.

---

BROOKS RUGEMER, CDS,

CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS FOLLOWS:

---

EXAMINATION

---

BY ATTORNEY LANGLEY:

Q.Thank you.  Can you state your name for the jury, Brooks, full name and ---?

A.Brooks Rugemer, R-U-G-E-M-E-R.

Q.And we're here at your home today.

Is that right?

A.Yes, we are.
Q.And I think part of the camera may be able to see you're in a wheelchair now and have been for the past ---?
A.Since last October.
Q.Almost year?
A.A year and a couple days, yes.
Q.So thank you for opening up your home to us and agreeing to do this deposition for us today. You're on a limb preservation protocol. Is that what it's called?
A.Yes. I've had some severe complications from a knee replacement.
Q.Okay.
And some real bad infections in the knee?
A.Several bad infections. Last October they took out my knee. I do not have a knee of any sort right now. My upper and lower leg are pinned together straight. It's been that way for a year.
Q.And you've got another surgery coming up hopefully to fix that?
A.We're on track to get a new new knee November 30th.
Q.All right.
And your doctors have directed that you are not to

leave the house except for emergencies between now and November 30th?
A.Yeah. I can't leave the house unless I'm in a wheelchair van because I cannot bend my leg to get into a car.
Q.And the Court has allowed us to take your deposition here and Counsel have been kind enough to agree on that as well.
A.Yes. Thank you for everyone, for the accommodations.
Q.All right.
How are you employed?
A.I am a full time employee of Robson Forensic, R-O-B-S-O-N Forensic.
Q.What is Robson Forensic?
A.We are a forensic engineering firm. We do investigations on all sorts of matters, whether it's a construction claim. We have a medical group that does medical products. We have an automotive group that does car recalls, car defects, recalls. We have an aviation group. We have a maritime group. We have people from those fields that do investigations on behalf of Robson.
Q.Okay.
Do them nationwide throughout the United States?

A.Yes.
Q.And what do you do particularly for Robson?
A.I'm a commercial vehicle specialist. I run the trucking and warehousing group for Robson, anything related to commercial trucking, warehousing, distribution, logistics. I have a team of four that worked for me.
Q.And in that capacity do you provide consulting to trucking companies and to injured parties for compliance with the Federal Motor Carrier Safety regulations?
A.We do have a consulting wing. We don't do a lot with that. It's never been a large part. Probably 90 percent of my work outside of supervising my group is expert witness work.
Q.Okay.
And do you provide expert witnesses --- testimony and consulting on both sides, sometimes for the plaintiff, sometimes for the defendant?
A.That is correct.
Q.The last testimony you gave before this one, I think was a few months ago. Was that for a plaintiff or a defendant?
A.That was a ---. You caught me off guard.
Q.Sorry. I think it was for a defendant. That's

what the --- your testimony ---.
A.That was a defense case defending Costco.
Q.Okay.
And have you also provided testimony for partners at the Lewis Brisbois Law Firm that Mayflower's hired in this case?
A.Yes. I've worked with various attorneys within their firm myself. My group has worked with other attorneys from Lewis and other experts within our firm have as well.
Q.And before you came to Robson Forensic, what did you do for a living?
A.I was in transportation management, primarily safety compliance. I started my career in trucking in the early '80s as a driver. I drove through the mid-'90s.
We made a family decision where I'd come off the road to be --- spend more time with my family. We had --- we had young children at the time, so I started over as a safety clerk, as a dispatcher and working my way up through various levels of transportation management. I took business courses and compliance courses and federal motor carrier courses to further my --- my knowledge and experience as --- as I --- as I climb those ranks.

Q.I've seen in different places 1.4 and 1.3, maybe 1.4 somewhere in there million miles on the road. Is that --- is that right?
A.About a million point four, yes.
Q.Golly. And did you ever have any kind of wreck or incident that was your fault during that time period?
A.No, I have not. I've been --- I don't want to say lucky, but it's --- I've had a good, safe career.
Q.And when you were doing that kind of driving, were you doing local, regional and interstate driving?
A.It was all interstate. It was mostly regional to the northeast United States, some down through the --- along the east coast, up into Canada, west as far as the Chicago, you know, Illinois, Indiana areas and the Carolinas, Georgia, Florida. I didn't do too much going out west.
Q.All right.
And you worked for various carriers during that time, some national carriers. Consolidated Freightways and JB Hunt were a couple of the national carriers you worked with.
A.They were carriers where I was --- worked in safety compliance, yes.
Q.Okay.
And so that would have been after your over the

road career, you would have been actually in safety with those national groups?
A.Correct. For driving, I drove a little over six years with Overnite Transportation. That's O-V-E-R-N-I-T-E. They're no longer in existence. They were purchased by the railroad and then purchased by UPS. Then I worked for Contract Transportation Systems, CTS. They are the trucking division for Sherwin Williams Paint.
Q.Did you have a business yourself called Maryland Safety Services that provided training, CDL recruiting and hours of service auditing?
A.Yes. I work with local owner operators down at the piers, helped them with their compliance with their filing their annual forms with the DOT and the Federal Motor Carrier Administration. I put together training programs for them. I helped them with the hiring of drivers, doing the screening and vetting as needed.
Q.When you were director of safety after that at Consolidated Freightways, your resume says you were responsible for safety at 33 terminals and 3,800 employees.
Is that right?
A.Yes. That would be a combination of what we

called transit drivers, which went from terminal to terminal. The local drivers that make pickup and deliveries throughout their local area. Warehouse personnel, forklift operators, mechanics and office staff.

Q.And you were responsible for making sure that there was safety compliance with the Department of Transportation, the Federal Motor Carrier Safety regulations at the federal level, and then the departments of transportation for each state where you were operating the trucks?

A.Correct.

Q.And the director of safety job that you did, how many drivers did you hire throughout the entirety of your career participating in the hire --- participate in the hiring of drivers throughout your career?

A.Once I transitioned from being a driver into becoming a manager in safety compliance, I've been involved in a little over 5,000 driver hirings. That's been a combination of company drivers, employee drivers, owner operators, contractors.

One of the motor carriers I worked for owned a temp company. They would lease out drivers on a temporary basis and I hired the drivers for the leasing company.

Q.Have you been certified through the Transportation Safety Institute as a Federal Motor Carrier Safety regulation trainee through their institute?
A.I have.  For a while I was going live --- every year they would hold a week long seminar for people like myself, safety managers to be brought up to speed on any new regulations, clarity on any regulations that have been rewritten or revised.  I did that again live for several years.  After that, I did each --- I did them online for a couple years.
Q.And you got recertified each time?
A.Yes.
Q.And does the Transportation Safety Institute provide those certifications under the Federal Motor Carrier Safety regulations?
A.They do have a set of certifications.  The --- the CDS after my name is through a different organization.
Q.Okay.
What is that through?
A.The --- the group is called the North American Transportation Management Institute.
Q.Okay.
A.They're referred to as NATMI.
Q.What does CDS stand for?
A.Certified Director of Safety.

Q.All right.
And have you been a certified director of safety throughout the time period that you provided the reports and expert testimony in this case?
A.Yes. I've been associated with NATMI for close to 15 years.
Q.And you also served in the military in the U.S. Army?
A.I did.
Q.For a period. And after all of that, how long have you been specifically investigating commercial vehicles crashes?
A.For Robson, since 2005. My duties as a safety director, part of those duties were to investigate any crashes that my drivers were involved in. So from at least the mid-'90s through current.
Q.And you've provided expert testimony, like you said, on behalf of plaintiff and defendant, sometimes for the injured individual, plaintiff and sometimes for the trucking company.
Is that right?
A.That is correct, yes.
Q.And how does that break down? What percentage approximately is for the injured person versus the trucking company?

A.On a rolling average, I typically do about 65 percent plaintiff work versus defense work. Sometimes it's a little heavy one way or the other just as cases come in and cases settle, but that --- that's --- that's the rough breakdown.
Q.Okay.
About 65, 35?
A.Correct.
Q.And you're being paid for your work in this case through Robson?
A.Yes, I'm a full time employee of Robson. Robson bills my time at $605 an hour.
Q.Okay.
And you don't make more money when you --- when you --- they bill more of your time or less when they bill less? You get paid a salary?
A.I'm a salary employee, yes.
Q.Does that help in your objectivity in terms of not having a direct incentive to testify for one party or another?
A.Yeah. When a case is offered to us, I do quite a bit of research into the case to make sure it's a case that I can support the premise that I can build opinions that can be supported by recognized standards. I've turned down roughly 40 percent of the

cases that come to my group.
Q.And you've testified in state and federal court in the cases you do accept?
A.Yes.
Q.And have your opinions ever been not accepted by any court?
A.Not that I'm aware of, no.
Q.Each time you've offered an opinion or you've been offered as an expert testimony, the court has qualified you?
A.Yes.
ATTORNEY LANGLEY:
All right.
We'd offer Mr. Rugemer as an expert in commercial carrier operations under the Federal Motor Carrier Safety regulations, motor carrier safety management and compliance with the Federal Motor Carrier Safety regulations.
ATTORNEY MCDONALD:
I am objecting.  I'm not objecting to Mr. Rugemer's qualifications as an expert under the narrow terms of that statement.  However, I am objecting to the admission or any testimony regarding his reports from October 2024 and October 2026 on different grounds.

And I understand this is a video deposition and recorded deposition that will have to be presented to the Judge before she can make a ruling on my objection. And so to avoid unnecessary head butting, I'd like to discuss with Counsel the best way for me to state and preserve my objection and yet allow them to elicit the testimony they feel necessary, considering the issues presented here.

ATTORNEY LANGLEY:

I think just state your objection for the record and we'll address it. And if the court wishes to have only the portion of the testimony played that does not include the objections for the jury, then she can do that and we can get the video spliced appropriately.

But just so we're clear and I think our obligation is to put all necessary objections on the record. I don't want there to be any ambiguity going forward about that.

ATTORNEY MCDONALD:

I will work through my objections --- I will work through my objections now and place them on the record, and you can respond, Mr. Langley.

First and foremost, I object to the use or testimony of this witness and either his October

2024 report or his October 2026 report because this witness was improperly disclosed, not in full compliance with Federal Rule 26.

In reviewing my materials, I am not in possession of any deposition or testimonial history for this witness. I am not in possession of this witness's Curriculum Vitae or any history of publication, and I am not in possession of any financial statements or cost statements for this witness with the Plaintiff's Counsel.

I understand this is a long case and I have not been on this case for its duration. If those materials were previously provided and Plaintiff's Counsel can show me proof that they were previously provided, I will respectfully withdraw my objection. However, as of right now, my belief is that they have not complied with Rule 26 disclosure requirements.

Additionally, I object to both the October 2024 and the October 2026 reports to the extent that these reports provide an improper opinion. The opinion is improper in that this expert is providing a legal opinion. Under Montgomery v. Aetna Casualty and Surety Company, the 11th Circuit has consistently held that experts may provide factual understanding or scientific understanding. However,

they are not to testify to the legal implications of conduct. This expert's reports in both cases are merely thinly veiled legal conclusions regarding terms like agency and agreement.

Those are questions for the fact finder in this case. Those are also questions of law for the judge. They are not proper opinions for this expert. And I object to both reports to the extent they contain any of those opinions.

And secondly --- or thirdly, this witness has provided a supplemental report on October 2026 --- in October of 2026. As the parties are aware, liability discovery in this case closed almost a year ago at this point, if not before, due to the summary judgment motion and those arguments back in, I believe, July of 2025. For the Plaintiffs to then submit a supplemental expert report was on, I believe, the day of the day of the pretrial conference, and then attempt to take his trial deposition a week later is improper and is not in time with the order and the scheduling put forth by the court.

