IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION
* * * * * * * *

KYLE SLOAN, Individually; and*
as Personal Representative of*
the Estates of Rylie Sloan *
and Jamie Sloan; KYLE SLOAN *
as Surviving Spouse of Jamie *
Sloan; KYLE SLOAN as *
Surviving Parent of Rylie *
Sloan, *
Plaintiffs * Case No.
vs. * 2:22-cv-00076-LGW
NICHOLAS BURISH; LOCKE *
RELOCATIONS LLC; NATIONAL *
INDEMNITY COMPANY; MAYFLOWER *
TRANSIT LLC; JOE MOHALLAND, *
INC.; WESCO INSURANCE *

VIDEOTAPED DEPOSITION OF
BROOKS RUGEMER, CDS
October 14, 2026

Any reproduction of this transcript is prohibited without authorization by the certifying agency.



COMPANY; AND XYZ COMPANIES *
1-3, *
Defendants *
* * * * * * * *



VIDEOTAPED DEPOSITION
OF

BROOKS RUGEMER, CDS, taken on behalf of the Defendant herein, pursuant to the Rules of Civil Procedure, taken before me, the undersigned, Derek Richmond, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at 2108 Ebbvale Road, Manchester, Maryland, on Wednesday, October 14, 2026 beginning at 9:13 a.m.



A P P E A R A N C E S

T. RYAN LANGLEY, ESQUIRE
MATT FOSS, ESQUIRE
Langley Law Firm
229 Magnolia Street
Spartanburg, SC 29306
COUNSEL FOR PLAINTIFF

STEPHEN MCDONALD, ESQUIRE
Lewis Brisbois
600 Peachtree Street NE, Suite 4700
Atlanta, GA 30308
COUNSEL FOR DEFENDANT/MAYFLOWER TRANSIT LLC
(via Virtual)

JIM ELLIOTT, ESQUIRE
Elliott Blackburn, PC
3016 North Patterson Street
Valdosta, GA 31602
COUNSEL FOR DEFENDANT/LOCKE RELOCATIONS LLC
(via Virtual)

Page 5

A P P E A R A N C E S

MATTHEW SESSIONS, ESQUIRE
McMickle, Kurey & Branch, LLP
217 Roswell Street, Suite 200
Alpharetta, GA 30009
COUNSEL FOR DEFENDANT/JOE MOHOLLAND, INC.
(via Virtual)

HILLIARD BURTON, ESQUIRE
Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
COUNSEL FOR DEFENDANT/ NICHOLAS BURIST
(via Virtual)

Page 6

I N D E X


| | |
|---|---|
| DISCUSSION AMONG PARTIES | 9 - 19 |
| WITNESS: BROOKS RUGEMER, CDS | |
| EXAMINATION | |
| By Attorney McDonald | 19 – 58 |
| EXAMINATION | |
| By Attorney Langley | 58 - 64 |
| CERTIFICATE | 65 |


Page 7

EXHIBIT PAGE

| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| | NONE OFFERED | |

Page 8

OBJECTION PAGE

| ATTORNEY | PAGE |
|---|---|
| Langley | 29, 40, 41, 43, 45, 46, 48, 52, 52, 53, 57 |
| McDonald | 60, 63 |

Page 9

S T I P U L A T I O N

-----------------------------------------------------

(It is hereby stipulated and agreed by and between counsel for the respective parties that reading, signing, sealing, certification and filing are waived.)

-----------------------------------------------------

P R O C E E D I N G S

-----------------------------------------------------

VIDEOGRAPHER:
We are now on the video record. My name is Chad Noel. I'm a videographer present on behalf of Esquire Deposition Solutions. The date today is October 14, 2026, and the current time is 9:13 a.m. This deposition is being taken at 2108 Ebb Vale Road, Manchester, Maryland, 21102. The caption of the case is the United States District Court, Sloan versus Burist, et al., Case Number 2:22-cv-00076-LGW. The name of the witness is Brooks Rugemer, CDS. Will the attorneys present state their names and the parties they represent?
ATTORNEY LANGLEY:
Ryan Langley and Matt Foss on behalf of Kyle Sloan.

Page 10

ATTORNEY SESSIONS:
Matt Sessions on behalf of Defendant Joe Moholland.
ATTORNEY ELLIOTT:
Jim Elliott for Defendant, Locke Relocations.
ATTORNEY BURTON:
Hilliard Burton for Nicholas Burist.
ATTORNEY MCDONALD:
Stephen McDonald counsel for Mayflower.
VIDEOGRAPHER:
All right.
And at this time, the court reporter may now swear in the witness and we can proceed.
COURT REPORTER:
Sir, if you'll just raise your right hand.

---

BROOKS RUGEMER, CDS,

CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS FOLLOWS:

---

COURT REPORTER:
Thank you.

Page 11

ATTORNEY LANGLEY:
All right.
Thank you.
ATTORNEY MCDONALD:
I'm entitled to a brief discovery deposition before this begins.
ATTORNEY LANGLEY:
But it wasn't noticed.
ATTORNEY MCDONALD:
I thought we were operating under that agreement or assumption based on the supplemental report that was sent over on October 6th.
ATTORNEY LANGLEY:
Say that again. On what --- you sent what on October 6th?
ATTORNEY MCDONALD:
You all sent the supplemental report on October 6th. And that's how we've done it on all these other ones. So I just assumed that's what we were doing here, moving forward, that the Defense would get a brief decision discovery deposition based on the supplemental report.
ATTORNEY LANGLEY:
Okay.
What do you have in mind? How brief?

