**In The Matter Of:**

*Kyle Sloan, et al. v.*

*Nicholas Burist, et al.*

Nicholas Burist

December 12, 2023



*Janice D. Hayward, RMR*

*Independent Court Reporter*

*843.478.6756*

*JanHayward1@gmail.com*

Original File 121223NBurist.txt

Min-U-Script® with Word Index

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

Brunswick Division

| | |
|---|---|
| KYLE SLOAN, Individually; and as Personal Representative of the estate of Rylie Sloan and Jamie Sloan; KYLE SLOAN as Surviving Parent of Rylie Sloan; and SUSAN WEST, Individually; and as the next friend and natural guardian of K.W., a minor, | Case No.: 2:22-cv-00076-LGW |
| Plaintiffs, | |
| v. | |
| NICHOLAS BURIST; LOCKE RELOCATIONS LLC; NATIONAL INDEMNITY COMPANY; MAYFLOWER TRANSIT, LLC; JOE MOHOLLAND, INC; WESCO INSURANCE COMPANY; and XYZ COMPANIES 1-3, | |
| Defendants. | |

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF NICHOLAS BURIST

Taken on behalf of the Plaintiffs

Hampton, Virginia

December 12, 2023

Appearances:

CHARLES J. HODGE, ESQUIRE
MATT FOSS, ESQUIRE
T. RYAN LANGLEY, ESQUIRE (Via Zoom)
Hodge & Langley
229 Magnolia Street
P.O. Box 2765
Spartanburg, South Carolina 29304
On behalf of Plaintiff Kyle Sloan

JOSEPH R. PADGETT, ESQUIRE
JOSHUA DORMINY, ESQUIRE (Via Zoom)
Roden Law
333 Commercial Drive
Savannah, Georgia 31406
On behalf of Plaintiff Kyle Sloan

ANDREW NORDEN, ESQUIRE
AMI ROMANELLI, ESQUIRE
Osborne & Francis
433 Plaza Real
Suite 271
Boca Raton, Florida 33432
On behalf of Plaintiff Estate of Michael Hines

NATHANIEL HOFMAN, ESQUIRE (Via Zoom)
Stewart Miller Simmons Trial Attorneys
55 Ivan Allen, Jr. Boulevard NW
Suite 700
Atlanta, Georgia 30308
On behalf of Plaintiff Estate of Michael Hines

JONATHAN A. POPE, ESQUIRE
Hasty Pope
211 East Main Street
Canton, Georgia 30114
On behalf of Plaintiffs Raymond Tipton and Thelma Petno

W.M. CHANFRAU, SR., ESQUIRE (Via Zoom)
GREG OLSEN, ESQUIRE (Via Zoom)
Chanfrau & Chanfrau
701 M. Peninsula Drive
Daytona Beach, Florida 32118
On behalf of Plaintiffs Raymond Tipton and Thelma Petno

Appearances (Cont 'd.):

JOSEPH J. STEFFEN, JR., ESQUIRE (Via Zoom)
BRANDY MAI, ESQUIRE (Via Zoom)
The Law Offices of Joseph J. Steffen, Jr.
223 W. York Street
Savannah, Georgia
On behalf of Plaintiff Susan West

GRANT SMITH, ESQUIRE
Dennis, Corry, Smith & Dixon, LLP
900 Circle 75 Parkway
Suite 1400
Atlanta, Georgia 30339
On behalf of Defendant Nicholas Burist

DANIELLE SNOOK, ESQUIRE (Via Zoom)
Brunswick Judicial Circuit Public Defender
Camden County Office
403 Georgia Avenue, P.O. Box 667
Woodbine, Georgia 31569
On behalf of Defendant Nicholas Burist

TODD R. EHRENREICH, ESQUIRE (Via Zoom)
Lewis Brisbois
The Alhambra
2 Alhambra Plaza
Suite 1110
Coral Gables, Florida 33134
On behalf of Defendant Mayflower

CHRISTINA M. CURRELI, ESQUIRE (Via Zoom)
Chambless Higdon Richardson Katz & Griggs, LLP
3920 Arkwright Road
Suite 405
Macon, Georgia 31210
On behalf of Defendant National Indemnity Co.

MATT SESSIONS, ESQUIRE (Via Zoom)
McMickle, Kurey & Branch, LLP
217 Roswell Street
Suite 200
Alpharetta, Georgia
On behalf of Defendant Joe Moholland

JAMES GILSON, ESQUIRE
Hall Booth Smith, P.C.
191 Peachtree Street NE, Suite 2900
Atlanta, Georgia 30303

Also present:

Mr. Kyle Sloan (Via Zoom)
Gary Payne, Jr., Videographer

REPORTED BY: Lynn Burton

# I N D E X

| WITNESS | Examination by | Page |
|---|---|---|
| NICHOLAS BURIST | Mr. Hodge | 8, 295 |
| | Mr. Pope | 198 |
| | Mr. Norden | 214, 298 |
| | Mr. Ehrenreich | 275 |
| | Mr. Gilson | 290 |

# E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 1 | Certificates of Course Completion | 64 |
| 2 | Van Operator Separation Notification | 66 |
| 3 | Van Operator Separation Notification | 66 |
| 4 | List of Mayflower Employees | 70 |
| 5 | Agency Statement - Mayflower Transit | 97 |
| 6 | DOT Inspections | 110 |
| 7 | Inspection Report Correction | 126 |
| 8 | Photographs | 129 |
| 9 | Trans Advantage Invoices | 140 |
| 10 | Corporate Structure | 146 |
| 11 | Cell Phone Records | 148 |
| 12 | Hours of Service Report | 154 |
| 13 | Load Information | 155 |
| 14 | Georgia Subpoena Response | 179 |
| 15 | Defendant Burist's Supplemental Responses to Plaintiff's First Request for Production of Documents | 197 |
| 16 | Photographs | 202 |
| 17 | Photograph | 305 |

Videotaped deposition upon oral examination of NICHOLAS BURIST, taken on behalf of the Plaintiffs, before Lynn Burton, a Notary Public for the Commonwealth of Virginia at Large, commencing at 10:05 a.m., December 12, 2023, at the Courtyard by Marriott, 530 St. John's Road, Newport News, Virginia.

-----oOo-----

THE VIDEOGRAPHER: This is the video deposition of Nicholas Burist in the matter of Kyle Sloan, et al. versus Nicholas Burist, et al, U.S. District Court Southern District of Georgia Brunswick Division, Case Number 2:22-CV-00076.

This is held at 530 St. John's Road, Newport News, Virginia. The time is 10:05 a.m., December 12th, 2023. My name is Gary Payne, Jr., of Video Unlimited located in Chesapeake, Virginia. If all participants on Zoom would please keep their microphones on mute unless necessary.

Will the counsel please introduce themselves.

MR. HODGE: I'm Charlie Hodge. I'm part of the team that represents Kyle Sloan; his

deceased wife, Jamie; his deceased daughter Riley; and his daughter Jordan.

MR. NORDEN: Andrew Norden. I represent the Estate of Mr. Hines.

MR. PADGETT: Joseph Padgett. I'm here also for the Plaintiff Sloans in this case.

MR. POPE: Jonathan Pope on behalf of Thelma Petno and Raymond Tipton.

MR. SMITH: Grant Smith here on behalf of Nicholas Burist. And we've got his criminal defense attorney Danielle Snook attending by Zoom.

THE VIDEOGRAPHER: We are now on the record. Would you please swear in the witness.

NICHOLAS BURIST, having been first duly sworn, was examined and testified as follows:

MR. EHRENREICH: Before we get started, this is Todd Ehrenreich on behalf of Mayflower. I don't know if anybody else on Zoom wants to make an appearance.

MS. CURRELI: Yes. Christy Curreli on behalf of National Indemnity Company. Thank you.

MR. STEFFEN: Joe Steffen, Savannah, Georgia, on behalf of Susan West.

MR. SESSIONS: Matt Sessions on behalf of Joe Moholland.

MS. SNOOK: Danielle Snook. I'm the defense attorney for Mr. Burist in the Camden County criminal case that is accompanying this civil suit.

MR. LANGLEY: Ryan Langley on behalf of Plaintiffs, Kyle Sloan.

MR. HOFMAN: Nathaniel Hofman appearing on behalf of the plaintiffs in the Hines matter.

MS. MAI: Brandy Mai. I'm with Mr. Steffen. We represent Susan West on behalf of Kara West.

MR. OLSEN: Greg Olsen with Chanfrau & Chanfrau on behalf of the plaintiffs Tipton and Petno along with William Chanfrau, who will be joining shortly.

MR. HODGE: Ready to begin?

EXAMINATION

BY MR. HODGE:

Q. Mr. Burist, my name is, again, Charlie

Hodge. I'm going to ask you some questions today. These questions are not meant to harass or intimidate you. You've got a great team of lawyers. If I get out of line, they're going to point that out. If I ask you a question that you don't understand, I want you to point that out. Is that agreeable?
A. Yes.
Q. Will you also agree to be truthful, forthright, and not evasive in your answers?
A. Right. Yes.
Q. And you understand there are certain consequences if you don't tell the truth after being sworn?
A. Yes.
Q. All right. During this deposition now that you're under oath, you are to direct any questions you have about the questions that I render directly to me, and that would be the same with the examining other lawyers.
A. Okay.
Q. Okay?
A. Yes.
Q. All right. Where were you born and raised?
A. Cushing, Texas.

Q. Okay. And did you go to high school in Texas?
A. Yes.
Q. What year did you get out?
A. 1996.
Q. All right. What did you do after 1996?
A. I went into the Navy.
Q. And how long did you serve in the Navy?
A. Three and a half years.
Q. What was your position in the Navy?
A. I worked on the flight deck.
Q. All right. Were you overseas?
A. No.
Q. Okay. Is that the flight deck of a carrier?
A. Yes.
Q. Where were you assigned?
A. Newport News Dry Dock.
Q. Okay. Is that the first time you had been in the Virginia area, or did you have family in this area?
A. That was my first time.
Q. Okay. And you served in the Navy from what year to what year?
A. From -- from June 1996 until

February 1999.

Q. All right. Why did you get out in 1999?

A. I had a child on the way, and I was young, and I went UA, and the military -- the Navy let me out on an honorable discharge.

Q. Okay. So in 1999, where did you settle?

A. In Newport News, Virginia.

Q. Okay. Were you married at the time?

A. No.

Q. The lady that bore your child, what was her name?

A. Lomeka White.

Q. And does Ms. White still live in this area?

A. Yes.

Q. Okay. Do you have any relatives in south Georgia either by blood or marriage?

A. No.

Q. Any close friends or relatives, distant relatives even in the south Georgia area?

A. No.

Q. Okay. So 1999 you settled in the Newport News area?

A. Yes.

Q. And what do you do for a living now?

A. Then?
Q. Uh-huh. I'm going to ask you to take me through your work history if you would.
A. I started off, I was working at West Telemarketing Services in Hampton, Virginia. I did that about two years, and I moved to Williamsburg. I was working at -- I was working at Dollar Tree until -- I'm not quite sure the exact year.
But then I relocated back to Texas. Then I came back to Virginia, and I was working at Greensprings, the Greensprings Plantation in Williamsburg, Virginia. I went back to Texas, relocated back to Texas. Stayed there for a while. I'm not sure of the exact year and date.
I relocated back to Virginia, and I started working at Eastern State Hospital. And that was about 2004. I want to say the end of 2003, 2004 area. And I worked there until right at the end of 2010 to early 2011. And I continued working in the Williamsburg area. I was working at the -- whatever the plantation is, the resort in Williamsburg right up by Water Country. And I worked there while I was attending truck driving school. So I'm not sure the exact dates of the truck driving school, but I graduated in, I think, 2011. And I started driving

trucks in June -- June of 2011, and I drove trucks all the way up until July 2022.

Q. So I think in your testimony, you were talking about going back and forth to Texas.

A. Yes.

Q. I think I counted twice. Why did you go back and forth to Texas?

A. I really wasn't settled. I really wasn't settled at that time. I really didn't know exactly what I wanted to do. I had small kids at that time, and me and my first wife, we were basically just trying to find out what we wanted to do in our lives. And so that -- that's pretty much the back and forth. She had family in Williamsburg, and I had -- I had ties, job possibilities. So it just -- it was just pretty much a back and forth thing because I really wasn't tied into one thing that would ground me in one -- at one place.

Q. Now, you said your wife. What was that lady's name?

A. Lomeka White.

Q. Okay. So you and Ms. White eventually married?

A. Yes.

Q. When did you marry?

A. I'm not even sure. I'm not even sure.

We divorced in 2012, and I really haven't kept -- you know, since then, I haven't communicated with her or anything of that nature, so --
Q. How many children did you have with Ms. White?
A. Three.
Q. Okay. And what are their names and ages?
A. Nickera -- Nictoria. Nictoria White. She is 22 if I'm not mistaken. Nickera, she is 20 -- 19. 19. She will be 20 this year. And my youngest daughter, her name is Nickyra, and she is 14.
Q. All of those are with Ms. White?
A. Yes.
Q. Okay. What were the grounds for your divorce in 2012?
A. We just went our separate ways.
Q. Okay. So it was irreconcilable differences or something like that? Or were there allegations?
A. Well, she left us, so -- so I filed for divorce.
Q. Okay. And you filed on the grounds of what?
A. That we had separated, and she had been gone for a while. And I knew it wasn't -- there wasn't

no way we was going to work that out, so I filed for divorce.

Q. All right. And which county or division did you file in?

A. That's Newport News.

Q. Okay. And that divorce was granted in 2012?

A. Yes.

Q. And does your ex-wife have any contact with your kids?

A. Yes.

Q. Okay. Where does she live now?

A. In Williamsburg.

Q. All right. Now, have you been married since then?

A. Yes.

Q. And what was your second wife's name?

A. My wife's name is Loleane, L-O-L-E-A-N-E. Same last name.

Q. And what does Ms. Burist do?

A. She is disabled.

Q. How long has she been disabled?

A. I would say about -- I want to say -- I'm not -- I want to say about five years now.

Q. And what's the nature of her disability?

A. Nerve damage.
Q. In her back?
A. Back, yes.
Q. Okay. Is she able to ambulate? Walk?
A. She walks with a cane. Yeah, she walks with a cane sometimes. And then she has some other problems, so her mobility is not that great.
Q. I noticed when you came in, you had a cane.
A. Yes.
Q. How long have you had a cane?
A. I guess since about -- since about -- I'm not sure. It was a couple months after I got back home from Camden County.
Q. Okay. So it's now December of 2023.
A. Yes.
Q. When did you get home from Camden County?
A. November -- I believe it was the early part of November of 2022.
Q. Okay. And why do you use a cane?
A. I have nerve damage myself.
Q. What did that nerve damage occur from?
A. The accident.
Q. On July 1st?
A. Yes.

Q. Okay. And when you say, "nerve damage," can you describe the nature of the injury? Like did you have a ruptured disc?
A. I have -- I have some -- I can't remember what the term is. Carpal tunnel or --
Q. Carpal tunnel is usually in your fingers.
A. I have some issues with my shoulders, my legs, the use of my hands. I don't have the strength that I once did in my hands. My left side, my whole left side is weaker than my right side.
Q. And you attribute that to the wreck of July 1st?
A. Yes.
Q. Did you get medical treatment right after the wreck?
A. Yes, I did.
Q. Where did you get the treatment?
A. I don't know the name of the hospital, but it was in Florida.
Q. Okay. Kind of towards the Jacksonville area?
A. I believe so.
Q. You think it would be in the county where Jacksonville is?
A. I think it was in Duvall. I'm not sure.

Q. Okay. Were you hospitalized?
A. No.
Q. Did you go in, like, an emergency room visit?
A. Yes. It was emergency room.
Q. Was it just one visit?
A. Yes.
Q. Okay. Did you have any subsequent treatment after that?
A. No. Just as -- just what they offered me in the jail.
Q. And do you really get treated when you're in jail?
A. No, I didn't get any treatment. I got treatment at the -- at the emergency room. I had to get stitches. My right arm was -- how would you say it? It was wide open. Just put it like that.
Q. You had a cut and required stitches?
A. Yes.
Q. How many stitches?
A. I think it was four. I don't -- I don't know the exact name of the stitching type that it was, but it was four right here.
Q. On your right forearm?
A. Yes.

Q. And that was treated at that one ER visit?
A. Yes.
Q. Okay. And so you had no treatment in jail?
A. No. Just the -- they just cleaned my wound, and after a while, they took the stitches out. And later on they gave me some medication to help me sleep and some pain medicine.
Q. So after the ER visit, where did you go?
A. I went to -- I went to -- I went to jail in Florida.
Q. Jail in Florida. And what was that jail, do you remember?
A. I do not remember.
Q. How long did you stay in that jail?
A. I believe about five days. It was four or five days.
Q. Why were you in jail?
A. They charged me with the responsibility of the accident.
Q. Do you know the specific charges?
A. No.
Q. Okay. So five days in a Florida jail, and then were you transferred?

A. Yes. I was extradited to Camden County Safety Facility.
Q. So this takes us to about the 7th, 8th of July, something like that?
A. It would be about the 6th or the 7th. No, it would be about -- yes, you're right. About the 7th or the 8th.
Q. Okay. And how long did you stay in the Camden County jail?
A. I stayed there until -- until I got out about the end of October, beginning of November if I'm not mistaken.
Q. October or November of 2022?
A. Yes.
Q. And you've been out of jail since that time?
A. Yes.
Q. Okay. Are you scheduled for trial?
A. No.
Q. Okay. How was it that you were able to get out?
A. I got bond. I made bond.
Q. Do you know what your bond was?
A. No, I do not.
Q. Who paid for your bond?

A. My wife. My wife was able to post my bond.
Q. And where did -- it's Loleane?
A. Yes.
Q. And spell that for me again.
A. L-O-L-E-A-N-E.
Q. Okay. So where did Loleane get the money to post your bond?
A. From my general knowledge, she got a loan.
Q. Do you-all own the house that you live in?
A. No, sir, we do not.
Q. Okay. Has that loan been paid off?
A. No, it has not.
Q. Do you know how much the loan was for?
A. No, I do not.
Q. Okay. What have you been doing since you got out in October or November of 2022?
A. The majority of my time has been dedicated to doctor visits.
Q. Okay. And who are your doctors?
A. My current doctor is David Kirkland at Riverside Brentwood.
Q. David Kirkland. And he is where?

A. At Brentwood. It's a Riverside facility.
Q. Is Riverside like the name of a medical group?
A. Yes. Yes.
Q. Okay. Is that in Newport News?
A. Yes.
Q. And what type of doctor is Doctor Kirkland?
A. He is my -- I don't know what's the --
Q. Sometimes you get a family practitioner.
A. Yes. Yeah, he's my family care. My doctor.
Q. Okay. And what does Doctor Kirkland do in terms of treating you for your problems?
A. Well, I have not had a visit with Doctor Kirkland yet. My previous doctor was Patrick Pagador. He was a student, and his time was up, and he left.
Q. Patrick -- what's his last name?
A. Pagador. That would be P-A-G-A-D-O-R.
Q. You can probably tell I got hearing aids. So if I ask you to repeat, I'm not being disrespectful.
A. Okay.
Q. It just takes a little time to process.
A. I did not notice that.
Q. So Patrick Pagador.

A. Yes.
Q. He was a med student? Is that what you said?
A. From my understanding, yes. He finished up, I guess, intern. He finished up his time at the Brentwood facility, and he moved to another facility. Doctor Kirkland was his referral.
Q. Did you treat with Pagador at the Brentwood facility?
A. Yes.
Q. Okay. And was Pagador able to prescribe medications and that kind of thing for you?
A. Yes.
Q. And what kind of medications did he prescribe?
A. I have blood pressure medicine. I have -- I have gabapentin that was prescribed. I have been prescribed physical therapy. I've taken multiple MRIs, different tests of that nature.
Q. Now, if I understood what you were saying, you mentioned David Kirkland, but did you say that you had never seen David Kirkland?
A. I have not had a visit with Mr. Kirkland yet. I have an appointment coming up.
Q. Okay. Any other doctors?

A. I have a -- I have a spine specialist. I go to the neurologist. His name is David DeCarlo. And that also is a Riverside facility.
Q. D-E-C-A-R-L-O?
A. Yes.
Q. Okay. Is he -- you said he's a neurologist?
A. Yes.
Q. Okay. And is he the one who prescribes you gabapentin?
A. No. Doctor Pagador.
Q. What does Doctor DeCarlo do for you?
A. I get injections in my back, in five or six points in my back currently.
Q. Okay. Any other medical treatment?
A. No.
MR. HODGE: Would you -- somebody's making noise on the Zoom. Could we have whoever is on Zoom to mute, please. We're hearing background noise.
UNIDENTIFIED SPEAKER: Hey, Jim. Can you mute your microphone?
MR. PADGETT: And there's a phone call, too. Somebody on the phone needs to mute it, too, I think. I don't know who.

UNIDENTIFIED SPEAKER: And while we're paused, Mr. Hodge, I'm guessing everyone can hear you about as well as I can, which some questions I can hear, and other questions are a little garbled. So if you could either speak up or move a little closer to the microphone, us folks that didn't travel to Virginia would greatly appreciate it.

MR. HODGE: Well, I've got the microphone, like, pinned to me.

MR. NORDEN: So question. What if we moved the laptop --

UNIDENTIFIED SPEAKER: I'm having a hard time hearing as well.

MR. NORDEN: Why don't we move the laptop just a little closer to Charlie and out of view of the camera.

(There was a pause in the proceedings.)

THE VIDEOGRAPHER: Back on the record at 10:30 a.m.

BY MR. HODGE:

Q. When did you start seeing Doctor DeCarlo?

A. I'm not sure of the exact date.

Q. Okay. Has it been several months?

A. No, it has not. It's only been a few months. I would have to look on my chart.
Q. Okay. Any other doctors that you've seen?
A. No.
Q. All right. So how have you been surviving over this past year?
A. Different -- different types of assistance. Great cooperation with my landlord.
Q. Let me put it this way. What are your sources of income?
A. I don't have any source of income.
Q. Loleane, she has --
A. My wife is on disability.
Q. She gets her Social Security Disability check?
A. Disability.
Q. Does she have any other funds?
A. No.
Q. Do you own any stocks, bonds, properties, rentals, anything like that?
A. No.
Q. Nothing that would be an income generator?
A. No.

Q. Do you have any money that's still due you from Mayflower or Joe Moholland or anyone like that?
A. No.
Q. Okay. Do you know Kyle Sloan?
A. No.
Q. Have you looked him up on social media?
A. No. I don't -- I don't --
Q. Do you know what his race is?
A. I'm sorry?
Q. Do you know what his race is?
A. No, I do not.
Q. Okay. Did you ever look up on social media his daughter Riley?
A. No.
Q. How about his wife, Jamie?
A. No.
Q. Do you have anything you want to say to him?
A. Not at this time.
Q. Okay. Do commercial drivers owe a duty of care to other drivers?
A. Yes.
Q. Should companies only hire safe drivers?
A. I believe so.

Q. Is safety first?
A. Yes.
Q. Do you believe that drug and alcohol testing prevents companies from hiring impaired drivers?
A. Yes.
Q. And do you believe drug and alcohol testing prevents drunk drivers, truck drivers from being on the road?
A. Yes.
Q. Do you agree you cannot drive a tractor trailer after drinking?
A. Yes.
Q. Do you agree you cannot drive with open bottles of alcohol in the tractor?
A. Yes.
Q. Do you agree that you should not drive with illegal drugs inside of the tractor?
A. Yes.
Q. Is it foreseeable that if a commercial driver has been drinking, he will cause a collision?
MR. SMITH: Object to form. Calls for a legal conclusion.
MR. HODGE: Are we reserving objections except as to the form?

MR. SMITH: Uh-huh.

BY MR. HODGE:

Q. So we lawyers, we can't help ourselves. We're going to make objections during this testimony. And unless your lawyer tells you not to answer the question, the question stands, and I want it answered.

A. I understand.

Q. Okay. So is it foreseeable if a commercial driver has been drinking, he'll cause a collision?

MR. SMITH: Object to form. Calls for a legal conclusion.

THE WITNESS: When you say, "foreseeable," can you explain that?

BY MR. HODGE:

Q. That you could believe that something bad would happen if you were drinking and driving.

MR. SMITH: Object to the form. Calls for a legal conclusion.

BY MR. HODGE:

Q. Go ahead. Answer the question.

A. I do not agree.

Q. You do not agree. So you believe that you could drink and drive as a commercial driver, and it's not likely to cause a collision?

MR. SMITH: Object to form. Argumentative.

BY MR. HODGE:

Q. Is that right?

MR. SMITH: Object to form. Argumentative.

THE WITNESS: I plead the Fifth.

BY MR. HODGE:

Q. You plead the Fifth. And when you plead the Fifth Amendment, your Fifth Amendment right protects you from incriminating yourself. Do you understand that?

A. I understand that.

Q. And when you plead the Fifth Amendment in a civil case, an adverse inferences will be drawn against you. Do you understand that?

A. Yes.

Q. Okay. So you plead the Fifth on the question of is it foreseeable that if a commercial driver has been drinking, he will cause a collision?

A. That is a question that I cannot answer.
Q. Does drinking reduce judgment?
A. I would believe so.
Q. Okay. Does drinking alcohol reduce reaction time?
A. I -- I don't know how to answer the question. I'm not an expert on drinking.
Q. Well, if you're sober or you've been under the influence of alcohol, do you think the person who's sober is going to have a better reaction time than somebody who has been drinking alcohol?
A. Again, that's something that I cannot answer.
Q. Okay. Is drinking on the job ever okay?
A. No.
Q. Let's see what we can agree on. Can we agree that you should not operate a commercial vehicle that is mechanically unsafe?
A. Yes.
Q. Should you ever operate a commercial vehicle with insufficient brakes?
A. No.
Q. Should you always perform a pretrip inspection before operating a vehicle?
A. Yes.

Q. If you don't have good brakes, do you understand that it could contribute to a collision?
A. Yes.
Q. And the same goes with the trailer. If you don't have proper brakes on a trailer, do you see how that could contribute to a collision?
A. Yes.
Q. If the brakes are unsafe, does that provide for less forgiveness for mistakes on the road?
A. Could you repeat that?
Q. If the brakes aren't working good --
A. Right.
Q. -- and let's say you're confronted with a sudden situation, you got to apply the brakes soon --
A. Right.
Q. -- maybe you're going a little too fast. Now, I'm not saying just you. We're speaking hypothetically.
A. Right.
Q. But if you got good brakes, you can kind of make up for that, right? Sometimes.
A. I'm not -- I'm not sure. I'm not a mechanic. I don't know.
Q. Now, if you report mechanical issues, does that delay loads being delivered --

A. Not necessarily.
Q. -- on time?
A. Not necessarily.
Q. Has it happened with you where you had mechanical issues and you had to report them, and it did delay the delivery of the load?
A. I have -- I have not actually had a situation where -- if the -- if the mechanical issues are reported, then the truck is not drivable. The truck is only drivable if it's available.
Q. If you're route is delayed, does that mean less time for you to be making money?
A. No.
Q. If a driver is rushed, do you agree that decisions can be rushed?
A. Not necessarily.
Q. Is focus paramount for drivers of tractor trailers on the roadway?
A. When you say, "paramount," what exactly do you mean by --
Q. I mean like a first priority.
A. Now, could you repeat the question?
Q. So is focus a first priority for drivers on the roadway?
A. Yes.

Q. Do you think that in order to protect the public that trucking companies should provide their drivers with training and safety meetings?

A. Yes.

Q. Do you agree that they should not just rely on the fact that a driver is a licensed driver?

A. Yes.

Q. Can we agree the preventable collision is one in which the driver failed to do everything that that driver could reasonably have done to avoid that collision?

A. Could you repeat that one more time?

Q. Can we agree that a preventable collision is one in which the driver failed to do everything that reasonably could have been done to avoid it?

A. Now, you said, "a preventable collision." Could you repeat it a little bit slowly? Break it down.

Q. Do you agree that a preventable collision --

A. Right.

Q. -- is one in which the driver failed to do everything that reasonably could have been done to avoid that collision?

A. A preventable collision and the driver

failed to do everything that he could do, I mean, I'm really not saying that.

Q. Okay. You're not saying it. How would you define preventable collision?

A. Preventable, it just really depends on the condition.

Q. All right. I want you to -- you've got a notebook in front of you. I want you to go to Tab 2 of that notebook. Tell me what that is.

A. It says "Hours of Service."

Q. Do what?

A. It says "Hours of Service."

Q. Well, the document I'm looking at, it says "This is to certify that Nicholas Burist has completed the course Hours of Service Overview." Are we looking at the same document?

A. Yes, we are.

Q. And it says "On February 2nd, 2015, UniGroup, Inc."

A. Uh-huh.

Q. Who is UniGroup?

A. I don't know.

Q. Okay. Do you know if Mayflower is owned by UniGroup?

A. No, I do not.

Q. Well, how did you go about getting this certificate?
A. This -- this certificate was -- it was a completion of a training module.
Q. A training module?
A. Yes.
Q. A training module from who?
A. Joe Moholland.
Q. Was Joe Moholland an authorized Mayflower operator?
A. I'm not -- I don't know.
Q. Did the tractor you operated have Mayflower on it?
A. Yes, it did.
Q. Did you ever operate a tractor that did not bear Mayflower markings?
A. No, I did not.
Q. So how long did you work with the Joe Moholland group?
A. About six years.
Q. In all six years, every time you drove a tractor it had Mayflower markings on it?
A. I don't know for sure. And the reason I'm saying is because sometimes I would have to drive a rented vehicle, and I do not remember if it carried the

Mayflower logo.

Q. Okay. But the times that you did not drive a Mayflower vehicle but rather a vehicle that you retrieved from Moholland --

A. Right.

Q. -- would it have Mayflower markings on it?

A. Yes.

Q. Did you perceive yourself to be a Mayflower driver?

A. Yes, to a certain extent.

MR. EHRENREICH: Object to form. Todd Ehrenreich for Mayflower.

BY MR. HODGE:

Q. When you went to the initial preliminary hearing in Camden, Georgia, your wife came down, didn't she?

A. Yes.

Q. And did she state in open court that you were a Mayflower driver and had been for many years?

A. I don't remember.

MR. EHRENREICH: Object to form. Todd Ehrenreich for Mayflower.

BY MR. HODGE:
Q. All right. So this driver module that you described to me, how does that go? Do you ride with somebody, or you sit down at a computer?
A. Yes. It was computer generated.
Q. Computer generated?
A. Yes.
Q. And how often were you required to do that?
A. A couple times a year.
Q. So approximately what year would you have started with the Mayflower/Moholland group?
A. That would be --
MR. EHRENREICH: Object to form.

BY MR. HODGE:
Q. Go ahead.
A. Around 2000 -- around 2017.
Q. 2017. Now, this document indicates it was February of 2015.
A. I'm not sure. To my knowledge, I -- I'm thinking it's 2017. I cannot be for certain.
Q. Okay. So can you explain to me why this document says February of 2015?
A. No, I cannot.

Q. Were you in the Newport News area in 2015?
A. Yes.
Q. Were you operating with the Mayflower/Moholland group?
A. I don't remember. I don't remember.
Q. Okay. So go to the next page. This says -- the first one said "Hours of Service Overview." This next one says "Roadside Inspections."
A. Okay. I have a question.
Q. Certainly.
A. Now, where did these -- where did these come from? The documents that we're looking at right now, where did they come from, and who did they come from?
Q. They actually came from your attorneys, we think.
A. Okay. So I'm not sure if this is Joe Moholland or if it was my previous job, which was Virginia Transfer, which was also a Mayflower facility.
Q. Okay.
A. So I cannot say for sure.
Q. So do you know the interactions about what Mayflower requires in terms of driver qualification?

A. Yes. A DOT physical and a clean -- a negative urinalysis test.
Q. Does Mayflower run a background check on its drivers?
A. I'm not sure.
Q. Did you have a criminal record before you started operating for Mayflower-affiliated groups?
A. What do you mean by criminal record?
Q. Any criminal record.
A. I mean, no. You know, not to my -- not to my knowledge. As far as -- I mean, like I said, what do you consider as a criminal record?
Q. Do you have a criminal record?
A. I still don't understand what you're saying.
Q. Have you been convicted of any crimes?
A. Not to my understanding.
Q. Now, excluding this July 1st event. Okay?
A. Right.
Q. And I understand you have not been convicted.
A. Right.
Q. I'm talking about before that in the past. Do you have any criminal record?

A. I don't believe I've had -- I have a criminal record. I mean, I've been in some situations and -- nothing that I would say that would say that I had a criminal record. I mean, no.

Q. Okay. Have you ever gone into court and been accused of a crime?

A. Yes.

Q. Okay. What crime were you accused of?

A. Assault and battery on a -- yeah, assault and battery. Domestic violence.

Q. So assault and battery and domestic violence?

A. I'm saying domestic violence.

Q. Okay. Domestic violence against who?

A. That would have been with my first wife.

Q. Okay. And what were the allegations?

A. The allegations were that I put my hands on her.

Q. Okay. And how was that charge resolved?

A. It resolved. I went to anger management, and it was not processed. There were no charges filed.

Q. So you went through some kind of an anger management program, and then the charges were dropped?

A. Yes.

Q. Okay. Any other charges?

A. Not to my knowledge.
Q. Approximately what year was that?
A. I don't know.
Q. Okay. Was it before you were divorced?
A. Yes. This was early on in our relationship.
Q. I think you told me you were divorced in 2012.
A. Correct. From my first wife, yes.
Q. Any allegations about children or putting hands on children?
A. Yes.
Q. Tell me about that.
A. I plead the Fifth on that.
Q. Well, you have already dealt with that from a criminal perspective, haven't you?
A. Yes.
Q. So you pled guilty?
A. Again, I plead the Fifth on that situation.
Q. Okay. Well, did you hit your children in the face?
A. I plead the Fifth on that.
Q. Did you tell Mayflower that you beat up children?

A. I plead the Fifth on that.
Q. Okay. And you say your divorce was because your wife left as opposed to this violence you committed against your wife and your children?
A. I plead the Fifth.
Q. All right. Where did you get your initial truck tractor training? What school? What school?
A. I went to school at Shippers' Choice of Virginia.
Q. I'm sorry?
A. Shippers' Choice of Virginia.
Q. Shippers' Choice of Virginia?
A. Yes. Yes.
Q. Are they still in business?
A. Yes.
Q. How long did that school last?
A. It was -- well, I attended about two months. I tested out early, passed my test, and I --
Q. Go ahead.
A. No. I'm finished. You can go ahead.
Q. If I ever inadvertently cut you off, I want you to be able to finish your answers.
A. Right.
Q. Okay. So Shippers' Choice, about eight

weeks of training, and then you were -- you got your CDL and you were good to go?

A. Yes.

Q. So tell me what that training consisted of.

A. It was classroom and hands-on based.

Q. Okay.

A. The classroom, we went through the -- we went through the commercial motor vehicles handbook. It consisted of homework. Hands-on, we -- we did mostly backing skills, just getting familiar with the tractor itself.

Q. Were you taught that you should never drink alcohol and operate a commercial tractor trailer?

A. Yes.

Q. Were you taught that you should never do drugs and operate a commercial tractor trailer?

A. Yes.

Q. Were you taught that you should never smoke marijuana while operating a tractor trailer?

A. Yes.

Q. It would be wrong to do all those things, wouldn't it?

A. Yes.

Q. It wouldn't be just wrong. It would be

reckless, wouldn't it?
A. Yes.
Q. The -- referencing back to Tab 2, if you go to the last picture, it says that UniGroup has certified you as completed the course on compliance, safety, and accountability. Can you tell me what that consisted of?
A. The commercial motor vehicle standards.
Q. And so were you certified to commercial motor vehicle standards --
A. Yes.
Q. -- by UniGroup? How long did that take to actually take that module?
A. Most of the -- the modules, I guess, each one would be about from 10 to 15 minutes.
Q. Okay. So these three modules total maybe under an hour?
A. It just depends on the person.
Q. Okay. So what do you think your time taking these three modules was?
A. These three modules, I guess it took me about -- this is 2'15, so I was still relatively new to truck driving, so I guess it would have took me -- I don't know. I can't say.
Q. And I understand that you don't have an

exact number. Can you gave me an approximation?
A. No.
Q. Less than a day?
A. Yes.
Q. Less than half a day?
A. Yes.
Q. Okay. What other training did you receive from Mayflower/UniGroup?
A. Roadside inspections. Pretrip, post-trip, those inspections. Hours of service. Again, compliance, safety, and accountability.
Q. How often did you do training with Mayflower/UniGroup?
A. At least twice a year. So that would be, like, in quarters.
Q. Did you do direct training with Mayflower/UniGroup in 2022?
A. I'm not sure. I'm not sure.
Q. '21?
A. I'm not sure who it was through.
Q. Okay. Was it something similar to what we've seen on these documents?
A. Yes.
Q. And did you do something similar to what we see on these documents --

A. Yes.
Q. -- in 2022?
A. Yes.
Q. Okay. Do you know of any other group that would have offered this modular training apart from UniGroup/Mayflower?
A. No.
Q. How about road testing? Did you have, like, road testing even after you got your -- your Shippers' Choice certificate?
A. Each job, to my -- to my knowledge, each job that I worked on had a road test, yes.
Q. Do you remember when you got your road test with Mayflower/UniGroup/Moholland?
A. I remember doing it, but I don't remember exactly when it was.
Q. Okay. And you had mentioned to me earlier something about 2017.
A. Yes.
Q. So in that time frame somewhere?
A. Yes.
Q. Did you ever have another road test?
A. No. With this company, it's a moving company. So it -- it consisted mostly of delivering to residences. And so the road training consisted mostly

how to get in and out of different situations in neighborhoods and different illustrations of that nature.

Q. So kind of give me an example.

A. I pretty much delivered as far as Massachusetts. Each state is different. I generally like to deliver down south rather than up north because it's tighter up north than it is in the south because of the general areas. It gives you a lot more room to work with.

Q. Okay. So it was easier on you to go south because you had more room?

A. Well, I wouldn't say it was easier. It was just less hassle and less headache.

Q. Okay. So would the situation be replicated in Newport News, and you go out and practice in a neighborhood for the road test or --

A. Well, I wouldn't say that. I mean, my training came from basically each job. Each job was different. So you gained more experience from each time that you do it. So it's not -- nothing like you just got to -- in one particular area, you just keep doing it over and over. I mean, that -- I mean, that really doesn't -- that really doesn't produce anything. It doesn't say anything. The hands-on actually doing

it is really what a person gains the experience.
Q. And that hands-on was really you doing it yourself?
A. Yes.
Q. So Mayflower/UniGroup was not riding with you when you would go on these jobs?
A. No.
Q. Neither was Moholland or Locke Relocations?
A. No.
Q. Do you know that name, Locke Relocations?
A. Yes.
Q. Okay. And you know the name Moholland of course?
A. Yes.
Q. And of course you know Mayflower?
A. Yes.
Q. Tell me -- tell me how from your -- in your world how all that operates.
A. I'm not sure how that -- I'm not sure exactly how that works. I know that I contracted work through Mr. Locke, and that's about it.
Q. Okay. Did you have uniforms?
A. Yes.
Q. What were those uniforms?

A. It had Joe Moholland of course on it. And it had the Mayflower logo, the ship of course. And --

Q. And were you required to wear those uniforms when you were on the job?

A. Yes, yes.

Q. And were you wearing them the day before this wreck of July 1st?

A. You said before?

Q. Yes.

A. Yes.

Q. Okay. Were you wearing them the day of?

A. I don't remember what I was wearing.

Q. Okay. Where did you get the uniforms from?

A. I got them at the Joe Moholland facility in Hampton.

Q. Okay. And you were wearing those uniforms through June of 2022?

A. Yes.

Q. All right. Did Locke, Moholland, or Mayflower/UniGroup have any ride-along programs that you're aware of?

A. No.

Q. At least they never applied to you; is

that right?
A. As far as ride-along, can you be a little bit more specific?
Q. I mean like a representative from Mayflower, UniGroup, Moholland, Locke riding with you.
A. No.
Q. Okay. Did you ever have any remedial training or discipline from Mayflower/UniGroup, Moholland, Locke, anything like that?
A. No.
THE VIDEOGRAPHER: Mr. Hodge, your microphone fell off.
MR. HODGE: Sorry. Let's go off the record for just a second.
THE VIDEOGRAPHER: Going off the record at 11:00 o'clock a.m.
(There was a pause in the proceedings.)
THE VIDEOGRAPHER: Back on the record at 11:14 a.m.

BY MR. HODGE:
Q. Mr. Burist, what is your current address?
A. 3005 Roanoke Avenue, Newport News, Virginia 23607.
Q. How long have you lived there?

A. About six years.
Q. And do you intend to stay there in the near future?
A. Yes.
Q. Okay. And that's where your wife lives, too?
A. Yes.
Q. Okay. So you don't have any plans to move?
A. No.
Q. This is a deposition. Have you ever had a deposition taken before?
A. No.
Q. We -- it's my fault. We kind of got sidetracked. I was going over your employment history. I think you told me you went to Shippers' Choice and got your trucking certificate.
A. Yes.
Q. What did you do immediately after that?
A. Well, I started looking for employment. It took me a couple of weeks to find employment, so I continued working at the resort. I don't remember the name of it right off. It's by Water Country in Williamsburg.
Q. What did you do at the resort?

A. I was a houseman. I delivered linen, pick it up -- picked it up, took the amenities to the housekeepers as needed, and things of that nature.

Q. All right. And then your first trucking job --

A. Yes.

Q. -- who was that with?

A. It was through CCC Transportation in West Point, Virginia.

Q. What type of loads did you pick up and deliver?

A. We hauled beer out of Anheuser-Busch.

Q. Okay. Was that a tractor trailer, or was it a -- one of those rigs that -- like a beer truck?

A. No. It was a tractor trailer.

Q. Okay. You were over the road with that? I mean like different states?

A. Yes.

Q. Okay. How long did that job last?

A. About two years.

Q. And what happened with that job?

A. I started -- I started hauling port containers.

Q. Port containers?

A. Yes.

Q. And you get them at the dock in Newport News or various places?
A. Various places.
Q. Like what places?
A. The ports. NIT in Norfolk. They have another one in the Portsmouth area. I don't remember what that one was called. Sometimes at the -- and then just other locations.
Q. And what was the company that you worked for?
A. It was BBC Trucking.
Q. How long did that job last?
A. That lasted about two years also.
Q. Ten years?
A. Two.
Q. Two years. I'm sorry. Two years. Why did you leave that job?
A. Well, the situation came up with my kids, so I was pretty much forced to leave that situation because I had to take a lot of time off work.
Q. Well, what's the situation that you are referring to?
A. There were allegations that I -- my oldest daughter had made allegations that I -- that I was mistreating her.

Q. Is it in the context of sexual abuse?
A. No.
Q. Physical abuse?
A. Yes.
Q. Okay. And how did that work out?
A. It worked out. I pleaded guilty under the Alford plea.
Q. Okay. And what was your sentence?
A. I had to do -- I had to do an anger management course for 20 weeks if I'm not mistaken.
Q. Did that cost you your job with that BBC?
A. Yes.
Q. So do they have rules in place so that if you have a criminal record, you couldn't drive for them?
A. Yes.
Q. Do you think that's the way it ought to be with the trucking industry?
A. Well -- well, a history doesn't define who a person is. It only says that a person has gone through something in their life.
Q. Okay. Do you think those are reasonable rules that convicted felons should not be allowed to drive over the road?
A. No.

Q. All right. After that 26 -- after that 20 weeks was over with, did you get another job?

A. Not immediately. It was sometime after. I was -- I started working at Damco. It was a Walmart warehouse in Portsmouth, Virginia.

Q. And approximately what year?

A. It was 2014 if I'm not mistaken.

Q. Okay. What did you do for Damco?

A. I unloaded port containers.

Q. How long did that job last?

A. It lasted -- I'm not sure. I'm not sure exactly how -- the date on that. I worked there until I started working for Joe Moholland.

Q. All right. How did the Joe Moholland job come along?

A. Well, the lady that I previously worked for, her name is Miranda. And I drove for her at Virginia Transfer. And Mr. Locke -- her and Mr. Locke are close associates. And Mr. Locke was looking for a driver at that time, and she called me to let me know. And she asked me did I need a job, and I said yes. And she said it was a driving job, and I said okay. And she asked me was I interested, and I said yes. And she told me the gentleman's name was Mr. Locke, Kelvin Locke. And she called him, he called me, and he asked

me was I interested in a driving position. And I told him yeah. I told him yes, I would like the opportunity. And Mr. Locke gave me the opportunity.

Q. All right. And was he aware of your criminal history?

A. Mr. Locke knew what was going on with me.

Q. Okay. What was that lady's name again?

A. Miranda.

Q. Her last name?

A. Williams.

Q. Williams.

A. Yes. W-I-L-L-I-M-S -- I-A-M-S.

Q. And who does she work for?

A. She worked at Virginia Transfer.

Q. Does she still work there?

A. I don't know.

Q. Okay. So you got in touch with Mr. Locke, and he hired you?

A. Yes.

Q. Okay. This would have been approximately when?

A. From my -- from my general knowledge, I do believe it to be around 2017.

Q. Okay. Did you fill out some paperwork and all that type of thing?

A. Yes.
Q. Were you aware that paperwork came from Mayflower?
A. No.
Q. So the truck, the first tractor you were assigned --
A. Yes.
Q. -- is that the tractor that was involved in the wreck on July 1st?
A. I'm not -- I don't -- I don't even remember.
Q. Okay. Did that tractor bear Mayflower markings?
A. Yes.
Q. And every tractor you ever drove for Locke apart from the rentals you described always bore Mayflower markings?
A. Yes.
Q. Mayflower's DOT number?
A. Yes.
Q. Was there any kind of problem when you got out of Virginia Transfer?
A. No.
Q. You weren't fired or disciplined or anything like that?

A. Well, I had got hurt on the job there. And the owner of the company, I can't remember his name. When I came back, I was -- I was on light duty, and the light duty that he was giving me, it was not compliable to what I was able to do. And he was not pleased with my concerns and my well safety. And when I mentioned these things, he pretty much let me go.
Q. Okay. What was the nature of that injury?
A. My left eye. I got hit in the eye with a safety strap.
Q. All right.
A. The buckle of the safety strap, the metal piece.
Q. What harm did it cause to your eye?
A. It caused permanent eye damage to my left eye. So I have to wear glasses, these prescribed lenses unless it gets worse. And the worst case scenario, I would have to have surgery on my eye. But that has not been a factor as of yet.
Q. So you're wearing glasses now.
A. Yes.
Q. Have you been wearing glasses since that work-related injury?
A. Yes.

Q. Did it reduce your vision in the left eye?
A. Yes.
Q. So, you know, 20/20 is considered normal vision.
A. Yes.
Q. Do you know what your eye vision was after that injury?
A. No, I do not.
Q. Was it worse?
A. Well, it wasn't like it was at first.
Q. Well, let me ask you this: Did you wear glasses before that injury?
A. Yes.
Q. What did you wear glasses for?
A. They were just corrective lenses.
Q. Were they for nearsightedness or farsightedness?
A. I'm not sure. I can't remember.
Q. So if you can see far --
A. Uh-huh.
Q. -- but you can't see close up --
A. Right.
Q. -- that means you're farsighted.
A. Okay.

Q. If you can see close up, but you can't see at a distance, it means you're nearsighted. Which one did you --

A. So I was having some problems with the DOT exam itself, so that caused me to go get my eyes checked before it became a problem. So it wasn't something that someone made me go do. I took the initiative and done it on my own.

Q. How long ago was it identified that you had some eye problems?

A. That was -- that was the same day of my eye injury.

Q. Well, you told me you had corrective lenses before that time.

A. Yes, I did.

Q. And you told me you had problems with the DOT.

A. Right.

Q. Was that problems with the DOT before your eye injury?

A. Yes. Now, the problems that I'm referring to, I was having a hard time seeing from a distance, but I still passed the test. So instead of it -- allowing it to become a problem, I took the initiative and went and got my eyes checked on my own.

Q. So approximately when would that have been?
A. I don't remember.
Q. Well, you got out of Shippers' Choice, I think you told me, in 20 --
A. 11.
Q. 2011.
A. Yes.
Q. Was it within a year of Shippers' Choice?
A. No.
Q. Two years?
A. No. This was -- this was -- this was before I started working for Joe Moholland.
Q. Okay. So Damco was 2014?
A. Uh-huh.
Q. And that's before Joe Moholland --
A. Uh-huh.
Q. -- Locke, Mayflower --
A. Uh-huh.
Q. -- all that.
A. Yes.
Q. All right. We've got some information that in 2018, you actually resigned from Mayflower. Do you know anything about that?
A. Well, there was a couple times -- I was

doing a lot of -- I was doing a lot of work in Florida. And me and my wife, we wanted to either move to Florida or back to Texas because my mom and dad are not in the best shape. So I had put my resignation in to move. So that's where that came from.

Q. And your resignation, who did you submit it to?

A. Mr. Locke.

Q. Okay. You knew at that time you were driving for Mayflower, didn't you?

A. Well, I knew I was driving for Joe Moholland, but I never -- I never knew anything about Mayflower, just that I drove for Joe Moholland.

Q. All right. Do you know why Mayflower would have had in your records that you resigned as a driver for them?

A. No.

Q. Okay.

MR. HODGE: Ms. Court Reporter, we referred to Tab 2, I think it was. We referred to UniGroup certificates. I want to mark those as Plaintiff's Exhibit -- easier on you to do it collectively or --

THE REPORTER: Whatever you'd like to do is fine.

MR. HODGE: Okay. So what we'll do is at the end, if it's okay, we'll decide on how we'll mark it.

(The document was marked as Plaintiffs' Exhibit No. 1.)

BY MR. HODGE:

Q. Is there a company that you worked for called Century Express?

A. Yes.

Q. What's that company?

A. That was -- they were -- they were intertwined with the BBC Trucking.

Q. Okay. When you were talking about BBC, were you interchanging BBC with Century Express?

A. Yes.

Q. And did you get let go from either one of those?

A. Well, the charges came up about the -- about my kids, so yes.

Q. All right. And then I think in August -- actually, August of 2011 through June 2013, that was CCC Transportation?

A. Yes. In West Point, Virginia.

Q. Okay. And then Mayflower, Virginia

Transfer -- and Virginia Transfer was an authorized Mayflower operator; is that right?
A. I don't know.
MR. EHRENREICH: Object to form.

BY MR. HODGE:
Q. Did you have Mayflower markings on your Virginia Transfer vehicle?
A. Yes.
Q. It looks just like that in December 2015?
A. Yes.
Q. And Virginia Transfer ended because?
A. My eye injury.
Q. Your eye injury. Okay. And then after that, we've got SIMOS Insourcing Solutions from January 2016 to February of 2017?
A. That is a temp service. I was working through them at the Damco warehouse. The Walmart Distribution Center.
Q. And that didn't have anything to do with operating a --
A. No.
Q. -- tractor trailer?
A. No.
MR. HODGE: All right. I'm going to put

in an exhibit. This is Bates-stamped JMI00066.

(The documents was marked as Plaintiffs' Exhibit No. 2.)

BY MR. HODGE:

Q. I want you to take a look at this. I'll let your lawyer see it. In fact, this is a clean copy. All right. Tell me what it says up on the left-hand side of that document.

A. It says "Mayflower Transit."

Q. Okay. Do you remember this document?

A. No, I do not.

Q. You've never seen this document?

A. No, I have not seen this document.

Q. But it says "Mayflower Transit, LLC Van Operator Separation Notification." Did I read that correctly?

A. Yes.

Q. All right. What's the date on that?

A. It says 5 -- May 1st, 2018.

Q. 2018. I want to show you another one. It's Mayflower 001428. Again, we'll put these in at the end.

(The document was marked as Plaintiffs' Exhibit No. 3.)

BY MR. HODGE:
Q. And what does that document say up on the left-hand side?
A. It says "Mayflower Transit."
Q. All right. Does it have your name on there?
A. Yes.
Q. Okay. Do you know what that document is?
A. It says "Van Operator Separation Notification."
Q. Okay. So you don't have any idea where these documents came from?
A. No, I do not. I know both of these -- I know both of these -- both of these documents are attached to Joe Moholland because this is my driver identification number.
Q. And read the dates on the respective documents, please.
A. The first one says 2015, and the second one says 2018.
Q. All right. And despite those documents, you continued to operate tractors that bore Mayflower markings?
A. Yes.
Q. Did Mayflower ever tell you not to

operate vehicles with Mayflower markings?
A. No.
Q. Did Mayflower ever tell you that you were disassociated from their operation?
A. No.
Q. And that's through the wreck of July 1st of 2022?
A. Yes.
Q. Never notified?
A. No.
Q. Okay. Was there any change in the way you operated your tractor trailer between January of 2022 and this wreck of July 1st, 2022?
A. No.
Q. Any changes that were described to you by Moholland, Locke, or Mayflower or UniGroup?
A. As far as what?
Q. Operation.
A. Any specifics?
Q. Yeah, any specifics.
A. No. I'm asking you.
Q. Yeah. I mean, did you do your job any differently between that time frame and through the wreck of July 1st?
A. No.

Q. Okay. Were you told to do your job differently?
A. No.
Q. Were you told to identify or not identify Mayflower when you would have inspections for example?
A. No. I just produced the documents that were asked and pretty much went from there.
Q. Do you know this company called SignalHire?
A. No, I do not.
Q. Are there various sources you can check on the Internet for drivers and who they work with and that type of thing?
A. I don't know.
Q. I want to show you this document. If you look under Tab 3 at the top left, do you see a date on that document?
A. It says August 30th, 2022.
Q. Does it identify a time?
A. 7:55 p.m.
Q. Okay. And would you publish what the big print says beginning with list?
A. It says "List of Mayflower employees."
Q. All right. If you go to the second page, fourth column down.

A. Yes, sir.
Q. Publish that for me. What does it say?
A. It says "Nicholas Burist."
Q. To the right of it?
A. Independent contractor.
Q. The state?
A. Virginia.
Q. Okay. And do you see that -- you see that e-mail address?
A. Yes, I do.
Q. Okay. Did have an e-mail address?
A. Not to my knowledge, no.
Q. All right.
MR. HODGE: We'll put that in as an exhibit.
(The document was marked as Plaintiffs' Exhibit No. 4.)

BY MR. HODGE:
Q. In the Navy, did you get any kind of certificates?
A. Not that I can remember.
Q. Did you get any awards or merits, anything like that?
A. No.

Q. Were you ever disciplined in the Navy?
A. Yes, I did.
Q. What was your discipline in the Navy?
A. The consequences of my -- of going UA. I did 50 days in the brig. Went to temporary TPU.
Q. Listen, you're using some initials I'm not familiar with. So first tell us what UA is.
A. It's AWOL.
Q. UA means AWOL in the Navy world?
A. Right.
Q. Okay. You went AWOL in what year?
A. I don't remember the exact year.
Q. Why did you go AWOL?
A. My wife was -- my first wife was pregnant with my first daughter. She was having complications. I was young. So my first instinct was my family instead of being on the shift.
Q. So you did 50 days in the Navy's version of prison. You call it the brig; is that right?
A. Yes.
Q. Now, apart from the Camden incarceration and the Navy incarceration, have you been incarcerated other places?
A. No.
Q. We've talked a little bit about your

medical history.

A. Yes.

Q. You described after your eye injury that your vision was not the same after the eye injury as it was before. Did I hear that correctly?

A. That's correct.

Q. What's the difference?

A. My left eye is -- if I take my glasses off, you might can see how my eye kind of -- it's kind of closed up a little. So I had damage done to my cornea which is permanent. So the glass lens in my left eye is for that -- for that eye. My right eye is -- there's no damage to that. So it's just my left eye. So I have to wear these glasses.

Q. Well, when you say, "damage," I'm trying to understand. You already had issues before you hurt your eye. I'm trying to understand what -- what's the -- what's the problem associated with it?

A. No.

Q. Is it blurry? Do you have worsening vision from near or far? Just describe it for me if you would.

A. I mean, I really don't know how to -- I really don't know how to explain it. I was saying before that I had some problems with myself with my DOT

physical with the eye exam. Nobody told me to do it. I did it on my own. I got hit in the eye with a metal buckle, so that scratched -- that scratched my cornea. And so it reduced -- it reduced, I guess, the visibility in my eye to a certain percentage, so I have to wear -- I have to wear these glasses for the rest of my life.

Q. Well, the glasses, do they get your vision back to normal in that left eye that was damaged, the cornea damage?

A. Yes.

Q. So you see 20/20 with those glasses?

A. Well, I see pretty good.

Q. Do you know what your vision is?

A. No, sir, I do not.

Q. Okay. Do you have diabetes?

A. No.

Q. Hypertension?

A. Yes.

Q. How long have you had high blood pressure?

A. I don't know exactly how long I've had it, but I was diagnosed with it when I made it back home from Camden County.

Q. Okay. Never diagnosed before then?

A. No.
Q. And do you take medication for it?
A. Yes, I do.
Q. What's the name -- what's the name of the medication?
A. I was taking Amlodipine for a while. I take Losartan, and I take another blood pressure pill. It starts with an S, but I can't tell you what the name of it is.
Q. So a combination of those three?
A. No. Just a combination of the two. The one that starts with the S and the Losartan. I don't take the Amlodipine anymore.
Q. Have you gone a spell where you didn't take those pills?
A. I'm sorry?
Q. Have you gone a spell where you didn't take those pills? I'm interested in what happens to you if you don't take that medication.
A. Generally, I would get a headache. A real bad headache.
Q. Okay. Now, before July 1st, were you on any medications?
A. No.
Q. None whatsoever?

A. No.
Q. Who was your physician before July 1st?
A. I didn't have one.
Q. When was the last time you had seen a medical doctor for any reason?
A. Probably the last time I went to the emergency room.
Q. Would that have been in the year 2022?
A. I'm not sure.
Q. Why did you go to the emergency room?
A. I mean, it could be -- most of the time when I went to the emergency room, it had to be really serious, like -- like the flu or something like that. Other than that -- and that's the only time I would see a doctor.
Q. What emergency room would you go to?
A. Port Warwick. Port Warwick.
Q. Warwick, W-A-R-W-I-C-K?
A. Yes.
Q. Okay. Have you had any surgeries?
A. No.
Q. Ever been hospitalized for any reason?
A. No.
Q. Ever denied a medical certificate?
A. No.

Q. When was the last time you took a DOT physical?
A. It was -- if I'm not mistaken, it was in 2022.
Q. And who did you take it from?
A. The I&O clinic.
Q. I&O?
A. Yes.
Q. Where are they located?
A. On Aberdeen Road in Newport News.
Q. Is this a facility that routinely issues DOT medical certificates?
A. Yes.
Q. You go and give a drug sample, like a urine sample, all that kind of --
A. Uh-huh.
Q. Did Mayflower, UniGroup, Moholland, Locke have any kind of random drug testing?
A. Yes, they did.
Q. Okay. And when were you tested, if ever --
MR. EHRENREICH: Excuse me. Before you respond, this is Todd Ehrenreich. It's a compound question. You listed three defendants in one question. If you could divide all of

those up, that would clear up the question, and I won't have to object. Thank you.

MR. HODGE: Okay.

BY MR. HODGE:

Q. Who issued the requirement for you to have the urine testing?

A. It would be Joe Moholland's company.

Q. Okay. And so you did your drug testing?

A. Yes.

Q. Do you remember doing it in 2022?

A. Yes.

Q. How many times?

A. If I'm not mistaken, twice.

Q. Did you have advance notice of the testing?

A. No.

Q. Have you ever been advised that you were unable to drive because of a physical or mental problem?

A. No.

Q. Did you have workers' compensation coverage?

A. Yes.

Q. Did you file workers' compensation after

this wreck of July 1st?
A. No, I did not. I didn't even have a chance to file it. They sent me paperwork in Camden County.
Q. Okay.
A. Denying me.
Q. All right. And what was the basis of the denial?
A. They said that I had an accident for drunk driving, so they denied me.
Q. Did you appeal it?
A. No.
Q. Did you accept it as the truth?
A. I just didn't pay no more attention to it.
Q. Okay. Tell me how it worked, just the logistics of -- and if you can use this load, it would be great, but how you would be told about the load, where you would go, what you would do. Just kind of take it through right up to the point of the wreck.
A. I'm sorry. Could you repeat that?
Q. Take me through how you picked up the load, were to deliver the load, right up to the point of the wreck.
MR. SMITH: Clarification. You're asking

about the day of the accident?
MR. HODGE: Correct.
THE WITNESS: I plead the Fifth.

BY MR. HODGE:
Q. All right. So you're pleading the Fifth. And I'm not asking you about the circumstances of the wreck. I'm just asking you about the circumstances leading up to the wreck.
A. I don't remember.
Q. You don't remember?
A. No.
Q. So you have no memory whatsoever of these events of July 1st?
A. Again, I plead the Fifth.
Q. All right. And you're talking about the day of the wreck that you're pleading the Fifth; is that right?
A. I'm pleading the Fifth to the question that you're asking.
Q. Did you retrieve the load before July 1st?
A. Yes. I already had the information for the load.
Q. Well, tell me about the logistics of

that. How would you go about getting the load?

(The was a pause in the proceedings.)

BY MR. HODGE:

Q. Okay. Go ahead.

A. I would get the information from Mr. Locke. He would ask me when was I ready to leave back out. We would -- he would get the folders ready. The folder had all the information. Who the -- who the shippers were, where it was coming from, where it was going, the pickup date, the delivery date, the date that -- the latest date that it could be delivered. We would meet at the gas station in -- right around the corner from the Joe Moholland warehouse. At the gas station, we would fuel up so that would already be done. Either he would give me the folders beforehand, or I would get them the day of.

Q. Why was Locke involved as opposed to just Moholland giving you the same information?

A. Could you repeat the question?

Q. Why was Locke involved as opposed to Moholland just giving you the information directly?

A. Mr. Locke was the dispatcher.

Q. So Locke was the dispatcher for Moholland?

A. I'm not sure -- I'm not sure what his association with Joe Moholland is, but I would get -- I would get my work assignments from Mr. Locke.
Q. Is that how you perceived Mr. Locke, he was your dispatcher?
A. Yes.
Q. All right. Did you have direct connection with Moholland?
A. No. And for the record, I have never met Mr. Moholland.
Q. Okay. So you would get the information, and this information contained -- it contained a bill of lading?
A. Yes.
Q. What other information did the folder contain?
A. It contained -- it contained what type of load it was. It contained the pickup weight, the pickup -- the pickup delivery date and address. It had the shipper's information. It had the information where it was going, the delivery date for the -- the earliest -- the earliest date that it could be delivered, and the latest date that it could be delivered.
Q. Okay. Let's talk about the shipper's

information.
A. Okay.
Q. Have you heard of this company called TNN?
A. TMM.
Q. TMM?
A. Yes.
Q. Like Mike, Mike. Tango, Mike, Mike.
A. Right. Yes.
Q. Do you know what that stands for?
A. It's Total Military Moving if I'm not mistaken.
Q. Okay. And what kind of company is that?
A. They handle -- they were the coordinators for the military moving specifics.
Q. All right. And this TMM, do you understand how they would interact with Moholland and/or Locke?
A. No, I do not.
Q. If they were the shipper -- is that how TMM was described, as the shipper?
A. No. The shipper are the people that the goods belong to. TMM, they were just the coordinators that handled the military's move process.
Q. And had you done work with TMM before?

A. No.
Q. This was your first military load?
A. No. The answer to the first question is no, I have not -- I have not done business directly with TMM. The majority of the loads that we delivered are military loads or were military loads.
Q. Okay. And I may have phrased the question poorly.
A. Okay.
Q. Had you worked loads before this load that ended up in the crash of July 1st, had you worked loads for TMM before?
A. No.
Q. Had TMM been the coordinator of loads before?
A. Yes.
Q. All right. And that's what I mean when I'm -- you're using the term "coordinator," so I'll try to remember to use that.
A. Right.
Q. So do you have any idea about TMM's interaction with Mayflower, UniGroup, Moholland, and/or Locke?
A. No.
Q. Okay. On this particular load, do you

remember when you got that information from Mr. Locke?
A. I don't know the exact -- I don't know the date. I don't know a date. I don't know the exact date.
Q. Approximation given the wreck happened July 1st?
A. I'm not sure. I'm not sure exactly. I'm not sure exactly the date.
Q. When you get loads from Mr. Locke, would you get them weeks in advance or days in advance?
A. Days.
Q. Okay.
MR. HODGE: Let's take a break. We're going to put a battery in the computer.
THE VIDEOGRAPHER: Going off the record at 11:53 a.m.
(There was a pause in the proceedings.)
THE VIDEOGRAPHER: Back on the record at 12:05 p.m.

BY MR. HODGE:
Q. Mr. Burist, we were talking about the load, and you told me the information that Mr. Locke would give you.
A. Uh-huh.

Q. Delivery date, earliest, and latest. So take me through. You get that information, and what happens next with regard to that load?
A. Can you repeat that?
Q. You get the information from Mr. Locke.
A. Right.
Q. What do you do with it?
A. Well, after my truck is fueled up and I get the information, then I have to start planning my trip and finding my help.
Q. All right. Take me through that process.
A. Well, I would have to first of all find my help to deliver the loads. When I get that -- when I get that -- when I got that situated, then I would be able to determine when I would be -- when I would leave.
Q. All right. The help that you found, who did you find for this job?
A. Well, Charles Davenport was one of my helpers and Michael Hines. Both of these guys were pretty much more or less, if you would say, my permanent help.
Q. They had worked jobs with you before?
A. Yes.
Q. And so if you had a load to do, would

that be typical that you take two assistants?
A. It would just depend on the -- how many pounds the load was would determine on how many people I would need.
Q. What would your threshold be? In other words, if you were just going to take one, what would -- with the weight, what kind of weight would you be talking about?
A. Maybe -- maybe -- maybe 3,200 pounds. Something small like that that was going directly into a warehouse. Yeah, probably just one person. Because I would unload it, and the other person would unwrap it and place it on the floor at the respected place for the delivery.
Q. By the time July 1st, 2022, had come around, you had been delivering -- moving loads for several years; is that right?
A. Yes.
Q. How did you choose that versus, you know, like, delivering a gas tanker truck or -- I think before you delivered loads from the port?
A. Well, those loads were different. Those were pretty much just -- just back in. Working for Mr. Moholland, that were pretty much hands-on.
Q. It seems like that would be a harder job

than the other job you described --
A. Yes.
Q. -- is that right?
A. Physically, yes.
Q. Did you ever think about getting out of it or --
A. Yes. Several times.
Q. Okay. But you were physically unloading as well as whatever helpers you've got?
A. Yes.
Q. All right. How long had you known Charles Davenport?
A. I had known -- I had known Charles maybe a year. Maybe a year, maybe a little longer.
Q. How did you go about selecting him?
A. He was my neighbor. He lived a house over from my house. And the gentleman that he lived with, he brung Mr. Davenport to my attention. It was never my intention to use Mr. Davenport. Just a situation arised where I was short of help, and he was available. I had some jobs that, you know, I figured that he would be able to -- he would be able to assist me with. And he started working with me like that. It just depended on his availability. He was not, per se, my first go-to guy because I knew he wasn't -- he

wasn't able to be committed to working with me at the capacity that I was working.

Q. The capacity you were working was approximately what frequency?

A. Steadily.

Q. Like --

A. Continuously.

Q. -- every week?

A. Every day.

Q. Okay. When Davenport started working with you --

A. Yes.

Q. -- did you have him fill out some paperwork?

A. No, I didn't. We had a verbal -- a verbal interview. Just consisted of just a few questions, you know. First of all, I would give him the description of what I did, and I would -- him, per se, I let him know how much the job paid, and if he was interested or not, he would give me a call. When I first talked to him, I talked to him and his wife. I pretty much talked more to his wife than I did him, per se, until I guess when we actually started working together. He needed some money. I was looking for -- I was looking for some help. And so she thought it was

a good idea for him, you know, and it went from there.

Q. Did Mayflower/UniGroup or Moholland or Locke have any requirements about who you selected? Background checks, anything of that nature?

MR. EHRENREICH: Sorry. I apologize, Mr. Burist. Todd Ehrenreich objecting to that compound question again. Thank you.

BY MR. HODGE:

Q. Go ahead.

A. Again, neither -- neither of the -- neither one of those, per se. It was more -- it was more so on a -- a respect-type level when it came to selecting people for the jobs. One requirement was capability. And then I would say not a background check, a criminal background. That really -- that -- like I said before, that really does not define who a person is just because they've been through some things in their life.

With this job here, it's more -- it was more so the capability of the person if they were able to do it. The proficiency, the effectiveness of that person was -- was a big factor because there were other people who could -- being a part of a team, we could go in, knock the job out, and get back to our day. Not

every -- not every job was designed like that because you couldn't get the same help each time, per se, myself. So it was just decency and capability.

Q. So you didn't do a criminal background check on Davenport?

A. No.

Q. Did you ever do one on Hines?

A. No.

Q. Did anybody in the Moholland, Locke, or Mayflower/UniGroup do a background check on either of those individuals?

A. No.

Q. Did you list those individuals as your helpers?

A. Yes.

Q. And how would you go about that list?

A. I had labor forms or labor sheets, per se, that I had to fill out for each person that worked with me on each job unless it was a person that worked for Mr. Locke personally. That's how we would go about that situation.

Q. Did those individuals wear Moholland/Mayflower/UniGroup uniforms?

A. Yes. I provided those.

Q. All right. And where did you get those

from?

A. They would just wear some of my shirts, per se. And if they didn't work for me no more, they could keep the shirt. I'll get some new ones.

Q. Why did you have them wear Mayflower/UniGroup markings?

A. Because to do the job, we had to be in uniform.

Q. All right. So when you would be in uniform and you would step out and the general public would see you, what they would see is Mayflower/UniGroup markings?

A. Yes and no.

MR. EHRENREICH: Sorry, Mr. Burist. This is Todd Ehrenreich. Object to form. Thank you.

THE WITNESS: One -- one -- the overall shirt would say Joe Moholland. It would have Mayflower on -- somewhere on the ship.

BY MR. HODGE:

Q. On the what?

A. The Mayflower -- the Mayflower logo is the Mayflower ship.

Q. Okay. So it would have the ship?

A. Yes.

Q. All right. And when you were driving your tractor including the tractor that was involved in this wreck, it had Mayflower markings on it. We've established that, right?

A. Yes.

Q. Okay. And would you presume that people who saw that tractor would presume that in some sense that that vehicle was being operated on behalf of Mayflower?

MR. EHRENREICH: Mr. Burist, before you answer, this is Todd Ehrenreich again. Object to form.

THE WITNESS: Yes and no. Out of state, yes. In town, no.

BY MR. HODGE:

Q. Okay. And this wreck happened out of state?

A. Yes.

Q. When you say, "out of state," you're talking about out of the state of Virginia?

A. Yes.

Q. Okay. I want to go to Tab 4 if you would.

A. Okay.

Q. All right. If you'll turn to the first page. This is Mayflower 000077.
A. Yes.
Q. It says "Agency Statement for Mayflower Transit." Do you see that?
A. Yes.
Q. For the period ending July 13th, 2022.
A. Uh-huh.
Q. Do you see that?
A. Yes.
Q. And that was after this wreck; is that right?
A. Yes.
Q. Now, as you go to the bottom of that page -- strike that. Go to page 78 if you would. Very next page.
A. Okay.
Q. At the very bottom you see where it says "PDRM Prism-MTI Driver Insurance Premiums"?
A. Yes.
Q. And it's got numbers 37, 38, and 39.
A. Yes.
Q. All right. Continuing with that driver insurance premiums, I would ask you to go to page 79, line 41.

A. Okay.
Q. Are you with me?
A. Yes.
Q. And what's that date on that line 41?
A. July 1st, 2022.
Q. And to the right, what does it say?
A. Mike Peters.
Q. Under description, it says At7069. Does that mean anything to you?
A. No, it does not.
Q. Okay. And then right beside that -- that number At7069, it says "Burist, Nicholas."
A. Yes.
Q. That's you?
A. That's correct.
Q. All right. And then it says "Mike Peters."
A. Yes.
Q. Who's Mike Peters?
A. Well, at the Hampton -- at the Hampton office, Mike Peters is the boss.
Q. The Hampton office of what?
A. At Joe Moholland's company warehouse, Mike Peters is the boss.
Q. Okay. So this is an agency statement

from Mayflower Transit to Joe Moholland Moving. Do you see where it says that? I'm not making it up. Go back to page 78, and you'll see what I'm talking about.

A. Uh-huh.

Q. Did I read that correctly, Agency Statement Mayflower Transit, and then it's got Joe Moholland Moving with M00333 being Moholland's designated number?

A. Yes, that's what it says.

Q. And you understand that's the designated number for Joe Moholland within the UniGroup/Mayflower system?

A. Yes, I do.

Q. Okay. Now we go back to page 79.

A. Yes.

Q. We're on line number 41.

A. Yes.

Q. And we previously established on the previous page that this was payment of a driver insurance premium. Did you see that?

A. Yes.

MR. EHRENREICH: Let me object to form. This is Todd Ehrenreich.

BY MR. HODGE:
Q. And to the right in that column, it says "Due HQ."
A. Uh-huh.
Q. And the amount is 280.55.
A. Okay.
Q. Does that appear to be an insurance premium paid on your behalf?
A. I don't know.
MR. EHRENREICH: Object to form.

BY MR. HODGE:
Q. How was your insurance taken care of?
A. I don't know.
Q. Okay. Did you expect your vehicle was insured?
A. Yes.
Q. But you had no knowledge of the ins and outs of it?
A. No.
Q. That was a Mayflower Transit/Moholland thing?
A. I would say so.
Q. Okay.
MR. HODGE: We'll put that in as an

exhibit.

(The document was marked as Plaintiffs' Exhibit No. 5.)

BY MR. HODGE:

Q. What's an ELD in your world?

A. It's an electronic log device.

Q. Okay. And did you have an electronic log device in the tractor on July 1st?

A. I believe so. I'm not -- I don't remember.

Q. And had you used these ELDs in other runs?

A. Yes.

Q. For years?

A. No, not for years. It was -- it was fairly new to me.

Q. When approximately?

A. I couldn't say.

Q. Would it have been in the year 2021?

A. Possibly.

Q. Okay. Do you have any way of going back and checking that when you first --

A. No. Mike Peters took care of all that.

Q. What is an ELD?

A. It's an electronic log device.
Q. But how does it work?
A. It monitors -- it monitors -- well, basically, it's an electronic logbook. Instead of manually filling it out, it's electronic, so --
Q. All right. But what do you do? I mean, what do you put in it?
A. First to -- first of all, to actually get it running, you have to put your driver information in it. And then once you do that, you do it just like you do a regular logbook. You log into a -- either an on duty, not driving; pretrip inspection. After the pretrip inspection, you start with -- well, when it's safe to go, you would start -- the electronic log would pick up your driving. It might monitor your speed, stops. It had a few -- it had a few ins and outs to it versus doing it on paper. If you got under a certain speed, it would log you as not driving versus you doing it on paper. So you really had to keep an eye on it as far as hours of service. Because, like I said, it's electronic, and it just keeps rolling. So the electronic log versus the paper log, it actually will put you on the clock as you were saying earlier about time is money.
Q. So let's say you've got a big load.

You're going down I95.
A. Right.
Q. And there's some kind of sudden stoppage.
A. Right.
Q. So what happens with the ELD at that point?
A. It would log you as not driving. It would ask you if you're still driving, or when you pick speed back up, it would automatically start back by itself.
Q. So would you take action, like, if you got caught in a traffic jam?
A. No. No. Because, like I said, time is -- time is the factor with that. So, I mean, like, if it's not -- if it's not, like, an urgent delivery -- just, per se, say, you're on your way going out of town. You're on your way. That's not a big issue. All you have to do is just get to where you're going and start delivering the next day.
Q. Are you getting paid for just the time the vehicle's running?
A. No. You get paid by the job.
Q. By the job?
A. Yes.
Q. So why would it be important to measure

whether you stopped or not?
A. Well, that falls in the CDL regulations, hours of service.
Q. Okay.
A. Yes.
Q. Do you know why Mayflower would be paying that insurance premium that we saw on the previous exhibit?
A. I do not.
Q. Are pretrip inspections done digitally?
A. No.
Q. How are they done?
A. They're done physically.
Q. And how do you document that you have done a pretrip inspection?
A. Well, there are DVR slips.
Q. What's a DVR?
A. It's a -- it's sort of like when you go get your car inspected. It has each -- each thing that the person is checking on your vehicle. It's the same way with a semi.
Q. What does DVR stand for?
A. I don't remember exactly what it stands for. But you would -- you would -- you would check -- you would check off on anything that had a malfunction.

And then if it didn't have a malfunction, you just sign it, and it was good.
Q. So I fly airplanes. And we do a preflight inspection.
A. Right.
Q. And I'll look at the tires.
A. Yes.
Q. I'll look at the wing. I check the oil.
A. Right.
Q. Things of that nature.
A. Yes.
Q. Now, I don't have a written list, per se, but because it has a certain flow, I know what to do.
A. Right.
Q. But in your world, do you actually fill out that written checklist?
A. Well, I -- that was -- so it was pretty -- an in-town situation to do that.
Q. And tell me what do you mean by --
A. If you -- if you work locally.
Q. Well, what about over the road?
A. Well, if you're doing it over the road, I mean, it's really -- I mean, you really don't need to do that. Because if there was a problem, like I say, you call Mike Peters, and Mike Peters would send the --

they would get in contact with the appropriate people, and they would say, Hey, take it here, take it there. So all the paperwork would go back to Joe Moholland. All the paper -- all the -- everything in that nature would go back to Joe Moholland. In case it was something going on when I got back, that issue, I would address it verbally with Mr. Locke, and Mr. Locke would take the proper procedures to make sure that the problems got fixed.

Q. Well, it seems to me that would be more important to do a proper pretrip inspection when you're going to cover many miles. Like you would want to know the condition of your tires, wouldn't you?

A. Yes.

Q. You would want to know the condition of your brakes?

A. Right.

Q. Any grease leaking?

A. Right.

Q. And you would do the same type of inspection for the trailer as well, wouldn't you?

A. Yes.

Q. And how would you document that?

A. Same way.

Q. I mean, did you write it down?

A. No.
Q. So there's no written documentation of you ever doing a pretrip inspection for the trip that occurred on July 1st?
A. Well, yeah. That's a visual eye contact. Mike Peters -- Mike Peters would be -- would be available at the time, or Mr. Locke would be there.
Q. Are you saying that Mr. Locke would witness you doing --
A. Yes.
Q. -- doing the pretrip inspection?
A. Yes.
Q. That would be on every trip?
A. Yes. And this was -- this was a big issue. This was a big issue with Mike Peters and Mr. Locke. They were very big on safety.
Q. Did you carry your tractor home to your house, or did you leave it on Moholland's lot?
A. No. I left it at Joe Moholland's property.
Q. Did Peters or Locke make any written recordation of these pretrip inspections?
A. I don't know.
Q. Did anybody from Mayflower or UniGroup ever participate in a pretrip inspection?

A. No, no.

Q. End of May, June time frame of 2022, what routes were you driving?

A. My main routes were to Florida, Georgia. Sometimes Georgia. Various parts of Georgia, then to Florida, back to Virginia. Most times it was either that particular type route or just from Virginia to Florida and back to Virginia. But at that time, the last couple weeks, I guess the last three weeks or so I was not going to Florida as much. I was Georgia and different parts of North Carolina. Fort Bragg. Those type of situations.

Q. You told me earlier you had done a number of military moves.

A. Yes.

Q. And Jacksonville is a station. I guess is it called Mayport or something?

A. Mayport and the naval air station.

Q. All right. And did you deliver to a company called Conser?

A. Conser Moving & Storage, yes.

Q. Conser Moving & Storage, were they a Mayflower agent?

A. I don't know.

Q. Okay. Did you see Mayflower vehicles?

A. Yes.
Q. UniGroup vehicles?
A. I don't know. I can't remember seeing a UniGroup trailer.
Q. All right. But you saw Mayflower?
A. Yes.
Q. And do you know how the destination agent gets paid when the delivery is -- when a tractor trailer gets there?
A. No.
Q. And would the deal be you would drop that trailer off at that -- at Conser and then deadhead it back, or would you get another trailer and drive it back up?
A. No. I would deliver all the shipments that were inside the trailer that I was pulling, and then I would deadhead back to Virginia unless there was a stop that needed to be picked up on the way back.
Q. And was the Moholland/Locke group negotiating that pickup on the way back? How would you get the information, in other words, of a pickup on the way back?
A. I would get the information from Mr. Locke.
Q. Okay. And would that be before you ever

took the load and delivered it to Conser?
A. No. That would be information that would be shared on the -- on the way back.
Q. Okay. And how would that information be shared?
A. It would just depend. Sometimes -- I mean, it might have been -- sometimes maybe it might have been a spur of the moment-type situation. Call, Hey, where you at? Well, I'm in South Carolina right now. Well, hey, we got this load want to pick up somewhere in North Carolina. So I would have to make the necessary arrangements to pick that shipment up. I would have to inventory. I would have to inventory all the merchandise in the load that I was bringing back. I would have to weigh it. It would get -- it would get an empty weight and a heavy weight, and that would determine the total weight. And all that information would go back to the warehouse in Hampton. But that did not happen very often. Most of the time, I would come back empty.
Q. How did you get paid?
A. Mr. Locke paid me.
Q. When did he pay you?
A. He would pay me when I -- after each trip when I came back.

Q. How were expenses handled? Like, you got to get fuel every once in a while, don't you?
A. Mr. Locke would give me -- he would give me money for trip expenses. And I would -- I would make all the adjustments that I needed through that money, and I would bring back the receipts, and I would turn all the receipts and the money that I brung back to Mr. Locke.
Q. Was he giving you cash?
A. Yes.
Q. Did you have any credit cards?
A. No, I did not.
Q. How would you pay for fuel?
A. Cash.
Q. How would -- how would it be determined what would be enough money to get you through to the destination and deadheading back?
A. It just depended on where I was going. If I was going -- if I was going to somewhere, say, North Carolina, most of the time I would have a load going to North Carolina, he might give me $300. It was very rare that I had a shipment going to South Carolina. So if I was going from Virginia to Georgia to Florida back to Virginia, then I would have sufficient trip money to -- for labor and fuel and

various expenses. Maybe, say, something -- I need some oil or something of that nature. So Mr. Locke would make sure that I have what I needed to get the job done.

Q. How much did he give you cashwise before this job that culminated in the wreck of July 1st?

A. Again, like I said, it just depended on the job.

Q. Well, that job. How much?

A. He gave me $1,000.

Q. Is that a normal amount?

A. Yes, that would be a normal amount from Virginia to Georgia to Florida and back to Virginia because the cost of diesel is pretty high. So the diesel would pretty much take a nice chunk out of the money. And then, say, I had to get extra help. So the money that he would give me would suffice to take care of my trip. And when I got back, I would turn in the receipts and the money that's left over from the trip.

Q. When you go through a state but not get fuel, would you have to account for the miles that you drove through that state?

A. No.

Q. That was not a requirement?

A. No.

Q. If I used the term "IFTA," does that mean anything to you?
A. No.
Q. Okay. Tell me some destination agents that you recall. You have mentioned Conser.
A. Yes.
Q. And you saw Mayflower trucks in that entity. What others?
A. Covan, Atlas. Those -- those are pretty much -- those are pretty much the ones that I can remember. Covan, Atlas, then Mayflower. That's one of the main ones out there.
Q. Covan and Atlas, were they designated Mayflower delivery centers?
A. It just depended on if the shipment was going into storage, which would be a warehouse. So it would just depend on that.
Q. Did you ever go to those places and not see Mayflower markings and/or trailers?
A. It would be very --
MR. EHRENREICH: Object to form. Let me object to form, Mr. Burist. Go ahead.
THE WITNESS: It would be very rare that I went somewhere that there was not a Mayflower truck.

BY MR. HODGE:
Q. Okay. Northwest Movers, does that mean anything to you?
A. No.
Q. How about Slidell Moving? Have you ever heard of that?
A. No.
Q. Okay.
(A document was marked as Plaintiffs' Exhibit No. 6.)

BY MR. HODGE:
Q. Let's look at Tab 5. These are some DOT inspections. Do you recall -- if you'll go to the second page, in the middle of the page, do you see where it says "Mayflower Transit" --
A. Yes.
Q. -- "LLC, Fenton, Missouri"?
A. Yes.
Q. It's got at the top engine and transmission. Do you recognize that as being the type of tractor that you operated?
A. I don't remember.
Q. Okay. This is an inspection dated June 17th, 2022. Before this wreck.

A. Yes.
Q. Do you remember this inspection?
A. I have knowledge of it, yes.
Q. Okay. Tell me about it.
A. If I'm not mistaken, this is the weigh station when you first come into the state of Georgia coming from 95 south.
Q. Just after you pass South Carolina?
A. Yes. As soon as you come out of South Carolina, you pass right into the state of Georgia, and this weigh station is right there. Whatever type of equipment they use to -- it picked up -- it picked up some issues with my trailer, and it pulled me in. And --
Q. What -- tell me how that works.
A. Well, when you -- when you come in, they'll either speak to you through the speaker, or the DOT agent, he will come out physically, he or her, they will come out physically and tell you to pull in. So this particular time he said come in. I didn't know what was wrong. When he did come out, he said that the machine had picked up some issues. I think I had a flat tire -- I had a flat tire on my trailer. And so I had to sit there until -- until the roadside assistance people came to take care of that.

Q. Okay. And how did you notify the roadside assistance?
A. Well, I had a direct number that I had to call, and -- I had a direct number to call them and let them know what the issue was. And --
Q. Do you have that number in your telephone?
A. No, I do not. It was Trans Advantage.
Q. Trans Advantage?
A. Yes.
Q. And do you remember that number?
A. No, I do not.
Q. Okay.
A. No, I do not.
Q. So Trans Advantage, who is that?
A. Those were the roadside assistance people. Our company was listed for, I guess, the direct billing if I'm not mistaken. I really don't know how that works. That was just a number that was given to me to call in case I had mechanical problems.
Q. Were you aware that Trans Advantage was wholly owned by Mayflower, slash, UniGroup?
A. No, sir, I did not.
Q. Were you aware the three officers listed for Trans Advantage were employees of UniGroup?

A. No, I didn't.
MR. EHRENREICH: Object to form.

BY MR. HODGE:
Q. So you get notified of that, about this tire thing. I think it was tire flat or --
A. Yes.
Q. And was there also something with the trailer axle? Two left side inner tire blown? Or was it all on the trailer?
A. I don't remember. But I just remember that there was an issue with a flat tire, a blown tire. Something of that nature.
Q. Had you had that issue before?
A. Yes.
Q. Okay. And so what happened? What happened on this June 17th?
A. Just --
Q. You called Trans Advantage?
A. Yes. And I had to wait until somebody came. And other than that, I just had to wait for them to come fix the tire before I could get going again.
Q. What happens with your ELD?
A. With the ELD, I have to go off duty with that.

Q. So you would punch that off duty?
A. Yes. Or it -- I mean, it just depends. Like I was saying, it just depends on the -- where you're going, what you've got to do. So I can't remember exactly what I was doing that day. And I really don't even remember what I did. I might have logged off duty. I might have stayed on duty not driving. I don't remember.
Q. Before that problem was identified, did you know that you had a flat tire?
A. No. It's kind of -- it's kind of tricky with that situation. Not all the time that you will know when you get a flat tire. Sometimes you get a blowout, pow, and you'll see rubber just in your rearview. Sometimes somebody will come up and flag, Hey, your tire blown out. Something of that nature. I did learn that day that they do have the malfunction detection device. So that was something new to me. I did not know that.
Q. Who has the malfunction detection device?
A. The state of Georgia, the weigh station. So I'm not sure if all weigh stations have that, but I found out that day they do.
Q. Okay. So when a tire blows on a trailer, there's no feedback through the steering wheel?

A. Well, it just depends on -- it just depends on where the tire blows out at. Not all the time do you -- it doesn't give you an indication. It just depends where at. Because there's 18 wheels on the truck, so if one blow out, that's not going to make that big of a difference, you know. So you don't know unless it gives you, you know, an exact indication, you know, through the steering.

Q. Okay. So whatever time it took Trans Advantage to come to the weigh station and --

A. Well, Trans Advantage, they're just like your roadside assistance with your personal vehicle. You just call them. Like your insurance company. You call them, Hey, I got, you know --

Q. And they send somebody out?

A. And they send somebody out. And once they fix the problem, they'll sign off, and -- because you need that to -- you need that to leave because if you don't have that signature and you leave and the situation is not taken care of, you can get a nice fine for that.

Q. Okay. Have you been in a situation where you had to -- you're kind of pushing tight on the time for delivery and you have a mechanical issue like this?

A. Uh-huh.

Q. How do you reconcile or deal with that situation?
A. Well, like I said, we get paid by -- we got paid by the job. I mean, you didn't get paid until the job was done. So, I mean, it's not really like, Hey, you know, there's nothing really you can rush or do anything about. I mean, you just got to wait and be patient.
Q. Have you been in a situation where a mechanical issue sidelined you where you didn't make the delivery on time?
A. I've had that happen to me several times.
Q. Okay. And does that affect your pay?
A. No. Like I said, you just have to finish the job. It throwed it off on -- off from the date that I thought I was going to get paid. That's about it.
Q. Okay. Now, you notified Trans Advantage?
A. Yes.
Q. Trans Advantage sent somebody to --
A. Yes.
Q. -- have this fixed?
A. Yes.
Q. At any time within the next week, two weeks, three weeks, or a month did anyone from

Mayflower ever say, Hey, this doesn't have anything to do with us; he's not a Mayflower vehicle?
A. No.
MR. EHRENREICH: Object to form. Todd Ehrenreich. Thank you.

BY MR. HODGE:
Q. And did you have other inspections before June 17th of 2022 in that same year?
A. I don't -- I don't remember. I don't remember that.
Q. Okay. How did you get Trans Advantage's number?
A. It was given to me by Mr. Locke.
Q. Okay. All right. Were you given a citation for the June 17th issue?
A. No.
Q. Had you been given citations before in Georgia?
A. No. Not -- not to my knowledge.
Q. Have you ever gotten a citation?
A. Yes, I have.
Q. When you get a citation as the driver --
A. Yes.
Q. -- what do you do with it?

A. Well, in this case -- well, in this case working for Mr. Moholland, if I got a citation, I had to pay for it. The company didn't pay for it. I know in previous times if that happens, the company would pay for it. But being that I was an independent contractor, I had to pay for it myself.
Q. Would that include problems with the tractor or trailer as well?
A. No.
Q. Okay. We're just talking if you were speeding or something like that?
A. Yes.
Q. Any other that you would be personally responsible for as opposed to the Moholland/Locke group?
A. No.
Q. Did you ever have to get the lining on the wheel of the trailer changed?
A. Not to my knowledge.
Q. Okay. Before this trip, did you understand that there was an issue with the lining on the wheel of the trailer?
A. No, I didn't.
Q. And I'm talking about the July 1st trip.
A. No.

Q. Okay. Do you look at the axles when you do your pretrip?
A. Yes.
Q. Why is it important to look at the axles?
A. Well, the axles are a part of the suspension, and if there are problems with the suspension, then that could be potential problems during the trip.
Q. So how do you identify a problem with an axle? What would be an example?
A. Cracks. In the axle, I guess just cracks. Air leaks. Stuff of that nature.
Q. Would cracks be reflected in the sense of lines? Is that how you would see it?
A. It just depends. It just depends on, I guess, how severe it is, what actually makes the difference.
Q. We talked a lot about Mr. Davenport. We didn't really talk about Mr. Hines.
A. Okay.
Q. How long have you known Mr. Hines?
A. I've known Mr. Hines almost six years.
Q. Was he your go-to guy?
A. He was at one point in time. And he and I, we didn't do business as much as we did in the past.

And he had contacted me, and he wanted to -- he wanted to start doing business again. And yes, Mike was a great go-to guy.

Q. Had Mike contacted you about -- before this particular job or other jobs before?

A. Other jobs before.

Q. So you-all were kind of back in the routine where you would call him when you had a job?

A. Well, this -- this -- Mike's worked a little different this time because of his circumstances. Mike lived in Florida. At first we were doing business because he worked at the warehouse at Conser in Florida. And when I needed help -- when I needed help when I went down, they would let Mike work with me, and that's how he and I developed a relationship. And -- but -- and the months passed. Like I say, he started working for me again, and it became more -- more permanent than temporary.

Q. Would he then head back with you to Virginia?

A. Yes. At that time Mike was living with me in Virginia.

Q. And who all was living in the house?

A. It was me -- me, my wife, my grandson, and Mike.

Q. And we'll use that term at that time. We're talking about the 2022 time frame?
A. Yes.
Q. How many months had he lived with you?
A. It was only a short time. Maybe -- maybe -- maybe four at the most if I'm not mistaken. Because it wasn't --- it wasn't set up for him to live with me. He wanted to -- he wanted to move to Virginia so that he and I could work together on a more permanent basis. Like I said, I worked for myself, so by me needing the help, I got the okay from Mr. Locke for Mike to come to Virginia. But it was still --
Q. To have Mr. Hines come to Virginia?
A. Yes.
Q. Okay.
A. Not only with -- not only would Mr. Hines work with me on the road, he would work with Mr. Locke in town.
Q. Were you reimbursed for Hines' living expenses with you at all?
A. No.
Q. Okay. What was your financial arrangement with Mike Hines?
A. I paid Mike to -- I paid Mike to load the equipment that I needed -- well, that we needed for the

jobs. He worked with me out of town. But, unfortunately, Mike and I were not on as many jobs locally because I didn't work local unless I had to go on base. So -- so he was working with Mr. Locke at that time a little more than he was working with me. And another thing, he didn't have his ID, and he needed to renew that in Florida. So it was a little while before he and I was actually working together.

Q. Did he have a driver's license?

A. I don't know.

Q. And you said ID. What kind of ID are you talking about?

A. Just a general ID. His Florida ID was expired.

Q. Okay. Is that a big deal to get it renewed?

A. Well, it wasn't a big deal for me because it was nothing -- there wasn't nothing that he really needed an ID for in town. But it was kind of a big deal to him, I believe, just because he wanted to get it done. And the timing on the trips back to Florida, they -- it just didn't line up because I didn't have a lot of runs heading back that way. The July 1st was the first run I had back that way, I do believe, in about two, three weeks.

Q. Did Locke have its own area where tractors and trailers were parked, or it was all at Moholland?
A. All at Mr. Moholland's location.
Q. Did Locke have a location?
A. Mr. Locke's location is Joe Moholland's location.
Q. One in the same?
A. Yes.
Q. Okay.
MR. EHRENREICH: Hey, Charlie. It's Todd. Whenever it's convenient to take a break, a quick lunch break, let us know. Okay?
MR. HODGE: All right. This might be a good time. What kind of time frame? Is 30 minutes okay?
MR. EHRENREICH: It's five of. We can have a full 35 because I've got to jump on a call here also. So if we can have a full 35, that would be great.
MR. HODGE: Does that suit you-all? Everybody? Okay. Go off the record.
THE VIDEOGRAPHER: Going off the record at 12:56 p.m.
(A break was taken.)

THE VIDEOGRAPHER: Back on the record at 1:33 p.m.

BY MR. HODGE:

Q. Mr. Burist, earlier you told me you had had a workers' comp denial.

A. I don't know if it was so much a denial. They just said they wouldn't have nothing to do with it.

Q. Okay. And who was they?

A. The workman's comp. Vanliners.

Q. Vanliners?

A. Yeah. Workman's comp.

Q. And do you know where Vanliners is based?

A. No, I do not.

Q. Is it affiliated with Mayflower?

A. I'm not for certain.

Q. Okay. Did you have an assigned adjuster, or do you know?

A. No.

Q. Do you still have that paperwork?

A. I have it somewhere.

Q. Would you try to retrieve it and give it to your lawyer, and he can give it to me?

A. I sure will.

Q. A request for production. Okay. Earlier we were talking about Mayflower markings on the tractor --
A. Yes.
Q. -- Mayflower DOT number, Mayflower uniforms.
A. Yes.
Q. And I think you said something about Mayflower inventory. Did I understand it to be some kind of forms that Mayflower supplies with your runs?
A. Now, if I'm not mistaken, Mayflower would be on the bill of lading.
Q. Okay. The bill of lading. The boxes that items were stored in --
A. Uh-huh.
Q. -- what did those boxes have on them? Did they have any labeling?
A. They just had the name of the ship -- the name of the shipper and the date. The date that it was created.
Q. Okay. And you have weigh slips when you go through these inspection points; is that right?
A. No. That is only -- you get an empty weight before you go to pick up the goods, you get a weight after you pick it up, and then you get another

weight after you deliver it.

Q. Do those slips state Mayflower on them?

A. No. The slips would -- they would only read where you got it from.

(A document was marked as Plaintiffs' Exhibit No. 7.)

BY MR. HODGE:

Q. Let's look at Exhibit 6 if you could. And the first document on Exhibit 6 is Bates stamp Mayflower 158. Do you see that?

A. Uh-huh.

Q. Have you seen this document before?

A. No, I have not.

Q. Okay. And I think this document is reflecting the inspection of June 17th, 2022. Do you see that? And then Mayflower says that the motor carrier was misidentified on the inspection report. It says Mayflower (sic) is not an agent for Mayflower Transit, et cetera. Do you see that?

A. Yes.

Q. Before July 1st of 2022, had Mayflower ever discounted their relationship with Moholland to any regulatory authority?

A. Not to my knowledge.

MR. EHRENREICH: Object to form. Todd Ehrenreich.

BY MR. HODGE:

Q. Do you see the date entered at the top of this form?

A. Yes.

Q. It's August 2nd. That was after the wreck of July 1st; is that right?

A. That's correct.

Q. Okay. Had you ever seen any document of this type not only for June 17th but any other inspection reports that were rendered in the year 2022?

A. Could you repeat that?

Q. Had you ever seen a form like this before June -- excuse me. Had you ever seen a form like this that discounted any relationship between Mayflower and Moholland?

A. No.

Q. At any time?

A. No.

Q. All right. Look at Mayflower 159. It's the very next document. Do you recognize that document?

A. No, I do not.

Q. Do you know what it is?
A. Well, it says --
Q. Let me just ask --
A. It says it's a bill of lading.
Q. Okay. Do you recognize this as being the bill of lading for the job that you did which resulted in the wreck of July 1st, 2022?
A. No. I briefly -- I briefly saw the documents.
Q. Okay.
A. So I don't remember anything about the paperwork.
Q. Do you have any of those documents?
A. No, I do not.
Q. When I asked you earlier about how you got paid --
A. Yes.
Q. -- do you have any idea about how the TMM/Mayflower/Moholland, the destination agent, Conser, do you have any idea how they got ahead paid, or is that sort of outside of your pay grade?
A. That's outside of my pay grade.
Q. Okay. Very good. I want to look at some pictures if we could. If you go to Exhibit 7.
MR. HODGE: And, Madam Court Reporter,

every exhibit I'm going to mark at the end.

(The document was marked as Plaintiffs' Exhibit No. 8.)

BY MR. HODGE:

Q. That's tab 7, Exhibit 8. Are you with me? You got some pictures?

A. Yes.

Q. Is that your tractor?

A. Yes.

Q. This tractor, how long had you operated that tractor?

A. Since it was purchased.

Q. When was it purchased?

A. I don't remember the date it was purchased.

Q. Was it a matter of years that you had operated it?

A. Yes.

Q. Did you operate any others apart from any kind of rental thing if this vehicle was down for maintenance?

A. I was able to -- I was able to drive any and all vehicles that was on the Joe Moholland yard.

Q. Was this considered the Nicholas Burist

tractor?

A. No. No. This is just a particular tractor that I drove when I was working.

Q. Okay. Why this particular tractor as opposed to any other tractors?

A. Well, this tractor didn't have a governor on it.

Q. Okay. And why was that important to you?

A. It made it -- it made it very easy to get where I was going and get back, get some more. So we were talking about time is money. So I could pretty much get on up and down the road.

Q. The governor controls speed?

A. Yes.

Q. What speed would it kick in?

MR. SMITH: Object to form.

MR. HODGE: I'll rephrase.

BY MR. HODGE:

Q. How did it work?

A. It would tap out at -- it would govern at the top speed. It wouldn't go any faster than the truck -- the -- whichever vehicle was regulated, the speed that was regulated on.

Q. Okay. But how fast?

A. I'm not sure. I'm mean, I've never driven over 75. So that's -- that's a pretty good speed right there to get on around, you know, and keep getting on up the road and down the road.

Q. Does the governor work based on the highway? Like I've got this thing on my car, and it will pop up. In a 55 zone, it will say -- you know, it will pop up and tell me, Hey, you're going 60, and it's 55 or something like that.

A. No, sir. What you're talking about is something a little different. The governor basically says whatever speed the truck is governed to, it won't go any faster than that. Say, if your personal vehicle goes 110 miles an hour, well, if it has a governor on it, depending on where you got it from, it might be governed to 67, and the truck won't go faster than that.

Q. So on the Moholland lot, did they have governed vehicles?

A. I can't remember. It just depend on what vehicle it was.

Q. Did you ever drive a governed vehicle off the Moholland lot?

A. I can't recall.

Q. I'm just trying to figure out how fast

they would govern.
A. I understand. I don't remember.
Q. Okay. All right. Look at the next page. Do you see that page here? If it was a little wider, it would say M333, wouldn't it? Designated Moholland?
A. Yes.
Q. Do you understand that's Moholland's number within the Mayflower/UniGroup system?
A. Yes.
Q. And then it says "Joe Moholland Moving Operated by Mayflower Transit, Fenton, Missouri."
A. Yes.
Q. Was anybody -- did anybody ever tell you to change the way that appeared on that door?
A. No.
Q. And do you see where it says US DOT Number 125563?
A. Yes.
Q. Do you recognize that as a Mayflower DOT number?
A. Yes.
Q. And did anyone up to July 1st ever say, Don't use that number on that tractor?
A. No.
MR. EHRENREICH: Object to form.

MR. HODGE: Okay.

BY MR. HODGE:

Q. So the bottom picture below the operated by Mayflower Transit picture, it's got a tire.

A. Uh-huh.

Q. A rim. Do you see anything that's noteworthy about that tire or that rim?

A. It looks like that there's a slit in your upper left-hand corner, and the tread underneath looks to be chewed up.

Q. Okay. Is that your tractor, the one you were operating on July 1st?

A. The top picture is correct, but I don't -- I don't -- I'm not sure about the bottom picture.

Q. Should the tractor have been operated with a tire in this condition?

A. No.

Q. Okay. And as we go back to that top picture, you see under 333, there's a sticker?

A. Yes.

Q. Do you know what that sticker is?

A. That is -- if I'm not mistaken, that is the -- for the fuel, the fuel regulation.

Q. Okay. And can you see the initials of the state below that sticker for the fuel regulation?
A. It looks like it says MO as well.
Q. For Missouri?
A. Yes.
Q. Okay. Before the collision, had you had any issues with over-hours, like driving too many hours on the road?
A. No.
Q. How would that be regulated?
A. Well, you can -- you couldn't drive -- you can only drive 11 hours in a day's period of time. You have to take a 30-minute break having been coming up on eight hours.
Q. Does your ELD sort of determine that?
A. Yes.
Q. And if I use the term "Samsara," does that mean anything to you?
A. You said --
Q. Samsara.
A. No.
Q. You never heard that term?
A. No.
Q. Okay. Do you have any kind of log audit system?

A. Not that I'm aware of.
Q. A trip audit system?
A. No.
Q. Okay. Ever been sanctioned for the lack of either one of those?
A. No.
Q. In the tractor itself, are there cameras?
A. No.
Q. Okay.
A. Let me rephrase that. Yes, there's a dash cam.
Q. A dash cam?
A. Yes.
Q. Does that dash cam show outward?
A. Outward.
Q. Does it show the driver at all?
A. No.
Q. And what's the purpose of that dash cam?
A. It's -- from my knowledge, it's used to show the traffic in front of me.
Q. Have you seen dash cam footage from the wreck?
A. No.
Q. Are there vehicles, tractors that have dash cam within them, like you can see the driver?

A. Not that I'm aware of.
Q. Do you agree that if you had such a camera system where you could see the driver that the driver would be less likely to do things like smoking marijuana?
A. Yes.
Q. Drinking?
A. Yes.
Q. Alcohol?
A. (Witness nods head.)
Q. Texting while driving?
A. Yes.
Q. It would be a deterrent, wouldn't it?
A. Yes.
Q. Do you feel like that's a reasonable safety feature?
A. Yes.
Q. Okay. Do you know what a Comdata card is?
A. Yes.
Q. What is that?
A. It allows you a certain amount of money for fuel and other expenses. Per diem related, I guess.
Q. Did you have a Comdata card?

A. I did, but it was not activated.
Q. Okay. Are they -- are these Comdata cards activated on a job-by-job deal, or is it --
A. Mike Peters had control of that.
Q. How would you get Mike Peters to activate the Comdata card?
A. Just let him know, and he get it set up.
Q. Seems like that would be a better system of regulating expenses, gas, things like that than cash. Do you agree?
A. Not really.
Q. Okay.
A. It's pretty much the same thing. I mean, the amount of -- the amount of funds that you have available is pretty much the same.
Q. This Comdata card, if I were looking at one, what does it say on it?
A. Comdata.
Q. Does it have a name of, like, a customer?
A. Yes. No. Well, if I'm not mistaken, the Comdata card that I had said -- it had my name on it, and it said Joe Moholland, Inc.
Q. Now, was there a method of recording mileage?
A. Well, the mileage is on the dash.

Q. On the ELD?
A. No. On the actual speedometer on the actual dash.
Q. The trip odometer. Is that what you're talking about?
A. Yes.
Q. So would you record mileage before you left and after you arrived?
A. It wasn't -- that wasn't something that was on a need basis.
Q. There was no recordation of mileage then?
A. I mean, you could check it just by looking at it, you know. But it was not an issue with me and how I got paid. I didn't get paid by the mile.
Q. Okay. Did you have any kind of stationery or forms?
A. Forms?
Q. Yeah.
A. Yeah. The truck had -- it had forms. I had forms, label receipts. I had inventory sheets. I had signature sheets. All the necessary sheets for picking up -- picking up shipments and delivering.
Q. Were they Mayflower forms?
A. I really don't remember what they say. Only -- the way that you can tell, anything that I seen

that says Mayflower on it would be on the bill of lading.
Q. Okay.
A. That I can remember.
Q. When did you last use your Comdata card before this wreck?
A. I never used it.
Q. You had been given it but not activated it? Kind of like a credit card comes in the mail or something?
A. Yes.
Q. Who gave it to you?
A. I don't remember. It was either Mike Peters or Mr. Locke.
Q. Okay. If I use the term "Qualcomm System," does that mean anything to you?
A. Yes.
Q. What is the Qualcomm System?
A. The Qualcomm System is just a small device that the dispatcher uses to communicate with the driver. But I didn't have that in my truck.
Q. Okay. Why?
A. We -- the only time that I have ever used a Qualcomm was on my first job, and that's at CCC Transportation. And that was to dispatch. They

dispatched the loads through that. It was not so much verbal like at Joe Moholland.

Q. So did Moholland, Locke, and/or Mayflower, within the context of how you operated the vehicle, ever have a Qualcomm System?

A. Not -- no.

Q. Okay. Now, we touched on this a little earlier. If you had an issue with your tractor, you called Trans Advantage?

A. Well, not always immediately. If -- it just depended on what the situation was. I would -- I would call Mr. Locke first, and then Mr. Locke would advise me what to do next.

Q. Were there times you communicated directly to Trans Advantage?

A. Yes.

(A document was marked as Plaintiffs' Exhibit No. 9.)

BY MR. HODGE:

Q. So go to Tab 8. And this is a Trans Advantage invoice. Do you see that?

A. Uh-huh.

MR. SMITH: Is that a yes?

THE WITNESS: Yes. Thank you.

BY MR. HODGE:

Q. Okay. And it's addressed to Joe Moholland. It references sag hicube fixed charges, sag light hicube mileage charges. What does that mean?

A. I don't know.

Q. All right. And it shows you as the driver.

A. Correct.

Q. Okay. But you don't know what this invoice was all about?

A. No.

Q. Okay. Go to the next page. This will be 3542. This references something about tow hourly trailer only, repair road service hourly, shop labor shop rate, brake shoe kit, Voyager trailer seal, hub oiler hubcap gasket. Did I read all that correctly?

A. Yes.

Q. What was all that about?

A. I'm not sure.

Q. Okay. And this invoice is dated March 7th, 2022, at the top.

A. I'm looking to see where the -- what state it was in.

Q. Okay.

A. I don't see the state where it was

serviced.

Q. It looks to me like -- if you go down and see work requested toward the bottom part, it says "Tow vehicles from breakdown location I20 Exit 73A in Leesville.

A. Okay.

Q. That's near Lexington, South Carolina?

A. Yes.

Q. Are you remembering it now?

A. Yes.

Q. Tell me what happened.

A. I had a blowout. I had a blowout, and it messed up quite a bit of stuff on the trailer. I ended up being stuck in South Carolina for about three days. And from -- from what is listed on the paperwork, that's the work that they did.

Q. Okay. And then we'll go into page 3543. We see a further description of the work. It says "Replaced trailer LFO." You think that's a tire? It looks like a tire size to me.

A. I'm not sure.

Q. There's also something about "Tech advised of a leaking wheel seal."

A. Uh-huh.

Q. Do you remember that?

A. No, I don't remember that. There were quite a few things -- there were quite a few things that were wrong.
Q. Was it just the trailer, or was it the tractor as well?
A. No. It was just the trailer.
Q. And was the tractor that was hauling that trailer, was it the same tractor that we saw in the pictures?
A. I'm not -- I'm not sure.
Q. Okay.
A. It says Truck No. 251, so yes, it was.
Q. Same one. Okay. Was it the same trailer from the wreck that happened on July 1st?
A. I don't -- I don't know what trailer it was in the accident, and I don't see -- so I'm not sure. I can't say. I can't say yes or no. I don't remember.
Q. Did Moholland supply to you the trailers?
A. Yes.
Q. Did you know about a company called Payne? Have you ever heard of that company?
A. Yes.
Q. Tell me what you understand about Payne and its relationship with Moholland.

A. I don't -- I don't know anything about their relationship. But Payne is in between the shop in Hampton, 220 East -- E Street in Hampton, Virginia, it's between there and Woodbridge, Virginia. So when I would go to Woodbridge to drop off a trailer, sometimes I would stop by Payne on the way back and pick up an empty trailer and bring it back.

Q. Okay.

A. Yes.

Q. Did you ever inspect any trailers and found them -- find them to be deficient from Payne?

A. No. No.

Q. When you would pick up an empty trailer, would you go through the pretrip inspection like you're supposed to?

A. Yes.

Q. Would that be on Payne's lot?

A. Yes.

Q. Would it be recorded in any fashion?

A. Not to my knowledge.

Q. And would any Payne representatives be with you for the pretrip inspection?

A. Yes. They had a main mechanic. They had a main mechanic. I can't remember what his name was. And then there was another gentleman. What would

happen is that the trailer would be already pre-inspected. I would hook up to it. Whoever -- because I would have to sign the paperwork, so there would be a Payne representative there to also -- like if you were to pick up a rental vehicle, the representative would come out with you and do an inspection with you before they released that merchandise to you. So it was pretty much the same thing with the Payne trailers.

Q. What training did you ever receive on how to inspect a tractor and/or a trailer?

A. I received it in school.

Q. Okay. When you would call Trans Advantage, tell me -- give me an example how the call would go.

A. Okay. They would -- first they want to know my name. They want to know the company's number, which would be the 0 -- the 0333 number, my name, my number, and just that number right there. And they would look up the -- they would look up the company, and then they would find someone to come out and deal with the issue. And then they would -- then they would call back and let me know how long it was going to be. And then the people come out, and they do the work. Then they sign off on what was wrong with it, and then

I'm up and running again.
Q. Okay. Did you have any loads or trips scheduled after July 1st but before the wreck happened?
A. No. No. No. Just no.
(The document was marked as Plaintiffs' Exhibit No. 10.)

BY MR. HODGE:
Q. If you go to Tab 9 please. Tab 9 is a corporate structure identified through a Mayflower witness.
A. Okay.
Q. Did you have any idea about this corporate structure before the wreck of July 1st?
A. No, I did not.
Q. Do you see where there's a -- kind of a rectangular column sort of in the middle? It's got a lot of small writing, but among it is included Military Transportation Movers, LLC.
A. Yes.
Q. Military Transportation Systems, LLC.
A. Yes.
Q. Did you work for any of those companies?
A. No.
Q. Do you know which entities were

responsible for UniGroup's Government Moving?
A. No.
Q. Did you have to have any kind of special clearance yourself to do military moves?
A. Just the necessary requirements to get on base.
Q. What communication did Mayflower have with you?
A. No communication to my understanding.
Q. Okay. Do you know the relationship of Mayflower to its agents, like Moholland?
A. No, I do not.
Q. Do you know how Mayflower gets paid?
A. No, sir, I do not.
Q. Do you know how a job gets initiated?
A. No, I do not.
Q. Do you have any relationship with Rob Garr?
A. No, I do not.
Q. Did you know him before the wreck of July 1st?
A. I know of him.
Q. Okay. Kelvin Locke is the fellow that acted as your dispatcher for Moholland?
A. Yes.

Q. And how about Angela Locke? What was her role?
A. That's his wife. I believe, you know, they -- I really don't know her position. I just know that's his wife.
Q. Now, Mike Hines, did he live close to you? Michael Hines? Well, he lived at your place. That's right. You said he lived in Jacksonville.
A. Right.
Q. Were you-all kind of friends?
A. Yes.
(A document was marked as Plaintiffs' Exhibit No. 11.)

BY MR. HODGE:
Q. Exhibit 10 is a response from a cell phone subpoena. At the time of the wreck, what was your cell phone number?
A. 757-324-6966.
Q. Okay. I've got some numbers highlighted on a more blown-up version, okay, of this. It's not in your tab.
A. Okay.
Q. I'm going to show you. And what I want you to do if you know, I want you to read out the phone

number, and tell me whose number it is.
A. Okay.
Q. Okay? First page, page 1 of this document, top of the -- first number that's highlighted is 757-324-6966.
A. That's my number.
Q. All right. The one below it.
A. I do not know.
Q. Okay. The incoming number 904-428-7193, do you know that number?
A. I don't know that number, but the 904 is a Florida area code.
Q. Okay. Did you-all ever stay with Mr. Hines's father when you would go down to Jacksonville?
A. No.
Q. Where did you stay when you would go down there?
A. We would stay at the Ramada on Bay Meadows Road.
Q. Okay. The next incoming call is 866-512-5091. Do you know that number?
A. No.
Q. All right. What about 757-734-0308?
A. It's -- 757 is the area code, 349. That

is Mr. Locke's number.
Q. Okay. And there's a number right below it. Same area code, but it's a little different number. 320-6533.
A. I don't -- that's my wife's number.
Q. Your wife's number?
A. Yes.
Q. Okay. And then we have got an incoming of 573-289-4555.
A. I don't know whose number that is.
Q. Okay. On the next page, that 757-800-6254.
A. I don't know.
Q. Okay. How about 757-320-0975?
A. I don't know.
Q. 757-298-2967.
A. That is my wife's number.
Q. Florida number on the next one, 904-888-5894.
A. I don't know.
Q. On the next page, 817-601-1903.
A. I don't know.
Q. All right. And it looks like you had an incoming from an 817 area code, 817-380-3818.
A. I don't know.

Q. Don't know that number?
A. No.
Q. And then there's a 619 area code.
A. No.
Q. Don't know that number?
A. No.
Q. Okay. You recognize any of the numbers that are highlighted?
A. No.
Q. Same question for the next page. It's just one number. It's an 850 number. I think that's a Tennessee area code.
A. No, I do not.
Q. Okay. Go to the page 7 of that exhibit. 757-660-8489.
A. No, I don't know.
Q. And if you go to page 10, there are two numbers highlighted. Do you recognize either of those?
A. That is Mr. Locke's number, and the other number is my wife's number.
Q. Okay. And go to page 11.
A. I don't recognize any of the numbers.
Q. Okay.
A. The 256 -- 757-256-5792, that is my daughter's number.

Q. All right. And how about the 866 number? Do you recognize that?
A. No.
Q. And the Florida number, do you recognize that?
A. No.
Q. Okay. Page 12, we've got three entries. Do you recognize any of those numbers?
A. The 349-0308, that is Mr. Locke's number.
Q. And the incoming from Florida?
A. I don't know.
Q. Now we're on July 1st. The 757 number.
A. I don't know whose number that is.
Q. And we've got one at 18:23:06, 757-900-6482.
A. No, I don't know whose number that is.
Q. And then we've got an incoming at 18:50, 175 -- excuse me -- 757-771-5110.
A. I believe that's Mr. Davenport's number.
Q. Okay. Page 14, do you recognize any of the numbers?
A. I don't recognize the 904 area code. The 936 number, the second number is my sister's number. The 757-998 number, I don't know who that is. The 757-324-4119, that is my brother-in-law's number.

Q. So if you got a call in your tractor, how would you answer it?
A. I have a headset.
Q. Okay. Do you reach up and punch on it?
A. Just tap it.
Q. Okay. And if you want to make a call in your tractor while you're driving, how do you do that?
A. I could hold it. I could hold the button, and I could tell it -- I could tell it what to do.
Q. Does that require you to take your hand off the steering wheel?
A. I could -- I could -- it does, but the easiest way is just to tell the phone what to do. Hey, Google, call my wife or call whoever.
Q. And go to the last page if you would. And do you recognize -- I think that's page 14, maybe 15. Do you recognize any of those numbers?
A. The second number, the 936-553 number, that is my mother's phone number.
Q. Do you know when you made that call?
A. That says --
Q. I mean, it gives us a time.
A. It says 9:42.
Q. Would that have been after the wreck?

A. 9:42 is in the morning. 21 is in the --
Q. Very good.
A. Oh, that's at -- that's at nighttime. That's at nighttime. That's military time.
Q. Do you recognize any of the other numbers?
A. No, sir.
(The document was marked as Plaintiffs' Exhibit No. 12.)

BY MR. HODGE:
Q. So why don't you go to Tab 11. Do you see that document?
A. Yes.
Q. And then kind of go to JMI00021.
A. Okay.
Q. Have you ever seen a document like this?
A. Yes.
Q. Is this the -- that's a Samsara-type system, isn't it?
A. I'm not sure what type of system it is, but that's a log.
Q. Okay. And is this the way it always read?
A. Yes. Electronically or manually.

Q. Was there any different formatting in 2021 versus 2022?
A. No.
Q. Okay. No changes on who was listed on the Samsara system?
A. It just depends. It just depends on who was driving the vehicle.
Q. Okay. But from your standpoint whenever you're driving the vehicle, this format was the same in 2021 as it was in 2022?
A. Yes.
(A document was marked as Plaintiffs' Exhibit No. 13.)

BY MR. HODGE:
Q. All right. Let's look at 11. We kind of mentioned bills of lading, and that's what we're going to look at right now.
A. We're already on --
Q. Tab 12.
A. 12. Okay.
Q. Now, go to the next page. Do you recognize this as the bill of lading?
A. Yes.
Q. For this job?

A. Yes.
Q. So who's Northwest Movers, Inc.? It's listed at the top.
A. I'm not -- I'm not sure what that is.
Q. Okay. Is this the way the bills of lading would read before -- well, in 2021 and 2022?
A. Yes.
Q. The format was the same?
A. Yes.
Q. Bills of lading never said Mayflower on them?
A. I'm not sure. I mean, I have never really paid attention to that. The only time I really had to pay attention to it was when you were going on base, and that was for the officer at the gate.
Q. Okay. And you just show them this --
A. Yes.
Q. -- bill of lading?
A. Uh-huh. And they would know -- and they would look up who the shipper is and the address, and then that's how you would gain access to get on base.
Q. And you have been going on base for how many years?
A. Just about the whole time that I worked for Joe Moholland.

Q. Several years?

A. Yes.

Q. Before the wreck of July 1st?

A. Yes.

Q. And always the same, you take this type of bill of lading and you show it to them?

A. Yes.

Q. Okay. So if we look at the first bill of lading, it references something about Northwest Movers. It's got authority for shipment, BUPERS, B-U-P-E-R-S. Does that mean anything to you?

A. That is -- no, it does not. No, I don't know what that is.

Q. Okay. It would tell you the name of the ship or Navy supply in Norfolk?

A. Let me see.

Q. On the right-hand column at the top towards the top of the page.

A. Yes. That would be Gregory Nichols.

Q. Gregory Nichols. Who is Gregory Nichols?

A. That is the shipper. That's column 10.

Q. Column 10.

A. Yes.

Q. Okay.

A. Where it says "Property owner."

Q. Were you picking this load up at the naval base?
A. No.
Q. You picked it up from this Gregory Nichols?
A. I didn't pick -- I didn't pick anything up. It was already preloaded.
Q. Preloaded.
A. Yes.
Q. So it was already in the Moholland lot?
A. Yes. That means somebody else picked it up.
Q. Okay. All right. And you don't know who the Northwest Movers is?
A. No, sir.
Q. Now, when you do military loads, would you carry -- would part of the load be for one, maybe, serviceman and part of a load be for maybe another service person?
A. When you say, "service person," can you be a little more specific?
Q. So if a soldier -- excuse me -- a naval officer or somebody had movers, they might have their stuff -- I'm going to make up the name, Northwest Movers.

A. Okay.

Q. Okay? Then maybe Officer Jane Doe had a load located at Slidell Moving. Would they ever combine the loads and put it in one trailer and you deliver it?

A. Yes. There would be multiple loads for multiple shippers in the same trailer, and they usually try to get as many loads on one trailer as they could.

Q. Is that the way it was on this particular load, the wreck load, I should say?

A. Yes. Yes. I had multiple folders.

Q. Okay. And JMI00679, if you go to that page.

A. Okay.

Q. At the top left, it says "Slidell Moving."

A. Okay.

Q. Do you know who Slidell Moving is?

A. No, I do not.

Q. All right. Tell me what the next page is, JMI00637.

A. This is the packing verification form. This form lets you know that the shipper's goods have been picked up.

Q. And is that --

A. Hold on. Let me be a little bit more specific. This specific sheet says "Packing Verification Form." So that means that the shipper's goods have been packed, not picked up.

Q. When it says "I, Gregory Nichols, have checked my entire household," is that Gregory Nichols, an individual who's checked his household goods?

A. Yes.

Q. Okay. Now we're on JMI00624. Tell me what that is.

A. This is a weight ticket.

Q. Okay.

A. Okay. The top weight ticket -- let's see. Let's see. Let me see. I'm looking for the -- I'm looking for the date. Okay. The 14th at -- this is 16. So that's 4:00 o'clock in the evening. Okay. And the bottom one says 10:00 o'clock, so that's 10:00 o'clock in the morning. Okay. So -- okay. So the first ticket is -- the first weight ticket is when they pick the goods up. Okay? Oh, no. The first ticket is the empty weight ticket. The bottom scale ticket is the heavy weight for the goods being loaded on the trailer. So that lets you know the total weight amount for that shipment.

Q. You think it could be reversed? Because

the bottom ticket has a gross weight of 35,420, and the top ticket has 44,212.

A. Well, I was looking at the time. 10:00 o'clock. So -- yes, yes. You're right. You're right.

Q. Okay.

A. That was my mistake.

Q. And on company --

A. Uh-huh.

Q. -- what's the company that's listed?

A. It says Mayflower.

Q. And that was for this job, wasn't it?

A. That's what the paperwork says.

Q. Okay. And the trailer 2438, that was the trailer on this job?

A. Yes.

Q. All right. Do you have any idea who packed the load?

A. No, I do not.

Q. Do you have any idea who picked the load up to put it in the Moholland lot?

A. No, I do not. Without specific names, no.

Q. Okay. Tell me what JMI00664 is. It's the next document.

A. This is a reweigh request. Okay. So, now, what this is, the shipper -- the shipper wants the shipment to be reweighed because the military, per rank, requires -- allows you so much weight that they pay for, and what's not paid for by the military, then the shipper has to pay the excess amount. So this is -- so this is for the -- for the -- the shipper wants to -- wants to be precise in what the weight is. So they had made a rule that all shipments over 10,000 pounds had an automatic reweigh after being picked up and put on the trailer.

Q. All right.

A. And that was at the time of delivery. Before delivery, they had to be reweighed.

Q. What's JMI00665?

A. This is -- this is just -- this is just, as it says, this is the booking confirmation for the shipper. The member name, the pack date, the pickup date, the origin address where they picked it up from. The hauling agent is Joe Moholland. The destination is Jacksonville, Florida.

Q. Okay. And Conser Moving is the destination agent?

A. I do not see --

Q. It's on the bottom right. It says

"Destination agent."

A. Okay. Then -- then it would be going to -- but that doesn't necessarily -- just because it says Conser Moving & Storage doesn't mean that it's going into storage. It just means that, per se, if it went into storage, this is the storage facility that it would go to.

Q. But you were taking this load to Conser?

A. I'm not -- I'm not -- I'm not sure where these shipments were going. I don't -- I don't remember all that information. Because, like I said, I just -- I had just picked those folders up. You know, I -- you know, it's not like something that you really got to study like you about to take a test, you know. I need to have -- I had to have this stuff straight when it's time to go deliver it. So it's not -- I didn't really get a chance to look through it, you know, thoroughly.

Q. Well, you knew where you were driving to, didn't you?

A. Yes. I know I'm going to Florida, so all I got to do is get to Florida.

Q. Okay. But what do you do when you get there?

A. It depends. If I'm working that day,

we're going straight to the job. Like I told you about the reweigh, we're going to reweigh the shipment, and then we're going to the shipper's house, and we're going to deliver their household goods. If we not delivering on that day, when we get to Florida, then we're at our destination, and we will resume working the next morning, the following morning.

Q. All right. What's JMI00666?

A. I'm not sure what this -- I'm not sure what this -- I'm not sure what this form is. This -- this -- I don't -- I don't know what this is.

Q. How many folders, slash, loads did you have on the trailer the day the wreck happened?

A. I don't remember.

Q. Would it ever be where you would deliver one load to an address of a service person and maybe another load to the destination agent for storage?

A. Yes. That is quite common.

Q. All right. And the order of things, is there a particular order, or you just --

A. The order is -- okay. Perfect illustrations. Let's say that we're in Florida. We have shipments going into the warehouse. We got two, maybe three shipments going into the warehouse this particular day, and we got one going to a direct

residence. It would be in the best interest to drop the one on the street at the residence first and then deliver the other three at the warehouse because we're going to be at the warehouse. We don't have to go anywhere else.

But if it just so happened that the shipments going into the warehouse are already cleared, then we would do the shipments at the warehouse first, and then if we had time the same day to deliver at the residence, we would. If not, then we would have to -- I would have to call the shipper to see if we could reschedule for the next day. If the shipper said no, then we would have to deliver it the same day.

Q. Was this load to have been delivered on June 24th?

A. I'm not sure. I'm not sure when it would be delivered.

Q. Were you pressured to get the load there to Florida?

A. No.

Q. Considering it was July 1st?

A. No.

Q. Had you driven the day before, June 30th?

A. I'm not sure. I can't remember.

Q. How long does it take you to get from

Virginia Beach to Florida? Jacksonville?
A. About nine hours. GPS says nine hours, six minutes. I can get there about eight and a half hours.
Q. Okay. Do you know what time you had gotten up on the day of the wreck?
A. I don't remember.
Q. Did you start your trip on the day of the wreck, or did you start it the day before?
A. No. The day of.
Q. What time would you have gotten to the Moholland lot to pick up your trailer?
A. I don't recall. I don't recall right off.
Q. Would you always pick up the trailer at the Moholland lot, or would you ever get it, take it and maybe park it in front of your house or anything like that?
A. No. I would have to pick it up from Joe Moholland's lot.
Q. Okay. You told me that you -- I think earlier in your testimony, you sort of planned the route.
A. Right.
Q. And do you plan the route, like, the day

before, or do you do it days in advance?
A. I do it when I get all the folders. When I get all the assignment material, then I could start my trip planning.
Q. Any idea when you had gotten the assignment material?
A. If I'm not mistaken, I got -- I got the information the same day that I made it back from my previous trip.
Q. Okay. When was that?
A. If I'm not mistaken, it was the day before.
Q. All right. So on June 30th, you think you got the folders for your very next trip?
A. Yes. After we fueled.
Q. The June 30th trip, tell me where you had been and where you had come back from.
A. I don't remember.
Q. How many hours are you allowed to drive in a week?
A. 70.
Q. 70?
A. Yes.
Q. And how could we find out the trips that you had taken in that week before this wreck?

A. You would have to get that information from Joe Moholland.
Q. Okay. Did you have a time that you were supposed to deliver these loads?
A. No.
Q. What was your intended route?
A. Just from Virginia to Florida to the Conser -- to the Conser warehouse.
Q. Okay. Any particular roads that you use?
A. Just straight 95.
Q. 95. Can you access 95 from Newport News?
A. Yes.
Q. So you just get on 95 and just start driving?
A. Straight shot.
Q. How many hours had you been on the road before the wreck? Just before the wreck?
A. Eight hours.
Q. What was the weather like?
A. I don't remember.
Q. Okay. Are you supposed to drive slower in the rain?
A. Yes. I mean -- I mean, I wouldn't say you're supposed to, but I'm sure that, you know, you would, you know. It just depended on the person. I

would say, you know, take proper precautions, you know.
Q. Interstate 95 --
A. Yes.
Q. -- in the south of Georgia area.
A. Uh-huh.
Q. When it's raining.
A. Yes.
Q. What do you feel like would be a safe speed?
MR. SMITH: Object to form. Didn't give enough information to respond.

BY MR. HODGE:
Q. Answer the question.
A. Could you repeat the question?
Q. Understanding he's going to object --
MR. HODGE: You're objection is running because I don't want to get -- you know.

BY MR. HODGE:
Q. Interstate 95, South Georgia, raining. What do you think a safe speed is for a tractor trailer?
MR. SMITH: Same objection.
THE WITNESS: It just depends on the

speed limit.

BY MR. HODGE:

Q. Just before the wreck, what do you think a safe speed would have been?

MR. SMITH: Same objection.

THE WITNESS: I don't -- I don't -- I don't remember what the speed limit was.

BY MR. HODGE:

Q. What do you think a safe speed would have been?

A. It just depends on what the posted speed limit is.

Q. Okay. Do you have a recollection of the events just in the minutes preceding the wreck?

A. No.

Q. And is that because you don't remember, or you're pleading the Fifth?

A. I will plead the Fifth to that question.

Q. Okay. Had you been eating or drinking just before the wreck?

A. Again, I will plead the Fifth to that question.

Q. Had you been using the telephone just

before the wreck?
A. I don't remember.
Q. Did you have a social media account?
A. No.
Q. Ever had a social media account?
A. It's been a while ago. That's just not something that I do.
Q. So you had no Facebook or Twitter or Instagram, nothing like that --
A. No.
Q. -- at the time of the wreck?
A. No.
Q. Do you smoke marijuana?
A. I plead the Fifth to that question.
Q. How long have you smoked marijuana?
A. I plead the Fifth to that question.
Q. How many times a day did you smoke marijuana in 2021 and 2022?
A. I plead the Fifth to that question.
Q. Did Mayflower -- did you tell Mayflower you were smoking marijuana?
A. I plead the Fifth to that question.
MR. EHRENREICH: Object to form.

BY MR. HODGE:
Q. Did you tell Moholland that you were smoking marijuana?
A. I plead the Fifth to that question.
Q. If the Mayflower truck had had forward-facing cameras, do you think you would be as inclined to smoke marijuana in that vehicle?
A. I plead the Fifth to that question.
MR. EHRENREICH: Object to form.

BY MR. HODGE:
Q. How long have you drunk alcohol?
A. I plead the Fifth to that question.
Q. Are you a beer drinker or a liquor drinker?
A. I plead the Fifth.
Q. Is it illegal to drink beer?
A. No, it's not.
Q. Is it illegal to drink liquor?
A. No, it's not.
Q. So how long have you been a beer drinker?
A. I plead the Fifth to that question.
Q. What's your beer of choice?
A. I plead the Fifth.
Q. What's your liquor of choice?

A. I plead the Fifth.
Q. All right. Did Mayflower, Moholland, or Locke ever provide alcohol or drug counseling programs?
A. I don't know.
MR. EHRENREICH: Object -- object to form. Todd Ehrenreich.

BY MR. HODGE:
Q. What alcohol did you drink on July 1st, 2022?
A. I plead the Fifth.
Q. Did you drink Corona?
A. I plead the Fifth.
Q. Did you drink Grey Goose?
A. I plead the Fifth.
Q. Did any of your assistants drink or take illegal drugs in the cab?
A. I plead the Fifth.
Q. Okay. I'm talking about them. I'm not talking about you.
A. I understand.
Q. Okay. And you're still pleading the Fifth?
A. I plead the Fifth.
Q. Does that mean you recognize it would be

a criminal violation if you allowed passengers, coworkers who have Mayflower uniforms on to partake of illegal drugs or alcohol?

A. I understand the question.

MR. SMITH: Object to form. Calls for a legal conclusion.

BY MR. HODGE:

Q. Would that be wrong?

A. That would be wrong, yes.

Q. Okay. That would -- would that be reckless?

A. That would be reckless.

Q. Would such use distract the driver potentially?

A. Well, it -- I don't believe that it would be a distraction what's behind me because I'm looking forward. It would be a concern.

Q. Were you called for status updates on your travels the day of the wreck by anybody? Could be Locke, Moholland, Mayflower, anybody.

A. Mr. Locke.

Q. Okay. What time?

A. I don't remember.

Q. And was that a common occurrence the

dispatcher would call you during the run?

A. Yes.

Q. How would the dispatcher know where you were?

A. They can track it from the ELD.

Q. Okay. And why did he call you that day?

A. There was a change in the schedule. My position was just to get to Florida to Conser. I ended up not having to deliver that day. All I needed to do was get to the warehouse. There was another team -- there was another team already there that needed to go to another destination, and all I needed to do was get down there. So -- and we would all deliver the next day, and we would all come back together.

Q. Is the warehouse at Conser?

A. Yes.

Q. Did you pay for alcohol while you were on the clock for this run?

A. I plead the Fifth.

Q. At the time of the wreck, were you actively drinking alcohol?

A. I plead the Fifth.

Q. At the time of the wreck, were you actively smoking marijuana?

A. I plead the Fifth.

Q. When you've arrived in the past at Conser, have you been visibly intoxicated on Conser's property?
A. No.
Q. Visibly intoxicated in front of Conser's employees?
A. No.
Q. Any of your runs ever take you to Missouri?
A. No.
Q. Following the wreck, did the police smell alcohol on your breath?
A. I don't know.
Q. Following the wreck, did police notice that your eyes were consistent with alcohol and drug use?
A. I don't know.
Q. Following the wreck, did you tell the police that there was another vehicle in front of you that caused you to wreck?
A. I plead the Fifth.
Q. Is that what you also told Mayflower?
MR. EHRENREICH: Object to form.
THE WITNESS: I haven't spoken to any Joe Moholland employees since that day.

BY MR. HODGE:

Q. Okay.

MR. EHRENREICH: Can you repeat that, Madam Court Reporter? We couldn't hear his response.

MR. HODGE: He says he hasn't talked to any Joe Moholland employees since that day.

MR. EHRENREICH: Thank you.

BY MR. HODGE:

Q. Tell me how the wreck happened.

A. I plead the Fifth.

Q. Do you know who called 911?

A. No, I do not.

Q. Did you fill out a statement after the collision?

A. No, I did not.

Q. Did you talk with the company at any point after the collision?

A. No, I did not.

Q. Did you give a report of the incident over the phone to anyone?

A. No, I did not.

Q. And you described your injury. You had a cut on your arm?

A. No. It was wide open. Half -- half was up, half was down.
Q. So do you still have a scar?
A. Yes, I do.
Q. Can you show it to me?
A. Well, it don't look nothing like what it did then, so -- right there.
Q. Okay. What I'm looking at --
MR. HODGE: And, counsel, you correct me. It looks to be three to four inches in length and approximately a centimeter wide.
MR. SMITH: I don't know about a centimeter wide, but however many inches. You might want to stick with the same metrics.
MR. HODGE: Well, you tell me. Just tell me what you think the measurement is.
MR. SMITH: Half inch wide.
MR. HODGE: Okay. Half inch wide.

BY MR. HODGE:
Q. And that took four stitches?
A. Yes. No. It didn't look -- it didn't look like this. It was meat was here, and meat was there. So it was wide open.
Q. Did it take four stitches?

A. I'm not sure how many stitches it took. It hurt.
Q. Okay. How did you cut your arm?
A. I'm not sure. I'm not sure.
(A document was marked as Plaintiffs' Exhibit No. 14.)

BY MR. HODGE:
Q. Let's go to Tab 13. Okay. Have you seen these uniform traffic citations issued by the Georgia Department of Public Safety?
A. No, I have not.
Q. Okay. Is that describing your vehicle, the 2014 International ProStar?
A. Yes.
Q. And across -- do you see where it says CDL yes, and then it's got an X for no? Did you have a CDL at the time of the wreck?
A. Yes.
Q. Okay. And it says accident. That was true, right?
A. Yes.
Q. Injuries. That was true. You described your own injury.
A. Yes.

Q. Did you see my client?
A. Yes, I did.
Q. What did you see?
A. I seen -- I seen him in his vehicle.
Q. What did you do?
A. I helped out.
Q. How did you help out?
A. I helped get his wife out of the car.
Q. Tell me about what you saw. What did you see of his wife?
A. Can we -- can we take a -- can we take a small break?
Q. Just answer that question, and then we'll take a small break.
THE WITNESS: Am I allowed to --
MR. SMITH: He needs you to finish the answer, and then we can take a break.
THE WITNESS: You said what did I see?

BY MR. HODGE:
Q. Yeah.
A. I seen him, and I seen his wife.
Q. And what condition was his wife in?
A. I don't -- I don't know exactly.
Q. Was she making noise?

A. I don't know. She couldn't get out, and I was helping get her out. And she was almost out until, I believe, the paramedics came, and they -- they -- they took her on out.
Q. Did you see blood?
A. No.
Q. Did you hear my client?
A. Mr. Sloan?
Q. Kyle Sloan.
A. Yes, I did.
Q. What did you hear?
A. He said, I'm all right. He said, I can't get out. He said, I'm going to have to be cut out or something of that nature. He said, Just help my wife.
Q. All right. And by the time that the paramedics arrived, they completed removing Ms. Sloan, Jamie Sloan?
A. I don't remember how it happened exactly because there was some other things going on at the same time.
Q. What other things?
A. Mr. Hines was laying somewhere in the -- there was glass. It was just -- I can't explain it.
Q. What did you do about Mr. Hines?
A. I picked him up. And somebody -- well,

somebody else had helped me get him out.

Q. Okay. What about Mr. Davenport?

A. There was nothing I could do for Mr. Davenport.

Q. Did you observe Mr. Davenport?

A. No, I did not. I just seen -- am I allowed to consult with my attorney?

MR. SMITH: We can't talk about your testimony. You can take a break if you need to.

THE WITNESS: Yeah. I don't want to ask you what to say. I just want to ask you a general, you know.

MR. HODGE: I'll tell you what. We'll go off the record. And that's permissible for him to ask you a question about only this line of questioning.

MR. SMITH: Okay.

MR. HODGE: Okay?

THE VIDEOGRAPHER: Going off the record at 2:46 p.m.

(There was a pause in the proceeding.)

THE VIDEOGRAPHER: Back on the record at 2:54 p.m.

BY MR. HODGE:
Q. Mr. Burist, before we went off, you requested to consult with your attorney --
A. Yes.
Q. -- on the particular line of questioning that I was asking, and I consented to that.
A. Right.
Q. Are you now ready to answer my questions?
A. Yes.
Q. Okay. So what did you see when you saw Jamie Sloan?
A. Like I said, I just -- I just seen his wife. She was in the -- she was in the front passenger seat. The door was stuck. There was -- it was stuck, so she couldn't get out the -- like you normally -- so I was doing everything within my ability to help her get out.
Q. Was she communicating?
A. I don't remember that. Everything was moving so fast. I don't remember.
Q. Where exactly did you go to assist her in -- assist in removing her from the vehicle?
A. To the -- to her side, to her door where she was at.
Q. What lane of traffic was that vehicle in?

A. It was just -- I can't explain. It was just stuff everywhere. A lot of glass.
Q. Was she on the I95 northbound side?
A. Yes.
Q. And you got to the I95 northbound side some way because you were proceeding southbound, weren't you?
A. Right.
Q. How did you get there?
A. I don't know.
Q. Okay. Did you observe Riley Sloan in the backseat and another young lady named Kara West?
A. Those -- those two young ladies were taken out. They were -- the second young lady, she was taken out, so that's when I started to help the -- his wife.
Q. All right. And after the paramedics came -- because you said that they came while you were assisting?
A. Yeah. That's when -- that's pretty much when everybody started to come. So --
Q. Where did you go?
A. I was -- they asked me to step back. And by that time, I noticed that -- that Mike was -- he was -- he was covered up with glass and some other

material. You could barely see him. So -- so I pulled him from underneath there. And I was just holding him in my arms, and some of the -- some of the other paramedics, they seen, and they helped get him out.

Q. Was he dead at the time?

A. No. No.

Q. No?

A. No.

Q. Was he talking to you?

A. No. He wasn't responding. He was still breathing, though.

Q. Did you ever see him quit breathing?

A. No. He quit -- he stopped breathing a little while after that.

Q. Did you see my client, Kyle Sloan, on the side of the pavement holding his daughter in his arms?

A. No, I did not.

Q. Do you know what happened to her?

A. Yes, I know what happened to her.

Q. What happened to her?

A. She died.

Q. This -- we were looking at this Tab 13. The offense has you charged with driving under the influence. Are you going to try that case?

A. Yes.

Q. Okay. The second, go to the next page, has you charged with homicide by vehicle first degree. Are you going to trial on that case?

A. Yes.

Q. The next page has commercial vehicle driver using/possessing alcohol. Are you going to trial on that case?

A. Yes.

Q. The next one has failure to maintain lane. Are you going to trial on that case?

A. Yes.

Q. The next one has following too closely. Are you going to trial on that case?

A. Yes.

Q. The next one has possession of an open container in the vehicle passenger area. Are you going to trial on that case?

A. Yes.

Q. The next one has you charged with possession of marijuana less than an ounce. Are you going to trial on that case?

A. Yes.

Q. The next one -- let me make sure that's not a repeat -- has homicide by vehicle first degree. Have you been charged with multiple homicide by first

degree since multiple people died?

A. Yes.

Q. Did you have a Missouri tag on that tractor?

A. Yes.

Q. Missouri is where Mayflower/UniGroup is?

A. I don't know.

Q. Okay. Sorry for all the paper -- paper shuffling, but there's a method to the madness of trying to cut through it. I want you to look at a document described as Georgia Subpoena ~~Return~~ 0034. It's a diagram. It's on the bottom right. It's little tiny writing on the bottom right.

MR. SMITH: Is it past the accident report?

MR. HODGE: It says 34 at the bottom Bates. Probably right after that.

MR. SMITH: Subpoena returns.

MR. HODGE: Georgia Subpoena Return 34.

MR. SMITH: Maybe -- oh, I see. Sorry.

MR. HODGE: Pretty small actually.

MR. SMITH: It's under some other ones. I didn't see that.

BY MR. HODGE:
Q. Do you see how the officer has diagrammed where your trailer ended up?
A. Yes.
Q. Is that accurate?
A. I don't know.
Q. Look at page 36. Do you see where it describes breath odor, alcoholic beverage?
A. Yes.
Q. Do you agree or disagree with that?
A. I plead the Fifth.
Q. All right. Did you talk to Mr. Tipton or Ms. Petno?
A. No. I don't -- I don't know.
Q. Look at page 45. This is a description from Mya Loree Justice, reporting officer who described the investigation. Have you seen this document?
A. I've seen so many documents. I can't say.
Q. Okay. Do you disagree with anything that's set forth in that document? I want you to have ample time to look at it. It goes through page 49. We can go off the record while you're reading it.
THE VIDEOGRAPHER: Going off the record at 3:03 p.m.

(There was a pause in the proceedings.)

THE VIDEOGRAPHER: Back on the record at 3:08 p.m.

BY MR. HODGE:

Q. You have had a chance to review documents 45 through 50 from the Georgia subpoena return. Do you take issue with anything that's written in those documents?

A. Well, I'm going to plead the Fifth to that question.

Q. Okay. Did my client do anything wrong?

A. I plead the Fifth.

Q. How do you feel like that's a self-incriminating question?

A. I plead the Fifth.

Q. Okay. You don't know of anything my client did wrong, do you, sir?

A. Again, I plead the Fifth.

Q. My client was minding his own business driving his family on the northbound lane of 95 when your tractor trailer approached him from the south, crossed that center line, and crashed directly over the median; isn't that right?

A. I don't know.

Q. There was nothing Kyle Sloan could have ever done to avoid this collision, is there?
A. I don't know.
Q. There's nothing anybody humanly possible could have done, including the Petnos, to avoid this collision; isn't that right?
A. I plead the Fifth.
Q. This collision was caused by you, wasn't it?
A. I plead the Fifth.
Q. Have you had contact with the family of Mike Hines?
A. No.
Q. How about Davenport?
A. No.
Q. At your residence at the time of the wreck, did you own a personal automobile?
A. No.
Q. How did you get around?
A. I don't own any vehicles.
Q. At the time of the wreck, did you own any vehicles?
A. No.
Q. How did you get to the lot where Moholland was?

A. I would drive.
Q. What did you drive?
A. It just depended. Sometimes I would get dropped off. I mean, the warehouse is not ten minutes from where I live. Sometimes I would walk.
Q. What did you drive when you drove?
A. I drove my truck.
Q. So you have a truck?
A. A truck.
Q. And you had a truck then?
A. Yes.
Q. Okay. Who was it insured by?
A. I don't know.
Q. Do you still have the truck?
A. Yes.
Q. Still drive it?
A. No. It's not running.
Q. It's not running. But it was running in -- before July 1st of 2022?
A. Yes.
Q. And you don't know who your insurance company was?
A. No, I don't.
Q. Is the insurance still valid on the vehicle?

A. No. The truck is not running.
Q. Did you keep your insurance card in the glove compartment?
A. No. All my information was lost in the accident.
Q. Well, your personal truck, you didn't keep an insurance --
A. No.
Q. Does Virginia require that you keep your insurance --
A. I don't know. I don't know.
MR. SMITH: You need to let him finish his question. Okay?
THE WITNESS: Okay.

BY MR. HODGE:
Q. South Carolina requires that you keep in your glove compartment the registration and the insurance information, and you're supposed to have that when you drive vehicles. Is it the same in Virginia?
A. Maybe. I don't know. Maybe it was. I don't recall.
Q. Does your wife drive?
A. Not much.
Q. Okay. When she drives, what does she

drive?
A. A 2000 -- a 2009 Chrysler Pacifica.
Q. Okay. Who is it insured with?
A. USAA.
Q. All right. Do you think your truck was insured with USAA?
A. No.
Q. Some different insurance company?
A. Yes.
Q. Do you know what your limits are?
A. No.
Q. Do you know what her limits are?
A. No.
Q. No any other vehicles in the household?
A. Yes. A '99 Chevy Suburban.
Q. Okay. Is that vehicle running?
A. Yes.
Q. Is it insured?
A. Yes.
Q. Who's it insured by?
A. USAA.
Q. All right. What was the truck that you mentioned before? What kind of vehicle?
A. It was a 1999 Lincoln Navigator.
Q. All right. Any other vehicles besides

those three?
A. I plead the Fifth.
Q. You plead the Fifth on whether you own any other vehicles?
A. I plead the Fifth.
Q. Okay. I want you to go to Tab 14 if you would. And looking at it, the tab is described as photographs produced by Sloan, 1 through 273. Okay?
A. Yes.
Q. I want you to -- it's pretty tiny, but if you'll look in the bottom right, I want you to go to 0135. Do you recognize that travel case? It's black and red.
A. No, I do not.
Q. Never seen it before?
A. No. I don't know. I don't know whose that is.
Q. You don't know whose it is?
A. No, I don't.
Q. How about any of those clothes? Do you recognize them?
A. No, I do not.
Q. Go to the picture just before that. It's page number -- I think it says 0123.
A. Okay.

Q. What's that?
A. I don't know what that is.
Q. You've never seen anything like that?
A. I don't know what that is. What is that?
Q. Look at -- let's see. Go two pictures in front of that. 121, what's that?
A. I don't know.
Q. Well, describe it.
A. I see a little bag. It looks -- something looks to be a key chain, and something looks like a little top.
Q. Okay. And I represent to you that that little bag came out of the bag that was black and red that I showed you earlier.
A. Okay.
Q. You don't have any idea what that is?
A. No, sir. That's not my bag.
Q. Okay. Now, I want you to go to -- let's see if there's a number. This picture was taken when we went and inspected your tractor. Is there a number on this one? It looks like that. Keep on thumbing until you come to it. Hold it up for the camera so they'll know exactly what we're looking at. Okay. That's your tractor, isn't it?
A. Yes.

Q. All right. Go to the next page if you would. That's your tractor and your trailer, isn't it?
A. Yes, I believe so.
Q. All right. And look at the picture. Hold this one up for the camera. That's the driver's side, isn't it?
A. I don't know.
Q. Okay. Well, do you see the step-off?
A. Yes.
Q. Okay. That would mean that's the driver's side, wouldn't it?
A. I guess.
Q. All right. Now, do you see a can in there?
A. Yes, I do.
Q. Can you tell what kind of can that is?
A. No, I can't.
Q. Okay. Go to this next page, and hold it up for the camera. Can you tell what kind of can that is on your driver's side?
A. No, I can't.
Q. You don't recognize that as a Corona can?
A. No, I don't.
Q. How about the bottle? Do you see that bottle?

A. I see the bottle.
Q. Do you recognize that as a Grey Goose bottle?
A. I guess.
Q. Okay. Why did you have Corona and Grey Goose in your tractor at the time you were operating a motor vehicle?
A. I plead the Fifth.
(A document was marked as Plaintiffs' Exhibit No. 15.)

BY MR. HODGE:
Q. There's a -- at the end of this notebook, and this is going to be under Tab 15, there's a series of checks written by Locke Relocations to you. Sorry. If you'll look at those checks, I think they begin October 29th of 2021, and they go through June 24th, 2022.
A. Yes.
Q. Do you see that? Is that how you get paid after a job, or was this cash before a job?
A. I would either get paid by a check or cash.
Q. Okay. So did you account for the cash that you received from Locke?

A. At what time frame?
Q. Any time frame.
A. You said can I account for it?
Q. Did you account for it, as in -- and I'm talking about reporting it as income to the Internal Revenue Service.
A. No.
Q. Okay.
MR. HODGE: All right. That's all I have for right now.
THE VIDEOGRAPHER: We're off the record at 3:20 p.m.
(There was a pause in the proceedings.)
THE VIDEOGRAPHER: Back on the record at 3:21 p.m.

EXAMINATION

BY MR. POPE:
Q. Mr. Burist, my name is John Pope. And I'm just going to ask a few questions. I don't have near as many as Charlie did. But, first of all, I just want to ask you when did you first get your driver's license?
A. My driver's license or my CDL?

Q. Yeah. Like most of us, you got it when you were 16?
A. I got mine when I was 15.
Q. 15. Okay. And when did you get your commercial driver's license?
A. I got that in 2011.
Q. Okay. Have either your driver's license or your commercial driver's license when you got that, has it ever been suspended or revoked?
A. Not that I -- not that I can think of off the top of my head.
Q. Okay. Do you still have your CDL now?
A. No, I do not.
Q. Okay. Did you have any chronic medical conditions on July 1st of 2022?
A. Not that I know of.
Q. Okay. No diabetics or high blood pressure?
A. Not that I know of.
Q. Okay. And I probably should have asked this, but you said you no longer have your CDL. Can you tell me what happened? How did you come to not have it any longer?
A. Yes. There's a time period when you have to renew your medical certification, and I was not able

to do that, and so my license -- my CDL was canceled.
Q. Okay. Why weren't you able to do it, to comply with the medical?
A. Because I was in jail.
Q. Okay. Do you currently have just a regular Virginia driver's licence?
A. Yes.
Q. Okay. Were you prescribed and taking any prescription medications in the 24-hour period leading up to July 1, 2022?
A. No.
Q. Okay. You understand you're named in several lawsuits regarding the collision on July 1st, 2022, generally, correct?
A. Yes.
Q. Other than those lawsuits, have you ever been a party to a lawsuit? Had to sue someone, someone sued you outside of -- again, outside of these lawsuits?
A. No.
Q. Okay. Now, I want to ask you some questions about Mayflower Transit. And is it okay if I just say, "Mayflower"?
A. Yes.
Q. Okay. Makes it a little easier for us.

A. Yes, yes, yes.

Q. As we know, Mayflower's logo was on the International ProStar you were operating on July 1st, 2022, correct?

A. Yes.

Q. And I know you have this photograph. I'm just going to make it easy. If you don't mind, that is a picture of the ProStar you were operating on July 1st, 2022, correct?

A. Yes.

Q. Okay. And can we agree -- if you wouldn't mind, do you mind just holding it up for the camera real briefly? Can we agree if someone passed you on July 1st, 2022, can we agree that if someone -- they saw that logo, they would think the truck is being operated by Mayflower?

MR. SMITH: Object to form. Calls for speculation.

MR. EHRENREICH: Todd Ehrenreich. Hold on, Mr. Burist. Todd Ehrenreich. Object to form.

BY MR. POPE:

Q. You can answer.

A. Yes.

Q. And, again, if you don't mind, I promise I won't make you hold it up too much longer. Sorry.
A. Okay. Yeah. I'm sorry.
Q. As we can see in this photograph -- and I should -- I should mark it. We got a video, but we'll know what it is. I know it's Tab 7.
MR. POPE: Okay. This will be Exhibit 16, the photograph.
(The document was marked as Plaintiffs' Exhibit No. 16.)

BY MR. POPE:
Q. And just for the record, tell us what Exhibit 16 is.
A. This is the Joe Moholland logo. Yeah.
Q. It's the side of the International ProStar you were operating on July 1st, 2022?
A. Yes.
Q. Okay. And if you could again, I promise I won't make you hold it too much longer. Again, we said on Exhibit 16, Mayflower's DOT number is on the side of your truck, correct?
A. Yes.
Q. If someone passed you on July 1st, 2022, and they looked -- you know, for whatever reason, they

looked up the DOT number, you would agree that they would think this truck is being operated by Mayflower?

MR. SMITH: Object to form. Calls for speculation.

MR. EHRENREICH: Object to form.

THE WITNESS: That's -- that's -- I mean, that's -- that's kind of a tricky question. For someone that doesn't know, it could be yes and no.

BY MR. POPE:

Q. Okay. It would certainly -- if they looked it up, it would certainly say it's being -- that's Mayflower's DOT number, correct?

A. If they looked it up, I don't know. I don't know what it would say.

Q. Okay. Fair. You mentioned earlier Mayflower's logo was on your uniform that you wore when you were working?

A. Yes.

Q. You would have put that uniform on when you got to work on July 1st of 2022, correct?

A. Yes.

Q. And the only reason you didn't it on is because you hadn't arrived for the pickup yet?

A. Because I wasn't working that day.
Q. Okay. Okay. You were going to --
A. I was going -- I was going to Conser Moving & Storage.
MR. EHRENREICH: Mr. Burist, we can no longer hear you. So the last two questions, we haven't been able to hear your response. I hear counsel loud and clear but just not yours. Thank you.
THE WITNESS: I'm sorry.
MR. EHRENREICH: It's okay.

BY MR. POPE:
Q. I think, and you correct me if I'm wrong, you said you -- when you were working the day previous, you did have a uniform on?
A. Yes.
Q. And you described it. The uniform had the Mayflower ship on it. I believe you -- I think you said that.
A. Yes. If I'm not mistaken, yes.
Q. Okay. You would agree that someone seeing you in your uniform with that Mayflower logo on in June of 2022, they would think you were working for Mayflower?

MR. SMITH: Object to form. Calls for speculation.

MR. EHRENREICH: Object to form. Todd Ehrenreich. Object to form.

THE WITNESS: Again, I say for someone that doesn't know, yes. But for someone that did not know, they would think it was Joe Moholland Moving because it's plain right there.

BY MR. POPE:

Q. So let's say again you're operating the International ProStar as it's shown in Exhibit 16.

A. Yes.

Q. You're wearing your uniform with the Mayflower boat on it, and you stop somewhere, and somebody in the public sees you. It would not surprise you if someone thought, Wow, you must be working for or affiliated with Mayflower?

MR. SMITH: Object to form. Calls for speculation.

MR. EHRENREICH: Todd Ehrenreich. Join in the objection.

THE WITNESS: It's a possibility.

BY MR. POPE:
Q. Yeah.
A. Yes.
Q. Now, and we talked about this earlier, the weight certification that were signed off on.
A. Yes.
Q. The person that signed off on it clearly thought that you were with Mayflower and wrote it in there?
MR. SMITH: Object to form.
MR. EHRENREICH: Object to form.
MR. SMITH: Misstates the facts.

BY MR. POPE:
Q. You can answer.
A. Okay. So the person that signed it, they wrote it because that's what the person that was getting the ticket told them.
Q. Got you. That -- meaning the person that told them thought you were operating on behalf of Mayflower?
A. Yes.
MR. EHRENREICH: Object to form.

BY MR. POPE:
Q. Okay. Have you -- strike that. How are you paying for your attorney in this case?
A. I'm not sure.
Q. Okay. To your knowledge, you're not personally paying any attorney for you in this case?
A. No.
Q. Okay. And you, again, don't know who that is?
A. No, I do not.
Q. Have you talked with anyone with Mayflower since the collision?
A. No.
Q. Have you talked with any attorney from Mayflower since the collision?
A. No.
Q. I only have a few more questions. You can put that down. Sorry to make you hold that.
A. Okay. No, no, no.
Q. Do you know Ray Tipton?
A. No, I do not.
Q. All right. Do you know anything about Ray? Do you know his ethnicity?
A. No, I do not.
Q. Do you know where he's from?

A. No.
Q. Do you know what vehicle he was in?
A. No, I do not.
Q. Do you know if he was driving or a passenger?
A. No, I don't know.
Q. Do you know if anyone was in the vehicle with him?
A. No, I do not.
Q. Okay. Did you feel Ray Tipton did anything to cause or contribute to the collision?
A. I don't know.
Q. Okay. As you sit here today, you don't know of anything that Ray Tipton did to cause or contribute to the collision. Do you agree with that?
A. I agree.
Q. Do you know if Ray was injured?
A. I mean, I got the paperwork, but -- I mean, the paperwork says he was injured, so --
Q. Do you know anything -- what, if anything, do you know about whether Ray was injured?
A. I don't know.
Q. You don't know if Ray is still treating for any injury from the collision?
A. No.

Q. You don't know if any injury Ray has is permanent in any way, correct?
A. No.
Q. All right. And you have not spoken with Ray at any time?
A. No.
Q. And you have not tried to talk with Ray since the collision?
A. No.
Q. Why not?
A. That's not in my personal interest to do that.
Q. Okay. As you sit here today, you're not denying that Ray was injured in the collision, correct?
A. Correct.
Q. Do you know Thelma Petno?
A. No, I do not.
Q. If I asked you the same question, do you know Thelma's ethnicity, what would your answer be?
A. I don't know.
Q. You don't know where she's from?
A. No.
Q. All right. You don't know what vehicle she was in?
A. No.

Q. You don't know if she was driving or a passenger, correct?
A. No.
Q. Okay. As you sit here today, you don't have any facts that Thelma did anything to cause or contribute to the collision, do you?
A. No.
Q. And do you know if Thelma suffered an injury in the collision?
A. I don't know.
Q. And you don't know if Thelma is still treating for any injury from the collision, correct?
A. Correct.
Q. Whether she need -- well, anything about her treatment, whether she had surgery or an injection or something, you wouldn't know?
A. Correct.
Q. And you have not spoken with Thelma at any time, correct?
A. Correct.
Q. And you have not tried to speak with Thelma since the collision?
A. Correct.
Q. Same question. Why not?
A. It's not in my best interest to do that.

Q. As you sit here today, you are not denying that Thelma was injured in the collision, correct?
A. Correct.
Q. Okay. Since you got back -- I think you said you got back to Virginia from Camden County, Georgia, sometime later in 2022 roughly. Does that sound right?
A. Yes.
Q. Have you taken any trips outside the state of Virginia at any time?
A. I've been to North Carolina.
Q. And when was that?
A. I've -- it was last Sunday.
Q. Okay. And where in North Carolina?
A. Tabor City.
Q. Okay. Who did you go with?
A. My wife and my brother-in-law.
Q. Okay. And what was the purpose of the trip?
A. Just to visit with relatives.
Q. Okay. Who lives there?
A. She has some cousins and an uncle.
Q. Okay. How long were you there?
A. Just the one day.

Q. Okay. And any other trips outside Virginia since that time?
A. We went to -- we went to Philadelphia a couple months ago.
Q. Okay. And where in Philadelphia?
A. We went to the -- I can't remember the name of the hospital. It's like -- I can't --
Q. Some hospital in Philadelphia?
A. Yes. Yeah, it was a hospital. I can't remember what the name of the hospital was. It's like a -- the name of a school or something like that.
Q. Do you know where it was? What city?
A. It was close to Upper Darby.
Q. And who did you go with?
A. With my wife and my sister-in-law.
Q. Okay. All right. And how long were you there?
A. Just one day.
Q. Okay. Any other trips outside the state of Virginia other than what you've already told me?
A. We went to Texas for Father's Day.
Q. Okay. All right. And when did you go to Texas?
A. I don't recall the exact date.
Q. Was it in 2023?

A. Yes.
Q. Okay. Do you know if it was in the summer, or was it in the spring?
A. It was in October.
Q. And where did you go in Texas?
A. We went to Cushing, Texas.
Q. And who's in Cushing, Texas?
A. My mom -- my momma, my daddy, my sister. We went to -- well, we went to a family reunion.
Q. Okay. And how long were you in Texas?
A. Two days.
Q. Okay. It was sort of a family reunion vacation kind of trip?
A. Not a vacation. Just -- just the family reunion, visit with my mom and dad, and we turned around and came back.
Q. How many relatives did -- I mean, you have a big family? A big family reunion?
A. Maybe -- maybe 20 people.
Q. Okay. All right. Any other -- again, I know you've told me about Philadelphia, Virginia, North Carolina. Any other trips outside the state of Virginia since you got back to Virginia after leaving Camden County, Georgia, in 2022?
A. No.

MR. POPE: Okay. I think that's all the questions I have.
MR. SMITH: Let's go off.
THE VIDEOGRAPHER: Going off the record at 3:35 p.m.
(There was a pause in the proceedings.)
THE VIDEOGRAPHER: Back on the record another 3:38 p.m.

EXAMINATION

BY MR. NORDEN:
Q. Mr. Burist, I introduced myself briefly. I represent the Estate of Michael Hines. I'm going to be jumping around a little bit based on questions you've already drawn earlier throughout the day and covering some additional topics. Okay?
A. Uh-huh.
Q. Mike, you refer to Michael Hines as Mike?
A. Yes.
Q. Okay. Because I hear his family refer to him as Little Mike. Did you have any nicknames for him? How did you refer to him?
A. Just Mike.
Q. Okay. Now, other than Mike, did you know

anybody else in his family?
A. No, I did not. His aunt. I don't remember what her name is.
Q. Okay. And do you recall any instances that you would actually stay over at his aunt's house in Jacksonville?
A. I only stayed there one time, and that was after work on my way back -- back to Virginia.
Q. And Mike would stay there, too?
A. Yes.
Q. I jotted down a note. You said that Mike was staying with you for a period of time. Did you say for four months?
A. I said I didn't know how long. Maybe -- maybe four months.
Q. Okay. And in that time, where was he staying in your house? Meaning, the place where you live, how many bedrooms are there?
A. There's three bedrooms.
Q. And so was there an open available bedroom for him to use?
A. Yes.
Q. I told you I'm going to jump around a little bit. When Mr. Hodge was asking you questions about the vehicles in your household, I heard you say

that your wife insures two vehicles with USAA, correct?
A. Yes.
Q. Did your wife ever serve in the military?
A. No.
Q. You are aware that USAA is only available to service members and/or family members of service members, correct?
A. Yes. Uh-huh.
Q. Yes?
A. Yes.
Q. Were you the qualifier for your wife to be able to get coverage with USAA?
A. I had USAA previously in years past, so the coverage was able to be picked back up.
Q. Right. Because you're retired from the military?
A. Well, I'm a military vet.
Q. Yes.
A. Yes.
Q. And as a result, your wife, by way of marriage, has entitlement to USAA?
A. Yes.
Q. Okay. And would there be any reason that you would have insured any other vehicles in your household with a carrier other than USAA?

A. No.
Q. And so the truck that you talked a little bit about, I'm not sure if I heard clearly. The truck that you said doesn't work currently --
A. Right.
Q. -- what vehicle is that? I mean what year and model is it?
A. It's a 1999 Lincoln Navigator.
Q. Okay. And so I heard about, I think, a Chevy Tahoe or Suburban?
A. A 1999 Chevy Suburban.
Q. And is that vehicle registered to you or your wife?
A. It's registered to my wife.
Q. Is that a vehicle that you drive and operate?
A. No.
Q. Are you listed as a household relative on the USAA insurance policy?
A. I'm not sure. I believe so.
Q. And do you know if you were ever specifically excluded as a driver of the two vehicles insured with USAA?
A. No, I don't.
Q. At the beginning of your deposition,

there was some conversation about your injuries, and you showed us the scar that you -- that is a result of this cash. In connection with the injuries that you've described, have you submitted an application for Social Security Disability benefits?
A. Not as of yet.
Q. Do you intend to?
A. Yes.
Q. And will your application be based upon the injuries that you sustained in the crash that we're here about?
A. Yes.
Q. The health care that you've received, how is that being paid for after this crash? Do you have benefits that you use through the VA? What do you do?
A. I have -- I have -- I have insurance through my wife's disability.
Q. Okay. Is it a private carrier or some other form of insurance?
A. It's Medicaid and Medicare through Anthem Blue Cross.
Q. And those benefits would be Virginia for Medicaid?
A. Yes.
Q. Were you qualified for the Medicaid

benefits subsequent to and as a result of this crash?
A. No, I didn't apply. I haven't applied for any services other than medical treatment.
Q. All right. So we're going to go back to the ELD issue. And there's some documents in this case that discuss the electronic logging system that your tractor was equipped with. The program is through a company called Samsara. It sounds like that's not an entity that you're familiar with, or you are?
A. I'm familiar with it.
Q. Okay. So what wasn't clear to me is recognizing that the tractor involved in this crash could be driven by other individuals at the company --
A. Yes.
Q. -- we can agree that for purposes of any time you are driving as a CDL-licensed individual, that logging should be specific to you, correct?
A. That's correct.
Q. And the times that you were driving should be specific to you, correct?
A. Well, no. Well, with this system right here, it will pick up -- it will pick up other use prior to logging in to myself.
Q. Sure. Yard moves will be tracked?
A. No. Actual -- actual use.

Q. Explain that for me a little bit.
A. Okay. So say somebody else uses the truck, then they would be required to -- they would be required to put their own information in. And I'm not -- I'm not exactly sure, you know, but -- I'm not sure if you're familiar with the term "slip seat." Say you used the tractor today, I use it tomorrow. And it's going to ask me did I use the truck yesterday. So that's what I'm saying.
Q. Okay. Now, when you talk about, I had actually jotted down from a previous answer you gave, it would ask you. And so it's the system giving a prompt, correct?
A. That's right.
Q. And the interface, meaning how you as a driver interact with that system, describe that for me. Is there a tablet or some device inside the cab, or is it run on your phone? How does it work?
A. No. It's -- it's actually -- it's actually mounted in the truck. So when me, myself personally, having the CDL, I would have to put my information in and log it in manually. So the information if somebody else used and it asks did you drive such and such, I would have to say no.
Q. And so, essentially, there are screen

prompts that you must respond to?
A. Yes.
Q. And when you say that there's an interface that is mounted in the truck, it's still a screen that we're talking about, right?
A. Yes.
Q. And that screen, is it dedicated only for these EDL activities -- excuse me, ELD activities?
A. I guess so. I'm not actually sure, you know.
Q. You as a driver, is there anything that you do with that interface other than log in and log out for purposes of your logging?
A. Yes. I have to -- we go back to the prompt situation. It does give you prompts. I have to log out when I stop or when I start to maintain hours of service, yes.
Q. Is there any type of messaging through that platform?
A. Not that I know of.
Q. Okay. What about route guidance?
A. It has that capability.
Q. Meaning can you receive push notifications through that tablet from dispatch or anyone else?

A. You can't receive them while the truck is moving. They -- they -- they come to the truck while it's -- it's inactive.
Q. Right. When the truck is stationary --
A. Right.
Q. -- any notifications will push through?
A. Yes. So all that is the beginning of the shift.
Q. All right. And looking at some of the logs that had been produced in this case, it appears that there is some type of unique user ID or access for you. And what I see is M22132.
A. That was -- oh, I'm sorry. Go ahead. I'm sorry.
Q. What is that?
A. That is my driver ID number.
Q. And is that driver ID number something that you would utilize in logging into the system?
A. Yes.
Q. Tell me, please, take me through the process of getting yourself logged in so that you are identified with the tractor on any given day.
A. I really don't even remember how that process works.
Q. Well, we know that you have a driver ID.

A. Right.
Q. Is that something that would be input when logging in?
A. Yes. In order to get to the -- to the hours of -- to the log itself, you have to put that information in.
Q. Did you have any type of password or other identifying information beyond the driver ID?
A. I do believe so. There was a password.
Q. And at this point, can you recall what your password was?
A. No, I can't.
Q. Was that a password that was assigned to you?
A. No. It was a password that I made up myself.
Q. And was there anybody at Locke or Moholland that you interacted with that had -- well, I'll refer to it as administrative controls, meaning they could also get logged in to those tablets?
A. Yes.
Q. Who would that be?
A. I don't know.
Q. But certainly if you had an issue with the electronic logging system, who would you ask?

A. Mike Peters.

Q. Aside from the built-in screen that we were talking about, did you also have any type of app or cell phone access for your electronic log-in?

A. No.

Q. The Samsara we were discussing, it wasn't clear to me the duration of time that was in this tractor that was involved in the crash. How long was it in there and you utilizing it?

A. Now, there were two types of -- there was two types of electronic log. The Samsara that you're referring to, that was though my phone. The ELD itself was mounted inside the truck. The Samsara on my phone I used for a good while where I got used to it, and then it was commercial motor vehicle regulated that we get ELDs inside the truck. So I was still fairly new to using the ELD.

Q. And in terms of how it worked or you interacted with it, meaning when it was on your phone versus you had to use the electronic logging in the truck, was it any different?

A. Yes. It was a lot different. The -- the ELD, pretty much as soon as you get in the vehicle, if the vehicle is moving anytime, it's picking it up. Versus with the phone, you can pretty much the same way

as you would do it on paper. So yeah, you really had to -- with the ELD you pretty much had to get where you're going because if you ran out of hours, then you had to stop. And if you -- if you moved the tractor, it would violate you according to hours of service.

Q. Yes. The built-in electronic log is stricter?

A. Yes, it is.

Q. Is that fair?

A. Yes.

Q. Okay. And on this particular truck, is that the first time that you had been a professional driver and your vehicle was equipped with electronic logs as opposed to paper logs?

A. You said the first time?

Q. Yeah.

A. No.

Q. Okay. What other company had you worked for that had electronic logging?

A. No other company. Just this company. I thought you meant just -- I mean, I thought you meant the first trip.

Q. Oh, no.

A. Oh, no, no, no. This was the first company that I had to use it.

Q. And so when -- when this technology was implemented and put in place, how were you trained on it?

A. I had to do -- I had to do a module. I had to do modules, and I had to do -- I had to do physically and verbally with Mike Peters. So he came out, showed me how to install it. He came and put it in, showed me how to work it. And if I had any questions, I would go directly to him.

Q. So these modules, we looked at the documents. Looks like they're electronic.

A. Yes.

Q. Where would you physically be when these modules were completed?

A. I would be inside the office.

Q. At where?

A. Joe Moholland.

Q. Okay. And Mike, would he be sitting with you?

A. No. They would be in the office area but not just sitting there with me.

Q. Mr. Hodge asked you about the camera technology on this particular tractor. You told him that there was a forward-facing camera, meaning it looks outward over the hood?

A. Yes.
Q. There was no cab-facing camera, correct?
A. Correct.
Q. Were there any cameras equipped or affixed to the mirrors that would look down the backside of the tractor and trailer?
A. Not that I'm aware of.
Q. Do you know whether or not the electronic logging system in your tractor was set up to send any notifications to anybody who was an administrator or had administrative controls if you had overspeed events, meaning within a -- within a certain number of miles per hour above the speed limit?
A. Yes.
Q. It was equipped with that?
A. Yes.
Q. Do you know, for instance, on I95 if the speed limit just hypothetically is 70 miles per hour, what the overspeed alert would be?
A. Anything over. Anything.
Q. All right. So this comes back to the issue of you preferred this particular tractor because it didn't have a governor on it?
A. Right.
Q. And I infer when I hear that that there

are instances where you travel potentially above the speed limit five or something greater?

A. Hold on. Let me rephrase. Let's go back. Let's go back. Okay. Let's go back to the previous question about the speed. It would -- if it was five or more, if I'm not mistaken, then it would show red. But I think four, four over the speed limit it would not -- it would not show speed.

Q. Sure. There's a buffer.

A. Right. Yeah. The same way that it's on the GPS on your phone, it would show red if you were going too fast, and it would show you what you could get away with.

Q. Do you know if anybody was actually monitoring any overspeed notifications?

A. No, I do not.

Q. Were you ever counseled, coached, or spoken to about speeding events?

A. I wouldn't -- I wouldn't say it as you -- as you put it. But when -- when I first got -- when I first go -- when we first started using that type of system, Mr. Locke at -- well, Mike Peters would tell Locke to call me, Hey, you're going too fast. So that right there, you know, you kind of adapt to the situation.

Q. So somebody was monitoring --
A. Yes.
Q. And there were instances where somebody would call you and say, Hey --
A. Slow it down, yes.
Q. And then in terms of who had access to any of the video footage that was captured by the forward-facing cameras, did you have the ability to log in and look at footage or download footage?
A. No, I did not.
Q. Do you know whether or not there are SIM cards, storage cards essentially, inside the tractor that also backed up footage captured by the camera?
A. No.
Q. And please tell me if this is outside the scope of what you know, whether or not there were any metrics by which the technology in the tractor tracked vehicle telematics?
A. You mean where another vehicle was at?
Q. So telematics meaning movement of the truck, angles, where it is. So GPS tracking. So let's start with GPS tracking. Do you know if the technology in that tractor would actually monitor your physical location?
A. I don't know.

Q. Did the folks who you interacted with at Locke or Moholland tell you they were able to track your location?
A. Not physically like -- like that. But like we were talking about just now, the ELD did track where you were, so they could pretty much know where you're at at all times.
Q. You were asked when the previous lawyer was speaking to you about how your defense is being paid for in this case.
A. Right.
Q. And this is somewhat of a different line of questioning. There's been a lot of conversation here today about different companies, right?
A. Yes.
Q. And before this crash happened and before this litigation ensued, did you pay any particular attention to the names of companies and corporate structure and so forth?
A. No.
Q. And any knowledge that you have now is the knowledge you gained subsequent or after this crash?
A. No.
Q. All right. And so as you sit here, you

still then don't really have much knowledge about the corporate structure or relationships of these entities we're talking about. Is that fair?
A. That's fair.
Q. Okay. And at any point from the time of this crash until the time of your depo as we're sitting here today have you been given any offers or assurances directly or indirectly regarding the substance of your testimony and any impact that it may have on you?
A. Can you repeat that?
Q. Absolutely. And I'll try and make it even easier. Has anybody made any offers or assurances to you about what the effect of the substance of your testimony is here today?
A. No.
Q. Okay. And do you have any interest in any of the companies that are named in this case having responsibility or not?
A. How so?
Q. Sure. So as an example, would you take any issue with Locke having legal responsibility for what happened in this crash?
A. I really don't know. I mean, I don't know the legalities of it, so --
Q. And that's my point. And so you don't

have any interest in who is or isn't responsible for what happened in this crash and how that may affect these companies. Is that fair?

A. I wouldn't say I don't care. I mean -- I mean, I'm very concerned. But, I mean, I don't have no control over it.

Q. Has any company told you directly or insinuated that they are going to come after you for any money that they are obligated to pay as a result of this crash?

A. No.

Q. There was some training conversation with Mr. Hodge, and that obviously starts as far back as obtaining your CDL, but then we looked at modules that had UniGroup information on it. Do you recall that?

A. Yes.

Q. And to your knowledge, the UniGroup materials that we looked at here today, is that a company that ever interviewed you for your position?

A. No.

Q. Do you know what oversight UniGroup had on your ability and access to drive for both Moholland and/or Locke?

A. No. I mean, just as far as it says UniGroup on the -- on the certificates. I mean,

that -- that's all I know.
Q. Okay. And so as it relates to any compliance or -- well, let's start with as it relates to any compliance issues qualifying you as a driver, do you know what the requirements were for UniGroup?
A. No.
Q. And do you know what requirements, if any, were implemented by Mayflower for you to be permitted to drive loads at Moholland and/or Locke?
A. That is a Mayflower qualification, Joe Moholland qualification. Basically you have to be able to pass a drug test. And what that means is Mayflower qualification allowed me to haul and -- haul across and bring back across state line. Joe Moholland authority just allowed me to take it there, permitted me to take it there, not worrying about bringing anything back across state line.
Q. So from your perspective, the loads that you would move both across state lines or within Virginia, were those all loads that were Mayflower loads?
A. They were different. Some were Mayflower loads. Some were Joe Moholland loads.
Q. And how would you as a driver differentiate that?

A. The urgency to get to the delivery.
Q. Tell me about that.
A. I mean, it would be like, Hey, you need to get that load as soon as possible, so --
Q. Which of the two had a greater sense of urgency?
A. The Mayflower.
Q. Mayflower's an important part of the work at Locke?
A. I would -- I would suspect so.
Q. All right. Based upon how you're -- perceive that sense of urgency. Is that what gives me that response?
A. Well, not really. It's just -- basically, it's just -- it was just my work ethic, you know. And my thing was this. The faster I could get it loaded, the faster I could come back and get paid, get some more, and do it all over again.
Q. All right. Aside from the medical qualification lapsing while you were still down in Camden County, is there anything currently that would prohibit you from reinstating or requalifying your CDL license?
A. No, there is not.
Q. Is there a reason you have not done that?

A. Yes. Because I have -- I have a bond restriction from the judge to not use my CDL.
Q. Okay. And I meant to ask you that. The process of bonding out you spoke a little bit with Mr. Hodge about.
A. Yes.
Q. Obviously in conjunction with being permitted to leave --
A. Yes.
Q. -- Camden and come back home --
A. Yes.
Q. -- the judge in Camden placed some restrictions on you. Is that fair?
A. Yes.
Q. Can you tell me what those are?
A. The restriction is pretty much no drugs or alcohol and not to perform any job that requires me to use my CDL.
Q. All right. Did the judge place any restrictions on you, just regular, routine, everyday driving?
A. No.
Q. So you're permitted to do so currently?
A. Yes.
Q. How did you get here today?

A. I drove.

Q. And which of the vehicles that you mentioned to Mr. Hodge did you drive here?

A. I drove the Pacifica.

Q. And at the time of this crash on, would you consider yourself to have been a professional driver?

A. Yes.

Q. Do you agree that going through the process of obtaining a CDL and driving that equipment that you had a higher amount of training than the average person on the road?

A. I wouldn't say training, but the experience.

Q. Okay. How about education?

A. Education is really not a factor with the handling of the vehicle. Like I said, it just depends on the experience. Because with this job right here, it requires more than just driving from one location to another location and just backing into the dock.

Q. Because why?

A. Because maybe more than half of the loads that were delivered had to be delivered into neighborhoods, so it required more skill, more experience.

Q. Neighborhoods are not laid out like yards.
A. That's right.
Q. Corners aren't cut the same way.
A. That's right.
Q. The amount of relief area on the side to be able to go deep and make a turn is not the same.
A. That's right.
Q. All right. And is that what you're referring to?
A. Yes.
Q. I'm going to follow up on some of Mr. Hodge's questions as it related to kind of general rules as it relates to being a professional driver. And would you agree that it would be unsafe to have drugs and/or alcohol in the cab of a tractor?
A. Yes.
Q. There were some questions that you invoked your Fifth Amendment privilege against self-incrimination throughout your testimony here today, right?
A. Yes.
Q. And Mr. Hodge pointed out to you that that will likely result in an adverse inference in this civil proceeding. Do you understand that?

A. Yeah, to a certain extent, but you can explain it to me.

Q. So it's not my place to explain it to you. You certainly have very competent counsel. But my question to you is knowing that there is a potential for this adverse inference and knowing that you have asserted your Fifth Amendment privilege, do you want to amend and answer any of the questions that you have already invoked your Fifth Amendment privilege on?

A. No.

Q. Recognizing your capacity as a professional driver, do you agree that you should do all that is within your power to prevent collisions when driving this heavy equipment?

A. Yes.

MR. SMITH: Object to form. Speculative. It leaves out facts required to answer.

BY MR. NORDEN:

Q. Do you agree that that's a good rule?

MR. SMITH: Same objection. Speculative and leaves out facts required to answer. Object to form.

THE WITNESS: I believe -- I believe that in anything that you do, it's at your best

interest to be the best you that you can be.

BY MR. NORDEN:

Q. Right. And when driving these trucks, recognizing you have to get a CDL, recognizing that you're regulated by the federal government in the job that you do -- all that's true, right?

A. Yes.

Q. And recognizing that many of these restrictions and requirements are in place because of the weight and the potential for harm that can be caused by this, that is the reason I ask you that as a professional driver when you are driving this equipment, should you be aware of your surroundings?

A. Yeah. You should always be aware of your surrounding whether it's a commercial vehicle or your personal vehicle.

Q. And my question is specific to when you're driving this equipment, should you also be aware of the signs and restrictions in any area where you are traveling?

A. To any -- to any CDL holder, you should do that.

Q. Yes. Your current residence, I think I heard you say you've lived at for six years; is that

right?
A. Yes.
Q. Is that a property that is owned by a private individual, or is it an apartment complex of some type?
A. No. It's a rental property.
Q. And the rental property, though, is that -- who's your landlord?
A. His name is Walter Leavitt.
Q. All right. So it's an individual?
A. Yes.
Q. When you moved into that property, did you have to fill out any type of an application?
A. No.
Q. And can you recall any application where you have held yourself out as an employee or driver on behalf of Mayflower?
A. No.
Q. When is the last time you had to fill out an application for anything?
A. It's been a while.
Q. Okay. And part of the reason for the question is I think most of us here have had the opportunity to go through the folks that came and spoke on your behalf at the bond hearing down in Camden

County. Your wife was pretty clear that it's her perspective at least that you were a driver for Mayflower.

A. Okay.

Q. You heard her say that, right?

A. No. I can't say that I heard her say that.

Q. Okay. And so you had both her and your pastor from the church come down and testify at that hearing; is that right?

A. Yes.

Q. And she was asked, "Who does he actually work for?" And your wife, Mrs. Burist, testified, "Mayflower." Attorney Snook asked again, "I'm sorry?" Her response again, "Mayflower." And it was again your wife's position that you have been working for Mayflower since 2014 or 2015. Is that what you tell her?

A. Well, I think it would go back --

MR. EHRENREICH: Mr. Burist. Mr. Burist.

THE WITNESS: I'm sorry.

MR. EHRENREICH: It's Todd Ehrenreich. Let me just object to form. Go ahead and answer. Thank you, sir.

THE WITNESS: Okay. Sorry. I think it would go back to the questions that was being asked earlier, if someone seen the sign, would they think that you worked for Mayflower or would you work for Joe Moholland. So I do believe that that -- that would be in that same category with the question you just asked me about my wife.

BY MR. NORDEN:

Q. Okay. And so your wife, seeing you, interacting with you, seeing your clothing --

A. Right.

Q. -- and having ridden in the -- because she rode in that truck with you, right?

A. Yes.

Q. Based on what you're saying, a person not only in the public but who shares a bed with you --

A. Right.

Q. -- believes you to be a Mayflower driver.

A. Well --

MR. EHRENREICH: Hold on, Mr. Burist. Let me object to form again.

THE WITNESS: Okay.

MR. EHRENREICH: Okay. You can answer.

THE WITNESS: Well, it's understandable, you know, because I'm -- like we were saying again, it's easy to get it mixed up because it says Joe Moholland, and it says Mayflower.

BY MR. NORDEN:

Q. Okay. So it could be one, the other, or both?

A. Like I said earlier, out of state, it could be Mayflower. But in town people know -- people can distinguish they know Joe Moholland from Virginia Transfer, which both of them are under the Mayflower logo. So, I mean, that -- that's my illustration right there.

Q. Okay. A couple questions about your wife. Do you know whether or not she has been arrested for anything in connection with this July 1st, 2022, crash?

A. No, she has not.

Q. Do you know whether or not your wife took possession of the contents of any item that was found in the semi tractor you were driving on July 1st, 2022?

A. There was nothing returned to me from that accident.

Q. Did you receive your cellular phone back?

A. No, I did not.
Q. Have you had any cellular phone that was inside that semi tractor since July 1st, 2022, back in your possession?
A. No.
Q. As we sit here today, do you believe that you have any item of Michael Hines in your possession at home?
A. I do not.
Q. None of his personal effects were left at your house and remain there after this crash?
A. What -- what belonged to Mr. Hines was mailed to his sister.
Q. And what's her name?
A. I do not know.
Q. Who sent her the personal effects?
A. My wife sent her her stuff. His stuff.
Q. Do you know how they got in touch with one another?
A. No, I do not.
Q. Did you have -- and we know you had a cell phone because we spent some time going through the records here today. That phone, was that something that you also utilized to take photographs?
A. Yes.

Q. Did you have any photographs on your phone from the trip that you were on that both Mr. Davenport and Mr. Hines were on with you?
A. No.
Q. So no photographs of either of those guys on this trip wearing any branded clothing or anything like that?
A. No.
Q. At the time this crash occurred, were either Mr. Hines or Mr. Davenport wearing any branded clothing specific to either Joe Moholland or Mayflower?
A. I'm not -- I don't -- I don't remember. I don't remember.
Q. All right. How about you?
A. No, I don't believe that I was wearing -- to be honest, I don't know what I had on. I don't remember.
Q. All right. To this day, has anybody told you that you do not have the permission or authority to drive for Mayflower?
A. No.
Q. At any time before this crash happened on July 1st, 2022, had you been told directly that you did not have permission to drive on behalf of Mayflower?
A. You said before?

Q. Correct.
A. No.
Q. Have you ever been told prior to this crash on July 1st, 2022, that you were disqualified as a driver for Mayflower?
A. No.
Q. Let's talk about Mr. Hines for a moment. There was a phrase that I wrote down. And this relates to his work with you, that for a period he was a great go-to guy for you.
A. Yes.
Q. Would you have considered him -- meaning if somebody saw you and Mike and asked, Hey, what does he do with you, how would you have described him? Like a title or job. What would you say he did?
A. If somebody asked what he did?
Q. Yeah. What does he do with you?
A. Move furniture.
Q. Okay. If I say that in context, like a law firm, there's lawyers, there's paralegals, secretaries, receptionists, and so forth. You know, kind of titles. Would he have had in your mind a title for the work he did with you?
A. The only -- excuse me if it -- but that's Mike. That's Mike. That's his title. That's Mike.

Q. Okay.
A. Yeah.
Q. And I was listening when you were talking with Mr. Hodge, and it seemed that at some point he was up here in Virginia staying with you and doing a fair bit of work with Mr. Locke; is that right?
A. That's correct.
Q. And was that -- where would that have been physically?
A. 220 E Street, Hampton, Virginia, at Joe Moholland's warehouse.
Q. At the Moholland yard?
A. Yes.
Q. And do you know how he was getting paid for any work he was doing over there?
A. No, I don't.
Q. Do you know what type of work he was doing over there?
A. He was moving furniture.
Q. Would it surprise you if Mr. Locke said, I have no idea who Mike is; I've never heard of him?
A. You said would it surprise me?
Q. Yes.
A. Yes.
Q. Okay. Would it surprise you if anybody

over at Moholland said the same thing, We don't know who Mike is; never heard of him?
A. Yes.
Q. The photograph that has been the subject of quite a few questions, I'm just going to ask you to take a look at it. I think that became Exhibit 16.
A. Yes.
Q. The DOT number that's in that photograph --
A. Yes.
Q. -- were you ever instructed to remove that DOT number off the side of that tractor?
A. No.
Q. And that would be true up and through July 1st, 2022; is that right?
A. That's correct.
Q. Okay. Thank you. You can put that down. I think I heard you say something about labor receipts. Did I hear that?
A. Yes.
Q. What is a labor receipt?
A. A labor receipt is just pretty much who did the job and their basic information. Their address, phone number.
Q. All right. And so for instance --

A. And how much they were paid.
Q. So for instance, any job that Mike did with you --
A. Yes.
Q. -- would his name appear on a labor receipt associated with that trip?
A. It would. It would -- it would have been before we Locke on with us being permanent.
Q. Meaning when he was moved up to Virginia --
A. Yes.
Q. -- and was staying with you?
A. Yes. He would not receive a labor form.
Q. Once he was up here?
A. Yes.
Q. Because he was over at the yard?
A. Yes, yes, yes.
Q. And those forms, were those provided to you by Mr. Locke or someone else?
A. Mr. Locke.
Q. Okay. And so recognizing that Mike was doing work over at the Moholland yard, I take it he had permission and consent to be on that yard?
A. Yes.
Q. Did you make an introduction for Mike

with somebody at Locke or somebody at Moholland?
A. Yes, I did.
Q. Who did you introduce him to?
A. Mr. Locke.
Q. Okay. I'm not going to spend too much time on it. Mr. Hodge covered with you some of the events that unfolded after this crash on July 1st, 2022. My question is going to be focused on Mr. Hines. It sounded like the first time that you went to his side or to see if you could render any aid that Mr. Hines was outside the tractor; is that right?
A. No. He was inside.
Q. Where was he in the tractor?
A. I mean, he was right -- he was laying like this, but he was covered up with debris.
Q. And that tractor, was it on its side?
A. Yes.
Q. Is it fair to say then that in the sequence of the crash that the occupants inside the vehicle moved from the original location?
A. Yes.
Q. And that where they ended up was different than where they were when the -- before the crash sequence began?
A. Yeah.

Q. Did you participate in getting Mr. Hines out of the tractor?
A. Yes, I did.
Q. And he was still alive at that time?
A. Yes.
Q. Do you know how long Mr. Hines -- approximately. I know you weren't sitting there with a watch, and there was a lot going on -- but approximately how long he lived after this crash?
A. It wasn't that long.
Q. The checks that you were asked to look at, I believe they're in that -- yes, that right there. All of those checks appear to have been issued by Locke Relocations; is that right?
A. Yes.
Q. And these checks -- or the last one that I looked at was one that was pointed out to you also, and it was dated 6/24/2022. Should that represent your pay for work completed?
A. Yes.
Q. And that money that you received -- so, for instance, this check 4540 for $1,000, was that to cover whatever work had been completed that week preceding?
A. Yes.

Q. Would you be responsible for paying anybody who helped you on those loads out of that $1,000?
A. No. Yes and no. They were paid -- they were paid the amount that they were owed under the payment guidelines that Mr. Locke provided. I paid out of my own pocket what I felt like they should have got that they didn't get.
Q. The payment guidelines issued by Mr. Locke was less than you thought was deserving of the work they had done?
A. Yes. Because these guys worked hard for me.
Q. Sure. It's physical work as you discussed.
A. Yes.
Q. And so let's just take, for example, any trip that would require materials to be loaded onto the trailer, transported to the shipper location, and then offloaded. I personally think of that as kind of like two moves.
A. Right.
Q. How much would, for example, Mr. Hines be paid for that?
A. Well, it depend. It would depend. The

packing is one price. The picking it up is one price. And the picking up and the delivering is the same price. So say we delivered 16,000 pounds. That is $160. $160 on picking up end, $160 on the delivery end. But out of state, the price of labor had gone up for Mr. Locke. He was not willing to pay the amount that had gone up. So in order for me to continue to be able to work, I had to pay the difference.
Q. Because you needed guys to come help?
A. That's right.
Q. All right. And so when you would -- so were you responsible for paying -- and I'm just going to focus on Mike. Were you responsible for paying him?
A. No.
Q. Would the company pay him?
A. Mr. Locke would pay him.
Q. How would Mr. Locke pay Mike?
A. I don't know. I don't know what agreement they had.
Q. Okay. Meaning, do you know if there were instances where Mr. Locke would pay -- you know, I'll refer to Mike as a helper or laborer -- in cash?
A. I don't -- I don't -- I don't know their arrangement.
Q. Okay. And so all of the checks that are

in that clipped document, all of those should represent your pay for work completed?
A. Yes.
Q. Aside from the restrictions you already told me about as part of the bond --
A. Yes.
Q. -- is there any type of check-in that you have to make with anybody up here locally?
A. No.
Q. All right. Is there any restriction on your ability to move throughout the United States?
A. No.
Q. And so you are not required to have any type of monitoring device; is that right?
A. That is correct.
Q. You know Mike's dad?
A. No, I do not.
Q. You never saw him or met him when you would go over to Mike's aunt's house to grab him?
A. No.
Q. Were your wife and Mike friendly with each other?
A. Yes.
Q. Everybody had a fine relationship at the house?

A. Yes.
Q. All right. Angela Locke, do you have any interaction with her? I see she signs the checks, it looks like.
A. Yes.
Q. Aside from getting your checks from her, what other involvement would you have with her?
A. That would be it.
Q. Let's talk about uniforms for a minute.
A. Yes.
Q. I heard you tell me that typically that your helpers or laborers like Mike, you would give them shirts; is that right?
A. Yes. I would give them my own shirt.
Q. All right. And were they required to pay for any of that stuff?
A. No.
Q. Were you -- while driving at Joe Moholland or driving their equipment, was it always kind of the same shirts?
A. Yes. Unless they -- unless they -- yeah, pretty much. Yes.
Q. Why would you have -- and I'm going to focus again on Mike. Why would you have Mike wear one of these branded shirts when you guys were working?

A. Because we had to be in uniform. And, again, they were considered -- whoever worked were considered as a team member. So it would be better to be in uniform than out.

Q. Okay. You know, I think about uniforms as having a variety of purposes.

A. Right.

Q. One of the purposes that I think about uniforms, tell me if you agree or not, is that it identifies somebody as having a specific role or purpose.

A. Yes.

Q. And it also signifies somebody having an association to a business or company.

A. Right.

Q. And that is anywhere we go, right? I mean, when I show up at a fast food restaurant, somebody's in a uniform, I know they work there, and they can help me, and so on with uniforms. Fair?

A. Yes.

Q. A guy like a pilot when you show up at the airport, he's got his pilot outfit on. I know he better be the guy in the seat, right?

A. Right.

Q. All right. Are you aware -- you may or

may not have knowledge of this -- that it was a requirement for you and anybody on your truck to wear these branded items bearing the Mayflower information as part of a master agreement?

A. No, no.

Q. But that was certainly a directive that was given to you --

A. Yes.

Q. -- by Locke and/or Moholland?

A. Mike Peters.

MR. EHRENREICH: Object to form.

THE WITNESS: Mike Peters.

BY MR. NORDEN:

Q. Mike Peters?

A. Yeah.

Q. Like, basically these are the marching orders, right?

A. Yes.

Q. I'm going to show you some clothing items that I have.

A. Okay.

Q. And I'll represent to you that I got these from the Hines family. And I just wanted to find out if this would be stuff that you gave to Mike.

A. Okay.
Q. All right? So we'll take some photographs of these. The photograph will become the Exhibit 17 which will be photographs of two gray T-shirts. One, size XL. Is that you?
A. No. These shirts are fairly new, so he would have got those from Mr. Locke.
Q. I see.
A. Yeah.
Q. So tell me if you would, I'm just going to hand you one. I believe they're identical. I'm going to toss that over here. And if you would, hold it up for the camera with the front and the back. So the front of that T-shirt only has one thing on it, which is the name Mayflower with the ship that you told me about. Just take a look and just confirm that for me.
A. Yes.
Q. Okay. That's consistent with what you testified to earlier; is that right?
A. Yes.
Q. And if you would, you take a look first and then turn it around. What does the back of the shirt say?
A. It says Joe Moholland Moving.

Q. And can you flip that around. It says Joe Moholland Moving, Woodbridge, Virginia and Hampton Roads, Virginia. And we then see what beneath that writing?
A. Mayflower.
Q. Specifically describe it. That's a truck and a trailer, right?
A. Truck and a trailer.
Q. That's a branded trailer name?
A. Yes.
Q. Which is Mayflower?
A. Yes.
Q. And then there's a telephone number and then the joemohollandmoving.com web address?
A. Right.
Q. Okay. So I was looking at this other shirt. I was looking at this other shirt, and it's quite a bit smaller. I think it might actually be a size small. Mike's a pretty skinny guy?
A. Yeah, he was a smaller frame guy.
Q. Okay. So these shirts, though, that I -- two shirts that I put on the table, are those both the types of shirts that Mike would wear when you guys were working together?
A. Yes.

Q. Is there any different T-shirt that you can recall Mike would have used other than the ones that we're looking at here?
A. No.
Q. The other thing that will be included as part of Exhibit 17 photographs, I guess there's a pair of cargo shorts.
A. Uh-huh.
Q. And the name that's stitched on them that appears to be a brand is UniFirst. Have you ever seen that? Do you have any --
A. No.
Q. Do you have any shorts like this?
A. No.
Q. And also there's a barcode on it.
A. No, I don't. Unh-unh.
Q. Is this the type of clothing and/or uniform that would be issued by or provided by Moholland or Locke?
A. It would be black bottom. That's it. Just a black bottom.
Q. So that's the uniform essentially. You have to wear black shorts or black pants?
A. Yes.
Q. Okay. Because I also got a pair of black

cargo pants that the family gave me.
A. Right.
Q. Were these -- do you recall if Mike ever wore these pants and/or shorts with you?
A. No, I don't recall seeing him wearing any of those two items. But the shirts, yes.
Q. But did he comply with the requirement to wear black?
A. Yes, he did.
Q. Okay. So maybe you just don't recall the specific shorts or pants?
A. Right. Right. Yes.
Q. And I know we hit on it, but would there be a reason the guys, Mr. Hines or Mr. Davenport, would not have been wearing kind of the uniform on July 1st?
A. The only reason that they wouldn't have is if they didn't have it. They wouldn't be wearing it if they didn't have it.
Q. Okay.
A. But it's a requirement, so they had to have it.
Q. And Mike had been working with you long enough at that point that he would have had these materials available?
A. Yes. They are similar to the shirts that

he wore down in Florida when he was working for Conser. Instead of saying Joe Moholland, it would just say Conser. And it would be the same thing.

Q. What, with a Mayflower on it?

A. Yes.

Q. All right. And so you know of at least two companies, Conser and Joe Moholland, that are laid out in identical fashion, just different names of the companies doing Mayflower work?

A. Uh-huh.

Q. Is that right?

A. That's correct.

Q. Okay.

MR. NORDEN: Guys, if you don't mind, I'm going to take a five-minute break. I'm going to step away for a couple minutes, and I'll come back and finish up.

THE VIDEOGRAPHER: Going off the record at 4:36 p.m.

(There was a pause in the proceedings.)

THE VIDEOGRAPHER: We are back on the record at 4:42 p.m.

BY MR. NORDEN:

Q. Question for you generally. Were there

times that you would pass through areas that there were tolls on your trips?
A. There were times.
Q. How were tolls dealt with?
A. They would be paid in cash unless, like different parts up north, that they didn't take -- just pay by plate.
Q. It gets the image, and then the bill goes back to whoever the plate is associated to?
A. Yes.
Q. Okay. You were shown by Mr. Hodge a couple of these van operator separation notification documents. Do you recall that?
A. Yes.
Q. All right. So I'm going to hand them back to you. One is dated 12/15/2015 as an effective date, and the other, an effective date of separation of 5/1/2018. Please take a look and tell me if you recognize at the bottom completed by any of those signatures?
A. No.
Q. Okay. You're not familiar with those individuals' signatures at least?
A. Okay. The 2015 one, at the top it says Miranda Williams. This -- this one that's for 2018,

I'm not sure what that says. I'm not sure if that's MP or not. I'm not sure.

Q. Okay. I was just curious if that was Mr. Peters.

A. Yeah. I'm not sure because I don't recognize these papers.

Q. Okay.

A. I don't recognize this at all. When I -- when I submitted for my resignation at Joe Moholland, I did it through e-mail, not this type of paperwork.

Q. Okay. And I don't have it, so I'm going to ask for your Social Security number, but we're going to go off record when you provide it so that it doesn't appear on this transcript for privacy reasons.

A. Okay.

Q. So we're going to go off, I'm going to ask you to give it to me, and we'll come back on and continue the depo. Okay?

MR. HODGE: And it won't be on the written transcript either?

MR. NORDEN: No.

THE VIDEOGRAPHER: Going off the record at 4:45 p.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at

4:45 p.m.

BY MR. NORDEN:

Q. Mr. Burist, just to be clear, on the day of this crash, can we agree that Mr. Hines was on that truck with you for the purpose of work?

A. Yes.

Q. He was not just there riding along with you as a buddy, right?

A. That's correct.

Q. He was there for a specific purpose, and it was in furtherance of this moving business; is that right?

A. Yes.

Q. Were there times that you would text message when you were driving the semi tractor?

A. Not that -- not that I can recall.

Q. And so if your phone records show that there were outgoing and incoming text messages, would you have any reason to dispute what's on those phone records?

A. Yes, I would.

Q. Okay. You were also shown as one of the exhibits that I'm going to now hand back to you on page 13, there's a highlight. Mr. Hodge went over some

highlights, and he asked you about some phone numbers. Do you recall that?
A. Uh-huh.
Q. So I'm going to hand this back to you. And that bottom highlight is number -- can you read that phone number out loud, please?
A. It says 771-5110.
Q. Area code 757; is that right?
A. Yes, it does say 757.
Q. Okay. And I thought I heard you say that that was your -- I thought I heard you say that was your wife's number or Mr. Davenport's number.
A. Uh-huh.
Q. Did I hear that correctly that you thought that was Mr. Davenport's number?
A. I don't know whose number it was actually because the time -- the time here is military time, and that's 6:50. And that's in the evening time.
Q. So it's our understanding it's actually UTC, so it would be 2:50. That's going to be at some point shortly after this crash. And so that was the reason that I wanted to revisit that because there would be no reason that you get a call --
A. That's right.
Q. -- from Mr. Davenport's number at that

point.
A. That's right.
Q. In fact, it's my understanding that that number goes back to Locke Relocation.
A. Okay. I don't -- I don't recognize the number. But because it was a 757 number that I didn't recognize, I assumed it was Mr. Davenport.
Q. Did you speak to anybody at Locke in the hours after this crash?
A. No, I did not.
Q. Did they ever ask you, did anybody at Locke or at Moholland, for your version of these events?
A. No.
Q. And the letter -- sounds like it was a letter that you got just out of the gate saying you're not going to get workers' comp.
A. Yes.
Q. That was not prompted by a claim for workers' compensation?
A. No, it was not.
Q. And just to clarify for me, I think I heard you respond to Mr. Hodge about any compensation you received from Locke Relocations, the -- the money for your work?

A. Yes.
Q. Did I hear you -- did I hear correctly that you did not report all of that income as wages to the IRS?
A. No. You misunderstood what -- he asked me had I filed -- had I filed, and I told him no.
Q. I see. So when is the last year you filed returns?
A. I don't -- I don't recall. Because I got 1099.
Q. Okay. So the Locke Relocation would 1099 you?
A. Yes.
Q. Starting in what year?
A. I believe 2000 -- I'm not sure. I'm not sure.
Q. And so for any year that you started receiving 1099s from Locke Relocations, have you filed tax returns?
A. No, I have not.
Q. Do you have any tax liens that you're aware of?
A. No, I do not.
Q. At this point, is it that you don't believe you earned enough income to file a return, or

you just haven't gotten around to it?
A. No, I haven't got around to it because I know I owe, and I didn't have it to pay.
Q. Because you know once you file, then you're going to have a tax lien?
A. Exactly.
Q. I'm going to read a number of company names to you.
A. Okay.
Q. And I'm just going to go one by one. You can tell me -- after I read the names, just tell me I recognize it or no, I don't.
A. Okay.
Q. We'll do that and then go from there.
A. Okay.
Q. Joe Moholland, Inc.
A. Yes.
Q. Moholland Transfer Company.
A. Yes.
Q. Moholland Transfer, Incorporated.
A. No.
Q. Modern Transport Services.
A. No.
Q. Alliance Transportation.
A. Yes.

Q. Combined Van Lines.
A. No.
Q. AARD Wolf Transfer.
A. No.
Q. Crossroads Moving & Storage.
A. No.
Q. Are any of the entities that you responded in the affirmative that you are aware of or have heard of, have any of those entities paid you for professional driving?
A. No.
Q. Have you ever spoken to anybody who is a relative of Mike after this crash?
A. No.
Q. Has your wife spoken to anybody who's a relative of Mike after this crash?
A. Yes.
Q. Who?
A. His sister.
Q. Why?
A. She said that she found some stuff. Well, she was allowed to go through some of the stuff that was recovered from the crash, and she wanted to know if it was mine. And they exchanged information so that she could send Mike -- send her Mike's belongings

that were left at the house before the accident.
Q. Was there anything that the family retrieved that was your property that needed to be sent back to you?
A. Not that I know of.
Q. As it relates to any time that Mike was on your truck, and I guess let's focus it specific to this trip when the accident happened. We can agree he was not a driver of the tractor?
A. That's correct.
Q. To your knowledge, he did not have a CDL license?
A. That is correct.
Q. And there is nothing that Mike did that caused this crash?
A. No.
Q. You were, in fact, the only person in the truck at the time of this crash that held a CDL; is that correct?
A. That is correct.
Q. With the -- you referred to it as folders, I think, that Mr. Locke would give you for your upcoming trips; is that right?
A. Yes.
Q. Were there ever times that Mr. Locke

would give you a folder that had any photographs of pre-move -- I call it inspection, essentially where somebody goes out to the house and they photograph what's to be moved. Have you ever seen that?
A. Not to my remembrance.
Q. Okay. I've seen some reference to loading photos. Have you ever seen loading photos?
A. Yes.
Q. Okay.
A. Yes.
Q. How would you see that?
A. At the end -- at the end of every shipment that is completed, there would be a sheet to operate the loads with the shipper's name and the date and sometimes with the weight on it. Take a picture of it. Also you take a picture of the folder when we get ready to start a delivery and I think sometimes when we were picking up.
Q. And so the photos that you would take would be on your cell phone, I assume?
A. Yes.
Q. And would you e-mail those off to Locke or somebody?
A. Yes.
Q. Did you do that as the work was being

completed?
A. Yes. Uh-huh.
Q. Are you familiar with an individual Barbara -- I'm probably going to pronounce the last name wrong, Draughan, D-R-A-U-G-H-A-N, at Joe Moholland?
A. Yes.
Q. Who is she to your knowledge?
A. To me, she was the head lady.
Q. Okay.
A. Yes.
MR. HODGE: She was what?
BY MR. NORDEN: The head lady.

BY MR. NORDEN:
Q. And when you say, "the head lady," is that the office you don't want to end up in?
A. No. She was -- she -- she handled everything. Yeah, so she was the go-to lady. You know, she pretty much -- she had all the juice right next to Mike Peters.
Q. All right. So they both kind of ran that place?
A. Yes.
Q. How about Tyrone Myles? You think he

would have been a Joe Moholland person?
A. I believe Tyrone works in Woodbridge, yes.
Q. Do you know if you took any photos of any of the contents of the stuff that was on the trailer July 1st of 2022 and sent that off to Locke or anybody?
A. No.
Q. You ever been told that the tractor that you were driving had previously been stolen? That a tag was reported stolen?
A. No. I heard that at one of the hearings, but no, never.
Q. Okay.
MR. NORDEN: I don't have any other questions for you. Thank you.
THE WITNESS: Thank you.
MR. NORDEN: All right. Everybody who's on Zoom, all the plaintiff attorneys have completed questioning, so it's over to you guys.
MR. EHRENREICH: I'll go. This is Todd Ehrenreich.

EXAMINATION

BY MR. EHRENREICH:

Q. Mr. Burist, you have heard me. I guess you've seen me on some kind of screen there.

A. Yes.

Q. I represent Mayflower. I'm going to narrow and tailor my questions to really the events of the date of the accident. I'm not going to ask you questions about the accident, but as it relates to Moholland and Locke Relocations --

A. Yes.

Q. -- I'm going to ask you those questions. Okay?

A. Okay.

Q. All right. So one of the issues that those of us on Zoom are having, sometimes we can't hear you.

A. Yes.

Q. So I'm not sure exactly why, but we can't hear. So whatever is easier for you. If I can't hear you, I'll just tell you. Okay?

A. Okay.

Q. All right. So on the events leading up to the trip that you were going to take on that July

day, who contacted you, or did you contact somebody about employment for that -- for that day in July? Can you hear me?
A. Yes. I'm trying -- can you --
Q. Yeah. So you -- you were going to get in a truck and drive and -- and deliver a load of products.
A. Right.
Q. My question to you is who contacted you to drive on that day, or did you contact somebody and ask if you could drive on that day?
A. No. I had previous instructions from Mr. Locke.
Q. Okay. And describe those previous instructions for me, would you?
A. Well, I received the folders as usual, and one -- one of the -- one of the loads were being delivered the same day, but it had got switched up. And all I needed to do was just get to Florida to Conser -- Conser warehouse because they had another team down there already, and they had a job that needed doing. And so I already had guys set up for that.
Q. So Mrs. Locke testified as the representative for Locke Relocations a few months ago.
A. Okay.

Q. And I think she described for us how it was -- it was predetermined.
A. Right.
Q. So usually her husband decided who was going to drive those -- for those deliveries on those days and then would present the drivers with, This is your schedule for the week or for the month. Was that -- was that your agreement with Mr. Locke?
A. No. Each -- it was just job to job.
Q. Okay. But you talked about a folder. You said folders. Tell me about what you mean by that.
A. That -- that is a complete trip.
Q. All right. So, what, would Mr. Locke come to you or meet with you, or how did that happen where he would have a folder with all of the details for the complete trip?
A. Either I would -- either we would meet at the Joe Moholland warehouse or I would come to his house or we would meet at the gas station, at the fuel pumps, or he would drop them off to me at my house.
Q. All right. Was there a -- would there be a preliminary phone call between the two of you where he would say, Hey, I have a trip July 2nd. Are you available?
A. No. He would usually contact me when I'm

getting ready to head back and give me a preview of what was coming up.

Q. A preview, meaning I'm going to need you to drive on these certain days?

A. Just to let me know when -- when the loads were supposed to be ready, where they were going, and availability, you know. So just to -- pretty much just to be prepared or to get prepared.

Q. But he -- he -- would he present you with certain days? So would he say at the end of June, the beginning of July, These are the dates that I believe I'm going to need to you drive for me?

A. No.

Q. So you got to help me out here. How did that work between the two of you?

A. Okay. So, again, as I say, he would -- the trips would be -- it just -- it just fell on when the trailer was completely loaded. Then I would know what that schedule would look like. Each folder would have a -- a delivery date. And so they would be -- they would be set up simultaneously to be delivered in that order and return back to Virginia.

Q. And how many -- how many days' notice would Mr. Locke give you that he was expecting you to go on a trip for him?

A. It could be -- it could be anywhere from two days to a week.
Q. And you said that with the trailer being loaded. In this case was the trailer loaded on the Locke property, or were you going to pick up a loaded trailer?
A. No. The trailer was already loaded. All I had to do was disconnect and hook up to the loaded trailer.
Q. And where was the loaded trailer located on this last trip?
A. At Joe Moholland's warehouse.
Q. All right. The Locke Relocation property and the Joe Moholland property, is it one in the same?
A. Yes, it is.
Q. All right. Was it always Mr. Locke who contacted you to drive for Locke Relocations?
A. Yes.
Q. All right. Did you meet with anyone from Joe Moholland about this trip prior to your departure?
A. No.
Q. Did anybody from Joe Moholland tell you that Mayflower had terminated its relationship with Joe Moholland earlier that year?
A. No.

Q. As far as the DOT number that you were using for that date, did Joe Moholland tell you that, in fact, you were driving under their DOT number?

A. No. I didn't get any information like that.

Q. All right. The trucks themselves -- let me take a step back. The truck that you were using on that day, I think you said that you had used that cab before; is that correct?

A. Yes.

Q. And was that the cab that had been assigned to you for 2022?

A. Yes.

Q. And who assigned that cab to you?

A. Mr. Locke.

Q. Do you know who owned it?

A. I do not know.

Q. What is your understanding of who owned it?

A. My understanding is Mr. Locke owned it.

Q. Okay. And the trailer itself, what was your understanding of who owned the trailer?

A. My understanding, the trailer, that Payne owned it.

Q. When you would drive -- did you ever

knowingly drive under Joe Moholland's DOT number?
A. I'm not sure.
Q. So my question is a little bit better because that was a bad one. Before you would leave on a trip, did anyone tell you that you were using the Joe Moholland DOT number?
A. No.
Q. All right. Do you know if Locke Relocations had its own DOT number?
A. No, I do not.
Q. When -- prior to this -- to this trip, were you provided with any instructions from anyone from Mayflower?
A. No.
Q. All right. Before -- and we're just talking about this trip. Were you in contact with anyone from Mayflower regarding any aspect or detail of this particular trip?
A. No.
Q. The DOT number that was on that truck, how long had you been in possession of that cab?
A. You mean -- you mean -- I mean, could you be a little bit more specific?
Q. Yeah. And I apologize. What I'm trying not to do is ask the questions you were asked before.

So you were asked questions about whether you had only been assigned to one truck.
A. Right.
Q. Whether you brought the truck, just the cab, would you bring it home and then bring it to the gas station and those sorts of questions. So I'll ask -- I'll ask specifically about this cab. Was that cab at your home, or did you have to go to Locke Relocations to pick it up?
A. As of right now, I don't remember how I did that.
Q. Okay.
A. But in most cases, I would pick it up from the yard and go.
Q. Do you know if other people also drove that cab?
A. Yes, they did.
Q. Okay. All right. There was a lot of stuff in the truck, and lots of times, because I do a lot of trucking work, we see cabs that are full of personal items, I'll call them, because people live in that cab during the workweek. Sleepers and whatnot. Was this cab considered a sleeper or something that a driver like you would be able to sleep in?
A. Yes.

Q. Okay. Did you ever have the opportunity in 2022 to sleep in that particular cab?
A. Yes.
Q. Was it your plan to use that as a sleeper on this trip?
A. That's -- that was yet to be determined.
Q. Okay. You did have two people in the cab with you?
A. Yes.
Q. Who approved that?
A. Mr. Locke.
Q. Okay. The payments themselves in 2022 when you were driving for Locke Relocations, did you always receive your payment from Locke Relocations?
A. Yes.
Q. All right. In 2022 did Mayflower ever send you a check for your work?
A. No.
Q. The same question with the two gentlemen in the cab. What was your understanding, were they paid by Locke, or did Locke pay you, and then you paid for the two gentlemen in the cab?
A. No. Well, it just -- it just depended. Well, with Mr. Davenport, I would pay him -- I would pay him out of the expense money that I got from

Mr. Locke. But with Mr. Hines, he would receive his money from Mr. Locke.

Q. Okay. Did you take annual -- annual drug tests?

A. Yes.

Q. And who would schedule your drug tests for you?

A. Well, nobody would schedule it. They would just announce it, and you would have to go get it done.

Q. And those results would go to whom?

A. I'm not sure.

Q. All right. Was it your understanding that Locke Relocations was involved in ensuring that you completed your annual drug test?

A. I'm not sure whose responsibility it was.

Q. In 2022 did you drive for anyone other than Locke Relocations?

A. No.

Q. Mr. Peters, what were your interactions with him just generally in 2022?

A. My interaction with him was basically he would keep me up to date on the different regulations and standards and things of that nature. Anything else would be with Mr. Locke.

Q. You talked -- you gave some testimony, Mr. Burist, about some education and ongoing education. Was it Mr. Peters that arranged for you to look at those pods of education?

A. I'm not -- I'm not sure who was behind that.

Q. All right. If -- if the corporate representative for Joe Moholland testified that you were, in fact, driving under its DOT number on the date of this accident, do you have any reason to doubt that or disbelieve it?

A. I wouldn't know what to think. All I know, I was authorized to drive it. I know that it was drivable. So that would be all I could account for.

Q. Whose decision is it as to what DOT number you'd be driving for a particular trip?

A. I'm not sure.

Q. Is it your decision?

A. No.

Q. Just a couple more questions. In 2022 did you consider yourself an independent trucker, an independent contractor?

A. Yes, I did.

Q. All right. Did you pay your own taxes if you were to pay them?

A. I was required to, yes.
Q. Did Locke or Joe Moholland pay for any health insurance for you?
A. Not to my knowledge.
Q. When you sent in your letter of resignation or e-mail to resignation -- it's late. I'm sorry. I'll try to speak a little clearer. You talked before about submitting a resignation. Do you recall that?
A. Yes.
Q. Who did you send that to?
A. Mr. Locke.
Q. Did he acknowledge that he received it?
A. Yes.
Q. And my last few questions, you discussed about there's -- there are onboard computers now or there have been for a while which provides certain information. Some of it is like Qualcomm, I think, that you were asked about before, which is that ability to communicate with a dispatcher. On this -- on this trip, who did you consider to be the dispatcher?
A. Mr. Locke.
Q. All right. And if you wanted to communicate with Mr. Locke during the trip, how would you do that? We'll focus on 2022. Okay?

A. I would have to -- I would have to call him, reach out to him.
Q. All right. And was that with your private phone?
A. Yes.
Q. All right. There's also the onboard data collector that you talked about. Remember? There's a specific name. I think it was called your -- your ELD, your electronic log device?
A. Yes.
Q. Right. And who was that information for?
A. I do not know.
Q. Who -- when the data was collected, who downloaded it, or who viewed it?
A. I don't know.
Q. Was it Mr. Locke?
A. I don't know who it was.
Q. Okay. Did you ever discuss any of the data that was collected on the ELD with anyone?
A. No.
Q. Your -- all trip expenses were reimbursed or paid for by Locke. Would that be accurate?
A. Yes.
Q. The -- the uniform, we'll call it a uniform, the shirts that you wore, who provided those

to you?
A. Mr. Locke.
Q. Okay. Did you have to return them after every trip?
A. No.
Q. So would he provide the shirts, and you kept them?
A. Yes.
Q. Okay. The shirts, you were not wearing one of those T-shirts that was presented to you on the date of the accident; is that correct?
A. I don't remember.
Q. You don't remember?
A. No.
Q. Did you have a surplus or a lot of those shirts so that you would just show up in one of those shirts when Mr. Locke asked you to make a delivery?
A. Yes.
Q. All right. Approximately how many of those shirts did you have at home?
A. Well, I wouldn't say at home. Altogether I guess I had about six.
Q. Where were they kept?
A. They were -- they were kept in my drawer in my bedroom. I usually kept about four on me at all

times because I kept a bag packed.

Q. And we seem to keep T-shirts forever. I know I do. How old were those T-shirts?

A. Well, my clothes were fairly old. I mean, I would wear them, you know, until they were all beat up.

Q. They were -- is it fair to say that Mr. Locke gave those T-shirts to you before 2022?

A. I might have -- I might have received a couple in the year of 2022, but for the most part, yes.

MR. EHRENREICH: That's all I have. Thank you, Mr. Burist. I know it's been a long day.

THE WITNESS: Okay. Thank you.

MR. SESSIONS: This is Matt Sessions for Joe Moholland. I don't have any additional questions.

MR. SMITH: Thank you.

THE WITNESS: Thank you.

MS. CURRELI: Christy Curreli for National Indemnity Company. No questions from me either. Thank you.

THE WITNESS: Thank you.

MR. ELLIOTT: This is Jim Elliott for Locke Relocations. No questions.

THE WITNESS: Thank you.

MR. HODGE: From the plaintiffs, I have follow-up questions.

MR. GILSON: This is Jim Gilson from Payne, Inc. I have a few questions.

MR. SMITH: Go ahead, Jim.

EXAMINATION

BY MR. GILSON:

Q. Hello, Mr. Burist.

A. Hello.

Q. I'm Jim Gilson. I represent Payne, Inc. Going back to July 1st, 2022, how did you get to Joe Moholland's facility that day?

A. I drove my truck.

Q. And what kind of truck was that?

A. I believe it was a 1999 Lincoln Navigator.

Q. And when you got there, then you parked the truck at the facility?

A. Yes.

Q. Then what did you do?

A. Did a pretrip inspection.

Q. On what?

A. On the truck and the trailer.

Q. Okay. And what kind of pretrip inspection did you do?

A. All around inspection. Truck and trailer.

Q. So with regards to the trailer, what do you do?

A. I check -- I check the connectors on the trailer. The lights. The signal lights, four ways. Of course the tires. The handles on the -- on the doors. I look for cracks. Cracks. Any type of -- any type of defect that should not be there that's visible to the eye.

Q. Do you look at the brakes?

A. I'm sorry?

Q. Do you look at the brakes?

A. Yes, I did.

Q. How long does it typically take you to do your walk-around pretrip inspection of the trailer?

A. If you -- if you do it thoroughly, take your time, I guess about -- I guess about 15 good minutes.

Q. You think you did that type of inspection on July 1st, 2022?

A. Yes, I do.

Q. If you --
A. I did, I mean.
Q. If you see anything that is a concern, whether it's a defect or something that you're concerned about, do you note it in your ELD?
A. No. What I do is I -- I reported it to Mr. Locke, and Mr. Locke took it from there.
Q. Do you recall if you reported anything to Mr. Locke on July 1st, 2022?
A. No.
Q. In your log, there's a notation that you did a pretrip inspection on July 1st, 2022, at 6:28 a.m. Does that sound right?
A. I guess. I guess so if the log says that. I really don't -- really don't remember.
Q. If there's a pretrip inspection noted in the log, does that mean you've done a pretrip inspection and did not find any defects or anything of concern?
A. Yes.
Q. Once you did your pretrip inspection, then what did you do?
A. I really don't -- I really don't know what I did right now at this time.
Q. And what was the exact location of where

you were? What's the address?
A. That would be 220 E Street, Hampton, Virginia.
Q. And -- well, as far as what you did then, I assume you had to make sure you had all of your paperwork together, you had Mr. Davenport and Mr. Hines ready to go, and then you got in the truck?
A. Are you asking me?
Q. Yes, sir.
A. Again, I can't say at this time. I don't remember.
Q. But eventually you would have gotten in your truck so you could leave?
A. Yes.
Q. And what route do you take from that location to get to I95 south?
A. It is usually -- it is usually -- it just depends. Most of the time it's 664 to 95. 664 to 58 to 95.
Q. Approximately how far away is that?
A. That's about an hour and a half.
Q. So it takes you about an hour and a half to get to I95?
A. Yes.
Q. And in that time period, are there places

where you have to come to a stop because of traffic lights?

A. There are a couple of spots, yes.

Q. Along the way, are there places where you would have to apply the truck's brakes?

A. Yes.

Q. On that date, do you recall there being any issues with how the truck handled?

A. There were not any issues to my knowledge at the beginning of my trip.

Q. Would that include there were no problems with the way the brakes were working?

A. Starting off, yes. No problems.

Q. And along the way, you would have driven from that location down to south Georgia to the site of the accident. You made that drive that day, July 1st, 2022?

A. Yes.

Q. And would you have applied the brakes quite frequently over the course of that traffic?

A. I wouldn't -- I wouldn't say that. It just depends on traffic.

Q. Would you have applied the brakes over the course of your trip down to the south part of Georgia?

A. Yes.
Q. How did you know the trailer was a Payne, Inc. trailer?
A. It was written on the trailer.
Q. And you independently remember that?
A. Not -- not directly, but something in my mind tells me that Payne was on that trailer. I don't remember exactly.
MR. GILSON: Thank you, Mr. Burist.
THE WITNESS: Thank you.

FURTHER EXAMINATION

BY MR. HODGE:
Q. Mr. Burist, briefly, reference was made to that letter of resignation sent to Locke. I think we established it's like 2015, 2017, or something like that?
A. I'm not sure exactly when it was. Like I said, I e-mailed the document, so the -- the -- the date of the resignation would be with the document.
Q. And the purpose of that was to switch from being an employee where they took out taxes and all that to becoming an independent contractor?
A. No.

Q. What was the purpose?
A. Well, the purpose was relocation. But it ended up -- it didn't work out that way.
Q. All right. And then you kept working for them?
A. Yes.
Q. And you kept working for them under the same -- in the same fashion that you had worked for them before you sent that letter of resignation?
A. No. I got a raise --
Q. Okay.
A. -- actually.
Q. So you leveraged the threat of resignation to get more money?
A. Well, it -- it was not -- it was not -- the intention was to relocate. But they really didn't want me to go, and when it didn't -- when it didn't turn out that way, you know, some things kind of went in my favor.
Q. All right. So you made more money after sending that letter of resignation?
A. Yes.
Q. Who else drove that cab?
A. I cannot say.
Q. And you still drove that same tractor

that bore Mayflower markings?
A. Yes.
Q. Okay. And you always kept a bag packed with Mayflower T-shirts?
A. I -- I generally kept things on hand ready to go.
Q. Okay.
A. I wouldn't say completely packed, but, you know, ready to go at any given moment.
Q. Was Locke or Peters present for the pretrip inspection at 6:28 a.m. on July 1st?
A. Not to my remembrance.
Q. Now, you referenced that there did not appear to be issues at the beginning of the trip in response to -- from Payne's lawyer. Did any problems or issues arise during the trip?
A. I would plead the Fifth to that question.
Q. Okay. And I'm -- I'm specifically asking about before the wreck of July 1st.
A. At the beginning of the trip, there were no problems.
Q. Did problems arise during the trip?
A. Again, I would plead the Fifth to that question.
Q. Okay. If problems arose, was it your

duty to pull the truck over and get them corrected?
A. Yes.
Q. Did you do so?
A. I didn't say there were any problems.
Q. But you didn't say there weren't any problems either.
A. Exactly. And I pleaded the Fifth to just leave it -- leave it at there.
MR. HODGE: All right. You got any questions?
MR. NORDEN: I do.
MR. HODGE: All right. That's it for me. Now you get Mr. Norden.
MR. EHRENREICH: We didn't hear you. Did you say there are no further questions?
MR. NORDEN: No. It's Andrew. I have a couple questions.
MR. EHRENREICH: Okay.

FURTHER EXAMINATION

BY MR. NORDEN:
Q. Mr. Burist, as part of that pretrip inspection specific to a trailer --
A. Yes.

Q. -- how are you able to visualize the brakes?
A. You mean to visualize the brakes?
Q. Yeah. How can you look at them?
A. You can look in and see them.
Q. And the brakes on the trailer, are those discs or some other form of brakes?
A. They're the same as pads. They're just bigger than a regular vehicle.
Q. Okay. And when you look at the brakes, are you looking at depth of remaining life on the sacrificial part of the brake?
A. You're looking at -- you're looking at depth. You're also looking for rust. You're looking for cracks. You're looking for oil leaks. You're looking for all those -- all those things.
Q. And what I'm kind of trying to get around to here, are you a mechanic?
A. No, I'm not. But I was trained to do my pretrip inspection that way.
Q. Understood.
A. Yes, sir.
Q. Were you in any way responsible for maintenance of brakes on these trailers?
A. No, I was not.

Q. Would you expect, recognizing this trailer, this Payne, Inc. trailer, was a third party, would you expect that the owner of that trailer would be responsible for its maintenance?
A. Yes.
Q. And keeping the brakes in good working order?
A. Yes.
Q. Appropriate depth left on the brakes?
A. Yes.
Q. That the tires be kept in good working order on the trailer?
A. Yes.
Q. And that all that work be done by the owner of that as opposed to yourself. True?
A. Yes.
Q. I mean, we're talking about a visual inspection that you do as opposed to substantive maintenance that is to be done by the owner; is that fair?
A. Yes.
Q. Last questions here. Talking about Joe Moholland and Locke Relocations, recognizing that they're on the same property, do you know the difference between those two entities?

A. When you ask it that way, I would say no.

Q. So let's focus on July 1st, the day of this crash.

A. Yes.

Q. This is your perspective, right? You're the driver. Based on your reasonable belief, at all times that you worked as a driver for Locke, slash, Moholland, including July 1st, 2022, is it your understanding you had permission to associate and otherwise use the Mayflower logo on your equipment?

A. Yes.

Q. That you were allowed to use the Mayflower name on your equipment?

MR. EHRENREICH: Object to form. Counsel, you're talking about your equipment. What equipment are you talking about?

BY MR. NORDEN:

Q. It's your understanding that as the driver at all times including July 1st, 2022, that you were permitted to have the Mayflower name on the tractor that you were driving?

MR. EHRENREICH: Object to form.

THE WITNESS: Well, I guess to answer your question, I don't -- I don't really know

the association with the name on the trailer. I just know that I was -- had permission to drive the truck.

BY MR. NORDEN:

Q. Okay. And at no point for the entirety of the time that you were working and driving through the direction of Mr. Locke were those DOT numbers changed; is that true?

A. I'm not -- I'm not -- I'm not sure. I'm not sure.

Q. At all times that you drove the particular tractor that was involved in this wreck on July 1st, 2022, the Mayflower name was on the door of that cab, wasn't it?

A. Yes.

MR. SMITH: Objection. Asked and answered.

BY MR. NORDEN:

Q. And at all times you were directed to utilize and wear those branded shirts including the Mayflower name on the front and truck on the back, true?

MR. SMITH: Objection. Asked and

answered.

BY MR. NORDEN:

Q. Is that true?

A. Yes.

MR. SMITH: Objection. Asked and answered.

BY MR. NORDEN:

Q. And all of these things that we're talking about, being the uniform, the name on the side of the tractor, those are things that were readily and visibly apparent to the public, true?

MR. SMITH: Objection. Asked and answered.

MR. NORDEN: That was not asked, nor has it been answered.

THE WITNESS: Yes.

MR. NORDEN: Thank you, sir.

MR. HODGE: Ask my question.

BY MR. NORDEN:

Q. To your knowledge, did anybody else drive the tractor involved in this wreck the week prior to July 1st, 2022?

A. I don't know. I mean, I know that other people drove the tractor, but I don't know that information.

Q. Okay. Same question as it relates to within the month prior to the crash.

A. I would say yes, other people drove the truck besides me.

Q. And who would be the best person to ask about who those individuals are?

A. Mr. Locke.

MR. NORDEN: Thank you, sir. I have no further questions.

(A discussion was held off the record.)

BY MR. NORDEN:

Q. Do you know who any of those people are that would have driven the same tractor within the month?

A. No.

MR. NORDEN: All right. I don't have anything else.

MR. SMITH: Anybody else have any questions?

MR. EHRENREICH: Is Mr. Burist going to read?

MR. SMITH: Yes.

MR. EHRENREICH: All right. I assume it's going to be ordered, so I'll take a copy. Thank you.

THE VIDEOGRAPHER: This deposition is complete at 5:45 p.m.

(A document was marked as Plaintiffs' Exhibit No. 17.)

(The deposition concluded at 5:45 p.m.)

-----oOo-----

C E R T I F I C A T E

I, NICHOLAS BURIST, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below:)

Page Line Correction

C E R T I F I C A T E (Continued)

Page Line Correction

__________ ________________________________

Date Signature

CITY OF_________________________,

STATE OF________________________.

I hereby certify that NICHOLAS BURIST, appeared before me this __ day of _______________________, 2024, and affixed his signature to the foregoing deposition.

________________________

Notary Public

My commission expires:

__________________________

COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

I, Lynn Burton, Court Reporter, do hereby certify that the within deponent, NICHOLAS BURIST, appeared before me at Newport News, Virginia, as hereinbefore set forth; and after being first duly sworn by me, was thereupon examined upon his oath by counsel; that his examination was recorded in Stenotype by me and reduced to typescript under my direction; and that the foregoing transcript constitutes a true, accurate, and complete transcript to the best of my ability.

I further certify that I am not related to nor otherwise associated with any party or counsel to this proceeding, nor otherwise interested in the event thereof.

Given under my hand at Virginia Beach, Virginia, this 27th day of December, 2023.

____________________________

Lynn Burton, Court Reporter
Notary No. 7230058
My commission expires: 9/30/25

## $

**$1,000 (3)**
108:10;251:22;
252:3
**$160 (3)**
253:4,4,4
**$300 (1)**
107:21

## A

**AARD (1)**
270:3
**Aberdeen (1)**
76:10
**ability (5)**
183:16;229:8;
232:22;254:11;
286:19
**able (24)**
16:4;20:20;21:1;
23:11;43:23;59:5;
85:15;87:22,22;88:1;
89:21;129:23,23;
199:25;200:2;204:7;
216:12,14;230:2;
233:11;237:7;253:8;
282:24;299:1
**above (2)**
227:13;228:1
**Absolutely (1)**
231:11
**abuse (2)**
55:1,3
**accept (1)**
78:13
**access (6)**
156:21;168:11;
222:11;224:4;229:6;
232:22
**accident (16)**
16:23;19:21;78:9;
79:1;143:16;179:20;
187:14;192:5;243:24;
271:1,8;275:9,10;
285:10;288:11;
294:16
**accompanying (1)**
8:7
**according (1)**
225:5
**account (7)**
108:21;171:3,5;
197:24;198:3,4;
285:14
**accountability (2)**
45:6;46:11
**accurate (2)**
188:5;287:22
**accused (2)**
41:6,8
**acknowledge (1)**
286:13
**across (5)**
179:16;233:13,14,
17,19
**acted (1)**
147:24
**action (1)**
99:11
**activate (1)**
137:5
**activated (3)**
137:1,3;139:8
**actively (2)**
175:21,24
**activities (2)**
221:8,8
**actual (4)**
138:2,3;219:25,25
**actually (25)**
33:7;39:16;45:13;
48:25;62:23;64:22;
88:23;98:8,22;
101:15;119:16;122:8;
187:21;215:5;220:11,
19,20;221:9;228:14;
229:23;241:12;
259:18;266:16,19;
296:12
**adapt (1)**
228:24
**additional (2)**
214:17;289:16
**address (11)**
51:22;70:9,11;
81:19;102:7;156:20;
162:19;164:16;
248:24;259:14;293:1
**addressed (1)**
141:2
**adjuster (1)**
124:18
**adjustments (1)**
107:5
**administrative (2)**
223:19;227:11
**administrator (1)**
227:10
**advance (4)**
77:15;84:10,10;
167:1
**Advantage (14)**
112:8,9,15,21,25;
113:19;115:10,11;
116:18,20;140:9,15,
22;145:14
**Advantage's (1)**
117:12
**adverse (3)**
30:20;237:24;238:6
**advise (1)**
140:13
**advised (2)**
77:18;142:23
**affect (2)**
116:13;232:2
**affiliated (2)**
124:16;205:18
**affirmative (1)**
270:8
**affixed (1)**
227:5
**again (37)**
8:25;21:5;31:12;
42:19;46:11;57:7;
66:22;79:15;89:7,11;
92:11;108:7;113:22;
120:2,17;146:1;
170:23;189:19;
200:18;202:1,19,20;
205:5,11;207:8;
213:20;234:18;
241:14,15,15;242:23;
243:3;255:24;256:2;
278:16;293:10;
297:23
**against (4)**
30:21;41:14;43:4;
237:19
**Agency (3)**
93:4;94:25;95:5
**agent (9)**
104:23;105:7;
111:18;126:19;
128:19;162:20,23;
163:1;164:17
**agents (2)**
109:4;147:11
**ages (1)**
14:7
**ago (4)**
61:9;171:6;212:4;
276:24
**agree (31)**
9:8;28:11,14,17;
29:25;30:1;31:16,17;
33:14;34:5,8,13,19;
136:2;137:10;188:10;
201:11,13,14;203:1;
204:22;208:15,16;
219:15;236:9;237:15;
238:12,20;256:9;
265:5;271:8
**agreeable (1)**
9:6
**agreement (3)**
253:19;257:4;277:8
**ahead (11)**
29:24;38:17;43:20,
21;80:5;89:10;
109:22;128:20;
222:13;241:24;290:6
**aid (1)**
250:10
**aids (1)**
22:20
**air (2)**
104:18;119:12
**airplanes (1)**
101:3
**airport (1)**
256:22
**alcohol (19)**
28:3,7,15;31:4,9,
11;44:14;136:9;
172:12;173:3,9;
174:3;175:17,21;
176:12,15;186:6;
235:17;237:16
**alcoholic (1)**
188:8
**alert (1)**
227:19
**Alford (1)**
55:7
**alive (1)**
251:4
**allegations (6)**
14:19;41:16,17;
42:10;54:23,24
**Alliance (1)**
269:24
**allowed (9)**
55:23;167:19;
174:1;180:15;182:7;
233:13,15;270:22;
301:12
**allowing (1)**
61:24
**allows (2)**
136:22;162:4
**almost (2)**
119:22;181:2
**along (5)**
8:18;56:15;265:8;
294:4,14
**Altogether (1)**
288:21
**always (11)**
31:23;58:16;
140:10;154:23;157:5;
166:15;239:15;
255:19;279:16;
283:14;297:3
**ambulate (1)**
16:4
**amend (1)**
238:8
**Amendment (6)**
30:15,15,19;
237:19;238:7,9
**amenities (1)**
53:2
**Amlodipine (2)**
74:6,13
**among (1)**
146:18
**amount (12)**
96:5;108:11,12;
136:22;137:14,14;
160:24;162:6;236:11;
237:6;252:5;253:6
**ample (1)**
188:22
**and/or (12)**
82:18;83:22;
109:19;140:3;145:11;
216:6;232:23;233:9;
237:16;257:9;260:17;
261:4
**Andrew (2)**
7:3;298:16
**Angela (2)**
148:1;255:2
**anger (3)**
41:20,22;55:9
**angles (1)**
229:21
**Anheuser-Busch (1)**
53:12
**announce (1)**
284:9
**annual (3)**
284:3,3,15
**answered (6)**
29:7;302:18;303:1,
7,15,17
**Anthem (1)**
218:20
**anymore (1)**
74:13
**apart (4)**
47:5;58:16;71:21;
129:20
**apartment (1)**
240:4
**apologize (2)**
89:5;281:24
**app (1)**
224:3
**apparent (1)**
303:13
**appeal (1)**
78:11
**appear (5)**
96:7;249:5;251:13;
264:14;297:14
**appearance (1)**
7:22
**appeared (1)**
132:14
**appearing (1)**
8:11
**appears (2)**
222:10;260:10
**application (5)**
218:4,9;240:13,15,
20
**applied (4)**
50:25;219:2;
294:19,23
**apply (3)**

32:14;219:2;294:5
**appointment (1)**
23:24
**appreciate (1)**
25:8
**approached (1)**
189:22
**appropriate (2)**
102:1;300:9
**approved (1)**
283:10
**approximately (12)**
38:11;42:2;56:6;57:20;62:1;88:4;97:18;178:11;251:7,9;288:19;293:20
**approximation (2)**
46:1;84:5
**area (25)**
10:20,21;11:14,20,23;12:18,20;17:21;39:1;48:22;54:6;123:1;149:12,25;150:3,24;151:3,12;152:22;169:4;186:16;226:20;237:6;239:20;266:8
**areas (2)**
48:9;263:1
**Argumentative (2)**
30:5,10
**arise (2)**
297:16,22
**arised (1)**
87:20
**arm (3)**
18:16;177:25;179:3
**arms (2)**
185:3,16
**arose (1)**
297:25
**Around (16)**
38:18,18;57:23;80:13;86:16;131:3;190:19;213:16;214:15;215:23;258:23;259:1;269:1,2;291:4;299:17
**arranged (1)**
285:3
**arrangement (2)**
121:23;253:24
**arrangements (1)**
106:12
**arrested (1)**
243:16
**arrived (4)**
138:8;176:1;181:16;203:25
**Aside (4)**
224:2;234:19;254:4;255:6
**aspect (1)**
281:17
**Assault (3)**
41:9,9,11
**asserted (1)**
238:7
**assigned (7)**
10:17;58:6;124:18;223:13;280:12,14;282:2
**assignment (2)**
167:3,6
**assignments (1)**
81:3
**assist (3)**
87:22;183:21,22
**assistance (5)**
26:9;111:24;112:2,16;115:12
**assistants (2)**
86:1;173:16
**assisting (1)**
184:19
**associate (1)**
301:9
**associated (3)**
72:18;249:6;263:9
**associates (1)**
56:19
**association (3)**
81:2;256:14;302:1
**assume (3)**
272:20;293:5;305:2
**assumed (1)**
267:7
**assurances (2)**
231:7,12
**At7069 (2)**
94:8,12
**Atlas (3)**
109:9,11,13
**attached (1)**
67:15
**attended (1)**
43:18
**attending (2)**
7:11;12:23
**attention (5)**
78:14;87:18;156:13,14;230:18
**attorney (8)**
7:11;8:6;182:7;183:3;207:3,6,14;241:14
**attorneys (2)**
39:16;274:18
**attribute (1)**
17:11
**audit (2)**
134:24;135:2
**August (4)**
64:21,22;69:18;127:8
**aunt (1)**
215:2
**aunt's (2)**
215:5;254:19
**authority (4)**
126:24;157:10;233:14;245:19
**authorized (3)**
36:9;65:1;285:13
**automatic (1)**
162:10
**automatically (1)**
99:9
**automobile (1)**
190:17
**availability (2)**
87:24;278:7
**available (8)**
33:10;87:21;103:7;137:15;215:20;216:5;261:24;277:24
**Avenue (1)**
51:23
**average (1)**
236:12
**avoid (5)**
34:10,15,24;190:2,5
**awards (1)**
70:23
**aware (15)**
50:23;57:4;58:2;112:21,24;135:1;136:1;216:5;227:7;239:14,15,19;256:25;268:22;270:8
**away (3)**
228:13;262:16;293:20
**AWOL (4)**
71:8,9,11,13
**axle (3)**
113:9;119:10,11
**axles (3)**
119:1,4,5

## B

**back (110)**
12:9,10,12,13,15;13:4,7,13,16;16:2,3,13;24:13,14;25:19;45:3;51:18;59:3;63:3;73:9,23;80:8;84:18;86:23;89:25;95:2,14;97:22;99:9,9;102:3,5,6;104:6,8;105:13,14,17,18,20,22;106:3,14,18,20,25;107:6,7,17,24;108:13,18;120:7,19;122:21,23,24;124:1;130:10;133:20;144:6,7;145:23;167:8,17;175:14;182:22;184:23;189:2;198:14;211:5,6;213:16,23;214:7;215:8,8;216:14;219:4;221:14;227:21;228:4,4,4;232:13;233:14,16;234:17;235:10;241:19;242:2;243:25;244:3;258:13,23;262:17,21;263:9,16;264:17,25;265:24;266:4;267:4;271:4;278:1,22;280:7;290:14;302:23
**backed (1)**
229:13
**background (7)**
24:20;40:3;89:4,15,16;90:4,10
**backing (2)**
44:11;236:20
**backseat (1)**
184:12
**backside (1)**
227:6
**bad (3)**
29:18;74:21;281:4
**bag (6)**
195:9,13,13,17;289:1;297:3
**Barbara (1)**
273:4
**barcode (1)**
260:15
**barely (1)**
185:1
**base (6)**
122:4;147:6;156:15,21,22;158:2
**based (8)**
44:6;124:14;131:5;214:15;218:9;234:11;242:17;301:6
**basic (1)**
248:23
**basically (8)**
13:11;48:19;98:4;131:11;233:11;234:15;257:17;284:22
**basis (3)**
78:7;121:10;138:10
**Bates (2)**
126:10;187:17
**Bates-stamped (1)**
66:1
**battery (4)**
41:9,10,11;84:14
**Bay (1)**
149:19
**BBC (5)**
54:11;55:11;64:13,14,15
**Beach (1)**
166:1
**bear (2)**
36:16;58:12
**bearing (1)**
257:3
**beat (2)**
42:24;289:6
**became (3)**
61:6;120:18;248:6
**become (2)**
61:24;258:3
**becoming (1)**
295:24
**bed (1)**
242:18
**bedroom (2)**
215:21;288:25
**bedrooms (2)**
215:18,19
**beer (6)**
53:12,14;172:14,17,21,23
**beforehand (1)**
80:16
**began (1)**
250:24
**begin (2)**
8:20;197:16
**beginning (8)**
20:11;69:22;217:25;222:7;278:11;294:10;297:14,20
**behalf (16)**
7:7,9,20,24;8:2,3,9,12,14,17;92:8;96:8;206:20;240:17,25;245:24
**behind (2)**
174:17;285:5
**belief (1)**
301:6
**believes (1)**
242:20
**belong (1)**
82:23
**belonged (1)**
244:12
**belongings (1)**
270:25
**below (4)**
133:4;134:2;149:7;150:2
**beneath (1)**
259:3
**benefits (4)**
218:5,15,22;219:1
**beside (1)**
94:11
**besides (2)**
193:25;304:7
**best (6)**
63:4;165:1;210:25;

238:25;239:1;304:8
**better (5)**
31:10;137:8;256:3,23;281:3
**beverage (1)**
188:8
**beyond (1)**
223:8
**big (13)**
69:21;89:23;98:25;99:17;103:14,15,16;115:6;122:15,17,19;213:18,18
**bigger (1)**
299:9
**bill (11)**
81:12;125:12,13;128:4,6;139:1;155:23;156:18;157:6,8;263:8
**billing (1)**
112:18
**bills (3)**
155:17;156:5,10
**bit (14)**
34:17;51:3;71:25;142:13;160:1;214:15;215:24;217:3;220:1;235:4;247:6;259:18;281:3,23
**black (8)**
194:12;195:13;260:20,21,23,23,25;261:8
**blood (6)**
11:17;23:16;73:20;74:7;181:5;199:17
**blow (1)**
115:5
**blown (3)**
113:9,12;114:16
**blown-up (1)**
148:21
**blowout (3)**
114:14;142:12,12
**blows (2)**
114:24;115:2
**Blue (1)**
218:21
**blurry (1)**
72:20
**boat (1)**
205:15
**bond (9)**
20:22,22,23,25;21:2,8;235:1;240:25;254:5
**bonding (1)**
235:4
**bonds (1)**
26:20
**booking (1)**
162:17
**bore (4)**
11:10;58:16;67:22;297:1
**born (1)**
9:23
**boss (2)**
94:21,24
**both (12)**
67:13,14,14;85:20;232:22;233:19;241:8;243:8,12;245:2;259:22;273:22
**bottle (4)**
196:24,25;197:1,3
**bottles (1)**
28:15
**bottom (17)**
93:14,18;133:4,15;142:3;160:17,21;161:1;162:25;187:12,13,16;194:11;260:20,21;263:19;266:5
**boxes (2)**
125:13,16
**Bragg (1)**
104:11
**brake (2)**
141:15;299:12
**brakes (22)**
31:21;32:1,5,8,11,14,20;102:16;291:14,16;294:5,12,19,23;299:2,3,6,7,10,24;300:6,9
**brand (1)**
260:10
**branded (6)**
245:6,10;255:25;257:3;259:9;302:22
**Brandy (1)**
8:13
**Break (11)**
34:17;84:13;123:12,13,25;134:13;180:12,14,17;182:9;262:15
**breakdown (1)**
142:4
**breath (2)**
176:12;188:8
**breathing (3)**
185:11,12,13
**Brentwood (4)**
21:24;22:1;23:6,9
**briefly (5)**
128:8,8;201:13;214:13;295:15
**brig (2)**
71:5,19
**bring (5)**
107:6;144:7;233:14;282:5,5
**bringing (2)**
106:14;233:16
**brother-in-law (1)**
211:18
**brother-in-law's (1)**
152:25
**brought (1)**
282:4
**brung (2)**
87:18;107:7
**buckle (2)**
59:13;73:3
**buddy (1)**
265:9
**buffer (1)**
228:9
**built-in (2)**
224:2;225:6
**BUPERS (1)**
157:10
**B-U-P-E-R-S (1)**
157:10
**Burist (34)**
7:10,16;8:6,25;15:20;35:14;51:22;70:3;84:22;89:6;91:14;92:10;94:12;109:22;124:5;129:25;183:2;198:20;201:20;204:5;214:13;241:13,20,21;242:22;265:4;275:4;285:2;289:12;290:11;295:9,15;298:23;304:24
**Burton (1)**
4:6
**business (8)**
43:15;83:4;119:25;120:2,12;189:20;256:14;265:12
**button (1)**
153:9

## C

**cab (19)**
173:17;220:17;237:16;280:8,11,14;281:21;282:5,7,8,16,22,23;283:2,7,20,22;296:23;302:15
**cab-facing (1)**
227:2
**cabs (1)**
282:20
**call (33)**
24:23;71:19;88:20;101:25;106:8;112:4,4,20;115:13,14;120:8;123:19;140:12;145:13,14,23;149:21;153:1,6,15,15,21;165:11;175:1,6;228:23;229:4;266:23;272:2;277:22;282:21;287:1,24
**called (16)**
54:7;56:20,25,25;64:9;69:8;82:3;104:17,20;113:19;140:9;143:21;174:19;177:13;219:8;287:8
**Calls (8)**
28:22;29:12,20;174:5;201:17;203:3;205:1,19
**cam (6)**
135:11,12,14,18,21,25
**Camden (15)**
8:6;16:14,17;20:1,9;37:17;71:21;73:24;78:3;211:6;213:24;234:21;235:10,12;240:25
**came (23)**
12:10;16:8;37:17;39:16;48:19;54:18;58:2;59:3;63:5;64:19;67:12;89:13;106:25;111:25;113:21;181:3;184:18,18;195:13;213:16;226:6,7;240:24
**camera (11)**
25:17;136:3;195:22;196:5,19;201:13;226:22,24;227:2;229:13;258:13
**cameras (4)**
135:7;172:6;227:4;229:8
**can (91)**
17:2;22:20;24:21;25:2,3,4;29:15;31:16,16;32:20;33:15;34:8,13;38:23;43:21;45:6;46:1;51:2;60:20;61:1;69:11;70:22;72:9;78:17;85:4;109:10;115:20;116:6;123:17,19;124:24;134:1,11,12;135:25;138:25;139:4;158:20;166:3;168:11;175:5;177:3;178:5;180:11,11,11,17;182:9;188:23;196:13,16,16,19,19,22;198:3;199:10,21;201:11,13,14,24;202:4;204:5;206:15;207:18;219:15;221:23;223:10;224:25;231:10;235:15;238:1;239:1,11;240:15;242:25;243:11;248:17;256:19;259:1;260:2;265:5,17;266:5;269:11;271:8;276:2,4;299:4,5
**canceled (1)**
200:1
**cane (5)**
16:5,6,9,11,20
**capability (4)**
89:15,21;90:3;221:22
**capacity (3)**
88:2,3;238:11
**captured (2)**
229:7,13
**car (3)**
100:19;131:6;180:8
**card (8)**
136:18,25;137:6,16,21;139:5,9;192:2
**cards (4)**
107:11;137:3;229:12,12
**care (9)**
22:11;27:22;96:13;97:24;108:17;111:25;115:20;218:13;232:4
**cargo (2)**
260:7;261:1
**Carolina (14)**
104:11;106:9,11;107:20,21,23;111:8,10;142:7,14;192:17;211:12,15;213:22
**Carpal (2)**
17:5,6
**carried (1)**
36:25
**carrier (4)**
10:15;126:18;216:25;218:18
**carry (2)**
103:17;158:17
**case (23)**
7:6;8:7;30:20;59:18;102:5;112:20;118:1,1;185:24;186:3,7,10,13,17,21;194:12;207:3,6;219:5;222:10;230:10;231:17;279:4
**cases (1)**
282:13
**cash (9)**
107:9,14;137:10;197:21,23,24;218:3;253:22;263:5
**cashwise (1)**
108:5
**category (1)**
242:7
**caught (1)**
99:12

**cause (8)** 28:21;29:10;30:3, 25;59:15;208:11,14; 210:5
**caused (6)** 59:16;61:5;176:20; 190:8;239:12;271:15
**CCC (3)** 53:8;64:23;139:24
**CDL (18)** 44:2;100:2;179:17, 18;198:25;199:12,21; 200:1;220:21;232:14; 234:22;235:2,18; 236:10;239:5,22; 271:11,18
**CDL-licensed (1)** 219:16
**cell (5)** 148:16,18;224:4; 244:22;272:20
**cellular (2)** 243:25;244:2
**Center (2)** 65:19;189:23
**centers (1)** 109:14
**centimeter (2)** 178:11,13
**Century (2)** 64:9,15
**certain (13)** 9:11;37:11;38:22; 73:5;98:17;101:13; 124:17;136:22; 227:12;238:1;278:4, 10;286:17
**Certainly (6)** 39:11;203:12,13; 223:24;238:4;257:6
**certificate (5)** 36:2,3;47:10;52:17; 75:24
**certificates (4)** 63:21;70:21;76:12; 232:25
**certification (2)** 199:25;206:5
**certified (2)** 45:5,9
**certify (1)** 35:14
**cetera (1)** 126:20
**chain (1)** 195:10
**chance (3)** 78:3;163:17;189:6
**Chanfrau (3)** 8:16,17,18
**change (3)** 68:11;132:14;175:7
**changed (2)** 118:18;302:9
**changes (2)** 68:15;155:4
**charge (1)** 41:19
**charged (5)** 19:20;185:23; 186:2,19,25
**charges (7)** 19:22;41:21,23,25; 64:19;141:3,4
**Charles (3)** 85:19;87:12,13
**Charlie (4)** 8:25;25:16;123:11; 198:22
**chart (1)** 26:2
**check (15)** 26:16;40:3;69:11; 89:16;90:5,10; 100:24,25;101:8; 138:12;197:22; 251:22;283:17;291:8, 8
**checked (4)** 61:6,25;160:6,7
**check-in (1)** 254:7
**checking (2)** 97:23;100:20
**checklist (1)** 101:16
**checks (9)** 89:4;197:15,16; 251:11,13,16;253:25; 255:3,6
**Chevy (3)** 193:15;217:10,11
**chewed (1)** 133:11
**child (2)** 11:3,10
**children (6)** 14:4;42:10,11,21, 25;43:4
**Choice (10)** 43:9,12,13,25; 47:10;52:16;62:4,9; 172:23,25
**choose (1)** 86:19
**Christy (2)** 7:23;289:20
**chronic (1)** 199:14
**Chrysler (1)** 193:2
**chunk (1)** 108:15
**church (1)** 241:9
**circumstances (3)** 79:7,8;120:11
**citation (4)** 117:16,21,23;118:2
**citations (2)** 117:18;179:10
**City (2)** 211:16;212:12
**civil (3)** 8:8;30:20;237:25
**claim (1)** 267:19
**Clarification (1)** 78:25
**clarify (1)** 267:22
**classroom (2)** 44:6,8
**clean (2)** 40:1;66:7
**cleaned (1)** 19:6
**clear (6)** 77:1;204:8;219:11; 224:7;241:1;265:4
**clearance (1)** 147:4
**cleared (1)** 165:7
**clearer (1)** 286:7
**clearly (2)** 206:7;217:3
**client (6)** 180:1;181:7; 185:15;189:12,18,20
**clinic (1)** 76:6
**clipped (1)** 254:1
**clock (2)** 98:23;175:18
**close (6)** 11:19;56:19;60:22; 61:1;148:6;212:13
**closed (1)** 72:10
**closely (1)** 186:12
**closer (2)** 25:6,16
**clothes (2)** 194:20;289:4
**clothing (5)** 242:12;245:6,11; 257:20;260:17
**coached (1)** 228:17
**code (8)** 149:12,25;150:3, 24;151:3,12;152:22; 266:8
**collected (2)** 287:13,19
**collectively (1)** 63:23
**collector (1)** 287:7
**collision (33)** 28:21;29:11;30:3, 25;32:2,6;34:8,11,13, 16,20,24,25;35:4; 134:6;177:16,19; 190:2,6,8;200:13; 207:12,15;208:11,15, 24;209:8,14;210:6,9, 12,22;211:2
**collisions (1)** 238:13
**column (6)** 69:25;96:2;146:17; 157:17,21,22
**combination (2)** 74:10,11
**combine (1)** 159:4
**Combined (1)** 270:1
**Comdata (8)** 136:18,25;137:2,6, 16,18,21;139:5
**coming (5)** 23:24;80:10;111:7; 134:13;278:2
**commercial (17)** 27:21;28:20;29:10; 30:2,24;31:17,20; 44:9,14,17;45:8,9; 186:5;199:5,8; 224:15;239:16
**committed (2)** 43:4;88:1
**common (2)** 164:18;174:25
**communicate (3)** 139:20;286:20,24
**communicated (2)** 14:2;140:14
**communicating (1)** 183:18
**communication (2)** 147:7,9
**comp (4)** 124:6,11,13;267:17
**companies (10)** 27:24;28:4;34:2; 146:23;230:14,18; 231:17;232:3;262:7,9
**Company (38)** 7:24;47:23,24;54:9; 59:2;64:8,11;69:8; 77:8;82:3,13;94:23; 104:20;112:17; 115:13;118:3,4; 143:21,22;145:20; 161:8,10;177:18; 191:22;193:8;219:8, 13;225:18,20,20,25; 232:7,19;253:15; 256:14;269:7,18; 289:21
**company's (1)** 145:17
**compartment (2)** 192:3,18
**compensation (4)** 77:22,25;267:20,23
**competent (1)** 238:4
**complete (3)** 277:12,16;305:6
**completed (12)** 35:15;45:5;181:16; 226:14;251:19,23; 254:2;263:19;272:13; 273:1;274:19;284:15
**completely (2)** 278:18;297:8
**completion (1)** 36:4
**complex (1)** 240:4
**compliable (1)** 59:5
**compliance (4)** 45:5;46:11;233:3,4
**complications (1)** 71:15
**comply (2)** 200:3;261:7
**compound (2)** 76:24;89:7
**computer (4)** 38:4,5,6;84:14
**computers (1)** 286:16
**concern (3)** 174:18;292:3,19
**concerned (2)** 232:5;292:5
**concerns (1)** 59:6
**concluded (1)** 305:9
**conclusion (4)** 28:23;29:13,21; 174:6
**condition (5)** 35:6;102:13,15; 133:18;180:23
**conditions (1)** 199:15
**confirm (1)** 258:16
**confirmation (1)** 162:17
**confronted (1)** 32:13
**conjunction (1)** 235:7

**connection (3)** 81:8;218:3;243:17
**connectors (1)** 291:8
**consent (1)** 249:23
**consented (1)** 183:6
**consequences (2)** 9:12;71:4
**Conser (22)** 104:20,21,22; 105:12;106:1;109:5; 120:13;128:19; 162:22;163:4,8; 168:8,8;175:8,15; 176:2;204:3;262:1,3, 7;276:20,20
**Conser's (2)** 176:2,5
**consider (4)** 40:12;236:6; 285:21;286:21
**considered (6)** 60:4;129:25; 246:12;256:2,3; 282:23
**Considering (1)** 165:21
**consisted (6)** 44:4,10;45:7;47:24, 25;88:16
**consistent (2)** 176:15;258:19
**consult (2)** 182:7;183:3
**contact (8)** 15:9;102:1;103:5; 190:11;276:1,10; 277:25;281:16
**contacted (5)** 120:1,4;276:1,9; 279:17
**contain (1)** 81:16
**contained (5)** 81:12,12,17,17,18
**container (1)** 186:16
**containers (3)** 53:23,24;56:9
**contents (2)** 243:21;274:5
**context (3)** 55:1;140:4;246:19
**continue (2)** 253:7;264:18
**continued (3)** 12:19;52:22;67:22
**Continuing (1)** 93:23
**Continuously (1)** 88:7
**contracted (1)** 49:21
**contractor (4)** 70:5;118:6;285:22; 295:24
**contribute (5)** 32:2,6;208:11,15; 210:6
**control (2)** 137:4;232:6
**controls (3)** 130:13;223:19; 227:11
**convenient (1)** 123:12
**conversation (3)** 218:1;230:13; 232:12
**convicted (3)** 40:16,22;55:23
**cooperation (1)** 26:9
**coordinator (2)** 83:14,18
**coordinators (2)** 82:14,23
**copy (2)** 66:7;305:3
**cornea (3)** 72:11;73:3,10
**corner (2)** 80:14;133:10
**Corners (1)** 237:4
**Corona (3)** 173:12;196:22; 197:5
**corporate (5)** 146:10,14;230:18; 231:2;285:7
**corrected (1)** 298:1
**corrective (2)** 60:16;61:13
**correctly (6)** 66:17;72:5;95:5; 141:16;266:14;268:2
**cost (2)** 55:11;108:14
**counsel (4)** 178:9;204:8;238:4; 301:15
**counseled (1)** 228:17
**counseling (1)** 173:3
**counted (1)** 13:6
**Country (2)** 12:22;52:23
**County (13)** 8:7;15:3;16:14,17; 17:23;20:1,9;73:24; 78:4;211:6;213:24; 234:21;241:1
**couple (13)** 16:13;38:10;52:21; 62:25;104:9;212:4; 243:15;262:16; 263:12;285:20; 289:10;294:3;298:17
**course (10)** 35:15;45:5;49:14, 16;50:1,2;55:10; 291:10;294:20,24
**court (5)** 37:20;41:5;63:19; 128:25;177:4
**cousins (1)** 211:23
**Covan (3)** 109:9,11,13
**cover (2)** 102:12;251:23
**coverage (3)** 77:23;216:12,14
**covered (3)** 184:25;250:6,15
**covering (1)** 214:17
**coworkers (1)** 174:2
**Cracks (6)** 119:11,12,13; 291:11,11;299:15
**crash (32)** 83:11;218:10,14; 219:1,12;224:8; 230:16,23;231:6,22; 232:2,10;236:5; 243:18;244:11;245:9, 22;246:4;250:7,19, 24;251:9;265:5; 266:21;267:9;270:13, 16,23;271:15,18; 301:3;304:5
**crashed (1)** 189:23
**created (1)** 125:20
**credit (2)** 107:11;139:9
**crime (2)** 41:6,8
**crimes (1)** 40:16
**criminal (16)** 7:10;8:7;40:6,8,9, 12,13,25;41:2,4; 42:16;55:14;57:5; 89:16;90:4;174:1
**Cross (1)** 218:21
**crossed (1)** 189:23
**Crossroads (1)** 270:5
**culminated (1)** 108:6
**curious (1)** 264:3
**CURRELI (4)** 7:23,23;289:20,20
**current (3)** 21:23;51:22;239:24
**currently (5)** 24:14;200:5;217:4; 234:21;235:23
**Cushing (3)** 9:25;213:6,7
**customer (1)** 137:19
**cut (7)** 18:18;43:22; 177:25;179:3;181:13; 187:10;237:4

**D**

**dad (3)** 63:3;213:15;254:16
**daddy (1)** 213:8
**damage (9)** 16:1,21,22;17:1; 59:16;72:10,13,15; 73:10
**damaged (1)** 73:10
**Damco (4)** 56:4,8;62:14;65:18
**Danielle (2)** 7:11;8:5
**Darby (1)** 212:13
**dash (8)** 135:11,12,14,18,21, 25;137:25;138:3
**data (3)** 287:6,13,19
**date (39)** 12:14;25:24;56:12; 66:19;69:16;80:11, 11,11,12;81:19,21,22, 23;84:3,3,4,8;85:1; 94:4;116:15;125:19, 19;127:5;129:15; 160:15;162:18,19; 212:24;263:17,17; 272:14;275:9;278:20; 280:2;284:23;285:9; 288:11;294:7;295:21
**dated (4)** 110:24;141:20; 251:18;263:16
**dates (3)** 12:24;67:17;278:11
**daughter (7)** 7:1,2;14:11;27:14; 54:24;71:15;185:16
**daughter's (1)** 151:25
**Davenport (17)** 85:19;87:12,18,19; 88:10;90:5;119:18; 182:2,4,5;190:14; 245:3,10;261:14; 267:7;283:24;293:6
**Davenport's (4)** 152:19;266:12,15, 25
**David (5)** 21:23,25;23:21,22; 24:2
**day (55)** 46:3,5;50:7,12; 61:11;79:1,17;80:17; 88:9;89:25;99:19; 114:5,17,23;163:25; 164:5,13,25;165:9,12, 13,23;166:6,8,9,10, 25;167:8,11;171:17; 174:20;175:6,9,14; 176:25;177:7;204:1, 15;211:25;212:18,21; 214:16;222:22; 245:18;265:4;276:1, 2,10,11,18;280:8; 289:13;290:15; 294:16;301:2
**days (14)** 19:17,18,24;71:5, 18;84:10,11;142:14; 167:1;213:11;277:6; 278:4,10;279:2
**days' (1)** 278:23
**day's (1)** 134:12
**dead (1)** 185:5
**deadhead (2)** 105:12,17
**deadheading (1)** 107:17
**deal (7)** 105:11;116:1; 122:15,17,20;137:3; 145:21
**dealt (2)** 42:15;263:4
**debris (1)** 250:15
**DeCarlo (3)** 24:2,12;25:23
**D-E-C-A-R-L-O (1)** 24:4
**deceased (2)** 7:1,1
**December (2)** 16:15;65:10
**decency (1)**

90:3
**decide (1)**
64:2
**decided (1)**
277:4
**decision (2)**
285:15,18
**decisions (1)**
33:15
**deck (2)**
10:11,14
**dedicated (2)**
21:21;221:7
**deep (1)**
237:7
**defect (2)**
291:12;292:4
**defects (1)**
292:18
**defendants (1)**
76:24
**defense (3)**
7:11;8:6;230:9
**deficient (1)**
144:11
**define (3)**
35:4;55:19;89:17
**degree (3)**
186:2,24;187:1
**delay (2)**
32:25;33:6
**delayed (1)**
33:11
**deliver (18)**
48:7;53:11;78:23;
85:13;104:19;105:15;
126:1;159:5;163:16;
164:4,15;165:3,9,13;
168:4;175:9,13;276:6
**delivered (16)**
32:25;48:5;53:1;
80:12;81:23,24;83:5;
86:21;106:1;165:14,
17;236:23,23;253:3;
276:18;278:21
**deliveries (1)**
277:5
**delivering (7)**
47:24;86:16,20;
99:19;138:22;164:5;
253:2
**delivery (18)**
33:6;80:11;81:19,
21;85:1;86:14;99:15;
105:8;109:14;115:24;
116:11;162:13,14;
234:1;253:4;272:17;
278:20;288:17
**denial (3)**
78:8;124:6,7
**denied (2)**
75:24;78:10
**Denying (3)**
78:6;209:14;211:2
**Department (1)**
179:11
**departure (1)**
279:20
**depend (6)**
86:2;106:6;109:17;
131:20;252:25,25
**depended (8)**
87:24;107:18;
108:7;109:15;140:11;
168:25;191:3;283:23
**depending (1)**
131:15
**depends (17)**
35:5;45:18;114:2,3;
115:1,2,4;119:15,15;
155:6,6;163:25;
169:25;170:13;
236:17;293:18;
294:22
**depo (2)**
231:6;264:18
**deposition (6)**
9:15;52:11,12;
217:25;305:5,9
**depth (3)**
299:11,14;300:9
**describe (6)**
17:2;72:21;195:8;
220:16;259:6;276:14
**described (15)**
38:3;58:16;68:15;
72:3;82:21;87:1;
177:24;179:23;
187:11;188:16;194:7;
204:18;218:4;246:14;
277:1
**describes (1)**
188:8
**describing (1)**
179:13
**description (4)**
88:18;94:8;142:18;
188:15
**deserving (1)**
252:10
**designated (4)**
95:8,10;109:13;
132:5
**designed (1)**
90:1
**despite (1)**
67:21
**destination (10)**
105:7;107:17;
109:4;128:19;162:20,
23;163:1;164:6,17;
175:12
**detail (1)**
281:17
**details (1)**
277:15
**detection (2)**
114:18,20
**determine (4)**
85:15;86:3;106:17;
134:15
**determined (2)**
107:15;283:6
**deterrent (1)**
136:13
**developed (1)**
120:15
**device (9)**
97:7,9;98:1;114:18,
20;139:20;220:17;
254:14;287:9
**diabetes (1)**
73:16
**diabetics (1)**
199:17
**diagnosed (2)**
73:23,25
**diagram (1)**
187:12
**diagrammed (1)**
188:2
**died (2)**
185:21;187:1
**diem (1)**
136:23
**diesel (2)**
108:14,15
**difference (5)**
72:7;115:6;119:17;
253:8;300:25
**differences (1)**
14:18
**different (25)**
23:19;26:8,8;48:1,
2,6,20;53:17;86:22;
104:11;120:10;
131:11;150:3;155:1;
193:8;224:21,22;
230:12,14;233:22;
250:23;260:1;262:8;
263:6;284:23
**differentiate (1)**
233:25
**differently (2)**
68:23;69:2
**digitally (1)**
100:10
**direct (7)**
9:16;46:16;81:7;
112:3,4,18;164:25
**directed (1)**
302:21
**direction (1)**
302:8
**directive (1)**
257:6
**directly (11)**
9:17;80:22;83:4;
86:10;140:15;189:23;
226:9;231:8;232:7;
245:23;295:6
**disability (6)**
15:25;26:14,15,17;
218:5,17
**disabled (2)**
15:21,22
**disagree (2)**
188:10,20
**disassociated (1)**
68:4
**disbelieve (1)**
285:11
**disc (1)**
17:3
**discharge (1)**
11:5
**discipline (2)**
51:8;71:3
**disciplined (2)**
58:24;71:1
**disconnect (1)**
279:8
**discounted (2)**
126:23;127:17
**discs (1)**
299:7
**discuss (2)**
219:6;287:18
**discussed (2)**
252:15;286:15
**discussing (1)**
224:6
**discussion (2)**
264:24;304:13
**dispatch (2)**
139:25;221:24
**dispatched (1)**
140:1
**dispatcher (9)**
80:23,24;81:5;
139:20;147:24;175:1,
3;286:20,21
**dispute (1)**
265:20
**disqualified (1)**
246:4
**disrespectful (1)**
22:21
**distance (2)**
61:2,23
**distant (1)**
11:19
**distinguish (1)**
243:11
**distract (1)**
174:14
**distraction (1)**
174:17
**Distribution (1)**
65:19
**divide (1)**
76:25
**division (1)**
15:3
**divorce (5)**
14:15,21;15:2,6;
43:2
**divorced (3)**
14:1;42:4,7
**Dock (3)**
10:18;54:1;236:20
**doctor (14)**
21:21,23;22:7,7,12,
13,15,16;23:7;24:11,
12;25:23;75:5,15
**doctors (3)**
21:22;23:25;26:3
**document (46)**
35:13,16;38:19,24;
64:4;66:9,11,13,14,
24;67:2,8;69:15,17;
70:16;97:2;100:14;
102:23;110:9;126:5,
10,13,15;127:11,23,
24;129:2;140:17;
146:5;148:12;149:4;
154:8,13,17;155:12;
161:25;179:5;187:11;
188:17,21;197:9;
202:9;254:1;295:20,
21;305:7
**documentation (1)**
103:2
**documents (17)**
39:13;46:22,25;
66:2;67:12,14,18,21;
69:6;128:9,13;
188:18;189:6,9;
219:5;226:11;263:13
**Doe (1)**
159:2
**Dollar (1)**
12:7
**Domestic (4)**
41:10,11,13,14
**done (24)**
34:10,15,23;61:8;
72:10;80:16;82:25;
83:4;100:10,12,13,15;
104:13;108:4;116:5;
122:21;190:2,5;
234:25;252:11;
284:10;292:17;
300:14,19
**door (4)**
132:14;183:14,23;
302:14
**doors (1)**
291:11
**DOT (27)**
40:1;58:19;61:5,17,
19;72:25;76:1,12;
110:13;111:18;125:5;
132:16,19;202:21;
203:1,14;248:8,12;

280:1,3;281:1,6,9,20; 285:9,15;302:8
**doubt (1)** 285:10
**down (30)** 34:18;37:17;38:4; 48:7;69:25;99:1; 102:25;120:14; 129:21;130:12;131:4; 142:2;149:14,17; 175:13;178:2;207:18; 215:11;220:11;227:5; 229:5;234:20;240:25; 241:9;246:8;248:17; 262:1;276:21;294:15, 24
**download (1)** 229:9
**downloaded (1)** 287:14
**Draughan (1)** 273:5
**D-R-A-U-G-H-A-N (1)** 273:5
**drawer (1)** 288:24
**drawn (2)** 30:20;214:16
**drink (8)** 30:2;44:14;172:17, 19;173:9,12,14,16
**drinker (3)** 172:14,15,21
**drinking (13)** 28:12,21;29:10,19; 30:25;31:2,4,7,11,14; 136:7;170:21;175:21
**drivable (3)** 33:9,10;285:14
**drive (44)** 28:11,14,17;30:2; 36:24;37:3;55:14,24; 77:19;105:13;129:23; 131:22;134:11,12; 167:19;168:21;191:1, 2,6,16;192:20,23; 193:1;217:15;220:24; 232:22;233:9;236:3; 245:20,24;276:6,10, 11;277:5;278:4,12; 279:17;280:25;281:1; 284:17;285:13; 294:16;302:2;303:23
**driven (5)** 131:2;165:23; 219:13;294:14; 304:17
**driver (55)** 28:21;29:10;30:2, 25;33:14;34:6,6,9,10, 14,22,25;37:10,21; 38:2;39:24;56:20; 63:16;67:15;93:19, 23;95:19;98:9; 117:23;135:16,25; 136:3,4;139:21; 141:7;174:14;186:6; 217:22;220:16; 221:11;222:16,17,25; 223:8;225:13;233:4, 24;236:7;237:14; 238:12;239:13; 240:16;241:2;242:20; 246:5;271:9;282:24; 301:6,7,20
**drivers (12)** 27:21,22,24;28:5,8, 8;33:17,23;34:3;40:4; 69:12;277:6
**driver's (10)** 122:9;196:5,11,20; 198:23,25;199:5,7,8; 200:6
**drives (1)** 192:25
**driving (50)** 12:23,24,25;29:19; 45:23;56:22;57:1; 63:10,11;78:10;92:1; 98:12,15,18;99:7,8; 104:3;114:8;134:7; 136:11;153:7;155:7, 9;163:19;168:14; 185:23;189:21;208:4; 210:1;219:16,19; 235:21;236:10,19; 238:14;239:4,13,19; 243:22;255:18,19; 265:16;270:10;274:9; 280:3;283:13;285:9, 16;301:22;302:7
**drop (4)** 105:11;144:5; 165:1;277:20
**dropped (2)** 41:23;191:4
**drove (18)** 13:1;36:21;56:17; 58:15;63:13;108:22; 130:3;191:6,7;236:1, 4;282:15;290:16; 296:23,25;302:12; 304:2,6
**drug (11)** 28:3,7;76:14,18; 77:9;173:3;176:15; 233:12;284:3,6,15
**drugs (6)** 28:18;44:17; 173:17;174:3;235:16; 237:16
**drunk (3)** 28:8;78:10;172:12
**Dry (1)** 10:18
**due (2)** 27:1;96:3
**duly (1)** 7:16
**duration (1)** 224:7
**During (8)** 9:15;29:5;119:8; 175:1;282:22;286:24; 297:16,22
**duty (9)** 27:21;59:3,4;98:12; 113:24;114:1,7,7; 298:1
**Duvall (1)** 17:25
**DVR (3)** 100:16,17,22

## E

**earlier (16)** 47:18;98:23; 104:13;124:5;125:1; 128:15;140:8;166:22; 195:14;203:17;206:4; 214:16;242:3;243:9; 258:20;279:24
**earliest (3)** 81:22,22;85:1
**early (4)** 12:19;16:18;42:5; 43:19
**earned (1)** 268:25
**easier (6)** 48:11,13;63:22; 200:25;231:12; 275:21
**easiest (1)** 153:14
**East (1)** 144:3
**Eastern (1)** 12:16
**easy (3)** 130:9;201:7;243:3
**eating (1)** 170:21
**EDL (1)** 221:8
**education (5)** 236:15,16;285:2,2, 4
**effect (1)** 231:13
**effective (2)** 263:16,17
**effectiveness (1)** 89:22
**effects (2)** 244:10,16
**EHRENREICH (63)** 7:19,20;37:12,13, 23,24;38:14;65:4; 76:22,23;89:5,6; 91:14,15;92:10,11; 95:22,23;96:10; 109:21;113:2;117:4, 5;123:11,17;127:1,2; 132:25;171:23;172:9; 173:5,6;176:23; 177:3,8;201:19,19,20; 203:5;204:5,11; 205:3,4,21,21;206:11, 23;241:20,23,23; 242:22,25;257:11; 274:20,21;275:3; 289:11;298:14,18; 301:14,23;304:24; 305:2
**eight (4)** 43:25;134:14; 166:3;168:18
**either (22)** 11:17;25:5;63:2; 64:17;80:16;90:10; 98:11;104:6;111:17; 135:5;139:13;151:18; 197:22;199:7;245:5, 10,11;264:20;277:17, 17;289:22;298:6
**ELD (18)** 97:6,25;99:5; 113:23,24;134:15; 138:1;175:5;219:5; 221:8;224:12,17,23; 225:2;230:5;287:8, 19;292:5
**ELDs (2)** 97:12;224:16
**electronic (19)** 97:7,8;98:1,4,5,14, 21,22;219:6;223:25; 224:4,11,20;225:6,13, 19;226:11;227:8; 287:9
**Electronically (1)** 154:25
**ELLIOTT (2)** 289:24,24
**else (14)** 7:21;158:11;165:5; 182:1;215:1;220:2, 23;221:25;249:19; 284:24;296:23; 303:23;304:21,22
**e-mail (5)** 70:9,11;264:10; 272:22;286:6
**e-mailed (1)** 295:20
**emergency (7)** 18:3,5,15;75:7,10, 12,16
**employee (2)** 240:16;295:23
**employees (5)** 69:23;112:25; 176:6,25;177:7
**employment (4)** 52:15,20,21;276:2
**empty (6)** 106:16,20;125:23; 144:7,13;160:21
**end (14)** 12:17,18;20:11; 64:2;66:23;104:2; 129:1;197:13;253:4, 5;272:12,12;273:17; 278:10
**ended (7)** 65:12;83:11; 142:13;175:8;188:3; 250:22;296:3
**ending (1)** 93:7
**engine (1)** 110:20
**enough (4)** 107:16;169:11; 261:23;268:25
**ensued (1)** 230:17
**ensuring (1)** 284:14
**entered (1)** 127:5
**entire (1)** 160:6
**entirety (1)** 302:6
**entities (5)** 146:25;231:2; 270:7,9;300:25
**entitlement (1)** 216:21
**entity (2)** 109:8;219:9
**entries (1)** 152:7
**equipment (11)** 111:12;121:25; 236:10;238:14; 239:14,19;255:19; 301:10,13,15,16
**equipped (4)** 219:7;225:13; 227:4,15
**ER (2)** 19:1,10
**essentially (4)** 220:25;229:12; 260:22;272:2
**established (3)** 92:4;95:18;295:17
**Estate (2)** 7:4;214:14
**et (1)** 126:20

**ethic (1)**
234:15
**ethnicity (2)**
207:23;209:19
**evasive (1)**
9:9
**even (9)**
11:20;13:25,25;47:9;58:10;78:2;114:6;222:23;231:12
**evening (2)**
160:16;266:18
**event (1)**
40:18
**events (8)**
79:14;170:16;227:12;228:18;250:7;267:13;275:8,24
**eventually (2)**
13:21;293:12
**Everybody (4)**
123:22;184:21;254:24;274:17
**everyday (1)**
235:20
**everyone (1)**
25:2
**everywhere (1)**
184:2
**exact (12)**
12:8,14,24;18:22;25:24;46:1;71:12;84:2,3;115:7;212:24;292:25
**exactly (20)**
13:9;33:19;47:16;49:21;56:12;73:22;84:7,8;100:23;114:5;180:24;181:18;183:21;195:23;220:5;269:6;275:20;295:8,19;298:7
**exam (2)**
61:5;73:1
**EXAMINATION (7)**
8:22;198:17;214:10;275:1;290:8;295:12;298:20
**examined (1)**
7:17
**examining (1)**
9:18
**example (7)**
48:4;69:5;119:10;145:14;231:20;252:17,23
**except (1)**
28:25
**excess (1)**
162:6
**exchanged (1)**
270:24
**excluded (1)**
217:22
**excluding (1)**
40:18
**Excuse (6)**
76:22;127:16;152:18;158:22;221:8;246:24
**Exhibit (36)**
63:22;64:5;66:1,3,25;70:15,17;97:1,3;100:8;110:10;126:6,9,10;128:24;129:1,3,6;140:18;146:6;148:13,16;151:14;154:9;155:13;179:6;197:10;202:8,10,14,21;205:12;248:6;258:4;260:6;305:8
**exhibits (1)**
265:24
**Exit (1)**
142:4
**expect (3)**
96:15;300:1,3
**expecting (1)**
278:24
**expense (1)**
283:25
**expenses (7)**
107:1,4;108:1;121:20;136:23;137:9;287:21
**experience (5)**
48:20;49:1;236:14,18,25
**expert (1)**
31:7
**expired (1)**
122:14
**explain (8)**
29:15;38:23;72:24;181:23;184:1;220:1;238:2,3
**Express (2)**
64:9,15
**extent (2)**
37:11;238:1
**extra (1)**
108:16
**extradited (1)**
20:1
**ex-wife (1)**
15:9
**eye (29)**
59:10,10,15,16,17,19;60:2,7;61:10,12,20;65:13,14;72:3,4,8,9,12,12,12,14,17;73:1,2,5,9;98:19;103:5;291:13
**eyes (3)**
61:5,25;176:15

## F

**face (1)**
42:22
**Facebook (1)**
171:8
**Facility (12)**
20:2;22:1;23:6,6,9;24:3;39:20;50:16;76:11;163:6;290:15,21
**fact (6)**
34:6;66:7;267:3;271:17;280:3;285:9
**factor (4)**
59:20;89:23;99:14;236:16
**facts (4)**
206:12;210:5;238:17,22
**failed (4)**
34:9,14,22;35:1
**failure (1)**
186:9
**Fair (11)**
203:17;225:9;231:3,4;232:3;235:13;247:5;250:18;256:19;289:7;300:20
**fairly (4)**
97:17;224:16;258:6;289:4
**falls (1)**
100:2
**familiar (7)**
44:11;71:7;219:9,10;220:6;263:22;273:3
**family (18)**
10:20;13:14;22:10,11;71:16;189:21;190:11;213:9,12,14,18,18;214:21;215:1;216:6;257:24;261:1;271:2
**far (12)**
40:11;48:5;51:2;60:20;68:17;72:21;98:20;232:13,24;280:1;293:4,20
**farsighted (1)**
60:24
**farsightedness (1)**
60:18
**fashion (3)**
144:19;262:8;296:8
**fast (7)**
32:16;130:25;131:25;183:20;228:12,23;256:17
**faster (5)**
130:22;131:13,16;234:16,17
**father (1)**
149:14
**Father's (1)**
212:21
**fault (1)**
52:14
**favor (1)**
296:19
**feature (1)**
136:16
**February (5)**
11:1;35:18;38:20,24;65:16
**federal (1)**
239:6
**feedback (1)**
114:25
**feel (4)**
136:15;169:8;189:14;208:10
**fell (2)**
51:12;278:17
**fellow (1)**
147:23
**felons (1)**
55:23
**felt (1)**
252:7
**Fenton (2)**
110:18;132:11
**few (12)**
26:1;88:16;98:16,16;143:2,2;198:21;207:17;248:5;276:24;286:15;290:5
**Fifth (58)**
30:11,14,15,15,19,23;42:14,19,23;43:1,5;79:3,6,15,17,19;170:19,20,23;171:14,16,19,22;172:4,8,13,16,22,24;173:1,11,13,15,18,23,24;175:19,22,25;176:21;177:12;188:11;189:10,13,16,19;190:7,10;194:2,3,5;197:8;237:19;238:7,9;297:17,23;298:7
**figure (1)**
131:25
**figured (1)**
87:21
**file (5)**
15:4;77:25;78:3;268:25;269:4
**filed (8)**
14:20,22;15:1;41:21;268:6,6,8,18
**fill (7)**
57:24;88:13;90:18;101:15;177:15;240:13,19
**filling (1)**
98:5
**financial (1)**
121:22
**find (9)**
13:12;52:21;85:12,18;144:11;145:21;167:24;257:24;292:18
**finding (1)**
85:10
**fine (3)**
63:25;115:20;254:24
**fingers (1)**
17:6
**finish (5)**
43:23;116:14;180:16;192:12;262:17
**finished (3)**
23:4,5;43:21
**fired (1)**
58:24
**firm (1)**
246:20
**first (57)**
7:16;10:19,22;13:11;28:1;33:21,23;39:8;41:15;42:9;53:4;58:5;60:11;67:19;71:7,14,15,16;83:2,3;85:12;87:25;88:17,21;93:1;97:23;98:8,8;111:6;120:11;122:24;126:10;139:24;140:12;145:16;149:3,4;157:8;160:19,19,20;165:2,8;186:2,24,25;198:22,23;225:12,15,22,24;228:20,21,21;250:9;258:22
**five (8)**
15:24;19:17,18,24;24:13;123:17;228:2,6
**five-minute (1)**
262:15
**fix (2)**
113:22;115:17
**fixed (3)**
102:9;116:22;141:3
**flag (1)**
114:15
**flat (6)**
111:23,23;113:6,12;114:10,13
**flight (2)**
10:11,14
**flip (1)**
259:1
**floor (1)**
86:13

**Florida (32)**
17:19;19:12,13,24;63:1,2;104:4,6,8,10;107:24;108:13;120:11,13;122:7,13,21;149:12;150:18;152:4,10;162:21;163:21,22;164:5,22;165:19;166:1;168:7;175:8;262:1;276:19
**flow (1)**
101:13
**flu (1)**
75:13
**fly (1)**
101:3
**focus (7)**
33:17,23;253:13;255:24;271:7;286:25;301:2
**focused (1)**
250:8
**folder (7)**
80:9;81:15;272:1,16;277:10,15;278:19
**folders (10)**
80:8,16;159:11;163:12;164:12;167:2,14;271:22;276:16;277:11
**folks (3)**
25:7;230:1;240:24
**follow (1)**
237:12
**following (5)**
164:7;176:11,14,18;186:12
**follows (1)**
7:17
**follow-up (1)**
290:3
**food (1)**
256:17
**footage (5)**
135:21;229:7,9,9,13
**forced (1)**
54:19
**forearm (1)**
18:24
**foreseeable (4)**
28:20;29:9,15;30:24
**forever (1)**
289:2
**forgiveness (1)**
32:9
**form (55)**
28:22,25;29:12,20;30:4,9;37:12,23;38:14;65:4;91:15;92:12;95:22;96:10;109:21,22;113:2;117:4;127:1,6,15,16;130:16;132:25;159:22,23;160:3;164:10;169:10;171:23;172:9;173:6;174:5;176:23;201:17,21;203:3,5;205:1,3,4,19;206:10,11,23;218:19;238:16,23;241:24;242:23;249:13;257:11;299:7;301:14,23
**format (2)**
155:9;156:8
**formatting (1)**
155:1
**forms (8)**
90:17;125:10;138:16,17,19,20,23;249:18
**Fort (1)**
104:11
**forth (7)**
13:4,7,13,16;188:21;230:19;246:21
**forthright (1)**
9:9
**forward (1)**
174:18
**forward-facing (3)**
172:6;226:24;229:8
**found (5)**
85:17;114:23;144:11;243:21;270:21
**four (13)**
18:21,23;19:17;121:6;178:10,21,25;215:13,15;228:7,7;288:25;291:9
**fourth (1)**
69:25
**frame (8)**
47:20;68:23;104:2;121:2;123:15;198:1,2;259:20
**frequency (1)**
88:4
**frequently (1)**
294:20
**friendly (1)**
254:21
**friends (2)**
11:19;148:10
**front (10)**
35:8;135:20;166:17;176:5,19;183:13;195:6;258:13,14;302:23
**fuel (10)**
80:15;107:2,13,25;108:21;133:25,25;134:2;136:23;277:19
**fueled (2)**
85:8;167:15
**full (3)**
123:18,19;282:20
**funds (2)**
26:18;137:14
**furniture (2)**
246:18;247:19
**further (5)**
142:18;295:12;298:15,20;304:12
**furtherance (1)**
265:12
**future (1)**
52:3

**G**

**gabapentin (2)**
23:17;24:10
**gain (1)**
156:21
**gained (2)**
48:20;230:22
**gains (1)**
49:1
**garbled (1)**
25:5
**Garr (1)**
147:18
**Gary (1)**
4:4
**gas (6)**
80:13,14;86:20;137:9;277:19;282:6
**gasket (1)**
141:16
**gate (2)**
156:15;267:16
**gave (10)**
19:8;46:1;57:3;108:10;139:12;220:11;257:25;261:1;285:1;289:8
**general (7)**
21:9;48:9;57:22;91:10;122:13;182:12;237:13
**generally (6)**
48:6;74:20;200:14;262:25;284:21;297:5
**generated (2)**
38:5,6
**generator (1)**
26:24
**gentleman (2)**
87:17;144:25
**gentleman's (1)**
56:24
**gentlemen (2)**
283:19,22
**Georgia (24)**
8:2;11:17,20;37:17;104:4,5,5,10;107:23;108:13;111:6,10;114:21;117:19;169:4,21;179:10;187:11,19;189:7;211:7;213:24;294:15,25
**gets (7)**
26:15;59:18;105:8,9;147:13,15;263:8
**GILSON (5)**
290:4,4,10,13;295:9
**given (10)**
84:5;112:20;117:14,15,18;139:8;222:22;231:7;257:7;297:9
**gives (4)**
48:9;115:7;153:23;234:12
**giving (5)**
59:4;80:19,22;107:9;220:12
**glass (4)**
72:11;181:23;184:2,25
**glasses (10)**
59:17,21,23;60:13,15;72:8,14;73:6,8,12
**glove (2)**
192:3,18
**goes (6)**
32:4;131:14;188:22;263:8;267:4;272:3
**good (16)**
32:1,11,20;44:2;73:13;89:1;101:2;123:15;128:23;131:2;154:2;224:14;238:20;291:21;300:6,11
**goods (8)**
82:23;125:24;159:23;160:4,7,20,22;164:4
**Google (1)**
153:15
**Goose (3)**
173:14;197:2,6
**go-to (5)**
87:25;119:23;120:3;246:10;273:19
**govern (2)**
130:21;132:1
**governed (4)**
131:12,16,19,22
**Government (2)**
147:1;239:6
**governor (6)**
130:6,13;131:5,11,14;227:23
**GPS (4)**
166:2;228:11;229:21,22
**grab (1)**
254:19
**grade (2)**
128:21,22
**graduated (1)**
12:25
**grandson (1)**
120:24
**Grant (1)**
7:9
**granted (1)**
15:6
**gray (1)**
258:4
**grease (1)**
102:18
**great (7)**
9:3;16:7;26:9;78:18;120:3;123:20;246:9
**greater (2)**
228:2;234:5
**greatly (1)**
25:8
**Greensprings (2)**
12:11,11
**Greg (1)**
8:16
**Gregory (6)**
157:19,20,20;158:4;160:5,6
**Grey (3)**
173:14;197:2,5
**gross (1)**
161:1
**ground (1)**
13:17
**grounds (2)**
14:14,22
**group (7)**
22:3;36:19;38:12;39:5;47:4;105:19;118:15
**groups (1)**
40:7
**guess (25)**
16:12;23:5;45:14,21,23;73:4;88:23;104:9,16;112:17;119:11,16;136:24;196:12;197:4;221:9;260:6;271:7;275:4;288:22;291:21,21;292:14,14;301:24
**guessing (1)**
25:2
**guidance (1)**
221:21
**guidelines (2)**
252:6,9
**guilty (2)**

42:18;55:6
**guy (8)**
87:25;119:23;
120:3;246:10;256:21,
23;259:19,20
**guys (10)**
85:20;245:5;
252:12;253:9;255:25;
259:23;261:14;
262:14;274:19;
276:22

## H

**half (11)**
10:9;46:5;166:3;
178:1,1,2,17,18;
236:22;293:21,22
**Hampton (11)**
12:5;50:17;94:20,
20,22;106:18;144:3,
3;247:10;259:2;293:2
**hand (6)**
153:11;258:11;
263:15;265:24;266:4;
297:5
**handbook (1)**
44:9
**handle (1)**
82:14
**handled (4)**
82:24;107:1;
273:18;294:8
**handles (1)**
291:10
**handling (1)**
236:17
**hands (4)**
17:8,9;41:17;42:11
**hands-on (5)**
44:6,10;48:25;49:2;
86:24
**happen (5)**
29:19;106:19;
116:12;145:1;277:14
**happened (22)**
33:4;53:21;84:5;
92:17;113:16,17;
142:11;143:14;146:3;
164:13;165:6;177:11;
181:18;185:18,19,20;
199:22;230:16;
231:22;232:2;245:22;
271:8
**happens (5)**
74:18;85:3;99:5;
113:23;118:4
**harass (1)**
9:2
**hard (3)**
25:13;61:22;252:12
**harder (1)**
86:25
**harm (2)**
59:15;239:11
**hassle (1)**
48:14
**haul (2)**
233:13,13
**hauled (1)**
53:12
**hauling (3)**
53:22;143:7;162:20
**head (7)**
120:19;136:10;
199:11;273:9,13,16;
278:1
**headache (3)**
48:14;74:20,21
**heading (1)**
122:23
**headset (1)**
153:3
**health (2)**
218:13;286:3
**hear (20)**
25:3,4;72:5;177:4;
181:7,11;204:6,7,7;
214:21;227:25;
248:19;266:14;268:2,
2;275:17,21,21;
276:3;298:14
**heard (20)**
82:3;110:6;134:22;
143:22;215:25;217:3,
9;239:25;241:5,6;
247:21;248:2,18;
255:11;266:10,11;
267:23;270:9;274:11;
275:4
**hearing (6)**
22:20;24:19;25:14;
37:17;240:25;241:10
**hearings (1)**
274:11
**heavy (3)**
106:16;160:22;
238:14
**held (4)**
240:16;264:24;
271:18;304:13
**Hello (2)**
290:11,12
**help (20)**
19:8;29:4;85:10,13,
17,22;87:20;88:25;
90:2;108:16;120:13,
14;121:11;180:7;
181:14;183:16;
184:15;253:9;256:19;
278:14
**helped (5)**
180:6,8;182:1;
185:4;252:2
**helper (1)**
253:22
**helpers (4)**
85:20;87:9;90:14;
255:12
**helping (1)**
181:2
**Hey (16)**
24:21;102:2;106:9,
10;114:16;115:14;
116:6;117:1;123:11;
131:8;153:14;228:23;
229:4;234:3;246:13;
277:23
**hicube (2)**
141:3,4
**high (4)**
10:1;73:20;108:14;
199:17
**higher (1)**
236:11
**highlight (2)**
265:25;266:5
**highlighted (4)**
148:20;149:4;
151:8,18
**highlights (1)**
266:1
**highway (1)**
131:6
**Hines (32)**
7:4;8:12;85:20;
90:7;119:19,21,22;
121:13,16,23;148:6,7;
181:22,24;190:12;
214:14,19;244:7,12;
245:3,10;246:7;
250:8,11;251:1,6;
252:23;257:24;
261:14;265:5;284:1;
293:6
**Hines' (1)**
121:19
**Hines's (1)**
149:14
**hire (1)**
27:24
**hired (1)**
57:18
**hiring (1)**
28:4
**history (5)**
12:3;52:15;55:19;
57:5;72:1
**hit (4)**
42:21;59:10;73:2;
261:13
**HODGE (110)**
8:20,24;9:1;24:17;
25:2,9,22;28:24;29:3,
17,23;30:7,13;37:15;
38:1,16;51:11,13,21;
63:19;64:1,7;65:6,25;
66:5;67:1;70:14,19;
77:3,5;79:2,5;80:4;
84:13,21;89:9;91:20;
92:16;96:1,12,25;
97:5;110:1,12;113:4;
117:7;123:14,21;
124:4;126:8;127:4;
128:25;129:5;130:17,
19;133:1,3;140:20;
141:1;146:8;148:15;
154:11;155:15;
169:13,17,20;170:3,
10;172:1,11;173:8;
174:8;177:1,6,10;
178:9,15,18,20;179:8;
180:20;182:13,18;
183:1;187:16,19,21;
188:1;189:5;192:16;
197:12;198:9;215:24;
226:22;232:13;235:5;
236:3;237:23;247:4;
250:6;263:11;264:19;
265:25;267:23;
273:12;290:2;295:14;
298:9,12;303:20
**Hodge's (1)**
237:13
**HOFMAN (2)**
8:11,11
**hold (13)**
153:8,8;160:1;
195:22;196:5,18;
201:19;202:2,20;
207:18;228:3;242:22;
258:12
**holder (1)**
239:22
**holding (3)**
185:2,16;201:12
**home (10)**
16:13,17;73:24;
103:17;235:10;244:8;
282:5,8;288:20,21
**homework (1)**
44:10
**homicide (3)**
186:2,24,25
**honest (1)**
245:16
**honorable (1)**
11:5
**hood (1)**
226:25
**hook (2)**
145:2;279:8
**Hospital (6)**
12:16;17:18;212:7,
8,9,10
**hospitalized (2)**
18:1;75:22
**hour (6)**
45:17;131:14;
227:13,18;293:21,22
**hourly (2)**
141:13,14
**Hours (21)**
35:10,12,15;39:8;
46:10;98:20;100:3;
134:7,12,14;166:2,2,
4;167:19;168:16,18;
221:16;223:5;225:3,
5;267:9
**house (16)**
21:11;87:16,17;
103:18;120:23;164:3;
166:17;215:5,17;
244:11;254:19,25;
271:1;272:3;277:19,
20
**household (7)**
160:6,7;164:4;
193:14;215:25;
216:25;217:18
**housekeepers (1)**
53:3
**houseman (1)**
53:1
**HQ (1)**
96:3
**hub (1)**
141:15
**hubcap (1)**
141:16
**humanly (1)**
190:4
**hurt (3)**
59:1;72:16;179:2
**husband (1)**
277:4
**Hypertension (1)**
73:18
**hypothetically (2)**
32:18;227:18

## I

**I&O (2)**
76:6,7
**I20 (1)**
142:4
**I95 (6)**
99:1;184:3,5;
227:17;293:16,23
**I-A-M-S (1)**
57:12
**ID (11)**
122:6,11,11,13,13,
19;222:11,16,17,25;
223:8
**idea (11)**
67:11;83:21;89:1;
128:18,20;146:13;
161:17,20;167:5;
195:16;247:21
**identical (2)**
258:11;262:8
**identification (1)**
67:16

**identified (4)** 61:9;114:9;146:10;222:22
**identifies (1)** 256:10
**identify (4)** 69:4,4,19;119:9
**identifying (1)** 223:8
**IFTA (1)** 109:1
**illegal (5)** 28:18;172:17,19;173:17;174:3
**illustration (1)** 243:13
**illustrations (2)** 48:2;164:22
**image (1)** 263:8
**immediately (3)** 52:19;56:3;140:10
**impact (1)** 231:9
**impaired (1)** 28:4
**implemented (2)** 226:2;233:8
**important (5)** 99:25;102:11;119:4;130:8;234:8
**inactive (1)** 222:3
**inadvertently (1)** 43:22
**Inc (8)** 35:19;137:22;156:2;269:16;290:5,13;295:3;300:2
**incarcerated (1)** 71:22
**incarceration (2)** 71:21,22
**inch (2)** 178:17,18
**inches (2)** 178:10,13
**incident (1)** 177:21
**inclined (1)** 172:7
**include (2)** 118:7;294:11
**included (2)** 146:18;260:5
**including (5)** 92:2;190:5;301:8,20;302:22
**income (6)** 26:11,12,23;198:5;268:3,25
**incoming (7)** 149:9,21;150:8,24;152:10,17;265:19
**Incorporated (1)** 269:20
**incriminating (1)** 30:16
**Indemnity (2)** 7:24;289:21
**Independent (5)** 70:5;118:5;285:21,22;295:24
**independently (1)** 295:5
**indicates (1)** 38:19
**indication (2)** 115:3,7
**indirectly (1)** 231:8
**individual (5)** 160:7;219:16;240:4,10;273:3
**individuals (5)** 90:11,13,22;219:13;304:9
**individuals' (1)** 263:23
**industry (1)** 55:18
**infer (1)** 227:25
**inference (2)** 237:24;238:6
**inferences (1)** 30:20
**influence (2)** 31:9;185:24
**information (42)** 62:22;79:23;80:6,9,19,22;81:11,12,15,20,20;82:1;84:1,23;85:2,5,9;98:9;105:21,23;106:2,4,17;163:11;167:8;168:1;169:11;192:4,19;220:4,22,23;223:6,8;232:15;248:23;257:3;270:24;280:4;286:18;287:11;304:3
**initial (2)** 37:16;43:7
**initials (2)** 71:6;134:1
**initiated (1)** 147:15
**initiative (2)** 61:8,25
**injection (1)** 210:15
**injections (1)** 24:13
**injured (5)** 208:17,19,21;209:14;211:2
**Injuries (4)** 179:23;218:1,3,10
**injury (17)** 17:2;59:9,24;60:8,13;61:12,20;65:13,14;72:3,4;177:24;179:24;208:24;209:1;210:9,12
**inner (1)** 113:9
**input (1)** 223:2
**ins (2)** 96:18;98:16
**inside (10)** 28:18;105:16;220:17;224:13,16;226:15;229:12;244:3;250:12,19
**insinuated (1)** 232:8
**Insourcing (1)** 65:15
**inspect (2)** 144:10;145:11
**inspected (2)** 100:19;195:20
**inspection (33)** 31:24;98:12,13;100:15;101:4;102:11,21;103:3,11,25;110:24;111:2;125:22;126:16,18;127:13;144:14,22;145:7;272:2;290:24;291:3,4,19,23;292:12,16,18,21;297:11;298:24;299:20;300:18
**Inspections (8)** 39:9;46:9,10;69:5;100:10;103:22;110:14;117:8
**Instagram (1)** 171:9
**install (1)** 226:7
**instance (4)** 227:17;248:25;249:2;251:22
**instances (4)** 215:4;228:1;229:3;253:21
**instead (4)** 61:23;71:17;98:4;262:2
**instinct (1)** 71:16
**instructed (1)** 248:11
**instructions (3)** 276:12,15;281:12
**insufficient (1)** 31:21
**Insurance (18)** 93:19,24;95:20;96:7,13;100:7;115:13;191:21,24;192:2,7,10,19;193:8;217:19;218:16,19;286:3
**insured (8)** 96:16;191:12;193:3,6,18,20;216:24;217:23
**insures (1)** 216:1
**intend (2)** 52:2;218:7
**intended (1)** 168:6
**intention (2)** 87:19;296:16
**interact (2)** 82:17;220:16
**interacted (3)** 223:18;224:19;230:1
**interacting (1)** 242:12
**interaction (3)** 83:22;255:3;284:22
**interactions (2)** 39:23;284:20
**interchanging (1)** 64:15
**interest (6)** 165:1;209:11;210:25;231:16;232:1;239:1
**interested (4)** 56:23;57:1;74:18;88:20
**interface (3)** 220:15;221:4,12
**intern (1)** 23:5
**Internal (1)** 198:5
**International (4)** 179:14;201:3;202:16;205:12
**Internet (1)** 69:12
**Interstate (2)** 169:2,21
**intertwined (1)** 64:13
**interview (1)** 88:16
**interviewed (1)** 232:19
**intimidate (1)** 9:2
**into (18)** 10:7;13:16;41:5;86:10;98:11;109:16;111:6,10;142:17;163:5,6;164:23,24;165:7;222:18;236:20,23;240:12
**in-town (1)** 101:18
**intoxicated (2)** 176:2,5
**introduce (1)** 250:3
**introduced (1)** 214:13
**introduction (1)** 249:25
**inventory (4)** 106:13,13;125:9;138:20
**investigation (1)** 188:17
**invoice (3)** 140:22;141:10,20
**invoked (2)** 237:19;238:9
**involved (9)** 58:8;80:18,21;92:2;219:12;224:8;284:14;302:13;303:24
**involvement (1)** 255:7
**irreconcilable (1)** 14:17
**IRS (1)** 268:4
**issue (19)** 99:17;102:6;103:15,15;112:5;113:12,14;115:24;116:10;117:16;118:21;138:13;140:8;145:22;189:8;219:5;223:24;227:22;231:21
**issued (5)** 77:6;179:10;251:13;252:9;260:18
**issues (15)** 17:7;32:24;33:5,8;72:16;76:11;111:13,22;134:7;233:4;275:16;294:8,9;297:14,16
**item (2)** 243:21;244:7
**items (5)** 125:14;257:3,20;261:6;282:21

**J**

**Jacksonville (8)** 17:20,24;104:16;148:8;149:15;162:21;166:1;215:6

**jail (12)**
18:11,13;19:5,11,13,13,16,19,24;20:9,15;200:4
**jam (1)**
99:12
**Jamie (4)**
7:1;27:16;181:17;183:11
**Jane (1)**
159:2
**January (2)**
65:16;68:12
**Jim (5)**
24:21;289:24;290:4,6,13
**JMI00021 (1)**
154:15
**JMI00066 (1)**
66:1
**JMI00624 (1)**
160:9
**JMI00637 (1)**
159:21
**JMI00664 (1)**
161:24
**JMI00665 (1)**
162:15
**JMI00666 (1)**
164:8
**JMI00679 (1)**
159:12
**job (60)**
13:14;31:14;39:19;47:11,12;48:19,19;50:5;53:5,19,21;54:12,17;55:11;56:2,10,14,21,22;59:1;68:22;69:1;85:18;86:25;87:1;88:19;89:20,25;90:1,19;91:7;99:22,23;108:3,6,8,9;116:4,5,15;120:5,8;128:6;139:24;147:15;155:25;161:12,15;164:1;197:21,21;235:17;236:18;239:6;246:15;248:23;249:2;276:21;277:9,9
**job-by-job (1)**
137:3
**jobs (8)**
49:6;85:23;87:21;89:14;120:5,6;122:1,2
**Joe (73)**
8:1,4;27:2;36:8,9,18;39:18;50:1,16;56:13,14;62:13,16;63:11,13;67:15;77:8;80:14;81:2;91:17;94:23;95:1,6,11;102:3,5;103:19;123:6;129:24;132:10;137:22;140:2;141:2;156:25;162:20;166:19;168:2;176:24;177:7;202:15;205:7;226:17;233:10,14,23;242:5;243:4,11;245:11;247:10;255:18;258:25;259:2;262:2,7;264:9;269:16;273:5;274:1;277:18;279:12,14,20,22,23;280:2;281:1,5;285:8;286:2;289:16;290:14;300:22
**joemohollandmovingcom (1)**
259:14
**John (1)**
198:20
**Join (1)**
205:21
**joining (1)**
8:19
**Jonathan (1)**
7:7
**Jordan (1)**
7:2
**Joseph (1)**
7:5
**jotted (2)**
215:11;220:11
**Jr (1)**
4:4
**judge (3)**
235:2,12,19
**judgment (1)**
31:2
**juice (1)**
273:20
**July (73)**
13:2;16:24;17:12;20:4;40:18;50:8;58:9;68:6,13,24;74:22;75:2;78:1;79:14,22;83:11;84:6;86:15;93:7;94:5;97:9;103:4;108:6;118:24;122:23;126:22;127:9;128:7;132:22;133:13;143:14;146:3,14;147:21;152:12;157:3;165:21;173:9;191:19;199:15;200:10,13;201:3,9,14;202:17,24;203:22;243:17,22;244:3;245:23;246:4;248:15;250:7;261:15;274:6;275:25;276:2;277:23;278:11;290:14;291:24;292:9,12;294:16;297:11,19;301:2,8,20;302:14;303:25
**jump (2)**
123:18;215:23
**jumping (1)**
214:15
**June (20)**
10:25;13:1,1;50:19;64:22;104:2;110:25;113:17;117:9,16;126:16;127:12,16;165:15,23;167:13,16;197:17;204:24;278:10
**Justice (1)**
188:16

## K

**Kara (2)**
8:15;184:12
**keep (11)**
48:22;91:4;98:19;131:3;192:2,7,9,17;195:21;284:23;289:2
**keeping (1)**
300:6
**keeps (1)**
98:21
**Kelvin (2)**
56:24;147:23
**kept (11)**
14:1;288:7,23,24,25;289:1;296:4,7;297:3,5;300:11
**key (1)**
195:10
**kick (1)**
130:15
**kids (4)**
13:10;15:10;54:18;64:20
**Kind (51)**
17:20;23:12,14;32:20;41:22;48:4;52:14;58:21;70:20;72:9,9;76:15,18;78:19;82:13;86:7;99:3;114:11,11;115:23;120:7;122:11,19;123:15;125:10;129:21;134:24;138:15;139:9;146:16;147:3;148:10;154:15;155:16;193:23;196:16,19;203:7;213:13;228:24;237:13;246:22;252:20;255:20;261:15;273:22;275:5;290:17;291:2;296:18;299:17
**Kirkland (9)**
21:23,25;22:8,13,16;23:7,21,22,23
**kit (1)**
141:15
**knew (7)**
14:25;57:6;63:9,11,12;87:25;163:19
**knock (1)**
89:25
**knowing (2)**
238:5,6
**knowingly (1)**
281:1
**knowledge (25)**
21:9;38:21;40:11;42:1;47:11;57:22;70:12;96:18;111:3;117:20;118:19;126:25;135:19;144:20;207:5;230:21,22;231:1;232:17;257:1;271:11;273:8;286:4;294:9;303:23
**known (5)**
87:11,13,13;119:21,22
**Kyle (6)**
4:3;8:10;27:5;181:9;185:15;190:1

## L

**label (1)**
138:20
**labeling (1)**
125:17
**labor (10)**
90:17,17;107:25;141:14;248:18,21,22;249:5,13;253:5
**laborer (1)**
253:22
**laborers (1)**
255:12
**lack (1)**
135:4
**ladies (1)**
184:13
**lading (13)**
81:13;125:12,13;128:4,6;139:2;155:17,23;156:6,10,18;157:6,9
**lady (8)**
11:10;56:16;184:12,14;273:9,13,16,19
**lady's (2)**
13:19;57:7
**laid (2)**
237:1;262:7
**landlord (2)**
26:9;240:8
**lane (3)**
183:25;186:10;189:21
**Langley (2)**
8:9,9
**lapsing (1)**
234:20
**laptop (2)**
25:12,15
**last (24)**
15:19;22:18;43:17;45:4;53:19;54:12;56:10;57:9;75:4,6;76:1;104:9,9;139:5;153:16;204:6;211:14;240:19;251:16;268:7;273:4;279:11;286:15;300:22
**lasted (2)**
54:13;56:11
**late (1)**
286:6
**later (2)**
19:8;211:7
**latest (3)**
80:12;81:23;85:1
**law (1)**
246:20
**lawsuit (1)**
200:17
**lawsuits (3)**
200:13,16,19
**lawyer (5)**
29:6;66:7;124:24;230:8;297:15
**lawyers (4)**
9:3,19;29:4;246:20
**laying (2)**
181:22;250:14
**leading (3)**
79:9;200:9;275:24
**leaking (2)**
102:18;142:23
**leaks (2)**
119:12;299:15
**learn (1)**
114:17
**least (5)**
46:14;50:25;241:2;262:6;263:23
**leave (12)**
54:17,19;80:7;85:16;103:18;115:18,19;235:8;281:4;293:13;298:8,8
**leaves (2)**
238:17,22
**leaving (1)**
213:23
**Leavitt (1)**
240:9
**Leesville (1)**
142:5
**left (21)**

14:20;17:9,10;22:17;43:3;59:10,16;60:1;69:16;72:8,12,13;73:9;103:19;108:19;113:9;138:8;159:15;244:10;271:1;300:9
**left-hand (3)** 66:8;67:3;133:10
**legal (5)** 28:23;29:13,21;174:6;231:21
**legalities (1)** 231:24
**legs (1)** 17:8
**length (1)** 178:10
**lens (1)** 72:11
**lenses (3)** 59:18;60:16;61:14
**less (10)** 32:9;33:12;46:3,5;48:14,14;85:21;136:4;186:20;252:10
**lets (2)** 159:23;160:23
**letter (6)** 267:15,16;286:5;295:16;296:9,21
**level (1)** 89:13
**leveraged (1)** 296:13
**Lexington (1)** 142:7
**LFO (1)** 142:19
**licence (1)** 200:6
**license (9)** 122:9;198:24,25;199:5,7,8;200:1;234:23;271:12
**licensed (1)** 34:6
**lien (1)** 269:5
**liens (1)** 268:21
**life (4)** 55:21;73:7;89:19;299:11
**light (3)** 59:3,4;141:4
**lights (3)** 291:9,9;294:2
**likely (3)** 30:3;136:4;237:24
**limit (7)** 170:1,8,14;227:13,18;228:2,7
**limits (2)** 193:10,12
**Lincoln (3)** 193:24;217:8;290:18
**line (11)** 9:4;93:25;94:4;95:16;122:22;182:15;183:5;189:23;230:12;233:14,17
**linen (1)** 53:1
**lines (3)** 119:14;233:19;270:1
**lining (2)** 118:17,21
**liquor (3)** 172:14,19,25
**list (5)** 69:22,23;90:13,16;101:12
**listed (8)** 76:24;112:17,24;142:15;155:4;156:3;161:10;217:18
**Listen (1)** 71:6
**listening (1)** 247:3
**litigation (1)** 230:17
**little (34)** 22:23;25:5,6,16;32:16;34:17;51:2;71:25;72:10;87:14;120:10;122:5,7;131:11;132:4;140:7;150:3;158:21;160:1;185:14;187:12;195:9,11,13;200:25;214:15,22;215:24;217:2;220:1;235:4;281:3,23;286:7
**live (8)** 11:13;15:12;21:11;121:7;148:6;191:5;215:18;282:21
**lived (9)** 51:25;87:16,17;120:11;121:4;148:7,8;239:25;251:9
**lives (3)** 13:12;52:5;211:22
**living (4)** 11:25;120:21,23;121:19
**LLC (4)** 66:15;110:18;146:19,21
**load (37)** 33:6;78:17,18,23,23;79:21,24;80:1;81:18;83:2,10,25;84:23;85:3,25;86:3;98:25;106:1,10,14;107:20;121:24;158:1,17,18;159:3,10,10;161:18,20;163:8;164:16,17;165:14,18;234:4;276:6
**loaded (10)** 160:22;234:17;252:18;278:18;279:4,4,5,7,8,10
**loading (2)** 272:7,7
**loads (32)** 32:25;53:10;83:5,6,6,10,12,14;84:9;85:13;86:16,21,22;140:1;146:2;158:16;159:4,6,8;164:12;168:4;233:9,18,20,21,23,23;236:22;252:2;272:14;276:17;278:6
**loan (3)** 21:10,14,16
**local (1)** 122:3
**locally (3)** 101:20;122:3;254:8
**located (3)** 76:9;159:3;279:10
**location (14)** 123:4,5,6,7;142:4;229:24;230:3;236:19,20;250:20;252:19;292:25;293:16;294:15
**locations (1)** 54:8
**Locke (143)** 49:8,11,22;50:21;51:5,9;56:18,18,19,24,25;57:3,6,18;58:16;62:18;63:8;68:16;76:17;80:7,18,21,23,24;81:3,4;82:18;83:23;84:1,9,23;85:5;89:3;90:9,20;102:7,7;103:7,8,16,21;105:24;106:22;107:3,8;108:2;117:14;121:11,17;122:4;123:1,5;139:14;140:3,12,12;147:23;148:1;173:3;174:21,22;197:15,25;223:17;228:22,23;230:2;231:21;232:23;233:9;234:9;247:6,20;249:8,19,20;250:1,4;251:13;252:6,10;253:6,16,17,21;255:2;257:9;258:7;260:19;267:4,8,12,24;268:11,18;271:22,25;272:22;274:6;275:11;276:13,23,24;277:8,13;278:24;279:5,13,16,17;280:15,20;281:8;282:8;283:11,13,14,21,21;284:1,2,14,18,25;286:2,12,22,24;287:16,22;288:2,17;289:8,25;292:7,7,9;295:16;297:10;300:23;301:7;302:8;304:10
**Locke's (4)** 123:6;150:1;151:19;152:9
**log (23)** 97:7,8;98:1,11,14,18,22,22;99:7;134:24;154:22;220:22;221:12,12,16;223:5;224:11;225:6;229:8;287:9;292:11,14,17
**logbook (2)** 98:4,11
**logged (3)** 114:7;222:21;223:20
**logging (10)** 219:6,17,23;221:13;222:18;223:3,25;224:20;225:19;227:9
**log-in (1)** 224:4
**logistics (2)** 78:17;79:25
**logo (10)** 37:1;50:2;91:22;201:2,15;202:15;203:18;204:23;243:13;301:10
**logs (3)** 222:10;225:14,14
**Loleane (4)** 15:18;21:3,7;26:13
**L-O-L-E-A-N-E (2)** 15:18;21:6
**Lomeka (2)** 11:12;13:20
**long (35)** 10:8;15:22;16:11;19:16;20:8;36:18;43:17;45:12;51:25;53:19;54:12;56:10;61:9;73:20,22;87:11;119:21;129:11;145:23;165:25;171:15;172:12,21;211:24;212:16;213:10;215:14;224:8;251:6,9,10;261:22;281:21;289:12;291:18
**longer (6)** 87:14;199:21,23;202:2,20;204:6
**look (46)** 26:2;27:13;66:6;69:16;101:6,8;110:13;119:1,4;126:9;127:22;128:23;132:3;145:20,20;155:16,18;156:20;157:8;163:17;178:6,22,23;187:10;188:7,15,22;194:11;195:5;196:4;197:16;227:5;229:9;248:6;251:11;258:16,22;263:18;278:19;285:3;291:11,14,16;299:4,5,10
**looked (9)** 27:7;202:25;203:1,13,15;226:10;232:14,18;251:17
**looking (29)** 35:13,16;39:13;52:20;56:19;88:24,25;137:16;138:13;141:22;160:14,15;161:3;174:17;178:8;185:22;194:7;195:23;222:9;259:16,17;260:3;299:11,13,13,14,14,15,16
**looks (15)** 65:10;133:9,10;134:3;142:2,20;150:23;178:10;195:9,10,10,21;226:11,25;255:4
**Loree (1)** 188:16
**Losartan (2)** 74:7,12
**lost (1)** 192:4
**lot (24)** 48:9;54:20;63:1,1;103:18;119:18;122:23;131:18,23;144:17;146:18;158:10;161:21;166:12,16,20;184:2;190:24;224:22;230:13;251:8;282:18,20;288:15
**lots (1)** 282:19
**loud (2)** 204:8;266:6
**lunch (1)** 123:13

**Lynn (1)**
4:6

## M

**M00333 (1)**
95:7
**M22132 (1)**
222:12
**M333 (1)**
132:5
**machine (1)**
111:22
**Madam (2)**
128:25;177:4
**madness (1)**
187:9
**MAI (2)**
8:13,13
**mail (1)**
139:9
**mailed (1)**
244:13
**main (4)**
104:4;109:12;144:23,24
**maintain (2)**
186:9;221:16
**maintenance (4)**
129:22;299:24;300:4,19
**majority (2)**
21:20;83:5
**makes (2)**
119:16;200:25
**making (4)**
24:18;33:12;95:2;180:25
**malfunction (4)**
100:25;101:1;114:17,20
**management (3)**
41:20,23;55:10
**manually (3)**
98:5;154:25;220:22
**many (26)**
14:4;18:20;37:21;77:13;86:2,3;102:12;121:4;122:2;134:7;156:23;159:8;164:12;167:19;168:16;171:17;178:13;179:1;188:18;198:22;213:17;215:18;239:9;278:23,23;288:19
**March (1)**
141:21
**marching (1)**
257:17
**marijuana (10)**
44:20;136:5;171:13,15,18,21;172:3,7;175:24;186:20
**mark (4)**
63:21;64:3;129:1;202:5
**marked (17)**
64:4;66:2,24;70:16;97:2;110:9;126:5;129:2;140:17;146:5;148:12;154:8;155:12;179:5;197:9;202:9;305:7
**markings (14)**
36:16,22;37:6;58:13,17;65:7;67:23;68:1;91:6,12;92:3;109:19;125:2;297:1
**marriage (2)**
11:17;216:21
**married (3)**
11:8;13:22;15:14
**marry (1)**
13:24
**Massachusetts (1)**
48:6
**master (1)**
257:4
**material (3)**
167:3,6;185:1
**materials (3)**
232:18;252:18;261:24
**Matt (2)**
8:3;289:15
**matter (2)**
8:12;129:17
**May (7)**
66:20;83:7;104:2;231:9;232:2;256:25;257:1
**maybe (29)**
32:16;45:16;86:9,9,9;87:13,14,14;106:7;108:1;121:5,6,6;153:17;158:17,18;159:2;164:16,24;166:17;187:20;192:21,21;213:19,19;215:14,15;236:22;261:10
**Mayflower (155)**
7:20;27:2;35:23;36:9,13,16,22;37:1,3,6,10,13,21,24;39:20,24;40:3;42:24;49:16;50:2;51:5;58:3,12,17;62:18,23;63:10,13,14;64:25;65:2,7;66:10,15,22;67:4,22,25;68:1,3,16;69:5,23;76:17;83:22;91:18,22,22,23;92:3,9;93:2,4;95:1,6;96:21;100:6;103:24;104:23,25;105:5;109:7,11,14,19,24;110:16;112:22;117:1,2;124:16;125:2,5,5,9,10,11;126:2,11,17,19,19,22;127:17,22;132:11,19;133:5;138:23;139:1;140:4;146:10;147:7,11,13;156:10;161:11;171:20,20;172:5;173:2;174:2,21;176:22;200:22,23;201:16;203:2;204:19,23,25;205:15,18;206:8,21;207:12,15;233:8,10,12,20,22;234:7;240:17;241:3,14,15,17;242:4,20;243:4,10,12;245:11,20,24;246:5;257:3;258:15;259:5,11;262:4,9;275:7;279:23;281:13,17;283:16;297:1,4;301:10,13,21;302:14,23
**Mayflower/Moholland (2)**
38:12;39:5
**Mayflower/UniGroup (12)**
46:8,13,17;49:5;50:22;51:8;89:2;90:10;91:6,12;132:8;187:6
**Mayflower/UniGroup/Moholland (1)**
47:14
**Mayflower-affiliated (1)**
40:7
**Mayflower's (6)**
58:19;201:2;202:21;203:14,18;234:8
**Mayport (2)**
104:17,18
**Meadows (1)**
149:20
**mean (74)**
33:12,20,21;35:1;40:8,10,11;41:2,4;48:18,23,23;51:4;53:17;68:22;72:23;75:11;83:17;94:9;98:6;99:14;101:19,23,23;102:25;106:7;109:1;110:2;114:2;116:4,5,7;131:1;134:18;137:13;138:12;139:16;141:4;153:23;156:12;157:11;163:4;168:23,23;173:25;191:4;196:10;203:6;208:18,19;213:17;217:6;225:21;229:19;231:23;232:4,5,5,24,25;234:3;243:13;250:14;256:17;277:11;281:22,22,22;289:5;292:2,17;299:3;300:17;304:1
**meaning (13)**
206:19;215:17;220:15;221:23;223:19;224:19;226:24;227:12;229:20;246:12;249:9;253:20;278:3
**means (7)**
60:24;61:2;71:9;158:11;160:3;163:5;233:12
**meant (4)**
9:2;225:21,21;235:3
**measure (1)**
99:25
**measurement (1)**
178:16
**meat (2)**
178:23,23
**mechanic (4)**
32:23;144:23,24;299:18
**mechanical (6)**
32:24;33:5,8;112:20;115:24;116:10
**mechanically (1)**
31:18
**med (1)**
23:2
**media (4)**
27:7,14;171:3,5
**median (1)**
189:24
**Medicaid (3)**
218:20,23,25
**medical (12)**
17:14;22:2;24:15;72:1;75:5,24;76:12;199:14,25;200:3;219:3;234:19
**Medicare (1)**
218:20
**medication (4)**
19:8;74:2,5,19
**medications (4)**
23:12,14;74:23;200:9
**medicine (2)**
19:9;23:16
**meet (5)**
80:13;277:14,17,19;279:19
**meetings (1)**
34:3
**member (2)**
162:18;256:3
**members (3)**
216:6,6,7
**memory (1)**
79:13
**mental (1)**
77:19
**mentioned (8)**
23:21;47:17;59:7;109:5;155:17;193:23;203:17;236:3
**merchandise (2)**
106:14;145:8
**merits (1)**
70:23
**message (1)**
265:16
**messages (1)**
265:19
**messaging (1)**
221:18
**messed (1)**
142:13
**met (2)**
81:9;254:18
**metal (2)**
59:13;73:2
**method (2)**
137:23;187:9
**metrics (2)**
178:14;229:17
**Michael (5)**
85:20;148:7;214:14,19;244:7
**microphone (4)**
24:22;25:6,10;51:12
**middle (2)**
110:15;146:17
**might (14)**
72:9;98:15;106:7,7;107:21;114:6,7;123:14;131:15;158:23;178:14;259:18;289:9,9
**Mike (73)**
82:8,8,8,8;94:7,16,19,21,24;97:24;101:25,25;103:6,6,15;120:2,4,11,14,21,25;121:12,23,24,24;122:2;137:4,5;139:13;148:6;184:24;190:12;214:19,19,22,24,25;215:9,11;224:1;226:6,18;228:22;246:13,25,25,25;247:21;248:2;249:2,21,25;253:13,17,22;254:21;255:12,24,24;257:10,12,15,25;259:23;260:2;261:3,22;270:13,16,

25;271:6,14;273:21
**Mike's (5)**
120:9;254:16,19;259:19;270:25
**mile (1)**
138:14
**mileage (5)**
137:24,25;138:7,11;141:4
**miles (5)**
102:12;108:21;131:14;227:13,18
**military (18)**
11:4;82:11,15;83:2,6,6;104:14;146:18,21;147:4;154:4;158:16;162:3,5;216:3,16,17;266:17
**military's (1)**
82:24
**mind (7)**
201:7,12,12;202:1;246:22;262:14;295:7
**minding (1)**
189:20
**mine (2)**
199:3;270:24
**minute (1)**
255:9
**minutes (7)**
45:15;123:16;166:3;170:16;191:4;262:16;291:22
**Miranda (3)**
56:17;57:8;263:25
**mirrors (1)**
227:5
**misidentified (1)**
126:18
**Missouri (6)**
110:18;132:11;134:4;176:9;187:3,6
**Misstates (1)**
206:12
**mistake (1)**
161:7
**mistaken (17)**
14:9;20:12;55:10;56:7;76:3;77:14;82:12;111:5;112:18;121:6;125:11;133:24;137:20;167:7,11;204:21;228:6
**mistakes (1)**
32:9
**mistreating (1)**
54:25
**misunderstood (1)**
268:5
**mixed (1)**
243:3
**MO (1)**
134:3
**mobility (1)**
16:7
**model (1)**
217:7
**Modern (1)**
269:22
**modular (1)**
47:5
**module (6)**
36:4,5,7;38:2;45:13;226:4
**modules (8)**
45:14,16,20,21;226:5,10,14;232:14
**Moholland (116)**
8:4;27:2;36:8,9,19;37:4;39:19;49:8,13;50:1,16,21;51:5,9;56:13,14;62:13,16;63:12,13;67:15;68:16;76:17;80:14,19,22,25;81:2,8,10;82:17;83:22;86:24;89:2;90:9;91:17;95:1,7,11;102:3,5;118:2;123:3;126:23;127:18;129:24;131:18,23;132:5,10;137:22;140:2,3;141:3;143:19,25;147:11,24;156:25;158:10;161:21;162:20;166:12,16;168:2;172:2;173:2;174:21;176:25;177:7;190:25;202:15;205:8;223:18;226:17;230:2;232:22;233:9,11,14,23;242:5;243:4,11;245:11;247:12;248:1;249:22;250:1;255:19;257:9;258:25;259:2;260:19;262:2,7;264:9;267:12;269:16,18,20;273:6;274:1;275:11;277:18;279:14,20,22,24;280:2;281:6;285:8;286:2;289:16;300:23;301:8
**Moholland/Locke (2)**
105:19;118:14
**Moholland/Mayflower/UniGroup (1)**
90:23
**Moholland's (13)**
77:8;94:23;95:7;103:18,19;123:4,6;132:7;166:20;247:11;279:12;281:1;290:15
**mom (3)**
63:3;213:8,15
**moment (2)**
246:7;297:9
**moment-type (1)**
106:8
**momma (1)**
213:8
**money (22)**
21:7;27:1;33:12;88:24;98:24;107:4,6,7,16,25;108:16,17,19;130:11;136:22;232:9;251:21;267:24;283:25;284:2;296:14,20
**monitor (2)**
98:15;229:23
**monitoring (3)**
228:15;229:1;254:14
**monitors (2)**
98:3,3
**month (4)**
116:25;277:7;304:5,18
**months (10)**
16:13;25:25;26:2;43:19;120:16;121:4;212:4;215:13,15;276:24
**more (33)**
34:12;48:9,12,20;51:3;78:14;85:21;88:22;89:12,13,20,21;91:3;102:10;120:18,18;121:9;122:5;130:10;148:21;158:21;160:1;207:17;228:6;234:18;236:19,22,24,24;281:23;285:20;296:14,20
**morning (4)**
154:1;160:18;164:7,7
**Most (11)**
45:14;75:11;104:6;106:19;107:20;121:6;199:1;240:23;282:13;289:10;293:18
**mostly (3)**
44:11;47:24,25
**mother's (1)**
153:20
**motor (6)**
44:9;45:8,10;126:17;197:7;224:15
**mounted (3)**
220:20;221:4;224:13
**move (10)**
25:6,15;52:9;63:2,4;82:24;121:8;233:19;246:18;254:11
**moved (8)**
12:6;23:6;25:12;225:4;240:12;249:9;250:20;272:4
**movement (1)**
229:20
**Movers (7)**
110:2;146:19;156:2;157:9;158:14,23,25
**moves (4)**
104:14;147:4;219:24;252:21
**moving (26)**
47:23;82:11,15;86:16;95:1,7;104:21,22;110:5;132:10;147:1;159:3,16,18;162:22;163:4;183:20;204:4;205:8;222:2;224:24;247:19;258:25;259:2;265:12;270:5
**MP (1)**
264:1
**MRIs (1)**
23:19
**Mrs (2)**
241:13;276:23
**much (43)**
13:13,15;21:16;48:5;54:19;59:7;69:7;85:21;86:23,24;88:19,22;104:10;108:5,9,15;109:10,10;119:25;124:7;130:12;137:13,15;140:1;145:8;162:4;184:20;192:24;202:2,20;224:23,25;225:2;230:6;231:1;235:16;248:22;249:1;250:5;252:23;255:22;273:20;278:7
**multiple (6)**
23:18;159:6,7,11;186:25;187:1
**must (2)**
205:17;221:1
**mute (3)**
24:19,22,24
**Mya (1)**
188:16
**Myles (1)**
273:25
**myself (9)**
16:21;72:25;90:3;118:6;121:10;214:13;219:23;220:20;223:16

**N**

**name (54)**
8:25;11:11;13:19;14:11;15:17,18,19;17:18;18:22;22:2,18;24:2;49:11,13;52:23;56:17,24;57:7,9;59:3;67:5;74:4,4,8;125:18,19;137:19,21;144:24;145:17,18;157:14;158:24;162:18;198:20;212:7,10,11;215:3;240:9;244:14;249:5;258:15;259:9;260:9;272:14;273:5;287:8;301:13,21;302:1,14,23;303:11
**named (3)**
184:12;200:12;231:17
**names (6)**
14:7;161:22;230:18;262:8;269:8,11
**narrow (1)**
275:8
**Nathaniel (1)**
8:11
**National (2)**
7:24;289:21
**nature (16)**
14:3;15:25;17:2;23:19;48:3;53:3;59:8;89:4;101:10;102:4;108:2;113:13;114:16;119:12;181:14;284:24
**naval (3)**
104:18;158:2,22
**Navigator (3)**
193:24;217:8;290:19
**Navy (11)**
10:7,8,10,23;11:4;70:20;71:1,3,9,22;157:15
**Navy's (1)**
71:18
**near (4)**
52:3;72:21;142:7;198:22
**nearsighted (1)**
61:2
**nearsightedness (1)**
60:17
**necessarily (4)**
33:1,3,16;163:3
**necessary (3)**
106:12;138:21;147:5
**need (14)**
56:21;86:4;101:23;108:1;115:18,18;138:10;163:15;182:9;192:12;210:14;234:3;278:3,12
**needed (18)**

53:3;88:24;105:18; 107:5;108:3;120:13, 14;121:25,25;122:6, 19;175:9,11,12; 253:9;271:3;276:19, 21
**needing (1)** 121:11
**needs (2)** 24:24;180:16
**negative (1)** 40:2
**negotiating (1)** 105:20
**neighbor (1)** 87:16
**neighborhood (1)** 48:17
**neighborhoods (3)** 48:2;236:24;237:1
**Neither (4)** 49:8;89:11,11,12
**Nerve (4)** 16:1,21,22;17:1
**neurologist (2)** 24:2,7
**new (6)** 45:22;91:4;97:17; 114:18;224:16;258:6
**Newport (11)** 10:18;11:7,22;15:5; 22:5;39:1;48:16; 51:23;54:1;76:10; 168:11
**News (11)** 10:18;11:7,23;15:5; 22:5;39:1;48:16; 51:23;54:2;76:10; 168:11
**next (32)** 39:7,9;85:3;93:16; 99:19;116:24;127:23; 132:3;140:13;141:12; 149:21;150:11,18,21; 151:10;155:22; 159:20;161:25;164:7; 165:12;167:14; 175:13;186:1,5,9,12, 15,19,23;196:1,18; 273:21
**nice (2)** 108:15;115:20
**Nicholas (6)** 7:10,16;35:14;70:3; 94:12;129:25
**Nichols (6)** 157:19,20,20; 158:5;160:5,6
**Nickera (2)** 14:8,9
**nicknames (1)** 214:22
**Nickyra (1)** 14:11
**Nictoria (2)** 14:8,8
**nighttime (2)** 154:3,4
**nine (2)** 166:2,2
**NIT (1)** 54:5
**Nobody (2)** 73:1;284:8
**nods (1)** 136:10
**noise (3)** 24:18,20;180:25
**None (2)** 74:25;244:10
**nor (1)** 303:16
**NORDEN (33)** 7:3,3;25:11,15; 214:12;238:19;239:3; 242:10;243:6;257:14; 262:14,24;264:21; 265:3;273:13,15; 274:14,17;298:11,13, 16,22;301:18;302:5, 20;303:3,9,16,19,22; 304:11,15,20
**Norfolk (2)** 54:5;157:15
**normal (4)** 60:4;73:9;108:11, 12
**normally (1)** 183:15
**north (10)** 48:7,8;104:11; 106:11;107:20,21; 211:12,15;213:21; 263:6
**northbound (3)** 184:3,5;189:21
**Northwest (5)** 110:2;156:2;157:9; 158:14,24
**notation (1)** 292:11
**note (2)** 215:11;292:5
**notebook (3)** 35:8,9;197:13
**noted (1)** 292:16
**noteworthy (1)** 133:8
**notice (4)** 22:24;77:15; 176:14;278:23
**noticed (2)** 16:8;184:24
**Notification (3)** 66:16;67:10;263:12
**notifications (4)** 221:24;222:6; 227:10;228:15
**notified (3)** 68:9;113:5;116:18
**notify (1)** 112:1
**November (5)** 16:18,19;20:11,13; 21:19
**number (96)** 46:1;58:19;67:16; 94:12;95:8,11,16; 104:13;112:3,4,6,11, 19;117:13;125:5; 132:8,17,20,23; 145:17,18,19,19; 148:18;149:1,1,4,6,9, 10,11,22;150:1,2,4,5, 6,10,17,18;151:1,5, 11,11,19,20,20,25; 152:1,4,9,12,13,16,19, 23,23,23,24,25; 153:19,19,20;194:24; 195:19,20;202:21; 203:1,14;222:16,17; 227:12;248:8,12,24; 259:13;264:12;266:5, 6,12,12,15,16,25; 267:4,6,6;269:7; 280:1,3;281:1,6,9,20; 285:9,16
**numbers (11)** 93:21;148:20; 151:7,18,22;152:8,21; 153:18;154:6;266:1; 302:8

## O

**oath (1)** 9:16
**Object (47)** 28:22;29:12,20; 30:4,9;37:12,23; 38:14;65:4;77:2; 91:15;92:11;95:22; 96:10;109:21,22; 113:2;117:4;127:1; 130:16;132:25; 169:10,16;171:23; 172:9;173:5,5;174:5; 176:23;201:17,20; 203:3,5;205:1,3,4,19; 206:10,11,23;238:16, 22;241:24;242:23; 257:11;301:14,23
**objecting (1)** 89:6
**objection (9)** 169:17,24;170:6; 205:22;238:21; 302:17,25;303:6,14
**objections (2)** 28:24;29:5
**obligated (1)** 232:9
**observe (2)** 182:5;184:11
**obtaining (2)** 232:14;236:10
**obviously (2)** 232:13;235:7
**occupants (1)** 250:19
**occur (1)** 16:22
**occurred (2)** 103:4;245:9
**occurrence (1)** 174:25
**o'clock (5)** 51:16;160:16,17, 18;161:4
**October (5)** 20:11,13;21:19; 197:17;213:4
**odometer (1)** 138:4
**odor (1)** 188:8
**off (48)** 12:4;21:14;43:22; 51:12,13,15;52:23; 54:20;72:9;84:15; 100:25;105:12; 113:24;114:1,7; 115:17;116:15,15; 123:22,23;131:22; 144:5;145:25;153:12; 166:14;182:14,19; 183:2;188:23,24; 191:4;198:11;199:10; 206:5,7;214:3,4; 248:12;262:18; 264:13,16,22,24; 272:22;274:6;277:20; 294:13;304:13
**offense (1)** 185:23
**offered (2)** 18:10;47:5
**offers (2)** 231:7,12
**office (5)** 94:21,22;226:15, 20;273:17
**officer (5)** 156:15;158:23; 159:2;188:2,16
**officers (1)** 112:24
**offloaded (1)** 252:20
**often (3)** 38:8;46:12;106:19
**oil (3)** 101:8;108:2;299:15
**oiler (1)** 141:16
**old (2)** 289:3,4
**oldest (1)** 54:24
**OLSEN (2)** 8:16,16
**onboard (2)** 286:16;287:6
**once (7)** 17:9;98:10;107:2; 115:16;249:14;269:4; 292:21
**one (90)** 13:17,17,17;18:6; 19:1;24:9;34:9,12,14, 22;39:8,9;45:15; 48:22;53:14;54:6,7; 61:3;64:17;66:21; 67:19,20;74:12;75:3; 76:25;85:19;86:6,11; 89:12,14;90:7;91:16, 16;109:11;115:5; 119:24;123:8;133:12; 135:5;137:17;143:13; 149:7;150:18;151:11; 152:14;158:17;159:4, 8;160:17;164:16,25; 165:2;186:9,12,15,19, 23;195:21;196:5; 211:25;212:18;215:7; 236:19;243:7;244:19; 251:16,17;253:1,1; 255:24;256:8;258:5, 11,14;263:16,24,25; 265:23;269:10,10; 274:11;275:16; 276:17,17,17;279:14; 281:4;282:2;288:10, 16
**ones (5)** 91:4;109:10,12; 187:22;260:2
**ongoing (1)** 285:2
**only (28)** 26:1;27:24;33:10; 55:20;75:14;121:5, 16,16;125:23;126:3; 127:12;134:12; 138:25;139:23; 141:14;156:13; 182:15;203:24; 207:17;215:7;216:5; 221:7;242:18;246:24; 258:14;261:16; 271:17;282:1
**onto (1)** 252:18
**oOo- (1)**

305:11
**open (7)**
18:17;28:14;37:20;178:1,24;186:15;215:20
**operate (10)**
31:17,20;36:15;44:14,17;67:22;68:1;129:20;217:16;272:14
**operated (12)**
36:12;68:12;92:8;110:22;129:11,18;132:11;133:4,17;140:4;201:16;203:2
**operates (1)**
49:19
**operating (12)**
31:24;39:4;40:7;44:20;65:21;133:13;197:6;201:3,8;202:17;205:11;206:20
**operation (2)**
68:4,18
**operator (5)**
36:10;65:2;66:16;67:9;263:12
**opportunity (4)**
57:3,3;240:24;283:1
**opposed (8)**
43:3;80:18,21;118:14;130:5;225:14;300:15,18
**order (9)**
34:1;164:19,20,21;223:4;253:7;278:22;300:7,12
**ordered (1)**
305:3
**orders (1)**
257:18
**origin (1)**
162:19
**original (1)**
250:20
**others (2)**
109:8;129:20
**otherwise (1)**
301:10
**ought (1)**
55:17
**ounce (1)**
186:20
**ourselves (1)**
29:4
**out (103)**
9:3,4,6;10:4;11:2,5;13:12;15:1;19:7;20:10,15,21;21:19;25:16;43:19;48:1,16;53:12;55:5,6;57:24;58:22;62:4;80:8;87:5;88:13;89:25;90:18;91:10;92:13,17,20,21;98:5;99:16;101:16;108:15;109:12;111:9,18,19,21;114:16,23;115:2,5,15,16;122:1;130:21;131:25;145:6,21,24;148:25;167:24;177:15;180:6,7,8;181:1,2,2,4,13,13;182:1;183:15,17;184:14,15;185:4;195:13;221:13,16;225:3;226:7;235:4;237:1,23;238:17,22;240:13,16,19;243:9;251:2,17;252:2,6;253:5;256:4;257:25;262:8;266:6;267:16;272:3;278:14;283:25;287:2;295:23;296:3,18
**outfit (1)**
256:22
**outgoing (1)**
265:19
**outs (2)**
96:19;98:16
**outside (10)**
128:21,22;200:18,18;211:10;212:1,19;213:22;229:15;250:11
**outward (3)**
135:14,15;226:25
**over (33)**
26:7;48:23,23;52:15;53:16;55:24;56:2;87:17;101:21,22;108:19;131:2;162:9;177:22;189:23;215:5;226:25;227:20;228:7;232:6;234:18;247:15,18;248:1;249:16,22;254:19;258:12;265:25;274:19;294:20,23;298:1
**overall (1)**
91:16
**over-hours (1)**
134:7
**overseas (1)**
10:12
**oversight (1)**
232:21
**overspeed (3)**
227:11,19;228:15
**Overview (2)**
35:15;39:8
**owe (2)**
27:21;269:3
**owed (1)**
252:5
**own (17)**
21:11;26:20;61:8,25;73:2;123:1;179:24;189:20;190:17,20,21;194:3;220:4;252:7;255:14;281:9;285:24
**owned (8)**
35:23;112:22;240:3;280:16,18,20,22,24
**owner (5)**
59:2;157:25;300:3,15,19

## P

**Pacifica (2)**
193:2;236:4
**pack (1)**
162:18
**packed (5)**
160:4;161:18;289:1;297:3,8
**packing (3)**
159:22;160:2;253:1
**Padgett (3)**
7:5,5;24:23
**pads (1)**
299:8
**Pagador (6)**
22:16,19,25;23:8,11;24:11
**P-A-G-A-D-O-R (1)**
22:19
**page (41)**
39:7;69:24;93:2,15,15,16,24;95:3,14,19;110:15,15;132:3,4;141:12;142:17;149:3,3;150:11,21;151:10,14,17,21;152:7,20;153:16,17;155:22;157:18;159:13,20;186:1,5;188:7,15,22;194:24;196:1,18;265:24
**paid (38)**
20:25;21:14;88:19;96:8;99:20,22;105:8;106:21,22;116:3,4,4,16;121:24,24;128:16,20;138:14,14;147:13;156:13;162:5;197:21,22;218:14;230:10;234:17;247:14;249:1;252:4,5,6,24;263:5;270:9;283:21,21;287:22
**pain (1)**
19:9
**pair (2)**
260:6,25
**pants (4)**
260:23;261:1,4,11
**paper (8)**
98:17,19,22;102:4;187:8,8;225:1,14
**papers (1)**
264:6
**paperwork (14)**
57:24;58:2;78:3;88:14;102:3;124:21;128:12;142:15;145:3;161:13;208:18,19;264:10;293:6
**paralegals (1)**
246:20
**paramedics (4)**
181:3,16;184:17;185:4
**paramount (2)**
33:17,19
**park (1)**
166:17
**parked (2)**
123:2;290:20
**part (15)**
16:19;89:24;119:5;142:3;158:17,18;234:8;240:22;254:5;257:4;260:6;289:10;294:24;298:23;299:12
**partake (1)**
174:2
**participate (2)**
103:25;251:1
**particular (20)**
48:22;83:25;104:7;111:20;120:5;130:2,4;159:9;164:20,25;168:9;183:5;225:11;226:23;227:22;230:17;281:18;283:2;285:16;302:13
**parts (3)**
104:5,11;263:6
**party (2)**
200:17;300:2
**pass (4)**
111:8,10;233:12;263:1
**passed (5)**
43:19;61:23;120:16;201:13;202:24
**passenger (4)**
183:13;186:16;208:5;210:2
**passengers (1)**
174:1
**password (5)**
223:7,9,11,13,15
**past (6)**
26:7;40:25;119:25;176:1;187:14;216:13
**pastor (1)**
241:9
**patient (1)**
116:8
**Patrick (3)**
22:16,18,25
**pause (9)**
25:18;51:17;80:2;84:17;182:21;189:1;198:13;214:6;262:20
**paused (1)**
25:2
**pavement (1)**
185:16
**pay (34)**
78:14;106:23,24;107:13;116:13;118:3,3,5,6;128:21,22;156:14;162:5,6;175:17;230:17;232:9;251:19;253:6,8,15,16,17,21;254:2;255:15;263:7;269:3;283:21,24,25;285:24,25;286:2
**paying (6)**
100:6;207:3,6;252:1;253:12,13
**payment (4)**
95:19;252:6,9;283:14
**payments (1)**
283:12
**Payne (15)**
4:4;143:22,24;144:2,6,11,21;145:4,9;280:23;290:5,13;295:2,7;300:2
**Payne's (2)**
144:17;297:15
**PDRM (1)**
93:19
**people (19)**
82:22;86:3;89:14,24;92:6;102:1;111:25;112:17;145:24;187:1;213:19;243:10,10;282:15,21;283:7;304:2,6,16
**per (14)**
87:24;88:18,22;89:12;90:2,17;91:3;99:16;101:12;136:23;162:3;163:5;227:13,18
**perceive (2)**
37:9;234:12
**perceived (1)**
81:4
**percentage (1)**

73:5
**Perfect (1)**
164:21
**perform (2)**
31:23;235:17
**period (7)**
93:7;134:12;199:24;200:9;215:12;246:9;293:25
**permanent (7)**
59:16;72:11;85:22;120:18;121:10;209:2;249:8
**permissible (1)**
182:14
**permission (5)**
245:19,24;249:23;301:9;302:2
**permitted (5)**
233:9,15;235:8,23;301:21
**person (26)**
31:9;45:18;49:1;55:20,20;86:11,12;89:18,21,23;90:18,19;100:20;158:19,20;164:16;168:25;206:7,16,17,19;236:12;242:17;271:17;274:1;304:8
**personal (9)**
115:12;131:13;190:17;192:6;209:11;239:17;244:10,16;282:21
**personally (5)**
90:20;118:13;207:6;220:21;252:20
**perspective (4)**
42:16;233:18;241:2;301:5
**Peters (26)**
94:7,17,19,21,24;97:24;101:25,25;103:6,6,15,21;137:4,5;139:14;224:1;226:6;228:22;257:10,12,15;264:4;273:21;284:20;285:3;297:10
**Petno (4)**
7:8;8:18;188:13;209:16
**Petnos (1)**
190:5
**Philadelphia (4)**
212:3,5,8;213:21
**phone (28)**
24:23,24;148:17,18,25;153:14,20;177:22;220:18;224:4,12,13,19,25;228:11;243:25;244:2,22,23;245:2;248:24;265:18,20;266:1,6;272:20;277:22;287:4
**photograph (7)**
201:6;202:4,8;248:4,9;258:3;272:3
**photographs (8)**
194:8;244:24;245:1,5;258:3,4;260:6;272:1
**photos (4)**
272:7,7,19;274:4
**phrase (1)**
246:8
**phrased (1)**
83:7
**physical (8)**
23:18;40:1;55:3;73:1;76:2;77:19;229:23;252:14
**Physically (9)**
87:4,8;100:13;111:18,19;226:6,13;230:4;247:9
**physician (1)**
75:2
**pick (22)**
53:2,10;98:15;99:8;106:10,12;125:24,25;144:6,13;145:5;158:6,6;160:20;166:12,15,19;219:22,22;279:5;282:9,13
**picked (16)**
53:2;78:22;105:18;111:12,12,22;158:4,11;159:24;160:4;161:20;162:10,19;163:12;181:25;216:14
**picking (8)**
138:22,22;158:1;224:24;253:1,2,4;272:18
**pickup (8)**
80:11;81:18,19,19;105:20,21;162:18;203:25
**picture (12)**
45:4;133:4,5,14,16,21;194:23;195:19;196:4;201:8;272:15,16
**pictures (4)**
128:24;129:7;143:9;195:5
**piece (1)**
59:14
**pill (1)**
74:7
**pills (2)**
74:15,18
**pilot (2)**
256:21,22
**pinned (1)**
25:10
**place (11)**
13:17;55:13;86:13,13;148:7;215:17;226:2;235:19;238:3;239:10;273:23
**placed (1)**
235:12
**places (7)**
54:2,3,4;71:23;109:18;293:25;294:4
**plain (1)**
205:8
**Plaintiff (2)**
7:6;274:18
**Plaintiffs (4)**
8:10,12,17;290:2
**Plaintiffs' (17)**
64:4;66:2,24;70:16;97:2;110:9;126:5;129:2;140:17;146:5;148:12;154:8;155:12;179:5;197:9;202:9;305:7
**Plaintiff's (1)**
63:22
**plan (2)**
166:25;283:4
**planned (1)**
166:22
**planning (2)**
85:9;167:4
**plans (1)**
52:8
**Plantation (2)**
12:11,21
**plate (2)**
263:7,9
**platform (1)**
221:19
**plea (1)**
55:7
**plead (48)**
30:11,14,14,19,23;42:14,19,23;43:1,5;79:3,15;170:20,23;171:14,16,19,22;172:4,8,13,16,22,24;173:1,11,13,15,18,24;175:19,22,25;176:21;177:12;188:11;189:10,13,16,19;190:7,10;194:2,3,5;197:8;297:17,23
**pleaded (2)**
55:6;298:7
**pleading (5)**
79:6,17,19;170:19;173:22
**please (8)**
7:14;24:19;67:18;146:9;222:20;229:15;263:18;266:6
**pleased (1)**
59:6
**pled (1)**
42:18
**pm (18)**
69:20;84:19;123:24;124:2;182:20,23;188:25;189:3;198:12,15;214:5,8;262:19,22;264:23;265:1;305:6,9
**pocket (1)**
252:7
**pods (1)**
285:4
**point (18)**
9:4,6;53:9;64:24;78:20,23;99:6;119:24;177:19;223:10;231:5,25;247:4;261:23;266:21;267:1;268:24;302:6
**pointed (2)**
237:23;251:17
**points (2)**
24:14;125:22
**police (3)**
176:11,14,19
**policy (1)**
217:19
**poorly (1)**
83:8
**pop (2)**
131:7,8
**POPE (14)**
7:7,7;198:19,20;201:23;202:7,12;203:11;204:13;205:10;206:1,14;207:1;214:1
**port (6)**
53:22,24;56:9;75:17,17;86:21
**ports (1)**
54:5
**Portsmouth (2)**
54:6;56:5
**position (6)**
10:10;57:1;148:4;175:8;232:19;241:16
**possession (6)**
186:15,20;243:21;244:4,7;281:21
**possibilities (1)**
13:15
**possibility (1)**
205:23
**possible (2)**
190:4;234:4
**Possibly (1)**
97:21
**post (2)**
21:1,8
**posted (1)**
170:13
**post-trip (1)**
46:10
**potential (3)**
119:7;238:5;239:11
**potentially (2)**
174:15;228:1
**pounds (4)**
86:3,9;162:10;253:3
**pow (1)**
114:14
**power (1)**
238:13
**practice (1)**
48:16
**practitioner (1)**
22:10
**precautions (1)**
169:1
**preceding (2)**
170:16;251:24
**precise (1)**
162:8
**predetermined (1)**
277:2
**preferred (1)**
227:22
**preflight (1)**
101:4
**pregnant (1)**
71:14
**pre-inspected (1)**
145:2
**preliminary (2)**
37:16;277:22
**preloaded (2)**
158:7,8
**premium (3)**
95:20;96:8;100:7
**Premiums (2)**
93:19,24
**pre-move (1)**
272:2
**prepared (2)**
278:8,8
**prescribe (2)**
23:11,15
**prescribed (4)**
23:17,18;59:17;200:8
**prescribes (1)**
24:9
**prescription (1)**
200:9
**present (3)**
277:6;278:9;297:10
**presented (1)**
288:10
**pressure (4)**
23:16;73:21;74:7;

199:18
**pressured (1)**
165:18
**presume (2)**
92:6,7
**pretrip (24)**
31:23;46:9;98:12, 13;100:10,15;102:11; 103:3,11,22,25;119:2; 144:14,22;290:24; 291:2,19;292:12,16, 17,21;297:11;298:23; 299:20
**pretty (35)**
13:13,15;48:5; 54:19;59:7;69:7; 73:13;85:21;86:23, 24;88:22;101:18; 108:14,15;109:9,10; 130:11;131:2;137:13, 15;145:8;184:20; 187:21;194:10; 224:23,25;225:2; 230:6;235:16;241:1; 248:22;255:22; 259:19;273:20;278:7
**prevent (1)**
238:13
**preventable (7)**
34:8,13,16,19,25; 35:4,5
**prevents (2)**
28:4,8
**preview (2)**
278:1,3
**previous (12)**
22:16;39:19;95:19; 100:7;118:4;167:9; 204:15;220:11;228:5; 230:8;276:12,14
**previously (4)**
56:16;95:18; 216:13;274:9
**price (4)**
253:1,1,3,5
**print (1)**
69:22
**prior (6)**
219:23;246:3; 279:20;281:11; 303:24;304:5
**priority (2)**
33:21,23
**Prism-MTI (1)**
93:19
**prison (1)**
71:19
**privacy (1)**
264:14
**private (3)**
218:18;240:4;287:4
**privilege (3)**
237:19;238:7,9
**probably (6)**
22:20;75:6;86:11; 187:17;199:20;273:4
**problem (9)**
58:21;61:6,24; 72:18;77:20;101:24; 114:9;115:17;119:9
**problems (21)**
16:7;22:14;61:4,10, 16,19,21;72:25; 102:9;112:20;118:7; 119:6,7;294:11,13; 297:15,21,22,25; 298:4,6
**procedures (1)**
102:8
**proceeding (3)**
182:21;184:6; 237:25
**proceedings (8)**
25:18;51:17;80:2; 84:17;189:1;198:13; 214:6;262:20
**process (7)**
22:23;82:24;85:11; 222:21,24;235:4; 236:10
**processed (1)**
41:21
**produce (1)**
48:24
**produced (3)**
69:6;194:8;222:10
**production (1)**
125:1
**products (1)**
276:7
**professional (6)**
225:12;236:6; 237:14;238:12; 239:13;270:10
**proficiency (1)**
89:22
**program (2)**
41:23;219:7
**programs (2)**
50:22;173:3
**prohibit (1)**
234:22
**promise (2)**
202:1,19
**prompt (2)**
220:13;221:15
**prompted (1)**
267:19
**prompts (2)**
221:1,15
**pronounce (1)**
273:4
**proper (4)**
32:5;102:8,11; 169:1
**properties (1)**
26:20
**property (12)**
103:20;157:25; 176:3;240:3,6,7,12; 271:3;279:5,13,14; 300:24
**ProStar (5)**
179:14;201:3,8; 202:17;205:12
**protect (1)**
34:1
**protects (1)**
30:16
**provide (5)**
32:9;34:2;173:3; 264:13;288:6
**provided (6)**
90:24;249:18; 252:6;260:18;281:12; 287:25
**provides (1)**
286:17
**public (6)**
34:2;91:10;179:11; 205:16;242:18; 303:13
**publish (2)**
69:21;70:2
**pull (2)**
111:19;298:1
**pulled (2)**
111:13;185:1
**pulling (1)**
105:16
**pumps (1)**
277:20
**punch (2)**
114:1;153:4
**purchased (3)**
129:13,14,16
**purpose (8)**
135:18;211:19; 256:11;265:6,11; 295:22;296:1,2
**purposes (4)**
219:15;221:13; 256:6,8
**push (2)**
221:23;222:6
**pushing (1)**
115:23
**put (25)**
18:17;26:10;41:17; 63:4;65:25;66:22; 70:14;84:14;96:25; 98:7,9,23;159:4; 161:21;162:11; 203:21;207:18;220:4, 21;223:5;226:2,7; 228:20;248:17; 259:22
**putting (1)**
42:10

**Q**

**Qualcomm (6)**
139:15,18,19,24; 140:5;286:18
**qualification (5)**
39:25;233:10,11, 13;234:20
**qualified (1)**
218:25
**qualifier (1)**
216:11
**qualifying (1)**
233:4
**quarters (1)**
46:15
**quick (1)**
123:13
**quit (2)**
185:12,13
**quite (8)**
12:8;142:13;143:2, 2;164:18;248:5; 259:18;294:20

**R**

**race (2)**
27:9,11
**rain (1)**
168:22
**raining (2)**
169:6,21
**raise (1)**
296:10
**raised (1)**
9:24
**Ramada (1)**
149:19
**ran (2)**
225:3;273:22
**random (1)**
76:18
**rank (1)**
162:4
**rare (2)**
107:22;109:23
**rate (1)**
141:15
**rather (2)**
37:3;48:7
**Ray (11)**
207:20,23;208:10, 14,17,21,23;209:1,5, 7,14
**Raymond (1)**
7:8
**reach (2)**
153:4;287:2
**reaction (2)**
31:5,10
**read (12)**
66:16;67:17;95:5; 126:4;141:16;148:25; 154:24;156:6;266:5; 269:7,11;304:25
**readily (1)**
303:12
**reading (1)**
188:23
**Ready (10)**
8:20;80:7,8;183:8; 272:17;278:1,6; 293:7;297:6,9
**real (2)**
74:21;201:13
**really (46)**
13:8,8,9,16;14:1; 18:12;35:2,5;48:24, 24;49:1,2;72:23,24; 75:12;89:16,17; 98:19;101:23,23; 112:18;114:6;116:5, 6;119:19;122:18; 137:11;138:24;148:4; 156:13,13;163:13,17; 222:23;225:1;231:1, 23;234:14;236:16; 275:8;292:15,15,23, 23;296:16;301:25
**rearview (1)**
114:15
**reason (15)**
36:23;75:5,22; 202:25;203:24; 216:23;234:25; 239:12;240:22; 261:14,16;265:20; 266:22,23;285:10
**reasonable (3)**
55:22;136:15;301:6
**reasonably (3)**
34:10,15,23
**reasons (1)**
264:14
**recall (22)**
109:5;110:14; 131:24;166:13,13; 192:22;212:24;215:4; 223:10;232:15; 240:15;260:2;261:3, 5,10;263:13;265:17; 266:2;268:9;286:8; 292:8;294:7
**receipt (3)**
248:21,22;249:6
**receipts (5)**
107:6,7;108:19; 138:20;248:18
**receive (8)**
46:8;145:10; 221:23;222:1;243:25; 249:13;283:14;284:1
**received (8)**
145:12;197:25;

218:13;251:21; 267:24;276:16; 286:13;289:9
**receiving (1)** 268:18
**receptionists (1)** 246:21
**reckless (3)** 45:1;174:12,13
**recognize (27)** 110:21;127:23; 128:5;132:19;151:7, 18,22;152:2,4,8,20, 22;153:17,18;154:5; 155:23;173:25; 194:12,21;196:22; 197:2;263:19;264:6, 8;267:5,7;269:12
**recognizing (8)** 219:12;238:11; 239:5,5,9;249:21; 300:1,23
**recollection (1)** 170:15
**reconcile (1)** 116:1
**record (39)** 7:14;25:19;40:6,8, 9,12,13,25;41:2,4; 51:14,15,18;55:14; 81:9;84:15,18; 123:22,23;124:1; 138:7;182:14,19,22; 188:23,24;189:2; 198:11,14;202:13; 214:4,7;262:18,22; 264:13,22,24,25; 304:13
**recordation (2)** 103:22;138:11
**recorded (1)** 144:19
**recording (1)** 137:23
**records (4)** 63:15;244:23; 265:18,21
**recovered (1)** 270:23
**rectangular (1)** 146:17
**red (4)** 194:13;195:13; 228:7,11
**reduce (3)** 31:2,4;60:1
**reduced (2)** 73:4,4
**refer (5)** 214:19,21,23; 223:19;253:22
**reference (2)** 272:6;295:15
**referenced (1)** 297:13
**references (3)** 141:3,13;157:9
**referencing (1)** 45:3
**referral (1)** 23:7
**referred (3)** 63:20,20;271:21
**referring (4)** 54:22;61:22; 224:12;237:10
**reflected (1)** 119:13
**reflecting (1)** 126:16
**regard (1)** 85:3
**regarding (3)** 200:13;231:8; 281:17
**regards (1)** 291:6
**registered (2)** 217:12,14
**registration (1)** 192:18
**regular (4)** 98:11;200:6; 235:20;299:9
**regulated (5)** 130:23,24;134:10; 224:15;239:6
**regulating (1)** 137:9
**regulation (2)** 133:25;134:2
**regulations (2)** 100:2;284:23
**regulatory (1)** 126:24
**reimbursed (2)** 121:19;287:21
**reinstating (1)** 234:22
**related (2)** 136:23;237:13
**relates (7)** 233:2,3;237:14; 246:8;271:6;275:10; 304:4
**relationship (10)** 42:6;120:16; 126:23;127:17; 143:25;144:2;147:10, 17;254:24;279:23
**relationships (1)** 231:2
**relative (3)** 217:18;270:13,16
**relatively (1)** 45:22
**relatives (5)** 11:16,19,20; 211:21;213:17
**released (1)** 145:7
**relief (1)** 237:6
**relocate (1)** 296:16
**relocated (3)** 12:9,13,15
**Relocation (4)** 267:4;268:11; 279:13;296:2
**Relocations (17)** 49:9,11;197:15; 251:14;267:24; 268:18;275:11; 276:24;279:17;281:9; 282:9;283:13,14; 284:14,18;289:25; 300:23
**rely (1)** 34:6
**remain (1)** 244:11
**remaining (1)** 299:11
**remedial (1)** 51:7
**remember (78)** 17:4;19:14,15; 36:25;37:22;39:6,6; 47:13,15,15;50:13; 52:22;54:6;58:11; 59:2;60:19;62:3; 66:11;70:22;71:12; 77:11;79:10,11; 83:19;84:1;97:11; 100:23;105:3;109:11; 110:23;111:2;112:11; 113:11,11;114:5,6,8; 117:10,11;128:11; 129:15;131:20;132:2; 138:24;139:4,13; 142:25;143:1,18; 144:24;163:11; 164:14;165:24;166:7; 167:18;168:20;170:8, 18;171:2;174:24; 181:18;183:19,20; 212:6,10;215:3; 222:23;245:12,13,17; 282:10;287:7;288:12, 13;292:15;293:11; 295:5,8
**remembering (1)** 142:9
**remembrance (2)** 272:5;297:12
**remove (1)** 248:11
**removing (2)** 181:16;183:22
**render (2)** 9:17;250:10
**rendered (1)** 127:13
**renew (2)** 122:7;199:25
**renewed (1)** 122:16
**rental (4)** 129:21;145:5; 240:6,7
**rentals (2)** 26:21;58:16
**rented (1)** 36:25
**repair (1)** 141:14
**repeat (13)** 22:21;32:10;33:22; 34:12,17;78:21; 80:20;85:4;127:14; 169:15;177:3;186:24; 231:10
**rephrase (3)** 130:17;135:10; 228:3
**Replaced (1)** 142:19
**replicated (1)** 48:16
**report (6)** 32:24;33:5;126:18; 177:21;187:15;268:3
**REPORTED (5)** 4:6;33:9;274:10; 292:6,8
**Reporter (4)** 63:19,24;128:25; 177:4
**reporting (2)** 188:16;198:5
**reports (1)** 127:13
**represent (9)** 7:3;8:14;195:12; 214:14;251:18;254:1; 257:23;275:7;290:13
**representative (5)** 51:4;145:4,6; 276:24;285:8
**representatives (1)** 144:21
**requalifying (1)** 234:22
**request (2)** 125:1;162:1
**requested (2)** 142:3;183:3
**require (3)** 153:11;192:9; 252:18
**required (11)** 18:18;38:8;50:4; 220:3,4;236:24; 238:17,22;254:13; 255:15;286:1
**requirement (6)** 77:6;89:14;108:24; 257:2;261:7,20
**requirements (5)** 89:3;147:5;233:5,7; 239:10
**requires (5)** 39:24;162:4; 192:17;235:17; 236:19
**reschedule (1)** 165:12
**reserving (1)** 28:24
**residence (5)** 165:1,2,10;190:16; 239:24
**residences (1)** 47:25
**resignation (11)** 63:4,6;264:9;286:6, 6,8;295:16,21;296:9, 14,21
**resigned (2)** 62:23;63:15
**resolved (2)** 41:19,20
**resort (3)** 12:21;52:22,25
**respected (1)** 86:13
**respective (1)** 67:17
**respect-type (1)** 89:13
**respond (4)** 76:23;169:11; 221:1;267:23
**responded (1)** 270:8
**responding (1)** 185:10
**response (6)** 148:16;177:5; 204:7;234:13;241:15; 297:15
**responsibility (4)** 19:20;231:18,21; 284:16
**responsible (8)** 118:14;147:1; 232:1;252:1;253:12, 13;299:23;300:4
**rest (1)** 73:6
**restaurant (1)** 256:17
**restriction (3)** 235:2,16;254:10

**restrictions (5)** 235:13,20;239:10,20;254:4
**result (5)** 216:20;218:2;219:1;232:9;237:24
**resulted (1)** 128:6
**results (1)** 284:11
**resume (1)** 164:6
**retired (1)** 216:15
**retrieve (2)** 79:21;124:23
**retrieved (2)** 37:4;271:3
**Return (6)** 187:11,19;189:7;268:25;278:22;288:3
**returned (1)** 243:23
**returns (3)** 187:18;268:8,19
**reunion (4)** 213:9,12,15,18
**Revenue (1)** 198:6
**reversed (1)** 160:25
**review (1)** 189:6
**revisit (1)** 266:22
**revoked (1)** 199:9
**reweigh (4)** 162:1,10;164:2,2
**reweighed (2)** 162:3,14
**ridden (1)** 242:14
**ride (1)** 38:3
**ride-along (2)** 50:22;51:2
**riding (3)** 49:5;51:5;265:8
**Right (272)** 9:10,15,23;10:6,12;11:2;12:18,21;15:3,14;17:10,14;18:16,23,24;20:6;26:6;30:8,15;32:12,15,19,21;34:21;35:7;37:5;38:2;39:13;40:20,23;43:6,24;50:21;51:1;52:23;53:4;56:1,14;57:4;59:12;60:23;61:18;62:22;63:14;64:21;65:2,25;66:8,19;67:5,21;69:24;70:4,13;71:10,19;72:12;78:7,20,23;79:6,16,18;80:13;81:7;82:9,16;83:17,20;85:6,11,17;86:17;87:3,11;90:25;91:9;92:1,4;93:1,12,23;94:6,11,16;96:2;98:6;99:2,4;101:5,9,14;102:17,19;104:19;105:5;106:9;111:10,11;117:15;123:14;125:22;127:9,22;131:3;132:3;141:6;145:19;148:8,9;149:7,24;150:2,23;152:1;155:16,18;158:13;159:20;161:4,5,17;162:12,25;164:8,19;166:13,24;167:13;173:2;178:7;179:21;181:12,15;183:7;184:8,17;187:12,13,17;188:12;189:24;190:6;193:5,22,25;194:11;196:1,4,13;198:9,10;205:8;207:22;209:4,23;211:8;212:16,22;213:20;216:15;217:5;219:4,21;220:14;221:5;222:4,5,9;223:1;227:21,24;228:10,24;230:11,14,25;234:11,19;235:19;236:18;237:3,5,8,9,21;239:4,7;240:1,10;241:5,10;242:13,15,19;243:13;245:14,18;247:6;248:15,25;250:11,14;251:12,14;252:22;253:10,11;254:10,14;255:2,13,15;256:7,15,16,23,24,25;257:18;258:2,20;259:7,15;261:2,12,12;262:6,11;263:15;265:9,13;266:8,24;267:2;271:23;273:20,22;274:17;275:16,24;276:8;277:3,13,21;279:13,16,19;280:6;281:8,15;282:3,10,18;283:16;284:13;285:7,24;286:23;287:3,6,11;288:19;292:13,24;296:4,20;298:9,12;301:5;304:20;305:2
**right-hand (1)** 157:17
**rigs (1)** 53:14
**Riley (3)** 7:2;27:14;184:11
**rim (2)** 133:7,8
**Riverside (4)** 21:24;22:1,2;24:3
**road (23)** 28:9;32:9;47:8,9,12,13,22,25;48:17;53:16;55:24;76:10;101:21,22;121:17;130:12;131:4,4;134:8;141:14;149:20;168:16;236:12
**roads (2)** 168:9;259:3
**Roadside (6)** 39:9;46:9;111:24;112:2,16;115:12
**roadway (2)** 33:18,24
**Roanoke (1)** 51:23
**Rob (1)** 147:17
**rode (1)** 242:15
**role (2)** 148:2;256:10
**rolling (1)** 98:21
**room (9)** 18:3,5,15;48:9,12;75:7,10,12,16
**roughly (1)** 211:7
**route (7)** 33:11;104:7;166:23,25;168:6;221:21;293:15
**routes (2)** 104:3,4
**routine (2)** 120:8;235:20
**routinely (1)** 76:11
**rubber (1)** 114:14
**rule (2)** 162:9;238:20
**rules (3)** 55:13,23;237:14
**run (5)** 40:3;122:24;175:1,18;220:18
**running (9)** 98:9;99:21;146:1;169:17;191:17,18,18;192:1;193:16
**runs (4)** 97:13;122:23;125:10;176:8
**ruptured (1)** 17:3
**rush (1)** 116:6
**rushed (2)** 33:14,15
**rust (1)** 299:14
**Ryan (1)** 8:9

## S

**sacrificial (1)** 299:12
**safe (6)** 27:24;98:14;169:8,22;170:5,11
**Safety (11)** 20:2;28:1;34:3;45:6;46:11;59:6,11,13;103:16;136:16;179:11
**sag (2)** 141:3,3
**same (55)** 9:18;15:19;32:4;35:16;61:11;72:4;80:19;90:2;100:20;102:20,24;117:9;123:8;137:13,15;143:8,13,13;145:8;150:3;151:10;155:9;156:8;157:5;159:7;165:9,13;167:8;169:24;170:6;178:14;181:20;192:20;209:18;210:24;224:25;228:10;237:4,7;238:21;242:6;248:1;253:2;255:20;262:3;276:18;279:14;283:19;296:8,8,25;299:8;300:24;304:4,17
**sample (2)** 76:14,15
**Samsara (7)** 134:17,20;155:5;219:8;224:6,11,13
**Samsara-type (1)** 154:19
**sanctioned (1)** 135:4
**Savannah (1)** 8:1
**saw (11)** 92:7;100:7;105:5;109:7;128:8;143:8;180:9;183:10;201:15;246:13;254:18
**saying (16)** 23:21;32:17;35:2,3;36:24;40:15;41:13;72:24;98:23;103:8;114:3;220:9;242:17;243:2;262:2;267:16
**scale (1)** 160:21
**scar (2)** 178:3;218:2
**scenario (1)** 59:19
**schedule (5)** 175:7;277:7;278:19;284:6,8
**scheduled (2)** 20:18;146:3
**school (9)** 10:1;12:23,24;43:7,8,9,17;145:12;212:11
**scope (1)** 229:16
**scratched (2)** 73:3,3
**screen (5)** 220:25;221:5,7;224:2;275:5
**se (10)** 87:24;88:19,23;89:12;90:2,18;91:3;99:16;101:12;163:5
**seal (2)** 141:15;142:23
**seat (3)** 183:14;220:6;256:23
**second (9)** 15:17;51:14;67:19;69:24;110:15;152:23;153:19;184:14;186:1
**secretaries (1)** 246:21
**Security (3)** 26:15;218:5;264:12
**seeing (7)** 25:23;61:22;105:3;204:23;242:11,12;261:5
**seem (1)** 289:2
**seemed (1)** 247:4
**seems (3)** 86:25;102:10;137:8
**sees (1)** 205:16
**selected (1)** 89:3
**selecting (2)** 87:15;89:14
**self-incriminating (1)** 189:15
**self-incrimination (1)** 237:20
**semi (4)** 100:21;243:22;244:3;265:16
**send (8)**

101:25;115:15,16;227:9;270:25,25;283:17;286:11
**sending (1)** 296:21
**sense (4)** 92:7;119:13;234:5,12
**sent (9)** 78:3;116:20;244:16,17;271:3;274:6;286:5;295:16;296:9
**sentence (1)** 55:8
**separate (1)** 14:16
**separated (1)** 14:24
**Separation (4)** 66:16;67:9;263:12,17
**sequence (2)** 250:19,24
**series (1)** 197:14
**serious (1)** 75:13
**serve (2)** 10:8;216:3
**served (1)** 10:23
**Service (17)** 35:10,12,15;39:8;46:10;65:17;98:20;100:3;141:14;158:19,20;164:16;198:6;216:6,6;221:17;225:5
**serviced (1)** 142:1
**serviceman (1)** 158:18
**Services (3)** 12:5;219:3;269:22
**SESSIONS (4)** 8:3,3;289:15,15
**set (6)** 121:7;137:7;188:21;227:9;276:22;278:21
**settle (1)** 11:6
**settled (3)** 11:22;13:8,9
**several (6)** 25:25;86:17;87:7;116:12;157:1;200:13
**severe (1)** 119:16
**sexual (1)** 55:1
**shape (1)** 63:4
**shared (2)** 106:3,5
**shares (1)** 242:18
**sheet (2)** 160:2;272:13
**sheets (4)** 90:17;138:20,21,21
**shift (2)** 71:17;222:8
**ship (8)** 50:2;91:18,23,24;125:18;157:15;204:19;258:15
**shipment (8)** 106:12;107:22;109:15;157:10;160:24;162:3;164:2;272:13
**shipments (8)** 105:15;138:22;162:9;163:10;164:23,24;165:7,8
**shipper (14)** 82:20,21,22;125:19;156:20;157:21;162:2,2,6,7,18;165:11,12;252:19
**shippers (2)** 80:10;159:7
**Shippers' (8)** 43:9,12,13,25;47:10;52:16;62:4,9
**shipper's (6)** 81:20,25;159:23;160:3;164:3;272:14
**shirt (6)** 91:4,17;255:14;258:24;259:17,17
**shirts (17)** 91:2;255:13,20,25;258:6;259:21,22,23;261:6,25;287:25;288:6,9,16,17,20;302:22
**shoe (1)** 141:15
**shop (3)** 141:14,15;144:2
**short (2)** 87:20;121:5
**shortly (2)** 8:19;266:21
**shorts (5)** 260:7,13,23;261:4,11
**shot (1)** 168:15
**shoulders (1)** 17:7
**show (18)** 66:21;69:15;135:14,16,20;148:24;156:16;157:6;178:5;228:7,8,11,12;256:17,21;257:20;265:18;288:16
**showed (4)** 195:14;218:2;226:7,8
**shown (3)** 205:12;263:11;265:23
**shows (1)** 141:6
**shuffling (1)** 187:9
**sic (1)** 126:19
**side (20)** 17:9,10,10;66:9;67:3;113:9;183:23;184:3,5;185:16;196:6,11,20;202:16,22;237:6;248:12;250:10,16;303:11
**sidelined (1)** 116:10
**sidetracked (1)** 52:15
**sign (5)** 101:1;115:17;145:3,25;242:3
**signal (1)** 291:9
**SignalHire (1)** 69:9
**signature (2)** 115:19;138:21
**signatures (2)** 263:20,23
**signed (3)** 206:5,7,16
**signifies (1)** 256:13
**signs (2)** 239:20;255:3
**SIM (1)** 229:11
**similar (3)** 46:21,24;261:25
**SIMOS (1)** 65:15
**simultaneously (1)** 278:21
**sister (3)** 213:8;244:13;270:19
**sister-in-law (1)** 212:15
**sister's (1)** 152:23
**sit (8)** 38:4;111:24;208:13;209:13;210:4;211:1;230:25;244:6
**site (1)** 294:15
**sitting (4)** 226:18,21;231:6;251:7
**situated (1)** 85:14
**situation (19)** 32:14;33:8;42:20;48:15;54:18,19,21;87:20;90:21;101:18;106:8;114:12;115:20,22;116:2,9;140:11;221:15;228:25
**situations (3)** 41:2;48:1;104:12
**six (8)** 24:14;36:20,21;52:1;119:22;166:3;239:25;288:22
**size (3)** 142:20;258:5;259:19
**skill (1)** 236:24
**skills (1)** 44:11
**skinny (1)** 259:19
**slash (3)** 112:22;164:12;301:7
**sleep (3)** 19:9;282:24;283:2
**sleeper (2)** 282:23;283:4
**Sleepers (1)** 282:22
**Slidell (4)** 110:5;159:3,15,18
**slip (1)** 220:6
**slips (4)** 100:16;125:21;126:2,3
**slit (1)** 133:9
**Sloan (12)** 4:3;8:10;27:5;181:8,9,16,17;183:11;184:11;185:15;190:1;194:8
**Sloans (1)** 7:6
**Slow (1)** 229:5
**slower (1)** 168:21
**slowly (1)** 34:17
**small (8)** 13:10;86:10;139:19;146:18;180:12,14;187:21;259:19
**smaller (2)** 259:18,20
**smell (1)** 176:11
**SMITH (42)** 7:9,9;28:22;29:1,12,20;30:4,9;78:25;130:16;140:24;169:10,24;170:6;174:5;178:12,17;180:16;182:8,17;187:14,18,20,22;192:12;201:17;203:3;205:1,19;206:10,12;214:3;238:16,21;289:18;290:6;302:17,25;303:6,14;304:22;305:1
**smoke (4)** 44:20;171:13,17;172:7
**smoked (1)** 171:15
**smoking (4)** 136:4;171:21;172:3;175:24
**Snook (4)** 7:11;8:5,5;241:14
**sober (2)** 31:8,10
**Social (7)** 26:15;27:7,13;171:3,5;218:4;264:12
**soldier (1)** 158:22
**Solutions (1)** 65:15
**Somebody (27)** 24:24;31:11;38:4;113:20;114:15;115:15,16;116:20;158:11,23;181:25;182:1;205:16;220:2,23;229:1,3;246:13,16;250:1,1;256:10,13;272:3,23;276:1,10
**somebody's (2)** 24:17;256:18
**someone (14)** 61:7;145:21;200:17,17;201:13,14;202:24;203:8;204:22;205:5,6,17;242:3;249:19
**sometime (2)** 56:3;211:7
**sometimes (16)** 16:6;22:10;32:21;36:24;54:7;104:5;106:6,7;114:13,15;144:5;191:3,5;

272:15,17;275:17
**somewhat (1)**
230:12
**somewhere (8)**
47:20;91:18;
106:11;107:19;
109:24;124:22;
181:22;205:15
**soon (4)**
32:14;111:9;
224:23;234:4
**sorry (22)**
27:10;43:11;51:13;
54:16;74:16;78:21;
89:5;91:14;187:8,20;
197:15;202:2,3;
204:10;207:18;
222:13,14;241:14,22;
242:1;286:7;291:15
**sort (6)**
100:18;128:21;
134:15;146:17;
166:22;213:12
**sorts (1)**
282:6
**sound (2)**
211:8;292:13
**sounded (1)**
250:9
**sounds (2)**
219:8;267:15
**source (1)**
26:12
**sources (2)**
26:11;69:11
**south (19)**
11:16,20;48:7,8,12;
106:9;107:22;111:7,
8,9;142:7,14;169:4,
21;189:22;192:17;
293:16;294:15,24
**southbound (1)**
184:6
**speak (5)**
25:5;111:17;
210:21;267:8;286:7
**SPEAKER (4)**
24:21;25:1,13;
111:17
**speaking (2)**
32:17;230:9
**special (1)**
147:3
**specialist (1)**
24:1
**specific (17)**
19:22;51:3;158:21;
160:2,2;161:22;
219:17,20;239:18;
245:11;256:10;
261:11;265:11;271:7;
281:23;287:8;298:24
**specifically (4)**
217:22;259:6;
282:7;297:18
**specifics (3)**
68:19,20;82:15
**speculation (4)**
201:18;203:4;
205:2,20
**Speculative (2)**
238:16,21
**speed (22)**
98:15,18;99:9;
130:13,15,22,24;
131:3,12;169:9,22;
170:1,5,8,11,13;
227:13,18;228:2,5,7,8
**speeding (2)**
118:11;228:18
**speedometer (1)**
138:2
**spell (3)**
21:5;74:14,17
**spend (1)**
250:5
**spent (1)**
244:22
**spine (1)**
24:1
**spoke (2)**
235:4;240:24
**spoken (6)**
176:24;209:4;
210:18;228:18;
270:12,15
**spots (1)**
294:3
**spring (1)**
213:3
**spur (1)**
106:8
**stamp (1)**
126:10
**stand (1)**
100:22
**standards (3)**
45:8,10;284:24
**standpoint (1)**
155:8
**stands (3)**
29:7;82:10;100:23
**start (15)**
25:23;85:9;98:13,
14;99:9,19;120:2;
166:8,9;167:3;
168:13;221:16;
229:22;233:3;272:17
**started (20)**
7:19;12:4,16,25;
38:12;40:7;52:20;
53:22,22;56:4,13;
62:13;87:23;88:10,
23;120:17;184:15,21;
228:21;268:17
**Starting (2)**
268:14;294:13
**starts (3)**
74:8,12;232:13
**State (25)**
12:16;37:20;48:6;
70:6;92:13,18,20,21;
108:20,22;111:6,10;
114:21;126:2;134:2;
141:23,25;211:11;
212:19;213:22;
233:14,17,19;243:9;
253:5
**Statement (4)**
93:4;94:25;95:6;
177:15
**states (2)**
53:17;254:11
**station (10)**
80:13,15;104:16,
18;111:6,11;114:21;
115:10;277:19;282:6
**stationary (1)**
222:4
**stationery (1)**
138:16
**stations (1)**
114:22
**status (1)**
174:19
**stay (8)**
19:16;20:8;52:2;
149:13,17,19;215:5,9
**Stayed (4)**
12:13;20:10;114:7;
215:7
**staying (4)**
215:12,17;247:5;
249:12
**Steadily (1)**
88:5
**steering (3)**
114:25;115:8;
153:12
**STEFFEN (3)**
8:1,1,14
**step (4)**
91:10;184:23;
262:16;280:7
**step-off (1)**
196:8
**stick (1)**
178:14
**sticker (3)**
133:21,23;134:2
**still (25)**
11:13;27:1;40:14;
43:15;45:22;57:15;
61:23;99:8;121:12;
124:21;173:22;178:3;
185:10;191:14,16,24;
199:12;208:23;
210:11;221:4;224:16;
231:1;234:20;251:4;
296:25
**stitched (1)**
260:9
**stitches (7)**
18:16,18,20;19:7;
178:21,25;179:1
**stitching (1)**
18:22
**stocks (1)**
26:20
**stolen (2)**
274:9,10
**stop (6)**
105:18;144:6;
205:15;221:16;225:4;
294:1
**stoppage (1)**
99:3
**stopped (2)**
100:1;185:13
**stops (1)**
98:16
**Storage (11)**
104:21,22;109:16;
163:4,5,6,6;164:17;
204:4;229:12;270:5
**stored (1)**
125:14
**straight (4)**
163:15;164:1;
168:10,15
**strap (2)**
59:11,13
**Street (4)**
144:3;165:2;
247:10;293:2
**strength (1)**
17:8
**stricter (1)**
225:7
**strike (2)**
93:15;207:2
**structure (4)**
146:10,14;230:19;
231:2
**stuck (3)**
142:14;183:14,14
**student (2)**
22:17;23:2
**study (1)**
163:14
**Stuff (13)**
119:12;142:13;
158:24;163:15;184:2;
244:17,17;255:16;
257:25;270:21,22;
274:5;282:19
**subject (1)**
248:4
**submit (1)**
63:6
**submitted (2)**
218:4;264:9
**submitting (1)**
286:8
**subpoena (5)**
148:17;187:11,18,
19;189:7
**subsequent (3)**
18:8;219:1;230:22
**substance (2)**
231:8,13
**substantive (1)**
300:18
**Suburban (3)**
193:15;217:10,11
**sudden (2)**
32:14;99:3
**sue (1)**
200:17
**sued (1)**
200:18
**suffered (1)**
210:8
**suffice (1)**
108:17
**sufficient (1)**
107:25
**suit (2)**
8:8;123:21
**summer (1)**
213:3
**Sunday (1)**
211:14
**supplies (1)**
125:10
**supply (2)**
143:19;157:15
**supposed (6)**
144:15;168:4,21,
24;192:19;278:6
**sure (79)**
12:8,14,23;13:25,
25;16:13;17:25;
25:24;32:22;36:23;
38:21;39:18,22;40:5;
46:18,18,20;49:20,20;
56:11,11;60:19;75:9;
81:1,1;84:7,7,8;
102:8;108:3;114:22;
124:25;131:1;133:15;
141:19;142:21;
143:10,17;154:21;
156:4,12;163:9;
164:9,9,10;165:16,16,
24;168:24;179:1,4,4;
186:23;207:4;217:3,
20;219:24;220:5,6;
221:9;228:9;231:20;
252:14;264:1,1,2,5;
268:15,16;275:20;
281:2;284:12,16;
285:5,17;293:5;
295:19;302:10,11
**surgeries (1)**
75:20

**surgery (2)** 59:19;210:15
**surplus (1)** 288:15
**surprise (4)** 205:16;247:20,22,25
**surrounding (1)** 239:16
**surroundings (1)** 239:14
**surviving (1)** 26:7
**Susan (2)** 8:2,14
**suspect (1)** 234:10
**suspended (1)** 199:9
**suspension (2)** 119:6,7
**sustained (1)** 218:10
**swear (1)** 7:14
**switch (1)** 295:22
**switched (1)** 276:18
**sworn (2)** 7:17;9:13
**system (21)** 95:12;132:8;134:25;135:2;136:3;137:8;139:16,18,19;140:5;154:20,21;155:5;219:6,21;220:12,16;222:18;223:25;227:9;228:22
**Systems (1)** 146:21

**T**

**Tab (19)** 35:8;45:3;63:20;69:16;92:23;110:13;129:6;140:21;146:9,9;148:22;154:12;155:20;179:9;185:22;194:6,7;197:14;202:6
**table (1)** 259:22
**tablet (2)** 220:17;221:24
**tablets (1)** 223:20
**Tabor (1)** 211:16
**tag (2)** 187:3;274:10
**Tahoe (1)** 217:10
**tailor (1)** 275:8
**talk (9)** 81:25;119:19;177:18;182:8;188:12;209:7;220:10;246:7;255:9
**talked (14)** 71:25;88:21,21,22;119:18;177:6;206:4;207:11,14;217:2;277:10;285:1;286:7;287:7
**talking (31)** 13:4;40:24;64:14;79:16;84:22;86:8;92:21;95:3;118:10,24;121:2;122:12;125:2;130:11;131:10;138:5;173:19,20;185:9;198:5;221:5;224:3;230:5;231:3;247:3;281:16;300:17,22;301:15,16;303:11
**Tango (1)** 82:8
**tanker (1)** 86:20
**tap (2)** 130:21;153:5
**taught (3)** 44:13,16,19
**tax (3)** 268:19,21;269:5
**taxes (2)** 285:24;295:23
**team (6)** 9:3;89:24;175:10,11;256:3;276:21
**Tech (1)** 142:22
**technology (4)** 226:1,23;229:17,22
**Telemarketing (1)** 12:5
**telematics (2)** 229:18,20
**telephone (3)** 112:7;170:25;259:13
**tells (2)** 29:6;295:7
**temp (1)** 65:17
**temporary (2)** 71:5;120:18
**Ten (2)** 54:14;191:4
**Tennessee (1)** 151:12
**term (8)** 17:5;83:18;109:1;121:1;134:17,22;139:15;220:6
**terminated (1)** 279:23
**terms (4)** 22:14;39:24;224:18;229:6
**test (10)** 40:2;43:19;47:12,14,22;48:17;61:23;163:14;233:12;284:15
**tested (2)** 43:19;76:20
**testified (5)** 7:17;241:13;258:20;276:23;285:8
**testify (1)** 241:9
**testimony (8)** 13:3;29:5;166:22;182:9;231:9,14;237:20;285:1
**testing (8)** 28:4,8;47:8,9;76:18;77:7,9,16
**tests (3)** 23:19;284:4,6
**Texas (14)** 9:25;10:2;12:9,12,13;13:4,7;63:3;212:21,23;213:5,6,7,10
**Texting (1)** 136:11
**Thelma (8)** 7:8;209:16;210:5,8,11,18,22;211:2
**Thelma's (1)** 209:19
**therapy (1)** 23:18
**thinking (1)** 38:22
**third (1)** 300:2
**thoroughly (2)** 163:18;291:20
**though (4)** 185:11;224:12;240:7;259:21
**thought (11)** 88:25;116:16;205:17;206:8,20;225:21,21;252:10;266:10,11,15
**threat (1)** 296:13
**Three (18)** 10:9;14:6;45:16,20,21;74:10;76:24;104:9;112:24;116:25;122:25;142:14;152:7;164:24;165:3;178:10;194:1;215:19
**threshold (1)** 86:5
**throughout (3)** 214:16;237:20;254:11
**throwed (1)** 116:15
**thumbing (1)** 195:21
**ticket (10)** 160:11,13,19,19,21,21,22;161:1,2;206:18
**tied (1)** 13:16
**ties (1)** 13:14
**tight (1)** 115:23
**tighter (1)** 48:8
**times (22)** 37:2;38:10;62:25;77:13;87:7;104:6;116:12;118:4;140:14;171:17;219:19;230:7;263:1,3;265:15;271:25;282:19;289:1;301:7,20;302:12,21
**timing (1)** 122:21
**tiny (2)** 187:13;194:10
**Tipton (6)** 7:8;8:17;188:12;207:20;208:10,14
**tire (18)** 111:23,23;113:6,6,9,12,12,22;114:10,13,16,24;115:2;133:5,8,18;142:19,20
**tires (4)** 101:6;102:13;291:10;300:11
**title (3)** 246:15,22,25
**titles (1)** 246:22
**TMM (9)** 82:5,6,16,21,23,25;83:5,12,14
**TMM/Mayflower/Moholland (1)** 128:19
**TMM's (1)** 83:21
**TNN (1)** 82:4
**today (14)** 9:1;208:13;209:13;210:4;211:1;220:7;230:14;231:7,14;232:18;235:25;237:21;244:6,23
**Todd (18)** 7:20;37:12,23;76:23;89:6;91:15;92:11;95:23;117:4;123:12;127:1;173:6;201:19,20;205:3,21;241:23;274:20
**together (6)** 88:24;121:9;122:8;175:14;259:24;293:6
**told (32)** 42:7;52:16;56:24;57:1,2;61:13,16;62:5;69:1,4;73:1;78:18;84:23;104:13;124:5;164:1;166:21;176:22;206:18,20;212:20;213:21;215:23;226:23;232:7;245:18,23;246:3;254:5;258:15;268:6;274:8
**tolls (2)** 263:2,4
**tomorrow (1)** 220:7
**took (18)** 19:7;45:21,23;52:21;53:2;61:7,24;76:1;97:24;106:1;115:9;178:21;179:1;181:4;243:20;274:4;292:7;295:23
**top (17)** 69:16;110:20;127:5;130:22;133:14,20;141:21;149:4;156:3;157:17,18;159:15;160:13;161:2;195:11;199:11;263:24
**topics (1)** 214:17
**toss (1)** 258:12
**total (4)** 45:16;82:11;106:17;160:23
**touch (2)** 57:17;244:18
**touched (1)** 140:7
**tow (2)** 141:13;142:3
**toward (1)** 142:3
**towards (2)** 17:20;157:18
**town (6)** 92:14;99:17;121:18;122:1,19;243:10
**TPU (1)** 71:5

**track (3)**
175:5;230:2,5
**tracked (2)**
219:24;229:17
**tracking (2)**
229:21,22
**tractor (85)**
28:11,15,18;33:17;36:12,15,22;43:7;44:12,14,17,20;53:13,15;58:5,8,12,15;65:23;68:12;92:2,2,7;97:9;103:17;105:8;110:22;118:8;125:3;129:9,11,12;130:1,3,4,6;132:23;133:12,17;135:7;140:8;143:5,7,8;145:11;153:1,7;169:22;187:4;189:22;195:20,24;196:2;197:6;219:7,12;220:7;222:22;224:8;225:4;226:23;227:6,9,22;229:12,17,23;237:16;243:22;244:3;248:12;250:11,13,16;251:2;265:16;271:9;274:8;296:25;301:22;302:13;303:12,24;304:2,17
**tractors (4)**
67:22;123:2;130:5;135:24
**traffic (7)**
99:12;135:20;179:10;183:25;294:1,20,22
**trailer (84)**
28:12;32:4,5;44:14,17,20;53:13,15;65:23;68:12;102:21;105:4,9,12,13,16;111:13,23;113:9,10;114:24;118:8,18,22;141:14,15;142:13,19;143:4,6,8,13,15;144:5,7,13;145:1,11;159:4,7,8;160:23;161:14,15;162:11;164:13;166:12,15;169:23;188:3;189:22;196:2;227:6;252:19;259:7,8,9;274:5;278:18;279:3,4,6,7,9,10;280:21,22,23;291:1,5,6,9,19;295:2,3,4,7;298:24;299:6;300:2,2,3,12;302:1
**trailers (7)**
33:18;109:19;123:2;143:19;144:10;145:9;299:24
**trained (2)**
226:2;299:19
**training (18)**
34:3;36:4,5,7;43:7;44:1,4;46:7,12,16;47:5,25;48:19;51:8;145:10;232:12;236:11,13
**Trans (15)**
112:8,9,15,21,25;113:19;115:9,11;116:18,20;117:12;140:9,15,21;145:13
**transcript (2)**
264:14,20
**Transfer (12)**
39:20;56:18;57:14;58:22;65:1,1,8,12;243:12;269:18,20;270:3
**transferred (1)**
19:25
**Transit (11)**
66:10,15;67:4;93:5;95:1,6;110:16;126:20;132:11;133:5;200:22
**Transit/Moholland (1)**
96:21
**transmission (1)**
110:21
**Transport (1)**
269:22
**Transportation (6)**
53:8;64:23;139:25;146:19,21;269:24
**transported (1)**
252:19
**travel (3)**
25:7;194:12;228:1
**traveling (1)**
239:21
**travels (1)**
174:20
**tread (1)**
133:10
**treat (1)**
23:8
**treated (2)**
18:12;19:1
**treating (3)**
22:14;208:23;210:12
**treatment (9)**
17:14,17;18:9,14,15;19:4;24:15;210:15;219:3
**Tree (1)**
12:7
**trial (7)**
20:18;186:3,7,10,13,17,21
**tricky (2)**
114:11;203:7
**tried (2)**
209:7;210:21
**trip (49)**
85:10;103:3,13;106:24;107:4,25;108:18,19;118:20,24;119:8;135:2;138:4;166:8;167:4,9,14,16;211:20;213:13;225:22;245:2,6;249:6;252:18;271:8;275:25;277:12,16,23;278:25;279:11,20;281:5,11,16,18;283:5;285:16;286:21,24;287:21;288:4;294:10,24;297:14,16,20,22
**trips (10)**
122:21;146:2;167:24;211:10;212:1,19;213:22;263:2;271:23;278:17
**truck (71)**
12:23,24;28:8;33:9,10;43:7;45:23;53:14;58:5;85:8;86:20;109:25;115:5;130:23;131:12,16;138:19;139:21;143:12;172:5;191:7,8,9,10,14;192:1,6;193:5,22;201:15;202:22;203:2;217:2,3;220:3,8,20;221:4;222:1,2,4;224:13,16,21;225:11;229:21;242:15;257:2;259:6,8;265:6;271:7,18;276:6;280:7;281:20;282:2,4,19;290:16,17,21;291:1,4;293:7,13;294:8;298:1;302:3,23;304:7
**trucker (1)**
285:21
**trucking (7)**
34:2;52:17;53:4;54:11;55:18;64:13;282:20
**trucks (5)**
13:1,1;109:7;239:4;280:6
**truck's (1)**
294:5
**true (9)**
179:21,23;239:7;248:14;300:15;302:9,24;303:4,13
**truth (2)**
9:12;78:13
**truthful (1)**
9:8
**try (6)**
83:18;124:23;159:8;185:24;231:11;286:7
**trying (8)**
13:11;72:15,17;131:25;187:10;276:4;281:24;299:17
**T-shirt (2)**
258:14;260:1
**T-shirts (6)**
258:5;288:10;289:2,3,8;297:4
**tunnel (2)**
17:5,6
**turn (6)**
93:1;107:7;108:18;237:7;258:23;296:18
**turned (1)**
213:15
**twice (3)**
13:6;46:14;77:14
**Twitter (1)**
171:8
**two (36)**
12:6;43:18;53:20;54:13,15,16,16;62:11;74:11;86:1;113:9;116:25;122:25;151:17;164:23;184:13;195:5;204:6;213:11;216:1;217:22;224:10,11;234:5;252:21;258:4;259:22;261:6;262:7;277:22;278:15;279:2;283:7,19,22;300:25
**type (29)**
18:22;22:7;53:10;57:25;69:13;81:17;102:20;104:7,12;110:21;111:11;127:12;154:21;157:5;221:18;222:11;223:7;224:3;228:21;240:5,13;247:17;254:7,14;260:17;264:10;291:11,12,23
**types (4)**
26:8;224:10,11;259:23
**typical (1)**
86:1
**typically (2)**
255:11;291:18
**Tyrone (2)**
273:25;274:2

**U**

**UA (4)**
11:4;71:4,7,9
**unable (1)**
77:19
**uncle (1)**
211:23
**under (17)**
9:16;31:9;45:17;55:6;69:16;94:8;98:17;133:21;185:23;187:22;197:14;243:12;252:5;280:3;281:1;285:9;296:7
**underneath (2)**
133:10;185:2
**understandable (1)**
243:1
**understood (2)**
23:20;299:21
**unfolded (1)**
250:7
**unfortunately (1)**
122:2
**Unh-unh (1)**
260:16
**UNIDENTIFIED (3)**
24:21;25:1,13
**UniFirst (1)**
260:10
**uniform (18)**
91:8,10;179:10;203:18,21;204:16,18,23;205:14;256:1,4,18;260:18,22;261:15;287:24,25;303:11
**uniforms (12)**
49:23,25;50:5,14,19;90:23;125:6;174:2;255:9;256:5,9,19
**UniGroup (20)**
35:19,21,24;45:4,12;51:5;63:21;68:16;76:17;83:22;103:24;105:2,4;112:22,25;232:15,17,21,25;233:5
**UniGroup/Mayflower (2)**
47:6;95:11
**UniGroup's (1)**
147:1
**unique (1)**
222:11
**United (1)**
254:11
**unless (9)**
29:6;59:18;90:19;105:17;115:7;122:3;255:21,21;263:5
**unload (1)**
86:12
**unloaded (1)**
56:9
**unloading (1)**
87:8
**unsafe (3)**
31:18;32:8;237:15

**unwrap (1)**
86:12
**up (139)**
12:21;13:2;22:17;23:5,5,24;25:5;27:7,13;32:21;42:24;48:7,8;53:2,2,10;54:18;60:22;61:1;64:19;66:8;67:2;72:10;77:1,1;78:20,22,23;79:9;80:15;83:11;85:8;95:2;98:15;99:9;105:14,18;106:10,12;111:12,12,22;114:15;121:7;122:22;125:24,25;130:12;131:4,7,8;132:22;133:11;134:14;137:7;138:22,22;142:13,14;144:6,13;145:2,5,20,20;146:1;153:4;156:20;158:1,4,7,12,24;159:24;160:4,20;161:21;162:10,19;163:12;166:6,12,15,19;175:9;178:2;181:25;184:25;188:3;195:22;196:5,19;200:10;201:12;202:2;203:1,13,15;216:14;219:22,22;223:15;224:24;227:9;229:13;237:12;243:3;247:5;248:14;249:9,14;250:15,22;253:1,2,4,5,7;254:8;256:17,21;258:13;262:17;263:6;272:18;273:17;275:24;276:18,22;278:2,21;279:5,8;282:9,13;284:23;288:16;289:6;296:3
**upcoming (1)**
271:23
**updates (1)**
174:19
**upon (2)**
218:9;234:11
**upper (2)**
133:10;212:13
**urgency (3)**
234:1,6,12
**urgent (1)**
99:15
**urinalysis (1)**
40:2
**urine (2)**
76:15;77:7
**USAA (11)**
193:4,6,21;216:1,5,12,13,21,25;217:19,23
**use (27)**
16:20;17:8;78:17;83:19;87:19;111:12;121:1;132:23;134:17;139:5,15;168:9;174:14;176:16;215:21;218:15;219:22,25;220:7,8;224:20;225:25;235:2,18;283:4;301:10,12
**used (11)**
97:12;109:1;135:19;139:7,23;220:7,23;224:14,14;260:2;280:8
**user (1)**
222:11
**uses (2)**
139:20;220:2
**using (8)**
71:6;83:18;170:25;224:17;228:21;280:2,7;281:5
**using/possessing (1)**
186:6
**usual (1)**
276:16
**usually (7)**
17:6;159:7;277:4,25;288:25;293:17,17
**UTC (1)**
266:20
**utilize (2)**
222:18;302:22
**utilized (1)**
244:24
**utilizing (1)**
224:9

**V**

**VA (1)**
218:15
**vacation (2)**
213:13,14
**valid (1)**
191:24
**Van (4)**
66:15;67:9;263:12;270:1
**Vanliners (3)**
124:11,12,14
**variety (1)**
256:6
**various (5)**
54:2,3;69:11;104:5;108:1
**vehicle (54)**
31:17,21,24;36:25;37:3,3;45:8,10;65:8;92:8;96:15;100:20;115:12;117:2;129:21;130:23;131:13,21,22;140:5;145:5;155:7,9;172:7;176:19;179:13;180:4;183:22,25;186:2,5,16,24;191:25;193:16,23;197:7;208:2,7;209:23;217:6,12,15;224:15,23,24;225:13;229:18,19;236:17;239:16,17;250:20;299:9
**vehicles (19)**
44:9;68:1;104:25;105:2;129:24;131:19;135:24;142:4;190:20,22;192:20;193:14,25;194:4;215:25;216:1,24;217:22;236:2
**vehicle's (1)**
99:21
**verbal (3)**
88:15,16;140:2
**verbally (2)**
102:7;226:6
**verification (2)**
159:22;160:3
**version (3)**
71:18;148:21;267:12
**versus (7)**
86:19;98:17,18,22;155:2;224:20,25
**vet (1)**
216:17
**Via (1)**
4:3
**video (2)**
202:5;229:7
**Videographer (23)**
4:4;7:13;25:19;51:11,15,18;84:15,18;123:23;124:1;182:19,22;188:24;189:2;198:11,14;214:4,7;262:18,21;264:22,25;305:5
**view (1)**
25:16
**viewed (1)**
287:14
**violate (1)**
225:5
**violation (1)**
174:1
**violence (5)**
41:10,12,13,14;43:3
**Virginia (62)**
10:20;11:7;12:5,10,12,15;25:7;39:20;43:10,12,13;51:24;53:9;56:5,18;57:14;58:22;64:24,25;65:1,8,12;70:7;92:21;104:6,7,8;105:17;107:23,24;108:13,13;120:20,22;121:8,12,13;144:3,4;166:1;168:7;192:9,20;200:6;211:6,11;212:2,20;213:21,23,23;215:8;218:22;233:20;243:11;247:5,10;249:10;259:2,3;278:22;293:3
**visibility (1)**
73:5
**visible (1)**
291:12
**visibly (3)**
176:2,5;303:13
**vision (7)**
60:1,5,7;72:4,21;73:9,14
**visit (8)**
18:4,6;19:2,10;22:15;23:23;211:21;213:15
**visits (1)**
21:21
**visual (2)**
103:5;300:17
**visualize (2)**
299:1,3
**Voyager (1)**
141:15

**W**

**wages (1)**
268:3
**wait (3)**
113:20,21;116:7
**Walk (2)**
16:4;191:5
**walk-around (1)**
291:19
**walks (2)**
16:5,5
**Walmart (2)**
56:4;65:18
**Walter (1)**
240:9
**wants (4)**
7:21;162:2,8,8
**warehouse (22)**
56:5;65:18;80:14;86:11;94:23;106:18;109:16;120:12;164:23,24;165:3,4,7,8;168:8;175:10,15;191:4;247:11;276:20;277:18;279:12
**Warwick (3)**
75:17,17,18
**W-A-R-W-I-C-K (1)**
75:18
**watch (1)**
251:8
**Water (2)**
12:22;52:23
**way (39)**
11:3;13:2;15:1;26:10;55:17;68:11;97:22;99:16,17;100:21;102:24;105:18,20,22;106:3;122:23,24;132:14;138:25;144:6;153:14;154:23;156:5;159:9;184:6;209:2;215:8;216:20;224:25;228:10;237:4;294:4,12,14;296:3,18;299:20,23;301:1
**ways (2)**
14:16;291:9
**weaker (1)**
17:10
**wear (17)**
50:4;59:17;60:12,15;72:14;73:6,6;90:22;91:2,5;255:24;257:2;259:23;260:23;261:8;289:5;302:22
**wearing (14)**
50:7,12,13,18;59:21,23;205:14;245:6,10,15;261:5,15,17;288:9
**weather (1)**
168:19
**web (1)**
259:14
**week (8)**
88:8;116:24;167:20,25;251:23;277:7;279:2;303:24
**weeks (10)**
44:1;52:21;55:10;56:2;84:10;104:9,9;116:25,25;122:25
**weigh (7)**
106:15;111:5,11;114:21,22;115:10;125:21
**weight (21)**
81:18;86:7,7;106:16,16,17;125:24,25;126:1;160:11,13,19,21,22,23;161:1;162:4,8;206:5;239:11;272:15
**weren't (5)**
58:24;184:7;200:2;251:7;298:5
**West (7)**
8:2,14,15;12:4;53:8;64:24;184:12
**whatnot (1)**
282:22

**what's (28)**
15:25;22:9,18;54:21;64:11;66:19;72:7,17,18;74:4,4;94:4;97:6;100:17;135:18;161:10;162:5,15;164:8;172:23,25;174:17;195:1,6;244:14;265:20;272:4;293:1
**whatsoever (2)**
74:25;79:13
**wheel (5)**
114:25;118:18,22;142:23;153:12
**wheels (1)**
115:4
**Whenever (2)**
123:12;155:8
**whichever (1)**
130:23
**White (7)**
11:12,13;13:20,21;14:5,8,12
**whole (2)**
17:9;156:24
**wholly (1)**
112:22
**who's (9)**
31:10;94:19;156:2;160:7;193:20;213:7;240:8;270:15;274:17
**whose (9)**
149:1;150:10;152:13,16;194:16,18;266:16;284:16;285:15
**wide (7)**
18:17;178:1,11,13,17,18,24
**wider (1)**
132:4
**wife (47)**
7:1;13:11,18;21:1,1;26:14;27:16;37:17;41:15;42:9;43:3,4;52:5;63:2;71:14,14;88:21,22;120:24;148:3,5;153:15;180:8,10,22,23;181:14;183:13;184:16;192:23;211:18;212:15;216:1,3,11,20;217:13,14;241:1,13;242:8,11;243:16,20;244:17;254:21;270:15
**wife's (9)**
15:17,18;150:5,6,17;151:20;218:17;241:16;266:12
**William (1)**
8:18
**Williams (3)**
57:10,11;263:25
**Williamsburg (7)**
12:6,12,20,21;13:14;15:13;52:24
**W-I-L-L-I-M-S (1)**
57:12
**willing (1)**
253:6
**wing (1)**
101:8
**within (13)**
62:9;95:11;116:24;132:8;135:25;140:4;183:16;227:12,12;233:19;238:13;304:5,17
**Without (1)**
161:22
**witness (36)**
7:14;29:14;30:11;79:3;91:16;92:13;103:9;109:23;136:10;140:25;146:11;169:25;170:7;176:24;180:15,18;182:10;192:14;203:6;204:10;205:5,23;238:24;241:22;242:1,24;243:1;257:12;274:16;289:14,19,23;290:1;295:10;301:24;303:18
**Wolf (1)**
270:3
**Woodbridge (4)**
144:4,5;259:2;274:2
**words (2)**
86:6;105:21
**wore (4)**
203:18;261:4;262:1;287:25
**work (59)**
12:3;15:1;36:18;48:10;49:21;54:20;55:5;57:13,15;63:1;69:12;81:3;82:25;91:3;98:2;101:20;120:14;121:9,17,17;122:3;130:20;131:5;142:3,16,18;145:24;146:23;203:22;215:8;217:4;220:18;226:8;234:8,15;241:13;242:5;246:9,23;247:6,15,17;249:22;251:19,23;252:11,14;253:8;254:2;256:18;262:9;265:6;267:25;272:25;278:15;282:20;283:17;296:3;300:14
**worked (28)**
10:11;12:18,22;47:12;54:9;55:6;56:12,16;57:14;64:8;78:16;83:10,11;85:23;90:18,19;120:9,12;121:10;122:1;156:24;224:18;225:18;242:4;252:12;256:2;296:8;301:7
**workers' (5)**
77:22,25;124:6;267:17,20
**working (44)**
12:4,7,7,10,16,19,20;32:11;52:22;56:4,13;62:13;65:17;86:23;87:23;88:1,2,3,10,23;118:2;120:17;122:4,5,8;130:3;163:25;164:6;203:19;204:1,15,24;205:17;241:16;255:25;259:24;261:22;262:1;294:12;296:4,7;300:6,11;302:7
**workman's (2)**
124:11,13
**work-related (1)**
59:24
**works (5)**
49:21;111:15;112:19;222:24;274:2
**workweek (1)**
282:22
**world (4)**
49:19;71:9;97:6;101:15
**worrying (1)**
233:16
**worse (2)**
59:18;60:10
**worsening (1)**
72:20
**worst (1)**
59:18
**wound (1)**
19:7
**Wow (1)**
205:17
**wreck (56)**
17:11,15;50:8;58:9;68:6,13,24;78:1,20,24;79:8,9,17;84:5;92:3,17;93:11;108:6;110:25;127:9;128:7;135:22;139:6;143:14;146:3,14;147:20;148:17;153:25;157:3;159:10;164:13;166:6,9;167:25;168:17,17;170:4,16,22;171:1,11;174:20;175:20,23;176:11,14,18,20;177:11;179:18;190:17,21;297:19;302:13;303:24
**write (1)**
102:25
**writing (3)**
146:18;187:13;259:4
**written (8)**
101:12,16;103:2,21;189:8;197:15;264:20;295:4
**wrong (11)**
44:22,25;111:21;143:3;145:25;174:9,10;189:12,18;204:14;273:5
**wrote (3)**
206:8,17;246:8

## X

**XL (1)**
258:5

## Y

**yard (7)**
129:24;219:24;247:12;249:16,22,23;282:14
**yards (1)**
237:2
**year (27)**
10:4,24,24;12:8,14;14:10;26:7;38:10,11;42:2;46:14;56:6;62:9;71:11,12;75:8;87:14,14;97:20;117:9;127:13;217:7;268:7,14,17;279:24;289:10
**years (22)**
10:9;12:6;15:24;36:20,21;37:21;52:1;53:20;54:13,14,16,16;62:11;86:17;97:15,16;119:22;129:17;156:23;157:1;216:13;239:25
**yesterday (1)**
220:8
**you-all (5)**
21:11;120:7;123:21;148:10;149:13
**young (5)**
11:4;71:16;184:12,13,14
**youngest (1)**
14:10

## Z

**zone (1)**
131:7
**Zoom (7)**
4:3;7:12,21;24:18,19;274:18;275:17

## 0

**0 (1)**
145:18
**000077 (1)**
93:2
**001428 (1)**
66:22
**0034 (1)**
187:11
**0123 (1)**
194:24
**0135 (1)**
194:12
**0333 (1)**
145:18

## 1

**1 (4)**
64:5;149:3;194:8;200:10
**1:33 (1)**
124:2
**10 (6)**
45:15;146:6;148:16;151:17;157:21,22
**10,000 (1)**
162:9
**10:00 (3)**
160:17,18;161:4
**10:30 (1)**
25:20
**1099 (2)**
268:10,11
**1099s (1)**
268:18
**11 (6)**
62:6;134:12;148:13;151:21;154:12;155:16
**11:00 (1)**
51:16
**11:14 (1)**
51:19
**11:53 (1)**
84:16
**110 (1)**
131:14
**12 (4)**
152:7;154:9;155:20,21
**12/15/2015 (1)**

263:16
**12:05 (1)**
84:19
**12:56 (1)**
123:24
**121 (1)**
195:6
**125563 (1)**
132:17
**13 (4)**
155:13;179:9;185:22;265:25
**13th (1)**
93:7
**14 (5)**
14:11;152:20;153:17;179:6;194:6
**14th (1)**
160:15
**15 (7)**
45:15;153:18;197:10,14;199:3,4;291:21
**158 (1)**
126:11
**159 (1)**
127:22
**16 (8)**
160:16;199:2;202:8,10,14,21;205:12;248:6
**16,000 (1)**
253:3
**17 (3)**
258:4;260:6;305:8
**175 (1)**
152:18
**17th (6)**
110:25;113:17;117:9,16;126:16;127:12
**18 (1)**
115:4
**18:23:06 (1)**
152:14
**18:50 (1)**
152:17
**19 (2)**
14:10,10
**1996 (3)**
10:5,6,25
**1999 (8)**
11:1,2,6,22;193:24;217:8,11;290:18
**1st (66)**
16:24;17:12;40:18;50:8;58:9;66:20;68:6,13,24;74:22;75:2;78:1;79:14,22;83:11;84:6;86:15;94:5;97:9;103:4;108:6;118:24;122:23;126:22;127:9;128:7;132:22;133:13;143:14;146:3,14;147:21;152:12;157:3;165:21;173:9;191:19;199:15;200:13;201:3,9,14;202:17,24;203:22;243:17,22;244:3;245:23;246:4;248:15;250:7;261:15;274:6;290:14;291:24;292:9,12;294:16;297:11,19;301:2,8,20;302:14;303:25

## 2

**2 (4)**
35:8;45:3;63:20;66:3
**2:46 (1)**
182:20
**2:50 (1)**
266:20
**2:54 (1)**
182:23
**20 (6)**
14:9,10;55:10;56:2;62:5;213:19
**20/20 (2)**
60:4;73:12
**2000 (3)**
38:18;193:2;268:15
**2003 (1)**
12:17
**2004 (2)**
12:17,17
**2009 (1)**
193:2
**2010 (1)**
12:19
**2011 (6)**
12:19,25;13:1;62:7;64:22;199:6
**2012 (4)**
14:1,15;15:7;42:8
**2013 (1)**
64:22
**2014 (4)**
56:7;62:14;179:14;241:17
**2015 (9)**
35:18;38:20,24;39:2;65:10;67:19;241:17;263:24;295:17
**2016 (1)**
65:16
**2017 (7)**
38:18,19,22;47:18;57:23;65:16;295:17
**2018 (5)**
62:23;66:20,21;67:20;263:25
**2021 (6)**
97:20;155:2,10;156:6;171:18;197:17
**2022 (72)**
13:2;16:19;20:13;21:19;46:17;47:2;50:19;68:7,13,13;69:18;75:8;76:4;77:11;86:15;93:7;94:5;104:2;110:25;117:9;121:2;126:16,22;127:13;128:7;141:21;155:2,10;156:6;171:18;173:10;191:19;197:18;199:15;200:10,14;201:4,9,14;202:17,24;203:22;204:24;211:7;213:24;243:17,22;244:3;245:23;246:4;248:15;250:8;274:6;280:12;283:2,12,16;284:17,21;285:20;286:25;289:8,10;290:14;291:24;292:9,12;294:17;301:8,20;302:14;303:25
**2023 (2)**
16:15;212:25
**21 (2)**
46:19;154:1
**2'15 (1)**
45:22
**22 (1)**
14:9
**220 (3)**
144:3;247:10;293:2
**23607 (1)**
51:24
**2438 (1)**
161:14
**24-hour (1)**
200:9
**24th (2)**
165:15;197:17
**251 (1)**
143:12
**256 (1)**
151:24
**26 (1)**
56:1
**273 (1)**
194:8
**280.55 (1)**
96:5
**29th (1)**
197:17
**2nd (3)**
35:18;127:8;277:23

## 3

**3 (2)**
66:25;69:16
**3,200 (1)**
86:9
**3:03 (1)**
188:25
**3:08 (1)**
189:3
**3:20 (1)**
198:12
**3:21 (1)**
198:15
**3:35 (1)**
214:5
**3:38 (1)**
214:8
**30 (1)**
123:16
**3005 (1)**
51:23
**30-minute (1)**
134:13
**30th (4)**
69:18;165:23;167:13,16
**320-6533 (1)**
150:4
**333 (1)**
133:21
**34 (2)**
187:16,19
**349 (1)**
149:25
**349-0308 (1)**
152:9
**35 (2)**
123:18,19
**35,420 (1)**
161:1
**3542 (1)**
141:13
**3543 (1)**
142:17
**36 (1)**
188:7
**37 (1)**
93:21
**38 (1)**
93:21
**39 (1)**
93:21

## 4

**4 (2)**
70:17;92:23
**4:00 (1)**
160:16
**4:36 (1)**
262:19
**4:42 (1)**
262:22
**4:45 (2)**
264:23;265:1
**41 (3)**
93:25;94:4;95:16
**44,212 (1)**
161:2
**45 (2)**
188:15;189:7
**4540 (1)**
251:22
**49 (1)**
188:22

## 5

**5 (3)**
66:20;97:3;110:13
**5/1/2018 (1)**
263:18
**5:45 (2)**
305:6,9
**50 (3)**
71:5,18;189:7
**55 (2)**
131:7,9
**573-289-4555 (1)**
150:9
**58 (1)**
293:18

## 6

**6 (3)**
110:10;126:9,10
**6/24/2022 (1)**
251:18
**6:28 (2)**
292:13;297:11
**6:50 (1)**
266:18
**60 (1)**
131:8
**619 (1)**
151:3
**664 (2)**
293:18,18
**67 (1)**
131:16
**6th (1)**
20:5

## 7

**7 (5)**
126:6;128:24;129:6;151:14;202:6
**7:55 (1)**
69:20
**70 (3)**
167:21,22;227:18
**73A (1)**
142:4
**75 (1)**
131:2
**757 (5)**
149:25;152:12;

266:8,9;267:6
**757-256-5792 (1)**
151:24
**757-298-2967 (1)**
150:16
**757-320-0975 (1)**
150:14
**757-324-4119 (1)**
152:25
**757-324-6966 (2)**
148:19;149:5
**757-660-8489 (1)**
151:15
**757-734-0308 (1)**
149:24
**757-771-5110 (1)**
152:18
**757-800-6254 (1)**
150:12
**757-900-6482 (1)**
152:15
**757-998 (1)**
152:24
**771-5110 (1)**
266:7
**78 (2)**
93:15;95:3
**79 (2)**
93:24;95:14
**7th (4)**
20:3,5,7;141:21

## 8

**8 (3)**
129:3,6;140:21
**817 (1)**
150:24
**817-380-3818 (1)**
150:24
**817-601-1903 (1)**
150:21
**850 (1)**
151:11
**866 (1)**
152:1
**866-512-5091 (1)**
149:22
**8th (2)**
20:3,7

## 9

**9 (3)**
140:18;146:9,9
**9:42 (2)**
153:24;154:1
**904 (2)**
149:11;152:22
**904-428-7193 (1)**
149:9
**904-888-5894 (1)**
150:19
**911 (1)**
177:13
**936 (1)**
152:23
**936-553 (1)**
153:19
**95 (10)**
111:7;168:10,11,11,13;169:2,21;189:21;293:18,19
**99 (1)**
193:15