**In The Matter Of:**

*Kyle Sloan, et al. v*
*Nicholas Burist, et al.*

---

*Rob Garr*
*April 27, 2023*
*30(B)(6) Joe Moholland Inc.*

---

*Janice D. Hayward, RMR*
*Independent Court Reporter*
*843.478.6756*
*JanHayward1@gmail.com*

Original File 04-27-2023 Moholland.txt
Min-U-Script® with Word Index

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

BRUNSWICK DIVISION

CASE NO. 2:22-CV-00076-LGW

KYLE SLOAN, INDIVIDUALLY; AND AS PERSONAL REPRESENTATIVE OF THE ESTATES OF RYLIE SLOAN AND JAMIE SLOAN; KYLE SLOAN AS SURVIVING SPOUSE OF JAMIE SLOAN; KYLE SLOAN AS SURVIVING PARENT OF RYLIE SLOAN; AND SUSAN WEST, INDIVIDUALLY; AND AS THE NEXT FRIEND AND NATURAL GUARDIAN OF K.W., A MINOR, )

Plaintiffs, )

vs. )

NICHOLAS BURIST; LOCKE RELOCATIONS LLC; NATIONAL INDEMNITY COMPANY; MAYFLOWER TRANSIT LLC; JOE MOHOLLAND, INC.; WESCO INSURANCE COMPANY; AND XYZ COMPANIES 1-3, )

Defendants. )

------------------------------------

ZOOM VIDEOCONFERENCE DEPOSITION

30(B)(6)JOE MOHOLLAND INC.

WITNESS: ROB GARR

DATE: Thursday, April 27, 2023

TIME: 1:16 P.M.

LOCATION: Zoom Videoconference

REPORTED BY: KATIE L. GRAFF

FOR: Janice D. Hayward, RMR
NCRA Registered Merit Reporter
240 Oak View Way
Summerville, South Carolina 29483
843.478.6756
JanHayward1@Gmail.com

Any Court, party, or person who has purchased a transcript, may, without paying a further fee to the reporter, reproduce a copy or portion thereof as an exhibit pursuant to Court order or rule or for internal use, but shall NOT otherwise provide or sell a copy or copies to any other party or person.

APPEARANCES

FOR THE PLAINTIFFS

T. Ryan Langley
rlangley@hodgelawfirm.com
Hodge & Langley
229 Magnolia Street
P.O. Box 2765
Spartanburg, South Carolina 29306

FOR THE PLAINTIFFS

Matthew Foss
Mfoss@hodgelawfirm.com
Hodge & Langley
229 Magnolia Street
P.O. Box 2765
Spartanburg, South Carolina 29306

FOR THE PLAINTIFFS

Joseph R. Padgett
jpadgett@rodenlaw.com
Roden Law
333 Commercial Drive
Savannah, Georgia 31406

FOR THE PLAINTIFFS

Josh Dorminy
jdorminy@rodenlaw.com
Roden Law
333 Commercial Drive
Savannah, Georgia 31406

FOR THE DEFENDANT JOE MOHOLLAND INC.

Matthew R. Sessions
msessions@mkblawfirm.com
McMickle, Kurey & Branch, LLP
217 Roswell Street
Alpharetta, Georgia 30009

FOR THE DEFENDANT LOCKE RELOCATIONS LLC

James L. Elliot
jelliott@ebbglaw.com
Elliot & Blackburn
3016 North Patterson Street
Valdosta, Georgia 31602

FOR THE DEFENDANT NICHOLAS BURIST

George Duncan
gduncan@dcplaw.com
Dennis, Corry, Smith & Dixon, LLP
900 Circle 75 Parkway, Suite 1400
Atlanta, Georgia 30339

FOR THE DEFENDANT NICHOLAS BURIST

Benjamin Stahl
bstahl@wachp.com
Waldon Adelman Castilla Hiestand & Prout
900 Circle 75 Parkway, Suite 1040
Atlanta, Georgia 30339

FOR THE DEFENDANT JOE MOHOLLAND MOVING

Warner Fox
wfox@hpylaw.com
Hawkins Parnell & Young, LLC
303 Peachtree Street NE, Suite 4000
Atlanta, Georgia 30308

FOR THE DEFENDANT MAYFLOWER TRANSIT LLC

Brantley Cole Rowlen
brantley.rowlen@lewisbrisbois.com
Lewis Brisbois Bisgaard & Smith
600 Peachtree Street, Northeast Suite 4700
Atlanta, Georgia 30308

FOR THE DEFENDANT MAYFLOWER TRANSIT LLC

David L. Luck
david.luck@lewisbrisbois.com
Lewis Brisbois Bisgaard & Smith
2 Alhambra Plaza, Suite 1110
Coral Gables, Florida 33134

ALSO PRESENT

Susan West

INDEX TO EXAMINATIONS


| | |
|---|---|
| Examination By Mr. Langley | 8 |
| Examination By Mr. Luck | 189 |
| Examination By Mr. Sessions | 202 |
| Examination By Mr. Langley | 203 |


INDEX TO EXHIBITS

Plaintiffs' Exhibits


| | | |
|---|---|---|
| 1 | Notice of Deposition | 9 |
| 2 | Police Report | 13 |
| 3 | Tractor Pictures | 25 |
| 4 | Agency Agreements | 35 |
| 5 | Bates 271 | 51 |
| 6 | Bill of Lading | 78 |
| 7 | Mayflower Organizational Chart | 111 |
| 8 | Email from Mayflower | 116 |
| 10 | Hours of Service | 170 |
| 11 | Truck Inspection | 176 |


INDEX TO EXHIBITS

Defendants' Exhibits


| | | |
|---|---|---|
| 9 | Correspondence | 135 |

(The deposition begins at 1:16 PM.)

THE VIDEOGRAPHER: Now on the record at 1:16 p.m. Eastern Standard Time on April 27th, 2023. This is the 30(b)(6) video deposition of Joe Moholland Inc. Counsel has waived the reading of the caption.

Counsel, please state your appearances for the record.

MR. SESSIONS: Matt Sessions, counsel for Joe Moholland.

MR. LANGLEY: Ryan Langley, counsel for Kyle Sloan, Rylie Sloan, Estates of Rylie Sloan and Jamie Sloan, and Karen West.

MR. FOX: Warner Fox, also counsel for Joe Moholland.

MR. STAHL: Ben Stahl covering for Brian Williams. Counsel for Nicholas Burist.

MR. DUNCAN: George Duncan, covering for Grant Smith. Also counsel for Burist.

MR. ELLIOT: Jim Elliot, counsel for Locke Relocations LLC.

THE VIDEOGRAPHER: Okay. If you'll

swear or affirm the witness, please.

(ROB GARR, after being sworn/affirmed via Zoom, testified as follows:)

EXAMINATION

BY MR. LANGLEY:

Q All right, Mr. Garr. My name is Ryan Langley. We met a moment ago over the -- the computer here. You have been designated as a 30(b)(6) corporate representative for this deposition today. Do you understand that?

A I do.

Q And for what entity are you appearing today?

A Joe Moholland Inc.

Q Any other entities?

A No.

Q Okay. You've sworn an oath to tell the truth. Do you understand that, that you have a moral and legal obligation to give me true and accurate answers?

A Yes.

Q And that's not just in your personal capacity, but in your capacity as the corporate representative witness for Joe Moholland Inc.?

A Yes.

Q And in the -- the capacity as -- as corporate representative, do you understand your testimony is binding on the corporation and that you are responsible to have educated yourself on all matters known to the corporation?

A Yes.

Q And so any -- any -- any answer that you give today will be as if it was provided by Joe Moholland Inc.?

A Right. Understood that.

Q All right. I mentioned a moment ago that we may get this Exhibit 1, the deposition notice, and I'll do that and send that to the court reporter.

(Plaintiff's Exhibit Number 1 was marked for identification.)

BY MR. LANGLEY:

Q And I'll share my screen here, if I can. Are you able to see that deposition notice, went out April 12th?

A Yes, I can see it now, yeah.

Q Okay. And there are a number of topics that we included on an exhibit, but I guess we'll get to that. The date and time is today at 1:00 p.m. It is now 1:20 p.m. on my clock here.

And we've all agreed, however -- the 12 or so many people we've got the -- the Zoom here to conduct the deposition at this time. That -- that right?

A Yes. Yep.

Q And you're here in response to that notice, correct?

A Yes.

Q And we've discussed with your counsel the topics of the notice, but I will note for the record that David Luck, Brantley Rowlen, Seth Friedman were all served with notice of this deposition for Mayflower and represented to us that they would attend today, but -- but so far none have -- have sought to join the Zoom, as -- as best we can tell.

So have you reviewed this Exhibit A? Are you prepared to testify on these topics that were listed?

A Yes, and I am.

Q Okay. Do you have anything -- any reason that you would not be able to tell the truth today?

A I do not.

Q And do you agree to be honest, forthright and non-evasive in answering my questions today?

A Yes.

Q The deposition rules require that I -- I instruct you that if you don't understand a question that I ask, you ask me to repeat it or rephrase it. Do you agree to that?

A Yes.

Q And if you answer a question that I ask, I'm going to rely on your answer and we'll rely on it for the purposes of this litigation. Is that agreeable?

A Yes.

Q If you wish to clarify an answer that you gave earlier in the deposition, then I'll ask you to point that out to me, and I'll be happy to allow you to do so. But once the deposition concludes, I'll go ahead and give you fair warning, I'm going to ask you was there anything else that you think is important we haven't talked about in this case.

So between the -- now and then, be mindful that -- that that question is coming. And so my intent is to get full and comprehensive responses from you today. Is that understood?

A Understood, yeah.

Q We received some documents from your counsel this morning. We have also yet to receive our -- our responses to -- to interrogatories that

we sent and so we'll need to leave the deposition open for the purposes of -- of asking questions about those documents and those interrogatory responses.

What have you done to prepare for your deposition today other than talk to your counsel?

A That's about the extent of it.

Q Have you reviewed any documents? Other than this exhibit that I'm showing you here?

A I have not.

Q All right. Well, let's start with the first topic there, defendant's organizational structure including each department, division, duties and so on, topic number 1 on the -- on the notice.

A Uh-huh.

Q You mentioned that you're here today on behalf of Joe Moholland Inc., and that is the entity that was listed in the police report for the crash that took place on July 1st, 2022, that -- that we're obviously here about, as the owner of the vehicle being operated by Nicholas Burist.

Is that accurate, that Joe Moholland Inc. owned that vehicle?

A No, that is incorrect. The vehicle was owned by the Locke Relocations.

Q Okay. Do you know why it is that the vehicle was listed as being owned by Joe Moholland Inc. in the police report?

A No, I don't.

Q And we'll mark that as Exhibit 2.

(Plaintiff's Exhibit Number 2 was marked for identification.)

BY MR. LANGLEY:

Q Show you a copy of it. So this is what I was making reference to a moment ago. You see right here -- can you see my cursor?

A Oh, yeah, owner's last name. Yeah, I see it there.

Q Have you seen that before?

A It's possible around the time of the accident I saw this, but I don't recall.

Q All right. Do you know if Joe Moholland Inc. has a trailer in its ownership with a trailer tag of 249030C?

A My assumption is that's the trailer that was involved in the accident, and it -- if that's the case, that was a trailer leased by the company.

Q Okay.
A Not owned by the company.
Q When you say the company, who are you referring to?
A I'm sorry. Joe -- Joe Moholland Inc.
Q So Joe Moholland Inc. leased this trailer with tag number 249030C?
A If it's the trailer I'm thinking of, the one that was involved in the accident, yes.
Q Okay. The tag number for the truck that was involved in the collision with -- with my clients, police officer has written 59AP8M. Is that a tag number that is registered to Joe Moholland Inc.?
A Off the top of my head, I'm not sure. But if I'm looking at it in context, I'm -- I'm assuming that that's the tractor that was involved in the accident.
Q Oh, this is the -- this is the motor vehicle crash report from that.
A Yeah. So that's probably the tractor that is involved in the accident.
Q And you have no explanation for why the police officer has listed Joe Moholland Inc. as the owner of that tractor and trailer?

A I don't. Other than it was just marked that way in error.
Q Did you or anybody else on behalf of Joe Moholland Inc. ever reach out to the Georgia Department of Motor Vehicles or Highway Patrol and tell them that this police report was done in error?
A I don't believe so. I didn't personally.
Q All right. So tell me what the relationship is between Joe Moholland Inc. and Locke Relocations. Or start with what it was on July 1st, 2022.
A Sure. So Locke Relocations Inc. is a contractor to Joe Moholland Inc., and they will haul shipments on behalf of Joe Moholland Inc. as a contractor, household good shipments. That would include packing, loading, hauling and delivery services.
Q Okay. And is that true today?
A It is, yes.
Q So you -- Joe Moholland Inc. currently has the relationship you just described with Locke Relocations as of April 27th, 2023?
A Yes.
Q Is there a written agreement that outlines

the -- the fees and responsibilities of the parties between Joe Moholland Inc. and Locke Relocations?
A There is, yeah. It's called the Independent Contractor Operating Agreement.
Q Okay. Do you know if that's been produced in this case?
A I'm not sure what the term produced means, but...
Q Given me a copy?
A I -- I don't know.
Q Okay. We'll take a look for it. And I don't -- I don't believe that we have that.
MR. SESSIONS: Ryan, that -- Ryan, that's one of the things we produced to you this morning.
BY MR. LANGLEY:
Q Okay. Well, we may have to come back and ask you some other questions about that later, Mr. Garr. I hadn't had an opportunity to -- to review what was produced just this morning.
A Understood. Sure.
Q Does Joe Moholland Inc. have a relationship with Total Military movers that is similar to the one it has with Locke Relocations?
A That relationship is different.

Q Okay.
A Total Military Management, or TMM, serves as kind of a back office function for moving and storage companies that move shipments for military service members domestically.
Q Okay. Was Total Military Management -- that's what you said TMM stands for?
A Yes. Total Military Management, TMM.
Q Total Military Management involved in the movement of goods and -- and furniture and -- and whatever was in the trailer Mr. Burist was -- was hauling on July 1st, 2022?
A No, they were not involved in the physical movement of the goods. So the services they would provide would include household goods claims service, operation support, customer service. Back -- back office-type functions.
Q So we've talked to counsel for TMM and the way they described -- at least the way I understood the way they described the relationship was -- or -- or kind of the hierarchy of parties is that US government through one or more entities contracts with TMM for movement of military personnel, household goods when people are being transported from one location to another when there is a

military transfer.

And from there, TMM, Total Military Management, has a responsibility to find a mover or movers. Is that what happened in -- in the case involving Mr. Burist and my clients on July 1st, 2022?

A Part of what TMM does is to distribute volume across a partner network to -- to find the most efficient methods to move shipments from point A to point B. So I don't know if that's the same thing as what you were told, but that's kind of the way I look at it.

Q Well, did TMM have the responsibility from the government to find a mover for the goods that were being transported on July 1st by Mr. Burist?

A I'm not sure I would use the word responsibility. I would say they facilitate in assuring efficient transport of goods from point A to point B.

Q Well, did the government contact you at Joe Moholland first for this move or did they contact TMM first?

A The offer would have gone through TMM's queue.

Q Okay. And TMM then has the choice of who

to hire for the move, isn't that true?
A To some extent, yes.
Q Okay. And -- but you don't like the word responsibility?
A Yeah, because I -- I think of it more as load management because the -- the government's not contracting with TMM directly. They are contracting with the partner that TMM works within, and the partner entity is essentially agreeing to allow TMM to distribute tonnage so that it's effectively and efficiently moved from, you know, one point to another point domestically.
Q You said the government is contracting with a partner network?
A Yes. Indirectly.
Q Who is the partner network in this case?
A Well, the government contracts with hundreds of entities to perform domestic household goods moves, and a certain percentage of those work with TMM as partners to, you know, effectively ship tonnage.
Q Well, my question is more specific. I want to know who the government contracted with -- what entities make up this partner network for the transportation of goods -- domestic household goods

Mr. Burist was carrying on July 1st, 2022.

A The specific transportation service providers, I don't know who they were, but they would have been part of TMM partner network.

Q Well, we know Joe Moholland was involved, we know Locke --

A The physical transport, that's correct.

Q What -- tell me what that means, the physical transport?

A So hauling the household goods, physically hauling the household goods from point A to point B. And that might also include packing services and delivery services.

Q So who did those things in this case? Who packed the truck, who was responsible for the delivery services and the -- the physical move like you just described?

A It was Locke Relocations operating on behalf of Joe Moholland Inc.

Q Okay. So tell me how that works just from the beginning.

A Sure.

Q How the call comes in, who it comes from, how Moholland makes the decision to -- to hire Locke, what other parties are involved, all that

kind of thing.

A Sure. So an offer would come in through the -- the DoD secure system by way of TMM, and it would be a shipment that is picking up in one of our primary service areas. And so the offer would be, hey, this is a shipment that is picking up with such-and-such a pickup spread, and it's picking up from this location. Are you able to service it, and if so, how can you service it?

And then our operations staff would respond either no, we cannot service it, or yes, we can service it. And if the answer is yes, we can service it, we -- we explain how we can service that. Meaning we can pack and haul it or we can pack it only or we can pack and what we call protect it, which means we can pack the shipment and bring it back to the warehouse to store it until the driver is available to pick it up.

If it's a shipment that we are unable to service, we would typically assign that shipment to a contractor that works with us, like Locke Relocations, to service it on our behalf.

Q So explain to me, again, maybe I -- you said it and I -- I just missed it.

A Sure.

Q The computer offer goes to TMM. And how does it go from TMM to Joe Moholland?
A Oh, it's just done through email.
Q And TMM sends an email just to Joe Moholland or they send it to a bunch of different entities and whoever responds first gets it?
A In this case, it would've come to us first. And if we couldn't have serviced it, then it would've been offered to another provider.
MR. SESSIONS: And, Ryan, the -- the -- there were two loads involved in this accident, and we sent both of the emails receiving and accepting those offers from TMM to you this morning as well.
MR. LANGLEY: Okay. Well, again, we haven't had an opportunity to -- to review all that.
BY MR. LANGLEY:
Q So there are emails where TMM sends load information to just Joe Moholland, and Joe Moholland has the opportunity to accept or reject that before TMM goes on to anybody else. Is that right?
A That's correct, yes.
Q And -- and did you tell me if there's a

written agreement between TMM and Joe Moholland?
A There is. There is a written agreement.
Q And have you guys produced that?
MR. SESSIONS: We haven't. I didn't think it was relevant to the jurisdictional issues with Mayflower, but we can -- we can try to locate it.
MR. LANGLEY: Okay.
BY MR. LANGLEY:
Q Does that written agreement between TMM and Joe Moholland reference this partner network that you're talking about, Mr. Garr?
A I don't believe it does.
Q Does TMM give you the discretion to hire whoever you want as a contractor for the delivery of these -- these type of military domestic household goods?
A Yes.
Q And is your agreement with Locke Relocations, the written agreement, is it -- is it an exclusive agreement where if you get an order from -- from TMM the way you described or an offer, that you have to send it to Locke?
A No.
Q Okay.

A I'm sorry. Go ahead.
Q Well, you may have been about to answer the question. Who else could you have sent it to?
A So we have other contractors that work for us that will haul shipments on our behalf.
Q Who are those?
A They operate as LLCs. There's probably -- geez. I mean, there are some LLCs -- some contractors that work for us that only pack shipments. There are some that -- that only do local work for us, meaning within our service areas, our geographical local service areas. And there are others that will haul shipments for us. And they operate under similar agreements like ICOA's.
Q Can you give me any names for those?
A Oh, geez. Off the top of my head -- I'd have to go to my binder. M&A Transportation is one that jumps out at me.
Q Is that in Kentucky?
A No, that would be based in Virginia, I believe.
Q Okay. You mentioned --
A -- Moving Solutions is another, Moving Solutions LLC.

Q Okay.
A One would be called Lanier Renly Packaging Elite LLC. That's one of our pack contractors.
Q All right. I'll show you now what we've marked as Exhibit 3. Make it back to that police report. These are some pictures of the vehicle involved in the collision on July 1st that were produced by Locke Relocations.
MR. LANGLEY: Mark this as Exhibit 3, Madam Court Reporter.
(Plaintiff's Exhibit Number 3 was marked for identification.)
BY MR. LANGLEY:
Q Have you seen these pictures before, Mr. Garr?
A I have not.
Q All right. You see on the side of the truck where it says 251-333?
A Yes.
Q Does that mean anything to you?
A It does, yeah. That's the unit number.
Q Okay. Does that also correspond with a agency agreement between Joe Moholland Inc. and Locke -- or excuse me, and Mayflower?

A It does not.
Q Okay.
A Although when we were an agent for Mayflower, the equipment we used was qualified by Mayflower. When we were still an agent for Mayflower.
Q What do you mean by that?
A I don't know the specific steps, but if a -- if a shipment is going to be hauled under Mayflower's authority, there is a -- there is a -- a process to add that vehicle to the fleet.
Q Okay.
A But that numbering scheme is -- is our own internal numbering scheme.
Q And when you say our own, you mean Joe Moholland?
A Joe Moholland Inc., yeah, I apologize.
Q Is there a difference between Joe Moholland Inc. --
A I'm sorry, say again.
Q Is there a difference between Joe Moholland Inc. and Joe Moholland Moving?
A There is not. Joe Moholland Moving is a d/b/a for Joe Moholland Inc.
Q Is there a difference between Joe

Moholland Inc. and Moholland Transfer Company?
A There are. They are two different operating entities.
Q And which entity was involved in the transportation of these goods on July 1st?
A Joe Moholland Inc.
Q Moholland Transfer Company didn't have anything to do with the transfer of goods on July 1st?
A That's correct.
Q How do you know that?
A It was interstate hauling, and interstate hauling is done under the authority of Joe Moholland Inc.
Q Why is that?
A That's our operating model.
Q Do you have a bill of lading for this transfer of good?
A There should be a government bill of lading. I don't have it handy.
Q We didn't see that in production.
MR. LANGLEY: Matt, do you know if -- if that was produced?
MR. SESSIONS: I don't know if -- if we produced it. Once again, we produced

what was limited to the jurisdictional question as to Mayflower. So I don't -- don't know if -- if that may have gotten...

MR. ROWLEN: So our position would be that would be very important to -- to the jurisdictional questions with Mayflower because the dates and times of the shipment on the -- the bill of lading would dictate when it was ordered, when it was completed, and I -- in a minute I'll show you what we got from Locke and may come back to that. But that's probably something that we will need.

MR. SESSIONS: Okay.

MR. ROWLEN: Hey, this is Brantley Rowlen for -- for Mayflower. I -- I -- maybe missed something, maybe I missed getting here, but how -- how are the dates and times of when the shipment was ordered and all have anything to do with jurisdiction discovery for -- related to Mayflower?

MR. LANGLEY: Well, I don't think I've got a responsibility to -- to -- to

say that on the spot why that would be the case, but -- but I will.

The date and time that -- that this was ordered, we think implicates the agency agreement between Mayflower and Moholland. But regardless, I -- I don't think it's your deposition, Brantley, to -- to --

MR. ROWLEN: No, it's -- it's -- no, it's not. But -- no. I can make objections to anything I want, first of all.

Second of all, it is -- it's -- it's everyone's deposition. I'm a party to this case so I can ask questions and I can object to things. And I think there's been some discussion -- excessive discussion about the scope of the discovery limited to my client.

And so to the extent you're requesting these on relevant to the jurisdictional discovery of my client, I think that in my case, my position. So we can discuss it another time. It's just it's not been produced or you would have

it in your hands right now.
But thank you for the explanation.
MR. LANGLEY: I think it would become more evident in -- in a minute when we get the bill of ladings that have been produced about why -- of why it's important.

BY MR. LANGLEY:

Q But back to Exhibit 3 here, these pictures that were produced by Locke of the -- the tractor and trailer that were -- was involved in the collision with my clients. The date on here is July 13th, 2022. Do you see that, Mr. Garr?

A I do.

Q Did Joe Moholland Inc. -- when was Joe Moholland Inc. made aware of this collision?

A We were made aware on the 1st of July within probably 30 minutes of when the incident occurred.

Q And who made you aware of the collision?

A I was made aware by our VP of operations, who was made aware by the owner of Locke Relocations.

Q And what are those individuals' names?

A Our VP of operations name is Michael Peters. And the owner of Locke Relocations is Kelvin Locke.

Q And how did Mr. Locke become aware of the collision?

A I don't know if he was aware of the collision, but he -- he kept in pretty close contact with the driver. And, as I recall, the driver hadn't contacted him back. And so he had asked our VP of operations, Michael Peters, if Mike knew where the -- the tractor was located at the time. And that's when they discovered that the accident had occurred.

Q When the driver didn't respond?

A After the driver didn't respond and then our ops checked the location of the tractor.

Q Okay. How did your -- when you say our ops, you mean Joe Moholland Inc.?

A Joe Moholland Inc., yeah.

Q Was Joe Moholland Inc. tracking the -- the location of that trailer through some electronic tracking means?

A Correct.

Q And what's that called?

A Samsara, S-A-M-S-A-R-A.

Q Okay.
A That provides electronic logging and telematics.
Q All right. How is that referred to internally at -- at Joe Moholland? Just as Samsara?
A Samsara, yeah, or ELD.
Q Okay. And were any other entities tracking this truck on July 1st through ELD or Samsara other than Joe Moholland Inc. and Locke Relocations?
A No.
Q Did Mayflower have access to that ELD program during the -- the pendency of the agency agreement between Joe Moholland Inc., and Mayflower?
A At the time of the accident, no.
Q That wasn't my question.
A I'm sorry. Could you restate the question.
Q Yes. During the -- during the time there was an agency agreement between Joe Moholland Inc. and Mayflower, did Mayflower have access to that electronic tracking Samsara information for Joe Moholland trucks?
A I -- I don't think so. I don't think so.

Q Was there ever a time in the relationship between Joe Moholland and Mayflower that Mayflower or any of its related entities had access to that electronic tracking information?
A I don't believe so. Although I'm not a hundred percent sure of the -- you know, the technical management of the system.
Q You mentioned before that these markings that we see in Exhibit 3, those are Joe Moholland Inc. markings, correct?
A That's correct, yes.
Q And do -- but you -- you've testified earlier that you believe the actual owner of this vehicle, this -- this International, I think it was, ProStar truck was Locke Relocations?
A That's correct.
Q Do you have a registration that would verify that?
A Probably, yeah. I would think so.
Q All right.
A Either I or our office or Locke Relocations would have some documentation.
Q Okay. I'd ask you to -- to find that and produce that to your counsel, please.
How would it be that Locke

Relocation had all of the markings on this truck that we see in these pictures? I'll let it scroll all the way down for -- of the page.

A Yeah, that is our practice. So for -- for -- for this contractor or for any of the contractors that work for us, we would have our markings on those vehicles.

Q When you say our markings, you talking about what we see on Page 2 of Exhibit 3 here?

A Yeah, the Joe Moholland Inc. markings.

Q Well, it doesn't say that, right?

A Joe Moholland Moving, yeah.

Q And then it says operated by Mayflower Transit, then Missouri?

A Right.

Q Do you know whose DO -- US DOT number that is on the door?

A I believe that's Mayflower's DOT number.

Q Do you know how that came to -- to be placed on the -- the truck that was involved in this collision with my clients?

A Yes. Yeah. Our operations staff would have put those decals on that door.

Q When?

A Probably years prior, depending on how

long this vehicle was in our fleet.
Q Okay. And why would those decals on the door of the truck involved in the collision with my clients if Mayflower was not involved in -- in that partner network as you described before?
A You mean on -- at this point in the day of the accident?
Q Correct.
A They should have. I mean, by the terms of the temporary agency agreement, we should have removed all decals by this point, by the time the accident occurred.
Q And when you say we?
A Joe Moholland Inc., yeah.
Q What do you base that on? That it -- it was Joe Moholland Inc.'s responsibility to remove those decals?
A Based on the -- the document, temporary agency agreement.
Q Okay. I've seen a -- a number of temporary agency agreements. See if I can find the one that you produced. Mark this as Exhibit 4.
(Plaintiff's Exhibit Number 4 was marked for identification.)

BY MR. LANGLEY:
Q We'll just mark it all together, the agency agreement, just JMI 3, 4, 5, 6, 7, 8, 9; 2008 amendment, which is 10; 11, letter from Mark Polansky; and UniGroup, which is 12; and that -- the temporary agency agreement, which is JMI 1. Is that what you were referring to earlier?
A Yes. This one you have here is what I was referring to.
Q I noticed that this document does not have a date on it. Do you know when this document was signed?
A There may be another version that has the date on it. But it would have been probably the January time frame. Sometime in January.
Q January of 2022?
A Of '22. I'm sorry. Yeah.
Q All right. And you mentioned that you believe it was Joe Moholland's responsibility to remove any markings from the truck and you mentioned Mayflower pursuant to this agreement. Can you point to me where you're referencing in this agreement that you think that's -- that is stated or outlined?
A There's some -- in here I believe there was some discussion about branding. But I -- I do

know that during our phone conversations with the transition team that was made very clear as well, the expectations of removing branding and markings from equipment.

Q By what date?

A Boy, it's been a little while now, but I think everything had to be done within 60 days of -- of the agreement termination.

Q Okay. So 60 days from April 28th, 2022?

A Honestly I don't really recall.

Q Now, there's a letter -- I'll show you this letter just before. It's not a memory contest. Take a minute and read and refresh your recollection.

A Yeah, this -- this letter I certainly remember.

Q References that 60-day period that you just mentioned in the second paragraph, so see if that's what you're talking about.

A Yeah, that sounds right.

Q Okay. Did you receive this letter?

A I did, yeah.

Q Did you respond to it?

A I did not.

Q Did you have --

A I did have a conversation subsequent to receiving this letter with somebody within UniGroups -- that might have been in risk management or legal team -- just sort of reinforcing the importance of -- of making sure that any markings that we had had been removed.
Q Do you remember the date of that conversation?
A I'm sorry, I don't remember.
Q It would've been after July 11th, 2022?
A It would've been on or around that date.
Q Okay.
A Could've been before or could've been after but it would've been right around that time frame.
Q And what -- what was the reason for the -- the UniGroup risk management person following up with you to tell you the importance of removing the -- the Mayflower DOT numbers or logos or any identifying information on your trucks?
A Well, it come to their attention that we weren't complying with the terms of the temporary agency agreement.
Q Okay. What's the implication of that? Did you get sued?

A No, we did not.
Q Did you have a demand for indemnification as is referenced in this letter?
A I'm not sure.
Q Well, you're the president of Mohol -- Joe Moholland Inc., correct?
A I am, yeah.
Q Don't you think if a -- a demand for indemnification or payment money came in from United Group or Mayflower or any of the other entities as part of UniGroup that you'd know about it?
A Well, I would -- I would -- you know, and I'm -- I'm obviously not a legal expert, but I would almost view this as a demand for indemnification, this letter.
Q Okay. Has United --
A Or -- or the agency agreement, or the temporary agency agreement.
Q What do you mean by that?
A That, you know, the terms were pretty clear about removing the branding from the vehicles.
Q Well, I asked you to identify for me earlier -- maybe I didn't give you enough of a chance to -- can you point out to me where in this

temporary agent agreement it says that it's Moholland's responsibility to remove the branding?

A In just skimming through it, I don't see it, but it was certainly clear to me that that was a requirement.

Q Take your time.

A All right.

Is there anything below Item 1 there on the first column? Okay, yeah. Can you scroll back up again for me.

Q Sure.

A Yeah, I guess it would be under Item 5.

Q Okay. Can we agree that that provision does not state it's Moholland's responsibility to remove the marking?

MR. SESSIONS: Object to the form.

A It does not explicitly state that.

BY MR. LANGLEY:

Q Okay. And No. 6 of this temporary agency agreement, heading says Agency Agreement Terms Incorporated. Do you see that?

A I do.

Q And then it goes on to say some specific sections are incorporated by reference. Was it your understanding that the entire agency agreement terms

were incorporated?

MR. SESSIONS: Object to the form.

A I'm -- I'm not sure I understand the question. Could you repeat that for me.

BY MR. LANGLEY:

Q Sure. It -- to me, this provision is a little ambiguous as to whether or not the heading applies, where it says Agency Agreement Terms Incorporate, which to me would implicate all agency agreement terms, or the more specific writing where it says these specific provisions, Sections 3C and 5M and 5P of the terminated agency agreement between the parties are hereby incorporated.

And what my question is for you is, did you read that to mean that agency agreement, all terms are incorporated, and then has an emphasis 3C, 5M, and 5P, or that only sections 3C, 5M, and 5P were incorporated?

A Well, I -- I'm -- honestly I'm not sure I analyzed that section in -- to that level of detail. For me, it was a matter of understanding that we were transitioning away from the van line affiliation, and this agreement provided a facility to do that.

Q Okay. Well, then it says, at the end,

this provision does not modify or alter the parties' rights or obligations under the terms of the agency agreement. See that there at the end?

A I do, yes.

Q So is it reasonable to interpret that to mean that the agency agreement that was in place prior continue to control the parties' arrangement?

MR. SESSIONS: Object to the form.

A I mean, sitting here now, having that conversation, yeah, I would agree.

BY MR. LANGLEY:

Q Okay. And so going back up to that agreement, there's both the original agreement from July 25th, 2008, and then the addendum or amendment in -- let's see -- some days later. Or maybe even the same day.

Do you recall amendment to the agency agreement?

A I recall insofar as we needed to produce that as a part of putting together the temporary agency agreement.

Q Okay.

A The biggest part of that. I -- I do recall there was an addendum, yes.

Q All right. And was that addendum enforced

and did -- did Joe Moholland consider that to be part of its agreement with Mayflower and UniGroup?

MR. SESSIONS: Object to the form.

A I -- I would assume so. I -- I'm not sure I gave that a whole lot of thought.

BY MR. LANGLEY:

Q Was that your signature or somebody else's there under President for Joe Moholland 333?

A That's someone else's signature.

Q Who signature is that?

A That's Owen Joseph Moholland, who was the president of the company in 2008.

Q Okay. Is that your predecessor or?

A That's correct.

Q Direct predecessor? Was there anybody between the two of y'all?

A Direct predecessor, yeah.

Q All right. Did you -- did you assume responsibilities for a lot of contracts that Mr. Moholland had signed when he was president?

A Yes.

Q And would this be one of them?

A That's would, yes.

Q And when we saw earlier 333 on the truck that was involved in this collision, is that the

same 333 as we see in this agreement?

A Yes.

Q So I mentioned to you earlier that I -- I found it important to understand the date of the bill of lading.

A Yes.

Q And the reason is -- part of the reason is this provision, 5KG, can you read into the record this 5KG provision, please? Just read it out loud.

A You want me to read it?

Q Yes, please.

A Sure, okay.

The termination of this agreement shall not affect any rights or obligations under this agreement which shall have previously accrued or shall thereafter arise with respect to any occurrence prior to termination or any rights or obligations which this agreement specifies shall not end upon such termination, and such rights and obligations shall continue to be governed by the terms of this agreement.

As to any shipment that has commenced prior to the date on which this agreement is terminated, the terms, provisions, and conditions of this agreement will continue to apply to such a

shipment.
Q All right. Can you tell me when the shipment that Mr. Burist was carrying on July 1st in the truck that was involved in the collision with my clients, can you tell me when that shipment commenced?
A Commenced meaning when the offer was given?
Q You tell me. I -- I'm not in the trucking industry; I'm reading the language as a lawyer. Can you tell me what it means in the trucking world?
A In the context of this agreement?
Q Sure. I mean, this is the agreement we're here about, right?
A You'll have to just bear with me a moment here.
Q Yeah, no problem.
A So I interpret the word commenced here to mean when the shipment's actually serviced. That would be my interpretation of it.
Q Okay. And what do you base that on?
A The -- the term commenced.
Q I understand.
A I equate that with execution.
Q And -- and what my -- what I'm asking you

now is how do you come up with that definition for the word commenced? What do you base that on? Is that an industry term that's in some type of industry related manual that we could look up? And I -- I --

A No, I -- I don't believe so, no.

Q Okay. So can we agree there's some ambiguity as to what commenced means?

A Yeah, I think that's fair to say.

Q But in any event, it's -- it's referencing the possibility of transfers or transports or -- or continuation of an agency agreement between Mayflower and Moholland that could go beyond the date of the termination that we see in this agreement? We agree on that?

A Yeah, in fact, I think the -- the temporary agency agreement directly addresses that. I think it discusses shipments that are in -- in process.

Q Okay.

A In fact, I think that's, you know, one of the main points of the agreement.

Q I pulled up the temporary agency agreement for you to look at. Can you point to me where you're talking about?

A Yeah, I don't see it stated here.
Q Okay. So since Paragraph 6 of the temporary agency agreement says the temporary agency agreement does not modify or alter the parties' rights or obligations under the terms of the agency agreement, can we agree that -- that to the extent there is question on shipments that commenced prior to the date that the agreement is terminated that these provisions in the agreement will continue to apply, that the actual agency agreement, JMI 10 and 11, would control?
MR. SESSIONS: Object to the form.
A So, yeah, I would read that as any shipment that was -- that was physically serviced during that period.
BY MR. LANGLEY:
Q Well, that's not what it says, is it, sir?
A Well, the question is about the word commenced, right?
Q Well, really the question right now is, which agreement controlled? And when I asked earlier did this provision of 5KG control the -- the July 1st shipment of goods that involved collision with my clients that we're here about today, you said the temporary agency agreement actually has

some language on it. So at least that's what I heard you say.

So we went to the temporary agency agreement. I don't think you were able to find the language that would alter this. So my question now is, can we agree that the -- that the operative provision is this 5KG or any set of facts for a shipment that commenced prior to the date that the agreement's terminated?

A So it's -- so -- I'm going to have to ask you to repeat that because there's a constant -- some dense language in there was a little over my head. I -- I apologize.

