**In The Matter Of:**

*Kyle Sloan, et al. v*
*Nicholas Burist, et al.*

---

*Angela Locke*
*May 12, 2023*
*Locke Relocations LLC*

---

*Janice D. Hayward, RMR*
*Independent Court Reporter*
*843.478.6756*
*JanHayward1@gmail.com*

Original File 051223ALocke.txt

Min-U-Script® with Word Index

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

Brunswick Division

| | |
|---|---|
| KYLE SLOAN, Individually; and as Personal Representative of the Estate of Rylie Sloan and Jamie Sloan; KYLE SLOAN as Surviving Parent of Rylie Sloan; and SUSAN WEST, Individually; and as the next friend and natural guardian of K.W., a minor, | Case No.: 2:22-cv-00076-LGW |
| Plaintiffs, | |
| v. | |
| NICHOLAS BURIST; LOCKE RELOCATIONS LLC; NATIONAL INDEMNITY COMPANY; MAYFLOWER TRANSIT, LLC; JOE MOHOLLAND, INC; WESCO INSURANCE COMPANY; and XYZ COMPANIES 1-3, | |
| Defendants. | |

30(b)(6) VIDEO DEPOSITION UPON ORAL EXAMINATION

OF ANGELA LOCKE

Taken on behalf of the Plaintiffs

Hampton, Virginia

May 12, 2023

Appearances:

JOSEPH PADGETT, ESQUIRE
Roden Law
333 Commercial Drive
Savannah, Georgia 31406
On behalf of the Plaintiffs

CHARLES J. HODGE, ESQUIRE
MATT FOSS, ESQUIRE
Hodge & Langley
229 Magnolia Street
Spartanburg, South Carolina 29306
(Participating via Zoom)
On behalf of the Plaintiffs

JAMES L. ELLIOTT, ESQUIRE
Elliott & Blackburn
3016 North Patterson Street
Valdosta, Georgia 31602
On behalf of Locke Relocations, LLC

TODD R. EHRENREICH, ESQUIRE
Lewis Brisbois Bisgaard & Smith, LLP
2 Alhambra Plaza
Suite 1110
Cora Gables, Florida 33134
(Appearing via Zoom)
On behalf of Mayflower Transit, LLC

THEODORE JOHNSON, ESQUIRE
Waldon Adelman Castilla Hiestand & Prout
900 Circle 75 Parkway
Suite 1040
Atlanta, Georgia 30339
(Appearing via Zoom)
On behalf of Nicholas Burist

ELLIOTT REAM, ESQUIRE
Hawkins Parnell & Young, LLC
303 Peachtree Street, NE
Suite 4000
Atlanta, Georgia 30308
(Appearing via Zoom)
On behalf of Joe Moholland, Inc.

LEIGH MILLER, ESQUIRE
McMickle, Kurey & Branch, LLP
217 Roswell Street
Suite 200
Alpharetta, Georgia 30004
(Appearing via Zoom)
On behalf of Joe Moholland, Inc.

Also present:

Gary Payne, Videographer

Josh Dorminy, Esquire (Appearing via Zoom)

Mr. Kyle Sloan (Appearing via Zoom)

Ms. Susan West (Appearing via Zoom)

REPORTED BY: Lynn Burton

# I N D E X


| WITNESS | Examination by | Page |
|---|---|---|
| ANGELA LOCKE | Mr. Padgett | 7 |
| | Mr. Ehrenreich | 121 |


# E X H I B I T S


| No. | Description | Page |
|---|---|---|
| 1 | Plaintiffs' Notice of 30(b)(6) Deposition and Requests for Production to Defendant Locke Relocations LLC | 11 |
| 3 | Booking Confirmation for SCAC NWMO | 80 |
| 4 | Application for Employment of Nicholas Burist | 65 |
| 5 | Joe Moholland, Inc. and Locke Relocation Independent Contractor Operating Agreement | 15 |
| 6 | Equipment Description Addendum and Statement of Lease Certification | 108 |

Video deposition upon oral examination of ANGELA LOCKE, taken on behalf of the Plaintiffs, before Lynn Burton, a Notary Public for the Commonwealth of Virginia at Large, commencing at 10:14 a.m., May 12, 2023, at the Embassy Suites, 1700 Coliseum Drive, Hampton, Virginia.

-----oOo-----

THE VIDEOGRAPHER: This is the 30(b)(6) video deposition of Locke Relocations LLC by its representative, Angela Locke, in the matter of Kyle Sloan, et al., versus Nicholas Burist, et al., U.S. District Court, Southern District of Georgia, Brunswick Division, Case Number 2:22-cv-00076. This is held at 1700 Coliseum Drive, Hampton, Virginia. The time is 10:14 a.m., May 12, 2023.

My name is Gary Payne, Jr., of Video Unlimited located in Chesapeake.

Will the counsel please introduce themselves.

MR. PADGETT: Joseph Padgett here on behalf of the plaintiffs.

MR. ELLIOTT: John Elliott for Locke

Relocations LLC.

MR. EHRENREICH: This is Todd Ehrenreich on behalf of Mayflower.

MR. JOHNSON: Theodore Johnson here for Brian Williams on behalf of Nicholas Burist.

MR. REAM: Elliott Ream for Joe Moholland, Inc.

MS. MILLER: Leigh Miller from McMickle, Kurey & Branch also here for Joe Moholland, Inc.

MR. PADGETT: And then Matt Foster is with me. Susan West is with me. Josh Dorminy is with me. He doesn't have a mic.

Who is KS that's muted? Do we know who that is?

MR. SLOAN: It's Kyle.

MR. PADGETT: Oh, okay. Hey, Kyle. Sorry. I guess I should have figured that out based on the initials.

THE REPORTER: And we have Charles' iPad.

MR. PADGETT: Yup. And Charlie's with us, too, yup.

All right. That should be everybody.

Hey, Charlie. Can you mute your iPad? There we go. All right.

Can you swear the witness, please.

ANGELA LOCKE, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PADGETT:

Q. Good morning.
A. Good morning.
Q. Will you please state your name for the record?
A. Angela Locke.
Q. Ms. Angela, we met just a few minutes ago. My name is Joseph Padgett, and I represent the plaintiffs and their families in this matter, the Sloan family as well as Susan West. I'm here to ask you several questions today. Do you understand that you're here to give deposition testimony in a case involving a tractor trailer incident?
A. I do.
Q. Have you given a deposition before?
A. No.
Q. All right. I just want to give you a few ground rules. I'm sure your counsel has covered some of them with you. If at any time you don't understand my question, please ask me to repeat it or rephrase it.

I'm happy to do so. I'm not going to try to trick you. We just want to know what you know.

A. Okay.

Q. And what your company knows. The court reporter is taking down everything, so it's important to answer with a yes or a no. I'm going to understand you if you nod or if you say, "Uh-huh." I'm going to keep going. I'm going to try to catch it. Your counsel is going to also try to catch it. But just very important for the record to have a clean transcript.

And then if you can let me finish my question before you give an answer, that way we have a clean transcript as well. And I'll try to do the same.

A. Okay.

Q. Conversationally, we don't normally do that, and so this is a little bit different.

If at any time you need a break, just let me know. I would just ask that you answer the question that's been posed before the break, and then we can take any breaks and as many breaks as you need.

A. Okay.

Q. All right.

MR. PADGETT: And, Jim, do you want to circle back on signature? You said you want

to -- you-all want to reserve?

MR. ELLIOTT: We'll reserve unless we change our mind about that later.

MR. PADGETT: Okay.

BY MR. PADGETT:

Q. All right. Ms. Locke, what is your date of birth?

A. 10/10/54.

Q. And what city do you live in?

A. Newport News, Virginia.

Q. Okay. How long have you lived there?

A. Since 2005.

Q. All right. Do you have any plans to move anytime soon?

A. Hopefully. A few years from now.

Q. A few years from now? Where do you plan on heading?

A. Louisa County, Virginia.

Q. Okay. How far is that from Newport News?

A. I'll say two hours.

Q. Okay. I would ask if you -- if you move during the pendency of this litigation, you would let your counsel know --

A. Sure.

Q. -- your future address so we can get you if we need you down the road.
A. Okay.
Q. Do you have any family either through blood or marriage in south Georgia?
A. No.
Q. Okay. Nobody -- nobody close to you that you know that lives in south Georgia?
A. No.
Q. All right. And you have been identified as the corporate representative for Locke Relocations, the person that can best answer the questions and the document production that we have issued. Do you understand that you've been identified as a corporate representative for Locke Relocations?
A. Yes.
Q. Okay. And who made that designation for you to be the -- the corporate rep? How did you come to be here today? How did you get this privilege of sitting here with us today?
A. I did --
Q. Okay.
A. -- basically because I -- yeah, I did.
Q. Okay. And what is your role in that -- in that company?

A. Part owner.
Q. Okay.
A. My husband and I own it.
Q. So your husband is Kelvin?
A. Yes.
Q. Okay. And you-all own it together?
A. Yes.
Q. And are you two the only two principals of that company?
A. The only two. Yes.
Q. Okay. So it was either going to be him or you.
A. That's it.
Q. All right. Understood. I'm going to show you what's going to be marked as Exhibit No. 1.
A. Okay.
MR. PADGETT: If you want to take a look at that, Jim, and then hand it to her. I think I've got a copy for the court reporter as well.
MR. ELLIOTT: Okay. This is the notes.
MR. PADGETT: This is Exhibit 1.
(The document was marked as Plaintiffs' Exhibit No. 1.)
MR. ELLIOTT: Let's have you work off the one that he handed us.

THE WITNESS: Okay.
MR. PADGETT: I only brought two of everything for the most part.
MR. ELLIOTT: That's fine. No worries. I've got a PDF of it here from the Dropbox.
MR. PADGETT: All right.

BY MR. PADGETT:
Q. Ms. Locke, have you seen this document before? And you can take a minute and look through the whole thing. In one way or -- in one version or another, have you -- have you seen this document?
A. Yes.
Q. Okay. The first portion is just saying that we're going to be here today taking the deposition.
A. Uh-huh.
Q. And then it goes into what's called a document production. Exhibit A --
A. Okay.
Q. -- to this document is a document production. I'm going to go over some of these things with you. I want to make sure that some of the things we've asked for have been produced if you have it. I'm not insinuating that there are documents that you have

that we have not been given, but a lot of times in these depositions with a records custodian or a corporate representative, they'll say, You know what? I do have that, you know, once we start talking about these things --

A. Okay.

Q. -- and kind of tell you why we need these things. And I know a lot of these documents that we're going to go through speak for themselves, but I will ask you about your understanding or your company's understanding of some of the things therein.

A. Okay.

Q. Did you help search and produce some of the documents that were produced to us?

A. Yes.

Q. Were you involved with the search and going through the system and finding the things that you had?

A. Yes.

Q. Okay. Was there anybody else that helped compile these documents?

A. No.

Q. Okay. All right. So we've been over Number 1 on this Exhibit A briefly, the organizational structure of -- of Locke Relocations. And you answered

to this just you and your husband, Kelvin, correct?
A. Correct.
Q. Okay. How many employees do you-all have?
A. About seven.
Q. Okay.
A. Six, seven.
Q. And what are those employees' -- you know, what roles do you have employees in?
A. Some are drivers. Some pack, packers.
Q. Okay. How many drivers do you-all have?
A. Four.
Q. All right. And how many packers do you have?
A. Maybe five.
Q. Okay. And are some of the drivers also packers?
A. Some of -- yeah.
Q. Okay. Any other employees other than drivers and packers?
A. No.
Q. Okay. Do you have a dispatcher?
A. The dispatcher is Joe Moholland.
Q. Okay. And do you have a safety personnel, or does Joe Moholland handle that as well?

A. Joe Moholland.
Q. Okay. Moving on to No. 2. Let's talk about the defendant's business and/or agency relationship between Locke Relocations and any of the defendants in this action. So first of all, what is your understanding of the relationship between Locke Relocations and Joe Moholland?
A. That's who we have the contract with is Joe Moholland.
Q. Okay. And when you say, "Contract," is that the --
A. It's just a contractor's agreement that we have with him.
Q. Okay. All right. Let's go to -- let's take a look at that.
MR. PADGETT: And that's going to be Plaintiffs' 5. So I'm already out of order. That didn't take long.
(The document was marked as Plaintiffs' Exhibit No. 5.)

BY MR. PADGETT:
Q. All right. I'm going to show you -- and take a minute to look at it. This is Bates-stamped JMI. It's produced to us from Joe Moholland.

MR. ELLIOTT: He's referring to that number.

THE WITNESS: Uh-huh. Okay.

BY MR. PADGETT:

Q. If I tell you the page number, I'm going to be more referring to the page number in the bottom right corner there.

A. Okay.

Q. Starts with JMI.

A. Uh-huh.

Q. And this goes from JMI 273 to JMI 326.

A. Okay.

Q. Okay. When you talk about an operating agreement, is this the agreement that you're referencing?

A. Yes.

Q. Okay. And let's see. All right. Is this agreement still in effect today?

A. Yes.

Q. Has it been amended? Do you have any --

A. Not to my knowledge.

Q. Okay. You don't have any amendments or updates to this agreement?

A. No.

Q. Okay. And do you know what date this went into effect?
A. I do not.
Q. Okay. I could point you to JMI 287.
A. 287. Okay.
Q. So it looks like --
A. March 1st.
Q. -- maybe March 11?
A. 11.
Q. Uh-huh. Does it look like March -- let's say March 2020. Does that -- does that sound accurate?
A. It does.
Q. Okay. And is that about when you-all began to do business with Joe Moholland?
A. No. We started in 2014.
Q. Okay. Under what agreement were you-all operating in 2014?
A. The same. Contractor, independent contractor.
Q. Okay. So the relationship is basically the same now as it was from the beginning in 2014?
A. Yes.
Q. Okay. And what do you understand the relationship to be? You know, I know there's a lot of pages here, but what does Joe Moholland do, and what

does Locke Relocations do as -- in this relationship?
A. We -- we have a contract with Joe Moholland. They pretty much do everything. They dispatch for us. That's where we get our jobs from. Then we provide the vehicles and the employees.
Q. Okay.
A. And everything else, like safety training, things are handled through Joe Moholland.
Q. Okay. On the first page of that agreement -- right there. You're at it. The very first page, the bottom left corner says, "2004 UniGroup, Inc." Do you know who UniGroup is?
A. I think UniGroup -- not exactly. But I think UniGroup was what Mayflower was in there with UniGroup.
Q. Okay.
A. But we're not with UniGroup anymore.
Q. Okay. And when you say, "We," who do you mean is not with UniGroup anymore?
A. I don't think UniGroup and Joe Moholland, they're not with them anymore.
Q. Okay. And what do you base that information on?
A. Just hearing it.
Q. Okay. Who told you that Joe Moholland

and Mayflower -- or UniGroup, excuse me, don't have a relationship anymore?

A. I thought they were one in the same. It may not be. I thought that Mayflower was through UniGroup. I know that they dissolved the relationship with Mayflower. But as to the particulars of it, I don't know.

Q. Okay. Do you know who told you about it? When you -- when did you first hear about that breakup or -- or split up?

A. I think it had to be July of 2022.

Q. Was it after the incident that we're here to talk about today?

A. Pretty much or close to it, yeah.

Q. All right. Is that when -- after this incident, is that when you first heard that Mayflower or UniGroup did not have a relationship with Joe Moholland anymore?

A. Yes.

Q. Okay. Did you ever receive any documents or any amendments, you know, to any agreements that you had with Joe Moholland identifying that they did not do business with Mayflower anymore?

A. No.

Q. Okay. Let's go to JMI 277. The first

paragraph, I'm going to read it, and just make sure I don't, you know, mess it up. But it says, "Joe Moholland, Inc., herein Company, is an authorized motor carrier that transports and stores household goods and general commodities under either its own operating authority or as an agent of United Van Lines, LLC, and/or Mayflower Transit, herein Van Line, under Van Line's operating authority." Is United Van Lines, LLC -- what do you understand that entity to be?

A. I have no idea.

Q. Okay. Never -- never really heard of them too much?

A. No.

Q. All right. And then it says, "And/or Mayflower Transit." But you had -- you had understood or you did understand that Mayflower Transit was operating with Joe Moholland at some point, correct?

A. Yes.

Q. Okay. All right. And it looks like here in this document, and correct me if I'm wrong, Locke Relocations would be the contractor any time it says, "Contractor" in this agreement. Do you agree with that?

A. Correct.

Q. Okay. And when it says, "Company," you

agree that it would be referencing Joe Moholland?
A. Yes.
Q. All right. Did you understand that Joe Moholland had any agreements with any other entities other than Mayflower when you-all began to operate with Joe Moholland?
A. I -- I don't know about -- I mean, I wouldn't know.
Q. Okay.
A. Yeah.
Q. And was it important to what you-all did who they were pulling for or under what authority?
A. (Witness shakes head.)
MR. ELLIOTT: You need to answer out loud.
THE WITNESS: No.

BY MR. PADGETT:
Q. Okay. So that's a no? Okay. Do you know whose DOT number was on the truck on July 1st, 2022?
A. I -- I think that it was still some of the -- the placards hadn't been removed and that it may have been Mayflower's DOT number that was on there.
Q. Okay. Did anyone from Mayflower reach

out to you following this incident?
A. No.
Q. Okay. And do you understand when I say, "Incident," I'm referring to a collision that occurred in -- on July 1st, 2022, in south Georgia?
A. Yes.
Q. Okay. So if I say, "Incident" or "Collision," you'll understand that's what I'm talking about?
A. Yes.
Q. Okay. Let's go to the next page, JMI 278. All right. And let's look at 6.a. It says, "Qualification of Drivers."
A. Uh-huh.
Q. What was your understanding who qualified the drivers to be able to drive? And when I say, "Drivers," I mean your drivers that are driving your equipment.
A. When it was Mayflower, Mayflower had Mayflower qualifications that all drivers had to meet. And they still -- they still do --
Q. Okay.
A. -- for Joe Moholland.
Q. Through Joe Moholland?
A. Uh-huh.

Q. So let's say you want to hire a driver tomorrow.
A. Uh-huh.
Q. Who would qualify that driver? Would it be Mayflower or Joe Moholland?
A. Joe Moholland.
Q. Okay. And when did that change?
A. I mean, as far as I know, it didn't change.
Q. Okay.
A. I mean, they still went through a qualification program. I guess it was just different companies now. But as far as I know, yeah, they have always went through the company, Joe Moholland, to get qualified.
Q. So you would say to Joe Moholland, This is the driver that we want to hire.
A. Uh-huh.
Q. They would perform the qualification?
A. Yes.
Q. Okay. And it was your understanding that prior, they would do that through Mayflower?
A. Yes.
Q. Okay. And if you hired someone tomorrow, it's your understanding that they would not use

Mayflower?
A. No, they would not.
Q. Okay. All right. And do you have anything documenting that?
A. No.
Q. Okay. Did you receive any documentation from Joe Moholland telling you that they no longer are an agent of Mayflower?
A. No.
Q. And you received nothing from Mayflower telling you that?
A. No.
Q. Okay. And as far as you understand, this operating agreement between Locke and Moholland is still in effect?
A. Yes.
Q. 279, next page, 6.b.1 talks about who maintains the equipment. And you can read that paragraph if you would like before my question.
A. Uh-huh.
Q. Who maintains the equipment? The tractors?
A. We do.
Q. Okay. And when you say, "We," that means Locke?

A. Locke Relocations.
Q. Okay. All right. Does anybody help with that or oversee with that? Or that's 100 percent you-all's responsibility?
A. Yeah. Any maintenance, that's our responsibility.
Q. Okay. Who does the annual inspections? Or who gets those done? Is that another responsibility of Locke?
A. The DOT inspections?
Q. Uh-huh.
A. Are done by Joe Moholland.
Q. Joe Moholland?
A. Uh-huh.
Q. Okay. What about the yearly inspection on the tractor, you know, to get your yearly inspection?
A. They're --
Q. Joe Moholland handles that?
A. Uh-huh.
Q. Okay. At any point did Mayflower handle that?
A. I guess when it was Mayflower, yeah.
Q. Okay. So before last summer, it would have been Mayflower handling that?

A. Yes.
Q. Okay. Who's responsible -- whose responsibility would it be to make sure the tires and brakes are operating properly?
A. Locke Relocations.
Q. Okay. If a DOT inspection happened in another state, and let's say there was some deficiencies with the tractor, who would receive that notice?
A. Joe Moholland.
Q. Joe Moholland? And then they let you-all know?
A. Uh-huh. Yes.
Q. Okay. What about any fines or citations? Who would receive those?
A. Joe Moholland.
Q. Okay. And then they would let you know of it, and then would they seek reimbursement for those? Or do you know who pays the fines?
A. I don't know.
Q. Okay. On that same page, let's look down at 7.a. 7 says it's, "Contractor Not Employee of Company," which would be -- contractor here would be Locke Relocations, correct?
A. Uh-huh. Yes.

