**In The Matter Of:**

*Kyle Sloan, et al. v*
*Nicholas Burist, et al.*

---

*Jason Jones*
*May 10, 2023*
*Mayflower Transit LLC*

---

*Janice D. Hayward, RMR*
*Independent Court Reporter*
*843.478.6756*
*JanHayward1@gmail.com*

Original File SLOAN-JASONJONES.TXT
**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

KYLE SLOAN, INDIVIDUALLY; )
AND AS PERSONAL )
REPRESENTATIVE OF THE )
ESTATES OF RYLIE SLOAN AND )
JAMIE SLOAN, ET AL., )
)
PLAINTIFFS, )
)
VS. ) NO. 2:22-CV-00076-LGW
) DIVISION NO.
NICHOLAS BURIST, ET AL., )
)
DEFENDANTS. )

DEPOSITION TAKEN OF

JASON JONES,
CORPORATE REPRESENTATIVE OF
MAYFLOWER TRANSIT,

ON BEHALF OF THE PLAINTIFFS

MAY 10TH, 2023

REPORTED BY:
JULIE E. STELFOX
CERTIFIED COURT REPORTER - MO NO. 300
CERTIFIED SHORTHAND REPORTER - IL NO. 084.003463
REGISTERED MERIT REPORTER - NCRA NO. 13751
CERTIFIED REALTIME REPORTER - NCRA NO. 13751

METRO COURT REPORTING, INC.
P.O. BOX 29548
ST. LOUIS, MISSOURI 63126
636-349-3333
METRODEPOS@ATT.NET

INDEX OF APPEARANCES

| | |
|---|---|
| CHARLES J. HODGE<br>MATTHEW FOSS<br>T. RYAN LANGLEY<br>HODGE & LANGLEY<br>229 MAGNOLIA STREET<br>P.O. BOX 2765<br>SPARTANBURG,<br>SOUTH CAROLINA 29306<br>864-585-3873 | FOR THE PLAINTIFFS<br>CO-COUNSEL |
| JOSEPH R. PADGETT<br>RODEN LAW<br>333 COMMERCIAL DRIVE<br>SAVANNAH, GEORGIA 31406<br>912-303-5850 | FOR THE PLAINTIFFS<br>CO-COUNSEL |
| JOSHUA DORMINY<br>RODEN LAW<br>13 ST. ANDREWS COURT<br>BRUNSWICK, GEORGIA 31520<br>(VIA ZOOM) | FOR THE PLAINTIFFS<br>CO-COUNSEL |
| BENJAMIN STAHL<br>WALDEN, ADELMAN, CASTILLA,<br>HIESTAND & PROUT<br>900 CIRCLE 75 PARKWAY<br>SUITE 1040<br>ATLANTA, GEORGIA 30339<br>(VIA ZOOM) | FOR THE DEFENDANT<br>NICHOLAS BURIST |
| JAMES L. ELLIOTT<br>ELLIOTT & BLACKBURN<br>3016 NORTH PATTERSON STREET<br>VALDOSTA, GEORGIA 31602<br>(VIA ZOOM) | FOR THE DEFENDANT<br>LOCKE RELOCATIONS |

INDEX OF APPEARANCES

TODD R. EHRENREICH — FOR THE DEFENDANT MAYFLOWER TRANSIT, LLC
LEWIS, BRISBOIS, BISGAARD & SMITH
2 ALHAMBRA PLAZA
SUITE 1110
CORAL GABLES, FLORIDA 33134
786-353-0210

MATTHEW SESSIONS — FOR THE DEFENDANT JOE MOHOLLAND, INC.
MCMICKLE, KUREY & BRANCH
217 ROSWELL STREET
SUITE 200
ALPHARETTA, GEORGIA 30004
(VIA ZOOM)

ELLIOTT REAM — FOR THE DEFENDANT JOE MOHOLLAND MOVING
HAWKINS, PARNELL & YOUNG
303 PEACHTREE STREET, NE
SUITE 4000
ATLANTA, GEORGIA 30308-3243
(VIA ZOOM)

EDWARD FOPPE — VIDEOGRAPHER
ARCHWAY VIDEO
1513 FAIROAKS DRIVE
TROY, ILLINOIS 62294
618-530-6225

MARK J. VOLANSKY — ALSO PRESENT
SENIOR COUNSEL
UNIGROUP, INC.
ONE PREMIER DRIVE
FENTON, MISSOURI 63026
636-305-5000

KYLE SLOAN — ALSO PRESENT
SUSAN WEST

INDEX OF EXAMINATIONS

DIRECT EXAMINATION BY MR. LANGLEY......PAGE 8
CROSS-EXAMINATION BY MR. EHRENREICH.... 156
REDIRECT EXAMINATION BY MR. LANGLEY.... 160

PLAINTIFFS' INDEX OF EXHIBITS*


| EXH | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 1: | PLAINTIFFS NOTICE OF 30(B)(6) DEPOSITION TO DEFENDANT MAYFLOWER TRANSIT | 11 |
| 2: | CORPORATE STRUCTURE UNIGROUP AND SUBSIDIARIES ORGANIZATION CHART | 14 |
| 3: | LETTER FROM MARK VOLANSKY TO ROB GARR DATED 7/11/22 | 44 |
| 4: | AGENCY AGREEMENTS | 71 |
| 5: | BILLS OF LADING | 59 |
| 6: | GEORGIA MOTOR VEHICLE CRASH REPORT | 87 |
| 7: | AGENCY STATEMENT - MAYFLOWER TRANSIT | 89 |
| 8: | DRIVER QUALIFICATION FILES | 114 |
| 9: | RECORDS ABOUT VEHICLE SAFETY INSPECTIONS AND VARIOUS DOCUMENTS | 126 |
| 10: | INDEPENDENT CONTRACTOR OPERATING AGREEMENT | 137 |
| 11: | BOOKING CONFIRMATION FOR SCAC NWMO/BOOKED DATE: 2022-04-06 | 151 |
| 12: | DECLARATION OF JASON JONES IN SUPPORT OF MAYFLOWER TRANSIT, LLC'S, MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION | 155 |


*ORIGINAL EXHIBITS RETAINED BY COUNSEL FOR PLAINTIFFS.

DEPOSITION OF JASON JONES, PRODUCED, SWORN, AND EXAMINED ON BEHALF OF THE PLAINTIFFS, PURSUANT TO NOTICE, TAKEN BETWEEN THE HOURS OF 8:46 A.M. AND 12:25 P.M. OF WEDNESDAY, MAY 10TH, 2023, AT THE OFFICES OF LEWIS, BRISBOIS, BISGAARD & SMITH, 100 SOUTH 4TH STREET, CITY OF ST. LOUIS STATE OF MISSOURI, BEFORE ME, JULIE E. STELFOX, MISSOURI CCR, ILLINOIS CSR, NCRA RMR AND CRR, OF METRO COURT REPORTING, INC., IN A CERTAIN CAUSE NOW PENDING IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF GEORGIA, BRUNSWICK DIVISION.

TRANSCRIPT OF PROCEEDINGS

(Mr. Mark Volansky is not present at this time.)

THE VIDEOGRAPHER: This is the video deposition of Jason Jones as the corporate representative of Defendant Mayflower Transit.

Today's date is May 10th, 2023. The time is 8:46 a.m., Central Standard Time. This is the case of Kyle Sloan, et al., versus Nicholas Burist, et al.

This case is pending in the United States District Court for the Southern District of Georgia, Brunswick Division, Case Number 2:22-CV-00076LGW.

All counselors present and participating remotely via Zoom will be reflected on the stenographic record. My name is Ed Foppe. The court reporter is Julie Stelfox, and she will now swear in the witness.

THE REPORTER: Do you solemnly swear the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

DIRECT EXAMINATION

BY MR. LANGLEY:

Q. Good morning, Mr. Jones. I'm Ryan Langley. We met just before the deposition began. I'll be asking you some questions today.

This deposition was noticed as a 30(b)(6) deposition for you as a corporate representative of Mayflower Transit, LLC, or Inc.

You understand what we're doing today?

A. Yes.

Q. Have you had your deposition taken before?

A. Yes.

Q. How many times?

A. A dozen.

Q. Okay. When was the last time?

A. A year ago.

Q. So the rules require that I -- that even though you've done it a number of times before, I have to go back through and explain to you a little bit more about the process, make sure we're on the same page.

If I ask you a question and you answer the question, I'm going to rely on your answers.

Is that understood?

A. Yes.
Q. You've sworn an oath to tell the truth, which means you have a legal and moral obligation to do so.
A. Yes.
Q. You understand that?
A. I do.
Q. And is there any reason you're not able to tell the truth today, such as under the influence of some kind of drug or alcohol or anything like that?
A. No, sir.
MR. EHRENREICH: Let me just object. He has a legal. He's not a moral reason to answer, correct? Moral is a wrong word.
MR. LANGLEY: You don't think he has a moral obligation to tell the truth?
MR. EHRENREICH: I don't think you can tell somebody that he has a moral obligation. He has a legal obligation. Moral, that's another world, so I'm going to object to that.
Q. Do you think you have a moral obligation to tell the truth today?
MR. EHRENREICH: Object to form.
A. Yes, I do.

Q. All right. If you don't understand a question that I'd ask, I'd ask you to repeat it or rephrase it. Is that agreeable?

A. Yes.

Q. If you think of something that would alter the answer to a question that you've provided previously as the day goes along, please point that out to me because it's important that I get as full a testimony from you today as possible.

A. Okay.

Q. If you need a break at any time, you're entitled to one. I would just ask that you finish any outstanding answer to a question that I've asked prior to taking the break.

And I'll caution you that we have an exception to our rules about communication with counsel: That you're not permitted to communicate with counsel during the break about the substance of the deposition.

So that would be the one -- one time. Most of the time, the vast majority of the time today, my questions will never be intended to elicit any type of communication you had with your attorneys.

But, just as a fair warning, when we come back from breaks, that will be the first question I ask, okay?

A. Okay.

Q. All right. What have you reviewed?

MR. EHRENREICH: He's not saying you can't talk to me, so go ahead.

Q. The instruction was you can't speak about the substance of the deposition or I'm entitled to inquire about that, okay?

A. Okay.

Q. What did you review in preparation for your deposition today?

A. The materials that were provided in discovery, much of them, and then just information that was provided to me from my attorneys.

Q. Okay. Were there any particular documents that you can recall reviewing which you think are significant?

A. I reviewed some emails from -- that had gone back and forth. I reviewed agent contract, the temporary contract. Those are probably the most substantive. I didn't go through the driver qualifications files or anything like that.

(Plaintiff's Exhibit 1 marked for

identification, J.S.)
Q. Okay. Did you review this document that's in front of you that's marked as Exhibit 1, the notice of your deposition today?
A. Yes, I did.
Q. And are you prepared to provide answers to the topics that are identified in this notice?
MR. EHRENREICH: Subject to the prior objections, answer.
A. Yes.
Q. All right. If we get to a topic that you feel like you're not prepared or you don't have the information for, will you agree to identify for me the person that you think would be in the best position to answer that question?
A. Yes.
Q. What is your current position with Mayflower?
A. I am the Senior Vice-President of Member Success.
Q. Okay. How long have you been in that role?
A. For about one year.
Q. How long have you been with the company overall?

A. This August will be five years, so just under five years.
Q. And what were your prior roles before Senior Vice-President of Member Success?
A. I was Vice-President of Human Resources and Safety just prior to this role, and before that I was Vice-President of Driver Development.
Q. Have you ever been a driver --
A. No, sir.
Q. -- over-the-road driver?
A. No, sir.
Q. Tell me about your educations. Start with college and any postgraduate.
A. I have a bachelor's degree in business management and a master's degree in human resources management.
Q. And where are those degrees from?
A. From University of Phoenix and Ottawa University.
Q. Where are you from originally?
A. Arizona.
Q. And are you employed by UniGroup or by Mayflower Transit, LLC?
A. By UniGroup.
Q. What's the difference?

A. UniGroup is the parent company of Mayflower.

Q. Okay. And how many other entities is UniGroup the parent company of besides Mayflower?

A. There are several. I don't know the exact number. I believe we've produced a chart that shows that.

Q. Yeah.

MR. LANGLEY: Make that Exhibit 2. Organizational chart. Todd, I think you got a copy, I saw in my file.

MR. EHRENREICH: Yeah, I was just going to ask you -- I was going to ask if you wanted to go sequentially from yesterday, but that's fine. This will do. This is your Number 2?

MR. LANGLEY: Yeah.

(Discussion was held off the record.)

(Plaintiff's Exhibit 2 marked for identification, J.S.)

Q. Is this the organizational chart you were referencing in your answer a moment ago?

A. Yes, sir.

Q. And how did this organization come to be organized in this way?

A. UniGroup was incorporated as a

cooperative to do what cooperatives do to pull resources for independent companies and to increase efficiency and profitability.

Q. And how does having all these dozens of entities increase efficiency?

A. You -- we benefit from economies of scale. Many of -- many of our -- the agents that we contract with are smaller companies that wouldn't have the buying power in the industry; whereas, as a co-op, we can benefit from economies of scale as well as broaden the network so that they can rely on one another to help move goods and services.

Q. Well, nobody on this sheet here is an agent, correct?

A. No, that's correct.

Q. Okay. So what I want to know is how is it possible that you can have dozens of entities like this and be more efficient?

A. Many of them are necessary because of the nature of our business. For example, if you look at the -- many under Mayflower or under United, each one of those exists for particular reasons, even though they are just LLCs, but they, under certain business, you have to have a

business entity to do that, and so they're separated out.

Q. Can you give me an example?

A. These exist for SCAC codes for military moves. Each one of them -- each company can only have one SCAC code, and so we have many companies to be able to have many SCAC codes so that we can do more military business.

Q. What's the purpose of the military requiring each entity to have its own SCAC code?

A. I --

MR. EHRENREICH: Object to form.

A. Yeah, I don't know what -- why the military does the things that they do.

Q. Is it your understanding that this collision that we're here about today from July 1st, 2022, involved a transport of military goods?

MR. EHRENREICH: Object to form.

A. Yes, I learned -- everything I know about the accident I learned from my attorneys, and that is my understanding.

Q. Why do you use the word "accident"?

A. Because you just did.

Q. I think I said "collision," but in any event --

MR. EHRENREICH: Object to form.
A. It was an accident.
Q. Do you consider it to be an accident?
A. I --
MR. EHRENREICH: Once again, you don't refer to anything that you learned from me. Anything you learned outside of discussing with me, you can answer, okay?
A. I didn't learn anything outside of what we discussed with my attorneys.
Q. That's fine. Do you consider it to be an accident what happened on July 1st, 2022?
MR. EHRENREICH: Object to form.
A. That's a general term that I have used throughout my career, and so I don't -- I don't know enough about the collision to make any other type of determination like that.
Q. What do you know about the events of July 1st, 2022?
MR. EHRENREICH: He's not answering the question. That's attorney-client. As instructed, anything you learned outside of me, feel free to share with counsel. Anything you learned from me, stays between us.
A. I have not learned anything outside of

counsel.
Q. You don't know anything about the July 1st, 2022, collision that we're here about today that you can answer for me?
A. No.
Q. All right. When I refer to "Mayflower" throughout the course of the deposition today, can we agree that that generally covers all of the entities on this chart we see as -- or we've marked as Exhibit 2?
A. Yeah, I would agree to that.
Q. Are there any other entities that Mayflower operated under on this worksheet or any other entities in its relationship with Moholland?
A. No.
Q. And when I say "Moholland," what does that mean to you?
A. Joe Moholland, which was a former agent that we contracted with.
Q. Okay. And did you ever have any direct involvement in that contract or Agency Agreement?
A. No.
Q. And you understand, when you answer, you're answering on behalf of the corporation?
A. Yes.

Q. And the corporation has no knowledge, no information it can share with me about the July 1st, 2022, collision that killed four people?

MR. EHRENREICH: Object to form. He's answered.

A. No, other than --

MR. LANGLEY: I think we're reserving all objections except as to form, right? No speaking objections?

MR. EHRENREICH: You don't need to warn me about anything. Keep asking your questions.

MR. LANGLEY: I want to have an agreement on --

(Inaudible.)

THE REPORTER: I cannot take both of you at the same time and it's a video.

MR. EHRENREICH: You keep trying to get into attorney-client stuff and I keep telling you not --

MR. LANGLEY: I haven't asked one thing about an attorney-client question.

MR. EHRENREICH: You did, after he told you all he knew about was from me, you kept asking.

MR. LANGLEY: No, I asked did he

understand -- I'm not going to go through a speaking --

MR. EHRENREICH: Just ask your question and I'll object.

MR. LANGLEY: No, this is my deposition. You will not direct me how I conduct --

THE REPORTER: Guys, I can't take both of you at the same time, so I'm writing nothing.

(Discussion was held off the record.)

MR. LANGLEY: I'm not going to be intimidated by you, okay?

MR. EHRENREICH: And I not by you. So ask your questions. I just want to get this over with. That's all. Let's go.

MR. LANGLEY: It will be done when it's done.

MR. EHRENREICH: Let's go. I didn't put a time limit on it. I said let's go.

MR. LANGLEY: I want an agreement on the record that we are reserving objections except as to form.

MR. EHRENREICH: I'm going to object as I see fit, so go.

MR. LANGLEY: Are you going to continue to make speaking objections?

MR. EHRENREICH: Are you going to continue to delay this deposition?

MR. LANGLEY: Get the judge on the phone. If you refuse to make an agreement that you will not make speaking objections, I think that's a fundamental question we have to have resolved before we can move forward.

MR. EHRENREICH: We didn't have a problem yesterday. I'm not anticipating having a problem today, so I don't know why you --

MR. LANGLEY: I didn't take the deposition yesterday.

MR. EHRENREICH: -- why you're creating it yesterday, but somebody who's an extremely talented litigator did and we didn't have a problem.

MR. LANGLEY: Can we have an agreement?

MR. EHRENREICH: So I'm not going to have a problem with you. So if you want to waste somebody's time, waste somebody's time. I don't want to. I want to get his deposition completed.

MR. LANGLEY: The question is simple. Do you agree not to make speaking objections? I have allowed it to go on a number of times for you to answer for him, but I'm not going to allow it

to go on throughout the day.

MR. EHRENREICH: I have not once answered for him, but when it comes to attorney-client, I'm allowed to speak up, and I did.

MR. LANGLEY: We -- that --

MR. EHRENREICH: You can agree to that, right?

MR. LANGLEY: The last question --

MR. EHRENREICH: I can speak up on an attorney-client.

MR. LANGLEY: You can instruct him not to answer.

MR. EHRENREICH: And I did.

MR. LANGLEY: I agree with that.

MR. EHRENREICH: Okay.

MR. LANGLEY: Do you agree not to make speaking objections today?

MR. EHRENREICH: So what I'm going to do is I'm going to make my objections according to the Federal Rules of Civil Procedure. If you think I've overstepped my bounds, I'm sure you'll tell me. That I can promise. I think that's what you're asking me.

MR. LANGLEY: I think that we have to have an agreement about whether or not your

objections are going to be reserved except as to the form, because I'm not going to have you continue to instruct him through the day.

MR. EHRENREICH: I haven't instructed anything. Only thing that I went more than form on was attorney-client. That's all I've done, and the rules allow me to do that. That's all I've done.

MR. HODGE: Ryan.

(Discussion was held off the record between the plaintiffs' attorneys.)

Q. Have you read the complaint in this case, Mr. Jones?

A. No, I have not.

Q. Have you read any of the police reports, any of the information about the wreck?

A. No, I have not.

Q. So from a corporate representative standpoint, you cannot tell me anything about the July 1st, 2022, collision, can we agree on that?

A. Yes.

MR. EHRENREICH: So I have a duty to correct something for you. He was also given the deposition of the corporate rep for Joe Moholland to review.

MR. LANGLEY: Okay.
Q. Have you read the deposition of Rob Garr, the corporate rep for Joe Moholland?
A. Yes, I have, I apologize.
Q. All right. Did you reach any conclusions after reading that deposition?
A. No, informational.
Q. Did you disagree with anything that you read in there?
A. No.
Q. All right. On this work chart, back to Exhibit 2, are there any entities on there that are responsible for government moving?
A. The -- could you tell me what you mean by "responsible for" because that's --
Q. That, as an entity, you told me earlier that they have different SCAC codes, I think.
A. Yeah.
Q. So that's what I'm trying to understand. Which of these entities have different SCAC codes for the purpose of facilitating government or military moves?
A. "Facilitating" is the word that I think better fits. Yeah, the ones that are listed under Mayflower Transit, LLC, and United Van Lines, LLC,

those are the ones that have the SCAC codes, but the entities that are responsible -- or that are -- that facilitate the moves are United Van Lines and Mayflower Transit.

Keeping in mind that they facilitate those moves, they don't do the moves. The moves are done by agents that are independent companies that we contract with.

Q. And what is it about the word "responsible" that you don't think is applicable here?

A. I just didn't understand what you were getting at. "Facilitating" was more clear to me what you were asking.

Q. Can we agree that United Van Lines and Mayflower have a responsibility to reach agreements with contractors that provide safe transportation?

MR. EHRENREICH: Object to form.

A. Yes.

Q. And are there any other entities on this chart, other than United Van Lines and Mayflower, that participate, facilitate, or are responsible for government or military moves?

A. There is UniGroup Worldwide that may do

international moves, but all of the domestic work are under the other two entities.

Q. Okay. And has any -- at any point in Mayflower or United Van Lines' history, the actual transportation been done by an employee of Mayflower or United Van Lines for government moves, military-related moves?

MR. EHRENREICH: Object to form.

A. No, not to my knowledge.

Q. When was the last time, if ever, that Mayflower actually had truck driver employees?

A. Never, to my knowledge, under the current corporate structure, for as long as I know of.

Q. So if the military were to directly have a relationship with the contractors or the companies that actually do the moves, would there be any need for Mayflower?

MR. EHRENREICH: Object to form.

A. So I understand the question, you're saying if the military just went directly to the companies, would there be a need for Mayflower?

Q. Right. Do you understand that -- or do you understand that a company called Locke Relocations was involved through Joe Moholland in

hiring a driver to transport the goods on July 1st, 2022?

MR. EHRENREICH: Object to form.

A. I learned that only through the documentation that I reviewed in preparation for this deposition, so, yes.

Q. Well, that's fine. I mean, that's what you're here for is because you are the company's person that's most knowledgeable about all these facts we've identified in this notice.

A. Okay.

Q. So I just want to make sure that -- you give that caveat like that's something unusual, but that's the whole purpose for us being here today is what you've learned and what your responsibility was to be educated on those topics on behalf of the company.

MR. EHRENREICH: Object to form.

Q. You understand that?

A. Yeah, I'm not sure what -- why you're interpreting what I'm saying is that -- my feelings behind what I'm saying and my motivation behind what I'm saying, but what I'm saying is that, outside of this case, I'm not familiar with Locke Relocation at all.

Q. That's fine.
A. That's the point I was trying to make.
Q. Just so we can move forward efficiently, when I ask you a question, unless I say "Do you have any personal knowledge about it?" it will be for the purpose of you answering on behalf of Mayflower as a corporate representative.
A. That's what I'm doing.
Q. Okay. Very good. So the reason I was bringing that up now is just for time's sake so on each question you don't have to feel the need to say "I only learned this in preparation for today."
If I want some -- for you to answer a question in your individual capacity, I'll point that out.
A. Okay.
Q. So the question was do you -- are you aware that Locke Relocations and, through Joe Moholland, hired a driver for the purpose of transporting the goods on July 1st, 2022?
MR. EHRENREICH: Object to form.
A. Yes.
Q. And my question now is, if the military had gone directly to Locke Relocations, would

there have been any point for Mayflower -- been any service or role Mayflower would have provided in this move?

MR. EHRENREICH: Object to form.

A. Mayflower didn't provide anything in this. It wasn't Mayflower's move.

Q. I understand that's the position that the company's taken, but in past -- I'm asking you now over past moves and --

A. Well, no, you asked specifically for the July 1st move is what you asked, and my answer is is that there was no Mayflower involvement in this whatsoever.

Q. Okay. So for past moves, for any other times where Mayflower was involved in a transaction like this with a government move or Moholland was involved or Locke or any other local actual truck driver company to transport the goods, what -- if the government were to contract directly with those entities, those more local entities actually doing the work, would there be any loss in the transaction?

A. Yes.

Q. What would -- okay. So what would that be? What would Mayflower provide that those

entities could not?

MR. EHRENREICH: Object to form.

A. Mayflower provides a lot more than just customer interaction. There's benefits that they receive from being part of a co-op that helped their company that's outside of just connecting with customers.

Q. Okay. Can you tell me what those are?

A. There's many things. There's any moves that are done where Mayflower is involved, is done on Mayflower's DOT number, which means that we house the driver qualification files, we comply with all of the federal regulations for interstate commerce, I mean, and do all of the auditing from drug testing of drivers to ELD compliance and auditing and maintaining files on equipment, and all of those -- all of those compliance issues we handle. We also have insurance towers. We also help out with claims if anything's damaged.

So there's a lot of other benefits involved other than just getting with customers.

Q. Okay. And tell me what you mean when you say "insurance towers."

A. We have excess insurance that we use to cover moves that we are involved in.

MR. EHRENREICH: Let me just object to form as "insurance," but go ahead and ask your questions.
Q. When you say "insurance," you mean liability coverage in the event of a collision or wreck where people are injured and make a claim?
A. Yes.
Q. And what are those carriers and what are the amounts?
MR. EHRENREICH: Object to form.
A. I would have to get back to you on that. I don't know that.
Q. You don't know any carrier --
A. No.
Q. -- that you can identify for me that would provide coverage?
A. Not off the top of my head.
Q. Well, this was a critical function that you identified that Mayflower provides, right --
A. Yes.
Q. -- in these transactions?
A. Yes.
Q. Can you give me a range of the amount? Is it a million dollars, five million dollars, ten million dollars insurance?

MR. EHRENREICH: Object to form.
A. It's -- we go up to 70 million.
Q. And is that the initial coverage or is that a umbrella policy?
A. It's an umbrella policy.
Q. And when you say a "tower" of coverage, do you mean that 70 million is in the aggregate if you added all of them up?
A. Yes.
Q. All right. You also mentioned claims for damages. Is that part of the same thing or is that more in the actual physical damage for any lost goods?
A. Lost, yes, physical damage for lost goods.
Q. And tell me how that works, how Mayflower provides assistance to the local carriers on that.
MR. EHRENREICH: Object to form.
(Mr. Mark Volansky is now present.)
A. We have a claims department that takes the claims from the customer and then helps to process them and then ultimately we facilitate payment of those claims out to the customer.
Q. Did Mayflower make any payment on any

claims related to the July 1st, 2022, collision?
MR. EHRENREICH: Object to form.
A. No.
Q. Did Mayflower receive any payment for the transport of any of the goods from the July 1st, 2022, collision?
A. No.
Q. How do you know that?
A. We checked.
Q. Where did you check?
A. Well, we checked if the -- if that move was in our system, if we had any record of the move at all, and we do not.
Q. Okay. And when you say "system," can you tell me what you mean by that?
A. In our IT systems, there -- we call it the mainframe, where all of our dispatch and AP and all of that is housed within that system, and there was -- there was no record of any of the loads on July -- from July -- the July 1st collision that we had any record of.
Q. And how did you perform that check?
A. We -- we looked at any -- all of the loads that were put in and then looked to see what -- if it was there, and it was not.

Q. Have you ever had an agent complete a load transfer that was not put in the mainframe?
A. If it was -- if it was done under their authority and outside of their relationship with Mayflower, sure.
Q. I'm talking about when Mayflower was involved and got some payment or remuneration.
Are you aware of any move where an agent completed it but it was not recorded in the mainframe?
A. No.
Q. How would you look for such a move?
A. Well, it's difficult to look for to find something that's not there --
Q. Right.
A. -- to prove a negative, and so we simply looked what was there and were able to know that it didn't appear.
Q. I understand that for this transaction. I'm asking you now more broadly. How can you say with certainty -- because it is difficult to prove a negative -- that it's never happened where an agent completed a move that did not end up in the mainframe?
MR. EHRENREICH: Object to form.

A. Again, they could have done that on their authority, but if it was on our authority, it couldn't be registered on our authority and we couldn't receive payment for it if it's not in our system.
Q. When you say "their authority," you mean their DOT number?
A. Oh, yes, sir.
Q. And so when you say "our authority," that would mean under Mayflower's DOT number?
A. Correct.
Q. How many different DOT numbers does Mayflower have?
MR. EHRENREICH: Object to form.
A. Just the one, as far as I know.
Q. Do you know what that number is?
A. Not off the top of my head.
Q. Can you tell me the last time that any Mayflower entity or any entity on this group we've identified or marked as Exhibit 2 had any business with Joe Moholland Moving?
A. I'd have to -- I'd have to refer to the discovery that we -- that we provided. I haven't memorized all of that, so we have -- but we did provide that in discovery.

Q. And I'm happy for your, if you wish to ask your counselor for a particular document, for him to provide it to you. I'm not trying to make you have a memory contest.
A. Yeah.
Q. So is there some particular document that either Todd can give you or I can give you that would help you answer that question?
A. The -- I believe the -- the -- the load document that we showed of all of the loads would have had the last (inaudible) with Joe Moholland?
MR. EHRENREICH: It was part of an exhibit yesterday.
MR. LANGLEY: Okay.
MR. EHRENREICH: Give me one second.
Q. Sure. While he's looking for that, did you look to see if there are any other continued business, any payments back and forth between Mayflower and Joe Moholland, Inc., after -- on or after July 1st, 2022?
A. Yes.
MR. EHRENREICH: I'm going to show him what was marked yesterday. Is this what you're talking about? This was -- is this it? Or if it's something else, I don't have it. If it's a

different document, I don't have anything.
THE WITNESS: Yeah.
MR. EHRENREICH: It may have been part of what you reviewed. I wouldn't have that with me.
Q. We have a number of documents we'll go through today.
A. Yeah.
Q. If you see what you're talking about --
MR. EHRENREICH: Or if you want to describe the document perhaps you think --
A. I can't even remember what it looks like.
MR. EHRENREICH: Okay.
A. These, looks like they happened on 4/22 of '22. There were probably a couple after that, after the termination date, that were already registered in the system that had to be completed. So I'm not sure that these are the last ones.
Q. Okay. Let me just identify for the record what you're looking at. This is Mayflower 15.
MR. EHRENREICH: And then there's a second page to it.
MR. LANGLEY: Okay. Before or after?

MR. EHRENREICH: Yeah.
Q. After Mayflower 16?
A. Yeah.
Q. Okay. So did you look at any other documents, invoices, accounting records or anything like that to determine whether or not Mayflower and Joe Moholland continued to have any business relationship on or after July 1st, 2022?
A. No.
Q. If there were documents showing payments between Mayflower and Joe Moholland Moving before, during, and after July 1st, 2022, can we agree that's an indication that the business continued?
MR. EHRENREICH: Object to form.
A. Yes.
Q. And that the agency relationship continued?
A. No.
Q. What's the difference?
A. Excuse me. Once the -- once the -- once the relationship -- when the contract ends, there could be residual things that happen for up to 18 months.
In fact, we don't -- we don't close out their agency statements, which is basically like a

bank statement that they get for 18 months after termination, because claims could come in on, you know, their customer has months to file a claim.

