**In The Matter Of:**

*Kyle Sloan, et al. v*

*Nicholas Burist, et al.*

Mayflower Transit LLC

Michael Kratzer as 30(b)(6)
January 8, 2025



*Rely Reporting LLC*
*Court Reporting and Legal Videography*
*Summerville, South Carolina 29483*
*office@relyreporting.com*
*(843)478-1176*

Original File 01-08-2025 Kratzer Mayflower.txt
**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION
CASE NO. 2:22-CV-00076-LGW

KYLE SLOAN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATES OF RYLIE SLOAN AND JAMIE SLOAN; KYLE SLOAN AS SURVIVING SPOUSE OF JAMIE SLOAN; KYLE SLOAN AS SURVIVING PARENT OF RYLIE SLOAN; AND SUSAN WEST, INDIVIDUALLY AND AS THE NEXT FRIEND AND NATURAL GUARDIAN OF K.W., A MINOR,

Plaintiffs,

vs.

NICHOLAS BURIST; LOCKE RELOCATIONS LLC; NATIONAL INDEMNITY COMPANY; MAYFLOWER TRANSIT LLC; JOE MOHOLLAND, INC.; WESCO INSURANCE COMPANY; AND XYZ COMPANIES 1-3,

Defendants.

-----------------------------------

ZOOM VIDEOCONFERENCE DEPOSITION

30(B)(6) DEPOSITION OF MAYFLOWER TRANSIT LLC

WITNESS: MICHAEL KRATZER

DATE: Wednesday, January 8, 2025

TIME: 11:07 a.m.

LOCATION: Zoom Videoconference

REPORTED BY: KATIE L. GRAFF
Rely Reporting LLC
156 Whitetail Road
Summerville, South Carolina 29483
843-478-1176
office@relyreporting.com

Any Court, party, or person who has purchased a transcript, may, without paying a further fee to the reporter, reproduce a copy or portion thereof as an exhibit pursuant to Court order or rule or for internal use, but shall NOT otherwise provide or sell a copy or copies to any other party or person.

APPEARANCES

FOR THE PLAINTIFFS

Charles Hodge
chodge@hodgelawfirm.com
Hodge Law Firm
951 East Main Street
Spartanburg, South Carolina 29302

FOR THE PLAINTIFFS

Matthew Foss
Matt@langleylawfirm.com
Langley Law Firm
229 Magnolia Street
P.O. Box 2765
Spartanburg, South Carolina 29306

FOR THE PLAINTIFFS

Ryan Langley
Ryan@langleylawfirm.com
Langley Law Firm
229 Magnolia Street
P.O. Box 2765
Spartanburg, South Carolina 29306

FOR THE PLAINTIFFS

Joseph R. Padgett
jpadgett@rodenlaw.com
Josh Dorminy
jdorminy@rodenlaw.com
Roden Law
333 Commercial Drive
Savannah, Georgia 31406

FOR THE PLAINTIFF MAKAYLA JANIA HINES, INDIVIDUALLY, AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MICHAEL ANTHONY HINES, JR., DECEASED

Andrew Norden
anorden@realtoughlawyers.com
Ami Romanelli
aromanelli@realtoughlawyers.com
Osborne Francis
433 Plaza Real Boulevard, Suite 271
Boca Raton, Florida 33432

FOR THE PLAINTIFFS THELMA PETNO AND RAYMOND E. TIPTON

Jonathan A. Pope
jpope@hastypope.com
Harrison Loftin
hloftin@hastypope.com
Hasty Pope LLP
211 East Main Street
Canton, Georgia 30114

FOR THE DEFENDANT NICHOLAS BURIST

Angela Cooper
acooper@dcplaw.com
Dennis, Corry, Smith & Dixon, LLP
900 Circle 75 Parkway, Suite 1400
Atlanta, Georgia 30339

FOR THE DEFENDANT LOCKE RELOCATIONS LLC

James L. Elliott
jelliott@ebbglaw.com
Elliott & Blackburn
3016 North Patterson Street
Valdosta, Georgia 31602

FOR THE DEFENDANT UNIGROUP, C.A.

Todd Ehrenreich
Todd.Ehrenreich@lewisbrisbois.com
Jeffrey Geldens
jeffrey.geldens@lewisbrisbois.com
Brighten Donner
brighten.donner@lewisbrisbois.com
Lewis Brisbois Bisgaard & Smith
600 Peachtree Street Northeast, Suite 4700

FOR THE DEFENDANT UNIGROUP, C.A.

Mark Volansky
mark_volansky@unigroup.com
Unigroup Inc.
1 Premier Drive
Fenton, Missouri 63026

FOR THE DEFENDANT JOE MOHOLLAND INC.

Matthew R. Sessions
msessions@mkblawfirm.com
McMickle, Kurey & Branch, LLP
217 Roswell Street
Alpharetta, Georgia 30009

FOR THE DEFENDANT VANLINER INSURANCE COMPANY

Carly Knight
carly.knight@swiftcurrie.com
Swift Currie
1420 Peachtree Street NE, Suite 800
Atlanta, Georgia 30309

FOR THE DEFENDANT PAYNE INC.

James E. Gilson
jgilson@hallboothsmith.com
Hall Booth Smith, PC
191 Peachtree Street NE, Suite 2900
Atlanta, Georgia 30303

LEGAL VIDEOGRAPHER

Tony Graff
tgraff@relyreporting.com
Rely Reporting LLC
Summerville, South Carolina

INDEX TO EXAMINATIONS


| | |
|---|---|
| Examination By Mr. Langley | 8 |
| Examination By Mr. Ehrenreich | 129 |
| Examination By Mr. Langley | 136 |


INDEX TO EXHIBITS


| | |
|---|---|
| 1 NOD | 12 |
| 2 Member/Agent self-terminate | 29 |
| 3 UniGroup portal email | 49 |
| 4 IFTA Stickers emails | 51 |
| 5 Mike Peters email | 63 |
| 6 m333 email | 67 |
| 7 Mayflower 46260 | 69 |
| 8 34589 email | 72 |
| 9 agency statement | 82 |
| 10 apparel email | 89 |
| 11 5020 load email | 98 |
| 12 JMI 00003-00011 | 105 |
| 13 email 5044 | 111 |
| 14 separation notification | 114 |
| 15 lease agreement | 115 |
| 16 list of agents May 2022 | 115 |
| 17 email | 123 |
| 18 agency agreement and amendment | 123 |
| 19 Steis email | 124 |

(The deposition begins at 11:07 a.m.)

THE VIDEOGRAPHER: We are now on the record at 11:07 a.m., January 8, 2025. Counsel has waived the reading of the caption. This is the 30(b)(6) video deposition of Mayflower Transit LLC.

Present is the court reporter, Katie Graff. And I am Tony Graff, the legal videographer.

Counsel, please state your appearances for the record.

MR. LANGLEY: Ryan Langley on behalf of the Sloan plaintiffs.

MR. ELLIOTT: Jim Elliott on behalf of Locke Relocations LLC.

MR. PADGETT: Joseph Padgett on behalf of the Sloan plaintiffs as well.

MR. POPE: John Pope on behalf of the Tipton and Petno plaintiffs.

MR. NORDEN: Andrew Norton on behalf of the Hines plaintiffs.

MS. ROMANELLI: Amy Romanelli on behalf of the Hines plaintiffs.

MR. SESSIONS: Matt Sessions on behalf of Joe Moholland.

MR. GILSON: Jim Gilson on behalf of Payne Inc.

MR. HODGE: Charlie Hodge on behalf of the Sloan plaintiffs.

MS. KNIGHT: Carly Knight on behalf of Vanliner Insurance Company.

MS. COOPER: Angela Cooper on behalf of Nicholas Burist.

MR. EHRENREICH: On behalf of Mayflower, this is Todd Ehrenreich. I believe Jeffrey Geldens and Brighten Donner are also on.

THE VIDEOGRAPHER: Is that everyone?

Will the court reporter please swear or affirm the witness.

(MICHAEL KRATZER, after being sworn/affirmed, testified as follows:)

EXAMINATION

BY MR. LANGLEY:

Q Thank you. Mr. Kratzer, I'm Ryan Langley. It's nice to meet you today. I'm going to be taking your deposition. Have you ever testified under oath?

A Yes, sir.

Q And what were the circumstances of that?

When did it happen and what was the nature of the testimony?
A I've testified numerous times. Many times.
Q When was the last time?
A Probably within the last year.
Q And was that as a corporate representative for Mayflower?
A No.
Q What is your job?
A My title is director of safety compliance. Safety and DOT compliance.
Q Okay. For Mayflower Transit?
A Employed by UniGroup.
Q Okay. And the prior testimony has been that in UniGroup employees, everybody that works for Mayflower. So you have a job with Mayflower, you work for UniGroup on behalf of all of its transit companies?
A I don't understand the question.
Q Do you work just for Mayflower Transit, or do you work for all of the UniGroup companies as a safety director?
A Neither.
Q Okay. Your prior testimony, when was

that, where was that, and what did it concern, most recent testimony?

A I don't recall the date. But it would have been in 2024 probably early. And it would have been testifying on behalf, I believe, of United Van Lines.

Q Okay. And how did you get designated to testify on behalf of United Van Lines?

A I don't know.

Q What did you testify about?

A I don't recall specifically what I testified about, but it was in relation to an accident.

Q Did you provide safety director services for Mayflower Transit related to Joe Moholland Inc. or Nicholas Burist?

A Yes.

Q All right. And have you testified as a 30(b)(6) witness for Mayflower Transit as a corporate representative before?

A I'm not sure.

Q Do you understand that that's what you're here today to do, to testify as the corporate representative for Mayflower Transit?

A Yes, sir.

Q All right. I'm just going to go through a few background rules and make sure that we're on the same page for how the deposition is going to proceed. Will you tell me if you don't understand a question that I ask?
A Yes, sir.
Q Will you tell me if you find my question to be confusing?
A Yes, sir.
Q Will you tell me if I've assumed an incorrect fact in question in the case?
A Yes, sir.
Q Will you tell me if you don't know the answer to a question?
A Yes.
Q Are you aware that your testimony today is about a lawsuit involving Kyle Sloan, his deceased daughter Riley, and his deceased wife Jamie?
A Yes.
Q And are you aware that your answers to the questions that I'm asking may be used in court?
A Yes, sir.
Q Do you understand that your answers today may be presented to a jury in this case?
A Yes, sir.

Q Will you provide the most complete and accurate answers possible for the jury?
A Yes.
Q And you understand this deposition is being videotaped and recorded?
A Yes, sir.
Q All right. I'll show you what we'll mark as Exhibit 1 in the case. And that is the deposition notice and the topics that we have sent to your counsel, have been the subject of some negotiation over the past few days. And I'll mark the exhibit first and then ask you some questions about it.
(Plaintiffs' Exhibit Number 1 was marked for identification.)
BY MR. LANGLEY:
Q Have you seen this document before?
A Yes, sir.
Q Are you prepared to testify today as to the agency relationship between Mayflower Transit LLC, Joe Moholland Moving, and Nicholas Burist on July 1st, 2022?
A Yes, sir.
Q All right. What do you understand your role in testifying on that exhibit and that

deposition topic to be today?
A My role is to answer questions as best I can.
Q All right. And you understand that that deposition notice required Mayflower Transit to designate someone to become the most knowledgeable person on that topic of the agency agreement between Joe Moholland, Mayflower, Nicholas Burist on July 1st, 2022?
MR. EHRENREICH: Object to form.
You can answer.
A Yes.
BY MR. LANGLEY:
Q And are you that person that's been designated as either the one most knowledgeable or having met with an individual that's most knowledgeable at Mayflower to provide corporate testimony today?
A Yes, sir.
Q And you understand that your testimony you give today --
MR. EHRENREICH: Just -- just -- hey, Ryan, so it's not the person with the most knowledge, it's the corporate rep. There is a difference. So you asked for a

corporate rep. It's a corporate rep.
MR. LANGLEY: Yeah. And I made that difference noted on the record.
MR. EHRENREICH: Thank you.
BY MR. LANGLEY:
Q And you understand that the testimony you give today is not about your knowledge only, but it will represent knowledge that's reasonably available to Mayflower Transit?
A Yes, sir.
Q Okay. Do you know who designated you to speak on behalf of Mayflower Transit?
MR. EHRENREICH: So that's going to be work product. That was an attorney decision.
MR. LANGLEY: Okay.
BY MR. LANGLEY:
Q Was there anybody that was not an attorney, Mr. Kratzer, that you're aware of that designated you to speak on behalf of Mayflower Transit?
A No, sir.
Q Do you know why you were designated to speak on behalf of Mayflower Transit today?
MR. EHRENREICH: Once again, that's

attorney-client and work product, so he's not going to answer that.

BY MR. LANGLEY:

Q Are you employed by any other entities besides UniGroup?

A No, sir.

Q And you -- you said your title before, but I didn't write it down. Would you please say it again?

A Director of safety and DOT compliance.

Q Okay. How long have you been the director of safety and DOT compliance?

A Nearing three years.

Q So you held that role at the time of this wreck that's at issue in this case?

A Yes, sir.

Q I haven't seen any correspondence with your name on it, emails or anything like that. Did you have any written correspondence with anybody about the nature of this wreck either before, during, or after July 1st, 2022?

A I don't believe so.

Q How is it that the safety director and person responsible for compliance with the DOT could have no involvement with this case when there's

correspondence to the DOT seeking to have Mayflower's name removed from a June 17th safety inspection or maintenance violation?

MR. EHRENREICH: Object to form.

A I do recall I did send an email to FMCSA giving them copies of our agency agreement with Moholland.

BY MR. LANGLEY:

Q When did you send that email?

A July of '22.

Q Do you know what date?

A Maybe the 5th.

Q And you sent an email to the FMCSA with the agency agreements, you said, between Mayflower and Joe Moholland Inc.?

A Yes, sir.

Q Did that include all the agency agreements including the extension of the agreement by addendum?

A Yes, sir.

Q And do you have that correspondence available to you today?

A Yes, sir.

Q Okay. Can you show it to me?

MR. EHRENREICH: And I'd have to

review it. So.

A I don't have it ready for viewing.

BY MR. LANGLEY:

Q Well, we're going to leave your deposition open to ask you questions about that. I believe it's relevant and should have been produced in the case.

MR. LANGLEY: And I don't believe it has today unless you can correct me, Todd.

MR. EHRENREICH: I'm sure we'll be looking it up as you ask questions.

MR. LANGLEY: All right.

BY MR. LANGLEY:

Q All right, Mr. Kratzer, can you give me your job description?

A My job description is to oversee DOT compliance for UniGroup.

Q Anything else?

A And also UniGroup safety policies.

Q Okay. Anything else?

A I don't think so.

Q And in your job as the director of safety compliance and safety policies for UniGroup, does that cover safety compliance, safety policies and DOT compliance for Mayflower Transit?

A Yes, sir.
Q And how long have you had that job? Is that the one you were telling me three years before?
A Yes, sir.
Q And prior to that, were you employed by Mayflower or UniGroup?
A UniGroup.
Q What was your job description more than three years ago?
A Safety manager.
Q So the director of safety compliance is a promotion, I presume, from safety manager?
A Yes, sir.
Q And you said UniGroup issues your W-2. Is that right?
A Yes, sir.
Q That email you sent to the FMCSA, what did it say?
A I'm not certain there was verbiage in it other than here's a copy of the lease agreement between Mayflower and Joe Moholland.
Q Okay. I think a minute ago, you said it was an agency agreement, and just now you said lease agreement. I think those are two different documents. Do you remember which one or was it

both?
A Yes, you're correct. It is agency agreement.
Q Okay. And who asked you to send that to the FMCSA, that email?
A Hope Maddox.
Q Hope Maddox?
A Yes, sir.
Q Who is Hope Maddox?
A She is an employee at FMCSA.
Q Okay. And how did she come to contact you?
A She had left -- I believe she left a voicemail on UniGroup's calling number, and someone forwarded me the message that she needed contact.
Q Okay. And did you call her before you sent the email?
A I don't recall.
Q Well, how did you know what to send her if you didn't talk to her?
A I likely talked to her to find out what she was after or what she wanted. I just don't recall calling her, but I likely did.
Q Okay. And what was the purpose of you

sending the agency agreement to -- I guess you sent it to Hope Maddox at FMCSA?

A I did.

Q And what was the purpose of you sending that email to Hope Maddox?

A To show that Joe Moholland was no longer under agency agreement with Mayflower Transit.

Q Did you discuss with Hope Maddox anything after that email was sent or have any other correspondence with her?

A No, sir.

Q Did she respond to you at all?

A No, sir.

Q So do you know if there was ever a conclusion reached by the FMCSA as to whether or not Joe Moholland was an agent of Mayflower on July 1st, 2022?

A I don't know.

Q Do you take a position on that issue, whether Joe Moholland was an agent of Mayflower on July 1st, 2022?

MR. EHRENREICH: Are you asking on his own behalf or on behalf of Mayflower?

MR. LANGLEY: Both.

MR. EHRENREICH: So let's -- let's --

let's -- if we can, Ryan, let's do it on behalf of Mayflower first. And if you want to follow up, that's okay.

MR. LANGLEY: All right. That's fine.

BY MR. LANGLEY:

Q So on behalf of Mayflower Transit, Mr. Kratzer, do you take a position as to whether or not Joe Moholland was an agent of Mayflower on July 1st, 2022?

A Yes.

Q What is that position?

A Mayflower's position is they were not an agent for Mayflower on July 1st, 2022.

Q All right. And what do you base that on?

A Lease agreement ending date was April 28th, 2022.

Q Anything else?

A I've reviewed the termination letter from Mayflower to Joe Moholland, which that includes the ending date of April 28th of 2022.

Q All right. Anything else?

A Not that I recall now.

Q Any different position that you take individually from what you just stated on behalf of

Mayflower as an entity?
A No, sir.
Q Does Mayflower acknowledge that there was a business relationship with Joe Moholland Inc. and Nicholas Burist that continued after April 28th, 2022, and through July 1st, 2022?
MR. EHRENREICH: Object to form. That's a compound question. I ask that you break that down.
MR. LANGLEY: All right.
BY MR. LANGLEY:
Q Does Mayflower acknowledge that there was a business relationship that continued with Joe Moholland Inc. after April 28th, 2022, and through July 1st, 2022, the date of this wreck?
A Could you ask the question again? Was there a business relationship? Is that what you asked?
Q Yes.
A Yes.
Q Does Mayflower acknowledge that there was a business relationship with Nicholas Burist that continued after April 28th, 2022, and through the date of this wreck on July 1st, 2022?
MR. EHRENREICH: Object to form.

A No, sir.
BY MR. LANGLEY:
Q And what is the basis for your answer on the business relationship with Nicholas Burist?
A When agency agreements expire, drivers are canceled in the system.
Q Was there any documentation that Mayflower ever sent to Joe Moholland Inc. specifically stating that Nicholas Burist was canceled in the system?
A I don't know.
Q And that's true for you individually and on behalf of Mayflower Transit as a corporate representative?
A That is correct.
Q Are you an officer, director, a managing agent of Mayflower or UniGroup?
A No. I am a director of UniGroup, but not managing partner, no.
Q Okay. And you've been given full authority today to speak on behalf of Mayflower Transit LLC, correct?
A Correct.
MR. EHRENREICH: Within the limitations of the deposition and the deposition topics, yes.

BY MR. LANGLEY:
Q And you agree that answers to the questions that I give are binding upon Mayflower Transit?
A Yes.
Q How much time did you spend preparing to respond to the inquiry today?
A Probably between 40 and 50 hours.
Q Okay. And what was your role in gathering all the knowledge that's known or reasonably available to Mayflower Transit with regard to this topic on the agency relationship between Mayflower, Joe Moholland, and Nicholas Burist on July 1st, 2022?
A Review of agency agreements.
Q And are you able --
MR. EHRENREICH: Hold on, hold on. I don't want to coach the witness, Ryan. But everything that you sent us, that Matt had sent us, Mike reviewed. All of those documents.
MR. LANGLEY: All right.
BY MR. LANGLEY:
Q You reviewed -- your testimony a moment ago was that you had reviewed agency documents. And

your counsel has spoken out to state that you've spent the 40 or 50 hours preparing for the deposition by reviewing all of the documents that we have produced as potential exhibits in the case. Is that right?
A That is correct.
Q And that includes a number of emails and Excel spreadsheets and other documents about the business relationship between Mayflower, Nicholas Burist, and Joe Moholland Inc., right?
A Yes, sir.
Q And did anyone other than a lawyer help you prepare for your testimony today?
A No, sir.
Q Who did you speak to to prepare for your testimony today other than the attorney?
A No one.
Q You didn't speak to any other employees of Mayflower Transit to be sure that you had the proper knowledge to testify to on behalf of the company?
A I did not.
Q Is there anything else that you did to prepare for your testimony today other than talk to your counsel?
A No, sir.

Q Did you talk to anyone at Joe Moholland Inc. or Tailored Move to prepare for your testimony today?
A No, sir.
Q Do you know Rob Garr?
A No, sir.
Q Do you know that name?
A Yes, sir.
Q And you understand him to be the president of Joe Moholland Moving and now Tailored Move?
A I didn't know he was the president, but I recognize he's from Joe Moholland.
Q Okay. His title may be something different from that. My understanding is he's the chief executive there. Have you ever had any communication with him?
A I don't -- I don't recall any.
Q As the safety director for Mayflower Transit, you didn't reach out to him after four people were killed in a truck that bore the name of Mayflower and the license plate says Mayflower when you're doing your communication with FMCSA on July 5th?
A No, sir, I did not.
Q Did you reach out to Nicholas Burist in

any way or any of the members of the families that have suffered the losses that have brought claims against Mayflower in this case?

A No, sir.

Q On the agency relationships, is there a department within Mayflower that is responsible for agency success or for compliance with the safety rules that you testified before?

A Yes.

Q And who was the person that would have been responsible on July 1st, 2022?

A For which part, sir?

Q Agent success that's specific to Mayflower Transit and Joe Moholland.

A Member success would be that department.

Q Okay. And is there a person that is in charge of that department at -- or the division of that department that would have overseen Joe Moholland Inc. and Mayflower Transit on July 1st, 2022?

A Yes, sir.

Q What's that person's name?

A Chris Wynn.

Q Did you talk to Chris Wynn in preparation for your deposition today?

A No, sir.
Q Have you ever talked to Chris Wynn about anything that he did or didn't do to ensure that the agency agreement was properly terminated with Joe Moholland Inc. by Mayflower Transit after April 28th, 2022?
A No, sir.
Q Does Mayflower have a list of items that should have -- or that must be completed per its policy in order for an agency agreement to be properly terminated?
A I believe so.
Q And is that one of the safety rules that your department is responsible for overseeing?
A No, sir.
Q Is that Chris Wynn's department, the agent/member success department?
A Yes, sir.
Q Have you reviewed that list of tasks that should be completed in order for an agency agreement to be properly terminated?
A Yes.
Q I'll show you what we'll mark as Exhibit 2.

(Plaintiffs' Exhibit Number 2 was marked
for identification.)

BY MR. LANGLEY:

Q This is a document that you reviewed, Mr. Kratzer?

A Yes, sir.

Q Is that the one applicable to the termination of the agency entered between Mayflower Transit and Joe Moholland Inc.?

A Yes, sir.

Q And is it the responsibility of both Mayflower and Moholland to tell their respective employees that their agency relationship is terminated?

A Yes.

Q Do you agree that when the employees are not told and they carry on business as usual and act under the authority to transact business under the agency agreement?

A I'm sorry? Could you repeat that question?

Q Yes. Can we agree there's no such communication about a termination of agency agreements that the employees may continue on operating under that authority in the agency?

A That is correct.

MR. EHRENREICH: Just so that we are on the same page, this is a voluntary termination. That's what is on the front of the document is voluntary termination.

MR. LANGLEY: I think that's an improper insertion of your testimony into the record, Todd.

MR. EHRENREICH: I'm saying -- I'm reading the -- I'm reading the title of the document. It says when member/agent self-terminates, voluntary.

MR. LANGLEY: All right. And he's already testified that this was applicable to this termination. So I find your comment improper. I've asked you to stop, please.

MR. EHRENREICH: Okay. It's not improper. I was reading the top of that page. It's not improper.

MR. LANGLEY: I'm not going to --

MR. EHRENREICH: That's my objection. That's my objection. Okay.

MR. LANGLEY: All right. And I think your objection is improper and I'd ask you

to stop.

MR. EHRENREICH: All right. So are you taking the position that this was a voluntary termination?

MR. LANGLEY: It's not my job to take a position, Todd. It's my job to ask the questions, and the witness has answered. And you inserting your position into the record is improper. And I'd ask you to stop, please.

MR. EHRENREICH: I'm asking you -- you've taken positions on everything, Mr. Langley, and I want to know if that's your -- the position you're taking today.

MR. LANGLEY: The witness is here to testify, not you. We're reserving objections except as to form. Please comply with that agreement.

MR. EHRENREICH: And you are to not mislead anyone. So that's why I'm here.

MR. LANGLEY: I'm not misleading. I asked him a question. Is this the termination agreement that applied to the case. His answer was an unqualified yes.

MR. EHRENREICH: You didn't ask him

if this was the termination agreement.

MR. LANGLEY: The record will speak for itself.

MR. EHRENREICH: Okay. You just called it a termination agreement, that's not what this is.

MR. LANGLEY: I asked him if this was the checklist that was applicable to the termination of the agreement between Mayflower Transit and Joe Moholland. And the answer was yes.