Any opinion that is solicited or gathered in the October 2026 supplemental report was not done timely and, therefore, should not be admitted before this court. Those are my objections to this

testimony moving forward.

ATTORNEY LANGLEY:

All right.

Our position is that we have complied with the requirements of Rule 26 in providing the information about Mr. Rugemer's compensation and his prior testimony at the time of the October 2024 expert disclosure.

We've allowed a discovery deposition today that we agreed would be an hour, it went about an hour and 20 minutes, as an accommodation for Mayflower that was not noticed, that was not properly requested, so that there --- there could be plenty of time to ask any questions about the --- the reports.

And so that there's been no prejudice to Mayflower in any way for the production of the reports, many of which were based on discovery that was not produced by Mayflower until just days prior to the reports being issued. So the documents were not available for the conclusions in the report until days prior to the report.

There's been no subpoena issued despite Mr. Rugemer's disclosure over two years ago in October of 2024 for any of his trial testimony or any of his compensation. And so on all of those grounds, we

believe that there's been compliance and no prejudice to Mayflower under the rule.

The legal objections we'll present to the court, our position is that his testimony as to compliance or lack thereof with the Federal Motor Carrier Safety regulations is a matter within his expert purview. The legal conclusions will ultimately be made by the court and the direction to the jury of what the law of the case is.

But as to compliance with the Federal Motor Carrier Safety regulations, we believe he is fit to provide testimony standards and customs in the industry. And so that is what we are offering him for in the case.

BY ATTORNEY LANGLEY:

Q.So, Mr. Rugemer, what were you asked to do in this case?

ATTORNEY MCDONALD:

Hold on, hold on. Mr. Langley, real quick.

ATTORNEY LANGLEY:

Okay.

ATTORNEY MCDONALD:

Just --- just so we can ---. Just so it's noted on the record, my understanding is that I

have now presented my objections, and we are going to place these objections before the court, whether that's through my motion, your motion somehow. But the objections have been stated and preserved. And you are now going to move forward with your testimony of Mr. Rugemer pending my objections. And if we have to redact portions of the testimony before it goes to the jury, that's what we'll do. But that's our understanding for today.

ATTORNEY LANGLEY:

Right. And, you know, we ---.

ATTORNEY MCDONALD:

Okay.

ATTORNEY LANGLEY:

Yeah. And we'll --- we'll --- we'll offer in documentation and --- and evidence through the course of the deposition, and if there are objections to any of that, then it would be your responsibility to state those on the record at that time.

ATTORNEY MCDONALD:

Yes, sir. I just don't want --- I don't want any implication that by not --- by allowing this deposition to move forward that I have waived those objections.

ATTORNEY LANGLEY:
And just so we can be clear on the record, you don't disagree that Mr. Rugemer is qualified as an expert in motor carrier operations, commercial motor carrier operations, motor carrier safety management and compliance with the Federal Motor Carrier Safety regulations. Is that what your statement was earlier?
ATTORNEY MCDONALD:
So I'm not --- I'm not disputing his qualifications in those circumstances.
ATTORNEY LANGLEY:
Okay.
Gotcha.
All right.
You ready to move forward now?
ATTORNEY MCDONALD:
Yes.
ATTORNEY LANGLEY:
Okay.
Great. Thank you.
BY ATTORNEY LANGLEY:
Q.All right.
Mr. Rugemer, what were you asked to do in this case as an expert?

A.I was asked to review the materials, get an understanding of what happened and the circumstances around it, develop opinions regarding the --- the use of the Moholland truck.
Q.All right.
And did you review the --- the pleadings in this case?
A.I did.
Q.Did you review the Georgia Department of Public Safety crash report?
A.I did.
Q.Did you review the June 17, 2022 Georgia Department of Public Safety roadside inspection?
A.I did. Yes.
Q.Did you review documents titled agency agreement between Mayflower Transit and Joe Moholland Moving?
A.Yes, I did.
Q.Did you review agreement between Locke Relocations, the owner of the truck in this --- this case, Mayflower Transit, the Plaintiff's alleged as the motor carrier in this case, and Joe Moholland Moving as an agent in this case?
A.I did. Yes.
Q.Did you review equipment and lease certifications?
A.I did.

Q.Between Mayflower Transit and Joe Moholland Moving?
A.Yes.
Q.Did you review the license and registration that was in the truck or on the outside of the truck for the DOT Number that was involved in this collision?
A.I did. Yes.
Q.Did you review the IRP and IFTA records?
A.I did. Yes.
Q.What are IRP and IFTA records?
A.IFTA stands for International Fuel Tax Agreement. So the states have gotten together and come up with a certification process that ensures that the fuel taxes paid by motor carriers gets apportioned out to the states, depending on the amount of miles a truck travels in that state.
Q.And is it the responsibility of the motor carrier who is responsible for the safety of the truck to pay those taxes?
A.Yes.
Q.And the IRP records, what does that stand for?
A.It's International --- I'm sorry, we went through this before. It's basically the registration for the tractor. Just like you and I would have a registration in our car. It would list the VIN

number, make and model, the owner. But with truck registrations or cab cards like this, it also lists who the feds identify as the motor carrier with safety responsibility.
Q.Okay.
When you say feds, you mean the federal government?
A.Yes, the federal government, the Federal Motor Carrier Administration.
Q.And you basically described it. But just for the record, IRP's International Registration Plan. Is that ---?
A.International Registration Plan, yeah.
Q.Okay.
And that's part of the FMSCR, the Federal Department of Transportation?
A.Yes.
Q.Is there also a state component to these licenses and registrations?
A.Many states have adopted the Federal Motor Carrier regs. They --- they've incorporated them by reference, sections 300 through 399. Some states have developed their own specific rules. I believe that Missouri has adopted the --- the federal regs which --- which are consistent.

Q.All right.
And Missouri was where this truck was registered to Mayflower Transit?
A.Yes.
Q.And Georgia was where this collision took place, of course. And Georgia has also adopted the Federal Motor Carrier Safety regulations?
A.They have, yes.
Q.And did you review weekly agency statements between Mayflower Transit and Joe Moholland Moving?
A.I did, yes.
Q.And did you review what's called a data queues file?
A.I did, yes.
Q.What is that document?
A.It's a list of potential violations, whether it's driver related or equipment related for a motor carrier.
Q.Did you review Joe Moholland's load and payment records?
A.I did, yes.
Q.And we're taking your deposition here today and asking you questions on the record. Did you review other depositions from other parties in the case?
A.I did, yes.

Q.Did that include the deposition of Rob Garr, the corporate representative for Joe Moholland Moving?
A.Yes.
Q.Chris Wynn, one of the corporate representatives for Mayflower Transit?
A.Yes.
Q.Jason Jones, another one of the corporate representations representatives for Mayflower Transit?
A.Yes.
Q.Angela Locke, the corporate representative for Locke Relocations?
A.Yes.
Q.Nicholas Burist, the driver in this case?
A.Yes.
Q.Bob McCabe, another corporate representative of Mayflower Transit?
A.Yes.
Q.And Mike Kratzer, who testified, I think, both as a fact witness and a corporate representative of Mayflower?
A.Of Mayflower, yes.
Q.And did your review of those documentations support your opinions that you've reached in this case?
A.They have, yes.

Q.And did you form opinions to a reasonable degree of professional certainty in the trucking safety field based on industry customs and practice?
A.I have, yes.
Q.And what are the crux of those opinions for this case? I think there's sort of three categories you've identified.
A.The first category would be it's my opinion that the agency agreement between Moholland and Mayflower was never terminated as Mayflower alleges. My support for that is the back and forth emails regarding the tags and the IFTA sticker on the trucks that were in place at the time of this subject crash. The fact that there were payments made after Mayflower alleges that the agency agreement was terminated, there were payments made for several months after the subject crash. Those were the bulk of the supporting documents behind my opinion.
Q.And we'll go through those documents now. The agency agreement is really in three parts. The first part is dated and signed July 25, 2008, the second July 28, 2008 and then the last temporary agency agreement doesn't have a date on it, but the provision seven says the term of this agreement shall begin January 22nd, 2022, and will terminate upon April

28th, 2022. I'll offer those into evidence for trial as Plaintiff's Exhibit 1.

---

(Whereupon, Plaintiff's Exhibit 1, Agency Agreement, was marked for identification.)

---

BY ATTORNEY LANGLEY:

Q.Is that the agency agreement that you were referring to earlier in your testimony?

A.Yes.

Q.All right.

If you look on page one under definitions, what does it define as the carrier in the case.

A.Number one, paragraph A, carrier shall mean Mayflower, its parent corporation and any corporation or entity which is or may be under the common ownership or control of either of them.

Q.All right.

Have you reviewed the corporate structure of Mayflower and who it's identified as its parent company and the definition of carrier there, any corporation or entity which is under the common ownership?

A.Yes. The parent corporation appears to be Unigroup CA.

Q.Okay.
And you've seen in the testimony from the Mayflower corporate representative witnesses that there are no real employees of Mayflower. Everybody really works for Unigroup, has a Unigroup email address and that kind of thing?
A.Correct. Yes.
Q.We'll offer that corporate structure in as Plaintiff's Exhibit 2 for trial.

---

(Whereupon, Plaintiff's Exhibit 2, Mayflower Corporate Structure, was marked for identification.)

---

BY ATTORNEY LANGLEY:
Q.So the --- there were some pictures taken of the tractor in the case that was driven by Nicholas Burist. And these were taken shortly after the collision. Have you seen those pictures?
A.I have, yes.
Q.Are those the pictures that I've just handed you there?
A.They are.
Q.All right.
And the pictures show what?

A.The first photo shows the driver's door of the truck. And on the door it says ---.
Q.Let me just point that out for the jury just so they can see. You can hold that.
Okay.
I didn't mean to interrupt you. Just want to make it clear there.
A.What --- what's labeled on the door is Joe Moholland Moving, operated by Mayflower Transit, Fenton, Missouri. There's a DOT Number of 125563.
Q.Whose DOT Number is that?
A.That's Mayflower's DOT Number. There's also a unit number on the truck. The first photo doesn't show it completely, but the second photo shows that the unit number is 251-0333.
Q.All right.
Can you show that picture to the jury? And where are you seeing 251-333?
A.Right here along the hood right --- right about there.
Q.All right.
We'll make that an exhibit for trial, Plaintiff's Exhibit 4 as well, so the jury will have that. Excuse me. That's Number 3.
---

(Whereupon, Plaintiff's Exhibit 3, Photos, was marked for identification.)