Page 12

ATTORNEY MCDONALD:
Within an hour.
ATTORNEY LANGLEY:
Say that again. You broke up.
ATTORNEY MCDONALD:
Not more than an hour. I mean, I'm not planning --- I'm not planning on doing one of my mega depositions that we took for some of the medical folks.
ATTORNEY LANGLEY:
Okay.
ATTORNEY MCDONALD:
But you know ---.
ATTORNEY LANGLEY:
Well, let's go off the record for a minute.
VIDEOGRAPHER:
Going off the video record at 9:15 a.m.
OFF VIDEO
ATTORNEY LANGLEY:
We'll stay on this --- the court reporter record, but just no reason to have video of this. The deposition wasn't noticed, Stephen. And I'm not aware of any agreement that there would be a discovery deposition prior to a de bene esse

Page 13

deposition. We're here, ready to go.
Mr. Rugemer is in a wheelchair with a limb preservation protocol. I'm looking at his leg up on the side of a wheelchair. We're in his home. The longer we are here, the more he is exposed to bacteria from all of us.
It's really surprising to me to hear about this deposition, this discovery deposition. So I'm going to need a minute to confer with Matt and Charlie about how to respond. So if there's any document that you can provide that shows an agreement to conduct a discovery deposition for this or any other de bene esse witness, if you could send that to matt@lsslawfirm.com, I'd be happy to review it, but otherwise, we'll take a couple minutes here and I'll chat with Charlie and Matt.
ATTORNEY MCDONALD:
I understand. Just let me know.
ATTORNEY LANGLEY:
Okay.
Thank you.
VIDEOGRAPHER:
Going off record at 9:17.
---
(WHEREUPON, A SHORT BREAK WAS TAKEN.)

Page 14

---
VIDEOGRAPHER:
Back on record 9:20 a.m.
ATTORNEY LANGLEY:
Stephen.
VIDEOGRAPHER:
Oh, sorry. Go ahead now. He can hear us now.
ATTORNEY LANGLEY:
Stephen, we're ready for you.
ATTORNEY MCDONALD:
I'm here.
ATTORNEY LANGLEY:
Okay.
We've discussed it. And while there is no notice of the deposition, formal or even verbal, as an accommodation, because the report was just produced, we will allow a discovery deposition. But we do need it to be short, as I said before, both for our purposes and Mr. Rugemer's help.
So as long as it's going to be under an hour and short and direct, then we can agree to that as an accommodation to you.
ATTORNEY MCDONALD:
I appreciate it. Thank you so much.

Page 15

ATTORNEY LANGLEY:
You're welcome. So we will not video that. But it --- because the --- our plan would not be to video that because the court reporter is not here for a discovery deposition, but we have --- the video court reporter. But at --- the stenographic court reporter is going to obviously record it for normal deposition purposes. Is that what your intent is?
ATTORNEY MCDONALD:
It's fine. But if the videographer is there, can she video it? I mean, we'll pay for it if we're going to make it our ---.
ATTORNEY LANGLEY:
Okay.
It's a he, but he is here. Yeah, I guess just do whatever you need to do with him on the record since there hasn't been any communication with him to this point. So he can be secure getting that to you and all that.
ATTORNEY MCDONALD:
Mr. Videographer, do you need my --- will you --- will you send me your email or put your email in the chat and I can communicate with you for the video transcript?

Page 16

VIDEOGRAPHER:
Yeah. So it'll all be done through Esquire. I don't work directly with Esquire. I'm just here on behalf of them. But I can give you an Esquire email to be able to order the video.
ATTORNEY MCDONALD:
Okay.
Great.
VIDEOGRAPHER:
I'll have to look into that because I'm not sure what that is at the moment, but when we go on a break, I can give you that.
ATTORNEY MCDONALD:
Okay.
Great. Thank you so much.
VIDEOGRAPHER:
So do we just want to like start over, I guess?
ATTORNEY LANGLEY:
Yeah, let's start over. So you can properly say, because I think you said before, it's a trial deposition. So this will be just a discovery deposition and they'll be different protocol for who's conducting it and who's responding.
VIDEOGRAPHER:

Okay.
So is he keeping what he said already on
the record?
ATTORNEY LANGLEY:
Yes.
VIDEOGRAPHER:
Okay. Okay. All right.
And this is for the discovery
deposition.
Correct?
ATTORNEY LANGLEY:
Yes.
ON VIDEO
VIDEOGRAPHER:
All right.
We are now on the video record. My name
is Chad Noel. I'm a videographer present on behalf of
Esquire Deposition Solutions. The date today is
October 14th, 2026 and the current time is 9:24 a.m.
This deposition --- this discovery deposition is being
taken at 21O8 Ebbvale Road, Manchester, Maryland,
21102.
The caption of this case is United
States District Court Sloan versus Burist, et al.,
Case Number 2:22-cv-00076-LGW. The name of the



witnesses, Brooks Rugemer, CDS. Will the attorneys
present state their names and the parties they
represent?
ATTORNEY LANGLEY:
Ryan Langley and Matt Foss on behalf of
Kyle Sloan.
ATTORNEY SESSIONS:
Matthew Sessions on behalf of Defendant
Joe Mohalland.
ATTORNEY ELLIOTT:
Jim Elliott for Defendant Locke
Relocations.
ATTORNEY BURTON:
Hilliard Burton for Nicholas Burist.
ATTORNEY MCDONALD:
Stephen McDonald for Defendant
Mayflower.
VIDEOGRAPHER:
All right.
And at this time the court reporter may
now swear in the witness and we can proceed.
COURT REPORTER:
Just raise your right hand.
---
BROOKS RUGEMER, CDS,



CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
FOLLOWS:
---
EXAMINATION
---
BY ATTORNEY MCDONALD:
Q.Mr. Rugemer, how you doing this morning?
A.I'm fine. Good morning, everyone.
Q.Good morning. My name is Stephen McDonald. I'm
attorney for Mayflower in this case. I understand you
prepared some expert reports.
A.Yes, sir.
Q.Okay.
Can you just briefly explain what you do for a
living?
A.I'm a commercial trucking specialist with Robson
Forensic. That's R-O-B-S-O-N. I run the trucking and
warehousing practice group for Robson.
Q.Explain what Robson Forensic is.
A.We are a forensic engineering firm. We have work
groups in all matters of industry, different business
sectors. We have a medical group. We have a
construction group.
A.We are hired to analyze a crash or an occurrence



and come up with opinions.
Q.Robson Forensic --- is Robson Forensic mostly in
litigation services?
A.Yes.
Q.Okay.
Have you ever testified in a case before?
A.I have.
Q.Okay.
Have you ever testified via deposition?
A.I have, yes.
Q.Have you ever testified in live trial?
A.I have.
Q.Have any of those depositions or live trials been
in the last five years?
A.Yes.
Q.Do you maintain an exhibit --- or do you maintain
a --- a testimonial history?
A.I do, yes.
Q.Okay.
So Robson Forensic is not currently a part of the
trucking industry.
Is that right?
A.They are not. They are a forensic engineering
firm.
Q.When did you start working for Robson?