Q No problem. Tell me what you don't understand and I'll try to repeat it.

A So the connection between this specific shipment and this agency agreement, I guess I'm not sure what specific question you're asking about that.

Q Is there anything you can point me to in the temporary agency agreement that alters the language we see in the last sentence of 5KG?

A No.

Q Okay. So you -- you mentioned earlier when I asked you what was the commencement date of

the shipment that involved the collision with my clients on July 1st, 2022, and I think you said, do I mean the order date? Did I understand you correctly when you responded earlier?

A Yeah.

Q Okay. What was the order date?

A I believe the offer came in in April.

Q Okay. Do you know what day?

A I'm sure we can find that.

Q Well, that's important.

A And, in fact, I think it may have been actually provided this morning, right?

MR. SESSIONS: Yes. Ryan, I'll represent to you those emails we produced show April 6th.

MR. LANGLEY: Okay. And -- and do you have a Bates number that we can just reference? We can make that an exhibit to the deposition.

MR. SESSIONS: Yes, sir. JMI 271.

MR. LANGLEY: We have those documents separate from what we've referenced as exhibits so far, so I'll ask Matt to pull up that record.

MR. SESSIONS: You want me to pull it

up now?
MR. LANGLEY: That's okay, I'll pull it up on my end so we don't have to -- to share a screen and then switch back and forth.
MR. SESSIONS: Yeah.
BY MR. LANGLEY:
Q And do you have a copy of that, Mr. Garr, that record?
A The -- the offer email?
Q Yes.
A Yes, I do.
Q Do you have it in front of you there?
A I do not.
Q Okay.
MR. LANGLEY: Yeah, go ahead and pull it up there, Matt.
MR. SESSIONS: Okay. That may get complicated. I'm not -- I'm not going to be able to do it on the spot. I'm working through two separate systems and my Zoom is different from my virtual desktop where I'm looking at the document.
MR. LANGLEY: Okay. Well, that's no problem. I think I can pull it up here.

Just a second.

MR. SESSIONS: Yeah.

MR. LANGLEY: All right. Yeah, I've got it.

(Plaintiff's Exhibit Number 5 was marked for identification.)

BY MR. LANGLEY:

Q All right, Mr. Garr, is that the email that you're talking about?

A Can you scroll down for me.

Q That's the full page. I can make it a little bigger. Are you able to read it now?

A Oh, yeah, yeah, no, I could read it before, I just wanted to see the bottom of the -- the thread.

Q Okay. This is the document that your counsel referred me to.

A Yeah. This looks like it, yeah.

Q Okay?

A Yes.

Q This -- this is the document you were referring to and I think you said early April, and that's consistent with this April 6th, right?

A Yes.

Q So can we agree that on April 6th, Joe

Moholland Inc. and Mayflower had an agency agreement?

A Yes, I believe we were operating under the temporary agency agreement at that time. Although it may have terminated around that time. I don't know the exact dates. I'm sure it's in the -- the temporary agreement.

Q Okay. I can put you back to it, but it didn't terminate until April 28th.

A 28, that sounds right, yes.

Q Okay. And so on April 6th at 9:48 a.m., TMM offers, sends an email to this address, CMVK and then JPPSONE at JMM333.com. Is that right?

A That's correct, yep.

Q That's the -- the same JMM333 that we see on the truck that --

A Correct.

Q -- showed you pictures of earlier. The truck in the collision? Is that right?

A Correct.

Q Okay. And so who is this CMVK email address? Do you know who that goes to?

A Specifically I don't off the top of my head. It's one of our probably dispatched distribution lists.

Q And so that's not an individual person?
A No, it would not be an individual person.
Q What does it mean when it says, TMM Inc. on behalf of Slidell Moving?
A So what we were talking about earlier where TMM with a partner network. So Slidell Moving would have been one of those partners. In an effort to distribute workload efficient -- efficiently around the country.
Q And I think your counsel said earlier that this shipment, this particular move was actually in two parts, is that right?
A Well, actually I believe they were two different shipments is what he meant, I believe.
Q Okay.
A They fall on two separate shipments.
Q But to the extent the word commenced for a shipment, as we read in the agreements before, can -- can include the date on which the order is sent, the order for -- for moving the goods that were involved in the collision with my clients was commenced on April 6th, 2022? Can we agree on that?
MR. SESSIONS: Object to the form.
A I would be very reluctant to say that

because it depends on the -- the legal definition of commenced in that context.

BY MR. LANGLEY:

Q Well, I'm asking you to presume that the word commenced includes the date of the order.

A In -- in the context of that --

MR. LUCK: Objecting to the form as well on that question.

THE WITNESS: I'm sorry?

MR. LUCK: I'm objecting to the form as well on that question.

BY MR. LANGLEY:

Q You can answer the question unless somebody --

A Yeah, no, it would just be difficult for me to -- if -- if you're asking me my opinion of the term commenced, it's my reading that agreement as a -- as an officer of the company -- essentially equates to the execution.

Q I'm not.

A Okay.

Q I asked you that earlier and you gave me -- you gave me your answer. I understand that.

A Okay.

Q So I'm asking you now to -- to -- to use

the definition of commenced to include the date of the order.

A Okay. So you're saying that -- you're telling that the word commenced means when the order is issued.

Q For the -- for the purpose of this question.

A Okay. Sure.

MR. LUCK: Object to the form.

BY MR. LANGLEY:

Q For the purpose of this question, I'd like you to assume that commence includes the -- as -- as far as this definition, for a shipment the date the order was sent.

A Sure.

Q Okay?

A Okay.

Q So based on that definition, do we agree that this order involving the -- the household goods in the Joe Moholland moving truck 333 commenced on April 6th, 2022?

MR. SESSIONS: Object to the form.

A Based on that definition, yes.

BY MR. LANGLEY:

Q Does Joe Moholland Moving have any kind of

relationship with Mayflower now?
A No.
Q What about with UniGroup?
A No.
Q No UniGroup subsidy or subdivision or government moving or anything like that?
A Nothing.
Q And does Joe Moholland Moving have trucks on its property that are identified as Mayflower trucks with Mayflower DOT numbers on the side of them?
A They do not.
Q When was the last time Joe Moholland Moving had any truck identified as a Mayflower truck on its property?
A It would've been some point during the summer of last year.
Q Summer of 2022?
A Yeah. There may have been some trailers that, you know, we were still waiting to -- in queue to get wrapped. Because it's a -- that's a time-consuming process to get trucks rewrapped. That's a logistics issue. But they would not have been -- they would not have been Mayflower-branded equipment at that point.

Q Okay. What you define as summer?
A Labor Day. I would say summer season ends Labor Day.
Q Okay. So into -- into July, early August?
A Labor Day would be the first Monday in September.
Q Okay. All right, yeah. Thanks. I didn't know that.
A No problem. I guess it's -- that's -- that's important, Memorial Day, Labor Day is our peak season, so.
Q Okay. We're going to get -- so -- so you consider summer to end Labor Day or basically the first -- first weekend in September?
A Yes.
Q All right. And do you know how many trucks or trailers that Joe Moholland removed the logos from between July 1st and Labor Day of 2022?
A Off the top of my head, I do not. I know we were scrambling to get it done because we knew we weren't compliant.
Q Okay. On -- and January -- July 11th after you get that call from risk management, can you give me any range of the number of trucks that at Joe Moholland still had Mayflower's name on it?

A Unfortunately I can't. I do know that I sent photos to that person to -- to show that we had rebranded that equipment that was in question, and I may have sent them photos of, I'm guesstimating, you know, 20 pieces of equipment.

Q Okay. Did you send it by email?

A I did.

Q Can you provide those emails to your counsel?

A Sure.

Q And it was at least 20 different pieces of equipment?

A I -- I -- I'm -- I'm guesstimating it was, you know, 10 to 20 pieces of equipment.

Q Okay. You keep saying we were not in -- in compliance. Why are you so eager to defend Mayflower in that?

MR. SESSIONS: Object to the form.

MR. LUCK: Might as well object to the form.

A You know, I wouldn't say --

BY MR. LANGLEY:

Q It's not a good question. Everybody didn't like it.

A No, I'm -- I'm -- I'm happy to answer

it. No, I wouldn't say I'm here to defend Mayflower. I would say that it was very clear to me what the requirements were as part of the unwinding of the 20-plus year relationship. It was very clear to me what -- what was intended by the temporary agency agreement.

We worked with a strong team at Mayflower to help us transition off, very responsive, very helpful. And for me to say that I didn't know that we weren't supposed to take those markings off would -- would be inaccurate. I -- I knew we were supposed to have had all of those markings off the trucks.

Q So why didn't you?

A It was a summer busy season. I mean, you know, this all happened over the span of a pretty short period of time. We have a lot of equipment. And 20-plus year van line affiliation. You know, you just -- it's hard to unwind overnight, you know.

So we did everything we could to get all the branding switched over. But, you know, you got to rely on installers to do their part and your operations staff to -- to do their part. And, you know, sometimes there's a -- there's a backlog

of getting stuff done.

But ultimately that was our responsibility to get that done and it was very clear to me.

Q And you were -- were you continuing in communication with the Mayflower transition team that you just represented during that full time period between April, when this order came in, and July 1st, when the -- the wreck took place?

A I'm sorry. Can you say that again.

Q So you mentioned that you had this great team of people at Mayflower, a transition team. Am I understanding correctly?

A Yeah, well, they were very helpful, responsive, answered all of our questions.

Q And my question now is, did -- did you continue in communication with them throughout the course of this shipment that came in, as we see in this email, JM 271, through the date of the collision with my clients on July 1st, 2022?

A Oh, was I speaking with them between April 6th and July 1st, is that the question?

Q Correct. Did you stay in communication with the Mayflower transition team or anybody else with Mayflower between April 6th and July 1st, 2022?

A It's possible, although I would say the preponderance of that communication was on the front end of the process. So there would have been a lot more of that in the January and February time frame, and it would've tapered off from -- from there as the number of questions I had decreased, you know, as we get the process going.

There -- there may have been communication, but I -- I don't recall specifically.

Q Who were you --

MR. SESSIONS: Hey -- hey, Ryan. We've been going -- we've been going about an hour since we started the depo. You got a problem with taking a short break?

MR. LANGLEY: I was planning on taking one at 3:00. I got about a 20-minute thing I need to do. Can you -- can you make it till then? If not, no problem. We can take it now.

THE WITNESS: Fine by me. Sure.

MR. SESSIONS: Okay.

MR. LANGLEY: All right. Yeah, we'll just plan on taking it at 3:00. Is that okay with you, David?

MR. LUCK: Sure.
MR. LANGLEY: Okay. Thanks.
BY MR. LANGLEY:
Q Do you remember the names of any of the individuals at Mayflower that you were communicating with between April 6th, 2022, when this order came in for this delivery of -- of goods that -- that was involved in the collision with my clients and -- and July 1st, 2022, when the wreck happened?
A So between April 6th and July 1st?
Q Yes.
A I don't know if I specifically communicated with these people during that time frame. But the transition team I was speaking about earlier, one of the gentlemen's name was Tim Woody, W-O-O-D-Y.
Q Okay. Any others?
A Yeah, there was one other gentlemen. Wynn? I think his last name was Wynn.
Q Okay. How do you spell that, W-I-N?
A I think it's W-Y-N-N.
Q That would be Chris?
A That's it, yeah.
Q Okay. Any others you can think of?
A No, they were the -- the primary

transition team, I guess you would call them.
Q Okay.
A They were support essentially, helping with the unwinding.
Q Who prep -- would prepare the bill of lading for this order that -- that we see in -- in the TMM emails that your counsel has marked JMI 271?
A The DoD would. I think the -- the bills of lading are actually produced by the base themselves, but in -- in general terms it's -- it's within DoD.
Q And is that something that you should have a copy of?
A Yes.
Q For this shipment?
A Yeah.
Q All right. And I think earlier you agreed to provide that to your counsel?
A Yeah.
Q All right. Is there anything else that is important about this email here, 271, for the initiation of the -- the load that ultimately was being delivered on July 1st, 2022, in the wreck with my clients?
A Yeah, this is basically how it works.

The offer comes through over email. We respond on whether we can service it or not. If so, if we can service it, how we can service it. And then they confirm that we've accepted it. So this is a -- pretty much how it works.

Q And I haven't seen any records that were produced showing payment for this order. Have you produced those or provided those to your counsel?

A No, I have not.

Q Okay. I'd ask you to do so.

Do you remember what the payment was for this shipment?

A I do not. So within DoD, these -- the payments are based off of tariff, and those tariff rates vary by time of year, by origin, destination, there's a variety of variables that come into play that determine what the ultimate rate is on the shipment.

Say, for example, you see this 40 percent discount? That's another variable that's used to calculate the actual payment.

Q I would assume it's a discount? Is that what that means?

A Yeah. See, that's a 40 percent discount off of the DoD's tariff.

Q And who does that 40 percent go to? TMM?
A It's shared among the various entities that participate in the shipment.
Q Okay. Well, tell me how it's shared and who all participates in the payment for this -- or, well, participated in the payment for this shipment involving the -- the -- the collision that took place on July 1st with my client?
A So Joe Moholland Inc. would retain -- boy, I have to -- I'd have to get a biller involved in this discussion, so I'm going to speak a little out of turn.
But most of the tariff payments come to Joe Moholland Inc., and then based on the ICOA I referenced earlier, Locke Relocations, in this specific instance, would get a certain percentage of what Joe Moholland Inc. would have received.
Q Okay. So TMM gets paid first and then they distribute the money? Or how does that work from the -- from a TMM standpoint?
A Yes. Yes. So TMM, acting on behalf of its partner network, will help distribute the funds. I think of it more as distribution of funds between the various entities that -- that

helped in the execution of the shipment.
Q Okay. So do -- can you tell based on this email what TMM was paid, what Slidell Moving was paid, what Joe Moholland was paid, and what Locke was paid?
A No, you wouldn't be able to tell that from this.
Q Can you tell if Mayflower was paid anything for this shipment?
A No, May -- May -- Mayflower wouldn't have been paid for the shipment.
Q How do you know that?
A Because the offer came from TMM and the shipment was hauled under Joe Moholland's authority.
Q On the pictures that I showed you of the truck, were you able to identify anything that showed Joe Moholland's authority by DOT number?
A Not on the truck itself.
Q So when you say Joe Moholland's authority, who was that communicated to?
A Well, I'd have to check with our operations management. But that's typically communicated with TMM. And, you know, at the time this shipment occurred, it would have to have been

hauled under Joe Moholland's authority because of -- because of the -- the unwinding of the agency relationship.

Q Well, I guess that's really a legal question that we talked about before under the meaning of the word commenced.

A Yeah. So as -- as a -- as a -- as a for instance, this shipment couldn't be registered in Mayflower's system because we were no longer an active agent.

Q Okay. As of April 6th, this shipment couldn't have been registered in Mayflower's system?

A That's correct. Yeah. My understanding, the whole point of the temporary agency agreement is to help sort of flush out stuff that's already registered in the system, to help unwind other aspects of the relationship like branding.

But even from the point in time that the -- the -- the agency temporary agreement took place, we couldn't put any more shipments into the Mayflower system. It's just to facilitate getting whatever's in there flushed out.

Q So what happened between April 6th and July 1st on this shipment?

A So it would have been added to the hauling calendar, and then a folder would have been created within local operations, a dispatch folder, as a paper folder. And then as you would have gotten closer to the date of packing, it would've been added to the calendar, the dispatch calendar, and a -- a crew would've been assigned, a driver would've been assigned.

This case it was Locke Relocations. And then Locke would've assigned resources internal to Locke Relocations LLC to then service the shipment.

Q So that hauling calendar that you referenced and the dispatch calendar that you referenced, those are both Joe Moholland software?

A That's correct. Joe Moholland Inc.

Q And does the -- the -- is -- when is the bill of lading created?

A That's a good question. I believe it's created at the time the shipment offer is initiated. So the DoD creates the -- the bill of lading, they offer the shipment out, and then the transportation service provider that accepts the shipment then receives the bill of lading.

Although it's possible that the

bill of lading is created after the shipment is accepted, but it's -- you know, it's close.

Q So you would expect Locke as the transportation service provider in this case to receive the bill of lading and then provided it to Joe Moholland, or the other way around?

A Other way around, yeah.

Q So Joe Moholland would've -- would've been provided the bill of lading and then they provided that to Locke?

A Right. That would've been at the dispatch folder I referenced.

Q Okay. Is the dispatch folder specific to each load?

A It is, that's correct. The shipping.

Q For this load, we see this identification number I'll highlight, BGNC0520701?

A Correct. That would be the government bill of lading number for that shipment.

Q Okay. I understand that -- that you're saying that Mayflower was not involved in -- in this shipment and obviously we'd take issue with that. But can you take me through how the process went have been different in -- in a transaction involving Mayflower, if at all?

A Sure, yeah. So if -- if we had still been an active agent for Mayflower, it's possible that that shipment would have been registered within the Mayflower system and, therefore, hauled under Mayflower's authority, under their DOT number.

So prior to the termination of the agency agreement, some percentage of shipments would've been hauled under Joe Moholland Inc.'s authority and some percentage under Mayflower's authority. Those that would've been hauled under Mayflower's authority would have been registered with Mayflower.

Q And where is that registration?

A It's in mainframe systems.

Q Okay. And what's it called?

A Oh boy.

Q Just tell me how you would do it if -- if -- if you -- if you had this load come in from Total Military Movers?

A Yep.

Q And -- and you considered it to be registered in Mayflower's system, what would Joe Moholland do to -- to make that registration?

A We'll actually log into the mainframe

and do it directly.
Q Well, help me understand what that means, mainframe. Is it -- is it a -- software have a -- a definition like Windows or -- or Outlook or something like that or you just know that it's the mainframe?
A No, I'm -- I'm -- I'm pretty familiar with it. So this system was originally developed on a mainframe, and so as the world transitioned over into PCs and Windows, there were still a lot of applications that were written in old software like COBOL and the like that were still hosted on mainframes. And so you needed like software that allows you to access the mainframe, and it's called terminal emulation software.
So it's a Windows program that runs on your computer but it allows you to connect over IP to a system that probably fronts the mainframe that essentially gets you a rate screen as if you were in front of the mainframe itself. And it runs the window -- Windows program on your PC.
Q Well, how can I, as a lawyer for these families that have suffered such a great loss, confirm that this shipment was never registered in Mayflower's mainframe?

A I would imagine that information could be produced that it wasn't in there, but I'm -- I'm -- I'm certain it wouldn't have been.
Q Produced by Joe Moholland, produced by Mayflower, produced by Locke, who do you mean could --
A I guess Mayflower.
Q All right. So if -- if you were to ask a question for that document from Mayflower or that -- that printout from the -- the mainframe or some type of computer expert to -- to come in and do a search of that mainframe, how would you write that question?
MR. LUCK: Object to form.
A Well, since the record wouldn't exist in the mainframe --
(Clarification by court reporter.)
BY MR. LANGLEY:
Q You can answer. He was making objection for the record.
A Okay. I would ask the question, can you produce a record of all of the shipments registered under Joe Moholland Inc.
Q Okay.
A For service for hauling over

such-and-such a period of time.

Q And would that be done by order date, by the date of actual transport, by this number we see on --

A I think it would be by order number.

Q Okay. And is this the order number that I've got highlighted on Joe Moholland Inc.?

A No, that's the government bill of lading number. The order number would be a number specific to that Mayflower mainframe that I referenced.

Q Okay. And what does that order number look like? Is it --

A Well, it starts with an M for Mayflower, and then it's got I believe a -- a four-digit number after that, like 1902, 1979, and then a dash and then another order number that might be just up like an incremental updated, you know. So the first part means something and the second part means something.

Q Did anyone other than -- or any entity other than Joe Moholland Inc. ever initiate that registration order number for transports that were done in the Mayflower system?

A It would only have been somebody within

Joe Moholland Inc. or potentially TMM.

Q What about Locke?

A No.

Q Locke -- Locke never had access to the Mayflower system?

A He did not.

Q So I'll try to summarize what I understand you -- how you would ask the question if you were trying to figure out --

A Sure.

Q You would ask for any registration of the -- either from Joe Moholland or from TMM for the shipment that was linked to this bill of lading number BC -- BGNC0502 -- 0520701?

A Yeah. Or, I mean, I --

MR. LUCK: Object to form.

A -- a more general question, could I see a list of all shipments that Joe Moholland Inc. is servicing over this time period.

BY MR. LANGLEY:

Q Okay.

A And if that -- nothing appears in there that would have been registered if it didn't, it wouldn't be.

Q But that wouldn't include the possibility

that TMM actually was the one that entered it in the Mayflower system, right?
A I'm sorry. Say that again.
Q In order to -- to give a comprehensive request to see if Mayflower's system had this bill of lading registered in it, we would need to ask that question. You just said all of Joe Moholland's registered shipment loads for this time period, April to -- to July.
A Um-hum.
Q And the same question for TMM. Because you -- and what I understood you to say just a minute ago was TMM could have made that order number in Mayflower's mainframe system as well?
A Right, but it would be the same query in the system regardless of who entered the order in.
Q Right, but to make sure that we cover it, we would need to ask for both?
MR. SESSIONS: Object to form.
A Could -- I mean, you could ask but it -- I believe it would be the same query. Shipments assigned for hauling by Joe Moholland Inc. over such-and-such a time period.
BY MR. LANGLEY:
Q Well, really we're talking about April to

July, right, April 6th to July 1st?

A Yeah, maybe even sooner than that, really, because I -- I -- we shouldn't have been registering shipments prior to that date even during the -- the period when the -- the temporary agency agreement was in effect.

Q Well, I understand that. But we're going to ask the question because that's our responsibility.

A Okay.

Q And -- and I want to understand for the purposes of any future discussions with the court how you would ask the question. And what I'm hearing you say is you would ask for any shipments registered in the Mayflower system under Joe Moholland Inc. or Total Military Management between April 6, 2022, and July 1, 2022?

MR. LUCK: Object to form.

A Although I think if you say -- if you qualify it and you say by Joe Moholland Inc. or TMM, you might be limiting the scope of the query.

BY MR. LANGLEY:

Q Okay. Well, how else could this shipment have been registered in Mayflower's system other than by Joe Moholland Inc. or TMM?

A It -- it wouldn't have been.
Q Well, my purpose is to -- to send a query that is not overly broad.
A Okay, well, that's fine.
Q Because when you say I might be limiting the query, I might be leaving something out. So are we talking past each other?
A Well, I mean --
MR. LUCK: Object to form.
A I guess you're asking me how I would ask the question. I would probably ask it in a -- in a -- in a broad sense. So what shipments are registered in the Mayflower system that Joe Moholland is scheduled to service and haul.
BY MR. LANGLEY:
Q Okay.
A But I believe, to point, if you ask the question the same way but add in the qualifier registered by an individual at Joe Moholland Inc. or TMM, I believe the results set would be the same.
Q But to be sure that we didn't miss something we're -- on the possibility that TMM made the registration for this particular load, we would need to ask for both?

A You could, sure.
Q All right. I'll show you what we'll mark now as Exhibit --
MR. LANGLEY: What exhibit number are we on? Okay. We had 271 as 5, Madam Court Reporter.
THE COURT REPORTER: Did you mark that as 5? Okay, I'll put that down. This will be 6?
MR. LANGLEY: Yeah. Thank you.
THE COURT REPORTER: Got it, sorry.
MR. LANGLEY: That's why I asked.
(Plaintiff's Exhibit Number 6 was marked for identification.)
BY MR. LANGLEY:
Q I'll show you now a document that was produced -- bear with me. All right. Sorry about that. I couldn't find it at first. So --
A It's -- yeah, that's it right there.
Q This is document Exhibit 6 that was produced by Locke Relocations that has the same number under what I understand to be bill of lading number from the email that we just looked at as Exhibit 5, BGNC0520701, correct?
A Right.

Q And so this would be the bill of lading for the load that was in the truck on July 1st involved in the -- in the collision with my clients, is that correct?

A Correct. One of two loads, correct.

Q Well, the other one has a different bill of lading number.

A Yeah, it's a different shipment.

Q Okay. But the -- the order that we agreed from TMM and the email that came in earlier had this bill of lading on them?

A Right. There would've been a similar one for the other order number.

Q Well, it's a different number?

A Right, yeah. Different offer.

Q Different offer, different number?

MR. SESSIONS: Ryan. Ryan, we -- those other emails we produced to you too. I was just getting you the first one that had the right date. So it's, you know, 269 instead of 271 is the other one in our production.

A You'll see a very similar email for the other shipment.

BY MR. LANGLEY:
Q Well, I'm just trying make sure that I have the proper bill of lading number for the actual goods that were in the truck that -- that was involved in the collision with my clients.
A Right. There will be two of those.
Q Okay. So two different shipments between the same truck?
A Correct.
Q We spoke over one another there. Both of those bill of lading numbers involved the transfer of these household goods or the -- the actual contents of the trailer that was involved in the collision with my client?
A That's correct. There were two separate shipments on the trailer at the time of the accident.
Q Well, it's -- it's confusing to me because the dates are different. So, for example, on Section 12 of the bill of lading for the order that matches up with the -- the first email we looked at, Joe Moholland 271, and I understand from the counsel there's another email that matches up with this bill of lading number.
A Uh-huh.

Q But the -- the date of the order for the bill of lading that matches up with that email on 271 is March 2nd, 2022. You see that?
A Yeah. Yeah, I see that. I wasn't aware of that.
Q So the date of the order and the date of the email that you got from TMM are two different days, right? March --
A Yeah, I believe we got the offer from TMM in the beginning of April.
Q So do you know what the significance of the date of order is on this?
A I do not. I mean, it could have been sitting on somebody's desk at the base for 30 days.
Q But in any event, can we agree that these two bill of ladings that we'll mark as Exhibit 6 match up with the order that Joe Moholland filled for the transfer of goods that were involved in the collision with my clients on July 1st?
A Yes.
Q Was there any separate payment -- back to that -- that temporary agency agreement, was there any exchange of any kind of consideration for that temporary agency agreement or any payment between

Moholland and Mayflower for that?
A No.
Q Is there an organizational and subsidiaries chart for Joe Moholland Inc. or -- or Joe Moholland Movers or the other entity, I think you said Moholland Transfer Company Inc.?
A Yes. You mean an org chart?
Q Yes.
A Yes.
Q What other organizations does it include?
A Well, there are multiple commonly owned companies with the same management structure.
Q Can you list those companies quickly?
A Here, now?
Q Yes.
A So there's Joe Moholland Inc., Moholland Transfer Inc., Modern Transportation Services, Alliance Transportations, Combined Van Lines, Aardwolf transfer.
Q How do you spell that?
A A-A-R-D-W-O-L-F. And is that six or seven?
Q I'm sorry, I wasn't keeping count.
A Oh. Well, there's seven of them. So Joe Moholland -- Crossroads Moving and Storage.

Not sure if I mentioned that.
Q Crossroads Moving and Storage. Okay. Are there any other DOT numbers that Moholland has for those various entities, or is there one DOT number that it uses for all of them?
A All of the hauling is done under the DOT number of Joe Moholland Inc. Each of the other entities has a DOT. That's for the purpose of doing business with the DoD. But the hauling is done under the DOT number of Joe Moholland Inc.
Q What is the DOT number?
A 486221. I -- I -- don't hold me to that. That -- that's close, but I'm not sure that's exact.
Q 482661, you said?
A 486221.
Q 486221. And I think you said earlier that when Joe Moholland does a shipment, it registers with some entity its DOT number prior to that shipment. Did I understand you correctly?
A I'm sorry. Say that again.
Q Did Joe Moholland in this -- this load that we've been talking about -- the two loads, the two bills of lading that we've seen for the -- the goods that were being transported involved in the

July 1st, 2022, collision with my clients?
A Um-hum.
Q Did Joe Moholland ever register its own DOT number as responsible for carrying that shipment?
A Register with -- with DoD?
Q Any entity?
A I'm not sure there's a paper transaction.
Q But you said earlier for this load, the July 1st, 2022, load that we've been talking about, you said that Mr. Burist was driving under the authority of Joe Moholland's DOT number. I understand you currently?
A Yes.
Q And I want to know was that registered anywhere. Because we know the DOT number on the side of the truck was not Joe Moholland's DOT number, right?
A Right. That's correct.
Q So did Joe Moholland Inc. ever register anywhere with any governmental entity or any other Highway Patrol, Department of Public Safety, any -- any place to let the public or anybody else know that the operator of that truck was, in fact, not

operating under Mayflower's DOT numbers it said on the side but Joe Moholland's DOT number, this 486221 that you told me?

A Yeah, I would have to confirm with our operations management to -- to get the exact process for that, because I -- I don't know off the top of my head.

Q All right. I'll ask you to do that.

A Sure.

Q And to the extent the answer is any different than I don't know, then I'll -- I'll rely on you to produce that. Otherwise we'll -- we'll take the answer as -- as no, that -- that Joe Moholland never did report to any entity that it was, on July 1st, operating under any DOT number other than what was on the side of the door.

MR. LUCK: Object to the -- object to the form. If there's not a response, there's not a response. I don't -- I don't think you can say you're going to assume it's an answer.

MR. LANGLEY: Well, he said I don't know that we ever did register with any other entity, but it -- but there -- that -- I may have some documentation to

change that.

What I'm saying is, unless there is some documentation or some answer provided to change it, I'm -- I'm going to construe his answer as no, there was no registration under any other DOT number other than what was on the side of the truck.

MR. SESSIONS: Yeah, Ryan, I'll just -- I'll just add in, you know, you're welcome to construe it how you like. I'll object to any stipulation that my client has testified that they didn't register as Joe Moholland. So it -- it -- it's not going to end up being an issue, but, you know, he -- that's not what he testified to.

MR. LANGLEY: Were you aware, Matt, just so we can not have some ambiguity hanging over all this, that there was some registration under the Joe Moholland DOT number that -- that we can just get to the point on this now?

MR. SESSIONS: No, I don't, other than the email you've looked at where Joe

Moholland responded to TMM saying we've got the load. I -- I don't know of any specific system where they go in and create some document that will prove it to you off the top of my head. It may exist. Rob -- Rob will look for it, and if it exists, we'll give it to you.

MR. LANGLEY: Okay.

A Check with the operations staff on what they -- what the process they follow for that.

BY MR. LANGLEY:

Q All right. You mentioned, I think, seven total entities that Joe Moholland Inc. has that its -- that -- in its org chart. Is that right?

A Well, there's seven -- there are seven different companies. They're not -- it's not a parent/child relationship, you know, there's seven -- seven -- seven separate entities.

Q And have -- do any of those entities currently have a relationship with Mayflower or UniGroup or any of its entities?

A No.

Q Are you familiar with Government Transportation Specialists LLC?

A Government Transportation Specialists

LLC. No, not off the top of my head.
Q How about Mayflower Military Movers?
A Mayflower Military Movers. No.
Q Has Joe Moholland or any of its related entities ever done business with Government Transportation Specialists LLC or Mayflower Military Movers LLC?
A I couldn't say.
Q Why not? Why couldn't you say that?
A I -- I'm not familiar with those names. It's certainly possible that when Joe Moholland was an agent for Mayflower that we would've serviced military business for one of those companies, but I don't know.
Q When Joe Moholland was an agent for Mayflower, did Total Military Movers provide business to Joe Moholland that was registered with the Mayflower mainframe that you described earlier?
A The shipments could have been registered in the Mayflower mainframe, but the offers would've come from the DoD.
Q I understand that.
A If the shipment would have hauled under the authority of Mayflower, it would've been registered in the Mayflower mainframe.

Q And how was the -- the fee split at that time between Joe Moholland and Mayflower?
A Boy, I -- I don't know how those distributions work. Not off the top of my head. I can talk to one of our senior billers about that.
Q But there was --
A I believe at that time the distribution would've been made out of Mayflower, had that been the case. In fact, I'm almost sure that's the case.
Q Okay. So if -- if the load had been registered with Mayflower, then TMM would have paid Mayflower and then Mayflower would have paid Joe Moholland whatever its share was?
A Yes, that's correct.
Q Okay.
A That's correct.
Q Now, you're going to give me the documentation or get it to your attorney to provide to me the documentation that shows how the load that was being carried on July 1st, 2022, was paid by --
A Yeah, I think I wrote that down.
MR. SESSIONS: I -- I've got it written down, Rob, to the extent you --

yeah. I won't let you forget it.

MR. ROWLEN: All right. Well, now is a good stopping point. We'll go ahead and take a break. And like I said, I -- I've got a -- I've got a medical appointment that'll take about 20 minutes. So if we can come back about 3:20, then it's a -- it's a Zoom thing too, so.

THE WITNESS: Should we just, like, pause on the Zoom and leave it open?

MR. SESSIONS: Rob, Rob, you should -- you -- and turn off your video. Otherwise you can just leave it hanging.

THE WITNESS: Okay, that's what I'll do then.

THE VIDEOGRAPHER: Off the record, 2:56 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: Back on the record, 3:26 p.m.

BY MR. LANGLEY:

Q All right. Mr. Garr, you ready to proceed?

A Yes.

Q I should have told you at the beginning if

you need a break at any time, just let me know. My hope would be over the next hour and a half to finish up. Any -- any lawyer that tells you an exact time, you can -- you can be sure that they're -- they're lying to you. But that's my -- that's my goal. May -- may go a little longer than that.

But certainly if you need a break at anytime, just let me know. I'll be happy to accommodate you. Just, you know, I would ask that you answer the question that is pending prior to taking a break, okay?

A Thank you, appreciate that.

Q All right. Yes, sir.

So earlier I -- I thought I understood you to say that Joe Moholland Inc. handled all of the interstate transfers or -- or moving assignments for the company, is that right?

A Correct.

Q So Moholland Transfer Company should not have ever been listed in -- as -- as a -- or -- or operating under its DOT number for any interstate transfer of goods?

A Correct.

Q And what's the consequence for that? I

mean, is there -- is there a penalty that's paid by the company if there's a violation of that rule, or paid to -- to an FM CSA? Or -- or what -- what's the -- what's the meaning of that in the bigger picture?

A Well, I believe technically, because each of the commonly-owned companies has their own DOT number, that a shipment could be hauled under the authority of the companies, it's just our practice not to do it that way.

Q Okay. So there -- are you saying there's no legal prohibition on Moholland Transfer Company doing interstate shipments?

A That's correct.

Q All right. Did Joe Moholland or any of its related seven entities that you mentioned to me earlier ever employ or have a relationship with Nicholas Burist?

A As an employee?

Q Or as a 1099 contractor?

A No.

Q Was Joe Moholland Inc. aware that Locke Relocations was going to have Nicholas Burist transfer this load on July 1st, 2022?

A Locke Relocations would make their own

determinations about who's hauling what shipment. Now, whether operations folks would've known in advance that Nicholas Burist was hauling a specific shipment, probably not. You could maybe draw conclusions based on, you know, who was where. But I would say generally no. Locke's going to make that decision.

Q Is there any other insurance that is applicable to Joe Moholland Inc. other than the Wesco coverage, the two policies that have been tendered in this case?

A There is not.

Q Are there any other carriers with whom Joe Moholland has an insurance relationship or had an insurance relationship as of July 1st, 2022?

A There's not.

Q What about today? Did -- did -- are you insured or is Joe Moholland insured by any other carrier other than Wesco?

A Yeah, I believe Wesco declined coverage for once the policy year ended, and so the auto coverage is provided by a different carrier now.

Q Wesco declined coverage at -- for this policy period after the July 1st, 2022, wreck, because of that wreck?

A I believe so. I don't know for sure, but I believe so.
Q Okay. Is there any correspondence to that effect?
A Not that I'm aware. I believe they just said they're declining coverage.
Q And who is the coverage with now?
A A company called Prime.
Q And does that cover all of the -- of the vehicles for Joe Moholland Inc.?
A It does.
Q What's the total trucks at Joe Moholland Inc. -- well, strike that.
On July 1st, 2022, was any of Joe Moholland Inc's equipment being used for the transfer of the -- the two bill of ladings that we've seen for the goods involved in the -- in the collision with my clients?
A I'm sorry. You said Joe Moholland Inc.-owned equipment?
Q Correct.
A No.
Q Was Joe Moholland Inc. aware that Locke Relocations was using the -- the trailer that was involved in the collision, that International

ProStar that Mr. Burist was driving?
A Yes.
Q Was that a vehicle that had -- had -- Joe Moholland had previously owned?
A No.
Q Was that a vehicle that Joe Moholland was aware Locke was using for prior transfer of goods?
A Yes.
Q How many different transactions do you think that vehicle completed?
A I -- I couldn't even venture a guess.
Q In the hundreds or thousands?
A Wouldn't be thousands. It could be tens, hundreds.
Q Okay. Do you know how many of those shipments were done where there was a registration with Mayflower?
A In that specific tractor?
Q Correct.
A Boy, I don't know, unfortunately. So in other words, would -- would a shipment have been hauled using that tractor under the authority of Mayflower?
Q Correct.
A Yeah, I don't believe so in that

tractor, because I believe that runs up and down the East Coast. Or was running up and down the East Coast. But I couldn't say for certain.

Q So how would it be then that Mayflower's DOT number was placed on the side of that tractor if it never was used for a shipment of goods that were registered in the Mayflower mainframe?

A Because it's a tractor. All the tractors in the fleet would have the Mayflower -- would have had the Mayflower DOT number on them at the time that the company was an agent for the van line.

Q Okay. So every single one of the Joe Moholland trucks that were being used for shipments had that same logo on the side?

A If they were primarily interstate fleet, yes. If it was -- if they were trucks used primarily for local work, then they would've had the Joe Moholland number on the side.

Q Okay. How many trucks were in that interstate fleet?

A I don't know off the top of my head.

Q Just a ballpark?

A Oh boy.

MR. LUCK: Object to the form.