Q. Okay. And 7.a says, "Contractor furnishes and controls all personnel." What do you understand personnel to mean in that agreement?
A. The people that work for us.
Q. Okay. So would it be safe to say it's up to Locke to hire help as far as moving, loading and unloading?
A. Yes.
Q. All right. Would Joe Moholland have any part in that?
A. Just to clear them for it. Do a background check.
Q. Okay. Do they do that with the people that were loading and unloading as well?
A. All personnel.
Q. Okay. And would these be employees of Locke that are doing the loading and unloading?
A. Yes.
Q. Okay. Charles Davenport and Mr. Hines that were also involved in this incident that were in the tractor, were they employees of Locke Relocations?
A. No.
Q. Okay. Do you know who they are?
A. I mean, I know now, but I didn't then.
Q. Okay. You had not met them or you didn't

know them before July 1, 2022?
A. No.
Q. Okay. Were they cleared in any way by Locke to be in that vehicle?
A. No.
Q. Okay. Who was supposed to do the loading and unloading of that -- on that trip?
A. Nicholas.
Q. And that's Nicholas Burist?
A. Burist, yes.
Q. Okay. Do your drivers sometimes do the loading and unloading by themselves?
A. Sometimes they do. It's up to them.
Q. Okay. Up to them, what do you mean by that?
A. I mean if it's an excessive amount or whatever, they -- when they go to another company, that company usually has help there. They may help them load and unload.
Q. But it was you-all -- it was Locke's understanding that it was going to be just Nicholas Burist doing this load and unload?
A. Yes.
Q. Okay. And then if there's an item on the truck like a piano, is that the scenario you described

when it gets to its destination, there would be people there to help?

A. Yes.

Q. Who coordinates that?

A. Most of the time the company that they go in to. If they're going to a warehouse, the warehouse usually has help. They have a list of help that would help them.

Q. Okay. Did that warehouse or that company ever charge you for using their labor?

A. Nicholas probably would pay them out of his own money because that's -- he's the one responsible for it. So then he probably would pay it out.

Q. So is he paid -- he's paid a portion for the unloading and loading?

A. Yes.

Q. Okay. And he's paid a portion for driving?

A. Yes.

Q. Okay. Was it common for the drivers such as Nicholas Burist to hire friends or buddies to help them with the loading or unloading?

A. I mean, I don't know whether they're friends or buddies, but it was common for them to -- if

they needed help, they would hire help.
Q. And did they have autonomy to do that, or did they have to contact you and say, Hey, I'd like these people to help with the unloading?
A. No, they don't contact us.
Q. Okay. So -- okay. So who would have to screen or qualify the helpers, the people that are helping your drivers with the unloading? Is there any process there to qualify or screen those people?
A. I don't know.
Q. Okay. You've never screened somebody that was going to help with just loading or unloading?
A. No.
Q. Okay. Does it surprise you to hear there were other people in the truck with Mr. Burist on the date of this accident?
A. Yes. I had no knowledge of it.
Q. All right. Let's go to section 9.d, which is on JMI 280. And this talks about the contractor's access to freight documentation. And if you need a minute to read that, I'll give you a second. But my question is going to be what information you have on that, your access to freight documentation.
A. We're issued a booking confirmation that tells us the customer's name, address, how much it

weighs, where it's going to and from.

Q. Okay. Who gives you that when you say you're issued a booking confirmation?

A. Joe Moholland.

Q. Okay. And how is that provided to you-all? E-mail?

A. Paper.

Q. Paper?

A. Yes.

Q. So they send it to you in the mail?

A. No. It's issued, like, at the job.

Q. Okay.

A. It's given to -- it's a folder that's made up, and then all the information is in the folder.

Q. Okay. And when you say, "At the job," what do you mean?

A. At Joe Moholland.

Q. At pickup?

A. Yes. At the base job.

Q. Okay.

A. At Joe Moholland they're issued a folder, and they give the folder to the contractor with all the information in it.

Q. Okay. Do you share an office with Joe Moholland?

A. No.
Q. No? Okay. So I'm wondering how does it get from Joe Moholland's office to your driver?
A. We have to go there and pick up our --
Q. Okay. Understood. So when the driver goes to pick up the load, the documentation is there at Joe Moholland?
A. Yes.
Q. And they get it there?
A. Yes.
Q. You don't have a booking confirmation or any information on that load in your office or in your system anywhere before the driver goes to pick it up?
A. It comes to us, and then we give it to our driver.
Q. Okay. Okay. So the booking confirmation, are you-all able to book these loads for Joe Moholland?
A. No.
Q. Okay. So who does the booking?
A. Joe Moholland.
Q. Okay. And then when you say, "It comes to us" --
A. Oh, I'm sorry. Locke Relocations.
Q. Okay. So Joe Moholland does the booking.

A. Uh-huh.
Q. And how does that booking confirmation get to Locke Relocations?
A. In a folder.
Q. Okay.
A. It's -- well, it's hard to explain. It's a folder, and it has all the information in it, what we need, forms that we need to sign. It's made up through Joe Moholland. And the contractors all get that. They pick up their folder each day, and that's their job.
Q. Okay.
A. Their assigned job.
Q. Is that the first time that you-all know about these loads is when they're there to pick that up and --
A. It's on a dispatch. They dispatch the jobs to us and let us know that that's the job that you have for that day.
Q. Okay. And how is that done, the dispatch?
A. Joe Moholland dispatches on their computer.
Q. Okay. Do you-all have access to that?
A. No.
Q. Okay. So you don't have access to any of

Joe Moholland's databases or --

A. No.

Q. Okay.

MR. ELLIOTT: Joseph.

MR. PADGETT: Uh-huh.

MR. ELLIOTT: Let me try to help a little bit. I think there's a little bit of confusion on your part because she hasn't said it right out loud. But they perform the work that they do for Joe Moholland at Joe Moholland's location rather than --

MR. PADGETT: Understood. Okay.

THE WITNESS: Yeah. We don't have a --

MR. ELLIOTT: -- at a separate location.

THE WITNESS: Yeah.

BY MR. PADGETT:

Q. So you-all don't have a separate yard or office?

A. No.

Q. Okay. So your drivers are showing up -- when they show up to work, they're showing up to Joe Moholland's yard?

A. Yes.

Q. Okay.

MR. PADGETT: That was the disconnect.
MR. ELLIOTT: And it became clear to me you didn't know that.
THE WITNESS: Okay.

MR. PADGETT:
Q. And when I asked if you-all shared an office, that's what I was getting to. But I understand now you don't go into Joe Moholland's office to do your work, but the loads are there, your drivers show up there?
A. Yes.
Q. So you-all are essentially providing the employees and the equipment?
A. And the equipment, yes.
Q. Okay. All right. But you don't have a separate yard for your trucks?
A. No.
Q. Okay. Are all of your trucks parked on a Joe Moholland lot?
A. Yes.
Q. Okay. And is Joe Moholland the only company that you-all haul for?
A. Yes.
Q. Okay. Do you have a separate lease

agreement for your trucks with Joe Moholland outside of this operating agreement?

A. No.

Q. Okay. So the trucks would be listed in an addendum to this agreement most likely, correct?

A. (No audible response.)

Q. Should be? Okay. That's okay. If you don't know, you can just say you don't know.

MR. ELLIOTT: If you know.

THE WITNESS: I don't know.

BY MR. PADGETT:

Q. Okay. That's fine. Have you ever -- has Locke ever booked loads?

A. No.

Q. Okay. So that's not a -- it's not part of you-all's job to book the loads or get the business?

A. No.

Q. Okay. That's what you have Joe Moholland for, correct?

A. Yes.

Q. Okay. All right. Have you ever been able to log onto Mayflower's database to access loads or information on loads?

A. No.

Q. Okay. What about to submit billing? Who do you submit your billing to?
A. Joe Moholland.
Q. Joe Moholland. But you don't have access to Joe Moholland's mainframe or documents or database?
A. No.
Q. Okay. Are your drivers paid or are you paid a fuel surcharge?
A. Yes.
Q. Who pays the fuel surcharge?
A. Joe Moholland.
Q. Okay. And then they pay that to Locke?
A. Relocations.
Q. Okay. Do you know if Mayflower has ever paid a fuel surcharge to Locke Relocations?
A. Not sure.
Q. Okay. And it could be that they pay Moholland who pays Locke Relocations, correct?
A. Possibly.
Q. Okay. Do you know who pays the fuel use tax at the end of the year?
A. No.
Q. Okay. On JMI 282 --
A. Uh-huh.
Q. -- 10.e.5 says, "Company/Van Line," which

we know from the first paragraph is Mayflower or UniGroup or United Van Line, "Responsibility for Additional Tax." Did you have any understanding outside of what this paragraph says about how that would work?

A. No.

Q. Okay. Let's go to JMI 283.

A. Okay.

Q. This talks about accidents and claims.

A. Uh-huh.

Q. And it talks about the reporting of accidents and claims. If an accident happens in one of your trucks, who do you report it to?

A. We would report it to Joe Moholland.

Q. Okay. Is that what happened in this -- in this instance?

A. No.

Q. Okay. How did you-all -- how did you or Kelvin find out about this accident or this incident, this crash?

A. Actually, through Joe Moholland's video cam that was in the truck.

Q. Okay. So the dash cam?

A. Yes.

Q. The dash cam was property of Joe

Moholland?
A. Yes.
Q. Okay. And do you-all have a feed of that dash cam, or is it uploaded to your computers? And when I say, "yours," Locke's computers.
A. No.
Q. No. Okay. So when you say that's how you heard about the incident, who informed you-all of the incident?
A. Mike Peters, the vice president.
Q. Okay. And he called Kelvin, or did he call you?
A. I think he called Locke.
Q. Okay. Do you know who he spoke to?
A. My husband.
Q. Okay. You said Locke, so I was wondering which one.
A. Oh, sorry.
Q. That's okay.
A. No problem.
Q. Yeah. So he spoke to Kelvin? Okay. Was it -- do you know when that was?
A. That was on the day of the accident.
Q. Okay. Do you know what -- do you know the nature of that -- do you know what was said in that

conversation?

A. I think we were trying to call Nick, and we didn't get him. So then that's when he called -- well, my husband called Joe Moholland and asked Mike about it. And Mike looked on the feed, and that's when he saw he had an accident.

Q. Okay. Is it common for your husband to talk to the drivers and check on them?

A. Uh-huh.

Q. Okay.

A. Yes. Sorry.

Q. That's okay. So he had tried to call Mr. Burist on that day, couldn't reach him, and eventually reached out to Joe Moholland?

A. Yes.

Q. Okay. Did anybody from your company reach out to Mayflower about this accident, incident?

A. No.

Q. Okay. So we're going to get a little bit technical here. Do you have an understanding -- any understanding about an indemnity agreement between Locke and Moholland?

A. No.

Q. Okay. And it would just be -- you have no other knowledge other than what's in this document,

correct?
A. Correct.
Q. Okay. Have you had discussions with Moholland -- other than through your counsel or -- I don't ever want to ask about anything that you've talked to Mr. Elliott about. But have you had any discussions with Moholland about indemnity in this -- pertaining to this crash?
A. No.
Q. Okay. Do you know if your husband has?
A. No, he hasn't.
Q. He hasn't?
A. No.
Q. Okay. Do you have any understanding of any indemnity agreement between Locke and Mayflower?
A. No.
Q. Okay. No, you have no understanding, or no, there is none?
A. No, I have no understanding.
Q. Okay. Let's go to JMI 285.
A. Okay.
Q. And I'm looking at 19.b. And this deals with required removal of identification upon termination. Have you -- you said earlier that you've been -- you've been notified that there's no more

relationship between Moholland and Mayflower. At any point did anybody reach out to you about removing the placards or the DOT number or the signage on the side of the vehicles?

A. No. They -- no.

Q. Okay. Is it your -- what is your understanding of whose responsibility it is to remove those?

A. It would be Joe Moholland, I'm assuming.

Q. Okay. Okay. Even though it's your trucks?

A. Yes.

Q. Okay. And what makes you say that it would be Joe Moholland's responsibility?

A. Because they print out the new information that goes on our truck. So it's sent to Joe Moholland. So then I guess they pass it on to us to -- and they put it on our truck.

Q. Okay. So the IFTA tags that allow you to operate interstate, Moholland handles that --

A. Yes.

Q. -- and puts those stickers on the trucks?

A. Yes.

Q. Okay. When they're updating the registration on the truck for the tag, they put the new

year sticker on the tag and things like that?
A. Yes.
Q. Okay. And you said earlier you didn't know at the time of this incident that Mayflower and Moholland had separated, correct?
A. No. I mean, we wouldn't have privy to that information anyway.
Q. Okay.
A. I mean, that would be probably between Joe Moholland and Mayflower.
Q. Okay. But nobody informed you --
A. They wouldn't tell us.
Q. Okay. Sorry. They wouldn't tell you?
A. (Witness shakes head.)
Q. Okay. So when you get a booking from Moholland, you don't necessarily know who they're hauling that for?
A. No.
Q. Okay. Has that ever been important? Has it ever been discussed?
A. No, not to my knowledge.
Q. Okay. Okay. And that's fair. I'm just wondering.
A. Yeah.
Q. Okay. Has the signage been changed since

July 1, 2022, on your trucks?
A. Yes.
Q. Okay. What do they say now? If you know.
A. I just know they -- it's not Mayflower anymore. Just the DOT numbers have changed. And I think it's Tailor Made -- Tailor Move.
Q. Tailor Move?
A. Yes.
Q. Okay. And what is your understanding of what Tailor Move is?
A. It's the new company they went with.
Q. Okay. And when you say, "They," who do you mean?
A. From what my understanding is, Joe Moholland sold out the company to Tailor Made.
Q. Move?
A. Move. I'm sorry.
Q. Okay. So this is the new -- the new owners of --
A. The new owners --
Q. -- Joe Moholland?
A. Yes. Long & Foster, Tailor Move.
Q. Long & Foster?
A. Yeah.

Q. Okay. And you think -- is that the same company -- is it your understanding that Tailor and Long & Foster --

A. Yeah.

Q. -- are one entity?

A. Yes.

Q. Or at least connected?

MR. ELLIOTT: I'm not going anywhere. I'm just going to stand up.

THE WITNESS: Oh, okay.

MR. ELLIOTT: Old back.

BY MR. PADGETT:

Q. Okay. So JMI 290, if you could go to that. There's a section here. It's in this boxed section. It's the bottom portion of that boxed section.

A. Uh-huh.

Q. And it says -- I mean, this -- this, I'm assuming, is a rate schedule, correct?

A. I assume so.

Q. Okay. And if you look in the first few pages -- the few pages before it, it kind of outlines the percentages for services.

A. Okay. Yes.

Q. In that bottom box, it talks about, "Enclosed Compensation Schedule Only Applies to Mayflower Dedicated Service Jobs."
A. What page are we on?
Q. Oh, sorry. JMI 290.
A. Okay.
Q. And it's that bottom portion of the box.
A. Uh-huh.
Q. And then right in the middle, it says, "Enclosed Compensation Schedule Only Applies to Mayflower Dedicated Service Jobs." Would you know -- when you get a bill of lading or when you get your booking confirmation sheet, would you know whether or not it was a Mayflower dedicated service job?
A. I would not.
Q. Okay. So who know -- who would do the billing from Locke --
A. Joe Moholland.
Q. -- to Moholland? Moholland handles the billing?
A. Yes.
Q. Okay. So they would -- they would assign a rate based on your contract, and they just pay you for it?
A. Yes.

Q. And you wouldn't know what rate they're getting or who they're getting it from?
A. No.
Q. Okay. So you've got to have some good faith and trust in Joe Moholland to do the right thing, right?
A. Yes.
Q. Okay. Let's go to JMI 306. So we're moving quite a bit. All right. And I'm looking down at the bottom. There's subsection i and then ii or subsection 2, unauthorized passengers.
A. Uh-huh.
Q. I'm going to read that. "Any contractor," so that would be Locke here, "or driver provided by contractor found to be transporting an unauthorized passenger shall immediately remove the passenger from the unit." Did you have any understanding about unauthorized passengers and what was to be done if you had an unauthorized passenger in your truck?
A. I mean, I did not. This is -- I'm just reading this, but, I mean, I understand.
Q. This is the basis of your understanding is what's in this document?
A. Yes.

Q. Have you-all ever had unauthorized passengers in your trucks before?
A. No.
Q. Okay. Is it -- is it your position that the two individuals that were in the truck with Mr. Burist were unauthorized passengers?
A. Yes.
Q. Okay. And you didn't know of them before July 1st?
A. No knowledge.
Q. Okay. Did you have knowledge of your drivers using other people riding with them to the delivery, to the destination to unload?
A. No.
Q. Okay. Was this the first time that you had heard of that?
A. Yes.
Q. Let's go back. I skipped too far forward. Let's go back a few pages to JMI 202.
A. Okay.
Q. And this is dealing with claims --
A. Uh-huh.
Q. -- for damage. So 1, Claims; a, contractor's claims liability percent and cash charge-back.

A. Uh-huh.
Q. And then subsection i says, "Van Lines," which here is United Van Lines or Mayflower, "hauling charge-back policy applies to cargo claims for household goods and special products." Have you ever gotten a charge-back for claims, for damaged claims?
A. We do. We're charged a percentage of the claims.
Q. Okay. Tell me how that -- how that works. If there's a damage -- if there's a claim made, who contacts Locke?
A. Joe Moholland.
Q. Okay. And then you-all have to reimburse them a percentage?
A. Yes.
Q. Okay. Based on that damage?
A. Yes.
Q. Okay. And then are you aware if Mayflower has ever sent you-all a charge-back?
A. Not really.
Q. It would be through Moholland?
A. Yes. Yeah. Everything is done with the booking, the paying, the -- all of that. We just submit our folder back to them. We submit our folders and our paperwork back to Joe Moholland, and it's all

processed through their billing.

Q. Okay. Was there a cargo claim subsequent to this accident?

A. Not sure.

Q. Okay. You haven't seen any documentation?

A. No.

Q. You haven't been charged a charge-back on this particular case?

A. No.

Q. Okay. One thing I do want you to help me clear up, JMI 311. JMI 311 is an attachment to the agreement. It's Attachment C dealing with insurance.

A. Uh-huh.

Q. How much insurance did Locke Relocations carry as of July 1st, 2022?

A. A million.

Q. One million? And there's some language in here right in the middle, section ii, subsection A.1.

A. Uh-huh.

Q. And it talks about a $3 million limit that was necessary under this contract. Did you ever have any discussions with Joe Moholland about having to have $3 million in coverage?

A. No.
Q. Okay. And then there's another section that I want you to eyeball for me. JMI 316 and JMI 318. These are dealing with -- they revert back to this paragraph, and they talk about what was selected here. So the selection says, "Contractor," which would be Locke, "acknowledges that contractor has previously elected to obtain insurance coverages through third parties who are not affiliated with company," which would be Moholland, "and contractor confirms those elections." So did you-all go out and procure your own insurance policy?
A. Yes.
Q. And it was not through Joe Moholland?
A. No.
Q. Was Joe Moholland an additional insured under your insurance policy?
A. I'm not quite sure, but -- yeah, I'm not sure about --
Q. Okay.
A. -- what their insurance --
Q. Okay. Let's look at JMI 318. And this page is signed, and it's, you know, a -- and it's an appendix to Attachment C, which is what we read about the $3 million limit.

A. Okay.
Q. And it says, "Contractor acknowledges that contractor is free to meet contractor's indemnification-funding obligation under section 14(c) of the independent contractor operating agreement." Okay. And, "Contractor indicated in the signature block by obtaining and maintaining commercial automobile public liability insurance that satisfies the requirements of section 2(a) of Attachment C," which is JMI 311 --
A. Uh-huh.
Q. -- "of the agreement. Nevertheless, contractor has elected to meet the indemnification-funding obligation by participating in Company's PL/PD indemnity limiter program." Do you have any knowledge of Moholland's indemnity limiter program?
A. No.
Q. Okay. All right. So there was never any discussion about -- that you know of about indemnifying Joe Moholland in event of a crash like this?
A. No.
Q. Okay. And it looks like that was your husband that signed this?
A. Yes.

Q. Okay. Does that look like his signature to you?
A. Yes.
Q. So you don't have any additional information on why the insurance that you-all selected was selected or why the limits that you-all selected were selected?
A. You mean our personal one?
Q. Uh-huh. No. For Locke.
A. Under the company?
Q. Uh-huh.
A. I don't know.
Q. Okay. So you don't know what an indemnity limiter program is?
A. No.
Q. Do you think Kelvin would know?
A. I don't think so.
Q. Okay. All right. Do you know if UniGroup or Mayflower were added as additional insureds under your policy?
A. I don't know.
Q. Okay. Let's go to JMI 314. And this is still dealing with the insurance.
A. Uh-huh.
Q. Section d.i.A.

A. Uh-huh.
Q. So it says -- d says, "Required contents of additional insured endorsement. Contractor shall furnish to company and Van Line a copy of the written additional insured endorsements obtained from contractor's insurance carrier or carriers specifying A, that it was agreed that subject to the terms and conditions contained in the policy of insurance, the insurance afforded by the policy of insurance shall also extend to the following as additional insureds." And there's a list there. That first group, does that look like Joe Moholland companies?
A. Joe Moholland.
Q. Okay. Are you familiar with all of these companies?
A. Not really.
Q. Okay. Do you have any -- any knowledge of Combined Van Lines?
A. No.
Q. Alliance Relocation?
A. No.
Q. Crossroads?
A. Crossroads.
Q. Uh-huh. Do you have any knowledge of them?

A. They're, I mean, the different companies within Joe Moholland. That's what they were.

Q. Okay. Okay. And that was your understanding?

A. Yes.

Q. Okay. And then United Van Lines?

A. Don't know.

Q. Okay. Mayflower Transit?

A. No, not now.

Q. Okay. Not now. But at any point were all of these listed on your insurance as additional insureds?

A. No.

MR. ELLIOTT: Joe, may I ask did Dave Nelson produce to you a certified copy of the National Indemnity policy?