So the residual claim could come in on a load that was hauled prior to the termination, and so there could conceptually -- I'm not testifying that that happened in this case, but there could conceptually be some sort of transaction that could happen up to 18 months after termination that would not represent a continued business relationship of them continuing to perform business on behalf of Mayflower.

Q. Do you know of any continued business on behalf of Mayflower after June 30th, 2022, by Joe Moholland or Locke Relocations?

A. No, I don't.

Q. Can you think of any reason why there would be ongoing payments to Joe Moholland as recently as April of 2023?

A. As I said, there could -- I'm not aware of any. There could conceptually be something that could have happened that was in reference to a load that was done prior to their termination.

Q. All right. Are you aware of any relationship between United Van Lines and Joe

Moholland Moving?
A. No.
Q. How about Trans Advantage, Inc.?
A. There could have been some -- Trans Advantage does -- Trans Advantage does -- they sell trucks. They're a subsidiary of UniGroup, and so there could have been business between the two of them.
Q. What do you mean when you say "they sell trucks"?
A. They're an entity that provides goods and services. Not just to our agents but to the market at large. They sell trucks, they sell moving supplies, boxes, straps, things like that.
Q. Do you know if they sold -- that Trans Advantage sold a truck or any of the supplies or trailer or materials used for the transport on the July 1st, 2022, collision?
A. No, I don't.
Q. You mentioned that claims could come in after the termination of the Agency Agreement. If the claim comes in, does Mayflower retain the right to seek indemnification for any payments that it has to make?
MR. EHRENREICH: Object to form.

A. Yes.
Q. And has Mayflower exercised its right or put Joe Moholland on notice of its claim for indemnification for any payments that Mayflower has to make because of actions by Joe Moholland?
MR. EHRENREICH: Object to form.
A. No.
Q. It has not?
A. No.
Q. Okay. So if a claim were made or paid by Mayflower, would Mayflower seek indemnification from Joe Moholland?
MR. EHRENREICH: Object to form.
A. I mean, it depends on the nature of the claim.
Q. A claim for personal injury or wrongful death damages from the July 1st, 2022, collision?
MR. EHRENREICH: Object to form.
A. Because Mayflower was not involved in any way in that, there's been no such claim made.
Q. My question's a little bit different. My question is, if Mayflower makes payment related to Joe Moholland's act or in-act related to the July 1st, 2022, collision, will Mayflower seek indemnification from Joe Moholland on that?

MR. EHRENREICH: Object to form.
A. I guess I'm struggling with -- I'm struggling with pretending that something's going to happen or supposing what if.
They have not made -- that has not happened, and so the fact is that -- the fact of my answer is no.
Q. Have you seen a letter -- and I'll provide you a copy of it in just a minute -- from shortly after this collision, I believe it's on July 11, 2022, where a representative from UniGroup and or Mayflower makes a demand for indemnification? At least that's the way Rob Garr testified to it.
A. I think I have seen that letter.
Q. Do you disagree with that letter?
MR. EHRENREICH: Object to form.
A. Well, I maybe disagree with your characterization of the letter. I'd have to review it.
Q. Do you recall, in your review of Mr. Garr's deposition, when he testified that he viewed that letter as a demand for indemnification by Mayflower toward Joe Moholland?
A. No, I don't recall that.

Q. How many total agents operate under these entities that we've seen in Exhibit 2 here?
A. There are a hundred ninety-six primary agents with approximately 450 locations.
Q. How many of those locations and agents are in Georgia?
A. I'd have to look. Probably two or three.
Q. Okay. When I looked it up, I found four that --
A. Yeah.
Q. -- had independent locations or at least independent addresses that listed themselves as affiliated with Mayflower as an agent.
A. That seems right.
Q. Okay. And with those four local agents in Georgia, does Mayflower continue to have those relationships today?
A. As far as I know, yes.
Q. Here's the letter that I was referencing earlier. I've got an extra copy.
MR. LANGLEY: That's the one you were talking about before.
Mark that one as Exhibit 3.
Q. Once you've had an opportunity to read

it, let me know.

(Plaintiff's Exhibit 3 marked for identification, J.S.)

Q. The last paragraph is really the one I'm going to ask you about. I don't mean to direct you away from reading the rest.

A. Okay.

Q. So you see in the last paragraph where it starts "The purpose of this letter is to"?

A. Yes.

Q. I'm going to read it into the record. You make sure I read it correctly, okay?

A. Okay.

Q. "The purpose of this letter is to, one, demand that Moholland immediately cease and desist using any and all UniGroup intellectual property, signage, marks, license plates, or references to United operating authority and, two, put you on notice that United and UniGroup will seek recourse from Moholland in the event any demand, claim, lawsuit, or penalty of any kind is made against United or UniGroup or any subsidiary as a result of the July 1st, 2022, crash."

Did I read that correctly?

A. Yes.

Q. And is Mark -- do you know Mark Volansky, Senior Counsel for UniGroup?
A. I do.
Q. Is that him sitting here with us today?
A. That's the guy.
Q. And you believe this letter's authentic, even though it wasn't produced by Mayflower? It's on UniGroup letterhead.
A. Yes.
Q. So now I'll ask my question again. If Mayflower is to make payment to any of the plaintiffs in this litigation or anybody related to the July 1st, 2022, crash, will Mayflower seek recourse from Joe Moholland for payment of that?
MR. EHRENREICH: Object to form.
A. It seems in the letter it is stated that that would happen. That would be a determination that would be made by our legal counsel.
Q. All right. But we can agree that's what this letter says?
A. Yes, yes.
Q. Does Mayflower still conduct military moves?
MR. EHRENREICH: Object to form.
A. Through our agents, yes.

Q. And what agents do the military moves today?
A. I couldn't list. Many of them.
Q. Can you list any of them through -- that would have a route similar to the one that's involved in this crash, from somewhere in the southeast, Virginia to Florida?
A. Suddath Relocations does it. They're in Florida.
Q. Okay. Suddath, S-u-d-d?
A. Yeah, I mean, there's hundreds.
Q. And who is the -- is that the actual entity that does the transportation analogous to Locke Relocations in this July crash, or is that more of the Moholland type facilitator that would be replaced?
MR. EHRENREICH: Object to form.
A. More of the Moholland. They're an agent of ours.
Q. All right. Direct agent?
A. Yes.
Q. And does Mayflower ever have any communication beyond the agent to the actual entities that do the driving on the road and the actual drivers?

A. Generally not.
Q. Have you seen the documentation where Mayflower participated or conducted the training and certification of Nicholas Burist, the driver involved in the July 1, 2022, crash?
A. Yes.
Q. And was Mr. Burist employed by Mayflower at one time?
A. No.
Q. Never was employed by Mayflower?
A. No.
Q. How is it that Mayflower became the entity responsible or undertook the responsibility to certify him as a driver?
A. Because when -- when our agents contract with us, they perform services under Mayflower's DOT number, and so because they're under our DOT number, we serve as the compliance entity for all things: For their driver qualification files and things like that, and that may include some training of the drivers that are -- that are contracted with us.
Even though they don't work directly for us, the Department of Transportation doesn't look at that. They look at the relationship of the DOT

number and who they're hauling for, and because it's for our DOT number, we're obligated to provide that.

Q. All right. And Nicholas Burist was one such driver who operated under Mayflower's DOT number?

A. At one time, yes.

Q. And can we agree that, when Mayflower undertakes the responsibility of training a driver, it has to do so in a reasonable manner?

A. Yes.

Q. And it has to do so in compliance with the Federal Motor Carriers Safety Regulations?

A. Yes.

Q. And it would never be acceptable to have a driver on the road who was drunk or high or driving recklessly, can we agree on that?

A. I would agree on that.

Q. How does Mayflower receive compensation from its agents for military moves?

MR. EHRENREICH: Object to form.

A. So there's -- it's basically done on a percentage basis. So the payment would come into Mayflower, Mayflower would then remit payment to the agent, holding back Mayflower's percentage of

the business.

Q. Has there ever been a course of dealing, either between Mayflower and Joe Moholland or any other military moving entity, where the agent was paid first and then remitted its portion to Mayflower?

A. Not to my knowledge.

Q. In the Agency Agreement, one of the documents that you said you referenced or reviewed in preparation for your deposition today, have you seen the language where Mayflower asks its agents to aggressively seek out tender of loads?

A. I'd have to review the document. I don't remember that exactly --

Q. Sure.

A. -- but I --

MR. EHRENREICH: I'm going to give him what was used yesterday. I'm handing Jason JMI00003, Agency Agreement. You want to point out the specific paragraph for him.

MR. LANGLEY: Sure. You want me to or are you going to?

MR. EHRENREICH: You. You referenced it.

Q. Yeah, page 3.

A. Okay.

Q. If you look under 3A, B, and C, starting at the top, "The Duties of the Agent shall be: A: To represent the carrier in an active and aggressive manner in selling transportation services of the carrier."

Do you see that?

A. Yes.

Q. And what I'm asking you now is is there any time where the agent, Joe Moholland or any other agent of Mayflower, sells the transportation services and gets paid and then remits those funds to Mayflower?

A. No. No, they would -- they would sell the transportation services. They would then, when it's awarded, enter it into Mayflower's system, and then it would go through the Mayflower system so that Mayflower would get paid and it would go.

MR. EHRENREICH: Can you just clarify, when you say "they," can you clarify who "they" is? When we use pronouns --

A. I'm sorry, the agent. The agent would get the business. The agent would enter it into Mayflower's system, and then it would flow through

Mayflower's system.

Q. And I know that's how it's supposed to go. What safeguards are in place, if any, to prevent an agent from soliciting business on their own, actively and aggressively, as they're directed to do, and either keep the money all for themselves, even though it's in the course of this Agency Agreement, or not transmitting the full amount to Mayflower, all those kinds of things?

MR. EHRENREICH: Object to form.

A. Well, if they're performing it under Mayflower's DOT number, there would be things such as on there inspections and things like that that would let us know that that's happening, and then we wouldn't have record of the load, so that would be a safeguard.

I mean, we don't know what we don't know, but if they're conducting business on their -- on the agent's own -- if the agent is conducting business on the agent's own DOT number, then there would be no way to know that.

Q. So if Mayflower's put on notice of a DOT inspection outside the term of an Agency Agreement, what actions is it supposed to take to ensure that that agent isn't continuing to operate

under the Agency Agreement leading the public to believe that?

MR. EHRENREICH: Object to form.

A. Yeah, we would contact the agent, and each situation is so varied that we would deal with each situation independently, but we would immediately contact the agent and investigate what was happening.

Q. Are you aware that that scenario I just described took place in June, a few weeks before this wreck, where Mr. Burist had a DOT inspection and he was operating under Mayflower's DOT number and also in conjunction with Joe Moholland in Georgia?

A. Yes.

Q. And can you tell me anything that Mayflower did in response to that to prevent Joe Moholland or Nicholas Burist from continuing to operate under Mayflower's DOT number?

A. I'm not aware of actions that were taken with Joe Moholland at that time. I know that there were actions taken with the federal government to resolve the issue that it wasn't under our DOT number and that it wasn't our truck or our driver, and that that was resolved and the

federal government agreed that it was not, and so that -- those violations were removed from Mayflower.

Q. That was all done a month or so after this collision we're here about today, right?

A. Yeah, it takes time to work through the system.

Q. Well, are you aware of any action that Mayflower took between the time that the Georgia Department of Transportation put them on notice that Nicholas Burist was driving, in June, after the time period you say the Agency Agreement terminated, right?

A. Yes.

Q. Any action that Mayflower took to Joe Moholland, Nicholas Burist, Locke Relocations, any of those entities, to say "You can't be driving under our DOT number" prior to July 1st, 2022, when this collision took place?

A. No, I don't believe we were aware of it before then.

Q. I thought you said a moment ago that when you -- one of the ways that -- the safeguards you have is that, when trucks are out on the road and they're getting inspected and this kind of

thing, that would let you know that their -- they may be operating under your DOT number improperly.

A. Yes, sir, but our phones don't ring in the middle of the night when that happens.

It takes time for those reports to work their way through the system and then to appear on the sources that we use to audit such things and to audit what things were done.

And so it isn't instantaneous. It takes weeks, sometimes months, to work its way through the system.

Q. Your system, Mayflower's system?

A. No, the federal system.

Q. Okay. When did Mayflower get notice that Nicholas Burist was operating under its DOT number in June of 2022 using Joe Moholland as a transport and using the same truck that was involved in the collision?

A. I don't know the exact time. I'd have to -- we produced the documentation that we sent to the federal government, and so I would rely on those dates to know when that happened.

Q. Have you or Mayflower undertaken any investigation to determine when that actual notice was provided to Mayflower from the Georgia

Department of Transportation from the Federal Highway Safety Department? Any of those entities?

A. No, not that I'm aware of.

Q. So you're relying solely on the fact that in August there was this effort made to take Mayflower's name off of those inspections and those fines for the truck that was involved in this collision?

A. Yes.

Q. Can we agree it's possible that Mayflower was put on notice between the June date where Mr. Burist was stopped and cited and prior to the July 1st collision that took place that we're here about today?

MR. EHRENREICH: Object to form.

A. It's possible.

Q. On the 3C there: "The duties of the agent shall be to assist in the investigation and adjustments of claims or loss or damage to shipments transported under the operating authority of the carrier."

Do you see that?

A. Yes.

Q. What are all the ways that you can determine if a shipment is being made under the

operating authority of Mayflower as the carrier?
A. If you could give me just one second, let me read all of that sentence to get context here.
Q. Sure.
A. Okay. I'm sorry, could you repeat your question?
Q. Sure. What are all the ways that you would define the scope of the relationship for transportation under the operating authority for Mayflower? What does that mean?
A. It means any -- any loads that are transported in connection with Mayflower's operating authority.
Q. And what are the indicia of that? The DOT number on the side of the truck be one?
A. Yes.
Q. What are some of the others?
A. The load would be registered in Mayflower's system. The driver and the equipment would be qualified under Mayflower's DOT number would be mainly.
Q. And we talked about registered under Mayflower's system, that's the mainframe thing you told me about before?

A. Yes.
Q. And what does it mean to be qualified for the driver? I can't remember exactly what you said, the second indicia was there, but --
A. The equipment was the second one. It means, to be qualified, that they meet Department of Transportation Regulations: That we have a driver qualification file, they've been drug tested. All of those requirements from the compliance standpoint.
Q. Did you have a driver qualifications file on Nicholas Burist?
A. Yes.
Q. Any other indicia of transportation under Mayflower's operating authority other than registered under the Mayflower system, qualified equipment, like a driver qualification file, and the placement of the placard or the logo with the DOT number on it?
A. Yeah, the -- the only other one I'd add is there would be a bill of lading that would indicate Mayflower on the bill of lading.
Q. Okay. Any others?
A. No, not that I can think of.
Q. Has there ever been a circumstance where

the bill of lading does not identify Mayflower but identifies the agent only?

MR. EHRENREICH: Object to form.

A. I don't know. There could be. I don't know.

Q. Who prepares the bill of lading for military moves?

A. The government does.

Q. The government ever make mistakes about who the transportation provider is?

A. I imagine the government does make mistakes, yes.

Q. When that happens, does that disrupt the payment or the flow of the shipment, or do you guys just move on with it because that's the way it is with the government?

MR. EHRENREICH: Object to form.

A. You know, I don't know how that's handled. I would have to -- I would have to ask our operations folks about that.

Q. Have you seen the bills of lading in the transportation for the July 1st, 2022, collision?

A. Yes, I have.

Q. And did you come to any conclusions after reviewing those for the purpose of my

questions here today?
A. I did conclude that Mayflower's name was not on the bills of lading.
Q. All right. Any other -- sure, go ahead.
MR. EHRENREICH: Just handing the deponent JMI00677 and 679.
MR. LANGLEY: We'll mark that as Exhibit 5 in just a minute.
MR. EHRENREICH: I'm doing your job for you.
MR. FOSS: Thank you. Thank you. Need another copy?
MR. EHRENREICH: Thanks. I'll work it out with Charlie later, so...
THE WITNESS: Sorry, was there a question I'm supposed to answer?
Q. Your counsel handed you the Bill of Lading and wanted you to have an opportunity to review it before I ask you any other questions. Just let me know when you're ready.
(Plaintiff's Exhibits 4 and 5 marked for identification, J.S.)
Q. That will be 5.
A. Okay.
Q. All right. So we'll mark that one as

Exhibit 5. Do you see on the Bill of Lading there where it says North-West Movers, Inc., on the first page?
A. Yes.
Q. And then Moholland Transfer Company in parentheses underneath that?
A. Yes.
Q. What is North-West Movers, Inc.?
A. I don't know.
Q. Then similarly, on page 2, Slidell Moving and then Moholland Transfer Company, do you see that --
A. Yes.
Q. -- at the top? Then when it says "Tender To," that box is blank.
A. Okay.
Q. Right?
A. Yes.
Q. And what does that mean, "Tender To"?
A. I don't know what that means.
Q. When Mayflower accepts a government move, is it proper to say that the shipment is tendered to Mayflower as the carrier?
MR. EHRENREICH: Object to form.
A. I don't know. I don't know that

language.

Q. Okay. On the date of these orders, can we agree that the dates are March 15th on one and March 2nd on the other?

A. Yes.

Q. And both of those would have been within the time period of the Agency Agreement between Mayflower and Moholland?

A. Yes.

Q. Generally speaking, what are the duties of Mayflower, as the carrier, the duties of Moholland, or the agent, as it were, and then the duties of any independent contractor that Moholland would use for the actual work in the shipments and the moves under this agreement, back to Exhibit 4?

A. The duties of the transportation of the goods?

Q. Right. Just give me, if you can, a general overview, like you were teaching a middle school class one day: "This is what we do at Mayflower, this is how we have agents, this is what the agents do, and we have an agreement that outlines all of that."

If you were making that description for

me or, for a simplified explanation, how would you describe that?

A. Yeah, so it depends on what the customer's asked for.

The agent would send their people in to pack for the customer. If they requested to pack, they would pack. They would then load their goods onto a trailer, and then they would transport the materials to their new home, at which time they would deliver them in to the home, and unpack them if the customer asked to do that.

And then there's about a thousand variations of different things that could happen with, depending on the timing of the move, does it go into the warehouse for a time? If so, maybe another agent then would deliver it.

So there's -- it can get -- it's not always quite so clean, but for the purposes of the middle school class, that's how I would describe it.

Q. And you didn't make reference to the independent contractor that the agents would hire.

A. Right, yes.

Q. How would you describe that relationship and what oversight and responsibility Mayflower

has with that?
A. Yeah, so the independent contractors the agents hire would be qualified with Mayflower.
They would oversee the packing, they would oversee the loading of the truck, they would ensure that all of the goods are secured properly in the trailer, and then they would actually drive the truck and trailer to the destination.
Q. And you mentioned "qualified." So Mayflower qualifies the driver. Do they also qualify the equipment?
A. Yes, sir.
Q. And when they do so, do they have responsibility to make sure the equipment's in -- "they," I'll ask the question again so the pronoun's not confusing.
When Mayflower qualifies a driver, you told me they have a responsibility to do so in a reasonable manner, right?
A. Yes.
Q. When Mayflower qualifies the equipment that the driver is using, does Mayflower also have a responsibility to make sure that equipment is in proper working order?
A. Yes.

Q. And I asked you before: Did Mayflower qualify Mr. Burist as a driver.
Did it also qualify this equipment, M333 truck that was involved in this collision, as safe and suitable for road operation?
MR. EHRENREICH: Object to form.
A. Yes.
Q. Did Mayflower ever have an Agency Agreement with Locke Relocations directly?
A. No.
Q. Was it aware that Moholland had entered into an agreement with Locke Relocations?
A. No.
Q. Well, how would it know -- how would Mayflower know then who to qualify as a driver and who to qualify for the equipment if it didn't know who the independent contractors were?
MR. EHRENREICH: Object to form.
A. If the driver and the equipment were operating under -- going to operate under Mayflower's authority, the agent would inform us of that and we would then qualify them.
Q. Okay. And Mayflower did do that with Mr. Burist and the equipment he was operating but it did not do that with Locke Relocations?

MR. EHRENREICH: Object to form.
A. Yeah, I don't know. Outside of this, I don't know who Locke Relocation is, and that's still not clear to me. I don't know. So we don't know.
Q. All right. And we may be able to make it more clear in a moment because it appears that there's an agreement between Moholland and Locke Relocations that was prepared by UniGroup.
Were you aware of that?
A. No.
MR. EHRENREICH: Object to form.
Q. All right. Back to that. Did Mayflower ever have an Agency Agreement or any other type of contract with Total Military Management or TMM?
A. Not an Agency Agreement. TMM isn't an agency. They're a -- they're a third party but UniGroup does work with TMM.
Q. It looks to me like TMM is a facilitator that doesn't really do -- well, we've yet to get all their documentation, so I'll strike that.
What does Total Military Management do in the function of this sequence between carrier, agent, the independent contractor and the driver? How does TMM fit into that?

A. Yes, so they're one of the entities that works directly with the military in order to, to use your word, which is a good word, to facilitate the moves.
Q. All right.
A. So they would get it and then they would put that -- that move out to the various carriers.
Q. Some correspondence we've seen in this case indicates that TMM was paid 40 percent or so of the shipment payment, I guess from the government, for the July 1st, 2022, transport.
Is that a normal percentage for a facilitator?
MR. EHRENREICH: Object to form.
A. Yeah, I don't know. I don't know what their relationship with this move was.
Q. Well, when you have worked with them in the past, when Mayflower's worked with Total Military Management in the past, is that a standard percentage you have to pay to an entity that facilitates the order, I guess, from the government to the carrier?
A. Yeah, there is a percentage. I don't -- I don't know what that percentage is off the top of my head.

Q. Does 40 percent strike you as high?
A. No. I mean, it just depends.
Q. Okay. That would be relatively standard in the industry for facilitating military shipment?
MR. EHRENREICH: Object to form.
A. Could be, yeah.
Q. And what does Total Military Management do to earn that 40 percent?
MR. EHRENREICH: Object to form.
A. I'm not familiar with Total Military Management's internal workings.
Q. And you said there was not an Agency Agreement I think between Mayflower and Total Military Management. Was there ever any other type of agreement or contract?
A. I would have to check on that. I don't know if there's -- I know there's a relationship. I don't know that it's a contractual relationship.
Q. And what do you know about the relationship?
A. Just that we utilize their services to obtain military business.
Q. And when you utilize their services, what did they do for Mayflower other than

facilitate that transaction between Mayflower and the government?
A. That's what they do.
Q. Do they have any responsibilities other than making that connection?
A. Again, I don't know what their responsibilities with their agreement with the government is, but, yeah, they just make that connection.
Q. Does Mayflower have an indemnification agreement with Total Military Management the same way as it does with Joe Moholland?
A. No, not that I'm aware of.
MR. EHRENREICH: Object to form.
Q. And are you aware of any written agreement between Mayflower and Total Military Management?
A. I'm not.
Q. But there is some type of agreement, you just don't know the document?
A. Yes.
Q. Who would be the best person to identify that document?
A. Probably Brigid Shields.
Q. Can you spell that, please?

A. B-r-i-g-i-d, and Shields, S-h-i-e-l-d-s.
Q. When you worked with Total Military Management, did they get paid first and then distribute the funds for shipments, or does Mayflower get paid first and distribute the funds for the shipments?
A. I believe Total Military Management gets paid first and then distributes.
Q. And what is Brigid Shield's job definition?
A. She's one of our in-house counsel.
Q. Okay. Is there somebody you can tell me that's not a lawyer that I can talk to that would have the ability to tell me about these transactions and how payment goes?
A. I don't blame you for not wanting to talk to lawyers, by the way. Probably --
Q. You can see how they treat me.
A. Tony Arces.
Q. Okay.
A. A-r-c-e-s, Arces. He's our vice-president over pricing.
Q. Okay. Is there a software, other than the mainframe, that tracks payment of invoices, either from somebody like Total Military

Management or Joe Moholland or an independent contractor, however it may go?

A. No.

Q. So all of that invoicing, payment, accounting, all of that's done in the mainframe?

A. Yes, sir.

Q. Does it have any other name besides mainframe?

A. That's what we refer to it as.

Q. I kind of thought I saw like HOD or something like that.

A. No, that's -- that's how -- that's how the agents refer to it. I can't remember what HOD stands for, but, no, it's the mainframe is what we refer to it as.

Q. And if that thing goes down, Mayflower's just out of business for that day?

A. Yeah, it's bad.

Q. Big deal?

A. It's a big deal.

Q. All right. Did Mayflower do any moving or shipments with Joe Moholland other than military moves?

A. Yes.

Q. What other types of moves?

A. Just residential, individual family moves, yeah.

Q. Were there any other contracts or just this one Agency Agreement we've marked as Exhibit 4?

A. Yeah, no, this Agency Agreement would cover the total relationship.

Q. I want you to flip over to page 10, JMI10 on that Agency Agreement.

A. I'm sorry, you said page 4?

Q. Page 10.

A. Oh, page 10.

Q. Yeah, that is Exhibit 4, so JMI10.

A. Okay.

Q. It should say 2008 Amendment to Agency Agreement at the top.

A. Yes.

Q. Do you know why this document, JMI10 and JMI11, was not produced by Mayflower?

MR. EHRENREICH: Object to form.

A. No, I don't.

Q. Would there be any reason to exclude it from this case?

A. No.

Q. If you look on the next page, it's for

"Agent: Joe Moholland 333," correct?
A. Yes.
Q. And that's the same marking and identification that was on the truck that was involved in the collision with my clients on July 1st, 2022, correct?
MR. EHRENREICH: Object to form.
A. Yes.
Q. Look on that second page to -- excuse me, page 11. Page 2 of that supplement, paragraph F. If you could read that and then I'm going to ask you a question about it.
A. Do you want me to read it aloud?
Q. You can just read it to yourself.
A. Okay. Okay.
Q. And I'll read the portion I'm going to ask you about now. It says "Any notice provided for in this paragraph" -- which is about termination, if you look up at the prior page -- "shall be deemed to have been given the day it is delivered personally or one business day after being sent by express overnight courier service or three business days after being deposited in the United States mail, certified, postage prepaid, addressed to the party entitled to receive such

notice at its principal place of business."

Did I read it correctly?

A. Yes.

Q. Are you aware of any documentation that reflects that that provision was complied with in the termination notice sent to Joe Moholland?

A. No.

Q. Then down on paragraph G, if you could read that one, then I'm going to ask you a question about that, particularly the last sentence.

A. Okay.

Q. The last sentence says "As to any shipment that has commenced prior to the date on which this agreement is terminated, the terms, provisions, and conditions of this agreement will continue to apply to such shipment."

Did I read it correctly?

A. Yes.

Q. Can we agree that Mayflower's position is that the Agency Agreement terminated on April 28th, 2022?

MR. EHRENREICH: Object to form.

A. No. The Temporary Agreement terminated at that date. The Agency Agreement terminated, I

believe it was January the 20th, 2022, at which time a Temporary Agreement was -- a Temporary Agency Agreement was issued, and that temporary agreement terminated April 28th, 2022.

Q. All right. Can we agree that the Temporary Agency Agreement states that "This agreement creates no rights or obligations not already existing and does not modify or alter the party's rights or obligations under the terms of the Agency Agreement"? It's paragraph 6. Sorry.

A. On the Temporary Agreement you're reading?

Q. Correct. Last paragraph. Last sentence of paragraph 6.

A. Yes.

Q. Okay. So the Temporary Agency Agreement, we can agree, terminated April 28th, 2022, based on Mayflower's contentions?

A. Yes.

Q. And that agreement references back and doesn't change any of the terms of the existing Agency Agreement, correct?

MR. EHRENREICH: Object to form.

A. Yes.

Q. And so back to the JMI10 -- or, excuse

me, 11, G: "As to any shipment that is commenced prior to the date on which this agreement is terminated," which would be including all the paragraphs we just referenced, April 28th, 2022, by Mayflower's context?

A. Right.

Q. Can we agree that the bills of lading reflect that this shipment commenced on March 15th and March 2nd, 2022?

MR. EHRENREICH: Object to form.

A. I agree that that's when it commenced, yes.

MR. LANGLEY: Let's take a short break.

THE VIDEOGRAPHER: We are going off record at 10:06 a.m.

(Temporary recess was held.)

THE VIDEOGRAPHER: We're on standby. We are back on the record at 10:20 a.m.

Q. All right. Mr. Jones, did you have any discussions with your counsel about the substance of the case while we were on the break?

A. No, sir.

Q. Okay. Did Mayflower do any marketing for Joe Moholland as its agent?

A. Not specifically for Joe Moholland.

Mayflower does marketing for the Mayflower brand and for services, but not specifically for the agent.

Q. When Mayflower does its marketing, does it promote itself to provide the services like you described to me earlier, basically a higher level of efficiency, access to higher insurance, more driver training and responsibility?

A. You know, they're more marketing towards homeowners, and so most of the marketing is more about, yeah, caring for your goods, safety of that, ease of moving, things like that.

Q. Is there any difference really, whether it's marketing to a homeowner or just the public at large, about Mayflower being this name you can rely on to provide this security and proper training and all of that?

A. We don't -- Mayflower doesn't market our insurance coverages, but we market that it's a good, safe company that would care for their goods.

Q. And be responsible to the public, train the drivers appropriately, check equipment appropriately, all that sort of thing?

A. Sure. I mean I don't know that that's

specifically in the commercials or ads, but that's certainly what we represent.

Q. Well, the idea is there, right? I'm sure the marketing people put their spin on it, however they do, but the idea is to leave the public with the perception that Mayflower is this significant big name brand that you can rely on to be a trustworthy, corporate partner for shipments in America?

A. Yes.

Q. And part of that includes proper training of drivers and making sure equipment's safe and that kind of thing?

A. Yes.

Q. And so when drivers move from Mayflower to -- qualified drivers move on to other entities and work in any other places, do they carry that qualification with them?

A. Yes.

Q. All right. And is there any time where any qualification of Nicholas Burist by Mayflower was ever terminated prior to July 1st, 2022?

A. He was -- he was terminated as a -- his qualifications to perform services under Mayflower's DOT number was terminated on April --

April 29th, I believe, of '22.

Q. And was there any direct communication to Nicholas Burist that said "You are no longer qualified to operate under Mayflower's DOT number" prior to July 1st, 2022, that you can point me to?

A. No.

Q. Were there any marketing efforts made on behalf of Joe Moholland or any other agents after that April 29th, 2022, date?

A. Again, as I said before, Mayflower does not market for specific agents, so, no.

Q. Did Mayflower conduct any investigation into the collision of July 1st, 2022?

A. No.

Q. After the April 29th, 2022, date, are you aware of the 60-day period where that was provided to -- for the removal of logos and some other things like that?