And you are seeking now to insert some question into his mind about that by making a note about what the records says. And I find that objectionable, and I'd ask you to please stop.

MR. EHRENREICH: All I did was read the title of your document. That was all.

MR. LANGLEY: It's inappropriate. It's not appropriate.

MR. EHRENREICH: Okay.

BY MR. LANGLEY:

Q Can we agree, Mr. Kratzer, that communication is key and required in order for the

Mayflower Transit policy for termination to be fulfilled?
A Yes.
Q And is there a particular individual that's responsible for the termination process other than Chris Wynn?
A I don't know.
Q Have you heard the name Tim Woody?
A Yes, sir.
Q Do you know if Tim Woody had some responsibility for termination of the agency agreement between Mayflower Transit and Joe Moholland Inc.?
A I do not.
Q All right. Let's go through the list here. Number 1. Mayflower or its member -- and here where it says member, that would be Mayflower, correct?
A No, that would be Joe Moholland.
Q Okay. I would've thought Moholland -- Joe Moholland would've been the agent.
A Member and agent is the same.
Q Okay. And so we see agency success director. Is that Chris Wynn or Tim Woody?
A I believe that was Chris Wynn.

Q And so in this case when we see member, that's Joe Moholland is your understanding. Is that right?

A That's correct.

Q And in this case, did Joe Moholland call or send a letter to Chris Wynn or Tim Woody or someone else at Mayflower seeking to terminate the agency relationship?

A Yes.

Q Okay. And was there a call made to discuss the intent and purpose for the termination and gather more information?

A I believe so.

Q Were there emails that were exchanged about the termination, about the use of license plates, IFTA stickers, decals, identification markers, and that type of thing by Joe Moholland through the course of the termination of the agency agreement?

A I remember some of those, yes.

Q Okay. And did you see the -- well, we'll come back to that.

And then it says, ASD provides a high-level overview what takes place in the basic steps in the termination process with a member who

is voluntarily self-terminating. Is that correct?
A Yes.
Q And what are those basic steps in the termination process?
A I don't know specifically.
Q Would they --
A Probably those listed in the termination letter.
Q Okay. I'm sorry. I didn't mean to interrupt you.
A It's okay. Yes, sir. It would be the ones listed in the termination letter.
Q All right. And next is, a written notice, email or letter, is sent to ASD and should reference the requested effective termination date by the member that is confirmed and discussed by the ASD with the member. Is that right?
A Yes.
Q Is it Mayflower's position that that effective termination date is April 28th, 2022?
A Yes, sir.
Q And the documentation to bear that out includes the agency agreement and the addendum for the extension of the agency record, correct?
A As well as the termination letter.

Q Okay. So is there any other documentation that would fall under these four categories we've gone over so far other than the agency agreement, the agreement to extend the agency, and the termination letter?
A Not that I know of.
Q And the terms of those agreements are binding on both parties, correct, both Mayflower Transit and Joe Moholland Inc.?
A I don't know.
Q Is there any reason they wouldn't be?
A I don't know how they're -- how they're specifically stated.
Q Well, I'm not asking you that. I'm asking is there any reason that those agency agreements and the agreement to extend the period of agency would not be binding on both parties? Is there any other side agreement that you're aware of or something else that keeps you from answering that question specifically?
A No. I know of nothing else.
Q All right. Number 5. The ASD then replies with sending/e-mailing UniGroup, United Van Lines, Mayflower Transit's letter acknowledging the notice of intent voluntary self-term also confirming

the effective termination date.
Was that done in this case?
A I don't know.
Q Have you seen email correspondence that identifies the effective termination date as April 28th of 2022?
A Yes, sir.
Q Have you seen continued correspondence between Mayflower and Joe Moholland after April 28th, 2022, completing the items that are necessary for effective termination?
A I don't recall.
Q You don't recall seeing any documentation or correspondence between Mayflower Transit and Joe Moholland Inc. after April 28th, 2022, about completing the checklist items for termination?
A I don't recall those dates, anything after a date.
Q All right. Do you recall seeing any correspondence about Mayflower's termination of Joe Moholland as an agent --
A I do.
Q -- and the completion of the checklist? Okay. What's on that checklist for termination?
A I recall seeing a termination letter

which has requirements in it.
Q All right. Anything else?
A No, sir.
Q Do you remember what those requirements are?
A I do not.
Q Does one of them include recovery of license plates and the authorization stickers or any type of decals by the agent?
A I don't -- I don't know. I know that it requires the agent to remove all branding and markings on equipment.
Q And does the checklist also state that if the agent does not do so, then there will be a police report made for those items?
A I don't recall.
Q Was there ever any communication between Mayflower and Joe Moholland that if the license plates were not returned by a specific date, then Joe Moholland would no longer be authorized to operate and run under those plates?
A I believe so.
Q And you see the date of March of 2023 as the date that Joe Moholland understood to be the time period that it had to run under the Mayflower

plates, it was Mayflower's responsible motor carrier for safety?

A I don't recall that.

Q Do you deny it?

A No. I just don't recall that.

Q Do you have any basis to refute that Joe Moholland's correspondence indicates that it believed it was running under Mayflower's authority as their responsible motor carrier for safety through March of 2023?

A No.

Q All right. Next. ASD then send an internal email to all major department managers and directors notifying them of the terminating agent and effective termination date. This provides awareness for each department so they know how they must interact with shipment workflow and the terminating member before the termination date.

Have you ever seen such an email?

A Yes.

Q Okay. What date was it sent?

A I don't know.

Q Well, can you tell me how to find it? Because I don't recall seeing that email from -- I

guess it would have been -- you tell me the email that you're referring to. Who was it from?

A I don't know who it was from. It would come from somebody in the member success department that send out a termination notice.

Q And you can't tell me a person or a date for that?

A I cannot.

Q Okay. Next one. ASD stays in contact as the general point of contact with the member during the termination process that can be for a few weeks or a few months to address the winding down of all necessary van line interstate authority business.

Did that take place in this case?

A I don't know.

Q Does the documentation and the emails reflect that the wind-down and inclusion of the Mayflower Transit and Joe Moholland authority business extended through July 1st and past July 1st, 2022?

A No.

Q Why do you say that?

A I know of no communication that extended through July 1st.

Q All right. We'll come back to that.
A Okay.
Q Do you know the date on which the wind-down of the necessary van line interstate authority business, or in this case Mayflower Transit authority business completed?
A I do not.
Q Have you seen the communication and documentation to reflect that as late as October of 2022, Mayflower was still listing Joe Moholland as an agent?
A No.
Q Okay. You deny that there are documents in this most recent production that list Joe Moholland Moving as an agent for Mayflower Transit in October of 2022?
A I do not deny it. I don't recall that document.
Q All right. And do you deny that their documents have been the most recent production as to Mayflower Transit agent, Joe Moholland Moving under JMM333 on the same agency agreement that is indicated by the placard on the truck for Mayflower Transit that was involved in this collision in November of 2022?

A I don't recall any.
Q But you don't deny that they exist?
A I do not.
Q All right. And is there any particular deadline or date in this, or is it open as to a few weeks to a few months to address the wind-down of the necessary authority business?
A I think there are different dates defined in the termination letter.
Q All right. But in this checklist that we're looking at here, is there a definitive policy for Mayflower either in this document or any other that sets a hard deadline for the time between the notice of the termination and the wind-up of the authority business?
MR. EHRENREICH: Object to form.
A I don't understand what you mean by authority business.
BY MR. LANGLEY:
Q I'm just reading the document. It says winding down of all necessary van line interstate authority business. And can we agree that this van line that's referred to here, it's talking about Mayflower Transit?
A Yes, sir.

Q So that's the language I'm using for Mayflower Transit's policy on checklist. When it uses that phrase, authority business, the wind-down of Mayflower Transit authority business, is there any document that you can point me to that says there is a set time period of weeks or months that that must be concluded, or is it on a case-by-case basis?

A It's in the determination -- the termination letter.

Q I understand it's in the termination letter. But the termination letter does not reflect the facts of what took place in this case.

MR. EHRENREICH: Object to form.

Move to strike that.

BY MR. LANGLEY:

Q For April 28th being the deadline for all business to be concluded, the business was not concluded, as you testified to earlier, Mr. Kratzer, on April 28th, 2022.

MR. EHRENREICH: Object to form.

BY MR. LANGLEY:

Q And my question for you now is, can you point me to any document that has a specific time period, either weeks or months, for the wind-down of

Mayflower Transit authority business after the termination date?

MR. EHRENREICH: Object to form.

A Yes. The termination letter.

BY MR. LANGLEY:

Q Any other documents?

A None that I know of.

Q Can we agree that the checklist that we've been reviewing here does not set a specific date, but rather says it may be for a few weeks to a few months?

A Agreed.

Q And that is for the winding down of all necessary Mayflower Transit authority business. Did I read that correctly?

MR. EHRENREICH: Object to form. I don't see the word Mayflower.

MR. LANGLEY: He's already testified in this context --

MR. EHRENREICH: Sorry, I'll withdraw the objection.

MR. LANGLEY: Thank you.

A Could you reask, please?

BY MR. LANGLEY:

Q Yes. Can we agree that there's no

specific time period in this checklist that we've marked as Exhibit 2, I believe, for the wind-down of necessary Mayflower Transit authority business?
A Yes.
Q Okay. The next one. A few days before the effective termination date, the ASD will complete the member termination fact sheet and email to the AAE administrative assistant.
Have you seen a member termination fact sheet in this case?
A No, sir.
Q All right. The AAE administration assistant will send out to designated UniGroup executive management and the Board of Directors the day of the member's termination.
Have you seen any AAE administration assistant communication that would fit that definition?
A I have not.
Q The AAE also sends out an email notice of the member's termination to UniGroup management and all members in the network.
Does that document exist?
A I don't know.
Q Would that be true for the other -- I

don't know if you gave this as well, or the other answers on these other documents. You're not aware of the existence of such a document?
A I am not aware of the document.
Q And that's both individually and your testimony as a corporate representative for Mayflower?
A That is correct.
Q And then finally, the ASD has created a hard copy record file of the terminating agent and retains information and documentation related to the termination. All documents are also in electronic format.
What documents other than the agency agreement, the extension of the agency agreement, and the termination letter exist under that definition in Item No. 10 there?
A I don't know of any others.
Q And can we agree that the purpose of this checklist is so that there is no confusion about the deadlines and the dates for termination of the agency authority?
A No.
Q And what's the purpose of this document?
A Well, we've already testified there is

no termination date or -- in this document at all. Deadlines in this document at all. That would be in a determination letter.

Q All right. And is the purpose of this compliance checklist as a policy of Mayflower Transit to ensure that the deadline set in any kind of termination letter is complied with?

A I don't know.

Q Well, what is the purpose for this policy if it's not to ensure that a termination of agency is done correctly?

MR. EHRENREICH: Object to form.

A It would be a guideline list of what to do during termination or for termination.

BY MR. LANGLEY:

Q Is this a policy of Mayflower, one of the safety policies that you have under -- I guess you said it was a different department number, success department. Would this be a policy and procedure of Mayflower?

MR. EHRENREICH: Object to form.

A I don't know.

BY MR. LANGLEY:

Q Is there any reason or basis that you could tell me on behalf of Mayflower that this is

not one of its policies or procedures?
A There are not.
Q Was there a move coordinator in addition to Tim Woody or Chris Wynn that would've been responsible for acting on behalf of Mayflower to terminate the agency agreement with Moholland in this case?
A Not that I know of.
Q What is IFTA?
A International Fuel Tax Agreement, I believe.
Q Okay. And what is the significance of that within your job and commercial vehicle operations?
A It's a registration to pay fuel tax in the states that you run miles in.
Q And did the IFTA stickers and documents have to be kept in a cab that's accessible for compliance with law enforcement by the agents and the drivers?
A Yes.
Q And when an agent or a driver like Joe Moholland gets set up with Mayflower, are they enrolled in a UniGroup portal?
A There is a driver portal for drivers.

Q And is there also a UniGroup portal for agents?

A I don't know that it would be a portal, but there is a platform.

Q And so the portal for UniGroup for the emails that have been produced in the case to us, that would have been for Nicholas Burist as a driver, not UniGroup or not Joe Moholland as an agent?

A I don't know which one you're referring to.

Q Okay. Let's pull up this 31438. That's 3.

MR. FOSS: 3.

MR. LANGLEY: I'll show you what we'll mark as Exhibit 3.

(Plaintiffs' Exhibit Number 3 was marked for identification.)

THE WITNESS: Okay. So now could you reask the question, please.

BY MR. LANGLEY:

Q Yes. Is this document for a user ID for an individual driver or for Joe Moholland as an agent? The information for the user ID and password is redacted.

A For Joe Moholland as a...
Q I'm sorry?
A For Joe Moholland.
Q Okay. And so as late as April 20th, 2022, UniGroup is sending on behalf of Mayflower Transit correspondence to Joe Moholland under the JMM333 agency agreement new log-ins for the portal and passwords.
A Yes.
Q And is this portal for UniGroup only available to agents of Mayflower Transit?
A No.
Q Is an agent -- does an agent have to be qualified as a member of UniGroup or one of its other members in order to have access to the portal?
A Yes. Until that date is expired.
Q All right. Can you point me to any documentation other than -- well, strike that.
Can you point me to any documentation similar to the one that we're looking at now that says that Joe Moholland was ever terminated as an agent in the UniGroup portal prior to July 1st, 2022?
MR. EHRENREICH: Object to the form.
A Nothing in this manner.

BY MR. LANGLEY:
Q Did UniGroup on behalf of Mayflower Transit certify Nicholas Burist as a driver that was safe to operate a commercial motor vehicle?
A Could you ask that again? I'm sorry.
Q Yes. Did UniGroup on behalf of Mayflower Transit certify Nicholas Burist as having properly completed a course of safety to be a driver of commercial motor vehicles?
A Yes.
Q And was that certification ever withdrawn prior to July 1st, 2022?
A I don't know.
Q Can you point me to any evidence that indicates that UniGroup or Mayflower Transit ever withdrew its certification or qualification of Nicholas Burist as a safe commercial motor vehicle driver prior to July 1st, 2022?
A I know of none.
MR. LANGLEY: All right. I'll show you what we'll mark as Exhibit 4. And this will be Mayflower 6104.
(Plaintiffs' Exhibit Number 4 was marked for identification.)

BY MR. LANGLEY:
Q Sorry, we'll start it at Mayflower 6068. Have you seen this document before, Mr. Kratzer, an email from Nikki Crum to Michael Peters under the JMM333 agency agreement?
A Yes.
Q And this is a March 11th, 2022, email communicating the unit numbers and the cab cards for the Joe Moholland transport drivers to keeping their vehicles for the compliance with law enforcement and the safety rules that are applicable. Is that right?
A Yes.
Q And so the -- was it four? Yeah. We'll mark this is Exhibit 4 along with the next page. But before we do that, does Nikki Crum work for you?
A No, sir.
Q Her title is listed in March of 2022 as a safety manager. Is that the title that you had before?
A Yes, sir.
Q But she's not under your division as the compliance and safety Director now?
A No, sir. She no longer works at UniGroup.

Q Okay. At the time of this correspondence in March of 2022, was Nikki Crum one of your employees that you were responsible for?
A No, sir.
Q Did she work in the safety department as indicated by this email?
A Yes, sir.
Q Who would she have been responsible to then? Who was her supervisor?
A Her manager is Adam Petry.
Q All right. And what are the job duties of the safety manager?
A I don't know.
Q Well, you had that job, didn't you, sir?
A I know what it was when I had it. I don't know what it is today.
Q Okay. And you had it in 2021? Was it pretty close to this time period?
A Pretty close to that time period, yes.
Q Okay. Can you tell me what the job duties of the safety manager were pretty close to this time period in March of 2022?
A My job duties as safety manager was to oversee parts of the safety department, parts being logs, roadside inspections, accident

investigation.

Q And as part of the job as safety manager, are -- is the safety manager responsible for ensuring that no entity is operating improperly under the authority of Mayflower Transit?

A Either the manager or someone that works for the manager, yes.

Q Okay. And we'll look at the second page of Exhibit 4. This is Mayflower 6104. Have you seen this document before?

A Yes, sir.

Q And is this the cab card for the Missouri Department of Transportation that was specific to Joe Moholland Moving JMM333 for the license plate that was on the truck driven by Nicholas Burist on July 1st, 2022?

A Yes.

Q And does this list Mayflower Transit LLC -- scroll down just a little -- as a responsible motor carrier for safety?

A Yes, sir.

Q And does this list -- I got it. That this was effective April 1st, 2022, and extended through March of 2023?

A Yes. Every plate is good for one year.

Q And was there ever -- or can you point me to any documentation that -- other than the termination letter that communicates that Joe Moholland Moving that it is not authorized to operate under this Missouri apportioned cab card on July 1st, 2022?
A I think I recall emails to that effect.
Q Okay. Can you tell me what date those emails were sent?
A No, sir. I looked at thousands of documents. I don't recall the date.
Q Can you tell me who sent those emails?
A I cannot.
Q Was there some discussion about the authority to use these plates where Moholland representatives indicated it was their belief that they were authorized to run under these plates until March of 2023 as indicated by this document?
A Could you ask that again? I've got my volume as high as it will go, it's still hard to hear.
Q All right. I'll try to speak up.
A Thank you.
Q The email correspondence you're talking about now, I'm trying to understand what it says and

why you testified a minute ago that you believe it indicates that Joe Moholland was not authorized to use this cab card on July 1st of 2023.

So can you tell me everything that you remember about those emails, who sent them and the dates on them?

A I don't recall a lot about the email. Only that it was a subject of returning plates.

Q Okay. Can you tell me any more specifics?

A No, sir.

Q Is there anything else that you can tell me that would have indicated from Mayflower to Joe Moholland that it did not have the authority to run under the plates and the Missouri cab card was with Mayflower as the motor carrier responsible for safety on July 1st, 2022?

A Agency agreement termination letter.

Q Anything else?

A No.

Q And can we agree that this license plate and this documentation was in the cab -- the license plate was on the truck and the trailer, and this cab card was in the cab of the vehicle that caused the collision with the Sloan plaintiffs in this case on July 1st, 2022?

MR. EHRENREICH: Object to form.

A I believe that's correct.

BY MR. LANGLEY:

Q And that this vehicle with the Missouri Department of Transportation that was involved in this collision on July 1st, 2022, on that day, remained registered to Mayflower Transit as a responsible motor carrier for safety?

A I believe so.

Q Can you point me to any documentation or communication to the Missouri Department of Transportation that states that Joe Moholland was not authorized to use the license plates or the authority of Mayflower on July 1st, 2022?

A I don't know.

Q So that's a no, you cannot point me to any correspondences as you sit here today?

A I cannot.

Q Can you point me to any correspondence that on behalf of -- or from Mayflower Transit to the FMCSA prior to July 1st, 2022, stating that Joe Moholland did not have the authority to operate with these license plates and the truck that was involved in the collision who struck the Sloan plaintiffs on July 1st, 2022?

A I do not believe that would be our practice.
Q So that's no, you can't point me to any such documentation?
A I cannot.
Q We looked before at the communication of March 11th with Nikki Crum sending to Joe Moholland the agency agreement JMM333, all these IFTA stickers and plates and the -- that were good for one year, I think you testified to. Is that right?
A Yes.
Q Did Mayflower Transit -- I know you've already testified about lack of any communication with FMCSA or the Missouri Department of Transportation.
Did Mayflower Transit ever communicate to any entity or give any indication to the general public that Joe Moholland Moving was not authorized to operate under its license plates and its truck and its agency agreement under JMM333?
A None that I know of.
MR. EHRENREICH: Can we take a break in about five minutes? Then the issue of those emails that we brought -- you

brought up early on, I'll take a deep dive into that.

MR. LANGLEY: I'm sorry?

MR. EHRENREICH: I asked if we could take a break in about five minutes. And the emails that you brought up, the FMCSA emails, I'm going to do a deeper dive into that.

Remember early on about 55 minutes ago, Mr. Kratzer said there was communication with the FMCSA regarding the agency and carrier issues?

MR. LANGLEY: Okay. Yeah. You're gonna look at those records?

MR. EHRENREICH: Yeah. I'm going to -- instead of -- so what I'll probably end up doing, assuming we find it, instead of your office spending the next six hours, or mine, going through the several hundred-thousand pages that have been produced over the last couple years, if we find it and I see it and there's no attorney-client or work product, I'm just going to give them to you and take a look.

MR. LANGLEY: All right.

MR. EHRENREICH: And if you feel that you need to bring him back or whether you can just review it today -- I don't know how long the emails are, I'd imagine they're pretty short -- you can ask him all the questions you want about it.

MR. LANGLEY: Okay. Yeah, that's fine. We can go ahead and take a break now if you'd like.

MR. EHRENREICH: Okay. I appreciate it. Thank you.

MR. LANGLEY: Yeah, thank you.

THE VIDEOGRAPHER: We are now off the record at 12:15 p.m.

(The deposition went off the record.)

THE VIDEOGRAPHER: We are back on the record at 12:43 p.m.

BY MR. LANGLEY:

Q All right, Mr. Kratzer, one of the things I didn't talk to you about at the beginning of the deposition is that if we take a break, it's not appropriate for you to talk to counsel about any of the substance of your testimony in the case.

I presume Mr. Ehrenreich informed you about that. But I just want to make

sure you didn't have any communication with any of the lawyers about the substance of your testimony during the break, correct?

A That is correct.

Q Okay. Did you have any communication with anybody else during the break?

A No, sir.

Q Are you at home where you are there? Your background is blurred. Or is that your office somewhere?

A It is an office at my dad's house.

Q An office at your dad's house?

A Yes, sir.

Q Okay. And is that in Missouri?

A Yes, sir.

Q What city?

A Sedalia.

Q Is that close to the Mayflower headquarters or UniGroup headquarters?

A It's a couple hundred miles away.

Q Do you work remotely or do you go into Mayflower UniGroup?

A I work remotely.

Q All right. When we went off the record before, we were talking about the use of the license

plates and any communication about the use of the plates by Moholland. And I want to show you some emails related to that.

So we'll start with Mayflower 5455. This is an email from Mike Peters on May 19, 2022. And it says Diane, it's sent to Diane Lopez. Who is Diane Lopez?

A She works for UniGroup.

Q And is she in the safety division?

A Yes. Safety department, yes.

Q And what's her title, or what was her title in May of 2022?

A I don't know.

Q Okay. So my computer sends this communication to Diane. Diane, it was agreed we could keep them and run under them until they expire in May 2023. We are not returning them until then.

And the subject line of that email is Missouri base plates.

Did I read it correctly?

A Yes, sir.

MR. EHRENREICH: Has this been marked as an exhibit?

MR. LANGLEY: Five.

(Plaintiffs' Exhibit Number 5 was marked for identification.)

MR. EHRENREICH: So is it -- and I'm sorry to interrupt. No substance on this, just procedural, is it just -- is the exhibit just one page?

MR. LANGLEY: Yeah, confidential Mayflower 5455.

MR. EHRENREICH: So I'm going to object to the exhibit as being incomplete.

MR. LANGLEY: Well, there's a long chain of emails. So I'm going to mark others that are in this chain of communication.

MR. EHRENREICH: Okay. Like I said, it was procedural, not substantive.

MR. LANGLEY: All right.

BY MR. LANGLEY:

Q And did Mayflower ever take any legal action between May 19th and July 1st, 2022, against Moholland to refute this statement made by Mike Peters, vice president of operations, part of the successor entity to Moholland Tailored Move to preclude Joe Moholland from operating and -- under the plates?

MR. EHRENREICH: Object to form.
A So you asked was there legal action taken during that time period?
BY MR. LANGLEY:
Q Correct.
A I don't know. I don't know what Diane's response to this was.
Q Well, it's just above there. It says, can you tell me who told you that? And then we'll get further into that discussion in just a moment.
But what I want to know is, did Mayflower take any legal action against Joe Moholland between May 19, 2022, and July 1st, 2022, the day of this wreck, to prevent Moholland from keeping those plates that were registered in the name of Mayflower as a responsible motor carrier for safety?
MR. EHRENREICH: Object to form.
A Again, not that I know of.
BY MR. LANGLEY:
Q Okay. Can you point me to any document that reflects any kind of legal action as we sit here today?
MR. EHRENREICH: Object to form.
A No, sir.

BY MR. LANGLEY:
Q And May of 2022 would have been after the date of the letter of termination that you'd been referencing before, right?
A Right.
Q That letter of termination was January of 2022?
A Correct.
MR. LANGLEY: Is that 5 or 6?
MR. FOSS: They're on 5 if you want to mark them separately, 6.
BY MR. LANGLEY:
Q Okay. And did Mayflower ever report those license plates as stolen?
A I don't believe we're allowed to.
BY MR. LANGLEY:
Q So that's a no?
A That is a no.
MR. EHRENREICH: Object to form.
BY MR. LANGLEY:
Q Did Mayflower ever tell the Missouri Department of Transportation or FMCSA that Joe Moholland was not authorized to operate under those plates through the date of the expiration in 2023?
MR. EHRENREICH: Object to form.

A Other than notifying FMCSA through the agency agreement, no.

BY MR. LANGLEY:

Q That notification was on July 5th, 2022?

A Correct. Referencing April 28, '22.

Q Okay. I'll ask my question again. Between May 19th, 2022, and July 1st, 2022, the date of this wreck, did Mayflower ever communicate to the FMCSA or the Missouri Department of Transportation and state that Joe Moholland was not authorized to run under the Mayflower license plates?