---

BY ATTORNEY LANGLEY:
Q.Looking back at Exhibit 1. If you would flip over to page nine of that exhibit. This is the agency agreement. That's it there. Page nine.
A.Okay.
Yeah.
Q.And it says agent. And who does it have listed?
A.As the agent, Joe Moholland Moving.
Q.And what's next to that?
A.The carrier is identified as Mayflower Transit.
Q.And beside Joe Moholland Moving, what does it state there, the number associated with this agency agreement?
A.Agency agreement M as in Mary 333.
Q.Okay.
And is that consistent with what you see in the photos we've marked as Exhibit 3 as the agency agreement for this truck that was in the collision with the Plaintiffs?
A.Yes.
Q.If you'll flip over to page 11 of the agency agreement between Mayflower and Joe Moholland, look at

paragraph G and read into the record the last sentence of paragraph G, please.
A.As to any shipment but that has been commenced prior to the date on which this agreement is terminated, the terms, provisions and conditions of this agreement will continue to apply to such shipment.
Q.Okay.
So for any shipment that commences while this agreement is in place or prior to the date that it is terminated, it's covered by this agency agreement?
A.Yes.
Q.And what is the date ---?
ATTORNEY MCDONALD:
I'm objecting to that.
BY ATTORNEY LANGLEY:
Q.Okay.
What is the date that Mayflower states that this agreement terminated?
A.I've not seen anything that --- that shows me a termination date.
Q.I understand that, but do you understand that Mayflower alleges that this agreement terminated, if you look at the next page, on April 28th, 2022?
A.I'm sorry. Yes. The --- the day that Mayflower

alleges it terminated its relationship with Moholland was April 28, 2022.
Q.And so have you reviewed the testimony of Mayflower's corporate representative about the definition of commenced in this agency agreement?
A.It's --- the trucking industry also uses the term booked. The load was commenced or booked. And once it's booked, it's --- it's --- it's put in the system. It's been planned. There's a --- a general date where it will be picked up and delivered. It can be sometime in the future as --- as operations call for it. But it's --- in this case, it's a load that was booked or commenced during the time of the agency agreement.
Q.All right.
So is it --- does that form the basis of part of your opinion that there was an express agency agreement in place between Mayflower Transit and Joe Moholland on July 1st, 2022?
A.Yes.
Q.And if you look at the temporary agency agreement, kook at paragraph six. It's the last page of Exhibit 1 there. You got it there.
A.Oh, I'm sorry.
Q.Yeah, paragraph six. If you could read the ---

the last sentence of paragraph six after the semicolon into the record, please --- or just starting with --- with this agreement creates no rights.
A.This agreement creates no rights or obligations not already existing, does not modify or alter the party's rights or obligations under the terms of the agency agreement.
Q.All right.
And so you connect these three agreements together based on that?
A.Yes.
Q.We discussed that the IRP cab cards earlier. Have you reviewed correspondence between Mayflower Transit and Joe Moholland Moving where the IRP cab cards were sent from Mayflower to Joe Moholland for truck number 251-333?
A.Yes.
Q.Is that the correspondence from Mayflower's safety manager to Mike Peters, Joe Moholland's vice president, for the IRP cab card for this tractor that was involved in the collision?
A.Yes.
Q.We'll offer that as Plaintiff's Exhibit 4.
---
(Whereupon, Plaintiff's Exhibit 4, Correspondence

- IRP, was marked for identification.)
---
BY ATTORNEY LANGLEY:
Q.And is this document the IRP cab card that was for that truck, 251-333?
A.This is the IRP card or registration for that tractor, yes.
Q.And is that like an official registration with the State of Missouri Department of Transportation?
A.Yes. This was provided by the Missouri Department of Transportation.
Q.And that's a government document, a record of public activity that is in the normal course and part of industry custom and law that this has to be kept in the vehicle that is 251-333, the same truck that we saw in Exhibit 3?
A.Yes. Just like you or I have a registration for our car, it must stay in the car.
Q.We'll offer that as Plaintiff's Exhibit 5 into the record.
---
(Whereupon, Plaintiff's Exhibit 5, IRP cab card, was marked for identification.)
---
BY ATTORNEY LANGLEY:

Q.If you could, before you put that one in your stack there, if you could read into the record the Missouri Department of Transportation, who that --- Missouri identifies at the bottom as the motor carrier responsible for safety?
A.So at the bottom of the cab card, there is a line that says the motor carrier responsible for safety and gives the DOT Number of --- and the name of Mayflower Transit.
Q.Is that DOT Number the same DOT Number that was on the truck that we see in Exhibit 3?
A.It is, yes.
Q.And this IRP cab card had an effective date starting in April 21st, 2022 and ending when?
A.March 31st, 2023.
Q.Have you seen any documentation, correspondence, email, phone call, record, anything whatsoever where Mayflower Transit reported to the Missouri Department of Transportation that this document, the IRP apportioned cab card, should be terminated prior to March 3rd, 31st, 2023?
A.I've not seen anything.
Q.All right.
We'll, again, make that Exhibit 5 and put into evidence. We talked about IFTA stickers earlier, and

I think you said that's the International Fuel Tax Agreement license?
A.Yes.
Q.And is there also a document with the Missouri Department of Transportation that shows the International Fuel Tax Agreement between the parties?
A.Yeah. So there will be a sticker on the outside of the truck that says IFTA. It'll have some other information on it. And there is a printed certification that must be carried with the truck at all times.
Q.Is that the document that I've handed you now, the IFTA motor carrier public record from the Department of Transportation in Missouri?
A.It is, yes.
Q.And what does it list as the U.S. Department of Transportation number?
A.125563, which corresponds to Mayflower Transit.
Q.And does it correspond to the Department of Transportation number that we see on the --- on the truck that was involved in this collision?
A.It does. It's the same DOT Number on the truck.
Q.And it has an effective date beginning January 1, 2022 and ending when?
A.December 31st, 2022.

Q.And have you seen any correspondence from Mayflower or any other entity to the Missouri Department of Transportation that would terminate this IFTA sticker prior to July --- excuse me, December 31st, 2022?
A.No.
Q.And so that would cover the July 1st, 2022 date of this collision?
A.That is correct, yes.
Q.And are IFTA licenses transferable?
A.They are not.  They are assigned to a motor carrier who can cancel it if it's no longer needed or in effect.  But no, they are not transferable.
Q.And is that stated on this form?
A.It does --- next to the last line, it says the license must return --- the licensee must return the license to the department and remove the decals from all qualified motor carriers operated by this carrier under --- upon termination of the business operations.
Q.All right.
So if, as Mayflower alleges in this case, there had been a termination of the relationship between Mayflower and Joe Moholland prior to July 1st, 2022, would the industry require that this --- and the law require in Missouri that this IFTA sticker be

terminated and returned to the Missouri Department of Transportation?
A.Yes. And if I can fix something from my previous answer, I didn't read the entire portion where it does say this license is not transferable between carriers.
Q.All right.
And so there would be no way for --- would there be any way for Joe Moholland to operate any load using IFTA stickers and IRP cab cards of Mayflower under a different DOT Number or a different carrier?
A.No, they are DOT Number specific, they are motor carrier specific.
Q.So in this case, for the July 1st, 2022 load, did Mayflower Transit provide the means and the methods for the truck that was operated by Nicholas Burist to be on the road on that day?
A.Yes, they provided the license plate, the registration card and the IFTA information. Without any of that, the truck is not legal to operate on any public roadways. The truck is basically what we call grounded.
Q.And again, did you see any communication from Mayflower or any party to --- to the Missouri Transportation --- Department of Transportation terminating this business operation between Joe

Mohalland Moving and Mayflower Transit prior to July 1st, 2022?
A.No.
Q.We'll offer that into evidence as Plaintiff's Exhibit 6, Missouri Department of Transportation IFTA license.
---
(Whereupon, Plaintiff's Exhibit 6, IFTA Public Record, was marked for identification.)
---
BY ATTORNEY LANGLEY:
Q.All right.
You mentioned before that you reviewed certain agency statements between Mayflower Transit and Joe Moholland Moving.
Is that correct?
A.Yes.
Q.And did those agency statements identify agent payments between Joe Moholland Moving and Mayflower Transit?
A.They did.
Q.And who was making those payments and who was receiving those payments?
A.Mayflower was making those payments to Moholland, Joe Moholland Moving.

Q.Were those payments under a specific agreement identified as M333?
A.Yes.
Q.And was that the same agreement that was on the agency statement that we saw before, the same number?
A.Yes.  Moholland and --- everything between Moholland and Mayflower travels under that M33 identifier.
Q.I provided you Mayflower documents that were produced in discovery that are labeled 72 to 88 numbered in --- in the case.  Did those documents reflect eight agency payments between the dates of May 31st, 2022 and August 8th, 2022 of $20,000 each from Mayflower to Joe Moholland Moving?
A.They do.
Q.And so Mayflower in the month prior to this wreck and the month after this wreck --- month and seven days or so, so a total of about nine weeks, four weeks before and five weeks after, paid Joe Moholland Moving about $160,000 in agent fees?
A.Yes.
Q.And that's how they're identified on this form --- or read, if you would, how they're identified on this form under the payments that you see there on various pages.

A.The ledger code used by Mayflower Transit for these payments is AGTP, agent payments.
Q.All right.
And if you flip over to the document that is titled Mayflower 79.  They're not in order because they weren't produced that way.
A.Okay.
Q.And do you see that there was a payment made where Mayflower was seeking reimbursement from Joe Moholland Moving of $280.55 for payment made on behalf of Nicholas Burist, slash, Mike Peters?
A.I do.  It's line 41.
Q.And that was July 1st, 2022?
A.Yes.
Q.The same driver that was involved in this collision?
A.Correct.  Yes.
Q.Same truck that was involved in this collision?
A.Yes.
Q.Same date as this collision?
A.Yes.
Q.And Mike Peters is the vice president of Joe Moholland Moving?
A.Yes.
Q.And when it says do HQ, what does that mean under

the industry?
A.It's --- it's --- typically it could mean something that was overpaid and the overages is pulled back, in this case would be by Mayflower or it's some other service that Mayflower paid for on behalf of Burist and Peters.
Q.Is it an indication where you have multiple statements under an agency statement form that there's an ongoing agency agreement between Mayflower Transit and Joe Moholland Moving on July 1st, 2022?
A.Yes. Yes.
Q.And so when it says do HQ, does that look to you as a payment made by Mayflower that Moholland transfer --- Joe Moholland Transportation has to pay back to reimburse Mayflower for?
A.Yes, for whatever the goods or services were.
Q.All right.
We'll offer the agency statements identified into evidence as Plaintiff's Exhibit 7.
---
(Whereupon, Plaintiff's Exhibit 7, Agency Statements, was marked for identification.)
---
BY ATTORNEY LANGLEY:
Q.So did you also review certain emails --- you did

state earlier that you reviewed certain emails about the approval of the use of the IRP cap card, the IFTA stickers and the license and registration from Mayflower to Joe Moholland?
A.Yes.
Q.And those emails are from around May of 2022 up through and after this wreck on July of 2022.
Is that correct?
A.Yes.
Q.And the emails are between Mike Peters, who we just talked about a moment ago, the vice president of Mayflower, and Nicole Crumb, who is the employee of Mayflower that we saw before that we marked on Exhibit 4 that transmitted the cab cards to Mike Peters from Mayflower to Joe Moholland Moving.
Is that correct?
A.Right.  She identifies herself as the safety manager in the May 19, 2022 email.
Q.And she --- if you look on the very first page there, Mike Peters says to Diane Lopez at Unigroup there, after there's some communication about the base plates, and Ms. Lopez says on May 19th, please send them back as soon as you can.  Talking about the license plates.
Is that right?