Page 21

A.In 2005.
Q.Prior to working for Robson, where did you work?
A.I worked in the trucking sector. I worked for several major motor carriers around the country.
Q.What was the most recent motor carrier you worked for?
A.So to clear up something on my CV, I came to Robson in 2005. I went part time in 2006 and took a contract position with Performance Food Group. They're a nationwide food distributor. I was their safety compliance manager for a year and a half under contract.
When that contract was over, I went back to Robson. So Performance, Food Group prior to them was Gainey Transportation. Hahn Transportation, which is a local tanker chemical transport company. I work for Consolidated Freightways, a major LTL carrier from '99 to 2001.
For a short time I had my own business doing driver recruiting, safety training and compliance. That business was Maryland Safety Services. Prior to that, I worked for JB Hunt Transport. And my first job outside of my driving career was with Eagle Carrier from 1994 through 1996.
Q.Okay.

Page 22

So since 2005 your only work actually in the trucking industry was a part time --- was a part time role?
A.It was a full time role. Robson hired me and weren't --- they weren't quite sure how to market me and build a trucking practice. At the same time I was headhunted by a group looking to fill a position with a major food distributor that has a distribution center near my home. So I took that, I maintained a relationship with Robson as a part time employee to work on the cases that I did have. And then once that contract was over with Performance Food Group, I went direct --- back to Robson full time.
Q.You mentioned a issue on --- you mentioned clear up --- no, strike that.
You mentioned some --- quote, clearing up some confusion on your CV. Are you looking at your CV now?
A.I am.
Q.Okay.
So you maintain a CV?
A.I do. Robson does.
Q.Okay, okay.
So you were paid for your time in preparing this report.
Is that correct?

Page 23

A.I'm a full time salaried employee of Robson.
Q.So was Robson paid for your time in preparing this report?
A.Yes.
Q.Okay.
And those payment records, they're maintained somewhere.
Correct?
A.We have --- we have an accounting department that maintains the billing records. Yes.
Q.I'm assuming you have a commercial driver's license?
A.I did until last year. Due to my medical condition with my knee, my DOT physical was --- was due and I didn't feel I could pass it, so I downgraded my license for now.
Q.Okay.
You prepared your first report in October 11th --- strike that.
You prepared your first report for this case back in 2024.
Is that correct?
A.Yes.
Q.Okay.
And how did you get in contact with the attorneys

Page 24

for the Plaintiffs?
A.Most likely they called us. We have a marketing and business development group that does advertising. The call would have came in. It would have gotten routed to me as the practice group leader for trucking and warehousing, and I accepted the case.
Q.Okay.
Do you know about when that would have been?
A.Sitting here, I do not. And I apologize for that. I can certainly provide that information as well as any billing information that you need.
Q.But --- so there are written communications between you and the counsel for the Plaintiffs in this case.
Is that right?
A.There will be an engagement contract and then invoices that were sent out on a regular basis.
Looking at the case number, it looks like we may have been retained in the first half of 2024, maybe the first quarter.
ATTORNEY LANGLEY:
And Stephen, we --- we would permit the production of the communication only within the limits of Rule 26.
BY ATTORNEY MCDONALD:

Q.So you can confirm with me that those written communications exist?
A.Yes. There is an engagement contract and there are billing invoices that have gone out.
Q.Are there any emails or text messages or any other forms of written communication between you and anyone who worked --- who's working on behalf of the Plaintiff or Plaintiff's Counsel?
ATTORNEY LANGLEY:
I think all those communications would --- would not be discoverable under Rule 26 as that's communication between counsel and expert. But I'm not going to tell him not to answer the question.
THE WITNESS:
Well, Robson has a 30-day email retention policy, so the only thing I would have would be in the last 30 days, which I believe there was a link sent for the materials and just some back and forth trying to schedule this --- this deposition today and the logistics bond.
BY ATTORNEY MCDONALD:
Q.Okay.
As we sit here today, do you know how much the Hodge Law Firm or any other Plaintiffs or any other attorneys for the Plaintiffs have compensated Robson


Forensic?
A.I do not, but I --- I can get that.
Q.Go ahead and get that for me, if you can.
A.Of course.
Q.Mr. Rugemer, I don't believe you have ever been deposed in this case.
Is that accurate?
A.I have not.
Q.Okay.
Do you have your October 2024 expert report in front of you?
A.I do.
Q.Okay.
Ho many pages is the report in front of you?
A.How many pages?
Q.Uh-huh.
A.Eleven (11).
Q.Okay.
Can you tell me what materials you reviewed to prepare this October 11th report?
A.I reviewed documents. The lease agreements, some email communications between Mayflower and Moholland. The registration for the tractor, the IFTA sticker. Photos. Post crash photos. The deposition of Christopher Wynn. The Mayflower 30(b)(6) designation.


The agency agreement. Excerpts from the Locke deposition --- I'm sorry, the Locke 30(b)(6) deposition. Exhibit 12 from Jason Jones, Senior VP at Mayflower regarding monies that were paid. Some screenshots of Mayflower's computer system. That's on page six. Looks like an AS400 computer system, mainframe system. Emails from Garr with Mayflower --- I'm sorry, with Moholland. Some information about Tailored Move which purchased or somehow merged with Moholland. Some more screen prints of computer printouts from Mayflower. A booking confirmation sheet. And some other exhibits from Mayflower. More --- more computer information from Mayflower.
Q.Okay.
You said that you received excerpts from the Locke depo. Did I hear you correctly?
A.I used excerpts from the Locke dep. I would have --- I would have reviewed the entire deposition.
Q.When you took this dep --- when you prepared this report, had you --- had you reviewed the Joe Moholland deposition?
A.I don't refer to it. I don't recall when I received it as related to the date of my report.
Q.Can you --- and I don't have enough time here.