A 15.
BY MR. LANGLEY:
Q 15, you said?
A I'm guesstimating.
Q Can we agree it's at least 10?
A Probably.
Q Well, you told me earlier there were 20 different pieces of equipment that the Mayflower DOT number removed off of them. And I think you said it included trailers --
A Yeah.
Q -- per the July 11th, 2022, letter that we looked at earlier.
A Yeah. And that would've included other equipment besides tractors as well.
Q Yeah, I think you mentioned it could have included -- the 20 included trailers.
Do you remember what of that 20 included trucks or tractors that had the Mayflower logo and -- and DOT number on it?
A I don't, but it wouldn't be difficult to find that.
Q Okay. I'd ask you to do that and provide it to your attorney.
A Sure.

Q Would there have been any indication to the public, any -- any person looking at this tractor load driving down the road, that any entity other than Joe Moholland Moving as an affiliate of Mayflower, Mayflower DOT number on the side was responsible for that load?

A The trailer would have had no specific markings on it because it was a -- a leased trailer. And the tractor had the markings on it that we had looked at earlier.

Q Okay. So my question is, would there have been any indication to the public that any other entity was responsible for that load besides Joe Moholland Moving and Mayflower?

A No, there wouldn't have been.

Q That bill of lading and -- so on this bill of lading for the two -- two different shipments that -- that comprised the one load that was in the -- the trailer on July 1st that was involved with my clients, can you tell where that load originated from and where it was going to?

A Yeah. Yeah. It originated in Virginia Beach and it was destined for Jacksonville, Florida.

Q Okay. And it looks like 1657 Guthrie

Street, Virginia Beach?
A Yes.
Q And is that Gregory Nichols' property, is that the -- the, I guess, naval officer that was moving from Virginia Beach to Jacksonville?
A Correct.
Q Who paid Mr. Nichols for his loss of all of his goods that were being transported?
A Joe Moholland Inc.
Q Do you know what that number was?
A I believe it was in the 50 to $60,000 range.
Q Is there documentation of that payment?
A There is, yes.
Q That your counsel could provide me? Would you provide that to your counsel to provide to me?
A Sure.
Q Was any of his property able to be salvaged or was it just all considered a total loss?
A It was essentially a total loss. I believe there were sentimental items recovered by one or both of the shippers. But essentially they were paid it out as total losses.
Q So the second bill of lading is for this Ashley Sheriff who had a different address in

Norfolk, Virginia, but was also going to Jacksonville. Was the -- the -- this Sheriff also paid by Joe Moholland Moving for the loss of her goods?

A Yes.

Q And was that a common practice to take the -- the household goods from a service member who was moving from one city to another and combine two different service members into one trailer for efficiency sake when you're going through generally the same area to generally the same area?

A Yes.

Q I'd also ask you that if you would provide the -- any payment made by Joe Moholland or any other entity for the damage to Ms. Sheriff's goods to your counsel so you can provide that to us. Is that agreeable, Mr. Garr?

A Yes.

Q Did Joe Moholland Inc. ever do any training for any of Locke's drivers?

A We required drivers to be DOT qualified and go through the DOT qualification process.

Q So is that a yes or a no?

A Yes.

Q And did Joe Moholland ever participate in

any training for Nicholas Burist?

A Yes, Nicholas Burist would have been required to have been qualified, DOT qualified.

Q I -- I have not seen in your production any documentation that verifies that he had a certificate of training completion or anything like that with -- with Joe Moholland's -- or actually, I take that back.

Do you have access to Joe -- JMI 106?

MR. SESSIONS: Are you asking if Rob does?

MR. LANGLEY: Yeah.

MR. SESSIONS: He's not going to have a copy of what we produced to you with the Bates numbering on it.

BY MR. LANGLEY:

Q Okay. Let me see if I can just show you this document. Have you -- have you seen that before, this certificate of training completion for Nicholas Burist where it says Joe Moholland Inc. on there?

A Yes.

Q I don't know if it's backwards or not.

A It -- it's good. Looks the right -- the

proper way.
Q Okay. Well, I'll represent to you it's JMI 106 that your counsel has produced to us. It's dated April 3rd, 2017. It says agency dealer name and number, Joe Moholland M333. Is that right?
A Yes.
Q So that would have been the same M333 that we saw on the side of the truck in the pictures that we marked earlier?
A Yes.
Q So it was no secret to Joe Moholland or to -- to Mayflower -- I think that Mayflower actually performed that training -- that Nicholas Burist was driving for Joe Moholland?
MR. LUCK: Object to form.
A He was driving for Joe Moholland.
BY MR. LANGLEY:
Q Was Mr. Burist primarily or previously, rather, employed by Mayflower?
A Not that I'm aware of.
Q I'll represent to you there's been some documentation produced that -- at -- at one point he was employed or at least had an independent contractor arrangement with Mayflower.
MR. LUCK: Object to form.

BY MR. LANGLEY:
Q Do you have any basis to dispute that?
A That would be news to me.
Q Are you aware of any other drivers that were responsible for the load that Mr. Burist was driving on July 1st, 2022?
A No, I think he was -- I think he picked up and was delivering those shipments.
Q Did Joe Moholland or Mayflower, to your knowledge, ever report the -- the tractor or the trailer that was involved in the collision with my clients on July 1st as stolen?
A No.
Q Did Joe Moholland or Mayflower, to your knowledge, ever send a representative to Kelly's Towing to inspect the -- the tractor or the trailer after the collision?
A A representative of Joe Moholland?
Q Or Mayflower, to your knowledge.
A Not to my knowledge. Although the insurance company I believe did. I don't know if that would be -- that would fall under what you're saying here.
Q Okay. And what communication did Joe Moholland have with the insurance company about the

condition of the tractor or anything along those lines after July 1st?

A I think most of the discussion was one way. In other words, the insurance company asked for -- for information and Joe Moholland Inc. provided it.

Q Did the insurance company ever ask you why it was that Mayflower's DOT number and information was on the side of the truck?

A No, I don't think they ever asked that.

Q Did any insurance carrier for Mayflower ever reach out to you?

A No.

Q Did any attorney for Mayflower ever reach out to you?

A No. Aside from the discussion we had earlier about the -- the cease-and-desist letter. Although I'm not sure if that was legal or risk management.

Q Okay. And you don't know if it was a lawyer that you talked to after that letter where they were insistent that you actually remove all of the logos and DOT numbers from your trucks?

A Correct. I don't know if he was a lawyer or not.

Q But in any event, all those conversations happened after July 11th, 2022?

A Around July 11th. It might have been a few days before or after we had that -- those conversations.

Q Okay. But in any event, it happened -- those conversations all happened after July 1st, 2022?

A Yes.

Q You don't recall any such conversation with risk management for Mayflower prior to July 1st, 2022?

A Correct.

Q Does Joe Moholland have any maintenance or inspection records for the -- the 2014 ProStar that was involved in this collision?

A Yes. And I -- I believe those would have been provided. Matt maybe would know.

MR. LANGLEY: You -- you guys provided those, Matt?

MR. SESSIONS: Believe so -- I don't -- I -- I'm sure we have, though I don't think we produced them. Once again, I was limiting the production to jurisdictional questions related to

Mayflower.
BY MR. LANGLEY:
Q So what would be the purpose of Joe Moholland maintaining inspection and maintenance records on that truck?
A Because it's a DOT requirement. And so there are certain -- as -- as a result there are certain requirements we impose on anyone or anything that's operating under our authority, be it personnel or equipment. For example, you know, getting drivers qualified.
Q Did Mayflower keep a record of those inspection or maintenance records for that truck, to your knowledge?
A I could guess. Want me to guess?
MR. LUCK: Object to form. I don't want you to guess.
BY MR. LANGLEY:
Q I want you to tell me what you -- what you believe from your experience and your relationship with Mayflower. Or -- and to the extent you have an opinion about what the DOT wants.
A I -- I believe -- I believe DOT inspections would have been sent to Mayflower, but I -- I -- I'm not sure about that.

MR. LUCK: Object to form.
BY MR. LANGLEY:
Q And when would those -- the -- the last DOT inspection have been done on that truck?
A Oh boy. Matt, maybe you have that handy. I -- I don't. February of '22.
MR. SESSIONS: I want to say we did produce that to you actually.
MR. LANGLEY: Okay.
A I believe it was February of '22. Was the DOT annual inspections.
BY MR. LANGLEY:
Q Okay. And during that time period, there was -- there was still the agency agreement with Mayflower, so it's your belief that Mayflower got a copy of those DOT --
A Probably not. Not for the one in February.
Q Okay. Why not?
A Because by February we would've been operating under the temp -- temporary agency agreement. Which, again, was -- was, as I understood, more about just kind of flushing out what was still in the system and giving us time to rebrand equipment.

Q Okay. Is it your testimony that no new load was ever entered into the Mayflower registration mainframe after -- by Joe Moholland after January of 2022?

A Correct. And if it did happen, it would've been in error. Shouldn't have happened.

Q But in any event, we would verify that based on the -- this discussion we had earlier, the request about any of the -- the record will speak for itself, so we don't have to go back through all that.

A Yes.

MR. LANGLEY: Matt, in -- and my office is telling me that Mayflower produced, you know, from their records the February DOT inspection, the annual inspection.

BY MR. LANGLEY:

Q You might be surprised to learn that, that Mayflower kept it because we thought that the agreement had shifted by that time.

A Right. Yeah. I am surprised to hear that, yeah.

Q Okay. What else changed in the relationship between Moholland and Mayflower from

the January date, 1st January 2022 that was different than the way it was prior to the termination of communications?

A Well, the most significant change is no more shipments could be registered in the Mayflower system. So we were to continue servicing shipments that had already been registered, but we were to -- we were not to register any new shipments in the Mayflower system. So that was a significant change.

Another significant change from my point of view was the fact that we had to rebrand all of the equipment. That was a very time-consuming and expensive effort.

Q Was there any documentation or communication that -- to support your statement there that you were not to -- to enter any new registrations into the -- to the Mayflower mainframe after January 1, 2022?

A Yeah, honestly I'm surprised it's not explicit in the temporary agency agreement, to be honest with you, because that was my understanding of how it was supposed to work. It's probably documented somewhere, but I couldn't tell you exactly where.

Q Well, I'd ask you to look for that and to the extent of the document and provide it to your counsel. Just so we're specific on what I'm looking for is any communications or documents that would reflect what you've just stated, which that -- is that Joe Moholland Inc. was not to enter any new registration in the Mayflower system after January 1, 2022.

And I -- I've been using Mayflower all along, but it's really -- the relationship was with -- with -- in some of the -- the paperwork that was seen in the communication that we'll see in a minute, the -- at least discussion of a relationship beyond Mayflower to other UniGroup entities. Right?

A Correct, yeah.

Q And what other UniGroup entities would Joe Moholland have a relationship with on July 1st, 2022, if any?

A Well, there were no relationships with Mayflower on July 1st.

Q What about any other UniGroup entities?

A None.

Q What about this -- where are the names -- UniGroup government business unit?

A Yeah, I -- I don't know what that is.
Q You never communicated with Chris Wynn about UniGroup's government business unit?
A I've communicated with Chris Wynn, but I'm not familiar with that company name.
Q Well, I don't know there's a company name. It -- it may encompass all of the -- the various entities I mentioned to you earlier in the -- in the government business unit.
In fact, I'll just pull that up. Make this Exhibit 7, I believe.
(Plaintiff's Exhibit Number 7 was marked for identification.)
BY MR. LANGLEY:
Q All right. I'll show you a document's been produced by Mayflower of a -- of an organizational chart. Can you see that?
A I do, yeah. Can you zoom in just a little bit.
Q Yeah. So at the top there's UniGroup CA, and then Mayflower Transit and United Van Lines. That's what I was reading from earlier when I mentioned two entities, Government Transportation Specialists under United Van Lines and Mayflower Military Movers under Mayflower Transit LLC.

A Yeah, I do not know those entities.

Q Did anybody from any UniGroup company that could have been under the UniGroup government business unit ever contact you after January of 2022?

A Not that I can recall.

Q Do you -- do you know the name Rae Hickenbotham?

A I do, yeah.

Q Did Rae Hickenbotham ever contact you after January of 2022 about continuing business with Mayflower or UniGroup's government business unit?

A Not that I can recall. I've certainly communicated with Rae, but I don't remember communicating after January of last year. Although it's possible.

Q What did you communicate with Rae about?

A I remember asking for military scores. So when we were an agent for Mayflower, I would ask Rae for military reports. And I also think that Rae was involved with Brinks at one point for military business.

Q Is there a list of all the existing shipments that Joe Moholland completed for Mayflower after January 1, 2022?

A Yes, I believe that list does exist.
Q Okay. If you haven't produced it already, can you -- can you provide that to your counsel so he can give it to us?
A Sure.
Q Have you communicated with Rae Hickenbotham on behalf of any other entity other than Joe Moholland Inc. that would have done business with UniGroup's government business unit?
A No.
Q Do you know Brian Schuckalo, S-C-H-U-C-K-A-L-O?
A I do, yes.
Q Who is Brian Schuckalo?
A Brian is the chief new business ventures officer with the Long & Foster Companies.
Q Why would he have been copied on communications with you and Tim Woody about the temporary agreement between Joe --
A If I was -- when the company was sold, there was discussion with UniGroup about maintaining the ongoing agency affiliation with -- with UniGroup, and Brian was involved in those discussions. Ultimately the decision was made by UniGroup's board to terminate that agency

agreement after the sale of the company.
Q The sale of what company?
A Joe Moholland Inc.
Q What -- what was the date of the sale of Joe Moholland Inc.?
A 12/31 of 2021.
Q Okay. And was that the reason for termination of the agreement, the overall agency agreement between Joe Moholland Inc. and Mayflower?
A Yes.
Q And so there was some discussion about continuing that agency agreement after that 12/31/2021 date?
A Right. Post sale. But UniGroup ultimately decided to terminate the affiliation.
Q But according to the correspondence I've seen, it was Joe Moholland Inc. that initiated termination, that -- that communication that was in January of 2022, right?
A No, it would've been UniGroup.
Q Okay. I don't want to -- I don't want to presume anything.
A It was some point in early January.
Q Okay. Tell me -- tell me -- tell me everything you can remember about that

communication, that termination of the agreement?

A So what I can recall is -- and I believe this is part of the agency agreement that when there was a significant change in ownership of an agency, that UniGroup has the opportunity to review the stock transaction and -- and make a decision about whether they're going to continue the relationship. And if the -- the -- the new owner has to reapply.

I think that's what it boiled down to is because of the significant change in ownership, the company would have to reapply to be agents of UniGroup. And ultimately the Uni board decided it did not want to continue the agency relationship because of the new ownership.

Q Are you part of the new ownership of Joe Moholland?

A No.

Q You part of the old ownership?

A Yes.

Q And -- and you sold your stake but remained as president?

A Correct.

Q Do you have an earn-out period or time that you have to remain as part of the sale?

A No.
Q Show you a letter that maybe I'm confused about, that I thought indicated that the termination came from the Moholland side.
A Okay.
(Plaintiff's Exhibit Number 8 was marked for identification.)
Q So this is January 20th, 2022, from Mayflower to -- to you, Rob Garr, as president of Joe Moholland Moving and Moholland Transfer. And, again, you see that M333 and M444, right?
A Yes.
Q And that's the same M333 that was on the truck that was involved in the collision with my clients?
A Yes.
Q So at the first sentence, Mayflower Transit acknowledges receipt of your January 19th, 2022, email establishing the termination of the agency agreements.
A I would agree with you that language makes it seem as if we initiated that termination, but I know that the decision was made by UniGroup.
Q So the -- I've seen -- well, was there an actual notice of termination that was sent by

UniGroup to Joe Moholland?
A Probably.
Q Okay.
A Might have been an email.
Q Was -- was there ever any letter sent certified mail, return receipt requested?
A Well, unfortunately I don't recall.
Q I'd ask that you look for the notice that you received of termination from Mayflower and provide it to your -- your counsel and -- and they can -- they can provide it to us. Is that agreeable?
A Yes.
Q Has Mayflower ever given personal service, hand delivered service of any notice of termination to Joe Moholland?
A No.
Q And just so we're clear, I -- I think you said Mayflower has never given notice of termination to Joe Moholland by certified mail, return receipt requested, is that right?
A No, I said I didn't recall if they had or not.
Q Okay. You're going to look and see?
A Yeah. Yeah, I wrote it down.

Q We'll -- we'll look at the next page, I think has your January 19th email.
A Oh, okay. Yeah, that would be helpful.
Q Is this the January 19th email that was referenced earlier in that letter?
A That's probably it, yes.
Q Which says, from you, Tim and Chris, great speaking with you this afternoon. Thanks again for your time. As discussed, we are requesting a 90-day termination date for our two agencies.
A Right.
Q That sound like Joe Moholland is requesting the termination from Mayflower?
A Yeah, the focus there is we wanted to request 90 days to unwind the relationship. I think the default was like 30 or 45 days.
Q I gotcha.
A So we're requesting additional time.
Q So there was correspondence that preceded January 19th communication that we see here, Mayflower 007?
A Yes.
Q All right. The way I read it initially was that this was the first salvo or communication to establish the termination. That's not accurate?

A Right. There would have been email or phone conversations that took place before this. During those conversations, we would've been notified that UniGroup was -- had decided not to continue the relationship.

Q Okay. And you say email and phone conversations. Again, you don't know of any personal service of notice or any service of notice of termination that was sent by certified mail with return receipt?

A Correct, I do not recall that.

Q And to the extent that -- that would exist prior to January 19th, you will produce that to your counsel?

A Yes.

Q Is there a system for the communication of the -- the bills of lading from Joe Moholland to Mayflower?

A So a method to present or provide the bills of lading to Mayflower?

Q Right. Is that done through that mainframe you were talking about before or is there some other way that the bills of lading are submitted?

A Well, I don't know. Again, I'd have to

check with our operations management team. But probably by email. It would've been by email. It would not have been through -- the mainframe is all text-based.

Q Right. Well, I -- I think I cut you off earlier. You were starting to tell me -- or maybe I just didn't ask any follow-up questions, but you were starting to tell me what changed about the relationship from January 1, 2022, to April of 2022, and I don't know that you told me everything there was to -- to say about that.

A Yeah, there -- so the two big ones were the registration of the shipments, and -- and -- and no longer registrations with Mayflower. And the second one was rebranding all the equipment.

I mean, and not just the equipment but, you know, letterhead, signage and -- and all that kind of stuff.

And in addition to IT transitions, we had to implement our own systems to backflow for the loss of access to the services that were being provided previously by Mayflower.

Q Okay. Did -- prior to January 1, 2022, did Joe Moholland have any other major source of business other than its agency relationship with

Mayflower?
A Oh, yes. Most certainly. Yeah. So most of our business was -- was government business.
Q Okay.
A And -- and not of that -- very little of that came from Mayflower.
Q So what would be the point from a business standpoint of Joe Moholland doing government business, getting these orders from TMM which originally sourced from the government, why would Joe Moholland benefit from including Mayflower on that transaction?
A Oh, I'm sorry. In which transaction? I -- I -- I was anticipating a question and I -- I -- I -- I'm sorry. I...
Q Well, and why don't you answer the question you thought I was going to ask? Maybe that'll help.
A I thought you were going to ask me what was the benefit of the relationship with Mayflower.
Q Well, that's essentially what I was getting at. If you had all this business from the military on your own, what was the point in

having -- having the agency agreement with Mayflower?

A Well, that wasn't always the case, right? So the -- the company has been around for 30-plus years, and -- and -- and an agent for Mayflower Van Lines for 20-plus of those years.

Early on in that relationship the company was doing a lot of what we call COD business outside of the government business, people moving locally and long distance. And so having that branding was very good for Joe Moholland. You know, Mayflower brand is very recognizable.

And so we just sort of maintained that over the years. We always maintained a small COD department to do some of those moves. But the preponderance of our business was government. From the time I joined until the time of the termination of the agency agreement.

Q So was there any benefit to Joe Moholland at -- after January 1 of 2022 to the Mayflower relationship?

A Was there any benefit to Joe Moholland Inc. after January?

Q Correct. Was -- was Joe Moholland Inc. continuing to be paid for shipments by Mayflower

after January 1, 2022?
A It would've been for shipments that were already registered prior to the termination of the agreements, so it would've been --
Q Okay.
A -- Joe Moholland Inc. would've been paid for those shipments.
Q Okay. And is there an accounting record of all payments from Mayflower to Joe Moholland Inc. after January 1 of 2022?
A Yeah, Mayflower may have that.
Q Well, Joe Moholland would have it too, right?
A Yeah, that would be a remittance. And we can probably track that down -- it's probably a year-plus old.
Q Okay. If you could do that and provide that to your counsel, I'd appreciate it.
So that would be payments from Mayflower to Joe Moholland after January 1, 2022. Did you understand that, Mr. Garr?
A Yes. Yes.
Q Were there any other incidents where a truck like this with Mayflower's logo and DOT number on the side was involved in a collision after this

January 1st, 2022, date where Moholland was responsible for the -- the shipment and load or at least finding a contractor to fulfill the shipment and load?

A No.

Q Has Joe Moholland and all of its employees completed the removal of any branding from Mayflower as of today, April 27, 2023?

A Yes.

Q So I'm going to point you back to this communication with Chris Wynn. This line here. So this letter is dated January 20th, 2022, right?

A Uh-huh. Yes.

Q And so the final paragraph or -- or second to the final paragraph says, as a reminder, it will take up to 180 days from the effective termination date to finalize your statement and accounts for M333 and M444. I read that correctly?

A Yes.

Q So 180 days from January 20th, 2022, is -- calculate it here -- is July 19th, 2022?

A That -- that sounds right.

Q Okay. So in the invoices that we see for this M333 truck that was involved in the collision with my clients, Mayflower's correspondence

indicates that the relationship would still be in existence in some respect on July 19th, 2022. We agree on that?

MR. LUCK: Object to form.

A Yes, through the remittance of the agency statements.

BY MR. LANGLEY:

Q And what is an agency statement?

A It's -- it's a list of transactions that have occurred that are either payments to the agency or payments due from the agency. So, for example, if an agency had all the shipment under Mayflower's authority, those things would include payments to the agency for that shipment.

But it may also include debits for agency expenses that are paid for by Van -- by Mayflower. For example, insurance, services that the -- that the van line provides, like IT services. So there's credits and debits on that statement each month.

Q Do you recall what the last date of payment was on the M333 vehicle?

A I -- I don't.

Q In the collision with my clients?

A I don't.

Q But this letter from Mayflower contemplates that payment could have been up to July 19th, 2022?
MR. LUCK: Object to form.
A It -- it does.
BY MR. LANGLEY:
Q And did you agree with that?
A Yes.
Q And that's from Chris Wynn, senior director, UniGroup. That right?
A Yes.
Q And that's -- that was the point person who you said earlier I think was acting as part of the transition team for Mayflower Transit and Joe Moholland moving?
A Yeah. The point person I would say was Tim Woody, but Chris Wynn was working with him. They were the two -- our -- our two primary points of contact for the unwinding process.
Q Does Mayflower still owe Joe Moholland any money today?
A No.
Q And how about vice versa? Does Joe Moholland owe Mayflower any money today?
A No.

Q Did the -- did the transaction ever occur that way? I know you told me earlier that when Mayflower and Joe Moholland were involved in a military move with TMM, TMM would pay Mayflower and then Mayflower would remit its portion to Joe Moholland. Or at least that's what I understood you to say.

A Yeah, I believe that's how that worked, yes.

Q Was it ever done the other way where the military entity, whether it was TMM or any other, paid Joe Moholland and then Joe Moholland paid Mayflower?

A No.

Q Did -- did Joe Moholland pay Mayflower any of the proceeds of the payment from TMM for the July 1st transport that my clients were involved in the collision with?

A No.

Q And how do you know that?

A Because the shipment would have been hauled under Joe Moholland Inc. Safari, and we didn't have a relationship with Mayflower at that point. The shipment would not have been registered in Mayflower's system.

Q You haven't seen the Mayflower system I think you told me earlier, right?
A I've seen the screens, yeah.
Q But you -- you haven't -- you said it would not have been registered. You don't know whether it was registered or not, and that's the whole point of the conversation we had earlier.
A I -- yeah, I cannot say definitively that it was not, but it should not have been.
Q And you -- you said earlier I think that this load was being transported under the Joe Moholland DOT number, but that -- that -- I want to make sure I've got all of the documentation or evidence that you base that statement on. Is there anything other than that one email, that JMI 271, that you base that on?
A No.
Q I know you're going to look to see if there's any communication or documentation. But as we sit here today, the sole basis for your statement that the July 1st shipment in the truck that caused the injuries and death to my clients, the sole basis for your statement of that was that an operation under the Mayflower DOT number -- excuse me, Moholland DOT number is that JMI 271?

A Yes.
Q Do you remember -- moving on to this January 20th email from Chris Wynn -- the last time you communicated with him about the M333 truck that's at issue in this case?
A About the specific truck?
Q Well, he says -- and this is January 20th, 2022, email -- we will remain in touch with you during this transition. And what I'm asking now is, do you remember the last time Mayflower Transit or UniGroup or anybody on its behalf communicated with you regarding the M333 truck and agency agreement that was involved in this collision?
A I don't believe I ever had a conversation with them about that.
Q Okay. So when Chris Wynn wrote in this email, we will remain in touch with you during this transition, what did you take that to mean? Just that emails would be coming.
A Yeah. Yeah. Or I would say, you know, the rebranding, IT transition, again, you know, flushing out whatever orders might have been remaining in the system.
Q I know you said that any branding for Joe Moholland or its employees had been removed from

trucks and -- and websites and Internet sites that are under control of -- of Joe Moholland or otherwise.

To the extent those still exist, to the extent that -- that LinkedIn profiles of Joe Moholland employees, for example, indicate that there's still an agency agreement between Mayflower and Joe Moholland, can we agree that that leads the public to believe that there's still an agency agreement between Joe Moholland and Mayflower?

MR. LUCK: Object to the form.

A Yeah. If someone were to look up a LinkedIn profile -- I'm using your example -- of an employee of the company and that LinkedIn profile still referenced Mayflower, then, yeah, then -- then -- then a third party would be led to believe there was still some kind of agency affiliation. At least for that individual.

BY MR. LANGLEY:

Q Okay. In some of the communication we've seen, there's a reference to this -- to a portal, an agent HOD. Is that the same thing as the mainframe you referenced earlier?

A Yeah, I think so.

Q Let me show you what I'm talking about.

A Yeah, host on demand. That is the mainframe. Yeah.

Q Okay. And this here at the bottom of this letter, access to Mayflower systems such as the portal and agent host on demand will be discontinued for agency numbers M333 and M44 -- 444.

A Yeah, those are IT systems, and I believe Host on Demand is the mainframe.

Q Okay. And it says access beyond 30 days from the effective termination date that you requested by contacting Chris Wynn, right?

A Yes.

Q And the effective termination date was actually April 28th according to this letter, right?

A Yes.

Q So can we agree that Joe Moholland still had access to the mainframe, which is referred to as a portal or agent HOD, at the time the order came in for the shipment of goods that was in the truck on July 1st in the collision that caused the injury and death to my clients?

MR. LUCK: Object to form.

A Yes. So April 28th is the termination date, and it says 30 days from the effective

termination date. So yes.
BY MR. LANGLEY:
Q So to the extent you testified earlier that there wouldn't have been any way for a Joe Moholland employee to enter in this shipment order into the -- to the portal and mainframe and agent HOD, that's incorrect?
MR. LUCK: Object to form.
(Simultaneous speaking.)
A I believe the access was changed. I -- and I don't recall for sure, but I believe the access permissions were changed.
BY MR. LANGLEY:
Q Well, that's not what this letter for Mayflower says, is it, sir?
MR. LUCK: Object to form.
A No, it doesn't.
BY MR. LANGLEY:
Q This letter says that you will have access 30 days from the effective termination date. So that would be not just through April 28th but May 28th.
MR. LUCK: Object to form.
BY MR. LANGLEY:
Q That's what the letter reads, right?

A That's how I read it, yeah.
Q And so there would have been an ability for Joe Moholland to enter the order into the Mayflower portal and agent HOD on April 6th, 2022, when this order came in for the shipment that's involved in this collision?
MR. LUCK: Object to form.
A Based on the wording in this letter, I would agree with that statement.
BY MR. LANGLEY:
Q All right. Do you know of any or can you point me to any other communication with Mayflower that would contradict that understanding that you just described?
A No, I don't believe I could.
Q Well, as we go through these communications, if you see something that you can point me to, please do so.
A Will do.
Q Did UniGroup ever give a reason for the notice of termination other than that change of ownership you mentioned before?
A They did not. It was based on change of ownership.
Q And it looks like Chris Wynn agreed to

your request for the 90 days in this email that was basically establishing that April 28th termination period?

A Yes.

Q So is there any way for us to -- to know definitively when that -- that temporary agency agreement was signed?

A I could check and see if I have a copy that's got the date on it.

Q Okay. I'd ask you to do that. And if you have that, provide it to your counsel.

MR. LUCK: Ryan, we -- we produced the email where Mr. Garr emailed the completed, signed agreements to Mayflower. So we can clear that up later in the deposition, if you'd like?

MR. LANGLEY: That's okay. We can -- we can do it now, if you've got it. I'll let you share your screen. We can mark that as an exhibit.

MR. LUCK: Okay. Let's see if my technology knowledge is up to snuff here.

MR. LANGLEY: Yeah, if you want to email it to me, I can fumble through it.

MR. LUCK: I think I've done it

before. Can you guys see that?
THE WITNESS: Yes.
MR. LUCK: Okay.
(Defendant's Exhibit Number 9 was marked for identification.)
BY MR. LANGLEY:
Q Does that refresh your recollection, Mr. -- Mr. Garr, as to what date the agreements would've been signed?
A Yeah. Yeah, it would have been sometime on or before January 26th.
Q Okay.
MR. LANGLEY: So if you could send that to the court reporter.
MR. LUCK: Will do. Madam Court Reporter, what number would that one be?
MR. LANGLEY: It's 8. 9.
(Discussion off the record.)
BY MR. LANGLEY:
Q And, Mr. Garr, this is the -- that Brian Schepperlou (sic) gentleman we were talking about earlier, and I think you said he's with Long & Foster. And is that a brokerage-type agency to help facilitate purchases of -- of these kind of entities or what do they do?

A They're a real estate company.
Q And how would he have been involved in helping to try to navigate a continuation of the agency agreement? Or what was the purpose of him being copied on this January 21st, 2022, email?
A Well, his role at Long & Foster is the chief new business ventures officer.
Q So how would a real estate chief new business ventures officer have anything to do with this communication on a temporary agency agreement between Moholland and Mayflower?
A Well, they were the -- they were the buyer of Joe Moholland Inc.
Q I gotcha. Sorry I missed that. I missed that earlier. So Long & Foster bought Joe Moholland Inc.?
A Yes.
Q So they do more than real estate?
A Yes.
Q And so they were interested in continuing the relationship with Mayflower?
A Yes.
Q And for whatever reason, Mayflower elected not to do that?
A Correct.

Q Is there a difference between Mayflower Van Line and interstate business and the government business?

A Mayflower's government business?

Q Yes.

A I don't know.

Q I'll show you why I asked. This is what I was referencing earlier.

A Sure.

Q The email, January 26th, 2022, Chris Wynn to you copying Tim Woody and Brian Schuckalo again, Thank you, Rob, for forwarding the executed documents. I am also of the understanding that UniGroup's Government Business unit may be in contact with you to address foreign agent arrangements for handling ongoing future government business for them. Remember when I asked you earlier?

A Yes. Now that I understand the question, yeah.

Q And you said you con -- you -- you've talked to Rae Hickenbotham, but not about UniGroup government business?

A Correct, I would've spoken with Rae about customer service scores or rates in the

past.

Q So is it your testimony that Moholland, Joe Moholland Inc. or any of its related entities has never done any business with UniGroup government business?

A We may have in the past when we were an agent. I mean, we -- we serviced government shipments for Mayflower prior to the termination of the agency agreements.

Q On July 1st, 2022, was there any servicing of government shipments by Joe Moholland?

A Was that the end of the question? I'm sorry.

Q Yes.

A Was there any servicing by Joe Moholland Inc. of government shipments, period, or -- or of someone's -- someone specifically, their government shipments?

Q On July 1st of 2022, was there any servicing by Joe Moholland of Mayflower government shipping?

A Oh, Mayflower government shipments. No, there was not.

Q What about UniGroup government shipments?

A There was not.

Q So what -- what does this mean? I mean, is this just made up stuff in this email that never came to pass? What -- what am I to make of this on behalf of these families that have -- that have lost so much? It -- it appears to indicate an ongoing relationship with Moholland and the UniGroup government business division, and you're telling me it's just -- just nothing?

MR. LUCK: Object to form.

A My guess is what he's referring here to is the -- the shipments that were in queue that had already been registered with Mayflower that had yet to be serviced. And it's possible -- should be contacting you in the near future, unless you had already done so.

BY MR. LANGLEY:

Q Well, I'm more interested in -- in the sentence above where it says, UniGroup's government business unit may -- may be in contact with you to address foreign agent arrangements for handling ongoing future government business for them.

A Yeah, the -- maybe there was some consideration of -- of -- of using Joe Moholland Inc. to service Mayflower government shipments in the future. I'm not sure.

Q Well, by -- okay.
A But we didn't.
Q Well, when I -- when I read ongoing, it sounds to me like that Moholland is going to continue to service UniGroup's or Mayflower's government business.
MR. LUCK: Object to form.
A Yeah, it looks like Chris is -- is potentially keeping the door open to handling future government business.
BY MR. LANGLEY:
Q Can we agree that the shipment on July 1st, 2022, was government business?
MR. LUCK: Object to form.
MR. SESSIONS: Object to form.
A Yes.
MR. LUCK: Sorry, I didn't mean to speak over you, Matt.
MR. SESSIONS: You didn't.
BY MR. LANGLEY:
Q Is there any other communication that you're aware of between Joe Moholland, any -- any employee of Joe Moholland and Rae Hickenbotham or anybody from the UniGroup government business unit that hasn't been produced to us?

A I doubt it.
Q Go down and look at another similar email. So this is April 22nd, 2022, from Chris Wynn to you. And, again, it references M333. We agreed earlier that's the truck involved in this collision, right?
A M30 -- M333 is the agency ID.
Q And that's the same ID that we see on the truck that was involved --
A Correct.
Q And so Chris says, Rob, M333 dash M444, Moholland is in its wind down with the temporary agency agreement effectively terminating April 28th, 2022, where no additional Mayflower or United Authority Shipment activity involvement can take place after that date other than Moholland's related military approved business?
A Right. That makes sense.
Q Can we agree that the shipment on July 1st, 2022, was military approved business?
MR. LUCK: Object to form.
A It was.
MR. SESSIONS: Hey -- hey, Ryan. Just to save us all headache. You understand that M333 just means Joe Moholland Inc., right?

MR. LANGLEY: I -- I -- I -- I don't understand that and I -- and I don't agree that that's what the documents reflect.

MR. SESSIONS: And you should ask my client if that's what that means. I just want to save you time.

MR. LANGLEY: I -- I've asked him a number of times what that means and I think the record will reflect that.

MR. SESSIONS: Okay. Just trying to help.

BY MR. LANGLEY:

Q So when it says, I left a return phone call to you this morning to answer your question about the ELD unit, what does that mean, Mr. Garr?

A Honestly, I don't remember what that's about. ELD is electronic logging device. It's a DOT requirement.

Q Right.

MR. LUCK: I'm also going to object to form.

A To answer your question about the -- the ELD unit. Hmm.

BY MR. LANGLEY:

Q Does this indicate that as of April 22nd,

2022, Mayflower was -- or UniGroup was continuing to have these ELD units in the vehicles?

MR. LUCK: Object to form.

A I believe we had to transition them off by the time the temporary agreement ended. So maybe he meant ELD units, like plural.

BY MR. LANGLEY:

Q Okay.

A That would be my guess. The transition of the ELD units.

Q In any event, this email seems to indicate that there was a ELD unit that belonged to UniGroup for the M333 agency agreement and also the -- the vehicle that was involved in the collision with my clients that belonged to UniGroup?

MR. LUCK: Object to form.

A As of the time of this email, April 22nd.

BY MR. LANGLEY:

Q And that had to be returned to UniGroup at -- at attention Fleet Technologies within 30 days of the effective termination date?

A Yeah, that sounds -- sounds right.

Q Do you know if that was done?

A Yes.

Q You have the same confidence that was done as -- as you do in your answer that all branding of Mayflower's had been removed as of today's date?
A Yeah, I think so. Yeah, within a reasonable, you know, degree of confidence.
Q So it says there are four shipments that need to be changed. Two shipments are Moholland's own shipments booked after the fact and load 5/25/22 and 6/9/22. You see that?
A Yes.
Q So the way I read that, when it says booked, that -- to me that sounds like it's placed into that portal system we talked about earlier.
A Yes.
Q You -- is that a yes? I'm sorry.
A Yes.
Q And were those shipments actually changed or canceled?
A Probably.
Q How would we know?
A We'd probably have to look in the system, in the mainframe to confirm.
Q And the two other shipments are by United agents, one for OA designation. What does that mean, OA designation?

A Origin agent.
Q Okay. And who was considered the origin agent for the July 1st, 2022, shipment?
A Joe Moholland Inc.
Q Wouldn't be TMM or the United States government?
A That's correct.
Q And then and one for DA designation, that we see in parentheses. What's DA?
A Destination agent.
Q Okay. Who would be the destination agent for the July 1st, 2022, shipment?
A Well, those shipments were taken in what's called temporary storage or storage in transit. I think both those shipments were being taken into storage. So it would've been a -- a local agent in Jacksonville.
So in other words, if those customers were ready to receive their shipments when the shipments were being hauled down to Florida, then Joe Moholland Inc. would have been the destination agent because those shipments would've delivered directly to residence.
But in this case, both of them delivered into storage. And so the destination

agent would be a local agent in Jacksonville.