MR. PADGETT: We have it.

MR. ELLIOTT: Okay.

MR PADGETT: We do.

MR. ELLIOTT: I thought you did, but I just wanted to make sure you did.

MR. PADGETT: Yeah, we do. Yup.

BY MR. PADGETT:

Q. So you don't have any information or

knowledge about the insurance policy and whether or not these were all named insureds on that policy?
A. No.
Q. Okay. Have you reviewed that policy lately?
A. No.
Q. Do you still have the same insurance policy that was in effect on July 1, 2022?
A. No.
Q. Okay. Who are you insured with now?
A. Progressive.
Q. Okay. What was the reason for the change?
A. I mean, they just said -- the other insurance said it didn't meet what they covered anymore.
Q. Okay.
A. So that's why we had to change.
Q. Did they give you any other reasoning?
A. No.
Q. Do you know if it was due to this collision that happened on July 1st, 2022?
A. I don't know.
Q. Okay. Is it possible that that was the reason?

A. I mean, it's possible.
Q. Okay.
A. Yeah.
Q. JMI 324, this is talking about a FastTrack Inventory System. Have you ever heard of a FastTrack Inventory System?
A. Never heard of it.
Q. Okay. So you have no information or knowledge as to how Locke uses -- or how Moholland uses a FastTrack equipment?
A. No.
Q. Okay. If you need a minute to read that, maybe -- it looks like a scanner. This talks about a device for scanning.
A. Any type of device would have been done through Joe Moholland.
Q. Okay.
A. We don't place any devices in our truck.
Q. Okay. Even for, like -- was there a device that you knew of for scanning when they're unloading the trailers for scanning all the boxes or anything like that?
A. It's done by paper.
Q. Okay. So there was no app or anything on Nicholas Burist's phone for unloading or scanning or

keeping track of the load?
A. No.
Q. Okay. Did Locke provide Nicholas Burist with a cell phone?
A. No.
Q. Okay. So any cell phone he would have had would have been a personal phone based on your understanding?
A. Yes.
Q. Okay. I'm going back to the exhibit list, which was with your deposition notice.
A. Okay.
Q. And going to No. 3, the VIN numbers and information for each and every tractor and/or trailer that was insured and was, you know, a Locke tractor and trailer on July 1, 2022. How many trucks did you-all have on July 1, 2022?
A. We had three.
Q. Three. Okay. And now you have two --
A. Yes.
Q. -- correct? Okay. And I've been provided a list of those by your counsel this morning, so I do have that.
All right. No. 4, provide a list of all commercial motor vehicle drivers who are actively

employed and/or contracted by Locke on July 1, 2022. Do you know who your drivers were as of July 1, 2022?

A. Nicholas Burist. Just commercial? Commercial drivers or regular driver's license?

Q. Do you-all have employees that -- this is mostly asking for commercial motor vehicle drivers. So the ones that are able to operate your semi trucks.

A. Okay.

Q. So that would have been how many drivers did you-all have on July 1, 2022?

MR. ELLIOTT: Truck drivers.

BY MR. PADGETT:

Q. Truck drivers.

A. Uh-huh. Nicholas Burist.

Q. Uh-huh. He was the only driver?

A. That's it.

Q. Okay. All right. So any load that Locke would take on for Moholland would have been moved by Nicholas Burist?

A. Yes.

Q. Okay. All right. And then we'll go to No. 5, inspection and maintenance records. Do you-all keep the inspection and maintenance records, or did Moholland for that vehicle?

A. Moholland does.
Q. They do?
A. Yes.
Q. Okay. Do you-all -- are you-all provided with copies of those?
A. No.
Q. Okay. No real need on your end to have that?
A. No.
Q. Okay. All right. Let's go to No. 6. Have you ever heard from anybody aside from Mr. Elliott that the semi truck involved in this collision was reported as stolen?
A. No.
Q. Okay. Is this the first you're hearing of that? Or was this notice the first that you've heard of that?
A. Yes.
Q. Okay. So you never got any notification that it was reported as stolen?
A. No.
Q. Okay. All right. Do you have access to, in your company or in your documents, any of the DOT inspections on this truck that was involved in this incident?

A. Joe Moholland would keep those.
Q. Okay. So Moholland would have those?
A. Yes.
Q. Okay. And, again, I think we talked about that. If there was something that -- you know, a citation or something, they would let you know to get that fixed, or would they fix it themselves?
A. No. They would let us know.
Q. Okay. All right. If the truck were shut down -- and I don't know if you-all have had this situation happen or not, but if the truck was placed out of service based on a DOT violation, would it be Locke's responsibility to send somebody out to repair it and get it back in operating condition, or would it be Moholland's?
A. It's our responsibility --
Q. Okay.
A. -- to do the repairs.
Q. Okay. Even if it was during a move and the truck was placed out of service, it was up to you-all to get it back, right?
A. If it was our truck, yes.
Q. Okay.
A. Just a truck.
Q. Yup. Do you ever receive these

notifications from Moholland on, like, a deficiency or a DOT citation, or do they just handle that?
A. They just handle them.
Q. Okay. They don't send it to you?
A. No.
Q. Okay. So you don't have any of those, any DOT --
A. No.
Q. -- citations or violations?
A. No.
Q. Okay. And then No. 8 talks about this particular shipment. Do you know where this shipment was going that was going on July 1st, 2022?
A. Jacksonville, Florida.
Q. Okay. Do you know what warehouse or who was the receiver of that shipment?
A. Conser.
Q. Okay. C-O-N-S-E-R?
A. Yes.
Q. Okay. Who is Conser?
A. Who are they?
Q. Do you know who they are, anything about them?
A. Just -- I know just as a warehouse, a moving company. Another moving company --

Q. Okay.
A. -- in Florida.
Q. Had you-all delivered to Conser before?
A. Yes.
Q. Okay. Do you have any correspondence with Conser at any point?
A. No.
Q. Okay. So if they had an issue with a shipment that arrived, they would call Joe Moholland?
A. Yes.
Q. Okay. And I'm asking more like the course of dealing, not like a hypothetical. But, like, you know, if you-all delivered to them before and they had an issue, they would reach out to Moholland, correct?
A. Yes.
Q. Okay. Did you have an understanding that your truck was leased on with Mayflower prior to July 1, 2022?
A. Yes.
Q. Okay. Did you receive any documentation showing that that had changed?
A. No.
Q. Okay. Did you ever sign a separate lease agreement or operating authority agreement with

Mayflower or any of their parent companies?
A. No.
Q. Okay. So the only agreement that you-all were operating under was --
A. Was this one.
Q. -- the one we have gone over?
A. Yes.
Q. Okay. Did you have a contract with Nicholas Burist?
MR. ELLIOTT: A written contract?

BY MR. PADGETT:
Q. A written contract.
A. No.
Q. No. Did he sign any separate lease agreements or operating agreements?
A. No.
Q. Okay. So nothing in writing identifying or establishing the relationship with Nicholas Burist?
A. No.
Q. Okay. But it's the company -- it's Locke's position that he was an employee?
A. Yes.
Q. Okay. How did you first meet Nicholas Burist?

A. I don't think I met him. But he just applied for -- to be a driver. Came and applied for a job, filled out an application, and then went through the process of being cleared for it.

Q. Okay. When was that? Do you know?

A. I don't have it in front of me right now. I don't know. On his application.

Q. Okay.

MR. ELLIOTT: There he goes switching around the numbers again.

MR. PADGETT: I know. I'm so out of whack.

MR. ELLIOTT: It's all right.

This is going to be Plaintiffs' 4.

(The document was marked as Plaintiffs' Exhibit No. 4.)

BY MR. PADGETT:

Q. Plaintiffs' 4 goes from the bottom numbers, the Bates numbers on the bottom 0005 to 0012.

A. On this?

Q. No. Right here. What I just handed you.

MR. ELLIOTT: The application you have in front of you.

THE WITNESS: Oh, okay.

BY MR. PADGETT:
Q. Plaintiffs' 4. So it goes from 0005 to 0012. Does your copy do that?
A. Yes.
Q. Okay. So about seven pages here.
A. Uh-huh.
Q. And I'll give you a minute to take a look at that.
A. Okay.
Q. And the top --
MR. ELLIOTT: I think that's eight pages.
MR. PADGETT: What's that?
MR. ELLIOTT: Eight pages.
MR. PADGETT: It could be. It probably is. Yeah, that's right. Yup, eight pages. I went to law school so I didn't have to do math.
THE WITNESS: Okay.

BY MR. PADGETT:
Q. And on the top right corner of that first page, do you see the date?
A. 2017.
Q. Does that sound about right of when you-all hired Nicholas Burist?
A. That sounds about right.

Q. Okay. You don't have any information to refute or dispute that 2017 is when he applied for -- to work with Locke?
A. No.
Q. Okay. Have you seen this application before?
A. Yes.
Q. Okay. When somebody applies to drive with your company, who do they apply with, or where does this application go?
A. The application is finished through Joe Moholland.
Q. Okay.
A. We get them to fill it out, and then we turn it in to them.
Q. Okay. So the blank document is a Moholland document?
A. Yes.
Q. But when Nicholas Burist -- he reaches out to Locke directly to solicit employment?
A. Yes.
Q. Okay. And so then you-all provide him with this blank copy, and he fills it out and brings it back?
A. Correct.

Q. Who does he bring it to?
A. He probably gives it back to Locke, and then we submit it to --
Q. To you or Kelvin?
A. Yes.
Q. Okay. Do you know who he submitted this to?
A. Probably my husband.
Q. Okay. And I'll say -- it's Kelvin?
A. Kelvin.
Q. Kelvin. Okay. Did you have any involvement in qualifying or interviewing Mr. Burist?
A. No.
Q. Okay. Were you-all aware of a prior DUI when he applied? Were you aware that he had a prior DUI?
A. No.
Q. Okay. Did you ever review this employment application before today?
A. No.
Q. Okay. So it's safe to say you don't have any information other than what's on this employment application about his screening or employment or prior employment or anything like that?
A. Correct.

Q. Okay. Once you get this employment application, what do you-all do next?
A. We submit it to Joe Moholland for screening --
Q. Okay.
A. -- and qualification to drive.
Q. Okay. Do you-all do any independent screening or qualifying?
A. No.
Q. Okay. So if the driver is good enough for Moholland, it's good enough for you-all?
A. Yes.
Q. Okay.
MR. PADGETT: So we've been going for about an hour. Are you-all good if we take a quick two- or three-minute break?
MR. ELLIOTT: Suits me.
MR. PADGETT: Okay.
THE VIDEOGRAPHER: Going off the record at 11:16 a.m.
(A break was taken.)
THE VIDEOGRAPHER: Back on the record at 11:25 a.m.

BY MR. PADGETT:
Q. All right. Back on. I was asking you a little bit about Mr. Burist's employment application. And you were not personally involved with the screening of Mr. Burist, correct?
A. Yes.
Q. Okay. Did you -- do you have any recollection of reviewing his employment application before it was submitted to Joe Moholland?
A. No, I didn't.
Q. Okay. Do you know if your husband did?
A. I'm -- and I'm just assuming that he did, yeah.
Q. Okay. And that's fine. If you don't know, you can say you don't know. Okay. And earlier you said you were not aware of a DUI, a prior DUI. On page -- on the first page of this application down towards the bottom, it says, "Have you ever been convicted of a DUI?" And he said "Yes. 6/7/2003." Did you know about that before today?
A. No, I didn't.
Q. Okay. Did you know of any criminal history that Mr. Burist had?
A. No.
Q. Okay. And you see the next question down

says, "Have you ever been convicted, pled guilty or no contest to, or otherwise been found to have committed a crime consisting -- constituting a felony or misdemeanor?" And he selected no, correct?
A. Correct.
Q. Okay. And you did not have any prior information about any felonies that Mr. Burist may or may not have committed?
A. No.
Q. Okay. And, again, you said it was Moholland's responsibility to screen and qualify these drivers?
A. Yes.
Q. Okay. Do you know how many times -- well, let me ask you another question. So strike that.
How many different trucks would Mr. Burist have been driving for you-all?
A. I'm trying to think of the -- maybe two.
Q. Okay. So it was the 2014 that was involved in this, the International. And then there was another truck at the time. Was it another 2014 that you-all had at the time, or was it the new truck?
A. I'm not sure when each was purchased, so I'm not sure.
Q. Okay. Would he mainly use the same

truck?
A. Yes.
Q. Okay. And what would determine what truck he used?
A. I have no idea.
Q. His preference?
A. Preference, I guess. I'm not sure.
Q. Okay. Okay. Do you know how many times the truck that was involved in this incident was put out of service?
A. No.
Q. Okay. Would that be something that Moholland would have?
A. I'm not sure.
Q. Okay.
A. I -- yeah, I'm not sure.
Q. Okay. And, again, I think you said Moholland doesn't necessarily send those documents to you. They just identify to you that there's been a problem?
A. Yes.
Q. Okay. When Mr. Burist was driving for you-all, did he drive continually for you-all from 2017 to 2022?
A. Somewhat, yeah.

Q. What do you mean?
A. I mean there would be maybe times there wasn't trips going long distance.
Q. Sure. But did he ever quit and come back?
A. No.
Q. He remained an employee for those five years?
A. To my knowledge, he did.
Q. Okay. Did he have any other accidents or motor vehicle collisions while he was employed with you-all?
A. No.
Q. Okay. Did you-all know of any other car accidents or collisions he was involved in?
A. No.
Q. Do you know if following this collision, if Mr. Burist underwent a postaccident drug screen?
A. Not sure.
Q. Okay. But you-all didn't order one?
A. No.
Q. Okay. Do you think it's Moholland -- based on you-all's agreement, would it be Moholland's responsibility to order that?
A. Yes.

Q. Okay. Would you-all get a bill for that?
A. No.
Q. Okay. That's part of their --
A. Qualifications, uh-huh.
Q. Okay. Does Locke -- do you-all keep logs on the drivers?
A. No.
Q. Who does?
A. Joe Moholland.
Q. Do you know what program they use or software?
A. No.
Q. Okay. Have you ever had to review your drivers' logs?
A. No.
Q. Okay. So as far as the -- you know, keeping up with federal regulation on logs, that's all -- you leave that to Moholland as well?
A. Yes.
Q. Did you-all keep a driver qualification file?
A. Moholland would have that.
Q. Moholland?
A. Yeah.
Q. Okay. And you mentioned that any cell

phone that Mr. Burist would have had would have been his personal cell phone?

A. Yes.

Q. Okay. Do you-all issue company phones to any of your drivers?

A. No.

Q. Do you-all have a way of communicating with your drivers other than cell phone?

A. No.

MR. ELLIOTT: When they're on the road, you mean?

BY MR. PADGETT:

Q. Yeah, when they're on the road. Sorry.

A. No.

Q. No. There's no Qualcomm that you could speak to them through the truck?

A. No.

Q. Okay. Did you-all provide any bluetooth devices to your drivers?

A. No.

Q. Is that something that if they had one, it would have been their own personal?

A. I guess, yeah. We didn't -- I know we didn't provide anything.

Q. Okay. All right. Do you know if Moholland did?
A. I don't know.
Q. Okay. Do you know what kind of hardware and equipment was equipped on your truck by Moholland as far as GPS or Qualcomm, anything like that?
A. I'm not -- I don't know.
Q. Okay. So it could -- it could have been. Your truck could have been -- could have had these --
A. I know it's equipped with something. I just don't know what it was.
Q. Okay. Understood. Who provided the dash camera?
A. Joe Moholland.
Q. Okay. Have you seen that footage --
A. Yes.
Q. -- from this incident?
A. Yes.
Q. Okay. And if it was shown to you by your counsel, don't tell me that. But are you -- you know, who provided that video to you?
A. I mean, it was just -- we went into the office and looked at it from the device.
Q. Okay. Do you know what day you went and looked at it?

A. I think the same time it happened because that's what he was telling us. He informed us that -- of the accident, so we saw it.

MR. ELLIOTT: When you say, "He," you're talking about Mr. Peters?

THE WITNESS: Peters, yeah.

BY MR. PADGETT:

Q. Thanks. Have you spoken to Nicholas Burist since this collision?

A. I have not.

Q. Okay. Has Kelvin spoken to him?

A. Have not.

Q. So you-all didn't get in touch with him that day, the day when Kelvin was trying to reach him --

A. No. We never got in touch with him.

Q. -- when you-all realized that an incident had happened? Okay. You never got in touch with him since?

A. Unh-unh.

Q. Did you send any correspondence or communication to him to separate or to fire him as a driver?

A. No.

Q. Okay. Has he -- is he still an employee of Locke Relocations?
A. No.
Q. Okay. How did that come about? How was he fired?
A. He's just not driving anymore.
Q. Okay. Has he reached out to try to come back to work?
A. No.
Q. Okay. Has he reached out to you-all at all?
A. No.
Q. Okay. Do you know anything about his whereabouts?
A. Not really.
Q. Okay. Do you know if he's still in jail? Do you know if he's out of jail?
A. I don't think. Now, that's just what I think. I don't know for sure. But I don't think -- I think he's out on bond or something.
Q. But you don't have any personal knowledge --
A. No.
Q. -- of that? Okay. Do you know if any of your employees now keep in touch with him?

A. No.
Q. Okay. So you haven't heard of anybody speaking to him that works with you?
A. No.
Q. Okay. The load that was being transported on July 1st, 2022, do you know where it was coming from?
A. I don't know.
Q. Do you know where Burist would have loaded that up?
A. I'm not sure. Without looking at the booking confirmation, I wouldn't know.
Q. Okay. All right.
A. I don't remember.
Q. Okay. How would it normally work? Would the truck be loaded and already at Moholland on their yard and he would just go hook up to it, or would he have to load it sometimes?
A. Sometimes. It depends. Yeah.
Q. Okay.
A. Somebody else could have loaded it, and then he would just drive it to the destination.
Q. Okay. I'm going to hand you what's identified as JMI 665 through JMI 669. And this has been marked as Plaintiffs' Exhibit 3.

(The document was marked as Plaintiffs' Exhibit No. 3.)

MR. ELLIOTT: That's not something we had. That came from Joe Moholland.

THE WITNESS: Okay.

MR. ELLIOTT: Just for your information. Moholland produced that to the plaintiffs.

BY MR. PADGETT:

Q. Ms. Locke, have you seen this booking confirmation before?

A. I've seen something like this, yes.

Q. Okay. Does this look like the standard booking confirmation, or does this look like a booking confirmation you would have been given in the past from Moholland?

A. Yes.

Q. Okay. Can you tell by looking at this if Mr. Burist loaded this trailer somewhere or just picked it up at Moholland's yard?

A. No. It doesn't tell us who did it. It just tells us the origin of where it was loaded.

Q. Okay. And where does it say it was loaded?

A. Virginia Beach.

Q. Okay. And do you-all have -- does Moholland have a yard in Virginia Beach?
A. No.
Q. But you don't know if you-all were involved in the loading of it just based on this document?
A. I mean, based on this document, I don't. But yeah, we would have loaded it and --
Q. Okay. So on this particular load, you-all would have loaded it, transported it, and unloaded it --
A. Yes.
Q. -- correct? Okay. And then on July 1st, 2022, do you know where this load was coming from on that day?
A. No.
Q. Okay. Do you know where -- you did say you knew where it was going to, correct?
A. Yes.
Q. Okay. Does it -- is it identified on this document?
A. Uh-huh. It has destination at the bottom. It says Jacksonville, Florida.
Q. Okay. And then destination agent just to the right of that, Conser Moving and Storage of

Jacksonville?
A. Correct.
Q. You've had no communications with Conser?
MR. ELLIOTT: About this?
MR. PADGETT: Sure.

BY MR. PADGETT:
Q. About this?
A. No.
Q. And you said you've shipped to that location before?
A. Yes.
Q. Okay. Has Mr. Burist been to that location before?
A. Yes.
Q. Okay. So who determines when Mr. Burist picks up a load and starts his travel?
A. Locke Relocations.
Q. Locke? So does somebody dispatch him?
A. When you say, "Dispatch," meaning --
Q. Hey, I need you to pick up this load --
A. Yes.
Q. -- on this date, take it here.
A. Yes. We do.
Q. Okay. Who does that? Do you do that, or

does Kelvin do that?
A. Kelvin.
Q. Okay. You think on this -- for this particular load, Kelvin would have called him and coordinated the transport?
A. Yes.
Q. Okay. Does the driver go -- the driver has access to these documents, the booking confirmation?
A. It's in the folder.
Q. Okay. So when he shows up to Moholland's yard, this is one of the things that he's given?
A. Yes.
Q. Okay. What else is in that folder?
A. Oh, God.
Q. Are the bills of lading included in that folder?
A. Maybe.
Q. Okay.
A. The 619s, which is the -- authorized for them to pay us for it.
Q. Okay.
A. I'm trying to think what else is in the folder. Because the folders are made up through Joe Moholland, and then we just get the folder, and then we

pretty much give the folder to him.
Q. Okay. And when you say we get it, the driver picks it up?
A. Locke Relocations gets the folder.
Q. Okay.
A. The folder is then given to Nick.
Q. Okay.
A. And -- or the driver, whomever the driver is. And then he handles it from there. And when he finishes the load, the paperwork comes back to us. We submit it back to Joe Moholland.
Q. Okay. And is it you or Kelvin personally that are receiving the folder, giving it to Nick, and then getting it from Nick and giving it back to Moholland?
A. Yes.
Q. Okay. And do you-all review anything before you hand it to him?
A. We review it to make sure all the paperwork is signed and everything like that.
Q. Do you check dates, like when it needs to be there to help him coordinate the transport?
A. We do that before, yeah.
Q. Okay. All right. Had Mr. Burist taken a load from Virginia to Conser in the past?