A. Yes.

Q. Can you tell me any more about that time period and the relationship between Mayflower and Joe Moholland during that?

A. It was -- there was -- there was no relationship between them at that time. It was just a time period for them to remove our brands

from all of their buildings, equipment, everything.

Q. Was that done?

A. No.

Q. And have you seen pictures in the course of this litigation where it's not done today, there's still Mayflower trucks and trailers on the lot at Joe Moholland?

A. I have not --

MR. EHRENREICH: Object to form.

A. I have not seen that.

Q. Would you be surprised to learn that?

A. Yes.

Q. Were there any agreements for shared equipment or lease of equipment or anything like that between Joe Moholland and Mayflower after that April 29th, 2022, date?

A. No.

Q. Were there any shared software programs after that date?

A. I don't think so. There was -- there was one -- I remember, as I reviewed documentation, there was a -- they had requested additional 30 days for some software on the sales side that they wanted to keep, which was granted,

but other than that, there wasn't.

Q. I asked you earlier about the mainframe database and any search that was done to see if this July 1st, 2022, shipment was placed into that Mayflower database.

Is there a separate database for United Van Lines or any of the other entities that we see on that organizational chart?

A. No.

Q. There would just be one database that would cover all the moves, all the shipments, for all these hundreds of agents?

A. That's correct.

Q. And how long did Mayflower spend searching that for the July 1st, 2022, collision shipment -- or shipment that resulted in the collision that we're here about today?

A. I don't know how long it took.

Q. Do you know who did that search?

A. No, I don't.

Q. And in the course of your preparation did you do anything to make sure the search was conducted accurately?

A. No.

Q. Did Mayflower provide any IT support to

Joe Moholland for Locke Relocations or Nicholas Burist?

A. For their IT systems?

Q. Well, I guess really more on the EDL and tracking type systems in the truck and any type of data recorders or any communication from the truck to the -- from the truck driver back to Joe Moholland or Locke Relocations.

MR. EHRENREICH: We went from mainframe to EDL. Now we're just dealing with the EDL? Because you asked --

MR. LANGLEY: Well, let me ask my question again.

MR. EHRENREICH: Yeah.

Q. Are you aware of any software or technology at all where Nicholas Burist, Locke Relocations, Joe Moholland, any of those entities would have shared that software with Mayflower for communications purposes?

A. During what time period?

Q. Prior to July 1st, 2022.

A. Yes, at any time prior to that, when they were -- when they were an agent for us, yes, there were.

Q. And how did that work?

A. Specific to an ELD, there's an ELD in compliance with federal regulations on board the truck, which provides electronic logging and other telematics.
Q. What does telematics mean?
A. Telematics records things such as speed, hard braking, where there's a forward facing camera, when they were with us, gives some engine data.
Q. Okay. When was that ELD system or telematics system removed from the M333 truck involved in this collision?
A. I don't know.
Q. Do you know if it's still there today?
A. I don't.
Q. Do you know if Mayflower was receiving those communications on July 1st, 2022?
A. No, they were not.
Q. How do you know that?
A. Because the truck associated with that ELD was no longer active in our system.
Q. Can you point me to any documentation that would show that that ELD communication was terminated? I guess you're talking about between April 29th, 2022, and July 1st, 2022?

A. Right, right. On April 29th all of the equipment was -- all the equipment was disqualified from our system and, as such, we would no longer be receiving any of that information from that ELD.

Q. How does equipment become disqualified from a system?

A. It's a computer thing where we go in and mark it as disqualified, so it no longer appears on any operations boards or within our system that would be auditable to the DOT.

Q. And in the course of your preparation for today, did you investigate whether or not that ELD and telematics equipment was, in fact, disqualified on the M333 truck --

A. Yes.

Q. -- between April 29th and July 1st, 2022?

A. Yes, it was.

Q. And can you point me to the document that shows that or some type of metadata receipt or any electronic form or email or any anything whatsoever that would show that actually took place?

A. No.

Q. Is it possible that that ELD and telematics equipment continued to transmit information to Mayflower after April 28th and up to and through July 1st, 2022?

MR. EHRENREICH: Object to form.

A. No.

Q. How do you know that if you can't point me to any documentation that shows it was cut off?

A. Because it -- the information is not transmitted directly to Mayflower --

Q. Okay.

A. -- even for trucks that we have in our system. It's transmitted to the third party. Samsara is the name of the company, the third party. It's transmitted to them and then they then put it in a workable form and transmit it to us, to Mayflower.

And so they would only -- they have many, many customers, and so they would only transmit back to Mayflower equipment and drivers that are registered in our system and affiliated with Mayflower.

So if they were no longer affiliated with Mayflower, that company would no longer remit that information to us.

Q. And how often does Samsara provide that data to Mayflower about its drivers?

A. It's constant. It's realtime. Almost realtime.

Q. But you can't point me to any documentation that shows from the mainframe that Samsara was told "No longer transmit information for Nicholas Burist or M333"?

A. I -- we could get that, I imagine. I don't have it now.

Q. Well, I think it's pretty important. So would it be easy for you to get that and provide it to your counsel?

A. Yes.

Q. All right. I'd ask you to do so.

A. Yeah.

Q. And if you could describe for me what it would look like.

MR. EHRENREICH: So I'll get an email from counsel afterwards, and then we'll go through.

Q. If you could describe for me what you think that would look like, that way I can draft the email that Todd's talking about accurately.

A. I don't know exactly what form it would

come in. We'd have to get with the folks that do that. I don't know.

Q. Okay. Well, if you were describing -- if you were me writing the email to Todd, how would you describe the document or email or correspondence or whatever it is that shows that this termination with Samsara took place regarding Nicholas Burist and that M333 truck?

A. Yeah, I would just ask for documentation that the Samsara device in that truck was no longer being monitored by Mayflower.

Q. Okay. By "that truck," is it sufficient to describe it as M333?

A. No.

Q. Would we be talking about the same thing?

A. No, M333 is a -- is the agent code for Joe Moholland. It's not specific to a truck, so that would not be sufficient. Probably --

Q. We've seen -- I'm sorry, go ahead.

A. Probably a VIN number --

Q. Okay.

A. -- would be sufficient.

Q. Have you seen the logo markings on the truck involved in the collision that say "M333"?

A. Yes.
Q. Are there any other trucks that bore that logo?
A. Probably.
Q. But you don't know that for sure?
A. I don't know. I know Joe Moholland's agency number in our system was M333.
MR. LANGLEY: 6?
THE REPORTER: I think so.
MR. FOSS: Yes, 6.
MR. LANGLEY: We'll mark the police report as Exhibit 6. Show this to Todd.
MR. EHRENREICH: Okay.
(Plaintiff's Exhibit 6 marked for identification, J.S.)
Q. So, Mr. Jones, we've marked the Georgia Motor Vehicle Crash Report for this collision on July 1st, 2022, as Exhibit 6 and the VIN --
MR. EHRENREICH: Just give him another second. I think he's reading.
MR. LANGLEY: Okay. Yeah, I'm sorry.
Q. Let me know when you're ready.
A. Okay.
Q. All right. So going back to making sure I accurately described this request for this

Samsara information, my understanding of the VIN number that you've asked me to provide in that request is the one that we see on this Georgia Motor Vehicle Crash Report for the 2014 International ProStar that was involved in the collision.

You see that VIN number there on the sheet?

A. Yes, yes.

Q. All right. Is that the same VIN number we're talking about so there's no confusion about what we're asking for with the Samsara --

A. Yes.

Q. -- information?

A. Yep, if -- yeah, if that's the truck that was involved in the collision, then yes.

Q. Okay. All right. If you flip back over to the Agency Agreement, that's Number 4, Exhibit 4. I'm going to go to JMI008 at the bottom right there. Paragraph J. Have you read that paragraph before?

A. I have. Let me read it again to refresh my memory here.

Q. Sure. Let me know when you're ready.

A. Okay.

Q. All right. In the last -- well, first let me ask you, does this paragraph deal with the responsibilities of Mayflower as the carrier and Joe Moholland as the agent after the termination of the agreement with regard to name, logo, trademark, service mark, trade name, trade dress, or design, material furnished by Mayflower?

A. Yes.

Q. And in the last sentence, does it state that there's a liquidated damages provision that in the event that Joe Moholland does not properly remove names, logos, trademarks, DOT numbers, from its vehicles, that Mayflower has the right to charge Joe Moholland $250 per day for any unauthorized use of those logos or DOT numbers?

A. Yes.

Q. Did Mayflower ever charge Joe Moholland any amount at any time for improper use of Mayflower's DOT number or logo?

A. No.

(Plaintiff's Exhibit 7 marked for identification, J.S.)

Q. I'll show you what we've marked as Exhibit 7, I believe.

MR. FOSS: Here's another copy.

MR. LANGLEY: Todd, I don't know if that was marked yesterday.

A. Is that your copy of that?

Q. Yeah, maybe an extra. So we had asked in our document request and then identification of the notice for the deposition today and the topics for the VIN numbers, DOT numbers, license plate numbers for the tractor and trailer involved in the litigation and any relationship between Mayflower and Joe Moholland or Nicholas Burist.

And I believe that this documentation was identified as responsive to that request, and it looks to me to be various invoicing between Joe Moholland and Mayflower.

So my question to you is is that what these documents look like to you as invoicing between Joe Moholland and Mayflower?

A. Yes.

Q. And can you tell me, starting just with the first document, Mayflower 61, what this payment would be for on October 24th, 2022, four months after the collision involving my clients where it appears that Mayflower paid Joe Moholland $5,791.26?

A. No, I don't know what this is for.

Q. Can we agree that payment between Mayflower Transit and Joe Moholland Moving four months after the collision involving my clients is an indication that Mayflower and Joe Moholland were continuing to do business together during that time period?

MR. EHRENREICH: Object to form.

A. No.

Q. Why would Joe Moholland be paid by Mayflower on October 24th, 2020, and all these other 80-some pages of invoices after July 1st, 2022, if there wasn't some type of ongoing business relationship?

THE REPORTER: You said 2020.

Q. 2022. That's what I intended to say.

MR. LANGLEY: Thank you.

A. As I testified earlier, these payments are not necessarily indicative of ongoing loads being hauled.

So we keep these agency statements open for 18 months after -- after termination because things need to be settled out, and things can change for 18 months up there: So a load could end up paying differently, a claim can happen.

There's a lot of things that can happen

far after the fact that would -- where monies would need to be exchanged, but it is not indicative of an ongoing active relationship.

Q. Tell me what these payments are for then.

A. I don't know. It doesn't say that on here.

Q. Are there any of the documents that reflect -- I mean, these were produced by Mayflower and it says "Agency Statement - Mayflower Transit" at the top, right?

A. It does say that.

Q. And it says "For the period ending 10/26/2022." I mean, I didn't create that document. Mayflower created that document.

A. Okay.

Q. So my question now is do you refuse to concede that an Agency Statement produced by Mayflower Transit for a period ending October 26, 2022, indicates an ongoing agency relationship between Mayflower and Joe Moholland Moving?

MR. EHRENREICH: Object to form.

A. I concede that there's ongoing -- could be ongoing payments from business previously conducted between the two entities. I do not

concede that this is indicative of continuing loads being hauled after the termination date.

Q. Well, my question is not is it indicative of loads being hauled.

My question is did Mayflower create a document -- that we see Mayflower 61 and all these others behind it that says "Agency Statement - Mayflower Transit For the Period Ending 10/26/2022, for M333 - Joe Moholland Moving"? Can we agree that's what it says at the top of the sheet?

A. That's what it says at the top of the sheet.

In the beginning of this deposition you told me that I could clarify anything that I felt to make sure that everything happened.

That's what I'm doing. I'm -- you're asking me a question and I'm telling you that I agree that this is indicative that things continued to happen.

I don't, however, agree that it's indicative of an ongoing active hauling relationship with Mayflower, and I'm clarifying that for you, as you instructed.

Q. I appreciate that, and we're talking

past each other, I think. All I'm asking you -- and I think one word is being changed in each of your answers that's different from my question.

My question is does the document, and set of documents we've marked here, that say "Agency Statements - Mayflower Transit," for the periods that are listed here, all subsequent to July 1, 2022, for M333 - Joe Moholland Moving, indicate an ongoing agency relationship?

MR. EHRENREICH: Object to form.

A. I've answered your question.

Q. Well, you've answered it by adding "hauling" or "shipment" or "continued loads," and that's not my question. So that's I think the difference.

MR. EHRENREICH: Object to form.

A. Okay.

Q. My question is specific to an Agency Agreement. Can we agree an Agency Statement between Mayflower Transit and Joe Moholland Moving for these time periods indicates an ongoing agency relationship during those time periods?

MR. EHRENREICH: Object to form.

A. You said an Agency Agreement. This is not indicative of an active Agency Agreement, no.

Q. An Agency Statement is not indicative of an active Agency Agreement?
A. No.
Q. And you can't tell me what these payments are for?
A. No.
Q. Are there any other records that would reflect what these payments are for?
A. I'm sure there are. I have not memorized every payment for every load in our system, so I don't -- I can't tell. It's not on here, but I'm sure we do have some records of what these would be for.
Q. Who would know the answer to that question?
A. I'm sure our accounting department. We would be able to find that out.
Q. Could you identify -- do you need to take a break?
A. No, I am fine.
Q. Can you identify a person for me that would be able to say and confirm to these families that have suffered so much that these payments are not for the load that was being shipped on July 1st, 2022?

A. I can -- I can confirm that these payments were not that.

Q. How?

A. Because it couldn't have happened. It wasn't -- and let me explain to you why it couldn't have happened.

It wasn't our load. The load was never registered in the Mayflower system. The truck that was hauling it was not in the Mayflower system; therefore, nothing could be attached to that truck.

The driver that drove was not in the Mayflower system; therefore, that driver could not be connected to any load within the Mayflower system.

So there's three -- there's three different things that we have confirmed, without a doubt: The loads were not in our system, we know that; the driver was not in our system, we know that; and the truck was not in our system, we know that.

So because I know that, I know that these payments could not be for a load that we did not haul, that we did not register, with a driver that we did not have a relationship with, and a

truck that we did not have a relationship with.

Q. How can you know that with such certainty? How can you tell me this driver is not in the system?

I mean, again, you're saying -- I'm asking you to prove a negative, but you're asking me to trust you on behalf of this company that you work for and who pays your bills and pays for your family. You've got certainly an incentive, and I know you want to answer but let me get this question out.

How can you identify for me any documentation -- or can you identify for me any documentation to prove what you just said, that, in fact, they're not in the system and were not in the system on July 1st, 2022?

A. Yeah, so we have provided you documentation of the cancellation, of when the cancellation was done on October -- on, I'm sorry, April 29th.

Q. Talking about the emails?

A. Yes.

Q. Okay.

A. I'm here -- I'm here testifying to that fact under oath, honestly and morally, which is

why I'm here doing, and so my testimony is that that stuff happened.

Q. I understand, but I think your testimony earlier was, and you correct me if I'm wrong, but that you didn't look at the system, right?

A. Right.

Q. You didn't do the search for Nicholas Burist, you didn't do the search for this truck.

A. But I'm not here testifying -- sorry.

Q. You didn't do the search for this shipment.

A. But I'm not here testifying for me. I'm here testifying on behalf of my company and I know that those were done.

Q. And I want to know who did them and if there's any receipt or documentation or confirmation that that search was done.

A. We provided that to you.

Q. I don't think I've seen a documentation that reflects that other than an email that says communication. What I'm thinking of is some type of electronic document.

You know what metadata is? Have you ever heard that phrase?

A. No.

Q. When you make a change on a word document and then you go back and delete it, there's some sort of record behind it.

It's like soft- -- you know, IT people that are a lot smarter than me can go back and look at a history.

Is there anything like that that you're aware of? Like an audit trail? Maybe that phrase is something similar.

A. Yes, in -- in -- perhaps my attorneys would have to help me here, but, in the discovery that we provided, there was documentation of the disqualification of the driver that I remember seeing, so we can point to that.

Q. Okay.

A. And it happened, my memory serves, it was on April 29th of 2022 that he was disqualified in our system.

MR. LANGLEY: Okay. Is that something that's been provided, Todd, that you know of?

MR. EHRENREICH: I believe so. I believe that there was supplemental, yeah.

THE WITNESS: Yes.

MR. LANGLEY: Let's go off the record for a second.

THE VIDEOGRAPHER: We are going off the record at 10:51 a.m.
(Temporary recess was held.)
THE VIDEOGRAPHER: We're on standby. We are back on the record at 10:54 a.m.
Q. All right. So your counsel's going to see if we can find that document that you referenced about. The way I understood it, it's some type of confirmation of a termination of Nicholas Burist as a driver from Mayflower on April 29th?
A. Yes.
Q. All right. And we'll come back to that if we find it. So on this exhibit I want to ask you a few more questions and see if you can identify any other payments for me.
On Mayflower 62, if you look, again it says "Agency Statement - Mayflower Transit, Joe Moholland Moving," right?
A. Yes.
Q. And it says, halfway down, a third of the way down, "UPS," United Parcel Services, is that right?
A. Yes.
Q. And then some other information and the

total payment was $1,627.88. Can you tell me what this was for?

A. Just looking what I see here, it looks like there were some claims items.

As I mentioned before, sometimes the claims come in after the fact and so it was -- I would concur that -- or I would deduce that there was something with claims from looking at this.

Q. Well, it looks like there's a Balance Forward at the top of $1714.76, right?

A. Yes.

Q. And then the two claims items total 55.99 and those appear to be reduced from that Balance Forward, right?

A. Yes.

Q. So can you tell me what that Balance Forward is for? And is M451 there by that 10/17/22 date, is that another code like M333?

A. Yes.

Q. So could that indicate that there was a shipment done between Mayflower Transit and Joe Moholland Moving under M451's contract?

A. Not necessarily. It was -- these were -- these were claims items. I don't know when the shipment for these claims was done. It could have

been any time, so we'd have to again investigate that further. I don't know from this.

Q. All right. But the date on this document is 10/19/22, can we agree on that?

A. Yes.

Q. Okay. Next one 10/12/22, again back to "M333 - Joe Moholland Moving" -- and actually the prior document at the top also said "M333 - Joe Moholland Moving," right?

A. Yes.

Q. Another $1714.76. Can you tell me what this one's for?

A. Again, this is a monthly agent statement. It's the --

Q. Monthly or weekly?

A. I'm sorry, weekly. And so it looks like there was no activity this week on it and they just had the balance.

Q. Okay. That's the prior balance from the week that we just looked at?

A. Yes.

Q. All right. Next one, 10/5/2022, if you look under 9- -- the second entry, line 2, where it says "9/29/22" --

A. Mm-hmm.

Q. -- is that a bill of lading number U0164-00545-1?

A. I don't know.

Q. And further down where it says "Driver M25644," can you tell me what that means?

A. No.

Q. Does this indicate that a driver was paid a hundred twenty-five dollars for something between Mayflower Transit and Joe Moholland Moving on October 5th, 2022?

A. It looks like this was -- again, it says -- it says above the number 2 there in the middle, that it was in the Claims System. So this was something to do with the claim that had come in.

Q. Well, again, the Balance Forward is a different amount than that, right?

MR. EHRENREICH: Hey, Ryan, I have the document. Let me go get it printed out.

MR. LANGLEY: Okay.

MR. EHRENREICH: Just give me one minute.

MR. LANGLEY: Sure.

THE VIDEOGRAPHER: You want to stay on?

MR. EHRENREICH: No, this will just take me two minutes to get the document.

THE VIDEOGRAPHER: You want to stay on?
MR. LANGLEY: No, we're off.
THE VIDEOGRAPHER: We're going off the record at 10:59 a.m.
(Temporary recess was held.)
MR. EHRENREICH: Okay. We can go back on.
THE VIDEOGRAPHER: We are back on the record at 11 a.m.
MR. LANGLEY: Are they making some copies?
MR. EHRENREICH: I'm getting them. So I just figured keep going. When she brings them in, we can change course.
Q. We were talking about this Mayflower 64 document, Mr. Jones?
A. Yes.
Q. And I think you were describing to me that you were unable to give any specifics about this, but you believe, based on what the language says, it's a claims made?
A. Yes.
Q. What are some of the claims that could have been made during this time period by a driver for the Moholland and Mayflower Transit

relationship that would be called an Agency Statement?

A. This wouldn't be a claim by the driver. This would be a claim by the customer, and that's just referencing the driver that -- could be referencing the driver that hauled that particular load that is in question here.

Q. So we don't know if this shipment was done September 21st, 2022, September 21st, 2021?

A. Correct.

Q. Same questions on the next page, what are the "LEAS Invoices - Trans Advantage"? What does that mean?

A. That is the lease invoices for Trans Advantage.

Q. Okay.

A. So it looks like there was some equipment being leased from Trans Advantage.

Q. And so, as part of the Agency Agreement between Mayflower Transit and Joe Moholland Moving, there was continued lease of equipment as of September 22nd, 2022?

A. No, that would not be contained within the Agent Agreement. Again, Trans Advantage is a separate entity from Mayflower and does business

independent of Mayflower. They lease -- they lease equipment to people outside of Mayflower in the market.

Q. Can you read for me what the heading is on this document into the record?

A. It's an Agency Statement on Mayflower Transit for the period of September 28th, '22, for M00333 Joe Moholland Moving.

Q. You believe this document shows an invoice of equipment from LEAS Invoices - Trans Advantage between those entities and Joe Moholland Moving?

A. Yeah. Yes, it isn't uncommon for third-party services to be run through the Agency Statement that the agent might sign up for. We have several of those types of third-party services that they get and then it's just run through their Agency Statements, so that's not uncommon.

Q. Can we agree that this indicates an ongoing lease arrangement between Trans Advantage -- which is a Mayflower or UniGroup entity, right?

A. Yes.

Q. -- and Joe Moholland Moving as of September 28, 2022?

A. Yes.
Q. All right. Next page says "Toll Invoices: Mayflower." Again, same heading, "Agency Statement - Mayflower Transit."
This time for the period ending September 22nd, 2022? Do you see that?
A. Yes.
Q. And it indicates I guess an invoice by Joe Moholland to Mayflower for tolls that were incurred maybe in Maryland? Is that what MD stands for?
A. Yes.
Q. For July -- excuse me, June 11, 2022, and June 13th, 2022, on again the M00333 Agency Agreement?
A. Yes.
Q. Did Mayflower pay for tolls incurred by Joe Moholland Moving on June 11th and June 13th, 2022?
A. I don't know if that's the date of when the tolls occurred, if that cost was incurred there or not, but it appears that that's -- it was for a toll.
Q. All right. And do you have any indication that it was for a different date that

the toll was incurred?
A. No.
Q. Because the toll date is one date and then the invoice date is another, can we agree on that?
A. Yes.
Q. Does that lead you to believe that the toll was incurred on the June 11th and June 13 dates?
MR. EHRENREICH: Object to form.
A. Yeah, I don't know that.
Q. Do you have any basis to refute that?
MR. EHRENREICH: Object to form.
A. I'm just saying I don't know. I don't know when it was done.
Q. So I'll accept that you can't point me to anything that would indicate that tolls were incurred on any other date?
A. No.
Q. If, in fact, Mayflower paid invoices for tolls in June of 2022 that were incurred by Joe Moholland Moving, would that indicate an ongoing agency relationship in June of 2022, payment of tolls incurred on that date?
A. Not necessarily. If they were not

removing our insignias from the side of their trucks and went through a toll, then it could be that it was assessed to us, to Mayflower, erroneously.

As you can see, that was charged back to Joe Moholland, so Mayflower did not pay those tolls. They were -- Moholland paid them.

Q. Show me where you're looking at to show the chargeback.

A. Well, where it says "$10.20," it's under the category of "Due Headquarters," HQ, Due Headquarters. The other side is what's due the agent.

So that indicates that it was a payment -- that this was an invoiced payment to Mayflower from Joe Moholland. It's deducted from their current balance. And as you see, the total amount there, you'll -- the balance, you'll see that it is reduced by that amount.

Q. Okay. So your interpretation of that is, because the amount due to the agent was decreased by the toll -- well, you tell me what that means to you because isn't that the normal course of business? That when Joe Moholland incurred a toll during the pendency of the Agency

Agreement, that was reduced from their balance owed --

A. Yes.

Q. -- from Mayflower to Joe Moholland?

A. Yes. What I'm -- yes, what I'm saying is we know, unfortunately, that the Mayflower insignias were not all removed from all of Joe Moholland's equipment, so that could have been the case of why they received a toll if indeed these dates, the 6/11 and 6/13 date, represents when the tolls were actually incurred, it could have been done because of those unauthorized decals on the truck and would not necessarily indicate an ongoing relationship.

Q. But you're speculating about that, you don't know?

A. Sure, as you're speculating that there is.

Q. Well, I don't have anything to go on but this. You've got access to all of the Mayflower --

A. Yeah.

Q. -- databases and ways to confirm.

A. Yes.

Q. Right?

MR. EHRENREICH: Let's ask a question.

A. Yes.

Q. So you're in a position of superior knowledge. So saying I'm suggesting something does not advance the ball.

A. Yeah, so my speculation would be testimony.

Q. Can you point me to anything that, on this document or any other, that shows that these tolls were not incurred by Joe Moholland on June 11th and June 13th and then paid for by Mayflower?

MR. EHRENREICH: Object to form.

A. No.

Q. And that was the way it was done prior to April 29th on the invoicing? If Joe Moholland went through a toll, it would be invoiced just this same way in the course of business for the Agency Agreement, correct?

A. Yes.

Q. Same thing on the next page. "UPS Invoice 9/10/2022," sent for reimbursement 9/13/2022.

Can you think of any reason why Joe Moholland would have the right to bill Mayflower under an Agency Agreement for M333 for UPS

invoices on September 13th, 2022, if there was not an ongoing Agency Agreement?

A. I don't know what that was for, but you have it backwards again. Joe Moholland is not billing Mayflower for that. Mayflower is billing Joe Moholland for that.

Q. Okay.

A. And I don't know what that was for.

Q. Well, same question then, is that the same way the billing would have been done during the period where we agree that the Agency Agreement was in place up to April 29th, 2022?

A. Yes.

Q. And can you tell me then any reason, other than the existence of an Agency Agreement on September 13th, 2022, why we see this billing between Joe Moholland and Mayflower?

A. I don't know specifically on this, but as I previously testified, agency statements are kept open for 18 months.

Balances are not paid out in full for 18 months, because there's residual things such as what we're looking at that happened as the relationship winds down, and there's always residual things that happen, whether it's claims,

whether it's whatever, so it is -- it is how it would be.

It is not indicative of a continuing contractual relationship between the two entities.

Q. But it is the same course of business we would see if we looked at similar invoices during the period where we agree that there was an agency contract?

A. Yes.

Q. And if you want to just look through and confirm that for each of these, that all of these would have been done in the same course of business, this exact same way, if the time period had been during -- during the period where we agree there was an agency relationship, then we can kind of move on from the tedium of all of them.

A. Yes, I can -- I agree to that.

MR. LANGLEY: Two pages?

MR. EHRENREICH: I think I gave you six pages total.

MR. LANGLEY: Oh, there's one copy?

MR. EHRENREICH: I have one I was going to keep and one I was going to give to the deponent and that's your working copy, so...

MR. LANGLEY: Very good. Thanks.

(Plaintiff's Exhibit 8 marked for identification, J.S.)

MR. LANGLEY: Thank you, Mark, for providing that, Mark.

Q. All right. Mr. Jones, let me know when you've had an opportunity to review Exhibit 8.

A. Okay.

Q. All right. So tell me what these documents are we're looking at.

A. So this is -- these are print-outs from the mainframe which would be the driver qualification file. So if you see at the top there it says "V/O Information," that refers to van operator, which is how we refer to drivers as van operators.

Q. Okay.

A. You'll see the "VO/ID." So his ID was M22132 in our system, and then "Status: Cancelled 4/29/22."

Q. All right. What's the significance of the date July 5th, 2022, in the upper right?

A. That was probably the date that these reports were run.

Q. How do we know that's not the date that

they were created, that there was a backdate to cancellation of 4/29/2022?
A. I don't know how to prove that.
Q. Did Mayflower do any investigation to ensure that -- the accuracy of these documents or audit of any kind to confirm that, in fact, the cancellation was entered in the system on April 29th, 2022, as opposed to July 5th, 2022?
A. I'm not aware that any investigation like that took place.
Q. Okay. Where it says "Qualifications: license Expires July 6, 2025," would that be for Mr. Burist?
A. Yes.
Q. It says "Phys. Due," I assume that means physical due?
A. Yes.
Q. 9/16/2022?
A. Yes.
Q. And so Mayflower was monitoring Mr. Burist's license and when his physicals were due?
A. Yes.
Q. And by "his" I mean Nicholas Burist.
A. Yes.
Q. What does it mean down where it says

"12/Month, Rating, SCR, Haul," all that -- all those entries?

A. Those are internal ratings for performance ratings. It's a rolling 12 months, so we look at 12 months of how much they hauled, driver rating, which is a makeup of claims safety, customer feedback. It's internal ratings.

Q. Is that rating a good rating, a bad rating, something in the middle?

A. Something in the middle.

Q. What's the scale?

A. 1 to 5 with 1 being the best.

Q. Okay. Why would a person have below 1?

A. If maybe they had a speeding ticket or, you know, when they go through a roadside inspection, if violations is found on their equipment, if they have bad customer service complaint or claims against them that were deemed to be their fault, things like that, for cargo claims.

Q. Is there any summary of that for Mr. Burist in this paperwork we see here?

A. No.

Q. Okay. Look on the next page under "Qualifications." I guess first, before we get

there, again it indicates this July 5th, 2022, date at the top right, correct?
A. Yes.
Q. Then under "Qualifications" it says "Temporary From" and then "To," and those dates are blank, right?
A. Yes.
Q. And a little further down it says "Substance Test: 11/24/20," is that right?
A. Yes.
Q. And "Cause: DQ," does that mean disqualify?
A. No, "Cause" is driver qualification.
Q. Okay.
A. "Prequalified." So this is his preemployment test.
Q. Was he tested at all for any substance abuse between November 24th, 2020, and July 5th, 2022?
A. I do not see an indication of that.
Q. Is this document or series of documents -- I think you're counsel said it was six --
MR. EHRENREICH: Six pages, I believe.
Q. Six pages. -- all from the mainframe system that you were describing to me earlier?

A. Yes.
Q. Was it ever transmitted to the Federal Motor Carrier Safety Administration?
A. No.
Q. Was it ever transmitted to the Virginia DMV?
A. No.
Q. Was it ever transmitted to Moholland, Joe Moholland Moving?
A. Joe Moholland Moving would have access to this, yes.
Q. When?
A. When they were an agent for us.
Q. Well, I thought you told me that, as of July 5th, 2022, they were not an agent for you.
A. Yes.
Q. So --
A. They would have had access to this information on hand. This is an ongoing file that exists for him.
Q. Well, assume for a minute that this cancellation was not entered until July 5th, 2022 -- and I'm saying that as a hypothetical for the purpose of this question -- would Joe Moholland Moving have access to this on July 5th, 2022?