A Not that I know of.

Q So is that a no?

A Not that I know of.

Q Can you point me to any documentation or evidence to reflect that there was any such communication --

A No, sir.

Q -- to the Missouri Department of Transportation or the FMCSA?

A No, sir.

Q All right.

MR. LANGLEY: I've got the ones -- what's that Bates stamp on the ones with the June 30th, July 1st?

MR. EHRENREICH: Before we go on, are you done with the Exhibit 5 and any other parts of that string of emails all the way through, I think it's May 23rd or May 25th?

MR. LANGLEY: No, I'm not. We're going to go through the end of -- the communication actually goes to June 28th. So that's the -- where I was going to reference next.

This is going to be 6.

(Plaintiffs' Exhibit Number 6 was marked for identification.)

BY MR. LANGLEY:

Q All right. I'm going to show you what's been marked as Exhibit 6. And this is further correspondence on this issue specific to the plates for the truck that was under JMM333.

MR. EHRENREICH: And I'll ask again, is this -- it's just the one page that's going to be the Exhibit 6?

You guys are muted. Sorry.

MR. LANGLEY: Yeah. For this, and then there will be another exhibit that has additional correspondence on this same

thread.
MR. EHRENREICH: Okay. I'll object again. Just it's an incomplete thread, but go ahead.
BY MR. LANGLEY:
Q All right. So have you had an opportunity to read this email? And, again, from Michael Peters.
A Could you make it larger, please? There we go. Thank you. I couldn't see it.
Q Is that big enough, or you want it to be bigger?
A No, that's fine, thank you. That's fine. Okay.
Q All right. And so this is communication again from Mike Peters to Nicole Crum and Darniece Martin at UniGroup for an update on our progress related to the Missouri base plates, right?
A Yes.
Q And this is June 28th, 2022?
A Yes.
Q And the next line says, we were just told that it could take four to six weeks for our IRP/IFTA account to be valid. We cannot register the following units until that account is

operational.

And one of the units is 251-333. And based on Exhibit 4, that is the unit that was involved in this collision, correct?

A Correct.

Q And the request is, do you think we could get an extension on just these units for just this reason? All the other units should be done.

Is that what it says?

A Yes.

Q Okay. And then on the next page, the response to that email, looks like it came from Adam Petry now. That first email was sent June 28th at 9:35 a.m. And there is another email titled Missouri base plates.

MR. LANGLEY: And we'll mark this is Exhibit 7. This is Mayflower 46260.

(Plaintiffs' Exhibit Number 7 was marked for identification.)

BY MR. LANGLEY:

Q And this is Adam Petry, senior manager of safety, which I think you said before was Tony's and Nikki's boss at the time. Is that right?

A That's correct.

Q And I'm going to read Mr. Petry's email

into the record to make sure that -- you make sure I read it correctly, okay?

A Okay.

Q Mike Peters, good afternoon, Rob. From Adam Petry to Rob Garr, copied to Tracy Evans regarding Missouri base plates. Mike Peters from your office reached out to us this morning asking for an extension to return the base plates for 12 units.

After checking with legal, I'm sorry to inform we cannot grant another extension past this Friday, July 1st. We will need confirmation that these will be sent back on or before Friday; otherwise, legal will need to be involved.

Did I read it correctly?

A Yes, sir.

Q Was there any legal action ever taken against Joe Moholland by Mayflower or UniGroup when the license plates were not returned on or before July 1st?

MR. EHRENREICH: Object to form.

A I don't know.

BY MR. LANGLEY:

Q As you sit here today, can you point me to

any documentation showing any legal action taken against Mayflower to prevent the use of the plates on July 1st by Joe Moholland Inc.?

A Could you state that again.

Q As you sit here today on behalf of Mayflower Transit, can you point me to any documentation that would reflect action taken against Joe Moholland to prevent use of the plates in this email on July 1st, 2022?

A No.

Q Did you ever participate in an inspection of the truck that was that JMM333-251, the truck that was involved in this collision?

A No, sir.

Q Do you know if any Mayflower Transit employees or UniGroup employees participated in an inspection of the truck after the collision on July 1st?

A No.

Q Was there ever a meeting of the directors to discuss this case?

A No.

Q Did you ever participate in a meeting about this case after the collision on July 1st, 2022?

A No.

Q Was the truck involved in this collision ever reported stolen by Mayflower?

A No.

Q And I think you told me before, the license plates and the IFTA stickers were never reported as stolen either, correct?

A Correct.

Q All right. Let's see here.

(Plaintiffs' Exhibit Number 8 was marked for identification.)

BY MR. LANGLEY:

Q All right. I'll show you what we've marked as Exhibit 8. And this is Mayflower 34589. Have you seen this document before?

MS. GRAFF: Ryan, I'm going to interrupt you. This should be Exhibit 7.

MR. LANGLEY: Okay. Exhibit 7.

MS. GRAFF: Thank you.

Okay. We had 7 as Mayflower 46260. And 6 as Mayflower 6246.

BY MR. LANGLEY:

Q Back to that Exhibit 7 for a moment. I just want a clear record.

So on this, the email that we

read before, Mr. Kratzer, about the communication from Adam Petry to Rob Garr, did Mayflower ever recover those plates --
A I don't know.
Q -- for JMM333-251?
A I don't know.
Q Do you have any documentation that the plates were ever recovered?
A No.
Q And is there any other correspondence after June 28th, 2022, saying that the -- in this email that we're looking at here, modifying this extension date through Friday July 1st, 2022?
A No, sir.
Q All right. So we'll make this now Exhibit 8 on the June 17th matter of the roadside inspection report for Nicholas Burist, right? Is that what this email correspondence concerns?
A Yes.
Q And was this what you sent the FMCSA a copy of the agency agreement to address, or was it another issue?
A I don't know what this is in reference to, the report. Could you magnify it, please? Thank you. Sorry.

Yes. It was in relation to this.

Q All right. I'm not sure what you're answering yes to.

A What was your question again?

Q Okay. Thank you.

A Yes.

Q The July 1st correspondence that you sent to the FMCSA with the agency agreement between Mayflower and Joe Moholland, was it related -- that correspondence to the FMCSA related to this issue of the June 17th roadside inspection involving Nicholas Burist or some other issue?

A It looks like another issue. The date is of a different inspection date.

Q Okay. What did -- this email correspondence talks about an inspection date of June 17th, 2022. Do you see that in the middle of the page?

A Yes, sir. Yes, sir.

Q Okay. And the driver is listed as Nicholas Burist, right?

A Yes.

Q And it's -- next to him, it says M22132 canceled, right?

A Yes.
Q And it -- the --
(Brief interruption.)
MR. LANGLEY: I'm sorry?
MR. EHRENREICH: Hey, Charlie, you need to mute your phone. Go ahead, Ryan, start over.
BY MR. LANGLEY:
Q Yeah. The correspondence we're looking at here, Mr. Kratzer, is about a Nicholas Burist date of inspection June 17th, 2022, right?
A Yes, sir.
Q And the subject is roadside inspection documentation is needed. Is that right?
A Yes.
Q Mayflower is communicating with Lisa Buchanan on behalf of UniGroup safety. And I guess in this context, that would be for Mayflower, right?
A Right.
Q About this inspection report on June 17th. And on June 20th, she's asking Joe Moholland, and again Mike Peters, under the JMM333 agreement for documentation about this incident. Is that right?
A Yes.

Q And it says, the following roadside inspection hit the FMCSA portal this morning, and I show this driver has been canceled since 4-29-22 and the equipment is not qualified. Can you please let me know if this should be under Joe Moholland Moving. Thank you.
Did I read it correctly?
A Yes, sir.
Q Is part of Mayflower's agreement with its agents the undertaking of the responsibility to require proper documentation and communication with the FMCSA?
A Yes.
Q And is this an indication that the agency agreement between Mayflower and Joe Moholland for JMM333 continued at least as of June 20th, 2022?
MR. EHRENREICH: Object to form.
A Ask that again, please.
BY MR. LANGLEY:
Q Does this email show that Mayflower's undertaking part of what it does for its agents in compliance with the FMCSA and communication of documentation for roadside inspections or the agency agreement of JMM333?
A No.

Q I'm sorry, I couldn't understand your answer.
A No.
Q So why is Mayflower undertaking to communicate with the FMCSA on behalf of Joe Moholland?
MR. EHRENREICH: Object to form.
A Because the inspection showed up on Mayflower's FMCSA portal as an inspection of one of our drivers under our authority, and we knew that couldn't be correct, because both the driver and the equipment was canceled. So we used this information to DataQ to the state and show that it was not under our authority in any way.
BY MR. LANGLEY:
Q Okay. And was your correspondence on July 5th to the FMCSA about this incident or another communication?
A Another communication.
Q And what was that other communication?
A It was in relation to the accident on July 1st.
Q Okay. In what way?
A I don't recall the specific conversation with Hope Maddox at FMCSA. Her title, I'm not

sure. When I left there, she was state program manager. But I understand her title has changed.

So I would've had a conversation -- I don't remember specifics, but I would've had a conversation with her, because I returned a phone call that came into the accident hotline and it would've been given to me.

I would've called Hope and had a conversation to see what she wanted, because there was nothing in the voicemail about what she needed.

Q So you knew you could communicate to the FMCSA about any matters related to agency agreements or authorization or qualification of drivers before July 1st, right?

MR. EHRENREICH: Object to form.

A I have no -- I had no need to communicate with FMCSA prior to July 5th.

BY MR. LANGLEY:

Q Well, that's not my question, sir. My question is, were you aware that you had the ability to communicate to the FMCSA on matters involving agency and driver authorization prior to July 1st, 2022?

MR. EHRENREICH: Object to form.

A No, I would have no reason to.

BY MR. LANGLEY:
Q Again, that's not my question whether you had a reason to communicate with them or not. My question is, did you know that you could communicate to the FMCSA to tell them the same thing you apparently told them on July 5, 2022, after this wreck, we're not associated with this driver anymore, even though our name is on the truck and our license plates are on the truck, and all of the other information we've been talking about today?
MR. EHRENREICH: Object to form.
A I believe I could -- I could call them to tell them I know they have no database to which to collect that data or keep it.
BY MR. LANGLEY:
Q All right. And did any employee of UniGroup or Mayflower ever communicate that to the FMCSA prior to July 1st and after June 20th, 2022, hey, Nicholas is out here driving one of our trucks and he's not supposed to be?
MR. EHRENREICH: Object to form.
A No.
BY MR. LANGLEY:
Q All right. And so look -- well, first of all, is there any correspondence that you're aware

of after June 20th and before July 6th on this issue of the June 17th inspection?

A None that I know of.

Q Can you tell me anything that Mayflower or UniGroup did to anybody or communicated to anybody, the Missouri Department of Transportation, the FMCSA, any other governmental entity at all between June 20th and July 1st, 2022, to say Nicholas Burist should not be driving a truck that has Mayflower license plates, Mayflower DOT numbers, and Mayflower decals?

MR. EHRENREICH: Object to form.

A No.

BY MR. LANGLEY:

Q And then on July 6th, we see this email from Carol Hanke again, the same chain. Good afternoon, we still haven't received the required documents on the roadside inspection report. Please provide a copy of the inspection report along with all repair documents within two business days.

Did I read it correctly?

A Yes, sir.

Q And then she says, if not received in a timely manner, we will have no choice but to unqualify the equipment until these documents are

received.
Did I read it correctly?
A Yes, sir.
Q And when she's talking about the equipment, she's talking about the vehicle and truck that is at issue in this case, the JMM333-251, correct?
A Yes. That was already disqualified by the state.
Q Well, that's not what she says, is it, sir?
A She doesn't say it's qualified.
Q Well, she says, I will have no choice but to unqualify it. Isn't the inference there it's qualified?
A No. That appears to me to be a copy-and-paste thing that is exactly the same as in Lisa Buchanan's as the ending sentence, that if it's not received. I think that's just a form email that they sent.
Q Well, okay. Does the language say, if not received in a timely manner, we will have no choice but to unqualify the equipment?
A It does.
Q All right. And they are -- the equipment

that we're talking about is the truck that was at -- involved in this collision, JMM333-251?
A Yes.
Q Did Mayflower continue to send --
MR. LANGLEY: And that's all of them for the exhibit.
BY MR. LANGLEY:
Q Did Mayflower continue to send invoices to Joe Moholland on and after July 1st, 2022, titled agency agreement invoices?
A Yes.
Q And did those invoices include charges for Nicholas Burist rentals of trailers?
MR. EHRENREICH: Object to form.
A I don't recall.
BY MR. LANGLEY:
Q All right. I'll show you one that I'm talking about.
MR. LANGLEY: I'll mark this as Exhibit 9.
(Plaintiffs' Exhibit Number 9 was marked for identification.)
MR. LANGLEY: Make it a little bigger.
So this is Mayflower 78 and 79,

right? Yeah. We'll mark these two documents as Exhibit 9. If you go up to the top.

BY MR. LANGLEY:

Q Earlier I asked you about agency statements between Mayflower Transit and Joe Moholland Moving on the M333. Do you recall saying yes a moment ago about those agency statements, Mr. Kratzer?

A Yes, sir.

Q And then I asked you a follow-up question about was there any payments being made on behalf of Nicholas Burist rentals of trailers under those same agency agreements, and I think you said, I don't know.

And so I'm showing you this document now that's Exhibit 9, a two-page document from July 6, 2022, showing a payment on July 1st, 2022, for Nicholas Burist and Mike Peters. Do you see that?

A Yes.

Q And so does that indicate that there was at least some business relationship going on between Mr. Burist, Joe Moholland, and Mayflower Transit on July 1st, 2022?

MR. EHRENREICH: Object to form.

A It looks like the business would be past due billings.

BY MR. LANGLEY:

Q Okay. So there -- can we agree there is some business relationship going on between Nicholas Burist, Joe Moholland, and Mayflower Transit under this agency statement of July 6th, 2022?

A Yes, sir, I believe the termination letter extends this at least six months.

Q Okay. Do you know what the van separation agreement is?

MR. EHRENREICH: Say it again. A what separation agreement?

BY MR. LANGLEY:

Q Van, V-A-N.

A No.

Q Have you ever heard that phrase for a Mayflower van operating agreement or van separation agreement?

A That doesn't sound familiar.

Q Mr. Burist testified, I believe, that he entered into a van operating agreement or something like that in around 2015. Have you had an opportunity to read his testimony in your preparation for the deposition today?

A No, sir.
Q Okay. I believe that's what the record states, is that he entered into a van operator agreement with Mayflower in around 2015. Do you have any basis to refute that?
A No.
Q And is there any documentation Mayflower has that Nicholas Burist was ever terminated in writing from that van operation agreement?
MR. EHRENREICH: Object to form.
A I don't know what van operation agreement you're referring to.
BY MR. LANGLEY:
Q The one that I just asked you about.
A That, I have no knowledge of.
Q Okay. Do you have any -- any basis to -- or any evidence to show that there was any written termination of Nicholas Burist operating agreement with Mayflower?
MR. EHRENREICH: Object to form.
A I don't know of an operating agreement nor a cancellation.
BY MR. LANGLEY:
Q Okay. Is there any documentation in any way that Nicholas Burist signed acknowledging that

he had -- as you've testified, Mayflower, he accepted or acknowledged the termination Mayflower is alleging in this case?
A None that I know of.
Q And when we talk about the agency agreement, earlier I asked you, is one of the bases for the role that Mayflower plays in these cases the use of the UniGroup system. Do you remember that?
A Yes, sir.
Q And that's part of one of the suite of services that Mayflower offers to agents when they come under the umbrella and become an agent of Mayflower/UniGroup. Is that right?
A Correct.
Q And I want to go through some others that are my understanding or part of that agency agreement and part of the services that Mayflower would offer to its agents. And I'm going to go through a list of them and ask you about those and get your perspective from Mayflower's standpoint.
There are these elements of an agency agreement between Mayflower and the operators that it uses, okay?
A What do you mean by operators?
Q Well, like Joe Moholland Moving. When I

think of the structure in this case, it's Mayflower offers services to the actual entities, companies and contractors, that are doing work and moving the loads, right?

A No. We just have an agency agreement with the motor carrier themselves, the agent we call them, to operate under Mayflower authority until that agreement is canceled.

Q And so the operation under the Mayflower authority, part of that means access to the UniGroup system?

A Yes.

Q Okay. And so these are the other factors that I understand are listed or the other opportunities that are given to agents who operate under the Mayflower authority. And I just want to make sure that I understand them correctly.

So the first one we talked about, use of the UniGroup system, that's something that is a -- agents have access to and they operate under the Mayflower authority, right?

A They have limited access.

Q Okay. And qualification of equipment. Is that another element that shows that an agent is authorized to operate under Mayflower's authority?

A It is a piece of evidence that the vehicle is qualified to operate under United -- or van line authority -- Mayflower authority.

Q Okay. Would qualification of drivers be a piece of evidence that an agent is authorized to operate under Mayflower's authority?

A That would be evidence that that driver was allowed and authorized to operate under that authority.

Q Okay. Would maintaining the files of drivers be evidence that an agent was authorized to operate under Mayflower's authority?

A It would indicate that a driver would be qualified to operate under Mayflower authority.

Q Okay. Would a driver or any other workers assisting the driver wearing Mayflower's uniforms be evidence that the agent or driver was operating under Mayflower's authority?

A No, sir.

Q Why not?

A I've seen Mayflower T-shirts for sale at garage sales.

Q Does Mayflower and as part of its offering to agents give access to the purchase of discounted shirts for its agents?

A I don't know that Mayflower does that at all.

Q All right. I'll show you a document that I've got.

MR. LANGLEY: I'll show you what we'll mark as Exhibit 10.

(Plaintiffs' Exhibit Number 10 was marked for identification.)

BY MR. LANGLEY:

Q And this is a communication from UniGroup to Joe Moholland and other agents of Mayflower on May 25th, 2022. Is that right?

A That's for employees.

MR. EHRENREICH: Can I see who that's from, please?

MR. LANGLEY: Okay. Yeah.

Can you make it a little bigger for him?

A I believe Colleen Mennemeyer is an employee of Trans Advantage.

BY MR. LANGLEY:

Q Okay. And is access to the Trans Advantage system a piece of evidence that an agent is authorized to operate under the Mayflower authority?

MR. EHRENREICH: Object to form.
A I don't know the link to Trans Advantage's system.
BY MR. LANGLEY:
Q Is that a yes or a no?
MR. EHRENREICH: Object to form.
A I don't know.
BY MR. LANGLEY:
Q Do any other companies have access to use of the Trans Advantage system other than Mayflower agents?
A Mayflower wouldn't know that. That would be Trans Advantage's questions.
Q Are you aware of Trans Advantage doing any business with any other entities other than Mayflower agents?
MR. EHRENREICH: So that's the last question about Trans Advantage. I'll let him answer this if he's aware, but we're going to move on.
A I'm not aware.
MR. LANGLEY: It's not about Trans Advantage. It's about Mayflower's interaction with Trans Advantage and to the extent that that is evidence of an

agency agreement. So I'm going to ask the questions. I think that's --

MR. EHRENREICH: I'm going to -- I'm going to object. And I'll have you rephrase it. Because the way you phrased the last question is a Trans Advantage question. So you can rephrase it and see if it fits into this deposition.

BY MR. LANGLEY:

Q Does Mayflower Transit have any information that anyone other than Mayflower agents is authorized to work with Trans Advantage?

A We do not.

Q And is it an indication of the agency agreement and operation under Mayflower's authority that Trans Advantage is working with an agent?

MR. EHRENREICH: Object to form.

A Mayflower would have no idea.

BY MR. LANGLEY:

Q Well, it's the same type of questions I was asking you before. Is work with Trans Advantage an element or evidence of an agent's authority to operate under Mayflower's authority?

MR. EHRENREICH: Object to form.

A I don't believe so.

BY MR. LANGLEY:
Q Okay. Is Trans Advantage a part of UniGroup?
A I believe they're a wholly-owned subsidiary.
Q Do you know or does Mayflower know of any entity that works with Trans Advantage other than Mayflower agents or UniGroup agents?
MR. EHRENREICH: Object to form.
A Yes.
BY MR. LANGLEY:
Q Okay. Which companies work with Trans Advantage that are not Mayflower agents?
MR. EHRENREICH: All right. So give me one second, Mike. Let me think about the question, okay?
All right. So I'm going to let this question go, but that's it.
Go ahead.
A Mayflower has knowledge that Trans Advantage leases and sells equipment to anyone either related or not to Mayflower.
BY MR. LANGLEY:
Q Okay. And when you say equipment, does -- did Trans Advantage lease or sell any equipment to

Joe Moholland or Nicholas Burist that was involved in this collision?
A I don't know.
MR. EHRENREICH: Object to form.
BY MR. LANGLEY:
Q So the email that I'm asking you about here on Exhibit 10 is from Trans Advantage and it goes May 25th, 2022. And the question I asked you before when we started this is, does this list all of the Mayflower agents as recipients to the email?
A I have no --
MR. EHRENREICH: Object to form.
A No idea.
BY MR. LANGLEY:
Q And does this correspondence offer for sale the Mayflower agency moving and storage T-shirts?
MR. LANGLEY: Go over to 5962.
MR. EHRENREICH: So it's a Trans Advantage document. We talked about this yesterday. You're asking him about a Trans Advantage document. So I think you're going way too far with this, Ryan. Way too far.
MR. LANGLEY: Well, it's one of the

documents that we indicated would be a part of the exhibits today.

MR. EHRENREICH: Okay. And I told you guys yesterday that there were documents that you included that there's no way my corporate representative for Mayflower would be able to testify. And I specifically used the word Trans Advantage in discussing that.

So this is the document to which I was referring. And I've let you go pretty far afield about your Trans Advantage questions. And you're going to ask him specific questions about this document which he's identified as a Trans Advantage document, and he is not going there.

BY MR. LANGLEY:

Q Does Trans Advantage have the authority from Mayflower to offer the sales of Mayflower T-shirts?

A I have no idea.

Q Do you have any document that you can point me to to show that Trans Advantage was somehow unauthorized to offer for sale to Joe Moholland,

Mayflower T-shirts?
MR. EHRENREICH: Object to form.
A None to Trans Advantage or any other company in the world.
BY MR. LANGLEY:
Q Okay. So Mayflower took no steps to prevent Trans Advantage from offering to Mayflower agents T-shirts that stated your agency name, Moving and Storage, and Mayflower on the shirt?
MR. EHRENREICH: Object to form.
A No.
BY MR. LANGLEY:
Q And Mayflower was aware that Trans Advantage was doing that in May of 2022?
MR. EHRENREICH: Object to form.
A Yes.
BY MR. LANGLEY:
Q And Mayflower was aware that Trans Advantage was offering Joe Moholland the opportunity to purchase T-shirts that say your agency name, Moving and Storage, with the Mayflower truck on there in May of 2022?
MR. EHRENREICH: Object to form.
A I can't determine from Trans Advantage marketing whether or not that's a -- that

Mayflower has offered, or that's just a picture of something that somebody might want to do.
BY MR. LANGLEY:
Q Okay. Well, the next page says, custom uniform shirt order form Mayflower, right? And it has Wendy Franklin as a contact person for Mayflower at the bottom. Is that right?
A Wfranklin@geiger. It's not a Mayflower person.
Q Okay. What is Geiger? Is that the T-shirt company?
A I have no idea.
Q Are you aware of whether Mr. Burist or any of the other occupants of the Mayflower truck were wearing these types of Mayflower shirts on July 1st, 2022?
MR. EHRENREICH: Object to form.
A I don't know.
BY MR. LANGLEY:
Q Did Mayflower ever tell Nicholas Burist at any time and that you can point me to in the document that he was not to wear a Mayflower shirt or uniform prior to July 1st, 2022?
MR. EHRENREICH: Object to form.
A No.

BY MR. LANGLEY:

Q Okay. There's a few more factors I want to go over with you about the indicators of an agency agreement or the authority to operate under Mayflower's DOT number.

Would continuing to book loads through Mayflower's system for transport be an indication of an agent's authorization to operate under Mayflower's authority?

A I missed the first part about something about a load. Do what with a load?

Q Okay. Yeah. Continuing to book loads in the Mayflower system or by email communication, would that be an indication of an agent's authorization to operate under Mayflower's authority?

MR. EHRENREICH: Object to form.

A Maybe.

BY MR. LANGLEY:

Q Under what circumstances would it not be?

A They could not operate under Mayflower's authority at all after April 28th.

Q Well, if there are documents from UniGroup, Mayflower requesting Joe Moholland to undertake a load transport after April 28th, 2022,

would that be an indication of authorization to operate under Mayflower's authority?

MR. EHRENREICH: Object to form.

A No.

BY MR. LANGLEY:

Q So when those loads were booked, under whose authority were they booked?

A I don't know what loads you're speaking of.

Q All right.

MR. LANGLEY: We need to make it a little bigger if you can.

BY MR. LANGLEY:

Q Are you able to read that, Mr. Kratzer?

A Yes, sir.

MR. LANGLEY: We'll mark this is Exhibit 11. It is 5020, the Bates stamp.

(Plaintiffs' Exhibit Number 11 was marked for identification.)

BY MR. LANGLEY:

Q And my question to you earlier was about requests for carrying of loads or booking of loads. Would that be an indication of an agent's authorization to operate under Mayflower's authority. And I think what you said is there was

none after April 28th, 2022. Did I understand your testimony correctly?