A.Yes.
Q.And what is Mr. Peters' response there at the top of that?
A.He replies to Diane, it was a great agreed that we could keep them, meaning the plates and run them until they expire in 2023. We are not returning them until then.
Q.Okay.
When he says we can keep them and run under them, what does that mean in the industry?
A.He intends at this time to keep Mayflower's plates in order to operate his trucks.
Q.All right.
If you flip over to the next page, we'll see some correspondence between Nikki Crumb, Nicole Crumb, she's identified there, and Mr. Peters that follows up on this conversation. And it says in line two, when an agent leaves the van lines, in this case, the van lines would be Mayflower Transit.
Right?
A.Yes.
Q.They are not allowed to keep the Missouri base plates. Is that what it says?
A.Yes.
Q.And then at the end of the email, it says, we show

you have 32 trailer plates, 4 straight truck plates and 12 tractor plates. The sooner you get them back, the sooner they will get on the transfer list and we can start transferring them out. And then she says, we will need all Missouri plates back by June 15th, otherwise we will have to delete them with Missouri.
A.Yeah.
Q.Did I read it correctly? Did I read it correctly?
A.Yes, you did. Yes.
Q.Mr. Peter says in response, Tim Woody will be contacting you about this.
Is that right?
A.Yes.
Okay.
So the conversation then goes to Tim Woody. And now Rob Garr is included and the reference is to hi, Rob, but the email is sent to Mr. Peters. And it says, hi, Rob, sorry I missed your call. Meetings most of the day. This is May 24th.
Right?
A.Yes, May 24th, 2022.
Q.Okay.
Says Chris Wynn and I met with Nikki Crumb to discuss the Missouri plates. According to Nikki, we are bound by law on the usage of the plates. I read

it correctly?
A.Yes.
Q.There is no gray area or consideration that can be contemplated in this matter. Very respectfully, Tim Woody.
A.That's what it says. Yes.
Q.Okay.
Flip over to the --- to the next page. The next day, May 25th now. Rob follows up with --- on this same email chain that --- and now he's talking to Tracy Evans at Mayflower and he says, we were told earlier this year by Unigroup that the units we had registered in Missouri were covered until March 2023 and that we didn't need to take any action until closer to the renewal date. Based on the thread below, it looks like the actual process is different from the information we were provided. Now that we understand that, we are hoping to find a reasonable compromise. Did I read it correctly?
A.Yes.
Q.And is there any compromise based on what Nikki Crumb has said in the following email there with --- with Missouri law?
A.No. They are bound by law to cancel the plates. There's --- there's no grace period for --- for

Moholland to continue to run these.
Q.All right.
And so here now we have more communication on the next page from Michael Peters to Nikki Crumb. And it's titled Missouri base plates. The date on this is June 28th, 2022. Good morning, Nicole, wanted to give you an update on our progress. Everything has been done except for the ones listed below. We were just told it will take four to six weeks for our IRP IFTA account to be valid. We cannot register the following units until that account is operational. Do you think we could get an extension --- says could an extension --- assume he meant get an extension --- on just these units for just this reason. All other units should be done. And one of the reference units that down there, you see 251-333.
A.Yes.
Q.Is that the --- the unit involved in this collision?
A.It is, yes.
Q.Plaintiff's ---. So the same day there's more communication from Nikki Crumb internally now to Adam Petrie and Tracy Evans. And it says good morning, Joe Moholland is asking for an extension on the both --- below plates because they say they can't get their

plates until their IRP and IFTA accounts are set up. And it goes on to say, my concern is that so much can happen and come back to us the longer we keep letting them use our plates. We have already had some tolls, and as you know from Steve's dealing, a roadside inspection that wasn't good at all.

A.Right.

Q.And Adam Petrie then responds at the top. Thanks, Nikki, I'm attempting to get a hold of Rob Garr. Is that right?

A.Yes.

ATTORNEY MCDONALD:

I'm just --- preservation on the record. I'm objecting to the use of that Nicole Crumb to Adam Petrie and Tracy Evans email dated June 28, 2022 as hearsay, out of court statement being offered for the truth of the matter asserted. That's my objection to that email being used in this manner.

ATTORNEY LANGLEY:

It's a statement of a party opponent made within the scope of her employment, and under 801D2, it's admissible. It's also admissible under hearsay exceptions because it's not offered for the truth of the matter asserted, but to show notice and to show information that was available to Mayflower.

It's also a business record that was made at the time, at or near the time of the crash by someone with knowledge of the crash.  It's kept in the ordinary course of conduct --- regularly conducted activity by Mayflower and made as a regular practice of Mayflower and produced by Mayflower.  So we believe that it would be admissible for all those reasons.

BY ATTORNEY LANGLEY:

Q.All right.

The next ---.

ATTORNEY MCDONALD:

Do you want me to respond --- would you like me to respond or is my objection sufficiently preserved?

ATTORNEY LANGLEY:

I think you need to state on the record anything that you feel is important.  I'm not going to tell you how to practice.  But our agreement for this deposition and all the others is that for de bene esse depositions we are stating all objections on the record.

ATTORNEY MCDONALD:

I dispute your characterization of it as a business record.  It's plainly not a business record.  It's simply an email exchange and I'm not

sure if it's not being offered for the truth of the matter asserted simply what Plaintiff asserts Mayflower's knowledge of an assessment of the risk, I don't understand how it has any relevancy to this matter at all.

It is --- no matter what they say it is being offered for, how it is being taken and how it was used in this expert's deposition is for the truth of the matter contained therein. We maintain it as hearsay. Whether or not we produced it or not is --- is irrelevant to its hearsay consideration for the court.

ATTORNEY LANGLEY:

Well, the point of its production by --- by Mayflower was that it is a regularly conducted activity of Mayflower, a business record of Mayflower and regular practice of Mayflower. And then under 801D2, because Nikki Crumb is a safety manager of Mayflower, it is a statement of a party opponent made within the course and scope of her employment and, therefore, admissible.

ATTORNEY MCDONALD:

I --- I don't believe that sufficient groundwork has been established that Nikki Crumb was --- was an officer or in a position to testify or

speak on behalf of Mayflower itself. In this circumstance, it appears that Nikki Crumb is merely speaking as an individual and as an individual employee regarding her view of the situation. That's --- that's our response to that position forward.

ATTORNEY LANGLEY:

All right.

Nikki Crumb is identified as the manager of safety in all these emails. And so that's the basis for authority that we're asserting.

ATTORNEY MCDONALD:

Okay.

BY ATTORNEY LANGLEY:

Q.Okay.

So if you flip to the next page, there's some communication from Darnice Martin (phonetic) at JMM 333. Is that under the same agency agreement that we've talked about before, 333?

A.I don't think I ---.

Q.It's on 1194.

A.1194.

Okay.

Yes, I have it.

Q.Okay.

And she says, I've sent some of the license plates

back to UPS. They should arrive on June 25th.
Is that right?
A.Yes.
Q.And Nikki Crumb responds, good morning, Darnice, thanks for letting me know.
A.Yes.
Q.Then on the next page, there's communication from Rob Garr and Adam Petrie and Tracy Evans where Adam Petrie says, good afternoon, Rob. Mike Peterson from your office reached out to us from this morning, this is on June 28th, asking for an extension to return the base plates for 12 units.
After checking with legal, I am sorry to inform that we cannot grant another extension pass this Friday, July 1st. Did I read it correctly?
A.Yes, you did.
Q.And that's from Adam Petrie, Senior Manager of Safety Administration?
A.With Unigroup, yes.
Q.And he references that he has checked with legal about that state.
Is that right?
A.Yes. After checking with legal, I am sorry to inform you we cannot grant another extension past Friday 7/1.

Q.And the day of the collision in this case was on Friday 7/1?
Is that correct?
A.Yes.
Q.Does that form the basis for your opinion that there was authorization for Joe Moholland to operate this tractor under Mayflower's IRP, IFTA stickers and license and registration on July 1st?
A.Yes.
Q.So we'll look at the next page. And now we're to July 5th, 2022 after the wreck. Nikki Crumb is following up on the same email chain with Darnice Martin and Adam Petrie, Tracy Evans and another person we haven't seen before, Bridget Shields, but has a Unigroup email address.
Right?
A.Yes. Uh-huh.
Q.So this is correspondence between Mayflower and Joe Moholland on July 5, four days after the wreck?
A.Yes.
Q.And it says to Darnice at Joe Moholland, Darnice, did you get temps for any of the tractors and straight trucks or have you not started that process? Did I read it correctly?
Q.You did.

Q.And then the response then at the top, good afternoon, Nikki. I sent some plates back last week and you should receiving --- be receiving some more tomorrow. Can you check what our estimated refund will be for returning these plates. Did I read that ---?
A.That's what it says, yes.
Q.And then there's follow up from Nikki Crumb on the following page that says the only --- excuse me. Due to us not receiving the plates back by the extended deadline that was discussed between my management team and Rob Garr, we had to delete the plates with Missouri. Did I read it correctly?
A.You did, yes.
Q.Once a plate is --- once we delete a plate from Missouri, we are unable to transfer the plate and cannot issue a refund. Is that read correctly?
A.Correct. Yes.
Q.And so do you --- how do you read that extended deadline that was discussed between my management team and Rob Garr relative to the July 1st collision?
A.It tells me there's just an ongoing, nearly interminable allowance of Moholland to keep using these tags. They're being asked for, they're being asked for. There's --- again, as I said earlier, this

whole process should have only taken a couple, three days. There's one email that we looked at where they were collected and sent on the 25th to be received by the 28th of that month. So that's how simple this process is.
And there are so many ways to document that it's being done or at least document that the truck isn't being used during that time, and none of those --- none of those practices or actions were taken.
Q.And is that a violation of the industry custom and the Federal Motor Carrier Safety regulations?
A.Of course. I don't want anyone using my truck --- or using my plates without having some kind of agreement with them. It opens with up to any possible scenarios that are bad for me.
Q.And does it make Mayflower the responsible motor carrier for safety on the dates that they have authorized the use of their registration, license plates, IFTA stickers and tracker?
A.Yes.
ATTORNEY MCDONALD:
Objection to this line of testimony under legal conclusion and legal testimony as explained at the beginning of this deposition.
BY ATTORNEY LANGLEY:

Q.All right.
The group of emails we've identified are Mayflower production 5452 to 5455, Mayflower production 64 --- excuse me, 6246, 1193 to 1194, 46256 and 46257, 46260. We would offer those into evidence as Exhibit 8.

---

(Whereupon, Plaintiff's Exhibit 8, Emails, was marked for identification.)

---

ATTORNEY MCDONALD:
Subject to prior objection regarding hearsay.
ATTORNEY LANGLEY:
All right.
You don't have any additional ---.
ATTORNEY MCDONALD:
Subject to my prior objection regarding hearsay. Sorry.
ATTORNEY LANGLEY:
All right.
Thanks. No additional objections.
Stephen, you --- you just objected to the one page which was 1194, I think.
Is that right? The communication between ---?

ATTORNEY MCDONALD:
Yeah. Yes.
BY ATTORNEY LANGLEY:
Q.Okay.
I'll show you some communication from Adam Petrie to Tracy Evans on July 1st, 2022.
A.Would you like me to read it?
Q.Sure.
A.It's dated July 1st, 2022, 11:58 a.m. Central Time. Nikki was able to confirm that all Moholland plates should be in the mail first thing next week, period. Majority have already been received or are on their way.
Q.So this is the date of the collision just a few hours before the collision.
Is that right?
A.Yes.
Q.And Adam Petrie, who we identified as one of the senior managers for safety at Mayflower, is showing his knowledge that Mayflower is continuing to allow the use of Moholland's plates through the end of the week ending July 1st, 2022.
Is that right?
A.Yes, that's how I see it. Yes.
Q.We'll offer this into ex --- evidence as

Plaintiff's Exhibit 9.

---

(Whereupon, Plaintiff's Exhibit 9, 7/1/22 Correspondence, was marked for identification.)

---

BY ATTORNEY LANGLEY:

Q.There was reference made in some of the earlier discussion about a roadside examination or a roadside inspection, rather, on June 17, 2022. Do you recall that?