The Plaintiff's attorneys have agreed that I can be thorough, perhaps even tedious, in my depositions of Plaintiff's witnesses. But out of respect for your condition aspect, out of respect for your time, if you could, could you just briefly explain to me what your conclusions were in this October 2024 report?
A.I have one finding at the end of the report. I can read it into the record. Information gleaned from Unigroup/Mayflower's own records show that an ongoing business relationship, an agency relationship with Moholland/Burist existed at the time of the subject crash.
Q.Okay. As someone who is not an expert in the trucking and transportation industry, can you explain to me what a business relationship --- can you --- can you explain to me what a business relationship and an agency relationship are in this context?
A.In this context, an agency relationship would be a independently owned and controlled company that would sign a service agreement of some sort with another entity to provide similar services as that entity provides.
Q.And is business relationship something different, or is that just a turn of phrase you use there?
A.It's a --- it's a phrase.

Page 29

Q.Okay.
So functionally, for my understanding of your report, business relationship and agency relationship are the same thing?
ATTORNEY LANGLEY:
Object to the form.
THE WITNESS:
Yes.
BY ATTORNEY MCDONALD:
Q.Okay.
So it's your position in this October 2024 report that Mayflower and Moholland/Burist maintained a business relationship and an agency relationship?
A.Yes.
Q.Okay.
Briefly as you can, can you educate me on how you got to that conclusion? And I understand it's in your report, but it's edifying for me to hear it from you.
A.I reviewed the lease agreement, the agency agreement, various emails between the parties. It's very clear to me that Moholland was still in an active agency relationship with Mayflower at the time.
Q.You say at the time. What do you mean?
A.At the time of the subject crash. I'm sorry.
Q.Your --- have you ever been excluded from

Page 30

testifying in trial?
A.No.
Q.Have any portion of your reports ever been excluded from testifying in trial or for being prevented --- presented in trial?
A.Not that I'm aware of.
Q.Are you a member of any professional organizations?
A.I'm a member of a group called NATMI. That's N-A-T-M-I. It's the North American Transportation Management Institute. They are --- they are a benchmarking group that works within the transportation industry to ensure that people that hold themselves out as a safety manager or safety director have the proper knowledge and skill and experience to perform that job. I'm a certified director of the safety with NATMI.
I'm a Maryland of Maryland Motor Truck Association. I live in Maryland and each state has a trucking association. I'm --- I'm a member of the local motor truck association. That's it for now.
Q.Were you a member of NAT --- excuse me, member of NATMI and the Maryland Trucking Safety Association ---
A.Yep.
Q.--- in October of 2024 when you prepared this

Page 31

report?
A.Yes.
Q.You prepared a second report in this case as well. Correct?
A.I did, yes.
Q.Okay.
And this was the supplemental report that was dated October 6, 2026?
A.Correct.
Q.Okay.
When were you first contacted about that report?
A.I'm not sure. Would have been four to six weeks prior.
Q.Well, today is October 14, 2026. Now you told me earlier that Robson Forensic has a 30 day email retention policy.
A.Yes.
Q.Is that right?
A.Yes.
Q.So it's --- it's understandable that as we sit here today, any emails that would have been sent on --- sent and received on about September 15 and forward would be preserved.
Is that right?
A.They should be, yes.

Page 32

Q.Okay.
Do you have the power to set aside or preserve any written communications between you and Plaintiff's Counsel regarding this supplemental report that are currently in your email inbox?
A.I can. I would go through our IT department to do that, but yes.
Q.I ask that you do that in this case based on the communications I just provided to you.
ATTORNEY LANGLEY:
We would not consent to the production of those documents as our position is they're counsel to expert communications that are not discoverable under Rule 26.
ATTORNEY MCDONALD:
Okay.
I understand that objection. But I'm still going to ask him to set them aside. And you and I can talk about that tomorrow or after this.
Okay?
ATTORNEY LANGLEY:
Okay.
BY ATTORNEY MCDONALD:
Q.Do you have the October 6th report in front of you, 2026?

Page 33

A.I do.
Q.Okay.
I assume that you or Robson Forensic were paid for this report as well?
A.Yes.
Q.Okay.
Can you explain to me your findings or opinions on this supplemental report?
A.I have two findings on this report. Number one, the additional depositions and documents strengthen the opinions in my original report, that an ongoing business relationship and agency relationship with Mayflower/Moholland existed at the time of the collision on July 1st, 2022.
Number two, on July 1, 2022, the tractor Burist was operating carried Mayflower's cab card, Missouri portion plates, the IFTA credentials and Mayflower's DO --- and the D --- and DOT number. Sorry.
Mayflower was listed as the motor carrier responsible for safety with Mayflower's knowledge and under an extended plate return deadline that Mayflower itself had granted.
Q.And how did you come to those supplemental findings in your supplemental report?
A.Page one of the report shows a list of depositions

Page 34

that I reviewed. On page two, I start to break them down by groups. The first group, Group A, Mayflower's credentials were on the tractor. I explain what that means. Along with the DOT number and IFTA and the apportioned cab card. Section B, I discussed where Mayflower knowingly allowed the plates to remain on Moholland's units through July 1st, 2022. Page three, section C, Burist had a DOT inspection where they found defective brakes and tires. The initial violations went on Mayflower as the controller of the truck.
And D, the business relationship continued before and after the collision. Mayflower Bates documents 7146 through 7,176 to show they coordinated with Moholland on a military shipment on or after the subject crash. I show were Mayflower assisted Moholland in booking a load, but using a different carrier. That's Mayflower Bates 120527 through 120562. And that several months after the crash on July 29, 2022, there was a bill sent to Moholland for --- for repair work done on the truck and a DOT inspection.
Q.Can you --- can you repeat that? What --- what --- where was that, the --- this bill you said that was sent for ---?