Q And so those shipments would need to be reassigned to another agent by the booker. Who was the booker in that -- context of that sentence?

A Let me -- let me read this again. Make sure I'm giving you the best answer I can.

The two -- the other two shipments are by other United agents. Okay. So what I think happened here was -- so another agent within the UniGroup network, either United or Mayflower, in this case it looks like United, both shipments, and assigned us as the -- either the origin agent or the destination agent on those shipments.

So whoever U234 is would've been the booker for the first one, and whoever U127 is would've been the booker for the second one. They're both going to be agents for what appears to be United based on the U designation.

So what they're saying here is, hey, the -- the -- the -- the United agent that assigned you as the OA or DA on the shipments, they're going to end up reassigning the agents because it can't be you.

Q So in this context, you would be

considered -- Joe Moholland would be considered the agent?

A Yes.

Q And do you know what happened in those other shipments? If -- if Joe Moholland actually was canceled or if they fulfilled those agreements?

A I do not.

Q But both of those would have been after the April 28th established effective date of termination that we saw on the other correspondence, right?

A Yes.

Q And so to the extent Mo -- Joe Moholland completed those May 25th, 2022, and June 9th, '22 -- 2022, shipments, that would be evidence of an ongoing relationship after the April 28th effective date of termination we've seen in the other Mayflower correspondence?

A Yeah, I think. But what he's saying here is, hey, the -- the agency agreement's about to terminate. I still see four shipments in the system. They have to be changed before -- because the -- the agency agreement is terminating.

Q What does it mean when it says, Moholland's own shipments booked after the fact?

A We may have been the booker on two shipments.

Q Well, that would also contradict what you told me earlier, right, which is that -- that Mayflower -- excuse me, Moholland did not make any bookings after January 1, 2022, in the Mayflower mainframe system?

MR. LUCK: Object to form.

A Yeah, yeah, I don't know when those orders would've been entered in the system because those are the load dates. So I -- I can't tell you when the data was entered in.

BY MR. LANGLEY:

Q So in the -- back to kind of our discussion on the language where we -- we looked earlier at the -- at the order date and is the commencement -- meaning of the word commencement and then also the -- now what we see here as load dates. Tell me -- tell me what the load date would be for the July 1, 2022, shipment that caused the injuries to my clients?

A The load date would've been late June. The load dates for both of those shipments would have been late June.

Q What do you base that on?

A The fact that the -- the shipments were being hauled on July 1st. The driver was on his way to Florida from Georgia. And he was in Georgia at the time of the accident. So he would've loaded those probably, you know, one to four days prior.

Q Is there any place in the Mayflower system for booking that we see here where the order date is entered?

A I don't know.

Q Have you ever made a booking in the Mayflower mainframe system?

A I have not.

Q Who does that for Joe Moholland?

A Move coordinators and operations staff.

Q Who would've been the -- the person responsible for booking any type of loads for Joe Moholland on July 2nd -- 1st, 2022?

A Loading -- I'm -- I'm -- I'm sorry. Can you define what you mean by loading. You mean like data entry?

Q Right. And I'm talking about, you know, the -- this -- this reference to the booker, whoever the booker is. Who had that job at -- at Joe Moholland on July 1st, 2002?

A Umm...
Q Let me just -- let me -- let me -- let me ask you that question a little different.
A Sure.
Q Who had the booker job in the context as we see in this email here, which is Mayflower 14, between March 15th, 2022, and July 1st, 2022?
A So I'm -- I'm sorry. The question is who would've had the -- the job of the data -- of data entry between those dates?
Q Well, yeah, and actually the -- the other bill of lading for the other part of the load was from March 2nd. And I'll see -- say -- let me try to ask the question again.
You -- you're changing my -- or -- or you're defining my question about a booker to be the data entry person. And I just want to make sure before I ask my question we're talking about the same thing.
A So the booker is the -- is the entity that -- that books the business, that wins the business.
Q Okay.
A An origin agent or a destination agent or a hauling agent is an entity that helps in the

transport -- pickup and transport and delivery of goods.

Q Yeah, I got that. I -- I'm really focused on this booker thing. And I understand now why you're saying it's really a data entry person because the booker is really the entity that got the business.

A Yeah.

Q Between March 2nd, 2022, and July 1st, 2022, who would the data entry employees at Joe Moholland, who were responsible for completing this booking process, when Joe Moholland earned business as a booker?

A The answer would depend on what line of business it was, whether it was military or government or -- or DoD.

Q Military or government.

A Military or government would probably have been a move coordinator at Total Military Management.

Q Okay. So somebody at Total Military Management would've handled being -- doing the data entry on behalf of Joe Moholland as the booker if, in fact, Mayflower was involved in the shipment on July 1st, 2022?

A Yes.
Q And when is that data entry made? Because we're -- we're looking at a April 22nd, 2022, email for May and June shipments, right? So it's -- it can happen at least a month or two out, the actual booking in the system of the order. Can we agree on that?
A Yes.
Q So, again, if you've got a date of order of -- of March 2nd or March 15th, as we see on the bills of lading for the -- the shipment that was involved in the collision with my clients on July 1st, 2022, it's conceivable that order could have been booked in the Mayflower system during this same time period prior to April 28th, 2022?
MR. LUCK: Object to form.
A So I -- I'm sorry. Can you ask that question one more time. I want to make sure I answer it properly.
BY MR. LANGLEY:
Q Yeah, I think you answered it earlier -- something about -- just making sure I understand.
A Okay.
Q What, to me, this email indicates is that orders can be booked in the Mayflower system ahead

of the actual transport date?

MR. LUCK: Object to form.

A Yes, they could be.

BY MR. LANGLEY:

Q And in this email, we have an indication that as of April 22nd, two orders, at least, for May 25th and June 9th, 2022, had been entered into the Mayflower system for shipments that would take place a month or more later?

A Yes.

Q Is that a fair reading of this?

A Yes.

Q And so what I want to understand now is, is it conceivable that shipments for orders dated March 2nd and March 15th, 2022, involved in -- in -- the bills of lading involved in the July 1, 2022, transportation that we're here about, my clients were -- were injured and killed, could have been booked in the Mayflower system during this April time period?

MR. LUCK: Object to form.

A Right. And that's why I guess he sent this email is, hey, he's letting us know the temporary agreement is about to expire. I have checked the system and I found these four orders

that have to be modified.

BY MR. LANGLEY:

Q All right. And what I'm saying is, we don't know, because this -- because the -- the orders have not been produced, either by you or Mayflower, if, in fact, it was booked in the system?

A Right. There's not enough information in this email to say.

Q Did Mayflower -- or Moholland, rather, ever perform any shipments for Mayflower that were not booked in the system?

A Would Moholland have ever serviced a shipment for Mayflower that was not booked in the Mayflower system? I do not believe so. I'm trying to think if there would ever be a use case where that would happen. And I can't think of one.

Q Do you agree that it's possible?

MR. LUCK: Object to form.

A It's possible that Moholland could service a shipment for Mayflower that wasn't registered in the Mayflower system.

I -- I wouldn't think so, but I guess theoretically it's possible. I can't think of a potential use case.

BY MR. LANGLEY:

Q Do you remember what you and Chris talked about in this conversation where he says I left a return phone call to you this morning to answer your question about the ELD unit?

A Yeah, my guess is that it had to do with transitioning off of Mayflower's ELD systems.

Q Okay. And was there later an extension at that time period to June 30th?

A I -- I don't recall.

Q Show you email to that effect. This is Mayflower 17. And I'll give you a chance to read it and then I'll ask you some questions about it. Just let me know when you're ready.

A Yes, I -- I do remember that. Yeah, that was -- that was leaning into extend the access to a sales tool, a sales system.

MR. LUCK: Yeah, I'm -- I'm just going to object to form there because the last exhibit was ELDs and this one is the mainframe, so we're -- it's confusing the two.

MR. LANGLEY: Okay. This is all one exhibit that is in one chronological communication.

MR. LUCK: Oh, I get it. They're just two different things in the emails. One is ELD and one is mainframe.

MR. LANGLEY: Okay.

BY MR. LANGLEY:

Q Okay. How are they different, Mr. Garr?

A Sorry. How is the ELD different from the mainframe?

Q Right. This prior email referenced a wind down with the temporary agency agreement and -- as mentioned -- other than Moholland's related military approved business. And then there was some discussion of this ELD unit being returned.

And I guess my question now is, was the time period for the return of the email -- or excuse me, the ELD unit extended another 60 days as is indicated by this email which addresses the mainframe system access extension?

MR. SESSIONS: Object to the form.

A Yet in this case we were looking for --

MR. LUCK: Same objection.

A -- access to the sales tool. It was an online IT system. So that's different from the ELDs.

BY MR. LANGLEY:
Q But do you remember if the ELD for the agency agreement M333, which is the same marking that was on the truck involved in this collision, was returned to Mayflower by the April 28th deadline or the June 30th deadline that was extended for the mainframe system access or at all?
A I don't recall.
Q Who would have been responsible for returning that ELD unit to Mayflower?
A Ultimately it would've been our VP of operations, Michael Peters.
Q So we would have to ask him if, in fact, it was returned ever?
A Right.
Q But as far as you know sitting here today, it -- it could still be in that truck?
MR. SESSIONS: Object to the form.
MR. LUCK: Join.
A The same ELD unit?
BY MR. LANGLEY:
Q Correct.
A Yeah. Well, the service was certainly transitioned. So in other words, like a -- a cell phone on a new cell phone service.

Q Well, tell me how it works. Because what I'm conceiving is a -- a unit that is in the truck, an ELD unit that actually transmits information back.
A Correct.
Q Talking about in this email. So my question to you now is, do you, on behalf of Joe Moholland Inc., have any evidence that that ELD unit was ever returned to Mayflower?
A I would have to check into that. I couldn't answer that now.
Q Okay. And I asked you --
A But what I can say with -- with a high degree of confidence is that the service itself was transitioned over.
Q Do you -- by service it -- itself, do you mean the payment for the communication to whatever provider?
A The entire service. Like a -- like I said, the analogy I would use is a -- a cell phone and cell phone service and whatever services that the cell phone provider gives you.
Q Okay. So --
A We created our own instance of -- of the software, of the program, to manage by Joe

Moholland Inc.
Q Up -- so up to April 28th, 2022, that service was being paid for by Joe -- by Mayflower?
A I don't know when the transition actually occurred. It would have been sometime in that time frame.
Q Okay. And who would have the documentation to show when Joe Moholland stopped paying for that service and when it returned to Mayflower?
A Or when we -- do you mean when Joe Moholland started paying for the service directly?
Q Correct, yes. Yeah, to -- let me try to ask the question again.
A Sure.
Q Does Joe Moholland have documentation showing when it started paying for the ELD service that had previously been paid for by Mayflower?
A Yeah, we can pull credit card statements.
Q All right. I'd ask you to do that and provide it to your counsel.
A Sure.
Q Prior to that date, whatever it shows, Mayflower would have paid for that service for the

ELD unit in the -- the truck that was involved in the collision with my clients?

A Yeah, I think the way it used to work is remember we were talking about the agency statements that had credits and debits on there? I think that was one of those passthrough expenses to the agencies.

Q So in other words, you get a -- you get a payment and the check stub has on there whatever TMM pays or whatever entity is the originating entity for the shipment, and then it gives -- got that balance at the top and then there are certain reductions for various expenses that -- that were associated with the shipment that were paid by Mayflower, but -- but I guess indirectly paid by Moholland because the net amount of the payment took out those expenses?

A That's right. That's exactly right.

Q And you're going to produce to me that payment, the documentation of the payment for the July 1, 2022, shipment?

A Right. I think I -- I've got a laundry list of items here, but I believe that's one of them.

Q Well, that's an important one. If you

could please make sure that's on there?
A Yeah.
Q Do you have it on your list, Mr. Garr?
A I do.
Q Was there any other communication between you and Chris Wynn after April 22nd, 2022?
A I don't believe so.
Q Is there any record of -- of access to the mainframe system by Joe Moholland after June 30th, 2022? The Mayflower mainframe systems?
A In -- in other words, how would we provide evidence that it either was or was not accessed?
Q Correct.
A Yeah, Mayflower would have to provide that.
Q But did you have a login and a password and that kind of thing to access the system?
A Oh, yeah, yeah, we -- we sure did.
Q That was unique to Joe Moholland?
A Right.
Q So Mayflower has a record of whether or not Joe Moholland ever accessed that mainframe system through its unique username and password after June 30th, 2022?

A Yes, I -- I would think so.
Q Does this email indicate that there was -- there's still an ongoing relationship between Joe Moholland and Mayflower, at least as to the access to the mainframe system, on June 30th, 2022, one day before this wreck?
MR. SESSIONS: Object to the form.
BY MR. LANGLEY:
Q Is that a yes?
A No, I'm --
Q I'll ask you one more time. Keep getting an -- an objection at the same time you're trying to answer. Is that a yes?
A Yes.
Q Thank you. And this is a follow-up to that same email, right?
A Right.
Q What was the purpose of this? Is this April 22nd correspondence?
A Yeah, what's the difference between those two, I'm not sure.
Q One's sent April 22nd.
A Um-hmm.
Q And it's from Chris Wynn to Kathy Steis, Debbie Haley, Janice Siess?

A Oh, okay. Yeah. So I guess he sent notification to me later. That looks like it's an internal communication.

Q Yeah, I -- I think you're right. So this was confirmation sent to you that, in fact, that was going to be done?

A Yeah. Yep.

Q And did you ever follow up with Chris Wynn about this?

A Not that I can recall.

Q All right. I'll show you now what's marked as Mayflower 19. It's part of the same exhibit. Have you seen this communication before?

A No.

Q All right. Well, read through it, let me know when you've read it and I'll ask you some questions about it.

A Okay.

Q So it appears to be a communication from the DOT. Do you know if -- if -- do you know who Sue Demien is?

A I do not know.

Q And the reference to a -- a report number, do you know what that report number is?

A I do not.

Q Do you know what the ID number is?
A I do not.
Q Okay. In the explanation, I'll read it. The motor carrier -- in this case, Mayflower Transit LLC is identified at the top -- was misidentified on this inspection report. Moholland Transfer is not an agent for Mayflower Transit. And as they stated they were at the time, that was not correct. Attached is the BOL the driver should have shown to the inspecting officer when the operating authority was being identified.
The driver and the equipment were not then and are not now part of our company, nor were they under our authority or dispatch. We ask that you please remove this inspection from our Mayflower safety profile.
Were you ever provided any of -- of that information?
A No.
Q Were you ever asked anything about removal of Mayflower as a responsible party on August 2nd, 2022, for an inspection report?
A Someone within our operations team may have been contacted, but I was not personally.
Q Does this indicate that someone from

Moholland was representing to the Georgia Department of Public Safety that as of August 2nd, 2022, there was an ongoing relationship between Moholland and Mayflower Transit?

MR. SESSIONS: Object to the form.

A I don't know. This is the first I'm seeing it, so I'm not sure what the interaction was.

BY MR. LANGLEY:

Q What is a BOL?

A A bill of lading.

Q Okay.

MR. LANGLEY: Dave, do you know what bill of lading this is referencing? Apparently it's not attached on our side about this email?

MR. LUCK: We produced the associated bill of lading, I believe, in our production. I don't have it at my fingertips at the moment, but I can provide it to you.

MR. LANGLEY: Okay. But do you know if it's either of the bill of lading in -- that we looked at earlier and marked as an exhibit in the case?

MR. LUCK: I don't know the answer to that. I would -- I would have to have it in front of me to -- to look.

MR. LANGLEY: I'm looking at Mayflower 159. It seems to me to be the same bill of lading. BGNC0520034.

MR. LUCK: Okay.

MR. LANGLEY: Is that the same one you produced that was attached to this email?

MR. LUCK: I -- I'd have to -- like I said, I'd have to pull up our production and go through it. I -- I don't have them pulled up at that moment. I know that whenever bill of lading was provided by Joe Moholland led to the DOT and the Georgia Department of Public Safety agreeing that it was Moholland's truck and taking Mayflower off the inspection report.

BY MR. LANGLEY:

Q Were you involved in any of what Mr. Luck just described, Mr. Garr?

A No.

Q Do you know anybody at Joe Moholland that

was?
A It's very possible somebody was. In fact, it's likely. But this is the first time I'm seeing it.
Q Do you know Sue Demien is a -- is an employee of Mayflower?
A I don't know that name.
Q This is a note, as Mr. Luck said, that the inspection report will be reassigned. Please allow 45 days for this to be removed from your company's profile. Did you have any involvement in that?
A Is that a question for me?
Q Yes, sir.
A Yeah, no. Not personally.
Q Did anybody from the Georgia Department of Transportation ever reach out to you and ask you about this inspection report or why it was that Mayflower was originally listed on the inspection report?
A No.
Q Who would have -- have been the responsible party or employee at Joe Moholland for that type of issue?
A Likely would have been either our VP of operations or one of his direct reports in

management.
Q Okay. I told you we'd take another break around 5:00. I'm getting close to being done, to the end. Let me check with the smart people in the room and I'll hopefully finish up here shortly.
THE VIDEOGRAPHER: Off the record at 5:10.
(A brief recess was taken.)
THE VIDEOGRAPHER: Back on the record, 5:25 p.m.
BY MR. LANGLEY:
Q Mr. Garr, did you meet with anybody other than your attorneys to prepare for your deposition today?
A No.
Q You didn't meet with any attorneys for any of the other parties to the litigation or have any kind of communication with them?
A I did not.
Q Did you meet with any other representatives or talk to any other representatives of any of the other defendants in this case or any of the other entities that we've talked about, Locke Relocations or TMM or Mayflower or UniGroup?
A No, not about this deposition.

Q Okay. Did you have meetings or discussions with any of the representatives from those groups about any other topics related to this case?
A Over what period of time? I mean, it's possible I had a conversation with somebody about the case at some point.
Q Between April of -- or excuse me. Between the time that you were given notice of this deposition -- I think it was April 12th or so -- and the deposition. So just the past month, let's say?
A Have I talked with any of those entities about this case at all?
Q Correct.
A Yeah, TMM had notified me that they received some -- a letter.
Q Okay. Yeah, we sent them a subpoena for their records and we're waiting on that production.
A Yeah. But that's about the extent of it.
Q And was that a phone call, an email? How did that go?
A A phone call, I think.
Q And who did you talk to you and what did

they say?
A I spoke with their -- their VP of ops, senior VP of ops, and he let me know they'd received a letter. And -- and I guess they said they were -- they would have to talk to their attorneys about how to respond to it. Or if I had seen anything related to it, which I hadn't.
Q Okay. Any other communication?
A No.
Q All right. Were there any other bills of lading or goods that were being transported on July 1st, 2022, in this M333 marked truck that we've been talking about all day here, other than those two bill of ladings that I've shown you and we marked as exhibits?
A No, it was just those two.
Q I've seen some documentation that looks to me to be a record of the EDL since our information. And I'll show you this and mark this as Exhibit 10.
(Plaintiff's Exhibit Number 10 was marked for identification.)
BY MR. LANGLEY:
Q And it's a little different format than I'm used to seeing on these type EDL productions. But have -- have you seen this document or -- or --

A Yes.
Q -- these documents before?
A Yes.
Q It's marked JMI 20 through JMI 27 or 28 for the July 1st, 2022 -- well, excuse me, that goes back to June.
So the July 1st goes from -- from 2021 to 22 and then on 23 it begins June 30th. Do you see that? I know I kind of flipped through it quickly. If you need me to go back, I can.
A No, this is fine.
Q Is that all of the EDL data that -- that Joe Moholland has related to the -- to the trip Mr. Burist was on on July 1st, 2022, and June 30th, 2022?
A I -- I would assume so, yeah.
Q So the EDL data does not capture any other -- speed or braking or any other information for the Samsara?
A Samsara device, the telematics would capture additional data, but the ELD would be what you see here. So the Samsara device is both an ELD and it's a telematics device.
Q And you just produced the -- the -- the

ELD and not produce the telematics?
A Right.
Q Okay. I'd ask you to -- to provide the telematics information documentation to your counsel. Offer production to us.
So I'm trying to understand this documentation and -- and see, if you can tell me, when the actual load left Virginia based on this document for the -- the -- the shipment that was involved in the collision with my clients. And I'll be happy to scroll up or down and -- and you tell me if you can --
A When -- when they actually left Virginia?
Q Correct. My understanding is this -- these two bills of lading that are involved -- or that were included in the shipment that was in the truck on July 1st were going from Virginia to Jacksonville, when did that shipment leave Virginia?
A I don't know off the top of my head. It should be -- it should be in here.
Q Okay. Well, tell me which way you want me to scroll and -- and I'll help you help me find it.
A Scroll down slowly. At the bottom of it?

Q This is June 30th.
A Yeah. Can -- can you scroll down further?
Q Sure.
A What day is this? Is this -- what day is that?
Q I think it's a continuation of June 30th, but it's got this which shows total hours on duty, June 27, 0, June 28, 0, June 29th, 8.
A Can you keep scrolling down. So the question is when did he leave residence or when did he leave the warehouse?
Q Yeah, looks to me like the -- the shipment departed Virginia on June 30th somewhere around 9:46 a.m. Is that right?
A It -- that -- that could be.
Q And then we scroll on up and it looks like he ended the -- the -- the -- the night there around 3:00 a.m. in Walterboro, South Carolina, on the 30th. Is that right?
A Well, I'm not sure. I'm not the best person to -- to read ELDs, but...
Q Well, I'm not either, that's why I'm asking you the questions.
A I -- I may not be the best person to ask

this question.
Q Can we agree the ELD that Joe Moholland has produced indicates that the shipment that was in the truck at the time of the collision with my clients left Virginia on June 30th?
A Boy, I'd really like to confirm that with operations, but -- but it's very possible that they left on June 30th.
Q Well, it's very important.
A Yeah.
Q So that's something that -- that we need a -- a -- an answer on as soon as possible.
A Okay. Is that something I can get back to you on to confirm? I -- I -- I'd be very -- if it's that important, I'd be very reluctant to give you a guess on that just from scrolling through these ELDs online.
Q Sure. Yeah. And I -- I'd ask it -- if -- if possible, no later than -- than by Monday. Today's the 30th. Monday -- or excuse me, today's the 27th, Thursday. Monday, May 1st, would that give you enough time to get a definitive answer to that, Mr. Garr?
A Yes.
Q And if at all possible by tomorrow. And

will the person that would know if certain -- with certainty the answer to that question be in tomorrow?

A I hope so.

Q Okay.

MR. SESSIONS: We'll -- we'll do -- we'll do our best, Ryan.

MR. LANGLEY: I appreciate that.

MR. SESSIONS: Yep.

BY MR. LANGLEY:

Q So it seems to indicate to me that -- again, Mr. -- well, I guess we'll wait to see what your person says about the -- the shipment and when it departed.

MR. LANGLEY: Matt, depending on what they say and how they interpret this, we -- we may have some follow-up questions about this EDL.

MR. SESSIONS: Okay.

BY MR. LANGLEY:

Q Did -- Mr. Garr, did -- did Joe Moholland receive notice from the -- the Georgia Department of Transportation of an out of service indication for -- for the truck that was involved in this collision?

A An out of service for the truck involved in the collision?
Q Yes, sir.
A Prior to the accident?
Q Let me see if I can pull it up for you.
A Because there certainly could have been a roadside on that tractor at some point prior to the accident.
Q Believe it's June 17th of 2022 so it would've been prior to the -- the...
A I mean, I think I know what you're referring to. It showed up on our -- on our Safersys sometime in August I believe it was.
Q So this -- this is the information that I'm talking about here. And we'll mark this as Exhibit 11.
(Plaintiff's Exhibit Number 11 was marked for identification.)
BY MR. LANGLEY:
Q So inspection date, June 17th, 2022, report number, and it's indicated as Mayflower Transit. My question to you now is, did Joe Moholland have notice of this June 17th, 2022, inspection by the -- by the Georgia Department of Public Safety?

A Yeah, if it's the inspection I'm thinking of, it showed up on our Safersys record. I think sometime in August or September, that's when we were first notified about it.

Q Okay. And you're not aware of being notified about it before?

A No. So what we'll do is -- as part of our compliance meetings, we -- we run the Safersys reports. The SMS system -- and I think this came up during like an August or September review. So the first time it appeared on our report.

Q When you get those, are you supposed to sign them as this indicates on this Page 5 here of signature of carrier official?

A Yeah, no, I wouldn't have received that. It would've just appeared in the FMCSA report.

Q Well, it says Moholland Transfer Company Inc. driver Nicholas Burist. Says notice to motor carriers, this certification must be signed and returned within 15 days?

A Yeah. Wasn't signed by me.

Q Okay.

A This is the report that we found out about well after the fact. I -- I remember this.

Q Well, did Mayflower communicate anything

to you about this report between June 17th, 2022, and July 1st, 2022?
A If it's the report I'm thinking, no.
Q Well, this is the report. And I'm happy to zoom in on any of it that you'd like. Are you able to see that?
A Yeah. If it's -- if it's the same report I'm thinking of, it -- it appeared on our Safersys report in that -- like the August or September time frame.
Q Well, what I'm trying to figure out now while I got you here is, is this that report, to eliminate your qualification of if this is the report?
A So, yeah, I -- I can't say definitively but I would say likely it is.
Q How can we get that from a likely to a definitive?
A I can pull up the -- our compliance meeting notes from that date.
Q Okay. And -- and that date, you're talking about that July or August time period when you think --
A It would've been -- I think it was August or September when it first appeared on the

port.

Q If you can get me those compliance meeting notes to your counsel, I would appreciate it.

Does Joe Moholland keep a record of how many loads it moves through any particular state?

A Yes.

Q So would you be able to produce that for me for the state of Georgia?

A Yes. I would be able to provide that from probably May of last year, April of last year moving forward.

Q Okay. Just April of 2022 through July of -- of --

THE WITNESS: Matt, I don't know if you're writing this stuff down too or if I should take notes on this because -- I'm not going to miss anything.

MR. SESSIONS: We're writing it down. We'll send you an email with everything that we've asked --

THE WITNESS: Okay. So I'm not going to -- I don't have to write any more down. I want to make sure I don't miss anything.

MR. SESSIONS: I'm running out of ink

in my pen and paper, but I'm writing down. List is getting long. Did you say April through July, Ryan?

MR. LANGLEY: Yes.

MR. SESSIONS: Okay.

MR. DUNCAN: 2022.

BY MR. LANGLEY:

Q All right, Mr. Garr. You mentioned to me earlier that there was shared IT systems that when the -- when the termination happened between Joe Moholland and Mayflower, one of the big things that Joe Moholland had to do was -- was get a new IT system. Did I understand you correctly?

A Right. New IT software systems, yeah.

Q What were some other things that were shared in the course of the agency agreement or -- or thereafter between Mayflower and Joe Moholland other than the IT software?

A Well, the branding. So like all the trim --

MR. LUCK: I just want to object to the form for the record. Sorry. You can answer.

THE WITNESS: Okay.

MR. LUCK: You can answer.

A So brand -- so like logos on trailers. Like I mentioned, we're still getting trailers rewrapped. IT systems were -- were a big one. Registration that's in the Mayflower system. And those are probably the big three.

BY MR. LANGLEY:

Q Did you share any moving coordinators?

A No.

Q Did you share any marketing personnel?

A No.

Q Did you do any joint marketing?

A No.

Q Did you rely on Mayflower -- the marketing they were doing, was that part of the -- the benefit of the bargain that Joe Moholland got by doing business with Mayflower?

A Yeah. Yeah. The Mayflower brand is -- is a big value proposition for being a van line agent.

Q And by operating Mayflower trucks or Joe Moholland trucks with Mayflower logos on the side of them, Mayflower gets the benefit of that as well, right?

MR. LUCK: Object to form.

A So the question is, does Mayflower get a

benefit from having the Mayflower brand on the side of Joe Moholland Inc. trailers?

BY MR. LANGLEY:

Q Or trucks?

A Or trucks.

MR. LUCK: Object to form.

A I suppose so, because the -- it's the new agents that, you know, to -- that pay to participate in the network. So I would say most agents would agree that the -- the primary benefit is with the agents.

BY MR. LANGLEY:

Q I'm not sure I follow you there. What's the purpose of Mayflower's logo being on the truck and trailer if not to -- to communicate for the benefit of Mayflower and spreading their name?

MR. LUCK: Object to form.

A I would say it's more to the benefit of the agent. I mean, I suppose I can see how it would benefit Mayflower. But primarily the benefit is to the agent because you've got that nationwide brand on the side of the trailer.

Maybe I'm not understanding the question correctly.

BY MR. LANGLEY:
Q I think I understand your answer. You're saying there's a -- there's a benefit to the agent and there's a benefit to the principal for Mayflower's name being on the truck and trailer. Is that --
MR. LUCK: Object to form.
A So I -- I'm sorry. One more time. I didn't catch the end of that.
BY MR. LANGLEY:
Q I understood your answer to be that there's a benefit to both parties when the -- when Mayflower's name is on the side of the truck?
MR. SESSIONS: Objection.
A But, yeah, primarily for the agent.
BY MR. LANGLEY:
Q So we can agree that -- that Mayflower's essentially getting some marketing benefit to having its name on trucks that are driving down the road being seen by all these other drivers?
MR. LUCK: Object to form.
A I'm not -- I'm not sure I would agree with that.
BY MR. LANGLEY:
Q Have you ever seen those trucks that --

or -- or vehicles that drive around and they -- they're like mobile billboards?
A Sure, yeah.
Q And they've got advertisements on them? How is this any different?
MR. LUCK: Object to form.
A Well, I can tell you that the agents pay to get those -- those logos on the side of the trailers.
BY MR. LANGLEY:
Q Do principals pay to take them off?
A The principals of the agents?
Q Correct. Like in this --
A Yeah.
Q -- Mayflower? Mayflower is paying to --
A We're still -- we're still doing that now. Like I said, we're still wrapping all these trailers that we had, you know, previously from Mayflower.
Q Did Mayflower pay to have its name taken off of this M333 truck that we've been talking about all day?
A No. That was our obligation, Inc. -- Joe Moholland Inc.'s obligation.
Q And who at Joe Moholland was in charge of

that de-identification?
A Ultimately it was my responsibility.
Q Who actually did the work?
A It would've been operations staff.
Q Is there a particular person?
A Yeah, our VP of operations, Michael Peters. I've mentioned him earlier.
Q Okay. Did he keep the scrapings from the logo when he removed it from the M333 truck?
A The decals on the -- on the doors?
Q Correct.
A No, I think once you scrape them off, they just come off in pieces.
Q Has that been removed from that truck?
A From the truck that was involved in the accident?
Q Yes, sir.
A Boy, I -- I don't believe so because they never left the -- the tow yard.
Q Okay. So as far as you know, that -- the -- the truck that was involved in a collision with my client is still at the tow yard at Kelly's Towing?
A I don't know where it is. I -- I can't -- I don't believe it's still there because

I know the tow yard was -- was eager to work with the insurance company to have it moved.

Q You said it was your responsibility to make sure that the -- the logo was scraped off on that and all the other trucks. Have you made sure the Mayflower logo and DOT number were scraped off of that M333 truck that was involved in this collision?

A Not by the time of the accident. And then after the accident, it was at the tow yard.

Q As of today, April 27, 2023, have you made sure that the DOT number and Mayflower name are -- are off that truck that was involved in --

A No, I never had access to it after the accident. It's not something we would be able to touch.

Q What was the name of that IT company where you -- you guys shared with -- with Mayflower?

A I'm sorry. The name of the IT company?

Q Yeah, I thought you said there was a lot of shared items and software. I was wanting to know the name of the provider of the company for that.

A Well, there was that Samsara product that we talked about.

Q Okay.

A I wouldn't call that a shared service. That's the telematics and the ELD system. There was a system called Quotes To Go that our COD sales teams used to book appointments.
Q How do you -- how do you -- is that Quotes To Go like T-O?
A Yeah, T-O.
Q Okay.
A There was the -- the mainframe access we talked about.
Q It's proprietary to Mayflower?
A That one was, yeah.
Q Were there any other third-party providers of IT services you can identify other than the ones you talked about?
A The software systems?
Q Or any IT?
A Let me think for a minute, okay. Bear with me a second here. Let me think about this.
I think most of the access was through the mainframe. And then our sales team used Quotes To Go to book appointments and manage leads. Other IT systems. Oh, there were some reporting tools. So you could view like your agency scorecard online.

Q Okay. Who was the provider for that?
A Oh boy. I just -- it's like -- Clip View was the software I think it was called.
So, yeah, there was some online reporting tools. And then there was a system in -- called Burke, B-U-R-K-E, and I don't know if that was the integrator of is that was the actual software tool. But that was a tool that we used to look at survey results, like customer satisfaction survey results.
Q Okay. Any others?
A I think that's about it. Like that Burke one we just used very infrequently. I'm really trying to think back.
MR. LANGLEY: Okay. That's all the questions I have. Please answer any questions your counsel and Mr. Luck may have for you.
MR. LUCK: So, Matt, it's me now who's up?
MR. SESSIONS: If you want to be.
MR. LUCK: I -- I -- I'll take it. If you want to do it, it's up to you, but I -- I'll take it just to move it forward.
EXAMINATION

BY MR. LUCK:

Q Mr. Garr, we haven't previously. I'm David Luck. I'm counsel for Mayflower Transit LLC. Really appreciate your time and patience today.

I believe Plaintiff's counsel already went over the ground rules regarding depositions, but just to be clear, if you don't understand my question, I don't want you to answer it. Let me know. I can rephrase.

I don't want you to guess. I don't want you to speculate. You let me know if you don't know. That's fine.

And then the other thing that I would do before we get started is just to note that my client's challenging personal jurisdiction in this case. So my participation in this deposition is solely with regard to the question of whether the Court has personal jurisdiction over our client.

That's a legal issue not for you, Mr. Garr, so I'm just putting that on the record so that the Court understands I'm not waiving a personal jurisdiction defense by engaging in deposition questions.

So with that said, we'll go ahead and start with the questions.

So, Mr. Garr, you received some questions from Plaintiff's counsel regarding whether you, on behalf of Joe Moholland, received certified mail return receipt requested notification from Mayflower as to the termination of the agency van line agreement.

Regardless of any certified mail, is there any dispute here that Joe Moholland knew that this relationship was terminated effective April 28th, 2022?

A No.
Q Okay.
MR. LANGLEY: Object to the form.
BY MR. LUCK:
Q Next question. You also received questions regarding the bills of lading for the shipments that were on the truck on July 1st of 2022 that was involved in this accident. Did either of those bills of lading at all mention Mayflower or list Mayflower's DOT number?
A No, they wouldn't.
Q Next question. You also received some questions that identified M444 and M333 as somehow being identification numbers for the truck involved in the accident. Is that what those numbers mean or

do they mean something else?

MR. LANGLEY: Object to form.

THE WITNESS: I'm sorry. Go ahead, Ryan.

MR. LANGLEY: I was making an objection for the record.

A Okay. Should I go ahead and answer?

BY MR. LUCK:

Q Yes, sir, go ahead and answer.

A M333 is a reference to the agency Joe Moholland Inc., and M444 is a reference to the agency Moholland Transfer Inc. You have identifying equipment that's assigned to a particular agency and that's why sometimes the names of vehicles or documents or other resources are prefaced with the name of the agency.

Q I understand. So see if you agree with this. M333, that would have been the prior van line agency identifier for Joe Moholland Moving, is that correct?

A Yes.

Q Okay. And M444 would have been the prior van line agency identifier for Moholland Transfer?

A Yes.

Q Okay. Thank you for that.

Next question. I'm going to share my screen because I have some questions regarding some of the documents that we've gone over. Let me know if you can see this. It's not up yet. Okay.

Mr. Garr, can you see that page?

A Yes.

Q Okay. I'm just going to scroll through so that everyone can see what it is we're dealing with here because I know this is only showing a portion of the page. So if I scroll up, it says temporary agency agreement. And I scroll down, this one you signed, it looks like on behalf of Moholland Transfer Co. Incorporated. Do you see that, Mr. Garr?

A Yes.

Q Okay. That's the first one. The next one is substantially the same. And I'll let you look at it to confirm that, but I'm going to represent it's substantially the same. But at the end, you sign on behalf of Joe Moholland Moving. Do you see that, Mr. Garr?

A Yes.

Q Okay. I'm going to go back up to the top and I'm going to scroll out so you can see more of

the agreement. And you let me know when you want me to scroll down.

I want you to take a look at this and confirm whether this is the temporary agency agreement for Moholland Transfer that you would've signed on or about January 26th of 2022. Take your time, Mr. Garr, and take a look at it.

A Yes, I'm confident this is it.

Q Okay. So you received some questions from Plaintiff's counsel about how it is that you knew that this agreement was for purposes of running out only existing business that Joe Moholland would've had before the January 20th termination of the agency agreement, which was then effective April 20th.

You remember those questions, Mr. Garr?

A Earlier today?

Q Yes.

A Yes.

Q Okay. And I believe your response to some of those questions was you'd be surprised if that wasn't addressed in the temporary agent's agreements. Do you remember that testimony, Mr. Garr?

A Yes.
Q Okay. So I'm going to direct you to Paragraph 3 of this agreement, and I'm going to scroll and make it a little larger for you. And I'm not going to characterize this for you. I want you to read Paragraph 3 and then you let me know what you understood that paragraph to mean when you signed this agreement on behalf of the relevant Joe Moholland entity.
Just take a look at it and let me know what you think this paragraph means.
A Read it to myself?
Q Yes, sir. Yes, sir. And then I'll read it for the record when you're done.
A I agree that's a statement the agency -- the -- the moving company is no longer to book any moves under the authority of Mayflower.
Q And what's the date --
A Or -- or -- or to serve as an origin or destination agent for another booker within the network.
Q Understood. And what's the date after which the Joe Moholland entity was no longer supposed to book anything under Mayflower's authority?