A. Yes.
Q. Okay. Was that a pretty common destination?
A. Yes.
Q. Okay. Have you been to that facility before?
A. Conser?
Q. Uh-huh.
A. Yes.
Q. You've seen the facility?
A. Oh, me personally?
Q. Yeah. Personally.
A. No, not personally.
Q. Okay. This particular load, can you tell how it originated? Who booked this load with Joe Moholland? Can you tell?
A. I don't know.
Q. Do you ever have access to that information?
A. No.
Q. You know, and I'm asking whether it was a Mayflower-originated load, TMM. You know, who it was that was paying Moholland for this load.
A. I don't know.
Q. And for what you-all do, it's not really

relevant to you-all?
A. No.
Q. Okay. So on this particular load, you don't have any information on who it was that booked Joe Moholland to move this freight?
A. No.
Q. Okay. And your only communication in situations like this is with Moholland?
A. Yes.
Q. Okay. Did you or Kelvin go to the scene of this incident?
A. No.
Q. Did you-all -- have you-all spoken to any of the plaintiffs in this case?
A. No.
Q. Have you spoken to any of the investigating officers?
MR. ELLIOTT: Law enforcement.

BY MR. PADGETT:
Q. Law enforcement.
A. I think some state trooper or somebody maybe have called us.
Q. Okay. Do you recall if you spoke to him or if it was Kelvin?

A. I think it was me.
Q. Do you remember any of the nature of that conversation?
A. Not really. It was just information that was provided to us as to what happened and the police report.
Q. Okay.
A. And I may have asked, myself, for a copy of it. But I don't think I ever got anything. Joe Moholland got it and then furnished it.
Q. Okay. So you have seen that accident report or the crash report?
A. Yes.
Q. Okay. And you believe it was Joe Moholland that gave you that?
A. Yes.
Q. Okay. Did you ever receive any photographs of the accident scene?
A. No.
Q. So you haven't seen any pictures from that incident?
A. Just on the news.
Q. Okay. Do you and Kelvin, Locke, do you-all have any policies and procedures in place for preserving evidence after you have been made aware of

an incident?

A. No.

Q. Okay. Do you-all try to do that? Do you-all try to just keep everything that you may need in the future?

A. Repeat that.

Q. Do you have -- do you try to keep everything -- when you hear about an incident like this, do you go -- make sure you gather up all the documents that you need to try to preserve them? Or do you think that Moholland would have everything?

A. Oh, I'm thinking Moholland would probably have all that. But in the -- going from here, I probably would, yeah.

Q. Okay. All right. How long have you been in the trucking industry?

A. My husband's been in it longer than I. I just kind of, like, got into it once we started.

Q. Okay.

A. In 2014.

Q. And in 2014 is when you-all first agreed to have an operating agreement with Moholland?

A. Correct.

Q. Have you been a part of a trucking company that -- or has -- has Locke been an agent or an

independent contractor or a contractor with any other companies other than Moholland?
A. No.
Q. Okay. So ever since you've been in the trucking industry, you have dealt directly with Moholland only?
A. Yes.
Q. Okay. And you said Kelvin had a past history in trucking?
A. I mean, he worked for the company, not as a contractor but as an employee.
Q. Okay. When you, "The company," who did he work for?
A. I mean, not as -- Joe Moholland.
Q. Sure.
A. He worked as a warehouse manager, or he went out to do jobs just like the other guys.
Q. For Joe Moholland?
A. Yes.
Q. Okay. And do you know how he came to open up this company and lease on with Joe Moholland? Did they approach him and ask him?
A. I think -- I'm not sure.
Q. Okay.
A. I'm not sure how it all came about. But

I guess it's just something -- that's the next step.
Q. Okay.
A. More money.
Q. In his career?
A. Yeah. Exactly.
Q. Sure. Okay. So he saw a need, Hey, they need some trucks. I can buy some trucks and lease them out?
A. Yup.
Q. Who did you-all purchase these trucks from?
A. We didn't start out with tractors.
Q. Okay.
A. You know, just started out with pack -- the little pack truck that I don't even know where we got that truck from. But it was just a pack van.
Q. Like a box truck?
A. Yeah, like a box truck.
Q. Okay. So when you-all started in 2014, didn't have a semi truck?
A. No.
Q. Okay. And when did you-all purchase your first semi truck? Would it have been in 2017 when Nicholas started driving for you-all?
A. It may have been.

Q. Okay.
A. I don't want to say exact. I don't know. I don't know the exact date.
Q. Sure. But do you think there were a few years where you just had the box truck?
A. Yes. Yes.
Q. Okay. Now, would that do local moves only?
A. Yes.
Q. Okay. What would -- would it go to the homes and load up the furniture --
A. Yes.
Q. And then take it where? To Moholland?
A. To the warehouse or either to other -- the other houses that were local.
Q. If they were not moving long distance?
A. It depends on weight. You know, it couldn't be over a certain weight for a certain truck.
Q. Okay. And then you purchased a semi truck. Was that semi truck ever owned by Moholland?
A. Our truck?
Q. The International.
A. No.
Q. Okay. So it was purchased from somebody else?

A. Yes.
Q. Okay. Did they have to do any inspections of that truck before they agreed to let it move their products?
A. Only thing I know is just the DOT inspections.
Q. Okay. So Kelvin was not a truck driver?
A. No.
Q. Okay. So he worked in the warehouse?
A. Yes.
Q. And is this the first trucking company that he's been involved in?
A. Yes.
Q. Okay. Other than his employment with Moholland?
A. Yes.
Q. Okay. All right. Was it you or Kelvin that procured the insurance for Locke Relocations, the liability insurance?
A. I did.
Q. Okay. Are any of your drivers owner-operators? Did any of them own their own trucks and pull for you-all?
A. No.
Q. So you-all own the trucks that they

drive?
A. Yes.
Q. Okay. And are all of your drivers employees, or are some independent contractors?
A. They're employees.
Q. Okay. And they're paid through a 1099?
A. Yes.
Q. Okay. And you-all provided the 1099s for Mr. Burist, I think, for about three years, three or four years before this incident?
A. Yes.
Q. Did you gather those up? Are you the one that gathered those --
A. Yes.
Q. Okay. And provided them to your attorney?
A. Yes.
Q. Okay. As far as safety training, Locke, do you-all do any safety training for your drivers?
A. No.
Q. Does Moholland do any safety training for your drivers?
A. Yes, I think so.
Q. Okay.
A. I'm not sure.

Q. Not too sure? Okay. Do you know if Mayflower ever provided safety training to your drivers?

A. Don't know.

Q. Don't know. Okay. Do you receive any -- let's say one of your drivers does a safety training through one of these companies. Do you-all receive a certificate or any paperwork to show that they've received that?

A. No. Moholland would keep that.

Q. Okay. And they would keep that in the driver qualifications file as far as you know?

A. (No audible response.)

Q. Don't know?

A. I have no idea.

Q. Okay. Okay. The moves that you make for Moholland, are they specifically military moves always?

A. Yes.

Q. So never any just a consumer wanting to move that's not military related. They're always military-related moves as far as you understand?

A. Yes.

Q. Has it always been the case since 2014 when you-all started with Moholland that they were military moves?

A. Yes.
Q. Okay. And would it be safe to say that 100 percent of the moves that you make -- based on your understanding, 100 percent of the moves that you-all make for Moholland are military-related moves?
A. Yes.
Q. Okay. Do you know anything about TMM, Total Military Management?
A. A little.
Q. Okay. What do you know about them?
A. That's who give us the jobs.
Q. Okay. So TMM will book loads through Moholland based on things that you have seen?
A. Yes.
Q. Okay. Do they ever directly communicate with Locke?
A. No. It's all done through Joe Moholland.
Q. Okay. Do you know if this was a TMM job on July 1st, 2022?
A. I don't know.
Q. Okay. Were you-all paid for loss of this tractor? The property damage? Did you-all receive a check --
A. Through our insurance?
Q. Yes.

A. Yes.
Q. Was that through National Indemnity?
A. Yes.
Q. Okay. And the tractor was totaled?
A. Yes.
Q. So you've -- Locke's never paid individuals for unloading or loading other than their employees, correct?
A. There may be day labor, but that's it.
Q. Okay. Who qualifies the day labor?
A. They still have to go through the qualifying process.
Q. Through Moholland?
A. Yes.
Q. Okay. So Davenport and Hines, the two guys that were in the tractor at the time, do you know if they were ever qualified by Moholland?
A. No, I don't know.
Q. But you had never heard of them?
A. Unh-unh. No. Sorry.
Q. That's okay. So it would be your understanding that Burist would have paid them out of his portion for loading and unloading?
A. Yes.
Q. Okay. Do you know how much he's paid for

loading and unloading?
A. No. He's paid on a -- it's by weight and then just the trip.
Q. And it's like $5 a pound or something like that? Does that sound about right?
A. I mean, I don't think that sounds about right. I have no idea.
Q. I saw something about $5 per something.
A. No.
Q. And then who pays him? Is that paid -- do you-all pay him for that?
A. We pay him, yes.
Q. Okay. Does Moholland ever pay him for anything?
A. No.
Q. Okay. So they pay you-all, and you-all pay him?
A. Yes.
Q. Okay. Do you know who owned the trailer that was being pulled on July 1st, 2022?
A. I don't know.
Q. Okay. You didn't own the trailer?
A. No.
Q. Do you-all own any trailers?
A. No.

Q. Okay. So you-all just provide the tractors and the drivers?
A. Yes.
Q. Okay. You-all don't have any agreement with the trailer company?
A. No.
Q. Would that be Moholland --
A. Yes.
Q. -- based on your understanding? Okay. Did this truck have electric logs? Do you know if it had an electric log?
A. I don't know.
Q. Okay. If it did, would that be something that Moholland would have put on there?
A. Yes.
Q. Okay. Do you know who monitored the service for the electric logs on that truck?
A. It would be them if they added anything.
Q. Okay. And you don't know what third-party company they may have used for their data?
A. I don't know.
Q. Okay. And you had no access to any of those logs?
A. No.
Q. Okay. And you-all would not receive a

bill or pay for the service for that network or carrier that handles the electronic logs?

A. No.

Q. Okay. Is it your understanding that would be Moholland as well?

A. Yes.

Q. Okay. Have you ever heard of Transit Advantage?

A. I've heard about it, but I don't know what they do.

Q. Okay. Do you know if they had a relationship with Moholland?

A. I'm not sure.

Q. Okay. Were you ever provided with a lease agreement between Moholland and Mayflower pertaining to this truck?

A. No.

Q. Okay. But you-all did understand that your truck was leased on with Mayflower?

A. Yes.

Q. Okay. And as of July 1st, 2022, that was still your understanding that that truck was leased on with Mayflower?

A. I'm not sure. I mean, I'm not really sure.

Q. Okay. Earlier you said you found out about the separation between Mayflower and Moholland after the accident.
A. After the accident, yes.
Q. So as of July 1, 2022, did you-all think it was just business as usual?
A. Yeah.
Q. Okay. And that the truck was still leased on with Mayflower?
A. Yes.
Q. Okay. And you never received any notice, even to date, that that agency had been terminated?
A. No.
Q. Any documentation?
A. No.
Q. Okay. And it was only through verbal communication from Moholland?
A. Yes.
Q. Okay. And that was following -- that was after July 1st, 2022?
A. Yes.
Q. Okay. Did Locke do any independent investigation into this incident, what happened?
A. No.
Q. Was the National Indemnity insurance

policy the only insurance policy that you-all had in effect to cover liability on your trucks on this date?

A. Yes. Yes.

Q. Okay. Have any workers' compensation claims been filed on behalf of Mr. Burist?

A. No.

Q. Have any been attempted to be filed or opened on behalf of Charles Davenport or Michael Hines?

A. No.

Q. Have you received any communication or correspondence -- other than notices of lawsuits or claims, have you received any correspondence from the Estates of Charles Davenport or Michael Hines?

A. No.

Q. Okay. And you didn't know them personally?

A. No.

Q. Either one of them?

A. No.

Q. Okay. Do you know if employee manuals or handbooks were provided either by you-all or by Moholland to your drivers?

A. I don't know.

Q. Okay. You have never seen an employee handbook or manual?

A. No.
Q. No. And you-all don't provide them to your drivers?
A. No, we don't.
Q. Okay. The placarding you said is done by Moholland?
A. Yes.
Q. Okay. And that goes for the decals on the side of the trucks and things like that?
A. Yes.
Q. Okay. Do you -- is it your understanding that those have been updated --
A. Yes.
Q. -- since? Okay. We asked for and we didn't get anything, any electronic or written correspondence and communications between Locke and Moholland or Locke or Mayflower or Locke or any of the defendants in this case. And that's -- you know, I'm going to exclude your counsel from that. But you don't have any e-mails or letters about this incident or anything pertaining to it?
A. I don't.
Q. Okay. Other than, I guess, the correspondence that was given about paying you for the damage to the lost property value in the truck?

A. That was, yeah, from the insurance company.
Q. Is that the only other --
A. Yes.
Q. Okay. So nothing other than that?
A. No.
Q. No e-mails from Chris Garr or anybody from Moholland?
MR. ELLIOTT: Rob Garr.

BY MR. PADGETT:
Q. Rob Garr. Sorry.
A. Oh, no.
Q. Okay. Do you-all normally communicate via e-mail about, you know, booking loads and things like that? Or is it all in person when you show up to grab the --
A. Yeah, it's all in person. Like I said, they make the folders, the folders are all put together, and then they give them to us.
Q. Okay. So they don't e-mail you, see if you -- Hey, can you-all cover this load for us? They just pretty much dispatch you-all?
A. Yeah. They just pretty much dispatch us.
Q. Okay.

MR. ELLIOTT: And, Joseph, I think that we produced to you the part of the claim file with regard to the --

MR. PADGETT: Property damage.

MR. ELLIOTT: -- property damage to the -- to the Locke Relocations tractor.

MR. PADGETT: Yeah. We have that.

MR. ELLIOTT: Okay.

MR. PADGETT: Yup. And that's why I said, you know, other than that --

MR. ELLIOTT: I just want to make sure I didn't think I did and I didn't do it.

MR. PADGETT: No. I've seen it, so we got it from somewhere.

MR. ELLIOTT: Okay.

BY MR. PADGETT:

Q. Okay. Did the Moholland sale, when they sold to another company, did it change anything per your operating agreement?

A. Not that I know of.

Q. It's just business as usual on you-all's end?

A. Yes.

Q. Okay. And they didn't require you to

sign and fill out a new operating agreement?
A. No.
Q. All right. And so you say the -- with -- regarding the dash cam video, you went to Moholland's office to watch that?
A. Yes.
Q. You-all were not provided with a copy of that?
A. No.
Q. Okay. Would the driver have access to, like, the rate info? Is there a rate info sheet or how much he's going to get paid on this load in the folder from Moholland?
A. No.
Q. Or did you just know, Hey, this one is going from Virginia to Jacksonville. You kind of know what it's going to pay, and he kind of knows what he's going to make?
A. Yes.
Q. Okay. So there's not a rate info sheet given to the driver per load?
A. No.
Q. Okay. Is there a rate info sheet given to you-all other than a bill or a payment whenever you book a load?

A. Not when we book it, no.
Q. So the rate is governed by the operating agreement that we discussed earlier?
A. Yes.
Q. Okay. So everybody is on the same page. When you accept a load, you know pretty much what you're going get paid for it?
A. (No audible response.)
Q. In theory?
A. In theory.
Q. Okay. There was a moment of pause there. What were you thinking about?
A. No. We -- it depends on -- it's a lot of variables in there. You know, it's like weight changes or, you know, destination. It may not go to the destination. It may go to the warehouse. So it's a lot of different things that determine payment.
Q. Okay. Do you know based on anything you have seen today or from prior knowledge who was transporting this load from the Jacksonville warehouse to the individuals' homes?
A. No.
Q. Okay. So that was not part of what you-all were booked to do?
A. No. Once it goes into the warehouse,

then the customer contacts the warehouse, and then they charge to --
Q. Okay. If it's a local move around here, you-all would do the unloading, too, into the individual's home?
A. Yes.
Q. Okay. Do you-all still do that?
A. Yes.
Q. Okay. But once it's going to a warehouse, as soon as they accept the goods, you-all are off the hook?
A. It's their responsibility.
Q. Okay. Understood. All right. So Locke never put any GPS monitoring systems on any of its trucks?
A. No.
Q. Okay. And you told me earlier, and I just want to clarify, you-all never had access to any of Moholland's databases to look at loads or anything like that?
A. No.
Q. It's just physical papers, what they hand you?
A. Yes.
Q. Okay. Does Locke do any marketing, or is

there no need because you're going to just get the work from Moholland?
A. Correct.
Q. Okay. Does Moholland advertise or market Locke as one of their -- have you ever seen any advertisements where they've said, Locke is one of our people that we use to haul your goods?
A. No.
Q. Never seen that?
A. No.
Q. Okay. Does Locke have any social media accounts or platforms?
A. No.
Q. And you said that the only way you-all would communicate with drivers usually is just calling them on their cell phone?
A. Yes.
Q. Okay. All right. I'm going to show you Plaintiffs' Exhibit 6.
(The document was marked as Plaintiffs' Exhibit No. 6.)

BY MR. PADGETT:
Q. This is a lease agreement, and it is Mayflower 3 and Mayflower 6.

MR. ELLIOTT: Okay. Those are the Bates stamp numbers are Mayflower 3 and Mayflower 6?
MR. PADGETT: Correct. And these are pretty new. I don't think we have had them for very long.

BY MR. PADGETT:
Q. Have you ever seen these before?
A. No.
Q. Okay. Do the unit numbers, does that look like something that you've seen before? Is that you-all's personal -- or is that you-all's identification number for your truck 24 and --
A. 251.
Q. -- 251? Uh-huh.
A. I don't know what 24 is, but I know 251 is. I don't know about this one.
Q. Okay. So this Kentucky 1999, is that not your tractor?
A. I don't think so, no.
Q. Okay. All right. Could that be the box truck?
A. No.
Q. Okay. The box truck wasn't a 1999 two-axle?

A. Unh-unh.
Q. Okay. So we'll -- let's just look at Mayflower 6 then. So you've never been provided with this?
A. No.
Q. Okay. Does that look like the truck just based on your understanding of the truck that was involved in the incident? Was that unit 251?
A. Yeah. That 1357.
Q. And the VIN number looks familiar?
A. Yeah. The last four.
Q. Okay.
A. Yeah. I remember that part.
Q. But you don't have any -- other than what this document may say, is there anything that you know about any lease agreement between Moholland and Mayflower?
A. No.
Q. Okay. And did you ever receive any documentation or communication to tell you that this lease agreement has ended or been cancelled or terminated?
A. No.
Q. Okay. Have you received any communication or correspondence from either Mayflower

or Moholland stating that Mr. Burist has been disqualified as a driver?

A. No.

MR. PADGETT: All right. Let's take one more break. I think I'm pretty much -- I'm about to wrap up.

MR. ELLIOTT: That's good news. That means he's close to being through.

THE VIDEOGRAPHER: Going off the record at 12:05 p.m.

(A break was taken.)

THE VIDEOGRAPHER: We're back on the record at 12:30 p.m.

BY MR. PADGETT:

Q. All right. I just have a few more questions for you. And I appreciate your time, and I appreciate your patience with me today looking through all these documents with me.

A. No problem.

Q. A couple things I have. What is your e-mail address for work? For Locke?

A. It's just -- I use my personal e-mail.

Q. Okay. So you use your personal. So I don't need your personal e-mail. But do you have an

e-mail address, JM333?
A. Yes.
Q. Okay. So what is that?
A. Alocke@jm333.com.
Q. Okay. Got you. And that's your personal, or that's the business?
A. That's the business.
Q. Okay. So that -- so you have an e-mail address, and JM333 is Joe Moholland?
A. Yes.
Q. Okay. 333 being --
A. The specific place.
Q. Okay. So JM333 is which facility?
A. Hampton.
Q. Hampton. Okay. And then the 444 would be --
MR. ELLIOTT: If you know.

BY MR. PADGETT:
Q. -- Newport News?
A. (No audible response.)
Q. You don't know?
A. 444 is Woodbridge.
Q. Woodbridge. Okay. Sorry. So Moholland has two locations here close by?

A. No.
Q. No?
MR. ELLIOTT: Woodbridge is up near D.C.
THE WITNESS: Northern Virginia.

BY MR. PADGETT:
Q. Okay. So not close by.
A. No.
Q. Okay. All right. Do you-all haul from there?
A. No.
Q. Okay. So you mostly deal with Joe Moholland 333?
A. Yes.
Q. Which would be Newport News?
A. Hampton.
Q. Hampton. Okay. And then do you have a physical office in that building that you can use in Joe Moholland's yard?
A. We can sit at a desk if we're in there.
Q. Okay. But you don't have a computer there or anything like that personally?
A. No.
Q. Okay. All right. But you have access to it if you need it. Do you-all have a physical office

for Locke?
A. Just our house.
Q. That's at your home?
A. Uh-huh.
Q. Okay. I don't need the address, but that's in Newport News?
A. Newport News.
Q. About how far is that from Hampton? If you're driving from your house to --
A. Ten minutes.
Q. -- Moholland? Ten minutes?
A. Uh-huh.
Q. Okay. Does Kelvin have an e-mail at JM333?
A. Klocke.
Q. Klocke? Okay. And it was JM333 --
A. Dot com.
Q. Okay. Dot com. All right. Do you have any knowledge about an investigation that was conducted in Georgia after the wreck at the wrecker yard at the -- where the truck was taken to? Did you have any -- did you have any part -- did Locke have any part in that investigation?
A. No.
Q. Do you know who did that investigation?