A. No.

Q. Is there any documentation you're aware of to show that this was transmitted to Joe Moholland Moving in any way other than if Joe Moholland accessed it through the mainframe?

A. No.

Q. Is there any documentation you're aware of to show when Joe Moholland Moving was -- had their access to the mainframe terminated?

A. I'm sure there -- I'm sure that does exist. I'm not aware of that document, but we would -- we would certainly have that.

Q. Okay. Would that be something easy for you to find?

A. Yes.

Q. Could you provide that to your counsel?

A. Yes.

MR. EHRENREICH: And just as per agreement with counsel, I, typically, I get an email. As long as I don't object, I do it informally. If I object, I would tell you that you would have to do it formally. I don't see me posing objections to this.

MR. LANGLEY: Okay. Thank you. Matt's keeping a list for us, so we describe it

correctly.
MR. EHRENREICH: I was doing your job before. Now you're going to do your job.
MR. LANGLEY: Now he's going to do your job.
Q. I started to ask you, did Nicholas Burist have access to this mainframe?
A. No.
Q. Did Locke Relocations have access to this mainframe?
A. No.
Q. Was this documentation ever sent to Locke Relocations or Nicholas Burist?
A. No.
Q. Was anything done that would have made the public at large aware that Mayflower no longer qualified Nicholas Burist as its driver?
A. No.
Q. Look at the next page. "Van/Operator" number at the top.
A. Yes.
Q. I think you told me that was for Mr. Burist. 22132, that was his identification number in the mainframe system?
A. Yes.

Q. And do you, under "Monitors & Suspensions," looks like he had a suspension between April 27th, '18, and April 27th, '19. It just says "Other." Then it says "User ID TNRM1." Can you tell me what that is?
A. No.
Q. Do you know why Mr. Burist's qualification was suspended for that year?
A. No, I don't.
Q. Would that be a pretty serious violation that would lead to somebody being suspended for a year?
A. It could be a -- it could be a lot of things. It could be that he took a leave of absence himself. It could be -- it could be a lot of things. We would want to suspend him so he doesn't appear in our auditable lists, so I don't know why that was.
Q. Okay. All right. Then on the next page indicates a few other dates on which Mr. Burist was either cancelled as an agent or switched as an agent. Can you tell me why those various transactions took place?
A. As you can see, just it's just notes in the system of interactions with his file dating

back some seven years.

Q. But Mayflower last qualified Nicholas Burist as a driver on 12/11/2020. Can we agree that's what these documents indicate?

A. Yes.

Q. And that qualification was under the Moholland 333 designation that we've seen on the Agency Agreement and on the truck that he was driving on July 1st?

A. Yes.

Q. The next page, can you tell me what this means when it says "Select Accident and Press Enter"?

A. That's just a instruction. So there's no accidents listed here. So if there was an accident there, then you could select the Accident, press Enter, and get some details on it within the system that there were.

Q. Oh, if, in fact, this was printed on July 5th, 2022, as you indicated you thought maybe earlier, that would be incorrect for Mr. Burist, because of the collision on July 1st, right? That would have been included --

MR. EHRENREICH: Object.

Q. -- as an accident for him or should have

been included under this?

A. No.

MR. EHRENREICH: Object to form.

A. He was not -- he was not a driver for Mayflower on July 1st, 2022, so we would have -- we would not still be monitoring him nor would we have any official knowledge of the accident to enter it.

Q. Does Mayflower agree that Mr. Burist was driving the M333 truck on July 1st, 2022, that caused this collision?

A. Yes.

MR. EHRENREICH: Object to form.

Q. Anything else that's significant to you about this document, that six-page document provided by your counsel -- was it Exhibit --

MR. EHRENREICH: 8.

A. No.

Q. -- that we haven't talked about?

A. No.

Q. You doing okay?

A. Yep.

Q. Let me know if you need a break; otherwise, I plan to just push on through.

A. I'm good.

Q. While we're getting another document, could you flip back to the police report, please.

A. Can I go through these? Okay. I've got it here.

Q. Okay. Do you know why it was that the police officer initially tagged this as a Mayflower Transit vehicle?

A. No.

Q. Could it be because at the time of the collision the truck had Mayflower's name on it and Mayflower's DOT number on it?

MR. EHRENREICH: Object to form.

A. Yes, it could be that.

Q. There's no dispute about that, right?

A. No.

Q. Was Mayflower listed as any coinsured or Joe Moholland listed as any coinsured with Mayflower on any insurance policies applicable on July 1st, 2022?

A. No.

Q. And how do you know that?

A. Because they were not an agent for us on July 1st, 2022, or Joe Moholland was not an agent for Mayflower on July 1st, 2022.

Q. Was there any correspondence that you're

aware of between the Mayflower and any of its insurance carriers or the Federal Motor Carrier Safety Administration that said "Joe Moholland is not an agent of ours" as of July 1st, 2022?

A. No.

Q. Same questions for Locke Relocations. Are you aware of any insurance agreements where Locke and Mayflower would be listed as named insureds?

A. No.

Q. Who would be the responsible party at Mayflower to produce the applicable insurance or the insurance policies are in force as of July 1st, 2022?

A. That would be our -- I'm not sure of the exact title, but it would be Mr. Mark Volansky.

Q. Do you know why it is, without telling me anything that you and Mr. Volansky have discussed that's attorney-client privilege, but why it is that this insurance information has not been produced?

MR. EHRENREICH: Object to form.

A. Because we were not involved in the collision. Mayflower was not involved in the collision.

Q. If Georgia law requires the production of that insurance information, regardless of whether an entity is agreeing to be involved in the collision or not, if there's a dispute like there is here, would you agree to produce that information?

MR. EHRENREICH: Object to form.

A. Yeah, that would be something that our legal counsel would take up. It's not something I can commit to.

Q. All right. Let me show you what we'll mark as Exhibit 9.

(Plaintiff's Exhibit 9 marked for identification, J.S.)

Q. This is an eight-page document that to me indicates some records about safety and inspection maintenance and equipment and permit tracking for the VIN number I believe that is the -- under a master lease it says.

Can you tell me any more about that? If that relates in any way to Joe Moholland? It was produced in this case, so I'm assuming somehow it does.

A. It looks like it was -- it looks like this was a truck that was qualified with Mayflower

under Joe Moholland.

Q. Okay. And we see that "Unit Number: 24" and then the same Moholland Agency Agreement number 333, right?

A. Right.

Q. Would there be any reason for this equipment lease for that truck to have been terminated on May 18th, 2022?

A. It was cancelled then. I assume it was cancelled due to the end of the Temporary Agreement with Joe Moholland on April 28th.

Q. So what would be the purpose of it being cancelled on May 18th if, in fact, the Agency Agreement terminated on April 29th, as you've testified to earlier?

A. Administrative lag, just time to process it.

Q. Any other reason you can think of?

A. No.

Q. Similar question on the next page, this indicates to me that this was a safety inspection that took place or was due to take place on November 15th, 2022. Do you see that at the bottom left-hand column?

I'm on page 2, Mayflower 147 on the left

side.

MR. EHRENREICH: He said "left side." Look at the right side -- left side. There you go.

A. "Inspection Date," you said start Inspection Date: 2/15/2022?

Q. "Inspection Due Date: 11/15/2022."

A. Right. So that was -- it was inspected on the February 15th and then it was due to be inspected again on 11/15.

Q. All right. And did Mayflower maintain a master lease for every truck and trailer that were part of the Agency Agreement with Joe Moholland?

A. Yes. I'm not sure what that term "master lease" means. I don't know how we interpret that or why we use that, but...

Q. That's what the document says, though, right?

A. Yes, it does, yes.

Q. And this is between -- it's a Mayflower document and it indicates the unit number 333 for the Agency Agreement for Moholland?

A. Yes.

Q. Mayflower 3, the third page of that exhibit, is this a lease agreement for the trailer

or truck and trailer?
A. This looks like the unit. So this looks like it's a -- it's a document that it documents the -- that the -- this unit is qualified to perform services for Mayflower.
Q. Okay. And is it both a tractor and a trailer?
A. No, just the tractor.
Q. And it says "Mayflower Transit is operating this vehicle pursuant to a lease agreement with Joe Moholland Moving," right?
A. Correct.
Q. So would this be in addition to the Agency Agreement?
A. Yes.
Q. Same thing for the next page, but this one has some information for the actual VIN number at issue in this case. If you'll reflect -- or direct your attention back over to the police report, 3HSDJAPR7EN491357, right?
A. Yes.
Q. And is this a lease agreement between Mayflower Transit and Joe Moholland Moving for that vehicle that was involved in the collision with my clients on July 1st, 2022?

A. Yes.
Q. Can you point me to any document that shows that the lease agreement between Mayflower Transit and Joe Moholland for the truck involved in the collision was ever terminated?
A. I have not seen the document. That should be -- we can -- we can produce that, though.
Q. Okay. All right. I'd add that to the list. That's something that easy for you to find?
A. Yes.
Q. If you could provide that to your counsel.
A. Yes.
Q. But you believe there was a separate termination of the lease agreement in addition to the Agency Agreement between the parties?
A. Yes, it would -- it would show in our mainframe the equipment being disqualified.
Q. Okay.
A. Yes.
Q. And would that be true -- okay. Well, what I'm asking is a little bit different now.
Is there any notice of termination sent to Joe Moholland for the termination of this lease

either on the truck or the trailer or is what you're thinking of just in the mainframe?

A. No, there would have been additional document.

Q. Okay. You might need to speak up a little bit.

A. Sorry.

Q. I'm having a hard time picking up what you're saying.

MR. EHRENREICH: Did you get his answer?

THE REPORTER: I did.

Q. What I understood you to say is there would not be any additional lease termination other than what's in the mainframe for the lease agreement we see here?

A. That's correct.

Q. So nothing sent to Joe Moholland terminating the lease?

A. Correct.

Q. Either on the truck or the trailer?

A. Right.

Q. All right. Next document, "Vehicle Inspection Report." Do you see at the top left where it says "Mayflower Transit"?

A. Yes.

Q. Down at the bottom where it says "1st Copy UniGroup Safety Department"?
A. Yes.
Q. "2nd Copy Agent"?
A. Yes.
Q. "3rd copy to be left on power unit or trailer"?
A. Yes.
Q. Do you know who performed this inspection? Is that something Mayflower does?
A. It's done by third parties. Shops, third parties. You can see this looks like it was performed by a shop in Norfolk, Virginia.
Q. Okay. Down in the bottom left?
A. Yes.
Q. Does Mayflower pay for this for the agent, or does the agent pay for it and it's deducted like we saw before?
A. That's how it works, yes.
Q. So some of the invoices that we saw in that other sheet, the other exhibit, could have been for inspections like this?
A. That's the manner in which it would be charged, yes, yes.
Q. That was Exhibit, so we're clear,

Exhibit --
A. 7.
Q. -- 7. And does Mayflower require these vehicle inspections as part of the general oversight and responsibilities that you identified to me earlier that add value to this whole transaction?
A. Yes, it is also required by the FMCS.
Q. All right. If you'll flip over to Mayflower 004.
A. Okay.
Q. And this is actually an inspection on the truck that has the VIN number. It's the same truck that was involved in the collision on July 1st. Do you see that VIN number there, "3HS" in the middle?
A. Yes.
Q. Can we agree that's the same truck that was involved in the collision on July 1st?
A. Yes.
Q. Can we agree that that's Mayflower's DOT number being used by Joe Moholland in the middle of the page where it says "Agency/Dealer"?
A. Yes.
Q. And this was February of 2022, correct?

A. Yes.
Q. Down at the bottom. This inspection was --
MR. EHRENREICH: Bottom left.
A. Yep.
THE REPORTER: I'm sorry?
MR. EHRENREICH: Bottom left, I said.
Q. Bottom left?
A. Yes.
Q. And was done by Bynum's Welding & Repairs in Virginia? The last page of that exhibit.
A. Yes. That's your copy of that.
Q. Fine. Thanks. Is there any other way that Mayflower gets notice of vehicles failing an inspection or driver getting a ticket or wreck or anything like that other than through Samsara?
A. Yeah, yes.
Q. What other ways?
A. Their agents would be required to report to us drivers -- van operators are required to call in to our Safety Department any time they're involved in a collision or anything, and then we also receive reports from the DOT on inspections and any DOT recordable accidents.

Q. Did Mayflower receive any such correspondence after July 1st, 2022, related to this wreck that we're here about today?
A. Not to my knowledge.
Q. How was it that they, Mayflower, had a representative attend an inspection at Kelley's Towing within a few days of the collision if they weren't put on notice somehow?
A. I'm sorry, I thought -- I thought -- I was thinking of a federal entity informing us. So, yes, we were -- we were put on notice of the accident --
Q. Okay.
A. -- of the collision.
Q. Who put you on notice of the July 1st, 2022, collision?
A. I don't know.
Q. But in any event, that prompted someone to go and inspect the vehicle at the Kelley's Towing yard near the scene of the collision, right?
A. Yes.
Q. And what was Mayflower informed about that vehicle inspection?
A. I don't know. I haven't seen that.

Q. Does it exist? Was there correspondence related to that?
A. I don't -- I haven't seen anything. I don't know.
Q. How do you know that, in fact, Mayflower was informed, as you testified to a minute ago? What do you base that answer on?
A. Because we're here today. I mean, we were informed of the -- that the accident had happened. I don't know who informed us or what, but we knew that it happened.
Q. My point is that you knew within a close period of time to the collision?
A. Yes.
Q. And I want to know how and what the response was to that.
A. I don't know.
Q. Who would know the answer to that question?
A. Mark Volansky.
Q. Anybody else?
A. No, he would be the main guy.
Q. Can you tell me if the call came in from Joe Moholland, from Locke Relocations, from Nicholas Burist, from all three, none of them?

A. I don't know.
Q. As the corporate representative, did you make any effort to investigate that?
A. I did not.
Q. Earlier I asked you a question about whether or not UniGroup had prepared any independent contractor agreements between its agents and the independent contractors that they used for the actual shipment of the goods.
Do you remember that?
A. Yes.
Q. I think your answer at the time was you weren't aware of any?
A. Yes.
Q. This is one that's been produced by Joe Moholland in the case, and we'll mark it as Exhibit 10.
(Plaintiff's Exhibit 10 marked for identification, J.S.)
Q. Starting on page one there, do you see down at the bottom left where it settles UniGroup, Inc.?
A. Yes.
Q. Does that indicate to you that this is a UniGroup created document?

A. Yes.
Q. All right. And the title of the agreement it says "Joe Moholland, Inc., and Locke Relocation, Independent Contractor Operating Agreement," right?
A. Yep.
Q. Have you ever seen this document before?
A. No.
Q. I know earlier you testified you weren't aware of UniGroup preparing these for its agents and independent contractors, but does it now look to be another service that Mayflower would provide to its agents again to help facilitate these moves and shipments?
A. It could be.
Q. Do you know if UniGroup produced such an agreement for anybody other than Joe Moholland and Locke Relocation?
A. No, I don't.
Q. Flip over to page JMI277 in the bottom right. In the top left paragraph, the first paragraph, I'm going to read it. You make sure I read it correctly, okay?
A. Okay.
Q. First sentence, "Joe Moholland, Inc.,

quote, Company, is an authorized motor carrier that transports and stores household goods and general commodities under either its own operating authority or as an agent of United Van Lines, LLC, and or Mayflower Transit, LLC., under Van Lines' operating authority."

Did I read it correctly?

A. Yes.

Q. Tell me what this relationship means. I mean, to the extent you hadn't already described it already, is there any difference here specific to this Joe Moholland/Locke relationship or is this the same as what we talked about before?

A. This is -- this here just states that Joe Moholland is an agent for Mayflower.

Q. Right. And what I'm asking you now -- because it's an Independent Contractor Agreement with Locke Relocations. So if you want to flip over to the signature page, look at that and confirm where you -- JMI287.

Do you see where it's signed by Kelvin Locke?

A. Yes.

Q. As the owner of Locke Relocations?

MR. EHRENREICH: You said "as the

owner"?

MR. LANGLEY: What's that?

MR. EHRENREICH: You said "as the owner"?

MR. LANGLEY: Right.

MR. EHRENREICH: Yeah.

Q. Do you see that, Mr. Jones?

A. Yes, I do.

Q. And so what I'm asking you now is is this relationship unique in the Mayflower, Agent - Moholland, Independent Contractor - Locke, factual scenario or is this how UniGroup/Mayflower did it with all of its agents and independent contractors?

MR. EHRENREICH: Object to form.

A. This is the -- something similar to this would be throughout our system between the agent and the van operator. It's not necessarily this exact form. Different agents use different like ICOA agreements we call this, Independent Contractor Operating Agreement. Different agencies different ones, but all certainly, where they have independent contractors, this would exist with all of them.

Q. When Joe Moholland uses this agreement,

is it with the permission of UniGroup and Mayflower?

A. Yes.

Q. And when they have the designation "as a motor carrier transporting as an agent under Van Lines' operating authority," would that give a third party the belief that Joe Moholland could accept a tender of a shipment?

MR. EHRENREICH: Object to form.

A. Yes.

Q. Are there any loads between, other than this transaction that we're here about today, that you're aware of, between Joe Moholland, Locke, and Total Military Management? Any other shipments, that you're aware of, during the pendency of the Agency Agreement between Mayflower and Moholland?

A. I'm not aware, no.

Q. How would we get the answer to that question? Would that be something you could search in the mainframe?

A. What timeframe?

Q. During the pendency of the Agency Agreement between Joe Moholland and Mayflower.

A. So ask that question again.

Q. Where Total Military Management and Joe

Moholland are both involved, one, that would be one question, and then the second where Joe Moholland, Total Military Management, and Locke Relocations, the three entities are involved.

A. We would -- we may have records where, if Mayflower's involved, with Mayflower, Joe Moholland, possibly comes through TMM. We would not have any records of Locke Relocation.

If TMM, Joe Moholland, and Locke Relocations had any loads that were hauled that did not involve Mayflower, we would not have any record of that.

Q. Okay. And what I'm asking for is any loads during the period of the Agency Agreement where Joe Moholland and TMM were involved. Would that be something you could search?

A. Yeah, I think that is something we can research.

Q. We'll add that to the email list.

A. Okay.

Q. Was this agreement ever terminated by Mayflower, this Independent Contractor Agreement between Joe Moholland as carrier for Van Lines and Mayflower and Locke?

A. No, we were -- no.

Q. Flip over to 279. There's a number of responsibilities there on the left side. I'm going to point you to section 6.c: Drug and Alcohol Testing.
A. Yes.
Q. And it says "Contractor and its driver shall, as required by federal statutes and regulations, comply with the drug and alcohol policy and company safety policies, and including participating in companies and or Van Lines' random drug and alcohol testing program and submitting to all other required drug or alcohol tests."
Back at the beginning "Van Line" was used to describe Mayflower and United Van Lines. Do you recall that?
A. Yes.
Q. And then further down it says that "All such tests shall be done by an outside testing service selected by Van Line at contractor's expense."
A. Yes.
Q. Read it correctly?
A. Yes.
Q. Would that contractor's expense be

recorded the same way that we saw in the invoices we went through earlier on Exhibit 7?

A. Yes.

Q. Further down on "Uniforms: To meet customer expectations regarding security, efficiency, and professionalism, contractor and all of contractor's drivers, helpers, and other personnel shall wear uniforms that comply with company's policies and procedures. Company is to deduct all such expenses from contractor's settlement compensation and/or escrow fund."

Did Mayflower provide any uniforms for Moholland's drivers or Mr. Burist to wear?

A. No.

Q. Did it provide any uniforms for any of its agents?

A. No.

Q. How about any other kinds of pens or koozies or were there any other type of materials provided like that for use by drivers?

A. I mean, there could have been, you know, during Driver Appreciation Week there's probably swag that they give to them --

Q. Right.

A. -- and stuff like that. So, and not in

the normal course of, you know, like every agent gets this many or something like that.

Q. Gotcha. And that Driver Appreciation Week, did Mr. Burist participate in that?

A. I don't know.

Q. When does that normally take place?

A. I believe it's in September every year.

Q. And what goes on with that? Are they invited to --

A. It's a National Driver Appreciation thing, so, yeah, they -- we have food and all -- a lot of the agents have stuff as well, but we do it at the headquarters as well. Giveaways and food and stuff like that.

Q. Are there like awards for getting high rankings, that number 1 out of 5 thing you told me about?

A. No, not at that time, no.

Q. You can flip over to JMI282.

A. Okay.

Q. 10.e.3, that paragraph there, you see that?

A. Yes.

Q. It says "Company and Van Line Will Make Required Filings"?

A. Yes.
Q. And was that true for this relationship? Did Van Line, here defined as United, or UniGroup and Mayflower, make the required filings for this relationship between Joe Moholland and Locke Relocations?
A. Yes.
Q. Further down on the 10.e.5 and 10.e.6 for the Taxes and Administrative Fees, were those use taxes and administrative fees paid by Van Line, again Mayflower and UniGroup, for the Moholland and Locke Relocation agreement and then invoiced as we see in Exhibit 7?
MR. EHRENREICH: Object to form.
A. Yes.
Q. Were any such fuel or use taxes paid after April 29th, 2022?
A. I don't know. They could have been processed after that date for miles that had been run prior to the termination of the contract.
Q. But you don't know if any payments were made for any miles that were run after April 29th, 2022?
MR. EHRENREICH: Object to form.
A. No.

Q. If you flip over to JMI284. Excuse me, 285, I apologize. 19.b is the section I was asking you about.

A. Okay.

Q. It says "Required Removal of Identification Upon Termination." It says "Upon termination or the completion of the transportation or other services provided for herein, whichever occurs later, contractor, unless otherwise notified or instructed by company, shall at contractor's own expense immediately and permanently obliterate and remove from the equipment all company and Van Line" -- which we've defined to include Mayflower earlier -- "identification and all company or Van Line identification devices," right?

A. Yes.

Q. Did Mayflower ever direct Locke Relocations to remove its -- Mayflower's DOT number from the truck?

A. No.

MR. EHRENREICH: Would that be a good time to take two minutes?

MR. LANGLEY: Sure. I'm almost done, so, yeah.

MR. EHRENREICH: Thank you.
THE VIDEOGRAPHER: We are going off the record at 11:58.
MR. EHRENREICH: I still need two minutes.
MR. LANGLEY: No problem.
(Temporary recess was held.)
THE VIDEOGRAPHER: We're on standby. We are back on the record at 12:07 p.m.
Q. Are you aware, Mr. Jones, of any reporting by Mayflower of the truck at issue involved in the July 1, 2022, collision, as stolen?
A. No.
Q. You told me a little bit before about this August communication where Mayflower reached out to the Federal Motor Carrier Safety Administration and had their -- the Mayflower names removed from any of the documentation that was related to the July 1, 2022, wreck.
A. Yes.
Q. You remember I was talking about that earlier?
A. Yes.
Q. Who did that communication on behalf of

Mayflower?

A. It was Sue Demien.

Q. Okay. And anybody else?

A. No.

Q. Who is Rae Hickinbotham?

A. Rae is an employee that works for UniGroup. I believe she's in the -- works with the government and military world with those loads.

Q. All right. Are you aware of any communication between Rae Hickinbotham and Rob Garr or anybody at Joe Moholland Moving about continuation of business after April 29th, 2022?

A. No.

Q. During that communication with the DOT, you said Damien --

A. Sue Demien.

Q. Sue Demien?

A. Yeah.

Q. Did Sue Demien communicate at all with Joe Moholland or Locke or Nicholas Burist?

A. Not to my knowledge, no.

Q. And do you know why that was done in August, if there was anything specific that happened? Because I think you told me Mayflower

was made aware of this wreck within a couple days of it happening.

Do you know why it took until August to report to the Federal Motor Carrier Safety Administration that Mayflower shouldn't be involved?

A. It was -- it was reported to us that we were involved by them and we disputed that.

Q. Let's try to take out the pronouns just so we're clear.

A. I'm sorry. The DOT reported to Mayflower that the accident had happened on our DOT number and Mayflower disputed that.

Q. All right. Was there any process for that or any hearing or anything like that?

A. There is a process to do that. I'm not real familiar with the process, but there is a process.

Q. Okay. Do you know what sort of correspondence was exchanged in that?

A. No.

Q. I'll show you what we'll mark as Exhibit 11, I believe.

(Plaintiff's Exhibit 11 marked for identification, J.S.)

Q. All right. Mr. Jones, this is a five-page document we've marked as Exhibit 11 now. It's titled "Booking Confirmation For SCAC NM- -- NWMO/Booked Date: 2022-04-06." Do you see that?
A. I do.
Q. Are you familiar with the form of this document? Have you seen this before?
A. No, I haven't.
Q. Do you know who created this document?
A. No, I don't.
Q. Is this a document that UniGroup has in its system?
A. No, I've never seen this type of a document.
Q. If you look down at the bottom right where it says "Destination" and "Destination Agent," which is Conser Moving & Storage of Jacksonville?
A. Okay, I see that.
Q. Do you see that?
A. Yes.
Q. And then it's got "Corp. Code M0121"?
A. Yes.
Q. Is that a Mayflower agent number?
A. It is, yes.

Q. And is Conser Moving & Storage of Jacksonville a Mayflower agent, even as of today?
A. Yes, they are.
Q. They were the destination agent for the shipment of goods that was being transported by the truck involved in the July 1st, 2022, collision with my clients, right?
A. I don't -- I don't know that.
Q. I'm going to show you back to Exhibit 5 and point you to the name "Nicholas Gregory." Do you see that on there?
A. Yes.
Q. Do you see on Exhibit 11 -- I guess that says 11?
THE REPORTER: 10.
Q. That says 10, okay. Exhibit 11 that I've just handed you, do you see also where that says "Nichols, Gregory" on there? I guess Gregory Nichols is actually his name since it's "Nichols, comma, Gregory."
A. Yes.
Q. And so can we agree now that the bill of ladings for the shipment that we're here about today matches with this booking confirmation that I've provided with you Exhibit 11?

A. Yes.
Q. And so the other question was can we agree that that shipment was accepted by a Mayflower agent named Conser Moving & Storage of Jacksonville?
A. As a destination agent, yes.
Q. And again, we see North-West Movers on page 2 of Exhibit 11, and that corresponds with North-West Movers on the bill of lading.
A. Okay.
Q. Do you see that?
A. Yes.
Q. Similarly, on the JMI668 of Exhibit 11, that corresponds with the second page of the bill of lading and the names and the entities involved there, right?
A. Yes.
Q. That Slidell Moving and Ashley Sheriff?
A. Yes.
Q. And it also notes that the agent, destination agent, was Conser Moving & Storage, which was the Mayflower agent?
A. Yes.
Q. Bear with me one minute. I'm going to look over my notes and getting pretty close to

being done.

MR. LANGLEY: Do you have any questions, Todd?

MR. EHRENREICH: Very brief whenever you're ready.

Q. Do you recall completing an affidavit or a Declaration in Support of a Motion to Dismiss filed by Mayflower back in September?

A. Yes.

MR. EHRENREICH: There were two affidavits. I'm not sure which one you have.

MR. FOSS: (Inaudible.)

MR. EHRENREICH: There was one for the motion to dismiss and then there was one for the jurisdiction issues, I think.

MR. FOSS: Yeah.

MR. EHRENREICH: That was the first one. There was a subsequent.

MR. FOSS: Yep, this is the exhibit.

MR. LANGLEY: We'll mark it as Exhibit 12. I'll let you take a look at it. They're both in there.

MR. EHRENREICH: Okay. No problem.

(Plaintiff's Exhibit 12 marked for identification, J.S.)

Q. Have you had an opportunity to review those declarations?
A. Yes.
Q. Who drafted those?
A. It was drafted by our -- by counsel.
Q. Did you have any edits to them?
A. No.
Q. Do you have any edits to them today?
A. No.
Q. And that's true for both the first declaration we see on the first few pages and then the second one that is further into the document?
A. Yes, that's true for both.
Q. How long was the relationship between Mayflower and Joe Moholland prior to its termination?
A. I don't recall that. I don't know.
Q. If Mr. Garr's testimony -- and I don't recall exactly, but if his testimony was 14 years, would that sound about right?
A. Yeah, yeah.
Q. Do you know Chris Wynn?
A. I do, yes.
Q. He testified yesterday. He, I believe, was identified by Mayflower as the Senior Director

of Member Success, which I think he defined to include a responsibility over the agency partnerships between Mayflower and its agents.

A. Yes.

Q. Would that be a fair description?

A. Yes.

Q. The way you understand his role?

A. Yes.

Q. And so would you defer to Mr. Wynn -- would the company defer to Mr. Wynn for -- as the person most knowledgeable about the agency and the termination of any agency agreements?

MR. EHRENREICH: Object to form.

A. Yes.

MR. LANGLEY: No further questions.

MR. EHRENREICH: Very briefly. Thank you. Very briefly.

CROSS-EXAMINATION

BY MR. EHRENREICH:

Q. Mr. Jones, the truck that was involved in this collision that led to this complaint, was that owned by Mayflower or UniGroup?

A. No.

Q. The trailer that was hitched to the tractor that was involved in this incident that

led to this lawsuit, was that owned by Mayflower or UniGroup?

A. No.

Q. You saw -- counsel asked about pictures of trailers that are on the lot at what was formerly Joe Moholland. Were any of those owned by UniGroup or Mayflower?

A. No.

Q. Quickly turning to what's been marked as Exhibit 10, do you know what a template is?

A. Yes.

Q. All right. This Exhibit 10, would this be considered a template to be filled in by the agents but provided by Mayflower UniGroup?

A. Yes.

Q. Looking through Exhibit 10, in information that was completed has Joe Moholland, it has Locke in here. Was any of that information placed into this document by anyone at UniGroup or Mayflower or would this have been completed by Joe Moholland?

A. It was completed by Joe Moholland.

Q. And you looked at the signatures to this contract?

A. Yes, I did.

Q. Did you see anybody from Mayflower or UniGroup sign this agreement?

A. No, I did not.

Q. When a agent is terminated from its agreement with UniGroup and Mayflower, when a truck is terminated as part of the system and when a driver is terminated, part of the system, what does that prevent the agent from doing in relation to the -- to the system as you described before?

If that's a bad question, I'll clarify.

You talked before with counsel about the agents in this case, Joe Moholland would have certain access to an integration system between Mayflower and Joe Moholland.

Do you remember that testimony?

A. Yes.

MR. LANGLEY: Object to the form.

Q. When that relationship is terminated, what does it prevent the agent from doing in relation to that mainframe system that you've described?

MR. LANGLEY: Object to the form.

A. They are not permitted to enter any loads into the system.

Q. Okay. If the truck has been terminated,

would the same apply to that?
A. Yes.
Q. And the same question for a driver?
A. Yes.
Q. We saw before, there was a document that we produced to counsel today and was kind enough to accept it that's been marked as 8. Do you remember this document?
A. Yes.
Q. At the top where it says "Status Cancelled," it relates to the driver, Mr. Burist, where it says "Cancelled: 4/29/22." What does that mean?
MR. LANGLEY: Object to the form.
A. It means that he was no longer -- the driver was no longer a qualified driver under Mayflower's DOT number, so he could not perform any work for -- under Mayflower's DOT number.
Q. So trying to understand that testimony, the use of Mr. Burist in relation to your DOT number, was that terminated as of 4/29/22?
A. Yes.
MR. LANGLEY: Object to the form.
Q. All right. Any use of that DOT number after that, would that have been with or without

the authorization of Mayflower and UniGroup?