A All right. What I testified to was there was no loads hauled under Mayflower authority after April 28, 2022.

BY MR. LANGLEY:

Q Well, this one seems to indicate that there is a request for JMM333 from the UniGroup Government Operations Division to carry a load on June 15th, 2022.

A Yes.

Q And so was this under Mayflower's authorization?

A No. Mayflower's conclusion is this was a temporary employee for summer help who offered this not knowing they had been canceled in error.

Q And so there's a number of these that we can go through. And it sounds like you've read them pretty carefully and done some investigation to identify a temporary worker there. Were any of the loads that we see after April 28th, 2022, into June, July, and later periods in 2022, actually fulfilled?

A No, sir. And I think this is the only one asking for an actual haul. I think the rest of them that I reviewed, all were asking for labor

or maybe a trailer for someone else to use. But not asking them to haul anything other than this one in error.

Q I'm sorry. I cut you off. Were you finished with the answer?

A Yes.

Q Can we agree that this does show that Mayflower's business relationship with Joe Moholland continued after April 28th, 2022?

MR. EHRENREICH: Object to form.

A Yes.

BY MR. LANGLEY:

Q All right. In the agency agreement, one of the references is to -- is phrased, to solicit and participate in business as one of the suite of services that Mayflower offers to its agents. What does that mean?

A Could you ask it again?

Q Yeah. I think it's in Page 2, Paragraph 2B of the agency agreement. And I can pull it up for you if you'd like.

A That's okay. If you just -- can we just read it.

Q Okay. It says that one of the offerings from Mayflower to its agents is to solicitate and --

or to solicit and participate in business. What does that mean?
A I believe that would mean participate and solicitate -- solicitate business under Mayflower branding.
Q Okay. And so would that be an indication of an agent's authorization to operate under Mayflower's authority?
A Only if it's within the dates of the agency agreement.
Q All right. And if it's for the participation in business, would that be true as well?
A No.
Q Why not?
A We can -- as you can see by the termination letter, we still conduct business after the agency agreement has expired to finish out business with them.
Q Do you continue to conduct business with Joe Moholland or its successor company, Tailored Move, today?
MR. EHRENREICH: Object to form.
A I probably -- it's possible that we would still somehow conduct business, but none of

it would be hauling under Mayflower authority.

BY MR. LANGLEY:

Q So January 7th or 8th here, 2025, Mayflower still conducts some business with Joe Moholland or its successor company, Tailored Move?

A I don't know. I don't know.

Q Okay. There are documents that reflect as late as November of 2024 Mayflower's continued business involvement with Joe Moholland. Do you have any basis to refute that or reject that?

MR. EHRENREICH: Object to form.

A I don't know what document you're referring to, but I do not.

BY MR. LANGLEY:

Q Well, I'm saying is there any basis for you as the corporate representative for Mayflower today to say, no, Mayflower was not conducting business with Joe Moholland or Tailored Move as late at November of 2024?

MR. EHRENREICH: Object to form.

A No, sir.

BY MR. LANGLEY:

Q Okay. If an agent is promoting the brand of the carrier, is that an indication of authorization to operate under the Mayflower

authority?
A No.
Q If an agent is representing the carrier in an active and aggressive manner, is that an indication of authorization to operate under Mayflower's authority?
A No.
Q And if an agent is assisting in dispatching vehicles, is that an indication of an agent's authorization to operate under Mayflower's authority?
A I guess that depends on which vehicles they're dispatching.
Q Okay. Tell me what you mean by that.
A I don't know what vehicles they're dispatching. I mean, the fact that -- I mean, every motor carrier dispatches vehicles, not many under Mayflower authority.
Q Well, I'm just reading from the -- the agency agreement again. That's one of the -- part of the services that Mayflower offers to its agents is the reason I asked the question.
A It's a list of what -- it's a list of what the agents are allowed to do under the agency agreement within those dates, yes.

Q All right. And that would be for any loads that are covered by the agency agreement?
A Yes.
Q And for the full time period of the agency agreement?
A Those under Mayflower authority, yes.
Q Okay. And that agency agreement covers all loads that Mayflower gives authority for the agents to act on Mayflower's DOT number and with Mayflower as the responsible motor carrier for safety, and that's the purpose of the agency agreement. Can we agree on that?
MR. EHRENREICH: Object to form.
A Yes.
BY MR. LANGLEY:
Q Okay. And then on the carrier side, the agreement references that Mayflower furnishes to the agent necessary forms for booking and processing of shipments. Would that be an indication for an agent's authorization to operate under Mayflower's authority?
A No. That would be something allowed for the agency to do under their agency agreement.
Q So under the agency agreement in Paragraph 4, it says, the duties of the carrier

shall read, 4C, to furnish the agent at the agent's cost necessary forms for the booking and processing of shipments to be handled by the carrier.

I'll pull it up if you'd like to see it.

MR. LANGLEY: Why don't you just do that.

(Plaintiffs' Exhibit Number 12 was marked for identification.)

BY MR. LANGLEY:

Q Do you see there in 4C where I was reading from on the document there, the duties of the carrier shall be?

A Yes.

Q And I think you said something different, that that was the agent's responsibility. Does this help -- would you like to change your answer based on review of this?

A Not the way you asked it, no.

Q Okay. What was it about the way I asked it that you found disagreeable?

A I disagree that the fact that -- that this would allow anyone to do these things. The way you -- if you could lead with the leading question that you've used on these.

It's confusing to me, because it seems to me that there's a big difference in the way that you're asking the beginning of the question and what the truth is.

Q Okay.

A So ask the question again, and I'll be able to point it out specifically, if you would, please.

Q All right. Is one of the indicators of an agent's authorization to operate under Mayflower's authority the carrier furnishing to the agent forms for booking and processing of shipments?

A I don't believe any of these are indicators of any of that. This is an agency agreement that allows those listed in the agency agreement these specific things during the period in which they see the agreement is. It's not an indicator. So I have difficulty with the word indicator.

Q Okay. So let me see if I can try to understand your answer.

A Thank you.

Q Because the way I read it, the duties of the carrier under the agency agreement, if we see carrier taking those actions, that would be an

indication of the existence of an agency agreement. You disagree with that?

MR. EHRENREICH: Object to form.

A I would say that under this agreement, if Mayflower did furnish the agent and agents cost necessary forms and booking for processing of shipments under this one for Moholland, yes.

BY MR. LANGLEY:

Q And that would be -- when you say yes, that would be an indication of existence of an agency agreement?

A Well, again, no. That would mean that anybody that we would issue a form to or that would get one of our forms would have some sort of agency agreement, and that wouldn't necessarily be true.

Q Okay. Well, I'm just trying to understand what you meant when you said yes a minute ago, of what question you're answering yes to. Can you help me understand that?

A Yeah. The yes was to this specific form with this agency agreement to Moholland. It isn't an indicator that there is an agreement, no. But would we furnish forms and those sort of things listed in there, yes, under this agreement, we

would.

Q Okay. All right. So for the relationship -- the agency relationship between Mayflower and Joe Moholland, there were forms furnished to Moholland for booking and processing of shipments?

A Yes, sir.

Q And then for the carrier under 4E there, to provide transportation services for shipments booked by the agent and accepted by the carrier and suitable equipment and as promptly as operating conditions will warrant.

What are transportation services as defined there?

A Transportation services as defined there probably is packing, loading, delivering.

Q And can we agree that on or after July 1st, 2022, Joe Moholland used the Mayflower IFTA sticker, used the Mayflower Missouri Department of Transportation IRP apportioned plates, used the Trans Advantage program, used the Mayflower decals and Department of Transportation number on his truck, and continued to operate the Mayflower truck that -- or the license plates that we've been talking about today?

A Yes.

MR. EHRENREICH: Object to form.

Let me know when it's convenient for a break. I'll grab a quick bite to eat, then I can follow up on those email issues, okay?

MR. LANGLEY: Okay. That sounds good. We'll do that now.

MR. EHRENREICH: Okay. About 35 -- is 35 minutes okay?

MR. LANGLEY: That will be fine.

MR. EHRENREICH: Okay.

THE VIDEOGRAPHER: We are off the record at 1:51 p.m.

(The deposition went off the record.)

THE VIDEOGRAPHER: We are back on the record at 2:38 p.m.

MR. LANGLEY: Thank you.

BY MR. LANGLEY:

Q Mr. Kratzer, earlier you mentioned that the -- Nikki Crum or Nicole Crum is no longer employed with Mayflower and UniGroup. When was her employment terminated and why?

A It was a voluntary separation. She left to go somewhere else. And it has been, oh,

probably six months ago.
Q Did it have anything to do with this wreck?
A No, sir.
Q Have any Mayflower or UniGroup employees been disciplined in any way as a result of this wreck?
A No.
Q Has there been any investigation internally between Mayflower and UniGroup or among Mayflower and UniGroup about termination of agency agreements or how to do it differently as a result of this wreck?
A Not that I know of.
Q Is there anything Mayflower would have done differently with the termination of Joe Moholland as an agent based on information that Mayflower has now?
MR. EHRENREICH: Object to form.
A No.
BY MR. LANGLEY:
Q We talked about the continued business relationship between Mayflower and Joe Moholland after April 28th. And I want to show you what we'll mark as Exhibit 13. And this will be

Mayflower 5044.

(Plaintiffs' Exhibit Number 13 was marked for identification.)

BY MR. LANGLEY:

Q And this is a document that is an email communication requesting a load shipment on July 1st from UniGroup to Joe Moholland. Do you see that document?

A Yes, sir.

Q And I'm going to read the email. It says, we are in search of a new DA for this shipment. ETA is this Friday, July 1st, 2022 -- which would've been the date of this wreck -- please advise if you can accept this shipment for SIT.

Do you see that?

A Yes, sir.

Q What does SIT stand for?

A Storage in transit.

Q Okay. And so was this storage in transit accepted by Moholland?

A I don't know. This is a request for them to accept it into their warehouse for storage.

Q And you don't know whether or not this actually took place?

A I do not.
Q But can we agree that that this Exhibit 13 is further documentation of the continued business relationship between Joe Moholland and Mayflower Transit on July 1st, 2022?
A I think this is June 28th of '22.
Q But the date requested for the ETA is -- I assume that means estimated time of arrival at the shipping storage location is July 1st, right?
A That's what that indicates.
Q Okay. So my question is, can we agree that this is evidence of a continued business relationship between Mayflower Transit and Joe Moholland on July 1st, 2022?
MR. EHRENREICH: Object to form.
A No. No.
BY MR. LANGLEY:
Q It's asking about the work to be done on July 1st, 2022, right?
A It is an email from June 28th. That's the communication. That's the business deal where they're asking can they take into storage in their warehouse a shipment on July 1st. There's no evidence here that says anybody responded or it happened on July 1st or after.

Q Okay. Can we agree that this email discusses the potential for business between Joe Moholland and Mayflower Transit on July 1st, 2022?
MR. EHRENREICH: Object to form.
A Yes.
BY MR. LANGLEY:
Q All right. Nicholas Burist, we talked before about his qualification by Mayflower in the 2015 time period. Do you recall that?
A Yes, sir.
Q And did he drive under that qualification in the 2022 period up to April 28th, 2022, with Mayflower's explicit authority?
MR. EHRENREICH: Object to the form.
A He would've been authorized to do so. I'm not certain which days he operated.
BY MR. LANGLEY:
Q Okay. So we can agree Nicholas Burist was authorized to drive under Mayflower's authority at least between January 1st, 2022, and April 28th, 2022?
A Yes.
Q And why was Mr. Burist's operator agreement canceled?
A The agency agreement was canceled.

Q Okay. And was there ever any independent communication of Mr. Burist canceling his operating agreement or was -- is it just that the agency agreement with Joe Moholland that you're relying on to say that the agreement with Mr. Burist was canceled?

A I don't know of any driver agreement with Mr. Burist to cancel.

Q Okay. I'm going to show you what we'll mark as Exhibit 14.

(Plaintiffs' Exhibit Number 14 was marked for identification.)

BY MR. LANGLEY:

Q And this is a van operator separation notification. This is -- do you remember earlier I asked you about a van operator agreement?

A Yes.

Q And so we'll mark this one as Exhibit 14. And this appears to me to be a van operator separation notification in 2018 with Mr. Burist. Is that accurate?

A Yes, sir.

Q Is there any such similar document for Mr. Burist in 2022?

A None that I know of.

Q Okay. You mentioned before there was a lease agreement between Mayflower Transit and Joe Moholland Inc., correct?
A Correct.
Q And I want to pull that up for you, and show you what we'll mark as Exhibit 15 here.
(Plaintiffs' Exhibit Number 15 was marked for identification.)
BY MR. LANGLEY:
Q This is a two-page document. It is Mayflower 4389 and 4390. You see those pages on the bottom there?
A Yes, sir.
Q Okay. Is this the entirety of the lease agreement between Mayflower Transit and Joe Moholland under the M333?
A Yes.
Q All right. On November -- or strike that.
On some of the Excel spreadsheets that have been provided to us, Joe Moholland is listed as an agent of Mayflower on one section that's been marked there as Exhibit 16. And that is Mayflower 46276.
(Plaintiffs' Exhibit Number 16 was marked for identification.)

BY MR. LANGLEY:
Q It's a big document. But we'll zoom in, I want to see the bigger picture. And at the top that says company name, agent number, and common owner, common owner number, all of that kind of information. The street address, and so on. Do you see that?
A Yes, sir.
Q And then under line 90, does it list Joe Moholland Moving under M333 at 15481 Farm Creek Drive in Woodbridge, Virginia, as an agent?
A Yes, sir.
Q All right. On the prior testimony of the 30(b)(6) witnesses, there was some question of a continued business relationship on government-related moves. Did you review any of that testimony in preparation for your deposition today?
A No, sir.
Q Do you have any information about that, on continued relationship on government-related load shipments between Mayflower and Joe Moholland?
A No, sir, none.
Q Is there anything else that's important to you about this case that you want to tell me on

behalf of Mayflower today?
A No, sir.
Q Does Mayflower have any evidence that the Sloan plaintiffs could have done anything to prevent this tragedy from happening to their family?
MR. EHRENREICH: Object to form.
A I don't know.
BY MR. LANGLEY:
Q You don't know of any as you sit here today?
A Correct.
MR. EHRENREICH: So before we get off, I think we have documents that we need to send you. I just need to review them. So if you'll just give me a couple minutes.
MR. LANGLEY: Okay. Is that the email --
MR. EHRENREICH: So I don't -- I don't want you to say you have no more questions. I think that what has been provided to me in the last couple of minutes are the emails that Mike had discussed with you.
So let me take a look at them,

and let me get them to you, and then you can make a decision as to what you want to do, okay?

MR. LANGLEY: All right. Thank you.

MR. EHRENREICH: Just give me a couple minutes.

THE VIDEOGRAPHER: Are we going off the record?

MR. EHRENREICH: Yeah.

THE VIDEOGRAPHER: Off the record at 2:48 p.m.

(The deposition went off the record.)

THE VIDEOGRAPHER: We are now on the record at 3:14 p.m.

BY MR. LANGLEY:

Q All right. During the break, we were provided five pages of documents that we don't believe have been provided before. One of them is an email that we've been discussing today from you to Hope Maddox at the FMCSA attaching the temporary agency agreements with Mayflower Transit and Moholland Transfer Company.

And then another document that's Bates stamped confidential Mayflower 122893. That looks to be an email from a Kathleen Steis, and it's

not indicated as to who that was sent. And it's --

MR. LANGLEY: Todd, I don't know if you guys did this accidentally or what, but there are two Bates stamps, 122893. The first temporary agency agreement, and that this email from Kathy Steis. So maybe we should clear that up before we move forward.

MR. EHRENREICH: What's your question? I'm sorry, I missed the question.

MR. LANGLEY: There's two documents that are Bates stamped 122893. The email from Kathy Steis confidential Mayflower temporary agency agreement. Was that intentional?

MR. EHRENREICH: No.

MR. LANGLEY: Okay. Well, the one has been marked as Kathy Steis email for purposes of the deposition is Mayflower 122895.

MR. EHRENREICH: Yeah, we were doing this in a hurry.

MR. LANGLEY: All right. That's okay.

MR. EHRENREICH: Yeah.

MR. LANGLEY: And so is this intended to be part of the communication that was sent with attachments from Mike to Hope Maddox? Or why is it attached here?

MR. EHRENREICH: I'm not sure your question. So there were one, two emails. There are two emails and an attachment -- or two attachments. And then there's a separate email from Steis or Steis, S-T-E-I-S.

MR. LANGLEY: Yeah, we looked and we don't see that this has ever been produced before. And I think we'd like to talk to Ms. Steis as the agent and contract specialist. So I don't --

MR. EHRENREICH: Why don't we do this. Why don't you go ahead and ask Mike the questions that you have. And if you still feel the need to talk to her, that's something you and I can talk about.

MR. LANGLEY: All right. Well, just for the purposes of the record, I don't want to waive the right to talk to Ms. Steis by asking those questions.

MR. EHRENREICH: Understood.

MR. LANGLEY: All right.

BY MR. LANGLEY:

Q Okay. Mr. Kratzer, you mentioned earlier in your deposition testimony some communication with the FMCSA on July 5th, 2022, about this wreck. Is this that communication?

A Yes, sir.

Q And it looks like that you are forwarding the temporary agreement between Mayflower Transit LLC and Moholland Transfer for the agency agreements M333 and M444. Is that correct?

A Yes.

Q It does not appear to me that you sent the actual agency agreements that these temporary agency agreements modified. Are there any other attachments to your email other than these two documents?

A No, sir.

Q Okay. There's another email that's been produced to us today from a Kathy Steis. It doesn't show to whom it was sent, but it's dated May 2nd, 2022. And I think we'd agree that would be marked as Mayflower Bates document 122895.

Was this email from Kathy Steis

that doesn't have a to line, was that sent to the FMCSA?
A No, sir.
Q Was there any other written correspondence, email or otherwise, between you and the FMCSA other than what was produced, which we'll, I guess, mark as Exhibit 17 now?
A No, sir.
Q Was there any response from Hope Maddox at FMCSA?
A No, sir. No response.
Q What was the purpose for you sending this email?
A To show that Moholland 333 and 444 was no longer authorized to operate under Mayflower authority on the date of the accident.
Q But you did not send the agency agreement and the amendment to the agency agreement between Mayflower Transit and Joe Moholland that we'll mark as Exhibit 17 now -- or 18.
MR. FOSS: She wanted to mark this other one. The JMM3 or whatever.
MR. LANGLEY: That's 17?
MR. FOSS: We didn't mark it.
MR. LANGLEY: Okay. So Exhibit 17

will be just the four pages of communication between Mike Kratzer and Hope Maddox at FMCSA.

Exhibit 18 will be the agency agreement and the amendment to the agency agreement between Mayflower and Joe Moholland.

(Plaintiffs' Exhibit Number 17 was marked for identification.)

(Plaintiffs' Exhibit Number 18 was marked for identification.)

BY MR. LANGLEY:

Q So do you see what we've marked as Exhibit 18?

A Yes.

Q Mr. Kratzer -- all right. And is that the agency agreement and then the amendment to the agency agreement that we see on Page 10 and 11 of the document there?

A Yes.

Q And the temporary agency agreement that you provided to the FMCSA does not modify or alter the parties' rights or obligations under the terms of the agency agreement we've marked as Exhibit 18, right?

MR. EHRENREICH: Object to form.
A Correct.
BY MR. LANGLEY:
Q But you chose not to send the FMCSA the agency agreement, the full agency agreement, that governed the relationship between Mayflower and Moholland?
A That's correct.
Q Okay.
MR. LANGLEY: And so this would be 19?
MR. FOSS: Yes.
(Plaintiffs' Exhibit Number 19 was marked for identification.)
MR. LANGLEY: Exhibit 19 to the deposition, we'll make this email from Kathy Steis to --
BY MR. LANGLEY:
Q Who was this sent to, do you know?
A I believe it's sent to every department.
Q You broke up there. Can you say that again, please?
A I believe it's sent to every department at UniGroup.
Q And how do you know that?

A I get one of these on every agency termination. I actually testified to this document earlier. And my testimony when you'd asked about if I'd had notification of the termination, and I referenced this email that I recalled.

Q Do you know why you're not listed as the recipient?

A Oh, I have no idea.

Q But you found this email in your search of your inbox just now?

A Yes, sir. Yes, sir.

Q Have you found any other emails that are related to this case?

A No, sir.

Q Do you know -- you said this went to every employee of UniGroup?

A No. I would -- I would guess it went to and I testified that it probably went to every department. Not every employee.

Q Every department. So like the department heads? What do you mean by every department? I don't quite understand.

A UniGroup has many departments, right? Safety department, operations, claims, those sort

of things. It probably goes to each department.
Q I understand. And what I'm trying to understand is the distinction between an email going to every department and then an email going to every employee. What's the difference there?
A I don't know. Just depends who they sent it to. I don't make a determination who this went to. And it doesn't show who it all went to. I'm just assuming it went to the departments.
Q It doesn't show anybody it went to.
A Correct.
Q How are you able to find it and why are we just now getting it, you know, two and a half years into this litigation?
A You reminded me of it when you asked the question if there was anything that I remember getting a notification that they were canceled, and I said there is when I thought about it.
And this is what I was thinking about, because these are sent out on all terminations. And so then I was able to go back and look in my inbox and find it during break.
Q All right. And your belief is this went to all of the Mayflower and UniGroup departments. Is that right? Did I understand your testimony

correctly?
A I believe so.
Q And you received it because you are a department head or you were in May of 2022?
A Not a department head, but director.
Q Okay. Well, I guess I'm still confused about how it was that you received it if it didn't go to every Mayflower employee or UniGroup employee?
A I don't know how they determine who it goes to. I have no idea.
Q And you can't tell based on the document that's been provided who it was sent to because there's no to line, right?
A Correct.
Q So is that something we'd have to ask Kathy Steis to get the answer to?
A Yes.
Q And you -- could you list for me the other departments that you mentioned before?
A The ones I mentioned before was safety department, operations, claims.
Q Okay. Are there any others you can think of?
A Sure. Legal department, revenue accounting. Several departments.

Q Is Trans Advantage a department?
A No, sir.
Q That would be something separate?
A Yes, sir.
Q So when you're listing these departments, those are departments of just Mayflower?
A Yes, sir.
Q Was operations one of the departments that you listed a minute ago that was within Mayflower?
A Yes.
Q And what does operations do?
A I'm not certain what they do.
Q Okay. Are there any other emails that you're aware of that relate to this case that haven't been produced?
A No, sir.
MR. LANGLEY: Please answer any questions that Mr. Ehrenreich might have for you.
MR. EHRENREICH: Did anyone cross-notice it? If not, I just had a couple of questions to clarify.
MR. NORDEN: We did not cross-notice, but these are consolidated for discovery. But the Hines counsel does not have any

questions. Thank you.

MR. EHRENREICH: Yeah, I don't have an issue if somebody else has questions before I ask. I have no problem with it. I was just going to let the cross-noticer go first, that was all.

MR. NORDEN: Okay. Nothing from me. Thank you, Todd.

MR. POPE: This is John Pope. Nothing on Tipton and Petno either.

MR. EHRENREICH: If you're not hearing anything, I just have a couple of questions for clarification.

EXAMINATION

BY MR. EHRENREICH:

Q Mr. Kratzer, if you can detail for us your employment history prior to being employed by UniGroup, Mayflower.

A I was employed by Missouri Department of Transportation under contract of federal DOT for 26 and a half years.

Q And what was your job title after you left there?

A I believe it was supervisor.

Q In your role with the FDOT in its Missouri

location, were you -- did you have experience with temporary agency agreements and the disillusionment of agreements between carriers and agents?

A Yes, sir.

Q All right. In that has been described the relationship between Mayflower and Moholland as a -- how would you describe that relationship in terms that the FDOT would use?

MR. LANGLEY: Object to the form. He's not appearing on behalf of FDOT.

MR. EHRENREICH: I understand that, but you on other depositions decided to go deeply into people's background. You didn't do it this time. And I need to show it as a condition precedent to some of his responses.

MR. LANGLEY: Well, he's not being deposed as some type of expert on the DOT. And that's --

MR. EHRENREICH: I'm not asking him -- not at all.

MR. LANGLEY: All right.

BY MR. EHRENREICH:

Q Go ahead, Mike.

A So the agreement would show that during

the period that the agreement was good for, that the carrier, motor carrier, was allowed or authorized to operate under Mayflower authority.
Q At some point in July, did Chris Wynn come to you -- or excuse me. I'll back up a second.
You said that there was probably a call from somebody from the FDOT into some sort of a hotline regarding this accident. I think that's what you testified to. Am I right?
A Yes, sir.
Q All right. And do you have an independent recollection of listening to that message?
A No. I did not listen to it.
Q Did somebody at either UniGroup or Mayflower listen to that and contact you?
A Yes.
Q And was that Chris Wynn?
A I don't recall.
Q The conversation, to the best of your recollection, what was it?
A I called Hope back to see what she was calling for, and she asked about Moholland specifically. And I said, that agency does not operate under an agreement at this time with Mayflower. And she said, can you send proof of

that.
Q All right. So before we get to the proof that you sent, Hope is the woman that you referred to before at the FDOT in the Missouri office?
A Yes, sir.
Q Okay. And when she asked for some sort of documentation as to the termination of any agreement between -- excuse me -- an agency agreement between Mayflower and Moholland, what did you send her?
A I sent her the documents that were in the email, which was the amendment to the lease agreement.
Q So the temporary agency agreement?
A Yes, sir.
Q Why would you have sent that document to her?
A Based on experience, that's what I would've accepted when working there to prove that an agent no longer was authorized to operate under a motor carrier's authority.
Q And the document that was sent, the temporary agency agreement, you're familiar with that document that was sent?
A Yes, sir.
Q And there's a Paragraph 7 that says, term

and termination. The term of this agreement shall begin on January 20, 2022, and will terminate upon April 28, 2022.