A.Yes.

Q.And do these documents have handed you show the record of that roadside inspection?

A.They do. And they show three violations, three defects.

Q.Who was the driver on that date, June 17, 2022?

A.Nicholas Burist.

Q.And who was listed as the motor carrier?

A.Mayflower Transit, LLC.

Q.And what was the equipment ID listed under the vehicle identification for the tractor?

A.I know it's on here somewhere.

Q.It's kind of small. I know.

A.It's tractor unit number 251-0333.

Q.That's the same tractor that was involved in the

collision that caused the death of Kyle Sloan's wife and daughter ---
A.Yes.
Q.--- and injuries to him? And you said there were three violations, one with the brakes, with leaks, one with the tires, and then no, slash, expired or improper license plate. Is that what it says?
A.Yes. For the trailer.
Q.How does the --- this is a Georgia Department of Public Safety Motor Carrier Safety Assistant Program record.
Correct?
A.Yes.
Q.How does that get transmitted to Mayflower? Is there a system for that internally where Mayflower is listed as another carrier?
A.Whenever a commercial truck is stopped at a inspection area, whether it's a rest area or a designated scales, scale house, if the driver or the equipment is found to have any sort of defect that's notable and is going to be cited for, the feds add that to the system and it filters its way through the safer system, the day queue, and it creates a notification to the motor carrier.
Q.All right.

If you flip over to the third page of that set of documents that I've handed you, there's some email correspondence between Sue Demian, who's the senior director --- or, excuse me, Safety Compliance Manager, Risk Management at Unigroup Mayflower that also shows that Mayflower received notice of this roadside inspection, the defect in the brakes, the defect in the tires and the problem with the license plate. And this is dated June 21st, 2022.
Correct?
A.Yes.
Q.And I'll read it into the record here from Sue Demian. Follow along and make sure I read it correctly, please. It says good morning. We just received a roadside inspection report that included two maintenance violations for a total of 42 CSA. The violations included a flat tire and brake connections with leaks, which are serious violations that could lead to a crash out on the roads.
The reason for my concern is that both vehicles still have our Missouri base plates and I'm fairly certain they haven't removed our brand decals from the equipment. Because of this, challenging the Motor Carrier Operating authority with the State of Georgia will be difficult. But most important, the risk this

brings to our company cannot be ignored. Is there any other actions we can take so this doesn't continue? Do we issue a cease and desist order? Do we report the plates as stolen to the State of Missouri? I look forward to your thoughts on this issue, Sue Demian, Safety Compliance Manager, Risk Management.
A.That's what it reads, yes.
Q.All right.
And then Chris Wynn, the senior director of safety at Unigroup Mayflower, responded. We have always given the terminating agent a little time from a few weeks to a month to get all that removed as it is unrealistic to expect it can be removed from, on, by a terminating date since they are in many cases still performing service --- van line service to the last day. As Moholland who has a of lot of equipment, we knew it may take them a little longer, as I said, to remove or during the month of June.
Is that right?
A.Yes.
Q.So is this form part of the basis that Mayflower --- of your opinion that Mayflower knowingly allowed Joe Moholland to continue the use of its license plates and assumed the risk to its company?
A.Oh, absolutely. That they are condoning the use

of it.

ATTORNEY MCDONALD:

And I'm objecting to this prior line of testimony or the addition of this testimony onto the record as hearsay.

ATTORNEY LANGLEY:

All right.

It's a statement of a party opponent made within the scope of the employment. It is a business record at or near the time of the crash made by someone with knowledge about the state of the agency agreement kept in the course of regularly conducted activity describing the regular practice of Mayflower's business with its agents.

ATTORNEY MCDONALD:

My same objection. It's not a business record. It's an email. There's no foundation or explanation that these documents were made by, you know, corporate officers or corporate representatives of Mayflower. It appears to simply be employee communications regarding, you know --- regarding these --- these base plate issues. And that's our objection to these two emails back and forth.

ATTORNEY LANGLEY:

All right.

We would also say it's self-authenticating. And it also shows a ratification of the extension of the agreement to continue the agency agreement.

BY ATTORNEY LANGLEY:

Q.The next page on July 6th. This is Lisa Buchanan, a compliance auditor for Unigroup Mayflower, communicating with Mike Peters who again is the vice president of Joe Moholland.

Correct?

A.Yes.

Q.It says, good afternoon. Roadside inspection documentation is needed is the title of the email. We still haven't received the required documents for the roadside inspection report. Please provide a copy of the inspection report along with all repair documents within two business days. This is five days after the wreck causing the death of Plaintiff's wife and daughter and injuries to him, July 6.

A.Yes. Uh-huh.

Q.And it says if not received in a timely manner, we will have no choice but to unqualify the equipment until these documents are received. Did I read it correctly?

A.Yes.

Q.On the next page is the my data queues Mayflower Transit motor carrier communication. Correct?
A.Yes.
Q.And did Mayflower in August of 2022 make an attempt to have its name removed from this roadside inspection report?
A.They did. Yes.
Q.And under what basis did Mayflower try to get removed from the roadside inspection report?
A.In their explanation they wrote the motor carrier was misidentified on this inspection report, period. Moholland Transfer is not an agent of Mayflower Transit. And if they stated they were at the time, that it was not --- that it was not correct. Attached is the bill of lading that the driver should have shown to the inspecting officer when the operating authority was being identified.
The driver and the equipment were not then and are not now part of our company, nor were they under our authority or dispatch. We ask that you please remove this inspection from our Mayflower safety profile. Thank you.
Q.Were any of the IFTA stickers or cards --- cab cards, or other documentation of the license and

registration provided to the State of Georgia by Mayflower in this attempt to remove their name from the roadside inspection?
A.No.  They omitted that sort of information.
Q.Omitted it?
A.Yes.  And they also tried to suggest that the bill of lading is somehow attached to a DOT Number and it's not.
Q.All right.
And that's the next page in the --- in the document, bill of lading that Mayflower provided to the Georgia Department of Transportation.  Does Mayflower have to be on a bill of lading in order to be a responsible motor carrier for safety?
A.No.  No.
Q.In fact, have you seen a number of bills of lading during the agency period of Moholland and Mayflower Transit where it's clear that Mayflower has Joe Moholland operating as its agent, but Mayflower is not listed on the bill of lading?
A.I've not seen Mayflower listed on any of the bill of ladings involved in this.
Q.And is that normal industry and custom, you can be a motor carrier but not be listed on the bill of lading?

A.There's no requirement that the --- the bill of --- the motor carrier or the DOT Number be listed on a bill of lading. What you have is this place where they identify the delivery driver --- or delivering carrier. And in this case, whoever --- I don't know who Land Pack is.
Q.Yeah.
A.But that's --- that's who was assigned this load to move it.
Q.So the iss --- submission of the bill of lading doesn't really tell you anything about who the motor carrier is?
A.No, it doesn't.
Q.The actual public records to identify the motor carrier are the documents we've identified before in Exhibits 4 and 5 with the IFTA sticker and the IRP apportioned cap card.
Is that right?
A.That is correct, yes.
Q.All right.
We'll offer this packet, the driver examination report, as Exhibit 10, and documents accompanying it.
---
(Whereupon, Plaintiff's Exhibit 10, 6/17/22 Roadside Inspection, was marked for

identification.)

---

ATTORNEY MCDONALD:

Same objection to the emails that I objected to contained in that exhibit. Just preserving.

ATTORNEY LANGLEY:

Okay.

Any other objection to the rest of the exhibit?

Okay.

Hearing none, we'll move forward.

ATTORNEY MCDONALD:

Can you hear me?

ATTORNEY LANGLEY:

Yeah, I can hear you.

ATTORNEY MCDONALD:

Okay.

Yeah, I -- I said --- I said none. I just want to make sure my mic's working.

ATTORNEY LANGLEY:

Okay.

Yeah, I did not hear you say none.

Thank you for --- for making that clear. So the only objection you have to Exhibit 10 is the Mayflower

131391 page.
Is that right?
ATTORNEY MCDONALD:
Yes.
ATTORNEY LANGLEY:
Okay.
And we would say again for the same reasons. The other emails are admissible, notice, statement of the party opponent under 801D2, a business record under 80036 and self-authenticating. And also shows ratification of the extension on the agency agreement.
All right.
ATTORNEY MCDONALD:
Same response as before.
ATTORNEY LANGLEY:
All right.
Thank you.
BY ATTORNEY LANGLEY:
Q.The correspondence continued between Joe Moholland Moving and Mayflower Transportation on July 13th, 2022. Have you seen some --- some documentation of that?
A.Yes.
Q.And this is from a Stephen Bojan, the director of

Risk Management and accident prevention at Unigroup or Mayflower. And it says to Rob Garr, the president of Joe Moholland --- and this is July 13th, now 12 days after the wreck, I would greatly --- Rob, I would greatly appreciate your sending pictures of a corporation equipment without Unigroup decals or plates from your Hampton yard as requested. I know there's a lot going on and understand the delay. Please let us know if we can be of any assistance with your efforts.

And Rob says yes, I'll send you photos from the Hampton Yard tomorrow a.m. as well as additional photos from the Woodbridge yard.

First of all, I guess what --- what do you see as the purpose that Steve Bojan, the director of risk management, is seeking here pictures without Unigroup decals or plates?

ATTORNEY MCDONALD:

Object to the form. It asks for the witness to speculate as to the mindset of another individual.

BY ATTORNEY LANGLEY:

Q.All right.

I'll ask it another way. Is it industry custom to try to cover up your involvement in a collision after

the wreck?
A.It's not ---.
ATTORNEY MCDONALD:
Object to the form as to the --- try to --- the use of the language try to cover up, that's not proper line of questioning. It's argumentative. It's frankly disrespectful. Unnecessary under the circumstances.
ATTORNEY LANGLEY:
All right.
Objection's noted for the record.
BY ATTORNEY LANGLEY:
Q.You can answer the question. Is it industry custom to cover --- to make attempts to cover up involvement in a collision after the fact?
A.No, it is not.
Q.Is it a violation of the Federal Motor Carrier Safety regulations to try to find ways to make it appear that you were not the motor carrier involved in the collision?
A.They don't say it specifically, but there is a section of the Federal Motor Carrier Law that says motor carriers cannot falsify documents or allow others to falsify documents on their behalf.
Q.And have you seen pictures from the Joe Moholland

yard showing Mayflower identified trailers and trucks long after July 1st, 2022 and long after July 13th, 2022?

A.Yes.

Q.So would --- would this request be for selective pictures of just some equipment without Unigroup decals and plates from the Hampton yard?

ATTORNEY MCDONALD:

Again, object to the form. This is going for speculation as to what Steve Bojan said when he typed this email almost four years ago. The witness did not testify that he interviewed Mr. Bojan. He didn't testify that he knows anything about the background of these emails.

I've tried to be very polite and allow this discovery deposition to move forward --- or not --- this trial deposition to move forward and to allow Plaintiff to continue their line of questioning. They are injecting absolutely unproven and unsupported allegations of a cover up and dishonesty that is nowhere else in the record and frankly is approaching the limits of good conscious and borderline sanctionability. This needs to be either amended, cured or stopped.