Page 35

A.Sure. It's Mayflower Bates 070941 and 942, Trans Advantage, which is one of Unigroup subsidiaries, billed Moholland under their agency code M00333 for a November 29, 2022 breakdown repair and DOT inspection.
Q.Do you have any understanding if that last bit, Mayflower 070941, 070942, if that was related to a carve out such as a military move?
A.I don't know. I'm not sure I understand exactly what --- I mean, I saw the term carve out, but it shows that --- it shows me that Mayflower is still using Moholland, that they're still an agreement between the two.
Q.Why does it say that? Why does --- why does a bill show that?
A.If there's no agreement, why is there any billing going back and forth at all is my contention. I've been involved in the hiring of over 5,000 drivers. They've been direct hire drivers. They've been hires for a temp service. I've hired owner operators who my various motor carrier employers have titled either owner operators or contractors. Once we --- once that relationship is over, it's over. There should be no more billing between the two.
That could be rectified within a couple days. It doesn't --- I can't think of a scenario why nearly six

Page 36

months later, five months later, there's still financial transactions going on between the two.
Q.Is it not possible that you could have an agreement that there could be an --- that there could be an agreement between two companies for some type of work and not others?
A.It's possible, yes.
Q.If you go back to your first report, the one that was done October of 2024, I believe that you relied on deposition testimony from Christopher Wynn regarding, quote, Moholland's military approved business.
Is that right?
A.I'm sorry, could you say the last part again.
Q.On your first --- on your October 2024 report, one of the things you rely on is this alleged approval of military related business or military approved business. I'm looking at page two here.
A.Yes. As addressed by Christopher Wynn during his deposition, yes.
Q.Okay.
You indicate that because there was a bill that was sent in November between Trans Advantage and Moholland, that therefore, that means that there was some sort of agency relationship.
A.In my opinion, yes.

Page 37

ATTORNEY MCDONALD:
Okay.
If you guys can give me five minutes, I appreciate it and I'll come back and I think I'm just about done ---
ATTORNEY LANGLEY:
Okay.
ATTORNEY MCDONALD:
--- with my discovery deposition.
ATTORNEY LANGLEY:
Great.
Thank you.
VIDEOGRAPHER:
Going off the video record at 9:58 a.m.
OFF VIDEO
---
(WHEREUPON, A SHORT BREAK WAS TAKEN.)
---
ON VIDEO
VIDEOGRAPHER:
Going back on the video record at 10:05 a.m.
BY ATTORNEY MCDONALD:
Q.Mr. Rugemer, I'm trying to move quickly here. I'd like to direct your attention just briefly to page

Page 38

five of your October 2024 report.
A.Okay.
Q.You list what you claim to be payments from Mayflower to Moholland after termination of agency agreement. Did I read that correctly?
A.Their --- their payments ---.
ATTORNEY LANGLEY:
Where are you reading from, Stephen? I don't see payments. Oh, that's ---.
BY ATTORNEY MCDONALD:
Q.I'm at the October 2024 report, page five, subset --- subheader ---.
ATTORNEY LANGLEY:
Got you.
Okay.
Thank you.
THE WITNESS:
I only hesitated when you --- when you said the --- the termination of the agreement. I contend that it wasn't terminated, but yes, these were payments that were made during that time period.
BY ATTORNEY MCDONALD:
Q.Okay.
But just for --- just for clarity of the record, the title of your subheader, your words is payment

Page 39

from Mayflower to Moholland after termination of agency agreement. I read that correctly?
A.Yes.
Q.Okay.
In that section, you list a series of payments. I'm not going to go through all of them, but it continues on to the next page, page six. Did I read that ---?
Is that correct?
A.Yes, sir.
Q.Okay.
And specifically after this collision, the collision we're here about today, there's, you know, an agent payment. It says agent payment, $20,000 Mayflower 00079. Did I read that correctly? For 7/6/2022?
A.Yes.
Q.Okay.
And then there's a series of those agent payments from 7/11, 7/20, 7/18, 7/22.
Is that right?
A.Yes.
Q.Okay.
And then if you scroll to the next page, page six, there's similar agent payments allegedly made on 8/1,

Page 40

8/15, 9/6 and 9/20 --- 9/21.
Is that correct?
A.Yes.
Q.Okay.
As we sit here today, do you know what those agent payments were?
A.No. I mean, let me --- let me clarify that I understand what an agency payment is. I can't say specifically on these payments.
A.The point I was making is they continued long after the subject crash. If there was not a --- if there's not a service agreement or an agency agreement, I --- I don't understand why payments were still being made.
Q.So you --- but you don't --- is it safe to say that you don't under --- you don't know what those ledger entries represent or don't represent?
ATTORNEY LANGLEY:
Object to the form.
THE WITNESS:
Some of the --- some of them were coded, and I did not have access to Mayflower's coding structure. The --- the ones that I could identify are listed here, so that's a long way of saying, no, I don't know exactly what these payments were for.

Page 41

BY ATTORNEY MCDONALD:
Q.Okay.
Can I direct your attention to page nine of your October 2024 report?
A.Okay.
Q.You have the conclusion or assertion that the load Moholland was transporting was confirmed and booked while the Mayflower/Moholland Agency agreement was still in place.  Did I read that correctly?
A.Yes.
Q.Okay.
Do you know who the load was booked through?
A.I'm aware it was --- I cannot remember their initials.  I'm sorry, I just can't --- I can't recall the name of the outfit they booked it through.  CM --- CMM ---.
Q.Well, it's --- this isn't a pop quiz.  Does Total Military Moves sound familiar?
A.TMM, yes.  I was --- yes.  Thank you.
Q.Okay.
Yeah, it's not.  I mean, it's on there.
Okay.
So you would agree with me that this move was booked --- according to the information in front of you and the information in your report, this move was

Page 42

booked through TMM.
Is that right?
ATTORNEY LANGLEY:
Object to the form.
THE WITNESS:
Yes.
BY ATTORNEY MCDONALD:
Q.Do you know who assigned it from TMM to Moholland?
A.I do not.
Q.Are you aware if TMM is a subsidiary of Mayflower or Unigroup?
A.I don't think they are.
Q.Okay.
You have a lot of communication --- you have a lot in your October 2024 repor --- report about payments that allegedly went between Moholland --- about payments that went between Moholland and Unigroup or Moholland and Mayflower in the summer and, I guess, early fall of 2022.  However, do you have any evidence or any information that money was exchanged between Total Military Moves and Mayflower or Unigroup?
A.I'm sorry.  Ask me that again.  I want to make sure I get it right.
Q.I probably had an unnecessary preamble there.  Do you have any information that money was exchanged