A January 20th, 2022.

Q Okay. And just to make sure that I read this correctly, I want you to give me a -- a yes-or-no response after I read this. You let me know yes if I read it correctly, or no if I read it incorrectly.

It states, 3, Limitation. Temporary agent shall have no right to sell any moves under carrier's authority or to accept any additional requests for transportation services after January 20th of 2022.

A Yes.

Q Okay. So that's correct. And then take a look, Mr. Garr, at Paragraph 2 above that which defines transportation services. And just let me know when you're done.

A I'm -- I'm finished.

Q Okay. Reading Paragraphs 2 and 3 in conjunction, is it your understanding that after January 20th, 2022, the relevant Joe Moholland entity lacks authority to book any new business under the Mayflower banner?

MR. LANGLEY: Object to the form.

BY MR. LUCK:

Q You can answer.

A Yes.
Q Okay. Understood. Mr. Garr, I'd also like you to take a look at Paragraph 5, which is entitled Trademarks. And let me know when you're done reading.
A Okay.
Q In light of the previous paragraphs that we looked at regarding the authority for any new Mayflower business conducted by Joe Moholland and then reading that alongside Paragraph 5, is it your understanding that the relevant Joe Moholland entity, which for this agreement is Moholland Transfer, would not have authority to use Mayflower's trademarks, logos, branding, et cetera, except to finish out any business for Mayflower that predated January 20th of, 2022?
MR. LANGLEY: Object to the form.
BY MR. LUCK:
Q You can answer.
A Correct.
Q Okay. Understood. Let's take a look at Paragraph 7, Mr. Garr. Take a look at it and let me know when you're done reading. It's entitled Term and Termination.
A Okay, I'm finished.

Q Okay. What is the time frame for the temporary agency agreement based on that paragraph?

A January 20th, 2022, until April 28th, 2022.

Q Thank you. I'm going to just scroll down to the next agreement, which as we discussed previously is for Joe Moholland Moving, and I'm going to scroll out so you can look at the same thing.

And my only question on the second agreement is, does it have all of the same provisions that we just discussed above with regard to Moholland Transfer?

MR. LANGLEY: Object to the form.

A Yes, it does.

BY MR. LUCK:

Q Thank you. I'm going to move to another document. So this is an email that you saw earlier in questioning with the Plaintiff's counsel. I don't remember the exhibit number. If anyone else does, please feel free to let me know.

But it's the January 20th, 2022, email from Chris Wynn to you. Do you remember seeing that email earlier, Mr. Garr?

A Earlier today? Right.

Q Yes.
A Yes. Yes, sir.
Q Okay.
MR. LANGLEY: It's part of Exhibit 8, Dave.
MR. LUCK: Okay. Understood.
BY MR. LUCK:
Q Mr. Garr, does this email communicate that the effective date for the termination of the prior agency agreements, both for Moholland Moving and Moholland Transfer, was communicated to you?
A Yes.
Q And what was that date, the termination effective date?
A April 28th, 2022.
Q And does this email also specify that you had a certain additional period of time to ensure that all signage and branding on Moholland equipment, tractors and trailers indicating an affiliation with Mayflower needed to be removed?
A Yes.
Q Okay. And how many days were provided past April 28th?
A 60 days.
Q Correct. So I'm a lawyer, not a

mathematician, but to me that's two months. So by the end of June 2022, all signage, branding, et cetera, indicating Mayflower needed to be taken off of any Joe Moholland equipment. Is that correct?
A Yes.
Q Understood. And the end of June 2022 predates July 1st, 2022, correct?
A Yes.
Q Understood. Okay. Moving on to the -- another document. This is another email that was also addressed I believe earlier today during your testimony. It's an email from Chris Wynn to you and Brian -- and I apologize, I'm going to butcher this name -- Schuckalo. Is that correct? Schuckalo?
A It's -- it's pretty close.
Q Okay. All right. So Friday, January 1st -- January 21st, 2022. Take a look at that email and let me know when you're done reading it, and I'm going to have a couple of questions.
A Okay.
Okay, I've read it.
Q Okay. Does this email communicate to you that Mr. Wynn was providing the two temporary agency agreements that we went over at the beginning of my questioning?

A Yes.
Q Okay. Did you, in fact, receive those two temporary agent agreements, one for Joe Moholland Moving and one for Moholland Transfer?
A Yes.
Q Okay. Those are my questions on that exhibit.
Next document, which is going to be related to this. This is another email that we discussed earlier today during your testimony. I know the exhibit number for this one because I furnished it. I believe it's Exhibit 9. And if I'm wrong, anyone feel free to correct me, but I believe this is Exhibit 9.
It's a January 26th, 2022, email from you to Chris Wynn and Brian and CCing Tim Woody. Take a look at that email, Mr. Garr, and let me know when you're done reading it.
A Okay, I've finished reading.
Q Okay. Is that, in fact, an email from you to those gentlemen?
A Yes.
Q And do you state in that email that you are attaching the signed agreements that we discussed earlier?

A Yes.
Q Okay. Understood. So the only other question that I have, Mr. Garr, is, there were a number of questions about a continued military business for some UniGroup entity. Was this July 1st, 2022, shipment an authorized military shipment on behalf of Mayflower or any other UniGroup entity?
A No.
Q Did Mayflower have any involvement in this July 1st, 2022, accident or the shipments on the truck?
A No.
MR. LUCK: Those are all my questions. I appreciate your time, Mr. Garr.
MR. SESSIONS: Does anyone else have any questions before I ask him one final question?
MR. LANGLEY: I -- I was just going to ask him if there's anything important about all of this interaction with Mayflower and Joe Moholland that we haven't talked about or anything he wanted to clarify about any of his earlier answers as I told him I would ask earlier.

But I intend to do that at the end. If you want me to do it before your questions, that's fine.

MR. SESSIONS: No, I can -- I can go ahead and ask my -- my question.

MR. LANGLEY: Okay.

EXAMINATION

BY MR. SESSIONS:

Q Mr. Garr, there's been some discussion about M333. I just want to make sure I have a full understanding. Around the time of this accident, did M -- or did 333 appear on tractors operated by Joe Moholland?

A At the time of the accident?

Q Yes.

A Yes. There probably -- well, there was at least one, probably others as well.

Q I guess my real question is, is that specific to the tractor involved in this accident or is that a general identifier that it's a Joe Moholland tractor?

A It's the latter.

MR. LANGLEY: Object to form.

MR. SESSIONS: Okay, that -- that's all I have.

EXAMINATION

BY MR. LANGLEY:

Q All right. Is there anything about your earlier testimony, Mr. Garr, that you wish to -- to amend or clarify or correct, or -- or do you stand by your answers that you provided me earlier?

A Yeah, I -- I think I'm comfortable with responses.

Q Okay. We'll get you a list of all of those follow-up items. I'll send it to you -- to you and to your camp. Or I'll send it to your counsel, not to you. And --

A May I ask one -- can -- can I one -- one request?

Q Sure. Yes, sir.

A Can you maybe prioritize the list? So, I mean, if there's certain items you need sooner than later, maybe put them at the top of the list so we can focus on those first.

Q We well. We'll -- I think the only major priority -- well, we'll just be specific in our --

A I think payment was a big one, I know you said.

MR. LANGLEY: Now, we got some of the comm -- we got some other depositions

coming up that --

MR. SESSIONS: Ryan. Ryan, you and I can have this conversation later and -- and figure out exactly what you need and when you need it. I don't want to make everyone else hang around and -- and listen to that, so.

MR. LANGLEY: Sounds good.

THE VIDEOGRAPHER: Does this conclude the video deposition?

MR. LANGLEY: Yes.

THE VIDEOGRAPHER: Okay. This will conclude the 30(b)(6) video deposition of Joe Moholland Incorporated. We're off the record at 6:08 p.m. Eastern Standard Time on April 27th, 2023.

(The signature is waived and the deposition concludes at 6:08 P.M.)

---oOo---

STATE OF SOUTH CAROLINA )
: CERTIFICATE
COUNTY OF DORCHESTER )

I, Katie L. Graff, Notary Public, certify that I was authorized to and did voice stenographically report the foregoing deposition, and that the transcript is a true record of the testimony given by the witness.

I further certify that the witness was duly sworn and cautioned by me to tell the truth, the whole truth, and nothing but the truth. I certify that the same was reduced to typewritten form from my original voice stenograph notes by computer-aided transcription.

I further certify that I am not of counsel or kin to any of the parties to this cause of action nor am I interested in any manner in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this the 8th day of May 2023.



Katie L. Graff
Notary Public, South Carolina
My Comm. Expires 03-07-2033

## $

**$60,000 (1)** 99:11

## A

**Aardwolf (1)** 82:19
**A-A-R-D-W-O-L-F (1)** 82:21
**ability (1)** 133:2
**able (13)** 9:19;10:21;21:8;48:4;50:20;51:12;66:6,17;99:18;178:6;179:8,10;186:15
**above (3)** 139:18;195:14;197:12
**accept (2)** 22:22;195:9
**accepted (2)** 64:4;69:2
**accepting (1)** 22:13
**accepts (1)** 68:23
**access (23)** 32:12,21;33:3;71:14;74:4;101:9;120:21;131:4,9,18;132:10,12,19;155:17;156:18,22;157:7;161:8,18;162:4;186:14;187:9,20
**accessed (2)** 161:13,23
**accident (24)** 13:18,23;14:9,18,22;22:12;31:13;32:15;35:7,12;80:17;149:4;176:4,8;185:16;186:9,10,15;190:18,25;201:10;202:11,14,19
**accommodate (1)** 91:10
**according (2)** 114:16;131:14
**accounting (1)** 123:8
**accounts (1)** 124:17
**accrued (1)** 44:16
**accurate (3)** 8:20;12:24;118:25
**acknowledges (1)** 116:18
**across (1)** 18:8
**acting (2)** 65:22;126:13
**active (2)** 67:10;70:2
**activity (1)** 141:14
**actual (11)** 33:13;47:10;64:21;73:3;80:3,12;116:25;152:5;153:1;172:8;188:7
**actually (20)** 45:19;47:25;49:12;53:12,14;63:9;70:25;75:1;101:7;102:13;104:22;107:8;131:14;144:17;147:5;150:11;158:3;159:5;172:13;185:3
**add (3)** 26:11;77:18;86:10
**added (2)** 68:1,6
**addendum (3)** 42:14,24,25
**addition (1)** 120:19
**additional (5)** 118:18;141:13;171:22;195:10;198:17
**address (5)** 52:12,22;99:25;137:15;139:20
**addressed (2)** 193:23;199:11
**addresses (2)** 46:17;156:17
**advance (1)** 93:3
**advertisements (1)** 184:4
**affect (1)** 44:14
**affiliate (1)** 98:4
**affiliation (6)** 41:23;59:18;113:22;114:15;130:18;198:20
**affirm (1)** 8:1
**afternoon (1)** 118:8
**again (22)** 21:23;22:16;26:20;27:25;40:10;60:10;75:3;83:21;105:23;107:22;116:11;118:8;119:7,25;129:21;137:11;141:4;146:5;150:14;152:9;159:14;175:12
**agencies (2)** 118:10;160:7
**agency (100)** 25:24;29:5;32:13,20;35:10,19,21;36:3,6;38:23;39:17,18;40:19,20,25;41:8,9,12,15;42:2,6,18,21;46:12,17,23;47:3,3,5,10,25;48:4,17,21;52:1,4;59:6;67:3,15,20;70:8;76:6;81:23,25;102:4;107:14,21;109:21;113:22,25;114:8,12;115:3,5,14;116:20;120:25;122:1,18;125:6,8,11,11,12,14,16;129:12;130:7,9,17;131:6;134:6;135:23;136:4,10;138:9;141:6,12;143:13;147:20,23;156:10;157:3;160:4;180:16;187:24;190:5;191:10,12,14,16,19,23;192:12;193:5,14;194:15;197:2;198:10;199:23
**agent (44)** 26:3,5;40:1;67:10;70:2;88:12,15;96:11;112:19;122:5;130:22;131:5,19;132:6;133:4;137:15;138:7;139:20;145:1,3,10,11,17,22;146:1,1,3,9,13,13,21;147:2;150:24,24,25;164:7;181:19;182:19,21;183:3,15;194:20;195:8;200:3
**agents (10)** 115:13;144:24;146:8,18,23;182:8,10,11;184:7,12
**agent's (1)** 193:23
**ago (4)** 8:7;9:11;13:12;75:13
**agree (30)** 10:23;11:4;40:13;42:10;46:7,15;47:6;48:6;51:25;53:23;55:18;81:16;97:5;116:21;125:3;126:7;130:8;131:17;133:9;140:12;141:18;142:2;152:6;154:18;174:2;182:10;183:17,22;191:17;194:15
**agreeable (3)** 11:9;100:17;117:12
**agreed (5)** 10:1;63:17;79:9;133:25;141:4
**agreeing (2)** 19:10;166:18
**agreement (113)** 15:25;16:4;23:1,2,10,19,20,21;25:24;29:5;32:14,20;35:10,19;36:3,6,21,22;37:8;38:23;39:17,18;40:1,20,20,25;41:8,10,12,15,23;42:3,6,13,13,18,21;43:2;44:1,14,15,18,21,23,25;45:12,13;46:12,15,17,22,23;47:3,4,6,8,9,10,21,25;48:4,17,21;52:2,4,7;54:17;59:6;67:15,20;70:8;76:6;81:23,25;107:14,22;108:21;109:21;113:19;114:1,8,9,12;115:1,3;122:1,18;129:12;130:7,10;134:7;136:4,10;141:12;143:5,13;147:23;153:24;156:10;157:3;180:16;190:6;192:12;193:1,5,11,14;194:3,8;196:12;197:2,6,11
**agreements (14)** 24:14;35:21;53:19;116:20;123:4;134:14;135:8;138:9;147:6;193:24;198:10;199:24;200:3,24
**agreement's (2)** 48:9;147:20
**ahead (10)** 11:15;24:1;50:16;90:3;152:25;189:25;191:3,7,9;202:5
**Alliance (1)** 82:18
**allow (3)** 11:13;19:10;167:9
**allows (2)** 71:14,17
**almost (2)** 39:14;89:10
**along (2)** 104:1;110:10
**alongside (1)** 196:10
**alter (3)** 42:1;47:4;48:5
**alters (1)** 48:21
**Although (9)** 26:3;33:5;52:5;61:1;68:25;76:19;103:20;104:18;112:16
**always (2)** 122:3,14
**ambiguity (2)** 46:8;86:19
**ambiguous (1)** 41:7
**amend (1)** 203:5
**amendment (3)** 36:4;42:14,17
**among (1)** 65:2
**amount (1)** 160:16
**analogy (1)** 158:20
**analyzed (1)** 41:20
**annual (2)** 107:11;108:16
**answered (2)** 60:15;152:21
**anticipating (1)** 121:15
**apologize (3)** 26:17;48:13;199:13
**Apparently (1)** 165:15
**appear (1)** 202:12
**appearances (1)** 7:9
**appeared (4)** 177:11,16;178:8,25
**appearing (1)** 8:12
**appears (4)** 74:22;139:5;146:18;163:19
**applicable (1)** 93:9
**applications (1)** 71:11
**applies (1)** 41:8
**apply (2)** 44:25;47:10
**appointment (1)** 90:5
**appointments (2)** 187:4,22
**appreciate (6)** 91:13;123:18;175:8;179:3;189:4;201:14
**approved (3)** 141:16,19;156:12
**April (60)** 7:4;9:20;15:23;37:9;49:7,15;51:22,23,25;52:9,11;53:23;55:21;60:8,22,25;

62:6,10;67:11,24;75:9,25;76:1,17;81:10;102:4;120:9;124:8;131:14,24;132:21;133:4;134:2;141:3,12;142:25;143:17;147:9,16;152:3,15;153:6,20;157:5;159:2;161:6;162:19,22;169:8,10;179:11,13;180:2;186:11;190:10;193:14;197:3;198:15,23;204:16
**area (2)** 100:11,11
**areas (3)** 21:5;24:12,12
**arise (1)** 44:16
**around (15)** 13:17;38:11,14;52:5;53:10;69:6,7;105:3;122:4;168:3;173:14,18;184:1;202:11;204:6
**arrangement (2)** 42:7;102:24
**arrangements (2)** 137:16;139:20
**Ashley (1)** 99:25
**Aside (1)** 104:16
**aspects (1)** 67:17
**assign (1)** 21:20
**assigned (7)** 68:7,8,10;75:22;146:12,22;191:13
**assignments (1)** 91:18
**associated (2)** 160:14;165:17
**assume (6)** 43:4,18;55:12;64:22;85:21;171:17
**assuming (1)** 14:17
**assumption (1)** 13:22
**assuring (1)** 18:18
**Attached (3)** 164:9;165:15;166:9
**attaching (1)** 200:24
**attend (1)** 10:14
**attention (2)** 38:21;143:21
**attorney (3)** 89:20;97:24;104:14
**attorneys (3)** 168:13,16;170:6
**August (9)** 57:4;164:21;165:2;176:13;177:3,10;178:9,22,25
**authority (25)** 26:10;27:13;66:15,18,20;67:1;70:5,10,11,12;84:13;88:24;92:9;95:22;106:9;125:13;141:14;164:10,14;194:17,25;195:9,21;196:8,13
**authorized (1)** 201:6
**auto (1)** 93:21
**available (1)** 21:18
**aware (17)** 30:17,18,21,22,23;31:4,6;81:4;86:18;92:22;94:5,23;95:7;102:20;103:4;140:22;177:5
**away (1)** 41:22

## B

**back (27)** 16:17;17:3,17,17;21:17;25:6;28:13;30:10;31:9;40:10;42:12;50:4;52:8;81:22;90:7,19;101:8;108:10;124:10;148:14;158:4;168:9;171:6,10;174:13;188:14;192:24
**backflow (1)** 120:21
**backlog (1)** 59:25
**backwards (1)** 101:24
**balance (1)** 160:12
**ballpark (1)** 96:23
**banner (1)** 195:22
**bargain (1)** 181:15
**base (8)** 35:15;45:21;46:2;63:9;81:14;128:14,16;148:25
**based (14)** 24:21;35:18;55:18,23;64:14;65:14;66:2;93:5;108:8;133:8,23;146:19;172:8;197:2
**basically (3)** 57:13;63:25;134:2
**basis (3)** 103:2;128:20,23
**Bates (2)** 49:17;101:16
**BC (1)** 74:14
**Beach (3)** 98:23;99:1,5
**bear (3)** 45:15;78:17;187:18
**become (2)** 30:4;31:4
**beginning (4)** 20:21;81:10;90:25;199:24
**begins (2)** 7:1;171:8
**behalf (18)** 12:19;15:3,15;20:19;21:22;24:5;53:5;65:22;113:7;129:11;139:4;151:23;158:7;190:3;192:13,21;194:8;201:7
**belief (1)** 107:15
**belonged (2)** 143:12,15
**below (1)** 40:8
**Ben (1)** 7:18
**benefit (16)** 121:12,21;122:19,22;181:14,22;182:1,10,16,18,20,21;183:3,4,12,18
**besides (2)** 97:15;98:13
**best (5)** 10:15;146:6;173:21,25;175:7
**beyond (3)** 46:13;110:14;131:9
**BGNC0502 (1)** 74:14
**BGNC0520034 (1)** 166:6
**BGNC0520701 (2)** 69:17;78:24
**big (6)** 120:12;180:11;181:3,5,18;203:22
**bigger (2)** 51:12;92:4
**biggest (1)** 42:23
**bill (38)** 27:17,19;28:9;30:6;44:5;63:5;68:18,21,24;69:1,5,9,19;73:8;74:13;75:5;78:22;79:1,6,11;80:3,11,20,23;81:2,17;94:16;98:16,16;99:24;150:12;165:11,14,18,23;166:6,15;170:14
**billboards (1)** 184:2
**biller (1)** 65:10
**billers (1)** 89:5
**bills (11)** 63:8;83:24;119:17,20,23;152:11;153:16;170:10;172:16;190:16,19
**binder (1)** 24:18
**binding (1)** 9:3
**bit (1)** 111:19
**board (2)** 113:25;115:13
**boiled (1)** 115:10
**BOL (2)** 164:9;165:10
**book (5)** 187:4,22;194:16,24;195:21
**booked (9)** 144:8,12;147:25;152:14,25;153:19;154:6,11,13
**booker (15)** 146:3,4,16,17;148:1;149:23,24;150:5,16,20;151:4,6,13,23;194:20
**booking (5)** 149:8,11,17;151:12;152:6
**bookings (1)** 148:6
**books (1)** 150:21
**both (16)** 22:12;42:13;68:15;75:18;77:25;80:10;99:22;145:15,24;146:11,18;147:8;148:23;171:23;183:12;198:10
**bottom (3)** 51:14;131:3;172:24
**bought (1)** 136:15
**Boy (10)** 37:6;65:10;70:17;89:3;95:20;96:24;107:5;174:6;185:18;188:2
**braking (1)** 171:19
**brand (5)** 122:12;181:1,17;182:1,22
**branding (14)** 36:25;37:3;39:21;40:2;59:22;67:18;122:11;124:7;129:24;144:2;180:19;196:14;198:18;199:2
**Brantley (3)** 10:11;28:16;29:7
**break (6)** 61:15;90:4;91:1,9,12;168:2
**Brian (9)** 7:19;113:11,14,15,23;135:20;137:11;199:13;200:16
**brief (2)** 90:18;168:8
**bring (1)** 21:17
**Brinks (1)** 112:21
**broad (2)** 77:3,12
**brokerage-type (1)** 135:23
**bunch (1)** 22:5
**Burist (21)** 7:20,22;12:23;17:11;18:5,15;20:1;45:3;84:12;92:18,23;93:3;95:1;101:1,2,21;102:14,18;103:5;171:15;177:18
**Burke (2)** 188:6,13
**B-U-R-K-E (1)** 188:6
**business (54)** 83:9;88:5,13,17;110:25;111:3,9;112:4,11,12,22;113:9,9,15;120:25;121:3,4,8,10,24;122:9,9,16;136:7,9;137:2,3,4,14,17,23;138:4,5;139:7,19,21;140:6,10,13,24;141:16,19;150:21,22;151:7,12,15;156:12;181:16;193:12;195:21;196:9,15;201:5
**busy (1)** 59:15
**butcher (1)**

199:13
**buyer (1)**
136:13

## C

**CA (1)**
111:20
**calculate (2)**
64:21;124:21
**calendar (5)**
68:2,6,7,13,14
**call (10)**
20:23;21:15;57:23;63:1;122:8;142:14;155:4;169:22,24;187:1
**called (10)**
16:3;25:2;31:24;70:16;71:15;94:8;145:14;187:3;188:3,6
**came (14)**
34:19;39:9;49:7;60:8,18;62:6;66:13;79:10;116:4;121:7;131:19;133:5;139:3;177:9
**camp (1)**
203:11
**can (143)**
9:18,21;10:15;13:13;21:9,12,13,13,14,15,15,16;23:7,7;24:16;29:10,15,16,24;35:21;36:21;39:25;40:9,13;44:8;45:2,5,10;46:7,24;47:6;48:6,20;49:9,17,18;50:25;51:10,11,25;52:8;53:20,20,23;54:13;57:23;58:8;60:10;61:18,19,20;62:24;64:2,3,3;66:2,8;69:23;71:22;72:19,21;81:16;82:13;85:20;86:19,22;89:5;90:7,13;91:4,4;97:5;98:20;100:16;101:18;111:17,18;112:6,13;113:3,3,4;114:25;115:2;117:11,11;123:15;130:8;131:17;133:11,17;134:15,17,18,19,24;135:1;140:12;141:14,18;146:6;149:19;152:5,6,17,25;158:13;159:19;163:10;165:20;171:11;172:7,12;173:2,2,10;174:2,13;176:5;178:17,19;179:2;180:22,25;182:19;183:17;184:7;187:14;189:9;192:4,6,9,25;195:25;196:19;197:8;202:4,4;203:13,13,16,19;204:3
**canceled (2)**
144:18;147:6
**capacity (3)**
8:23,23;9:1
**caption (1)**
7:7
**capture (2)**
171:18,22
**card (1)**
159:19
**Carolina (1)**
173:19
**carried (1)**
89:22
**carrier (5)**
93:19,22;104:11;164:4;177:14
**carriers (2)**
93:13;177:19
**carrier's (1)**
195:9
**carrying (3)**
20:1;45:3;84:4
**case (29)**
11:17;13:24;16:6;18:5;19:16;20:14;22:7;29:2,15,23;68:9;69:4;89:10,11;93:11;122:3;129:5;145:24;146:11;154:15,25;156:20;164:4;165:25;168:22;169:4,7,14;189:16
**catch (1)**
183:9
**caused (3)**
128:22;131:21;148:20
**CCing (1)**
200:16
**cease-and-desist (1)**
104:17
**cell (5)**
157:24,25;158:20,21,22
**certain (10)**
19:19;65:16;72:3;96:3;106:7,8;160:12;175:1;198:17;203:17
**certainly (8)**
37:15;40:4;88:11;91:8;112:13;121:2;157:23;176:6
**certainty (1)**
175:2
**certificate (2)**
101:6,20
**certification (1)**
177:19
**certified (5)**
117:6,20;119:9;190:3,7
**cetera (2)**
196:14;199:3
**challenging (1)**
189:15
**chance (2)**
39:25;155:12
**change (9)**
86:1,4;109:4,10,11;115:4,11;133:21,23
**changed (7)**
108:24;120:8;132:10,12;144:7,17;147:22
**changing (1)**
150:15
**characterize (1)**
194:5
**charge (1)**
184:25
**chart (4)**
82:4,7;87:14;111:17
**check (7)**
66:22;87:9;120:1;134:8;158:10;160:9;168:4
**checked (2)**
31:16;153:25
**chief (3)**
113:15;136:7,8
**choice (1)**
18:25
**Chris (22)**
62:22;111:2,4;118:7;124:11;126:9,17;129:3,16;131:11;133:25;137:10;140:8;141:3,10;155:2;161:6;162:24;163:8;197:23;199:12;200:16
**chronological (1)**
155:24
**city (1)**
100:8
**claims (1)**
17:16
**Clarification (1)**
72:17
**clarify (3)**
11:11;201:24;203:5
**clear (9)**
37:2;39:21;40:4;59:2,5;60:4;117:18;134:15;189:7
**client (8)**
29:19,22;65:8;80:14;86:12;142:5;185:22;189:18
**clients (32)**
14:12;18:5;30:13;34:21;35:4;45:5;47:24;49:2;53:22;60:20;62:8;63:24;79:3;80:5;81:20;84:1;94:18;98:20;103:12;116:15;124:25;125:24;127:17;128:22;131:22;143:15;148:21;152:12;153:18;160:2;172:10;174:5
**client's (1)**
189:15
**Clip (1)**
188:2
**clock (1)**
9:25
**close (5)**
31:7;69:2;83:13;168:3;199:15
**closer (1)**
68:5
**CMVK (2)**
52:12,21
**Co (1)**
192:14
**Coast (2)**
96:2,3
**COBOL (1)**
71:12
**COD (3)**
122:8,15;187:3
**collision (47)**
14:11;25:8;30:13,17,21;31:5,7;34:21;35:3;43:25;45:4;47:23;49:1;52:19;53:22;60:20;62:8;65:7;79:3;80:5,14;81:20;84:1;94:18,25;103:11,17;105:16;116:14;123:25;124:24;125:24;127:18;129:13;131:21;133:6;141:5;143:14;152:12;157:4;160:2;172:10;174:4;175:25;176:2;185:21;186:8
**column (1)**
40:9
**combine (1)**
100:8
**Combined (1)**
82:18
**comfortable (1)**
203:7
**coming (3)**
11:19;129:19;204:1
**comm (1)**
203:25
**commence (1)**
55:12
**commenced (19)**
44:23;45:6,7,18,22;46:2,8;47:7,19;48:8;53:18,23;54:2,5,17;55:1,4,20;67:6
**commencement (3)**
48:25;148:17,17
**common (1)**
100:6
**commonly (1)**
82:11
**commonly-owned (1)**
92:7
**communicate (5)**
112:17;177:25;182:15;198:8;199:22
**communicated (10)**
62:13;66:21,24;111:2,4;112:14;113:6;129:4,11;198:11
**communicating (2)**
62:5;112:15
**communication (27)**
60:6,17,23;61:2,10;103:24;109:16;110:12;114:18;115:1;118:20,24;119:16;124:11;128:19;130:20;133:12;136:10;140:21;155:25;158:17;161:5;163:3,13,19;168:18;170:8
**communications (4)**
109:3;110:4;113:18;133:17
**companies (8)**
17:4;82:12,13;87:16;88:14;92:7,9;113:16
**company (36)**
13:25;14:2,3;27:1,7;43:12;54:18;82:6;91:18,20;92:2,12;94:8;96:11;103:21,25;104:4,7;111:5,6;112:2;113:20;114:1,2;115:12;122:4,8;130:14;136:1;164:13;177:17;186:2,17,19,22;194:16
**company's (1)**
167:10
**completed (6)**
28:11;95:10;112:24;124:7;134:14;147:14
**completing (1)**
151:11
**completion (2)**

101:6,20
**compliance (4)**
58:16;177:8;
178:19;179:2
**compliant (1)**
57:21
**complicated (1)**
50:19
**complying (1)**
38:22
**comprehensive (2)**
11:20;75:4
**comprised (1)**
98:18
**computer (4)**
8:8;22:1;71:17;
72:11
**con (1)**
137:21
**conceivable (2)**
152:13;153:14
**conceiving (1)**
158:2
**conclude (2)**
204:9,13
**concludes (2)**
11:14;204:18
**conclusions (1)**
93:5
**condition (1)**
104:1
**conditions (1)**
44:24
**conduct (1)**
10:3
**conducted (1)**
196:9
**confidence (3)**
144:1,5;158:14
**confident (1)**
193:8
**confirm (8)**
64:4;71:24;85:4;
144:22;174:6,14;
192:19;193:4
**confirmation (1)**
163:5
**confused (1)**
116:2
**confusing (2)**
80:18;155:21
**conjunction (1)**
195:19
**connect (1)**
71:17
**connection (1)**
48:16
**consequence (1)**
91:25
**consider (2)**
43:1;57:13
**consideration (2)**
81:24;139:23
**considered (5)**
70:22;99:19;145:2;
147:1,1
**consistent (1)**
51:23
**constant (1)**
48:12
**construe (2)**
86:5,11
**contact (8)**
18:20,22;31:8;
112:4,10;126:19;
137:15;139:19
**contacted (2)**
31:9;164:24
**contacting (2)**
131:11;139:14
**contemplates (1)**
126:2
**contents (1)**
80:13
**contest (1)**
37:12
**context (7)**
14:16;45:12;54:2,6;
146:4,25;150:5
**continuation (3)**
46:12;136:3;173:7
**continue (10)**
42:7;44:20,25;47:9;
60:17;109:6;115:7,
14;119:5;140:5
**continued (1)**
201:4
**continuing (6)**
60:5;112:11;
114:12;122:25;
136:20;143:1
**contracted (1)**
19:23
**contracting (3)**
19:7,8,13
**contractor (9)**
15:14,16;16:4;
21:21;23:15;34:5;
92:20;102:24;124:3
**contractors (4)**
24:4,9;25:4;34:6
**contracts (3)**
17:22;19:17;43:19
**contradict (2)**
133:13;148:3
**control (4)**
42:7;47:11,22;
130:2
**controlled (1)**
47:21
**conversation (9)**
38:1,8;42:10;
105:10;128:7;129:15;
155:3;169:6;204:3
**conversations (7)**
37:1;105:1,5,7;
119:2,3,7
**coordinator (1)**
151:19
**coordinators (2)**
149:15;181:7
**copied (2)**
113:17;136:5
**copy (7)**
13:11;16:9;50:8;
63:13;101:15;107:16;
134:8
**copying (1)**
137:11
**corporate (3)**
8:9,23;9:2
**corporation (2)**
9:3,5
**correctly (8)**
49:4;60:13;83:20;
124:18;180:13;
182:24;195:3,5
**correspond (1)**
25:23
**correspondence (7)**
94:3;114:16;
118:19;124:25;
147:10,18;162:19
**Counsel (40)**
7:6,8,10,12,16,19,
22,23;10:9;11:24;
12:7;17:18;33:24;
51:17;53:11;58:9;
63:7,18;64:8;80:22;
99:15,16;100:16;
102:3;110:3;113:3;
117:10;119:14;
123:18;134:11;
159:22;172:5;179:3;
188:17;189:3,5;
190:2;193:10;197:19;
203:12
**count (1)**
82:23
**country (1)**
53:10
**couple (1)**
199:19
**course (2)**
60:18;180:16
**court (11)**
9:13;25:11;72:17;
76:12;78:6,7,11;
135:14,15;189:18,21
**cover (2)**
75:17;94:9
**coverage (6)**
93:10,20,22,23;
94:6,7
**covering (2)**
7:18,21
**crash (2)**
12:20;14:20
**create (1)**
87:4
**created (5)**
68:3,18,20;69:1;
158:24
**creates (1)**
68:21
**credit (1)**
159:19
**credits (2)**
125:19;160:5
**crew (1)**
68:7
**Crossroads (2)**
82:25;83:2
**CSA (1)**
92:3
**currently (3)**
15:21;84:14;87:20
**cursor (1)**
13:13
**customer (3)**
17:16;137:25;188:9
**customers (1)**
145:19
**cut (1)**
120:5

**D**

**d/b/a (1)**
26:24
**DA (3)**
145:8,9;146:22
**damage (1)**
100:15
**dash (2)**
73:17;141:10
**data (12)**
148:12;149:21;
150:9,10,17;151:5,10,
22;152:2;171:13,18,
22
**date (64)**
9:24;29:3;30:13;
36:11,14;37:5;38:7,
11;44:4,23;46:14;
47:8;48:8,25;49:3,6;
53:20;54:5;55:1,13;
60:19;68:5;73:2,3;
76:4;79:20;81:1,6,6,
12;109:1;114:4,13;
118:10;124:1,17;
125:21;131:10,13,25;
132:1,20;134:9;
135:8;141:15;143:22;
144:3;147:9,17;
148:16,19,22;149:8;
152:9;153:1;159:24;
176:20;178:20,21;
194:18,22;198:9,13,
14
**dated (3)**
102:4;124:12;
153:14
**dates (8)**
28:8,19;52:6;80:19;
148:11,18,23;150:10
**Dave (2)**
165:13;198:5
**David (3)**
10:11;61:25;189:3
**day (15)**
35:6;42:16;49:8;
57:2,3,5,10,10,13,18;
162:5;170:13;173:5,
5;184:22
**days (21)**
37:7,9;42:15;81:8,
15;105:4;118:15,16;
124:16,20;131:9,25;
132:20;134:1;143:21;
149:6;156:16;167:10;
177:20;198:22,24
**deadline (2)**
157:6,6
**dealer (1)**
102:4
**dealing (1)**
192:9
**death (2)**
128:22;131:22
**Debbie (1)**
162:25
**debits (3)**
125:15,19;160:5
**decals (5)**
34:23;35:2,11,17;
185:10
**decided (3)**
114:15;115:14;
119:4
**decision (5)**
20:24;93:7;113:24;
115:7;116:23
**declined (2)**
93:20,23
**declining (1)**
94:6
**decreased (1)**
61:7
**default (1)**
118:16
**defend (2)**
58:16;59:1
**defendants (1)**
168:22
**defendant's (2)**
12:13;135:4
**defense (1)**
189:22
**define (2)**
57:1;149:20
**defines (1)**
195:15
**defining (1)**
150:16