A. I don't know.
Q. Okay. Did Locke personally hire an investigator to go out to Georgia and do any of these investigations? Not asking you if your insurance company did or if your counsel did.
A. No, we didn't.
Q. Personally, you-all did not?
A. Unh-unh.
Q. Okay. And I talked to you a little bit earlier about the driver inspections -- or, excuse me, about the DOT inspections.
A. Uh-huh.
Q. And you said you-all don't normally get a copy of those DOT inspections --
A. No.
Q. -- correct? So Moholland would just kind of tell you what that deficiency was for you-all to get it fixed?
A. If there was one.
Q. If there was one. Okay. Are you aware of a January and a June DOT inspection regarding --
MR. ELLIOTT: 2022?
BY MR. PADGETT:
Q. -- regarding deficiencies for 2022?

A. No.
Q. Okay. All right. If you got an out-of-service or there was a deficiency found, you would think -- it would be Moholland's responsibility to let you know about that?
A. Yes.
Q. Okay. You-all don't get any correspondence or communication from the DOT?
A. No.
Q. Okay. Whose responsibility would it be to ensure that the tires on the tractor are in safe operating -- you know, are legally to the limit?
A. Ours.
Q. Okay. Did you have any notice of any deficiency to the tractor tires prior to July 1, 2022?
A. No.
Q. Moholland never told you, Hey, we've gotten an inspection back. This needs to get fixed?
A. No.
Q. Okay. Do you ever get any -- have you seen any correspondence or communication between Moholland and Mayflower about those January or June inspections?
A. No.
Q. Okay. All right. Do your drivers have a

duty -- do you know if your drivers have a duty to do their daily inspections of the trucks and the trailers before they start their trip?
A. Yes. They look at the truck.
Q. Okay. What about the trailer?
A. They check the lights and all that stuff, make sure they're operating.
Q. Okay. What about brakes?
A. I mean, as far as they can. I mean, they don't actually go into it, but they do a physical inspection. Oil, gas, all that stuff.
Q. Okay. Should they look at the tires of the tractors -- of the trailers as well?
A. Yes.
Q. Okay. Do you get any record of your employees -- specifically Mr. Burist, does he ever give you a record of his inspections of the tractor or the trailer?
A. No.
Q. No. Okay. So who would -- if he does those inspections and there are documents, would he provide those documents to Moholland?
A. Yes.
Q. Okay. But you have never seen any of those?

A. Okay. I'm not quite understanding. Okay. What type of inspection are you --
Q. The driver inspection.
MR. ELLIOTT: Are you talking about, like, a pretrip inspection?

BY MR. PADGETT:
Q. Pretrip inspection. Driver inspection of the equipment.
A. Oh. If he does the pretrip inspection and there's something not operating on the vehicle, he would let us know, Locke Relocations know.
Q. Okay. Okay. All right. But as far as documenting the pretrip inspection, if there were documents, it would be -- it would go to Moholland?
A. If there were, yes.
Q. If there were. Okay. And you don't know if there were, or you think there are not?
A. I don't know if there were.
Q. Okay. So you don't have any knowledge if Mr. Burist conducted a pretrip inspection on the -- before he started this trip that led to this event?
A. No.
Q. Okay. No independent knowledge?
A. No.

Q. Okay. And you did not know of any tire deficiencies on the tractor as of July 1, 2022?
A. No.
Q. Okay. Without getting into what you discussed with your attorneys, what correspondence or communication has National Indemnity had with you about the status of my clients' claims? Do you understand where their claims are situated or any type of settlements or anything like that?
A. I just get copies like this.
Q. Okay.
A. Yeah, that's it.
Q. Copies of the legal documents from the case?
A. Yes.
Q. Okay. So didn't have a lot of communication with National Indemnity about what to do with your policy in this wreck?
A. No.
Q. Okay. Since 2014, how many accidents have your drivers been involved in? Not just Mr. Burist but all of your employees for Locke.
A. None.
Q. This was the first one?
A. Yup. Yes.

Q. That's okay. And since it was your tractor, do you or Kelvin handle investigating those accidents? I guess has there been one since this one?
A. No.
Q. Okay. I've talked about what you-all have done to investigate that. Okay. We were provided 1099s for Nicholas Burist up through 2020. Do you know why there was not a 1099 for 2021?
A. No.
Q. Okay. Do you think that's something you maybe can provide to your attorney?
A. Yes.
Q. Okay. Just search.
MR. ELLIOTT: If you will just look, and if you find that, send it to me. And if you find none, tell me that so I can communicate that to them.
THE WITNESS: I will.

BY MR. PADGETT:
Q. And then you think one has been sent out for 2022? I know it was probably only for half the year, but do you think one has been sent out?
A. Yes.
Q. Okay. If you can get both of those if

you're able to find them.
A. All right.
Q. Okay. Have you had any communication or correspondence to or from TMM following this incident?
A. No.
Q. No. They haven't reached out to you?
A. No.
Q. Okay.
MR. PADGETT: Jim, I think that's all I have.
MR. ELLIOTT: Okay. Does anybody on the Zoom have any questions?
MR. EHRENREICH: I have a couple if that's okay.
MR. ELLIOTT: Sure.

EXAMINATION

BY MR. EHRENREICH:
Q. Hey. This is Todd Ehrenreich. I represent Mayflower. These are quick questions. You had been asked questions before about the truck and the trailer involved in the Burist accident. I think you've confirmed that you folks, in fact, own the truck; is that right?

A. Yes.
Q. And how about the trailer? Who owned the trailer?
A. I don't know.
Q. All right. You were also asked a number of questions about the DOT numbers that would have been on the truck during any of the trips that started from your yard and what would have -- would have your -- the Locke drivers operating the trucks. You had a whole bunch of questions. Do you remember those?
A. Yes.
Q. All right. You referenced the DOT number. At some point were the DOT numbers changed on your trucks?
A. Yes.
Q. And when did that process begin?
A. I know it was after the accident. I'm not sure of exactly what date.
Q. All right. And who was responsible for removing those DOT numbers?
A. Joe Moholland.
Q. All right. And same question with the -- on the tractor and the trailer. There were some identification, words and logos that had the name Mayflower; would that be accurate?

A. Yes.
Q. Were any of those removed from the trucks and the trailers?
A. Yes.
Q. And who was responsible for that?
A. Joe Moholland.
Q. When did that process begin?
A. It happened sometime after the accident. I don't know the exact date.
Q. All right. The trailers that are in the yard that you share with -- on the Moholland property, who owns the various trailers that are there?
A. I have no idea.
Q. It's just not you?
A. No, it's not us.
Q. Okay. Were you told on the date of this accident, the Burist trip, whose DOT number Burist would be traveling under?
A. No.
Q. Is that something you rely on Joe Moholland for?
A. Yes.
Q. Did you have a DOT number last summer?
A. Personally? For Locke Relocations?
Q. Yes, ma'am.

A. No.
Q. Do you know if Joe Moholland had one?
A. I don't know for sure.
Q. Right. Any bills of lading, who would have completed bills of lading back in the first six or seven months of 2022 for any trips that Locke Relocations was involved in?
A. Joe Moholland.
Q. All right. Would the bills of lading be completed and then you receive a copy?
A. Yes.
Q. Did you receive a copy of the bill of lading for this trip?
A. I am not sure without looking at the file to see if it was in the file. But if it was, it would have been incorporated in the file.
Q. Okay. Did you need a copy of the bill of lading in order to be paid for the trip?
A. No.
Q. How would -- I'm not asking how much, but how would -- how would you get paid? Was it a prospective, meaning you would say, For this trip, we charge X? Or is it a retrospective, meaning that the trip is completed and then you submit a bill to Joe Moholland? Does that make sense?

A. We --

Q. Sorry if it doesn't.

MR. ELLIOTT: Just tell him how it works.

THE WITNESS: Can you repeat that? Yeah. How it works is that all the forms are incorporated into our file, our folder. We are given the folder, we do the trip, we resubmit the folders once the job is completed back to Joe Moholland. Joe Moholland then sends it to their billing department, and that's how we're paid.

BY MR. EHRENREICH:

Q. And one last question. And I think you answered this before, but either my handwriting is terrible or my hearing is going. Did Locke Relocations ever have a contract with Mayflower?

A. You mean a -- this contract that's here?

MR. ELLIOTT: Did Locke have a contract --

THE WITNESS: The independent contractor?

MR. ELLIOTT: Did Locke have a contract with Mayflower?

THE WITNESS: Oh, no. We've never had a contract with Mayflower. Just Joe Moholland.

MR. EHRENREICH: Thank you.
Thank you, counsel. No further questions.
MR. ELLIOTT: Any others? Hearing none --
MR. PADGETT: Do you have any?
MR. ELLIOTT: I have no questions.
MR. PADGETT: Will you-all -- when you tell the court reporter what you want as far as orders go, will you name who it is asking for what?
And then circle back on reading and -- are you going to --
MR. ELLIOTT: We'll read and sign.
MR. PADGETT: Okay.
THE VIDEOGRAPHER: This deposition is complete at 12:35 p.m.
MR. EHRENREICH: This is Todd Ehrenreich on behalf of Mayflower. Assuming this is ordered, we will take a copy with any exhibits that were used.
MS. MILLER: Lynn?
THE REPORTER: Yes.
MS. MILLER: This is Leigh Miller with McMickle, Kurey & Branch, and we will take a

copy as well.

THE REPORTER: Got you.

MS. MILLER: Thank you.

MR. REAMS: Ms. Burton, this is Elliot Reams. I'm with Hawkins Parnell & Young. I'll take an electronic copy, please.

THE REPORTER: Sure.

MR. REAMS: Thank you.

THE REPORTER: Thank you.

MS. MILLER: Thank you-all.

MR. PADGETT: You-all have a good weekend.

(The deposition concluded at 12:35 p.m.)

-----oOo-----

C E R T I F I C A T E

I, ANGELA LOCKE, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below:)

Page Line Correction

C E R T I F I C A T E (Continued)

Page Line Correction

__________ ________________________________

Date Signature

CITY OF__________________________,

STATE OF_________________________.

I hereby certify that ANGELA LOCKE, appeared before me this __ day of _______________________, 2023, and affixed her signature to the foregoing deposition.

_________________________

Notary Public

My commission expires:

____________________________

COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

I, Lynn Burton, Court Reporter, do hereby certify that the within deponent, ANGELA LOCKE, appeared before me at Hampton, Virginia, as hereinbefore set forth; and after being first duly sworn by me, was thereupon examined upon her oath by counsel; that her examination was recorded in Stenotype by me and reduced to typescript under my direction; and that the foregoing transcript constitutes a true, accurate, and complete transcript to the best of my ability.

I further certify that I am not related to nor otherwise associated with any party or counsel to this proceeding, nor otherwise interested in the event thereof.

Given under my hand at Virginia Beach, Virginia, this 22nd day of May, 2023.

______________________________

Lynn Burton, Court Reporter
Notary No. 7230058
My commission expires: 9/30/25

## $

**$3 (3)** 50:22,25;51:25
**$5 (2)** 97:4,8

## A

**A1 (1)** 50:20
**able (5)** 22:16;32:17;36:23;59:7;121:1
**accept (2)** 106:6;107:10
**access (13)** 30:20,23;33:23,25;36:23;37:4;60:22;83:8;85:18;98:22;105:10;107:18;113:24
**accident (16)** 30:16;38:12,19;39:23;40:6,17;50:3;77:3;87:11,18;100:3,4;121:23;122:17;123:8,17
**accidents (6)** 38:9,12;73:10,15;119:20;120:3
**accounts (1)** 108:12
**accurate (2)** 17:11;122:25
**acknowledges (2)** 51:7;52:2
**action (1)** 15:5
**actively (1)** 58:25
**Actually (2)** 38:21;117:10
**added (2)** 53:19;98:18
**addendum (1)** 36:5
**Additional (8)** 38:3;51:16;53:4,19;54:3,5,10;55:11
**address (6)** 10:1;30:25;111:22;112:1,9;114:5
**Advantage (1)** 99:8
**advertise (1)** 108:4
**advertisements (1)** 108:6
**affiliated (1)** 51:9
**afforded (1)** 54:9
**again (4)** 61:4;65:10;71:10;72:17
**agency (2)** 15:3;100:12
**agent (4)** 20:6;24:8;81:24;88:25
**ago (1)** 7:13
**agree (2)** 20:22;21:1
**agreed (3)** 54:7;88:21;92:3
**agreement (31)** 15:12;16:15,15,19,24;17:16;18:10;20:22;24:14;27:3;36:1,2,5;40:21;41:15;50:13;52:5,12;63:25,25;64:3;73:23;88:22;98:4;99:15;104:20;105:1;106:3;108:24;110:16,21
**agreements (4)** 19:21;21:4;64:16,16
**Alliance (1)** 54:20
**allow (1)** 42:19
**Alocke@jm333com (1)** 112:4
**Alpharetta (1)** 3:3
**always (4)** 23:14;94:17,20,23
**amended (1)** 16:21
**amendments (2)** 16:23;19:21
**amount (1)** 28:16
**and/or (5)** 15:3;20:7,14;58:14;59:1
**ANGELA (3)** 7:1,11,12
**annual (1)** 25:7
**answered (2)** 13:25;125:15
**anymore (9)** 18:17,19,21;19:2,18,23;44:6;56:16;78:6
**app (1)** 57:24
**Appearing (3)** 3:8,9,10
**appendix (1)** 51:24
**application (12)** 65:3,7,23;67:5,10,11;68:19,23;69:2;70:3,8,17
**applied (4)** 65:2,2;67:2;68:15
**Applies (4)** 46:2,10;49:4;67:8
**apply (1)** 67:9
**appreciate (2)** 111:17,18
**approach (1)** 89:22
**around (2)** 65:10;107:3
**arrived (1)** 63:9
**aside (1)** 60:11
**assign (1)** 46:22
**assigned (1)** 33:12
**assume (1)** 45:21
**assuming (4)** 42:9;45:20;70:12;126:19
**attachment (4)** 50:12,13;51:24;52:9
**attempted (1)** 101:7
**attorney (2)** 93:16;120:11
**attorneys (1)** 119:5
**audible (4)** 36:6;94:13;106:8;112:21
**authority (4)** 20:6,8;21:12;63:25
**authorized (2)** 20:3;83:20
**automobile (1)** 52:8
**autonomy (1)** 30:2
**aware (6)** 49:18;68:14,15;70:16;87:25;115:20

## B

**back (24)** 8:25;45:11;48:18,19;49:24,25;51:4;58:10;61:14,21;67:24;68:2;69:22;70:2;73:5;78:8;84:10,11,14;111:12;116:18;124:5;125:8;126:12
**background (1)** 27:12
**base (2)** 18:22;31:19
**based (12)** 46:23;49:16;58:7;61:12;73:23;81:5,7;95:3,13;98:9;106:18;110:7
**basically (2)** 10:23;17:20
**basis (1)** 47:23
**Bates (2)** 65:20;109:1
**Bates-stamped (1)** 15:24
**Beach (2)** 80:25;81:2
**became (1)** 35:2
**began (2)** 17:14;21:5
**begin (2)** 122:16;123:7
**beginning (1)** 17:21
**behalf (4)** 3:4;101:5,8;126:19
**best (1)** 10:12
**bill (7)** 46:12;74:1;99:1;105:24;124:12,17,24
**billing (6)** 37:1,2;46:17,20;50:1;125:10
**bills (4)** 83:16;124:4,5,9
**birth (1)** 9:8
**bit (7)** 8:17;34:7,7;40:19;47:9;70:3;115:9
**blank (2)** 67:16,23
**block (1)** 52:7
**blood (1)** 10:5
**bluetooth (1)** 75:19
**bond (1)** 78:20
**book (5)** 32:17;36:17;95:12;105:25;106:1
**booked (4)** 36:14;85:15;86:4;106:24
**booking (16)** 30:24;31:3;32:11,16,20,25;33:2;43:15;46:13;49:23;79:12;80:10,14,14;83:8;103:15
**both (1)** 120:25
**bottom (10)** 16:7;18:11;45:16;46:1,7;47:10;65:19,20;70:18;81:23
**box (7)** 46:1,7;90:17,18;91:5;109:21,24
**boxed (2)** 45:15,16
**boxes (1)** 57:21
**brakes (2)** 26:4;117:8
**Branch (1)** 126:25
**break (6)** 8:18,20;69:16,21;111:5,11
**breaks (2)** 8:21,21
**breakup (1)** 19:9
**briefly (1)** 13:24
**bring (1)** 68:1
**brings (1)** 67:23
**brought (1)** 12:2
**buddies (2)** 29:22,25
**building (1)** 113:18
**bunch (1)** 122:10
**Burist (41)** 28:9,10,22;29:22;30:15;40:13;48:6;58:3;59:3,15,20;64:9,19,25;66:24;67:19;68:12;70:5,23;71:7,17;72:22;73:18;75:1;77:10;79:9;80:19;82:13,16;84:24;93:9;96:22;101:5;111:1;117:16;118:21;119:22;120:7;121:23;123:17,17
**Burist's (2)** 57:25;70:3
**Burton (2)** 3:12;127:4
**business (8)** 15:3;17:14;19:23;36:17;100:6;104:22;112:6,7
**buy (1)**

90:7

## C

**call (4)** 39:12;40:2,12;63:9
**called (7)** 12:18;39:11,13; 40:3,4;83:4;86:23
**calling (1)** 108:15
**cam (5)** 38:22,23,25;39:4; 105:4
**Came (4)** 65:2;80:4;89:20,25
**camera (1)** 76:13
**can (20)** 8:12,20;10:1,12; 12:10;24:18;36:8; 70:15;80:18;85:14, 16;90:7;103:22; 113:18,20;117:9; 120:11,16,25;125:4
**cancelled (1)** 110:21
**car (1)** 73:14
**career (1)** 90:4
**cargo (2)** 49:4;50:2
**carrier (3)** 20:4;54:6;99:1
**carriers (1)** 54:6
**carry (1)** 50:16
**case (6)** 7:17;50:9;86:14; 94:23;102:18;119:14
**cash (1)** 48:24
**catch (2)** 8:8,9
**cell (6)** 58:4,6;74:25;75:2, 8;108:16
**certain (2)** 91:18,18
**certificate (1)** 94:8
**certified (1)** 55:15
**change (6)** 9:3;23:7,9;56:13, 18;104:19
**changed (4)** 43:25;44:6;63:22; 122:13
**changes (1)** 106:14
**charge (3)** 29:10;107:2;124:23
**charge-back (5)** 48:25;49:4,6,19; 50:8
**charged (2)** 49:7;50:8
**Charles (3)** 27:19;101:8,13
**check (5)** 27:12;40:8;84:21; 95:23;117:6
**Chris (1)** 103:7
**circle (2)** 8:25;126:12
**citation (2)** 61:6;62:2
**citations (2)** 26:14;62:9
**city (1)** 9:10
**claim (3)** 49:10;50:2;104:2
**claims (13)** 38:9,12;48:21,23, 24;49:4,6,6,8;101:5, 12;119:7,8
**clarify (1)** 107:18
**clean (2)** 8:10,14
**clear (3)** 27:11;35:2;50:12
**cleared (2)** 28:3;65:4
**clients' (1)** 119:7
**close (5)** 10:7;19:14;111:8; 112:25;113:7
**collision (6)** 22:4,8;56:22;60:12; 73:17;77:10
**collisions (2)** 73:11,15
**com (2)** 114:17,18
**Combined (1)** 54:18
**coming (2)** 79:7;81:14
**commercial (5)** 52:7;58:25;59:3,4,6
**committed (2)** 71:2,8
**commodities (1)** 20:5
**common (4)** 29:21,25;40:7;85:2
**communicate (4)** 95:15;103:14; 108:15;120:16
**communicating (1)** 75:7
**communication (11)** 77:23;86:7;100:17; 101:10;110:20,25; 116:8,21;119:6,17; 121:3
**communications (2)** 82:3;102:16
**companies (7)** 23:13;54:12,15; 55:1;64:1;89:2;94:7
**company (35)** 8:4;10:25;11:9; 20:3,25;23:14;26:23; 28:17,18;29:5,9; 35:23;40:16;44:12, 16;45:2;51:9;53:10; 54:4;60:23;62:25,25; 64:21;67:9;75:4; 88:25;89:10,12,21; 92:11;98:5,20;103:2; 104:19;115:5
**Company/Van (1)** 37:25
**company's (2)** 13:10;52:15
**Compensation (3)** 46:2,10;101:4
**compile (1)** 13:21
**complete (1)** 126:17
**completed (4)** 124:5,10,24;125:8
**computer (2)** 33:22;113:21
**computers (2)** 39:4,5
**concluded (1)** 127:13
**condition (1)** 61:14
**conditions (1)** 54:8
**conducted (2)** 114:19;118:21
**confirmation (11)** 30:24;31:3;32:11, 17;33:2;46:13;79:12; 80:11,14,15;83:9
**confirmed (1)** 121:24
**confirms (1)** 51:10
**confusion (1)** 34:7
**connected (1)** 45:7
**Conser (8)** 62:17,20;63:3,6; 81:25;82:3;84:25; 85:7
**C-O-N-S-E-R (1)** 62:18
**consisting (1)** 71:3
**constituting (1)** 71:3
**consumer (1)** 94:19
**contact (2)** 30:3,5
**contacts (2)** 49:11;107:1
**contained (1)** 54:8
**contents (1)** 54:2
**contest (1)** 71:2
**continually (1)** 72:23
**contract (13)** 15:8,10;18:2;46:23; 50:23;64:8,10,13; 125:17,18,20,22,25
**contracted (1)** 59:1
**Contractor (23)** 17:18,19;20:21,22; 26:22,23;27:1;31:22; 47:14,15;51:6,7,10; 52:2,3,5,6,13;54:3; 89:1,1,11;125:21
**contractors (2)** 33:9;93:4
**contractor's (5)** 15:12;30:20;48:24; 52:3;54:6
**controls (1)** 27:2
**conversation (2)** 40:1;87:3
**Conversationally (1)** 8:16
**convicted (2)** 70:19;71:1
**coordinate (1)** 84:22
**coordinated (1)** 83:5
**coordinates (1)** 29:4
**copies (3)** 60:5;119:10,13
**copy (14)** 11:19;54:4;55:15; 66:3;67:23;87:8; 105:7;115:14;124:10, 12,17;126:20;127:1,6
**corner (3)** 16:8;18:11;66:20
**corporate (4)** 10:11,14,18;13:3
**correspondence (11)** 63:5;77:22;101:11, 12;102:16,24;110:25; 116:8,21;119:5;121:4
**counsel (9)** 7:23;8:9;9:24;41:4; 58:22;76:20;102:19; 115:5;126:2
**County (1)** 9:19
**couple (2)** 111:21;121:13
**course (1)** 63:12
**court (3)** 8:4;11:19;126:9
**cover (2)** 101:2;103:22
**coverage (1)** 50:25
**coverages (1)** 51:8
**covered (2)** 7:23;56:15
**crash (4)** 38:20;41:8;52:21; 87:12
**crime (1)** 71:3
**criminal (1)** 70:22
**Crossroads (2)** 54:22,23
**custodian (1)** 13:2
**customer (1)** 107:1
**customer's (1)** 30:25