A. Without.

MR. LANGLEY: Object to the form.

MR. EHRENREICH: That's all I have. Thanks, guys. Do you have follow-up?

MR. LANGLEY: Just one follow-up.

Does anybody on the Zoom have any questions?

MR. STAHL: No, sir.

MR. SESSIONS: I have not.

MR. EHRENREICH: Thank you.

REDIRECT EXAMINATION

BY MR. LANGLEY:

Q. All right. Just one question. One of the requests we made for production of documents was "any and all employment files or manuals or handbooks provided to or used in the duties of Nicholas Burist, Charles Davenport, or Michael Hines." I don't think we've gotten anything responsive to that request.

Are you aware of any documents that are responsive to that request?

A. They were not Mayflower employees, so there would be no employment documents.

Q. Would there be a file for Mr. Burist as

a driver that's qualified by Mayflower?
A. The driver qualification file, yes.
Q. And has that been produced?
A. I believe it has been produced, yes.
Q. Okay. I'd just ask that you confirm that all documents related to Mr. Burist have been produced to your counsel and we'll include that on our --
A. I'll confirm that.
Q. -- that follow-up request.
A. Sure, yeah.
MR. EHRENREICH: Thank you. Thank you, counsel.
MR. LANGLEY: Thank you.
THE VIDEOGRAPHER: This is the end of the deposition. The time is 12:26 p.m. We are going off the record.
THE REPORTER: Signature?
MR. EHRENREICH: He'll read. Once again, I'll provide to him so I'll take that upon myself, and I don't anticipate any changes since you've done such a wonderful job.
THE REPORTER: Thank you.
(Discussion was held off the record.)
MR. EHRENREICH: I like I guess we just

get e-trans now, don't we?

THE REPORTER: You can get paper.

MR. EHRENREICH: No. I don't want to do that to you. Just send both in regular form and mini.

(Witness excused.)

(By agreement of all the parties, the signature of the witness is not hereby waived.)

********

SIGNATURE PAGE OF JASON JONES

I, JASON JONES, DO HEREBY STATE THAT I HAVE READ THE FOREGOING QUESTIONS AND ANSWERS APPEARING IN THIS TRANSCRIPT OF MY DEPOSITION PAGE ___ THROUGH AND INCLUDING PAGE ___; THAT THIS IS A TRUE AND ACCURATE (CORRECTED) REPORT OF SAID ANSWERS GIVEN IN RESPONSE TO THE QUESTIONS APPEARING HEREIN.

______________________________
JASON JONES

NOTARIAL CERTIFICATE

STATE OF MISSOURI )
) SS
COUNTY OF ST. LOUIS )

BEFORE ME PERSONALLY APPEARED JASON JONES, TO ME KNOWN TO BE THE PERSON DESCRIBED IN AND WHO EXECUTED THE FOREGOING INSTRUMENT AND ACKNOWLEDGED TO AND BEFORE ME THAT HE EXECUTED THE SAID INSTRUMENT IN THE CAPACITY AND FOR THE PURPOSE THEREIN EXPRESSED.

WITNESS MY HAND AND OFFICIAL SEAL THIS _____ DAY OF ___________________, 2023.

______________________________
NOTARY PUBLIC

C E R T I F I C A T E

I, JULIE E. STELFOX, MISSOURI CERTIFIED COURT REPORTER, ILLINOIS CERTIFIED SHORTHAND REPORTER, AND NATIONAL COURT REPORTERS ASSOCIATION REGISTERED MERIT REPORTER AND CERTIFIED REALTIME REPORTER, DO CERTIFY THAT PURSUANT TO NOTICE, AND TAKEN AT THE OFFICES OF LEWIS, BRISBOIS, BISGAARD & SMITH, 100 SOUTH 4TH STREET, CITY OF ST. LOUIS, STATE OF MISSOURI,

JASON JONES,

CAME BEFORE ME, WAS BY ME DULY SWORN TO TESTIFY THE WHOLE TRUTH OF HIS KNOWLEDGE OF THE MATTERS IN CONTROVERSY AFORESAID, WAS EXAMINED AND HIS EXAMINATION THEN WRITTEN IN STENOTYPY BY ME, AND AFTERWARDS TYPED, AND SIGNED, AS HEREINBEFORE SET OUT, ON THE DAY IN THAT BEHALF AFORESAID, AND SAID DEPOSITION IS HEREWITH RETURNED.

I FURTHER CERTIFY THAT I AM NOT COUNSEL, ATTORNEY, OR RELATIVE OF EITHER PARTY, OR CLERK OR STENOGRAPHER OF EITHER PARTY, OR OF THE ATTORNEY OF EITHER PARTY, OR OTHERWISE INTERESTED IN THE EVENT OF THIS SUIT.

GIVEN UNDER MY HAND IN THE COUNTY OF ST. LOUIS, STATE OF MISSOURI, ON THE _______ DAY OF _________________, 2023.

__________________________________

/S/JULIE E. STELFOX,
CCR, CSR, RMR, CRR

METRO COURT REPORTING, INC.
P.O. BOX 29548
ST. LOUIS, MISSOURI 63126
636-349-3333

May 22, 2023

Mr. Todd R. Ehrenreich
Lewis, Brisbois,
Bisgaard & Smith
2 Alhambra Plaza
Suite 1110
Coral Gables, Florida 33134

In re: Kyle Sloan, et al., vs. Nicholas Burist, et al.

Dear Mr. Ehrenreich:

Attached find a pdf transcript of the deposition of Jason Jones taken on May 10th, 2023. It is my understanding the witness will read your transcript of the deposition.

If the witness has any changes, please make them on the erratum sheets that are pages 166 and 167. The witness also needs to circle on the signature page whether it is "accurate" or "corrected."

After the witness has read the transcript, signed the erratum sheets, and had the signature page notarized, please forward the signature page and erratum sheets to Mr. Charles Hodge for inclusion in the original transcript with copies of same to all attorneys of record.

Sincerely,

Julie E. Stelfox,
CCR, CSR, RMR, CRR

cc: C. Hodge
M. Sessions
J. Elliott

DEPOSITION CORRECTION SHEET

KYLE SLOAN, ET AL. VS. NICHOLAS BURIST, ET AL., 2:22-CV-00076-LGW

WITNESS: JASON JONES

WITNESS: ______________________ DATE__________
(PRINT NAME)

1: PAGE ______ LINE ______

READS:___________________________________________

CHANGED TO:______________________________________

REASON FOR CHANGE:_____________________________

2: PAGE ______ LINE ______

READS:___________________________________________

CHANGED TO:______________________________________

REASON FOR CHANGE:_______________________________

3: PAGE: ______ LINE ______

READS:___________________________________________

CHANGED TO:______________________________________

REASON FOR CHANGE:_______________________________

4: PAGE: ______ LINE ______

READS:___________________________________________

CHANGED TO:______________________________________

REASON FOR CHANGE:_______________________________

____________________________
JASON JONES

DEPOSITION CORRECTION SHEET

KYLE SLOAN, ET AL. VS. NICHOLAS BURIST, ET AL., 2:22-CV-00076-LGW

WITNESS: JASON JONES

WITNESS ______________________ DATE __________
(PRINT NAME)

1: PAGE ______ LINE ______

READS:______________________________________________

CHANGED TO:_________________________________________

REASON FOR CHANGE:__________________________________

2: PAGE ______ LINE ______

READS:______________________________________________

CHANGED TO:_________________________________________

REASON FOR CHANGE:__________________________________

3: PAGE: ______ LINE ______

READS:______________________________________________

CHANGED TO:_________________________________________

REASON FOR CHANGE:__________________________________

4: PAGE: ______ LINE ______

READS:______________________________________________

CHANGED TO:_________________________________________

REASON FOR CHANGE:__________________________________

__________________________
JASON JONES

## $

**$1,627.88 (1)**
101:1
**$10.20 (1)**
109:10
**$1714.76 (2)**
101:10;102:11
**$250 (1)**
89:14
**$5,791.26 (1)**
90:24

## *

********** (1)**
162:9

## A

**ability (1)**
69:14
**able (6)**
9:8;16:7;34:17;65:6;95:17,22
**above (1)**
103:12
**absence (1)**
121:15
**abuse (1)**
117:18
**accept (3)**
108:16;141:8;159:7
**acceptable (1)**
48:15
**accepted (1)**
153:3
**accepts (1)**
60:21
**access (9)**
76:7;110:20;118:10,18,25;119:9;120:7,9;158:13
**accessed (1)**
119:5
**accident (13)**
16:20,22;17:2,3,12;122:12,16,17,25;123:7;135:12;136:9;150:12
**accidents (2)**
122:15;134:25
**according (1)**
22:19
**accounting (3)**
38:5;70:5;95:16
**accuracy (1)**
115:5
**accurately (3)**
80:23;85:24;87:25
**act (1)**
41:23
**action (2)**
53:8,15
**actions (4)**
41:5;51:24;52:20,22
**active (6)**
50:4;82:21;92:3;93:22;94:25;95:2
**actively (1)**
51:5
**activity (1)**
102:17
**actual (10)**
26:4;29:18;32:12;46:12,23,25;54:24;61:14;129:17;137:9
**actually (9)**
26:11,17;29:21;63:7;83:23;102:7;110:11;133:12;152:19
**add (4)**
57:20;130:9;133:6;142:19
**added (1)**
32:8
**adding (1)**
94:12
**addition (2)**
129:13;130:16
**additional (3)**
79:24;131:3,13
**addressed (1)**
72:25
**addresses (1)**
43:13
**adjustments (1)**
55:19
**Administration (4)**
118:3;125:3;148:18;150:5
**Administrative (3)**
127:16;146:9,10
**ads (1)**
77:1
**advance (1)**
111:5
**Advantage (10)**
40:3,5,5,16;105:12,15,18,24;106:11,21
**affidavit (1)**
154:6
**affidavits (1)**
154:11
**affiliated (3)**
43:14;84:21,23
**afterwards (1)**
85:20
**again (26)**
17:5;35:1;45:10;63:15;68:6;78:10;81:13;88:22;97:5;100:17;102:1,6,13;103:11,15;105:24;107:3,14;112:4;117:1;128:10;138:13;141:24;146:11;153:7;161:20
**against (2)**
44:21;116:18
**agencies (1)**
140:22
**Agency (74)**
18:21;38:16,25;40:21;49:8,19;51:8,23;52:1;53:12;61:7;64:8;65:14,16,17;67:13;71:4,6,9,15;73:21,25;74:3,6,10,16,22;87:7;88:18;91:20;92:10,18,20;93:7;94:6,9,18,19,21,24,25;95:1,2;100:18;105:1,19;106:6,14,18;107:4,14;108:23;109:25;111:18,25;112:2,11,15,19;113:7,15;122:8;127:3,13;128:13,22;129:14;130:17;141:16,22;142:14;156:2,11,12
**Agency/Dealer (1)**
133:23
**agent (69)**
11:21;15:15;18:18;34:1,8,23;43:14;46:18,20,23;48:25;49:4;50:3,10,11,23,23,24;51:4,19,25;52:4,7;55:18;58:2;61:12;62:5,16;64:21;65:24;72:1;75:24;76:3;81:23;86:17;89:4;102:13;105:24;106:15;109:13,21;118:13,15;121:21,22;124:22,23;125:4;132:4,17,17;139:4,15;140:10,17;141:5;145:1;151:17,24;152:2,4;153:4,6,20,21,22;158:4,8,19
**agents (31)**
15:7;25:7;40:12;43:1,4,5,16;45:25;46:1;47:15;48:20;49:11;61:22,23;62:22;63:3;70:13;78:8,11;80:12;134:20;137:8;138:10,13;140:13,19;144:16;145:12;156:3;157:14;158:12
**agent's (2)**
51:19,20
**aggregate (1)**
32:7
**aggressive (1)**
50:5
**aggressively (2)**
49:12;51:5
**ago (4)**
8:17;14:21;53:22;136:6
**agree (40)**
12:13;18:8,11;21:23;22:6,14,16;23:20;25:15;38:12;45:19;48:8,17,18;55:10;61:3;73:20;74:5,17;75:7,11;91:1;93:10,19,21;94:19;102:4;106:20;108:4;112:11;113:7,15,18;122:3;123:9;126:5;133:18,21;152:22;153:3
**agreeable (1)**
10:3
**agreed (1)**
53:1
**agreeing (1)**
126:3
**Agreement (92)**
18:21;19:13;20:19;21:4,17;22:25;40:21;49:8,19;51:8,24;52:1;53:12;61:7,15,23;64:9,12;65:8,14,16;67:14,16;68:7,11,16,19;71:4,6,9,16;73:15,16,21,24,25;74:2,3,4,6,7,10,11,17,20,22;75:2;88:18;89:5;94:19,24,25;95:2;105:19,24;107:15;110:1;111:18,25;112:2,12,15;119:19;122:8;127:3,11,14;128:13,22,25;129:11,14,22;130:3,16,17;131:15;138:3,5,17;139:17;140:21,25;141:16,23;142:14,21,22;146:12;158:2,5;162:7
**agreements (6)**
25:17;79:14;125:7;137:7;140:20;156:12
**ahead (4)**
11:7;31:2;59:4;86:20
**al (4)**
7:9,10;166:2,2
**alcohol (5)**
9:10;143:4,8,11,12
**allow (2)**
21:25;23:7
**allowed (2)**
21:24;22:4
**Almost (2)**
85:3;147:24
**along (1)**
10:7
**aloud (1)**
72:13
**alter (2)**
10:6;74:8
**always (2)**
62:18;112:24
**Amendment (1)**
71:15
**America (1)**
77:9
**amount (7)**
31:23;51:9;89:18;103:16;109:17,19,21
**amounts (1)**
31:9
**analogous (1)**
46:13
**and/or (1)**
144:11
**answered (4)**
19:5;22:3;94:11,12
**anticipate (1)**
161:21
**anticipating (1)**
21:9
**anything's (1)**
30:19
**AP (1)**
33:17
**apologize (2)**
24:4;147:2
**appear (4)**
34:18;54:6;101:13;121:17
**appears (4)**
65:7;83:9;90:23;107:22
**applicable (3)**
25:10;124:18;125:12
**apply (2)**
73:17;159:1
**appreciate (1)**
93:25
**Appreciation (3)**
144:22;145:3,10
**appropriately (2)**
76:23,24
**approximately (1)**
43:4
**April (27)**
39:19;73:21;74:4,17;75:4;77:25;78:1,9,15;79:17;82:25;83:1,17;84:3;97:20;99:17;100:11;111:15;112:12;115:7;121:3,3;127:11,14;146:17,

22;149:13
**Arces (2)** 69:19,21
**A-r-c-e-s (1)** 69:21
**Arizona (1)** 13:21
**arrangement (1)** 106:21
**Ashley (1)** 153:18
**assessed (1)** 109:3
**assist (1)** 55:18
**assistance (1)** 32:17
**associated (1)** 82:20
**assume (3)** 115:15;118:21;127:9
**assuming (1)** 126:22
**attached (1)** 96:10
**attend (1)** 135:6
**attention (1)** 129:19
**attorney- (1)** 22:3
**attorney-client (6)** 17:21;19:18,21;22:10;23:6;125:19
**attorneys (6)** 10:25;11:16;16:20;17:10;23:11;99:10
**audit (4)** 54:7,8;99:8;115:6
**auditable (2)** 83:11;121:17
**auditing (2)** 30:14,16
**August (5)** 13:1;55:5;148:16;149:24;150:3
**authentic (1)** 45:6
**authority (16)** 34:4;35:2,2,3,6,9;44:18;55:21;56:1,10,14;57:15;64:21;139:4,6;141:6
**authorization (1)** 160:1
**authorized (1)** 139:1
**awarded (1)** 50:16
**awards (1)** 145:15
**aware (33)** 28:19;34:8;39:20,24;52:9,20;53:8,20;55:3;64:11;65:10;68:13,15;73:4;78:16;81:15;99:8;115:9;119:2,7,11;120:16;125:1,7;137:13;138:10;141:13,15,17;148:10;149:10;150:1;160:21
**away (1)** 44:6

## B

**bachelor's (1)** 13:14
**back (31)** 8:20;11:2,21;24:11;31:11;36:18;48:25;61:15;65:13;74:20,25;75:18;81:7;84:20;87:24;88:17;99:2,5;100:5,13;102:6;104:6,8;109:5;122:1;124:2;129:19;143:14;148:9;152:9;154:8
**backdate (1)** 115:1
**backwards (1)** 112:4
**bad (4)** 70:18;116:8,17;158:10
**Balance (9)** 101:9,14,16;102:18,19;103:15;109:17,18;110:1
**Balances (1)** 112:21
**ball (1)** 111:5
**bank (1)** 39:1
**base (1)** 136:7
**based (2)** 74:18;104:20
**basically (3)** 38:25;48:22;76:6
**basis (2)** 48:23;108:12
**Bear (1)** 153:24
**became (1)** 47:12
**become (1)** 83:6
**began (1)** 8:4
**beginning (2)** 93:14;143:14
**behalf (9)** 18:24;27:17;28:6;39:12,14;78:8;97:7;98:13;148:25
**behind (4)** 27:22,23;93:7;99:3
**belief (1)** 141:7
**below (1)** 116:13
**benefit (2)** 15:6,10
**benefits (2)** 30:4,20
**besides (2)** 14:4;70:7
**best (3)** 12:15;68:22;116:12
**better (1)** 24:24
**beyond (1)** 46:23
**Big (3)** 70:19,20;77:7
**bill (11)** 57:21,22;58:1,6;59:17;60:1;103:1;111:24;152:22;153:9,14
**billing (4)** 112:5,5,10,16
**bills (4)** 58:21;59:3;75:7;97:8
**bit (5)** 8:21;41:21;130:23;131:6;148:15
**blame (1)** 69:16
**blank (2)** 60:15;117:6
**board (1)** 82:2
**boards (1)** 83:10
**Booking (2)** 151:3;152:24
**bore (1)** 87:2
**both (9)** 19:15;20:7;61:6;129:6;142:1;154:21;155:10,13;162:4
**bottom (11)** 88:19;127:24;132:1,14;134:2,4,7,8;137:21;138:20;151:15
**bounds (1)** 22:21
**box (1)** 60:15
**boxes (1)** 40:14
**braking (1)** 82:7
**brand (2)** 76:1;77:7
**brands (1)** 78:25
**break (7)** 10:12,15,19;75:13,21;95:19;123:23
**breaks (1)** 11:2
**brief (1)** 154:4
**briefly (2)** 156:16,17
**Brigid (2)** 68:24;69:9
**B-r-i-g-i-d (1)** 69:1
**bringing (1)** 28:10
**brings (1)** 104:13
**broaden (1)** 15:11
**broadly (1)** 34:20
**Brunswick (1)** 7:13
**buildings (1)** 79:1
**Burist (43)** 7:10;47:4,7;48:4;52:11,18;53:11,16;54:15;55:12;57:12;64:2,24;77:21;78:3;81:2,16;85:8;86:8;90:10;98:8;100:10;115:13,23;116:22;120:7,13,17,23;121:20;122:3,21;123:9;136:25;144:13;145:4;149:21;159:11,20;160:18,25;161:6;166:2
**Burist's (2)** 115:21;121:7
**business (32)** 13:14;15:21,25;16:1,8;35:20;36:18;38:8,13;39:10,12,13;40:7;49:1;50:24;51:4,18,20;67:23;70:17;72:21,23;73:1;91:5,13;92:24;105:25;109:24;111:17;113:5,13;149:13
**buying (1)** 15:9
**Bynum's (1)** 134:10

## C

**call (4)** 33:16;134:22;136:23;140:20
**called (2)** 26:24;105:1
**came (1)** 136:23
**camera (1)** 82:8
**can (115)** 9:18;11:18;15:10,12,18;16:3,5,7;17:8;18:4,7;19:2;21:7,17;22:6,9,11,22;23:20;25:15;28:3;30:8;31:15,23;33:14;34:20;35:18;36:7,7;38:12;39:17;45:19;46:4;48:8,17;50:20,21;52:16;55:10,24;57:24;61:2,19;62:17;68:25;69:12,13,18;72:14;73:20;74:5,17;75:7;76:15;77:7;78:5,20;82:22;83:20;85:23;90:19;91:1,22,24,25;93:9;94:19;95:21;96:1,1;97:2,3,12,13;99:5,14;100:7,15;101:1,16;102:4,11;103:5;104:6,14;106:4,20;108:4;109:5;111:8,23;112:14;113:16,18;121:5,22,24;122:3,11;124:3;126:10,20;127:18;130:2,7,7;132:12;133:18,21;136:23;142:17;145:19;152:22;153:2;162:2
**cancellation (5)** 97:18,19;115:2,7;118:22
**Cancelled (7)** 114:19;121:21;127:9,10,13;159:11,12
**capacity (1)** 28:15
**care (1)** 76:20
**career (1)** 17:15
**cargo (1)** 116:19
**caring (1)** 76:11
**carrier (17)** 31:13;50:4,6;55:21;

56:1;60:23;61:11; 65:23;66:22;89:3; 118:3;125:2;139:1; 141:5;142:23;148:17; 150:4
**carriers (5)** 31:8;32:18;48:13; 66:7;125:2
**carry (1)** 77:17
**case (14)** 7:9,11,13;23:13; 27:24;39:7;66:9; 71:23;75:21;110:9; 126:22;129:18; 137:16;158:12
**category (1)** 109:11
**Cause (2)** 117:11,13
**caused (1)** 123:11
**caution (1)** 10:16
**caveat (1)** 27:13
**cease (1)** 44:15
**Central (1)** 7:8
**certain (2)** 15:25;158:13
**certainly (4)** 77:2;97:9;119:12; 140:22
**certainty (2)** 34:21;97:3
**certification (1)** 47:4
**certified (1)** 72:24
**certify (1)** 47:14
**change (4)** 74:21;91:23;99:1; 104:14
**CHANGE_ (2)** 166:14,23
**changed (3)** 94:2;166:13,22
**changes (1)** 161:21
**characterization (1)** 42:19
**charge (2)** 89:14,17
**chargeback (1)** 109:9
**charged (2)** 109:5;132:24
**Charles (1)** 160:18
**Charlie (1)** 59:14
**chart (7)** 14:6,10,20;18:9; 24:11;25:22;80:8
**check (4)** 33:10,22;67:17; 76:23
**checked (2)** 33:9,11
**Chris (1)** 155:22
**circumstance (1)** 57:25
**cited (1)** 55:12
**Civil (1)** 22:20
**claim (14)** 31:6;39:3,4;40:22; 41:3,10,15,16,20; 44:20;91:24;103:14; 105:3,4
**claims (22)** 30:19;32:10,21,22, 24;33:1;39:2;40:20; 55:19;101:4,6,8,12, 24,25;103:13;104:21, 23;112:25;116:6,18, 20
**clarify (4)** 50:20,21;93:15; 158:10
**clarifying (1)** 93:23
**class (2)** 61:21;62:19
**clean (1)** 62:18
**clear (5)** 25:13;65:4,7; 132:25;150:10
**client (1)** 22:4
**clients (5)** 72:5;90:22;91:3; 129:25;152:7
**close (3)** 38:24;136:12; 153:25
**code (5)** 16:6,10;86:17; 101:18;151:22
**codes (5)** 16:4,7;24:17,20; 25:1
**coinsured (2)** 124:16,17
**college (1)** 13:13
**collision (51)** 16:16,24;17:16; 18:3;19:3;23:20;31:5; 33:1,6,21;40:18; 41:17,24;42:10;53:5, 19;54:18;55:8,13; 58:22;64:4;72:5; 78:13;80:15,17; 82:12;86:25;87:17; 88:6,16;90:22;91:3; 122:22;123:11; 124:10;125:24,25; 126:4;129:24;130:5; 133:14,19;134:23; 135:7,14,16,20; 136:13;148:12;152:7; 156:21
**column (1)** 127:24
**comma (1)** 152:20
**commenced (4)** 73:14;75:1,8,11
**commerce (1)** 30:14
**commercials (1)** 77:1
**commit (1)** 126:10
**commodities (1)** 139:3
**communicate (2)** 10:18;149:20
**communication (11)** 10:17,24;46:23; 78:2;81:6;82:23; 98:21;148:16,25; 149:11,15
**communications (2)** 81:19;82:17
**companies (7)** 15:2,8;16:6;25:7; 26:17,22;143:10
**company (23)** 12:24;14:1,4;16:5; 26:24;27:17;29:18; 30:6;60:5,11;76:20; 84:14,24;97:7;98:13; 139:1;143:9;144:9; 145:24;147:10,13,15; 156:10
**company's (3)** 27:8;29:8;144:9
**compensation (2)** 48:19;144:11
**complaint (3)** 23:12;116:18; 156:21
**complete (1)** 34:1
**completed (7)** 21:21;34:9,23; 37:18;157:17,20,22
**completing (1)** 154:6
**completion (1)** 147:7
**compliance (6)** 30:15,17;47:18; 48:12;57:10;82:2
**complied (1)** 73:5
**comply (3)** 30:12;143:8;144:8
**computer (1)** 83:8
**concede (3)** 92:18,23;93:1
**conceptually (3)** 39:6,8,21
**conclude (1)** 59:2
**conclusions (2)** 24:6;58:24
**concur (1)** 101:7
**conditions (1)** 73:16
**conduct (3)** 20:6;45:22;78:12
**conducted (3)** 47:3;80:23;92:25
**conducting (2)** 51:18,20
**confirm (8)** 95:22;96:1;110:23; 113:11;115:6;139:20; 161:5,9
**confirmation (4)** 98:17;100:9;151:3; 152:24
**confirmed (1)** 96:17
**confusing (1)** 63:16
**confusion (1)** 88:11
**conjunction (1)** 52:13
**connected (1)** 96:14
**connecting (1)** 30:6
**connection (3)** 56:13;68:5,9
**Conser (4)** 151:17;152:1; 153:4,21
**consider (2)** 17:3,11
**considered (1)** 157:13
**constant (1)** 85:3
**contact (2)** 52:4,7
**contained (1)** 105:23
**contentions (1)** 74:18
**contest (1)** 36:4
**context (2)** 56:3;75:5
**continuation (1)** 149:13
**continue (5)** 20:24;21:2;23:3; 43:17;73:17
**continued (10)** 36:17;38:7,13,17; 39:10,13;84:2;93:20; 94:13;105:21
**continuing (6)** 39:11;51:25;52:18; 91:5;93:1;113:3
**contract (14)** 11:21,22;15:8; 18:21;25:8;29:19; 38:21;47:15;65:15; 67:16;101:22;113:8; 146:20;157:24
**contracted (2)** 18:19;47:22
**contractor (13)** 61:13;62:22;65:24; 70:2;137:7;138:4; 139:17;140:11,21; 142:22;143:6;144:6; 147:9
**contractors (8)** 25:17;26:16;63:2; 64:17;137:8;138:11; 140:14,23
**contractor's (5)** 143:20,25;144:7, 10;147:11
**contracts (1)** 71:3
**contractual (2)** 67:19;113:4
**co-op (2)** 15:10;30:5
**cooperative (1)** 15:1
**cooperatives (1)** 15:1
**copies (1)** 104:11
**copy (12)** 14:11;42:9;43:21; 59:12;89:25;90:3; 113:22,25;132:2,4,6; 134:13
**Corp (1)** 151:22
**corporate (9)** 7:5;8:7;23:18,24; 24:3;26:13;28:7;77:8; 137:2
**corporation (2)** 18:24;19:1
**CORRECTION (1)**

166:1
**correctly (8)**
44:12,24;73:2,18;120:1;138:23;139:7;143:23
**correspondence (6)**
66:8;86:6;124:25;135:2;136:1;150:20
**corresponds (2)**
153:8,14
**cost (1)**
107:21
**counsel (23)**
10:18,19;17:23;18:1;45:2,18;59:17;69:11;75:20;85:13,20;117:22;119:16,19;123:16;126:9;130:13;155:5;157:4;158:11;159:6;161:7,13
**counselor (1)**
36:2
**counselors (1)**
7:15
**counsel's (1)**
100:6
**couple (2)**
37:16;150:1
**courier (1)**
72:22
**course (12)**
18:7;49:2;51:7;79:5;80:21;83:12;104:14;109:24;111:17;113:5,12;145:1
**Court (2)**
7:12,18
**cover (3)**
30:25;71:7;80:11
**coverage (4)**
31:5,16;32:3,6
**coverages (1)**
76:19
**covers (1)**
18:8
**crash (7)**
44:23;45:13;46:6,14;47:5;87:17;88:4
**create (2)**
92:14;93:5
**created (4)**
92:15;115:1;137:25;151:9
**creates (1)**
74:7
**creating (1)**
21:13
**critical (1)**
31:18
**CROSS-EXAMINATION (1)**
156:18
**current (3)**
12:17;26:13;109:17
**customer (10)**
30:4;32:22,24;39:3;62:6,11;105:4;116:7,17;144:5
**customers (3)**
30:7,21;84:19
**customer's (1)**
62:4
**cut (1)**
84:8