Are you familiar with that Paragraph 7?

A Yes, sir.

Q And did you, yourself, send that -- the documents to her or did Chris Wynn?

A I sent them.

Q All right. Did you ever hear back from Ms. -- what's her last name? Mixon?

A Maddox.

Q Maddox. I'm not even -- 0 for two.

Did you ever hear back from Ms. Maddox after those documents were sent to her?

A No, sir.

Q And based on your experience, both at -- with the FDOT and at Mayflower, what did that tell you?

A That they were satisfied that Moholland was not operating under Mayflower authority on July 1, 2022.

Q Okay. You were shown -- one of the documents you were shown was a spreadsheet that Mr. Langley showed you. Remember that? It was a

big spreadsheet and he asked you certain questions about it? I don't remember what the exhibit number was.

A Yes, sir.

Q It was -- right? And --

MR. LANGLEY: Exhibit 16.

MR. EHRENREICH: 15 or 16?

MR. LANGLEY: 16.

MR. EHRENREICH: 16, right.

BY MR. EHRENREICH:

Q You looked at -- you weren't asked too many questions about it, but what is your understanding of what that spreadsheet reflects?

A That spreadsheet is a list of all agents and locations and names of all active and non-active agents, or canceled agents.

Q So it's both active and canceled agents would be included on that spreadsheet?

A Yes, sir.

Q All right. Why both?

A Well, the purpose of that spreadsheet is to keep track of all agency numbers so that in the history of Mayflower, we would never repeat a number or an address. We would know it was somebody that was listed before, and we would

never repeat an agency number ever in our history. So for the purpose of adding a new agent in the future, that list is checked to make certain that numbers aren't repeated.

Q Okay. So assuming at Moholland, the two Moholland entities were inactive at that time, does that explain to you why they were included on that spreadsheet?

A Sure.

Q Last few questions. You were asked a lot of questions early on about the license plates and their return. Do you remember those questions?

A Yes, sir.

Q All right. There were a lot of emails that weren't shown to you, but you told Mr. Langley that you, in fact, reviewed all the documents and related documents for this deposition. Is that correct?

A Yes, sir.

Q The other emails that you reviewed that had been Bates stamped, what did that tell you about the license plate issue and the return of the license plates between the two Moholland entities and Mayflower?

MR. LANGLEY: Object to the form.

A The purpose of returning them was to get a refund from the state of Missouri. But at no time were they authorized after May -- after April 28th of 2022 to operate with those plates. They were just given time to get them back to us for a refund.

MR. EHRENREICH: Okay. That's all I have. I don't know if Mr. Langley had any follow-up questions.

EXAMINATION

BY MR. LANGLEY:

Q On the temporary agency agreements that were sent, you were pointed to that Paragraph 7, term and termination. So the paragraph before that that I read into the record, it says, the agency agreements or terms are incorporated.

That would be the two agency agreements we marked as Exhibit 18, I believe, the agency agreement with Mayflower and Moholland and then the amendment to that. That's what's referenced there with agency agreement terms incorporated, right?

A I believe that to be true.

Q Okay. And so when the reference is made to that agency agreement where it says that this

temporary agency agreement does not modify or alter the parties' rights or obligations under the terms of the agency agreement, we can agree that that agency agreement reference there is the agreements marked as Exhibit 18, correct?

A Correct.

Q Okay. On the Excel spreadsheet, you were asked a question about the agents, and I think you said something like the purpose of this sheet is to ensure that you don't have a repeat of an agency number. Did I understand your testimony correctly?

A Yes, sir.

Q And why is that important?

A I don't know why it's important. It's just been a policy of Mayflower since I've been here that we wouldn't repeat an agency number.

Q Okay. And is there any delineation between an existing and a former agent on this Excel spreadsheet that you see?

A No, sir.

Q Okay.

MR. LANGLEY: Thank you for your time today. No additional questions.

MR. EHRENREICH: Thank you. If it's ordered, I assume it will be, Katie, we'll

take a copy. I'll get it on to Mr. Kratzer so he can timely read it. And if he has to sign a jurat page, he will.

THE VIDEOGRAPHER: This concludes the video deposition at 3:38 p.m.

(The signature is reserved and the deposition concludes at 3:38 p.m.)

---oOo---

STATE OF SOUTH CAROLINA )
: CERTIFICATE
COUNTY OF DORCHESTER )

I, Katie L. Graff, Notary Public, certify that I was authorized to and did voice stenographically report the foregoing deposition, and that the transcript is a true record of the testimony given by the witness.

I further certify that the witness was duly sworn and cautioned by me to tell the truth, the whole truth, and nothing but the truth. I certify that the same was reduced to typewritten form from my original voice stenograph notes by computer-aided transcription.

I further certify that I am not of counsel or kin to any of the parties to this cause of action nor am I interested in any manner in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this the 24th day of January 2025.

Katie L Graff

Katie L. Graff
Notary Public, South Carolina
My Comm. Expires 03-07-2033

ATTESTATION

In Re: Sloan, et al. v. Burist, et al.
Case No.: 2:22-cv-00076-LGW
Deposition of: 30(b)(6) of Mayflower Transit LLC
Date Taken: Wednesday, January 8, 2025
Taken Before: Katie L. Graff, Notary Public

I have read the transcript of my deposition and find that no changes are necessary.

______________________________
Name of Deponent

Having read the transcript of my deposition, I wish to make the following corrections: (State reason.)

Page Line :

Page Line :

Page Line :

Page Line :

Page Line :

______________________________
Name of Deponent

Sworn to and subscribed before me this ______ day of__________, 202 , in ______________ County, South Carolina.

______________________________
Notary Public
State of South Carolina
My Comm. Expires:______________

January 24, 2025

Michael Kratzer
c/o Todd Ehrenreich

Dear Deponent,

Please find a copy of your deposition. You will also find enclosed the attestation page from the original deposition.

This is a verbatim transcript. If, however, you feel that it is necessary to make any corrections or changes, you may do so on the attestation page, indicating page and line number. You must state your reason for making the change.

Upon completion, please sign and date the attestation page from the original transcript in front of a notary public and return within 30 days to Katie L. Graff, 156 Whitetail Road, Summerville, South Carolina 29483.

If you have any questions, feel free to contact me.

Yours truly,

Katie L. Graff
Court Reporter

## A

**AAE (4)**
45:8,12,16,20
**ability (1)**
78:20
**able (6)**
24:16;94:7;98:14;106:7;126:12,21
**above (1)**
64:8
**accept (2)**
111:14,22
**accepted (4)**
86:2;108:10;111:20;132:18
**access (7)**
50:15;87:10,20,22;88:24;89:22;90:9
**accessible (1)**
48:18
**accident (6)**
10:13;53:25;77:21;78:6;122:16;131:8
**accidentally (1)**
119:3
**account (2)**
68:24,25
**accounting (1)**
127:25
**accurate (2)**
12:2;114:21
**acknowledge (3)**
22:3,12,21
**acknowledged (1)**
86:2
**acknowledging (2)**
36:24;85:25
**act (2)**
29:17;104:9
**acting (1)**
48:5
**action (7)**
63:20;64:2,12,22;70:18;71:1,7
**actions (1)**
106:25
**active (3)**
103:4;134:15,17
**actual (3)**
87:2;99:24;121:15
**actually (4)**
67:8;99:22;111:25;125:2
**Adam (5)**
53:10;69:12,21;70:5;73:2
**addendum (2)**
16:19;35:23
**adding (1)**
135:2
**addition (1)**
48:3
**additional (2)**
67:25;137:23
**address (5)**
40:12;42:6;73:21;116:6;134:24
**administration (2)**
45:12,17
**administrative (1)**
45:8
**Advantage (31)**
89:20,23;90:10,14,18,23,24;91:6,12,16,21;92:2,7,13,21,25;93:7,20,22;94:8,13,16,19,24;95:3,7,14,19,24;108:21;128:1
**Advantage's (2)**
90:3,13
**advise (1)**
111:13
**affirm (1)**
8:15
**afield (1)**
94:12
**afternoon (2)**
70:4;80:17
**again (23)**
14:25;15:9;22:16;51:5;55:19;64:19;66:6;67:19;68:3,7,16;71:4;74:5;75:22;76:18;79:2;80:16;84:12;100:18;103:20;106:6;107:12;124:22
**against (6)**
27:3;63:21;64:12;70:19;71:2,8
**agency (126)**
12:20;13:7;16:6,14,17;18:23;19:2;20:1,7;23:5;24:12,15,25;27:5,7;28:4,10,20;29:8,13,19,23,25;33:11,23;34:8,18;35:23,24;36:3,4,15,16;41:22;46:15,15,22;47:10;48:6;50:7;52:5;56:17;58:8,21;59:12;66:2;73:21;74:9;76:14,23;78:12,22;82:10;83:4,7,13;84:7;86:5,16,22;87:5;91:1,14;93:16;95:8,20;97:4;100:13,20;101:10,18;103:20,24;104:2,4,7,11,23,23,24;106:14,15,24;107:1,11,15,22;108:3;110:11;113:25;114:3;118:21;119:5,15;121:11,15,15;122:17,18;123:4,5,17,18,21,24;124:5,5;125:1;130:2;131:23;132:8,13,22;134:22;135:1;136:12,15,17,19,21,25;137:1,3,4,10,16
**agent (47)**
20:16,20;21:9,14;23:16;27:13;33:21,22;37:21;38:9,11,14;39:14;41:11,15,21;46:10;48:22;49:9,24;50:13,13,22;86:12;87:6,24;88:5,11,17;89:23;91:16;102:23;103:3,8;104:18;105:1;106:11;107:5;108:10;110:17;115:21;116:4,11;120:15;132:19;135:3;137:18
**agent/member (1)**
28:17
**agents (32)**
48:19;49:2;50:11;76:10,21;86:11,18;87:15,20;88:24,25;89:11;90:11,16;91:11;92:8,8,13;93:10;95:8;100:16,25;103:21,24;104:9;107:5;130:3;134:14,16,16,17;137:8
**agent's (10)**
91:22;97:8,14;98:23;101:7;103:10;104:20;105:1,16;106:10
**aggressive (1)**
103:4
**ago (9)**
18:9,22;24:25;56:1;59:10;83:7;107:18;110:1;128:9
**agree (19)**
24:2;29:16,22;32:24;42:22;44:8,25;46:19;56:20;84:4;100:7;104:12;108:17;112:2,11;113:1,18;121:23;137:3
**Agreed (2)**
44:12;62:15
**agreement (123)**
13:7;16:6,18;18:20,23,24;19:3;20:1,7;21:16;28:4,10,20;29:19;31:18,23;32:1,5,9;33:12;34:19;35:23;36:3,4,16,18;41:22;46:15,16;48:6,10;50:7;52:5;56:17;58:8,21;66:2;73:21;74:9;75:23;76:9,15,24;82:10;84:11,13,18,19,22;85:4,9,12,18,21;86:6,17,22;87:5,8;91:1,15;97:4;100:13,20;101:10,18;103:20,25;104:2,5,7,12,17,23,24;106:15,16,17,24;107:1,4,11,15,22,23,25;113:24,25;114:3,4,5,7,16;115:2,15;119:5,15;121:10;122:17,18;123:5,6,17,18,21,24;124:5,5;130:25;131:1,24;132:7,8,12,13,22;133:1;136:19,21,25;137:1,3,4
**agreements (20)**
16:14,17;23:5;24:15;29:24;36:7,15;78:12;83:13;110:12;118:21;121:11,15,16;130:2,3;136:12,16,18;137:4
**ahead (6)**
60:8;68:4;75:6;92:19;120:18;130:24
**alleging (1)**
86:3
**allow (1)**
105:23
**allowed (5)**
65:15;88:8;103:24;104:22;131:2
**allows (1)**
106:15
**along (2)**
52:15;80:19
**alter (2)**
123:22;137:1
**amendment (5)**
122:18;123:5,17;132:11;136:20
**among (1)**
110:10
**Amy (1)**
7:22
**Andrew (1)**
7:20
**Angela (1)**
8:7
**answered (1)**
31:7
**anymore (1)**
79:8
**apparently (1)**
79:6
**appear (1)**
121:14
**appearances (1)**
7:11
**appearing (1)**
130:10
**appears (2)**
81:16;114:19
**applicable (4)**
29:7;30:14;32:8;52:11
**applied (1)**
31:23
**apportioned (2)**
55:5;108:20
**appreciate (1)**
60:10
**appropriate (2)**
32:21;60:22
**April (26)**
21:17,21;22:5,14,23;28:5;35:20;37:5,9,15;43:17,20;50:4;54:23;66:5;97:22,25;99:1,5,21;100:9;110:24;113:12,20;133:3;136:3
**around (2)**
84:23;85:4
**arrival (1)**
112:8
**ASD (8)**
34:23;35:14,16;36:22;39:12;40:9;45:6;46:9
**assistant (3)**
45:8,13,17
**assisting (2)**
88:16;103:8
**associated (1)**
79:7
**assume (2)**
112:8;137:25
**assumed (1)**
11:10
**assuming (3)**
59:17;126:9;135:5
**attached (1)**
120:5
**attaching (1)**
118:20
**attachment (1)**
120:8
**attachments (3)**
120:4,9;121:17
**attorney (3)**
14:14,19;25:16
**attorney-client (2)**
15:1;59:23
**authority (66)**
23:20;29:18,25;39:8;40:13,19;41:5,6;42:7,15,18,22;43:3,4;44:1,14;45:3;46:22;54:5;55:15;56:13;57:14,22;77:10,14;87:7,10,16,21,25;88:3,3,6,9,12,14,18;89:25;91:15,22,23;

94:19;97:4,9,16,22;98:2,7,25;99:5;101:8;102:1;103:1,6,11,18;104:6,8,21;106:11;113:13,19;122:16;131:3;132:20;133:21
**authorization (14)** 38:8;78:13,22;97:8,15;98:1,24;99:13;101:7;102:25;103:5,10;104:20;106:10
**authorized (20)** 38:20;55:4,17;56:2;57:13;58:20;65:23;66:10;87:25;88:5,8,11;89:24;91:12;113:15,19;122:15;131:3;132:19;136:3
**available (4)** 14:8;16:22;24:11;50:11
**aware (15)** 11:16,20;14:19;36:18;46:2,4;78:20;79:25;90:14,19,21;95:13,18;96:13;128:14
**awareness (1)** 39:16
**away (1)** 61:20

## B

**back (13)** 34:22;41:1;60:2,16;70:13;72:23;109:16;126:21;131:5,21;133:10,14;136:5
**background (3)** 11:2;61:9;130:13
**base (6)** 21:15;62:19;68:18;69:15;70:6,8
**based (6)** 69:3;105:17;110:17;127:11;132:17;133:17
**bases (1)** 86:6
**basic (2)** 34:24;35:3
**basis (8)** 23:3;39:6;43:8;47:24;85:5,16;102:10,15
**Bates (7)** 66:24;98:17;118:24;119:4,13;121:24;135:21
**bear (1)** 35:22
**become (2)** 13:6;86:12
**begin (1)** 133:2
**beginning (2)** 60:20;106:3
**begins (1)** 7:1
**behalf (38)** 7:12,14,17,18,20,23,25;8:1,3,5,7,9;9:18;10:5,8;14:12,20,24;20:23,23;21:2,7,25;23:12,20;25:20;47:25;48:5;50:5;51:2,6;57:20;71:5;75:17;77:5;83:11;117:1;130:10
**belief (2)** 55:16;126:23
**besides (1)** 15:5
**best (2)** 13:2;131:19
**big (4)** 68:11;106:2;116:2;134:1
**bigger (5)** 68:12;82:24;89:17;98:12;116:3
**billings (1)** 84:2
**binding (3)** 24:3;36:8,17
**bite (1)** 109:4
**blurred (1)** 61:9
**Board (1)** 45:14
**book (2)** 97:6,12
**booked (3)** 98:6,7;108:10
**booking (6)** 98:22;104:18;105:2;106:12;107:6;108:5
**bore (1)** 26:20
**boss (1)** 69:23
**both (11)** 19:1;20:24;29:11;36:8,8,17;46:5;77:11;133:17;134:17,20
**bottom (2)** 96:7;115:12
**brand (1)** 102:23
**branding (2)** 38:11;101:5
**break (10)** 22:9;58:23;59:5;60:8,21;61:3,6;109:4;118:16;126:22
**Brief (1)** 75:3
**Brighten (1)** 8:11
**bring (1)** 60:2
**broke (1)** 124:21
**brought (4)** 27:2;58:25;59:1,6
**Buchanan (1)** 75:17
**Buchanan's (1)** 81:18
**Burist (40)** 8:8;10:16;12:21;13:8;22:5,22;23:4,9;24:13;25:10;26:25;49:7;51:3,7,17;54:15;73:17;74:13,22;75:10;80:8;82:13;83:12,18,23;84:6,21;85:8,18,25;93:1;96:13,20;113:7,18;114:2,5,8,20,24
**Burist's (1)** 113:23
**business (46)** 22:4,13,17,22;23:4;25:9;29:17,18;40:13,20;41:5,6;42:7,15,18,22;43:3,4,18,18;44:1,14;45:3;80:20;83:22;84:1,5;90:15;100:8,15;101:1,4,12,17,19,20,25;102:4,9,18;110:22;112:3,12,21;113:2;116:15

## C

**cab (9)** 48:18;52:8;54:12;55:5;56:3,14,21,22,23
**call (7)** 19:17;34:5,10;78:6;79:12;87:7;131:7
**called (3)** 32:5;78:8;131:21
**calling (3)** 19:14,24;131:22
**came (2)** 69:12;78:6
**can (72)** 13:3,11;16:24;17:9,14;21:1;29:22;32:24;39:24;40:11;42:22;43:5,23;44:8,25;46:19;50:17,19;51:14;53:20;55:1,8,12;56:4,9,11,20;57:10,19;58:23;60:3,5,8;64:8,21;66:15;70:25;71:6;76:4;80:4;84:4;89:14,17;91:7;94:23;96:21;98:12;99:18;100:7,20,22;101:16,16;104:12;106:20;107:19;108:17;109:5;111:14;112:2,11,22;113:1,18;118:2;120:21;124:21;127:22;129:16;131:25;137:3;138:2
**cancel (1)** 114:8
**canceled (13)** 23:6,9;74:25;76:3;77:12;87:8;99:16;113:24,25;114:6;126:17;134:16,17
**canceling (1)** 114:2
**cancellation (1)** 85:22
**caption (1)** 7:5
**card (5)** 54:12;55:5;56:3,14,23
**cards (1)** 52:8
**carefully (1)** 99:19
**Carly (1)** 8:5
**Carol (1)** 80:16
**carrier (23)** 39:1,9;54:20;56:15;57:8;59:12;64:16;87:6;102:24;103:3,17;104:10,16,25;105:3,13;106:11,24,25;108:8,10;131:2,2
**carriers (1)** 130:3
**carrier's (1)** 132:20
**carry (2)** 29:17;99:9
**carrying (1)** 98:22
**case (28)** 11:11,24;12:8;15:15,25;17:7;25:4;27:3;31:24;34:1,5;37:2;40:15;41:5;43:13;45:10;48:7;49:6;56:24;60:23;71:21,24;81:6;86:3;87:1;116:25;125:14;128:14
**case-by-case (1)** 43:7
**cases (1)** 86:7
**categories (1)** 36:2
**caused (1)** 56:23
**certain (5)** 18:19;113:16;128:12;134:1;135:4
**certification (2)** 51:11,16
**certify (2)** 51:3,7
**chain (3)** 63:12,13;80:16
**change (1)** 105:17
**changed (1)** 78:2
**charge (1)** 27:17
**charges (1)** 82:12
**Charlie (2)** 8:3;75:5
**checked (1)** 135:3
**checking (1)** 70:10
**checklist (11)** 32:8;37:16,23,24;38:13;42:10;43:2;44:8;45:1;46:20;47:5
**chief (1)** 26:15
**choice (3)** 80:24;81:13,22
**chose (1)** 124:4
**Chris (12)** 27:23,24;28:2,16;33:6,24,25;34:6;48:4;131:4,17;133:8
**circumstances (2)** 8:25;97:20
**city (1)** 61:16
**claims (3)** 27:2;125:25;127:21
**clarification (1)** 129:13
**clarify (1)** 128:22
**clear (2)** 72:24;119:7
**close (4)** 53:18,19,21;61:18
**coach (1)** 24:18
**collect (1)** 79:14
**Colleen (1)**

89:19
**collision (11)**
41:24;56:24;57:6,24;69:4;71:13,17,24;72:2;82:2;93:2
**comment (1)**
30:16
**commercial (4)**
48:13;51:4,9,17
**common (2)**
116:4,5
**communicate (9)**
58:18;66:8;77:5;78:11,17,21;79:3,4,17
**communicated (1)**
80:5
**communicates (1)**
55:3
**communicating (2)**
52:8;75:16
**communication (35)**
26:16,22;29:23;32:25;38:17;40:24;41:8;45:17;57:11;58:6,14;59:11;61:1,5;62:1,15;63:14;66:17;67:8;68:15;73:1;76:11,22;77:18,19,20;89:10;97:13;111:6;112:21;114:2;120:3;121:5,7;123:2
**companies (5)**
9:19,22;87:2;90:9;92:12
**Company (8)**
8:6;25:20;95:4;96:11;101:21;102:5;116:4;118:22
**complete (2)**
12:1;45:7
**completed (4)**
28:9,20;41:6;51:8
**completing (2)**
37:10,16
**completion (1)**
37:23
**compliance (16)**
9:12,12;15:10,12,24;17:17,23,24,25;18:11;27:7;47:5;48:19;52:10,23;76:22
**complied (1)**
47:7
**comply (1)**
31:18
**compound (1)**
22:8
**computer (1)**
62:14
**concern (1)**
10:1
**concerns (1)**
73:18
**concluded (3)**
43:7,18,19
**concludes (2)**
138:4,7
**conclusion (2)**
20:15;99:14
**condition (1)**
130:15
**conditions (1)**
108:12
**conduct (3)**
101:17,20,25
**conducting (1)**
102:17
**conducts (1)**
102:4
**confidential (3)**
63:7;118:24;119:14
**confirmation (1)**
70:13
**confirmed (1)**
35:16
**confirming (1)**
36:25
**confused (1)**
127:6
**confusing (2)**
11:8;106:1
**confusion (1)**
46:20
**consolidated (1)**
128:24
**contact (6)**
19:11,16;40:9,10;96:6;131:15
**context (2)**
44:19;75:18
**continue (4)**
29:24;82:4,8;101:20
**continued (13)**
22:5,13,23;37:8;76:16;100:9;102:8;108:23;110:22;112:3,12;116:15,21
**continuing (2)**
97:6,12
**contract (2)**
120:15;129:20
**contractors (1)**
87:3
**convenient (1)**
109:3
**conversation (5)**
77:24;78:4,5,9;131:19
**COOPER (2)**
8:7,7
**coordinator (1)**
48:3
**copied (1)**
70:5
**copies (1)**
16:6
**copy (5)**
18:20;46:10;73:21;80:19;138:1
**copy-and-paste (1)**
81:17
**corporate (11)**
9:7;10:20,23;13:17,24;14:1,1;23:12;46:6;94:6;102:16
**correctly (12)**
44:15;47:11;62:20;70:2,16;76:7;80:21;81:2;87:17;99:2;127:1;137:11
**correspondence (26)**
15:17,19;16:1,21;20:10;37:4,8,14,20;39:7;50:6;53:1;55:24;57:19;67:17,25;73:10,18;74:8,11,17;75:9;77:16;79:25;93:15;122:5
**correspondences (1)**
57:17
**cost (2)**
105:2;107:5
**Counsel (7)**
7:4,10;12:10;25:1,24;60:22;128:25
**couple (7)**
59:21;61:20;117:15,22;118:6;128:22;129:12
**course (2)**
34:18;51:8
**court (3)**
7:7;8:14;11:21
**cover (1)**
17:24
**covered (1)**
104:2
**covers (1)**
104:7
**created (1)**
46:9
**Creek (1)**
116:10
**cross-notice (2)**
128:21,23
**cross-noticer (1)**
129:5
**Crum (7)**
52:4,16;53:2;58:7;68:16;109:21,21
**custom (1)**
96:4
**cut (1)**
100:4