BY ATTORNEY LANGLEY:

Q.All right.
Question stands, if you can remember it.
A.I'd like to hear it again if I could.
Q.I'll repeat it. Would it be proper under the Federal Motor Carrier Safety regulations or industry --- or any industry custom or standard to send selective pictures showing some trucks not bearing a motor carrier's name when there are other trucks that do bear a motor carrier's name at the same time?
A.There's no reasoning for it. As I said earlier on, this whole process is something that they have protocols. Mayflower has protocols to do this with agents that they wish to separate from. This can be done in a matter of days.
It should not have taken the weeks and months that it took. As I said before --- I'm repeating myself. It takes minutes to take a license plate off of a truck. It takes a minute to gather the cab card out of the cab. You put them together in a UPS package, you send them back to Mayflower. It takes literally days. This could --- this could have been wrapped up in a couple days. Not the length of time that it's --- that it's stretched out and there's no rhyme or reason that I can understand as someone that's had to do this.

I've had to make sure that my owner operators that left me had their trucks scraped is what we call it. It doesn't take this long to do this. I --- I don't understand that part.
Q.Is that an indication that this agency agreement remained in place as of July 13th, 2022, the fact that it wasn't done during the time period when Mayflower alleges the agreement was terminated?
A.Yes. Yes.
Q.All right.
We'll offer this email as Plaintiff's Exhibit 11.
---
(Whereupon, Plaintiff's Exhibit 11, 7/13/22 Correspondence, was marked for identification.)
---
ATTORNEY MCDONALD:
I have no objection to this email.
However, my objection to that prior line of questioning and the salacious and unsupported facts assumed in that line of questioning, as well as the questioning where speculation is maintained.
BY ATTORNEY LANGLEY:
Q.Have you --- I know you mentioned before that you have reviewed some testimony of Rob Garr and you were asked by Counsel in the discovery deposition in this

case about review of the Joe Moholland corporate representative testimony which was with Rob Garr. Is that right?
A.Okay.
Yes.
Q.Okay.
Did Rob Garr have an incentive to testify favorably to --- to Mayflower in this case?
ATTORNEY MCDONALD:
Object to --- object to the form of the question as to speculation and --- just to speculation as to what Rob Garr's motivations were when he was testifying.
ATTORNEY LANGLEY:
Credibility of witnesses is always important in a case. And if that's what this line of questioning is offered for, you previously asked about the weight of Rob Garr's testimony and whether that was considered by the expert in forming his opinions. So that's the purpose of this line of questioning.
ATTORNEY MCDONALD:
Okay.
I will just --- I'll just maintain on the record that there are perhaps more efficient ways to question the credibility of Rob Garr than backdoor

testimony from this expert.
BY ATTORNEY LANGLEY:
Q.Did Rob Garr have an incentive to testify favorably to Mayflower?
A.Per this letter, absolutely. After the weeks and months of this issue with the base plates being --- not being returned and --- and Moholland begging and requesting for an extension after extension, ten days after the --- after the crash, Mr. Mark Polanski (phonetic), Senior counsel, director of corporate litigation for Unigroup, sent a demand letter that Moholland immediately cease and desist using any and all Unigroup intellectual property, signage, marks, license plates are references to United operating authority.
In the course of my handling this aspect for motor carriers, you do that at the time you are separating from them. And again, this should have been wrapped up in a week --- a couple days, a week, not the weeks and months that this has been dragged out.
Q.And you read the first part of that last paragraph about the removal of the signage and plates. And this is ten days after the wreck.
Right?
A.Yes.

Q.Have you ever seen any letter before from anybody at Mayflower demanding that they cease and desist using the plates or making any reference to Unigroup or Mayflower authority?
A.No. And the rest is paragraph --- if I failed to read it.
Q.Well, and before you do that, in fact, there was a reference to consulting with legal that you reviewed in forming your opinions in this case, that the management team and consult with legal allowed an extension by Mayflower to Joe Moholland of the use of the plates, the IFTA sticker and the IRP cab card up through to and through July 1st, 2022, the date of the collision.
A.Correct. Yes.
Q.Okay.
And so the second part of this paragraph that you were --- you're going to read, if you'll please read that into the record.
A.Number two --- so let me start at the beginning of that. The purpose of this letter is to, number one, I've read that part. But number two, to put you on notice that United and Unigroup will seek recourse from Moholland in the event any demand, claim, lawsuit, penalty --- or penalty of any kind is made

against United or Unigroup or any subsidiary as a result of the July 1st, 2022 crash.
Q.And who's that signed by?
A.Mark Polanski, Senior Counsel Director of Corporate Litigation for Unigroup.
Q.And who is it addressed to?
A.Mr. Rob Garr, president of Moholland Moving.
Q.We'll offer this into evidence as Plaintiff's Exhibit 12.

---

(Whereupon, Plaintiff's Exhibit 12, 7/11/22 Letter, was marked for identification.)

---

BY ATTORNEY LANGLEY:
Q.Does this form the basis of your opinion earlier that Rob Garr had an incentive to testify favorably to Mayflower and his credibility should be questioned?
A.Yes.
Q.All right.
You mentioned earlier that you reviewed certain lease agreements between Mayflower Transit and Joe Moholland Moving.
Is that right?
A.Yes.
Q.I want you to go back for a minute to Exhibit 5.

And that's the IRP cab card that was issued by the Missouri Department of Transportation. Does it list the lease arrangement between Joe Moholland and Mayflower Transit, how the lease arrangement was represented to the Missouri Department of Transportation?
A.It identifies Joe Moholland Moving as the lessee/leassor.
Q.All right.
And have you seen lease documentation and a statement of lease certification that it relates to that arrangement between Joe Moholland Moving --- the lease arrangement between Joe Moholland Moving and Mayflower Transit?
A.Yes. This is an internal document. It's not something that was issued by state agency or federal agency. Mayflower Transit is identifying themselves as the lessor and is operating the vehicle pursuant to a lease agreement with Joe Moholland.
Q.All right.
Is there such a term under the law or the industry as a leassor?
A.Not that I've used, no.
Q.And in any event, does the lease describe Mayflower Transit as the motor carrier in this lease

agreement?
A.It does.
Q.And is that explicit in this document signed by Nicole Crumb, Nikki Crumb, who we've talked about?
A.It reads, Mayflower Transit operates pursuant to registration with the Department of Transportation Number 125563, which is the DOT Number on the tractor, authorizing transportation as a motor carrier in interstate or foreign commerce over irregular routes between points in the United States, including Alaska, Hawaii and the District of Columbia.
Q.All right.
And which unit number is referenced on the top of the page for the --- the lease agreement and what this lease certification applies to?
A.It's unit number 251-333, which is the --- the tractor involved in the subject crash.
Q.All right.
We'll offer that as Plaintiff's Exhibit Number 13.
And if you look at ---. I'm sorry.
---
(Whereupon, Plaintiff's Exhibit 13, Lease Agreement, was marked for identification.)
---
ATTORNEY MCDONALD:

No objection.
ATTORNEY LANGLEY:
Okay.
Thank you.
BY ATTORNEY LANGLEY:
Q.Is there another document --- two-page document reflecting the actual operating lease agreement between Mayflower Transit and Joe Maholland Moving.
A.Yes. This one's dated October 2005.
Q.All right.
And it says Mayflower Transit is the carrier in the case.
Correct?
A.Yes.
Q.And where it says agent, how is it identified?
A.Moholland Transit, LLC.
Q.And if you look on the signature block under agent on page two?
A.It is signed by Michael --- I should know this by now.
Q.It's hard to read the signature. It looks like a Michael. We presume it's Michael --- Michael --- Michael Peters. But in any event, just above that, it's signed by some authority under Agent M333, Joe Moholland Moving.

Correct?
A.That is correct, yes.
Q.All right.
And it lists on page one a Mayflower Transit, LCC, a Missouri limited liability company, as the motor carrier.
A.It does, yes.
Q.And did you review the testimony from the Mayflower Unigroup corporate representative that testified that the entirety of the lease kept in the ordinary course of business between Mayflower and Unigroup and Joe Moholland is these two pages?
A.I did see that, yes. And it led me to wonder. The first page covers paragraphs one and two. The last page, it jumps to paragraph 19 with nothing between 2 and 19.
Q.Did you see the testimony from the Mayflower corporate representative stating that this is the entirety of the lease, and down at the production, it --- Mayflower produced this document as 4389 on page one and 4390 on page two?
Is that right?
A.Yes. Excuse me. Yes.
Q.All right.
We'll offer this into evidence as Plaintiff's

Exhibit 14.

---

(Whereupon, Plaintiff's Exhibit 14, Operating Lease Agreement, was marked for identification.)

---

BY ATTORNEY LANGLEY:

Q.Mr. Rugemer, is it ever permissible for one company to try to operate under another company's motor carrier number, IRP card, IFTA sticker and logo on the truck for a load not related to that motor carrier?

A.No.  No.

Q.Is that a violation of the Federal Motor Carrier Safety rules and specifically number 390.21?

A.It is.  It also would fall under what the feds have categorized in group of carriers called chameleon carriers, ---

Q.All right.

A.--- which try to hide themselves as another carrier.

Q.And that's impermissible?

A.That's correct, yes.

Q.And we've gone through a number of documents that you reviewed in compiling your reports showing that even if you accept Mayflower's allegations in this

case as true, that they terminated the agreement with Joe Moholland prior to July 1st, would it still be a violation of the aiding and abetting section of the Federal Motor Carrier Safety Regulations if Mayflower knowingly permitted Joe Moholland to operate its truck for a different load, but with the same IRP stickers, the same IFTA stickers, the same registration that we've seen before?
A.I believe so, yes.
Q.Does that form part of your opinions in this case that Mayflower aided and abetted --- at a minimum, even accepting what Mayflower says is true, they aided and abetted the violation of the Federal Motor Carrier Safety Regulations by Joe Moholland?
A.Yes.
Q.We'll take a short break.
VIDEOGRAPHER:
Going off the video record at 12:29 p.m.
OFF VIDEO
---
(WHEREUPON, A SHORT BREAK WAS TAKEN.)
---
ON VIDEO
VIDEOGRAPHER:
Going back on the video record at 12:38

p.m.
BY ATTORNEY LANGLEY:
Q.All the documents that you've seen from the lease to the IRP apportionment cab card, the IFTA stickers, do they all support your opinion that on July 1st, 2022, the tractor operated by Nicholas Burist that caused the death of Kyle Sloan's wife and daughter and serious injuries to Kyle himself was under the exclusive possession and control of Mayflower Transit, LLC?
A.Yes.
Q.And the Title 49, part 376 of the Federal Motor Carrier Safety Regulations, through all those documents make Mayflower Transit/Unigroup, as we've said here in the case, the responsible motor carrier for safety on that day?
A.Yes.
ATTORNEY MCDONALD:
Object to that questioning as improper legal opinion based upon my prior objection at the start.
ATTORNEY LANGLEY:
Okay.
And our --- our position would be that he's been agreed to as an expert on the Federal Motor

Carrier Safety regulations and that specific Federal Motor Carrier Safety Regulation for Lease Operation 370 --- Part 376 was identified for the question and that he gave his opinion on the applicability of Part 376 as the testimony --- specifically Part 376.12 on lease requirements and who constitutes an authorized motor carrier under these circumstances.

BY ATTORNEY LANGLEY:

Q.Have you also seen testimony from Nicholas Burist that at the time of the collision, he and the other occupants of the truck were wearing Mayflower T-shirts?

A.Yes.

Q.Have you seen pictures of those Mayflower T-shirts?

A.I have.

Q.And we don't have a printed copy of this one, so I'll have to show it to you on a computer screen.  But we'll make this Exhibit 15 to the deposition.

A.I can see that.