Page 43

between Total Military Moves and Mayflower or Unigroup as it relates to this load?
A.No, I wasn't making that contention.  The contention I was making is Mayflower allowing Moholland to use the tags, the IFTA and their service agreement, which I've not seen evidence that had been --- that it had been terminated.  They gave Moholland the means and the methods to put this truck on the road at the time.
Q.When you say service agreement, are you referring to the temporary agreement that was dated --- that was --- that was dated from October 20, not October --- from April 28, 2022?
ATTORNEY LANGLEY:
Object to the form.
THE WITNESS:
I'd like to see that one if I could, if it's possible.
ATTORNEY LANGLEY:
He's asking to see the document.
THE WITNESS:
Just want to make sure I give you accurate answer.
ATTORNEY MCDONALD:
Well, I think --- Mr. Langley, I think

Page 44

we're talking --- candidly I think me and the witness are talking about the same thing.  I just want to make sure there's not some additional document out there that I'm not aware of.
THE WITNESS:
Sir, with that clarification, I can say looking at the service agreement and the agency agreements, that's how I came to these conclusions.  If that clarifies anything.
BY ATTORNEY MCDONALD:
Q.Okay.
I'm going to show you my screen right quick just to make sure I know what we're talking about.  Mr. Rugemer, can you see my screen here?
A.Due to logistics of being in my kitchen, it's a little strained, but we'll work it out.  Give us --- give us a second, please.
Q.I can zoom in.  Or, Mr. Langley, you can show him.  I'm just showing him Exhibit 1 in the Dropbox that you all sent over today, the agency agreement.
A.Okay.
We have --- we have a printed copy here.  Thank you.
ATTORNEY LANGLEY:
I just handed him my copy.

ATTORNEY MCDONALD:
Okay.
Thanks, you all. Appreciate it.
BY ATTORNEY MCDONALD:
Q.So we've got this agency agreement here. This is the tip --- the document you're looking at, this is the temporary agency agreement. That's between Moholland and Mayflower.
Is that right?
A.Yes.
Q.Okay.
And this document, if you look there, if you look at the third paragraph, you know, it references a prior agency agreement that terminated on or about January 19, 2022.
Is that right?
ATTONREY LANGLEY:
Object to the form.
THE WITNESS:
That's what it says. Yes.
BY ATTORNEY MCDONALD:
Q.All right.
And then if you look at the last paragraph, paragraph seven, it says, the term of this agreement shall begin on January 20, 2022, and will terminate



upon April 28th, 2022. Did I read that correctly?
A.Yes.
Q.Okay.
So you're basing your claim regarding the ongoing agency agreement on July 1st on this document?
ATTORNEY LANGLEY:
Object to the form.
THE WITNESS:
This document supports my opinion that --- that there --- regardless of what they are claiming in this agreement, that they still continue to work together after April 28th, that --- that's --- their communications between the two. There are, again, Mayflower allowing Moholland the use of tags and the IFTA sticker and all that. That's --- this just reinforces my opinion.
Q.You also mentioned a --- you mentioned a service agreement. Did I hear you correctly?
A.I don't believe I referred to a service agreement. If I did, it's just a --- it's just trucking industry terminology or for the agency agreement and --- yeah, just the agency agreement.
Q.That's --- that's --- that's what I was trying to get at. I just heard you state earlier, you described some --- you --- you said there was a service



agreement, and I just --- I think we were talking about the same thing. I just had to make sure there wasn't some additional document out there I wasn't aware of.
A.No, I apologize. That's just a term of art in trucking. It's --- when two companies are working together, it's generally considered a service agreement. Trucking is a service industry.
Q.How long are IFTA stickers valid for?
A.I believe they need to be renewed each year.
Q.So if you renew an IFTA sticker in January of 2026, it's going to be good until January of 2027.
A.Yes.
Q.Okay.
In this case, you based some of your conclusions on the fact that Moholland was driving on Mayflower's IFTA sticker.
Is that right?
A.Yes, amongst other --- other documents. Yes.
Q.Okay.
To your --- and you believe that Mayflower renewed those IFTA stickers during the first half of 2022 when they were still under the agency agreement with Moholland.
Is that right?



A.I don't recall when they were renewed.
Q.Okay.
So despite relying on that assertion in your expert report, you don't actually know when the IFTA stickers were renewed or not? Is that what you're telling me?
ATTORNEY LANGLEY:
Object to the form.
THE WITNESS:
No, I do not. I wasn't questioning whether or not it was valid at the time or expired. Just the fact that it was on Moholland's truck, yet it's registered to Mayflower. The IFTA sticker can't be --- can't be transferred. It can be canceled by the motor carrier, but it can't be transferred to another motor carrier.
BY ATTORNEY MCDONALD:
Q.Tell me briefly about these cab cars. Can you explain to me, as someone who is not an expert in the trucking industry, what a cab car is?
A.A cab card is just the trucking industry term for a registration, a vehicle registration like you may have in your car. It contains similar information to identify the vehicle, identify the owner. With apportioned cab cards like we have here, it also

Page 49

identifies the motor carrier who is the motor carrier responsible for safety.
Q.Okay.
That's --- it's your contention that the cab cards that were in the --- that were in Mr. Burist's tractor trailer on the day of the collision were registered to Mayflower?
A.I don't have the evidence that they were actually in the truck at the time. I'm not doubting it, but yes, the --- the cab card itself shows --- shows Mayflower.
Q.And based on this supplemental report, you state that they were effective April 1st, 2022, through March 31st, 2023.
A.Are we still referring to my October 11th report.
Q.This year. Yeah, supplemental. No, I'm referring to your October 2026 report.
A.Okay.
ATTORNEY LANGLEY:
Hey, Stephen, we're --- we're past an hour now, so need to --- need to wrap it up.
ATTORNEY MCDONALD:
All right.
I'm nearly there.
ATTORNEY LANGLEY:

Page 50

All right.
To try to help expedite things, are you okay if I show him the IFTA sticker?
ATTORNEY MCDONALD:
Sure. Yeah, I mean, I'm just on page two of his supplemental report.
ATTORNEY LANGLEY:
But you're asking him about a document and dates, so I thought it might help to show them the document.
THE WITNESS:
Okay.
Sir, I'm on page two, and I do have a copy of the --- the paper certification behind the sticker. Behind the IFTA sticker.
BY ATTORNEY MCDONALD:
Q.And so that --- that --- that IFTA sticker ---?
No.
Okay.
So we got ---
A.I'm sorry.
Q.--- the IFTA sticker. You said that ---.
A.That was me. That was my mistake. I didn't mean to say IFTA. I meant to say cab card.
Q.Okay.