**definition (7)** 46:1;54:1;55:1,13,18,23;71:4
**definitive (2)** 174:22;178:18
**definitively (3)** 128:8;134:6;178:15
**degree (2)** 144:5;158:14
**de-identification (1)** 185:1
**delivered (4)** 63:23;117:15;145:23,25
**delivering (1)** 103:8
**delivery (6)** 15:18;20:13,16;23:15;62:7;151:1
**demand (6)** 39:2,8,14;131:1,5,8
**Demien (2)** 163:21;167:5
**dense (1)** 48:12
**departed (2)** 173:14;175:14
**department (9)** 12:14;15:5;84:23;122:15;165:1;166:17;167:15;175:22;176:24
**depend (1)** 151:14
**depending (2)** 34:25;175:15
**depends (1)** 54:1
**depo (1)** 61:14
**deposition (25)** 7:1,5;8:10;9:12,19;10:3,12;11:1,12,14;12:1,6;29:7,14;49:19;134:16;168:13,25;169:10,11;189:16,23;204:10,13,18
**depositions (2)** 189:7;203:25
**described (9)** 15:22;17:19,20;20:17;23:22;35:5;88:18;133:14;166:23
**designated (1)** 8:8
**designation (4)** 144:24,25;145:8;146:19
**desk (1)** 81:14
**desktop (1)** 50:22
**destination (8)** 64:16;145:10,11,22,25;146:13;150:24;194:20
**destined (1)** 98:23
**detail (1)** 41:21
**determinations (1)** 93:1
**determine (1)** 64:17
**developed (1)** 71:8
**device (4)** 142:17;171:21,23,24
**dictate (1)** 28:10
**difference (5)** 26:18,21,25;137:1;162:20
**different (32)** 16:25;22:5;27:2;50:22;53:15;58:11;69:24;79:6,8,14,15,16,16;80:7,19;81:7;85:11;87:16;93:22;95:9;97:8;98:17;99:25;100:9;109:2;150:3;156:2,6,7,23;170:23;184:5
**difficult (2)** 54:15;97:21
**Direct (4)** 43:15,17;167:25;194:2
**directly (5)** 19:7;46:17;71:1;145:23;159:12
**director (1)** 126:10
**discontinued (1)** 131:5
**discount (3)** 64:20,22,24
**discovered (1)** 31:12
**discovery (3)** 28:22;29:19,22
**discretion (1)** 23:14
**discuss (1)** 29:24
**discussed (6)** 10:9;118:9;197:6,12;200:10,25
**discusses (1)** 46:18
**discussion (14)** 29:17,18;36:25;65:11;104:3,16;108:8;110:14;113:21;114:11;135:18;148:15;156:13;202:9
**discussions (3)** 76:12;113:24;169:2
**dispatch (6)** 68:3,6,14;69:12,13;164:14
**dispatched (1)** 52:24
**dispute (2)** 103:2;190:8
**distance (1)** 122:10
**distribute (5)** 18:7;19:10;53:9;65:20,23
**distribution (3)** 52:25;65:24;89:8
**distributions (1)** 89:4
**division (2)** 12:14;139:7
**document (17)** 35:18;36:10,11;50:23;51:16,21;72:9;78:16,20;87:4;101:19;110:2;170:25;172:9;197:18;199:10;200:8
**documentation (17)** 33:22;85:25;86:3;89:20,21;99:13;101:5;102:22;109:15;128:13,19;159:8,16;160:20;170:17;172:4,7
**documented (1)** 109:24
**documents (10)** 11:23;12:3,9;49:21;110:4;137:13;142:3;171:2;191:15;192:3
**document's (1)** 111:15
**DoD (9)** 21:3;63:8,11;64:13;68:21;83:9;84:6;88:21;151:16
**DoD's (1)** 64:25
**domestic (3)** 19:18,25;23:16
**domestically (2)** 17:5;19:12
**done (31)** 12:5;15:6;22:3;27:13;37:7;57:20;60:1,3;73:2,24;83:6,10;88:5;95:16;107:4;113:8;119:21;127:10;134:25;138:4;139:15;143:24;144:1;163:6;168:3;194:14;195:16;196:5,23;199:18;200:18
**door (5)** 34:17,23;35:3;85:16;140:9
**doors (1)** 185:10
**DOT (51)** 34:16,18;38:19;56:10;66:18;70:5;83:3,4,6,8,10,11,19;84:4,13,17,18;85:1,2,15;86:6,21;91:22;92:8;96:5,10;97:8,20;98:5;100:21,22;101:3;104:8,23;106:6,22,23;107:4,11,16;108:16;123:24;128:12,24,25;142:18;163:20;166:16;186:6,12;190:20
**doubt (1)** 141:1
**down (27)** 34:3;51:10;78:8;89:23,25;96:1,2;98:3;115:11;117:25;123:15;141:2,11;145:20;156:10;172:11,24;173:2,10;179:16,19,23;180:1;183:19;192:12;193:2;197:5
**draw (1)** 93:5
**drive (1)** 184:1
**driver (10)** 21:18;31:8,9,14,15;68:8;149:2;164:9,12;177:18
**drivers (5)** 100:20,21;103:4;106:11;183:20
**driving (7)** 84:12;95:1;98:3;102:14,16;103:6;183:19
**due (1)** 125:11
**Duncan (3)** 7:21,21;180:6
**during (18)** 32:13,19,19;37:1;47:15;56:16;60:7;62:13;76:5;107:13;119:3;129:9,17;152:14;153:19;177:10;199:11;200:10
**duties (1)** 12:15
**duty (1)** 173:8

**E**

**eager (2)** 58:16;186:1
**earlier (62)** 11:12;33:13;36:7;39:24;43:24;44:3;47:22;48:24;49:4;52:18;53:6,11;54:22;62:15;63:17;65:15;79:10;83:17;84:10;88:18;91:15;92:17;97:7,13;98:10;102:9;104:17;108:8;111:8,22;118:5;120:6;126:13;127:2;128:2,7,10;130:23;132:3;135:22;136:15;137:8,18;141:4;144:13;148:4,16;152:21;165:24;180:9;185:7;193:18;197:18,24,25;199:11;200:10,25;201:24,25;203:4,6
**early (4)** 51:22;57:4;114:23;122:7
**earned (1)** 151:12
**earn-out (1)** 115:24
**East (2)** 96:2,3
**Eastern (2)** 7:3;204:15
**EDL (5)** 170:18,24;171:13,18;175:18
**educated (1)** 9:4
**effect (3)** 76:6;94:4;155:11
**effective (12)** 124:16;131:10,13,25;132:20;143:22;147:9,16;190:9;193:14;198:9,14
**effectively (3)** 19:11,21;141:12
**efficiency (1)** 100:10
**efficient (3)** 18:9,18;53:9
**efficiently (2)** 19:11;53:10
**effort (2)** 53:9;109:14
**either (12)** 21:11;33:21;74:12;125:10;146:10,12;154:5;161:12;165:23;167:24;173:23;

190:18
**ELD (28)**
32:6,8,12;142:15,17,23;143:2,6,10,12;155:5,7;156:3,7,13,16;157:2,10,20;158:3,8;159:17;160:1;171:22,24;172:1;174:2;187:2
**ELDs (4)**
155:20;156:24;173:22;174:17
**elected (1)**
136:23
**electronic (5)**
31:21;32:2,22;33:4;142:17
**eliminate (1)**
178:13
**Elite (1)**
25:3
**ELLIOT (2)**
7:23,23
**else (13)**
11:16;15:3;22:23;24:3;60:24;63:20;76:23;84:24;108:24;191:1;197:20;201:16;204:6
**else's (2)**
43:7,9
**email (71)**
22:3,4;50:10;51:8;52:12,21;58:6;60:19;63:21;64:1;66:3;78:23;79:10,23;80:21,23;81:2,7;86:25;116:19;117:4;118:2,4;119:1,6;120:2,2;128:15;129:3,8,17;134:1,13,24;136:5;137:10;139:2;141:2;143:11,17;150:6;152:3,24;153:5,23;154:8;155:11;156:9,15,17;158:6;162:2,16;165:16;166:10;169:22;179:20;197:18,23,24;198:8,16;199:10,12,18,22;200:9,15,17,20,23
**emailed (1)**
134:13
**emails (8)**
22:13,20;49:14;58:8;63:7;79:18;129:19;156:2
**emphasis (1)**
41:16
**employ (1)**
92:17
**employed (2)**
102:19,23
**employee (6)**
92:19;130:14;132:5;140:23;167:6,22
**employees (4)**
124:6;129:25;130:6;151:10
**emulation (1)**
71:15
**encompass (1)**
111:7
**end (15)**
41:25;42:3;44:19;50:3;57:13;61:3;86:15;138:12;146:23;168:4;183:9;192:20;199:2,6;202:1
**ended (3)**
93:21;143:5;173:18
**ends (1)**
57:3
**enforced (1)**
42:25
**engaging (1)**
189:22
**enough (3)**
39:24;154:7;174:22
**ensure (1)**
198:17
**enter (4)**
109:17;110:6;132:5;133:3
**entered (7)**
75:1,16;108:2;148:10,12;149:9;153:7
**entire (2)**
40:25;158:19
**entities (29)**
8:15;17:22;19:18,24;22:6;27:3;32:7;33:3;39:10;65:2,25;83:4,8;87:13,18,19,21;88:5;92:16;110:15,17,22;111:8,23;112:1;135:24;138:3;168:23;169:13
**entitled (2)**
196:4,23
**entity (27)**
8:12;12:19;19:9;27:4;73:21;82:5;83:19;84:7,22;85:14,24;98:3,13;100:15;113:7;127:11;150:20,25;151:6;160:10,10;194:9,23;195:21;196:12;201:5,7
**entry (7)**
149:21;150:10,17;151:5,10,23;152:2
**equate (1)**
45:24
**equates (1)**
54:19
**equipment (21)**
26:4;37:4;56:25;58:3,5,12,14;59:18;94:15,20;97:8,15;106:10;107:25;109:13;120:15,17;164:12;191:13;198:19;199:4
**error (3)**
15:2,6;108:6
**essentially (8)**
19:9;54:19;63:3;71:19;99:20,22;121:23;183:18
**establish (1)**
118:25
**established (1)**
147:9
**establishing (2)**
116:19;134:2
**estate (3)**
136:1,8,18
**Estates (1)**
7:13
**et (2)**
196:14;199:2
**even (5)**
42:15;67:19;76:2,4;95:11
**event (6)**
46:10;81:16;105:1,6;108:7;143:11
**Everybody (1)**
58:23
**everyone (2)**
192:9;204:6
**everyone's (1)**
29:14
**evidence (4)**
128:14;147:15;158:8;161:12
**evident (1)**
30:5
**exact (4)**
52:6;83:14;85:5;91:4
**exactly (3)**
109:25;160:18;204:4
**EXAMINATION (4)**
8:4;188:25;202:7;203:1
**example (7)**
64:19;80:19;106:10;125:12,17;130:6,13
**except (1)**
196:15
**excessive (1)**
29:17
**exchange (1)**
81:24
**exclusive (1)**
23:21
**excuse (7)**
25:25;128:24;148:5;156:16;169:8;171:5;174:20
**executed (1)**
137:12
**execution (3)**
45:24;54:19;66:1
**Exhibit (42)**
9:12,15,23;10:17;12:10;13:7,8;25:6,10,12;30:10;33:9;34:9;35:22,23;49:18;51:5;78:3,4,13,20,24;81:17;111:11,12;116:6;134:20;135:4;155:20,24;163:13;165:25;170:19,20;176:16,17;197:20;198:4;200:7,11,12,14
**exhibits (2)**
49:23;170:15
**exist (5)**
72:15;87:5;113:1;119:12;130:4
**existence (1)**
125:2
**existing (2)**
112:23;193:12
**exists (1)**
87:7
**expect (1)**
69:3
**expectations (1)**
37:3
**expenses (4)**
125:16;160:6,13,17
**expensive (1)**
109:14
**experience (1)**
106:20
**expert (2)**
39:13;72:11
**expire (1)**
153:24
**explain (2)**
21:13,23
**explanation (3)**
14:23;30:3;164:3
**explicit (1)**
109:21
**explicitly (1)**
40:17
**extend (1)**
155:16
**extended (2)**
156:16;157:6
**extension (2)**
155:8;156:18
**extent (15)**
12:8;19:2;29:20;47:6;53:18;85:10;89:25;106:21;110:2;119:12;130:4,5;132:3;147:13;169:20


## F


**facilitate (3)**
18:17;67:22;135:24
**facility (1)**
41:24
**fact (18)**
46:16,21;49:11;84:25;89:10;109:12;111:10;144:8;147:25;149:1;151:24;154:6;157:13;163:5;167:3;177:24;200:2,20
**facts (1)**
48:7
**fair (3)**
11:15;46:9;153:11
**fall (2)**
53:17;103:22
**familiar (4)**
71:7;87:23;88:10;111:5
**families (2)**
71:23;139:4
**far (5)**
10:14;49:23;55:13;157:16;185:20
**February (6)**
61:5;107:6,10,18,20;108:16
**fee (1)**
89:1
**feel (2)**
197:21;200:13
**fees (1)**
16:1
**few (1)**
105:4
**figure (3)**
74:9;178:11;204:4
**filled (1)**
81:18
**final (3)**
124:14,15;201:17
**finalize (1)**
124:17
**find (10)**
18:3,8,14;33:23;35:21;48:5;49:9;78:18;97:22;172:23
**finding (1)**
124:3
**Fine (5)**
61:21;77:4;171:12;189:12;202:3
**fingertips (1)**

165:20
**finish (3)**
91:3;168:5;196:15
**finished (3)**
195:17;196:25;200:19
**first (25)**
12:13;18:21,22;22:6,8;29:11;40:9;57:5,14,14;65:19;73:19;78:18;79:19;80:21;116:17;118:24;146:16;165:6;167:3;177:4,11;178:25;192:17;203:19
**fleet (6)**
26:11;35:1;96:9,16,21;143:21
**flipped (1)**
171:9
**Florida (3)**
98:24;145:20;149:3
**flush (1)**
67:15
**flushed (1)**
67:23
**flushing (2)**
107:23;129:22
**FM (1)**
92:3
**FMCSA (1)**
177:16
**focus (2)**
118:14;203:19
**focused (1)**
151:3
**folder (5)**
68:2,4,4;69:12,13
**folks (1)**
93:2
**follow (3)**
87:10;163:8;182:13
**following (1)**
38:17
**follows (1)**
8:3
**follow-up (4)**
120:7;162:15;175:17;203:10
**foreign (2)**
137:15;139:20
**forget (1)**
90:1
**form (62)**
40:16;41:2;42:8;43:3;47:12;53:24;54:7,10;55:9,22;58:18,20;72:14;74:16;75:19;76:18;77:9;85:18;96:25;102:15,25;106:16;107:1;125:4;126:4;130:11;131:23;132:8,16,23;133:7;139:9;140:7,14,15;141:20;142:21;143:3,16;148:8;152:16;153:2,21;154:19;155:19;156:19;157:18;162:7;165:5;180:22;181:24;182:6,17;183:7,21;184:6;190:13;191:2;195:23;196:17;197:14;202:23
**format (1)**
170:23
**forth (1)**
50:5
**forthright (1)**
10:23
**forward (2)**
179:12;188:24
**forwarding (1)**
137:12
**Foster (4)**
113:16;135:23;136:6,15
**found (3)**
44:4;153:25;177:23
**four (4)**
144:6;147:21;149:6;153:25
**four-digit (1)**
73:15
**FOX (2)**
7:16,16
**frame (7)**
36:15;38:15;61:5;62:14;159:6;178:10;197:1
**free (2)**
197:21;200:13
**Friday (1)**
199:16
**Friedman (1)**
10:11
**front (4)**
50:13;61:3;71:20;166:3
**fronts (1)**
71:18
**fulfill (1)**
124:3
**fulfilled (1)**
147:6
**full (4)**
11:20;51:11;60:7;202:10
**fumble (1)**
134:24
**function (1)**
17:3
**functions (1)**
17:17
**funds (2)**
65:24,25
**furnished (1)**
200:12
**furniture (1)**
17:10
**further (1)**
173:3
**future (6)**
76:12;137:16;139:14,21,25;140:10

## G

**GARR (42)**
8:2,6;16:19;23:12;25:16;30:14;50:8;51:8;90:22;100:17;116:9;123:21;134:13;135:8,20;142:15;156:6;161:3;166:23;168:12;174:23;175:21;180:8;189:2,20;190:1;192:6,15,22;193:7,17,25;195:14;196:2,22;197:24;198:8;200:17;201:3,15;202:9;203:4
**gave (4)**
11:12;43:5;54:22,23
**geez (2)**
24:8,17
**general (3)**
63:10;74:17;202:20
**generally (3)**
93:6;100:10,11
**gentleman (1)**
135:21
**gentlemen (2)**
62:18;200:21
**gentlemen's (1)**
62:15
**geographical (1)**
24:12
**George (1)**
7:21
**Georgia (9)**
15:4;149:3,4;165:1;166:17;167:15;175:22;176:24;179:9
**gets (4)**
22:6;65:19;71:19;181:22
**Given (5)**
16:9;45:8;117:14,19;169:9
**gives (2)**
158:22;160:11
**giving (2)**
107:24;146:6
**goal (1)**
91:6
**goes (6)**
22:1,23;40:23;52:22;171:5,7
**good (8)**
15:16;27:18;58:23;68:19;90:3;101:25;122:11;204:8
**goods (33)**
17:10,14,15,24;18:14,18;19:19,25,25;20:10,11;23:17;27:5,8;47:23;53:21;55:19;62:7;80:4,12;81:19;83:25;91:23;94:17;95:7;96:6;99:8;100:4,7,15;131:20;151:2;170:11
**gotcha (2)**
118:17;136:14
**governed (1)**
44:20
**government (50)**
17:22;18:14,20;19:13,17,23;27:19;56:6;69:18;73:8;87:23,25;88:5;110:25;111:3,9,23;112:3,12;113:9;121:3,9,11;122:9,17;137:2,4,14,16,23;138:4,7,11,16,18,20,22,24;139:7,18,21,24;140:6,10,13,24;145:6;151:16,17,18
**governmental (1)**
84:22
**government's (1)**
19:6
**Grant (1)**
7:22
**great (3)**
60:11;71:23;118:7
**Gregory (1)**
99:3
**ground (1)**
189:6
**Group (1)**
39:10
**groups (1)**
169:3
**guess (26)**
9:23;40:12;48:17;57:9;63:1;67:4;72:7;77:10;95:11;99:4;106:15,15,17;139:10;143:9;153:22;154:24;155:6;156:14;160:15;163:1;170:4;174:16;175:12;189:10;202:18
**guesstimating (3)**
58:5,13;97:4
**Guthrie (1)**
98:25
**guys (4)**
23:3;105:19;135:1;186:18

## H

**Haley (1)**
162:25
**half (1)**
91:2
**hand (1)**
117:15
**handled (2)**
91:17;151:22
**handling (3)**
137:16;139:20;140:9
**hands (1)**
30:1
**handy (2)**
27:20;107:6
**hang (1)**
204:6
**hanging (2)**
86:20;90:13
**happen (3)**
108:5;152:5;154:16
**happened (11)**
18:4;59:16;62:9;67:24;105:2,6,7;108:6;146:9;147:4;180:10
**happy (5)**
11:13;58:25;91:9;172:11;178:4
**hard (1)**
59:19
**haul (5)**
15:15;21:14;24:5,13;77:14
**hauled (12)**
26:9;66:14;67:1;70:4,9,11;88:23;92:8;95:22;127:22;145:20;149:2
**hauling (15)**
15:17;17:12;20:10,11;27:12,13;68:2,13;72:25;75:22;83:6,9;93:1,3;150:25
**head (11)**
14:15;24:17;48:13;52:24;57:19;85:7;87:5;88:1;89:4;96:22;172:20
**headache (1)**
141:23
**heading (2)**
40:20;41:7
**hear (1)**
108:22
**heard (1)**
48:2
**hearing (1)**

76:14
**help (10)** 59:8;65:23;67:15, 17;71:2;121:19; 135:23;142:11; 172:23,23
**helped (1)** 66:1
**helpful (3)** 59:9;60:14;118:3
**helping (2)** 63:3;136:3
**helps (1)** 150:25
**hereby (1)** 41:13
**hey (9)** 21:6;28:16;61:12, 12;141:22,22;146:21; 147:20;153:23
**Hickenbotham (5)** 112:8,10;113:7; 137:22;140:23
**hierarchy (1)** 17:21
**high (1)** 158:13
**highlight (1)** 69:17
**highlighted (1)** 73:7
**Highway (2)** 15:5;84:23
**hire (3)** 19:1;20:24;23:14
**Hmm (1)** 142:23
**HOD (4)** 130:22;131:19; 132:7;133:4
**hold (1)** 83:12
**honest (2)** 10:23;109:22
**Honestly (4)** 37:10;41:19; 109:20;142:16
**hope (2)** 91:2;175:4
**hopefully (1)** 168:5
**host (3)** 131:1,5,8
**hosted (1)** 71:12
**hour (2)** 61:14;91:2
**hours (1)** 173:8
**household (11)** 15:16;17:15,24; 19:18,25;20:10,11; 23:16;55:19;80:12; 100:7
**hundred (1)** 33:6
**hundreds (3)** 19:18;95:12,14

**I**

**ICOA (1)** 65:15
**ICOA's (1)** 24:15
**ID (3)** 141:6,7;164:1
**identification (13)** 9:16;13:9;25:13; 35:24;51:6;69:16; 78:14;111:13;116:7; 135:5;170:21;176:18; 190:24
**identified (5)** 56:9,14;164:5,11; 190:23
**identifier (3)** 191:19,23;202:20
**identify (3)** 39:23;66:17;187:14
**identifying (2)** 38:20;191:13
**imagine (1)** 72:1
**implement (1)** 120:20
**implicate (1)** 41:9
**implicates (1)** 29:4
**implication (1)** 38:24
**importance (2)** 38:5,18
**important (11)** 11:17;28:6;30:8; 44:4;49:10;57:10; 63:21;160:25;174:9, 15;201:20
**impose (1)** 106:8
**inaccurate (1)** 59:11
**Inc (101)** 7:5;8:14,24;9:9; 12:19,25;13:5,20; 14:5,6,14,24;15:4,10, 13,14,15,21;16:2,22; 20:19;25:24;26:17, 19,22,24;27:1,6,14; 30:16,17;31:18,19,20; 32:9,14,20;33:10; 34:10;35:14;39:6; 52:1;53:4;65:9,14,17; 68:16;72:23;73:7,22; 74:1,18;75:22;76:16, 20,25;77:19;82:4,6, 16,17;83:7,10;84:21; 87:13;91:16;92:22; 93:9;94:10,13,23; 99:9;100:19;101:21; 104:5;110:6;113:8; 114:3,5,9,17;122:23, 24;123:6,9;127:22; 136:13,16;138:3,16; 139:24;141:25;145:4, 21;158:8;159:1; 177:18;182:2;184:23; 191:11,12
**incident (1)** 30:19
**incidents (1)** 123:23
**include (9)** 15:17;17:15;20:12; 53:20;55:1;74:25; 82:10;125:13,15
**included (7)** 9:23;97:10,14,17, 17,19;172:17
**includes (2)** 54:5;55:12
**including (2)** 12:14;121:12
**Incorporate (1)** 41:9
**Incorporated (8)** 40:21,24;41:1,13, 16,18;192:14;204:14
**incorrect (2)** 13:1;132:7
**incorrectly (1)** 195:6
**Inc-owned (1)** 94:20
**incremental (1)** 73:18
**Inc's (4)** 35:16;70:9;94:15; 184:24
**indemnification (3)** 39:2,9,15
**Independent (2)** 16:4;102:23
**indicate (7)** 130:6;139:5; 142:25;143:11;162:2; 164:25;175:11
**indicated (3)** 116:3;156:17; 176:21
**indicates (4)** 125:1;152:24; 174:3;177:13
**indicating (2)** 198:19;199:3
**indication (4)** 98:1,12;153:5; 175:23
**Indirectly (2)** 19:15;160:15
**individual (4)** 53:1,2;77:19; 130:18
**individuals (1)** 62:5
**individuals' (1)** 30:25
**industry (3)** 45:10;46:3,4
**information (14)** 22:21;32:22;33:4; 38:20;72:1;104:5,8; 154:7;158:3;164:18; 170:18;171:19;172:4; 176:14
**infrequently (1)** 188:13
**initially (1)** 118:23
**initiate (1)** 73:22
**initiated (3)** 68:21;114:17; 116:22
**initiation (1)** 63:22
**injured (1)** 153:18
**injuries (2)** 128:22;148:20
**injury (1)** 131:21
**ink (1)** 179:25
**insistent (1)** 104:22
**insofar (1)** 42:19
**inspect (1)** 103:16
**inspecting (1)** 164:10
**inspection (16)** 105:15;106:4,13; 107:4;108:16,17; 164:6,15,22;166:19; 167:9,17,18;176:20, 24;177:1
**inspections (2)** 106:24;107:11
**installers (1)** 59:23
**instance (3)** 65:16;67:8;158:24
**instead (1)** 79:21
**instruct (1)** 11:2
**insurance (10)** 93:8,14,15;103:21, 25;104:4,7,11; 125:17;186:2
**insured (2)** 93:18,18
**integrator (1)** 188:7
**intend (1)** 202:1
**intended (1)** 59:5
**intent (1)** 11:20
**interaction (2)** 165:7;201:21
**interested (2)** 136:20;139:17
**internal (3)** 26:14;68:11;163:3
**internally (1)** 32:5
**International (2)** 33:14;94:25
**Internet (1)** 130:1
**interpret (3)** 42:5;45:18;175:16
**interpretation (1)** 45:20
**interrogatories (1)** 11:25
**interrogatory (1)** 12:3
**interstate (8)** 27:12,13;91:17,22; 92:13;96:16,21;137:2
**into (18)** 44:8;57:4,4;64:17; 67:21;70:25;71:10; 100:9;108:2;109:18; 132:6;133:3;144:13; 145:16,25;153:7; 155:16;158:10
**invoices (1)** 124:23
**involved (66)** 13:23;14:9,11,17, 22;17:9,13;20:5,25; 22:11;25:8;27:4; 30:12;34:20;35:3,4; 43:25;45:4;47:23; 49:1;53:22;62:8; 65:11;69:21;79:3; 80:5,11,13;81:19; 83:25;94:17,25; 98:19;103:11;105:16; 112:21;113:23; 116:14;123:25; 124:24;127:3,17; 129:13;133:6;136:2; 141:5,8;143:14; 151:24;152:12; 153:15,16;157:4; 160:1;166:22;172:10, 16;175:24;176:1;

185:15,21;186:7,13;190:18,24;202:19
**involvement (3)** 141:14;167:11;201:9
**involving (4)** 18:5;55:19;65:7;69:24
**IP (1)** 71:18
**issue (6)** 56:23;69:22;86:15;129:5;167:23;189:19
**issued (1)** 55:5
**issues (1)** 23:6
**Item (2)** 40:8,12
**items (5)** 99:21;160:23;186:21;203:10,17

**J**

**Jacksonville (6)** 98:23;99:5;100:2;145:17;146:1;172:19
**Jamie (1)** 7:14
**Janice (1)** 162:25
**January (49)** 36:15,15,16;57:22;61:4;108:4;109:1,1,19;110:7;112:4,11,15,25;114:19,23;116:8,18;118:2,4,20;119:13;120:9,23;122:20,23;123:1,10,20;124:1,12,20;129:3,7;135:11;136:5;137:10;148:6;193:6,13;195:1,11,20;196:16;197:3,22;199:16,17;200:15
**Jim (1)** 7:23
**JM (1)** 60:19
**JMI (11)** 36:3,6;47:10;49:20;63:7;101:9;102:3;128:15,25;171:4,4
**JMM333 (1)** 52:15
**JMM333com (1)** 52:13
**job (3)** 149:24;150:5,9
**Joe (271)** 7:5,11,17;8:14,24;9:8;12:19,24;13:4,19;14:5,5,6,13,24;15:3,10,14,15,21;16:2,22;18:21;20:5,19;22:2,4,21,21;23:1,11;25:24;26:15,17,18,21,22,23,24,25;27:6,14;30:16,16;31:18,19,20;32:5,9,14,20,22;33:2,9;34:10,12;35:14,16;36:19;39:5;43:1,8;51:25;55:20,25;56:8,13;57:17,25;65:9,14,17;66:4,14,18,20;67:1;68:15,16;69:6,8;70:9,23;72:4,23;73:7,22;74:1,12,18;75:7,22;76:15,20,25;77:13,19;80:22;81:18;82:4,5,16,25;83:7,10,18,22;84:3,13,18,21;85:2,13;86:14,21,25;87:13;88:4,11,15,17;89:2,14;91:16;92:15,22;93:9,13,18;94:10,12,15,19,23;95:3,6;96:13,19;98:4,13;99:9;100:3,14,19,25;101:7,9,21;102:5,11,14,16;103:9,14,18,24;104:5;105:14;106:3;108:3;110:6,17;112:24;113:8,19;114:3,5,9,17;115:16;116:10;117:1,16,20;118:12;119:17;120:24;121:9,12;122:11,19,22,24;123:6,9,12,20;124:6;126:14,20,23;127:3,5,12,12,15,22;128:11;129:24;130:2,5,8,10;131:17;132:4;133:3;136:13,15;138:3,11,15,20;139:23;140:22,23;141:24;145:4,21;147:1,5,13;149:14,17,24;151:10,12,23;158:7,25;159:3,8,11,16;161:9,20,23;162:3;166:16,25;167:22;171:14;174:2;175:21;176:22;179:4;180:10,12,17;181:15,20;182:2;184:24,25;190:3,8;191:10,19;192:21;193:12;194:8,23;195:20;196:9,11;197:7;199:4;200:3;201:22;202:13,20;204:14
**join (2)** 10:15;157:19
**joined (1)** 122:17
**joint (1)** 181:11
**Joseph (1)** 43:11
**JPPSONE (1)** 52:13
**July (89)** 12:21;15:11;17:12;18:5,15;20:1;25:8;27:5,8;30:13,18;32:8;38:10;42:14;45:3;47:23;49:2;57:4,18,22;60:9,20,22,25;62:9,10;63:23;65:8;67:25;75:9;76:1,1,17;79:2;81:20;84:1,11;85:15;89:22;92:24;93:15,24;94:14;97:12;98:19;103:6,12;104:2;105:2,3,7,11;110:18,21;124:21;125:2;126:2;127:16;128:21;131:21;138:10,19;140:12;141:18;145:3,12;148:20;149:2,18,25;150:7;151:9,25;152:12;153:16;160:21;170:11;171:5,7,15;172:18;178:2,22;179:13;180:3;190:17;199:7;201:5,10
**jumps (1)** 24:19
**June (27)** 147:14;148:22,24;152:4;153:7;155:9;157:6;161:9,25;162:5;171:6,8,15;173:1,7,9,9,9,14;174:5,8;176:9,20,23;178:1;199:2,6
**jurisdiction (4)** 28:22;189:15,18,22
**jurisdictional (5)** 23:6;28:1,7;29:22;105:25

**K**

**Karen (1)** 7:14
**Kathy (1)** 162:24
**keep (6)** 58:15;106:12;162:11;173:10;179:4;185:8
**keeping (2)** 82:23;140:9
**Kelly's (2)** 103:15;185:22
**Kelvin (1)** 31:3
**Kentucky (1)** 24:20
**kept (2)** 31:7;108:20
**killed (1)** 153:18
**kind (14)** 17:3,21;18:11;21:1;55:25;81:24;107:23;120:18;130:17;135:24;148:14;161:18;168:18;171:9
**knew (5)** 31:11;57:21;59:12;190:9;193:10
**knowledge (6)** 103:10,15,19,20;106:14;134:22
**known (2)** 9:5;93:2
**Kyle (1)** 7:13

**L**

**Labor (6)** 57:2,3,5,10,13,18
**lacks (1)** 195:21
**lading (45)** 27:17,20;28:9;44:5;63:6,9;68:18,22,24;69:1,5,9,19;73:8;74:13;75:6;78:22;79:1,7,11;80:3,11,20,24;81:2;83:24;98:16,17;99:24;119:17,20,23;150:12;152:11;153:16;165:11,14,18,23;166:6,15;170:11;172:16;190:16,19
**ladings (4)** 30:6;81:17;94:16;170:14
**LANGLEY (141)** 7:12,12;8:5,7;9:17;13:10;16:16;22:16,19;23:8,9;25:10,14;27:22;28:24;30:4,9;36:1;40:18;41:5;42:11;43:6;47:16;49:16,21;50:2,7,16,24;51:3,7;54:3,12;55:10,24;58:22;61:16,23;62:2,3;72:18;74:20;75:24;76:22;77:15;78:4,10,12,15;80:1;85:22;86:18;87:8,11;90:21;97:2;101:13,17;102:17;103:1;105:19;106:2,18;107:2,9,12;108:13,18;111:14;125:7;126:6;130:19;132:2,13,18,24;133:10;134:17,23;135:6,13,17,19;139:16;140:11,20;142:1,7,12,24;143:7,19;148:13;152:20;153:4;154:2;155:1,23;156:4,5;157:1,21;162:8;165:9,13,22;166:4,8,21;168:11;170:22;175:8,10,15,20;176:19;180:4,7;181:6;182:3,12;183:1,10,16,24;184:10;188:15;190:13;191:2,5;195:23;196:17;197:14;198:4;201:19;202:6,23;203:2,24;204:8,11
**language (7)** 45:10;48:1,5,12,22;116:21;148:15
**Lanier (1)** 25:2
**larger (1)** 194:4
**last (13)** 13:14;48:22;56:13,17;62:19;107:3;112:15;125:21;129:3,10;155:20;179:11,11
**late (2)** 148:22,24
**later (9)** 16:18;42:15;134:15;153:9;155:8;163:2;174:19;203:18;204:3
**latter (1)** 202:22
**laundry (1)** 160:22
**lawyer (6)** 45:10;71:22;91:3;104:21,25;198:25
**leads (2)** 130:8;187:22
**leaning (1)** 155:16
**learn (1)** 108:19
**leased (3)** 13:24;14:6;98:8
**least (13)** 17:19;48:1;58:11;97:5;102:23;110:13;124:3;127:6;130:18;152:5;153:6;162:4;

202:17
**leave (6)** 12:1;90:10,13; 172:19;173:11,12
**leaving (1)** 77:6
**led (2)** 130:16;166:16
**left (7)** 142:13;155:3; 172:8,13;174:5,8; 185:19
**legal (8)** 8:19;38:4;39:13; 54:1;67:4;92:12; 104:18;189:19
**letter (24)** 36:4;37:11,12,15, 21;38:2;39:3,15; 97:12;104:17,21; 116:2;117:5;118:5; 124:12;126:1;131:4, 14;132:14,19,25; 133:8;169:17;170:4
**letterhead (1)** 120:17
**letting (1)** 153:23
**level (1)** 41:20
**light (1)** 196:7
**likely (4)** 167:3,24;178:16,17
**Limitation (1)** 195:7
**limited (2)** 28:1;29:19
**limiting (3)** 76:21;77:5;105:24
**line (11)** 41:22;59:18;96:12; 124:11;125:18;137:2; 151:14;181:18;190:6; 191:18,23
**Lines (5)** 82:18;104:2; 111:21,24;122:6
**linked (1)** 74:13
**LinkedIn (3)** 130:5,13,14
**list (12)** 74:18;82:13; 112:23;113:1;125:9; 160:23;161:3;180:2; 190:20;203:9,16,18
**listed (6)** 10:18;12:20;13:4; 14:24;91:21;167:18
**listen (1)** 204:7
**lists (1)** 52:25
**litigation (2)** 11:8;168:17
**little (11)** 37:6;41:7;48:13; 51:12;65:12;91:6; 111:19;121:6;150:3; 170:23;194:4
**LLC (11)** 7:24;24:25;25:3; 68:11;87:24;88:1,6,7; 111:25;164:5;189:3
**LLCs (2)** 24:7,8
**load (33)** 19:6;22:20;63:22; 69:14,16;70:19; 77:24;79:2;83:22; 84:10,11;87:2;89:12, 21;92:24;98:3,6,13, 18,20;103:5;108:2; 124:2,4;128:11; 144:8;148:11,18,19, 22,23;150:12;172:8
**loaded (1)** 149:5
**loading (3)** 15:17;149:19,20
**loads (6)** 22:11;75:8;79:5; 83:23;149:17;179:5
**local (6)** 24:11,12;68:3; 96:18;145:17;146:1
**locally (1)** 122:10
**locate (1)** 23:7
**located (1)** 31:11
**location (4)** 17:25;21:8;31:16, 21
**Locke (42)** 7:24;13:2;15:10,13, 22;16:2,24;20:6,18, 25;21:22;23:19,23; 25:9,25;28:12;30:11, 24;31:2,3,4;32:9; 33:15,21,25;65:15; 66:4;68:9,10,11;69:3, 10;72:5;74:2,4,4; 78:21;92:22,25; 94:23;95:7;168:23
**Locke's (2)** 93:6;100:20
**log (1)** 70:25
**logging (2)** 32:2;142:17
**login (1)** 161:17
**logistics (1)** 56:23
**logo (7)** 96:15;97:20; 123:24;182:14;185:9; 186:4,6
**logos (7)** 38:19;57:18; 104:23;181:1,21; 184:8;196:14
**long (7)** 35:1;113:16; 122:10;135:22;136:6, 15;180:2
**longer (5)** 67:9;91:6;120:14; 194:16,23
**look (27)** 16:11;18:12;46:4, 24;73:13;87:6;110:1; 117:8,24;118:1; 128:18;130:12;141:2; 144:21;166:3;188:9; 192:18;193:3,7; 194:10;195:14;196:3, 21,22;197:8;199:17; 200:17
**looked (8)** 78:23;80:21;86:25; 97:13;98:10;148:15; 165:24;196:8
**looking (7)** 14:16;50:23;98:2; 110:3;152:3;156:20; 166:4
**looks (11)** 51:18;98:25; 101:25;133:25;140:8; 146:11;163:2;170:17; 173:13,17;192:13
**loss (6)** 71:23;99:7,19,20; 100:3;120:21
**losses (1)** 99:23
**lost (1)** 139:4
**lot (7)** 43:5,19;59:17;61:4; 71:10;122:8;186:20
**loud (1)** 44:9
**Luck (73)** 10:11;54:7,10;55:9; 58:19;62:1;72:14; 74:16;76:18;77:9; 85:17;96:25;102:15, 25;106:16;107:1; 125:4;126:4;130:11; 131:23;132:8,16,23; 133:7;134:12,21,25; 135:3,15;139:9; 140:7,14,17;141:20; 142:20;143:3,16; 148:8;152:16;153:2, 21;154:19;155:18; 156:1,21;157:19; 165:17;166:1,7,11,22; 167:8;180:21,25; 181:24;182:6,17; 183:7,21;184:6; 188:17,19,22;189:1,3; 190:14;191:8;195:24; 196:18;197:16;198:6, 7;201:13
**lying (1)** 91:5