## D

**daily (1)** 117:2
**damage (7)** 48:23;49:10,16; 95:22;102:25;104:4,5
**damaged (1)** 49:6
**dash (5)** 38:23,25;39:4; 76:12;105:4
**data (1)** 98:20
**database (2)** 36:23;37:5
**databases (2)** 34:1;107:19
**date (11)** 9:7;17:1;30:16; 66:21;82:23;91:3; 100:12;101:2;122:18; 123:9,16
**dates (1)**

84:21
**Dave (1)**
55:14
**Davenport (4)**
27:19;96:15;101:8,13
**day (10)**
33:10,18;39:23;40:13;76:24;77:15,15;81:15;96:9,10
**DC (1)**
113:3
**deal (1)**
113:12
**dealing (5)**
48:21;50:13;51:4;53:23;63:12
**deals (1)**
41:22
**dealt (1)**
89:5
**decals (1)**
102:8
**Dedicated (3)**
46:3,11,14
**defendants (2)**
15:5;102:18
**defendant's (1)**
15:3
**deficiencies (3)**
26:8;115:25;119:2
**deficiency (4)**
62:1;115:17;116:3,15
**delivered (2)**
63:3,13
**delivery (1)**
48:13
**department (1)**
125:10
**depends (3)**
79:19;91:17;106:13
**deposition (6)**
7:17,20;12:16;58:11;126:16;127:13
**depositions (1)**
13:2
**described (1)**
28:25
**designation (1)**
10:17
**desk (1)**
113:20
**destination (8)**
29:1;48:13;79:22;81:22,24;85:3;106:15,16
**determine (2)**
72:3;106:17
**determines (1)**
82:16
**device (4)**
57:14,15,20;76:23
**devices (2)**
57:18;75:20
**diA (1)**
53:25
**different (5)**
8:17;23:12;55:1;71:16;106:17
**directly (3)**
67:20;89:5;95:15
**disconnect (1)**
35:1
**discussed (3)**
43:20;106:3;119:5
**discussion (1)**
52:20
**discussions (3)**
41:3,7;50:24
**dispatch (8)**
18:4;33:16,16,20;82:19,20;103:23,24
**dispatcher (2)**
14:22,23
**dispatches (1)**
33:21
**dispute (1)**
67:2
**disqualified (1)**
111:2
**dissolved (1)**
19:5
**distance (2)**
73:3;91:16
**document (20)**
10:13;11:22;12:9,12,19,21,21;15:19;20:20;40:25;47:24;65:15;67:16,17;80:1;81:6,7,21;108:20;110:15
**documentation (8)**
24:6;30:20,23;32:6;50:6;63:21;100:14;110:20
**documenting (2)**
24:4;118:14
**documents (15)**
12:25;13:8,14,21;19:20;37:5;60:23;72:18;83:8;88:10;111:19;117:21,22;118:15;119:13
**done (10)**
25:8,12;33:19;47:19;49:22;57:15,23;95:17;102:5;120:6
**Dorminy (1)**
3:8
**DOT (23)**
21:20,24;25:10;26:6;42:3;44:6;60:23;61:12;62:2,7;92:5;114:17,18;115:11,14,21;116:8;122:6,12,13,20;123:17,23
**down (7)**
8:5;10:2;26:21;47:9;61:10;70:17,25
**drive (6)**
22:16;67:8;69:6;72:23;79:22;93:1
**driver (26)**
23:1,4,17;32:3,5,13,15;47:14;59:16;65:2;69:10;74:20;77:24;83:7,7;84:3,8,8;92:7;94:12;105:10,21;111:2;115:10;118:3,8
**drivers (43)**
14:10,11,16,20;22:13,16,17,17,20;28:11;29:21;30:8;34:21;35:10;37:7;40:8;48:12;58:25;59:2,4,6,9,11,14;71:12;74:6;75:5,8,20;92:21;93:3,19,22;94:3,6;98:2;101:22;102:3;108:15;116:25;117:1;119:21;122:9
**drivers' (1)**
74:14
**driver's (1)**
59:4
**driving (7)**
22:17;29:19;71:17;72:22;78:6;90:24;114:9
**Dropbox (1)**
12:5
**drug (1)**
73:18
**due (1)**
56:21
**DUI (5)**
68:14,16;70:16,16,19
**duly (1)**
7:1
**during (3)**
9:23;61:19;122:7
**duty (2)**
117:1,1

## E

**earlier (7)**
41:24;43:3;70:15;100:1;106:3;107:17;115:10
**effect (5)**
16:19;17:2;24:15;56:8;101:2
**EHRENREICH (7)**
121:13,19,20;125:13;126:1,18,18
**eight (3)**
66:11,13,15
**either (8)**
10:4;11:11;20:5;91:14;101:18,21;110:25;125:15
**elected (2)**
51:8;52:13
**elections (1)**
51:11
**electric (3)**
98:10,11,17
**electronic (3)**
99:2;102:15;127:6
**Elliot (1)**
127:4
**ELLIOTT (53)**
9:2;11:20,24;12:4;16:1;21:14;34:4,6,14;35:2;36:9;41:6;45:8,11;55:14,18,20;59:11;60:11;64:10;65:9,13,23;66:11,13;69:17;75:10;77:4;80:3,6;82:4;86:18;103:9;104:1,5,8,11,15;109:1;111:7;112:17;113:3;115:22;118:4;120:14;121:11,15;125:3,19,22;126:4,7,14
**else (6)**
13:20;18:7;79:21;83:14,23;91:25
**E-mail (9)**
31:6;103:15,21;111:22,23,25;112:1,8;114:13
**e-mails (2)**
102:20;103:7
**employed (2)**
59:1;73:11
**Employee (7)**
26:22;64:22;73:7;78:1;89:11;101:20,24
**employees (14)**
14:3,9,19;18:5;27:16,21;35:14;59:5;78:25;93:4,5;96:8;117:16;119:22
**employees' (1)**
14:8
**employment (9)**
67:20;68:19,22,23,24;69:1;70:3,8;92:14
**Enclosed (2)**
46:2,10
**end (3)**
37:21;60:7;104:23
**ended (1)**
110:21
**endorsement (1)**
54:3
**endorsements (1)**
54:5
**enforcement (2)**
86:18,21
**enough (2)**
69:10,11
**ensure (1)**
116:11
**entities (1)**
21:4
**entity (2)**
20:9;45:5
**equipment (8)**
22:18;24:18,21;35:14,15;57:10;76:5;118:9
**equipped (2)**
76:5,10
**ESQUIRE (2)**
3:1,8
**essentially (1)**
35:13
**establishing (1)**
64:19
**Estates (1)**
101:13
**Even (5)**
42:10;57:19;61:19;90:15;100:12
**event (2)**
52:21;118:22
**eventually (1)**
40:14
**everybody (1)**
106:5
**evidence (1)**
87:25
**exact (3)**
91:2,3;123:9
**exactly (3)**
18:13;90:5;122:18
**EXAMINATION (2)**
7:4;121:17
**examined (1)**
7:2
**excessive (1)**
28:16
**exclude (1)**
102:19
**excuse (2)**
19:1;115:10
**Exhibit (12)**
11:15,21,23;12:19;13:24;15:20;58:10;65:16;79:25;80:2;108:19,21
**exhibits (1)**
126:20
**explain (1)**
33:6
**extend (1)**
54:10
**eyeball (1)**
51:3

## F

**facility (3)** 85:5,10;112:13
**fact (1)** 121:24
**fair (1)** 43:22
**faith (1)** 47:5
**familiar (2)** 54:14;110:10
**families (1)** 7:14
**family (2)** 7:15;10:4
**far (15)** 9:20;23:8,13;24:13; 27:6;48:18;74:16; 76:6;93:18;94:12,21; 114:8;117:9;118:13; 126:9
**FastTrack (3)** 57:5,6,10
**federal (1)** 74:17
**feed (2)** 39:3;40:5
**felonies (1)** 71:7
**felony (1)** 71:3
**few (9)** 7:12,22;9:16,17; 45:22,23;48:19;91:4; 111:16
**file (7)** 74:21;94:12;104:2; 124:14,15,16;125:6
**filed (2)** 101:5,7
**fill (2)** 67:14;105:1
**filled (1)** 65:3
**fills (1)** 67:23
**find (4)** 38:19;120:15,16; 121:1
**finding (1)** 13:17
**fine (3)** 12:4;36:13;70:14
**fines (2)** 26:14,19
**finish (1)** 8:12
**finished (1)** 67:11
**finishes (1)** 84:10
**fire (1)** 77:23
**fired (1)** 78:5
**first (23)** 7:1;12:14;15:5; 18:9,11;19:9,16,25; 33:13;38:1;45:22; 48:15;54:11;60:15, 16;64:24;66:20; 70:17;88:21;90:23; 92:11;119:24;124:5
**five (2)** 14:15;73:7
**fix (1)** 61:7
**fixed (3)** 61:7;115:18;116:18
**Florida (3)** 62:14;63:2;81:23
**folder (20)** 31:13,14,21,22; 33:4,7,10;49:24; 83:10,14,17,24,25; 84:1,4,6,13;105:12; 125:6,7
**folders (5)** 49:24;83:24; 103:19,19;125:8
**folks (1)** 121:24
**following (5)** 22:1;54:10;73:17; 100:19;121:4
**follows (1)** 7:2
**footage (1)** 76:15
**forms (2)** 33:8;125:5
**forward (1)** 48:19
**Foster (3)** 44:23,24;45:3
**found (4)** 47:15;71:2;100:1; 116:3
**Four (3)** 14:12;93:10;110:11
**free (1)** 52:3
**freight (3)** 30:20,23;86:5
**friends (2)** 29:22,25
**front (2)** 65:6,24
**fuel (4)** 37:8,10,15,20
**furnish (1)** 54:4
**furnished (1)** 87:10
**furnishes (1)** 27:2
**furniture (1)** 91:11
**further (1)** 126:2
**future (2)** 10:1;88:5

## G

**Garr (3)** 103:7,9,12
**Gary (1)** 3:7
**gas (1)** 117:11
**gather (2)** 88:9;93:12
**gathered (1)** 93:13
**gave (1)** 87:15
**general (1)** 20:5
**Georgia (6)** 3:3;10:5,8;22:5; 114:20;115:3
**gets (3)** 25:8;29:1;84:4
**given (10)** 7:20;13:1;31:13; 80:15;83:12;84:6; 102:24;105:21,23; 125:7
**gives (2)** 31:2;68:2
**giving (2)** 84:13,14
**God (1)** 83:15
**goes (10)** 12:18;16:12;32:6, 13;42:16;65:9,19; 66:2;102:8;106:25
**Good (8)** 7:7,8;47:4;69:10, 11,15;111:7;127:11
**goods (4)** 20:4;49:5;107:10; 108:7
**governed (1)** 106:2
**GPS (2)** 76:6;107:14
**grab (1)** 103:17
**ground (1)** 7:23
**group (1)** 54:11
**guess (8)** 23:12;25:23;42:17; 72:7;75:24;90:1; 102:23;120:3
**guilty (1)** 71:1
**guys (2)** 89:17;96:16

## H

**half (1)** 120:22
**Hampton (5)** 112:14,15;113:16, 17;114:8
**hand (4)** 11:18;79:23;84:18; 107:22
**handbook (1)** 101:25
**handbooks (1)** 101:21
**handed (2)** 11:25;65:22
**handle (5)** 14:25;25:21;62:2,3; 120:2
**handled (1)** 18:8
**handles (5)** 25:19;42:20;46:19; 84:9;99:2
**handling (1)** 25:25
**handwriting (1)** 125:15
**happen (1)** 61:11
**happened (8)** 26:6;38:15;56:22; 77:1,19;87:5;100:23; 123:8
**happens (1)** 38:12
**happy (1)** 8:1
**hard (1)** 33:6
**hardware (1)** 76:4
**haul (3)** 35:23;108:7;113:9
**hauling (2)** 43:17;49:3
**Hawkins (1)** 127:5
**head (2)** 21:13;43:14
**heading (1)** 9:18
**hear (3)** 19:9;30:14;88:8
**heard (12)** 19:16;20:11;39:8; 48:16;57:5,7;60:11, 17;79:2;96:19;99:7,9
**hearing (4)** 18:24;60:15; 125:16;126:4
**help (17)** 13:13;25:2;27:6; 28:18,18;29:2,7,7,8, 22;30:1,1,4,12;34:6; 50:11;84:22
**helped (1)** 13:20
**helpers (1)** 30:7
**helping (1)** 30:8
**herein (2)** 20:3,7
**Hey (7)** 30:3;82:21;90:6; 103:22;105:15; 116:17;121:20
**Hines (4)** 27:19;96:15;101:8, 13
**hire (6)** 23:1,17;27:6;29:22; 30:1;115:2
**hired (2)** 23:24;66:24
**history (2)** 70:23;89:9
**home (2)** 107:5;114:3
**homes (2)** 91:11;106:21
**hook (2)** 79:17;107:11
**Hopefully (1)** 9:16
**hour (1)** 69:15
**hours (1)** 9:21
**house (2)** 114:2,9
**household (2)** 20:4;49:5
**houses (1)** 91:15
**husband (10)** 11:3,4;14:1;39:15; 40:4,7;41:10;52:24; 68:8;70:11
**husband's (1)** 88:17
**hypothetical (1)** 63:12

## I

**idea (5)** 20:10;72:5;94:15;

97:7;123:13
**identification (3)** 41:23;109:13; 122:24
**identified (4)** 10:10,14;79:24; 81:20
**identify (1)** 72:19
**identifying (2)** 19:22;64:18
**IFTA (1)** 42:19
**ii (2)** 47:10;50:19
**immediately (1)** 47:16
**important (4)** 8:5,10;21:11;43:19
**Inc (3)** 3:4;18:12;20:3
**incident (25)** 7:18;19:12,16;22:1, 4,7;27:20;38:19;39:8, 9;40:17;43:4;60:25; 72:9;76:17;77:18; 86:11;87:21;88:1,8; 93:10;100:23;102:20; 110:8;121:4
**included (1)** 83:16
**incorporated (2)** 124:16;125:6
**indemnification-funding (2)** 52:4,14
**indemnifying (1)** 52:20
**indemnity (11)** 40:21;41:7,15; 52:15,16;53:14; 55:16;96:2;100:25; 119:6,17
**independent (8)** 17:18;52:5;69:7; 89:1;93:4;100:22; 118:24;125:21
**indicated (1)** 52:6
**individuals (2)** 48:5;96:7
**individuals' (1)** 106:21
**individual's (1)** 107:5
**industry (2)** 88:16;89:5
**info (4)** 105:11,11,20,23
**information (20)** 18:23;30:22;31:14, 23;32:12;33:7;36:24; 42:16;43:7;53:5; 55:25;57:8;58:14; 67:1;68:22;71:7;80:6; 85:19;86:4;87:4
**informed (3)** 39:8;43:11;77:2
**insinuating (1)** 12:25
**inspection (16)** 25:15,17;26:6; 59:23,24;115:21; 116:18;117:11;118:2, 3,5,8,8,10,14,21
**inspections (12)** 25:7,10;60:24;92:3, 6;115:10,11,14; 116:23;117:2,17,21
**instance (1)** 38:16
**insurance (24)** 50:13,15;51:8,12, 17,21;52:8;53:5,23; 54:6,8,9,9;55:11;56:1, 7,15;92:18,19;95:24; 100:25;101:1;103:1; 115:4
**insured (5)** 51:16;54:3,5;56:10; 58:15
**insureds (4)** 53:19;54:10;55:12; 56:2
**International (2)** 71:20;91:22
**interstate (1)** 42:20
**interviewing (1)** 68:12
**into (11)** 12:18;17:2;35:9; 76:22;88:18;100:23; 106:25;107:4;117:10; 119:4;125:6
**Inventory (2)** 57:5,6
**investigate (1)** 120:6
**investigating (2)** 86:17;120:2
**investigation (4)** 100:23;114:19,23, 25
**investigations (1)** 115:4
**investigator (1)** 115:3
**involved (14)** 13:16;27:20;60:12, 24;70:4;71:20;72:9; 73:15;81:5;92:12; 110:8;119:21;121:23; 124:7
**involvement (1)** 68:12
**involving (1)** 7:17
**issue (3)** 63:8,14;75:4
**issued (5)** 10:13;30:24;31:3, 11,21
**item (1)** 28:24

**J**

**Jacksonville (5)** 62:14;81:23;82:1; 105:16;106:20
**jail (2)** 78:16,17
**January (2)** 115:21;116:22
**Jim (3)** 8:24;11:18;121:9
**JM333 (5)** 112:1,9,13;114:14, 16
**JMI (25)** 15:25;16:10,12,12; 17:4;19:25;22:11; 30:19;37:23;38:7; 41:20;45:14;46:5; 47:8;48:19;50:12,12; 51:3,3,22;52:10; 53:22;57:4;79:24,24
**job (11)** 31:11,15,19;33:10, 12,17;36:17;46:14; 65:3;95:18;125:8
**jobs (6)** 18:4;33:17;46:3,11; 89:17;95:11
**Joe (112)** 3:4;14:23,25;15:1, 7,9,25;17:14,25;18:2, 8,20,25;19:17,22; 20:2,17;21:1,3,6; 22:23,24;23:5,6,14, 16;24:7;25:12,13,19; 26:10,11,16;27:9; 31:4,17,21,24;32:3,7, 18,21,25;33:9,21; 34:1,10,10,22;35:9, 20,22;36:1,19;37:3,4, 5,11;38:14,21,25; 40:4,14;42:9,14,17; 43:10;44:15,22; 46:18;47:5;49:12,25; 50:24;51:14,16; 52:21;54:12,13;55:2, 14;57:16;61:1;63:9; 67:11;69:3;70:9;74:9; 76:14;80:4;83:24; 84:11;85:15;86:5; 87:9,14;89:14,18,21; 95:17;112:9;113:12, 19;122:21;123:6,20; 124:2,8,24;125:9,9,25
**Joseph (3)** 7:13;34:4;104:1
**Josh (1)** 3:8
**July (25)** 19:11;21:20;22:5; 28:1;44:1;48:9;50:16; 56:8,22;58:16,17; 59:1,2,10;62:13; 63:19;79:6;81:13; 95:19;97:20;99:21; 100:5,20;116:15; 119:2
**June (2)** 115:21;116:22

**K**

**keep (10)** 8:8;59:24;61:1; 74:5,20;78:25;88:4,7; 94:10,11
**keeping (2)** 58:1;74:17
**Kelvin (24)** 11:4;14:1;38:19; 39:11,21;53:16;68:4, 9,10,11;77:12,15; 83:1,2,4;84:12;86:10, 25;87:23;89:8;92:7, 17;114:13;120:2
**Kentucky (1)** 109:18
**kind (7)** 13:7;45:23;76:4; 88:18;105:16,17; 115:16
**Klocke (2)** 114:15,16
**knew (2)** 57:20;81:18
**knowledge (17)** 16:22;30:17;40:25; 43:21;48:10,11; 52:16;54:17,24;56:1; 57:9;73:9;78:22; 106:19;114:19; 118:20,24
**knows (2)** 8:4;105:17
**Kurey (1)** 126:25
**Kyle (1)** 3:9