**D**

**damage (3)**
32:12,14;55:19
**damaged (1)**
30:19
**damages (3)**
32:11;41:17;89:10
**Damien (1)**
149:16
**data (3)**
81:6;82:9;85:2
**database (4)**
80:3,5,6,10
**databases (1)**
110:23
**date (31)**
7:7;37:17;55:11;61:2;73:14,25;75:2;78:9,15;79:17,20;93:2;101:18;102:3;107:20,25;108:3,3,4,18,24;110:10;114:22,23,25;117:2;128:5,6,7;146:19;151:4
**dates (6)**
54:22;61:3;108:9;110:10;117:5;121:20
**dating (1)**
121:25
**Davenport (1)**
160:18
**day (8)**
10:7;22:1;23:3;61:21;70:17;72:20,21;89:14
**days (4)**
72:23;79:24;135:7;150:1
**deal (4)**
52:5;70:19,20;89:2
**dealing (2)**
49:2;81:10
**death (1)**
41:17
**decals (1)**
110:12
**Declaration (2)**
154:7;155:11
**declarations (1)**
155:2
**decreased (1)**
109:22
**deduce (1)**
101:7
**deduct (1)**
144:10
**deducted (2)**
109:16;132:18
**deemed (2)**
72:20;116:18
**Defendant (1)**
7:6
**defer (2)**
156:9,10
**define (1)**
56:9
**defined (3)**
146:3;147:14;156:1
**definition (1)**
69:10
**degree (2)**
13:14,15
**degrees (1)**
13:17
**delay (1)**
21:2
**delete (1)**
99:2
**deliver (2)**
62:10,16
**delivered (1)**
72:21
**demand (4)**
42:12,23;44:15,20
**Demien (4)**
149:2,17,18,20
**department (9)**
32:21;47:24;53:10;55:1,2;57:6;95:16;132:2;134:22
**depending (1)**
62:14
**depends (3)**
41:14;62:3;67:2
**deponent (2)**
59:6;113:25
**deposited (1)**
72:23
**deposition (24)**
7:5;8:4,6,7,11;10:20;11:9,13;12:4;18:7;20:5;21:2,12,21;23:24;24:2,6;27:6;42:22;49:10;90:6;93:14;161:16;166:1
**describe (10)**
37:11;62:2,19,24;85:17,22;86:5,13;119:25;143:15
**described (6)**
52:10;76:6;87:25;139:10;158:9,21
**describing (3)**
86:3;104:18;117:25
**description (2)**
61:25;156:5
**design (1)**
89:7
**designation (2)**
122:7;141:4
**desist (1)**
44:15
**destination (6)**
63:8;151:16,16;152:4;153:6,21
**details (1)**
122:17
**determination (2)**
17:17;45:17
**determine (3)**
38:6;54:24;55:25
**Development (1)**
13:7
**device (1)**
86:10
**devices (1)**
147:16
**difference (5)**
13:25;38:19;76:13;94:15;139:11
**different (15)**
24:17,20;35:12;37:1;41:21;62:13;94:3;96:17;103:16;107:25;130:23;140:19,19,21,22
**differently (1)**
91:24
**difficult (2)**
34:13,21
**DIRECT (8)**
8:1;18:20;20:6;44:5;46:20;78:2;129:19;147:18
**directed (1)**
51:6
**directly (8)**
26:15,21;28:25;29:20;47:23;64:9;66:2;84:10
**Director (1)**
155:25
**disagree (3)**
24:8;42:16,18
**discovery (4)**
11:15;35:23,25;99:11
**discussed (2)**
17:10;125:19
**discussing (1)**
17:7
**Discussion (4)**
14:17;20:9;23:10;161:24
**discussions (1)**
75:20
**Dismiss (2)**
154:7,14
**dispatch (1)**
33:17
**dispute (2)**
124:14;126:4
**disputed (2)**
150:8,13
**disqualification (1)**
99:13
**disqualified (6)**
83:3,6,9,15;99:17;130:19
**disqualify (1)**
117:12
**disrupt (1)**
58:13
**distribute (2)**
69:4,5
**distributes (1)**
69:8
**District (2)**
7:12,12
**Division (1)**
7:13
**DMV (1)**
118:6
**document (53)**
12:2;36:2,6,10;37:1,11;49:13;68:20,23;71:18;83:20;86:5;90:5,20;92:15,15;93:6;94:4;98:22;99:2;100:7;102:4,8;103:18,25;104:16;106:5,9;111:9;117:21;119:11;123:15,15;124:1;126:15;128:17,21;129:3;130:2,6;131:4,22;137:25;138:7;151:2,7,9,11,14;155:12;157:19;159:5,8
**documentation (21)**
27:5;47:2;54:20;65:21;73:4;79:23;82:22;84:8;85:6;86:9;90:11;97:13,14,18;98:16,19;99:12;119:2,7;120:12;148:19
**documents (17)**
11:18;37:6;38:5,10;49:9;90:16;92:8;94:5;114:10;115:5;117:21;122:4;129:3;160:15,21,24;161:6
**dollars (4)**
31:24,24,25;103:8
**domestic (1)**
26:1
**done (38)**

8:19;20:15,16;23:6, 8;25:7;26:5;30:10,10; 34:3;35:1;39:23; 48:22;53:4;54:8;70:5; 79:3,6;80:3;97:19; 98:14,17;101:21,25; 105:9;108:15;110:12; 111:14;112:10; 113:12;120:15; 132:11;134:10; 143:19;147:24; 149:23;154:1;161:22
**DOT (41)**
30:11;35:7,10,12; 47:17,17,25;48:2,5; 51:12,20,22;52:11,12, 19,24;53:18;54:2,15; 56:16,21;57:19; 77:25;78:4;83:11; 89:12,15,19;90:7; 124:11;133:21; 134:24,25;147:19; 149:15;150:11,13; 159:17,18,20,24
**doubt (1)**
96:18
**down (16)**
70:16;73:8;100:21, 22;103:4;112:24; 115:25;117:8;132:1, 14;134:2;137:21; 143:18;144:4;146:8; 151:15
**dozen (1)**
8:15
**dozens (2)**
15:4,18
**DQ (1)**
117:11
**draft (1)**
85:23
**drafted (2)**
155:4,5
**dress (1)**
89:6
**drive (1)**
63:7
**driver (61)**
11:23;13:7,8,10; 26:11;27:1;28:20; 29:18;30:12;47:4,14, 19;48:5,10,16;52:25; 56:20;57:3,8,11,17; 63:10,17,22;64:2,15, 19;65:24;76:8;81:7; 96:12,13,19,24;97:3; 99:13;100:10;103:4, 7;104:24;105:3,5,6; 114:12;116:6;117:13; 120:17;122:3;123:4; 134:16;143:6;144:22; 145:3,10;158:7; 159:3,11,16,16;161:1, 2
**drivers (14)**
30:15;46:25;47:21; 76:23;77:12,15,16; 84:20;85:2;114:15; 134:21;144:7,13,20
**driving (6)**
46:24;48:17;53:11, 17;122:9;123:10
**drove (1)**
96:12
**drug (7)**
9:10;30:15;57:8; 143:3,8,11,12
**drunk (1)**
48:16
**Due (11)**
109:11,11,12,21; 115:15,16,21;127:10, 22;128:7,9
**during (17)**
10:19;38:12;78:22; 81:20;91:5;94:22; 104:24;109:25; 112:10;113:6,14,14; 141:15,22;142:14; 144:22;149:15
**Duties (7)**
50:3;55:17;61:10, 11,13,17;160:17
**duty (1)**
23:22

## E

**earlier (15)**
24:16;43:21;76:6; 80:2;91:17;98:4; 117:25;122:21; 127:15;133:6;137:5; 138:9;144:2;147:14; 148:23
**earn (1)**
67:9
**ease (1)**
76:12
**easy (3)**
85:12;119:13; 130:10
**economies (2)**
15:6,10
**Ed (1)**
7:17
**edits (2)**
155:6,8
**EDL (3)**
81:4,10,10
**educated (1)**
27:16
**educations (1)**
13:12
**efficiency (4)**
15:3,5;76:7;144:6
**efficient (1)**
15:19
**efficiently (1)**
28:3
**effort (2)**
55:5;137:3
**efforts (1)**
78:7
**EHRENREICH (153)**
9:13,18,24;11:6; 12:8;14:12;16:12,18; 17:1,5,13,20;19:4,10, 17,22;20:3,12,17,22; 21:1,8,13,18;22:2,6,9, 13,15,18;23:4,22; 25:19;26:8,19;27:3, 18;28:22;29:4;30:2; 31:1,10;32:1,19;33:2; 34:25;35:14;36:12, 15,22;37:3,10,14,23; 38:1,14;40:25;41:6, 13,18;42:1,17;45:15, 24;46:17;48:21; 49:17,23;50:20; 51:10;52:3;55:15; 58:3,17;59:5,9,13; 60:24;64:6,18;65:1, 12;66:14;67:6,10; 68:14;71:20;72:7; 73:23;74:23;75:10; 79:10;81:9,14;84:5; 85:19;87:13,19;91:7; 92:22;94:10,16,23; 99:21;103:17,20,24; 104:6,12;108:10,13; 111:1,12;113:20,23; 117:23;119:18;120:2; 122:24;123:3,13,17; 124:12;125:22;126:7; 128:2;131:10;134:4, 7;139:25;140:3,6,15; 141:9;146:14,24; 147:22;148:1,4; 154:4,10,13,17,23; 156:13,16,19;160:4, 11;161:12,19,25; 162:3
**eight-page (1)**
126:15
**either (8)**
36:7;49:3;51:6; 69:25;121:21;131:1, 20;139:3
**ELD (9)**
30:15;82:1,1,10,21, 23;83:5,14;84:1
**electronic (3)**
82:3;83:22;98:22
**elicit (1)**
10:24
**else (4)**
36:25;123:14; 136:21;149:3
**email (8)**
83:22;85:19,24; 86:4,5;98:20;119:20; 142:19
**emails (2)**
11:20;97:21
**employed (3)**
13:22;47:7,10
**employee (2)**
26:5;149:6
**employees (2)**
26:11;160:23
**employment (2)**
160:16,24
**end (4)**
34:23;91:24; 127:10;161:15
**ending (4)**
92:13,19;93:8; 107:5
**ends (1)**
38:21
**engine (1)**
82:8
**enough (2)**
17:16;159:6
**ensure (3)**
51:25;63:6;115:5
**enter (6)**
50:16,24;122:13, 17;123:8;158:23
**entered (3)**
64:11;115:7;118:22
**entities (27)**
14:3;15:5,18;18:9, 12,14;24:12,20;25:2, 21;26:2;29:20,21; 30:1;43:2;46:24; 53:17;55:2;66:1; 77:16;80:7;81:17; 92:25;106:11;113:4; 142:4;153:15
**entitled (3)**
10:13;11:10;72:25
**entity (15)**
16:1,10;24:16; 35:19,19;40:11; 46:13;47:13,18;49:4; 66:20;105:25;106:22; 126:3;135:10
**entries (1)**
116:2
**entry (1)**
102:23
**equipment (31)**
30:16;56:20;57:5, 17;63:11,21,23;64:3, 16,19,24;76:23;79:1, 15,15;83:2,2,6,14; 84:2,20;105:18,21; 106:2,10;110:8; 116:17;126:17;127:7; 130:19;147:13
**equipment's (2)**
63:14;77:12
**erroneously (1)**
109:4
**escrow (1)**
144:11
**et (4)**
7:9,10;166:2,2
**e-trans (1)**
162:1
**even (8)**
8:18;15:24;37:12; 45:7;47:23;51:7; 84:12;152:2
**event (5)**
16:25;31:5;44:20; 89:11;135:18
**events (1)**
17:18
**exact (5)**
14:6;54:19;113:13; 125:16;140:19
**exactly (4)**
49:14;57:3;85:25; 155:19
**EXAMINATION (2)**
8:1;160:12
**example (2)**
15:21;16:3
**except (3)**
19:8;20:20;23:1
**exception (1)**
10:17
**excess (1)**
30:24
**exchanged (2)**
92:2;150:20
**exclude (1)**
71:22
**Excuse (5)**
38:20;72:9;74:25; 107:13;147:1
**excused (1)**
162:6
**exercised (1)**
41:2
**Exhibit (52)**
11:25;12:3;14:9,18; 18:10;24:12;35:20; 36:13;43:2,24;44:2; 59:7;60:1;61:16;71:4, 13;87:12,14,18; 88:18;89:21,24; 100:14;114:2,7; 123:16;126:12,13; 128:25;132:21,25; 133:1;134:12;137:17, 18;144:2;146:13; 150:22,24;151:2; 152:9,13,16,25;153:8, 13;154:19,20,24; 157:10,12,16
**Exhibits (1)**

59:21
**exist (4)**
16:4;119:11;136:1;140:24
**existence (1)**
112:15
**existing (2)**
74:8,21
**exists (2)**
15:23;118:20
**expectations (1)**
144:5
**expense (3)**
143:21,25;147:11
**expenses (1)**
144:10
**Expires (1)**
115:12
**explain (2)**
8:20;96:5
**explanation (1)**
62:1
**express (1)**
72:22
**extent (1)**
139:10
**extra (2)**
43:21;90:4
**extremely (1)**
21:14

**F**

**facilitate (7)**
25:3,5,23;32:23;66:3;68:1;138:13
**facilitates (1)**
66:21
**facilitating (4)**
24:21,23;25:13;67:4
**facilitator (3)**
46:15;65:19;66:13
**facing (1)**
82:7
**fact (14)**
38:24;42:6,6;55:4;83:14;92:1;97:15,25;101:6;108:20;115:6;122:19;127:13;136:5
**facts (1)**
27:10
**factual (1)**
140:11
**failing (1)**
134:15
**fair (2)**
11:1;156:5
**familiar (4)**
27:24;67:11;150:17;151:6
**families (1)**
95:22
**family (2)**
71:1;97:9
**far (3)**
35:15;43:19;92:1
**fault (1)**
116:19
**February (2)**
128:9;133:25
**Federal (15)**
22:20;30:13;48:13;52:22;53:1;54:13,21;55:1;82:2;118:2;125:2;135:10;143:7;148:17;150:4
**feedback (1)**
116:7
**feel (3)**
12:12;17:22;28:11
**feelings (1)**
27:22
**Fees (2)**
146:9,10
**felt (1)**
93:15
**few (5)**
52:10;100:15;121:20;135:7;155:11
**figured (1)**
104:13
**file (10)**
14:11;39:3;57:8,12,17;114:13;118:19;121:25;160:25;161:2
**filed (1)**
154:8
**files (5)**
11:24;30:12,16;47:19;160:16
**Filings (2)**
145:25;146:4
**filled (1)**
157:13
**find (6)**
34:13;95:17;100:7,14;119:14;130:10
**fine (6)**
14:14;17:11;27:7;28:1;95:20;134:14
**fines (1)**
55:7
**finish (1)**
10:13
**first (14)**
11:2;49:5;60:3;69:3,5,8;89:1;90:20;116:25;138:21,25;154:17;155:10,11
**fit (2)**
20:23;65:25
**fits (1)**
24:24
**five (3)**
13:1,2;31:24
**five-page (1)**
151:2
**flip (9)**
71:8;88:17;124:2;133:9;138:20;139:18;143:1;145:19;147:1
**Florida (2)**
46:7,9
**flow (2)**
50:25;58:14
**FMCS (1)**
133:8
**folks (2)**
58:20;86:1
**follow-up (3)**
160:5,6;161:10
**food (2)**
145:11,13
**Foppe (1)**
7:17
**force (1)**
125:13
**form (86)**
9:24;16:12,18;17:1,13;19:4,8;20:21;23:2,5;25:19;26:8,19;27:3,18;28:22;29:4;30:2;31:2,10;32:1,19;33:2;34:25;35:14;38:14;40:25;41:6,13,18;42:1,17;45:15,24;46:17;48:21;51:10;52:3;55:15;58:3,17;60:24;64:6,18;65:1,12;66:14;67:6,10;68:14;71:20;72:7;73:23;74:23;75:10;79:10;83:22;84:5,16;85:25;91:7;92:22;94:10,16,23;108:10,13;111:12;123:3,13;124:12;125:22;126:7;140:15,19;141:9;146:14,24;151:6;156:13;158:17,22;159:14,23;160:3;162:4
**formally (1)**
119:22
**former (1)**
18:18
**formerly (1)**
157:6
**forth (2)**
11:21;36:18
**forward (7)**
21:7;28:3;82:7;101:10,14,17;103:15
**FOSS (6)**
59:11;87:10;89:25;154:12,16,19
**found (2)**
43:9;116:16
**four (5)**
19:3;43:9,16;90:21;91:2
**free (1)**
17:22
**front (1)**
12:3
**fuel (1)**
146:16
**full (3)**
10:9;51:8;112:21
**function (2)**
31:18;65:23
**fund (1)**
144:11
**fundamental (1)**
21:6
**funds (3)**
50:12;69:4,5
**furnished (1)**
89:7
**further (8)**
102:2;103:4;117:8;143:18;144:4;146:8;155:12;156:15

**G**

**Garr (3)**
24:3;42:13;149:12
**Garr's (2)**
42:22;155:18
**gave (1)**
113:20
**general (4)**
17:14;61:20;133:4;139:3
**generally (3)**
18:8;47:1;61:10
**Georgia (9)**
7:13;43:6,17;52:14;53:9;54:25;87:16;88:3;126:1
**gets (4)**
50:12;69:7;134:15;145:2
**Giveaways (1)**
145:13
**given (2)**
23:23;72:20
**gives (1)**
82:8
**God (1)**
7:23
**goes (4)**
10:7;69:15;70:16;145:8
**Good (8)**
8:3;28:9;66:3;76:20;114:1;116:8;123:25;147:22
**goods (17)**
15:12;16:17;27:1;28:21;29:19;32:13,15;33:5;40:11;61:18;62:7;63:6;76:11,21;137:9;139:2;152:5
**Gotcha (1)**
145:3
**government (19)**
24:13,21;25:24;26:6;29:16,19;52:23;53:1;54:21;58:8,9,11,16;60:21;66:11,22;68:2,8;149:8
**granted (1)**
79:25
**Gregory (4)**
152:10,18,18,20
**group (1)**
35:19
**guess (10)**
42:2;66:10,21;81:4;82:24;107:8;116:25;152:13,18;161:25
**guy (2)**
45:5;136:22
**Guys (3)**
20:7;58:15;160:5

**H**

**halfway (1)**
100:21
**hand (1)**
118:19
**handbooks (1)**
160:17
**handed (2)**
59:17;152:17
**handing (2)**
49:18;59:5
**handle (1)**
30:18
**handled (1)**
58:19
**happen (9)**
38:22;39:9;42:4;45:17;62:13;91:24,25;93:20;112:25
**happened (17)**
17:12;34:22;37:15;39:7,22;42:6;54:22;93:16;96:4,6;98:2;99:16;112:23;136:10,11;149:25;150:12
**happening (3)**
51:14;52:8;150:2
**happens (2)**
54:4;58:13
**happy (1)**
36:1
**hard (2)**
82:7;131:8
**haul (2)**
96:24;116:1

**hauled (7)** 39:5;91:19;93:2,4;105:6;116:5;142:10
**hauling (4)** 48:1;93:22;94:13;96:9
**head (3)** 31:17;35:17;66:25
**heading (2)** 106:4;107:3
**Headquarters (3)** 109:11,12;145:13
**heard (1)** 98:24
**hearing (1)** 150:15
**held (8)** 14:17;20:9;23:10;75:16;100:3;104:5;148:7;161:24
**help (6)** 7:23;15:12;30:19;36:8;99:11;138:13
**helped (1)** 30:5
**helpers (1)** 144:7
**helps (1)** 32:22
**hereby (1)** 162:8
**herein (1)** 147:9
**Here's (2)** 43:20;89:25
**Hey (1)** 103:17
**Hickinbotham (2)** 149:5,11
**high (3)** 48:16;67:1;145:15
**higher (2)** 76:6,7
**Highway (1)** 55:2
**himself (1)** 121:15
**Hines (1)** 160:19
**hire (2)** 62:22;63:3
**hired (1)** 28:20
**hiring (1)** 27:1
**history (2)** 26:4;99:6
**hitched (1)** 156:24
**HOD (2)** 70:10,13
**HODGE (1)** 23:9
**holding (1)** 48:25
**home (2)** 62:9,10
**homeowner (1)** 76:14
**homeowners (1)** 76:10
**honestly (1)** 97:25
**house (1)** 30:12
**housed (1)** 33:18
**household (1)** 139:2
**HQ (1)** 109:11
**Human (2)** 13:5,15
**hundred (2)** 43:3;103:8
**hundreds (2)** 46:11;80:12
**hypothetical (1)** 118:23

**I**

**ICOA (1)** 140:20
**ID (2)** 114:18;121:4
**idea (2)** 77:3,5
**identification (17)** 12:1;14:19;44:3;59:22;72:4;87:15;89:22;90:5;114:3;120:23;126:14;137:19;147:6,15,16;150:25;154:25
**identified (7)** 12:7;27:10;31:19;35:20;90:12;133:5;155:25
**identifies (1)** 58:2
**identify (10)** 12:14;31:15;37:20;58:1;68:22;95:18,21;97:12,13;100:16
**imagine (2)** 58:11;85:9
**immediately (3)** 44:15;52:7;147:11
**important (2)** 10:8;85:11
**improper (1)** 89:18
**improperly (1)** 54:2
**in-act (1)** 41:23
**Inaudible (3)** 19:14;36:11;154:12
**Inc (8)** 8:8;36:19;40:3;60:2,8;137:22;138:3,25
**incentive (1)** 97:9
**incident (1)** 156:25
**include (4)** 47:20;147:14;156:2;161:7
**included (2)** 122:23;123:1
**includes (1)** 77:11
**including (2)** 75:3;143:9
**incorporated (1)** 14:25
**incorrect (1)** 122:21
**increase (2)** 15:3,5
**incurred (11)** 107:10,17,21;108:1,8,18,21,24;109:25;110:11;111:10
**indeed (1)** 110:9
**indemnification (7)** 40:23;41:4,11,25;42:13,23;68:10
**independent (21)** 15:2;25:7;43:12,13;61:13;62:22;63:2;64:17;65:24;70:1;106:1;137:7,8;138:4,11;139:17;140:11,13,20,23;142:22
**independently (1)** 52:6
**indicate (9)** 57:22;94:9;101:20;103:7;108:17,22;110:13;122:4;137:24
**indicated (1)** 122:20
**indicates (11)** 66:9;92:20;94:21;106:20;107:8;109:14;117:1;121:20;126:16;127:21;128:21
**indication (4)** 38:13;91:4;107:25;117:20
**indicative (9)** 91:18;92:3;93:1,4,19,22;94:25;95:1;113:3
**indicia (3)** 56:15;57:4,14
**individual (2)** 28:15;71:1
**industry (2)** 15:9;67:4
**influence (1)** 9:10
**inform (1)** 64:21
**informally (1)** 119:21
**information (20)** 11:15;12:13;19:2;23:16;83:5;84:3,9,25;85:7;88:1,14;100:25;114:14;118:19;125:20;126:2,6;129:17;157:17,18
**informational (1)** 24:7
**informed (4)** 135:23;136:6,9,10
**informing (1)** 135:10
**in-house (1)** 69:11
**initial (1)** 32:3
**initially (1)** 124:6
**injured (1)** 31:6
**injury (1)** 41:16
**inquire (1)** 11:10
**insignias (2)** 109:1;110:7
**inspect (1)** 135:19
**inspected (3)** 53:25;128:8,10
**inspection (15)** 51:23;52:11;116:16;126:17;127:21;128:5,6,7;131:23;132:10;133:12;134:2,16;135:6,24
**inspections (5)** 51:13;55:6;132:22;133:4;134:24
**instantaneous (1)** 54:9
**instruct (2)** 22:11;23:3
**instructed (4)** 17:21;23:4;93:24;147:10
**instruction (2)** 11:8;122:14
**insurance (15)** 30:18,23,24;31:2,4,25;76:7,19;124:18;125:2,7,12,13,20;126:2
**insureds (1)** 125:9
**integration (1)** 158:13
**intellectual (1)** 44:16
**intended (2)** 10:23;91:15
**interaction (1)** 30:4
**interactions (1)** 121:25
**internal (3)** 67:12;116:3,7
**international (2)** 26:1;88:5
**interpret (1)** 128:16
**interpretation (1)** 109:20
**interpreting (1)** 27:21
**interstate (1)** 30:13
**intimidated (1)** 20:11
**into (14)** 19:18;44:11;48:23;50:16,24;62:15;64:12;65:25;78:13;80:4;106:5;155:12;157:19;158:24
**investigate (4)** 52:7;83:13;102:1;137:3
**investigation (5)** 54:24;55:18;78:12;115:4,9
**invited (1)** 145:9
**invoice (4)** 106:10;107:8;108:4;111:21
**invoiced (3)** 109:15;111:16;146:13
**invoices (12)** 38:5;69:24;91:11;105:12,14;106:10;107:3;108:20;112:1;113:6;132:20;144:1
**invoicing (4)** 70:4;90:13,16;111:15
**involve (1)** 142:11
**involved (39)** 16:17;26:25;29:15,17;30:10,21,25;34:7;

41:19;46:6;47:5;54:18;55:7;64:4;72:5;82:12;86:25;88:5,16;90:8;125:23,24;126:3;129:24;130:4;133:14,19;134:23;142:1,4,6,15;148:12;150:6,8;152:6;153:15;156:20,25
**involvement (2)** 18:21;29:12
**involving (2)** 90:22;91:3
**issue (3)** 52:23;129:18;148:11
**issued (1)** 74:3
**issues (2)** 30:17;154:15
**items (3)** 101:4,12,24

## J

**Jacksonville (3)** 151:18;152:2;153:5
**January (1)** 74:1
**Jason (3)** 7:5;49:18;166:25
**JMI00003 (1)** 49:19
**JMI00677 (1)** 59:6
**JMI008 (1)** 88:19
**JMI10 (4)** 71:9,13,18;74:25
**JMI11 (1)** 71:19
**JMI277 (1)** 138:20
**JMI282 (1)** 145:19
**JMI284 (1)** 147:1
**JMI287 (1)** 139:20
**JMI668 (1)** 153:13
**job (6)** 59:9;69:9;120:2,3,5;161:22
**Joe (127)** 18:18;23:24;24:3;26:25;28:19;35:21;36:11,19;38:7,11;39:14,18,25;41:3,5,12,23,25;42:24;45:14;49:3;50:10;52:13,17,21;53:15;54:16;68:12;70:1,22;72:1;73:6;75:24,25;78:8,22;79:8,16;81:1,7,17;86:18;87:6;89:4,11,14,17;90:10,13,17,23;91:2,4,9;92:21;93:9;94:8,20;100:18;101:21;102:7,8;103:9;105:20;106:8,11,24;107:9,18;108:21;109:6,16,24;110:4,7;111:10,15,23;112:4,6,17;118:9,10,24;119:3,4,8;124:17,23;125:3;126:21;127:1,11;128:13;129:11,23;130:4,25;131:17;133:22;136:24;137:15;138:3,17,25;139:12,15;140:25;141:7,13,23,25;142:2,6,9,15,23;146:5;149:12,21;155:15;157:6,17,20,22;158:12,14
**Jones (12)** 7:5;8:3;23:13;75:19;87:16;104:16;114:6;140:7;148:10;151:1;156:20;166:25
**JS (11)** 12:1;14:19;44:3;59:22;87:15;89:22;114:3;126:14;137:19;150:25;154:25
**judge (1)** 21:3
**Julie (1)** 7:18
**July (72)** 16:16;17:12,19;18:2;19:2;23:20;27:1;28:21;29:11;33:1,5,20,20,20;36:20;38:8,12;40:18;41:17,24;42:11;44:23;45:13;46:14;47:5;53:18;55:13;58:22;66:11;72:5;77:22;78:5,13;80:4,15;81:21;82:17,25;83:17;84:4;87:18;91:11;94:8;95:24;97:16;107:13;114:22;115:8,12;117:1,18;118:15,22,25;122:9,20,22;123:5,10;124:19,23,24;125:4,13;129:25;133:14,19;135:2,15;148:12,20;152:6
**June (15)** 39:14;52:10;53:11;54:16;55:11;107:13,14,18,18;108:8,8,21,23;111:10,11
**jurisdiction (1)** 154:15

## K

**Keep (8)** 19:11,17,18;51:6;79:25;91:20;104:13;113:24
**Keeping (2)** 25:5;119:25
**Kelley's (2)** 135:6,19
**Kelvin (1)** 139:21
**kept (2)** 19:23;112:20
**killed (1)** 19:3
**kind (8)** 9:10;44:21;53:25;70:10;77:13;113:16;115:6;159:6
**kinds (2)** 51:9;144:18
**knew (3)** 19:23;136:11,12
**knowledge (9)** 19:1;26:9,12;28:5;49:7;111:4;123:7;135:4;149:22
**knowledgeable (2)** 27:9;156:11
**koozies (1)** 144:19
**Kyle (2)** 7:9;166:2

## L

**lading (12)** 57:21,22;58:1,6,21;59:3,18;60:1;75:7;103:1;153:9,15
**ladings (1)** 152:23
**lag (1)** 127:16
**LANGLEY (64)** 8:2,4;9:16;14:9,16;19:7,12,20,25;20:5,10,15,19,24;21:3,11,17,22;22:5,8,11,14,16,24;24:1;36:14;37:25;43:22;49:21;59:7;75:13;81:12;87:8,11,21;90:1;91:16;99:19,24;103:19,22;104:2,10;113:19,22;114:1,4;119:24;120:4;140:2,5;147:24;148:6;154:2,20;156:15;158:17,22;159:14,23;160:3,6,13;161:14
**language (3)** 49:11;61:1;104:20
**large (3)** 40:13;76:15;120:16
**last (16)** 8:16;22:8;26:10;35:18;36:11;37:19;44:4,8;73:10,13;74:13,13;89:1,9;122:2;134:11
**later (2)** 59:14;147:9
**law (1)** 126:1
**lawsuit (2)** 44:21;157:1
**lawyer (1)** 69:13
**lawyers (1)** 69:17
**lead (2)** 108:7;121:11
**leading (1)** 52:1
**learn (2)** 17:9;79:12
**learned (10)** 16:19,20;17:6,7,22,23,25;27:4,15;28:12
**LEAS (2)** 105:12;106:10
**lease (19)** 79:15;105:14,21;106:1,2,21;126:19;127:7;128:12,15,25;129:10,22;130:3,16,25;131:13,14,18
**leased (1)** 105:18
**least (2)** 42:13;43:12
**leave (2)** 77:5;121:14
**led (2)** 156:21;157:1
**left (12)** 127:25;128:2,3;131:23;132:6,14;134:4,7,8;137:21;138:21;143:2
**left-hand (1)** 127:24
**legal (5)** 9:3,14,20;45:18;126:9
**letter (10)** 42:8,15,16,19,23;43:20;44:9,14;45:16,20
**letterhead (1)** 45:8
**letter's (1)** 45:6
**level (1)** 76:6
**liability (1)** 31:5
**license (4)** 44:17;90:7;115:12,21
**limit (1)** 20:18
**line (10)** 102:23;143:14,20;145:24;146:3,11;147:13,15;166:11,20
**Lines (10)** 24:25;25:3,15,22;26:6;39:25;80:7;139:4;142:23;143:15
**Lines' (4)** 26:4;139:5;141:6;143:10
**liquidated (1)** 89:10
**list (5)** 46:3,4;119:25;130:10;142:19
**listed (7)** 24:24;43:13;94:7;122:15;124:16,17;125:8
**lists (1)** 121:17
**litigation (3)** 45:12;79:6;90:9
**litigator (1)** 21:15
**little (6)** 8:21;41:21;117:8;130:23;131:6;148:15
**LLC (6)** 8:8;13:23;24:25,25;139:4,5
**LLCs (1)** 15:24
**load (15)** 34:2;36:9;39:5,23;51:15;56:19;62:7;91:23;95:10,24;96:7,7,14,23;105:7
**loading (1)** 63:5
**loads (15)** 33:20,24;36:10;49:12;56:12;91:18;93:2,4;94:13;96:18;141:11;142:10,14;149:9;158:24
**local (4)** 29:17,20;32:17;43:16
**locations (3)**