## D

**DA (1)**
111:11
**dad's (2)**
61:11,12
**Darniece (1)**
68:16
**data (1)**
79:14
**database (1)**
79:13
**DataQ (1)**
77:13
**date (38)**
10:3;16:11;21:16,21;22:15,24;35:15,20;37:1,5,18;38:19,23,24;39:15,18,22;40:6;41:3;42:5;44:2,9;45:6;47:1;50:16;55:8,11;65:3,24;66:7;73:13;74:14,15,17;75:10;111:13;112:7;122:16
**dated (1)**
121:22
**dates (6)**
37:17;42:8;46:21;56:6;101:9;103:25
**daughter (1)**
11:18
**day (3)**
45:15;57:6;64:14
**days (4)**
12:11;45:5;80:20;113:16
**deadline (4)**
42:5,13;43:17;47:6
**deadlines (2)**
46:21;47:2
**deal (1)**
112:21
**decals (4)**
34:16;38:9;80:11;108:21
**deceased (2)**
11:17,18
**decided (1)**
130:12
**decision (2)**
14:15;118:2
**deep (1)**
59:1
**deeper (1)**
59:7
**deeply (1)**
130:13
**defined (3)**
42:9;108:14,15
**definition (2)**
45:18;46:17
**definitive (1)**
42:11
**delineation (1)**
137:17
**delivering (1)**
108:16
**deny (5)**
39:4;41:13,17,19;42:2
**department (40)**
27:6,15,17,18;28:14,16,17;39:13,16;40:5;47:18,19;53:5,24;54:13;57:5,11;58:15;62:10;65:22;66:9,19;80:6;108:19,22;124:20,23;125:20,21,21,22,25;126:1,4;127:4,5,21,24;128:1;129:19
**departments (8)**
125:24;126:9,24;127:19,25;128:5,6,8
**depends (2)**
103:12;126:6
**deposed (1)**
130:18
**deposition (26)**
7:1,6;8:22;11:3;12:4,9;13:1,5;17:4;23:24,25;25:3;27:25;60:15,21;84:25;91:8;109:15;116:17;118:12;119:20;121:5;124:16;135:17;138:5,7
**depositions (1)**
130:12
**describe (1)**
130:7
**described (1)**
130:5
**description (3)**
17:15,16;18:8
**designate (1)**
13:6
**designated (6)**
10:7;13:15;14:11,20,23;45:13
**detail (1)**
129:16
**determination (3)**
43:9;47:3;126:7
**determine (2)**
95:24;127:9
**Diane (5)**
62:6,6,7,15,15
**Diane's (1)**
64:6
**difference (4)**
13:25;14:3;106:2;126:5
**different (7)**
18:24;21:24;26:14;42:8;47:18;74:15;105:15
**differently (2)**

110:12,16
**difficulty (1)**
106:18
**director (14)**
9:11,23;10:14;15:10,11,23;17:22;18:11;23:15,17;26:18;33:24;52:23;127:5
**directors (3)**
39:14;45:14;71:20
**disagree (2)**
105:22;107:2
**disagreeable (1)**
105:21
**disciplined (1)**
110:6
**discounted (1)**
88:24
**discovery (1)**
128:24
**discuss (3)**
20:8;34:11;71:21
**discussed (2)**
35:16;117:24
**discusses (1)**
113:2
**discussing (2)**
94:9;118:19
**discussion (2)**
55:14;64:10
**disillusionment (1)**
130:2
**dispatches (1)**
103:17
**dispatching (3)**
103:9,13,16
**disqualified (1)**
81:8
**distinction (1)**
126:3
**dive (2)**
59:1,7
**division (4)**
27:17;52:22;62:9;99:9
**document (47)**
12:17;29:4;30:5,11;32:19;41:18;42:12,20;43:5,24;45:23;46:3,4,24;47:1,2;49:22;52:3;54:10;55:18;64:21;72:15;83:16,16;89:3;93:20,22;94:10,15,16,23;96:22;102:12;105:12;111:5,8;114:23;115:10;116:2;118:23;121:24;123:19;125:3;127:11;132:15,21,23
**documentation (25)**
23:7;35:22;36:1;37:13;40:17;41:9;46:11;50:18,20;55:2;56:21;57:10;58:4;66:15;71:1,7;73:7;75:14,23;76:11,23;85:7,24;112:3;132:7
**documents (31)**
18:25;24:21,25;25:3,8;41:13,20;44:6;46:2,12,14;48:17;55:11;80:18,20,25;83:1;94:1,5;97:23;102:7;117:13;118:17;119:12;121:18;132:10;133:8,15,24;135:16,17
**done (8)**
37:2;47:11;67:2;69:8;99:19;110:16;112:18;117:4
**Donner (1)**
8:12
**DOT (12)**
9:12;15:10,12,24;16:1;17:16,25;80:10;97:5;104:9;129:20;130:18
**down (6)**
15:8;22:9;40:12;42:21;44:13;54:19
**drive (3)**
113:11,19;116:11
**driven (1)**
54:15
**driver (18)**
48:22,25;49:8,23;51:3,8,18;74:21;76:3;77:11;78:22;79:7;88:7,13,15,16,17;114:7
**drivers (8)**
23:5;48:20,25;52:9;77:10;78:13;88:4,11
**driving (2)**
79:19;80:9
**due (1)**
84:2
**during (10)**
15:21;40:10;47:14;61:3,6;64:3;106:16;118:16;126:22;130:25
**duties (6)**
53:11,20,23;104:25;105:12;106:23

**E**

**earlier (8)**
43:19;83:4;86:6;98:21;109:20;114:15;121:4;125:3
**early (4)**
10:4;59:1,9;135:11
**eat (1)**
109:5
**effect (1)**
55:7
**effective (8)**
35:15,20;37:1,5,11;39:15;45:6;54:23
**EHRENREICH (129)**
8:9,10;13:10,22;14:4,13,25;16:4,25;17:10;20:22,25;22:7,25;23:23;24:17;30:2,9,18,22;31:2,11,19,25;32:4,18,22;42:16;43:14,21;44:3,16,20;47:12,21;50:24;57:1;58:23;59:4,15;60:1,10,24;62:22;63:3,9,15;64:1,18,24;65:19,25;67:1,19;68:2;70:22;75:5;76:17;77:7;78:15,24;79:11,21;80:12;82:14;83:25;84:12;85:10,20;89:14;90:1,6,17;91:3,17,24;92:9,14;93:4,12,19;94:3;95:2,10,15,23;96:17,24;97:17;98:3;100:10;101:23;102:11,20;104:13;107:3;109:2,9,12;110:19;112:15;113:4,14;117:6,12,19;118:5,9;119:9,17,22;120:1,6,17;121:1;124:1;128:18,20;129:2,11,15;130:11,20,23;134:7,9,10;136:7;137:24
**either (9)**
13:15;15:20;42:12;43:25;54:6;72:7;92:22;129:10;131:14
**electronic (1)**
46:12
**element (2)**
87:24;91:22
**elements (1)**
86:21
**ELLIOTT (2)**
7:14,14
**else (16)**
17:18,20;21:18,22;25:22;34:7;36:19,21;38:2;56:11,18;61:6;100:1;109:25;116:24;129:3
**email (62)**
16:5,9,13;18:17;19:5,18;20:5,9;35:14;37:4;39:13,20,25;40:1;45:7,20;52:4,7;53:6;55:24;56:7;62:5,19;68:7;69:12,13,14,25;71:9;72:25;73:12,18;74:16;76:20;80:15;81:20;93:6,10;97:13;109:5;111:5,10;112:20;113:1;117:18;118:19,25;119:6,13,19;120:10;121:17,20,25;122:5,13;124:16;125:5,10;126:3,4;132:11
**emails (23)**
15:18;25:7;34:14;40:17;49:6;55:7,9,12;56:5;58:25;59:6,7;60:4;62:3;63:12;67:3;117:23;120:7,8;125:13;128:13;135:14,20
**Employed (6)**
9:14;15:4;18:5;109:22;129:17,19
**employee (9)**
19:10;79:16;89:20;99:15;125:17,20;126:5;127:8,8
**employees (10)**
9:16;25:18;29:13,16,24;53:3;71:16,16;89:13;110:5
**employment (2)**
109:23;129:17
**end (2)**
59:17;67:7
**ending (3)**
21:16,21;81:18
**enforcement (2)**
48:19;52:10
**enough (1)**
68:11
**enrolled (1)**
48:24
**ensure (4)**
28:3;47:6,10;137:10
**ensuring (1)**
54:4
**entered (3)**
29:8;84:22;85:3
**entirety (1)**
115:14
**entities (5)**
15:4;87:2;90:15;135:6,23
**entity (6)**
22:1;54:4;58:18;63:23;80:7;92:7
**equipment (12)**
38:12;76:4;77:12;80:25;81:5,23,25;87:23;92:21,24,25;108:11
**error (2)**
99:16;100:3
**estimated (1)**
112:8
**ETA (2)**
111:11;112:7
**Evans (1)**
70:5
**even (2)**
79:8;133:13
**everybody (1)**
9:16
**everyone (1)**
8:13
**evidence (14)**
51:14;66:16;85:17;88:1,5,7,11,17;89:23;90:25;91:22;112:12,24;117:3
**exactly (1)**
81:17
**EXAMINATION (3)**
8:18;129:14;136:10
**Excel (4)**
25:8;115:19;137:7,18
**except (1)**
31:17
**exchanged (1)**
34:14
**excuse (2)**
131:5;132:8
**executive (2)**
26:15;45:14
**Exhibit (66)**
12:8,12,14,25;28:24;29:1;45:2;49:16,17;51:21,23;52:15;54:9;62:23;63:1,6,10;67:2,12,16,21,24;69:3,17,18;72:10,14,17,18,23;73:16;82:6,20,21;83:2,16;89:6,7;93:7;98:17,18;105:8;110:25;111:2;112:2;114:10,11,18;115:6,7,22,24;122:7,20,25;123:4,8,10,14,24;124:13,15;134:2,6;136:18;137:5
**exhibits (2)**
25:4;94:2
**exist (3)**
42:2;45:23;46:16
**existence (3)**
46:3;107:1,10
**existing (1)**
137:18
**experience (3)**
130:1;132:17;133:17
**expert (1)**

130:18
**expiration (1)** 65:24
**expire (2)** 23:5;62:16
**expired (2)** 50:16;101:18
**explain (1)** 135:7
**explicit (1)** 113:13
**extend (2)** 36:4,16
**extended (3)** 40:20,24;54:23
**extends (1)** 84:9
**extension (7)** 16:18;35:24;46:15;69:7;70:8,11;73:13
**extent (1)** 90:25

**F**

**fact (6)** 11:11;45:7,10;103:16;105:22;135:16
**factors (2)** 87:13;97:2
**facts (1)** 43:13
**fall (1)** 36:2
**familiar (3)** 84:20;132:22;133:4
**families (1)** 27:1
**family (1)** 117:5
**far (4)** 36:3;93:23,24;94:12
**Farm (1)** 116:10
**FDOT (6)** 129:25;130:8,10;131:7;132:4;133:18
**federal (1)** 129:20
**feel (2)** 60:1;120:20
**few (11)** 11:2;12:11;40:11,12;42:5,6;44:10,10;45:5;97:2;135:10
**file (1)** 46:10
**files (1)** 88:10
**finally (1)** 46:9
**find (9)** 11:7;19:22;30:15;32:15;39:24;59:17,22;126:12,22
**fine (5)** 21:5;60:8;68:13,14;109:11
**finish (1)** 101:18
**finished (1)** 100:5
**first (8)** 12:12;21:2;69:13;79:24;87:18;97:10;119:5;129:6
**fit (1)** 45:18
**fits (1)** 91:8
**five (4)** 58:24;59:5;62:24;118:17
**FMCSA (40)** 16:5,13;18:17;19:5,10;20:2,15;26:22;57:21;58:15;59:6,11;65:22;66:1,9,20;73:20;74:9,11;76:2,12,22;77:5,9,17,25;78:12,17,21;79:5,18;80:7;118:20;121:6;122:2,6,10;123:3,22;124:4
**follow (2)** 21:3;109:5
**following (2)** 68:25;76:1
**follows (1)** 8:17
**follow-up (2)** 83:10;136:9
**form (65)** 13:10;16:4;22:7,25;31:17;42:16;43:14,21;44:3,16;47:12,21;50:24;57:1;64:1,18,24;65:19,25;70:22;76:17;77:7;78:15,24;79:11,21;80:12;81:19;82:14;83:25;85:10,20;90:1,6;91:17,24;92:9;93:4,12;95:2,10,15,23;96:5,17,24;97:17;98:3;100:10;101:23;102:11,20;104:13;107:3,13,21;109:2;110:19;112:15;113:4,14;117:6;124:1;130:9;135:25
**format (1)** 46:13
**former (1)** 137:18
**forms (7)** 104:18;105:2;106:11;107:6,14,24;108:4
**forward (1)** 119:8
**forwarded (1)** 19:15
**forwarding (1)** 121:9
**FOSS (5)** 49:14;65:10;122:21,24;124:12
**found (3)** 105:21;125:10,13
**four (5)** 26:19;36:2;52:14;68:23;123:1
**Franklin (1)** 96:6
**Friday (4)** 70:12,14;73:13;111:12
**front (1)** 30:4
**Fuel (2)** 48:10,15
**fulfilled (2)** 33:2;99:22
**full (3)** 23:19;104:4;124:5
**furnish (3)** 105:1;107:5,24
**furnished (1)** 108:5
**furnishes (1)** 104:17
**furnishing (1)** 106:11
**further (3)** 64:10;67:16;112:3
**future (1)** 135:3

**G**

**garage (1)** 88:22
**Garr (3)** 26:5;70:5;73:2
**gather (1)** 34:12
**gathering (1)** 24:9
**gave (1)** 46:1
**Geiger (1)** 96:10
**Geldens (1)** 8:11
**general (2)** 40:10;58:19
**gets (1)** 48:23
**GILSON (2)** 8:1,1
**given (4)** 23:19;78:7;87:15;136:5
**gives (1)** 104:8
**giving (1)** 16:6
**goes (4)** 67:8;93:8;126:1;127:10
**gonna (1)** 59:14
**good (6)** 54:25;58:9;70:4;80:16;109:8;131:1
**governed (1)** 124:6
**Government (1)** 99:9
**governmental (1)** 80:7
**government-related (2)** 116:16,21
**grab (1)** 109:4
**Graff (4)** 7:8,8;72:16,19
**grant (1)** 70:11
**guess (8)** 20:1;40:1;47:17;75:17;103:12;122:7;125:18;127:6
**guideline (1)** 47:13
**guys (3)** 67:22;94:4;119:3

**H**

**half (2)** 126:13;129:21
**handled (1)** 105:3
**Hanke (1)** 80:16
**happen (1)** 9:1
**happened (1)** 112:25
**happening (1)** 117:5
**hard (3)** 42:13;46:10;55:20
**haul (2)** 99:24;100:2
**hauled (1)** 99:4
**hauling (1)** 102:1
**head (2)** 127:4,5
**headquarters (2)** 61:19,19
**heads (1)** 125:22
**hear (3)** 55:21;133:10,14
**heard (2)** 33:8;84:17
**hearing (1)** 129:12
**held (1)** 15:14
**help (4)** 25:12;99:15;105:17;107:19
**here's (1)** 18:20
**hey (3)** 13:22;75:5;79:19
**high (1)** 55:20
**high-level (1)** 34:24
**Hines (3)** 7:21,23;128:25
**history (3)** 129:17;134:23;135:1
**hit (1)** 76:2
**HODGE (2)** 8:3,3
**Hold (2)** 24:17,17
**home (1)** 61:8
**Hope (14)** 19:6,7,9;20:2,5,8;77:25;78:8;118:20;120:4;122:9;123:3;131:21;132:3
**hotline (2)** 78:7;131:8
**hours (3)** 24:8;25:2;59:19
**house (2)** 61:11,12
**hundred (1)** 61:20
**hundred-thousand (1)** 59:20
**hurry (1)** 119:23

**I**

**ID (2)** 49:22,24
**idea (6)** 91:18;93:13;94:22;

96:12;125:9;127:10
**identification (20)** 12:15;29:2;34:16; 49:18;51:24;63:2; 67:13;69:19;72:11; 82:22;89:8;98:19; 105:9;111:3;114:12; 115:8,25;123:9,11; 124:14
**identified (1)** 94:15
**identifies (1)** 37:5
**identify (1)** 99:20
**IFTA (6)** 34:16;48:9,17;58:9; 72:6;108:18
**imagine (1)** 60:4
**important (3)** 116:24;137:13,14
**improper (6)** 30:7,16,19,20,25; 31:9
**improperly (1)** 54:4
**inactive (1)** 135:6
**inappropriate (1)** 32:20
**inbox (2)** 125:11;126:22
**Inc (16)** 8:2;10:15;16:15; 22:4,14;23:8;25:10; 26:2;27:19;28:5;29:9; 33:13;36:9;37:15; 71:3;115:3
**incident (2)** 75:23;77:17
**include (3)** 16:17;38:7;82:12
**included (3)** 94:5;134:18;135:7
**includes (3)** 21:21;25:7;35:23
**including (1)** 16:18
**inclusion (1)** 40:18
**incomplete (2)** 63:10;68:3
**incorporated (2)** 136:16,22
**incorrect (1)** 11:11
**independent (2)** 114:1;131:11
**indicate (3)** 83:21;88:13;99:7
**indicated (7)** 41:23;53:6;55:16, 18;56:12;94:1;119:1
**indicates (4)** 39:7;51:15;56:2; 112:10
**indication (14)** 58:18;76:14;91:14; 97:8,14;98:1,23; 101:6;102:24;103:5, 9;104:19;107:1,10
**indicator (3)** 106:18,19;107:23
**indicators (3)** 97:3;106:9,14
**individual (3)** 13:16;33:4;49:23
**individually (3)** 21:25;23:11;46:5
**inference (1)** 81:14
**inform (1)** 70:11
**information (9)** 34:12;46:11;49:24; 77:13;79:10;91:11; 110:17;116:6,20
**informed (1)** 60:25
**inquiry (1)** 24:7
**insert (1)** 32:13
**inserting (1)** 31:8
**insertion (1)** 30:7
**inspection (16)** 16:3;71:11,17; 73:17;74:12,15,17; 75:11,13,20;76:2; 77:8,9;80:2,18,19
**inspections (2)** 53:25;76:23
**instead (2)** 59:16,17
**Insurance (1)** 8:6
**intended (1)** 120:2
**intent (2)** 34:11;36:25
**intentional (1)** 119:16
**interact (1)** 39:17
**interaction (1)** 90:24
**internal (1)** 39:13
**internally (1)** 110:10
**International (1)** 48:10
**interrupt (3)** 35:10;63:4;72:17
**interruption (1)** 75:3
**interstate (3)** 40:13;41:4;42:21
**into (19)** 30:7;31:8;32:13; 59:2,7;61:21;64:10; 70:1;78:6;84:22;85:3; 91:8;99:21;111:22; 112:22;126:14; 130:13;131:7;136:15
**investigation (3)** 54:1;99:19;110:9
**invoices (3)** 82:8,10,12
**involved (9)** 41:24;57:5,23;69:4; 70:15;71:13;72:2; 82:2;93:1
**involvement (2)** 15:25;102:9
**involving (3)** 11:17;74:12;78:21
**IRP (1)** 108:20
**IRP/IFTA (1)** 68:24
**issue (13)** 15:15;20:19;58:24; 67:17;73:22;74:11, 13,14;80:2;81:6; 107:13;129:3;135:22
**issues (3)** 18:14;59:12;109:6
**Item (1)** 46:17
**items (4)** 28:8;37:10,16; 38:15

**J**

**Jamie (1)** 11:18
**January (5)** 7:3;65:6;102:3; 113:20;133:2
**Jeffrey (1)** 8:11
**Jim (2)** 7:14;8:1
**JMM3 (1)** 122:22
**JMM333 (11)** 41:22;50:6;52:5; 54:14;58:8,21;67:18; 75:22;76:16,24;99:8
**JMM333-251 (4)** 71:12;73:5;81:6; 82:2
**job (16)** 9:10,17;17:15,16, 22;18:2,8;31:5,6; 48:13;53:11,14,20,23; 54:2;129:22
**Joe (101)** 7:25;10:15;12:21; 13:8;16:15;18:21; 20:6,16,20;21:9,20; 22:4,13;23:8;24:13; 25:10;26:1,10,12; 27:14,18;28:4;29:9; 32:10;33:12,19,20; 34:2,5,17;36:9;37:9, 14,20;38:18,20,24; 39:6;40:19;41:10,14, 21;48:22;49:8,23; 50:1,3,6,21;52:9; 54:14;55:3;56:2,12; 57:12,21;58:7,19; 63:24;64:12;65:22; 66:10;70:19;71:3,8; 74:10;75:21;76:5,15; 77:5;82:9;83:5,23; 84:6;86:25;89:11; 93:1;94:25;95:19; 97:24;100:8;101:21; 102:4,9,18;108:4,18; 110:16,23;111:7; 112:4,13;113:2; 114:4;115:2,15,20; 116:9,22;122:19; 123:6
**John (2)** 7:18;129:9
**Joseph (1)** 7:16
**July (74)** 12:22;13:8;15:21; 16:10;20:16,21; 21:10,14;22:6,15,24; 24:13;26:23;27:11, 19;40:20,21,25; 50:23;51:12,18; 54:16;55:6;56:3,16, 25;57:6,14,21,25; 63:20;64:13;66:4,7, 25;70:12,21;71:3,9, 17,24;73:13;74:8; 77:16,22;78:14,17,22; 79:6,18;80:1,8,15; 82:9;83:17,17,24; 84:7;96:15,23;99:22; 108:17;111:7,12; 112:5,9,14,19,23,25; 113:3;121:6;131:4; 133:22
**June (21)** 16:2;66:25;67:8; 68:20;69:13;73:11, 16;74:12,18;75:11,20, 21;76:16;79:18;80:1, 2,8;99:10,21;112:6,20
**jurat (1)** 138:3
**jury (2)** 11:24;12:2

**K**

**Kathleen (1)** 118:25
**Kathy (7)** 119:6,14,19; 121:21,25;124:17; 127:16
**Katie (2)** 7:8;137:25
**keep (3)** 62:16;79:14;134:22
**keeping (2)** 52:9;64:15
**keeps (1)** 36:19
**kept (1)** 48:18
**key (1)** 32:25
**killed (1)** 26:20
**kind (3)** 47:6;64:22;116:5
**knew (2)** 77:10;78:11
**KNIGHT (2)** 8:5,5
**knowing (1)** 99:16
**knowledge (7)** 13:24;14:7,8;24:10; 25:20;85:15;92:20
**knowledgeable (3)** 13:6,15,17
**known (1)** 24:10
**KRATZER (21)** 8:16,20;14:19; 17:14;21:8;29:5; 32:24;43:19;52:3; 59:10;60:19;73:1; 75:10;83:8;98:14; 109:20;121:4;123:2, 16;129:16;138:2
**Kyle (1)** 11:17

**L**

**labor (1)** 99:25
**lack (1)** 58:14
**LANGLEY (184)** 7:12,12;8:19,20; 12:16;13:13;14:2,5, 16,17;15:3;16:8;17:3, 8,12,13;20:24;21:4,6; 22:10,11;23:2;24:1,

22,23;29:3;30:6,13,
21,24;31:5,13,15,21;
32:2,7,20,23;42:19;
43:16,22;44:5,18,22,
24;47:15,23;49:15,
21;51:1,20;52:1;57:3;
59:3,13,25;60:7,12,
18;62:24;63:7,11,17,
18;64:4,20;65:1,9,12,
16,20;66:3,23;67:6,
14,23;68:5;69:16,20;
70:24;72:12,18,22;
75:4,8;76:19;77:15;
78:18;79:1,15,23;
80:14;82:5,7,16,19,
23;83:3;84:3,14;
85:13,23;89:5,9,16,
21;90:4,8,22;91:9,19;
92:1,11,23;93:5,14,
18,25;94:18;95:5,12,
17;96:3,19;97:1,19;
98:5,11,13,16,20;
99:6;100:12;102:2,
14,22;104:15;105:6,
10;107:8;109:7,11,18,
19;110:21;111:4;
112:17;113:6,17;
114:13;115:9;116:1;
117:8,17;118:4,15;
119:2,12,18,24;120:2,
12,22;121:2,3;122:23,
25;123:12;124:3,10,
15,18;128:17;130:9,
17,22;133:25;134:6,
8;135:15,25;136:8,
11;137:22

**language (2)**
43:1;81:21

**larger (1)**
68:9

**last (8)**
9:5,6;59:21;90:17;
91:6;117:22;133:11;
135:10

**late (4)**
41:9;50:4;102:8,18

**later (1)**
99:22

**law (2)**
48:19;52:10

**lawsuit (1)**
11:17

**lawyer (1)**
25:12

**lawyers (1)**
61:2

**lead (1)**
105:24

**leading (1)**
105:24

**lease (7)**
18:20,23;21:16;
92:25;115:2,14;
132:11

**leases (1)**
92:21

**least (4)**
76:16;83:22;84:9;
113:20

**leave (1)**
17:4

**left (5)**
19:13,13;78:1;
109:24;129:22

**legal (10)**
7:9;63:19;64:2,12,
22;70:10,14,18;71:1;
127:24

**letter (23)**
21:19;34:6;35:8,12,
14,25;36:5,24;37:25;
42:9;43:10,12,12;
44:4;46:16;47:3,7;
55:3;56:17;65:3,6;
84:9;101:17

**license (21)**
26:21;34:15;38:8,
18;54:14;56:20,21;
57:13,23;58:20;
61:25;65:14;66:11;
70:20;72:6;79:9;
80:10;108:24;135:11,
22,23