---

(Whereupon, Plaintiff's Exhibit 15, T-Shirt, was marked for identification.)

---

BY ATTORNEY LANGLEY:

Q.And is that a picture of Mayflower shirt on the front and then Joe Moholland Moving with a Mayflower truck on the back?
A.It is, yes.
Q.Okay.
We'll offer that picture into evidence as Plaintiff's Exhibit 15.
ATTORNEY MCDONALD:
No objection.
ATTORNEY LANGLEY:
I'm sorry?
ATTORNEY MCDONALD:
No objection.
ATTORNEY LANGLEY:
All right.
Thank you. Please answer any questions that Mr. McDonald has for you.

---

EXAMINATION

---

BY ATTORNEY MCDONALD:
Q.Mr. Ruegemer, how are you doing? Are you okay?
A.Doing fine, sir. Thank you.
Q.Okay.
I understand the realities of wound care. I

understand the realities of home health. And so if we need to accommodate that or work around that, just let me know. It's not my goal today to put you at risk or make you experience any unnecessary pain.
A.I appreciate that. I really do.
Q.You've provided two reports thus far in this case.
Correct?
A.Correct.
Q.You provided an October 2024 report.
A.Yes.
Q.Okay.
And you provided an October 2026 report?
A.That's correct.
Q.Okay.
In preparing both reports, you reviewed deposition testimony of individuals and witnesses in this case.
Is that right?
A.I did, yes.
Q.Okay.
And that would include the deposition testimony of Nicholas Burist.
Correct?
A.Yes.
Q.That would include the deposition testimony of Angela Locke on behalf of Locke Relocations?

A.Yes.
Q.And that would include the deposition testimony of Rob Garr, who was corporate deponent for Moholland Transportation.
Is that right?
A.Yes.
Q.Okay.
Now, you are aware that in his testimony, Nicholas first testified that he contracted through Locke Relocations for this load.
Is that right?
A.I am aware, yes.
Q.That he reported to and he received assignments only from Locke Relocations.
A.That's what he testified to, yes.
Q.You're aware that Nicholas Burist testified that he was paid by Mr. Locke?
A.Yes.
Q.Correct?
A.Yes.
Q.You are aware that Nicholas Burist testified that the cab he was driving was assigned to him by Locke.
Correct?
A.Yes.
Q.You're aware that he testified that the subject

load, the load that he was transportat ---
transporting on the day of the collisions was assigned
to him by Locke?
A.Yes.
Q.And you said earlier that you reviewed the
testimony from Locke Relocations as well.
Correct? From Angela Locke?
A.I did, yes.
Q.Okay.
And Angela Locke of Locke Relocations testified
that Locke actually owned the truck involved in this
incident.
Correct?
A.Yes, I'm aware of.
Q.And that they --- and that they provided the truck
to Moholland to ship this load?
A.Yes.
Q.And that Locke assigned the truck to Burist?
A.Yes.
Q.Okay.
You also reviewed the testimony of Rob Garr on
behalf of Joe Moholland.
Is that right?
A.I have, yes.
Q.Okay.

Now, I understand that you don't think Joe Moholland is credible. You're allowed to think what you want to think about people. That's your right as an American. My question is just a simple yes or no as to whether or not you are aware of this testimony from Mr. Moholland.
Okay.
You're aware that Mr. Mo --- that Mr. Garr on behalf of Joe Holland, testified that this load, the load in question today, was a Locke Relocations load operating on behalf of Joe Maholland? That's right?
A.Yes.
Q.Okay.
You're aware that Rob Garr testified that Mayflower was not involved in this shipment at all?
A.That's what he testified to, yes.
Q.Were you aware that at the time of this incident, at least according to Joe Moholland, Mayflower did not even have access to Joe Moholland's Samsara, or electronic tracking program?
A.I'm aware of that. Yes.
Q.You are aware that Joe Moholland testified that Mayflower was not to be paid for this shipment because the offer came from TMM and the shipment was hauled under Moholland's authority? That's right, isn't it?

A.Yes, I'm aware of that.
Q.All right.
That last question, I referenced an entity called TMM. You're aware that TMM stands for Total Military Moves. That's right?
A.Yes.
Q.Okay.
And you would agree with me that based on your review of the evidence, this load in question today was actually booked through Total Military Moves. Is that right?
A.That is correct, yes.
Q.And Total Military Moves, to your knowledge, assigned the load to Joe Moholland?
A.Correct.
Q.You are not aware as we sit here today of any payment from Total Military Moves to Mayflower? Correct?
A.No, I'm not.
Q.You talked a lot on Direct Examination about this temporary agency agreement. Now, you are aware that Joe --- that Rob Garr, on behalf of Joe Moholland, testified that the temporary agency agreement related to, quote, already existing shipments. Is that correct?

A.Yes.
Q.He even went a step further and said that that temporary agency agreement, quote, did not apply to new ones like this.
A.I'm aware of that. Yes.
Q.Specifically, Rob Garr of Joe Moholland testified that Mayflower received no compensation for this load?
A.Correct.
Q.Okay.
Rob Garr of Joe Moholland even testified that he agreed that the decals on the door which had Mayflower's DOT Number should have been removed by Moholland by the date of this collision.
Is that right?
A.Yes.
Q.And finally, just to put a bow on this, Rob Garr testified under oath that Joe Moholland had no relationship with Mayflower as of July 1st, 2022?
A.Well, that's what he testified to, yes.
Q.On Direct Examination, you were asked to identify a series of exhibits. If you give me one moment, I'd like to ask you a couple questions about them now.
A.Okay.
Q.So if you refer to Exhibit 7.
A.Okay.

Q.You identify --- you identified these agency statements from Mayflower Transit regarding Joe Moholland Moving, and you identified these as being a part of how you reached your conclusions.
Is that correct?
A.Yes.
Q.I believe specifically you referred to --- well, now I'm trying to scroll up and find the page. I apologize. I believe you referred to Mayflower 78 and 79, this agency ---. Are you there? Mayflower 78,79 is a part of Exhibit 7.
A.I am, yes.
Q.Okay.
This statement is allegedly an agency statement from Mayflower Transit regarding items with Joe Moholland Moving.
Is that right?
A.Yes.
Q.If you scroll to the second page, there is a series of line items and dates.
Is that right?
A.Yes.
Q.And at line item number 41 dated July 1st, 2022, there's a doc --- there's a statement there, description 7069 Burist, Nicholas/Mike Peters. And it

is for --- it says do HQ 285 --- $280.55. Did I read that correctly?

A.Yes.

Q.Okay.

You testified on Direct Examination that you relied on this agency statement and specifically that specific line item in order to form your opinion regarding an ongoing agency relationship at the time of the collision.

Correct?

A.No, I don't believe I said that I would refer to line 41 as the sole support for my opinions. I did not say that.

Q.And so did you --- well, did you rely on this document, Mayflower 78, 79, at all in forming your opinion?

A.What I have in my report on page five --- I'm sorry, that's the October 2024 report --- is I have a list of --- the list of charges that range from April 28th, 2022, all the way out through September 21st, 2022, where there are payments being made --- agent payments being made up to the day of the crash and after the crash for --- for at least two months.

And my contention is if there was truly a break from Moholland, why are they still paying Moholland's

agent fee? Why did they continue to allow Moholland to use the base plates and the IFTA sticker? It doesn't --- it doesn't make business opportunities operational sense.
Q.Okay.
So you identify these payments and you identify these payments ---. And when I say these payments, I'm now referring to the list of payments you identify on page five of your October 2024 report that you just told me about.
A.Correct.
Q.You identify these payments and you identify that these payments are indicative of what you contend to be an ongoing agency relationship?
A.They're payments for something. And as I said in my report, some of them are coded. And I didn't get the key code for what these are. Yes, there are categories within. 078 and 079, for instance, the line 41 you referred to, description AT7069, I don't know what that is. Or any of those descriptions beginning with A.
Those are codes that are used by Mayflower's accounting. They know what they are. I don't know what they are. So I can't say for certain what some of these other charges were. But it shows activity

between the two long after Mayflower claims that they had parted ways with Moholland.

Q.But --- I appreciate that answer and I really appreciate you providing all that context because that context is necessary to the jury to evaluate this claim. But, you know, you indicated something there and I just want to highlight it right quick. You don't actually know what these payments are for. Correct?

A.That is correct. And I say that in my report. I don't know what they're for, but they're payments nonetheless.

Q.Okay.

But you don't know if they could --- they could have been payments for prior --- for prior moves that were conducted under the temporary agency agreement or moves that were maybe even done year before. You just have no idea.

A.Well, to take those two categories, if they were done a year before, I would --- I can't imagine Mayflower being patient, waiting for payment that's a year overdue. And they're showing weekly payments of this agent fee, the $20,000. I --- I can't imagine that Mayflower --- or Moholland would have stood still and not taken action if they were not receiving that

if they were still a contractor. Or inversely, if they're no longer a contractor, why are they still accepting weekly agent payments? That's what doesn't make sense from a business standpoint or operationally.
Q.Do you know if --- if Moholland was even making those payments?
A.If Moholland was making those payments?
Q.Right.
A.They're in the ledger. I --- I can't imagine why they would be in the ledger if they're not.
Q.Okay.
But what --- what I'm trying to assess and what I'm trying to understand, you have incorporated these agency statements as a part of your report and a part of your conclusions.
Correct?
A.To support my conclusions, yes.
Q.Okay.
But you don't know what these agency statements are for specifically, and you don't know whether or not the money was actually sent or exchanged.
Correct?
A.Correct. And sir, I don't want to argue with you and be disrespectful. My point is, yes, maybe the

next week settlement monies are paid. Typically when you separate from a driver or an owner operator or an agent like this, you --- you make the separation. And the separation wasn't made here.
It would be like if I terminated the driver, but continued to pay them for several weeks afterwards.
Or an owner operator, I continue to cut them a settlement check, even though they don't officially --- you know, I've terminated my agreement with them.
I don't know why they would continue to make any sort of payments through the period of time where they --- they claim --- and they meaning Mayflower claims that the agent agreement was --- was terminated and up --- up to the crash and after the crash.
Q.Give me just one moment here. I think I can answer something for you.
VIDEOGRAPHER:
Counsel, can we go off the record real quick to change the media?
ATTORNEY MCDONALD:
I'm nearly done.
VIDEOGRAPHER:
Okay.
ATTORNEY MCDONALD:
But we can go off record.

VIDEOGRAPHER:
If you're almost done, we can keep going. It's fine.
ATTORNEY LANGLEY::
Why don't we just go ahead and change it because I got some follow up?
VIDEOGRAPHER:
Okay.
Going off the video record at 1:00 P.M.
OFF VIDEO
---
(WHEREUPON, A SHORT BREAK WAS TAKEN.)
---
ON VIDEO
VIDEOGRAPHER:
Going back on the video record at 1:01 p.m.
BY ATTORNEY MCDONALD:
Q.You said --- Mr. Rugemer, you just said that you don't understand why there would have been payments going back and forth regarding --- you don't understand why there would have been payments going back and forth after the expiration of these agency agreements. And that in your opinion, that indicates that there was an ongoing agency relationship.