Page 51

And that cab card is dated ---.
ATTORNEY LANGLEY:
I thought you were asking him about the IFTA sticker. I handed him the IFTA the sticker form. I'll hand him the cab card now.
ATTORNEY MCDONALD:
It's okay. We're all --- we're flying the plane while building it.
BY ATTORNEY MCDONALD:
Q.So you've got this ---. Here's --- here's all I'm trying to get at. The cab card is dated as effective from April 1st, 2022 to March 31st, 2023.
Is that right?
A.Yes.
Q.Okay.
And similar to IFTA stickers, are these cab cards generally good for a year at a time?
A.Yes.
Q.Okay.
So when Mayflower provided the cab card in April of 2022, you would agree with me that they were still operating under the temporary agency agreement that we saw earlier?
ATTORNEY LANGLEY:
Object to the form.

Page 52

THE WITNESS:
Yes.
BY ATTORNEY MCDONALD:
Q.Okay.
And so they --- based on your understanding of this, Mayflower would have submitted for cab cards while there was a valid agency agreement. And then those cab cards would --- those cab cards would have stayed in place while they were active and valid for approximately a year?
A.The cab card would --- would go with --- yes.
Yes. Basically, yes.
Q.What do you believe Mayflower should have done in this circumstance?
ATTORNEY LANGLEY:
Object to the form.
THE WITNESS:
If they had truly canceled Moholland's agreements, they need to immediately collect up the license plates, the cab cards, had the --- their name taken off of the door of the trucks. The IFTA sticker scraped off, all of it. If you're --- if you're breaking from a company, if you're breaking from a driver or a agent like this, those are the steps that happen. It happens with --- I've had to do the same

Page 53

thing with just company drivers. You cancel their fuel card, you turn off their access to email, you --- anything else they have access to with the company. If it's an owner operator, they don't get their final settlement check unless they remove the placards from their truck and return any other equipment to me. Mayflower allowed this to continue. And I've not seen any evidence yet there was a true termination of the service agreement --- I'm sorry, the --- the agency agreement.

Q.Your experience in the trucking industry, how quickly does that --- does all of that take place? Because as you're aware, scraping signage, scraping decals, canceling IFTA cards, canceling cab cards --- how long does that typically take place in your experience in the trucking industry?

ATTORNEY LANGLEY:

Object to the form.

THE WITNESS:

You can ground the truck in one day by taking the tags off of it and taking the cab card out. If you need more time to take the sticker off the truck, that's fine. Because without the tags, the truck can't legally operate. So Mayflower could have demanded the tags within 48 hours, 72 hours, however

Page 54

long it takes for an overnight package to get from Moholland to Mayflower. The stickers and all can come later. But again, the truck is basically unable to be driven on public roads without a license plate.

BY ATTORNEY MCDONALD:

Q.Are you aware of written communications from Mayflower to Moholland demanding the license plates before the July 1st collision?

A.Yes.

Q.Okay.

In your view, why are those communications is not sufficient to satisfy the request you just stated?

A.To satisfy which request? I'm not sure I follow you.

Q.Well, you just said --- and I'm not trying to put words in your mouth, but you just said --- I asked you what Mayflower should have done. And you said Mayflower should have demanded the license plates because that can --- that --- if you --- if you get the license plates back, that's how you ground a truck and a truck can't operate on public roads.

Is that fair?

A.Yes.

Q.Okay.

And then I asked you if you were aware of written

Page 55

communications from Mayflower to Moholland demanding the return of their license plates before July 1st, 2020?

A.I'm aware of that.

Q.You said you were aware of that?

A.Yes.

Q.Okay.

Why are those written communications not good enough to satisfy you or to satisfy your questions here regarding Mayflower's relationship with Moholland in this collision?

A.Well, it showed a rather long history of Moholland first refusing to return to plates and then pleading for an extension. And Mayflower showing they had noticed that something could happen if Mayflower continued to use the place.

Yet they agreed to extend a period of time and extend it. I think they extended it a couple times at least. I don't --- I can't recall exactly. But if the relationship was truly over, you get your plates back. It does not have to take weeks and weeks and months and months.

And if --- you know, I understand Moholland doesn't want to shut his trucks down, but the plates belong to Mayflower. If Moholland does not want to

Page 56

cooperate, you simply stop those payments that were continuing and --- and until Mayflower --- I'm sorry, until Moholland returns the place. But the physical plate itself, to take it off the truck and secure it, takes --- takes no time.

Q.Okay.

However right quick, just point of clarification. You said that taking off the physical plates takes no time, but you're aware that Mayflower is in St. Louis and Moholland was in Virginia Beach. Is that right? Or Hampton, Virginia. I apologize.

A.I am aware of that. And what I said is you take the plates off, you secure them, that --- that grounds the truck. The truck's not allowed to be on the public roadways anymore. You gather them together, you overnight them to Mayflower, and the transaction's complete. So 48 hours, 72 hours, that would be a reasonable amount of time to take plates off a truck and mail them back to Mayflower.

Q.Just the point I'm trying to get at is just under these circumstances, you would agree with me that Mayflower did not necessarily --- this isn't a situation where the company shared a facility. Like, it's not like Mayflower could have sent somebody out

to the yard with a screwdriver and taken the plates off themselves. Could they?
ATTORNEY LANGLEY:
Object to the form.
THE WITNESS:
They actually could have. They could have dispatched somebody out to, if nothing else, witness compliance, watch Moholland take the --- physically take the plates off the truck, collect the ones that were taken off the truck and bring them back. They --- they could have ask for photographic evidence that the plates were removed.
This isn't a new phenomenon in trucking.
There's a high turnover of drivers, whether they're company drivers, owner, operators, contractors. This is something that happens with every motor carrier out there. Their --- processes have been put in place for years to handle this. This should have taken a couple days at best.
ATTORNEY MCDONALD:
All right.
I appreciate your time. I appreciate Plaintiff's Counsel playing nice in the sandbox and allowing me this discovery deposition based on your supplemental report. I'm ready to move forward.