## M

**M&A (1)** 24:18
**M30 (1)** 141:6
**M333 (24)** 102:5,7;116:11,13; 124:18,24;125:22; 129:4,12;131:6; 141:4,6,10,24;143:13; 157:3;170:12;184:21; 185:9;186:7;190:23; 191:10,18;202:10
**M44 (1)** 131:6
**M444 (6)** 116:11;124:18; 141:10;190:23; 191:11,22
**Madam (3)** 25:11;78:5;135:15
**mail (5)** 117:6,20;119:9; 190:4,8
**main (1)** 46:22
**mainframe (41)** 70:15,25;71:3,6,9, 14,19,20,25;72:10,12, 16;73:10;75:14; 88:18,20,25;96:7; 108:3;109:18;119:22; 120:3;130:22;131:2, 8,18;132:6;144:22; 148:7;149:12;155:21; 156:3,8,18;157:7; 161:9,10,23;162:5; 187:9,21
**mainframes (1)** 71:13
**maintained (2)** 122:14,15
**maintaining (2)** 106:4;113:22
**maintenance (3)** 105:14;106:4,13
**major (2)** 120:24;203:20
**makes (3)** 20:24;116:22; 141:17
**making (5)** 13:12;38:5;72:19; 152:22;191:5
**manage (2)** 158:25;187:22
**Management (20)** 17:2,6,8,9;18:3; 19:6;33:7;38:4,17; 57:23;66:23;76:16; 82:12;85:5;104:19; 105:11;120:1;151:20, 22;168:1
**manual (1)** 46:4
**many (7)** 10:2;57:16;95:9,15; 96:20;179:5;198:22
**March (9)** 81:3,8;150:7,13; 151:9;152:10,10; 153:15,15
**mark (11)** 13:7;25:10;35:22; 36:2,4;78:2,7;81:17; 134:19;170:19; 176:15
**marked (20)** 9:15;13:8;15:1; 25:6,12;35:23;51:5; 63:7;78:13;102:9; 111:12;116:6;135:4; 163:12;165:24; 170:12,14,20;171:4; 176:17
**marketing (4)** 181:9,11,13;183:18
**marking (2)** 40:15;157:3
**markings (13)** 33:8,10;34:1,7,8, 10;36:20;37:3;38:6; 59:11,13;98:8,9
**match (1)** 81:18
**matches (3)** 80:21,23;81:2
**mathematician (1)** 199:1
**Matt (13)** 7:10;27:22;49:23; 50:17;86:18;105:18, 20;107:5;108:13; 140:18;175:15; 179:15;188:19
**matter (1)** 41:21
**matters (1)** 9:5
**may (37)** 9:12;16:17;24:2;

28:3,12;36:13;49:11;50:18;52:5;56:19;58:4;61:9;66:10,10;85:25;87:5;91:6,6;111:7;123:11;125:15;132:21;137:14;138:6;139:19,19;147:14;148:1;152:4;153:6;164:23;173:25;174:21;175:17;179:11;188:17;203:13
**maybe (17)**
21:23;28:18,18;39:24;42:15;76:2;93:4;105:18;107:5;116:2;120:6;121:18;139:22;143:6;182:23;203:16,18
**Mayflower (251)**
10:13;23:6;25:25;26:4,5,6;28:2,7,17,23;29:5;32:12,14,21,21;33:2,2;34:13;35:4;36:21;38:19;39:10;43:2;46:13;52:1;56:1,9,10,14;58:17;59:2,8;60:6,12,24,25;62:5;66:8,10;67:22;69:21,25;70:2,4,13;72:5,7,9;73:10,14,24;74:5;75:2;76:15;77:13;82:1;87:20;88:2,3,6,12,16,18,20,24,25;89:2,9,13,14,14;95:17,23;96:7,9,10;97:8,19;98:5,5,14;102:12,12,19,24;103:9,14,19;104:11,14;105:11;106:1,12,21,24;107:15,15;108:2,14,20,25;109:6,9,18;110:7,10,14,21;111:16,21,24,25;112:12,19,24;114:9;116:9,17;117:9,14,19;118:13,21;119:18,20;120:14,22;121:1,7,12,22;122:2,6,12,20,25;123:9,11,20;124:7;125:17;126:1,14,20,24;127:3,4,5,13,15,23;128:1,24;129:10;130:7,10,15;131:4;132:15;133:4,12;134:14;136:11,21,23;137:1;138:8,20,22;139:12,24;141:13;143:1;146:11;147:18;148:5,6;149:7,12;150:6;151:24;152:14,25;153:8,19;154:6,9,10,13,14,21,22;155:12;157:5,10;158:9;159:3,10,18,25;160:15;161:10,15,22;162:4;163:12;164:4,7,16,21;165:4;166:5,19;167:6,18;168:24;176:21;177:25;180:11,17;181:4,13,16,17,20,21,22,25;182:1,16,20;184:15,15,19,20;186:6,12,18;187:11;189:3;190:5,19;194:17;195:22;196:9,15;198:20;199:3;201:7,9,22
**Mayflower-branded (1)**
56:24
**Mayflower's (31)**
26:10;34:18;57:25;67:9,12;70:5,10,12,23;71:25;75:5,14;76:24;85:1;96:4;104:8;123:24;124:25;125:13;127:25;137:4;140:5;144:3;155:7;182:14;183:5,13,17;190:20;194:24;196:14
**mean (43)**
24:8;25:21;26:7,15;31:18;35:6,9;39:19;41:15;42:6,9;45:13,19;49:3;53:4;59:15;72:5;74:15;75:20;77:8;81:13;82:7;92:1;120:16;129:18;138:7;139:1,1;140:17;142:15;144:25;147:24;149:20,20;158:17;159:11;169:5;176:11;182:19;190:25;191:1;194:7;203:17
**Meaning (6)**
21:14;24:11;45:7;67:6;92:4;148:17
**means (15)**
16:8;20:8;21:16;31:22;45:11;46:8;55:4;64:23;71:2;73:19,20;141:24;142:5,8;194:11
**meant (2)**
53:15;143:6
**medical (1)**
90:5
**meet (3)**
168:12,16,20
**meeting (2)**
178:20;179:2
**meetings (2)**
169:1;177:8
**member (1)**
100:7
**members (2)**
17:5;100:9
**Memorial (1)**
57:10
**memory (1)**
37:12
**mention (1)**
190:19
**mentioned (21)**
9:11;12:18;24:23;33:8;36:18,20;37:18;44:3;48:24;60:11;83:1;87:12;92:16;97:16;111:8,23;133:22;156:11;180:8;181:2;185:7
**met (1)**
8:7
**method (1)**
119:19
**methods (1)**
18:9
**Michael (4)**
31:1,10;157:12;185:6
**might (11)**
20:12;38:3;58:19;73:17;76:21;77:5,6;105:3;108:19;117:4;129:22
**Mike (1)**
31:11
**Military (34)**
16:23;17:2,5,6,8,9,23;18:1,3;23:16;70:20;76:16;88:2,3,6,13,16;111:25;112:18,20,22;121:25;127:4,11;141:16,19;151:15,17,18,19,21;156:11;201:4,6
**mindful (1)**
11:19
**minute (6)**
28:11;30:5;37:13;75:13;110:13;187:18
**minutes (2)**
30:19;90:6
**misidentified (1)**
164:5
**miss (3)**
77:22;179:18,24
**missed (5)**
21:24;28:18,18;136:14,14
**Missouri (1)**
34:14
**Mo (1)**
147:13
**mobile (1)**
184:2
**model (1)**
27:16
**Modern (1)**
82:17
**modified (1)**
154:1
**modify (2)**
42:1;47:4
**Mohol (1)**
39:5
**Moholland (299)**
7:5,11,17;8:14,24;9:9;12:19,25;13:4,19;14:5,6,13,24;15:4,10,14,15,21;16:2,22;18:21;20:5,19,24;22:2,5,21,21;23:1,11;25:24;26:16,17,19,22,22,23,24;27:1,1,6,7,14;29:6;30:16,17;31:18,19,20;32:5,9,14,20,23;33:2,9;34:10,12;35:14,16;39:6;43:1,8,11,20;46:13;52:1;55:20,25;56:8,13;57:17,25;65:9,14,17;66:4;68:15,16;69:6,8;70:9,24;72:4,23;73:7,22;74:1,12,18;75:22;76:16,20,25;77:14,19;80:22;81:18;82:1,4,5,6,16,16,25;83:3,7,10,18,22;84:3,21;85:14;86:14,21;87:1,13;88:4,11,15,17;89:2,15;91:16,20;92:12,15,22;93:9,14,18;94:10,12,15,19,23;95:4,6;96:14,19;98:4,14;99:9;100:3,14,19,25;101:21;102:5,11,14,16;103:9,14,18,25;104:5;105:14;106:4;108:3,25;110:6,18;112:24;113:8;114:3,5,9,17;115:17;116:4,10,10;117:1,16,20;118:12;119:17;120:24;121:9,12;122:11,19,22,24;123:6,9,12,20;124:1,6;126:15,20,24;127:3,6,12,12,15,22;128:12,25;129:25;130:2,6,8,10;131:17;132:5;133:3;136:11,13,15;138:2,3,11,15,20;139:6,23;140:4,22,23;141:11,25;145:4,21;147:1,5,13;148:5;149:14,18,25;151:11,12,23;154:9,12,20;158:8;159:1,8,12,16;160:16;161:9,20,23;162:4;164:6;165:1,3;166:16,25;167:22;171:14;174:2;175:21;176:23;177:17;179:4;180:11,12,17;181:15,21;182:2;184:24,25;190:3,8;191:11,12,19,23;192:13,21;193:5,12;194:9,23;195:20;196:9,11,12;197:7,13;198:10,11,18;199:4;200:3,4;201:22;202:13,21;204:14
**Moholland's (17)**
36:19;40:2,14;66:14,18,20;67:1;75:7;84:13,18;85:2;101:7;141:15;144:7;147:25;156:11;166:18
**moment (6)**
8:7;9:11;13:12;45:16;165:20;166:14
**Monday (4)**
57:5;174:19,20,21
**money (4)**
39:9;65:20;126:21,24
**month (4)**
125:20;152:5;153:9;169:11
**months (1)**
199:1
**moral (1)**
8:19
**more (20)**
17:22;19:5,22;30:5;41:10;61:4;65:24;67:21;74:17;107:23;109:5;136:18;139:17;152:18;153:9;162:11;179:23;182:18;183:8;192:25
**morning (7)**
11:24;16:15,20;22:14;49:12;142:14;155:4
**most (8)**
18:9;65:13;104:3;109:4;121:2,3;182:9;187:20
**motor (4)**
14:19;15:5;164:4;177:18
**move (11)**
17:4;18:9,21;19:1;20:16;53:12;127:4;149:15;151:19;188:24;197:17
**moved (2)**
19:11;186:2
**movement (3)**

17:10,14,23
**mover (2)**
18:4,14
**movers (9)**
16:23;18:4;70:20;
82:5;88:2,3,7,16;
111:25
**moves (5)**
19:19;122:16;
179:5;194:17;195:9
**moving (36)**
17:4;24:24,24;
26:22,23;34:12;53:5,
8,21;55:20,25;56:6,8,
14;66:3;82:25;83:2;
91:18;98:4,14;99:5;
100:3,8;116:10;
122:10;126:15;129:2;
179:12;181:7;191:19;
192:21;194:16;197:7;
198:10;199:9;200:4
**much (2)**
64:5;139:5
**multiple (1)**
82:11
**must (1)**
177:19
**myself (1)**
194:12

**N**

**name (22)**
8:6;13:14;31:1;
57:25;62:15,19;
102:4;111:5,6;112:7;
167:7;182:16;183:5,
13,19;184:20;186:12,
17,19,22;191:16;
199:14
**names (6)**
24:16;30:25;62:4;
88:10;110:24;191:15
**nationwide (1)**
182:22
**naval (1)**
99:4
**navigate (1)**
136:3
**near (1)**
139:14
**need (15)**
12:1;28:14;61:18;
75:6,18;77:25;91:1,8;
144:7;146:2;171:10;
174:11;203:17;204:4,
5
**needed (4)**
42:19;71:13;
198:20;199:3
**net (1)**
160:16
**network (12)**
18:8;19:14,16,24;
20:4;23:11;35:5;53:7;
65:23;146:10;182:9;
194:21
**new (16)**
108:1;109:9,17;
110:6;113:15;115:8,
15,16;136:7,8;
157:25;180:12,14;
182:8;195:21;196:8
**news (1)**
103:3
**next (8)**
91:2;118:1;190:15,
22;192:1,17;197:6;
200:8
**Nicholas (10)**
7:19;12:23;92:18,
23;93:3;101:1,2,21;
102:13;177:18
**Nichols (1)**
99:7
**Nichols' (1)**
99:3
**night (1)**
173:18
**none (2)**
10:14;110:23
**non-evasive (1)**
10:24
**nor (1)**
164:14
**Norfolk (1)**
100:1
**note (3)**
10:10;167:8;189:14
**notes (3)**
178:20;179:3,17
**notice (17)**
9:12,19;10:7,10,12;
12:16;116:25;117:8,
15,19;119:8,8;
133:21;169:9;175:22;
176:23;177:18
**noticed (1)**
36:10
**notification (2)**
163:2;190:4
**notified (4)**
119:4;169:16;
177:4,6
**Number (88)**
9:15,22;12:15;13:8;
14:7,10,13;25:12,22;
34:16,18;35:20,23;
49:17;51:5;57:24;
61:6;66:18;69:17,19;
70:6;73:3,5,6,9,9,9,
12,16,17,23;74:14;
75:13;78:4,13,22,23;
79:7,13,14,16;80:3,
24;83:4,7,10,11,19;
84:4,13,17,19;85:2,
15;86:6,22;91:22;
92:8;96:5,10,19;97:9,
20;98:5;99:10;102:5;
104:8;111:12;116:6;
123:24;128:12,24,25;
135:4,16;142:8;
163:23,24;164:1;
170:20;176:17,21;
186:6,12;190:20;
197:20;200:11;201:4
**numbering (3)**
26:13,14;101:16
**numbers (9)**
38:19;56:10;80:11;
83:3;85:1;104:23;
131:6;190:24,25

**O**

**OA (3)**
144:24,25;146:22
**oath (1)**
8:17
**object (63)**
29:16;40:16;41:2;
42:8;43:3;47:12;
53:24;55:9,22;58:18,
19;72:14;74:16;
75:19;76:18;77:9;
85:17,17;86:12;
96:25;102:15,25;
106:16;107:1;125:4;
126:4;130:11;131:23;
132:8,16,23;133:7;
139:9;140:7,14,15;
141:20;142:20;143:3,
16;148:8;152:16;
153:2,21;154:19;
155:19;156:19;
157:18;162:7;165:5;
180:21;181:24;182:6,
17;183:7,21;184:6;
190:13;191:2;195:23;
196:17;197:14;
202:23
**Objecting (2)**
54:7,10
**objection (5)**
72:19;156:21;
162:12;183:14;191:6
**objections (1)**
29:11
**obligation (3)**
8:19;184:23,24
**obligations (5)**
42:2;44:14,18,20;
47:5
**obviously (3)**
12:22;39:13;69:22
**occur (1)**
127:1
**occurred (6)**
30:20;31:13;35:12;
66:25;125:10;159:5
**occurrence (1)**
44:17
**Off (34)**
14:15;24:17;52:23;
57:19;59:8,11,13;
61:5;64:14,25;85:6;
87:5;88:1;89:4;90:12,
16;96:22;97:9;120:5;
135:18;143:4;155:7;
166:19;168:6;172:20;
184:11,21;185:12,13;
186:4,6,13;199:3;
204:14
**offer (16)**
18:23;21:2,5;22:1;
23:22;45:7;49:7;
50:10;64:1;66:13;
68:20,22;79:15,16;
81:9;172:5
**offered (1)**
22:9
**offers (3)**
22:14;52:12;88:20
**office (3)**
17:3;33:21;108:14
**officer (8)**
14:12,24;54:18;
99:4;113:16;136:7,9;
164:10
**office-type (1)**
17:17
**official (1)**
177:14
**old (3)**
71:11;115:19;
123:16
**once (5)**
11:14;27:25;93:21;
105:23;185:12
**one (77)**
14:9;16:14,24;
17:22,25;19:12;21:4;
24:19;25:2,3;35:22;
36:8;43:22;46:21;
52:24;53:8;61:17;
62:15,18;75:1;79:5,6,
13,19,21;80:10;83:4;
88:13;89:5;96:13;
98:18;99:22;100:8,9;
102:22;104:3;107:17;
112:21;120:15;
128:15;135:16;
144:24;145:8;146:16,
17;149:5;152:18;
154:17;155:20,23,24;
156:3,3;160:6,23,25;
162:5,11;166:8;
167:25;180:11;181:3;
183:8;187:12;188:13;
192:12,17,17;200:3,4,
11;201:17;202:17;
203:13,13,13,22
**ones (2)**
120:12;187:14
**One's (1)**
162:22
**ongoing (8)**
113:22;137:16;
139:5,21;140:3;
147:16;162:3;165:3
**online (4)**
156:23;174:17;
187:25;188:4
**only (10)**
21:15;24:9,10;
41:17;73:25;192:10;
193:12;197:10;201:2;
203:20
**oOo- (1)**
204:19
**open (3)**
12:2;90:10;140:9
**operate (2)**
24:7,14
**operated (3)**
12:23;34:13;202:12
**Operating (12)**
16:4;20:18;27:3,16;
52:3;85:1,15;91:22;
106:9;107:21;164:10;
181:20
**operation (2)**
17:16;128:24
**operations (19)**
21:10;30:23;31:1,
10;34:22;59:24;
66:23;68:3;85:5;87:9;
93:2;120:1;149:15;
157:12;164:23;
167:25;174:7;185:4,6
**operative (1)**
48:7
**operator (1)**
84:25
**opinion (2)**
54:16;106:22
**opportunity (4)**
16:19;22:17,22;
115:5
**ops (4)**
31:16,18;170:2,3
**order (40)**
23:21;49:3,6;53:20,
21;54:5;55:2,5,14,19;
60:8;62:6;63:6;64:7;
73:2,5,6,9,12,17,23;
75:4,13,16;79:9,13;
80:20;81:1,6,12,18;
131:19;132:5;133:3,
5;148:16;149:8;
152:6,9,13
**ordered (3)**
28:10,20;29:4
**orders (8)**
121:10;129:22;

148:10;152:25;153:6,14,25;154:5
**org (2)** 82:7;87:14
**organizational (3)** 12:13;82:3;111:17
**organizations (1)** 82:10
**origin (6)** 64:15;145:1,2;146:13;150:24;194:19
**original (1)** 42:13
**originally (3)** 71:8;121:11;167:18
**originated (2)** 98:21,22
**originating (1)** 160:10
**others (5)** 24:13;62:17,24;188:11;202:17
**Otherwise (3)** 85:12;90:13;130:3
**out (31)** 9:19;11:13;15:4;24:19;39:25;44:9;65:12;67:15,23;68:22;74:9;77:6;89:9;99:23;104:12,15;107:23;129:22;152:5;160:17;167:16;175:23;176:1;177:23;178:11;179:25;192:25;193:11;196:15;197:8;204:4
**outlined (1)** 36:23
**outlines (1)** 15:25
**Outlook (1)** 71:4
**outside (1)** 122:9
**over (21)** 8:7;48:13;59:16,22;64:1;71:10,18;72:25;74:19;75:22;80:10;86:20;91:2;122:14;140:18;158:15;169:5;189:6,18;192:4;199:24
**overall (1)** 114:8
**overly (1)** 77:3
**overnight (1)** 59:20
**owe (2)** 126:20,24
**Owen (1)** 43:11
**own (10)** 26:14,15;84:3;92:7,25;120:20;121:25;144:8;147:25;158:24
**owned (6)** 12:25;13:2,4;14:2;82:11;95:4
**owner (6)** 12:22;14:25;30:23;31:2;33:13;115:9
**owner's (1)** 13:14
**ownership (8)** 13:20;115:4,12,15,16,19;133:22,24

## P

**pack (6)** 21:14,15,15,16;24:9;25:3
**Packaging (1)** 25:3
**packed (1)** 20:15
**packing (3)** 15:17;20:12;68:5
**page (7)** 34:3,9;51:11;118:1;177:13;192:6,11
**paid (25)** 65:19;66:3,4,4,5,8,11;89:13,14,22;92:1,3;99:7,23;100:3;122:25;123:6;125:16;127:12,12;159:3,18,25;160:14,15
**paper (3)** 68:4;84:8;180:1
**paperwork (1)** 110:12
**paragraph (13)** 37:18;47:2;124:14,15;194:3,6,7,11;195:14;196:3,10,22;197:2
**Paragraphs (2)** 195:18;196:7
**parent/child (1)** 87:17
**parentheses (1)** 145:9
**Part (23)** 18:7;20:4;39:11;42:20,23;43:2;44:7;59:3,23,24;73:19,19;115:3,16,19,25;126:13;150:12;163:12;164:13;177:7;181:14;198:4
**participate (3)** 65:3;100:25;182:9
**participated (1)** 65:6
**participates (1)** 65:5
**participation (1)** 189:16
**particular (5)** 53:12;77:24;179:5;185:5;191:14
**parties (6)** 16:1;17:21;20:25;41:13;168:17;183:12
**parties' (3)** 42:1,7;47:4
**partner (11)** 18:8;19:8,9,14,16,24;20:4;23:11;35:5;53:7;65:23
**partners (2)** 19:20;53:8
**parts (1)** 53:13
**party (4)** 29:14;130:16;164:21;167:22
**pass (1)** 139:3
**passthrough (1)** 160:6
**password (2)** 161:17,24
**past (5)** 77:7;138:1,6;169:11;198:23
**patience (1)** 189:4
**Patrol (2)** 15:5;84:23
**pause (1)** 90:10
**pay (6)** 127:4,15;182:8;184:7,11,20
**paying (4)** 159:9,12,17;184:15
**payment (19)** 39:9;64:7,11,21;65:5,6;81:22,25;99:13;100:14;125:22;126:2;127:16;158:17;160:9,16,20,20;203:22
**payments (7)** 64:14;65:13;123:9,19;125:10,11,14
**pays (1)** 160:10
**PC (1)** 71:21
**PCs (1)** 71:10
**peak (1)** 57:11
**pen (1)** 180:1
**penalty (1)** 92:1
**pendency (1)** 32:13
**pending (1)** 91:11
**people (6)** 10:2;17:24;60:12;62:13;122:9;168:4
**per (1)** 97:12
**percent (4)** 33:6;64:20,24;65:1
**percentage (4)** 19:19;65:17;70:8,10
**perform (2)** 19:18;154:10
**performed (1)** 102:13
**period (21)** 37:17;47:15;59:17;60:8;73:1;74:19;75:8,23;76:5;93:24;107:13;115:24;134:3;138:16;152:15;153:20;155:9;156:15;169:5;178:22;198:17
**permissions (1)** 132:12
**person (15)** 38:17;53:1,3;58:2;98:2;126:12,16;149:16;150:17;151:5;173:22,25;175:1,13;185:5
**personal (6)** 8:22;117:14;119:8;189:15,18,22
**personally (3)** 15:8;164:24;167:14
**personnel (3)** 17:23;106:10;181:9
**Peters (4)** 31:2,10;157:12;185:7
**phone (12)** 37:1;119:2,6;142:13;155:4;157:25,25;158:20,21,22;169:22,24
**photos (2)** 58:2,4
**physical (4)** 17:14;20:7,9,16
**physically (2)** 20:11;47:14
**pick (1)** 21:18
**picked (1)** 103:7
**picking (3)** 21:4,6,8
**pickup (2)** 21:7;151:1
**picture (1)** 92:5
**pictures (7)** 25:7,15;30:10;34:2;52:18;66:16;102:8
**pieces (5)** 58:5,11,14;97:8;185:13
**place (10)** 12:21;42:6;60:9;65:8;67:21;84:24;119:2;141:15;149:7;153:8
**placed (3)** 34:20;96:5;144:12
**Plaintiff's (14)** 9:15;13:8;25:12;35:23;51:5;78:13;111:12;116:6;170:20;176:17;189:5;190:2;193:10;197:19
**plan (1)** 61:24
**planning (1)** 61:16
**play (1)** 64:17
**please (11)** 7:8;8:1;33:24;44:9,11;133:18;161:1;164:15;167:9;188:16;197:21
**plural (1)** 143:6
**PM (9)** 7:1,3;9:25,25;90:17,20;168:10;204:15,18
**point (37)** 11:13;18:10,10,18,19;19:12,12;20:11,12;35:6,11;36:21;39:25;46:24;48:20;56:16,25;67:14,19;77:17;86:23;90:3;102:22;109:12;112:21;114:23;121:8,25;124:10;126:12,16;127:24;128:7;133:12,18;169:7;176:7
**points (2)** 46:22;126:18
**Polansky (1)** 36:5
**police (6)** 12:20;13:5;14:12,24;15:6;25:6
**policies (1)** 93:10
**policy (2)**

93:21,24
**port (1)**
179:1
**portal (6)**
130:21;131:5,19;132:6;133:4;144:13
**portion (2)**
127:5;192:10
**position (2)**
28:5;29:23
**possibility (3)**
46:11;74:25;77:23
**possible (16)**
13:17;61:1;68:25;70:2;88:11;112:16;139:13;154:18,20,24;167:2;169:6;174:7,12,19,25
**Post (1)**
114:14
**potential (1)**
154:25
**potentially (2)**
74:1;140:9
**practice (3)**
34:4;92:10;100:6
**preceded (1)**
118:19
**predated (1)**
196:16
**predates (1)**
199:7
**predecessor (3)**
43:13,15,17
**prefaced (1)**
191:16
**prep (1)**
63:5
**prepare (3)**
12:5;63:5;168:13
**prepared (1)**
10:17
**preponderance (2)**
61:2;122:16
**present (1)**
119:19
**president (6)**
39:5;43:8,12,20;115:22;116:9
**presume (2)**
54:4;114:22
**pretty (6)**
31:7;39:20;59:17;64:5;71:7;199:15
**previous (1)**
196:7
**previously (8)**
44:15;95:4;102:18;120:22;159:18;184:18;189:2;197:7
**primarily (5)**
96:16,18;102:18;182:20;183:15
**primary (4)**
21:5;62:25;126:18;182:10
**Prime (1)**
94:8
**principal (1)**
183:4
**principals (2)**
184:11,12
**printout (1)**
72:10
**prior (27)**
34:25;42:7;44:17,23;47:7;48:8;70:7;76:4;83:19;91:11;95:7;105:11;109:2;119:13;120:23;123:3;138:8;149:6;152:15;156:9;159:24;176:4,7,10;191:18,22;198:9
**prioritize (1)**
203:16
**priority (1)**
203:21
**probably (27)**
14:21;24:8;28:13;30:19;33:19;34:25;36:14;52:24;71:18;77:11;93:4;97:6;107:17;109:23;117:2;118:6;120:2;123:15,15;144:19,21;149:5;151:18;179:11;181:5;202:16,17
**problem (6)**
45:17;48:14;50:25;57:9;61:15,20
**proceed (1)**
90:23
**proceeds (1)**
127:16
**process (11)**
26:11;46:19;56:22;61:3,7;69:23;85:6;87:10;100:22;126:19;151:12
**produce (9)**
33:24;42:19;72:22;85:12;107:8;119:13;160:19;172:1;179:8
**produced (38)**
16:5,7,14,20;23:3;25:9;27:23,25,25;29:25;30:7,11;35:22;49:14;63:9;64:7,8;72:2,4,4,5;78:17,21;79:18;101:15;102:3,22;105:23;108:15;111:16;113:2;134:12;140:25;154:5;165:17;166:9;171:25;174:3
**product (1)**
186:23
**production (8)**
27:21;79:22;101:4;105:24;165:19;166:12;169:19;172:5
**productions (1)**
170:24
**profile (4)**
130:13,15;164:16;167:11
**profiles (1)**
130:5
**program (4)**
32:13;71:16,21;158:25
**prohibition (1)**
92:12
**proper (2)**
80:3;102:1
**properly (1)**
152:19
**property (4)**
56:9,15;99:3,18
**proposition (1)**
181:18
**proprietary (1)**
187:11
**ProStar (3)**
33:15;95:1;105:15
**protect (1)**
21:16
**prove (1)**
87:4
**provide (24)**
17:15;58:8;63:18;88:16;89:20;97:23;99:15,16,16;100:13,16;110:2;113:3;117:10,11;119:19;123:17;134:11;159:22;161:12,15;165:21;172:3;179:10
**provided (17)**
9:8;41:23;49:12;64:8;69:5,9,9;86:4;93:22;104:6;105:18,20;120:22;164:17;166:15;198:22;203:6
**provider (7)**
22:9;68:23;69:4;158:18,22;186:22;188:1
**providers (2)**
20:3;187:13
**provides (2)**
32:2;125:18
**providing (1)**
199:23
**provision (7)**
40:13;41:6;42:1;44:8,9;47:22;48:7
**provisions (4)**
41:11;44:24;47:9;197:12
**Public (8)**
84:23,24;98:2,12;130:9;165:2;166:17;176:25
**pull (10)**
49:23,25;50:2,16,25;111:10;159:19;166:12;176:5;178:19
**pulled (2)**
46:23;166:14
**purchases (1)**
135:24
**purpose (8)**
55:6,11;77:2;83:8;106:3;136:4;162:18;182:14
**purposes (4)**
11:8;12:2;76:12;193:11
**pursuant (1)**
36:21
**put (5)**
34:23;52:8;67:21;78:8;203:18
**putting (2)**
42:20;189:20

**Q**

**qualification (2)**
100:22;178:13
**qualified (5)**
26:4;100:21;101:3,3;106:11
**qualifier (1)**
77:18
**qualify (1)**
76:20
**query (5)**
75:15,21;76:21;77:2,6
**queue (3)**
18:24;56:21;139:11
**quickly (2)**
82:13;171:10
**Quotes (3)**
187:3,5,22

**R**

**Rae (10)**
112:7,10,14,17,20,21;113:6;137:22,24;140:23
**range (2)**
57:24;99:12
**rate (2)**
64:18;71:19
**rates (2)**
64:15;137:25
**rather (2)**
102:19;154:9
**reach (4)**
15:4;104:12,14;167:16
**read (28)**
37:13;41:15;44:8,9,10;47:13;51:12,13;53:19;118:23;124:18;133:1;140:3;144:11;146:5;155:12;163:15,16;164:3;173:22;194:6,12,13;195:2,4,5,5;199:21
**reading (12)**
7:6;45:10;54:17;111:22;153:11;195:18;196:5,10,23;199:18;200:18,19
**reads (1)**
132:25
**ready (3)**
90:22;145:19;155:14
**real (4)**
136:1,8,18;202:18
**really (12)**
37:10;47:20;67:4;75:25;76:3;110:10;151:3,5,6;174:6;188:14;189:4
**reapply (2)**
115:9,12
**reason (7)**
10:20;38:16;44:7,7;114:7;133:20;136:23
**reasonable (2)**
42:5;144:5
**reassigned (2)**
146:3;167:9
**reassigning (1)**
146:23
**rebrand (2)**
107:25;109:12
**rebranded (1)**
58:3
**rebranding (2)**
120:15;129:21
**recall (19)**
13:18;31:8;37:10;42:17,19,24;61:10;105:10;112:6,13;115:2;117:7,22;119:11;125:21;132:11;155:10;157:8;163:10
**receipt (5)**
116:18;117:6,20;119:10;190:4
**receive (6)**
11:24;37:21;69:5;145:19;175:22;200:2
**received (11)**
11:23;65:18;117:9;169:17;170:4;177:15;190:1,3,15,22;193:9

**receives (1)** 68:24
**receiving (2)** 22:13;38:2
**recess (2)** 90:18;168:8
**recognizable (1)** 122:12
**recollection (2)** 37:14;135:7
**record (28)** 7:2,9;10:10;44:8; 49:24;50:9;72:15,20, 22;90:16,20;106:12; 108:9;123:8;135:18; 142:9;161:8,22; 168:6,10;170:18; 177:2;179:4;180:22; 189:21;191:6;194:14; 204:15
**records (6)** 64:6;105:15;106:5, 13;108:15;169:19
**recovered (1)** 99:21
**reductions (1)** 160:13
**reference (9)** 13:12;23:11;40:24; 49:18;130:21;149:23; 163:23;191:10,11
**referenced (11)** 39:3;49:22;65:15; 68:14,15;69:12; 73:11;118:5;130:15, 23;156:9
**References (2)** 37:17;141:4
**referencing (4)** 36:22;46:10;137:8; 165:14
**referred (3)** 32:4;51:17;131:18
**referring (6)** 14:4;36:7,9;51:22; 139:10;176:12
**reflect (3)** 110:5;142:3,9
**refresh (2)** 37:13;135:7
**regard (2)** 189:17;197:12
**regarding (6)** 129:12;189:6; 190:2,16;192:3;196:8
**regardless (3)** 29:6;75:16;190:7
**register (6)** 84:3,6,21;85:23; 86:13;109:9
**registered (30)** 14:13;67:8,12,16; 70:3,12,23;71:24; 72:23;74:23;75:6,8; 76:15,24;77:13,19; 84:16;88:17,19,25; 89:13;96:7;109:5,8; 123:3;127:25;128:5, 6;139:12;154:22
**registering (1)** 76:4
**registers (1)** 83:18
**registration (13)** 33:17;70:14,24; 73:23;74:11;77:24; 86:6,21;95:16;108:3; 110:7;120:13;181:4
**registrations (2)** 109:18;120:14
**reinforcing (1)** 38:5
**reject (1)** 22:22
**related (13)** 28:22;33:3;46:4; 88:4;92:16;105:25; 138:3;141:15;156:11; 169:3;170:7;171:14; 200:9
**relationship (37)** 15:10,22;16:23,25; 17:20;33:1;56:1;59:4; 67:3,17;87:17,20; 92:17;93:14,15; 106:20;108:25; 110:11,14,18;115:8, 15;118:15;119:5; 120:9,25;121:21; 122:7,21;125:1; 127:23;136:21;139:6; 147:16;162:3;165:3; 190:9
**relationships (1)** 110:20
**relevant (5)** 23:5;29:21;194:8; 195:20;196:11
**Relocation (1)** 34:1
**Relocations (24)** 7:24;13:2;15:11,13, 23;16:2,24;20:18; 21:22;23:20;25:9; 30:24;31:2;32:10; 33:15,22;65:15; 68:10,11;78:21; 92:23,25;94:24; 168:24
**reluctant (2)** 53:25;174:15
**rely (5)** 11:7,7;59:23;85:11; 181:13
**remain (3)** 115:25;129:8,17
**remained (1)** 115:22
**remaining (1)** 129:23
**remember (22)** 37:16;38:7,9;62:4; 64:11;97:18;112:14, 18;114:25;129:2,10; 137:17;142:16;155:2, 15;157:2;160:4; 177:24;193:16,24; 197:20,23
**reminder (1)** 124:15
**remit (1)** 127:5
**remittance (2)** 123:14;125:5
**removal (2)** 124:7;164:20
**remove (6)** 35:16;36:20;40:2, 15;104:22;164:15
**removed (10)** 35:11;38:6;57:17; 97:9;129:25;144:3; 167:10;185:9,14; 198:20
**removing (3)** 37:3;38:18;39:21
**Renly (1)** 25:2
**repeat (4)** 11:3;41:4;48:11,15
**rephrase (2)** 11:3;189:9
**report (26)** 12:20;13:5;14:20; 15:6;25:7;85:14; 103:10;163:23,24; 164:6,22;166:20; 167:9,17,19;176:21; 177:11,16,23;178:1,3, 4,8,9,12,14
**reporter (8)** 9:14;25:11;72:17; 78:6,7,11;135:14,16
**reporting (2)** 187:23;188:5
**reports (3)** 112:20;167:25; 177:9
**represent (4)** 49:14;102:2,21; 192:19
**representative (5)** 8:9,24;9:2;103:15, 18
**representatives (3)** 168:21,21;169:2
**represented (2)** 10:13;60:7
**representing (1)** 165:1
**request (5)** 75:5;108:9;118:15; 134:1;203:14
**requested (4)** 117:6,21;131:11; 190:4
**requesting (4)** 29:21;118:9,13,18
**requests (1)** 195:10
**require (1)** 11:1
**required (2)** 100:21;101:3
**requirement (3)** 40:5;106:6;142:18
**requirements (2)** 59:3;106:8
**residence (2)** 145:23;173:11
**resources (2)** 68:11;191:15
**respect (2)** 44:16;125:2
**respond (6)** 21:11;31:14,15; 37:23;64:1;170:6
**responded (2)** 49:4;87:1
**responds (1)** 22:6
**response (5)** 10:6;85:18,19; 193:21;195:4
**responses (4)** 11:21,25;12:4; 203:8
**responsibilities (2)** 16:1;43:19
**responsibility (13)** 18:3,13,17;19:4; 28:25;35:16;36:19; 40:2,14;60:3;76:9; 185:2;186:3
**responsible (12)** 9:4;20:15;84:4; 98:6,13;103:5;124:2; 149:17;151:11;157:9; 164:21;167:22
**responsive (2)** 59:9;60:15
**restate (1)** 32:17
**result (1)** 106:7
**results (3)** 77:20;188:9,10
**retain (1)** 65:9
**return (7)** 117:6,20;119:10; 142:13;155:4;156:15; 190:4
**returned (7)** 143:20;156:13; 157:5,14;158:9; 159:9;177:20
**returning (1)** 157:10
**review (4)** 16:20;22:17;115:6; 177:10
**reviewed (2)** 10:16;12:9
**rewrapped (2)** 56:22;181:3
**right (123)** 8:6;9:10,11;10:4; 12:12;13:12,19;15:9; 22:23;25:5,18;30:1; 32:4;33:20;34:11,15; 36:18;37:20;38:14; 40:7;42:25;43:18; 45:2,14;47:19,20; 49:12;51:3,8,23; 52:10,13,19;53:13; 57:7,16;61:23;63:17, 20;69:11;72:8;75:2, 15,17;76:1;78:2,17, 19,25;79:12,15,20; 80:6;81:8;84:19,20; 85:8;87:12,14;90:2, 22;91:14,18;92:15; 101:25;102:5;108:22; 110:15;111:15; 114:14,19;116:11; 117:21;118:11,23; 119:1,21;120:5; 122:4;123:13;124:12, 22;126:10;128:2; 131:11,15;132:25; 133:11;141:5,17,25; 142:19;143:23; 147:11;148:4;149:22; 152:4;153:22;154:3, 7;156:9;157:15; 159:21;160:18,18,22; 161:21;162:16,17; 163:4,11,15;170:10; 172:2;173:15,20; 180:8,14;181:23; 195:8;197:25;199:16; 203:3
**rights (5)** 42:2;44:14,17,19; 47:5
**risk (5)** 38:3,17;57:23; 104:18;105:11
**road (2)** 98:3;183:19
**roadside (1)** 176:7
**ROB (10)** 8:2;87:6,6;89:25;