**L**

**labor (3)** 29:10;96:9,10
**lading (7)** 46:12;83:16;124:4, 5,9,13,18
**language (1)** 50:18
**last (4)** 25:24;110:11; 123:23;125:14
**lately (1)** 56:5
**later (1)** 9:3
**law (3)** 66:16;86:18,21
**lawsuits (1)** 101:11
**lease (9)** 35:25;63:24;64:15; 89:21;90:7;99:15; 108:24;110:16,21
**leased (4)** 63:18;99:19,22; 100:9
**least (1)** 45:7
**leave (1)** 74:18
**led (1)** 118:22
**left (1)** 18:11
**legal (1)** 119:13
**legally (1)** 116:12
**LEIGH (2)** 3:1;126:24
**letters (1)** 102:20
**liability (4)** 48:24;52:8;92:19; 101:2
**license (1)** 59:4
**lights (1)** 117:6
**likely (1)** 36:5
**limit (3)** 50:22;51:25;116:12
**limiter (3)** 52:15,16;53:14
**limits (1)** 53:6
**Line (4)** 20:7;37:25;38:2; 54:4
**Lines (6)** 20:6,8;49:2,3; 54:18;55:6
**Line's (1)** 20:8
**list (5)** 29:7;54:11;58:11, 22,24
**listed (2)**

36:4;55:11
**litigation (1)** 9:23
**little (8)** 8:17;34:6,7;40:19; 70:3;90:15;95:9; 115:9
**live (1)** 9:10
**lived (1)** 9:12
**lives (1)** 10:8
**LLC (2)** 20:6,9
**load (27)** 28:19,22;32:6,12; 58:1;59:18;79:5,18; 81:9,14;82:17,21; 83:4;84:10,25;85:14, 15,22,23;86:3;91:11; 103:22;105:12,21,25; 106:6,20
**loaded (8)** 79:10,16,21;80:19, 22,24;81:8,10
**loading (12)** 27:6,14,17;28:6,12; 29:16,23;30:12;81:5; 96:7,23;97:1
**loads (10)** 32:17;33:14;35:10; 36:14,17,23,24;95:12; 103:15;107:19
**local (3)** 91:7,15;107:3
**location (4)** 34:10,14;82:11,14
**locations (1)** 112:25
**LOCKE (78)** 7:1,11;9:7;10:11, 15;12:9;13:25;15:4,6; 18:1;20:20;24:14,25; 25:1,9;26:5,24;27:6, 17,21;28:4;32:24; 33:3;36:14;37:12,15, 18;39:13,16;40:22; 41:15;46:17;47:14; 49:11;50:15;51:7; 53:9;57:9;58:3,15; 59:1,18;67:3,20;68:2; 74:5;78:2;80:10; 82:18,19;84:4;87:23; 88:25;92:18;93:18; 95:16;100:22;102:16, 17,17;104:6;107:13, 25;108:5,6,11; 111:22;114:1,22; 115:2;118:12;119:22; 122:9;123:24;124:6; 125:16,19,22
**Locke's (5)** 28:20;39:5;61:13; 64:22;96:6
**log (2)** 36:23;98:11
**logos (1)** 122:24
**logs (7)** 74:5,14,17;98:10, 17,23;99:2
**long (9)** 9:12;15:18;44:23, 24;45:3;73:3;88:15; 91:16;109:5
**longer (2)** 24:7;88:17
**look (21)** 11:17;12:10;15:15, 24;17:10;22:12; 26:21;45:22;51:22; 53:1;54:12;66:7; 80:13,14;107:19; 109:11;110:2,6; 117:4,12;120:14
**looked (3)** 40:5;76:23,25
**looking (6)** 41:22;47:9;79:11; 80:18;111:18;124:14
**looks (5)** 17:6;20:19;52:23; 57:13;110:10
**loss (1)** 95:21
**lost (1)** 102:25
**lot (7)** 13:1,8;17:24;35:20; 106:13,17;119:16
**loud (2)** 21:15;34:9
**Louisa (1)** 9:19
**Lynn (2)** 3:12;126:22

**M**

**ma'am (1)** 123:25
**mail (1)** 31:10
**mainframe (1)** 37:5
**mainly (1)** 71:25
**maintaining (1)** 52:7
**maintains (2)** 24:18,21
**maintenance (3)** 25:5;59:23,24
**makes (1)** 42:13
**Management (1)** 95:8
**manager (1)** 89:16
**manual (1)** 101:25
**manuals (1)** 101:20
**many (10)** 8:21;14:3,11,13; 58:16;59:9;71:14,16; 72:8;119:20
**March (4)** 17:7,8,10,11
**marked (7)** 11:15,22;15:19; 65:15;79:25;80:1; 108:20
**market (1)** 108:4
**marketing (1)** 107:25
**marriage (1)** 10:5
**math (1)** 66:16
**matter (1)** 7:14
**may (14)** 19:4;21:23;28:18; 55:14;71:7,8;87:8; 88:4;90:25;96:9; 98:20;106:15,16; 110:15
**Maybe (8)** 14:15;17:8;57:13; 71:18;73:2;83:18; 86:23;120:11
**Mayflower (60)** 18:14;19:1,4,6,16, 23;20:7,15,16;21:5, 25;22:19,19,20;23:5, 22;24:1,8,10;25:21, 23,25;37:14;38:1; 40:17;41:15;42:1; 43:4,10;44:5;46:3,11, 14;49:3,19;53:19; 55:8;63:18;64:1;94:2; 99:15,19,23;100:2,9; 102:17;108:25,25; 109:2,2;110:3,17,25; 116:22;121:21; 122:25;125:17,23,25; 126:19
**Mayflower-originated (1)** 85:22
**Mayflower's (2)** 21:24;36:23
**McMickle (1)** 126:25
**mean (33)** 18:19;21:7;22:17; 23:8,11;27:3,24; 28:14,16;29:24; 31:16;43:6,9;44:14; 45:19;47:21,22;53:8; 55:1;56:14;57:1;73:1, 2;75:11;76:22;81:7; 89:10,14;97:6;99:24; 117:9,9;125:18
**meaning (3)** 82:20;124:22,23
**means (2)** 24:24;111:8
**media (1)** 108:11
**meet (5)** 22:20;52:3,13; 56:15;64:24
**mentioned (1)** 74:25
**mess (1)** 20:2
**met (3)** 7:12;27:25;65:1
**Michael (2)** 101:8,13
**middle (2)** 46:9;50:19
**Mike (3)** 39:10;40:4,5
**military (4)** 94:17,20,25;95:8
**military-related (2)** 94:21;95:5
**MILLER (6)** 3:1;126:22,24,24; 127:3,10
**million (5)** 50:17,18,22,25; 51:25
**mind (1)** 9:3
**minute (5)** 12:10;15:24;30:21; 57:12;66:7
**minutes (3)** 7:12;114:10,11
**misdemeanor (1)** 71:4
**Moholland (181)** 3:4;14:23,25;15:1, 7,9,25;17:14,25;18:3, 8,20,25;19:18,22; 20:3,17;21:1,4,6; 22:23,24;23:5,6,14, 16;24:7,14;25:12,13, 19;26:10,11,16;27:9; 31:4,17,21,25;32:7, 18,21,25;33:9,21; 34:10;35:20,22;36:1, 19;37:3,4,11,18; 38:14;39:1;40:4,14, 22;41:4,7;42:1,9,17, 20;43:5,10,16;44:16, 22;46:18,19,19;47:5; 49:12,21,25;50:24; 51:10,14,16;52:21; 54:12,13;55:2;57:9, 16;59:19,25;60:1; 61:1,2;62:1;63:9,14; 67:12,17;69:3,11; 70:9;72:13,18;73:22; 74:9,18,22,23;76:2,5, 14;79:16;80:4,7,16; 81:2;83:25;84:11,15; 85:16,23;86:5,8; 87:10,15;88:11,12,22; 89:2,6,14,18,21; 91:13,20;92:15; 93:21;94:10,17,24; 95:5,13,17;96:13,17; 97:13;98:7,14;99:5, 12,15;100:2,17; 101:22;102:6,17; 103:8;104:18;105:13; 108:2,4;110:16; 111:1;112:9,24; 113:13;114:11; 115:16;116:17,22; 117:22;118:15; 122:21;123:6,11,21; 124:2,8,25;125:9,9,25
**Moholland's (18)** 32:3;34:1,10,23; 35:9;37:5;38:21; 42:14;52:16;61:15; 71:11;73:23;80:20; 83:11;105:4;107:19; 113:19;116:4
**moment (1)** 106:11
**money (2)** 29:12;90:3
**monitored (1)** 98:16
**monitoring (1)** 107:14
**months (1)** 124:6
**more (6)** 16:7;41:25;63:11; 90:3;111:5,16
**morning (3)** 7:7,8;58:22
**most (3)** 12:3;29:5;36:5
**mostly (2)** 59:6;113:12
**motor (4)** 20:3;58:25;59:6; 73:11
**move (13)** 9:14,22;44:7,8,11, 17,18,23;61:19;86:5; 92:4;94:20;107:3
**moved (1)** 59:19
**moves (8)**

91:7;94:16,17,21,25;95:3,4,5
**Moving (7)** 15:2;27:6;47:9;62:25,25;81:25;91:16
**much (13)** 18:3;19:14;20:12;30:25;50:15;84:1;96:25;103:23,24;105:12;106:6;111:5;124:20
**myself (1)** 87:8

## N

**name (5)** 7:9,13;30:25;122:24;126:10
**named (1)** 56:2
**National (5)** 55:16;96:2;100:25;119:6,17
**nature (2)** 39:25;87:2
**near (1)** 113:3
**necessarily (2)** 43:16;72:18
**necessary (1)** 50:23
**need (20)** 8:18,21;10:2;13:7;21:14;30:21;33:8,8;57:12;60:7;82:21;88:4,10;90:6,7;108:1;111:25;113:25;114:5;124:17
**needed (1)** 30:1
**needs (2)** 84:21;116:18
**Nelson (1)** 55:15
**network (1)** 99:1
**Nevertheless (1)** 52:12
**new (9)** 42:15,25;44:12,19,19,21;71:22;105:1;109:4
**Newport (6)** 9:11,20;112:20;113:15;114:6,7
**News (8)** 9:11,20;87:22;111:7;112:20;113:15;114:6,7
**next (5)** 22:11;24:17;69:2;70:25;90:1
**Nicholas (18)** 28:8,9,21;29:11,22;57:25;58:3;59:3,15,20;64:9,19,24;66:24;67:19;77:9;90:24;120:7
**Nick (4)** 40:2;84:6,13,14
**Nobody (3)** 10:7,7;43:11
**nod (1)** 8:7
**none (4)** 41:18;119:23;120:16;126:5
**normally (4)** 8:16;79:15;103:14;115:13
**Northern (1)** 113:4
**notes (1)** 11:20
**notice (5)** 26:9;58:11;60:16;100:11;116:14
**notices (1)** 101:11
**notification (1)** 60:19
**notifications (1)** 62:1
**notified (1)** 41:25
**Number (13)** 13:24;16:2,6,7;21:20,24;42:3;109:13;110:10;122:5,13;123:17,23
**numbers (10)** 44:6;58:13;65:10,20,20;109:2,10;122:6,13,20

## O

**obligation (2)** 52:4,14
**obtain (1)** 51:8
**obtained (1)** 54:5
**obtaining (1)** 52:7
**occurred (1)** 22:4
**off (4)** 11:24;69:19;107:11;111:9
**office (10)** 31:24;32:3,12;34:19;35:8,9;76:23;105:5;113:18,25
**officers (1)** 86:17
**Oil (1)** 117:11
**Old (1)** 45:11
**once (6)** 13:4;69:1;88:18;106:25;107:9;125:8
**one (34)** 11:25;12:11,11;19:3;29:12;38:12;39:17;45:5;50:11,18;53:8;64:5,6;73:20;75:22;83:12;93:12;94:6,7;101:18;105:15;108:5,6;109:17;111:4;115:19,20;119:24;120:3,3,21,23;124:2;125:14
**ones (1)** 59:7
**only (17)** 11:8,10;12:2;35:22;46:2,10;59:16;64:3;86:7;89:6;91:8;92:5;100:16;101:1;103:3;108:14;120:22
**onto (1)** 36:23
**oOo- (1)** 127:15
**open (1)** 89:21
**opened (1)** 101:8
**operate (3)** 21:5;42:20;59:7
**operating (21)** 16:14;17:17;20:5,8,17;24:14;26:4;36:2;52:5;61:14;63:25;64:4,16;88:22;104:20;105:1;106:2;116:12;117:7;118:11;122:9
**order (4)** 15:17;73:20,24;124:18
**ordered (1)** 126:20
**orders (1)** 126:10
**organizational (1)** 13:24
**origin (1)** 80:22
**originated (1)** 85:15
**others (1)** 126:4
**otherwise (1)** 71:2
**Ours (1)** 116:13
**out (38)** 15:17;21:14;22:1;29:11,14;34:9;38:19;40:14,17;42:2,15;44:16;51:11;61:12,13,20;63:14;65:3,11;67:14,20,23;72:10;78:7,10,17,20;89:17;90:8,12,14;96:22;100:1;105:1;115:3;120:21,23;121:6
**outlines (1)** 45:23
**out-of-service (1)** 116:3
**outside (2)** 36:1;38:4
**over (4)** 12:22;13:23;64:6;91:18
**oversee (1)** 25:3
**own (12)** 11:3,6;20:5;29:12;51:11;75:23;92:22,22,25;97:22,24;121:24
**owned (3)** 91:20;97:19;122:2
**owner (1)** 11:1
**owner-operators (1)** 92:22
**owners (2)** 44:20,21
**owns (1)** 123:12

## P

**pack (4)** 14:10;90:14,15,16
**packers (4)** 14:10,13,17,20
**PADGETT (63)** 7:6,13;8:24;9:4,6;11:17,21;12:2,6,8;15:16,22;16:5;21:18;34:5,12,17;35:1,6;36:12;45:13;55:17,19,22,24;59:13;64:12;65:11,18;66:1,12,14,19;69:14,18;70:1;75:13;77:8;80:9;82:5,7;86:20;103:11;104:4,7,9,13,17;108:23;109:3,7;111:4,15;112:19;113:6;115:24;118:7;120:20;121:9;126:6,8,15;127:11
**page (13)** 16:6,7;18:9,11;22:11;24:17;26:21;46:4;51:23;66:21;70:17,17;106:5
**pages (8)** 17:25;45:23,23;48:19;66:5,11,13,15
**paid (18)** 29:15,15,18;37:7,8,15;93:6;95:21;96:6,22,25;97:2,10;105:12;106:7;124:18,21;125:11
**Paper (3)** 31:7,8;57:23
**papers (1)** 107:22
**paperwork (4)** 49:25;84:10,20;94:8
**paragraph (5)** 20:1;24:19;38:1,4;51:5
**parent (1)** 64:1
**parked (1)** 35:19
**Parnell (1)** 127:5
**Part (12)** 11:1;12:3;27:10;34:8;36:16;74:3;88:24;104:2;106:23;110:13;114:22,22
**participating (1)** 52:14
**particular (6)** 50:9;62:12;81:9;83:4;85:14;86:3
**particulars (1)** 19:6
**parties (1)** 51:9
**pass (1)** 42:17
**passenger (3)** 47:16,17,19
**passengers (4)** 47:11,18;48:2,6
**past (3)** 80:15;84:25;89:8
**patience (1)** 111:18
**pause (1)** 106:11
**pay (13)** 29:11,13;37:12,17;46:23;83:21;97:11,12,13,16,17;99:1;105:17
**paying (3)** 49:23;85:23;102:24
**payment (2)**

105:24;106:17
**Payne (1)**
3:7
**pays (5)**
26:19;37:10,18,20;97:10
**PDF (1)**
12:5
**pendency (1)**
9:23
**people (9)**
27:4,13;29:1;30:4,7,9,15;48:12;108:7
**per (3)**
97:8;104:19;105:21
**percent (4)**
25:3;48:24;95:3,4
**percentage (2)**
49:7,14
**percentages (1)**
45:24
**perform (2)**
23:19;34:9
**person (3)**
10:12;103:16,18
**personal (10)**
53:8;58:7;75:2,23;78:21;109:12;111:23,24,25;112:6
**personally (10)**
70:4;84:12;85:11,12,13;101:16;113:22;115:2,7;123:24
**personnel (4)**
14:25;27:2,3,15
**pertaining (3)**
41:8;99:16;102:21
**Peters (3)**
39:10;77:5,6
**phone (8)**
57:25;58:4,6,7;75:1,2,8;108:16
**phones (1)**
75:4
**photographs (1)**
87:18
**physical (4)**
107:22;113:18,25;117:10
**piano (1)**
28:25
**pick (6)**
32:4,6,13;33:10,14;82:21
**picked (1)**
80:19
**picks (2)**
82:17;84:3
**pickup (1)**
31:18
**pictures (1)**
87:20
**PL/PD (1)**
52:15
**placarding (1)**
102:5
**placards (2)**
21:23;42:3
**place (3)**
57:18;87:24;112:12
**placed (2)**
61:11,20
**plaintiffs (3)**
7:14;80:7;86:14
**Plaintiffs' (11)**
11:22;15:17,19;65:14,15,19;66:2;79:25;80:1;108:19,20
**plan (1)**
9:17
**plans (1)**
9:14
**platforms (1)**
108:12
**please (3)**
7:9,25;127:6
**pled (1)**
71:1
**pm (4)**
111:10,13;126:17;127:13
**point (7)**
17:4;20:17;25:21;42:2;55:10;63:6;122:13
**police (1)**
87:5
**policies (1)**
87:24
**policy (14)**
49:4;51:12,17;53:20;54:8,9;55:16;56:1,2,4,8;101:1,1;119:18
**portion (6)**
12:14;29:15,18;45:16;46:7;96:23
**posed (1)**
8:20
**position (2)**
48:4;64:22
**possible (2)**
56:24;57:1
**Possibly (1)**
37:19
**postaccident (1)**
73:18
**pound (1)**
97:4
**preference (2)**
72:6,7
**present (1)**
3:6
**preserve (1)**
88:10
**preserving (1)**
87:25
**president (1)**
39:10
**pretrip (5)**
118:5,8,10,14,21
**pretty (9)**
18:3;19:14;84:1;85:2;103:23,24;106:6;109:4;111:5
**previously (1)**
51:7
**principals (1)**
11:8
**print (1)**
42:15
**prior (9)**
23:22;63:18;68:14,15,23;70:16;71:6;106:19;116:15
**privilege (1)**
10:19
**privy (1)**
43:6
**probably (9)**
29:11,13;43:9;66:14;68:2,8;88:12,14;120:22
**problem (3)**
39:20;72:20;111:20
**procedures (1)**
87:24
**process (5)**
30:9;65:4;96:12;122:16;123:7
**processed (1)**
50:1
**procure (1)**
51:11
**procured (1)**
92:18
**produce (2)**
13:13;55:15
**produced (5)**
12:24;13:14;15:25;80:7;104:2
**production (3)**
10:13;12:19,22
**products (2)**
49:5;92:4
**program (5)**
23:12;52:15,17;53:14;74:10
**Progressive (1)**
56:11
**properly (1)**
26:4
**property (6)**
38:25;95:22;102:25;104:4,5;123:11
**prospective (1)**
124:22
**provide (10)**
18:5;58:3,24;67:22;75:19,25;98:1;102:2;117:22;120:11
**provided (15)**
31:5;47:15;58:22;60:4;76:12,21;87:5;93:8,15;94:2;99:14;101:21;105:7;110:3;120:6
**providing (1)**
35:13
**public (1)**
52:8
**pull (1)**
92:23
**pulled (1)**
97:20
**pulling (1)**
21:12
**purchase (2)**
90:10,22
**purchased (3)**
71:23;91:19,24
**put (6)**
42:18,25;72:9;98:14;103:19;107:14
**puts (1)**
42:22

## Q

**Qualcomm (2)**
75:16;76:6
**Qualification (5)**
22:13;23:12,19;69:6;74:20
**qualifications (3)**
22:20;74:4;94:12
**qualified (3)**
22:15;23:15;96:17
**qualifies (1)**
96:10
**qualify (4)**
23:4;30:7,9;71:11
**qualifying (3)**
68:12;69:8;96:12
**quick (2)**
69:16;121:21
**quit (1)**
73:4
**quite (3)**
47:9;51:18;118:1

## R

**rate (8)**
45:20;46:23;47:1;105:11,11,20,23;106:2
**rather (1)**
34:11
**reach (6)**
21:25;40:13,17;42:2;63:14;77:15
**reached (4)**
40:14;78:7,10;121:6
**reaches (1)**
67:19
**read (7)**
20:1;24:18;30:21;47:13;51:24;57:12;126:14
**reading (2)**
47:22;126:12
**real (1)**
60:7
**realized (1)**
77:18
**really (7)**
20:11;49:20;54:16;78:15;85:25;87:4;99:24
**REAMS (3)**
127:4,5,8
**reason (2)**
56:12,25
**reasoning (1)**
56:19
**recall (1)**
86:24
**receive (14)**
19:20;24:6;26:8,15;61:25;63:21;87:17;94:5,7;95:22;98:25;110:19;124:10,12
**received (6)**
24:10;94:9;100:11;101:10,12;110:24
**receiver (1)**
62:16
**receiving (1)**
84:13
**recollection (1)**
70:8
**record (8)**
7:10;8:10;69:19,22;111:9,13;117:15,17
**records (3)**
13:2;59:23,24
**referenced (1)**
122:12
**referencing (2)**
16:16;21:1
**referring (3)**
16:1,7;22:4
**refute (1)**
67:2
**regard (1)**
104:3
**regarding (3)**
105:4;115:21,25
**registration (1)**
42:25
**regular (1)**
59:4