43:4,5,12
**Locke (37)**
26:24;27:25;28:19,25;29:17;39:15;46:14;53:16;64:9,12,25;65:3,8;81:1,8,16;120:9,13;125:6,8;136:24;138:3,18;139:18,22,24;140:11;141:13;142:3,8,9,24;146:5,12;147:18;149:21;157:18
**logging (1)**
82:3
**logo (5)**
57:18;86:24;87:3;89:5,19
**logos (3)**
78:17;89:12,15
**long (7)**
12:21,24;26:13;80:14,18;119:20;155:14
**longer (11)**
78:3;82:21;83:4,9;84:23,24;85:7;86:11;120:16;159:15,16
**look (29)**
15:22;34:12,13;36:17;38:4;43:7;47:24,25;50:2;71:25;72:9,19;85:18,23;90:16;98:5;99:6;100:17;102:23;113:10;116:5,24;120:19;128:3;138:11;139:19;151:15;153:25;154:21
**looked (7)**
33:23,24;34:17;43:9;102:20;113:6;157:23
**looking (8)**
36:16;37:21;101:3,8;109:8;112:23;114:10;157:16
**looks (15)**
37:12,15;65:19;90:13;101:3,9;102:16;103:11;105:17;121:2;126:24,24;129:2,2;132:12
**loss (2)**
29:22;55:19
**lost (3)**
32:13,14,14
**lot (9)**
30:3,20;79:8;91:25;99:5;121:13,15;145:12;157:5

**M**

**M00333 (2)**
106:8;107:14
**M0121 (1)**
151:22
**M22132 (1)**
114:19
**M25644 (1)**
103:5
**M333 (16)**
64:3;82:11;83:15;85:8;86:8,13,17,25;87:7;93:9;94:8;101:18;102:7,8;111:25;123:10
**M451 (1)**
101:17
**M451's (1)**
101:22
**mail (1)**
72:24
**main (1)**
136:22
**mainframe (24)**
33:17;34:2,10,24;56:24;69:24;70:5,8,14;80:2;81:9;85:6;114:12;117:24;119:5,9;120:7,10,24;130:19;131:2,14;141:20;158:20
**mainly (1)**
56:22
**maintain (1)**
128:11
**maintaining (1)**
30:16
**maintenance (1)**
126:17
**majority (1)**
10:22
**makes (2)**
41:22;42:12
**makeup (1)**
116:6
**making (5)**
61:25;68:5;77:12;87:24;104:10
**management (15)**
13:15,16;65:15,22;66:19;67:8,15;68:11,17;69:3,7;70:1;141:14,25;142:3
**Management's (1)**
67:12
**manner (4)**
48:10;50:5;63:19;132:23
**manuals (1)**
160:16
**many (16)**
8:14;14:3;15:7,7,20,22;16:6,7;30:9;35:12;43:1,5;46:3;84:19,19;145:2
**March (4)**
61:3,4;75:8,9
**Mark (18)**
7:2;32:20;43:24;45:1,1;59:7,25;83:9;87:11;89:6;114:4,5;125:16;126:12;136:20;137:16;150:22;154:20
**marked (23)**
11:25;12:3;14:18;18:10;35:20;36:23;44:2;59:21;71:4;87:14,16;89:21,23;90:2;94:5;114:2;126:13;137:18;150:24;151:2;154:24;157:9;159:7
**market (5)**
40:13;76:18,19;78:11;106:3
**marketing (8)**
75:23;76:1,4,9,10,14;77:4;78:7
**marking (1)**
72:3
**markings (1)**
86:24
**marks (1)**
44:17
**Maryland (1)**
107:10
**master (3)**
126:19;128:12,15
**master's (1)**
13:15
**matches (1)**
152:24
**material (1)**
89:7
**materials (4)**
11:14;40:17;62:9;144:19
**Matt's (1)**
119:24
**May (10)**
7:7;25:25;37:3;47:20;54:2;65:6;70:2;127:8,13;142:5
**maybe (7)**
42:18;62:15;90:4;99:8;107:10;116:14;122:20
**Mayflower (272)**
7:6;8:8;12:18;13:23;14:2,4;15:22;18:6,13;24:25;25:4,16,22;26:4,6,11,18,22;28:7;29:1,2,5,12,15,25;30:3,10;31:19;32:17,25;33:4;34:5,6;35:13,19;36:19;37:21;38:2,7,11;39:12,14;40:22;41:2,4,11,11,19,22,24;42:12,24;43:14,17;45:7,11,13,22;46:22;47:3,7,10,12;48:8,19,24,24;49:3,6,11;50:11,13,17,18;51:9;52:17;53:3,9,15;54:14,23,25;55:11;56:1,11;57:16,22;58:1;60:21,23;61:8,11,22;62:25;63:3,10,17,21,22;64:1,8,15,23;65:13;67:14,25;68:1,10,16;69:5;70:21;71:19;75:23;76:1,1,4,15,18;77:6,15,21;78:10,12,21;79:7,16;80:5,14,25;81:18;82:16;84:3,10,17,20,22,24;85:2;86:11;89:3,7,13,17;90:10,14,17,20,23;91:2,4,10;92:10,11,15,19,21;93:5,6,8,23;94:6,20;96:8,9,13,14;100:10,17,18;101:21;103:9;104:15,25;105:20,25;106:1,2,6,22;107:3,4,9,17;108:20;109:3,6,15;110:4,6,21;111:11,24;112:5,5,17;115:4,20;120:16;122:2;123:5,9;124:7,16,18,24;125:1,8,12,24;126:25;127:25;128:11,20,24;129:5,9,23;130:3;131:24;132:10,16;133:3,10;134:15;135:1,5,23;136:5;138:12;139:5,15;140:10;141:2,16,23;142:6,11,22,24;143:15;144:12;146:4,11;147:14,18;148:11,16,18;149:1,25;150:5,12,13;151:24;152:2;153:4,22;154:8;155:15,25;156:3,22;157:1,7,14,20;158:1,5,14;160:1,23;161:1
**Mayflower's (37)**
29:6;30:11;35:10;47:16;48:5,25;50:16,25;51:1,12,22;52:12,19;54:12;55:6;56:13,20,21,24;57:15;59:2;64:21;66:18;70:16;73:20;74:18;75:5;77:25;78:4;89:19;124:10,11;133:21;142:6;147:19;159:17,18
**MD (1)**
107:10
**mean (32)**
18:17;24:14;27:7;30:14,22;31:4;32:7;33:15;35:6,10;40:9;41:14;44:5;46:11;51:17;56:11;57:2;60:19;67:2;76:25;82:5;92:9,14;97:5;105:13;115:23,25;117:11;136:8;139:10;144:21;159:13
**means (12)**
9:3;30:11;56:12;57:6;60:20;103:5;109:23;115:15;122:12;128:15;139:9;159:15
**meet (2)**
57:6;144:4
**Member (3)**
12:19;13:4;156:1
**memorized (2)**
35:24;95:10
**memory (3)**
36:4;88:23;99:16
**mentioned (4)**
32:10;40:20;63:9;101:5
**met (1)**
8:4
**metadata (2)**
83:21;98:23
**Michael (1)**
160:18
**middle (8)**
54:4;61:20;62:19;103:12;116:9,10;133:16,22
**might (2)**
106:15;131:5
**miles (2)**
146:19,22
**military (34)**
16:4,8,9,14,17;24:22;25:24;26:15,21;28:24;45:22;46:1;48:20;49:4;58:7;65:15,22;66:2,19;67:4,8,11,15,23;68:11,16;69:2,7,25;70:23;141:14,25;142:3;149:8
**military-related (1)**
26:7
**million (5)**
31:24,24,25;32:2,7
**mind (1)**
25:5
**mini (1)**

162:5
**minute (6)** 42:9;59:8;103:21;118:21;136:6;153:24
**minutes (3)** 103:25;147:23;148:5
**mistakes (2)** 58:9,12
**Mm-hmm (1)** 102:25
**modify (1)** 74:8
**Moholland (146)** 18:14,16,18;23:24;24:3;26:25;28:20;29:17;35:21;36:11,19;38:7,11;39:15,18;40:1;41:3,5,12,25;42:24;44:15,20;45:14;46:15,18;49:3;50:10;52:13,18,21;53:16;54:16;60:5,11;61:8,12,14;64:11;65:8;68:12;70:1,22;72:1;73:6;75:24,25;78:8,22;79:8,16;81:1,8,17;86:18;89:4,11,14,17;90:10,14,17,23;91:2,4,9;92:21;93:9;94:8,20;100:19;101:22;102:7,9;103:9;104:25;105:20;106:8,11,24;107:9,18;108:22;109:6,7,16,24;110:4;111:10,15,24;112:4,6,17;118:8,9,10,24;119:4,5,8;122:7;124:17,23;125:3;126:21;127:1,3,11;128:13,22;129:11,23;130:4,25;131:17;133:22;136:24;137:16;138:3,17,25;139:15;140:11,25;141:7,13,16,23;142:1,3,7,9,15,23;146:5,12;149:12,21;155:15;157:6,17,21,22;158:12,14
**Moholland/Locke (1)** 139:12
**Moholland's (4)** 41:23;87:6;110:8;144:13
**moment (3)** 14:21;53:22;65:7
**money (1)** 51:6
**monies (1)** 92:1
**monitored (1)** 86:11
**monitoring (2)** 115:20;123:6
**Monitors (1)** 121:1
**month (1)** 53:4
**monthly (2)** 102:13,15
**months (13)** 38:23;39:1,3,9;54:10;90:22;91:3,21,23;112:20,22;116:4,5
**moral (7)** 9:3,14,15,17,19,20,22
**morally (1)** 97:25
**more (19)** 8:21;15:19;16:8;23:5;25:13;29:20;30:3;32:12;34:20;46:15,18;65:7;76:7,9,10;78:20;81:4;100:15;126:20
**morning (1)** 8:3
**Most (5)** 10:22;11:23;27:9;76:10;156:11
**Motion (2)** 154:7,14
**motivation (1)** 27:22
**Motor (9)** 48:13;87:17;88:4;118:3;125:2;139:1;141:5;148:17;150:4
**move (20)** 15:12;21:7;28:3;29:3,6,11,16;33:11,13;34:8,12,23;58:15;60:22;62:14;66:7,16;77:15,16;113:16
**Movers (4)** 60:2,8;153:7,9
**moves (26)** 16:5;24:22;25:3,6,6,6,24;26:1,7,7,17;29:9,14;30:9,25;45:23;46:1;48:20;58:7;61:15;66:4;70:23,25;71:2;80:11;138:13
**moving (38)** 24:13;35:21;38:11;40:1,14;49:4;60:11;70:21;76:12;91:2;92:21;93:9;94:8,20;100:19;101:22;102:7,9;103:9;105:21;106:8,12,24;107:18;108:22;118:9,10,25;119:4,8;129:11,23;149:12;151:17;152:1;153:4,18,21
**much (3)** 11:15;95:23;116:5
**myself (1)** 161:21

## N

**name (13)** 7:17;55:6;59:2;70:7;76:15;77:7;84:14;89:5,6;124:10;152:10,19;166:5
**named (2)** 125:8;153:4
**names (3)** 89:12;148:19;153:15
**National (1)** 145:10
**nature (2)** 15:21;41:14
**near (1)** 135:20
**necessarily (5)** 91:18;101:23;108:25;110:13;140:18
**necessary (1)** 15:20
**need (12)** 10:12;19:10;26:18,22;28:11;59:11;91:22;92:2;95:18;123:23;131:5;148:4
**negative (3)** 34:16,22;97:6
**network (1)** 15:11
**new (1)** 62:9
**next (13)** 71:25;102:6,22;105:11;107:2;111:20;116:24;120:19;121:19;122:11;127:20;129:16;131:22
**Nicholas (27)** 7:9;47:4;48:4;52:18;53:11,16;54:15;57:12;77:21;78:3;81:1,16;85:8;86:8;90:10;98:7;100:10;115:23;120:6,13,17;122:2;136:25;149:21;152:10;160:18;166:2
**Nichols (3)** 152:18,19,19
**night (1)** 54:4
**ninety-six (1)** 43:3
**NM- (1)** 151:3
**nobody (1)** 15:14
**none (1)** 136:25
**nor (1)** 123:6
**Norfolk (1)** 132:13
**normal (3)** 66:12;109:23;145:1
**normally (1)** 145:6
**North-West (4)** 60:2,8;153:7,9
**notes (3)** 121:24;153:20,25
**notice (19)** 12:4,7;27:10;41:3;44:19;51:22;53:10;54:14,24;55:11;72:17;73:1,6;90:6;130:24;134:15;135:8,11,15
**noticed (1)** 8:6
**notified (1)** 147:10
**November (2)** 117:18;127:23
**Number (57)** 7:13;8:19;14:6,15;21:24;30:11;35:7,10,16;37:6;47:17,18;48:1,2,6;51:12,20;52:12,19,24;53:18;54:2,16;56:16,21;57:19;77:25;78:4;86:21;87:7;88:2,7,10,18;89:19;103:1,12;120:20,23;124:11;126:18;127:2,4;128:21;129:17;133:13,15,22;143:1;145:16;147:20;150:13;151:24;159:17,18,21,24
**numbers (6)** 35:12;89:12,15;90:7,7,8
**NWMO/Booked (1)** 151:4

## O

**oath (2)** 9:2;97:25
**object (83)** 9:13,21,24;16:12,18;17:1,13;19:4;20:4,22;25:19;26:8,19;27:3,18;28:22;29:4;30:2;31:1,10;32:1,19;33:2;34:25;35:14;38:14;40:25;41:6,13,18;42:1,17;45:15,24;46:17;48:21;51:10;52:3;55:15;58:3,17;60:24;64:6,18;65:1,12;66:14;67:6,10;68:14;71:20;72:7;73:23;74:23;75:10;79:10;84:5;91:7;92:22;94:10,16,23;108:10,13;111:12;119:20,21;122:24;123:3,13;124:12;125:22;126:7;140:15;141:9;146:14,24;156:13;158:17,22;159:14,23;160:3
**objections (11)** 12:9;19:8,9;20:20,25;21:5,23;22:17,19;23:1;119:23
**obligated (1)** 48:2
**obligation (5)** 9:3,17,19,20,22
**obligations (2)** 74:7,9
**obliterate (1)** 147:12
**obtain (1)** 67:23
**occurred (1)** 107:21
**occurs (1)** 147:9
**October (5)** 90:21;91:10;92:19;97:19;103:10
**off (16)** 14:17;20:9;23:10;31:17;35:17;55:6;66:24;75:14;84:8;99:24;100:1;104:2,3;148:2;161:17,24
**officer (1)** 124:6
**official (1)** 123:7
**often (1)** 85:1
**Once (7)** 17:5;22:2;38:20,20,20;43:25;161:19
**one (58)** 10:13,21,21;12:23;15:12,23;16:5,6;19:20;35:15;36:15;43:22,24;44:4,14;46:5;47:8;48:4,7;

49:8;53:23;56:2,16;57:5,20;59:25;61:3,21;66:1;69:11;71:4;72:21;73:9;79:22;80:10;88:3;94:2;102:6,22;103:20;108:3;113:22,23,24;129:17;137:15,20;142:1,2;153:24;154:11,13,14,17;155:12;160:6,14,14
**ones (4)**
24:24;25:1;37:19;140:22
**one's (1)**
102:12
**ongoing (15)**
39:18;91:12,18;92:3,20,23,24;93:22;94:9,21;106:21;108:22;110:14;112:2;118:19
**only (8)**
16:5;23:5;27:4;28:12;57:20;58:2;84:18,19
**onto (1)**
62:8
**open (2)**
91:20;112:20
**operate (5)**
43:1;51:25;52:19;64:20;78:4
**operated (2)**
18:13;48:5
**operating (17)**
44:18;52:12;54:2,15;55:20;56:1,10,14;57:15;64:20,24;129:10;138:4;139:3,6;140:21;141:6
**operation (1)**
64:5
**operations (2)**
58:20;83:10
**operator (2)**
114:15;140:18
**operators (2)**
114:16;134:21
**opportunity (4)**
43:25;59:18;114:7;155:1
**opposed (1)**
115:8
**order (3)**
63:24;66:2,21
**orders (1)**
61:2
**organization (1)**
14:23
**Organizational (3)**
14:10,20;80:8
**organized (1)**
14:24
**originally (1)**
13:20
**others (3)**
56:18;57:23;93:7
**otherwise (2)**
123:24;147:10
**Ottawa (1)**
13:18
**ours (2)**
46:19;125:4
**out (20)**
10:8;16:2;28:16;30:19;32:24;38:24;49:12,19;53:24;59:14;66:7;70:17;91:22;95:17;97:11;103:18;112:21;145:16;148:17;150:9
**outlines (1)**
61:24
**outside (11)**
17:7,9,22,25;27:24;30:6;34:4;51:23;65:2;106:2;143:19
**outstanding (1)**
10:14
**over (14)**
20:13;29:9;69:22;71:8;88:17;129:19;133:9;138:20;139:19;143:1;145:19;147:1;153:25;156:2
**overall (1)**
12:25
**overnight (1)**
72:22
**oversee (2)**
63:4,5
**oversight (2)**
62:25;133:5
**overstepped (1)**
22:21
**over-the-road (1)**
13:10
**overview (1)**
61:20
**owed (1)**
110:2
**own (6)**
16:10;51:5,19,20;139:3;147:11
**owned (3)**
156:22;157:1,6
**owner (3)**
139:24;140:1,4

**P**

**pack (3)**
62:6,6,7
**packing (1)**
63:4
**page (34)**
8:22;37:24;49:25;60:3,10;71:8,10,11,12,25;72:9,10,10,19;105:11;107:2;111:20;116:24;120:19;121:19;122:11;127:20,25;128:24;129:16;133:23;134:11;137:20;138:20;139:19;153:8,14;166:11,20
**pages (6)**
91:11;113:19,21;117:23,24;155:11
**paid (17)**
41:10;49:5;50:12,18;66:9;69:3,5,8;90:23;91:9;103:8;108:20;109:7;111:11;112:21;146:10,16
**paper (1)**
162:2
**paperwork (1)**
116:22
**paragraph (15)**
44:4,8;49:20;72:10,18;73:8;74:10,13,14;88:20,20;89:2;138:21,22;145:21
**paragraphs (1)**
75:4
**Parcel (1)**
100:22
**parent (2)**
14:1,4
**parentheses (1)**
60:6
**part (10)**
30:5;32:11;36:12;37:3;77:11;105:19;128:13;133:4;158:6,7
**participate (2)**
25:23;145:4
**participated (1)**
47:3
**participating (2)**
7:15;143:10
**particular (5)**
11:17;15:23;36:2,6;105:6
**particularly (1)**
73:10
**parties (4)**
130:17;132:11,12;162:7
**partner (1)**
77:8
**partnerships (1)**
156:3
**party (7)**
65:17;72:25;84:13,15;106:14;125:11;141:7
**party's (1)**
74:9
**past (6)**
29:8,9,14;66:18,19;94:1
**pay (5)**
66:20;107:17;109:6;132:16,17
**paying (1)**
91:24
**payment (22)**
32:24,25;33:4;34:7;35:4;41:22;45:11,14;48:23,24;58:14;66:10;69:15,24;70:4;90:21;91:1;95:10;101:1;108:23;109:14,15
**payments (15)**
36:18;38:10;39:18;40:23;41:4;91:17;92:4,24;95:5,8,23;96:2,23;100:16;146:21
**pays (2)**
97:8,8
**penalty (1)**
44:21
**pendency (3)**
109:25;141:15,22
**pending (1)**
7:11
**pens (1)**
144:18
**people (6)**
19:3;31:6;62:5;77:4;99:4;106:2
**per (2)**
89:14;119:18
**percent (3)**
66:9;67:1,9
**percentage (6)**
48:23,25;66:12,20,23,24
**perception (1)**
77:6
**perform (6)**
33:22;39:11;47:16;77:24;129:5;159:17
**performance (1)**
116:4
**performed (2)**
132:9,13
**performing (1)**
51:11
**perhaps (2)**
37:11;99:10
**period (19)**
53:12;61:7;78:16,21,25;81:20;91:6;92:13,19;93:8;104:24;106:7;107:5;112:11;113:7,13,14;136:13;142:14
**periods (3)**
94:7,21,22
**permanently (1)**
147:12
**permission (1)**
141:1
**permit (1)**
126:17
**permitted (2)**
10:18;158:23
**person (6)**
12:14;27:9;68:22;95:21;116:13;156:11
**personal (2)**
28:5;41:16
**personally (1)**
72:21
**personnel (1)**
144:8
**Phoenix (1)**
13:18
**phone (1)**
21:4
**phones (1)**
54:3
**phrase (2)**
98:24;99:8
**Phys (1)**
115:15
**physical (3)**
32:12,14;115:16
**physicals (1)**
115:21
**picking (1)**
131:8
**pictures (2)**
79:5;157:4
**placard (1)**
57:18
**place (13)**
51:3;52:10;53:19;55:13;73:1;83:24;86:7;112:12;115:10;121:23;127:22,22;145:6
**placed (2)**
80:4;157:19
**placement (1)**
57:18
**places (1)**
77:17
**plaintiffs (1)**
45:12
**plaintiffs' (1)**
23:11
**Plaintiff's (11)**
11:25;14:18;44:2;59:21;87:14;89:21;114:2;126:13;137:18;150:24;154:24
**plan (1)**

123:24
**plate (1)**
90:7
**plates (1)**
44:17
**please (3)**
10:7;68:25;124:2
**pm (2)**
148:9;161:16
**point (18)**
10:8;26:3;28:2,15;29:1;49:19;78:5;82:22;83:20;84:7;85:5;99:14;108:16;111:8;130:2;136:12;143:3;152:10
**police (5)**
23:15;87:11;124:2,6;129:19
**policies (4)**
124:18;125:13;143:9;144:9
**policy (3)**
32:4,5;143:9
**portion (2)**
49:5;72:16
**posing (1)**
119:23
**position (5)**
12:15,17;29:7;73:20;111:3
**possible (5)**
10:10;15:18;55:10,16;84:1
**possibly (1)**
142:7
**postage (1)**
72:24
**postgraduate (1)**
13:13
**power (2)**
15:9;132:6
**preemployment (1)**
117:16
**prepaid (1)**
72:24
**preparation (6)**
11:12;27:5;28:12;49:10;80:21;83:12
**prepared (4)**
12:6,12;65:9;137:6
**prepares (1)**
58:6
**preparing (1)**
138:10
**Prequalified (1)**
117:15
**present (3)**
7:2,15;32:20
**Press (2)**
122:12,17
**pretending (1)**
42:3
**pretty (3)**
85:11;121:10;153:25
**prevent (4)**
51:4;52:17;158:8,19
**previously (3)**
10:7;92:24;112:19
**pricing (1)**
69:22
**primary (1)**
43:3
**principal (1)**
73:1
**PRINT (1)**
166:5
**printed (2)**
103:18;122:19
**print-outs (1)**
114:11
**prior (20)**
10:15;12:8;13:3,6;39:5,23;53:18;55:12;72:19;73:14;75:2;77:22;78:5;81:21,22;102:8,19;111:14;146:20;155:15
**privilege (1)**
125:19
**probably (10)**
11:22;37:16;43:7;68:24;69:17;86:19,21;87:4;114:23;144:22
**problem (6)**
21:9,10,16,19;148:6;154:23
**Procedure (1)**
22:20
**procedures (1)**
144:9
**PROCEEDINGS (1)**
7:1
**process (7)**
8:21;32:23;127:16;150:14,16,17,18
**processed (1)**
146:19
**produce (3)**
125:12;126:5;130:7
**produced (14)**
14:6;45:7;54:20;71:19;92:9,18;125:21;126:22;137:15;138:16;159:6;161:3,4,7
**production (2)**
126:1;160:15
**professionalism (1)**
144:6
**profitability (1)**
15:3
**program (1)**
143:11
**programs (1)**
79:19
**promise (1)**
22:22
**promote (1)**
76:5
**prompted (1)**
135:18
**pronouns (2)**
50:22;150:9
**pronoun's (1)**
63:16
**proper (4)**
60:22;63:24;76:16;77:11
**properly (2)**
63:6;89:11
**property (1)**
44:16
**ProStar (1)**
88:5
**prove (5)**
34:16,21;97:6,14;115:3
**provide (21)**
12:6;25:17;29:5,25;31:16;35:25;36:3;42:9;48:3;76:5,16;80:25;85:1,12;88:2;119:16;130:12;138:12;144:12,15;161:20
**provided (18)**
10:7;11:14,16;29:2;35:23;54:25;72:17;78:17;97:17;98:18;99:12,20;123:16;144:20;147:8;152:25;157:14;160:17
**provider (1)**
58:10
**provides (5)**
30:3;31:19;32:17;40:11;82:3
**providing (1)**
114:5
**provision (2)**
73:5;89:10
**provisions (1)**
73:16
**public (5)**
52:1;76:14,22;77:6;120:16
**pull (1)**
15:1
**purpose (10)**
16:9;24:21;27:14;28:6,20;44:9,14;58:25;118:24;127:12
**purposes (2)**
62:18;81:19
**pursuant (1)**
129:10
**push (1)**
123:24
**put (14)**
20:17;33:24;34:2;41:3;44:18;51:22;53:10;55:11;66:7;77:4;84:16;135:8,11,15

**Q**

**qualification (11)**
30:12;47:19;57:8,17;77:18,21;114:13;117:13;121:8;122:6;161:2
**qualifications (6)**
11:24;57:11;77:24;115:11;116:25;117:4
**qualified (14)**
56:21;57:2,6,16;63:3,9;77:16;78:4;120:17;122:2;126:25;129:4;159:16;161:1
**qualifies (3)**
63:10,17,21
**qualify (6)**
63:11;64:2,3,15,16,22
**question's (1)**
41:21
**Quickly (1)**
157:9
**quite (1)**
62:18
**quote (1)**
139:1

**R**

**Rae (3)**
149:5,6,11
**random (1)**
143:11
**range (1)**
31:23
**rankings (1)**
145:16
**Rating (5)**
116:1,6,8,8,9
**ratings (3)**
116:3,4,7
**reach (2)**
24:5;25:16
**reached (1)**
148:16
**read (24)**
23:12,15;24:2,9;43:25;44:11,12,24;56:3;72:11,13,14,16;73:2,9,18;88:20,22;106:4;138:22,23;139:7;143:23;161:19
**reading (4)**
24:6;44:6;74:12;87:20
**READS_ (2)**
166:12,21
**ready (4)**
59:20;87:22;88:24;154:5
**real (1)**
150:17
**really (4)**
44:4;65:20;76:13;81:4
**realtime (2)**
85:3,4
**reason (11)**
9:8,14;28:9;39:17;71:22;111:23;112:14;127:6,18;166:14,23
**reasonable (2)**
48:10;63:19
**reasons (1)**
15:24
**recall (7)**
11:18;42:21,25;143:16;154:6;155:17,19
**receipt (2)**
83:21;98:16
**receive (7)**
30:5;33:4;35:4;48:19;72:25;134:24;135:1
**received (1)**
110:9
**receiving (2)**
82:16;83:4
**recently (1)**
39:19
**recess (4)**
75:16;100:3;104:5;148:7
**recklessly (1)**
48:17
**record (25)**
7:17;14:17;20:9,20;23:10;33:12,19,21;37:21;44:11;51:15;75:15,18;99:3,24;100:2,5;104:4,9;106:5;142:12;148:3,9;161:17,24
**recordable (1)**
134:25
**recorded (2)**
34:9;144:1
**recorders (1)**
81:6
**records (7)**
38:5;82:6;95:7,12;126:16;142:5,8
**recourse (2)**

44:19;45:14
**REDIRECT (1)**
160:12
**reduced (3)**
101:13;109:19;
110:1
**refer (7)**
17:6;18:6;35:22;
70:9,13,15;114:15
**reference (2)**
39:22;62:21
**referenced (4)**
49:9,23;75:4;100:8
**references (2)**
44:17;74:20
**referencing (4)**
14:21;43:20;105:5,
6
**refers (1)**
114:14
**reflect (4)**
75:8;92:9;95:8;
129:18
**reflected (1)**
7:16
**reflects (2)**
73:5;98:20
**refresh (1)**
88:22
**refuse (2)**
21:4;92:17
**refute (1)**
108:12
**regard (1)**
89:5
**regarding (2)**
86:7;144:5
**regardless (1)**
126:2
**register (1)**
96:24
**registered (7)**
35:3;37:18;56:19,
23;57:16;84:21;96:8
**regular (1)**
162:4
**regulations (5)**
30:13;48:13;57:7;
82:2;143:8
**reimbursement (1)**
111:21
**related (8)**
33:1;41:22,23;
45:12;135:2;136:2;
148:20;161:6
**relates (2)**
126:21;159:11
**relation (3)**
158:8,20;159:20
**relationship (40)**
18:14;26:16;34:4;
38:8,16,21;39:11,25;
47:25;56:9;62:24;
66:16;67:18,19,21;
71:7;78:21,24;90:9;
91:13;92:3,20;93:23;
94:9,22;96:25;97:1;
105:1;108:23;110:14;
112:24;113:4,15;
139:9,12;140:10;
146:2,5;155:14;
158:18
**relationships (1)**
43:18
**relatively (1)**
67:3
**Relocation (6)**
27:25;65:3;138:4,
18;142:8;146:12
**Relocations (24)**
26:25;28:19,25;
39:15;46:8,14;53:16;
64:9,12,25;65:9;81:1,
8,17;120:9,13;125:6;
136:24;139:18,24;
142:4,10;146:6;
147:19
**rely (5)**
8:24;15:12;54:21;
76:16;77:7
**relying (1)**
55:4
**remember (10)**
37:12;49:14;57:3;
70:13;79:22;99:13;
137:10;148:22;
158:15;159:8
**remit (2)**
48:24;84:24
**remits (1)**
50:12
**remitted (1)**
49:5
**remotely (1)**
7:16
**removal (2)**
78:17;147:5
**remove (4)**
78:25;89:12;
147:12,19
**removed (4)**
53:2;82:11;110:7;
148:19
**removing (1)**
109:1
**remuneration (1)**
34:7
**rep (2)**
23:24;24:3
**Repairs (1)**
134:11
**repeat (2)**
10:2;56:6
**rephrase (1)**
10:3
**replaced (1)**
46:16
**report (8)**
87:12,17;88:4;
124:2;129:20;131:23;
134:20;150:4
**reported (2)**
150:7,11
**reporter (12)**
7:18,20;19:15;20:7;
87:9;91:14;131:11;
134:6;152:15;161:18,
23;162:2
**reporting (1)**
148:11
**reports (4)**
23:15;54:5;114:24;
134:24
**represent (3)**
39:10;50:4;77:2
**representative (7)**
7:6;8:8;23:18;28:7;
42:11;135:6;137:2
**represents (1)**
110:10
**request (7)**
87:25;88:3;90:5,12;
160:20,22;161:10
**requested (2)**
62:6;79:23
**requests (1)**
160:15
**require (2)**
8:18;133:3
**required (8)**
133:8;134:20,21;
143:7,12;145:25;
146:4;147:5
**requirements (1)**
57:9
**requires (1)**
126:1
**requiring (1)**
16:10
**research (1)**
142:18
**reserved (1)**
23:1
**reserving (2)**
19:7;20:20
**residential (1)**
71:1
**residual (4)**
38:22;39:4;112:22,
25
**resolve (1)**
52:23
**resolved (2)**
21:7;52:25
**Resources (3)**
13:5,16;15:2
**response (2)**
52:17;136:16
**responsibilities (5)**
68:4,7;89:3;133:5;
143:2
**responsibility (10)**
25:16;27:16;47:13;
48:9;62:25;63:14,18,
23;76:8;156:2
**responsible (8)**
24:13,15;25:2,10,
23;47:13;76:22;
125:11
**responsive (3)**
90:12;160:20,22
**rest (1)**
44:6
**result (1)**
44:22
**resulted (1)**
80:16
**retain (1)**
40:22
**review (9)**
11:12;12:2;23:25;
42:20,21;49:13;
59:19;114:7;155:1
**reviewed (7)**
11:5,20,21;27:5;
37:4;49:9;79:22
**reviewing (2)**
11:18;58:25
**right (104)**
10:1;11:5;12:11;
18:6;19:8;22:7;24:5,
11;26:23;31:19;
32:10;34:15;39:24;
40:23;41:2;43:15;
45:19;46:20;48:4;
53:5,13;59:4,25;
60:17;61:19;62:23;
63:19;65:6,13;66:5;
70:21;74:5;75:6,19;
77:3,20;83:1,1;85:15;
87:24;88:10,17,19;
89:1,13;92:11;98:5,6;
100:6,13,19,23;
101:10,14;102:3,9,22;
103:16;106:22;107:2,
24;110:25;111:24;
114:6,9,21,22;117:2,
6,9;121:19;122:22;
124:14;126:11;127:4,
5;128:3,8,11,18;
129:11,20;130:9;
131:21,22;133:9;
135:21;138:2,5,21;
139:16;140:5;144:24;
147:16;149:10;
150:14;151:1,15;
152:7;153:16;155:20;
157:12;159:24;
160:14
**rights (2)**
74:7,9
**ring (1)**
54:3
**road (4)**
46:24;48:16;53:24;
64:5
**roadside (1)**
116:15
**Rob (3)**
24:2;42:13;149:11
**role (4)**
12:22;13:6;29:2;
156:7
**roles (1)**
13:3
**rolling (1)**
116:4
**route (1)**
46:5
**rules (4)**
8:18;10:17;22:20;
23:7
**run (5)**
106:14,17;114:24;
146:20,22
**Ryan (3)**
8:3;23:9;103:17