**likely (2)**
19:22,24

**limitations (1)**
23:24

**limited (1)**
87:22

**line (10)**
40:13;41:4;42:21,
23;62:18;68:22;88:3;
116:9;122:1;127:13

**Lines (3)**
10:6,8;36:24

**link (1)**
90:2

**Lisa (2)**
75:16;81:18

**list (15)**
28:8,19;33:15;
41:14;47:13;54:18,
22;86:19;93:9;
103:23,23;116:9;
127:18;134:14;135:3

**listed (11)**
35:7,12;52:18;
74:21;87:14;106:15;
107:25;115:21;125:7;
128:9;134:25

**listen (2)**
131:13,15

**listening (1)**
131:12

**listing (2)**
41:10;128:5

**litigation (1)**
126:14

**little (4)**
54:19;82:23;89:17;
98:12

**LLC (6)**
7:6,15;12:21;23:21;
54:19;121:11

**load (6)**
97:11,11,25;99:9;
111:6;116:21

**loading (1)**
108:16

**loads (11)**
87:4;97:6,12;98:6,
8,22,22;99:4,21;
104:2,8

**location (2)**
112:9;130:1

**locations (1)**
134:15

**Locke (1)**
7:15

**log-ins (1)**
50:7

**logs (1)**
53:25

**long (4)**
15:11;18:2;60:4;
63:11

**longer (6)**
20:6;38:20;52:24;
109:21;122:15;
132:19

**look (6)**
54:8;59:14,24;
79:24;117:25;126:22

**looked (4)**
55:10;58:6;120:12;
134:11

**looking (5)**
17:11;42:11;50:20;
73:12;75:9

**looks (5)**
69:12;74:14;84:1;
118:25;121:9

**Lopez (2)**
62:6,7

**losses (1)**
27:2

**lot (3)**
56:7;135:10,14

## M

**M22132 (1)**
74:24

**M333 (4)**
83:6;115:16;
116:10;121:12

**M444 (1)**
121:12

**Maddox (14)**
19:6,7,9;20:2,5,8;
77:25;118:20;120:5;
122:9;123:3;133:12,
13,15

**magnify (1)**
73:24

**maintaining (1)**
88:10

**maintenance (1)**
16:3

**major (1)**
39:13

**making (1)**
32:14

**management (2)**
45:14,21

**manager (13)**
18:10,12;52:19;
53:10,12,21,23;54:2,
3,6,7;69:21;78:2

**managers (1)**
39:13

**managing (2)**
23:15,18

**manner (4)**
50:25;80:24;81:22;
103:4

**Many (4)**
9:3;103:17;125:24;
134:12

**March (9)**
38:23;39:10;52:7,
18;53:2,22;54:24;
55:18;58:7

**mark (21)**
12:7,11;28:23;
49:16;51:21;52:15;
63:12;65:11;69:16;
82:19;83:1;89:6;
98:16;110:25;114:10,
18;115:6;122:7,19,21,
24

**marked (30)**
12:14;29:1;45:2;
49:17;51:23;62:22;
63:1;67:12,16;69:18;
72:10,14;82:21;89:7;
98:18;105:8;111:2;
114:11;115:7,22,24;
119:19;121:23;123:8,
10,13,24;124:13;
136:18;137:5

**markers (1)**
34:17

**marketing (1)**
95:25

**markings (1)**
38:12

**Martin (1)**
68:17

**Matt (2)**
7:24;24:19

**matter (1)**
73:16

**matters (2)**
78:12,21

**may (21)**
11:21,24;26:13;
29:24;44:10;62:5,12,
17;63:20;64:13;65:2;
66:7;67:4,5;89:12;
93:8;95:14,22;
121:22;127:4;136:3

**Maybe (4)**
16:12;97:18;100:1;
119:7

**Mayflower (264)**
7:6;8:10;9:8,13,17,
17,21;10:15,19,24;
12:20;13:5,8,17;14:9,
12,20,24;16:14;
17:25;18:6,21;20:7,
16,20,23;21:2,7,9,14,
20;22:1,3,12,21;23:7,
12,16,20;24:3,11,12;
25:9,19;26:18,21,21;
27:3,6,13,19;28:5,8;
29:8,12;32:10;33:1,
12,16,17;34:7;36:8,
24;37:9,14;38:18,25;
40:19;41:5,10,15,21,
23;42:12,24;43:2,4;
44:1,14,17;45:3;46:7;
47:5,16,20,25;48:5,
23;50:5,11;51:2,6,15,
22;52:2;54:5,9,18;
56:12,15;57:7,14,20;
58:13,17;61:18,22;
62:4;63:8,19;64:12,
16;65:13,21;66:8,11;
69:17;70:19;71:2,6,
15;72:3,14,20,21;
73:2;74:10;75:16,18;
76:15;77:4;79:17;
80:4,9,10,10;82:4,8,
25;83:5,23;84:6,18;
85:4,7,19;86:1,2,7,11,
17,22;87:1,7,9,16,21;
88:3,14,21,23;89:1,
11,24;90:10,12,16;
91:10,11,18;92:6,8,
13,20,22;93:10,16;
94:7,20,20;95:1,6,7,9,
13,18,21;96:1,5,6,8,
14,15,20,22;97:13,24;
99:4;100:16,25;
101:5;102:1,4,16,17,
25;103:18,21;104:6,8,
10,17;107:5;108:4,18,
19,21,23;109:22;
110:5,10,11,15,18,23;
111:1;112:4,13;
113:3,8;115:2,11,15,
21,23;116:22;117:1,
3;118:21,24;119:14,
20;121:10,24;122:15,

19;123:6;124:6;
126:24;127:8;128:6,
9;129:18;130:6;
131:3,15,25;132:9;
133:18,21;134:23;
135:24;136:19;
137:15
**Mayflower/UniGroup (1)**
86:13
**Mayflower's (37)**
16:2;21:13;35:19;
37:20;39:1,8;76:9,20;
77:9;86:20;87:25;
88:6,12,16,18;90:23;
91:15,23;97:5,7,9,15,
21;98:2,24;99:12,14;
100:8;101:8;102:8;
103:6,10;104:9,20;
106:10;113:13,19
**mean (11)**
35:9;42:17;86:24;
100:17;101:2,3;
103:14,16,16;107:12;
125:22
**means (2)**
87:10;112:8
**meant (1)**
107:18
**meet (1)**
8:21
**meeting (2)**
71:20,23
**Member (14)**
27:15;33:16,17,22;
34:1,25;35:16,17;
39:18;40:4,10;45:7,9;
50:14
**member/agent (1)**
30:11
**members (3)**
27:1;45:22;50:15
**member's (2)**
45:15,21
**Mennemeyer (1)**
89:19
**mentioned (5)**
109:20;115:1;
121:4;127:19,20
**message (2)**
19:15;131:12
**met (1)**
13:16
**MICHAEL (3)**
8:16;52:4;68:7
**middle (1)**
74:18
**might (2)**
96:2;128:18
**Mike (14)**
24:20;62:5;63:22;
68:16;70:4,6;75:22;
83:18;92:15;117:23;
120:4,18;123:2;
130:24
**miles (2)**
48:16;61:20
**mind (1)**
32:13
**mine (1)**
59:19
**minute (4)**
18:22;56:1;107:18;
128:9
**minutes (7)**
58:24;59:5,10;
109:10;117:16,23;
118:6
**mislead (1)**
31:20
**misleading (1)**
31:21
**missed (2)**
97:10;119:10
**Missouri (20)**
54:12;55:5;56:14;
57:4,11;58:15;61:14;
62:19;65:21;66:9,19;
68:18;69:15;70:6;
80:6;108:19;129:19,
25;132:4;136:2
**Mixon (1)**
133:11
**modified (1)**
121:16
**modify (2)**
123:22;137:1
**modifying (1)**
73:12
**Moholland (125)**
7:25;10:15;12:21;
13:8;16:7,15;18:21;
20:6,16,20;21:9,20;
22:4,14;23:8;24:13;
25:10;26:1,10,12;
27:14,19;28:5;29:9,
12;32:10;33:13,19,20,
21;34:2,5,17;36:9;
37:9,15,21;38:18,20,
24;40:19;41:10,15,
21;48:6,23;49:8,23;
50:1,3,6,21;52:9;
54:14;55:4,15;56:2,
13;57:12,22;58:8,19;
62:2;63:21,23,24;
64:13,14;65:23;
66:10;70:19;71:3,8;
74:10;75:22;76:5,15;
77:6;82:9;83:6,23;
84:6;86:25;89:11;
93:1;94:25;95:19;
97:24;100:8;101:21;
102:5,9,18;107:7,22;
108:4,5,18;110:17,23;
111:7,20;112:4,14;
113:3;114:4;115:3,
16,21;116:10,22;
118:22;121:11;
122:14,19;123:7;
124:7;130:6;131:22;
132:9;133:20;135:5,
6,23;136:19
**Moholland's (1)**
39:7
**moment (4)**
24:24;64:10;72:23;
83:7
**months (7)**
40:12;42:6;43:6,25;
44:11;84:9;110:1
**more (5)**
18:8;34:12;56:9;
97:2;117:20
**morning (2)**
70:7;76:2
**most (8)**
10:1;12:1;13:6,15,
16,23;41:14,20
**motor (14)**
39:1,9;51:4,9,17;
54:20;56:15;57:8;
64:16;87:6;103:17;
104:10;131:2;132:20
**Move (10)**
26:2,10;43:15;48:3;
63:23;90:20;101:22;
102:5,18;119:8
**moves (1)**
116:16
**Moving (15)**
12:21;26:10;41:15,
21;54:14;55:4;58:19;
76:6;83:6;86:25;87:3;
93:16;95:8,21;116:10
**much (1)**
24:6
**must (3)**
28:9;39:17;43:7
**mute (1)**
75:6
**muted (1)**
67:22

**N**

**name (12)**
15:18;16:2;26:7,20;
27:22;33:8;64:16;
79:8;95:8,20;116:4;
133:11
**names (1)**
134:15
**nature (2)**
9:1;15:20
**Nearing (1)**
15:13
**necessarily (1)**
107:15
**necessary (10)**
37:10;40:13;41:4;
42:7,21;44:14;45:3;
104:18;105:2;107:6
**need (10)**
60:2;70:12,14;75:6;
78:16;98:11;117:14,
14;120:20;130:14
**needed (3)**
19:15;75:14;78:10
**negotiation (1)**
12:11
**Neither (1)**
9:24
**network (1)**
45:22
**new (3)**
50:7;111:11;135:3
**next (11)**
35:13;39:12;40:9;
45:5;52:15;59:18;
67:10;68:22;69:11;
74:24;96:4
**nice (1)**
8:21
**Nicholas (33)**
8:8;10:16;12:21;
13:8;22:5,22;23:4,9;
24:13;25:9;26:25;
49:7;51:3,7,17;54:15;
73:17;74:13,22;
75:10;79:19;80:8;
82:13;83:12,18;84:5;
85:8,18,25;93:1;
96:20;113:7,18
**Nicole (2)**
68:16;109:21
**Nikki (5)**
52:4,16;53:2;58:7;
109:21
**Nikki's (1)**
69:23
**non-active (1)**
134:16
**None (10)**
44:7;51:19;58:22;
80:3;86:4;95:3;99:1;
101:25;114:25;
116:23
**nor (1)**
85:22
**NORDEN (3)**
7:20;128:23;129:7
**Norton (1)**
7:20
**note (1)**
32:14
**noted (1)**
14:3
**notice (7)**
12:9;13:5;35:13;
36:25;40:5;42:14;
45:20
**notification (5)**
66:4;114:15,20;
125:4;126:17
**notifying (2)**
39:14;66:1
**November (4)**
41:25;102:8,19;
115:18
**Number (35)**
12:14;19:14;25:7;
29:1;33:16;36:22;
47:18;49:17;51:23;
63:1;67:12;69:18;
72:10;82:21;89:7;
97:5;98:18;99:17;
104:9;105:8;108:22;
111:2;114:11;115:7,
24;116:4,5;123:8,10;
124:13;134:2,24;
135:1;137:11,16
**numbers (4)**
52:8;80:10;134:22;
135:4
**numerous (1)**
9:3

**O**

**oath (1)**
8:23
**Object (63)**
13:10;16:4;22:7,25;
42:16;43:14,21;44:3,
16;47:12,21;50:24;
57:1;63:10;64:1,18,
24;65:19,25;68:2;
70:22;76:17;77:7;
78:15,24;79:11,21;
80:12;82:14;83:25;
85:10,20;90:1,6;91:4,
17,24;92:9;93:4,12;
95:2,10,15,23;96:17,
24;97:17;98:3;
100:10;101:23;
102:11,20;104:13;
107:3;109:2;110:19;
112:15;113:4,14;
117:6;124:1;130:9;
135:25
**objection (4)**
30:22,23,25;44:21
**objectionable (1)**
32:16
**objections (1)**
31:17
**obligations (2)**
123:23;137:2
**occupants (1)**
96:14
**October (2)**
41:9,16
**off (10)**
60:13,15;61:24;
100:4;109:13,15;
117:13;118:7,10,12

**offer (4)**
86:18;93:15;94:20,25
**offered (2)**
96:1;99:15
**offering (3)**
88:23;95:7,19
**offerings (1)**
100:24
**offers (4)**
86:11;87:2;100:16;103:21
**office (6)**
59:18;61:9,11,12;70:7;132:4
**officer (1)**
23:15
**Once (1)**
14:25
**one (49)**
13:15;18:3,25;25:17;28:13;29:7;38:7;40:9;45:5;47:16;48:1;49:10;50:14,20;53:2;54:25;58:10;60:19;63:6;67:20;69:2;77:9;79:19;82:17;85:14;86:6,10;87:18;92:15;93:25;99:7,24;100:3,13,15,24;103:20;106:9;107:7,14;114:18;115:21;118:18;119:18;120:7;122:22;125:1;128:8;133:23
**ones (4)**
35:12;66:23,24;127:20
**only (5)**
14:7;50:10;56:8;99:23;101:9
**oOo- (1)**
138:8
**open (2)**
17:5;42:5
**operate (35)**
38:21;51:4;55:5;57:22;58:20;65:23;87:7,15,20,25;88:2,6,8,12,14;89:24;91:23;97:4,8,15,21;98:2,24;101:7;102:25;103:5,10;104:20;106:10;108:23;122:15;131:3,24;132:19;136:4
**operated (1)**
113:16
**operating (11)**
29:25;54:4;63:24;84:18,22;85:18,21;88:17;108:11;114:2;133:21
**operation (4)**
85:9,11;87:9;91:15
**operational (1)**
69:1
**operations (7)**
48:14;63:22;99:9;125:25;127:21;128:8,11
**operator (5)**
85:3;113:23;114:14,16,19
**operators (2)**
86:22,24
**opportunities (1)**
87:15
**opportunity (3)**
68:6;84:24;95:19
**order (5)**
28:10,20;32:25;50:15;96:5
**ordered (1)**
137:25
**others (4)**
46:18;63:13;86:15;127:22
**otherwise (2)**
70:14;122:5
**out (13)**
19:22;25:1;26:19,25;35:22;40:5;45:13,20;70:7;79:19;101:19;106:7;126:20
**over (6)**
12:11;36:3;59:21;75:7;93:18;97:3
**oversee (2)**
17:16;53:24
**overseeing (1)**
28:14
**overseen (1)**
27:18
**overview (1)**
34:24
**own (1)**
20:23
**owner (2)**
116:4,5

## P

**packing (1)**
108:16
**PADGETT (2)**
7:16,16
**page (13)**
11:3;30:3,20;52:15;54:8;63:6;67:20;69:11;74:19;96:4;100:19;123:18;138:3
**pages (4)**
59:20;115:11;118:17;123:1
**Paragraph (6)**
100:19;104:25;132:25;133:5;136:13,14
**part (15)**
27:12;54:2;63:22;76:9,21;86:10,16,17;87:10;88:23;92:2;94:2;97:10;103:20;120:3
**participate (5)**
71:11,23;100:15;101:1,3
**participated (1)**
71:16
**participation (1)**
101:12
**particular (2)**
33:4;42:4
**parties (2)**
36:8,17
**parties' (2)**
123:23;137:2
**partner (1)**
23:18
**parts (3)**
53:24,24;67:3
**password (1)**
49:24
**passwords (1)**
50:8
**past (4)**
12:11;40:20;70:12;84:1
**pay (1)**
48:15
**payment (1)**
83:17
**payments (1)**
83:11
**Payne (1)**
8:2
**people (1)**
26:20
**people's (1)**
130:13
**per (1)**
28:9
**period (14)**
36:16;38:25;43:6,25;45:1;53:18,19,22;64:3;104:4;106:16;113:9,12;131:1
**periods (1)**
99:22
**person (9)**
13:7,14,23;15:24;27:10,16;40:6;96:6,9
**person's (1)**
27:22
**perspective (1)**
86:20
**Peters (9)**
52:4;62:5;63:22;68:8,16;70:4,6;75:22;83:18
**Petno (2)**
7:19;129:10
**Petry (5)**
53:10;69:13,21;70:5;73:2
**Petry's (1)**
69:25
**phone (2)**
75:6;78:6
**phrase (2)**
43:3;84:17
**phrased (2)**
91:5;100:14
**picture (2)**
96:1;116:3
**piece (3)**
88:1,5;89:23
**placard (1)**
41:23
**place (4)**
34:24;40:14;43:13;111:25
**plaintiffs (9)**
7:13,17,19,21,23;8:4;56:24;57:24;117:4
**Plaintiffs' (19)**
12:14;29:1;49:17;51:23;63:1;67:12;69:18;72:10;82:21;89:7;98:18;105:8;111:2;114:11;115:7,24;123:8,10;124:13
**plate (6)**
26:21;54:14,25;56:20,22;135:22
**plates (39)**
34:16;38:8,19,21;39:1;55:15,17;56:8,14;57:13,23;58:9,20;62:1,2,19;63:25;64:15;65:14,24;66:11;67:17;68:18;69:15;70:6,8,20;71:2,8;72:6;73:3,8;79:9;80:10;108:20,24;135:11,23;136:4
**platform (1)**
49:4
**plays (1)**
86:7
**please (19)**
7:10;8:14;15:8;30:17;31:10,17;32:16;44:23;49:20;68:9;73:24;76:4,18;80:18;89:15;106:8;111:13;124:22;128:17
**pm (8)**
60:14,17;109:14,17;118:11,14;138:5,7
**point (19)**
40:10;43:5,24;50:17,19;51:14;55:1;57:10,16,19;58:3;64:21;66:15;70:25;71:6;94:24;96:21;106:7;131:4
**pointed (1)**
136:13
**police (1)**
38:15
**policies (5)**
17:19,23,24;47:17;48:1
**policy (9)**
28:10;33:1;42:11;43:2;47:5,9,16,19;137:15
**POPE (4)**
7:18,18;129:9,9
**portal (11)**
48:24,25;49:1,3,5;50:7,10,15,22;76:2;77:9
**position (10)**
20:19;21:8,12,13,24;31:3,6,8,14;35:19
**positions (1)**
31:12
**possible (2)**
12:2;101:24
**potential (2)**
25:4;113:2
**practice (1)**
58:2
**precedent (1)**
130:15
**preclude (1)**
63:24
**preparation (3)**
27:24;84:25;116:17
**prepare (4)**
25:13,15,23;26:2
**prepared (1)**
12:19
**preparing (2)**
24:6;25:2
**Present (1)**
7:7
**presented (1)**
11:24
**president (3)**
26:9,11;63:22
**presume (2)**
18:12;60:24
**pretty (6)**
53:18,19,21;60:5;94:12;99:19
**prevent (5)**
64:14;71:2,8;95:7;117:4
**prior (13)**
9:15,25;18:5;50:22;

51:12,18;57:21; 78:17,22;79:18; 96:23;116:13;129:17
**Probably (11)** 9:6;10:4;24:8;35:7; 59:16;101:24;108:16; 110:1;125:19;126:1; 131:6
**problem (1)** 129:4
**procedural (2)** 63:5,16
**procedure (1)** 47:19
**procedures (1)** 48:1
**proceed (1)** 11:4
**process (4)** 33:5;34:25;35:4; 40:11
**processing (5)** 104:18;105:2; 106:12;107:6;108:5
**produced (8)** 17:6;25:4;49:6; 59:21;120:13;121:21; 122:6;128:15
**product (3)** 14:14;15:1;59:23
**production (2)** 41:14,20
**program (2)** 78:1;108:21
**progress (1)** 68:17
**promoting (1)** 102:23
**promotion (1)** 18:12
**promptly (1)** 108:11
**proof (2)** 131:25;132:2
**proper (2)** 25:19;76:11
**properly (4)** 28:4,11,21;51:7
**prove (1)** 132:18
**provide (5)** 10:14;12:1;13:17; 80:19;108:9
**provided (6)** 115:20;117:22; 118:17,18;123:22; 127:12
**provides (2)** 34:23;39:15
**public (1)** 58:19
**pull (4)** 49:12;100:20; 105:4;115:5
**purchase (2)** 88:24;95:20
**purpose (13)** 19:25;20:4;34:11; 46:19,24;47:4,9; 104:11;122:12; 134:21;135:2;136:1; 137:9
**purposes (2)** 119:20;120:23

**Q**

**qualification (6)** 51:16;78:13;87:23; 88:4;113:8,11
**qualified (6)** 50:14;76:4;81:12, 15;88:2,14
**quick (1)** 109:4
**quite (1)** 125:23

**R**

**rather (1)** 44:10
**reach (2)** 26:19,25
**reached (2)** 20:15;70:7
**read (20)** 32:18;44:15;62:20; 68:7;69:25;70:2,16; 73:1;76:7;80:21;81:2; 84:24;98:14;99:18; 100:23;105:1;106:23; 111:10;136:15;138:2
**reading (7)** 7:4;30:10,10,19; 42:20;103:19;105:11
**ready (1)** 17:2
**reask (2)** 44:23;49:20
**reason (7)** 36:11,15;47:24; 69:8;78:25;79:3; 103:22
**reasonably (2)** 14:8;24:10
**recall (26)** 10:3,11;16:5;19:19, 24;21:23;26:17; 37:12,13,17,19,25; 38:16;39:3,5,25; 41:17;42:1;55:7,11; 56:7;77:24;82:15; 83:6;113:9;131:18
**recalled (1)** 125:6
**received (7)** 80:17,23;81:1,19, 22;127:3,7
**recent (3)** 10:2;41:14,20
**recipient (1)** 125:8
**recipients (1)** 93:10
**recognize (1)** 26:12
**recollection (2)** 131:12,20
**record (24)** 7:3,11;14:3;30:8; 31:9;32:2;35:24; 46:10;60:14,15,17; 61:24;70:1;72:24; 85:2;109:14,15,17; 118:8,10,12,14; 120:23;136:15
**recorded (1)** 12:5
**records (2)** 32:15;59:14
**recover (1)** 73:3
**recovered (1)** 73:8
**recovery (1)** 38:7
**redacted (1)** 49:25
**reference (5)** 35:14;67:10;73:23; 136:24;137:4
**referenced (2)** 125:5;136:21
**references (2)** 100:14;104:17
**referencing (2)** 65:4;66:5
**referred (2)** 42:23;132:3
**referring (5)** 40:2;49:10;85:12; 94:11;102:13
**reflect (6)** 40:18;41:9;43:12; 66:16;71:7;102:7
**reflects (2)** 64:22;134:13
**refund (2)** 136:2,6
**refute (4)** 39:6;63:21;85:5; 102:10
**regard (1)** 24:11
**regarding (3)** 59:11;70:6;131:8
**register (1)** 68:24
**registered (2)** 57:7;64:15
**registration (1)** 48:15
**reject (1)** 102:10
**relate (1)** 128:14
**related (10)** 10:15;46:11;62:3; 68:18;74:10,11; 78:12;92:22;125:14; 135:17
**relation (3)** 10:12;74:1;77:21
**relationship (23)** 12:20;22:4,13,17, 22;23:4;24:12;25:9; 29:13;34:8;83:22; 84:5;100:8;108:3,3; 110:23;112:4,13; 116:15,21;124:6; 130:6,7
**relationships (1)** 27:5
**relevant (1)** 17:6
**Relocations (1)** 7:15
**relying (1)** 114:4
**remained (1)** 57:7
**remember (12)** 18:25;34:20;38:4; 56:5;59:9;78:4;86:8; 114:15;126:16; 133:25;134:2;135:12
**reminded (1)** 126:15
**remotely (2)** 61:21,23
**remove (1)** 38:11
**removed (1)** 16:2
**rentals (2)** 82:13;83:12
**rep (3)** 13:24;14:1,1
**repair (1)** 80:20
**repeat (5)** 29:20;134:23; 135:1;137:10,16
**repeated (1)** 135:4
**rephrase (2)** 91:5,7
**replies (1)** 36:23
**report (7)** 38:15;65:13;73:17, 24;75:20;80:18,19
**reported (2)** 72:3,7
**reporter (2)** 7:7;8:14
**represent (1)** 14:8
**representative (7)** 9:7;10:20,24;23:13; 46:6;94:6;102:16
**representatives (1)** 55:16
**representing (1)** 103:3
**request (3)** 69:6;99:8;111:21
**requested (2)** 35:15;112:7
**requesting (2)** 97:24;111:6
**requests (1)** 98:22
**require (1)** 76:11
**required (3)** 13:5;32:25;80:17
**requirements (2)** 38:1,4
**requires (1)** 38:11
**reserved (1)** 138:6
**reserving (1)** 31:16
**respective (1)** 29:12
**respond (2)** 20:12;24:7
**responded (1)** 112:24
**response (4)** 64:7;69:12;122:9, 11
**responses (1)** 130:16
**responsibility (4)** 29:11;33:11;76:10; 105:16
**responsible (16)** 15:24;27:6,11; 28:14;33:5;39:1,9; 48:5;53:3,8;54:3,19; 56:15;57:8;64:16; 104:10
**rest (1)** 99:24
**result (2)** 110:6,12
**retains (1)** 46:11
**return (3)** 70:8;135:12,22
**returned (3)**