However, another --- another individual that I don't believe you incorporated into your reporting, an individual by the name of Christopher Wynn, provided deposition testimony on behalf of Mayflower. And Mayflower's testimony was --- and Mr. Wynn's testimony in these circumstances is just very simple. Basically that after Moholland was officially terminated on January 19th, 2022, that there were still shipments in the pipeline. There were still shipments that had been scheduled or ordered, however --- however done so. And that they had to have an agency agreement or temporary agency agreement in order to handle those already ordered terms --- those already ordered shipments.
Do you have any reason to believe that some of the invoicing or ledgers that you've seen might not have had something to do with those orders already in the pipeline?
A.I don't have any information either way.
ATTORNEY MCDONALD:
Mr. Langley, those are all my questions for ---. Let me just ---. In case --- I asked these questions during my discovery deposition, let me ask them now just to confirm them for the record to the extent this needs to be provided to the jury.

BY ATTORNEY MCDONALD:
Q.Mr. Rugemer, you were retained by the Plaintiff's Counsel at some point prior to October 10, 2024. Correct?
A.Yes. I would have to say, looking at the --- the case number we assigned it, it was most likely the first quarter of 2024.
Q.And as you said on Direct Examination, your job with Robson Forensic is mostly to provide what we call litigation services.
Is that right?
A.That is correct, yes.
Q.So you --- you've testified frequently in --- in trucking cases around the country?
A.I have.
Q.And you've testified both in live trial and in deposition?
A.Yes.
Q.Okay.
You maintain a ledger of those depositions or that trial testimony, don't you?
A.We do. And we provide to our clients the standard four-year list. I have provided that to my client.
Q.And you maintain a Curriculum Vitae as well, do you not?

A.I do, yes.
Q.And your Curriculum Vitae list any publications or documents that you've authored, does it not?
A.If I had any. I've not authored anything.
Q.Have you ever given a presentation?
A.I've given presentation to legal groups around the country, both plaintiff and defense, topics such as logbooks, driver hiring, crash avoidance technology, those sort of topics.
Q.And would your CV include a list of that presentation history?
A.It does, yes.
Q.Okay.
You were paid approximately $605 an hour to prepare your October 2024 report.
Correct?
A.Robson bills my time at $605. Looking at the report, knowing --- doing the analysis and finding the proper parts of documents, that report was probably about an hour per.
Q.Well, I'm just looking at it. And my PDF copy is 11 pages.
A.So ---.
Q.Is your copy 11 pages?
A.It is. So I most likely would have billed 10 to

11 hours for that report.
Q.Okay.
Well, just to make it easier for everyone, $605 times 10 is $6,050. So are you --- is it your testimony that you estimate that this report cost you $60,000 --- $6,050?
A.It's what my client paid for it, yes. I'm happy to request all the billing for this case and provide them to my client. I can have that within a day.
ATTORNEY LANGLEY:
Yeah, we're happy to provide that, Stephen. That hadn't been requested before, so ---.
BY ATTORNEY MCDONALD:
Q.Okay.
And then you did a second report. October --- it was dated from October 6, 2026 as well.
A.That is correct.
Q.And your October 6, 2026 report supplements your findings in your October 2024 report?
A.It does, yes.
Q.Okay.
Finally, those are all my questions. I appreciate putting this witness forward and I appreciate the witness working with us.
A.You're very welcome. Thank you.

ATTORNEY LANGLEY:
All right.
Thank you. Just a short redirect.

---

RE-EXAMINATION

---

BY ATTORNEY LANGLEY:
Q.You were asked some questions about Locke Relocation and this load in question. Have you seen the agreement that was prepared by Unigroup/Mayflower and signed by Joe Moholland and Locke Relocations?
A.I have, yes.
Q.And have you seen where Joe Moholland is identified in that agreement as a motor carrier that transports and stores household goods and Mayflower Transit is identified as the van line and that the operating authority is under, and Locke Relocations is the owner of that truck?
A.Yes.
Q.And does that support your conclusion that the agency agreement covers this transaction where Locke is involved as the owner, Joe Moholland as the transporter, and Mayflower Transit as the motor carrier?
A.It does.

Q.Can there be one --- more than one motor carrier responsible for any particular load under the FMCSR?
A.Not running the same truck. It could be handed off to an entire different motor carrier, which is called interlining, with which is a common practice, but other than that, no.
Q.That's not what happened here?
A.No.
Q.You were asked about some testimony from Nicholas Burist. Did you see where he testified that he was qualified by Mayflower as a driver?
A.Yes.
Q.Did you see where he testified he was previously employed as Mayflower --- a driver?
A.Yes. And some of my parts of my reports show him entered in Mayflower's various computer apps.
Q.Mayflower gave him a rating as a driver prior to this collision?
A.Yes, they did.
Q.And did Mayflower decrease that rating from a four out of five to a three out of five just prior to this collision in the months leading up to it?
A.They did, yes.
Q.Did you see where Nicholas Burist testified that Mayflower never told him he was not a Mayflower driver

anymore prior to this collision?
A.I --- I recall him testifying to that, yes.
Q.Did you see Mr. Burist's testimony that --- where he said that when he was operating a Mayflower load, he was required to wear Mayflower shirts as well as the other occupants of the vehicle?
A.Yes.
Q.Have you seen documents that indicate that Joe Moholland, in fact, continued to have Samsara access after this collision?
A.I'm sorry. Ask me that again, please.
Q.There was a reference to the --- to the testimony of Rob Garr. Have you seen some documents that indicate communication with Samsara and access to the Samsara database after this collision by Joe Moholland?
A.Yes.
Q.And assuming everything that Rob Garr said is true about the load being booked by TMM and allocated or assigned to Joe Moholland Moving, was it still a violation of the Federal Motor Carrier Safety regulations for Joe Moholland to operate under Mayflower's registration, license plate, IFTA stickers and DOT Number?
A.It was. Yes.

Q.So this is not just some simple matter of scraping the DOT Number off the door and putting another one on. There was no way for that truck to be on the road on July 1st, 2022, but for Mayflower allowing the use of its license, registration, IFTA sticker and cab card?

A.That is correct. The license plate on the truck was Mayflower. The IFTA sticker on the truck was Mayflower. There's --- there's --- in my world, it's --- it's as clear as it gets who's controlling the truck.

Q.And the vehicle was actually qualified --- this equipment was qualified by Mayflower. You've seen that in the documents as well.

A.Yes.

Q.And the emails we went over after this collision where Mayflower says to Joe Moholland, if you do not get us certain plates and other documentation for this June 17th roadside inspection, we will have to unqualify the equipment.

A.Yep. I did see that, yes.

ATTORNEY MCDONALD:

Objection. We're now ---. Objection. We're now outside the scope of Cross Examination. At no point in my Cross Examination did I get into the

plates or emails regarding same
ATTORNEY LANGLEY:
Well, you --- you asked him about the existence of the agency agreement and whether or not Nicholas Burist had testified about certain parts of the agency agreement, Samsara access. And this is along those lines of access to the plates and the dates of the use of those plates.
So I don't think it's beyond the scope of your Cross.
BY ATTORNEY LANGLEY:
Q.So I'll ask the question again. Was there correspondence between Mayflower on July 5th and Joe Moholland that says if you do not get us certain documentations, we will unqualify the equipment that --- the tractor that was involved in this collision that killed Kyle Sloan's wife and daughter?
A.Yes, I've seen that.
Q.Does that communication refute what Rob Garr said?
A.It does.
Q.But even accepting what Rob Garr said as true and even accepting Mayflower's argument that the agency agreement terminated on April 28th, have you seen documents showing that Mayflower knowingly allowed the use of its IRP card, its IFTA sticker, its plate and

its decals up to and including July 1st, 2022, the date of this collision?
A.Yes. It's the entire discussion contained ---.
ATTORNEY MCDONALD:
Same objection. Cumulative and outside the scope of Cross Examination. This is just a resuscitation of their Direct. All of this material was covered in the Direct. And I didn't cross examine about any of the items in that question.
ATTORNEY LANGLEY:
I wrote this down specifically based on what you asked about Rob Garr and the deposition testimony that you cited from. So I think it's clearly within the scope of the Cross.
BY ATTORNEY LANGLEY:
Q.And so even accepting everything that Mayflower argued through Mr. McDonald there in its Cross Examination, would it still be a violation of the FMCSR for the load as it was described by Rob Garr and Mayflower here in this case?
A.Yes.
Q.And if Mayflower had not permitted the use of its license and registration on July 1st, would this truck have ever been legally on the road?
A.No. No.

Q.There were some questions about orders in the pipeline and whether these agency statements reflected payments that orders that --- for orders that may have been in the pipeline. Have you seen these agency statements go on for not just weeks --- days and weeks, but many months after July 1st, 2022?
A.Yes. Payments of all sorts that I haven't been able to identify from the coding.
Q.And if there were orders in the pipeline, as were discussed earlier, that were related to Mayflower, based on the commencement language in the agency agreement, would those still be covered by the relationship --- the agency relationship between Mayflower and Moholland?
A.Yes. And if I may add ---.
ATTORNEY MCDONALD:
Same objection as it calls for legal conclusion. Same objection as before I started my testimony, just flagging this particular question.
THE WITNESS:
If --- very few people that work outside of trucking understand some of these concepts and it's often part of my job to explain them in terms that ordinary people know, whether it's attorneys, judges or juries. I would equate this to would you continue

to make car payments on a car that you've sold? Would you continue to make insurance payments on a car that you sold? No. Would you let someone --- would you sell your car with your plates and your registration and allow them to continue to drive that car? No. That's what happened here.

The --- had Mayflower simply did what they knew they needed to do, which is to capture those plates, capture the documentation, then the truck is grounded. That's the term we use. The truck is grounded. It cannot go anywhere because it does not have legal plates.

BY ATTORNEY LANGLEY:

Q.All right.

And if this truck had been grounded appropriately under the Federal Motor Carrier Safety regulations, we're never here. Kyle Sloan's family is not taken from him on the way home from vacation on July 1st, 2022?

A.That's my opinion, yes.

ATTORNEY LANGLEY:

No further questions.

ATTORNEY MCDONALD:

No Recross is necessary.

VIDEOGRAPHER:

All right.
This concludes the trial video deposition of Brooks Rugemer, CDS. The current time is 1:17 p.m.
OFF VIDEO
COURT REPORTER:
Could Attorney McDonald --- can you just let me know if you want a copy of this and give me an email I can send it to?
ATTORNEY MCDONALD:
Yeah.
COURT REPORTER:
If you just want to put it in the chat?
ATTORNEY MCDONALD:
I'm going to put my email address in the chat.
COURT REPORTER:
Perfect. And if anybody else wants a copy that's on, too, just put it in the chat.
VIDEOGRAPHER:
As for the video orders, too, if you need a video order, just let me know.
ATTORNEY SESSIONS:
I need to order a transcript. This is Matt Sessions. I need an electronic copy of the

transcript, of the trial deposition.

COURT REPORTER:

Okay. Can you just put your email in the chat as well.

ATTORNEY MCDONALD:

Mr. Videographer and folks, do you all see my email and my order?

VIDEOGRAPHER:

I'm sorry, can you say that again?

ATTORNEY MCDONALD:

Do you see where I placed my email and my order as well?

VIDEOGRAPHER:

Yeah.

* * * * * * * *

VIDEOTAPED DEPOSITION CONCLUDED AT 1:17 P.M.

* * * * * * * *

COMMONWEALTH OF PENNSYLVANIA )
COUNTY OF DAUPHIN )

CERTIFICATE

I, Derek Richmond, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify: That the witness, Brooks Rugemer, CDS, whose testimony appears in the foregoing deposition, was duly sworn by me on October 14, 2026 and that the transcribed deposition of said witness is a true record of the testimony given by said witness; That the proceeding is herein recorded fully and accurately; That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

Dated the 19 day of October, 2026

Derek Richmond,
Court Reporter