If anybody wants to take a couple of minutes, I'm okay with that. I can always take five and stretch my legs.
THE WITNESS:
Okay.
Thank you, sir.
ATTORNEY LANGLEY:
I just got a couple questions, but if Jim and Matt have any questions, I'll let them go first.
ATTORNEY SESSIONS:
No questions.
ATTORNEY ELLIOTT:
No questions for Locke Relocations.
---
EXAMINATION
---
BY ATTORNEY LANGLEY:
Q.All right.
Yeah. Just a few questions here on some of the documents that you were asked about, but not --- not shown. The first one is the agency statement --- or a document titled Agency Statement, Mayflower Transit. And this is a document that was produced by Mayflower that you referenced in your first report there. And



you were asked some questions about the agency payments and did you know what those were? If we take Mayflower at its word for the agency statement, between it and Joe Moholland and the title that's used for those payments, what is listed right there?
A.AGTP agent payments.
Q.All right.
And that payment is from who to who?
A.From Mayflower to Moholland.
Q.Okay.
So what was the agent payment for according to May --- Mayflower's document?
A.It's --- it's a --- so the first page of this shows a payment from Mayflower to Moholland, May 31st, 2022, of $20,000 and is coded as an agent payment.
Q.All right.
And that's one of the six or eight that you referenced in your report?
A.Yes.
Q.Okay.
This load that was transported on July 1st, 2022 was a military move.
Correct?
A.Yes.
Q.So if there was a carve out, as alleged by



Mayflower's Counsel there, Mr. McDonald, for Military Moves, then this load would still be covered under the agreement between Mayflower and Moholland.
Is that right?
A.Yes, it would.
Q.And there wasn't ever ---.
ATTORNEY MCDONALD:
Object to form.
BY ATTORNEY LANGLEY:
Q.Okay.
You were asked a question about the report and if you had reviewed a deposition of Rob Garr. Rob Garr was the 30(b)(6) designee for Joe Moholland. And you referenced the Joe Moholland 30(b)(6) deposition in your October 2024 report?
A.Yes.
Q.Okay.
So you did review the deposition of Joe Moholland, corporate representative Rob Garr, because you referenced it on page four of your report.
Right?
A.Yes.
Q.Okay.
And based on that, you concluded that Moholland's witnesses have testified that Moholland never received

Page 61

or issued notice required by the agreement via certified mail return receipt requested and assessed Mayflower's agency agreement was never terminated pursuant to the agreement prior to July 1st, 2022, just reading from page four of your report.
A.That's what I recall. Yes.
Q.All right.
You were asked about the IFTA stickers and the time period for the renewal on this truck. And for this IFTA sticker, was it effective January 1st through December 31st of 2022?
A.It was. Yes.
Q.And that's the IFTA sticker that was provided by Mayflower to Moholland?
A.Correct.
Q.When you say the means and the methods to put this truck on the road, is that what you're talking about? The IFTA sticker, the IRP card, the cab card, the license plate, all those kinds of things?
A.Yes. Without those --- without the plates, without the stickers, without the registration, the truck can't be legally operated.
Q.You were asked a question about the agent payments --- or, excuse me, the TMM payments to Mayflower, if you had any evidence that TMM had ever paid Mayflower.

Page 62

Is payment required for a motor carrier to be responsible under the Federal Motor Carrier Safety Act?
A.The Federal Motor Carrier Safety Regulations don't --- are --- they do not address payment. They address the service and the movement of the truck and the driver.
Q.So is payment required in order to for a motor carrier to be responsible for a collision?
A.No. That was a long --- my answer was a long winded way to say no.
Q.And so your report, you were asked about the time period, and in your report, you referenced that the Mayflower corporate representative testified that this load commenced in March while the agency agreement was still in place. And based on that, you found that there was an express agency agreement for this load. Is that right?
A.Yes.
Q.And would it be --- even accepting Mr. McDonald's position as accurate that this load was booked by TMM and Mayflower was not involved in it, would it ever be legal for Joe Moholland to operate and transfer a load using Mayflower's IFTA sticker, using Mayflower's license and registration and cab card, but running it

Page 63

under a different motor carrier number?
A.No. The cab card and the IFTA sticker are DOT number specific. So they are assigned in this case to Mayflower.
Q.And does that form the basis of your opinion that even accepting what Mayflower says is true, that this load was not part of anything Mayflower had to do with that Mayflower aided and abetted the marking violation under the FMCs Rs by giving the means and methods to put that truck on the road?
A.Yes.
ATTORNEY MCDONALD:
Object to form.
COURT REPORTER:
Was that an objection to form?
ATTORNEY MCDONALD:
Yes.
BY ATTORNEY LANGLEY:
Q.And is that in your report there, the --- that you provided on October 2026?
A.It is. Yes.
Q.Okay.
ATTORNEY LANGLEY:
I think that's all we've got there.
ATTORNEY MCDONALD:

Page 64

Okay.
ATTORNEY LANGLEY:
All right.
Thanks.
VIDEOGRAPHER:
This concludes the discovery video deposition of Brooks Rugemer, CDS. The current time is 10:40 a.m.

* * * * * * * *

VIDEOTAPED DEPOSITION CONCLUDED AT 10:40 A.M.

* * * * * * * *

Page 65

COMMONWEALTH OF PENNSYLVANIA )
COUNTY OF DAUPHIN )

CERTIFICATE

I, Derek Richmond, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness, Brooks Rugemer, CDS, whose testimony appears in the foregoing deposition, was duly sworn by me on October 14, 2026 and that the transcribed deposition of said witness is a true record of the testimony given by said witness;

That the proceeding is herein recorded fully and accurately;

That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

Dated the 19 day of October, 2026

Derek Richmond,
Court Reporter