90:11,11;101:11;
116:9;137:12;141:10
**role (1)**
136:6
**room (1)**
168:5
**Rowlen (6)**
10:11;28:5,16,17;
29:9;90:2
**rule (1)**
92:2
**rules (2)**
11:1;189:6
**run (1)**
177:8
**running (3)**
96:2;179:25;193:11
**runs (3)**
71:17,21;96:1
**Ryan (17)**
7:12;8:6;16:13,13;
22:10;49:13;61:12;
79:17,17;86:9;
134:12;141:22;175:7;
180:3;191:4;204:2,2
**Rylie (2)**
7:13,14

## S

**Safari (1)**
127:22
**Safersys (4)**
176:13;177:2,8;
178:9
**Safety (5)**
84:23;164:16;
165:2;166:17;176:25
**sake (1)**
100:10
**sale (5)**
114:1,2,4,14;
115:25
**sales (5)**
155:17,17;156:22;
187:4,21
**salvaged (1)**
99:19
**salvo (1)**
118:24
**same (35)**
18:11;42:16;44:1;
52:15;75:11,15,21;
77:18,21;78:21;80:8;
82:12;96:15;100:11,
11;102:7;116:13;
130:22;141:7;144:1;
150:19;152:14;
156:21;157:3,20;
162:12,16;163:12;
166:6,8;178:7;
192:18,20;197:8,11
**Samsara (9)**
31:25;32:5,6,9,22;
171:20,21,23;186:23
**S-A-M-S-A-R-A (1)**
31:25
**satisfaction (1)**
188:9
**save (2)**
141:23;142:6
**saw (5)**
13:18;43:24;102:8;
147:10;197:18
**saying (12)**
55:3;58:15;69:21;
86:2;87:1;92:11;
103:23;146:20;
147:19;151:5;154:3;
183:3
**scheduled (1)**
77:14
**scheme (2)**
26:13,14
**Schepperlou (1)**
135:21
**Schuckalo (5)**
113:11,14;137:11;
199:14,14
**S-C-H-U-C-K-A-L-O (1)**
113:12
**scope (2)**
29:18;76:21
**scorecard (1)**
187:24
**scores (2)**
112:18;137:25
**scrambling (1)**
57:20
**scrape (1)**
185:12
**scraped (2)**
186:4,6
**scrapings (1)**
185:8
**screen (5)**
9:18;50:4;71:19;
134:19;192:2
**screens (1)**
128:3
**scroll (16)**
34:2;40:10;51:10;
172:11,23,24;173:2,
17;192:8,11,12,25;
193:2;194:4;197:5,8
**scrolling (2)**
173:10;174:16
**search (1)**
72:11
**season (3)**
57:2,11;59:15
**Second (10)**
29:13;37:18;51:1;
73:19;99:24;120:15;
124:14;146:17;
187:19;197:11
**secret (1)**
102:11
**section (2)**
41:20;80:20
**sections (3)**
40:24;41:11,17
**secure (1)**
21:3
**seeing (4)**
165:7;167:4;
170:24;197:24
**seem (1)**
116:22
**seems (3)**
143:11;166:5;
175:11
**sell (1)**
195:8
**send (10)**
9:13;22:5;23:23;
58:6;77:2;103:15;
135:13;179:20;
203:10,11
**sends (3)**
22:4,20;52:12
**senior (3)**
89:5;126:9;170:3
**sense (2)**
77:12;141:17
**sent (16)**
12:1;22:12;24:3;
53:21;55:14;58:2,4;
106:24;116:25;117:5;
119:9;153:22;162:22;
163:1,5;169:18
**sentence (4)**
48:22;116:17;
139:18;146:4
**sentimental (1)**
99:21
**separate (6)**
49:22;50:21;53:17;
80:15;81:22;87:18
**September (6)**
57:6,14;177:3,10;
178:10,25
**serve (1)**
194:19
**served (1)**
10:12
**serves (1)**
17:3
**service (47)**
17:5,16,17;20:2;
21:5,9,9,11,12,13,14,
20,22;24:11,12;64:2,
3,3;68:12,23;69:4;
72:25;77:14;100:7,9;
117:14,15;119:8,8;
137:25;139:24;140:5;
154:21;157:23,25;
158:14,16,19,21;
159:3,9,12,17,25;
175:23;176:1;187:1
**serviced (7)**
22:8;45:19;47:14;
88:13;138:7;139:13;
154:12
**services (13)**
15:18;17:14;20:13,
13,16;82:17;120:21;
125:17,18;158:21;
187:14;195:10,15
**servicing (5)**
74:19;109:7;
138:10,15,20
**SESSIONS (55)**
7:10,10;16:13;
22:10;23:4;27:24;
28:15;40:16;41:2;
42:8;43:3;47:12;
49:13,20,25;50:6,18;
51:2;53:24;55:22;
58:18;61:12,22;
75:19;79:17;86:9,24;
89:24;90:11;101:11,
14;105:21;107:7;
140:15,19;141:22;
142:4,10;156:19;
157:18;162:7;165:5;
175:6,9,19;179:19,25;
180:5;183:14;188:21;
201:16;202:4,8,24;
204:2
**set (2)**
48:7;77:20
**Seth (1)**
10:11
**seven (9)**
82:22,24;87:12,15,
15,18,18,18;92:16
**shall (6)**
44:14,15,16,18,20;
195:8
**share (7)**
9:18;50:4;89:15;
134:19;181:7,9;192:2
**shared (7)**
65:2,4;180:9,16;
186:18,21;187:1
**Sheriff (2)**
99:25;100:2
**Sheriff's (1)**
100:15
**shifted (1)**
108:21
**ship (1)**
19:21
**shipment (88)**
21:4,6,16,19,21;
26:9;28:9,20;44:22;
45:1,3,5;47:14,23;
48:8,17;49:1;53:12,
19;55:13;60:18;
63:15;64:12,18;65:3,
6;66:1,9,11,14,25;
67:8,11,25;68:12,20,
22,24;69:1,19,22;
70:3;71:24;74:13;
75:8;76:23;79:8,24;
83:18,20;84:5;88:23;
92:8;93:1,4;95:21;
96:6;124:2,3;125:12,
14;127:21,24;128:21;
131:20;132:5;133:5;
140:12;141:14,18;
145:3,12;148:20;
151:24;152:11;
154:13,21;160:11,14,
21;172:9,17,19;
173:13;174:3;175:13;
201:6,6
**shipments (71)**
15:15,16;17:4;18:9;
24:5,10,13;46:18;
47:7;53:15,17;67:21;
70:8;72:22;74:18;
75:21;76:4,14;77:12;
80:7,16;88:19;92:13;
95:16;96:14;98:17;
103:8;109:5,7,9;
112:24;120:13;
122:25;123:2,7;
138:8,11,16,18,22,24;
139:11,24;144:6,7,8,
17,23;145:13,15,19,
20,22;146:2,8,12,14,
22;147:5,15,21,25;
148:2,23;149:1;
152:4;153:8,14;
154:10;190:17;
201:10
**shipment's (1)**
45:19
**shippers (1)**
99:22
**shipping (2)**
69:15;138:21
**short (2)**
59:17;61:15
**shortly (1)**
168:5
**Show (17)**
13:11;25:5;28:12;
37:11;49:15;58:2;
78:2,16;101:18;
111:15;116:2;130:25;
137:7;155:11;159:8;
163:11;170:19
**showed (5)**
52:18;66:16,18;
176:12;177:2
**showing (4)**
12:10;64:7;159:17;
192:10
**shown (2)**
164:9;170:14
**shows (3)**
89:21;159:24;173:8

**sic (1)** 135:21
**side (20)** 25:18;56:10;84:18;85:2,16;86:7;96:5,15,19;98:5;102:8;104:9;116:4;123:25;165:15;181:21;182:2,22;183:13;184:8
**Siess (1)** 162:25
**sign (2)** 177:13;192:20
**signage (3)** 120:17;198:18;199:2
**signature (5)** 43:7,9,10;177:14;204:17
**signed (11)** 36:12;43:20;134:7,14;135:9;177:19,21;192:13;193:6;194:8;200:24
**significance (1)** 81:11
**significant (5)** 109:4,10,11;115:4,11
**similar (5)** 16:24;24:14;79:12,23;141:2
**Simultaneous (1)** 132:9
**single (1)** 96:13
**sit (1)** 128:20
**sites (1)** 130:1
**sitting (3)** 42:9;81:14;157:16
**six (1)** 82:21
**skimming (1)** 40:3
**Slidell (3)** 53:5,7;66:3
**Sloan (4)** 7:13,13,14,14
**slowly (1)** 172:24
**small (1)** 122:15
**smart (1)** 168:4
**Smith (1)** 7:22
**SMS (1)** 177:9
**snuff (1)** 134:22
**software (12)** 68:15;71:3,11,13,15;158:25;180:14,18;186:21;187:16;188:3,8
**sold (2)** 113:20;115:21
**sole (2)** 128:20,23
**solely (1)** 189:17
**Solutions (2)** 24:24,25
**somebody (7)** 38:2;43:7;54:14;73:25;151:21;167:2;169:6
**somebody's (1)** 81:14
**somehow (1)** 190:23
**someone (5)** 43:9;130:12;138:17;164:23,25
**someone's (1)** 138:17
**Sometime (5)** 36:15;135:10;159:5;176:13;177:3
**sometimes (2)** 59:25;191:14
**somewhere (2)** 109:24;173:14
**soon (1)** 174:12
**sooner (2)** 76:2;203:17
**sorry (28)** 14:5;24:1;26:20;32:17;36:17;38:9;54:9;60:10;75:3;78:11,17;82:23;83:21;94:19;121:14,16;136:14;138:13;140:17;144:15;149:19;150:8;152:17;156:7;180:22;183:8;186:19;191:3
**sort (3)** 38:4;67:15;122:13
**sought (1)** 10:15
**sound (1)** 118:12
**sounds (8)** 37:20;52:10;124:22;140:4;143:23,23;144:12;204:8
**source (1)** 120:24
**sourced (1)** 121:11
**South (1)** 173:19
**span (1)** 59:16
**speak (3)** 65:11;108:9;140:18
**speaking (4)** 60:21;62:14;118:8;132:9
**Specialists (4)** 87:24,25;88:6;111:24
**specific (19)** 19:22;20:2;26:8;40:23;41:10,11;48:16,18;65:16;69:13;73:10;87:3;93:4;95:18;98:7;110:3;129:6;202:19;203:21
**Specifically (4)** 52:23;61:10;62:12;138:17
**specifies (1)** 44:18
**specify (1)** 198:16
**speculate (1)** 189:11
**speed (1)** 171:19
**spell (2)** 62:20;82:20
**split (1)** 89:1
**spoke (2)** 80:10;170:2
**spoken (1)** 137:24
**spot (2)** 29:1;50:20
**spread (1)** 21:7
**spreading (1)** 182:16
**staff (6)** 21:10;34:22;59:24;87:9;149:15;185:4
**STAHL (2)** 7:18,18
**stake (1)** 115:21
**stand (1)** 203:5
**Standard (2)** 7:3;204:15
**standpoint (2)** 65:21;121:9
**stands (1)** 17:7
**start (3)** 12:12;15:11;189:25
**started (4)** 61:14;159:12,17;189:14
**starting (2)** 120:6,8
**starts (1)** 73:14
**state (6)** 7:8;40:14,17;179:6,9;200:23
**stated (4)** 36:23;47:1;110:5;164:7
**statement (9)** 109:16;124:17;125:8,19;128:14,20,23;133:9;194:15
**statements (3)** 125:6;159:20;160:5
**States (2)** 145:5;195:7
**stay (1)** 60:23
**Steis (1)** 162:24
**steps (1)** 26:8
**still (25)** 26:5;56:20;57:25;70:1;71:10,12;107:14,24;125:1;126:20;130:4,7,9,15,17;131:17;147:21;157:17;162:3;181:2;184:16,16,17;185:22,25
**stipulation (1)** 86:12
**stock (1)** 115:6
**stolen (1)** 103:12
**stopped (1)** 159:8
**stopping (1)** 90:3
**storage (7)** 17:4;82:25;83:2;145:14,14,16,25
**store (1)** 21:17
**Street (1)** 99:1
**strike (1)** 94:13
**strong (1)** 59:7
**structure (2)** 12:14;82:12
**stub (1)** 160:9
**stuff (5)** 60:1;67:16;120:18;139:2;179:16
**subdivision (1)** 56:5
**submitted (1)** 119:24
**subpoena (1)** 169:18
**subsequent (1)** 38:1
**subsidiaries (1)** 82:4
**subsidy (1)** 56:5
**substantially (2)** 192:18,20
**such-and-such (3)** 21:7;73:1;75:23
**Sue (2)** 163:21;167:5
**sued (1)** 38:25
**suffered (1)** 71:23
**summarize (1)** 74:7
**summer (6)** 56:17,18;57:1,2,13;59:15
**support (3)** 17:16;63:3;109:16
**suppose (2)** 182:7,19
**supposed (5)** 59:10,12;109:23;177:12;194:24
**sure (73)** 14:15;15:13;16:7,21;18:16;20:22;21:2,25;33:6;38:5;39:4;40:11;41:3,6,19;43:5;44:12;45:13;48:18;49:9;52:6;55:8,15;58:10;61:21;62:1;70:1;74:10;75:17;77:22;78:1;80:2;83:1,13;84:8;85:9;89:10;91:4;94:1;97:25;99:17;104:18;105:22;106:25;113:5;128:13;132:11;137:9;139:25;146:6;150:4,18;152:18,22;159:15,23;161:1,19;162:21;165:7;173:4,21;174:18;179:24;182:13;183:22;184:3;186:4,5,12;195:2;202:10;203:15
**surprised (4)** 108:19,22;109:20;193:22
**survey (2)** 188:9,10
**swear (1)** 8:1
**switch (1)**

50:4
**switched (1)**
59:22
**sworn (1)**
8:17
**sworn/affirmed (1)**
8:2
**system (59)**
21:3;33:7;67:9,12,16,22;70:4,23;71:8,18;73:24;74:5;75:2,5,14,16;76:15,24;77:13;87:3;107:24;109:6,10;110:7;119:16;127:25;128:1;129:23;144:13,22;147:22;148:7,10;149:7,12;152:6,14,25;153:8,19,25;154:6,11,14,22;155:17;156:18,23;157:7;161:9,18,24;162:5;177:9;180:13;181:4;187:2,3;188:5
**systems (12)**
50:21;70:15;120:20;131:4,7;155:7;161:10;180:9,14;181:3;187:16,23

**T**

**tag (4)**
13:21;14:7,10,13
**talk (5)**
12:6;89:5;168:21;169:25;170:5
**talked (13)**
11:17;17:18;67:5;104:21;137:22;144:13;155:2;168:23;169:13;186:24;187:10,15;201:23
**talking (21)**
23:12;34:8;37:19;46:25;51:9;53:6;75:25;77:7;83:23;84:11;119:22;130:25;135:21;149:22;150:18;158:6;160:4;170:13;176:15;178:22;184:21
**tapered (1)**
61:5
**tariff (4)**
64:14,14,25;65:13
**team (13)**
37:2;38:4;59:7;60:6,12,12,24;62:14;63:1;120:1;126:14;164:23;187:21
**teams (1)**
187:4
**technical (1)**
33:7
**technically (1)**
92:6
**Technologies (1)**
143:21
**technology (1)**
134:22
**telematics (6)**
32:3;171:21,24;172:1,4;187:2
**telling (3)**
55:4;108:14;139:7
**tells (1)**
91:3
**temp (1)**
107:21
**temporary (41)**
35:10,18,21;36:6;38:22;39:18;40:1,19;42:20;46:17,23;47:3,3,25;48:3,21;52:4,7;59:6;67:14,20;76:5;81:23,25;107:21;109:21;113:19;134:6;136:10;141:11;143:5;145:14;153:24;156:10;192:11;193:4,23;195:8;197:2;199:23;200:3
**tendered (1)**
93:11
**tens (1)**
95:14
**term (5)**
16:7;45:22;46:3;54:17;196:23
**terminal (1)**
71:15
**terminate (4)**
52:9;113:25;114:15;147:21
**terminated (6)**
41:12;44:24;47:8;48:9;52:5;190:9
**terminating (2)**
141:12;147:23
**termination (41)**
37:8;44:13,17,19;46:14;70:7;109:3;114:8,18;115:1;116:3,19,22,25;117:9,15,19;118:10,13,25;119:9;122:18;123:3;124:16;131:10,13,24;132:1,20;133:21;134:2;138:8;143:22;147:10,17;180:10;190:5;193:13;196:24;198:9,13
**terms (13)**
35:9;38:22;39:20;40:20,25;41:8,10,16;42:2;44:21,24;47:5;63:10
**testified (5)**
8:3;33:12;86:13,16;132:3
**testify (1)**
10:17
**testimony (7)**
9:3;108:1;138:2;193:24;199:12;200:10;203:4
**text-based (1)**
120:4
**Thanks (3)**
57:7;62:2;118:8
**that'll (2)**
90:6;121:19
**theoretically (1)**
154:24
**thereafter (2)**
44:16;180:17
**therefore (1)**
70:4
**thinking (4)**
14:8;177:2;178:3,8
**third (1)**
130:16
**third-party (1)**
187:13
**though (1)**
105:22
**thought (7)**
43:5;91:15;108:20;116:3;121:18,20;186:20
**thousands (2)**
95:12,13
**thread (1)**
51:15
**three (1)**
181:5
**throughout (1)**
60:17
**Thursday (1)**
174:21
**till (1)**
61:19
**Tim (6)**
62:15;113:18;118:7;126:17;137:11;200:16
**time-consuming (2)**
56:22;109:14
**times (3)**
28:8,20;142:8
**TMM (60)**
17:2,7,8,18,23;18:2,7,13,22,25;19:7,8,10,20;20:4;21:3;22:1,2,4,14,20,23;23:1,10,14,22;52:12;53:4,7;63:7;65:1,19,21,22;66:3,13,24;74:1,12;75:1,11,13;76:21,25;77:20,23;79:10;81:7,10;87:1;89:13;121:10;127:4,4,11,16;145:5;160:9;168:24;169:16
**TMM's (1)**
18:23
**T-O (2)**
187:6,7
**today (25)**
8:10,13;9:8,24;10:14,21,24;11:21;12:6,18;15:19;47:24;93:17;124:8;126:21,24;128:20;157:16;168:14;186:11;189:4;193:18;197:25;199:11;200:10
**today's (3)**
144:3;174:20,20
**together (2)**
36:2;42:20
**told (10)**
18:11;85:3;90:25;97:7;120:10;127:2;128:2;148:4;168:2;201:25
**tomorrow (2)**
174:25;175:3
**tonnage (2)**
19:10,21
**took (6)**
12:21;60:9;65:7;67:21;119:2;160:16
**tool (4)**
155:17;156:22;188:8,8
**tools (2)**
187:24;188:5
**top (15)**
14:15;24:17;52:23;57:19;85:7;87:5;88:1;89:4;96:22;111:20;160:12;164:5;172:20;192:24;203:18
**topic (2)**
12:13,15
**topics (4)**
9:22;10:10,18;169:3
**Total (17)**
16:23;17:2,6,8,9;18:2;70:20;76:16;87:13;88:16;94:12;99:19,20,23;151:19,21;173:8
**touch (3)**
129:8,17;186:16
**tow (4)**
185:19,22;186:1,10
**Towing (2)**
103:16;185:23
**track (1)**
123:15
**tracking (5)**
31:20,22;32:8,22;33:4
**tractor (19)**
14:17,21,25;30:11;31:11,16;95:18,22;96:1,5,8;98:3,9;103:10,16;104:1;176:7;202:19,21
**tractors (5)**
96:9;97:15,19;198:19;202:12
**Trademarks (2)**
196:4,14
**trailer (22)**
13:20,20,22,24;14:6,8,25;17:11;30:12;31:21;80:13,16;94:24;98:7,9,19;100:9;103:11,16;182:15,22;183:5
**trailers (10)**
56:19;57:17;97:10,17;181:1,2;182:2;184:9,18;198:19
**training (5)**
100:20;101:1,6,20;102:13
**transaction (6)**
69:24;84:9;115:6;121:13,14;127:1
**transactions (2)**
95:9;125:9
**transfer (27)**
18:1;27:1,7,8,18;80:11;81:19;82:6,17,19;91:20,23;92:12,24;94:16;95:7;116:10;164:6;177:17;191:12,23;192:14;193:5;196:13;197:13;198:11;200:4
**transfers (2)**
46:11;91:17
**Transit (12)**
34:14;111:21,25;116:18;126:14;129:10;145:15;164:4,7;165:4;176:22;189:3
**transition (14)**
37:2;59:8;60:6,12,24;62:14;63:1;126:14;129:9,18,21;143:4,9;159:4
**transitioned (3)**
71:9;157:24;158:15
**transitioning (2)**
41:22;155:7
**transitions (1)**
120:20
**transmits (1)**

158:3
**transport (8)**
18:18;20:7,9;73:3;127:17;151:1,1;153:1
**transportation (16)**
19:25;20:2;24:18;27:5;68:23;69:4;82:17;87:24,25;88:6;111:23;153:17;167:16;175:23;195:10,15
**Transportations (1)**
82:18
**transported (6)**
17:24;18:15;83:25;99:8;128:11;170:11
**transports (2)**
46:11;73:23
**trim (1)**
180:20
**trip (1)**
171:14
**truck (62)**
14:10;20:15;25:19;32:8;33:15;34:1,20;35:3;36:20;43:24;45:4;52:16,19;55:20;56:14,14;66:17,19;79:2;80:4,8;84:18,25;86:8;102:8;104:9;106:5,13;107:4;116:14;123:24;124:24;128:21;129:4,6,12;131:20;141:5,8;157:4,17;158:2;160:1;166:18;170:12;172:18;174:4;175:24;176:1;182:14;183:5,13;184:21;185:9,14,15,21;186:7,13;190:17,24;201:11
**trucking (2)**
45:9,11
**trucks (22)**
32:23;38:20;56:8,10,22;57:17,24;59:13;94:12;96:14,17,20;97:19;104:23;130:1;181:20,21;182:4,5;183:19,25;186:5
**true (3)**
8:19;15:19;19:1
**truth (2)**
8:18;10:21
**try (6)**
23:7;48:15;74:7;136:3;150:13;159:13
**trying (8)**
74:9;80:2;142:10;154:15;162:12;172:6;178:11;188:14
**turn (2)**
65:12;90:12
**two (41)**
22:11;27:2;43:16;50:21;53:13,14,17;79:5;80:6,7,15;81:7,17;83:23,24;93:10;94:16;98:17,17;100:8;111:23;118:10;120:12;126:18,18;144:7,23;146:7,7;148:1;152:5;153:6;155:22;156:2;162:21;170:13,16;172:16;199:1,23;200:2
**type (6)**
23:16;46:3;72:10;149:17;167:23;170:24
**typically (2)**
21:20;66:23

## U

**U127 (1)**
146:16
**U234 (1)**
146:15
**ultimate (1)**
64:17
**ultimately (7)**
60:2;63:22;113:24;114:15;115:13;157:11;185:2
**Um-hmm (1)**
162:23
**Um-hum (2)**
75:10;84:2
**Umm (1)**
150:1
**unable (1)**
21:20
**under (47)**
24:14;26:9;27:13;40:12;42:2;43:8;44:15;47:5;52:3;66:14;67:1,5;70:5,5,9,10,11;72:23;76:15;78:22;83:6,10;84:12;85:1,15;86:6,21;88:23;91:22;92:8;95:22;103:22;106:9;107:21;111:24,25;112:3;125:12;127:22;128:11,24;130:2;164:14;194:17,24;195:9,22
**understands (1)**
189:21
**Understood (18)**
9:10;11:21,22;16:21;17:19;75:12;91:16;107:23;127:6;183:11;194:7,22;196:2,21;198:6;199:6,9;201:2
**Unfortunately (3)**
58:1;95:20;117:7
**Uni (1)**
115:13
**UniGroup (39)**
36:5;38:17;39:11;43:2;56:3,5;87:21;110:15,17,22,25;111:20;112:2,3;113:21,23;114:14,20;115:5,13;116:23;117:1;119:4;126:10;129:11;133:20;137:22;138:4,24;139:6;140:24;143:1,12,15,20;146:10;168:24;201:5,7
**UniGroups (1)**
38:3
**UniGroup's (7)**
111:3;112:12;113:9,25;137:14;139:18;140:5
**unique (2)**
161:20,24
**unit (22)**
25:22;110:25;111:3,9;112:4,12;113:9;137:14;139:19;140:24;142:15,23;143:12;155:5;156:13,16;157:10,20;158:2,3,8;160:1
**United (12)**
39:9,16;111:21,24;141:13;144:23;145:5;146:8,10,11,19,21
**units (3)**
143:2,6,10
**unless (3)**
54:13;86:2;139:15
**unwind (3)**
59:19;67:17;118:15
**unwinding (4)**
59:4;63:4;67:2;126:19
**up (53)**
19:24;21:4,6,8,18;38:17;40:10;42:12;46:1,4,23;49:24;50:1,3,17,25;73:18;80:21,23;81:2,18;86:15;91:3;96:1,2;103:8;111:10;124:16;126:2;130:12;134:15,22;139:2;146:23;159:2,2;163:8;166:12,14;168:5;172:11;173:17;176:5,12;177:2,10;178:19;188:20,23;192:4,11,24;204:1
**updated (1)**
73:18
**upon (1)**
44:19
**use (6)**
18:16;54:25;154:15,25;158:20;196:13
**used (12)**
26:4;64:21;94:15;96:6,14,17;160:3;170:24;187:4,21;188:8,13
**username (1)**
161:24
**uses (1)**
83:5
**using (6)**
94:24;95:7,22;110:9;130:13;139:23

## V

**value (1)**
181:18
**van (14)**
41:22;59:18;82:18;96:11;111:21,24;122:6;125:16,18;137:2;181:18;190:5;191:18,23
**variable (1)**
64:20
**variables (1)**
64:16
**variety (1)**
64:16
**various (5)**
65:2,25;83:4;111:7;160:13
**vary (1)**
64:15
**vehicle (14)**
12:23,25;13:1,4;14:20;25:7;26:11;33:14;35:1;95:3,6,10;125:22;143:14
**Vehicles (7)**
15:5;34:7;39:22;94:10;143:2;184:1;191:15
**venture (1)**
95:11
**ventures (3)**
113:15;136:7,9
**verifies (1)**
101:5
**verify (2)**
33:18;108:7
**versa (1)**
126:23
**version (1)**
36:13
**via (1)**
8:2
**vice (1)**
126:23
**video (4)**
7:5;90:12;204:10,13
**VIDEOGRAPHER (8)**
7:2,25;90:16,19;168:6,9;204:9,12
**view (4)**
39:14;109:12;187:24;188:3
**violation (1)**
92:2
**Virginia (11)**
24:21;98:22;99:1,5;100:1;172:8,14,18,19;173:14;174:5
**virtual (1)**
50:22
**volume (1)**
18:8
**VP (8)**
30:22;31:1,10;157:11;167:24;170:2,3;185:6

## W

**wait (1)**
175:12
**waiting (2)**
56:20;169:19
**waived (2)**
7:6;204:17
**waiving (1)**
189:21
**Walterboro (1)**
173:19
**wants (1)**
106:22
**warehouse (2)**
21:17;173:12
**Warner (1)**
7:16
**warning (1)**
11:15
**way (25)**
15:2;17:19,19,20;18:12;21:3;23:22;34:3;69:6,7;77:18;92:10;102:1;104:4;109:2;118:23;119:23;127:2,10;132:4;134:5;144:11;149:3;160:3;172:22
**websites (1)**
130:1
**weekend (1)**
57:14
**welcome (1)**
86:11

**weren't (3)** 38:22;57:21;59:10
**Wesco (4)** 93:10,19,20,23
**West (1)** 7:15
**whatever's (1)** 67:23
**what's (14)** 31:24;38:24;70:16;91:25;92:3,4;94:12;145:9,14;162:20;163:11;182:13;194:18,22
**whenever (1)** 166:15
**whole (3)** 43:5;67:14;128:7
**who's (2)** 93:1;188:20
**whose (1)** 34:16
**Williams (1)** 7:19
**W-I-N (1)** 62:20
**wind (2)** 141:11;156:9
**window (1)** 71:21
**Windows (4)** 71:4,10,16,21
**wins (1)** 150:21
**wish (2)** 11:11;203:4
**within (16)** 19:9;24:11;30:19;37:7;38:2;63:11;64:13;68:3;70:4;73:25;143:21;144:4;146:10;164:23;177:20;194:20
**witness (11)** 8:1,24;54:9;61:21;90:9,14;135:2;179:15,22;180:24;191:3
**Woody (5)** 62:16;113:18;126:17;137:11;200:17
**W-O-O-D-Y (1)** 62:16
**word (10)** 18:16;19:3;45:18;46:2;47:18;53:18;54:5;55:4;67:6;148:17
**wording (1)** 133:8
**words (6)** 95:21;104:4;145:18;157:24;160:8;161:11
**work (12)** 19:20;24:4,9,11;34:6;65:20;89:4;96:18;109:23;160:3;185:3;186:1
**worked (2)** 59:7;127:8
**working (2)** 50:20;126:17
**workload (1)** 53:9
**works (6)** 19:8;20:20;21:21;63:25;64:5;158:1
**world (2)** 45:11;71:9
**wrapped (1)** 56:21
**wrapping (1)** 184:17
**wreck (6)** 60:9;62:9;63:23;93:24,25;162:6
**write (2)** 72:12;179:23
**writing (4)** 41:10;179:16,19;180:1
**written (8)** 14:12;15:25;23:1,2,10,20;71:11;89:25
**wrong (1)** 200:13
**wrote (3)** 89:23;117:25;129:16
**Wynn (20)** 62:19,19;111:2,4;124:11;126:9,17;129:3,16;131:11;133:25;137:10;141:3;161:6;162:24;163:8;197:23;199:12,23;200:16
**W-Y-N-N (1)** 62:21

**Y**

**y'all (1)** 43:16
**yard (4)** 185:19,22;186:1,10
**year (8)** 56:17;59:4,18;64:15;93:21;112:15;179:11,11
**year-plus (1)** 123:16
**years (4)** 34:25;122:5,6,14
**Yep (5)** 10:5;52:14;70:21;163:7;175:9
**yes-or-no (1)** 195:4

**Z**

**Zoom (8)** 8:3;10:2,15;50:21;90:8,10;111:18;178:5

**0**

**0 (2)** 173:9,9
**007 (1)** 118:21
**0520701 (1)** 74:14

**1**

**1 (19)** 9:12,15;12:15;36:6;40:8;76:17;109:19;110:8;112:25;120:9,23;122:20;123:1,10,20;148:6,20;153:16;160:21
**1:00 (1)** 9:24
**1:16 (2)** 7:1,3
**1:20 (1)** 9:25
**10 (6)** 36:4;47:10;58:14;97:5;170:19,20
**106 (2)** 101:10;102:3
**1099 (1)** 92:20
**11 (4)** 36:4;47:11;176:16,17
**11th (5)** 38:10;57:22;97:12;105:2,3
**12 (3)** 10:2;36:5;80:20
**12/31 (1)** 114:6
**12/31/2021 (1)** 114:13
**12th (2)** 9:20;169:10
**13th (1)** 30:14
**14 (1)** 150:6
**15 (3)** 97:1,3;177:20
**159 (1)** 166:5
**15th (3)** 150:7;152:10;153:15
**1657 (1)** 98:25
**17 (1)** 155:12
**17th (4)** 176:9,20,23;178:1
**180 (2)** 124:16,20
**19 (1)** 163:12
**1902 (1)** 73:16
**1979 (1)** 73:16
**19th (8)** 116:18;118:2,4,20;119:13;124:21;125:2;126:3
**1st (73)** 12:21;15:12;17:12;18:6,15;20:1;25:8;27:5,9;30:18;32:8;45:3;47:23;49:2;57:18;60:9,20,22,25;62:9,10;63:23;65:8;67:25;76:1;79:2;81:20;84:1,11;85:15;89:22;92:24;93:15,24;94:14;98:19;103:6,12;104:2;105:7,12;109:1;110:18,21;124:1;127:17;128:21;131:21;138:10,19;140:13;141:19;145:3,12;149:2,18,25;150:7;151:9,25;152:13;170:12;171:5,7,15;172:18;174:21;178:2;190:17;199:7,17;201:6,10

**2**

**2 (5)** 13:7,8;34:9;195:14,18
**2:56 (1)** 90:17
**20 (8)** 58:5,11,14;90:6;97:7,17,18;171:4
**2002 (1)** 149:25
**2008 (3)** 36:3;42:14;43:12
**2014 (1)** 105:15
**2017 (1)** 102:4
**2021 (2)** 114:6;171:8
**2022 (124)** 12:21;15:12;17:12;18:6;20:1;30:14;36:16;37:9;38:10;49:2;53:23;55:21;56:18;57:18;60:20,25;62:6,9;63:23;76:17,17;81:3;84:1,11;89:22;92:24;93:15,24;94:14;97:12;103:6;105:2,8,12;108:4;109:1,19;110:8,19;112:5,11,25;114:19;116:8,19;120:9,9,23;122:20;123:1,10,20;124:1,12,20,21;125:2;126:3;129:8;133:4;136:5;137:10;138:10,19;140:13;141:3,13,19;143:1;145:3,12;147:14,15;148:6,20;149:18;150:7,7;151:9,10,25;152:3,13,15;153:7,15,17;159:2;160:21;161:6,10,25;162:5;164:22;165:2;170:12;171:5,15,16;176:9,20,23;178:1,2;179:13;180:6;190:10,18;193:6;195:1,11,20;196:16;197:3,4,22;198:15;199:2,6,7,17;200:15;201:6,10
**2023 (5)** 7:4;15:23;124:8;186:11;204:16
**20-minute (1)** 61:18
**20-plus (3)** 59:4,18;122:6
**20th (13)** 116:8;124:12,20;129:3,7;193:13,15;195:1,11,20;196:16;197:3,22
**21st (2)** 136:5;199:17
**22 (5)** 36:17;107:6,10;147:14;171:8
**22nd (8)** 141:3;142:25;143:18;152:3;153:6;161:6;162:19,22
**23 (1)** 171:8
**249030C (2)**

13:21;14:7
**251-333 (1)**
25:19
**25th (3)**
42:14;147:14;153:7
**269 (1)**
79:21
**26th (4)**
135:11;137:10;193:6;200:15
**27 (4)**
124:8;171:4;173:9;186:11
**271 (10)**
49:20;60:19;63:7,21;78:5;79:21;80:22;81:3;128:15,25
**27th (4)**
7:4;15:23;174:21;204:16
**28 (3)**
52:10;171:4;173:9
**28th (17)**
37:9;52:9;131:14,24;132:21,22;134:2;141:12;147:9,16;152:15;157:5;159:2;190:10;197:3;198:15,23
**29th (1)**
173:9
**2nd (8)**
81:3;149:18;150:13;151:9;152:10;153:15;164:21;165:2

## 3

**3 (11)**
25:6,10,12;30:10;33:9;34:9;36:3;194:3,6;195:7,18
**3:00 (3)**
61:17,24;173:19
**3:20 (1)**
90:7
**3:26 (1)**
90:20
**30 (7)**
30:19;81:14;118:16;131:9,25;132:20;143:21
**30b6 (3)**
7:4;8:9;204:13
**30-plus (1)**
122:5
**30th (14)**
155:9;157:6;161:9,25;162:5;171:9,15;173:1,7,14,20;174:5,8,20
**333 (5)**
43:8,24;44:1;55:20;202:12
**3C (3)**
41:11,17,17
**3rd (1)**
102:4

## 4

**4 (3)**
35:22,23;36:3
**40 (3)**
64:20,24;65:1
**444 (1)**
131:6
**45 (2)**
118:16;167:10
**482661 (1)**
83:15
**486221 (4)**
83:12,16,17;85:2

## 5

**5 (9)**
36:3;40:12;51:5;78:5,8,24;177:13;196:3,10
**5/25/22 (1)**
144:8
**5:00 (1)**
168:3
**5:10 (1)**
168:7
**5:25 (1)**
168:10
**50 (1)**
99:11
**59AP8M (1)**
14:12
**5KG (5)**
44:8,9;47:22;48:7,22
**5M (3)**
41:12,17,17
**5P (3)**
41:12,17,17

## 6

**6 (8)**
36:3;40:19;47:2;76:17;78:9,13,20;81:17
**6/9/22 (1)**
144:9
**6:08 (2)**
204:15,18
**60 (4)**
37:7,9;156:16;198:24
**60-day (1)**
37:17
**6th (14)**
49:15;51:23,25;52:11;53:23;55:21;60:22,25;62:6,10;67:11,24;76:1;133:4

## 7

**7 (4)**
36:3;111:11,12;196:22

## 8

**8 (5)**
36:3;116:6;135:17;173:9;198:4

## 9

**9 (5)**
36:3;135:4,17;200:12,14
**9:46 (1)**
173:15
**9:48 (1)**
52:11
**90 (2)**
118:15;134:1
**90-day (1)**
118:9
**9th (2)**
147:14;153:7