**regulation (1)** 74:17
**reimburse (1)** 49:13
**reimbursement (1)** 26:18
**related (1)** 94:20
**relationship (11)** 15:4,6;17:20,24; 18:1;19:2,5,17;42:1; 64:19;99:12
**relevant (1)** 86:1
**Relocation (1)** 54:20
**Relocations (26)** 10:11,15;13:25; 15:4,7;18:1;20:21; 25:1;26:5,24;27:21; 32:24;33:3;37:13,15, 18;50:15;78:2;82:18; 84:4;92:18;104:6; 118:12;123:24;124:7; 125:16
**rely (1)** 123:20
**remained (1)** 73:7
**remember (4)** 79:14;87:2;110:13; 122:10
**removal (1)** 41:23
**remove (2)** 42:7;47:16
**removed (2)** 21:23;123:2
**removing (2)** 42:2;122:20
**rep (1)** 10:18
**repair (1)** 61:13
**repairs (1)** 61:18
**repeat (3)** 7:25;88:6;125:4
**rephrase (1)** 7:25
**report (5)** 38:13,14;87:6,12, 12
**REPORTED (3)** 3:12;60:13,20
**reporter (7)** 8:5;11:19;126:9,23; 127:2,7,9
**reporting (1)** 38:11
**represent (2)** 7:13;121:21
**representative (3)** 10:11,15;13:3
**require (1)** 104:25
**required (2)** 41:23;54:2
**requirements (1)** 52:9
**reserve (2)** 9:1,2
**response (4)** 36:6;94:13;106:8; 112:21
**responsibility (14)** 25:4,6,8;26:3;38:2; 42:7,14;61:13,16; 71:11;73:24;107:12; 116:4,10
**responsible (4)** 26:2;29:13;122:19; 123:5
**resubmit (1)** 125:7
**retrospective (1)** 124:23
**revert (1)** 51:4
**review (4)** 68:18;74:13;84:17, 19
**reviewed (1)** 56:4
**reviewing (1)** 70:8
**riding (1)** 48:12
**right (77)** 7:22;8:23;9:7,14; 10:10;11:14;12:6; 13:23;14:13;15:14, 23;16:8,18;18:10; 19:15;20:14,19;21:3; 22:12;24:3;25:2;27:9; 30:18;34:8;35:16; 36:22;46:9;47:5,6,9; 50:19;52:19;53:18; 58:24;59:18,22; 60:10,22;61:9,21; 65:6,13,22;66:15,20, 23,25;70:2;76:1; 79:13;81:25;84:24; 88:15;92:17;97:5,7; 105:3;107:13;108:18; 109:21;111:4,16; 113:9,24;114:18; 116:2,25;118:13; 121:2,25;122:5,12,19, 22;123:10;124:4,9
**road (3)** 10:2;75:10,14
**Rob (2)** 103:9,12
**role (1)** 10:24
**roles (1)** 14:9
**Roswell (1)** 3:2
**rules (1)** 7:23

## S

**safe (4)** 27:5;68:21;95:2; 116:11
**safety (7)** 14:24;18:7;93:18, 19,21;94:2,6
**sale (1)** 104:18
**same (11)** 8:14;17:18,21;19:3; 26:21;45:1;56:7; 71:25;77:1;106:5; 122:22
**satisfies (1)** 52:8
**saw (4)** 40:6;77:3;90:6; 97:8
**saying (1)** 12:14
**scanner (1)** 57:13
**scanning (4)** 57:14,20,21,25
**scenario (1)** 28:25
**scene (2)** 86:10;87:18
**schedule (3)** 45:20;46:2,10
**school (1)** 66:16
**screen (4)** 30:7,9;71:11;73:18
**screened (1)** 30:11
**screening (4)** 68:23;69:4,8;70:4
**search (3)** 13:13,16;120:13
**second (1)** 30:21
**section (9)** 30:18;45:15,16,17; 50:19;51:2;52:4,9; 53:25
**seek (1)** 26:18
**selected (6)** 51:5;53:5,6,6,7; 71:4
**selection (1)** 51:6
**semi (6)** 59:7;60:12;90:20, 23;91:19,20
**send (6)** 31:10;61:13;62:4; 72:18;77:22;120:15
**sends (1)** 125:9
**sense (1)** 124:25
**sent (4)** 42:16;49:19; 120:21,23
**separate (7)** 34:14,18;35:17,25; 63:24;64:15;77:23
**separated (1)** 43:5
**separation (1)** 100:2
**Service (8)** 46:3,11,14;61:12, 20;72:10;98:17;99:1
**services (1)** 45:24
**settlements (1)** 119:9
**seven (4)** 14:5,7;66:5;124:6
**several (1)** 7:16
**shakes (2)** 21:13;43:14
**shall (3)** 47:16;54:3,9
**share (2)** 31:24;123:11
**shared (1)** 35:7
**sheet (4)** 46:13;105:11,20,23
**shipment (4)** 62:12,12,16;63:9
**shipped (1)** 82:10
**show (7)** 11:15;15:23;34:22; 35:10;94:8;103:16; 108:18
**showing (3)** 34:21,22;63:22
**shown (1)** 76:19
**shows (1)** 83:11
**shut (1)** 61:9
**side (2)** 42:3;102:9
**sign (5)** 33:8;63:24;64:15; 105:1;126:14
**signage (2)** 42:3;43:25
**signature (3)** 8:25;52:6;53:1
**signed (3)** 51:23;52:24;84:20
**sit (1)** 113:20
**sitting (1)** 10:20
**situated (1)** 119:8
**situation (1)** 61:11
**situations (1)** 86:8
**Six (2)** 14:7;124:5
**skipped (1)** 48:18
**Sloan (2)** 3:9;7:14
**social (1)** 108:11
**software (1)** 74:11
**sold (2)** 44:16;104:19
**solicit (1)** 67:20
**somebody (7)** 30:11;61:13;67:8; 79:21;82:19;86:22; 91:24
**someone (1)** 23:24
**sometime (1)** 123:8
**sometimes (4)** 28:11,13;79:18,19
**Somewhat (1)** 72:25
**somewhere (2)** 80:19;104:14
**soon (2)** 9:15;107:10
**sorry (11)** 32:24;39:18;40:11; 43:13;44:18;46:5; 75:14;96:20;103:12; 112:24;125:2
**sound (3)** 17:11;66:23;97:5
**sounds (2)** 66:25;97:6
**south (3)** 10:5,8;22:5
**speak (2)** 13:9;75:17
**speaking (1)** 79:3
**special (1)** 49:5
**specific (1)** 112:12

**specifically (2)** 94:17;117:16
**specifying (1)** 54:6
**split (1)** 19:10
**spoke (3)** 39:14,21;86:24
**spoken (4)** 77:9,12;86:13,16
**stamp (1)** 109:2
**stand (1)** 45:9
**standard (1)** 80:13
**start (3)** 13:4;90:12;117:3
**started (8)** 17:15;88:18;90:14,19,24;94:24;118:22;122:7
**Starts (2)** 16:10;82:17
**state (3)** 7:9;26:7;86:22
**stating (1)** 111:1
**status (1)** 119:7
**step (1)** 90:1
**sticker (1)** 43:1
**stickers (1)** 42:22
**still (14)** 16:19;21:22;22:21,21;23:11;24:15;53:23;56:7;78:1,16;96:11;99:22;100:8;107:7
**stolen (2)** 60:13,20
**Storage (1)** 81:25
**stores (1)** 20:4
**Street (1)** 3:2
**strike (1)** 71:15
**structure (1)** 13:25
**stuff (2)** 117:6,11
**subject (1)** 54:7
**submit (8)** 37:1,2;49:24,24;68:3;69:3;84:11;124:24
**submitted (2)** 68:6;70:9
**subsection (4)** 47:10,11;49:2;50:19
**subsequent (1)** 50:2
**Suits (1)** 69:17
**summer (2)** 25:24;123:23
**supposed (1)** 28:6
**surcharge (3)** 37:8,10,15
**sure (39)** 7:23;9:25;12:23;20:1;26:3;37:16;50:4;51:18,19;55:21;71:23,24;72:7,14,16;73:4,19;78:19;79:11;82:5;84:19;88:9;89:15,23,25;90:6;91:4;93:25;94:1;99:13,24,25;104:11;117:7;121:15;122:18;124:3,14;127:7
**surprise (1)** 30:14
**Susan (2)** 3:10;7:15
**switching (1)** 65:9
**sworn (1)** 7:2
**system (4)** 13:17;32:13;57:5,6
**systems (1)** 107:14

**T**

**tag (2)** 42:25;43:1
**tags (1)** 42:19
**Tailor (7)** 44:7,7,8,11,16,23;45:2
**talk (5)** 15:2;16:14;19:13;40:8;51:5
**talked (4)** 41:6;61:4;115:9;120:5
**talking (5)** 13:4;22:8;57:4;77:5;118:4
**talks (8)** 24:17;30:19;38:9,11;46:1;50:22;57:13;62:11
**tax (2)** 37:21;38:3
**technical (1)** 40:20
**telling (3)** 24:7,11;77:2
**tells (2)** 30:25;80:22
**Ten (2)** 114:10,11
**terminated (2)** 100:12;110:22
**termination (1)** 41:24
**terms (1)** 54:7
**terrible (1)** 125:16
**testified (1)** 7:2
**testimony (1)** 7:17
**Thanks (1)** 77:9
**theory (2)** 106:9,10
**therein (1)** 13:11
**thinking (2)** 88:12;106:12
**third (1)** 51:8
**third-party (1)** 98:20
**though (1)** 42:10
**thought (3)** 19:3,4;55:20
**three (4)** 58:18,19;93:9,9
**three-minute (1)** 69:16
**times (4)** 13:1;71:14;72:8;73:2
**tire (1)** 119:1
**tires (4)** 26:3;116:11,15;117:12
**TMM (5)** 85:22;95:7,12,18;121:4
**today (10)** 7:16;10:19,20;12:15;16:19;19:13;68:19;70:20;106:19;111:18
**Todd (2)** 121:20;126:18
**together (2)** 11:6;103:20
**told (5)** 18:25;19:8;107:17;116:17;123:16
**tomorrow (2)** 23:2,24
**top (2)** 66:10,20
**Total (1)** 95:8
**totaled (1)** 96:4
**touch (4)** 77:14,17,19;78:25
**towards (1)** 70:18
**track (1)** 58:1
**tractor (17)** 7:18;25:16;26:8;27:21;58:14,15;95:22;96:4,16;104:6;109:19;116:11,15;117:17;119:2;120:2;122:23
**tractors (4)** 24:22;90:12;98:2;117:13
**trailer (13)** 7:18;58:14,16;80:19;97:19,22;98:5;117:5,18;121:23;122:2,3,23
**trailers (7)** 57:21;97:24;117:2,13;123:3,10,12
**training (6)** 18:8;93:18,19,21;94:2,6
**transcript (2)** 8:11,14
**Transit (5)** 20:7,15,16;55:8;99:7
**transport (2)** 83:5;84:22
**transported (2)** 79:6;81:10
**transporting (2)** 47:15;106:20
**transports (1)** 20:4
**travel (1)** 82:17
**traveling (1)** 123:18
**trick (1)** 8:1
**tried (1)** 40:12
**trip (10)** 28:7;97:3;117:3;118:22;123:17;124:13,18,22,24;125:7
**trips (3)** 73:3;122:7;124:6
**trooper (1)** 86:22
**truck (59)** 21:20;28:25;30:15;38:22;42:16,18,25;47:20;48:5;57:18;59:11,14;60:12,24;61:9,11,20,22,24;63:18;71:21,22;72:1,4,9;75:17;76:5,9;79:16;90:15,16,17,18,20,23;91:5,18,20,20,21;92:3,7;98:10,17;99:16,19,22;100:8;102:25;109:13,22,24;110:6,7;114:21;117:4;121:22,25;122:7
**trucking (5)** 88:16,24;89:5,9;92:11
**trucks (24)** 35:17,19;36:1,4;38:13;42:11,22;44:1;48:2;58:16;59:7;71:16;90:7,7,10;92:22,25;101:2;102:9;107:15;117:2;122:9,14;123:2
**trust (1)** 47:5
**try (10)** 8:1,8,9,14;34:6;78:7;88:3,4,7,10
**trying (4)** 40:2;71:18;77:15;83:23
**turn (1)** 67:15
**two (10)** 9:21;11:8,8,10;12:2;48:5;58:19;71:18;96:15;112:25
**two- (1)** 69:16
**two-axle (1)** 109:25
**type (3)** 57:15;118:2;119:8

**U**

**unauthorized (6)** 47:11,16,18,19;48:1,6
**Under (11)** 17:16;20:5,7;21:12;50:23;51:17;52:4;53:10,20;64:4;123:18
**Understood (6)** 11:14;20:15;32:5;34:12;76:12;107:13
**underwent (1)**

73:18
**Unh-unh (4)** 77:21;96:20;110:1; 115:8
**UniGroup (13)** 18:12,12,13,14,15, 17,19,20;19:1,5,17; 38:2;53:19
**unit (3)** 47:17;109:10;110:8
**United (5)** 20:6,8;38:2;49:3; 55:6
**unless (1)** 9:2
**unload (3)** 28:19,22;48:13
**unloaded (1)** 81:11
**unloading (16)** 27:7,14,17;28:7,12; 29:16,23;30:4,8,12; 57:21,25;96:7,23; 97:1;107:4
**up (36)** 19:10;20:2;27:5; 28:13,14;31:14;32:4, 6,13;33:8,10,14; 34:21,22,22;35:10; 45:9;50:12;61:20; 74:17;79:10,17; 80:20;82:17,21; 83:11,24;84:3;88:9; 89:21;91:11;93:12; 103:16;111:6;113:3; 120:7
**updated (1)** 102:12
**updates (1)** 16:24
**updating (1)** 42:24
**uploaded (1)** 39:4
**upon (1)** 41:23
**use (8)** 23:25;37:20;71:25; 74:10;108:7;111:23, 24;113:18
**used (3)** 72:4;98:20;126:21
**uses (2)** 57:9,9
**using (2)** 29:10;48:12
**usual (2)** 100:6;104:22
**usually (3)** 28:18;29:7;108:15

**V**

**value (1)** 102:25
**Van (11)** 20:6,7,7,8;38:2; 49:2,3;54:4,18;55:6; 90:16
**variables (1)** 106:14
**various (1)** 123:12
**vehicle (6)** 28:4;58:25;59:6,25; 73:11;118:11
**vehicles (2)** 18:5;42:4
**verbal (1)** 100:16
**version (1)** 12:11
**via (4)** 3:8,9,10;103:15
**vice (1)** 39:10
**video (3)** 38:21;76:21;105:4
**Videographer (6)** 3:7;69:19,22;111:9, 12;126:16
**VIN (2)** 58:13;110:10
**violation (1)** 61:12
**violations (1)** 62:9
**Virginia (7)** 9:11,19;80:25;81:2; 84:25;105:16;113:4

**W**

**warehouse (13)** 29:6,6,9;62:15,24; 89:16;91:14;92:9; 106:16,20,25;107:1, 10
**watch (1)** 105:5
**way (5)** 8:13;12:11;28:3; 75:7;108:14
**weekend (1)** 127:12
**weighs (1)** 31:1
**weight (4)** 91:17,18;97:2; 106:14
**West (2)** 3:10;7:15
**whack (1)** 65:12
**what's (7)** 11:15;12:18;40:25; 47:24;66:12;68:22; 79:23
**whenever (1)** 105:24
**whereabouts (1)** 78:14
**whole (2)** 12:11;122:9
**whomever (1)** 84:8
**Who's (1)** 26:2
**whose (5)** 21:20;26:2;42:7; 116:10;123:17
**within (1)** 55:2
**Without (3)** 79:11;119:4;124:14
**WITNESS (19)** 12:1;16:3;21:13,16; 34:13,15;35:4;36:10; 43:14;45:10;65:25; 66:17;77:6;80:5; 113:4;120:18;125:4, 21,24
**wondering (3)** 32:2;39:16;43:23
**Woodbridge (3)** 112:23,24;113:3
**words (1)** 122:24
**work (12)** 11:24;27:4;34:9,22; 35:10;38:5;67:3;78:8; 79:15;89:13;108:1; 111:22
**worked (3)** 89:10,16;92:9
**workers' (1)** 101:4
**works (4)** 49:10;79:3;125:3,5
**worries (1)** 12:4
**wrap (1)** 111:6
**wreck (2)** 114:20;119:18
**wrecker (1)** 114:20
**writing (1)** 64:18
**written (4)** 54:4;64:10,13; 102:15
**wrong (1)** 20:20

**Y**

**yard (11)** 34:18,23;35:17; 79:17;80:20;81:2; 83:12;113:19;114:20; 122:8;123:11
**year (3)** 37:21;43:1;120:23
**yearly (2)** 25:15,16
**years (6)** 9:16,17;73:8;91:5; 93:9,10
**you-all (119)** 9:1;11:6;14:3,11; 17:13,16;21:5,11; 26:11;28:20;31:6; 32:17;33:13,23; 34:18;35:7,13,23; 38:18;39:3,8;48:1; 49:13,19;51:11;53:5, 6;58:16;59:5,10,23; 60:4,4;61:10,21;63:3, 13;64:3;66:24;67:22; 68:14;69:2,7,11,15; 71:17,22;72:23,23; 73:12,14,20;74:1,5, 20;75:4,7,19;77:14, 18;78:10;81:1,4,10; 84:17;85:25;86:1,13, 13;87:24;88:3,4,21; 90:10,19,22,24;92:23, 25;93:8,19;94:7,24; 95:4,21,22;97:11,16, 16,24;98:1,4,25; 99:18;100:5;101:1, 21;102:2;103:14,22, 23;105:7,24;106:24; 107:4,7,10,18;108:14; 113:9,25;115:7,13,17; 116:7;120:5;126:8; 127:10,11
**you-all's (6)** 25:4;36:17;73:23; 104:22;109:12,12
**Young (1)** 127:5
**Yup (6)** 55:22;61:25;66:15; 90:9;104:9;119:25

**Z**

**Zoom (4)** 3:8,9,10;121:12

**0**

**0005 (2)** 65:20;66:2
**0012 (2)** 65:20;66:3

**1**

**1 (17)** 11:15,21,23;13:24; 28:1;44:1;48:23;56:8; 58:16,17;59:1,2,10; 63:19;100:5;116:15; 119:2
**10/10/54 (1)** 9:9
**100 (3)** 25:3;95:3,4
**1099 (2)** 93:6;120:8
**1099s (2)** 93:8;120:7
**10e5 (1)** 37:25
**11 (2)** 17:8,9
**11:16 (1)** 69:20
**11:25 (1)** 69:23
**12:05 (1)** 111:10
**12:30 (1)** 111:13
**12:35 (2)** 126:17;127:13
**1357 (1)** 110:9
**14c (1)** 52:4
**1999 (2)** 109:18,24
**19b (1)** 41:22
**1st (13)** 17:7;21:20;22:5; 48:9;50:16;56:22; 62:13;79:6;81:13; 95:19;97:20;99:21; 100:20

**2**

**2 (2)** 15:2;47:11
**2004 (1)** 18:11
**2005 (1)** 9:13
**2014 (10)** 17:15,17,21;71:19, 21;88:20,21;90:19; 94:23;119:20
**2017 (4)** 66:22;67:2;72:23; 90:23
**202 (1)** 48:19
**2020 (2)** 17:11;120:7
**2021 (1)** 120:8

**2022 (29)**
19:11;21:21;22:5;28:1;44:1;50:16;56:8,22;58:16,17;59:1,2,10;62:13;63:19;72:24;79:6;81:14;95:19;97:20;99:21;100:5,20;115:22,25;116:15;119:2;120:22;124:6
**217 (1)**
3:2
**24 (2)**
109:13,16
**251 (4)**
109:14,15,16;110:8
**273 (1)**
16:12
**277 (1)**
19:25
**278 (1)**
22:12
**279 (1)**
24:17
**280 (1)**
30:19
**282 (1)**
37:23
**283 (1)**
38:7
**285 (1)**
41:20
**287 (2)**
17:4,5
**290 (2)**
45:14;46:5
**2a (1)**
52:9

**3**

**3 (5)**
58:13;79:25;80:2;108:25;109:2
**30004 (1)**
3:3
**306 (1)**
47:8
**311 (3)**
50:12,12;52:10
**314 (1)**
53:22
**316 (1)**
51:3
**318 (2)**
51:4,22
**324 (1)**
57:4
**326 (1)**
16:12
**333 (2)**
112:11;113:13

**4**

**4 (5)**
58:24;65:14,16,19;66:2
**444 (2)**
112:15,23

**5**

**5 (3)**
15:17,20;59:23

**6**

**6 (6)**
60:10;108:19,21,25;109:2;110:3
**6/7/2003 (1)**
70:19
**619s (1)**
83:20
**665 (1)**
79:24
**669 (1)**
79:24
**6a (1)**
22:12
**6b1 (1)**
24:17

**7**

**7 (1)**
26:22
**7a (2)**
26:22;27:1

**8**

**8 (1)**
62:11

**9**

**9d (1)**
30:18