## S

**safe (4)**
25:17;64:4;76:20;
77:13
**safeguard (1)**
51:16
**safeguards (2)**
51:3;53:23
**Safety (14)**
13:6;48:13;55:2;
76:11;116:6;118:3;
125:3;126:16;127:21;
132:2;134:22;143:9;
148:17;150:4
**sake (1)**
28:10
**sales (1)**
79:24
**same (27)**
8:22;19:16;20:8;
32:11;54:17;68:11;
72:3;86:15;88:10;
105:11;107:3;111:17,
20;112:9,10;113:5,12,
13;125:6;127:3;
129:16;133:13,18;
139:13;144:1;159:1,3
**Samsara (8)**
84:14;85:1,7;86:7,
10;88:1,12;134:17
**saw (7)**
14:11;70:10;
132:18,20;144:1;
157:4;159:5
**saying (12)**
11:6;26:21;27:21,

22,23,23;97:5;108:14;110:5;111:4;118:23;131:9
**SCAC (8)** 16:4,6,7,10;24:17,20;25:1;151:3
**scale (3)** 15:7,11;116:11
**scenario (2)** 52:9;140:12
**scene (1)** 135:20
**school (2)** 61:21;62:19
**scope (1)** 56:9
**SCR (1)** 116:1
**search (9)** 80:3,19,22;98:7,8,10,17;141:20;142:16
**searching (1)** 80:15
**second (12)** 36:15;37:24;56:2;57:4,5;72:9;87:20;99:25;102:23;142:2;153:14;155:12
**section (2)** 143:3;147:2
**secured (1)** 63:6
**security (2)** 76:16;144:5
**seeing (1)** 99:14
**seek (6)** 40:23;41:11,24;44:19;45:13;49:12
**seems (2)** 43:15;45:16
**Select (2)** 122:12,16
**selected (1)** 143:20
**sell (5)** 40:6,9,13,13;50:14
**selling (1)** 50:5
**sells (1)** 50:11
**send (2)** 62:5;162:4
**Senior (4)** 12:19;13:4;45:2;155:25
**sent (7)** 54:20;72:22;73:6;111:21;120:12;130:24;131:17
**sentence (6)** 56:3;73:11,13;74:13;89:9;138:25
**separate (3)** 80:6;105:25;130:15
**separated (1)** 16:2
**September (10)** 105:9,9,22;106:7,25;107:6;112:1,16;145:7;154:8
**sequence (1)** 65:23
**sequentially (1)** 14:14
**series (1)** 117:21
**serious (1)** 121:10
**serve (1)** 47:18
**serves (1)** 99:16
**service (6)** 29:2;72:22;89:6;116:17;138:12;143:20
**services (16)** 15:13;40:12;47:16;50:6,12,15;67:22,24;76:2,5;77:24;100:22;106:14,17;129:5;147:8
**SESSIONS (1)** 160:10
**set (1)** 94:5
**settled (1)** 91:22
**settlement (1)** 144:11
**settles (1)** 137:21
**seven (1)** 122:1
**several (2)** 14:5;106:16
**shall (7)** 50:3;55:18;72:20;143:7,19;144:8;147:10
**share (2)** 17:23;19:2
**shared (3)** 79:14,19;81:18
**sheet (6)** 15:14;88:8;93:11,13;132:21;166:1
**Sheriff (1)** 153:18
**Shields (2)** 68:24;69:1
**Shield's (1)** 69:9
**S-h-i-e-l-d-s (1)** 69:1
**shipment (22)** 55:25;58:14;60:22;66:10;67:5;73:14,17;75:1,8;80:4,16,16;94:13;98:11;101:21,25;105:8;137:9;141:8;152:5,23;153:3
**shipments (9)** 55:20;61:15;69:4,6;70:22;77:8;80:11;138:14;141:14
**shipped (1)** 95:24
**shop (1)** 132:13
**Shops (1)** 132:11
**short (1)** 75:13
**shortly (1)** 42:10
**show (13)** 36:22;82:23;83:23;87:12;89:23;109:8,8;119:3,8;126:11;130:18;150:22;152:9
**showed (1)** 36:10
**showing (1)** 38:10
**shows (8)** 14:7;83:21;84:8;85:6;86:6;106:9;111:9;130:3
**side (9)** 56:16;79:25;109:1,12;128:1,2,3,3;143:2
**sign (2)** 106:15;158:2
**signage (1)** 44:17
**signature (3)** 139:19;161:18;162:8
**signatures (1)** 157:23
**signed (1)** 139:21
**significance (1)** 114:21
**significant (3)** 11:19;77:7;123:14
**similar (5)** 46:5;99:9;113:6;127:20;140:16
**similarly (2)** 60:10;153:13
**simple (1)** 21:22
**simplified (1)** 62:1
**simply (1)** 34:16
**sitting (1)** 45:4
**situation (2)** 52:5,6
**six (4)** 113:20;117:22,23,24
**six-page (1)** 123:15
**Slidell (2)** 60:10;153:18
**Sloan (2)** 7:9;166:2
**smaller (1)** 15:8
**smarter (1)** 99:5
**soft- (1)** 99:4
**software (5)** 69:23;79:19,24;81:15,18
**sold (2)** 40:15,16
**solely (1)** 55:4
**solemnly (1)** 7:20
**soliciting (1)** 51:4
**somebody (5)** 9:19;21:14;69:12,25;121:11
**somebody's (2)** 21:20,20
**somehow (2)** 126:22;135:8
**someone (1)** 135:18
**something's (1)** 42:3
**sometimes (2)** 54:10;101:5
**somewhere (1)** 46:6
**sorry (14)** 50:23;56:6;59:15;71:10;74:10;86:20;87:21;97:19;98:9;102:16;131:7;134:6;135:9;150:11
**sort (4)** 39:8;76:24;99:3;150:19
**sound (1)** 155:20
**sources (1)** 54:7
**southeast (1)** 46:7
**Southern (1)** 7:12
**speak (4)** 11:8;22:4,9;131:5
**speaking (7)** 19:9;20:2,25;21:5,23;22:17;61:10
**specific (7)** 49:20;78:11;82:1;86:18;94:18;139:11;149:24
**specifically (5)** 29:10;75:25;76:2;77:1;112:18
**specifics (1)** 104:19
**speculating (2)** 110:15,17
**speculation (1)** 111:6
**speed (1)** 82:6
**speeding (1)** 116:14
**spell (1)** 68:25
**spend (1)** 80:14
**spin (1)** 77:4
**STAHL (1)** 160:9
**Standard (3)** 7:8;66:20;67:3
**standby (3)** 75:17;100:4;148:8
**standpoint (2)** 23:19;57:10
**stands (2)** 70:14;107:11
**Start (2)** 13:12;128:5
**started (1)** 120:6
**starting (3)** 50:2;90:19;137:20
**starts (1)** 44:9
**state (1)** 89:9
**stated (1)** 45:16
**statement (12)** 39:1;92:10,18;93:7;94:19;95:1;100:18;102:14;105:2;106:6,15;107:4
**statements (5)** 38:25;91:20;94:6;106:18;112:19
**States (4)** 7:12;72:24;74:6;139:14
**Status (2)** 114:19;159:10
**statutes (1)**

143:7
**stay (2)**
103:23;104:1
**stays (1)**
17:24
**Stelfox (1)**
7:18
**stenographic (1)**
7:17
**still (6)**
45:22;65:4;79:7;82:14;123:6;148:4
**stolen (1)**
148:13
**stopped (1)**
55:12
**Storage (4)**
151:17;152:1;153:4,21
**stores (1)**
139:2
**straps (1)**
40:14
**strike (2)**
65:21;67:1
**structure (1)**
26:13
**struggling (2)**
42:2,3
**stuff (5)**
19:18;98:2;144:25;145:12,14
**Subject (1)**
12:8
**submitting (1)**
143:12
**subsequent (2)**
94:7;154:18
**subsidiary (2)**
40:6;44:22
**substance (5)**
10:19;11:9;75:20;117:9,17
**substantive (1)**
11:23
**Success (3)**
12:20;13:4;156:1
**S-u-d-d (1)**
46:10
**Suddath (2)**
46:8,10
**Sue (4)**
149:2,17,18,20
**suffered (1)**
95:23
**sufficient (3)**
86:12,19,23
**suggesting (1)**
111:4
**suitable (1)**
64:5
**summary (1)**
116:21
**superior (1)**
111:3
**supplement (1)**
72:10
**supplemental (1)**
99:22
**supplies (2)**
40:14,16
**support (2)**
80:25;154:7
**supposed (3)**
51:2,24;59:16
**supposing (1)**
42:4
**sure (36)**
8:21;22:21;27:12,20;34:5;36:16;37:19;44:12;49:15,21;56:5,8;59:4;63:14,23;76:25;77:4,12;80:22;87:5,24;88:24;93:16;95:9,12,16;103:22;110:17;119:10,10;125:15;128:14;138:22;147:24;154:11;161:11
**surprised (1)**
79:12
**suspend (1)**
121:16
**suspended (2)**
121:8,11
**suspension (1)**
121:2
**Suspensions (1)**
121:2
**swag (1)**
144:23
**swear (2)**
7:19,20
**switched (1)**
121:21
**sworn (1)**
9:2
**system (55)**
33:12,14,18;35:5;37:18;50:17,18,25;51:1;53:7;54:6,11,12,12,13;56:20,24;57:16;82:10,11,21;83:3,7,10;84:13,21;87:7;95:11;96:8,10,13,15,18,19,20;97:4,15,16;98:5;99:18;103:13;114:19;115:7;117:25;120:24;121:25;122:18;140:17;151:12;158:6,7,9,13,20,24
**systems (3)**
33:16;81:3,5

## T

**tagged (1)**
124:6
**talented (1)**
21:15
**talk (3)**
11:7;69:13,17
**talked (4)**
56:23;123:19;139:13;158:11
**talking (12)**
34:6;36:24;37:9;43:23;82:24;85:24;86:15;88:11;93:25;97:21;104:15;148:22
**Taxes (3)**
146:9,10,16
**teaching (1)**
61:20
**technology (1)**
81:16
**tedium (1)**
113:16
**telematics (6)**
82:4,5,6,11;83:14;84:2
**telling (3)**
19:18;93:18;125:17
**template (2)**
157:10,13
**temporary (14)**
11:22;73:24;74:2,2,3,6,11,16;75:16;100:3;104:5;117:5;127:10;148:7
**ten (1)**
31:24
**tender (4)**
49:12;60:15,19;141:8
**tendered (1)**
60:23
**term (3)**
17:14;51:23;128:14
**terminated (23)**
53:13;73:15,21,24,25;74:4,17;75:3;77:22,23,25;82:24;119:9;127:8,14;130:5;142:21;158:4,6,7,18,25;159:21
**terminating (1)**
131:18
**termination (22)**
37:17;39:2,5,9,23;40:21;72:19;73:6;86:7;89:4;91:21;93:2;100:9;130:16,24,25;131:13;146:20;147:6,7;155:16;156:12
**terms (3)**
73:15;74:9,21
**Test (2)**
117:9,16
**tested (2)**
57:9;117:17
**testified (8)**
42:14,22;91:17;112:19;127:15;136:6;138:9;155:24
**testifying (5)**
39:6;97:24;98:9,12,13
**testimony (9)**
7:21;10:9;98:1,3;111:7;155:18,19;158:15;159:19
**testing (4)**
30:15;143:4,11,19
**tests (2)**
143:13,19
**Thanks (4)**
59:13;114:1;134:14;160:5
**therefore (2)**
96:10,13
**thinking (3)**
98:21;131:2;135:10
**third (8)**
65:17;84:13,14;100:21;128:24;132:11,12;141:7
**third- (1)**
106:13
**third-party (1)**
106:16
**though (7)**
8:19;15:24;45:7;47:23;51:7;128:17;130:8
**thought (6)**
53:22;70:10;118:14;122:20;135:9,9
**thousand (1)**
62:12
**three (6)**
43:8;72:23;96:16,16;136:25;142:4
**throughout (4)**
17:15;18:7;22:1;140:17
**ticket (2)**
116:14;134:16
**timeframe (1)**
141:21
**times (4)**
8:14,19;21:24;29:15
**time's (1)**
28:10
**timing (1)**
62:14
**title (2)**
125:16;138:2
**titled (1)**
151:3
**TMM (9)**
65:15,16,18,19,25;66:9;142:7,9,15
**TNRM1 (1)**
121:4
**TO_ (2)**
166:13,22
**today (35)**
8:5,9;9:9,23;10:9,23;11:13;12:4;16:16;18:3,7;21:10;22:17;27:15;28:13;37:7;43:18;45:4;46:2;49:10;53:5;55:14;59:1;79:6;80:17;82:14;83:13;90:6;135:3;136:8;141:12;152:2,24;155:8;159:6
**Today's (1)**
7:7
**Todd (7)**
14:10;36:7;86:4;87:12;90:1;99:20;154:3
**Todd's (1)**
85:24
**together (1)**
91:5
**told (11)**
19:22;24:16;56:25;63:18;85:7;93:15;118:14;120:22;145:16;148:15;149:25
**Toll (10)**
107:2,23;108:1,3,8;109:2,22,25;110:9;111:16
**tolls (9)**
107:9,17,21;108:17,21,24;109:7;110:11;111:10
**Tony (1)**
69:19
**took (13)**
52:10;53:9,15,19;55:13;80:18;83:23;86:7;115:10;121:14,23;127:22;150:3
**top (17)**
31:17;35:17;50:3;60:14;66:24;71:16;92:11;93:10,12;101:10;102:8;114:13;117:2;120:20;131:23;138:21;159:10
**topic (1)**
12:11
**topics (3)**
12:7;27:16;90:6

**total (20)**
43:1;65:15,22;66:18;67:8,11,14;68:11,16;69:2,7,25;71:7;101:1,12;109:17;113:21;141:14,25;142:3
**toward (1)**
42:24
**towards (1)**
76:9
**tower (1)**
32:6
**towers (2)**
30:18,23
**Towing (2)**
135:7,20
**tracking (2)**
81:5;126:18
**tracks (1)**
69:24
**tractor (4)**
90:8;129:6,8;156:25
**trade (2)**
89:6,6
**trademark (1)**
89:6
**trademarks (1)**
89:12
**trail (1)**
99:8
**trailer (13)**
40:17;62:8;63:7,8;90:8;128:12,25;129:1,7;131:1,20;132:7;156:24
**trailers (2)**
79:7;157:5
**train (1)**
76:22
**training (6)**
47:3,21;48:9;76:8,17;77:12
**Trans (10)**
40:3,4,5,15;105:12,14,18,24;106:10,21
**transaction (7)**
29:16,22;34:19;39:8;68:1;133:7;141:12
**transactions (3)**
31:21;69:15;121:23
**TRANSCRIPT (1)**
7:1
**transfer (3)**
34:2;60:5,11
**Transit (24)**
7:6;8:8;13:23;24:25;25:4;91:2;92:11,19;93:8;94:6,20;100:18;101:21;103:9;104:25;105:20;106:7;107:4;124:7;129:9,23;130:4;131:24;139:5
**transmit (4)**
84:2,16,20;85:7
**transmitted (7)**
84:10,13,15;118:2,5,8;119:3
**transmitting (1)**
51:8
**transport (8)**
16:17;27:1;29:18;33:5;40:17;54:17;62:8;66:11
**transportation (16)**
25:18;26:5;46:13;47:24;50:5,11,15;53:10;55:1;56:10;57:7,14;58:10,22;61:17;147:8
**transported (3)**
55:20;56:13;152:5
**transporting (2)**
28:21;141:5
**transports (1)**
139:2
**treat (1)**
69:18
**truck (49)**
26:11;29:18;40:16;52:24;54:17;55:7;56:16;63:5,8;64:4;72:4;81:5,6,7;82:3,11,20;83:15;86:8,10,12,18,25;88:15;96:8,11,20;97:1;98:8;110:13;122:8;123:10;124:10;126:25;127:7;128:12;129:1;130:4;131:1,20;133:13,14,18;147:20;148:11;152:6;156:20;158:6,25
**trucks (8)**
40:6,10,13;53:24;79:7;84:12;87:2;109:2
**true (4)**
130:22;146:2;155:10,13
**trust (1)**
97:7
**trustworthy (1)**
77:8
**truth (7)**
7:21,22,22;9:2,9,17,23
**try (1)**
150:9
**trying (5)**
19:17;24:19;28:2;36:3;159:19
**turning (1)**
157:9
**twenty-five (1)**
103:8
**two (12)**
26:2;40:8;43:7;44:18;92:25;101:12;103:25;113:4,19;147:23;148:4;154:10
**type (14)**
10:24;17:17;46:15;65:14;67:16;68:19;81:5,5;83:21;91:12;98:21;100:9;144:19;151:13
**types (2)**
70:25;106:16
**typically (1)**
119:19

## U

**U0164-00545-1 (1)**
103:2
**ultimately (1)**
32:23
**umbrella (2)**
32:4,5
**unable (1)**
104:19
**unauthorized (2)**
89:15;110:12
**uncommon (2)**
106:13,19
**under (54)**
9:9;13:2;15:22,22,25;18:13;24:24;26:2,12;34:3;35:10;43:1;47:16,17;48:5;50:2;51:11;52:1,12,19,24;53:18;54:2,15;55:20,25;56:10,21,23;57:15,16;61:15;64:20,20;74:9;77:24;78:4;97:25;101:22;102:23;109:10;111:25;116:24;117:4;121:1;122:6;123:1;126:19;127:1;139:3,5;141:5;159:16,18
**underneath (1)**
60:6
**understood (3)**
8:25;100:8;131:12
**undertaken (1)**
54:23
**undertakes (1)**
48:9
**undertook (1)**
47:13
**unfortunately (1)**
110:6
**Uniforms (4)**
144:4,8,12,15
**UniGroup (35)**
13:22,24;14:1,4,25;25:25;40:6;42:12;44:16,19,22;45:2,8;65:9,18;106:22;132:2;137:6,21,25;138:10,16;141:1;146:3,11;149:7;151:11;156:22;157:2,7,14,19;158:2,5;160:1
**UniGroup/Mayflower (1)**
140:12
**unique (1)**
140:10
**Unit (5)**
127:2;128:21;129:2,4;132:6
**United (18)**
7:11;15:23;24:25;25:3,15,22;26:4,6;39:25;44:18,19,22;72:24;80:6;100:22;139:4;143:15;146:3
**University (2)**
13:18,19
**unless (2)**
28:4;147:9
**unpack (1)**
62:10
**unusual (1)**
27:13
**up (18)**
22:4,9;28:10;32:2,8;34:23;38:22;39:9;43:9;72:19;84:3;91:23,24;106:15;112:12;126:9;131:5,8
**Upon (3)**
147:6,6;161:20
**upper (1)**
114:22
**UPS (3)**
100:22;111:20,25
**use (15)**
16:22;30:24;50:22;54:7;61:14;66:3;89:15,18;128:16;140:19;144:20;146:10,16;159:20,24
**used (7)**
17:14;40:17;49:18;133:22;137:9;143:15;160:17
**User (1)**
121:4
**uses (1)**
140:25
**using (4)**
44:16;54:16,17;63:22
**utilize (2)**
67:22,24

## V

**V/O (1)**
114:14
**value (1)**
133:6
**Van (25)**
24:25;25:3,15,22;26:4,6;39:25;80:7;114:15,16;134:21;139:4,5;140:18;141:5;142:23;143:10,14,15,20;145:24;146:3,10;147:13,15
**Van/Operator (1)**
120:19
**variations (1)**
62:13
**varied (1)**
52:5
**various (3)**
66:7;90:13;121:22
**vast (1)**
10:22
**Vehicle (9)**
87:17;88:4;124:7;129:10,24;131:22;133:4;135:19,24
**vehicles (2)**
89:13;134:15
**versus (1)**
7:9
**via (1)**
7:16
**Vice-President (5)**
12:19;13:4,5,7;69:22
**video (2)**
7:4;19:16
**VIDEOGRAPHER (12)**
7:4;75:14,17;100:1,4;103:23;104:1,3,8;148:2,8;161:15
**viewed (1)**
42:23
**VIN (10)**
86:21;87:18;88:1,7,10;90:7;126:18;129:17;133:13,15
**violation (1)**
121:10
**violations (2)**
53:2;116:16
**Virginia (4)**
46:7;118:5;132:13;134:11
**VO/ID (1)**
114:18
**Volansky (6)**
7:2;32:20;45:2;125:16,18;136:20
**VS (1)**

166:2

## W

**waived (1)** 162:8
**warehouse (1)** 62:15
**warn (1)** 19:10
**warning (1)** 11:1
**waste (2)** 21:19,20
**way (21)** 14:24;41:20;42:13;51:21;54:6,10;58:15;68:12;69:17;85:23;100:8,22;111:14,17;112:10;113:13;119:4;126:21;134:14;144:1;156:7
**ways (5)** 53:23;55:24;56:8;110:23;134:19
**wear (2)** 144:8,13
**week (4)** 102:17,20;144:22;145:4
**weekly (2)** 102:15,16
**weeks (2)** 52:10;54:10
**Welding (1)** 134:10
**weren't (3)** 135:8;137:13;138:9
**What's (9)** 13:25;16:9;38:19;109:12;114:21;116:11;131:14;140:2;157:9
**whatsoever (2)** 29:13;83:23
**whenever (1)** 154:4
**whereas (1)** 15:10
**whichever (1)** 147:9
**whole (3)** 7:22;27:14;133:6
**who's (1)** 21:14
**winds (1)** 112:24
**wish (1)** 36:1
**within (9)** 33:18;61:6;83:10;96:14;105:23;122:18;135:7;136:12;150:1
**without (4)** 96:17;125:17;159:25;160:2
**witness (7)** 7:19,24;37:2;59:15;99:23;162:6,8
**wonderful (1)** 161:22
**word (8)** 9:15;16:22;24:23;25:9;66:3,3;94:2;99:1
**work (14)** 24:11;26:1;29:21;47:23;53:6;54:5,10;59:13;61:14;65:18;77:17;81:25;97:8;159:18
**workable (1)** 84:16
**worked (3)** 66:17,18;69:2
**working (2)** 63:24;113:25
**workings (1)** 67:12
**works (5)** 32:16;66:2;132:19;149:6,7
**worksheet (1)** 18:13
**world (2)** 9:21;149:8
**Worldwide (1)** 25:25
**wreck (7)** 23:16;31:6;52:11;134:16;135:3;148:20;150:1
**writing (2)** 20:8;86:4
**written (1)** 68:15
**wrong (2)** 9:15;98:4
**wrongful (1)** 41:16
**Wynn (3)** 155:22;156:9,10

## Y

**yard (1)** 135:20
**year (5)** 8:17;12:23;121:8,12;145:7
**years (4)** 13:1,2;122:1;155:19
**Yep (5)** 88:15;123:22;134:5;138:6;154:19
**yesterday (9)** 14:14;21:9,12,14;36:13,23;49:18;90:2;155:24

## Z

**Zoom (2)** 7:16;160:7

## 0

**004 (1)** 133:10

## 1

**1 (10)** 11:25;12:3;47:5;94:8;116:12,12,13;145:16;148:12,20
**10 (10)** 71:8,11,12;137:17,18;152:15,16;157:10,12,16
**10/12/22 (1)** 102:6
**10/17/22 (1)** 101:18
**10/19/22 (1)** 102:4
**10/26/2022 (2)** 92:14;93:9
**10/5/2022 (1)** 102:22
**10:06 (1)** 75:15
**10:20 (1)** 75:18
**10:51 (1)** 100:2
**10:54 (1)** 100:5
**10:59 (1)** 104:4
**10e3 (1)** 145:21
**10e5 (1)** 146:8
**10e6 (1)** 146:8
**10th (1)** 7:7
**11 (14)** 42:11;72:10;75:1;104:9;107:13;150:23,24;151:2;152:13,14,16,25;153:8,13
**11/15 (1)** 128:10
**11/15/2022 (1)** 128:7
**11/24/20 (1)** 117:9
**11:58 (1)** 148:3
**11th (3)** 107:18;108:8;111:11
**12 (4)** 116:4,5;154:21,24
**12/11/2020 (1)** 122:3
**12/Month (1)** 116:1
**12:07 (1)** 148:9
**12:26 (1)** 161:16
**13 (1)** 108:8
**13th (5)** 107:14,18;111:11;112:1,16
**14 (1)** 155:19
**147 (1)** 127:25
**15 (1)** 37:22
**15th (4)** 61:3;75:8;127:23;128:9
**16 (1)** 38:2
**18 (8)** 38:22;39:1,9;91:21,23;112:20,21;121:3
**18th (2)** 127:8,13
**19 (1)** 121:3
**19b (1)** 147:2
**1st (55)** 16:17;17:12,19;18:3;19:3;23:20;27:2;28:21;29:11;33:1,6,20;36:20;38:8,12;40:18;41:17,24;44:23;45:13;53:18;55:13;58:22;66:11;72:6;77:22;78:5,13;80:4,15;81:21;82:17,25;83:17;84:4;87:18;91:11;95:25;97:16;122:9,22;123:5,10;124:19,23,24;125:4,14;129:25;132:1;133:15,19;135:2,15;152:6

## 2

**2 (14)** 14:9,15,18;18:10;24:12;35:20;43:2;60:10;72:10;102:23;103:12;127:25;153:8;166:11
**2/15/2022 (1)** 128:6
**2:22-CV-00076LGW (1)** 7:14
**2008 (1)** 71:15
**2014 (1)** 88:4
**2020 (3)** 91:10,14;117:18
**2021 (1)** 105:9
**2022 (96)** 16:17;17:12,19;18:3;19:3;23:20;27:2;28:21;33:1,6;36:20;38:8,12;39:14;40:18;41:17,24;42:11;44:23;45:13;47:5;53:18;54:16;58:22;66:11;72:6;73:22;74:1,4,18;75:4,9;77:22;78:5,9,13,15;79:17;80:4,15;81:21;82:17,25,25;83:18;84:4;87:18;90:21;91:12,15;92:20;94:8;95:25;97:16;99:17;103:10;105:9,22;106:25;107:6,13,14,19;108:21,23;112:1,12,16;114:22;115:8,8;117:1,19;118:15,22,25;122:20;123:5,10;124:19,23,24;125:4,14;127:8,23;129:25;133:25;135:2,16;146:17,23;148:12,20;149:13;152:6
**2022-04-06 (1)** 151:4
**2023 (2)** 7:7;39:19
**2025 (1)** 115:12
**20th (1)** 74:1
**21st (2)** 105:9,9
**22 (3)** 37:16;78:1;106:7
**22132 (1)** 120:23
**22nd (2)** 105:22;107:6
**24 (1)** 127:3
**24th (3)** 90:21;91:10;117:18
**26 (1)**

92:19
**279 (1)** 143:1
**27th (2)** 121:3,3
**28 (1)** 106:25
**285 (1)** 147:2
**28th (7)** 73:22;74:4,17;75:4; 84:3;106:7;127:11
**29th (17)** 78:1,9,15;79:17; 82:25;83:1,17;97:20; 99:17;100:11;111:15; 112:12;115:8;127:14; 146:17,22;149:13
**2nd (3)** 61:4;75:9;132:4

**3**

**3 (4)** 43:24;44:2;49:25; 128:24
**30 (1)** 79:24
**30b6 (1)** 8:7
**30th (1)** 39:14
**333 (4)** 72:1;122:7;127:4; 128:21
**3A (1)** 50:2
**3C (1)** 55:17
**3HS (1)** 133:15
**3HSDJAPR7EN491357 (1)** 129:20
**3rd (1)** 132:6

**4**

**4 (8)** 59:21;61:16;71:5, 10,13;88:18,19; 166:20
**4/22 (1)** 37:15
**4/29/2022 (1)** 115:2
**4/29/22 (3)** 114:20;159:12,21
**40 (3)** 66:9;67:1,9
**450 (1)** 43:4

**5**

**5 (7)** 59:8,21,23;60:1; 116:12;145:16;152:9
**55.99 (1)** 101:13
**5th (9)** 103:10;114:22; 115:8;117:1,18; 118:15,22,25;122:20

**6**

**6 (8)** 74:10,14;87:8,10, 12,14,18;115:12
**6/11 (1)** 110:10
**6/13 (1)** 110:10
**60-day (1)** 78:16
**61 (2)** 90:20;93:6
**62 (1)** 100:17
**64 (1)** 104:15
**679 (1)** 59:6
**6c (1)** 143:3

**7**

**7 (6)** 89:21,24;133:2,3; 144:2;146:13
**70 (2)** 32:2,7

**8**

**8 (4)** 114:2,7;123:17; 159:7
**8:46 (1)** 7:8
**80-some (1)** 91:11

**9**

**9 (2)** 126:12,13
**9- (1)** 102:23
**9/10/2022 (1)** 111:21
**9/13/2022 (1)** 111:22
**9/16/2022 (1)** 115:18
**9/29/22 (1)** 102:24