38:19;70:20;78:6
**returning (3)**
56:8;62:17;136:1
**revenue (1)**
127:24
**review (6)**
17:1;24:15;60:3;105:18;116:16;117:14
**reviewed (9)**
21:19;24:20,24,25;28:19;29:4;99:25;135:16,20
**reviewing (2)**
25:3;44:9
**right (112)**
10:18;11:1;12:7,24;13:4;17:12,14;18:15;21:4,15,22;22:10;24:22;25:5,10;30:13,24;31:2;33:15;34:3;35:13,17;36:22;37:19;38:2;39:12;41:1,19;42:4,10;45:12;47:4;50:17;51:20;52:12;53:11;55:22;58:11;59:25;60:19;61:24;63:17;65:4,5;66:22;67:15;68:6,15,18;69:23;72:9,13;73:15,17;74:3,22,25;75:11,14,18,19,24;78:14;79:16,24;81:25;82:17;83:1;86:13;87:4,21;89:3,12;92:14,17;96:5,7;98:10;99:3;100:13;101:11;104:1;106:9;108:2;112:9,19;113:7;115:18;116:13;118:4,16;119:24;120:22,24;121:2;123:16,25;125:24;126:23,25;127:13;130:5,22;131:9,11;132:2;133:10;134:5,9,20;135:14;136:22
**rights (2)**
123:23;137:2
**Riley (1)**
11:18
**roadside (7)**
53:25;73:16;74:12;75:13;76:1,23;80:18
**Rob (4)**
26:5;70:4,5;73:2
**role (6)**
12:25;13:2;15:14;24:9;86:7;129:25
**ROMANELLI (2)**
7:22,22
**rules (4)**
11:2;27:8;28:13;52:11
**run (7)**
38:21,25;48:16;55:17;56:13;62:16;66:11
**running (1)**
39:8
**Ryan (8)**
7:12;8:20;13:23;21:1;24:18;72:16;75:6;93:23

**S**

**safe (2)**
51:4,17
**safety (44)**
9:11,12,23;10:14;15:10,12,23;16:2;17:19,22,23,24,24;18:10,11,12;26:18;27:7;28:13;39:2,9;47:17;51:8;52:11,19,23;53:5,12,21,23,24;54:2,3,20;56:16;57:8;62:9,10;64:17;69:22;75:17;104:11;125:25;127:20
**sale (3)**
88:21;93:16;94:25
**sales (2)**
88:22;94:20
**same (10)**
11:3;30:3;33:22;41:22;67:25;79:5;80:16;81:17;83:12;91:20
**satisfied (1)**
133:20
**saying (4)**
30:9;73:11;83:6;102:15
**scroll (1)**
54:19
**search (2)**
111:11;125:10
**second (3)**
54:8;92:15;131:5
**section (1)**
115:22
**Sedalia (1)**
61:17
**seeing (4)**
37:13,19,25;39:25
**seeking (3)**
16:1;32:12;34:7
**seems (2)**
99:7;106:2
**self-term (1)**
36:25
**self-terminates (1)**
30:12
**self-terminating (1)**
35:1
**sell (1)**
92:25
**sells (1)**
92:21
**send (16)**
16:5,9;19:4,20;34:6;39:12;40:5;45:13;82:4,8;117:14;122:17;124:4;131:25;132:9;133:7
**sending (5)**
20:1,4;50:5;58:7;122:12
**sending/e-mailing (1)**
36:23
**sends (2)**
45:20;62:14
**senior (1)**
69:21
**sent (39)**
12:9;16:13;18:17;19:18;20:1,9;23:8;24:19,20;35:14;39:22;55:9,12;56:5;62:6;69:13;70:13;73:20;74:8;81:20;119:1;120:4;121:14,22;122:1;124:19,20,23;126:7,20;127:12;132:3,10,15,21,23;133:9,15;136:13
**sentence (1)**
81:18
**separate (2)**
120:10;128:3
**separately (1)**
65:11
**separation (6)**
84:10,13,18;109:24;114:14,20
**services (9)**
10:14;86:11,17;87:2;100:16;103:21;108:9,13,15
**SESSIONS (2)**
7:24,24
**set (4)**
43:6;44:9;47:6;48:23
**sets (1)**
42:13
**several (2)**
59:19;127:25
**shall (3)**
105:1,13;133:1
**sheet (3)**
45:7,10;137:9
**shipment (5)**
39:17;111:6,11,14;112:23
**shipments (7)**
104:19;105:3;106:12;107:7;108:6,9;116:22
**shipping (1)**
112:9
**shirt (3)**
95:9;96:5,22
**shirts (2)**
88:25;96:15
**short (1)**
60:5
**show (27)**
12:7;16:24;20:6;28:23;49:15;51:20;62:2;67:15;72:13;76:3,20;77:13;82:17;85:17;89:3,5;94:24;100:7;110:24;114:9;115:6;121:22;122:14;126:8,10;130:15,25
**showed (2)**
77:8;133:25
**showing (3)**
71:1;83:15,17
**shown (3)**
133:23,24;135:15
**shows (1)**
87:24
**side (2)**
36:18;104:16
**sign (1)**
138:3
**signature (1)**
138:6
**signed (1)**
85:25
**significance (1)**
48:12
**similar (2)**
50:20;114:23
**sit (7)**
57:17;64:22;70:25;71:5;111:14,17;117:9
**six (4)**
59:18;68:23;84:9;110:1
**Sloan (7)**
7:13,17;8:4;11:17;56:24;57:24;117:4
**solicit (2)**
100:14;101:1
**solicitate (3)**
100:25;101:4,4
**somebody (6)**
40:4;96:2;129:3;131:7,14;134:25
**somehow (2)**
94:24;101:25
**someone (5)**
13:6;19:15;34:7;54:6;100:1
**somewhere (2)**
61:10;109:25
**sorry (15)**
29:20;35:9;44:20;50:2;51:5;52:2;59:3;63:4;67:22;70:11;73:25;75:4;77:1;100:4;119:10
**sort (5)**
107:14,24;125:25;131:7;132:6
**sound (1)**
84:20
**sounds (2)**
99:18;109:7
**speak (8)**
14:12,20,24;23:20;25:15,18;32:2;55:22
**speaking (1)**
98:8
**specialist (1)**
120:16
**specific (11)**
27:13;38:19;43:24;44:9;45:1;54:13;67:17;77:24;94:14;106:16;107:21
**specifically (8)**
10:11;23:8;35:5;36:13,20;94:8;106:7;131:23
**specifics (2)**
56:9;78:4
**spend (1)**
24:6
**spending (1)**
59:18
**spent (1)**
25:2
**spoken (1)**
25:1
**spreadsheet (9)**
133:24;134:1,13,14,18,21;135:8;137:7,19
**spreadsheets (2)**
25:8;115:20
**stamp (2)**
66:24;98:17
**stamped (3)**
118:24;119:13;135:21
**stamps (1)**
119:4
**stand (1)**
111:17
**standpoint (1)**
86:20
**start (3)**
52:2;62:4;75:7
**started (1)**
93:9
**state (9)**
7:10;25:1;38:13;66:10;71:4;77:13;78:1;81:9;136:2

**stated (3)** 21:25;36:13;95:8
**statement (2)** 63:21;84:7
**statements (2)** 83:5,7
**states (3)** 48:16;57:12;85:3
**stating (2)** 23:8;57:21
**stays (1)** 40:9
**Steis (12)** 118:25;119:6,14, 19;120:10,10,15,25; 121:21,25;124:17; 127:16
**S-T-E-I-S (1)** 120:11
**steps (3)** 34:25;35:3;95:6
**sticker (1)** 108:19
**stickers (5)** 34:16;38:8;48:17; 58:9;72:6
**still (8)** 41:10;55:20;80:17; 101:17,25;102:4; 120:20;127:6
**stolen (3)** 65:14;72:3,7
**stop (4)** 30:16;31:1,10; 32:17
**storage (8)** 93:16;95:9,21; 111:18,19,23;112:9, 22
**street (1)** 116:6
**strike (3)** 43:15;50:18;115:18
**string (1)** 67:3
**struck (1)** 57:24
**structure (1)** 87:1
**subject (4)** 12:10;56:8;62:18; 75:13
**subsidiary (1)** 92:5
**substance (3)** 60:23;61:2;63:4
**substantive (1)** 63:16
**success (7)** 27:7,13,15;28:17; 33:23;40:4;47:18
**successor (3)** 63:23;101:21;102:5
**suffered (1)** 27:2
**suitable (1)** 108:11
**suite (2)** 86:10;100:15
**summer (1)** 99:15
**supervisor (2)** 53:9;129:24
**supposed (1)** 79:20
**sure (13)** 10:21;11:2;17:10; 25:19;61:1;70:1,1; 74:3;78:1;87:17; 120:6;127:24;135:9
**swear (1)** 8:15
**sworn/affirmed (1)** 8:17
**system (10)** 23:6,9;86:8;87:11, 19;89:23;90:3,10; 97:7,13

**T**

**Tailored (6)** 26:2,10;63:23; 101:21;102:5,18
**talk (11)** 19:21;25:23;26:1; 27:24;60:20,22;86:5; 120:14,20,21,24
**talked (6)** 19:22;28:2;87:18; 93:20;110:22;113:7
**talking (9)** 42:23;55:24;61:25; 79:10;81:4,5;82:1,18; 108:25
**talks (1)** 74:17
**tasks (1)** 28:19
**Tax (2)** 48:10,15
**telling (1)** 18:3
**temporary (13)** 99:15,20;118:20; 119:5,15;121:10,15; 123:21;130:2;132:13, 22;136:12;137:1
**term (3)** 132:25;133:1; 136:14
**terminate (3)** 34:7;48:6;133:2
**terminated (7)** 28:4,11,21;29:14; 50:22;85:8;109:23
**terminating (3)** 39:14,18;46:10
**termination (71)** 21:19;29:8,23;30:4, 5,15;31:4,23;32:1,5,9; 33:1,5,11;34:11,15, 18,25;35:4,7,12,15, 20,25;36:5;37:1,5,11, 16,20,24,25;39:15,18; 40:5,11;42:9,14; 43:10,11,12;44:2,4; 45:6,7,10,15,21; 46:12,16,21;47:1,7, 10,14,14;55:3;56:17; 65:3,6;84:8;85:18; 86:2;101:17;110:11, 16;125:2,5;132:7; 133:1;136:14
**terminations (1)** 126:21
**terms (6)** 36:7;123:23;130:7; 136:16,21;137:2
**testified (19)** 8:17,22;9:3;10:12, 18;27:8;30:14;43:19; 44:18;46:25;56:1; 58:10,14;84:21;86:1; 99:3;125:2,19;131:9
**testify (7)** 10:8,10,23;12:19; 25:20;31:16;94:7
**testifying (2)** 10:5;12:25
**testimony (25)** 9:2,15,25;10:2; 11:16;13:18,20;14:6; 24:24;25:13,16,23; 26:2;30:7;46:6;60:23; 61:2;84:24;99:2; 116:13,17;121:5; 125:3;126:25;137:11
**thinking (1)** 126:19
**though (1)** 79:8
**thought (2)** 33:20;126:18
**thousands (1)** 55:10
**thread (2)** 68:1,3
**three (3)** 15:13;18:3,9
**Tim (5)** 33:8,10,24;34:6; 48:4
**timely (3)** 80:24;81:22;138:2
**times (2)** 9:3,4
**Tipton (2)** 7:19;129:10
**title (12)** 9:11;15:7;26:13; 30:10;32:19;52:18, 19;62:11,12;77:25; 78:2;129:22
**titled (2)** 69:14;82:9
**today (38)** 8:21;10:23;11:16, 23;12:19;13:1,18,21; 14:7,24;16:22;17:9; 23:20;24:7;25:13,16, 23;26:3;27:25;31:14; 53:16;57:17;60:3; 64:23;70:25;71:5; 79:10;84:25;94:2; 101:22;102:17; 108:25;116:18;117:1, 10;118:19;121:21; 137:23
**Todd (6)** 8:10;17:9;30:8; 31:6;119:2;129:8
**told (7)** 29:17;64:9;68:22; 72:5;79:6;94:3; 135:15
**Tony (1)** 7:8
**Tony's (1)** 69:22
**took (3)** 43:13;95:6;111:25
**top (3)** 30:19;83:2;116:3
**topic (3)** 13:1,7;24:12
**topics (2)** 12:9;23:25
**track (1)** 134:22
**Tracy (1)** 70:5
**tragedy (1)** 117:5
**trailer (2)** 56:22;100:1
**trailers (2)** 82:13;83:12
**Trans (33)** 89:20,22;90:2,10, 13,14,18,22,24;91:6, 12,16,21;92:2,7,12, 20,25;93:7,19,22; 94:8,12,15,19,24; 95:3,7,13,18,24; 108:21;128:1
**transact (1)** 29:18
**Transfer (2)** 118:22;121:11
**Transit (69)** 7:6;9:13,18,21; 10:15,19,24;12:20; 13:5;14:9,12,21,24; 17:25;20:7;21:7; 23:12,21;24:4,11; 25:19;26:19;27:14, 19;28:5;29:9;32:10; 33:1,12;36:9;37:14; 40:19;41:6,15,21,24; 42:24;43:4;44:1,14; 45:3;47:6;50:5,11; 51:3,7,15;54:5,18; 57:7,20;58:13,17; 71:6,15;83:5,23;84:6; 91:10;111:18,19; 112:5,13;113:3; 115:2,15;118:21; 121:10;122:19
**Transit's (2)** 36:24;43:2
**transport (3)** 52:9;97:7,25
**Transportation (14)** 54:13;57:5,12; 58:16;65:22;66:9,20; 80:6;108:9,13,15,20, 22;129:20
**truck (20)** 26:20;41:23;54:15; 56:22;57:23;58:21; 67:18;71:12,12,17; 72:2;79:8,9;80:9; 81:5;82:1;95:21; 96:14;108:23,23
**trucks (1)** 79:19
**true (5)** 23:11;45:25; 101:12;107:16; 136:23
**truth (1)** 106:4
**try (2)** 55:22;106:20
**trying (3)** 55:25;107:17;126:2
**T-shirt (1)** 96:11
**T-shirts (6)** 88:21;93:17;94:21; 95:1,8,20
**two (14)** 18:24;80:20;83:1; 119:4,12;120:7,8,9; 121:17;126:13; 133:13;135:5,23; 136:17
**two-page (2)** 83:16;115:10
**type (4)** 34:17;38:9;91:20; 130:18
**types (1)** 96:15

## U

**umbrella (1)** 86:12
**unauthorized (1)** 94:25
**under (88)** 8:22;20:7;29:18,18,25;36:2;38:21,25;39:8;41:21;46:16;47:17;50:6;52:4,22;54:5;55:5,17;56:14;58:20,21;62:16;63:24;65:23;66:11;67:18;75:22;76:5;77:10,14;83:12;84:6;86:12;87:7,9,16,21,25;88:2,6,8,12,14,18;89:24;91:15,23;97:4,9,15,20,21;98:2,6,24;99:4,12;101:4,7;102:1,25;103:5,10,18,24;104:6,20,23,24;106:10,24;107:4,7,25;108:8;113:11,19;115:16;116:9,10;122:15;123:23;129:20;131:3,24;132:19;133:21;137:2
**understood (2)** 38:24;121:1
**undertake (1)** 97:25
**undertaking (3)** 76:10,21;77:4
**uniform (2)** 96:5,23
**uniforms (1)** 88:16
**UniGroup (57)** 9:14,16,18,22;15:5;17:17,19,23;18:6,7,14;23:16,17;36:23;45:13,21;48:24;49:1,5,8;50:5,10,14,22;51:2,6,15;52:25;61:19,22;62:8;68:17;70:19;71:16;75:17;79:17;80:5;86:8;87:10,19;89:10;92:3,8;97:24;99:8;109:22;110:5,10,11;111:7;124:24;125:17,24;126:24;127:8;129:18;131:14
**UniGroup's (1)** 19:14
**unit (2)** 52:8;69:3
**United (4)** 10:6,8;36:23;88:2
**units (5)** 68:25;69:2,7,8;70:9
**unless (1)** 17:9
**unqualified (1)** 31:24
**unqualify (3)** 80:25;81:14,23
**up (18)** 17:11;21:3;48:23;49:12;55:22;59:1,6,17;77:8;83:2;100:20;105:4;109:5;113:12;115:5;119:7;124:21;131:5
**update (1)** 68:17
**upon (2)** 24:3;133:2
**use (13)** 34:15;55:15;56:3;57:13;61:25;62:1;71:2,8;86:8;87:19;90:9;100:1;130:8
**used (8)** 11:21;77:12;94:8;105:25;108:18,19,20,21
**user (2)** 49:22,24
**uses (2)** 43:3;86:23
**using (1)** 43:1
**usual (1)** 29:17

## V

**valid (1)** 68:24
**Van (19)** 10:6,8;36:23;40:13;41:4;42:21,22;84:10,15,18,18,22;85:3,9,11;88:3;114:14,16,19
**V-A-N (1)** 84:15
**Vanliner (1)** 8:6
**vehicle (7)** 48:13;51:4,17;56:23;57:4;81:5;88:2
**vehicles (6)** 51:9;52:10;103:9,12,15,17
**verbiage (1)** 18:19
**vice (1)** 63:22
**video (2)** 7:5;138:5
**VIDEOGRAPHER (11)** 7:2,9;8:13;60:13,16;109:13,16;118:7,10,13;138:4
**videotaped (1)** 12:5
**viewing (1)** 17:2
**violation (1)** 16:3
**Virginia (1)** 116:11
**voicemail (2)** 19:14;78:10
**volume (1)** 55:20
**voluntarily (1)** 35:1
**voluntary (6)** 30:3,5,12;31:4;36:25;109:24

## W

**W-2 (1)** 18:14
**waive (1)** 120:24
**waived (1)** 7:4
**warehouse (2)** 111:22;112:23
**warrant (1)** 108:12
**way (15)** 27:1;67:3;77:14,23;85:25;91:5;93:23,24;94:6;105:19,20,24;106:2,23;110:6
**wear (1)** 96:22
**wearing (2)** 88:16;96:15
**weeks (6)** 40:11;42:6;43:6,25;44:10;68:23
**Wendy (1)** 96:6
**weren't (2)** 134:11;135:15
**Wfranklin@geiger (1)** 96:8
**What's (10)** 27:22;37:24;46:24;62:11;66:24;67:15;119:9;126:5;133:11;136:20
**wholly-owned (1)** 92:4
**whose (1)** 98:7
**wife (1)** 11:18
**wind-down (6)** 40:18;41:4;42:6;43:3,25;45:2
**winding (3)** 40:12;42:21;44:13
**wind-up (1)** 42:14
**withdraw (1)** 44:20
**withdrawn (1)** 51:11
**withdrew (1)** 51:16
**within (8)** 9:6;23:23;27:6;48:13;80:20;101:9;103:25;128:9
**witness (6)** 8:15;10:19;24:18;31:7,15;49:19
**witnesses (1)** 116:14
**woman (1)** 132:3
**Woodbridge (1)** 116:11
**Woody (5)** 33:8,10,24;34:6;48:4
**word (3)** 44:17;94:8;106:18
**work (15)** 9:18,21,22;14:14;15:1;52:16;53:5;59:23;61:21,23;87:3;91:12,21;92:12;112:18
**worker (1)** 99:20
**workers (1)** 88:15
**workflow (1)** 39:17
**working (2)** 91:16;132:18
**works (5)** 9:16;52:24;54:6;62:8;92:7
**world (1)** 95:4
**wreck (12)** 15:15,20;22:15,24;64:14;66:8;79:7;110:3,7,13;111:13;121:6
**write (1)** 15:8
**writing (1)** 85:9
**written (4)** 15:19;35:13;85:17;122:4
**Wynn (11)** 27:23,24;28:2;33:6,24,25;34:6;48:4;131:4,17;133:8
**Wynn's (1)** 28:16

## Y

**year (3)** 9:6;54:25;58:10
**years (6)** 15:13;18:3,9;59:21;126:13;129:21
**yesterday (2)** 93:21;94:4

## Z

**zoom (1)** 116:2

## 1

**1 (4)** 12:8,14;33:16;133:22
**1:51 (1)** 109:14
**10 (5)** 46:17;89:6,7;93:7;123:18
**11 (3)** 98:17,18;123:18
**11:07 (2)** 7:1,3
**11th (2)** 52:7;58:7
**12 (2)** 70:8;105:8
**12:15 (1)** 60:14
**12:43 (1)** 60:17
**122893 (3)** 118:24;119:4,13
**122895 (2)** 119:21;121:24
**13 (3)** 110:25;111:2;112:2
**14 (3)** 114:10,11,18
**15 (3)** 115:6,7;134:7
**15481 (1)** 116:10
**15th (1)** 99:10
**16 (6)** 115:22,24;134:6,7,8,9
**17 (5)** 122:7,20,23,25;123:8
**17th (7)** 16:2;73:16;74:12,

18;75:11,21;80:2
**18 (7)**
122:20;123:4,10,14,24;136:18;137:5
**19 (5)**
62:5;64:13;124:11,13,15
**19th (2)**
63:20;66:7
**1st (62)**
12:22;13:9;15:21;20:16,21;21:10,14;22:6,15,24;24:13;27:11,19;40:20,21,25;50:23;51:12,18;54:16,23;55:6;56:3,16,25;57:6,14,21,25;63:20;64:13;66:7,25;70:12,21;71:3,9,18,24;73:13;74:8;77:22;78:14,22;79:18;80:8;82:9;83:17,24;96:15,23;108:18;111:7,12;112:5,9,14,19,23,25;113:3,20

## 2

**2 (4)**
28:24;29:1;45:2;100:19
**2:38 (1)**
109:17
**2:48 (1)**
118:11
**20 (1)**
133:2
**2015 (3)**
84:23;85:4;113:9
**2018 (1)**
114:20
**2021 (1)**
53:17
**2022 (103)**
12:22;13:9;15:21;20:17,21;21:10,14,17,21;22:6,6,14,15,23,24;24:14;27:11,20;28:6;35:20;37:6,10,15;40:21;41:10,16,25;43:20;50:4,23;51:12,18;52:7,18;53:2,22;54:16,23;55:6;56:16,25;57:6,14,21,25;62:6,12;63:20;64:13,13;65:2,7;66:4,7,7;68:20;71:9,25;73:11,13;74:18;75:11;76:16;78:23;79:6,18;80:8;82:9;83:17,18,24;84:7;89:12;93:8;95:14,22;96:16,23;97:25;99:1,5,10,21,22;100:9;108:18;111:12;112:5,14,19;113:3,12,12,20,21;114:24;121:6,23;127:4;133:2,3,22;136:4
**2023 (7)**
38:23;39:10;54:24;55:18;56:3;62:17;65:24
**2024 (3)**
10:4;102:8,19
**2025 (2)**
7:3;102:3
**20th (6)**
50:4;75:21;76:16;79:18;80:1,8
**22 (3)**
16:10;66:5;112:6
**23rd (1)**
67:4
**251-333 (1)**
69:2
**25th (3)**
67:5;89:12;93:8
**26 (1)**
129:21
**28 (3)**
66:5;99:5;133:3
**28th (27)**
21:17,21;22:5,14,23;28:6;35:20;37:6,10,15;43:17,20;67:9;68:20;69:13;73:11;97:22,25;99:1,21;100:9;110:24;112:6,20;113:12,20;136:4
**2B (1)**
100:20
**2nd (1)**
121:22

## 3

**3 (4)**
49:13,14,16,17
**3:14 (1)**
118:14
**3:38 (2)**
138:5,7
**30b6 (3)**
7:5;10:19;116:14
**30th (1)**
66:25
**31438 (1)**
49:12
**333 (1)**
122:14
**34589 (1)**
72:14
**35 (2)**
109:9,10

## 4

**4 (6)**
51:21,23;52:15;54:9;69:3;104:25
**40 (2)**
24:8;25:2
**4-29-22 (1)**
76:3
**4389 (1)**
115:11
**4390 (1)**
115:11
**444 (1)**
122:14
**46260 (2)**
69:17;72:21
**46276 (1)**
115:23
**4C (2)**
105:1,11
**4E (1)**
108:8

## 5

**5 (6)**
36:22;63:1;65:9,10;67:2;79:6
**50 (2)**
24:8;25:2
**5020 (1)**
98:17
**5044 (1)**
111:1
**5455 (2)**
62:5;63:8
**55 (1)**
59:9
**5962 (1)**
93:18
**5th (6)**
16:12;26:23;66:4;77:17;78:17;121:6

## 6

**6 (8)**
65:9,11;67:11,12,16,21;72:21;83:17
**6068 (1)**
52:2
**6104 (2)**
51:22;54:9
**6246 (1)**
72:21
**6th (3)**
80:1,15;84:7

## 7

**7 (9)**
69:17,18;72:17,18,20,23;132:25;133:5;136:13
**78 (1)**
82:25
**79 (1)**
82:25
**7th (1)**
102:3

## 8

**8 (4)**
7:3;72:10,14;73:16
**8th (1)**
102:3

## 9

**9 (4)**
82:20,21;83:2,16
**9:35 (1)**
69:14
**90 (1)**
116:9