**In The Matter Of:**

*Kyle Sloan, et al. v*

*Nicholas Burist, et al.*

*Christopher Wynn*

*May 9, 2023*

*Janice D. Hayward, RMR*

*Independent Court Reporter*

*843.478.6756*

*JanHayward1@gmail.com*

Original File SLOAN-CHRISTOPHERWYNN.TXT

**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

KYLE SLOAN, INDIVIDUALLY; AND AS PERSONAL REPRESENTATIVE OF THE ESTATES OF RYLIE SLOAN AND JAMIE SLOAN, ET AL.,

PLAINTIFFS,

VS.

NO. 2:22-CV-00076-LGW
DIVISION NO.

NICHOLAS BURIST, ET AL.,

DEFENDANTS.

VIDEO DEPOSITION TAKEN OF
CHRISTOPHER H. WYNN,
INDIVIDUALLY,
ON BEHALF OF THE PLAINTIFFS

MAY 9TH, 2023

REPORTED BY:
JULIE E. STELFOX
CERTIFIED COURT REPORTER - MO NO. 300
CERTIFIED SHORTHAND REPORTER - IL NO. 084.003463
REGISTERED MERIT REPORTER - NCRA NO. 13751
CERTIFIED REALTIME REPORTER - NCRA NO. 13751

METRO COURT REPORTING, INC.
P.O. BOX 29548
ST. LOUIS, MISSOURI 63126
636-349-3333
METRODEPOS@ATT.NET

INDEX OF APPEARANCES

| | |
|---|---|
| CHARLES J. HODGE<br>MATTHEW FOSS<br>T. RYAN LANGLEY (ZOOM)<br>HODGE & LANGLEY<br>229 MAGNOLIA STREET<br>P.O. BOX 2765<br>SPARTANBURG,<br>SOUTH CAROLINA 29306<br>864-585-3873 | FOR THE PLAINTIFFS<br>CO-COUNSEL |
| JOSEPH R. PADGETT<br>RODEN LAW<br>333 COMMERCIAL DRIVE<br>SAVANNAH, GEORGIA 31406<br>912-303-5850 | FOR THE PLAINTIFFS<br>CO-COUNSEL |
| JOSHUA DORMINY<br>RODEN LAW<br>13 ST. ANDREWS COURT<br>BRUNSWICK, GEORGIA 31520<br>(VIA ZOOM) | FOR THE PLAINTIFFS<br>CO-COUNSEL |
| BENJAMIN STAHL<br>WALDEN, ADELMAN, CASTILLA,<br>HIESTAND & PROUT<br>900 CIRCLE 75 PARKWAY<br>SUITE 1040<br>ATLANTA, GEORGIA 30339<br>(VIA ZOOM) | FOR THE DEFENDANT<br>NICHOLAS BURIST |
| JAMES L. ELLIOTT<br>ELLIOTT & BLACKBURN<br>3016 NORTH PATTERSON STREET<br>VALDOSTA, GEORGIA 31602<br>(VIA ZOOM) | FOR THE DEFENDANT<br>LOCKE RELOCATIONS |

INDEX OF APPEARANCES

| | |
|---|---|
| TODD R. EHRENREICH<br>LEWIS, BRISBOIS,<br>BISGAARD & SMITH<br>2 ALHAMBRA PLAZA<br>SUITE 1110<br>CORAL GABLES, FLORIDA 33134<br>786-353-0210 | FOR THE DEFENDANT<br>MAYFLOWER TRANSIT, LLC |
| MATTHEW SESSIONS<br>MCMICKLE, KUREY & BRANCH<br>217 ROSWELL STREET<br>SUITE 200<br>ALPHARETTA, GEORGIA 30004<br>(VIA ZOOM) | FOR THE DEFENDANT<br>JOE MOHOLLAND, INC. |
| WARNER S. FOX<br>HAWKINS, PARNELL & YOUNG<br>303 PEACHTREE STREET, NE<br>SUITE 4000<br>ATLANTA, GEORGIA 30308-3243<br>(VIA ZOOM) | FOR THE DEFENDANT<br>JOE MOHOLLAND<br>MOVING |
| EDWARD FOPPE<br>ARCHWAY VIDEO<br>1513 FAIROAKS DRIVE<br>TROY, ILLINOIS 62294<br>618-530-6225 | VIDEOGRAPHER |
| MARK J. VOLANSKY<br>SENIOR COUNSEL<br>UNIGROUP, INC.<br>ONE PREMIER DRIVE<br>FENTON, MISSOURI 63026<br>636-305-5000 | ALSO PRESENT |
| KYLE SLOAN<br>SUSAN WEST | ALSO PRESENT |

INDEX OF EXAMINATIONS

DIRECT EXAMINATION BY MR. HODGE.......PAGE 7

PLAINTIFFS' INDEX OF EXHIBITS*



| EXH | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 1: | CORPORATE STRUCTURE UNIGROUP SUBSIDIARIE ORGANIZATION CHART | 45 |
| 2: | AGENCY AGREEMENT | 66 |
| 3: | SIGNALHIRE LIST OF MAYFLOWER EMPLOYEES | 135 |
| 4: | EMAILED AND ATTACHMENTS BATE STAMPEDE STAMPED JMI00553 THROUGH MAYFLOWER 000020 | 139 |
| 5: | BILLS OF LADING | 186 |
| 6: | PHOTOGRAPHS | 188 |
| 7: | PHOTOGRAPHS | 194 |



*ORIGINAL EXHIBITS RETAINED BY COUNSEL FOR PLAINTIFFS

VIDEO DEPOSITION OF CHRISTOPHER H. WYNN, PRODUCED, SWORN, AND EXAMINED ON BEHALF OF THE PLAINTIFFS, PURSUANT TO NOTICE, TAKEN BETWEEN THE HOURS OF 1:11 P.M. AND 5:37 P.M. OF TUESDAY, MAY 9TH, 2023, AT THE OFFICES OF LEWIS, BRISBOIS, BISGAARD & SMITH, 100 SOUTH 4TH STREET, CITY OF ST. LOUIS STATE OF MISSOURI, BEFORE ME, JULIE E. STELFOX, MISSOURI CCR, ILLINOIS CSR, NCRA RMR AND CRR, OF METRO COURT REPORTING, INC., IN A CERTAIN CAUSE NOW PENDING IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF GEORGIA, BRUNSWICK DIVISION.

TRANSCRIPT OF PROCEEDINGS

(Mr. Ryan Langley and Mr. Kyle Sloan are not present.)

THE VIDEOGRAPHER: This is the video deposition of Christopher Wynn. Today's date is May 9th, 2023. The time is 1:11 p.m. Central Standard Time.

This is the case of Kyle Sloan, et al., versus Nicholas Burist, et al. This case is pending in the United States District Court for the Southern District of Georgia, Brunswick Division, Case Number 2:22-CV-00076-LGW.

This deposition is taking place at Lewis, Brisbois located at 100 South 4th Street, St. Louis, Missouri. All counselors present and participating remotely will be reflected in the stenographic record.

My name is Ed Foppe. The court reporter is Julie Stelfox. She will now swear in the witness.

THE REPORTER: Can you raise your right hand? Do you solemnly swear the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

CHRISTOPHER H. WYNN,

being produced, sworn, and examined on behalf of the Plaintiffs, deposeth and saith:

DIRECT EXAMINATION

BY MR. HODGE:

Q. Your full name, please, sir.

A. Christopher, middle initial H, last name Wynn.

Q. Okay. You go by Chris?

A. Chris, yes.

Q. Okay. I'll probably call you Mr. Wynn, but if I slip and call you Chris, I don't mean any disrespect.

A. That's acceptable.

Q. My name's Charlie Hodge, and Matt Foss and Joseph Padgett and Ryan Langley and I represent Kyle Sloan and his family.

You know about the Sloan family?

A. I do not.

Q. Okay.

THE VIDEOGRAPHER: Mr. Hodge, is your mic on?

MR. HODGE: It's right here.

THE VIDEOGRAPHER: Okay. All right. I just wanted to make sure. Okay.

Q. My clients were killed when a vehicle, which identified on the tractor side said Moholland Transfer, Agent for Mayflower, crossed a guardrail, crashed into them, killed the wife, the daughter, injured a passenger, injured my client, Kyle Sloan, very badly.

You didn't know that?

A. No, I do not.

Q. Okay. Well, that's what this lawsuit's about, and we're here to ask you some questions that deal with Mayflower's relationship with Moholland. Your name appears on some correspondence, that type of thing.

So if I ask you a question that you don't understand, I want you to point that out. Is that agreeable?

A. Yes.

Q. Will you also agree to be truthful, forthright with me, and not evasive in your answers?

A. Yes.

MR. EHRENREICH: Object to form.

Q. And sometimes we lawyers will object to the form. It's because counsel has a problem with the way I worded the question.

Unless you're instructed not to answer the question, you should not regard that as a prompt not to answer the question.

Is that clear?

A. Yes.

Q. Okay. All right. I'm going to find out a little bit about you and then we're going to get into the substance of your testimony, okay?

MR. EHRENREICH: Just so we understand it, he's not a corporate rep. He's here individually as a fact witness.

Q. Where were you born and raised?

A. St. Louis, Missouri.

Q. Been here all your life?

A. Yes, all 70 years.

Q. You're 70 years old.

A. I'll be 71 in three weeks.

Q. Well, there's hope for some of those who have been rode a little harder and put up a little wetter.

Okay. And you attended local schools in the St. Louis area?

A. Yes.

Q. When did you graduate high school?

A. '70, 1970.

Q. What did you do after you graduated?
A. Went to UMSL, University Missouri - St. Louis, four years.
Q. And what was that? UMSTIL?
A. UMSL, University Missouri - St. Louis.
Q. I gotcha. And what did you get your degree in?
A. Business Administration.
Q. About what year? That takes us about '74?
A. '74, correct.
Q. All right. What did you do after you graduated?
A. Interviewed and started with United Van Lines, which is one of the van lines now part of the UniGroup system.
Q. So when you started, what was your position?
A. I was an operation dispatch.
Q. And explain that to me so that I can understand.
A. Basically worked with -- Uni- -- United Van Lines is a household goods carrier, moving people's goods, products, from point A to point B. I dispatched the units or the trucks for the loads

to pick up/deliver.

Q. Did you do that directly for United Van Lines?

A. Yes.

Q. Was United Van Lines back in those days using other agents, like, for example, Moholland, or something of that nature?

A. They had agents, correct.

Q. Kind of give me a hypothetical, an example, of how a load would be booked and then how ultimately United would be paid.

MR. EHRENREICH: Timeframe. Back in the seventies?

MR. HODGE: Yeah.

Q. And then we're going to graduate to this area. I'm just trying to get educated.

A. Our agents are the bookers and represented United Van Lines so, as an agent, they would book the shipments.

We're an interstate carrier, so a move from St. Louis to Dallas, Texas, customer, Bob Smith. Bob Smith may talk to an agent in St. Louis, book an order. They would get it registered and with the dates, timeframes, weight, that various information, have it out into an

online type of -- at the time, in '74, things were not quite as online as they are now, but --

Q. Right.

A. -- technically was available such that agents would have access to shipments, loads could be put together. "Loads" meaning multiple shipments.

Maybe there were three or four shipments coming out of the greater St. Louis area that could constitute a truckload. At that time a truckload could have been upwards of 15- to 20,000 pounds total weight on those 40 footers. Today it's now 53 foot tractor trailers, but say going to the greater Dallas area or it could be somewhere in that.

Loads could be accepted. Dispatch would dispatch that to a hauling agent. An agent not only is an agent to book with the business but they also transport and deliver the goods: Load, transport, and deliver the shipments.

So we would just provide the information to the hauling agent. They would have those orders, load dates, and information, and would constitute their manifest of orders for that particular trip, load, and deliver, for the two,

two-week period it took to load shipments on route and then deliver.

Q. So did you call that document a booking document that would initiate this process?

A. There were individual orders. Order for service would be the term.

Q. Okay.

A. Individual movements and order for service, which produced again a dispatch ticket, that all that would be put together to a load, load manifest, again load, and then deliver.

If that's how you were looking at that construction --

MR. EHRENREICH: You got to answer his question first and then you can explain. He had asked you a simple question. Now listen to his question.

A. Can you --

Q. You're fine. I think you're helping me.

So in that setting, the way I just understood what you said, it sounds kind of like you were a broker. Like it sounds like the agent is doing the work.

A. Our agents are the bookers and they are the haulers, the transport -- those are the

services.

United Van Lines is the interstate carrier that holds the authority, interstate authority, to be able to have shipments moved to and from within the Continental US.

So they're not so much the broker, but we were the headquarters for all our agents within say US Continental US.

Q. So how did you get paid on your end, United Van Lines, if you've got this agent that's doing the booking and the hauling?

A. There is a commission structure on all shipments. You would have a booking commission -- say just call it a hundred percent. Booking agent got so much percent.

An origin agent who had to maybe prepare something at point of origin, if there was some packing, things like that, got a certain percent. Hauling agent, who hauled the order from point A origin to destination, got a percent.

If a DA, a destination agent, was needed or performed services, they would have paid services, and then United Van Lines, in the case here, would be paid a van line percentage or a commission. All that would equal a hundred

percent, and this is of the transportation revenue, line haul revenue that's there.

Q. Okay. So of the transportation revenue, back in the day, what kind of cut would United get?

MR. EHRENREICH: Object to form.

A. On average -- I could only tell you the percentage at that point in time was probably in the neighborhood of 8 percent.

Q. 8 percent. And what -- I mean no disrespect, but what did you do to get that 8 percent?

A. They still had the system, the dispatch to consolidate all the shipments to its system computerized, but it wasn't computer, but even though there were still manual tickets, everything still had to be computerized.

Q. Right.

A. Provided a lot of various services for our agents, whether it would have been claims, would have been safety, operational involvements.

We have areas that, all aspects, that agents were dependent upon corporate office or that headquarters to be able to provide for them.

You have permits that were still

involved, so licensing. Everything that went in piece to be an agent for the van line and to operate within the Continental US at that point in time.

Q. And these agents, were they, if they didn't have a DOT number, did they use, you know, your DOT number, your United Van Line number?

A. As an agent for United Van Lines, it had to be -- right. Prior to 1980 you had ICC, so you have to look at Interstate Commerce Commission, which changed over, and then you had Department of Transportation that then changed at that point, but the equivalent of an ICC number/DOT number, as we know it today, would have been required.

Q. Now, let's kind of fast-forward to 2022. Tell me how -- what role Mayflower Transit, for example, would play in the context of what you've just described.

A. Moholland -- or Mayflower, I take it back. Mayflower was one of two carriers -- you had United Van Lines and you had Mayflower Transit -- were two interstate carriers and they performed as an agent. They're technically an independent entity of a business that transports product and people's goods from a point A to point B.

So they would sell, meaning booking, or hauling, transporting, goods of people's personal property or possibly some kind of special product item.

And again, they were an agent which is made up -- an agent constitutes an independent carrier that's under contract with Mayflower.

Q. Okay. And how about the payment structure?

A. Payment structures are pretty consistent based on the type of business. If you're a COD business person, the shipment or the move, versus a corporate national account that may have a certain type of pricing versus a logistics shipment, which you could have different pricing. You could have different, at the time, tariffs that are in place that have pertinent pricing structure.

Everybody still paid on a commission or flat rate based on that type of move or order that it is.

Q. What materials have you reviewed in preparation for your deposition?

A. Other than having talked with the attorney to understand the case itself --

Q. And by the way, I want to make sure. I'm not trying to sneak into what you talked about with your lawyers --

A. Yeah.

Q. -- but I am --

A. Okay.

Q. -- entitled to know the materials.

A. I can only tell you I've been 49 years with the company. I represented nine different departments under six different divisions, management, and all those areas from Operations to Claims to Customer Service to Revenue Accounting to Agency Development to Contract Administration.

So over the years I've assumed, absorbed, information, and understand it.

Q. Okay. And so tell me what you reviewed on this particular case.

A. Other than looking at -- understanding the situation that Moholland, were they/were they not representing Mayflower, and understanding its position because they were no longer an agent for Mayflower, but understanding the timelines.

And my involvement, my current role as senior director for what we call Agency Success deals with agent terminations. One of my things

that I deal with --

MR. EHRENREICH: He wants to know what documents you reviewed in preparation for today, if you could tell him.

A. So I would have just looked at, at the time, my involvement with Moholland from the beginning, when the termination first took effect.

Understood the timelines of that process, the dates, what my correspondence or communications would have been with Moholland and the representatives for them up to the point of the termination itself.

And it was just understanding really a timeline that only took place from I'll just say January of 2022 to when the incidents evidently happened. I'll just say and understood from July of 2022.

Q. In this case was Moholland a booking agent?

A. Prior to their termination they were a booking agent, Mayflower, for the system, yes.

Q. And Moholland had a Temporary Agency Agreement that went through April 28th of 2022, didn't it?

A. Correct.

Q. All right. So they were a booking agent through that day?

A. No, they were only a booking agent through January 19th of 2022.

Q. Now, is there a company -- is there a phrase in your world called destination agent?

A. Yes.

Q. What does that mean?

A. A destination agent -- if, again, say a shipment from St. Louis to Dallas, Texas, if the move comes -- originates out of St. Louis -- you have an origin agent -- going down to Dallas, Texas, destination agent would be there if in the event services might have been needed.

A driver may take it there. Maybe it's a shipment that's going to involve storage and transit, warehouse destination, maybe some particular unpacking services to prepare things that were unloaded off the truck and an agent has to come to unpack. So a DA or destination agent performs those services.

Q. Is there a destination agent in this case?

MR. EHRENREICH: Object to form.

A. I don't know. I mean, you always have a

destination agent designated. That doesn't mean they're always going to be needed.

An agent, when they register an order in the system always has a booker, OA, hauler, DA.

Q. Where did you understand the load that ended up killing my clients was going to?

MR. EHRENREICH: Object to form.

A. Yeah, I have no knowledge of what they had on.

Q. So you haven't looked at the booking information?

MR. EHRENREICH: Object to form.

A. No.

Q. You haven't looked at the destination agent?

A. No, not on the shipment that was involved on the incident here because they were no longer an agent for the van line. I knew of all the shipments that I had to make sure were taken care of prior to April 28th of '22.

Q. Are you familiar with an agent called Conser Moving & Storage?

A. I am familiar with that agent, yes.

Q. Where are they located?

A. In Florida. I want to say possibly --

that's M121. I'm thinking they're out of the Jacksonville, Florida, area.

Q. Okay. Now, does your company do a lot of business with military?

A. Military is one of the commodity moves, yes. Government, military, nonmilitary, correct.

Q. Is there a sort of a separate mode of operation for military transports as opposed to, you know, a family that's moving from A to B?

A. Each commodity has some variations, but I wouldn't know the details of what that would involve other than, yes, we have a government involvement and what their requirements are.

Any customer has their own requirements. Government and military are very specific based on their bases and what's required of them. Beyond that, I wouldn't know specifics.

Q. In the structure of Mayflower, do you have -- do you have people that book transports, book loads, and those loads arrive at a destination agent of Mayflower?

A. I'm just trying to picture as you're stating: Book loads. Within the Mayflower system on -- if it's an order that's registered -- and again, I may have limited information on how -- or

understanding how you're trying to pose that.

If we have a Mayflower agent that's booked a government military shipment and it gets to a Mayflower agent, whether origin or destination, what that involvement is, but when you're saying books loads, that I don't know exactly how you're trying --

Q. Well, I think what I'm trying to get to is, if the load originated from a non-Mayflower affiliated entity but it arrives at a Mayflower agent, does Mayflower get their cut?

MR. EHRENREICH: Object to form.

A. If it's a non-Mayflower shipment, we would normally not, to my knowledge. Unless it's a Mayflower order number and it gets to that destination agent, one, we would not even know about it technically at UniGroup in our system.

That's how it looks. So I don't know how -- the agent might be paid if they have worked on something through an outside non-UniGroup, non-Mayflower arrangement but, again, our agents, being independent carriers, and they can perform services for us on booking and hauling, but if our agent is acting independent of that -- that's what I'm trying to picture in my mind right now,

independently -- we would not have knowledge or necessarily record in our system.

Q. If you have a temporary agent that delivers a load to a designated agent, a destination agent of Mayflower, your company's going to get paid for that, aren't they?

MR. EHRENREICH: Object to form.

A. The term "temporary agent" probably needs clarification. If it's specific to what we had to work with with Moholland, I could speak to that.

Q. Speak to it.

A. When Moholland was officially terminated January 19th of 2022 as an agent for Mayflower, they still had shipments in the pipeline: Whether it was their own bookings, whether they were designated as an OA, whether they were designated as a DA, from -- after that date of termination.

Because there were active Mayflower shipments -- they were there in those different responsibilities -- we had to put together a Temporary Agent Agreement that took effect January 20th, of which we gave it a 90-day term period and technically would then carry it up through April 28th.

This allowed us and allowed Moholland to then finish completion of those shipments that were in that pipeline during that time period.

Once they had finished April 28th, to our -- my knowledge and so forth, all shipments, whether they booked, delivered, OA/DA, those services would have completed, finished their area of responsibility, and there were no new shipments that would have occurred, either been booked or handled, beyond that date of April 28th of 2022.

Q. Are you familiar with a company called TMM?

A. I know of them. I've heard of them.

Q. Where is that company?

A. Where is that or what is it?

Q. What is that company?

A. It is probably, from my knowledge, probably a government -- we have entities out there that just deal with government military business. I've heard the term "TMM" used in that context, so they deal with government military business in the industry.

Q. Do you know this load, these two loads that were on this trailer, to be a military move?

A. No. Again, I don't know what -- after

April 28th I had no knowledge of any other shipment business, so I don't know what the two shipments you keep referring to.

Q. Were you aware that the shipments were booked on March 2nd and March 15th respectively of 2022?

A. If they were booked as new orders, short of the list that I was aware of, they should not have been booked by that agency. No, there should not have been any bookings, new bookings, that would have taken place.

Q. And you're telling me that we're here about a lawsuit that killed my clients and you're not aware of those dates or those documents?

MR. EHRENREICH: Object to form. Let's keep it professional, okay?

A. I'm not awa- -- other than we identified orders that, as of January 20th, that were booked already -- already booked.

If there was something new that booked after January 20th and it would not have been on a particular list of shipments, that's why I say I'd have to -- no, I would not know what those two orders that you're specifically referring to. I'd have to look at a list.

I know we identified some -- and I don't even know the exact number. Talking off the top of my head. -- whether it would have been 25 or 30 shipments between January 20th - April 28th that we identified at the time on that January 19th/20th period, but that's it.

But there were no new bookings that Moholland was allowed to do any actual booking of any new business. All they could do was finish up any existing business after their termination, and we only created the Temporary Agreement to allow to complete the existing business for that timeframe.

Q. Is Conser Moving & Storage an agent in good standing with Mayflower now?

A. To my knowledge, yes.

Q. Were they an agent in good standing in 2022?

A. To my knowledge, yes.

Q. And you used two initials, and you'll have to forgive me, I'm kind of a fifth grader. You said OA and DA. What does OA stand for?

A. Origin agent is for OA. Destination agent is DA.

Q. And if we say origin agent, is that the

same as booking agent?

A. It's a separate term, but booking agents quite often are also an origin agent.

If they book a shipment out of their own town -- a booking agent here in St. Louis, Missouri, books a shipment going to Dallas, Texas, they could also be the OA because they are also going to be potentially performing origin services: Packing, preparing certain additional services beyond transportation revenue. So they could be the booker and the OA, yes.

Q. And I appreciate that, that explanation, but how could you --

A. Yeah.

Q. -- how could there be a difference between an origin and a booking agent?

A. Again, the booker books the move, and they get paid a commission for booking the move with a customer, regardless of the type shipment: COD, international account, military.

If, as an origin agent, if there are origin services needed, that booker then also receives commission or revenues performing whatever those services are required at point of origin. So they would have a booking commission

and potentially an OA commission.

Q. And does the DA, the destination agent, get a commission?

A. The only way they'll get paid is if they actually perform services required at destination. Our agents always designate OA/DAs period. It's not always known at some point, until maybe a move starts to transpire, if they're going to require a destination service.

Q. If the loads in this case had reached the destination agent and the destination agent was an agent in good standing with the Mayflower group -- and I know there's another name for it, but I'm just going to use Mayflower --

A. Mm-hmm.

Q. -- would they have gotten a commission?

MR. EHRENREICH: Object to form.

A. If there were services required, they would be paid for services required. If there were no services required for the destination, even though they could have been designated on a registered shipment, if there were no services needed, then they would not receive any payment for those services because there was none to happen or take place.

Q. Would services rendered include the storage of a load that transported from Virginia to Florida?

A. If that was part of the shipment and it was now determined that -- and the reason you talk about storage in transit, if it's already known by the booker at point of origin that the customer may not have an address yet -- they just know that they're going to Dallas, Texas -- they're still trying to work through an address but they don't know if it will be ready, available, whatever the case, an agent, the booker, could indicate and register that it's going to be DA SIT at storage.

When they have a destination agent in mind, the booker is required to contact the DA and make sure that they would accept a DA, because their responsibility, as an agent for the van line, is to perform storage and whatever might be required.

In that case then they would go to that agent's warehouse, because we don't have an actual final delivery address for that customer. It would remain in that destination agent's warehouse under storage and transit up to a maximum of 180 days, as required.

If it's something less than, it could be in there for ten days, customer has an address now, "Here's my address," they contact that DA, destination agent.

they would work with the customer on whatever arrangement then is to meet for delivery of those goods and then take from their warehouse in Dallas, Texas, to the customer's address, whatever that might be, in the Dallas vicinity and perform those services and be paid accordingly for them.

Q. Okay. And when a destination agent gets their cut, how does Mayflower get its cut?

MR. EHRENREICH: Object to form.

A. They're still, just because their van line or corporate still has us -- not so much just of the DA, just of the overall order. Everything looks at the line haul transportation separate from additional assets or other services, so van line will always get a certain percentage cut.

It may vary. I said back in '74, when I talked about the 8 percent, or a certain percent, it could vary -- now, today -- it could vary based on the type of shipment: Government, COD, national account. All have some variations on the

commission structure that all equals a hundred percent still.

Q. What cut did you all get on this job?

A. I have no idea.

MR. EHRENREICH: Object to form.

Q. Well, if we wanted to find that specific information out, who would we ask?

MR. EHRENREICH: Object to form.

A. We would still have to go into the system to see what is required. I could only tell you that, from what I know, we probably have 30 pages of different commission structure variables through the system based on the commodity, date/ timeframes and so forth on how somebody paid us.

I wish it were simple as 10, 20, 30, 40 all the time. It's variables that are there, but there is a structure on how agents are paid for the various services when performed.

Q. We're going to ask for that information, and I want to make sure that we ask specifically so there's no misunderstanding.

How would I go about asking for that information? What words would I use? What terms would I use?

MR. EHRENREICH: So let me object to

form. He's not the corporate rep. In his individual capacity.

If you know the answer, you certainly can answer it.

MR. HODGE: Right.

A. Yeah, I couldn't. I mean, other than being able to get into a system -- and I myself can't even get into the system exactly.

I could pull up a general sheet, look to see if it would fit and fall within the guideline, but -- and then go in, but I don't have -- do I go into the system and look at any one of our hundred twenty-five thousand orders that we booked last year through our agency system to see how everybody was paid?

I don't have the exact access, but I know what would be needed to get to certain key divisions or people that might be able to access information like that, but that would be the limit.

Q. Tell me that knowledge. What divisions, what people?

A. It would be our supplier payment invoicing, which is think of it in terms of finance.

Q. And is there an individual you know that's affiliated with supplier payment invoicing?

A. We have a division made up of directors, managers, supervisors, and various staff, so I would be going to one of the members of management.

Q. Can you give me a management name?

A. If I'm asked the name, I would go right to the senior director to at least look at what that person could do. They would then check into the system to see what that is. That name of the person that I would be looking at would be Theresa Dawkins.

Q. Theresa Dawkins. Okay. Now, we kind of -- you've been very helpful in articulating and answering some of my previous questions, but I want to go back to your rise through the company.

You started out in dispatch, and what was your other role when you first started?

A. Dispatch, couple different roles between Operations, Household Goods, Logistics. After I left Operations, I then spent five years supervisor of Revenue Accounting and, after Revenue Accounting, spent another five years of management of Cargo Claims and Customer Service.

After that I spent 16 years -- I spent five years as a Director for Agency Development. Then 16 years for Director with Contract Administration.

Q. Go a little bit slower. Little bit slower. I'm trying to write this down because I'm going to ask you a little bit about it.

A. Yeah.

Q. I got cargo planes, I got director for Agency. What was the last part?

A. Development.

Q. Development. And this nice young lady, she's taking down what we say and, of course, I'm from the south, so we speak a little slower down there, but if you would just slow it down a little bit.

All right. So I got Director for Agency Development. Then what did you say?

A. 16 years of Director with Contract Administration, Rates and Tariffs, and Tabling, and then spent -- my current role now, as which I took back in I'll just say January of 2017, so for about the approximate last five and a half years now as Senior Director for Agency Success, which is really the most current name for what used to

be Agency Development, that I had those roles back in the nineties, yeah.

Q. I'm trying to figure out where you rank in the food chain. Sounds like you got a really good overall picture of the operations of Mayflower and, ultimately, I guess it expanded into what do you call it now, Uni- -- Univan Group?

A. UniGroup is our -- basically our holding company. You know, I look at it, within the corporate structure, United Van Lines and Mayflower basically are the interstate van lines that roll up under UniGroup parent company. And, really, yeah, yeah.

Q. Revenue Accounting, do you have an accounting background?

A. Other than courses, no accounting background. Like everybody from four years of college, I could say, yes, I took a couple courses in accounting.

Q. What did you do in Revenue Accounting?

A. Supervisor responsible for distribution of revenues to our agents on shipments that they booked, hauled, performed services on.

Q. So did you function in somewhat of an

audit capacity to make sure that your company was getting their cut from the booking agents, destination agents, etc.?

A. Audit was done --

MR. EHRENREICH: Object to form.

THE WITNESS: Oh, I'm sorry.

MR. EHRENREICH: That's okay.

A. Audit was done because just to confirm what paperwork was all there, signed paperwork was there, met all the criteria in order to properly assess that there was accurate invoicing of charges and how it was being paid.

Q. And how many people were you over in that job?

A. I had a revenue distribution team of six or seven people, had an audit team of three or four people, and I had a couple other smaller groups that are probably not relevant.

We had a record center of 43 people; utility clerks of three people. So, I mean, it was a large group, but the consistent team was Revenue Distribution. Team of those six or seven.

Q. You said you did cargo planes. I'm a pilot, so I enjoy that sort of thing. What did you do for cargo planes?

A. Manager responsible for a team on cargo claims. If there were damages, loss or damage of personal goods in a move that an individual had, they filed a claim. We processed that claim accordingly for damage or loss of goods in the movement of the goods from point A to point B.

MR. EHRENREICH: He said "cargo claims," not "cargo planes."

Q. Oh, you said "claims." I'm sorry, I heard the wrong word.

MR. EHRENREICH: Am I wrong or is it "claims" or "planes"?

THE WITNESS: Claims, c-l-a-i-m-s.

MR. EHRENREICH: Yeah, yeah, I thought you guys had a disconnect there.

THE WITNESS: I'm talking too fast, I realize.

MR. EHRENREICH: No, it's okay. You're midwest, you're southern. I'm in the middle so I'll translate for everybody. I just want to make sure you're answering his questions, and they're pointed questions, so...

Q. And then you were Director for Agency Development?

A. Development, yes.

Q. Did you say that was 16 years?
A. No. That was five years.
Q. Five years.
A. Yeah.
Q. What did you do for them?
A. Director, and we oversaw -- I had regional agency directors. So regions of the United States were divided into six regions.
Basically we dealt with agent performance. We were all about trying to make sure agents were performing such that we were -- or the end product was we worked with our agents across the United States to make sure they were performing to the best of their ability based on customer feedback from surveys, that they were performing accordingly in sales, operations, claims. Just making sure.
So we had an overall holistic approach to agent improvement, better improvement. Dealt with them, kept them updated on things. Made sure that everything was in good working order, what we call an agent in good standing, and that they were performing appropriately because the ultimate was to serve our customer, make sure they were getting the best service. So it was a driven logic.

Q. Okay. What regions did you have or did you have the whole country?
A. Had the whole country. I had six regionals rep -- regional AD reps, and then I managed those reps.
Q. Were you working with Moholland?
A. They -- I'll tell you, when I left that job -- because, if I'm not mistaken, the first Moholland office did not become an agent for Mayflower until 1999.
I ended my role in the fall of '99 and took on a new role in Contract Administration, so I probably would not have even known them at that time.
Q. And were you dealing with Conser down in Jacksonville?
A. No, I don't even think Conser was with us at that point in time. I couldn't tell you for fact, but I do not remember that name at that point in time. We have over 500, and at that time we were closer to 700 agents within the United States.
Q. And now you have how many agents?
A. Right now we have, full service agents, 452.

Q. Why has the number declined?

A. As time goes on, mergers, people move different lines of business. Some of our agents expanded by merging with other agents and some agents are just -- they may get out of the business.

There's any number of reasons. 95 percent of reasons for agents leaving are for whatever they're wanting to do. They may not have legacy plans and decide to leave. Maybe they'll just stay and do local business and not be involved with the van lines interstate business any further. It's business decisions in most cases of those agents.

Q. Then you went to Contract Administration after Agency Development. What did you do there?

A. Director. Oversaw all the administration contract negotiations with our corporate national accounts, whether it was household good, logistics, relocation entity companies.

Had RFP writing when we had a lot of corporate companies that were wanting RFPs. For business we had -- I had a group that did that.

Had Rates and Tariffs during that time

period, so we structured for the van lines our rates and tariff pricing across the United States.

Had Tabling, which was we tabled all the pricing in the UniGroup system for all domestic business lines of business: Commodities, residential, contracts, so forth, yeah.

Q. And how long were you doing that?

A. Just right at 16 years.

Q. That was the 16 year one?

A. Yeah.

Q. Okay. And then in January of 2017, is that when you started doing Agency Success?

A. Yes. That was the old agency development name given newer names, which technically today is now known as Agency Success, yes.

Q. Would that be a lateral transfer or a promotion, or how would you describe it?

A. I just did a lot of the business. I'm going to say it was all lateral because they were director levels, director, senior director levels, and I'm familiar with the business and strong background and experience was needed and it was just something that was being done, yes.

Q. And because you had a bigger overview

than perhaps many people, do you know what the revenues of Mayflower Transit were in 2022?

MR. EHRENREICH: Object to form.

A. I don't know off the top of my head, no.

Q. How about the UniGroup?

MR. EHRENREICH: Same objection.

A. Again, I could ballpark and give you a rough number, but I would not know.

Q. I understand. Give me a rough number. I understand that you don't have a specific number. What's your rough number?

A. If you're looking --

MR. EHRENREICH: Hold on before you answer. Let me just talk to Mark for a second. You stay here.

MR. HODGE: Sure.

THE VIDEOGRAPHER: You want to go off the record?

MR. EHRENREICH: Yeah, just give me one second.

THE VIDEOGRAPHER: We are going off the record at 1:52 p.m.

(Temporary recess was held.)

MR. EHRENREICH: We're back on.

THE VIDEOGRAPHER: We're on standby. We

are back on the record at 1:53 p.m.

Q. Go ahead.

A. Rough number, gross, for domestic household goods, would put it somewhere in the neighborhood of probably 900 to 950 million.

Q. Does that include the government business?

A. Government, residential, COD, and contract national account. It does not include logistics or any corporate international business.

Q. Is that UniGroup or is that --

A. UniGroup.

Q. UniGroup.

A. Mayflower within that is a much smaller number. I couldn't tell you what that number would be.

Q. Do you have any relatives by blood or marriage that live in south Georgia?

A. No, not that I'm aware of.

Q. Okay.

MR. EHRENREICH: So my coffee hit me pretty hard. Whenever it's convenient for you to take a two-minute break.

MR. HODGE: Absolutely.

MR. EHRENREICH: Just whenever it's

convenient.

MR. HODGE: Let's do it now, sure.

THE VIDEOGRAPHER: We are going off the record at 1:54 p.m.

(Temporary recess was held.)

THE VIDEOGRAPHER: We're on standby. We are back on the record at 2:02 p.m.

Q. Okay. We're back on, Mr. Wynn. I was just asking my partner, Mr. Foss, for a magnifying glass because I've got a document we're going to mark it as Plaintiff's Exhibit 1.

(Plaintiff's Exhibit 1 marked for identification, J.S.)

Q. I'm impressed with you. You looking at that doggone thing and you don't have glasses on. I got two pairs and a magnifying glass trying to read all of this stuff, but can you see it?

A. I can. Even though I was diagnosed two weeks ago with glaucoma and so I got to deal with that now, but my sight is still good. I just have a lot of blur.

I'm sharp but -- to see, but the blurs are -- and that was supposed to take out a cataract when they determined I had glaucoma. So I go to surgery next week with laser beams shot in

my eye. Looking forward to that, you know, but --
Q. But that's for the cataract? That will get you --
A. That's for the glaucoma.
Q. That's for the glaucoma?
A. Yeah, and then they'll take care of the cataract. So I can still read this stuff but it's a little blurry, but I've been lucky not to --
MR. EHRENREICH: He just wants to make sure you can read the document. Can you read the document?
A. I cannot -- I mean, I have to really --and it's because of the blur.
MR. EHRENREICH: But you can either read it or you can't, all right? If you can't read it --
A. Yeah, I can see it because if I can see -- because I can understand it when I see some of it.
Q. So the document I'm referring to is Mayflower 001446, and that's a Bate's stamp number on the bottom right and, as we go through some documents, I'll be using those numbers.
MR. HODGE: If I forget to use them, counselor, you remind me. I want to make sure

everybody who's listening, whatever, we're looking at the same document.

Q. This document is depicted as Corporate Structure UniGroup and Subsidiaries Organization Chart. It says as of January 27, 2023. So my first question is was this an accurate corporate structure as of the year 2022?

MR. EHRENREICH: Object to form. He's not a corporate rep.

A. Yeah, I wouldn't know. Could not tell you that.

Q. Okay. As you review this, can you think of anything that is different or was different in 2022 as opposed to this document setting forth the structure in January of 2023?

MR. EHRENREICH: Object to form.

A. No, could not say, but -- no.

Q. So it says up at the top that "UniGroup, C.A., A Missouri Cooperative," is at the top of the food chain.

A. Mm-hmm.

Q. Is that your understanding?

A. C.A., Collective Associates, yes.

Q. Collective Associates. When did that thing get organized?

A. End of 2018, beginning of 2019.
Q. Okay. What was the purpose, if you know?
A. Company restructured, but I have no knowledge exactly how or why.
Q. All right. And then on the top tier it's got six identified companies. Transportation Services Group, Inc., A Missouri Corporation, what's that?
A. That's from, you can see there, it represents the transportation, of which you'll see United Van Lines and Mayflower Transit as the two interstate carriers, domestic, hop interstate carriers, but that's just a name that I wouldn't -- it's just there representing something, I'm sure, in the corporate accounting line.
Q. Well, who do you work for?
A. I work for what's called Member Services Division, which will still roll up -- I'm trying to see where I think it could roll up, to be honest.
You know, this is an accounting structure. Do I know from an HR structure how it rolls up? I'm looking at it here.
I could -- other than I roll up under

UniGroup, C.A., but I don't know that it would -- it wouldn't fall under the insurance company, doesn't fall under the Worldwide company, so I'm still assuming it's going to have to fall up somewhere, maybe under Transportation Services, but I don't know that for a fact. That would be the logical conclusion.

Q. Well, who do you get paid by?

A. UniGroup.

Q. Your checks say UniGroup on them?

A. I never pay attention. It's all online.

Q. Okay. Do you get W-2s at the end of the year?

A. Yes.

Q. Who's the W-2 say you work for?

A. Has to be UniGroup.

Q. Okay. Would that -- do you think that would be the case for any employee of all these other companies that are listed under UniGroup?

MR. EHRENREICH: Object to form.

A. I don't know. I really don't know.

Q. Okay. You mentioned something about insurance. Are you part of some insurance company?

A. No, I was just looking at here Total

Insurance is one of the -- right to the right of Transportation Services Group was Total Insurance LTD.

Q. I see.

A. That's all I -- I was just reading off the chart here.

Q. Okay. Do you know what Transportation Services Group, Inc., is?

A. It has to just deal with transportation services of those van lines, the domestic interstate van lines.

Q. I meant to ask you, you started working for United Van Lines. Were they a separate company from Mayflower at the time that you started?

A. Mayflower did not ex- -- they were a separate -- Mayflower was not part of UniGroup until 19- -- May of 1995.

Q. I thought you told me UniGroup came into being 2018.

A. UniGroup itself, no, did not start until 1988.

Q. Oh, it started in 1988?

A. United Van Lines was its own separate United Van Lines, Inc., own company stand-alone.

Q. What about Mayflower?

A. It was its own company, not part of our system, totally independent. Just a competitor to UniGroup or competitor to United Van Lines.

Q. And when did they become under the same corporate umbrella?

A. '95.

Q. All right. Now, does UniGroup effectively create a monopoly on the moving business in the United States?

A. No.

Q. Is there a major competitor?

A. Many major competitors.

MR. EHRENREICH: Let me object to "monopoly" as a legal term.

Q. What competitor exists that grossed 900 hundred million in a year?

MR. EHRENREICH: Object to form.

Q. Do you know of any?

A. I would say Allied North American through Sirva.

Q. That would be a major competitor?

A. Yes.

Q. Anybody else you can think of?

A. There's other competitors, but I'll say

Atlas would be the next largest, yeah.
Q. All right. Is UniGroup the largest?
MR. EHRENREICH: Object to form.
A. They're probably in part.
THE WITNESS: I'm sorry.
MR. EHRENREICH: It's okay.
A. They're just in part. I couldn't tell you exactly if somebody has a little bit more this way or that way. I'm just saying they're all major competitors and similar business volumes.
Q. Okay. Now, as we traverse this matrix, beside Transportation Services is Total Insurance Limited, A Bermuda Corporation. Tell me about that one.
MR. EHRENREICH: Object to form.
A. I have no knowledge. I couldn't tell you who or what they do exactly other than I see the word "Insurance," but don't know.
Q. When you were in Revenue Accounting, did you have any dealings with Bermuda corporations?
A. No.
Q. They like holding companies for your money or something?
MR. EHRENREICH: Object to form.
A. Don't know.

Q. Okay. And how about Total Transportation Services, Inc.? That's the next one listed.
A. Again, I see what -- it's listed, but I don't know knowledge. I'm not involved with any of those other companies is all I can tell you.
Q. So do you know what it does?
A. I do not.
Q. How about Trans Advantage, Inc.?
A. I'm familiar with it. It is a leasing company.
Q. Like leases what?
A. Tractor trailers, trucks, equipment.
Q. Okay.
A. And it's to the industry, not necessarily just to our van line system within UniGroup. So anybody in the business can use them. They find them on a website and they'll see what they can offer in terms of leasing of product.
Q. Do you know if Trans Advantage ever leased to Moholland or sold to Moholland?
A. No idea.
Q. How about Locke, L-o-c-k-e?
A. No idea.

Q. Did you ever deal with Locke?
A. No.
Q. Do you have any idea what they are or --
A. Never heard of them --
Q. -- what they do?
A. -- until just now.
Q. Okay. UniGroup Worldwide, Inc., it says Missouri Corporation d/b/a UniGroup Relocation. What's that?
A. That is UniGroup's international company.
Q. So you-all do moving and -- outside the United States?
A. Yes.
Q. Give me an example.
MR. EHRENREICH: Object to form.
A. Again, I'm not part of it. They just do international moving. I couldn't tell you what countries, how they operate. The business is its own business entity.
Q. Okay. And under that it says United Van Lines International and Mayflower International. So can you tell me what those are?
A. No, other than they're part of international, so they're allowed, but, no, I have

no involvement, no knowledge of what, other than they're international oriented.

Q. Then to the right it says Re- -- I think that's Regroup Holdings, LLC, A Delaware Limited Liability Company.

Now, if somebody can help me with that first name, I'd appreciate it.

MR. VOLANSKY: RevGroup.

MR. HODGE: I'm sorry?

MR. VOLANSKY: RevGroup, R-e-v.

Q. R-e-v Group. RevGroup Holdings, LLC, what is that company?

A. I have no idea. No knowledge.

Q. And then underneath that RevGroup, Services, no knowledge?

A. No knowledge, no.

Q. And to the right of that Frontline Relocation Solutions, LLC?

A. Never heard of them, so no knowledge.

Q. Okay. Now let's go back underneath Transportation Services Group, Inc., that's the far left block, and it's got underneath Allegiant Move Management. What's that?

A. They are just -- a move management company assists agents with moves. So they're

just -- move manager is a whole 'nother structure within the industry, regardless of various carriers.

So they assist agents and move -- Move Management providing services for our agents and helping them with structuring of moves.

Q. Give me an example what that means.

A. I don't know much beyond that. I'm not directly involved with them but, I mean, I just know that the term's been there. They've been around for a few years.

As a move manager, in general, the term means you could have a move manager that helps put pieces of moves together for people that aren't as familiar with structuring. It might be an alternate service of -- think of it as an outside agency trying to put structure of taking care of customers for an agent.

Q. You married?

A. Yes.

Q. Got grandchildren?

A. Yes.

Q. How many?

A. Seven.

Q. I want you to pretend I'm a fifth

grader, okay? So I want you to explain to me like I'm a fifth grader.

What in the world is a move manager?

A. From an industry standpoint, move managers are there, they will help -- they work with clients, customers, and they could take care of some of the workload or flow.

Here's a customer, wants to work with an agent or contact an agent. Instead of the agent taking care of -- it's almost like you're -- I don't want to use the word "subletting."

You're actually performing services for the agent by managing the move, working with the customer, move coordination efforts between the client for an agent, and they manage the move.

The term itself, move manager, so they help agents help entities control and manage moves for them, and you'll have move coordinators within move managers who will help coordinate moves in contact with a customer, points of origin, points of destination, keeping the customer updated with what's going on with their move that's in process moving from point A to point B.

Sometimes an agent or an entity doesn't have enough staff, they can work through a move

manager like a third party that will take care of that, and they pay services to a move manager to handle that additional steps of coordination of a customer's move.

Q. I was asking about your family. Who are you married to?

MR. EHRENREICH: Object to form.

MR. HODGE: I'm -- I'm --

MR. EHRENREICH: I know, but there's no relevancy at all here.

MR. HODGE: Yeah, there absolutely is.

Q. I want to know who you're married to.

MR. EHRENREICH: Why is there a relevancy to who he's married to?

MR. HODGE: Because I want to find out if his wife has any relatives in Georgia.

A. Oh, wife's name --

MR. HODGE: By the way, counselor, no speaking objections. Object to the form or instruct your witness not to answer. That's the way it's going to be.

MR. EHRENREICH: When you ask a personal question like that, I'm allowed to inquire.

MR. HODGE: Okay.

MR. EHRENREICH: That was a personal

question.

MR. HODGE: It's a personal question.

Q. I want to find out about your relatives. I'm not going to ask about cousins. I want to know anybody you might have -- have any relatives in south Georgia?

MR. EHRENREICH: He already said he didn't.

A. No, she does not. Deborah Wynn named Deborah Norris, St. Louis born, raised.

Q. Very good.

A. That's it.

Q. Any of your children have any relations, married, anything like that?

A. No, three grown sons, and, nope, all here in St. Louis and, yeah.

Q. So you got the whole clan in this area?

A. All local. My youngest is now out in Vallejo, California, but, yes, the other two are here in town, yeah.

Q. And just for, so the jury knows, we're taking this deposition in St. Louis right now, is that right?

A. We're taking a what?

Q. We're taking this deposition --

A. Yes.
Q. -- in St. Louis, and the location, it's just beautiful. Outside is that Arch, that famous Archway --
A. Yes.
Q. -- and the beautiful thing at the offices of Lewis, Brisbois, is that right?
A. Correct.
Q. Okay. Now, where do you work out of?
A. I work out of UniGroup, C.A., Fenton, Missouri, suburb of St. Louis.
Q. Is that where Mayflower Transit is based as well?
A. Everything rolls, structures, under, yes. Domiciled, if you want to look at the term domiciled in Missouri, but we're structured here in St. Louis, Fenton, Missouri.
Q. So all these companies on this organization's chart, do they operate out of -- I mean, the ones that say they're a Missouri corporation, they operate out of Fenton?
A. They -- I mean, in the structured world, yes, yes. I don't know of anything else. I couldn't tell you by looking at these across the charts. Right now I'd say they are. There's

nothing that would tell me differently right now.
Q. So if we were in Fenton at your corporate headquarters, what kind of building is it? Is it like a skyscraper or --
A. No.
MR. EHRENREICH: Object to form.
Q. Just tell me what it's like.
A. It's a three-story building, approximately three levels, 300,000 square foot, hundred thousand each floor.
Q. How many employees in that, approximately?
A. You know, I don't know right now. Pandemic has done its own thing. People work remotely now, so my best guess would be 700 people.
Q. Okay. So underneath Allegiant I have United Mayflower Container. What's that?
A. We have a container process on moving goods. It's just you can ship goods in traditional mode, meaning you blanket wrap when you put things in, truck goes from point A to point B, unwraps and delivers.
We also found smaller shipments with fewer trucks going across in the household goods

industry. We now containerize customers with smaller shipments in the containers. Then we can move the containers.

They're not -- and they're still properly paper wrapped, blanket wrapped, in the container, but it's another means of moving shipments efficiently and requires not having so many trucks because we can move containers.

Q. As you're describing that to me, I think of a product called POD. You know what I'm talking about?

A. It could be in a similar line of thought.

Q. Okay.

A. Yeah.

Q. All right. And then UniGroup Worldwide Logistics, what's that?

A. It's their -- basically you're a special products moving company. They move the logistics: Trade show, high-beta electronics, spec-com, truckload, and LTL.

Q. And then to the right of Allegiant is United Van Lines, which you started with.

A. Yes.

Q. And got folded up into this

organization, is that right?

A. Mm-hmm, correct.

Q. So under United Van Lines I see 13 companies listed. Starts with -- would you say that's Abbey?

A. Yeah, Abbey.

Q. Yeah. A-b-b-e-y, Van lines, LLC. What's that?

A. There's all the names there. Basically they are basically government military booking, logics. What's called a SCAC code, S-C-A-C. And government military, you can establish -- it's been an industry norm for decades.

All carriers can have multiple sub paper companies. They get turns at the wheel to get more moves, and they establish paper companies because the government would issue moves to names of companies.

So whether you're Allied North American, Atlas, United, Mayflower, you have structured paper companies so you get additional moves through the government.

Q. When you use this term "structured paper company," what does that mean?

A. That's the name. Abbey is another

company underneath United and they will be a freight forwarder that handles business for the government on military.

Q. I guess I'm just slow, but I don't understand why you have to have all these companies. Why not just have one designated for military moves?

MR. EHRENREICH: Object to form. He's not a corporate rep.

A. Yep, I could -- other than this area to get more business, I don't know anything beyond that that I could tell you.

Q. They're to get more business, though, that's your response?

MR. EHRENREICH: Object.

Q. Okay. All right. And then under Mayflower Transit let's see how many we got. One, two, three. I'm counting 22 different companies. It begins at Elder Moving & Storage, about halfway through is Stealth Mayflower, LLC, and at the end is North Star Van Lines, LLC.

What's all that about?

MR. EHRENREICH: Object to form.

A. I don't know. Couldn't tell you more.

Q. Are you familiar with any of these

companies?
A. No, I'm seeing names of companies but not familiar per se with them.
Q. Okay. Well, do you know what any of them do?
A. Again, assume it is just again, as you're reading it off the list, I'm just assuming it is just a paper company.
Q. And the paper company is designed to generate more business?
A. Promote business to obtain more shipments.
Q. And, whoop, microphone popped off. Bear with me.
Now, if we added all your agents on top of this structure, that would be additional paper companies, wouldn't it?
MR. EHRENREICH: Object to form.
A. No. I mean, these companies don't have employees per se. It's just a name of a company, but maybe I'm not quite fully understanding. You got United Van Lines and you have Mayflower, those structures.
Q. If they don't have employees, what's the point in having a company?

MR. EHRENREICH: Object to form.
A. Again, it's just what was termed another turn at the wheel in which to get another shipment.
Q. If we put all the agents of UniGroup, we'd add about 500 more names of companies, wouldn't we?
MR. EHRENREICH: Object to form.
A. Again, we only have 452 full service agents in the system.
Q. I'm sorry, you did say that. If we said 452, we'd add 452 to this list, is that right?
MR. EHRENREICH: Object.
A. Well, they roll up under United Van Lines or Mayflower Transit. Mayflower Transit, yeah.
Q. Okay. All right. Let's go to the next exhibit, which is titled Agency Agreement and the Bate stamp is JMI four zeros and a 3. Give it to the witness.
(Plaintiff's Exhibit 2 marked for identification, J.S.)
MR. EHRENREICH: What's your Bate number?
MR. HODGE: JMI, a bunch of zeros and a

3.

MR. EHRENREICH: It's the same. I just haven't Bate stamped it. That's fine.

MR. HODGE: Okay?

MR. EHRENREICH: Yeah.

MR. HODGE: Ready?

Q. So in preparation for your deposition did you review this Agency Agreement?

A. Not per se, no. I'm familiar with it. I didn't review it.

Q. All right. Let's go over it a little bit. Number one, who wrote it?

A. The agreement is a standard document for all agents that want a contract, independent agents that want a contract with us. They would sign the agreement if they so choose to be an agent for Mayflower Transit.

Q. That wasn't the question. It's a real simple question. Who wrote it?

MR. EHRENREICH: Object to form.

A. I don't know.

Q. If you look up here on the right --

A. I mean, it could be the lawyers. I'll say the lawyers but -- the lawyers of Mayflower, but that's all I could say.

Q. Which company was responsible for creating this document? Let me be a little more --

MR. EHRENREICH: Object to form.

Q. -- specific.

MR. EHRENREICH: His personal knowledge. He's not a corporate rep.

A. Yeah, again, it's Mayflower, but, you know, it would be a standard rep, and I just assume a law department. I don't know there would be any one individual that would have written it.

Q. Well, I'm not asking for an individual. I'm talking about the company. This is a Mayflower-created document, isn't it, sir?

A. It is a created document, yes.

Q. And we know that because it's got "Mayflower" on top right of it, doesn't it?

A. Mm-hmm, yes.

Q. Mayflower Transit?

A. Yes.

Q. And you've probably seen a bunch of these documents because I think you told me you were Director of Agency Development for five years and you were in Contract Administration for 16 years.

A. Yeah.
Q. Is that right?
A. Yep.
Q. Okay.
A. The contracts didn't include agency agreements per se. Those contracts are with corporate account clients and the van line, whoever it was, but familiar with the agreement, at any rate.
Q. Well, since 2017 you've been responsible for a department called Agency Success?
A. That's correct.
Q. And specifically in that department you reviewed termination of contracts?
A. Termination of agents, which would include their contract as an agent, that's correct.
Q. And so you've seen literally hundreds of these kinds of agency agreements prepared by Mayflower, haven't you?
MR. EHRENREICH: Object to form.
A. Yes.
Q. All right. So Mayflower's the carrier. I'm just going to try to cut to it so we don't spend a whole bunch of time.

I want to go to the next page, JM4. The top heading references "Responsibility of the Agent," okay? In this case that agent's going to be Joe Moholland, is that right?

A. Mm-hmm.

Q. You need to answer yes or no.

A. Yeah, they are -- they were, yes.

Q. And I'm not correcting you on that. I'm just doing it for the court reporter. It's not disrespectful.

MR. EHRENREICH: What we didn't say, you can't -- you have to say yes or no. You can't just go uh-huh or nod. The court reporter can't take that down.

A. Yes.

Q. Very good. So the responsibility of the agent under 2A requires that agent "to act solely in matters within the scope of the agreement," is that right?

A. Yes.

Q. That includes destination agents as well, doesn't it?

A. Yes.

Q. "B: To solicit and participate in the rendering of transportation services in intrastate

commerce to the extent transported under carrier operating authorities, interstate commerce, or foreign commerce by the carrier."

Did I read that correctly?

A. Yes.

Q. Okay. Now, "solicit and participate in the rendering of transportation services," what does that mean?

MR. EHRENREICH: Objection. Form.

A. The shipment moves.

THE REPORTER: I'm sorry?

A. The movement of transportation of a shipment. They would haul the shipment, the hauling of the shipment.

Q. And Mayflower wants its agents to solicit and participate in the rendering of these transportation services because it means revenue for the company, right?

MR. EHRENREICH: Object to form.

A. Yes.

Q. Very good. "Such transportation services include, include, but are not limited to shipments whether for the general public, private shippters -- shippers, or any governmental entity." Did I read that correctly?

A. Yes.

Q. All right. And under D, 2D of this Agency Agreement, "To use the name, logo, trademark, service mark, trade name, trade dress, or design of lettering and color combination owned by and or used by the carrier in connection with any advertising or solicitation as an agent for the carrier, including the painting and lettering of vehicles belonging to or under the control of the agent."

Is that right?

A. Correct, yes.

Q. Does that mean that Mayflower wants its agents to say Mayflower on the side of its tractors?

MR. EHRENREICH: Object to form.

A. If they're operating as an agent and hauling for us, yes.

Q. Do you perceive a benefit derived by Mayflower for having lettering with an agent on its tractors as its moving interstate -- intrastate commerce?

MR. EHRENREICH: Object to form. He's not a corporate rep.

Q. Go ahead. Answer the question.

A. Yes.

Q. All right. Now, as we go down kind of about the fourth sentence from the bottom -- and I'm not intending to take it out of context. I'm just trying to cut to the chase.

MR. EHRENREICH: Bottom of D or bottom of the page?

MR. HODGE: I'm sorry?

MR. EHRENREICH: You said four sentences from the bottom. I'm asking four sentences of D?

MR. HODGE: Of D.

MR. EHRENREICH: D?

MR. HODGE: Yes, sir.

Q. "And may not be used to promote the services of any entity other than the carrier."

Did I read that correctly?

A. Yes.

Q. Okay. What's the purpose of being strict about that requirement in this Agency Agreement?

MR. EHRENREICH: Object to form.

A. Agents can also represent themselves separately from the van line, maybe for certain intra or local or commercial business, and not that Mayflower and international -- or not

international, but Mayflower's an intrastate carrier.

Q. Does UniGroup and or Mayflower do business in all the contiguous states of the United States?

A. Mayflower -- there may be one state that we currently do not. It's only because we have no agents in the state of West Virginia, for instance, but we would have -- we used to, we don't at the moment, so, but, technically, we would be doing within the contiguous US, correct.

Q. All right. And do you do business in Georgia?

A. Yes.

Q. Do you have actual facilities in Georgia?

A. Our agents have the facilities in Georgia. We do not own the facilities; the agents do.

Q. There's four of them at least in Georgia, aren't there?

A. I would have to go through -- and you're talking Mayflower, not United --

Q. Yes.

A. -- but I would have to think through,

but I know we have agents in Georgia, whether it would be greater Atlanta, Valdosta, Georgia -- I'm just trying to think real quick -- Columbus, Georgia, but I know there are agents in various locations.

Q. And that four is just Mayflower in the Georgia area. What about UniGroup? How many more agents does UniGroup have operating out of Georgia?

MR. EHRENREICH: Object to form.

A. UniGroup itself does not have agents. They are -- United Van Lines and Mayflower are the two intrastate domestic carriers that are under contract.

Q. How about United? How many?

A. I'd have to count again. You're probably again still looking at four or five agents at least. I'd have to look into the -- to locate the cities of which they're at, but, yes.

Q. So is there a delineation within UniGroup between a booking for United Van Lines and a booking for Mayflower, or does the money all flow into the same pot, so to speak?

MR. EHRENREICH: Object to form.

A. You know, I mean, they roll up under

UniGroup, so do I know how the accounting system exactly works? No.

Q. Okay. Let's kind of go down to I on this agreement. "The agent shall at all times have in effect insurance coverage required by carrier policies."

Do you see that?

A. Yes.

Q. Do you know what that insurance coverage requirement is?

A. There is just minimum required on your certificate of insurance or required minimal limitations that have to be there for workman's comp, equipment, certain things like that, that are spelled out.

I don't have the details. I just know there is required minimum certificate of coverage requirements to be met.

Q. What about carrier liability coverage? Are there minimum requirements within the Mayflower, United, or UniGroup operation?

A. There is minimum required because it's all about liability, period, yes.

(Mr. Ryan Langely is now present via Zoom.)

Q. So what do you know about that?
MR. EHRENREICH: Object to form.
A. I don't know the details. I am not in the insurance side of it. I just know that there are -- there's van line policy that requires agents to have some defined minimum limits of coverage.
Q. You don't know what those numbers are?
A. Not per se, no. I mean, it gets detailed, and I've seen details, but I don't memorize them or know. I just know that they are spelled out for agents to have the required minimum coverages.
Q. Now, do you know anything about excess or umbrella coverage that exists for Mayflower, United, or UniGroup?
MR. EHRENREICH: Object to form.
A. Do not. I know -- I've heard the terms but I am not familiar with the specifics whatsoever.
Q. Who would we inquire with, in terms of UniGroup operation, to get that information?
MR. EHRENREICH: Object to form.
A. Risk Management at UniGroup would be the area that deals with insurance, so...

Q. Okay. And Risk Management is located in Fenton at your corporate headquarters?
A. Correct.
Q. Go to page 5, if you would. We're going to number 3: "The Duties of the Agent: A: To represent the carrier in an active and aggressive manner in selling transportation services of the carrier."
A. And you said what -- I see "General Provisions: 5."
MR. EHRENREICH: Yeah, I think you're talking about page 4. May have been page 5.
MR. HODGE: Bate stamp 5.
MR. PADGETT: Bate stamp 5.
MR. EHRENREICH: Bate stamp 5, page 4 of the document.
THE WITNESS: Oh, okay. I thought it was page 5. I thought I wasn't seeing what he said.
MR. EHRENREICH: That's all right. Disconnect.
MR. HODGE: My apologies.
THE WITNESS: So page 4?
MR. EHRENREICH: Where it says "The Duties of the Carrier shall be."

Go ahead, counsel.
Q. You see where it says "The Duties of the Agent shall be"?
A. Yes.
Q. At the very top. I want to make sure we're on the right page. Look on that bottom number. It says JMI005.
A. Oh, that's 06. That's what I have for page 4. So 005.
MR. PADGETT: It's page 3 on the bottom of the page.
A. Page 3 on the document.
Q. Okay. But I'm going to refer consistently to the Bate stamps because these other folks are listening, okay?
A. So this number's what you're referring to?
Q. Yes. All right. We together now? "The Duties of the Agents shall be," you with me?
A. I see it.
Q. It says "To represent the carrier in an active and aggressive manner in selling transportation services of the carrier."
We can agree that Mayflower is the carrier, correct?

A. Correct.

Q. So what does that mean that they are to represent the carrier in an active and aggressive manner?

MR. EHRENREICH: Just let me object to form. There's more to the sentence. Go ahead.

A. I don't know. I mean, other than, if you're there, they want an agent to be able to sell transportation services, but I don't know by what they mean by "active aggressive manner" other than that's what they are asking the agent to do, but --

Q. It seems like that would kind of be your department, the Agency Success department, wouldn't it?

A. We deal with agent performance. We look at all aspects in a holistic manner of what an agent performs, but we don't sit there and try to define how much business an agent does in its immediate community, city, state. It would be a little bit difficult, so we just identify what that agent's performance.

We may look at -- compare one year to a prior year or look at a three-year history to determine any trending based on that nature, that

agent's own location, rural versus metropolitan, larger area. Based on the business mix, are they doing more residential, subcontract, combination mix of government military, residential, so forth.

So you work to try to understand their balance of business that that agent performs.

Q. And is your job, your department, to evaluate the good performance as well as the bad performance?

A. Correct.

Q. So do good performers get additional compensation, perks, any -- can you describe?

A. No, they are paid -- all agents are paid the same based on their commission structure. Based on the nature of the business, those that might do more of one type of business, it may pay more versus another, but all agents are under the same compensation structure.

Q. Well, how was Moholland ranking in say 2021?

A. I couldn't tell you, to be honest, how they ranked. I'd have to go back to the -- again, keeping in mind that we have the 450 at that time probably, and so many. Would I know of all agents where they ranked or were at? I couldn't tell

you.

Q. Well, "ranked" was a poor word. Let's use the word "perform." How were they performing?

MR. EHRENREICH: Object to form.

A. I could only say, from a general statement, they were performing in an acceptable range. They weren't not performing poorly. They weren't shooting for the sky. They were performing in a very acceptable bell curve logic, you know.

Q. Okay. And subparagraph B says "To solicit transportation services for the carrier."

So given your Agency Success department, how are they supposed to solicit transportation services for your company?

A. Again, if it's based on the nature of business that they're doing, one, if it's residential, there's a variety of ways in which they can advertise, either through their own, through things that are provided through UniGroup's marketing company that helps them promote the brand, how they do some things, but, again, they're going to do that.

If they have corporate national account

business, again, UniGroup assists agents on trying to provide collateral materials to help them promote national accounts.

We have a corporate sales department that works with our agents toward assisting of working with corporate national accounts so that an account sees not only an agent's own representation but has the backing of a corporate headquarter that helps in a relationship development.

Agents in and of themselves for government military already probably might, if they're located -- because not all our agents are doing government military, but those that are close to bases, Air Force, whatever the case might be, will look to meet whatever that particular base requirements are, but we have a government business unit that assists and work with our agents accordingly.

So it's just that general logic that they promote to be effective in representing the van line.

Q. Well, I appreciate your response, but I don't quite get the specifics of it.

"Assist in promoting," what does that

mean? I mean, give me some real life fifth grader examples.

MR. EHRENREICH: Object to form.

Q. Is that cooperative advertising? Is that what you're trying to say?

A. I'm just trying to think, when you say specific examples, again, I'm not in the branding side that much other than what's required of agents, but all we're trying to do is provide assistance with, again, brochure, literature, marketing.

Q. Brochures, literature, marketing. Okay. Now we're getting more specific.

A. I mean, those are things that we can provide. They go out to our -- to the online systems to look at what they can utilize.

Again, because of the departments that are at UniGroup's corporate office, they're there to help an agent -- still depends upon the agent to utilize the services and things that we're providing -- to supplement their sales activity, but it still falls on that agent's back responsibility to perform.

We're just giving them some tools, guidance, direction on what they're trying to do,

but we're not doing the selling for them per se, no.

Q. "C: To assist in the investigation and adjustment of claims for loss or damage to shipments transported under the direct -- excuse me -- under the operating authority of the carrier."

Did I read that correct?

A. Correct.

Q. So the agent is supposed to help you when -- they're supposed to assist in the adjustment of claims when there's damage to property?

A. Yes.

Q. How about damage to persons? How about if you kill somebody?

MR. EHRENREICH: Object to form.

A. That's outside of cargo claims.

Q. Okay. Is this paragraph referring just to cargo claims?

A. For loss or damage, it's related to cargo damage.

Q. Now, do you expect your agents to assist in the adjustment of claims for death or severe, significant, bodily injury?

A. My answer is I don't know, but, no, I don't think that we're there to deal with that aspect of it. It's all about movement of product.

Q. Skipping down to "F: To keep accurate and detailed books, records, and financial statements, records, that relate directly or indirectly to the performance of the agent under this agreement which shall be kept and prepared in accordance with carrier policies and the carrier shall have the right at all times during normal business hours to inspect the location and such records."

So you've been in Revenue Accounting. When you were in that department, did your department have the right to go into an agent's books and check them out?

A. Yes and no. What was required of the agent -- and I'm going back when I was in Revenue Accounting.

Q. Yeah.

A. That took place from 1986 to 1990. It was a hundred percent paper driven. Our agents were responsible, through an accrual process, required to send one hundred percent of the bill of ladings signed that structured it all related:

Weight tickets, inventories and so forth, so that we could determine there was accurate billing, the customer's goods delivered, signed for, and so forth.

So it was in that -- because I also had the records center besides. So, again, it took a team of about 40 people to maintain all records, and at that time we were doing 250,000 moves a year, less than what we're doing -- doing more than what we're doing today, but so it was all paper driven.

We've gone obviously now where it's pretty much not so much paper. It's all what we call white paper. It's electronic-driven documentation.

So again, paper works there, those areas today are still reviewing what agents forwarded the system. It's a sophisticated system that captures agents documents, what they are required to put in, which agent, what levels they're performing as: Bookers, OA, hauler, DAs, and required -- the captured data should be done in a timely manner within X days of delivery of a shipment so that we can accurately make sure a customer's receiving invoices, charges collected,

and that type of processing.
Q. In the medical word electronic records are a big deal now and they are different programs. In my part of the country there's a program called Epic, and that is recognized in medical jargon for the consolidation of medical records and information.
So one doctor, maybe a family physician, can access the records of a orthopedic treating physician. You follow me?
A. Mm-hmm, yes.
Q. Is there such a program in your world?
MR. EHRENREICH: Object to form.
A. I'm not aware that we have a program, as you described it there, no. We have a process where agents are required to send in stuff, but it is of UniGroup's own development design, structure.
Q. Okay. And understanding that it would be a -- what's the term for it when you, you know, protected information?
MR. EHRENREICH: Proprietary.
MR. HODGE: Proprietary.
Q. I understand it would be proprietary information created by UniGroup. How do you now,

in the 2021/2022 world, how did you assure that your agents weren't cheating you?

MR. EHRENREICH: Object to form.

A. To answer, I don't know, other than electronically it's going through things -- it has a check and balance system, but I would not know any detail to validate what you're saying.

Q. So is there a comparable department to your Revenue Accounting department that exists for -- we could talk to somebody in the 2021/2022 range?

A. And again, they have their built-in audit groups that review all the paperwork documentation. I don't know what the check and balance process is.

To answer the question, I would go back again to Senior Director Theresa Dawkins since she oversees supplemental invoicing and payments and would probably may be able to at least comment, you know, more accurately what is done to that.

Q. Do you know of any representative of UniGroup, Mayflower, United, going into an agent's business and inspecting the location and looking at the records?

A. No.

Q. All right. And then "I" references "To collect charges on prepaid shipments booked by the agent."

So when a job is booked, is a payment made typically?

Like I'm just going to give you an example. I've already mentioned to you that we're aware that the loads in this tractor that ended up killing my clients, the loads were booked March 2nd and March 15th of 2022, okay?

A. (Nodding Head.)

Q. When that load was booked, is money paid down?

MR. EHRENREICH: Object to form.

A. No. I mean, just as a general statement, no. Customers do not prepay.

Q. So a deposit is not required?

A. No. Consumer -- federal consumer regulations on carriers do not require customers to prepay before the service is performed.

Q. So how does it work? You book it in March. Are you given a date of the pickup? And I'm talking about from a customer's standpoint.

MR. EHRENREICH: Object to form.

A. Customer is the one that has a date load

spread and then it's up to the agent of the van line to work with the customer to accommodate that load spread or, if the carrier or the agent is unable to make it, they would have to let the customer know what can or can't be done and what kind of a different load date spread that would be, in general, across the system.

Q. Are there typically weeks or months that go from the time you book it until the time the load's picked up and delivered?

A. Weeks is probably not unusual. When you talk about advance, to say months, it would seem unusual but not necessarily, no. Agent, booking agent responsibility, they may know how far in advance they can book because there will be limitations at some point, but, no, I don't -- I could not answer that beyond.

Q. Can you give me an example of collecting a charge on a prepaid shipment booked by the agent?

A. The only way a prepayment could be done on a charge would be through credit card.

Q. Okay.

A. I mean, that would be the -- the example, what have to be done, the customer would

have to have a credit card or those would have to go through and be validated.

Beyond that, I don't know how -- I don't envision -- again, the process requires customers. You may just try to validate so you can estimate a cost for something, but actual prepayment before the service is performed, I still don't see that taking place.

Q. You mentioned to me before that you were familiar with TMM, Total Military Management?

A. Familiar with the term. I know of them but I have not been involved with them whatsoever.

Q. When UniGroup works with TMM through their agents, is there a payment that is due after a certain period of time, or do you have -- do you have any idea about how the payment works from TMM to UniGroup?

A. No, I have no knowledge or understanding how that would work or how they would do that.

Q. Because I got to tell ya, it doesn't make sense to me that I could call up, whether I was TMM or an individual, and schedule a move and not have to give a credit card to the booking agent.

MR. EHRENREICH: Is that a question?

MR. HODGE: Yeah.

Q. I mean, I don't understand how you could not require some kind of financial commitment in the form of a credit card and, if you cancelled, that you had a payment penalty for canceling. Kind of like booking a hotel room.

A. Again, I don't know. T- --

MR. EHRENREICH: Let me object to form. Move to strike. I don't know what the question is.

Q. He's objecting to the form. Go ahead and answer the question.

MR. EHRENREICH: I'm not telling you not to answer.

A. No, I don't -- and again, I don't know how TMM -- because they're not -- they're not an agent or representative for UniGroup, Mayflower, United. They're their own stand-alone entity, but how anybody is working with them, I don't know how that process is that TMM does with a customer.

Q. Well, I says "To collect charges on prepaid shipments booked by the agent," and then on the end of it it says "Except as provided in paragraph 3J herein and remit same promptly to the carrier."

So it sounds like the agent is supposed to collect money and then send it to you-all. Am I reading that correctly?

MR. EHRENREICH: Object to form.

A. I'm just looking at it to see how it's stated here.

Q. Sure.

A. And again, I don't know how TMM is involved here if it were an actual agency number. Now, I realize -- but again, there would be no forwarding of prepayment. That's what I don't -- would not say. Everything that I've understood for federal consumer regulations on dealing with residential business.

Now, I see here that it talks about it relative to government agency having jurisdiction over the shipment. I'm trying to understand that. I'll be honest, I don't know how to answer relative to that line within there.

Q. Okay. Do you believe it's a standard in the industry, by an entity like TMM or Moholland or UniGroup, that you have drivers that are competent?

MR. EHRENREICH: So let me object to form. "Standard in the industry" questions are

improper for this witness.

Q. Go ahead and answer.

MR. HODGE: No speaking objections.

MR. EHRENREICH: It's improper for this witness: "Standard in the industry."

MR. HODGE: No speaking objections.

A. When you say "competent," how do you define competent? I mean --

Q. Not driving drunk.

A. Right. Oh, no, we -- if you're looking at driver -- I mean, an agent or driver would have to be able -- would be under no influence of any type.

Q. You think any drivers associated with UniGroup should ever be under the influence of marijuana when they're operating a tractor?

A. No.

MR. EHRENREICH: Object to form.

Q. How about drinking tequila?

MR. EHRENREICH: Object to form.

Q. While they're driving.

A. No.

Q. How about doing meth or coke?

MR. EHRENREICH: Object to form.

A. They would be under no influence of any

substance.
Q. That's just as bad as it gets, isn't it?
A. Yeah.
MR. EHRENREICH: Object to form.
Q. It's a dangerous instrumentality. These tractors, they can kill people, can't they?
MR. EHRENREICH: Object to form.
Q. Do you agree?
A. Yes, I agree.
Q. Do you agree that there's a heightened sense of safety that needs to be applied to those operators?
MR. EHRENREICH: Object to form.
Q. Is that right?
A. Correct.
Q. Your company has a duty to select agents that select drivers that don't fool around with that kind of activity while they're operating tractors?
MR. EHRENREICH: Object to form.
Q. Isn't that right?
MR. EHRENREICH: Form.
A. The agency is the one that has the relationship with the drivers. So when you say the "company," I'm concerned UniGroup, Mayflower,

United, but the agent is the one that has the relationship with the drivers.

Those drivers are not selected, hired, or controlled per se by UniGroup, United, or Mayflower. It's the agency that has that driver either under contract or as an employee base.

Q. If you're taking a cut of the deal, you should have a responsibility, a shared responsibility, on putting safe drivers out on that highway?

A. We have a safety department.

MR. EHRENREICH: Object to form.

Q. Let's go to page 6, subparagraph M.

MR. EHRENREICH: It's 3M?

MR. HODGE: Yes.

Q. All right. Subparagraph M says "To promptly relay to the carrier any communications pertaining to the transportation of shipments."

What does that mean?

A. I read that as a very generic statement, but when it says "relay any communication pertaining to," the logic would be, if you were going to register an order, if you're updating and operasic, its loaded/delivered status.

I'm thinking of it in an operation

context because you're talking about pertains to transportation so you're looking at what point in this stage is something happening.

The only thing I can think of is operasics: Shipment's loading, date of load on a unit truck; when it's on route, checking, point of delivery. That's the only thing I could sit there and say promptly.

That's why most -- if the -- if the driver and the equipment is properly monitored and you have the sky vents and the ELDs, all the systems are being -- you know, electronic logging devices when I say ELD -- and things are on the units, they're being monitored in that context, but information should be trans- -- if it's part of and under the Van Lines/Mayflower, United system.

Q. Let me ask you about this system you termed ELD. Electronic locating devices?

A. Logging.

Q. Logging devices. Who owns those devices? The agent or UniGroup?

A. The agency leases those devices.

Q. From who?

A. They come back from UniGroup because we

want consistency of the devices.

Q. So UniGroup leases these devices, and these devices are activated, I guess, during a transport, is that accurate?

A. Correct.

Q. And when these devices are generating information, does UniGroup, Mayflower, United, whoever, do you have access to look at that information?

MR. EHRENREICH: Object to form.

A. They have access, right. Do I know that -- I'm trying to picture -- say that you got hundreds of units at any given minute. Do we have access? Yeah, access to look at historic data that's there.

Are they actually looking at a board per se to see what's happening at any given minute, day? No, but I would say, yes, access to information is capable to do.

Q. So there's a central monitoring station in Fenton?

A. I can't call it that. I don't know enough about the detail other than there is access to have data, but I don't know how that is captured, monitored.

Q. Sometimes you can -- I'm sorry, I didn't mean to cut you off. Go ahead.

A. No. I said I don't know how that is exactly captured, but there is access to data information. Do I know how that is done? No, I do not.

Q. So you don't know how the data is accessed, but you know that the data is there --

A. The ELD captures the log-in device.

Q. -- and somebody can access --

A. It can be done, yes.

Q. Okay. When you buy a product these days and you want to track its progress -- you get tracking information through like FedEx or UPS -- is that technology available to UniGroup as well on the transport of shipment?

A. If it's being done through the authority of the carrier and it is registered either with the carrier, it should be, but that's dependent upon the agent and, if they're using the equipment that they're supposed to be using that has the equipment, that we should have that.

Q. Did the Moholland tractor that killed my clients have a Mayflower ELD on it?

MR. EHRENREICH: Object to form.

A. I have no knowledge whether they would or wouldn't. They should have already been done -- I'm assuming this took place after the June 30th date, and all information was supposed to be already returned to the van line.

Q. Well, that's all well and good, but that doesn't answer my question. Did that tractor have an ELD that belonged to UniGroup at the time of the wreck?

MR. EHRENREICH: Object to form.

A. I don't know.

Q. And who would know that?

MR. EHRENREICH: Object to form.

A. You'd have to understand was it a -- was it a unit that even was under UniGroup's -- showing activity of a particular unit number.

So, again, I would have to look through Safety to understand registration of equipment: Did the agent register all of its equipment? Did they not register?

Agents have their own operating local commercial authority, which we may not always know or be aware of, but so, yeah, they should if it was an active registered piece of equipment, but it could have already been deactivated in our

system based on the fact that the agent was terminated by a certain date.

Q. Well, who would we go ask about that information? You're telling me what could be, but I want to know the answer, and who would I find the answer from?

MR. EHRENREICH: Object to form. He's not a corporate rep.

A. Yeah, that would have to be Safety.

Q. Safety. Is that a different department from Risk?

A. Yes.

Q. Okay. Who heads up Safety?

A. I'm trying to think of the different levels of people in my mind, but -- relative to monitoring equipment and registration of equipment.

I'm trying to think if that's Mike Crancer. I will refer to Mike Crancer. He has different responsibilities. I just don't know who oversees areas of the Safety Department that might have registration of equipment.

Q. Okay. Let's skip down to Q. "To appoint an agent of the carrier as origin agent when the agent secures an order involved in a

shipment originating from the warehouse of an agent of the carrier, and the agent agrees the carrier will divide the booking compensation in accordance with carrier policies."

So tell me, summarize that for me so I can understand it.

MR. EHRENREICH: Object to form.

A. The booker has a responsibility to appoint agents as -- when an agent books an order, before they book an order, they want to make sure they have a designated OA, origin agent, designated DA.

So they should be trying to line up, from the booker, to an agent in that origin agent location to assign, and it's technically how I'm -- I'm reading that and understanding how that should go: "To appoint an agent of the carrier as origin agent when an agent secures an order involving a shipment originating from a warehouse of an agent of the carrier."

So in that case it could be an origin SIT or it could be something that just originates. We have shipments that, for whatever reason, that order didn't originate until -- it didn't come from a residence. It was already at an agent

location.

At that point that agent is how I'm interpreting that. So if it's coming out of the originating origin agent, they just have to make sure they're naming that agent. That's how I taking that.

Q. When a destination agent is set forth on booking information, does the designated agent communicate with UniGroup in some fashion?

A. Other than the order registration that goes through the system. I'm not saying that they're not required, but the order's registered, so we'll capture a booking number, a booking agent, their associated agent, booking number, origin agent, booking number.

It's captured in that sense. I don't know that there's any other communication that gets involved at that point.

Q. And does it print out a sheet? So it's like booking confirmation: It has the date the order was booked and it has an origin agent and a destination agent?

A. Well, electronically. There's no paper.

Q. And that's in that proprietary system of UniGroup?

A. Well, they have designed their own operational system and paperless system. Yeah, paperless system, we call that white paper.

Q. Okay. And then where it says "Agent agrees the carrier will divide the booking compensation in accordance with carrier policies," now we're getting to the money thing.

How does the cut go?

MR. EHRENREICH: Object to form.

A. As stated previously, all the commission structures are all geared based on the type of shipment that it is: Interstate. So there will be booking commission, origin commission, hauling commission -- DA's a little bit different -- and there will be the van line commission.

And it structures what their payments are. So there's a consistent standardization process based on the type of shipment that it is, the commodity and so forth, yeah.

Q. R says "To register with the carrier all shipments in interstate commerce and foreign commerce strictly in accordance with the pooling plan and carrier policies."

How does an agent go about registering a shipment?

A. Simply put, it's an online order process. Again, it's online. Agent registers the order based on some date registration process.

Q. And that's a UniGroup --

A. Yes.

Q. -- procedure?

A. Correct.

Q. And then "S: To provide the van operators qualified labor in assisting in the packing, loading, unloading of shipments."

Did I read that correctly?

A. Yes.

Q. So what constitutes qualified labor?

MR. EHRENREICH: Object to form.

A. Basically -- it would be hard to say what constitutes qualified labor. Basically, a driver may call ahead to an origination agent, destination agent, and ask for if they have labor available, or the agent may be able to provide that driver or somebody with a labor resource point of contact, but that's about where it would go.

Q. How does UniGroup define what qualified labor is?

MR. EHRENREICH: Object to form. He's

not a corporate rep.

A. There are policies that could say uniformed labor, but it doesn't really go beyond that.

Can you tell somebody's education, experience level, so forth, and like that is where I'm coming from. No.

Q. Well, I guess the reason I'm asking the question is you're in Agency Success and you terminate these kinds of agreements. So there's got to be a definition of what that means.

If you don't know it, who does?

MR. EHRENREICH: Object to form.

A. We provide agents with various labor resource suppliers. Those labor resource suppliers do meet some of the requirements we have that would validate that the labor that is available are properly background checked to meet standards, that have insurance comp type coverage but, beyond that, we don't -- other than we cannot control anything beyond the characteristics of the individual labor, regardless of appearance.

Regardless of we might say uniformed, and define uniform, but we can't do anything beyond that.

Q. So background checks are appropriate?
A. Correct.
Q. You-all in the habit of putting child molesters as part of your qualified labor pool?
MR. EHRENREICH: Object to form. Move to strike.
A. No.
Q. No?
A. (Shaking head.)
Q. So if it came up on a background check, would it be against your procedures and policies to put a convicted child molester in a -- as qualified labor?
A. Yeah, the background --
MR. EHRENREICH: Object to form. Move to strike.
Q. How about someone who had a history of drug use?
MR. EHRENREICH: Object to form.
A. Based on the background check data and what it said and what they were convicted of wouldn't prevent somebody from being considered qualified, yeah.
Q. Well, if the driver has a history of DUIs, does that disqualify that driver from

operating one of --
A. Yes, it would.
Q. -- UniGroup's vehicles?
A. Yes, it would.
Q. Okay. And UniGroup insists on these background checks, doesn't it?
A. We have background, yes.
MR. EHRENREICH: Object.
Q. And you-all have the ability to perform background checks on both the drivers and of the qualified labor?
A. The agents, because the driver has the agent, yes.
Q. Okay. So if you abrogate that duty and you pull in DUI drivers and child molester laborers, then you violated your own policies, haven't you?
MR. EHRENREICH: Object to form. Move to strike.
A. I don't think it violate- -- we have a background check policy, and we expect agents to be able to apply the policy of the background checks that are there, that have been in place.
Q. Okay. Let's look at "The Duties of the Carriers shall be." That's number 4, 4A, and

paragraph A is "To compensate the agent for transportation services in accordance with the policies and the pooling plan, including paying the agent a commission, which are accepted and serviced by the carrier at rates established by carrier policies."

And then B says "To compile and render statements to the agent in accordance with carrier policies, which statements shall include all debits and credits."

So my question is what statement was compiled on this particular job by UniGroup?

MR. EHRENREICH: Object to form.

A. I wouldn't know.

Q. Who would know?

MR. EHRENREICH: Object to form.

Q. Is that Theresa Dawkins?

MR. EHRENREICH: Object to form.

A. We could find -- yeah, there isn't anything that I'd be able to know if the order -- yeah.

All it would be, if it's a registered order in the system, it would show who was being paid. That agency would have an agency statement that's issued weekly online to an agent that tells

them how they're being paid for a shipment.

Again, if it's been a shipment registered with the van line.

Q. What department does that statement come from?

A. The Finance Supplemental Payments. It's called Agency Statements.

Q. Finance Supplemental Payments, and it's called Agency Statements?

A. Agency Statements within that area, yeah.

Q. Very good. "E: To provide transportation services for all shipments booked by the agent and accepted by the carrier in suitable equipment and promptly as operating conditions would warrant."

What does that mean? I'm on paragraph E, 4E.

A. It says "Duties of the carrier will provide transportation service." What we do also at the carrier, from operations, you have central -- it's not so much that it's centralized dispatch, but we have operations that operate out of Fenton.

Agents that do not have shipments --

agents go into a system and they can look at the shipments is what I'm just trying to say.

So there is a system that allows agents to see and be able to say "I have a driver that's at point A" -- say again St. Louis -- "A space on the truck. I see through this system that there is some available tonnage I want to be able to take."

So you're sort of taking this context statement that agents utilizing say "I can be able to pull this shipment that's open and available and set it up on my truck as either on route or part of a load to the shipment."

So they're providing services through this online process in which agents can pick and find orders that they can supplement is what I'm reading the interp- -- the understanding of that.

Q. In this provision, "suitable equipment," what does that mean?

MR. EHRENREICH: Object to form.

A. Again, if the agent that's picking has registered active equipment in the system that's been validated, they would have the ability to load it on that system. It would be recognized through the system as being active and available

equipment.

If it were not suitable, meaning inspections, things that are outdated, it would be void and would not be in the system where it could be utilized to set it up on that, to assign it.

Q. If the equipment had faulty brakes, for example, would that be suitable?

MR. EHRENREICH: Object to form.

Q. I'm talking about the tractor.

A. Yeah, I'm saying -- no, if it's known, do I know at any moment any unit on the road, but if there's something where it's taken out of service because of that, it would be considered unsuitable.

Q. If the tractor had tires that were beyond wear limits, would that be suitable?

A. No.

MR. EHRENREICH: Object to form.

Q. Would it be wrong to operate such a tractor on the interstate highways?

A. Yes.

MR. EHRENREICH: Object to form.

Q. "To reasonably undertake the collection of advanced charges for transportation services performed and paid by the agent for shipments

accepted by the carrier for transportation services and to remit same to the agent."

Help me understand what that's talking about because it seems to -- kind of seems to contradict some of this other stuff that we talked about.

A. I think in prepayment terms --

MR. EHRENREICH: Object to form.

A. -- "advance charges" would mean, if it's COD shipment, the driver is going to be delivering the shipment to the customer.

They're contacting the customer in advance. Meaning on route there's an agreed date -- the driver is, you know, 24 to 48 hours out -- they're going to say that -- they're going to be making sure that the customer and or the booking agent for that customer's advance, and make sure the customer has those charges in line prior to releasing the shipment.

So when the driver would arrive at that destination address, there would be an exchange of a check that would either be collected, credit card payment that would be processed by the booker, which then is released, allowed to notify the driver they can release the customer's goods

to deliver to residents.

That's what that would boil down to in terms of the advanced charges collected prior to delivery.

Q. Look at the next page, JMI407, paragraph 5A.

MR. EHRENREICH: Can we take two minutes before we get to the next one?

MR. HODGE: Certainly. Yes, it's a good time for a break.

THE VIDEOGRAPHER: We are going off the record at 3:19 p.m.

(Temporary recess was held.)

(Mr. Kyle Sloan is now present.)

THE VIDEOGRAPHER: We are on standby. We are back on the record at 3:39 p.m.

Q. Let's continue with the Agency Agreement. JMI7, Bate stamp on the bottom right.

"General Provisions: 5A: Agent hereby recognizes carrier's property right and interest in the carrier's name, logo, trademark, service mark, trade name, trade dress, or design of lettering and color combination used by the carrier."

Is that important to Mayflower that the

markings be descriptive and consistent?
A. Yes, specific, yeah.
Q. Why is it important?
A. Consistency of the brand.
Q. And do you derive an advertising benefit when these tractors are displaying Mayflower logos?
A. Yes.
Q. All right. Then go to 8, if you would, page 8, subparagraph G. This would be "5G: Both parties agree it is necessary to establish certain high standards and general operating policies."
Did I read that correctly?
A. Yes.
Q. "High standards" would mean having competent safe operators on the highways, is that right?
MR. EHRENREICH: Object to form.
A. I don't know of specifics. I don't know.
Q. Then H you've got "The agent contributing -- agreeing to contribute to the general advertising fund of the carrier."
Can you give me an example of how that would work and what kind of amounts you expect the

agency -- the agent to contribute?
A. There is just a policy that says so much, up to a maximum, is assessed to each agency on an annual basis. That's really it, but I don't know that amount. It doesn't go out to huge, huge amounts. It's just to cover costs for advertising.
Q. So if you got -- if you're getting a commission -- I'm talking about UniGroup's getting a commission -- booking agent's getting a commission, destination agent's getting a commission, but the destination agent and the booking agent are actually remitting money back to the benefit of UniGroup in this general advertising fund?
A. No, it's a separate assessed flat annual fee, not part of the commission structure.
Q. Well, that's what I'm saying. It benefits UniGroup. It benefits Mayflower.
A. Yes.
MR. EHRENREICH: Object to form.
Q. Is that right?
A. They're just paying expenses to help advertising on agents' behalf across the country.
Q. Does that remittance cover all the

advertising expenses?

A. No.

Q. Do you know how much of it, percentage wise, the agents contribute to the overall advertising expense versus UniGroup?

A. I don't know. I really don't know.

Q. Who would know that?

A. I don't know offhand. You could get back into accounting and I would think it's just hard to find out.

Q. Theresa Dawkins maybe?

A. I don't think that would be her part. That's totally different budgeting.

Q. "Any sums collected by the agent for all services performed by the carrier or in the name of the carrier immediately become the property of the carrier," is that right?

MR. EHRENREICH: Object to form.

A. Correct.

Q. Okay. And then J says "Upon termination of the agreement, by cancellation or otherwise, the agent shall discontinue the use of the name -- carrier's name, logo, trademark," a lot of -- just about everything that would be affiliated with the carrier. Did I read that right?

A. Correct.
Q. Okay. And "If the agent shall fail, neglect or refuse to discontinue the use of the carrier's name, logo, trademark, within 30 days after the transformation -- after the termination," excuse me, "the agent shall pay to the carrier beyond such 30 day calendar period the sum of $250 a day for liquidated damages."
Is that right?
A. Correct.
Q. How much has UniGroup collected, if anything, from Moholland for utilizing Mayflower's name, logo, trademark?
A. I don't know.
Q. Has UniGroup or Mayflower ever insisted on any payment by Moholland back to it because of illicit use of their logo after the termination?
A. I have --
MR. EHRENREICH: Object to form.
A. Don't know.
Q. Well, who would know?
MR. EHRENREICH: Object to form.
A. I don't -- I don't know because I don't know how they would assess it.
Q. Who's responsible in UniGroup for

collecting such a liquidated damage amount?
MR. EHRENREICH: Object to form.
A. I'm not even sure. I don't know. I don't know.
Q. "Carrier may" -- I'm on K now. "Carrier may terminate this agreement for any cause or without cause upon ten days calendar prior notice." Did I read that right?
A. Correct.
Q. Now, you claim that your company terminated the agreement with Moholland but yet you almost immediately entered into an Agency Agreement with them, is that right?
A. Temporary Agreement in order to cover shipments that were still in the system.
Q. L, subparagraph L, says "Upon giving or receipt by the carrier of notice of termination, the carrier is authorized to withhold any sums which may be due to the agent pending the carrier's final accounting of and adjustments to any such balances."
So my question is did UniGroup, a Mayflower Transit, anything under UniGroup, ever withhold any sums that were due to Moholland?
MR. EHRENREICH: Object to form.

A. No, other than the agent was notified of that hundred eighty day -- their agency statement would be held if they owed anything during that time period, but, no, nothing was being withheld. Unless a claim, as an example, got filed a week after, that would have to be resolved, but, no, nothing.

Q. Are you aware that UniGroup has continued to remit monies to Moholland through 2022, well after this wreck on July 1st?

MR. EHRENREICH: Object to form.

A. No, don't know. I don't keep track of agency statements personally.

MR. HODGE: Okay. Go to page -- you okay?

THE REPORTER: Mm-hmm.

Q. Go to page 9, "Q: The agent agrees that in consideration of the agreement by the carrier to license the use of the name, logo, trademark, etc., the carrier shall have the sole right, power, and authority within its discretion to approve or disapprove the appointment of its agents, the location of such agents, and the arrangements through which agent conducts business on behalf of the carrier."

Now, is that provision referring to who Moholland, for example, might hire or who Conser might hire, that you-all would have the discretion to say, "No, we're not going to accept those people's qualified labor"?

MR. EHRENREICH: Object to form.

A. No.

Q. Or "We're not going to accept this fella as a driver"?

A. It has nothing to do. I think it's just the agency itself. They can't just decide to move themselves to another city, another location. So it's just it's Moholland and the two locations and that is the locations of where they have the ability to advertise if approved.

Q. And by the way, when Mayflower has an agent, they put a number after -- like an M333, for example, representing Moholland?

A. Correct.

Q. And an M444 representing another company of Moholland?

A. Correct.

Q. And so it goes?

A. Correct.

Q. Is that right? And if it's a United, is

it a U?
A. Yes.
Q. Is it UA or is it just U?
A. Just U and then whatever number might be associated with that agency.
Q. Okay. Now, you know we looked at all those other companies. I can't -- might have been Plaintiff's Exhibit 1, that corporate structure.
Do all those have different letters that are beside a booking? Strike that. Beside the reference to a company?
A. Other than the United/Mayflower companies domestically and in Canada, I'm not aware of any other number system structure.
Q. "The agent by" -- I'm still on Q. "The agent by and through the execution of this agreement agrees and consents that the carrier shall have the sole right, power, and authority to resolve any and all disputes covering the appointment of its agents, the location of its agents, disputes between and among its agents, involving the business of the carrier or the manner in which the agent conducts business on behalf of the carrier, and the agent shall be bound by the termination of the carrier in such

manners -- matters."

So what I'm trying to understand is does that mean that if -- let's just use Moholland. They're in the Virginia area, right?

A. Mm-hmm, correct.

Q. And some other moving company decides they're going to expand an operation that's within 30 miles of Moholland, is that kind of the situation that this --

A. That's correct.

Q. So UniGroup could either step in and say either "Moholland or other guy, you're not going to be able to" --

A. Agents can't just expand and move where they want to. Where they have an approved location, i.e., Moholland in Hampton, i.e., Moholland in Woodbridge, those were approved locations, but they can't just move somewhere else arbitrarily.

Q. Go to JMI10, please. This is the 2008 Amendment to the Agency Agreement. In general, can you tell me why these amendments occurred to the Agency Agreement?

A. I don't know. I don't know.

Q. Kind of skipping down to it says number

1, paragraph 5K, and then K subparagraph B.

A. This is on 11?

Q. Still on 10.

A. On 10? Okay.

Q. Still on 10 to the Amendment to the Agency Agreement.

A. Okay.

Q. So it continues to give the carrier "the right, upon ten days notice in writing, to terminate the agreement for cause" -- okay? -- "which terms shall include but not be limited to agent's failure to satisfy his responsibilities or duty under the agreement, agent's failure to satisfy on a timely basis any present or future financial obligations to the carrier, agent's failure to comply with any policies or procedures of carrier or any of carrier's affiliates; however, that, in the event of acts of gross negligence or willful breach of the agreement by the agent, carrier may terminate this agreement immediately upon written notice to agent. Carrier shall additionally have the right, upon at least ten days prior notice, to terminate this agreement without cause if such termination occurs following five years."

So what did Moholland do wrong to have UniGroup tell it that they weren't going to renew it --
MR. EHRENREICH: Object to form.
Q. -- its Agency Agreement?
A. They sold their company to an unapproved resource.
Q. So if an agent wants to sell the company, they got to get your approval first --
MR. EHRENREICH: Object to form.
Q. -- for them to remain as an agent?
A. That would require an application to be filed, and the application was denied because the company they sold it to was not approved, yes.
Q. What constitutes approval of a company?
A. I don't know per se. I just know that it was not approved.
Q. Well, you get assigned I guess the rather unpleasant duty to talk about termination of contracts. So surely you have to be given the information about why you're terminating a contract.
A. I was advised, yes.
Q. And so what was the issue with the company that Moholland sold to?

A. They sold it to a real estate company that we felt was a competitor and was unapproved, plain and simple.

Q. Well, if that company fell under your umbrella, subject to this Agency Agreement, how would they become a competitor?

MR. EHRENREICH: Object to form.

A. They just were not going to be approved. I don't know beyond that.

Q. Okay. Now, subparagraph D says "Carrier and agent specifically agree, in the event this agreement is terminated by either party for any reason within five years from the effective date of amendment, other than a termination by agent under subparagraph C or E of this paragraph, agent shall pay to carrier the excess of all incentives, commissions, and other amounts paid by carrier to agent or retained by agent," and then there's a lot more language in there.

My question is did Moholland ever have to pay any incentives, commissions, or other amounts?

MR. EHRENREICH: Object to form.

A. I don't know. Not aware of.

Q. Mayflower ever request any kind of

remittance?
A. Not that I'm aware of.
Q. Okay. And then E, it gives the carrier, your company, "the right to change the incentive commission and retention formula from time to time."
So you can raise the commission or you can lower the commission. You can raise what UniGroup gets or you can -- I mean, you got full discretion under that provision, is that right?
MR. EHRENREICH: Object to form.
A. It says it there, but it's going to be based on board approval, so agents would be -- it wouldn't be just arbitrary.
Q. Well, in the time that Moholland was operating for Mayflower, did you ever change their commission structure?
A. No, and that would be across the system for all agents, not just Moholland.
Q. Okay. All righty. Let's go to JMI12. Do you know Mark Volansky?
A. Yes.
Q. On July 11, 2022, Mark Volansky wrote to Moholland Moving, to Rob Garr, is that right?
A. Yes.

Q. Is this the first time UniGroup ever wrote Moholland and told them "You got to take our logos down"?

MR. EHRENREICH: Object to form.

A. I'm seeing it the first time here.

Q. Well, let's look at paragraph 2. "It has come to our attention that Joe Moholland and/or its successors in interest, Moholland, is utilizing the United marks and other UniGroup intellectual property in its business operations.

"We understand Moholland was involved in a serious crash on or about July 1st, 2022, where United's intellectual property, including its DOT number, were prominent."

It says, "As you are aware, your agency relationship with United and UniGroup ended effective April 28, 2022. As a courtesy, a 60 day period was extended to Moholland solely to remove signage and branding as well as return license plates or equipment."

Did I read that correctly?

A. Correct, yeah.

Q. This is a CYA letter written after its crash, isn't it, sir?

MR. EHRENREICH: Object to form. Move

to strike.

Q. Isn't it?

MR. EHRENREICH: Object to form.

A. I'm aware of this before this letter, so it would have been irrelevant.

Q. Well, you never wrote this kind of letter to Moholland, did you --

MR. EHRENREICH: Object to form.

Q. -- before July 1st, 2022?

A. I had the conversation with John -- Rob Garr on January 19th of 2019 -- I'm sorry, 2022 -- when he terminated, and we discussed this and he requested the 60 day. So that was already put forth that I already had that in writing.

Then the next day we issued the Temporary Agreement on January 20th, and it spelled out in the letter that we were giving him, at his request, the 60-day extension period beyond April 28th so he had time to remove signage, branding, from equipment and building and so forth.

Q. Now, you reference your January discussion. I've got some emails that are around that time.

Do you believe that your emails reflect

fully the scope of the conversation you had with Rob Garr or do you intend to amplify upon that in testimony?

MR. EHRENREICH: Object to form.

A. Other than -- not amplify. The letter that I had sent was an email and then an actual letter of acknowledgement of termination.

Q. So it says here "The purpose of this letter is to demand that Moholland immediately cease and desist using any and all UniGroup intellectual property, signage, marks, license plates, or references to United Operating authority and put you on notice that United and UniGroup will seek recourse from Moholland in the event any demand, claim, lawsuit, or penalty of any kind is made against United or UniGroup as a result of the July 1st, 2022, crash."

Did your company investigate this crash?

MR. EHRENREICH: Object to form. He's not a corporate rep.

A. Yeah, I don't know. I wasn't involved or aware.

Q. You don't know?

A. I don't know.

Q. Who would know?

A. I'm assuming our law department.
Q. Rob Volansky?
MR. EHRENREICH: It's Mark Volansky.
Q. I'm sorry, Mark Volansky.
A. Yes.
Q. Okay. Did Mayflower send representatives down to Georgia to look at this vehicle?
A. I have no knowledge, no.
Q. Okay. And has United, UniGroup, Mayflower, any-related entity, sought any recourse against Moholland?
MR. EHRENREICH: Object to form. He's not a corporate rep.
A. I don't know. Yeah, I'm not involved with that, so I don't know.
Q. Who would know?
A. I'm assuming our law department.
Q. All right. I'm looking at JMI1, Temporary Agency Agreement. Who is Tim Woody?
A. Manager of Acquisition Expansion. I work with him.
Q. Okay. Why would Tim Woody be signing this agreement as opposed to you, for example?
A. His role -- even though it's a temporary

agreement, situation being unique, but because it was a new -- another agreement -- he normally brings on new agents.

This was not a new agent, but because he's involved with agent acquisition, it was a temporary agreement to extend the original agreement to terminate, he was just -- part of his role as an expansion agent and signed it.

Q. Why would you-all do that? I mean, if you --

A. (Inaudible.)

Q. Let me finish. If you'd made up your mind to terminate the agreement with Moholland, why do you immediately go to a Temporary Agency Agreement?

MR. EHRENREICH: Object to form. Asked and answered.

Q. Go ahead.

A. Just the fact we still had to cover the shipments that Moholland had in the pipeline yet between January 20th up to the 90-day period of April 20th, which we determined because of shipments they already had in, and there was OA/DA bookings, and we needed to make sure they took care of all their shipments during that time

period.

So it was the only thing we could really do to officially and, in our mind, legally take care of all of those.

Q. That time period being up to April 28th, 2022, is that right?

A. Correct.

Q. And it does reference that "temporary agent has already booked or committed to service or store certain shipments of household goods," is that right?

A. Only during that time period.

Q. "Temporary agent agrees to act as carrier's temporary agent for the purpose of completing transportation services for carrier shipments under carrier's bill of lading."

A. Those shipments that we identified during that period up to April 28th.

Q. And you-all get paid for those jobs, right? When I say "you-all," I'm talking about UniGroup.

A. Correct.

Q. Okay. And it says "Carrier appoints agent solely for purposes of providing transportation services at carrier's direction for

the carrier shipments."

A. Correct.

Q. So you-all got to control the shipment process up to April 28th, didn't you?

A. That's correct. Those were shipments registered already in the system that carried it up to or through April 28th.

Q. Okay. And then the term of this agreement terminates April 28th, but, you know, I don't see a date that this thing was signed.

Do you know when it was?

A. I don't. I have an email when Rob sent them back to us, but -- and I don't have it with me obviously, but we had a date. I thanked him for returning them. I could tell you off the top of my head that I thought it was January 26th, but I'd have to look at the -- locate that email, yeah.

MR. HODGE: Off the record for just a second.

THE VIDEOGRAPHER: We are going off the record at 2- -- I'm sorry, at 4:04 p.m.

(Discussion was held off the record.)

(Plaintiff's Exhibit 3 marked for identification, J.S.)

THE VIDEOGRAPHER: We're on standby. We are back on the record at 4:06 p.m.

Q. You've got before you Exhibit 3. Are you familiar with the term "SignalHire" or the company SignalHire?

A. No, I am not.

Q. It's got a list of Mayflower employees as of August 30th, 2022. Do you see that?

A. Yes.

Q. If you look on the second page, who's the fourth employee listed?

MR. EHRENREICH: If I can -- I'll let you ask the question. I just object. Move to strike. This is a hearsay document. Go ahead.

MR. HODGE: Whatever.

Q. Go ahead.

A. I'm not familiar with Signa- -- Signa- -- SignalHire. I'm not familiar with this document, never seen it before.

Q. Well, if you go to the fourth line down, what name's listed on the left-hand side?

MR. EHRENREICH: Object to form.

A. Left -- you mean that Keenon Callins?

Q. No.

A. Page 2?

Q. Second page.
A. Second page. Nicholas Burist.
Q. Okay. Now, when you-all set up email accounts for your employees, do you put their first initial, then a bunch of X's, and then the last initial, at Mayflower.com?
A. No. We don't have this document. I'm not familiar with this at all.
Q. Well, I'm just asking you about email accounts.
A. No.
Q. No?
A. No. I am not familiar with this or who does this or how this is done or if it's even done at UniGroup. I'm...
Q. So if a consumer wants to check out who the driver is, would UniGroup have a listing of it?
A. I don't know.
Q. Well, consumers are more educated these days with computers and all of that, aren't they?
MR. EHRENREICH: Object to form.
A. I would agree.
Q. I mean, don't you find that they inquire about who's driving their stuff?

MR. EHRENREICH: Object to form.

A. Again, I would think that they would go to the agent because this person's an independent -- I mean, it's the agency that has the drivers, not the carrier.

So for Mayflower, United, we have no direct employee relationship with. Those drivers are I'll say either contractors or employees of the agents.

Q. Do you require your agents to supply UniGroup with a list of the drivers?

A. I don't know other than they have to be registered and qualified in the system. So in some manner they would have to be referenced with us, if they've been qualified as an active driver.

Q. So any driver for an agent that's operating for UniGroup is registered in your system, isn't it? Isn't that right?

MR. EHRENREICH: Object to form.

A. Again, they would have to be qualified.

Q. And what constitutes qualified?

A. I'm just saying as a term. I don't know what qualif- -- by qualified, I'm just using the term "qualified."

Q. Okay. Well, who would know that at your

fine organization?

MR. EHRENREICH: Object to form.

A. Again, it would have to be Safety that has registrations of equipment and drivers.

Q. Okay. Have you ever terminated agency agreements because you found out the drivers were substandard?

MR. EHRENREICH: Object to form.

A. No.

MR. HODGE: Okay. Can we call this Exhibit 4?

MR. FOSS: Yeah, that's it.

MR. HODGE: Very good.

(Plaintiff's Exhibit 4 marked for identification, J.S.)

Q. All righty. You've got before you Exhibit 4, and it's JMI00553.

MR. EHRENREICH: Just give me 30 seconds to look through this.

MR. HODGE: Certainly.

MR. EHRENREICH: Okay.

Q. All righty. JMI00553 looks to be an email from Tim Woody, whose title looks like is Manager of Agency Acquisition and Expansion.

A. Correct.

Q. Does he work under you?
A. Works with me.
Q. With you? Is he the guy that signed that Temporary Agreement?
A. Yes --
Q. I couldn't remember.
A. -- same person.
Q. Same person, okay. What does a Manager of Agency Acquisition Expansion do?
A. Again, new agents that come on board into the Mayflower/United system, whether it is an expansion of an existing agent in the van line who want to potentially get approval into its adding another agent at another location, or if we have agents that merge, but that's basically he deals with all those expansions of new agents in the system.
Q. So it sounds to me like Tim adds and you sort of subtract?
A. That's correct.
Q. Okay. And this is written to a Brian Schuckalo?
A. Yes.
Q. S-c-h-u-c-k-a-l-o. Who is Brian Schuckalo?

A. I will tell you I don't know. I understood Brian is involved with the Long & Foster Company that bought -- or Moholland sold their business to.

Q. Okay.

A. And he had needed to complete an application going forward for approval, as it was a change of ownership there that would require approval, and that was the process.

Q. Did you know the name of his company? I'm not talking about Long & Foster, but the name they used for the moving storage company.

A. Long & Foster is all I knew or understood.

Q. Okay. So Rob Garr's copied because he was the president of Moholland?

A. Correct.

Q. You're copied because you're part of this separation?

A. Correct.

Q. So he says "You'll find a sample copy of the Temporary Agreement we discussed yesterday." Looks like January 14th, 2022.

You think that's that Agency Agreement that we talked about?

A. One of those, yeah.

Q. Were there more than one Temporary Agency Agreement?

A. There had to be one established for M333, M444, because we had two Moholland locations; therefore, there were two.

And since both of those contracts were to be terminated on January 19th, even though this is dated the 14th, I would not have been -- I was copied in at this time and only heard about what was going on at the very first, matter of fact.

Other than that, that was -- the two Temporary Agreements had to fill in to carry on the shipments that were found in the system that we had to continue on through or up to April 28th that were effective January 20th.

Q. Go to the next page, JMI00554.

A. Okay.

Q. This is where apparently a letter is written to Brian Schuckalo from Bob McCabe. Who is Bob McCabe?

A. Just an Executive VP at UniGroup.

Q. Would he be in a superior position to you, lateral, what?

A. Superior.

Q. Okay. And this letter says that they "regret to inform that Long & Foster's application for full service agencies in Woodbridge and Hampton was not approved by the UniGroup board of directors."
Who made up the board of directors in the 2022 timeframe?
MR. EHRENREICH: Object to form.
A. I -- there's a list. I (couldn't| could} name them per se, but we have currently 12 and they're agents of the van lines. So our board of directors are made up of our agents who own the company, the shareholder agents of United, Mayflower, UniGroup, but...
Q. So there's 12 of --
A. Board of directors.
Q. And so it would be like a -- like Moholland was not obviously on the board, I take it, but it could have been a group like Moholland that would be represented by one director?
A. Correct.
Q. Okay. And then the language says "After thorough deliberation, the board of directors determined Long & Foster's application did not align with the strategic direction of the UniGroup

cooperative."

I want to know what that means: "Did not align with the strategic direction of UniGroup cooperative."

MR. EHRENREICH: Object to form.

A. I don't know. Those were words chosen by Mr. McCabe.

Q. Were you involved in this communication?

A. No, not at all.

Q. Okay. Now, if you go to JMI00555, is this a different Temporary Agency Agreement from the one that was signed by --

A. No.

Q. -- Mr. Woody?

A. These are the same other than this one's only -- this is one of two obviously because you can see Moholland -- Joe Moholland Moving, and there had to be another one for then Moholland Transfer. So we're seeing one of two.

I'm not sure where -- yeah, there would be one. Those that were signed and received would have been for each accordingly if it happened. So the sample here, which is obviously a draft, that's a draft.

Q. Well, I guess what I want to know is

were there multiple Temporary Agency Agreements between Moholland, Long & Foster, whatever group that was?

A. Don't know of anything with them. These Temporary Agreements were between Mayflower and Moholland. Obviously here Joe Moholland Moving and Moholland Transfer and Mayflower.

So it had nothing to do per se. I mean, it had -- as far as what Moholland was doing with Long & Foster.

Q. Now, we kind of went through that corporate structure and all those paper companies that you talked about. Why would Moholland have two separate companies?

MR. EHRENREICH: Object to form.

A. I don't know. All -- all -- our agents could have approved multiple locations. Why they would name them separately and differently, I have no idea.

Q. You've been dealing with agents for a long time.

A. Yes.

Q. Do you have agents that have multiple companies under their umbrella, the agent's umbrella?

A. That can be. We have agents, yes, that have multiple locations and they may name them differently at different locations, but it would be an approved full service agent with its own separate agency number, just like Moholland M333, M444. We have agents that would be the same process or logic, yes.

Q. Well, and why do they do that? Just for more booking?

MR. EHRENREICH: Object to form.

Q. I mean, that's what you described with the paper companies.

A. They're in different locations as well as different cities. So they're going to have -- I use the term "community." They're servicing a community, whether it's separate by 50 miles, some may be in different states. Goes through a normal approval process.

Q. Okay.

A. Yeah.

Q. I now want you to go to Mayflower 9. It's the next page. Now, this is a letter from you to Rob Garr dated January 20th, is that right?

A. Mm-hmm, correct.

Q. I presume you've reviewed this before

the deposition.
A. Yes.
Q. Okay. Now, on January 20th you tell Rob Garr "Effective with an agreed 90-day notice for April 28, 2022, you further recognize an additional 60 days beyond the April 28th date to be allowed to complete the removal and changeover of signage and branding on equipment, tractors, and trailers," right?
A. That is correct.
Q. Okay. So this thing is going to carry on until at least June 28th?
A. And we ended up actually rounding it to June 30th.
Q. Okay. One day before this wreck.
A. Not that -- I didn't have a crystal ball, no.
Q. But several months after the booking of this load had taken place and the destination agent had been appointed?
MR. EHRENREICH: Object to form.
Q. Is that right?
A. Yeah, and I didn't know any of this, so I wouldn't have had no knowledge of any of that until well after the fact of any of this taking

place.
Q. When these tractors go through states, they will be inspected by state authorities at times, is that right?
A. There's a process. I don't know because when you say "state authorities," but there's uniformity and which inspections have to take place with equipment, correct, inspections.
Q. Yeah. Like the Georgia Department of Safety or the South Carolina Highway Department --
A. And I don't know if it's --
Q. -- Department of Transportation?
A. Yeah, and I don't know if it's state versus at a federal level but, I mean, there is a process, yes.
Q. Now, when those inspections take place, if any deficiencies are noted, do they go -- do those deficiencies get reported through the UniGroup system?
A. They do, but I don't know the process or how that takes place. I don't have that involvement.
Q. Well, if you terminate -- allegedly terminate an Agency Agreement but then one of the vehicles that's owned by the agent, and it's got

Mayflower all over it, and it's reported back to you as an inspection occurred, what action, if any, does UniGroup take?

MR. EHRENREICH: Object to form.

A. Again, they would be deactivated in the system obviously, but do I know how they're deactivated and the process once the termination takes place.

There's a deactivation process that Safety would remove or take equipment out of the system, drivers come out of the system, and so forth based on that.

Q. Well, was any of the equipment, including the ELD, deactivated prior to July 1st of 2022 on this specific tractor that killed my clients?

A. I don't know.

Q. Okay. Well, if it's not deactivated, doesn't that presume that there's still a relationship?

MR. EHRENREICH: Object to form.

A. I say no, but I don't know.

Q. Do you know of any action UniGroup ever took against Moholland after the alleged date of termination of this Agency Agreement with regard

to inspections of this particular tractor in the particular state of Georgia --
MR. EHRENREICH: Object to form.
Q. -- that occurred before this wreck?
MR. EHRENREICH: This is not a corporate rep.
A. Don't know.
Q. No?
A. Don't know.
Q. Well, who's the corporate rep that knows the answers to all this stuff?
MR. EHRENREICH: Object to form.
Q. Just give me an example.
MR. EHRENREICH: You don't have to answer that.
THE WITNESS: Yeah.
MR. EHRENREICH: You can ask him --
Q. You don't know?
MR. EHRENREICH: -- who would know. I've allowed you to ask those questions and I'll continue to allow those questions.
MR. HODGE: That's a fair question.
Q. Who would know?
A. I assume the company representative is going to know.

Q. Okay. Can you think of an individual's name who might be such a company representative?

A. I'm assuming that they're going to look at the data and the information to determine if it would have been the Safety or within it would be executive management level.

MR. EHRENREICH: If you have a name, give it to him. If you don't, tell him you don't know. He's just asking for a name if you know it.

A. The representative that I'm thinking of is Jason Jones.

Q. What is Jason Jones' position?

A. Senior VP of Member Success, who I report directly to.

Q. Okay. Jason Jones is over Agency Success?

A. Correct.

Q. And is he over any other departments? I'm trying to picture a hierarchy.

A. Well, agents have position expansion.

Q. Okay.

A. Those areas there. He has probably other involvement, but I don't know some of the others he may cover or involved in, but mine and the one I just mentioned, those two for sure, yes.

Q. It says "Additionally, all logos and trademarks from any website or internet marketing need to be removed by the effective date."
That's what you're telling Rob Garr, is that right?
A. Yes.
Q. When did your company remove Nicholas Burist as an authorized driver for Mayflower?
MR. EHRENREICH: Object to form.
A. I don't know.
Q. Okay. If Nicholas Burist was listed as an authorized driver for Mayflower up to July 1st, 2022, would it be fair for a consumer to presume that he was an authorized driver for Mayflower?
MR. EHRENREICH: Object to form.
A. I don't know.
Q. Isn't it Mayflower's duty to strike him from the system?
MR. EHRENREICH: Object to form. "Duty's" a legal term.
A. Yeah, I don't know the process other than --
Q. Okay.
A. -- at the time of termination things are removed. Do I know how quickly they're removed,

that minute and a date? I don't know.
Q. Would you think that Mayflower would have the responsibility for removing Nicholas Burist as an authorized driver?
MR. EHRENREICH: Object to form. He's not a corporate rep.
A. Yeah, I don't know.
Q. Okay. What did you do to confirm that Moholland had removed logos or trademarks from any website or internet marketing?
A. To confirm? I, other than the letters that had gone out, I did not personally do anything differently.
Q. And the last paragraph on Mayflower 9 you say "Access to Mayflower systems such as the portal and H- -- Agent HOD"?
A. Yes.
Q. HOD stands for?
A. It's an old mainframe term. I couldn't even tell you anymore it's so out of date, but it is an existing term. Meaning agents have access to at least, if they need operational dispatch information, they still need a mainframe to take care of business operationally, so the HOD system was allowing them access to the point.

MR. EHRENREICH: It's HOD, H-O-D.
Q. H-O-D, the HOD system?
A. Yeah.
Q. Okay. So you put in like a password or something and that gets you in the portal?
A. As an agent, they have access. It's an online in our portal system for all agents that are agents approved in the system.
Once an agent terminates, normally they have 30 days after termination. We allowed them an additional 30 days because they were still having to finish up finance information, payment information, things of that nature.
Q. Who heads up the technology sector at UniGroup?
A. It's its own division, but -- it's a large division. Do I know who heads it up per se? Start talking about CTOs and CIOs.
MR. EHRENREICH: If you know the answer, give him the answer. If you know a name, give him the name.
A. I don't know the name. I'll give you a name. I'll just try Jaime Winkler.
Q. Spell the last name.
A. Winkler, W-i-n-k-l-e-r; Jaime,

J-a-i-m-e.
Q. Okay. Now, would you presume that somebody in Mr. Winkler's position or --
A. And it's a woman.
Q. It's a female. -- Miss Winkler's position would be able to determine whether or not that system had been accessed by Joe Moholland up through July 1st of 2022?
MR. EHRENREICH: Object to form.
A. Yeah, I don't know. I don't know how they would read the systems or how they would know or not know.
Q. Okay. Have you had occasion where you've had agency agreements terminated but those agents remained in contact with UniGroup and they used the portal?
A. Once they're out of the portal, that's it. They're done. They don't have access.
Q. Is the denial of access to the portal a technology function?
A. Yes.
Q. And that, you don't have anything to do with that?
A. Correct.
Q. You don't know how they do that?

A. Yes, I don't know how they do it, no.
Q. Do you know if it was ever done with Moholland?
A. I don't know.
Q. Mayflower 10, second page of your letter.
A. Mayflower 10?
Q. Yes. Again, the Bate stamp, it's four zeros and a 10.
A. I -- oh, okay. I'm sorry, it was out of sight. Okay. Sorry, I'm pulling from here. Okay, sorry.
MR. EHRENREICH: This is 10.
THE WITNESS: Yeah, I had these folded and I jumped.
MR. EHRENREICH: He's going to ask you questions about page 10.
THE WITNESS: Yep.
Q. So on the second page of your letter in the first paragraph: "All Mayflower shipping documents need to be processed, be scanned to the home office, through TransDocs as soon as possible."
What is TransDocs?
A. Again, it's an online system. Since we

don't deal with paper, I call -- we call it white paper. They're scanned electronically, electronically, so that information, bill of ladings signed by customers, any kind of invoicing, things like that, needs to be sent in to UniGroup for any finalization of the processing.

Q. Is that the proprietary information that UniGroup has developed?

A. Yes.

Q. And so these shipping documents get processed through this TransDocs?

A. Yes, it could be paper that's processed or to be processed, correct.

Q. And that paper, if you booked a job, that would have an agent of origin, destination agent, time that it's to be packed, time that it's to be shipped, is that correct?

A. That's correct.

Q. All that information is in that proprietary --

A. In that form, right. Electronic format, correct.

Q. And the only way that information takes place is to go through the UniGroup system?

A. Correct.
Q. The Mayflower system, is that right?
A. That is correct.
Q. Okay. And then you say "Van line sales/ operations functions will cease at M33 and M444. Physical facilities will be transitioned with no further reference with Mayflower Transit or UniGroup, C.A.," right?
A. Correct.
Q. Can we agree that there was reference to Mayflower Transit on the tractor on July 4th -- 1st that killed my clients?
MR. EHRENREICH: Object to form.
A. I don't know. I don't know.
MR. EHRENREICH: I would -- if you're going to move on to the next question, I would like to read the rest of that sentence. You can or I can. You stopped at "C.A."
It says "as stated by the effective termination date with signage and branding removal and changeover" --
MR. HODGE: Counsel, that's not appropriate objection. You can get your turn on Redirect.
MR. EHRENREICH: Somebody can read and

make it complete, so I did.

MR. HODGE: Okey-doke.

Q. All right. Let's go to Mayflower 7. Now, this kind of gets into what you've touched on before. You're conversing with Rob Garr.

I take it you-all are talking on the telephone and you're kind of documenting your discussion. Is that accurate?

A. We had that discussion on the 19th of January and then had the follow-ups, that's correct.

Q. All right. And when I asked you before and when I ask you now, do you believe that this email exchange between you and Rob Garr accurately covers the substance of your conversations?

A. Yes.

Q. Is there anything more to add, amplify, clarify, that we don't see in this correspondence?

A. No, because he had sent -- his email's immediately below that which was sent to us on the 19th at 2:26 talking about he's "requesting 90-day termination date for the two agencies and requesting additional 60 days beyond to complete changeover of signage and branding of equipment and trailers."

So I had gotten back and did a follow-up to the notice and was just trying to respond and confirm what we have, yeah.

Q. And you have the authority to say yea or no to such requests, or did you have to run it up the ladder?

A. No, this was already done prior to because things that had gone on in the 13th and 14th of January that took place by other executives with the termination, and it was already coming down to me to have that discussion on the 19th to -- confirming the termination letters from, you know, Bob McCabe, and so forth, and all we were doing -- we, because I also had Tim Woody and myself were on the call with Rob Garr, and we had that discussion just confirming it so we could move forward with the process of termination.

Q. If a company -- we read it before -- doesn't comply with your directives, you can hit them up for 250 bucks a day, can't you?

MR. EHRENREICH: Object to form.

A. It's possible but did not do that, that I'm aware of. I mean, I don't know.

Q. All right. Why did your company agree

to all these extensions?

A. The size of the agent. One, again, because the termination was abrupt in the sense that I was not aware there was a directive that this agent was to be terminated based on board approval not accepting the application.

When identified that there were a lot of shipments booked by Moholland in the system, bookings, OA/DA commitments that were going on still for a few months, it was important that, while we had to still officially terminate as a directive, in order to cover the existing shipments, we had to put a Temporary Agreement in place to make sure we were effectively still taking care of those customers accordingly and bookings, and that was the whole purpose and design for the Temporary Agreement to move forward.

Plus the agency has a lot of equipment based on the known size of Moholland in general. We knew this wasn't going to be an agent with two or three pieces of equipment that could take care of things and be done. They just had a lot based on the number of shipments that were still in the pipeline. So we knew it was going to take some

time.

Q. If you didn't accommodate his request and they had booked business, then UniGroup would not have gotten that commission, would it?

MR. EHRENREICH: Object to form.

A. The point was we were taking care of customers. It wasn't about commissions. It was taking care of customers based on order commitments signed by the agent on bookings they had in place already and OA/DA commitments with fellow agents already.

Q. Well, in fairness, you're not taking care of customers. If they booked it and they got a destination for it, you're not really doing anything for them, are you?

MR. EHRENREICH: Object to form.

A. I think we have a responsibility to the customer was the general logic, yeah.

Q. Okay. So that second paragraph says "While Tim Woody and I went over and discussed actions and functions needing to take place during the termination transition process in our phone call yesterday, you know that Tim and I are always both available for you and Brian on any other items or questions needing to be addressed or

answered."

So my question to you is what actions and functions needed to take place during the termination transition process?

A. The general logic is, when this happens, we try to make sure the agent's aware of what is going to take place and what we need to do.

We take -- we take the agency out of capacity operations so no new bookings can take place. We make sure that no -- our other agents in the system cannot register new shipments designating Moholland M333, M444, as an OA/DA on future orders to be registered, because it would just perpetuate things out to a longer timeline.

We make sure he understood that the Agency Agreement that they have or their agency statement goes out beyond a hundred eighty days after the effective termination date because there could still be debits or credits of revenue that flow in from activity that took place between January 20th through April 26th.

We just talk about signage removal of things from the building, from the equipment, what has to be done. We just go over all those general types of understandings so that they put -- and

then when the termination letters that go out, reinforce that same information.

It's just a matter I like to have a -- an actual verbal discussion with the agent, confirmed by the letter that we acknowledged the termination, which spelled out a lot of those very same things.

So it's just sort of a double coverage to make sure there's clear understanding what transpires.

Q. That letter was written on January 20th. Did I read that right?

A. Yeah.

Q. Now, if you go to Mayflower 11, it's an email exchange from you the very next day. You sent it to Brian Schuckalo.

MR. EHRENREICH: You said Mayflower 11? I'm sorry. 11?

MR. HODGE: Yes, Mayflower 11.

MR. ENRENREICH: Okay.

Q. From you to Rob Garr and Brian Schuckalo.

THE WITNESS: Is that it?

MR. EHRENREICH: Yeah.

Q. And you copied Tim Woody, and you

immediately send a Temporary Agent Agreement for Joe Moholland Moving and Moholland Transfer.

A. Mm-hmm.

Q. Is that right?

A. Correct. We were just trying to move expeditiously with the process, yeah.

Q. I want you to go a few pages back or, excuse me, forward, to Mayflower 25, four zeros and a 25.

A. Okay.

MR. EHRENREICH: Where is it?

THE WITNESS: Mayflower 25.

MR. EHRENREICH: Okay. Good.

Q. Now, this is from you, and you sent it to Rob Garr. Again, same copy to Tim Woody and Brian Schuckalo, and you thank Rob "for forwarding the executed documents," so he must have signed that Temporary Agency.

A. That's when you had mentioned, yeah, the date -- I said I thought it was January 26, which it is here.

Q. Then you say "I am also of the understanding that UniGroup's Government Business Unit may be in contact with you to address foreign agent arrangements for handling ongoing future

government business for them."

A. Mm-hmm.

Q. Is that right?

A. Correct.

Q. So there were already discussions about doing government business and retaining Rob's organization to conduct that business, correct?

MR. EHRENREICH: Object to form.

A. I understand. I'm not involved with government business per se, but that was the statement there, yes.

Q. That was the specific carve-out that UniGroup made with this organization, isn't it?

A. It's a carve out --

Q. Isn't it true?

A. -- for non-UniGroup business that Moholland would do for government military but under a non-UniGroup arrangement.

All -- any agents can do a lot of government military. It's a different animal than it is from residential, COD, and so forth. It's across the industry that way.

Just like when you referenced TMM, they are not an agent for United, but you have entities out there that will represent the government

military business and work the system, is the only way to say it, with carriers, period.

Q. UniGroup has a Government Business Unit?

A. Correct.

Q. This notation says that UniGroup Government Business Unit was going to address arrangements for Moholland's group to handle ongoing future government business for them. That's what this says.

MR. EHRENREICH: Object to form.

Q. Isn't that right?

A. Potential government business, correct. Do I know that it was going to be -- it would be non-UniGroup-based business.

Q. Look, Moholland's based in Woodbridge, Virginia. That's not too far from Washington, D.C., is it?

A. Yes.

Q. Is that right?

A. Yeah.

Q. Not too far from Norfolk, Virginia, is it?

A. Mm-hmm.

Q. Is that correct?

A. Correct.

Q. That's a prime source of moving business because these soldiers and Naval personnel, they get moved all over the place, don't they?
A. Correct.
Q. Right? You need to answer.
A. Yep.
Q. Is that correct?
A. Correct.
Q. So you have this carve-out discussion with Moholland's group to handle government business?
A. If they wanted to continue to do business under a non-UniGroup, that's when they have -- have that discussion, but I don't know much beyond how that transpires or works, but...
Q. And on July 1st, 2022, this was a government business move that was going to deliver a load to a designated agent of Mayflower, wasn't it, sir?
MR. EHRENREICH: Object to form.
A. Don't know. I don't know.
Q. And it ran through Georgia, right?
MR. EHRENREICH: Object to form.
A. I don't know.
Q. You don't know?

A. I was not involved with any of that.
Q. Okey-doke. Who's Rae Hickinbotham?
A. A manager with UniGroup's Government Business.
Q. Okay. So on that same page, 25, you say "Rae Hickinbotham should be contacting you in the near future, unless she's already done so."
Did you check with Rae to see if she had contacted Moholland about doing the government business which resulted in my client's deaths?
MR. EHRENREICH: Object to form.
A. I would have contacted Rae to see any arrangement that they would want to discuss. That was it.
Q. What did you and Rae talk about in terms of Moholland continuing to do business with UniGroup with the government side?
MR. EHRENREICH: Object to form.
A. That's all it is. Government business is government business. I just have them work with the agents that want to continue to do government business. I mean, it's -- it's that simple, and it's outside of UniGroup. They have non-UniGroup agreements or arrangements.
Q. Is Rae a female?

A. Yes.
Q. Is she related to Nancy Higginbotham?
A. No idea.
Q. With Conser Moving & Storage?
A. Not that I'm aware of, but, no, not that I'm aware of.
Q. Okay. Do you know an Ashley Peterson with Total Military Management?
A. TMM, no. I mean, I know TMM, the name and number, but I do not know Ashley.
Q. Okay. Is Rae still working with UniGroup?
A. To my knowledge, yes.
Q. And is she still in that governmental department?
A. Yes, to my knowledge.
Q. Would she be the head of it?
A. No, a manager.
Q. She is a manager or a manager would be above her?
A. I know there are a couple of managers. I don't know how the reporting is exactly for the Government Business Unit and who they now report up to or through or back at that time. It's sort of its own stand-alone area of business.

Q. Let's go to Mayflower 14.

MR. EHRENREICH: Where is that?

MR. HODGE: It's in this same sort of deal.

MR. FOSS: It's three pages later.

MR. EHRENREICH: Oh, okay. It's this page.

THE WITNESS: Is it beyond? No? Why do I not see it?

MR. EHRENREICH: Here, give me yours. Just take mine. Speed this up. Okay.

Q. All righty. This is from you to Rob Garr, I presume?

A. Yes.

Q. And you talk about the wind-down, and you say "no additional Mayflower or United authority shipment activity involvement can take place after that date, other than Moholland's related military-approved business."

Did I read that correct?

A. Correct.

Q. So you have authorized them to do military-approved business utilizing Mayflower's DOT number?

MR. EHRENREICH: Object to form.

Q. Isn't that right?
A. I just know, if they were doing anything, they were -- it was, as you said, a carve-out.
I just know that, based on what I had pulled, they would not be doing any further COD, national account. If there was any government military, that could continue on.
Q. Okay. This is the -- the second paragraph's discussion about ELDs, which we've talked about before, I kind of envision ELD as a separate unit on each tractor.
Is that a correct interpretation?
A. Correct.
Q. The second paragraph references "unit," singular, but did you mean to say that plural?
A. "The ELD unit must" -- yeah, it's probably units, but I just took it as a conversation regardless of whether it was one truck or 20 trucks. I just referenced it as a --
Q. So all the ELD units were supposed to be --
A. Returned.
Q. -- returned back to UniGroup?
A. Correct.

Q. Well, who was responsible for accounting for that?

A. Other than I'm saying he goes -- they go back to Fleet Technologies, an area where they're supposed to send them to.

I'm assuming they would be identifying returned ELDs, but beyond that, I don't know how the follow-up process would transpire.

Q. Is Fleet Technologies that IT division that we kind of touched on earlier?

A. I think it's sort of a quasi IT/ Operational area.

Q. Which department do they fall under, Fleet Technologies?

A. I'm going to say IT, but, again, it's sort of a quasi, but I'll say IT as a divisional responsibility, but I know Operations somehow is involved because they want to make sure units are taken out of operational sense. So that's just a follow-up probably between those two areas.

Q. Is that the Jason Jones guy that you referenced earlier?

A. No, no. So Jaime Winkler --

Q. Jaime Winkler, I'm sorry.

A. -- IT, and Operations, just from that

standpoint of they -- CELDs is they monitor trucks, so someone between the two areas, it's just a matter of how they converse. I don't know what that process is, though.

Q. Your last paragraph you reference "four shipments that need to be changed. Two shipments are Moholland's own shipments booked after the fact and load 5/25/22 and 6/9/22. They will need to be cancelled."

Do those loads have anything to do with the load that my client -- my clients were killed on?

MR. EHRENREICH: Object to form.

A. I have no idea if that -- I just saw two orders that had dates beyond 4/28 and I needed those cancelled. That's all they were at that time. Not knowing --

Q. Did you get that off of this UniGroup proprietary form?

A. It's, yeah, it's what we call -- yeah, it's an online system called -- yeah, it speaks for itself and it identifies that agent.

Q. Show me what you just showed. Okay. Make sure we see it on the camera. Okay. Very good. Thank you.

THE VIDEOGRAPHER: Can you hold that up?
MR. EHRENREICH: It's Mayflower 000015 he's holding up.
THE VIDEOGRAPHER: Thank you.
THE WITNESS: Okay?
Q. All right. Then the paragraph goes on to say "The other two shipments are by other United agents, one for OA destination," and it uses U234.
Would that be a United Van Lines destination?
A. Another agent -- United agent 127, correct.
Q. Okay. Wouldn't have anything to do with Moholland?
A. They were just designating Moholland evidently as an OA with some activity that was to take place on or around May 20th, and that would exceed and go beyond the April 28th date, so that had to be redesignated.
I'm basically telling Rob the booker is going to have to be notified that a -- the booker 127 is going to have to find and redesignate a new OA and that Moholland could not represent that.
Q. So did Moholland do United business as

well as Mayflower business?
A. It's conceivable that a United agent could not find a United agent in the area where Moholland was located and looked to see for Mayflower assistance. That's true.
Q. All right. And then on the same day, looks like you're working late, Mayflower 17. You wrote that email we just referred to at 10:04 and now we're at 5:12 p.m. You think a fella with your kind of service would get a little consideration for time spent in the office.
A. We all spend time.
MR. EHRENREICH: You can answer.
Q. Anyway, we're on 17. It says this email is sent to Kathy Steis, Debbie Haley, and Janet Siess. S- -- one is S-t-e-i-s and the other is S-i-e-s-s, and it says "Extend Access to UniGroup Systems."
So are these people in the technology side of things?
A. Debbie Haley and Janet Siess are in the technology side.
Q. Okay.
A. Kathy Steis works with me and Tim Woody, because it's all about the agency number itself,

and all we were doing was extending the agent to have continued access to the system for 30 days beyond the normal 30 days that they get so they can wrap up transition of paperwork, shipments that were in the system, yeah.

Q. And you extended additional time through June 30th? Those are your words.

A. That is correct.

Q. Is that right?

A. That was just access to the system so they could wrap up paperwork needs, as you can see from April 22nd, yeah, correct.

Q. I think I was asking you before, but you can make that call.

A. Yes.

Q. It looks like you did make that call.

A. Yes.

Q. So you extended the agreement with Moholland through June 30th, 2022?

A. I agreed to extend them access. Not extending the agreement, just giving them access to the United mainframe system because once -- normally, once an agent terminates, in this case April 28th, they have access for 30 days beyond.

And it's in my termination letter, by

the way, that went to them back on January 20th, but it says they have 30 days beyond that, which would have meant, technically, I'm rounding it off to May 28th.

They needed, they felt, they -- Moholland needed some additional time beyond that 30 days and see if they could get another 30 days access to the UniGroup mainframe system so they can complete -- it's a lot of things that go on but it's mostly for financial paperwork control on processing of shipments in the system otherwise, yeah.

The operational, the sales aspects of functionality, ceases under the agreement April 28th. It just gives them access to the system to complete behind-the-scenes paperwork, logic.

Q. I want you to look at Mayflower 18. This is an email sent to you from Rob Garr, Tim Woody. Kathy Steis was copied on it.

And this confirms you're giving access, extended access, through June 30th, 2022 --

A. Yeah.

Q. -- through the UniGroup mainframe system, is that right?

A. Correct, yeah.

Q. Go to Mayflower 19, if you would. This is to a Sue Demien, D-e-m-i-e-n. Can you tell me who she is?

A. Sue is in the Safety Department. First time I'm seeing this, so I don't know. I'm just looking at it, but she's in the Safety Department is all I can tell you.

Q. Okay. And this says -- this is sent on August 2nd, 2022, so we're talking about a full month after this wreck.

It says "The following requests for data review was assigned to the Georgia Department of Public Safety. Inspection - Assigned to Wrong Carrier." You see "USDOT: Mayflower Transit, LLC. Company Name: Mayflower Transit, LLC."

"The motor carrier" -- the explanation. "The motor carrier was misidentified on this inspection report. Moholland Transfer is not an agent for Mayflower Transit and, if they stated they were at the time, that was not correct."

"Attached is the BOL that the driver should have shown to the inspecting officer when the operating authority was being identified."

What does BOL stand for?

A. From a Safety perspective, I don't know.

I normally see the term, it's just bill of lading, but beyond me --

Q. Okay.

A. -- Safety would normally not have, I would think, bill of lading. It just doesn't seem to make sense to me.

Q. Now, when you all terminate these agency agreements, have you had where agents continued to have a Mayflower logo or some UniGroup-affiliated entity logo on their tractor and they get stopped by the authorities and they're cited for some reason? Does that happen?

A. It's possible, yes. I'm probably not myself directly always aware of it. It would not come to me, but if it happens, it's possible, and it could be -- and I don't know where it would go, whether it would be Safety, Law, I don't know.

Q. So when you have truly terminated an Agency Agreement and something gets sent from an investigating authority like the Georgia Department of Public Safety, you generate a response like this, is that right, to correct the record, so to speak?

MR. EHRENREICH: Object to form.

A. I don't know. I'm not involved, so

that's -- as I said to you, but I don't know how that process works.

Q. That's what it looks like, though, isn't it?

MR. EHRENREICH: Object to form.

A. I don't know how that works.

MR. EHRENREICH: Not a corporate representative.

Q. But if there were multiple inspections and citations in Georgia before July 1st, 2022, citing Moholland, linking Moholland to Mayflower, nothing like this was ever generated by your company?

MR. EHRENREICH: Object to form.

Q. Was it?

MR. EHRENREICH: He's not a corporate representative.

A. No, I don't know how the process works, so...

Q. And then we look at Mayflower 20, and this was a request -- "The following request was responded to by Andrew Morris of the Georgia Department of Safety," and it says "This inspection report will be reassigned. Please allow 45 days for this report to be removed from

the company's profile."
What I'm getting out of this is, when you have citations in states like Georgia, a UniGroup-affiliated entity, it kind of creates a record, so to speak, is that right?
MR. EHRENREICH: Object to form.
A. I don't know.
Q. You don't know?
A. I don't know.
Q. Okay.
A. I have no knowledge.
Q. Well, I just thought you might know since you had all these jobs in this organization.
A. I don't have that.
Q. Okay. Do you know of any request for any inspection reports that preceded the July 1st, '22, wreck but after April 28th, 2022, or at any time between January and July 1st where UniGroup sought redaction of being identified with Joe Moholland?
MR. EHRENREICH: Object to form.
A. No, I don't know because I'm not involved with that.
Q. Okay.
MR. EHRENREICH: Good time to take two

minutes?

MR. HODGE: Certainly.

THE VIDEOGRAPHER: We are going off the record at 5:02 p.m.

(Temporary recess was held.)

THE VIDEOGRAPHER: We're on standby. We are back on the record at 5:13 p.m.

Q. I want to -- I want to ask you, since you wrote this letter terminating this agreement and you've been in Contract Administration for many years, doesn't your agreement require that you terminate by Certified Mail hand delivery?

A. We have now gone through recognized electronically emailed. A lot had to do with the pandemic because people were not in offices anymore, things were not being delivered appropriately, so everything's being done electronically and acknowledged as the equivalent of. So there is no hand-delivered registered mail process. It is electronically done.

Q. Should UniGroup be held to the provisions it requires in its own agreements?

MR. EHRENREICH: Object to form.

A. I've already cleared with the Law Department previously from the pandemic era.

That's what's been allowed to do.
Q. Okay. Can we agree that there was no Certified Mail hand delivery termination of the agreement between Moholland and UniGroup?
A. Yes.
Q. So agents can accept loads on behalf of Mayflower, is that right?
A. As long as they're an agent for Mayflower, yes.
Q. Okay. And do you allow your agents to have contractors?
A. It's up to that -- correct. The drivers are contractors or employee basis. It's up to that agency.
Q. And you allow your agents to have contractors to assist with the loads?
A. Define "assist with the loads." I guess I'm trying to understand what --
Q. Putting stuff in a truck or a trailer.
A. Yes. I mean, the driver can assist.
Q. Okay. And you actually encourage agreements between your agents and these other contractors, don't you?
A. "Other contractors" meaning drivers?
Q. Drivers, yes.

A. Yes, that is the mode of how they function, right.

Q. And you encourage them to enter into these separate agreements, and UniGroup actually prepares those agreements, don't they?

MR. EHRENREICH: Object to form. It's a compound question.

Q. Okay. Let's break it down then. That's fair. Does UniGroup provide contracts for their agents to submit to the agent's contractors?

MR. EHRENREICH: Object to form.

A. I don't know what our law department does for agents relative to, you know, contractual agreements with their drivers. I'm assuming there could be assistance, but I don't know what they provide. I'm not aware of the specifics there.

Q. In your time, all those years in contract administration, did you not see where your company provided form contracts for your agents to use with other contractors?

MR. EHRENREICH: Object to form.

A. My involvement as Contract Administration was contracts of business between United and Mayflower and corporate accounts. Had nothing to do with our agents per se other than

the agent might be a book-in.

So the contracts I was was all the business with our national account contracts for services and business between the carrier and that account. Not -- not with the driver.

Q. It kind of looks like to me that you-all are doing some contract with an agent, but you're trying to indemnify yourself from any bad stuff that the agent does, and then you're also creating a contract for the agent to give to the contractor, so you further shield yourself from liability but all the while, every load, you're getting a cut. Am I reading that right?

MR. EHRENREICH: Object to form. Move to strike.

A. Yeah, I don't -- yeah, I'm not involved with the contractual aspect between --

(Discussion was held off the record between the plaintiffs' attorneys.)

MR. HODGE: Mark Exhibit 5.

MR. EHRENREICH: We're not back on yet.

THE VIDEOGRAPHER: We are on the record.

(Plaintiff's Exhibit 5 marked for identification, J.S.)

MR. EHRENREICH: Ready?

MR. HODGE: Ready?
Q. Have you seen this document before?
A. No, have not.
MR. HODGE: All right. So this is Exhibit 5, Miss Court Reporter?
THE REPORTER: Mm-hmm.
Q. Exhibit 5 is JMI00677, Bill of Lading. Now, I presume you've seen bill of ladings before, haven't you?
A. Yes.
Q. Do you know why UniGroup didn't produce this bill of lading?
MR. EHRENREICH: Object to form.
A. No, I don't know. I mean, I can see "Transportation Company North-West Movers." I have no idea who they are. They're not associated with -- as an agent for Mayflower or United.
Q. So this order -- there's two of them. Page 1 is 3/15/2022 and page 2 is 3/2/2022. Do you see that that was the date that the order was made?
A. I can see that, yes.
Q. Okay. And do you see that the pickup date is June 15th, 2022?
A. Yes.

Q. And the delivery date is July 5th, 2022?

A. Yes.

Q. Do you know an Ashley Nichols?

A. No, do not.

Q. And the department agency in this case is United States Navy?

A. I see that.

Q. Now, you wrote to Moholland back in 2022, you made all this fuss about them taking their logos off and all this kind of stuff, is that right?

MR. EHRENREICH: Object to form.

A. Understood you have to remove brandings, logos, decals, paint, yes.

MR. HODGE: All right. This is going to be Exhibit 6.

(Plaintiff's Exhibit 6 marked for identification, J.S.)

(Discussion was held off the record between the plaintiffs' attorneys.)

Q. What I'm going to do is just ask you a few things. My apologies that the Bate stamp numbers on these photographs, they're in lilliputian, real little tiny, need a magnifying glass.

So I'm probably just going to go by the first picture that we see on Exhibit 6. Do you know where this lot is?
A. No.
Q. I'm going to represent to you it's Moholland's lot.
A. Okay.
Q. You see a Mayflower trailer there?
A. I see a Mayflower trailer in the background.
Q. Do you see Joe Moholland? You can kind of see Joe?
A. Correct.
Q. The date on this picture, it was like last month.
A. Mm-hmm.
Q. Is that right?
A. Based on what I see in the photo.
Q. Now, I know you-all carved out and preserved your government business with Mayflower -- with Moholland's new owner.
Are you-all reconsidering letting them back in your group?
MR. EHRENREICH: Object to form.
Q. I think they call this new company

Taylor Move. You'll see it on some trucks.
A. Yeah, I see it.
Q. Are you?
A. No.
Q. No? Sure about that?
MR. EHRENREICH: Object to form.
A. No.
Q. Have you had any discussions with Taylor Move people --
A. No.
Q. -- i.e., Rob Garr, recently?
A. No.
Q. Okay. Is Taylor -- Taylor Move remitting their government carve-out business and getting commissions off of that?
MR. EHRENREICH: Object to form.
A. Not that I'm aware of.
Q. Look at the third picture. Do you see two Mayflower logos? I understand they're partially obscured, one on one trailer and one on another.
A. Third picture or the second picture?
Q. It would be the --
MR. EHRENREICH: Third.
Q. -- might -- might be more than four.

Hold on.

A. Yeah, I think it's fourth picture.

MR. EHRENREICH: One --

A. I see two trailers on the fourth.

MR. EHRENREICH: Which one are you looking at?

MR. HODGE: Two on the fourth.

MR. EHRENREICH: This one?

THE WITNESS: Yeah, that's what we're looking at.

MR. EHRENREICH: Okay. That question was do you see two Mayflower trailers?

THE WITNESS: Yes, I do.

Q. And as we look at the fifth picture, we can see the Mayflower logo very carefully, can't we?

A. Yes.

Q. Well, you-all hitting them for 250 a day for them still using your stuff?

MR. EHRENREICH: Object to form.

A. I'm not aware that we are.

Q. They still using the ELDs?

A. No.

MR. EHRENREICH: Object.

Q. How do you know?

A. I do not know, but I think they would be inactivated, but I do not know that they could be using.

Q. Well, it's just kind of weird to me that, after the trauma of the July 1st wreck, which killed my clients, and these letters and that letter from Mr. Moransky (sic), that you all would have at least taken some aggressive action to remove this stuff off their lot.

MR. EHRENREICH: Object to form.

Q. Help me understand that.

MR. EHRENREICH: Help you understand?

Q. Help me understand why you didn't do anything, or else you still have a relationship with them.

MR. EHRENREICH: Object to form. Move to strike.

A. They terminated with us. There would be nothing else to do.

Q. They didn't terminate that carve-out business.

MR. EHRENREICH: Object to form.

Q. How much you-all made off the carve-out business?

MR. EHRENREICH: Object to form.

Chasing shadows. Object to form.
A. Yeah, no knowledge.
MR. HODGE: (Inaudible.)
Q. Look at, when we go several pictures back, you see another Mayflower trailer. That makes about three of them. You can see the --
A. Okay. I don't know from all the perspectives. It could be the third one. I wouldn't -- between all the different trailers it continues, but I see it, though, yes.
Q. And you see it real clear in that very next page, don't you?
A. Yes.
MR. EHRENREICH: Let me see.
Q. March 9th, 2023. So we've seen multiple Mayflower vehicles in these pictures. What, if anything, are you-all going to do about that?
MR. EHRENREICH: Object to form. Move to strike.
A. Yeah, don't know.
Q. Okay. You reckon, if we rode up to that lot, today's May 9th, 2023, we'd see some more Mayflower vehicles in Moholland's lot?
MR. EHRENREICH: Object to form.
A. Don't know.

Q. I want you to look at this next exhibit. Another series of pictures.

(Plaintiff's Exhibit 7 marked for identification, J.S.)

MR. EHRENREICH: Are these time and date stamped?

MR. HODGE: I don't think so. I think they were taken in the same timeframe, the March 9th, 2023.

MR. EHRENREICH: That's fine. Okay.

MR. FOSS: The 0599 has got the date July 13th.

MR. EHRENREICH: What's the Bate stamp? I'm sorry.

MR. FOSS: 599 produced by Moholland.

Q. Now, you got a magnifying glass. I want you to go to JMI00587.

A. 587.

Q. Okay. On that red truck -- do you see the one I'm talking about?

A. Yes.

Q. -- has it got a Mayflower representation on there?

MR. EHRENREICH: Object to form. I can't make that out.

A. I can't make it out very well. I cannot make out any -- on the red truck I can't make it. I mean, I see things but I can't make out "Mayflower" or a logo or anything.

Q. All right. Well, let's go to a JMI00588. Do you see that white truck on the bottom?

A. Yep, I do, and I see the Mayflower logo and Mayflower.

MR. EHRENREICH: Let him ask you the question this time, okay?

Q. Okay. Well, no, that was -- that was good.

A. Yes.

Q. You're getting hungry like I am. I want you to go to JMI00599. This is from Rob Garr to Steve Bolan. Do you know who he is?

A. Steve Bolan, nope, I do not know the name. Oh, Bojan, I'm sorry.

Q. Oh, I'm sorry.

MR. EHRENREICH: It's a J, not an L.

Q. Okay. Bojan?

A. Yes.

Q. Who's he?

A. Well, you see the title, Director of

Risk Management.

Q. Okay. So he's the Risk Management guy?

A. And Accident Prevention. Yeah, that's what the title shows.

Q. I gotcha. And the "Subject" is "Photos of equipment in Woodbridge yard."

He sends a copy to this Mark Volansky guy, the guy that wrote the letter on July 11th, right?

A. Mm-hmm, yes.

Q. And he sends it out on July 13th. So it says "Hi Steve, Yes, I'll send you photos from the Hampton yard tomorrow a.m., as well as additional photos from the Woodbridge yard."

It sounds like Steve Bojan was asking for photographs of Moholland's lot, doesn't it?

MR. EHRENREICH: Object to form.

A. I'm just trying to -- not knowing the sequence, but I can read.

Q. Now, preceding that -- because these emails, they run from bottom to top of this -- Steve Bojan says "Rob, I would greatly appreciate your sending pictures of equipment without UniGroup decals or plates from your Hampton yard as requested."

Why do you think he'd say such a thing?
MR. EHRENREICH: Object to form.
A. Don't know.
Q. You hadn't seen this?
A. Nope, I haven't seen any of this, no, none of this.
Q. Does this Bojan still work for you-all?
A. No.
Q. Okay. July -- all of this is after the wreck, right?
MR. EHRENREICH: Object to form.
Q. Wreck was July 1st.
A. From my understanding.
Q. JMI600, another letter to Steve. "Good speaking with you yesterday. I walked our Woodbridge warehouse yard and, as requested, snapped photos of equipment showing door decals and license plates."
Why would such a thing be asked for?
MR. EHRENREICH: Object to form.
A. Don't know.
Q. Did you ask for such a thing when you terminated this -- allegedly terminated this agreement with Moholland?
MR. EHRENREICH: Object to form.

A. No.

Q. Okay. Go to JMI00604. Did UniGroup arrange for Missouri license plates to be placed on its tractors -- or tractors of its agents?

A. I don't know what the process is. I know of Missouri base plates, but I have no involvement, understanding, knowledge, how that works.

Q. Explain to me this Missouri base plates business.

A. I don't know. I just know that the term "Missouri base plates" comes up in that agents are normally required to return Missouri base plates to UniGroup.

Q. Well, how does a Woodbridge, Virginia, company get a Missouri plate on its vehicles?

A. I don't know. I don't know the process involved.

Q. Is that something that UniGroup requires of its agents: To have Missouri-based plates?

A. I don't know.

MR. HODGE: All righty. That's all I have. Thank you for your time.

MR. EHRENREICH: Thank you. He'll read. As ordered, I'll take a copy. I'll make sure to

get it -- I'll be responsible for getting him a copy of the deposition.

THE REPORTER: Okay.

THE VIDEOGRAPHER: This is the end of the deposition. The time is 5:36 p.m. We are going off the record.

THE REPORTER: Everybody on the Zoom, who's ordering transcripts? And if you could say your name when you talk.

MR. SESSIONS: Matt Sessions will take an electronic copy.

THE REPORTER: Okay.

MR. ELLIOTT: Jim Elliott would like an electronic copy.

THE REPORTER: Okay.

MR. STAHL: Benjamin Stahl is not ordering a copy at this time.

THE REPORTER: Anybody else?

MR. LANGLEY: Ryan Langley doesn't need a copy. Thank you.

THE REPORTER: The electronic format, do you guys want pdf's or e-trans?

MR. ELLIOTT: Jim Elliott wants a pdf. Compressed is fine but four to a page is fine.

THE REPORTER: Okay.

MR. SESSIONS: Matt Sessions, we're going to want -- Matt Sessions needs an e-tran.

MR. HODGE: I want obviously an original. I want a hard copy, e-trans, and I want you to make sure that the exhibits and a word index are attached to my copy.

(Witness excused.)

(By agreement of all the parties, the signature of the witness is not hereby waived.)

********

SIGNATURE PAGE OF CHRISTOPHER H. WYNN

I, CHRISTOPHER H. WYNN, DO HEREBY STATE THAT I HAVE READ THE FOREGOING QUESTIONS AND ANSWERS APPEARING IN THIS TRANSCRIPT OF MY DEPOSITION PAGE ___THROUGH AND INCLUDING PAGE ___; THAT THIS IS A TRUE AND ACCURATE (CORRECTED) REPORT OF SAID ANSWERS GIVEN IN RESPONSE TO THE QUESTIONS APPEARING HEREIN.

___________________________
CHRISTOPHER H. WYNN

NOTARIAL CERTIFICATE

STATE OF MISSOURI )
) SS
COUNTY OF ST. LOUIS )

BEFORE ME PERSONALLY APPEARED CHRISTOPHER H. WYNN, TO ME KNOWN TO BE THE PERSON DESCRIBED IN AND WHO EXECUTED THE FOREGOING INSTRUMENT AND ACKNOWLEDGED TO AND BEFORE ME THAT HE EXECUTED THE SAID INSTRUMENT IN THE CAPACITY AND FOR THE PURPOSE THEREIN EXPRESSED.

WITNESS MY HAND AND OFFICIAL SEAL THIS _____ DAY OF ___________________, 2023.

___________________________
NOTARY PUBLIC

C E R T I F I C A T E

I, JULIE E. STELFOX, MISSOURI CERTIFIED COURT REPORTER, ILLINOIS CERTIFIED SHORTHAND REPORTER, AND NATIONAL COURT REPORTERS ASSOCIATION REGISTERED MERIT REPORTER AND CERTIFIED REALTIME REPORTER, DO CERTIFY THAT PURSUANT TO NOTICE, AND TAKEN AT THE OFFICES OF LEWIS, BRISBOIS, BISGAARD & SMITH, 100 SOUTH 4TH STREET, CITY OF ST. LOUIS, STATE OF MISSOURI,

CHRISTOPHER H. WYNN,

CAME BEFORE ME, WAS BY ME DULY SWORN TO TESTIFY THE WHOLE TRUTH OF HIS KNOWLEDGE OF THE MATTERS IN CONTROVERSY AFORESAID, WAS EXAMINED AND HIS EXAMINATION THEN WRITTEN IN STENOTYPY BY ME, AND AFTERWARDS TYPED, AND SIGNED, AS HEREINBEFORE SET OUT, ON THE DAY IN THAT BEHALF AFORESAID, AND SAID DEPOSITION IS HEREWITH RETURNED.

I FURTHER CERTIFY THAT I AM NOT COUNSEL, ATTORNEY, OR RELATIVE OF EITHER PARTY, OR CLERK OR STENOGRAPHER OF EITHER PARTY, OR OF THE ATTORNEY OF EITHER PARTY, OR OTHERWISE INTERESTED IN THE EVENT OF THIS SUIT.

GIVEN UNDER MY HAND IN THE COUNTY OF ST. LOUIS, STATE OF MISSOURI, ON THE _______ DAY OF _________________, 2023.

__________________________________
/S/JULIE E. STELFOX,
CCR, CSR, RMR, CRR

METRO COURT REPORTING, INC.
P.O. BOX 29548
ST. LOUIS, MISSOURI 63126
636-349-3333

May 22, 2023

Mr. Todd R. Ehrenreich
Lewis, Brisbois,
Bisgaard & Smith
2 Alhambra Plaza
Coral Gables, Florida 33134

In re: Kyle Sloan, et al. vs. Nicholas Burist, et al.

Dear Mr. Ehrenreich:

Attached find a pdf transcript of the deposition of Christopher H. Wynn taken on May 9, 2023. It is my understanding the witness will read your transcript of the deposition.

If the witness has any changes, please make them on the erratum sheets that are pages 204 and 205. The witness also needs to circle on the signature page whether it is "accurate" or "corrected."

After the witness has read the transcript, signed the erratum sheets, and had the signature page notarized, please forward the signature page and erratum sheets to Mr. Charles Hodge for inclusion in the original transcript with copies of same to all attorneys of record.

Sincerely,

Julie E. Stelfox,
CCR, CSR, RMR, CRR

cc: C. Hodge
M. Sessions
J. Elliott

DEPOSITION CORRECTION SHEET

KYLE SLOAN, ET AL. VS. NICHOLAS BURIST, ET AL., 2:22-CV-00076-LGW

WITNESS: CHRISTOPHER H. WYNN

WITNESS: ______________________ DATE__________
(PRINT NAME)

1: PAGE ______ LINE ______

READS:____________________________________________

CHANGED TO:_______________________________________

REASON FOR CHANGE:_____________________________

2: PAGE ______ LINE ______

READS:____________________________________________

CHANGED TO:_______________________________________

REASON FOR CHANGE:_______________________________

3: PAGE: ______ LINE ______

READS:____________________________________________

CHANGED TO:_______________________________________

REASON FOR CHANGE:_______________________________

4: PAGE: ______ LINE ______

READS:____________________________________________

CHANGED TO:_______________________________________

REASON FOR CHANGE:_______________________________

____________________________
CHRISTOPHER H. WYNN

DEPOSITION CORRECTION SHEET

KYLE SLOAN, ET AL. VS. NICHOLAS BURIST, ET AL., 2:22-CV-00076-LGW

WITNESS: CHRISTOPHER H. WYNN

WITNESS ______________________ DATE __________
(PRINT NAME)

1: PAGE ______ LINE ______

READS:______________________________________________

CHANGED TO:_________________________________________

REASON FOR CHANGE:__________________________________

2: PAGE ______ LINE ______

READS:______________________________________________

CHANGED TO:_________________________________________

REASON FOR CHANGE:__________________________________

3: PAGE: ______ LINE ______

READS:______________________________________________

CHANGED TO:_________________________________________

REASON FOR CHANGE:__________________________________

4: PAGE: ______ LINE ______

READS:______________________________________________

CHANGED TO:_________________________________________

REASON FOR CHANGE:__________________________________

__________________________
CHRISTOPHER H. WYNN

## $

**$250 (1)**
119:8

## *

********** (1)**
200:10

## A

**Abbey (3)**
63:5,6,25
**A-b-b-e-y (1)**
63:7
**ability (4)**
39:14;109:9;112:23;122:15
**able (15)**
14:4;15:24;33:7,18;80:8;89:19;95:12;106:19;109:22;110:20;112:4,7,10;124:13;155:6
**above (1)**
170:20
**abrogate (1)**
109:14
**abrupt (1)**
161:3
**Absolutely (2)**
44:24;58:11
**absorbed (1)**
18:15
**accept (4)**
30:16;122:4,8;184:6
**acceptable (3)**
7:14;82:6,9
**accepted (4)**
12:16;110:4;111:14;114:1
**accepting (1)**
161:6
**access (28)**
12:5;33:16,18;88:9;99:8,11,14,14,18,23;100:4,10;153:15,21,25;154:6;155:18,19;176:17;177:2,10,20,21,24;178:8,15,20,21
**accessed (2)**
100:8;155:7
**Accident (1)**
196:3
**accommodate (2)**
91:2;162:2
**accordance (6)**
86:9;103:4;105:6,22;110:2,8
**accordingly (6)**
31:10;38:5;39:16;83:19;144:22;161:15
**account (10)**
17:13;28:20;31:25;44:9;69:7;82:25;83:7;172:7;186:3,5
**Accounting (18)**
18:12;34:23,24;36:15,16,17,20,21;48:16,22;52:19;76:1;86:13,19;89:9;118:9;120:20;173:1
**accounts (6)**
41:19;83:3,6;137:4,10;185:24
**accrual (1)**
86:23
**accurate (6)**
37:11;47:6;86:4;87:2;99:4;159:8
**accurately (3)**
87:24;89:20;159:14
**acknowledged (2)**
164:5;183:18
**acknowledgement (1)**
131:7
**Acquisition (4)**
132:21;133:5;139:24;140:9
**across (8)**
39:13;42:2;60:24;61:25;91:7;117:24;128:18;166:22
**act (2)**
70:17;134:13
**acting (1)**
23:24
**action (3)**
149:2,23;192:8
**actions (2)**
162:21;163:2
**activated (1)**
99:3
**active (9)**
24:19;78:6;79:22;80:3,10;101:24;112:22,25;138:15
**activity (6)**
84:21;96:18;101:16;163:20;171:17;175:17
**acts (1)**
125:18
**actual (7)**
27:8;30:21;74:15;92:6;94:9;131:6;164:4
**actually (7)**
29:5;57:12;99:16;117:13;147:13;184:21;185:4
**AD (1)**
40:4
**add (3)**
66:6,12;159:17
**added (1)**
65:15
**adding (1)**
140:13
**additional (13)**
28:9;31:19;58:3;63:21;65:16;81:11;147:6;154:11;159:23;171:16;177:6;178:6;196:13
**additionally (2)**
125:22;152:1
**address (9)**
30:8,10,22;31:2,3,8;114:21;165:24;167:6
**addressed (1)**
162:25
**adds (1)**
140:18
**adjustment (3)**
85:4,12,24
**adjustments (1)**
120:20
**Administration (11)**
10:8;18:13;35:4,20;40:12;41:15,18;68:24;183:10;185:18,23
**advance (5)**
91:12,15;114:9,13,17
**advanced (2)**
113:24;115:3
**Advantage (2)**
53:9,21
**advertise (2)**
82:20;122:15
**advertising (9)**
72:7;84:4;116:5,23;117:7,15,24;118:1,5
**advised (1)**
126:23
**affiliated (3)**
23:10;34:2;118:24
**affiliates (1)**
125:17
**again (49)**
13:9,11;17:5;20:9;22:25;23:21;25:25;28:17;43:7;53:4;54:17;65:6,6;66:2,9;68:8;75:16,17;81:22;82:17,24;83:1;84:7,10,17;87:6,16;89:12,17;92:4;93:7,15;94:8,10;101:17;106:2;111:2;112:5,21;138:2,20;139:3;140:10;149:5;156:8,25;161:2;165:15;173:15
**against (4)**
108:11;131:16;132:12;149:24
**agencies (2)**
143:3;159:22
**Agency (77)**
18:13,24;19:22;26:9;33:14;35:2,10,17,24;36:1;38:23;39:7;41:16;42:12,13,15;56:17;66:18;67:8;68:23;69:5,11,19;72:3;73:19;80:14;82:14;94:9,16;96:23;97:5;98:23;107:9;110:24,24;111:7,9,10;115:17;117:1,3;120:12;121:2,13;122:11;123:5;124:21,23;125:6;126:5;127:5;129:15;132:20;133:14;138:4;139:5,24;140:9;141:24;142:3;144:11;145:1;146:5;148:24;149:25;151:15;155:14;161:19;163:8,16,16;165:18;176:25;180:7,19;184:14;188:5
**Agent (229)**
8:3;11:18,22;12:17,17,18,22;13:22;14:10,14,16,19,21;16:2,8,23;17:5,6;18:21,25;19:19,21;20:1,3,6,9,12,13,19,20,22;21:1,3,15,18,21,23;22:21;23:2,4,11,16,19,24;24:3,4,5,8,14,22;27:14,17,23,24,25;28:1,3,5,16,21;29:2,11,11,12;30:12,14,17;31:4,12;39:9,19,22;40:9;56:18;57:9,9,9,13,15,24;67:17;69:16;70:3,17,17;72:7,10,17,20;76:4;78:5;79:3;80:8,11,16,18,19;81:6;84:19,19;85:10;86:7,18;87:20;90:3;91:1,3,13,14,20;92:24;93:17,22;94:1;95:11;97:1;98:22;100:20;101:19;102:1,24,24,25;103:2,2,9,11,14,14,17,18,18,20,25;104:2,4,5,7,8,14,14,15,21,22;105:4,24;106:2,17,18,19;109:13;110:1,4,8,25;111:14;112:21;113:25;114:2,17;115:19;116:21;117:1,12,13;118:14,22;119:2,6;120:19;121:1,17,24;122:17;123:15,16,23,24;125:20,21;126:8,11;127:11,14,15,18,18;133:4,5,8;134:9,13,14,24;138:3,16;140:12,14;146:4;147:20;148:25;153:16;154:6,9;157:16,17;161:2,5,21;162:9;164:4;165:1,25;166:24;168:18;174:22;175:12,12;176:2,3;177:1,23;179:19;184:8;186:1,7,9,10;187:17
**agents (123)**
11:6,8,17;12:5;13:24;14:7;15:20,23;16:5;23:21;28:2;29:6;32:17;36:23;37:2,3;39:11,12;40:21,23,24;41:3,4,5,8,14;55:25;56:4,5;57:17;65:15;66:5,10;67:14,15;69:15;70:21;71:15;72:14;73:22;74:8,17,18;75:1,4,8,11,18;77:6,12;79:19;81:13,17,24;83:1,5,11,13,19;84:9;85:23;86:22;87:17,19;88:16;89:2;92:14;96:16;101:21;103:9;107:14;109:12,21;111:25;112:1,3,10,15;118:4;121:23,23;123:20,21,21;124:14;128:13,19;133:3;138:9,10;140:10,15,16;143:11,12,13;145:16,20,23;146:1,6;151:20;153:21;154:7,8;155:15;162:11;163:10;166:19;169:21;175:8;180:8;184:6,10,15,22;185:10,13,20,25;198:4,12,20
**agents' (1)**
117:24
**agent's (17)**
30:21,23;70:3;80:22;81:1;83:7;84:22;86:15;89:22;117:10,11;125:12,13,15;145:24;163:6;185:10
**aggressive (5)**
78:6;79:22;80:3,10;192:8

**ago (1)**
45:19
**agree (11)**
8:18;79:24;96:8,9, 10;116:11;127:11; 137:23;158:10; 160:25;184:2
**agreeable (1)**
8:16
**agreed (3)**
114:13;147:4; 177:20
**agreeing (1)**
116:22
**Agreement (62)**
19:23;24:22;27:11; 66:18;67:8,13,16; 69:8;70:18;72:3; 73:20;76:4;86:8; 115:18;118:21;120:6, 11,13,14;121:18; 123:17;124:21,23; 125:6,10,13,19,20,23; 126:5;127:5,12; 130:16;132:20,24; 133:1,2,6,7,13,15; 135:9;140:4;141:22, 24;142:3;144:11; 148:24;149:25; 161:13,17;163:16; 165:1;177:18,21; 178:14;180:19;183:9, 11;184:4;197:24; 200:8
**agreements (15)**
69:6,19;107:10; 139:6;142:13;145:1, 5;155:14;169:24; 180:8;183:22;184:22; 185:4,5,14
**agrees (5)**
103:2;105:5; 121:17;123:17; 134:13
**ahead (11)**
44:2;72:25;79:1; 80:6;93:11;95:2; 100:2;106:17;133:18; 136:14,16
**Air (1)**
83:15
**al (2)**
6:8,9
**align (2)**
143:25;144:3
**alleged (1)**
149:24
**allegedly (2)**
148:23;197:23
**Allegiant (3)**
55:22;61:17;62:22
**Allied (2)**
51:20;63:19
**allow (5)**
27:11;150:21; 181:25;184:10,15
**allowed (10)**
25:1,1;27:8;54:25; 58:23;114:24;147:7; 150:20;154:10;184:1
**allowing (1)**
153:25
**allows (1)**
112:3
**almost (2)**
57:10;120:12
**alternate (1)**
56:16
**always (9)**
20:25;21:2,4;29:6, 7;31:20;101:22; 162:23;180:14
**Amendment (3)**
124:21;125:5; 127:14
**amendments (1)**
124:22
**American (2)**
51:20;63:19
**among (1)**
123:21
**amount (2)**
117:5;120:1
**amounts (4)**
116:25;117:6; 127:17,22
**amplify (3)**
131:2,5;159:17
**and/ (1)**
129:7
**Andrew (1)**
181:22
**animal (1)**
166:20
**annual (2)**
117:4,16
**answered (2)**
133:17;163:1
**anymore (2)**
153:20;183:16
**any-related (1)**
132:11
**apologies (2)**
78:22;188:22
**apparently (1)**
142:19
**appearance (1)**
107:22
**appears (1)**
8:12
**application (6)**
126:12,13;141:7; 143:2,24;161:6
**applied (1)**
96:11
**apply (1)**
109:22
**appoint (3)**
102:24;103:9,17
**appointed (1)**
147:20
**appointment (2)**
121:22;123:20
**appoints (1)**
134:23
**appreciate (4)**
28:12;55:7;83:23; 196:22
**approach (1)**
39:18
**appropriate (2)**
108:1;158:23
**appropriately (2)**
39:23;183:17
**approval (8)**
126:9,15;128:13; 140:13;141:7,9; 146:18;161:6
**approve (1)**
121:22
**approved (10)**
122:15;124:15,17; 126:14,17;127:8; 143:4;145:17;146:4; 154:8
**approximate (1)**
35:23
**approximately (2)**
61:9,12
**April (24)**
19:23;21:20;24:24; 25:4,10;26:1;27:4; 129:17;130:19; 133:22;134:5,18; 135:4,7,9;142:15; 147:5,6;163:21; 175:19;177:12,24; 178:14;182:17
**arbitrarily (1)**
124:19
**arbitrary (1)**
128:14
**Arch (1)**
60:3
**Archway (1)**
60:4
**area (17)**
9:22;11:16;12:9,14; 22:2;25:7;59:17; 64:10;75:7;77:25; 81:2;111:10;124:4; 170:25;173:4,12; 176:3
**areas (7)**
15:22;18:11;87:16; 102:21;151:22; 173:20;174:2
**around (4)**
56:11;96:17; 130:23;175:18
**arrange (1)**
198:3
**arrangement (4)**
23:21;31:6;166:18; 169:13
**arrangements (4)**
121:24;165:25; 167:7;169:24
**arrive (2)**
22:20;114:20
**arrives (1)**
23:10
**articulating (1)**
34:15
**Ashley (3)**
170:7,10;188:3
**aspect (2)**
86:3;186:17
**aspects (3)**
15:22;80:17;178:13
**assess (2)**
37:11;119:24
**assessed (2)**
117:3,16
**assets (1)**
31:19
**assign (2)**
103:15;113:5
**assigned (3)**
126:18;179:12,13
**assist (8)**
56:4;83:25;85:3,11, 23;184:16,17,20
**assistance (3)**
84:10;176:5;185:15
**assisting (2)**
83:5;106:9
**assists (3)**
55:25;83:1,18
**associated (4)**
95:14;104:14; 123:5;187:16
**Associates (2)**
47:23,24
**assume (3)**
65:6;68:10;150:24
**assumed (1)**
18:14
**assuming (8)**
49:4;65:7;101:3; 132:1,18;151:3; 173:6;185:14
**assure (1)**
89:1
**Atlanta (1)**
75:2
**Atlas (2)**
52:1;63:20
**Attached (2)**
179:21;200:6
**attended (1)**
9:21
**attention (2)**
49:11;129:7
**attorney (1)**
17:25
**attorneys (2)**
186:19;188:20
**audit (5)**
37:1,4,8,16;89:13
**August (2)**
136:8;179:9
**authorities (4)**
71:2;148:3,6; 180:11
**authority (12)**
14:3,4;85:6;100:17; 101:22;121:21; 123:18;131:13;160:4; 171:17;179:23; 180:20
**authorized (6)**
120:18;152:8,12, 14;153:4;171:22
**available (9)**
12:4;30:11;100:15; 106:19;107:18;112:7, 11,25;162:24
**average (1)**
15:7
**awa- (1)**
26:17
**aware (23)**
26:4,8,14;44:19; 88:14;90:8;101:23; 121:8;123:14;127:24; 128:2;129:15;130:4; 131:22;160:24;161:4; 163:6;170:5,6; 180:14;185:16; 190:17;191:21

**B**

**back (36)**
11:5,12;15:4;16:20; 31:21;34:17;35:22; 36:1;43:24;44:1;45:7, 8;55:20;81:22;84:22; 86:18;89:16;98:25; 115:16;117:13;118:9; 119:16;135:13;136:2; 149:1;160:1;165:7; 170:24;172:24;173:4; 178:1;183:7;186:21; 188:8;189:23;193:5
**background (14)**
36:16,18;42:23; 107:18;108:1,10,14, 20;109:6,7,10,21,22; 189:10
**backing (1)**
83:8
**bad (3)**
81:8;96:2;186:8

**badly (1)** 8:6
**balance (3)** 81:6;89:6,15
**balances (1)** 120:21
**ball (1)** 147:17
**ballpark (1)** 43:7
**base (6)** 83:17;97:6;198:6,9,12,13
**based (26)** 17:11,20;22:15;31:23;32:13;39:14;60:12;80:25;81:2,14,15;82:17;102:1;105:11,18;106:3;108:20;128:13;149:12;161:5,20,23;162:8;167:15;172:5;189:18
**bases (2)** 22:16;83:15
**Basically (11)** 10:22;36:9,12;39:9;62:18;63:9,10;106:15,16;140:15;175:21
**basis (3)** 117:4;125:14;184:13
**Bate (11)** 66:19,23;67:3;78:13,14,15;79:14;115:18;156:8;188:22;194:13
**Bate's (1)** 46:21
**beams (1)** 45:25
**Bear (1)** 65:13
**beautiful (2)** 60:3,6
**become (4)** 40:9;51:5;118:16;127:6
**beginning (2)** 19:7;48:1
**begins (1)** 64:19
**behalf (5)** 7:2;117:24;121:25;123:24;184:6
**behind-the-scenes (1)** 178:16
**bell (1)** 82:9
**belonged (1)** 101:8
**belonging (1)** 72:9
**below (1)** 159:20
**benefit (3)** 72:19;116:5;117:14
**benefits (2)** 117:19,19
**Benjamin (1)** 199:16
**Bermuda (2)** 52:13,20
**beside (3)** 52:12;123:10,10
**besides (1)** 87:6
**best (3)** 39:14,25;61:15
**better (1)** 39:19
**Beyond (28)** 22:16;25:10;28:10;56:8;64:11;91:17;92:3;107:3,20,21,25;113:16;119:7;127:9;130:18;147:6;159:23;163:17;168:15;171:8;173:7;174:15;175:19;177:3,24;178:2,6;180:2
**big (1)** 88:3
**bigger (1)** 42:25
**bill (8)** 86:24;134:16;157:3;180:1,5;187:7,8,12
**billing (1)** 87:2
**bit (9)** 9:7;35:5,5,7,16;52:8;67:12;80:21;105:14
**blanket (2)** 61:21;62:5
**block (1)** 55:22
**blood (1)** 44:17
**blur (2)** 45:21;46:13
**blurry (1)** 46:8
**blurs (1)** 45:22
**board (10)** 99:16;128:13;140:10;143:4,6,11,16,18,23;161:5
**Bob (5)** 11:21,22;142:20,21;160:13
**bodily (1)** 85:25
**boil (1)** 115:2
**Bojan (5)** 195:19,22;196:15,22;197:7
**BOL (2)** 179:21,24
**Bolan (2)** 195:17,18
**book (11)** 11:19,23;12:18;22:19,20,23;28:4;90:21;91:9,15;103:10
**booked (26)** 11:10;23:3;25:6,9;26:5,7,9,18,19,20;33:13;36:24;90:2,4,9,12;91:19;93:22;104:21;111:13;134:9;157:15;161:8;162:3,13;174:7
**booker (12)** 21:4;28:11,17,22;30:7,12,15;103:8,14;114:24;175:21,22
**bookers (3)** 11:17;13:24;87:21
**book-in (1)** 186:1
**booking (40)** 13:3;14:11,13,14;17:1;19:18,21;20:1,3;21:10;23:23;27:8;28:1,2,5,16,18,25;37:2;63:10;75:21,22;91:13;92:23;93:6;103:3;104:8,13,13,14,15,20;105:5,13;114:16;117:10,13;123:10;146:9;147:18
**bookings (9)** 24:16;26:10,10;27:7;133:24;161:9,16;162:9;163:9
**books (6)** 23:6;28:6,17;86:5,16;103:9
**born (2)** 9:12;59:10
**both (4)** 109:10;116:10;142:7;162:24
**bottom (10)** 46:22;73:3,6,6,10;79:6,10;115:18;195:7;196:21
**bought (1)** 141:3
**bound (1)** 123:25
**brakes (1)** 113:6
**brand (2)** 82:23;116:4
**branding (6)** 84:7;129:19;130:20;147:8;158:20;159:24
**brandings (1)** 188:13
**breach (1)** 125:19
**break (3)** 44:23;115:10;185:8
**Brian (8)** 140:21,24;141:2;142:20;162:24;164:16,21;165:16
**brings (1)** 133:3
**Brisbois (2)** 6:14;60:7
**brochure (1)** 84:10
**Brochures (1)** 84:12
**broker (2)** 13:22;14:6
**Brunswick (1)** 6:11
**bucks (1)** 160:21
**budgeting (1)** 118:13
**building (4)** 61:3,8;130:20;163:23
**built-in (1)** 89:12
**bunch (4)** 66:25;68:21;69:25;137:5
**Burist (5)** 6:9;137:2;152:8,11;153:4
**Business (91)** 10:8;12:18;16:24;17:11,12;22:4;25:20,22;26:2;27:9,10,12;41:3,6,11,12,13,24;42:5,5,19,22;44:7,10;51:10;52:10;53:17;54:19,20;64:2,11,13;65:10,11;73:24;74:4,12;80:19;81:2,6,15,16;82:18;83:1,18;86:11;89:23;94:14;121:24;123:22,23;129:10;141:4;153:24;162:3;165:23;166:1,6,7,10,16;167:1,3,6,8,12,14;168:1,11,13,17;169:4,10,16,19,20,22;170:23,25;171:19,23;175:25;176:1;185:23;186:3,4;189:20;190:14;192:21,24;198:10
**buy (1)** 100:12

C

**CA (6)** 47:19,23;49:1;60:10;158:8,18
**calendar (2)** 119:7;120:7
**California (1)** 59:19
**call (21)** 7:11,12;13:3;14:14;18:24;36:7;39:22;87:14;92:21;99:22;105:3;106:17;139:10;157:1,1;160:15;162:23;174:20;177:14,16;189:25
**called (11)** 20:6;21:21;25:11;48:18;62:10;63:11;69:11;88:5;111:7,9;174:21
**Callins (1)** 136:23
**came (2)** 50:19;108:10
**camera (1)** 174:24
**Can (94)** 6:21;10:20;13:15,18;18:8;23:22;33:4;34:7;45:17,18;46:7,10,10,14,17,17,18;47:12;48:10;51:24;53:6,17,19;54:23;55:6;57:25;61:20;62:2,8;63:12,14;73:22;79:24;81:12;82:20;84:14,16;87:24;88:9;91:5,15,18;92:5;96:6;98:4;100:1,10,11;103:6;107:5;112:1,10,15,16;114:25;115:7;116:24;124:22;128:7,8,8,9;136:12;139:10;144:17;146:1;150:17;151:1;158:10,17,18,23,25;160:20;163:9;166:19;171:17;175:1;176:13;177:4,11,14;178:9;179:2,7;184:2,6,20;187:14,22;189:11;191:15;193:6;196:19
**Canada (1)** 123:13

**canceling (1)** 93:5
**cancellation (1)** 118:21
**cancelled (3)** 93:4;174:9,16
**capable (1)** 99:19
**capacity (3)** 33:2;37:1;163:9
**capture (1)** 104:13
**captured (4)** 87:22;99:25;100:4;104:16
**captures (2)** 87:19;100:9
**card (5)** 91:22;92:1,23;93:4;114:23
**care (14)** 21:20;46:6;56:17;57:6,10;58:1;133:25;134:4;153:24;161:15,22;162:6,8,13
**carefully (1)** 191:15
**Cargo (10)** 34:25;35:9;37:23,25;38:1,7,8;85:18,20,22
**Carolina (1)** 148:10
**carried (1)** 135:6
**carrier (81)** 10:23;11:20;14:3;17:7;69:23;71:1,3;72:6,8;73:15;74:2;76:6,19;78:6,8,25;79:21,23,25;80:3;82:13;85:7;86:9,9;91:3;93:25;97:17;100:18,19;102:24;103:2,3,4,17,20;105:5,6,20,23;110:5,6,8;111:14,19,21;114:1;115:24;116:23;118:15,16,17,25;119:7;120:5,5,17,18;121:18,20,25;123:17,22,24,25;125:8,15,17,20,21;127:10,16,17;128:3;134:15,23;135:1;138:5;179:14,16,17;186:4
**carriers (11)** 16:20,22;23:22;48:13,14;56:3;63:14;75:13;90:19;109:25;167:2
**carrier's (9)** 115:20,21;118:23;119:4;120:20;125:17;134:14,16,25
**carry (3)** 24:24;142:13;147:11
**carve (1)** 166:14
**carved (1)** 189:19
**carve-out (6)** 166:12;168:9;172:4;190:14;192:20,23
**case (17)** 6:8,9,12;14:23;17:25;18:17;19:18;20:23;29:10;30:12,20;49:18;70:3;83:15;103:21;177:23;188:5
**cases (1)** 41:14
**cataract (3)** 45:24;46:2,7
**cause (4)** 120:6,7;125:10,24
**cease (2)** 131:10;158:5
**ceases (1)** 178:14
**CELDs (1)** 174:1
**center (2)** 37:19;87:6
**Central (3)** 6:6;99:20;111:21
**centralized (1)** 111:22
**certain (12)** 14:18;17:14;28:9;31:20,22;33:17;73:23;76:14;92:15;102:2;116:11;134:10
**certainly (4)** 33:3;115:9;139:20;183:2
**certificate (2)** 76:12,17
**Certified (2)** 183:12;184:3
**chain (2)** 36:4;47:20
**change (3)** 128:4,16;141:8
**changed (3)** 16:11,12;174:6
**changeover (3)** 147:7;158:21;159:24
**characteristics (1)** 107:21
**charge (2)** 91:19,22
**charges (8)** 37:12;87:25;90:2;93:21;113:24;114:9,18;115:3
**Charlie (1)** 7:15
**Chart (3)** 47:5;50:6;60:19
**charts (1)** 60:25
**chase (1)** 73:5
**Chasing (1)** 193:1
**cheating (1)** 89:2
**check (10)** 34:10;86:16;89:6,14;108:10,20;109:21;114:22;137:16;169:8
**checked (1)** 107:18
**checking (1)** 98:6
**checks (5)** 49:10;108:1;109:6,10,23
**child (3)** 108:3,12;109:15
**children (1)** 59:13
**choose (1)** 67:16
**chosen (1)** 144:6
**Chris (3)** 7:9,10,12
**Christopher (3)** 6:5;7:1,7
**CIOs (1)** 154:18
**citations (2)** 181:10;182:3
**cited (1)** 180:11
**cities (2)** 75:19;146:14
**citing (1)** 181:11
**city (2)** 80:20;122:12
**claim (5)** 38:4,4;120:10;121:5;131:15
**claims (14)** 15:20;18:12;34:25;38:2,7,9,12,13;39:17;85:4,12,18,20,24
**c-l-a-i-m-s (1)** 38:13
**clan (1)** 59:17
**clarification (1)** 24:9
**clarify (1)** 159:18
**clear (3)** 9:4;164:9;193:11
**cleared (1)** 183:24
**clerks (1)** 37:20
**client (3)** 8:5;57:15;174:11
**clients (11)** 8:1;21:6;26:13;57:6;69:7;90:9;100:24;149:16;158:12;174:11;192:6
**client's (1)** 169:10
**close (1)** 83:15
**closer (1)** 40:21
**COD (7)** 17:11;28:20;31:24;44:8;114:10;166:21;172:6
**code (1)** 63:11
**coffee (1)** 44:21
**coke (1)** 95:23
**collateral (1)** 83:2
**collect (3)** 90:2;93:21;94:2
**collected (5)** 87:25;114:22;115:3;118:14;119:11
**collecting (2)** 91:18;120:1
**collection (1)** 113:23
**Collective (2)** 47:23,24
**college (1)** 36:19
**color (2)** 72:5;115:23
**Columbus (1)** 75:3
**combination (3)** 72:5;81:3;115:23
**coming (4)** 12:9;104:3;107:7;160:11
**comment (1)** 89:19
**Commerce (7)** 16:10;71:1,2,3;72:22;105:21,22
**commercial (2)** 73:24;101:22
**commission (30)** 14:12,13,25;16:10;17:19;28:18,23,25;29:1,3,16;32:1,12;81:14;105:10,13,13,14,15;110:4;117:9,10,11,12,17;128:5,7,8,17;162:4
**commissions (4)** 127:17,21;162:7;190:15
**commitment (1)** 93:3
**commitments (3)** 161:9;162:9,10
**committed (1)** 134:9
**Commodities (1)** 42:5
**commodity (4)** 22:5,10;32:13;105:19
**communicate (1)** 104:9
**communication (3)** 97:21;104:17;144:8
**communications (2)** 19:10;97:17
**community (3)** 80:20;146:15,16
**comp (2)** 76:14;107:19
**companies (25)** 41:21,23;48:7;49:19;52:22;53:6;60:18;63:4,15,16,18,21;64:6,18;65:1,2,17,19;66:6;123:7,13;145:12,14,24;146:12
**company (65)** 18:9;20:5;22:3;25:11,14,16;34:17;36:10,13;37:1;48:4;49:2,3,24;50:14,25;51:2;53:11;54:11;55:5,12,25;62:19;63:24;64:1;65:8,9,20,25;68:1,13;71:18;82:16,22;96:16,25;120:10;122:20;123:11;124:6;126:6,9,14,15,25;127:1,4;128:4;131:18;136:5;141:3,10,12;143:13;150:24;151:2;152:7;160:19,25;179:15;181:13;185:19;187:15;189:25;198:16
**company's (2)** 24:5;182:1
**comparable (1)** 89:8
**compare (1)**

80:23
**compensate (1)**
110:1
**compensation (4)**
81:12,18;103:3;
105:6
**competent (4)**
94:23;95:7,8;
116:16
**competitor (7)**
51:3,4,12,16,22;
127:2,6
**competitors (3)**
51:13,25;52:10
**compile (1)**
110:7
**compiled (1)**
110:12
**complete (7)**
27:12;141:6;147:7;
159:1,23;178:9,16
**completed (1)**
25:7
**completing (1)**
134:15
**completion (1)**
25:2
**comply (2)**
125:16;160:20
**compound (1)**
185:7
**Compressed (1)**
199:24
**computer (1)**
15:15
**computerized (2)**
15:15,17
**computers (1)**
137:21
**conceivable (1)**
176:2
**concerned (1)**
96:25
**conclusion (1)**
49:7
**conditions (1)**
111:16
**conduct (1)**
166:7
**conducts (2)**
121:24;123:23
**confirm (4)**
37:8;153:8,11;
160:3
**confirmation (1)**
104:20
**confirmed (1)**
164:5
**confirming (2)**
160:12,16
**confirms (1)**
178:20
**connection (1)**
72:6
**consents (1)**
123:17
**Conser (6)**
21:22;27:14;40:15,
17;122:2;170:4
**consideration (2)**
121:18;176:11
**considered (2)**
108:22;113:13
**consistency (2)**
99:1;116:4
**consistent (4)**
17:10;37:21;
105:17;116:1
**consistently (1)**
79:14
**consolidate (1)**
15:14
**consolidation (1)**
88:6
**constitute (2)**
12:10,24
**constitutes (5)**
17:6;106:13,16;
126:15;138:21
**construction (1)**
13:13
**Consumer (5)**
90:18,18;94:13;
137:16;152:13
**consumers (1)**
137:20
**contact (7)**
30:15;31:3;57:9,20;
106:21;155:15;
165:24
**contacted (2)**
169:9,12
**contacting (2)**
114:12;169:6
**Container (3)**
61:18,19;62:6
**containerize (1)**
62:1
**containers (3)**
62:2,3,8
**context (6)**
16:17;25:21;73:4;
98:1,14;112:9
**contiguous (2)**
74:4,11
**Continental (3)**
14:5,8;16:3
**continue (6)**
115:17;142:15;
150:21;168:12;
169:21;172:8
**continued (3)**
121:9;177:2;180:8
**continues (2)**
125:8;193:10
**continuing (1)**
169:16
**contract (20)**
17:7;18:13;35:3,19;
40:12;41:15,18;44:9;
67:14,15;68:24;
69:16;75:14;97:6;
126:22;183:10;
185:18,22;186:7,10
**contractor (1)**
186:11
**contractors (8)**
138:8;184:11,13,
16,23,24;185:10,20
**contracts (11)**
42:6;69:5,6,14;
126:20;142:7;185:9,
19,23;186:2,3
**contractual (2)**
185:13;186:17
**contradict (1)**
114:5
**contribute (3)**
116:22;117:1;118:4
**contributing (1)**
116:22
**control (5)**
57:17;72:9;107:21;
135:3;178:10
**controlled (1)**
97:4
**convenient (2)**
44:22;45:1
**conversation (3)**
130:10;131:1;
172:19
**conversations (1)**
159:15
**converse (1)**
174:3
**conversing (1)**
159:5
**convicted (2)**
108:12,21
**Cooperative (4)**
47:19;84:4;144:1,4
**coordinate (1)**
57:19
**coordination (2)**
57:14;58:3
**coordinators (1)**
57:18
**copied (5)**
141:15,18;142:10;
164:25;178:19
**copy (11)**
141:21;165:15;
196:7;198:25;199:2,
11,14,17,20;200:4,6
**corporate (37)**
9:10;15:23;17:13;
31:16;33:1;36:11;
41:19,23;44:10;47:3,
6,9;48:16;51:6;61:3;
64:9;68:7;69:7;72:24;
78:2;82:25;83:4,6,8;
84:18;102:8;107:1;
123:8;131:20;132:14;
145:12;150:5,10;
153:6;181:7,16;
185:24
**Corporation (4)**
48:8;52:13;54:8;
60:21
**corporations (1)**
52:20
**correcting (1)**
70:8
**correctly (7)**
71:4,25;73:16;94:3;
106:11;116:13;
129:21
**correspondence (3)**
8:13;19:9;159:18
**cost (1)**
92:6
**costs (1)**
117:6
**could} (1)**
143:10
**couldn't| (1)**
143:9
**counsel (3)**
8:24;79:1;158:22
**counselor (2)**
46:25;58:18
**counselors (1)**
6:15
**count (1)**
75:16
**counting (1)**
64:18
**countries (1)**
54:19
**country (4)**
40:2,3;88:4;117:24
**couple (4)**
34:20;36:19;37:17;
170:21
**course (1)**
35:13
**courses (2)**
36:17,19
**Court (5)**
6:10,18;70:9,13;
187:5
**courtesy (1)**
129:17
**cousins (1)**
59:4
**cover (6)**
117:6,25;120:14;
133:19;151:24;
161:12
**coverage (8)**
76:5,9,17,19;77:7,
15;107:19;164:8
**coverages (1)**
77:13
**covering (1)**
123:19
**covers (1)**
159:15
**Crancer (2)**
102:19,19
**crash (4)**
129:12,24;131:17,
18
**crashed (1)**
8:4
**create (1)**
51:9
**created (3)**
27:11;68:15;88:25
**creates (1)**
182:4
**creating (2)**
68:2;186:9
**credit (5)**
91:22;92:1,23;93:4;
114:22
**credits (2)**
110:10;163:19
**criteria (1)**
37:10
**crossed (1)**
8:3
**crystal (1)**
147:16
**CTOs (1)**
154:18
**current (3)**
18:23;35:21,25
**currently (2)**
74:7;143:10
**curve (1)**
82:9
**customer (25)**
11:21;18:12;22:14;
28:19;30:7,22;31:2,5;
34:25;39:15,24;57:8,
14,20,21;90:25;91:2,
5,25;93:20;114:11,12,
16,18;162:18
**customers (11)**
56:18;57:6;62:1;
90:16,19;92:4;157:4;
161:15;162:7,8,13
**customer's (7)**
31:8;58:4;87:3,25;
90:23;114:17,25
**cut (13)**
15:4;23:11;31:13,
13,20;32:3;37:2;
69:24;73:5;97:7;
100:2;105:8;186:13
**CYA (1)**
129:23

## D

**d/b/a (1)**
54:8
**DA (13)**
14:21;20:20;21:4;24:18;27:22,24;29:2;30:13,15,16;31:3,17;103:12
**Dallas (8)**
11:21;12:14;20:10,12;28:6;30:9;31:8,9
**damage (8)**
38:2,5;85:4,12,15,21,22;120:1
**damages (2)**
38:2;119:8
**dangerous (1)**
96:5
**DAs (1)**
87:21
**DA's (1)**
105:14
**data (9)**
87:22;99:14,24;100:4,7,8;108:20;151:4;179:11
**date (32)**
6:5;24:18;25:10;90:22,25;91:6;98:5;101:4;102:2;104:20;106:3;114:13;127:13;135:10,14;147:6;149:24;152:3;153:1,20;158:20;159:22;163:18;165:20;171:18;175:19;187:20,24;188:1;189:14;194:5,11
**date/ (1)**
32:13
**dated (2)**
142:9;146:23
**dates (5)**
11:24;12:23;19:9;26:14;174:15
**daughter (1)**
8:5
**Dawkins (5)**
34:13,14;89:17;110:17;118:11
**day (14)**
15:4;20:2;99:18;119:7,8;121:2;129:17;130:13,15;147:15;160:21;164:15;176:6;191:18
**days (22)**
11:5;30:25;31:2;87:23;100:12;119:4;120:7;125:9,23;137:21;147:6;154:10,11;159:23;163:17;177:2,3,24;178:2,7,7;181:25
**DC (1)**
167:17
**deactivated (5)**
101:25;149:5,7,14,18
**deactivation (1)**
149:9
**deal (13)**
8:11;19:1;25:19,21;45:19;50:9;54:1;80:16;86:2;88:3;97:7;157:1;171:4
**dealing (3)**
40:15;94:13;145:20
**dealings (1)**
52:20
**deals (3)**
18:25;77:25;140:15
**dealt (2)**
39:9,19
**death (1)**
85:24
**deaths (1)**
169:10
**Debbie (2)**
176:15,21
**debits (2)**
110:10;163:19
**Deborah (2)**
59:9,10
**decades (1)**
63:13
**decals (3)**
188:14;196:24;197:17
**decide (2)**
41:10;122:11
**decides (1)**
124:6
**decisions (1)**
41:13
**declined (1)**
41:1
**deficiencies (2)**
148:17,18
**define (5)**
80:19;95:8;106:23;107:24;184:17
**defined (1)**
77:6
**definition (1)**
107:11
**degree (1)**
10:7
**Delaware (1)**
55:4
**deliberation (1)**
143:23
**delineation (1)**
75:20
**deliver (7)**
12:19,20,25;13:2,11;115:1;168:17
**delivered (4)**
25:6;87:3;91:10;183:16
**delivering (1)**
114:10
**delivers (2)**
24:4;61:23
**delivery (8)**
30:22;31:6;87:23;98:7;115:4;183:12;184:3;188:1
**demand (2)**
131:9,15
**Demien (1)**
179:2
**D-e-m-i-e-n (1)**
179:2
**denial (1)**
155:19
**denied (1)**
126:13
**Department (32)**
16:11;68:10;69:11,13;80:14,14;81:7;82:14;83:4;86:14,15;89:8,9;97:11;102:10,21;111:4;132:1,18;148:9,10,12;170:15;173:13;179:4,6,12;180:21;181:23;183:25;185:12;188:5
**departments (3)**
18:10;84:17;151:18
**dependent (2)**
15:23;100:19
**depends (1)**
84:19
**depicted (1)**
47:3
**deposeth (1)**
7:3
**deposit (1)**
90:17
**deposition (9)**
6:5,13;17:23;59:22,25;67:7;147:1;199:2,5
**derive (1)**
116:5
**derived (1)**
72:19
**describe (2)**
42:18;81:12
**described (3)**
16:18;88:15;146:11
**describing (1)**
62:9
**descriptive (1)**
116:1
**design (4)**
72:5;88:17;115:22;161:17
**designate (1)**
29:6
**designated (10)**
21:1;24:4,17,17;29:21;64:6;103:11,12;104:8;168:18
**designating (2)**
163:12;175:16
**designed (2)**
65:9;105:1
**desist (1)**
131:10
**destination (39)**
14:20,21;20:6,9,13,17,20,22;21:1,14;22:21;23:5,16;24:5;27:23;29:2,5,9,11,11,20;30:14,23;31:4,12;37:3;57:21;70:21;104:7,22;106:18;114:21;117:11,12;147:19;157:16;162:14;175:8,11
**detail (2)**
89:7;99:23
**detailed (2)**
77:10;86:5
**details (4)**
22:11;76:16;77:3,10
**determine (4)**
80:25;87:2;151:4;155:6
**determined (4)**
30:5;45:24;133:22;143:24
**developed (1)**
157:9
**Development (13)**
18:13;35:2,11,12,18;36:1;38:24,25;41:16;42:14;68:23;83:10;88:17
**device (1)**
100:9
**devices (9)**
98:13,19,21,22,23;99:1,2,3,6
**diagnosed (1)**
45:18
**difference (1)**
28:15
**different (26)**
17:15,16;18:9,10;24:20;32:12;34:20;41:3;47:13,13;64:18;88:3;91:6;102:10,14,20;105:14;118:13;123:9;144:11;146:3,13,14,17;166:20;193:9
**differently (4)**
61:1;145:18;146:3;153:13
**difficult (1)**
80:21
**DIRECT (3)**
7:4;85:5;138:7
**direction (4)**
84:25;134:25;143:25;144:3
**directive (2)**
161:4,12
**directives (1)**
160:20
**directly (5)**
11:2;56:9;86:6;151:14;180:14
**director (18)**
18:24;34:9;35:2,3,9,17,19,24;38:23;39:6;41:17;42:21,21,21;68:23;89:17;143:20;195:25
**directors (7)**
34:3;39:7;143:5,6,12,16,23
**disapprove (1)**
121:22
**disconnect (2)**
38:15;78:21
**discontinue (2)**
118:22;119:3
**discretion (3)**
121:21;122:3;128:10
**discuss (1)**
169:13
**discussed (3)**
130:12;141:22;162:20
**discussion (12)**
130:23;135:23;159:8,9;160:11,16;164:4;168:9,14;172:10;186:18;188:19
**discussions (2)**
166:5;190:8
**dispatch (9)**
10:19;12:16,17;13:9;15:13;34:18,20;111:23;153:22
**dispatched (1)**
10:25
**displaying (1)**
116:6
**disputes (2)**
123:19,21
**disqualify (1)**
108:25
**disrespect (2)**
7:13;15:11
**disrespectful (1)**

70:10
**distribution (3)**
36:22;37:15,22
**District (2)**
6:10,11
**divide (2)**
103:3;105:5
**divided (1)**
39:8
**Division (6)**
6:12;34:3;48:19;154:16,17;173:9
**divisional (1)**
173:16
**divisions (3)**
18:10;33:18,21
**doctor (1)**
88:8
**document (19)**
13:3,4;45:10;46:10,11,20;47:2,3,14;67:13;68:2,14,15;78:16;79:12;136:14,19;137:7;187:2
**documentation (2)**
87:15;89:14
**documenting (1)**
159:7
**documents (8)**
19:3;26:14;46:23;68:22;87:19;156:21;157:11;165:17
**doggone (1)**
45:15
**domestic (5)**
42:4;44:3;48:13;50:10;75:13
**domestically (1)**
123:13
**Domiciled (2)**
60:15,16
**done (23)**
37:4,8;42:24;61:14;87:22;89:20;91:5,21,25;100:5,11,17;101:2;137:14,14;155:18;156:2;160:7;161:23;163:24;169:7;183:17,20
**door (1)**
197:17
**DOT (4)**
16:6,7;129:13;171:24
**double (1)**
164:8
**down (19)**
20:12;35:6,13,14,15;40:15;70:14;73:2;76:3;86:4;90:13;102:23;115:2;124:25;129:3;132:7;136:20;160:11;185:8
**draft (2)**
144:23,24
**dress (2)**
72:4;115:22
**drinking (1)**
95:19
**driven (3)**
39:25;86:22;87:11
**driver (26)**
20:15;95:11,11;97:5;98:10;106:17,20;108:24,25;109:12;112:4;114:10,14,20,25;122:9;137:17;138:15,16;152:8,12,14;153:4;179:21;184:20;186:5
**drivers (19)**
94:22;95:14;96:17,24;97:2,3,9;109:10,15;138:4,7,11;139:4,6;149:11;184:12,24,25;185:14
**driving (3)**
95:9,21;137:25
**drug (1)**
108:18
**drunk (1)**
95:9
**due (3)**
92:14;120:19,24
**DUI (1)**
109:15
**DUIs (1)**
108:25
**during (10)**
25:3;41:25;86:10;99:3;121:3;133:25;134:12,18;162:21;163:3
**Duties (6)**
78:5,25;79:2,19;109:24;111:19
**duty (5)**
96:16;109:14;125:13;126:19;152:17
**Duty's (1)**
152:20

**E**

**earlier (2)**
173:10,22
**Ed (1)**
6:18
**educated (2)**
11:16;137:20
**education (1)**
107:5
**effect (3)**
19:7;24:22;76:5
**effective (8)**
83:21;127:13;129:17;142:16;147:4;152:3;158:19;163:18
**effectively (2)**
51:9;161:14
**efficiently (1)**
62:7
**efforts (1)**
57:14
**EHRENREICH (255)**
8:22;9:9;11:12;13:14;15:6;19:2;20:24;21:7,12;23:12;24:7;26:15;29:17;31:14;32:5,8,25;37:5,7;38:7,11,14,18;43:3,6,13,19,24;44:21,25;46:9,14;47:8,16;49:20;51:14,18;52:3,6,15,24;54:16;58:7,9,13,22,25;59:7;61:6;64:8,15,23;65:18;66:1,8,13,23;67:2,5,20;68:4,6;69:21;70:11;71:9,19;72:16,23;73:6,9,12,21;75:10,24;77:2,17,23;78:11,15,20,24;80:5;82:4;84:3;85:17;88:13,22;89:3;90:14,24;92:25;93:8,13;94:4,24;95:4,18,20,24;96:4,7,13,20,22;97:12,14;99:10;100:25;101:10,13;102:7;103:7;105:9;106:14,25;107:13;108:5,15,19;109:8,18;110:13,16,18;112:20;113:8,18,22;114:8;115:7;116:18;117:21;118:18;119:19,22;120:2,25;121:11;122:6;126:4,10;127:7,23;128:11;129:4,25;130:3,8;131:4,19;132:3,13;133:16;136:12,22;137:22;138:1,19;139:2,8,18,21;143:8;144:5;145:15;146:10;147:21;149:4,21;150:3,5,12,14,17,19;151:7;152:9,15,19;153:5;154:1,19;155:9;156:13,16;158:13,15,25;160:22;162:5,16;164:17,24;165:11,13;166:8;167:10;168:20,23;169:11,18;171:2,6,10,25;174:13;175:2;176:13;180:24;181:5,7,14,16;182:6,21,25;183:23;185:6,11,21;186:14,21,25;187:13;188:12;189:24;190:6,16,24;191:3,5,8,11,20,24;192:10,12,16,22,25;193:14,18,24;194:5,10,13,24;195:10,21;196:17;197:2,11,20,25;198:24
**eighty (2)**
121:2;163:17
**either (11)**
25:9;46:14;82:20;97:6;100:18;112:12;114:22;124:11,12;127:12;138:8
**ELD (9)**
98:13,19;100:9,24;101:8;149:14;172:11,17,21
**Elder (1)**
64:19
**ELDs (4)**
98:11;172:10;173:7;191:22
**electronic (7)**
88:2;98:12,19;157:22;199:11,14,21
**electronically (7)**
89:5;104:23;157:2,3;183:14,18,20
**electronic-driven (1)**
87:14
**electronics (1)**
62:20
**ELLIOTT (4)**
199:13,13,23,23
**else (6)**
51:24;60:23;124:18;192:14,19;199:18
**email (11)**
131:6;135:12,17;137:3,9;139:23;159:14;164:15;176:8,14;178:18
**emailed (1)**
183:14
**emails (3)**
130:23,25;196:21
**email's (1)**
159:19
**employee (5)**
49:18;97:6;136:11;138:7;184:13
**employees (6)**
61:11;65:20,24;136:7;137:4;138:8
**encourage (2)**
184:21;185:3
**end (7)**
14:9;39:12;48:1;49:12;64:20;93:23;199:4
**ended (5)**
21:6;40:11;90:8;129:16;147:13
**enjoy (1)**
37:24
**enough (2)**
57:25;99:23
**ENRENREICH (1)**
164:20
**enter (1)**
185:3
**entered (1)**
120:12
**entities (3)**
25:18;57:17;166:24
**entitled (1)**
18:7
**entity (12)**
16:24;23:10;41:20;54:20;57:24;71:25;73:15;93:18;94:21;132:11;180:10;182:4
**envision (2)**
92:4;172:11
**Epic (1)**
88:5
**equal (1)**
14:25
**equals (1)**
32:1
**equipment (30)**
53:13;76:14;98:10;100:20,22;101:18,19,24;102:16,17,22;111:15;112:18,22;113:1,6;129:20;130:20;139:4;147:8;148:8;149:10,13;159:24;161:19,22;163:23;196:6,23;197:17
**equivalent (2)**
16:13;183:18
**era (1)**
183:25
**establish (3)**
63:12,16;116:11
**established (2)**
110:5;142:4
**estate (1)**
127:1
**estimate (1)**
92:5
**et (2)**
6:8,9
**etc (2)**
37:3;121:20
**e-tran (1)**
200:2
**e-trans (2)**

199:22;200:4
**evaluate (1)** 81:8
**evasive (1)** 8:19
**even (14)** 15:15;23:16;27:2;29:21;33:8;40:13,17;45:18;101:15;120:3;132:25;137:14;142:8;153:20
**event (4)** 20:14;125:18;127:11;131:15
**Everybody (6)** 17:19;33:15;36:18;38:20;47:1;199:7
**everything's (1)** 183:17
**evidently (2)** 19:15;175:17
**ex- (1)** 50:16
**exact (2)** 27:2;33:16
**exactly (8)** 23:7;33:8;48:5;52:8,17;76:2;100:4;170:22
**EXAMINATION (1)** 7:4
**examined (1)** 7:2
**example (15)** 11:6,10;16:17;54:15;56:7;90:7;91:18,25;113:7;116:24;121:5;122:2,18;132:24;150:13
**examples (2)** 84:2,7
**exceed (1)** 175:19
**Except (1)** 93:23
**excess (2)** 77:14;127:16
**exchange (3)** 114:21;159:14;164:15
**excuse (3)** 85:5;119:6;165:8
**excused (1)** 200:7
**executed (1)** 165:17
**execution (1)** 123:16
**Executive (2)** 142:22;151:6
**executives (1)** 160:10
**Exhibit (19)** 45:11,12;66:18,21;123:8;135:24;136:3;139:11,14,17;186:20,23;187:5,7;188:16,17;189:2;194:1,3
**exhibits (1)** 200:5
**existing (5)** 27:10,12;140:12;153:21;161:12
**exists (3)** 51:16;77:15;89:9
**expand (2)** 124:7,14
**expanded (2)** 36:6;41:4
**Expansion (6)** 132:21;133:8;139:24;140:9,12;151:20
**expansions (1)** 140:16
**expect (3)** 85:23;109:21;116:25
**expeditiously (1)** 165:6
**expense (1)** 118:5
**expenses (2)** 117:23;118:1
**experience (2)** 42:23;107:6
**explain (4)** 10:20;13:15;57:1;198:9
**explanation (2)** 28:12;179:16
**extend (3)** 133:6;176:17;177:20
**extended (4)** 129:18;177:6,18;178:21
**extending (2)** 177:1,21
**extension (1)** 130:18
**extensions (1)** 161:1
**extent (1)** 71:1
**eye (1)** 46:1

**F**

**facilities (4)** 74:15,17,18;158:6
**fact (8)** 9:11;40:19;49:6;102:1;133:19;142:11;147:25;174:8
**fail (1)** 119:2
**failure (3)** 125:12,13,16
**fair (3)** 150:22;152:13;185:9
**fairness (1)** 162:12
**fall (6)** 33:10;40:11;49:2,3,4;173:13
**falls (1)** 84:22
**familiar (18)** 21:21,23;25:11;42:22;53:10;56:15;64:25;65:3;67:9;69:8;77:19;92:10,11;136:4,17,18;137:8,13
**family (5)** 7:17,18;22:9;58:5;88:8
**famous (1)** 60:3
**far (5)** 55:22;91:14;145:9;167:16,21
**fashion (1)** 104:9
**fast (1)** 38:16
**fast-forward (1)** 16:15
**faulty (1)** 113:6
**federal (3)** 90:18;94:13;148:14
**FedEx (1)** 100:14
**fee (1)** 117:17
**feedback (1)** 39:15
**fell (1)** 127:4
**fella (2)** 122:8;176:9
**fellow (1)** 162:11
**felt (2)** 127:2;178:5
**female (2)** 155:5;169:25
**Fenton (7)** 60:10,17,21;61:2;78:2;99:21;111:24
**few (4)** 56:11;161:10;165:7;188:22
**fewer (1)** 61:25
**fifth (5)** 27:21;56:25;57:2;84:1;191:14
**figure (1)** 36:3
**filed (3)** 38:4;121:5;126:13
**fill (1)** 142:13
**final (2)** 30:22;120:20
**finalization (1)** 157:6
**finance (4)** 33:25;111:6,8;154:12
**financial (4)** 86:5;93:3;125:15;178:10
**find (13)** 9:6;32:6;53:18;58:15;59:3;102:5;110:19;112:16;118:10;137:24;141:21;175:23;176:3
**fine (6)** 13:19;67:3;139:1;194:10;199:24,24
**finish (4)** 25:2;27:9;133:12;154:12
**finished (2)** 25:4,7
**first (14)** 13:15;19:7;34:19;40:8;47:6;55:7;126:9;129:1,5;137:5;142:11;156:20;179:4;189:2
**fit (1)** 33:10
**five (10)** 34:22,24;35:2,23;39:2,3;68:23;75:17;125:25;127:13
**flat (2)** 17:20;117:16
**Fleet (3)** 173:4,9,14
**floor (1)** 61:10
**Florida (3)** 21:25;22:2;30:3
**flow (3)** 57:7;75:23;163:20
**folded (2)** 62:25;156:14
**folks (1)** 79:15
**follow (1)** 88:10
**following (3)** 125:24;179:11;181:21
**follow-up (3)** 160:1;173:8,20
**follow-ups (1)** 159:10
**food (2)** 36:4;47:20
**fool (1)** 96:17
**foot (2)** 12:13;61:9
**footers (1)** 12:12
**Foppe (1)** 6:18
**Force (1)** 83:15
**foreign (3)** 71:3;105:21;165:24
**forget (1)** 46:24
**forgive (1)** 27:21
**form (175)** 8:22,24;15:6;20:24;21:7,12;23:12;24:7;26:15;29:17;31:14;32:5,8;33:1;37:5;43:3;47:8,16;49:20;51:18;52:3,15,24;54:16;58:7,19;61:6;64:8,23;65:18;66:1,8;67:20;68:4;69:21;71:9,19;72:16,23;73:21;75:10,24;77:2,17,23;80:6;82:4;84:3;85:17;88:13;89:3;90:14,24;93:4,8,11;94:4,25;95:18,20,24;96:4,7,13,20,22;97:12;99:10;100:25;101:10,13;102:7;103:7;105:9;106:14,25;107:13;108:5,15,19;109:18;110:13,16,18;112:20;113:8,18,22;114:8;116:18;117:21;118:18;119:19,22;120:2,25;121:11;122:6;126:4,10;127:7,23;128:11;129:4,25;130:3,8;131:4,19;132:13;133:16;136:22;137:22;138:1,19;139:2,8;143:8;144:5;145:15;146:10;147:21;149:4,21;150:3,12;152:9,15,19;153:5;155:9;157:22;158:13;160:22;162:5,16;166:8;167:10;168:20,23;169:11,18;171:25;174:13,19;

180:24;181:5,14;182:6,21;183:23;185:6,11,19,21;186:14;187:13;188:12;189:24;190:6,16;191:20;192:10,16,22,25;193:1,18,24;194:24;196:17;197:2,11,20,25
**format (2)** 157:22;199:21
**formula (1)** 128:5
**forth (15)** 25:5;32:14;42:6;47:14;81:4;87:1,4;104:7;105:19;107:6;130:14,21;149:12;160:13;166:21
**forthright (1)** 8:19
**forward (5)** 46:1;141:7;160:17;161:18;165:8
**forwarded (1)** 87:17
**forwarder (1)** 64:2
**forwarding (2)** 94:11;165:16
**Foss (6)** 7:15;45:9;139:12;171:5;194:11,15
**Foster (5)** 141:3,11,13;145:2,10
**Foster's (2)** 143:2,24
**found (3)** 61:24;139:6;142:14
**four (15)** 10:3;12:8;36:18;37:17;66:19;73:9,10;74:20;75:6,17;156:8;165:8;174:5;190:25;199:24
**fourth (6)** 73:3;136:11,20;191:2,4,7
**freight (1)** 64:2
**Frontline (1)** 55:17
**full (7)** 7:6;40:24;66:9;128:9;143:3;146:4;179:9
**fully (2)** 65:21;131:1
**function (3)** 36:25;155:20;185:2
**functionality (1)** 178:14
**functions (3)** 158:5;162:21;163:3
**fund (2)** 116:23;117:15
**further (5)** 41:13;147:5;158:7;172:6;186:11
**fuss (1)** 188:9
**future (5)** 125:14;163:13;165:25;167:8;169:7

## G

**Garr (15)** 128:24;130:11;131:2;146:23;147:4;152:4;159:5,14;160:16;164:21;165:15;171:13;178:18;190:11;195:16
**Garr's (1)** 141:15
**gave (1)** 24:23
**geared (1)** 105:11
**general (17)** 33:9;56:12;71:23;78:9;82:5;83:20;90:15;91:7;115:19;116:12,23;117:14;124:21;161:20;162:18;163:5,24
**generate (2)** 65:10;180:21
**generated (1)** 181:12
**generating (1)** 99:6
**generic (1)** 97:20
**Georgia (22)** 6:11;44:18;58:16;59:6;74:13,16,18,21;75:1,2,4,7,9;132:7;148:9;150:2;168:22;179:12;180:20;181:10,22;182:3
**gets (10)** 23:3,15;31:12;77:9;96:2;104:18;128:9;154:5;159:4;180:19
**given (6)** 42:14;82:14;90:22;99:13,17;126:20
**gives (2)** 128:3;178:15
**giving (5)** 84:24;120:16;130:17;177:21;178:20
**glass (4)** 45:10,16;188:25;194:16
**glasses (1)** 45:15
**glaucoma (4)** 45:19,24;46:4,5
**God (1)** 6:24
**goes (8)** 41:2;61:22;104:11;122:23;146:17;163:17;173:3;175:6
**good (22)** 27:15,17;29:12;36:5;39:21,22;41:20;45:20;59:11;70:16;71:21;81:8,11;101:6;111:12;115:9;139:13;165:13;174:25;182:25;195:13;197:14
**goods (17)** 10:23,24;12:19;16:25;17:2;31:7;34:21;38:3,5,6;44:4;61:20,20,25;87:3;114:25;134:10
**gotcha (2)** 10:6;196:5
**Government (43)** 22:6,12,15;23:3;25:18,19,21;31:24;44:6,8;63:10,12,17,22;64:3;81:4;83:12,14,17;94:16;165:23;166:1,6,10,17,20,25;167:3,6,8,12;168:10,17;169:3,9,17,19,20,22;170:23;172:7;189:20;190:14
**governmental (2)** 71:24;170:14
**grader (4)** 27:21;57:1,2;84:1
**graduate (2)** 9:24;11:15
**graduated (2)** 10:1,13
**grandchildren (1)** 56:21
**greater (3)** 12:9,14;75:2
**greatly (1)** 196:22
**gross (2)** 44:3;125:18
**grossed (1)** 51:16
**group (14)** 29:13;36:8;37:21;41:24;48:8;50:2,8;55:11,21;143:19;145:2;167:7;168:10;189:23
**groups (2)** 37:18;89:13
**grown (1)** 59:15
**guardrail (1)** 8:4
**guess (8)** 36:6;61:15;64:4;99:3;107:8;126:18;144:25;184:17
**guidance (1)** 84:25
**guideline (1)** 33:10
**guy (6)** 124:12;140:3;173:21;196:2,8,8
**guys (2)** 38:15;199:22

## H

**H- (1)** 153:16
**habit (1)** 108:3
**Haley (2)** 176:15,21
**half (1)** 35:23
**halfway (1)** 64:19
**Hampton (4)** 124:16;143:4;196:13,24
**hand (3)** 6:22;183:12;184:3
**hand-delivered (1)** 183:19
**handle (3)** 58:3;167:7;168:10
**handled (1)** 25:10
**handles (1)** 64:2
**handling (1)** 165:25
**happen (2)** 29:25;180:12
**happened (2)** 19:16;144:22
**happening (2)** 98:3;99:17
**happens (2)** 163:5;180:15
**hard (4)** 44:22;106:15;118:10;200:4
**harder (1)** 9:19
**haul (3)** 15:2;31:18;71:13
**hauled (2)** 14:19;36:24
**hauler (2)** 21:4;87:21
**haulers (1)** 13:25
**hauling (9)** 12:17,22;14:11,19;17:2;23:23;71:14;72:18;105:13
**head (6)** 27:3;43:4;90:11;108:9;135:16;170:17
**heading (1)** 70:2
**headquarter (1)** 83:9
**headquarters (4)** 14:7;15:24;61:3;78:2
**heads (3)** 102:13;154:14,17
**heard (7)** 25:13,20;38:10;54:4;55:19;77:18;142:10
**hearsay (1)** 136:14
**heightened (1)** 96:10
**held (9)** 43:23;45:5;115:13;121:3;135:23;183:5,21;186:18;188:19
**help (14)** 6:24;55:6;57:5,17,17,19;83:2;84:19;85:10;114:3;117:23;192:11,12,13
**helpful (1)** 34:15
**helping (2)** 13:19;56:6
**helps (3)** 56:13;82:22;83:9
**hereby (2)** 115:19;200:9
**herein (1)** 93:24
**Here's (2)** 31:3;57:8
**Hi (1)** 196:12
**Hickinbotham (2)** 169:2,6
**hierarchy (1)** 151:19
**Higginbotham (1)** 170:2
**high (3)** 9:24;116:12,15

**high-beta (1)**
62:20
**highway (2)**
97:10;148:10
**highways (2)**
113:20;116:16
**hire (2)**
122:2,3
**hired (1)**
97:3
**historic (1)**
99:14
**history (3)**
80:24;108:17,24
**hit (2)**
44:21;160:20
**hitting (1)**
191:18
**HOD (5)**
153:16,18,24;
154:1,2
**H-O-D (2)**
154:1,2
**HODGE (52)**
7:5,15,21,23;11:14;
33:5;43:16;44:24;
45:2;46:24;55:9;58:8,
11,15,18,24;59:2;
66:25;67:4,6;73:8,11,
13;78:13,22;88:23;
93:1;95:3,6;97:15;
115:9;121:14;135:19;
136:15;139:10,13,20;
150:22;158:22;159:2;
164:19;171:3;183:2;
186:20;187:1,4;
188:15;191:7;193:3;
194:7;198:22;200:3
**Hold (3)**
43:13;175:1;191:1
**holding (3)**
36:9;52:22;175:3
**Holdings (2)**
55:4,11
**holds (1)**
14:3
**holistic (2)**
39:18;80:17
**home (1)**
156:22
**honest (3)**
48:21;81:21;94:18
**hop (1)**
48:13
**hope (1)**
9:18
**hotel (1)**
93:6
**hours (2)**
86:11;114:14
**household (6)**
10:23;34:21;41:20;
44:4;61:25;134:10
**HR (1)**
48:23
**huge (2)**
117:5,5
**hundred (10)**
14:14,25;32:1;
33:12;51:17;61:10;
86:22,24;121:2;
163:17
**hundreds (2)**
69:18;99:13
**hungry (1)**
195:15
**hypothetical (1)**
11:9

**I**

**ICC (2)**
16:9,13
**idea (10)**
32:4;53:23,25;54:3;
55:13;92:16;145:19;
170:3;174:14;187:16
**identification (7)**
45:13;66:22;
135:25;139:15;
186:24;188:18;194:4
**identified (9)**
8:2;26:17;27:1,5;
48:7;134:17;161:7;
179:23;182:19
**identifies (1)**
174:22
**identify (1)**
80:21
**identifying (1)**
173:6
**ie (3)**
124:16,16;190:11
**illicit (1)**
119:17
**immediate (1)**
80:20
**immediately (7)**
118:16;120:12;
125:21;131:9;133:14;
159:20;165:1
**important (3)**
115:25;116:3;
161:10
**impressed (1)**
45:14
**improper (2)**
95:1,4
**improvement (2)**
39:19,19
**inactivated (1)**
192:2
**Inaudible (2)**
133:11;193:3
**Inc (7)**
48:8;50:8,25;53:2,
9;54:7;55:21
**incentive (1)**
128:4
**incentives (2)**
127:16,21
**incident (1)**
21:17
**incidents (1)**
19:15
**include (9)**
30:1;44:6,9;69:5,
16;71:22,22;110:9;
125:11
**includes (1)**
70:21
**including (4)**
72:8;110:3;129:13;
149:14
**indemnify (1)**
186:8
**independent (7)**
16:23;17:6;23:22,
24;51:3;67:14;138:3
**independently (1)**
24:1
**index (1)**
200:6
**indicate (1)**
30:12
**indirectly (1)**
86:7
**individual (9)**
13:5,8;33:2;34:1;
38:3;68:11,12;92:22;
107:22
**individually (1)**
9:11
**individual's (1)**
151:1
**industry (10)**
25:22;53:15;56:2;
57:4;62:1;63:13;
94:21,25;95:5;166:22
**influence (3)**
95:12,15,25
**inform (1)**
143:2
**information (33)**
11:25;12:21,23;
18:15;21:11;22:25;
32:7,19,23;33:19;
77:22;88:7,21,25;
98:15;99:7,9,19;
100:5,14;101:4;
102:4;104:8;126:21;
151:4;153:23;154:12,
13;157:3,8,20,24;
164:2
**initial (3)**
7:7;137:5,6
**initials (1)**
27:20
**initiate (1)**
13:4
**injured (2)**
8:5,5
**injury (1)**
85:25
**inquire (3)**
58:23;77:21;137:24
**insisted (1)**
119:15
**insists (1)**
109:5
**inspect (1)**
86:11
**inspected (1)**
148:3
**inspecting (2)**
89:23;179:22
**inspection (5)**
149:2;179:13,18;
181:24;182:16
**inspections (6)**
113:3;148:7,8,16;
150:1;181:9
**instance (1)**
74:9
**Instead (1)**
57:9
**instruct (1)**
58:20
**instructed (1)**
9:1
**instrumentality (1)**
96:5
**insurance (13)**
49:2,23,23;50:1,2;
52:12,18;76:5,9,12;
77:4,25;107:19
**intellectual (3)**
129:10,13;131:11
**intend (1)**
131:2
**intending (1)**
73:4
**interest (2)**
115:20;129:8
**international (10)**
28:20;44:10;54:10,
18,22,22,25;55:2;
73:25;74:1
**internet (2)**
152:2;153:10
**interp- (1)**
112:17
**interpretation (1)**
172:13
**interpreting (1)**
104:3
**interstate (15)**
11:20;14:2,3;16:10,
22;36:12;41:12;
48:13,13;50:11;71:2;
72:21;105:12,21;
113:20
**Interviewed (1)**
10:14
**into (24)**
8:4;9:8;11:25;18:2;
32:9;33:7,8,12;34:10;
36:7;39:8;50:19;
62:25;75:18,23;
86:15;89:22;112:1;
118:9;120:12;140:11,
13;159:4;185:3
**intra (1)**
73:24
**intrastate (4)**
70:25;72:22;74:1;
75:13
**inventories (1)**
87:1
**investigate (1)**
131:18
**investigating (1)**
180:20
**investigation (1)**
85:3
**invoices (1)**
87:25
**invoicing (5)**
33:24;34:2;37:11;
89:18;157:5
**involve (2)**
20:16;22:12
**involved (23)**
16:1;21:17;41:12;
53:5;56:9;92:12;94:9;
102:25;104:18;
129:11;131:21;
132:15;133:5;141:2;
144:8;151:24;166:9;
169:1;173:18;180:25;
182:23;186:16;
198:18
**involvement (10)**
18:23;19:6;22:13;
23:5;55:1;148:22;
151:23;171:17;
185:22;198:7
**involvements (1)**
15:21
**involving (2)**
103:19;123:22
**irrelevant (1)**
130:5
**issue (2)**
63:17;126:24
**issued (2)**
110:25;130:15
**IT/ (1)**
173:11
**item (1)**
17:4
**items (1)**
162:25

## J

**Jacksonville (2)** 22:2;40:16
**Jaime (4)** 154:23,25;173:23,24
**J-a-i-m-e (1)** 155:1
**Janet (2)** 176:15,21
**January (29)** 19:15;20:4;24:14,22;26:18,21;27:4,5;35:22;42:11;47:5,15;130:11,16,22;133:21;135:16;141:23;142:8,16;146:23;147:3;159:10;160:9;163:21;164:11;165:20;178:1;182:18
**jargon (1)** 88:6
**Jason (4)** 151:11,12,15;173:21
**Jim (2)** 199:13,23
**JM4 (1)** 70:1
**JMI (2)** 66:19,25
**JMI005 (1)** 79:7
**JMI00553 (2)** 139:17,22
**JMI00554 (1)** 142:17
**JMI00555 (1)** 144:10
**JMI00587 (1)** 194:17
**JMI00588 (1)** 195:6
**JMI00599 (1)** 195:16
**JMI00604 (1)** 198:2
**JMI00677 (1)** 187:7
**JMI1 (1)** 132:19
**JMI10 (1)** 124:20
**JMI12 (1)** 128:20
**JMI407 (1)** 115:5
**JMI600 (1)** 197:14
**JMI7 (1)** 115:18
**job (7)** 32:3;37:14;40:8;81:7;90:4;110:12;157:15
**jobs (2)** 134:19;182:13
**Joe (9)** 70:4;129:7;144:17;145:6;155:7;165:2;182:19;189:11,12
**John (1)** 130:10
**Jones (3)** 151:11,15;173:21
**Jones' (1)** 151:12
**Joseph (1)** 7:16
**JS (7)** 45:13;66:22;135:25;139:15;186:24;188:18;194:4
**Julie (1)** 6:19
**July (21)** 19:16;121:10;128:23;129:12;130:9;131:17;149:14;152:12;155:8;158:11;168:16;181:10;182:16,18;188:1;192:5;194:12;196:8,11;197:9,12
**jumped (1)** 156:15
**June (7)** 101:3;147:12,14;177:7,19;178:21;187:24
**jurisdiction (1)** 94:16
**jury (1)** 59:21

## K

**Kathy (3)** 176:15,24;178:19
**Keenon (1)** 136:23
**keep (4)** 26:3,16;86:4;121:12
**keeping (2)** 57:21;81:23
**kept (2)** 39:20;86:8
**key (1)** 33:17
**kill (2)** 85:16;96:6
**killed (8)** 8:1,4;26:13;100:23;149:15;158:12;174:11;192:6
**killing (2)** 21:6;90:9
**Kind (34)** 11:9;13:21;15:4;16:15;17:3;27:21;34:14;61:3;73:2;76:3;80:13;91:6;93:3,6;96:18;114:4;116:25;124:8,25;127:25;130:6;131:16;145:11;157:4;159:4,7;172:11;173:10;176:10;182:4;186:6;188:10;189:11;192:4
**kinds (2)** 69:19;107:10
**knew (4)** 21:18;141:13;161:21,25
**knowing (2)** 174:17;196:18
**knowledge (27)** 21:8;23:14;24:1;25:5,17;26:1;27:16,19;33:21;48:5;52:16;53:5;55:1,13,15,16,19;68:6;92:18;101:1;132:9;147:24;170:13,16;182:11;193:2;198:7
**known (6)** 29:7;30:6;40:13;42:15;113:10;161:20
**knows (2)** 59:21;150:10
**Kyle (5)** 6:2,8;7:17;8:6;115:14

## L

**labor (15)** 106:9,13,16,18,20,24;107:3,14,15,17,22;108:4,13;109:11;122:5
**laborers (1)** 109:16
**ladder (1)** 160:6
**lading (5)** 134:16;180:1,5;187:7,12
**ladings (3)** 86:25;157:4;187:8
**lady (1)** 35:12
**Langely (1)** 76:24
**Langley (4)** 6:2;7:16;199:19,19
**language (2)** 127:19;143:22
**large (2)** 37:21;154:17
**larger (1)** 81:2
**largest (2)** 52:1,2
**laser (1)** 45:25
**last (9)** 7:7;33:13;35:10,23;137:6;153:14;154:24;174:5;189:15
**late (1)** 176:7
**later (1)** 171:5
**lateral (3)** 42:17,20;142:24
**law (6)** 68:10;132:1,18;180:17;183:24;185:12
**lawsuit (2)** 26:13;131:15
**lawsuit's (1)** 8:9
**lawyers (5)** 8:23;18:3;67:23,24,24
**leased (1)** 53:22
**leases (3)** 53:12;98:23;99:2
**leasing (2)** 53:10,19
**least (8)** 34:9;74:20;75:18;89:19;125:22;147:12;153:22;192:8
**leave (1)** 41:10
**leaving (1)** 41:8
**left (4)** 34:22;40:7;55:22;136:23
**left-hand (1)** 136:21
**legacy (1)** 41:10
**legal (2)** 51:15;152:20
**legally (1)** 134:3
**less (2)** 31:1;87:9
**letter (19)** 129:23;130:4,7,17;131:5,7,9;142:19;143:1;146:22;156:6,19;164:5,11;177:25;183:9;192:7;196:8;197:14
**lettering (4)** 72:5,8,20;115:23
**letters (5)** 123:9;153:11;160:13;164:1;192:6
**letting (1)** 189:22
**level (3)** 107:6;148:14;151:6
**levels (5)** 42:21,21;61:9;87:20;102:15
**Lewis (2)** 6:14;60:7
**Liability (4)** 55:5;76:19,23;186:12
**license (5)** 121:19;129:19;131:11;197:18;198:3
**licensing (1)** 16:1
**life (2)** 9:14;84:1
**lilliputian (1)** 188:24
**limit (1)** 33:20
**limitations (2)** 76:13;91:16
**limited (5)** 22:25;52:13;55:4;71:22;125:11
**limits (2)** 77:6;113:16
**line (26)** 14:24;15:2;16:2,7;21:18;30:18;31:16,18,20;48:16;53:16;62:12;69:7;73:23;77:5;83:22;91:2;94:19;101:5;103:13;105:15;111:3;114:18;136:20;140:12;158:4
**Lines (35)** 10:15,15,23;11:3,5,18;14:2,10,23;16:8,21;36:11,12;41:3,12;42:1,5;48:12;50:10,11,13,24,25;51:4;54:22;62:23;63:3,7;64:21;65:22;66:15;75:12,21;143:11;175:10
**Lines/Mayflower (1)** 98:16
**linking (1)** 181:11
**liquidated (2)** 119:8;120:1
**list (8)**

26:8,22,25;65:7;66:12;136:7;138:11;143:9
**listed (7)** 49:19;53:3,4;63:4;136:11,21;152:11
**listen (1)** 13:16
**listening (2)** 47:1;79:15
**listing (1)** 137:17
**literally (1)** 69:18
**literature (2)** 84:10,12
**little (16)** 9:7,19,19;35:5,5,7,14,15;46:8;52:8;67:11;68:2;80:21;105:14;176:10;188:24
**live (1)** 44:18
**LLC (8)** 55:4,11,18;63:7;64:20,21;179:15,15
**load (25)** 11:10;12:19,23,25;13:1,10,11,11;21:5;23:9;24:4;25:23;30:2;90:12,25;91:3,6;98:5;112:13,24;147:19;168:18;174:8,11;186:12
**loaded/delivered (1)** 97:24
**loading (2)** 98:5;106:10
**loads (16)** 10:25;12:5,6,16;22:20,20,23;23:6;25:23;29:10;90:8,9;174:10;184:6,16,17
**load's (1)** 91:10
**local (5)** 9:21;41:11;59:18;73:24;101:21
**locate (2)** 75:19;135:17
**located (5)** 6:14;21:24;78:1;83:13;176:4
**locating (1)** 98:19
**location (11)** 60:2;81:1;86:11;89:23;103:15;104:1;121:23;122:12;123:20;124:16;140:14
**locations (9)** 75:5;122:13,14;124:18;142:6;145:17;146:2,3,13
**Locke (2)** 53:24;54:1
**L-o-c-k-e (1)** 53:24
**logging (3)** 98:12,20,21
**logic (8)** 39:25;82:9;83:20;97:22;146:7;162:18;163:5;178:16
**logical (1)** 49:7
**logics (1)** 63:11
**log-in (1)** 100:9
**logistics (6)** 17:14;34:21;41:20;44:10;62:17,19
**logo (12)** 72:3;115:21;118:23;119:4,13,17;121:19;180:9,10;191:15;195:4,8
**logos (7)** 116:7;129:3;152:1;153:9;188:10,14;190:19
**long (10)** 42:7;141:2,11,13;143:2,24;145:2,10,21;184:8
**longer (3)** 18:21;21:18;163:14
**look (34)** 16:10;26:25;33:9,12;34:9;36:10;60:15;67:22;75:18;79:6;80:16,23,24;83:16;84:16;99:8,14;101:17;109:24;112:1;115:5;129:6;132:7;135:17;136:10;139:19;151:3;167:15;178:17;181:20;190:18;191:14;193:4;194:1
**looked (5)** 19:5;21:10,14;123:6;176:4
**looking (20)** 13:12;18:18;34:12;43:12;45:14;46:1;47:1;48:24;49:25;60:24;75:17;89:23;94:5;95:10;98:2;99:16;132:19;179:6;191:6,10
**looks (9)** 23:18;31:18;139:22,23;141:23;176:7;177:16;181:3;186:6
**loss (4)** 38:2,5;85:4,21
**lot (20)** 15:19;22:3;41:22;42:19;45:21;118:23;127:19;161:7,19,23;164:6;166:19;178:9;183:14;189:3,6;192:9;193:22,23;196:16
**Louis (18)** 6:15;9:13,22;10:3,5;11:21,23;12:9;20:10,11;28:5;59:10,16,22;60:2,11,17;112:5
**lower (1)** 128:8
**LTD (1)** 50:3
**LTL (1)** 62:21
**lucky (1)** 46:8

## M

**M121 (1)** 22:1
**M33 (1)** 158:5
**M333 (4)** 122:17;142:5;146:5;163:12
**M444 (5)** 122:20;142:5;146:6;158:5;163:12
**magnifying (4)** 45:9,16;188:24;194:16
**Mail (3)** 183:12,19;184:3
**mainframe (5)** 153:19,23;177:22;178:8,23
**maintain (1)** 87:7
**major (4)** 51:12,13,22;52:10
**makes (1)** 193:6
**making (2)** 39:17;114:16
**manage (2)** 57:15,17
**managed (1)** 40:5
**management (14)** 18:11;34:6,7,25;55:23,24;56:5;77:24;78:1;92:10;151:6;170:8;196:1,2
**Manager (15)** 38:1;56:1,12,13;57:3,16;58:1,2;132:21;139:24;140:8;169:3;170:18,19,19
**managers (4)** 34:4;57:5,19;170:21
**managing (1)** 57:13
**manifest (2)** 12:24;13:11
**manner (8)** 78:7;79:22;80:4,10,17;87:23;123:23;138:14
**manners (1)** 124:1
**manual (1)** 15:16
**many (12)** 37:13;40:23;43:1;51:13;56:23;61:11;62:8;64:17;75:7,15;81:24;183:11
**March (7)** 26:5,5;90:9,10,22;193:15;194:8
**marijuana (1)** 95:16
**Mark (10)** 43:14;45:11;72:4;115:22;128:21,23;132:3,4;186:20;196:7
**marked (7)** 45:12;66:21;135:24;139:14;186:23;188:17;194:3
**marketing (5)** 82:22;84:11,12;152:2;153:10
**markings (1)** 116:1
**marks (2)** 129:9;131:11
**marriage (1)** 44:18
**married (5)** 56:19;58:6,12,14;59:14
**materials (3)** 17:22;18:7;83:2
**matrix (1)** 52:11
**Matt (4)** 7:15;199:10;200:1,2
**matter (3)** 142:11;164:3;174:3
**matters (2)** 70:18;124:1
**maximum (2)** 30:24;117:3
**May (32)** 6:6;11:22;17:13;20:15;22:25;30:8;31:21;41:5,9;50:18;73:14;74:6;78:12;80:23;81:16;89:19;91:14;92:5;101:22;106:17,19;120:5,6,19;125:20;146:2,17;151:24;165:24;175:18;178:4;193:22
**Maybe (11)** 12:8;14:16;20:15,17;29:7;41:10;49:5;65:21;73:23;88:8;118:11
**Mayflower (137)** 8:3;16:16,19,20,21;17:7;18:20,22;19:21;22:18,21,23;23:2,4,10,11,15;24:5,14,19;27:15;29:12,14;31:13;36:6,12;40:10;43:2;44:14;46:21;48:12;50:14,16,17;51:1;54:22;60:12;61:18;63:20;64:17,20;65:22;66:15,15;67:17,24;68:8,17,19;69:20;71:15;72:13,14,20;73:25;74:3,6,23;75:6,12,22;76:21;77:15;79:24;89:22;93:17;96:25;97:5;99:7;100:24;115:25;116:6;117:19;119:15;120:23;122:16;127:25;128:16;132:6,11;136:7;138:6;143:14;145:5,7;146:21;149:1;152:8,12,14;153:2,14,15;156:5,7,20;158:2,7,11;159:3;164:14,17,19;165:8,12;168:18;171:1,16;175:2;176:1,5,7;178:17;179:1,14,15,19;180:9;181:11,20;184:7,9;185:24;187:17;189:8,9,20;190:19;191:12,15;193:5,16,23;194:22;195:4,8,9
**Mayflower/United (1)** 140:11
**Mayflowercom (1)** 137:6
**Mayflower-created (1)** 68:14
**Mayflower's (6)** 8:11;69:23;74:1;

119:12;152:17;171:23
**McCabe (4)** 142:20,21;144:7;160:13
**mean (51)** 7:12;15:10;20:8,25;21:1;33:6;37:20;46:12;56:9;60:20,22;63:24;65:19;67:23;71:8;72:13;75:25;77:9;80:2,7,10;84:1,1,14;90:15;91:24;93:2;95:8,11;97:19;100:2;111:17;112:19;114:9;116:15;124:3;128:9;133:9;136:23;137:24;138:4;145:8;146:11;148:14;160:24;169:22;170:9;172:16;184:20;187:14;195:3
**meaning (7)** 12:6;17:1;61:21;113:2;114:13;153:21;184:24
**means (6)** 56:7,13;62:6;71:17;107:11;144:2
**meant (2)** 50:12;178:3
**medical (3)** 88:2,6,6
**meet (4)** 31:6;83:16;107:16,18
**Member (2)** 48:18;151:13
**members (1)** 34:5
**memorize (1)** 77:11
**mentioned (5)** 49:22;90:7;92:9;151:25;165:19
**merge (1)** 140:15
**mergers (1)** 41:2
**merging (1)** 41:4
**met (2)** 37:10;76:18
**meth (1)** 95:23
**metropolitan (1)** 81:1
**mic (1)** 7:22
**microphone (1)** 65:13
**middle (2)** 7:7;38:19
**midwest (1)** 38:19
**might (21)** 20:14;23:19;30:18;31:9;33:18;56:15;59:5;81:16;83:12,15;102:21;107:23;122:2,3;123:4,7;151:2;182:12;186:1;190:25,25
**Mike (2)** 102:18,19
**miles (2)** 124:8;146:16
**military (23)** 22:4,5,6,8,15;23:3;25:19,21,24;28:20;63:10,12;64:3,7;81:4;83:12,14;92:10;166:17,20;167:1;170:8;172:8
**military-approved (2)** 171:19,23
**million (2)** 44:5;51:17
**mind (6)** 23:25;30:15;81:23;102:15;133:13;134:3
**mine (2)** 151:24;171:11
**minimal (1)** 76:12
**minimum (6)** 76:11,17,20,22;77:6,13
**minute (3)** 99:13,17;153:1
**minutes (2)** 115:7;183:1
**misidentified (1)** 179:17
**Miss (2)** 155:5;187:5
**Missouri (18)** 6:15;9:13;10:2,5;28:6;47:19;48:8;54:8;60:11,16,17,20;198:3,6,9,12,13,16
**Missouri-based (1)** 198:20
**mistaken (1)** 40:8
**misunderstanding (1)** 32:21
**mix (2)** 81:2,4
**Mm-hmm (15)** 29:15;47:21;63:2;68:18;70:5;88:11;121:16;124:5;146:24;165:3;166:2;167:23;187:6;189:16;196:10
**mode (3)** 22:7;61:21;185:1
**Moholland (95)** 8:3,12;11:6;16:19;18:19;19:6,10,18,22;24:10,13;25:1;27:8;40:6,9;53:22,22;70:4;81:19;94:21;100:23;119:12,16;120:11,24;121:9;122:2,13,18,21;124:3,8,12,16,17;126:1,25;127:20;128:15,19,24;129:2,7,8,11,18;130:7;131:9,14;132:12;133:13,20;141:3,16;142:5;143:18,19;144:17,17,18;145:2,6,6,7,9,13;146:5;149:24;153:9;155:7;156:3;161:8,20;163:12;165:2,2;166:17;169:9,16;175:15,16,24,25;176:4;177:19;178:6;179:18;181:11,11;182:20;184:4;188:8;189:11;194:15;197:24
**Moholland's (9)** 167:7,15;168:10;171:18;174:7;189:6,21;193:23;196:16
**molester (2)** 108:12;109:15
**molesters (1)** 108:4
**moment (2)** 74:10;113:11
**money (6)** 52:23;75:22;90:12;94:2;105:7;117:13
**monies (1)** 121:9
**monitor (1)** 174:1
**monitored (3)** 98:10,14;99:25
**monitoring (2)** 99:20;102:16
**monopoly (2)** 51:9,15
**month (2)** 179:10;189:15
**months (4)** 91:8,12;147:18;161:10
**Moransky (1)** 192:7
**more (24)** 52:8;63:16;64:11,13,24;65:10,11;66:6;68:3;75:7;80:6;81:3,16,17;84:13;87:9;89:20;127:19;137:20;142:2;146:9;159:17;190:25;193:22
**Morris (1)** 181:22
**most (3)** 35:25;41:13;98:9
**mostly (1)** 178:10
**motor (2)** 179:16,17
**move (53)** 11:20;17:12,20;20:11;25:24;28:17,18;29:7;38:3;41:2;55:23,24;56:1,4,4,12,13;57:3,4,13,14,15,16,18,19,22,25;58:2,4;62:3,8,19;92:22;93:9;108:5,15;109:18;122:11;124:14,18;129:25;136:13;158:16;160:17;161:17;165:5;168:17;186:14;190:1,9,13;192:16;193:18
**moved (2)** 14:4;168:3
**movement (3)** 38:6;71:12;86:3
**movements (1)** 13:8
**Movers (1)** 187:15
**moves (12)** 22:5;55:25;56:6,14;57:17,19;63:16,17,21;64:7;71:10;87:8
**moving (21)** 10:23;21:22;22:9;27:14;51:9;54:12,18;57:23;61:19;62:6,19;64:19;72:21;124:6;128:24;141:12;144:17;145:6;165:2;168:1;170:4
**much (15)** 14:6,15;31:16;44:14;56:8;80:19;84:8;87:13,13;111:22;117:3;118:3;119:11;168:15;192:23
**multiple (8)** 12:6;63:14;145:1,17,23;146:2;181:9;193:15
**must (2)** 165:17;172:17
**myself (3)** 33:7;160:15;180:14

## N

**name (43)** 6:18;7:6,7;8:12;29:13;34:7,8,11;35:25;40:19;42:14;48:14;55:7;58:17;63:25;65:20;72:3,4;115:21,22;118:15,22,23;119:4,13;121:19;141:10,11;143:10;145:18;146:2;151:2,7,9;154:20,21,22,23,24;170:9;179:15;195:19;199:9
**named (1)** 59:9
**names (5)** 42:14;63:9,17;65:2;66:6
**name's (2)** 7:15;136:21
**naming (1)** 104:5
**Nancy (1)** 170:2
**national (9)** 17:13;31:25;41:19;44:9;82:25;83:3,6;172:7;186:3
**nature (5)** 11:7;80:25;81:15;82:17;154:13
**Naval (1)** 168:2
**Navy (1)** 188:6
**near (1)** 169:7
**necessarily (3)** 24:2;53:16;91:13
**necessary (1)** 116:11
**need (11)** 70:6;152:3;153:22,23;156:21;163:7;168:5;174:6,8;188:24;199:19
**needed (13)** 14:21;20:14;21:2;28:22;29:23;33:17;42:23;133:24;141:6;163:3;174:15;178:5,6
**needing (2)** 162:21,25
**needs (5)** 24:9;96:11;157:5;177:11;200:2
**neglect (1)** 119:3
**negligence (1)** 125:19
**negotiations (1)** 41:18
**neighborhood (2)** 15:9;44:5

**new (17)**
25:8;26:7,10,20;27:7,9;40:12;133:2,3,4;140:10,16;163:9,11;175:23;189:21,25
**newer (1)**
42:14
**next (14)**
45:25;52:1;53:2;66:17;70:1;115:5,8;130:15;142:17;146:22;158:16;164:15;193:12;194:1
**nice (1)**
35:12
**Nicholas (5)**
6:9;137:2;152:7,11;153:3
**Nichols (1)**
188:3
**nine (1)**
18:9
**nineties (1)**
36:2
**nod (1)**
70:13
**Nodding (1)**
90:11
**none (2)**
29:24;197:6
**non-Mayflower (3)**
23:9,13,21
**nonmilitary (1)**
22:6
**non-UniGroup (5)**
23:20;166:16,18;168:13;169:24
**non-UniGroup-based (1)**
167:14
**nope (3)**
59:15;195:18;197:5
**Norfolk (1)**
167:21
**norm (1)**
63:13
**normal (3)**
86:10;146:17;177:3
**normally (7)**
23:14;133:2;154:9;177:23;180:1,4;198:13
**Norris (1)**
59:10
**North (3)**
51:20;63:19;64:21
**North-West (1)**
187:15
**notation (1)**
167:5
**noted (1)**
148:17
**nother (1)**
56:1
**notice (8)**
120:8,17;125:9,21,23;131:13;147:4;160:2
**notified (2)**
121:1;175:22
**notify (1)**
114:24
**Number (37)**
6:12;16:6,7,7,13;23:15;27:2;41:1,7;43:8,9,11,11;44:3,15,15;46:21;66:24;67:12;78:5;79:7;94:9;101:16;104:13,14,15;109:25;122:17;123:4,14;124:25;129:14;146:5;161:24;170:10;171:24;176:25
**number/DOT (1)**
16:13
**numbers (3)**
46:23;77:8;188:23
**number's (1)**
79:16

**O**

**OA (13)**
21:4;24:17;27:22,22,23;28:7,11;29:1;87:21;103:11;175:8,17,24
**OA/DA (5)**
25:6;133:23;161:9;162:10;163:12
**OA/DAs (1)**
29:6
**Object (174)**
8:22,23;15:6;20:24;21:7,12;23:12;24:7;26:15;29:17;31:14;32:5,8,25;37:5;43:3;47:8,16;49:20;51:14,18;52:3,15,24;54:16;58:7,19;61:6;64:8,15,23;65:18;66:1,8,13;67:20;68:4;69:21;71:19;72:16,23;73:21;75:10,24;77:2,17,23;80:5;82:4;84:3;85:17;88:13;89:3;90:14,24;93:8;94:4,24;95:18,20,24;96:4,7,13,20;97:12;99:10;100:25;101:10,13;102:7;103:7;105:9;106:14,25;107:13;108:5,15,19;109:8,18;110:13,16,18;112:20;113:8,18,22;114:8;116:18;117:21;118:18;119:19,22;120:2,25;121:11;122:6;126:4,10;127:7,23;128:11;129:4,25;130:3,8;131:4,19;132:13;133:16;136:13,22;137:22;138:1,19;139:2,8;143:8;144:5;145:15;146:10;147:21;149:4,21;150:3,12;152:9,15,19;153:5;155:9;158:13;160:22;162:5,16;166:8;167:10;168:20,23;169:11,18;171:25;174:13;180:24;181:5,14;182:6,21;183:23;185:6,11,21;186:14;187:13;188:12;189:24;190:6,16;191:20,24;192:10,16,22,25;193:1,18,24;194:24;196:17;197:2,11,20,25
**objecting (1)**
93:11
**objection (3)**
43:6;71:9;158:23
**objections (3)**
58:19;95:3,6
**obligations (1)**
125:15
**obscured (1)**
190:20
**obtain (1)**
65:11
**obviously (8)**
87:12;135:14;143:18;144:16,23;145:6;149:6;200:3
**occasion (1)**
155:13
**occurred (4)**
25:9;124:22;149:2;150:4
**occurs (1)**
125:24
**off (25)**
20:19;27:2;43:4,17,21;45:3;50:5;65:7,13;100:2;115:11;135:15,19,21,23;174:18;178:3;183:3;186:18;188:10,19;190:15;192:9,23;199:6
**offer (1)**
53:19
**offhand (1)**
118:8
**office (5)**
15:23;40:9;84:18;156:22;176:11
**officer (1)**
179:22
**offices (2)**
60:7;183:15
**officially (3)**
24:13;134:3;161:11
**often (1)**
28:3
**Okey-doke (2)**
159:2;169:2
**old (3)**
9:16;42:13;153:19
**Once (6)**
25:4;149:7;154:9;155:17;177:22,23
**one (51)**
10:15;16:20;18:25;22:5;23:16;33:12;34:5;42:9;43:19;50:1;52:14;53:3;64:6,17;67:12;68:11;74:6;80:23;81:16;82:18;86:24;88:8;90:25;96:23;97:1;109:1;115:8;142:1,2,4;143:20;144:12,16,18,19,21;147:15;148:24;151:25;161:2;172:19;175:8;176:16;190:20,20,20;191:3,5,8;193:8;194:20
**ones (1)**
60:20
**one's (1)**
144:15
**ongoing (2)**
165:25;167:8
**online (11)**
12:1,2;49:11;84:15;106:1,2;110:25;112:15;154:7;156:25;174:21
**only (21)**
12:18;15:7;18:8;19:14;20:3;27:11;29:4;32:10;66:9;74:7;82:5;83:7;91:21;98:4,7;134:2,12;142:10;144:16;157:24;167:1
**open (1)**
112:11
**operasic (1)**
97:24
**operasics (1)**
98:5
**operate (6)**
16:3;54:19;60:19,21;111:23;113:19
**operating (14)**
71:2;72:17;75:8;85:6;95:16;96:18;101:21;109:1;111:15;116:12;128:16;131:12;138:17;179:23
**operation (6)**
10:19;22:8;76:21;77:22;97:25;124:7
**operational (6)**
15:21;105:2;153:22;173:12,19;178:13
**operationally (1)**
153:24
**Operations (12)**
18:11;34:21,22;36:5;39:16;111:21,23;129:10;158:5;163:9;173:17,25
**operators (3)**
96:12;106:9;116:16
**opposed (3)**
22:8;47:14;132:24
**order (28)**
11:23;13:5,8;14:19;17:20;21:3;22:24;23:15;31:17;37:10;39:21;97:23;102:25;103:9,10,18,24;104:10,21;106:1,3;110:20,23;120:14;161:12;162:8;187:18,20
**ordered (1)**
198:25
**ordering (2)**
199:8,17
**orders (10)**
12:23,24;13:5;26:7,18,24;33:13;112:16;163:13;174:15
**order's (1)**
104:12
**Organization (6)**
47:4;63:1;139:1;166:7,13;182:13
**organization's (1)**
60:19
**organized (1)**
47:25
**oriented (1)**
55:2
**origin (25)**
14:16,17,20;20:12;23:4;27:23,25;28:3,8,16,21,22,25;30:7;57:20;102:24;103:11,14,18,21;104:4,15,21;105:13;157:16
**original (2)**
133:6;200:4
**originate (1)**
103:24
**originated (1)**
23:9
**originates (2)**
20:11;103:22

**originating (3)**
103:1,19;104:4
**origination (1)**
106:17
**orthopedic (1)**
88:9
**others (1)**
151:24
**otherwise (2)**
118:21;178:11
**out (58)**
8:15;9:6;11:25;12:9;20:11;22:1;25:18;28:4;32:7;34:18;36:3;41:5;45:23;58:15;59:3,18;60:9,10,19,21;73:4;75:8;76:15;77:12;84:15;86:16;97:9;104:3,19;111:23;113:12;114:14;117:5;118:10;130:17;137:16;139:6;149:10,11;153:12,20;155:17;156:10;163:8,14,17;164:1,6;166:14,25;173:19;182:2;189:19;194:25;195:1,2,3;196:11
**outdated (1)**
113:3
**outside (6)**
23:20;54:12;56:16;60:3;85:18;169:23
**over (12)**
16:11;18:14;37:13;40:20;67:11;94:17;149:1;151:15,18;162:20;163:24;168:3
**overall (4)**
31:17;36:5;39:18;118:4
**oversaw (2)**
39:6;41:17
**oversees (2)**
89:18;102:21
**overview (1)**
42:25
**owed (1)**
121:3
**own (23)**
22:14;24:16;28:4;50:24,25;51:2;54:20;61:14;74:18;81:1;82:20;83:7;88:17;93:18;101:21;105:1;109:16;143:12;146:4;154:16;170:25;174:7;183:22
**owned (2)**
72:5;148:25
**owner (1)**
189:21
**ownership (1)**
141:8
**owns (1)**
98:21

**P**

**packed (1)**
157:17
**packing (3)**
14:18;28:9;106:10
**Padgett (3)**
7:16;78:14;79:10
**page (33)**
70:1;73:7;78:4,12,12,15,18,23;79:6,9,10,11,12;97:13;115:5;116:10;121:14,17;136:10,25;137:1,2;142:17;146:22;156:5,17,19;169:5;171:7;187:19,19;193:12;199:24
**pages (3)**
32:12;165:7;171:5
**paid (24)**
11:11;14:9,22,24;17:19;23:19;24:6;28:18;29:4,19;31:10;32:14,17;33:15;37:12;49:8;81:13,13;90:12;110:24;111:1;113:25;127:17;134:19
**paint (1)**
188:14
**painting (1)**
72:8
**pairs (1)**
45:16
**Pandemic (3)**
61:14;183:15,25
**paper (21)**
62:5;63:14,16,21,23;65:8,9,16;86:22;87:11,13,14,16;104:23;105:3;145:12;146:12;157:1,2,13,15
**paperless (2)**
105:2,3
**paperwork (7)**
37:9,9;89:13;177:4,11;178:10,16
**paragraph (14)**
85:19;93:24;110:1;111:17;115:5;125:1;127:15;129:6;153:14;156:20;162:19;172:15;174:5;175:6
**paragraph's (1)**
172:10
**parent (1)**
36:13
**part (18)**
10:15;30:4;35:10;49:23;50:17;51:2;52:4,7;54:17,24;88:4;98:15;108:4;112:13;117:17;118:12;133:7;141:18
**partially (1)**
190:20
**participate (3)**
70:24;71:6,16
**participating (1)**
6:16
**particular (9)**
12:25;18:17;20:18;26:22;83:16;101:16;110:12;150:1,2
**parties (2)**
116:11;200:8
**partner (1)**
45:9
**party (2)**
58:1;127:12
**passenger (1)**
8:5
**password (1)**
154:4
**pay (6)**
49:11;58:2;81:16;119:6;127:16,21
**paying (2)**
110:3;117:23
**payment (12)**
17:8,10;29:23;33:23;34:2;90:4;92:14,16;93:5;114:23;119:16;154:12
**payments (4)**
89:18;105:16;111:6,8
**pdf (1)**
199:23
**pdf's (1)**
199:22
**penalty (2)**
93:5;131:15
**pending (2)**
6:10;120:19
**people (19)**
22:19;33:18,22;37:13,16,17,19,20;41:2;43:1;56:14;61:14,16;87:7;96:6;102:15;176:19;183:15;190:9
**people's (4)**
10:24;16:25;17:2;122:5
**per (14)**
65:3,20;67:9;69:6;77:9;85:1;97:4;99:16;126:16;143:10;145:8;154:17;166:10;185:25
**perceive (1)**
72:19
**percent (14)**
14:14,15,18,20;15:1,9,10,12;31:22,22;32:2;41:8;86:22,24
**percentage (4)**
14:24;15:8;31:20;118:3
**perform (7)**
23:22;29:5;30:18;31:10;82:3;84:23;109:9
**performance (6)**
39:10;80:16,22;81:8,9;86:7
**performed (8)**
14:22;16:22;32:18;36:24;90:20;92:7;113:25;118:15
**performers (1)**
81:11
**performing (12)**
28:8,23;39:11,14,16,23;57:12;82:3,6,7,9;87:21
**performs (3)**
20:21;80:18;81:6
**perhaps (1)**
43:1
**period (18)**
13:1;24:23;25:3;27:6;29:6;42:1;76:23;92:15;119:7;121:4;129:18;130:18;133:21;134:1,5,12,18;167:2
**perks (1)**
81:12
**permits (1)**
15:25
**perpetuate (1)**
163:14
**person (5)**
17:12;34:10,12;140:7,8
**personal (6)**
17:2;38:3;58:22,25;59:2;68:6
**personally (2)**
121:13;153:12
**personnel (1)**
168:2
**persons (1)**
85:15
**person's (1)**
138:3
**perspective (1)**
179:25
**perspectives (1)**
193:8
**pertaining (2)**
97:18,22
**pertains (1)**
98:1
**pertinent (1)**
17:17
**Peterson (1)**
170:7
**phone (1)**
162:22
**photo (1)**
189:18
**photographs (2)**
188:23;196:16
**Photos (4)**
196:5,12,14;197:17
**phrase (1)**
20:6
**Physical (1)**
158:6
**physician (2)**
88:8,10
**pick (2)**
11:1;112:15
**picked (1)**
91:10
**picking (1)**
112:21
**pickup (2)**
90:22;187:23
**picture (12)**
22:22;23:25;36:5;99:12;151:19;189:2,14;190:18,22,22;191:2,14
**pictures (4)**
193:4,16;194:2;196:23
**piece (2)**
16:2;101:24
**pieces (2)**
56:14;161:22
**pilot (1)**
37:24
**pipeline (4)**
24:15;25:3;133:20;161:25
**place (27)**
6:13;17:17;19:14;26:11;29:25;86:21;92:8;101:3;109:23;147:19;148:1,8,16,21;149:8;157:25;160:9;161:14;162:10,21;163:3,7,10,20;168:3;171:18;175:18
**placed (1)**
198:3
**plain (1)**
127:3
**Plaintiffs (1)**
7:3

**plaintiffs' (2)** 186:19;188:20
**Plaintiff's (9)** 45:11,12;66:21; 123:8;135:24;139:14; 186:23;188:17;194:3
**plan (2)** 105:23;110:3
**planes (5)** 35:9;37:23,25;38:8, 12
**plans (1)** 41:10
**plate (1)** 198:16
**plates (10)** 129:20;131:12; 196:24;197:18;198:3, 6,9,12,13,20
**play (1)** 16:17
**please (3)** 7:6;124:20;181:24
**plural (1)** 172:16
**Plus (1)** 161:19
**pm (13)** 6:6;43:22;44:1; 45:4,7;115:12,16; 135:22;136:2;176:9; 183:4,7;199:5
**POD (1)** 62:10
**point (32)** 8:15;10:24,24; 14:17,19;15:8;16:3, 12,25,25;19:11; 28:24;29:7;30:7;38:6, 6;40:18,20;57:23,23; 61:22,23;65:25; 91:16;98:2,6;104:2, 18;106:21;112:5; 153:25;162:6
**pointed (1)** 38:22
**points (2)** 57:20,20
**policies (13)** 76:6;86:9;103:4; 105:7,23;107:2; 108:11;109:16;110:3, 6,9;116:12;125:16
**policy (4)** 77:5;109:21,22; 117:2
**pool (1)** 108:4
**pooling (2)** 105:22;110:3
**poor (1)** 82:2
**poorly (1)** 82:7
**popped (1)** 65:13
**portal (6)** 153:16;154:5,7; 155:16,17,19
**pose (1)** 23:1
**position (7)** 10:18;18:21; 142:23;151:12,20; 155:3,6
**possible (4)** 156:23;160:23; 180:13,15
**possibly (2)** 17:3;21:25
**pot (1)** 75:23
**Potential (1)** 167:12
**potentially (3)** 28:8;29:1;140:13
**pounds (1)** 12:12
**power (2)** 121:21;123:18
**preceded (1)** 182:16
**preceding (1)** 196:20
**prepaid (3)** 90:2;91:19;93:22
**preparation (3)** 17:23;19:3;67:7
**prepare (2)** 14:16;20:18
**prepared (2)** 69:19;86:8
**prepares (1)** 185:5
**preparing (1)** 28:9
**prepay (2)** 90:16,20
**prepayment (4)** 91:21;92:6;94:11; 114:7
**present (5)** 6:3,15;76:24; 115:14;125:14
**preserved (1)** 189:20
**president (1)** 141:16
**presume (6)** 146:25;149:19; 152:13;155:2;171:13; 187:8
**pretend (1)** 56:25
**pretty (3)** 17:10;44:22;87:13
**prevent (1)** 108:22
**Prevention (1)** 196:3
**previous (1)** 34:16
**previously (2)** 105:10;183:25
**pricing (5)** 17:14,15,17;42:2,4
**prime (1)** 168:1
**print (1)** 104:19
**Prior (10)** 16:9;19:20;21:20; 80:24;114:18;115:3; 120:7;125:23;149:14; 160:7
**private (1)** 71:23
**probably (21)** 7:11;15:8;24:8; 25:17,18;32:11; 37:18;40:13;44:5; 52:4;68:21;75:17; 81:24;83:12;89:19; 91:11;151:22;172:18; 173:20;180:13;189:1
**problem (1)** 8:24
**procedure (1)** 106:6
**procedures (2)** 108:11;125:16
**PROCEEDINGS (1)** 6:1
**process (34)** 13:4;19:9;57:22; 61:19;86:23;88:15; 89:15;92:4;93:20; 105:18;106:2,3; 112:15;135:4;141:9; 146:7,18;148:5,15,20; 149:7,9;152:21; 160:17;162:22;163:4; 165:6;173:8;174:4; 181:2,18;183:20; 198:5,17
**processed (6)** 38:4;114:23; 156:21;157:12,13,14
**processing (3)** 88:1;157:7;178:11
**produce (1)** 187:11
**produced (3)** 7:2;13:9;194:15
**product (7)** 16:24;17:3;39:12; 53:20;62:10;86:3; 100:12
**products (2)** 10:24;62:19
**professional (1)** 26:16
**profile (1)** 182:1
**program (3)** 88:5,12,14
**programs (1)** 88:4
**progress (1)** 100:13
**prominent (1)** 129:14
**Promote (5)** 65:11;73:14;82:23; 83:3,21
**promoting (1)** 83:25
**promotion (1)** 42:18
**prompt (1)** 9:3
**promptly (4)** 93:24;97:17;98:8; 111:15
**properly (4)** 37:10;62:5;98:10; 107:18
**property (7)** 17:3;85:13;115:20; 118:16;129:10,13; 131:11
**Proprietary (7)** 88:22,23,24; 104:24;157:8,21; 174:19
**protected (1)** 88:21
**provide (12)** 12:21;15:24;83:2; 84:9,15;106:8,19; 107:14;111:12,20; 185:9,16
**Provided (4)** 15:19;82:21;93:23; 185:19
**providing (4)** 56:5;84:21;112:14; 134:24
**provision (3)** 112:18;122:1; 128:10
**Provisions (3)** 78:10;115:19; 183:22
**public (3)** 71:23;179:13; 180:21
**pull (3)** 33:9;109:15;112:11
**pulled (1)** 172:6
**pulling (1)** 156:11
**purpose (5)** 48:2;73:18;131:8; 134:14;161:16
**purposes (1)** 134:24
**put (19)** 9:19;12:6;13:10; 24:21;44:4;56:13,17; 61:22;66:5;87:20; 106:1;108:12;122:17; 130:13;131:13;137:4; 154:4;161:13;163:25
**putting (3)** 97:9;108:3;184:19

## Q

**qualif- (1)** 138:23
**qualified (15)** 106:9,13,16,23; 108:4,13,23;109:11; 122:5;138:13,15,20, 21,23,24
**quasi (2)** 173:11,16
**quick (1)** 75:3
**quickly (1)** 152:25
**quite (4)** 12:2;28:3;65:21; 83:24

## R

**Rae (7)** 169:2,6,8,12,15,25; 170:11
**raise (3)** 6:21;128:7,8
**raised (2)** 9:12;59:10
**ran (1)** 168:22
**range (2)** 82:7;89:11
**rank (1)** 36:3
**ranked (3)** 81:22,25;82:2
**ranking (1)** 81:19
**rate (2)** 17:20;69:9
**Rates (4)** 35:20;41:25;42:2; 110:5
**rather (1)** 126:19
**Re- (1)** 55:3

**reached (1)** 29:10
**read (24)** 45:17;46:7,10,10, 14,15;71:4,25;73:16; 85:8;97:20;106:11; 116:13;118:25;120:8; 129:21;155:11; 158:17,25;160:19; 164:12;171:20; 196:19;198:24
**reading (6)** 50:5;65:7;94:3; 103:16;112:17; 186:13
**ready (4)** 30:11;67:6;186:25; 187:1
**real (6)** 67:18;75:3;84:1; 127:1;188:24;193:11
**realize (2)** 38:17;94:10
**really (11)** 19:13;35:25;36:4, 14;46:12;49:21; 107:3;117:4;118:6; 134:2;162:14
**reason (5)** 30:5;103:23;107:8; 127:13;180:12
**reasonably (1)** 113:23
**reasons (2)** 41:7,8
**reassigned (1)** 181:24
**receipt (1)** 120:17
**receive (1)** 29:23
**received (1)** 144:21
**receives (1)** 28:23
**receiving (1)** 87:25
**recently (1)** 190:11
**recess (4)** 43:23;45:5;115:13; 183:5
**reckon (1)** 193:21
**recognize (1)** 147:5
**recognized (3)** 88:5;112:24;183:13
**recognizes (1)** 115:20
**reconsidering (1)** 189:22
**record (22)** 6:17;24:2;37:19; 43:18,22;44:1;45:4,7; 115:12,16;135:19,22, 23;136:2;180:23; 182:5;183:4,7; 186:18,22;188:19; 199:6
**records (9)** 86:5,6,12;87:6,7; 88:2,7,9;89:24
**recourse (2)** 131:14;132:11
**red (2)** 194:19;195:2
**redaction (1)** 182:19
**redesignate (1)** 175:23
**redesignated (1)** 175:20
**Redirect (1)** 158:24
**refer (2)** 79:13;102:19
**reference (6)** 123:11;130:22; 134:8;158:7,10;174:5
**referenced (4)** 138:14;166:23; 172:20;173:22
**references (4)** 70:2;90:1;131:12; 172:15
**referred (1)** 176:8
**referring (6)** 26:3,24;46:20; 79:16;85:19;122:1
**reflect (1)** 130:25
**reflected (1)** 6:16
**refuse (1)** 119:3
**regard (2)** 9:2;149:25
**regardless (5)** 28:19;56:2;107:22, 23;172:19
**regional (2)** 39:7;40:4
**regionals (1)** 40:4
**regions (3)** 39:7,8;40:1
**register (7)** 21:3;30:13;97:23; 101:19,20;105:20; 163:11
**registered (14)** 11:24;22:24;29:22; 100:18;101:24; 104:12;110:22;111:3; 112:22;135:6;138:13, 17;163:13;183:19
**registering (1)** 105:24
**registers (1)** 106:2
**registration (5)** 101:18;102:16,22; 104:10;106:3
**registrations (1)** 139:4
**regret (1)** 143:2
**Regroup (1)** 55:4
**regulations (2)** 90:19;94:13
**reinforce (1)** 164:2
**relate (1)** 86:6
**related (4)** 85:21;86:25;170:2; 171:19
**relations (1)** 59:13
**relationship (8)** 8:11;83:9;96:24; 97:2;129:16;138:7; 149:20;192:14
**relative (4)** 94:16,19;102:15; 185:13
**relatives (4)** 44:17;58:16;59:3,5
**relay (2)** 97:17,21
**release (1)** 114:25
**released (1)** 114:24
**releasing (1)** 114:19
**relevancy (2)** 58:10,14
**relevant (1)** 37:18
**relocation (3)** 41:20;54:8;55:18
**remain (2)** 30:23;126:11
**remained (1)** 155:15
**remember (2)** 40:19;140:6
**remind (1)** 46:25
**remit (3)** 93:24;114:2;121:9
**remittance (2)** 117:25;128:1
**remitting (2)** 117:13;190:14
**remotely (2)** 6:16;61:15
**removal (3)** 147:7;158:20; 163:22
**remove (6)** 129:18;130:19; 149:10;152:7;188:13; 192:9
**removed (5)** 152:3,25,25;153:9; 181:25
**removing (1)** 153:3
**render (1)** 110:7
**rendered (1)** 30:1
**rendering (3)** 70:25;71:7,16
**renew (1)** 126:2
**rep (15)** 9:10;33:1;40:4; 47:9;64:9;68:7,9; 72:24;102:8;107:1; 131:20;132:14;150:6, 10;153:6
**report (5)** 151:14;170:23; 179:18;181:24,25
**reported (2)** 148:18;149:1
**reporter (15)** 6:18,21;70:9,13; 71:11;121:16;187:5, 6;199:3,7,12,15,18, 21,25
**reporting (1)** 170:22
**reports (1)** 182:16
**represent (8)** 7:17;73:22;78:6; 79:21;80:3;166:25; 175:24;189:5
**representation (2)** 83:8;194:22
**representative (7)** 89:21;93:17; 150:24;151:2,10; 181:8,17
**representatives (2)** 19:11;132:7
**represented (3)** 11:18;18:9;143:20
**representing (5)** 18:20;48:15;83:21; 122:18,20
**represents (1)** 48:11
**reps (2)** 40:4,5
**request (6)** 127:25;130:18; 162:2;181:21,21; 182:15
**requested (3)** 130:13;196:25; 197:16
**requesting (2)** 159:21,23
**requests (2)** 160:5;179:11
**require (7)** 29:8;90:19;93:3; 126:12;138:10;141:8; 183:11
**required (26)** 16:14;22:16;28:24; 29:5,18,19,20;30:15, 19,25;32:10;76:5,11, 12,17,22;77:12;84:8; 86:17,24;87:19,22; 88:16;90:17;104:12; 198:13
**requirement (2)** 73:19;76:10
**requirements (6)** 22:13,14;76:18,20; 83:17;107:16
**requires (6)** 62:7;70:17;77:5; 92:4;183:22;198:19
**residence (1)** 103:25
**residential (7)** 42:6;44:8;81:3,4; 82:19;94:14;166:21
**residents (1)** 115:1
**resolve (1)** 123:19
**resolved (1)** 121:6
**resource (4)** 106:20;107:15,15; 126:7
**respectively (1)** 26:5
**respond (1)** 160:2
**responded (1)** 181:22
**response (3)** 64:14;83:23;180:22
**responsibilities (3)** 24:21;102:20; 125:12
**responsibility (12)** 25:8;30:17;70:2,16; 84:23;91:14;97:8,9; 103:8;153:3;162:17; 173:17
**responsible (8)** 36:22;38:1;68:1;

69:10;86:23;119:25;
173:1;199:1
**rest (1)**
158:17
**restructured (1)**
48:4
**result (1)**
131:17
**resulted (1)**
169:10
**retained (1)**
127:18
**retaining (1)**
166:6
**retention (1)**
128:5
**return (2)**
129:19;198:13
**returned (4)**
101:5;172:23,24;
173:7
**returning (1)**
135:15
**R-e-v (2)**
55:10,11
**revenue (17)**
15:2,2,3;18:12;
28:10;34:23,24;
36:15,21;37:15,22;
52:19;71:17;86:13,
18;89:9;163:19
**revenues (3)**
28:23;36:23;43:2
**RevGroup (4)**
55:8,10,11,14
**review (5)**
47:12;67:8,10;
89:13;179:12
**reviewed (5)**
17:22;18:16;19:3;
69:14;146:25
**reviewing (1)**
87:17
**RFP (1)**
41:22
**RFPs (1)**
41:23
**right (118)**
6:21;7:23,24;9:6;
10:12;12:3;15:18;
16:9;20:1;23:25;33:5;
34:8;35:17;40:24;
42:8;46:15,22;48:6;
50:1,1;51:8;52:2;
55:3,17;59:22,23;
60:7,25;61:1,13;
62:16,22;63:1;64:16;
66:12,17;67:11,22;
68:17;69:2,23;70:4,
19;71:18;72:2,11;
73:2;74:12;78:20;
79:6,18;86:10,15;
90:1;95:10;96:14,21;
97:16;99:11;115:18,
20;116:9,17;117:22;
118:17,25;119:9;
120:8,13;121:20;
122:25;123:18;124:4;
125:9,22;128:4,10,24;
132:19;134:6,11,20;
138:18;146:23;147:9,
22;148:4;152:5;
157:22;158:2,8;
159:3,12;160:25;
164:12;165:4;166:3;
167:11,19;168:5,22;
172:1;175:6;176:6;
177:9;178:24;180:22;
182:5;184:7;185:2;
186:13;187:4;188:11,
15;189:17;195:5;
196:9;197:10
**righty (5)**
128:20;139:16,22;
171:12;198:22
**rise (1)**
34:17
**Risk (5)**
77:24;78:1;102:11;
196:1,2
**road (1)**
113:11
**Rob (21)**
128:24;130:10;
131:2;132:2;135:12;
141:15;146:23;147:3;
152:4;159:5,14;
160:15;164:21;
165:15,16;171:12;
175:21;178:18;
190:11;195:16;
196:22
**Rob's (1)**
166:6
**rode (2)**
9:19;193:21
**role (8)**
16:16;18:23;34:19;
35:21;40:11,12;
132:25;133:8
**roles (2)**
34:20;36:1
**roll (6)**
36:13;48:19,20,25;
66:14;75:25
**rolls (2)**
48:24;60:14
**room (1)**
93:6
**rough (4)**
43:8,9,11;44:3
**rounding (2)**
147:13;178:3
**route (4)**
13:1;98:6;112:12;
114:13
**run (2)**
160:5;196:21
**rural (1)**
81:1
**Ryan (4)**
6:2;7:16;76:24;
199:19

**S**

**S- (1)**
176:16
**safe (2)**
97:9;116:16
**safety (20)**
15:21;96:11;97:11;
101:18;102:9,10,13,
21;139:3;148:10;
149:10;151:5;179:4,
6,13,25;180:4,17,21;
181:23
**saith (1)**
7:3
**sales (4)**
39:16;83:4;84:21;
178:13
**sales/ (1)**
158:4
**same (21)**
28:1;43:6;47:2;
51:5;67:2;75:23;
81:14,18;93:24;
114:2;140:7,8;
144:15;146:6;164:2,
7;165:15;169:5;
171:3;176:6;194:8
**sample (2)**
141:21;144:23
**satisfy (2)**
125:12,14
**saw (1)**
174:14
**saying (8)**
23:6;52:9;89:7;
104:11;113:10;
117:18;138:22;173:3
**SCAC (1)**
63:11
**S-C-A-C (1)**
63:11
**scanned (2)**
156:21;157:2
**schedule (1)**
92:22
**school (1)**
9:24
**schools (1)**
9:21
**Schuckalo (6)**
140:22,25;142:20;
164:16,22;165:16
**S-c-h-u-c-k-a-l-o (1)**
140:24
**scope (2)**
70:18;131:1
**se (14)**
65:3,20;67:9;69:6;
77:9;85:1;97:4;99:17;
126:16;143:10;145:8;
154:17;166:10;
185:25
**second (12)**
43:14,20;135:20;
136:10;137:1,2;
156:5,19;162:19;
172:9,15;190:22
**seconds (1)**
139:18
**sector (1)**
154:14
**secures (2)**
102:25;103:18
**seeing (5)**
65:2;78:18;129:5;
144:19;179:5
**seek (1)**
131:14
**seem (2)**
91:12;180:5
**seems (3)**
80:13;114:4,4
**sees (1)**
83:7
**select (2)**
96:16,17
**selected (1)**
97:3
**sell (3)**
17:1;80:9;126:8
**selling (3)**
78:7;79:22;85:1
**send (7)**
86:24;88:16;94:2;
132:6;165:1;173:5;
196:12
**sending (1)**
196:23
**sends (2)**
196:7,11
**senior (6)**
18:24;34:9;35:24;
42:21;89:17;151:13
**sense (6)**
92:21;96:11;
104:16;161:3;173:19;
180:6
**sent (11)**
131:6;135:12;
157:5;159:19,20;
164:16;165:14;
176:15;178:18;179:8;
180:19
**sentence (3)**
73:3;80:6;158:17
**sentences (2)**
73:9,10
**separate (12)**
22:7;28:2;31:18;
50:13,17,24;117:16;
145:14;146:5,16;
172:12;185:4
**separately (2)**
73:23;145:18
**separation (1)**
141:19
**sequence (1)**
196:19
**series (1)**
194:2
**serious (1)**
129:12
**serve (1)**
39:24
**service (19)**
13:6,9;18:12;29:9;
34:25;39:25;40:24;
56:16;66:9;72:4;
90:20;92:7;111:20;
113:13;115:21;134:9;
143:3;146:4;176:10
**serviced (1)**
110:5
**services (57)**
14:1,22,23;15:19;
20:14,18,21;23:23;
25:7;28:9,10,22,24;
29:5,18,19,20,22,24;
30:1;31:10,19;32:18;
36:24;48:8,18;49:5;
50:2,8,10;52:12;53:2;
55:15,21;56:5;57:12;
58:2;70:25;71:7,17,
22;73:15;78:7;79:23;
80:9;82:12,16;84:20;
110:2;111:13;112:14;
113:24;114:2;118:15;
134:15,25;186:4
**servicing (1)**
146:15
**SESSIONS (5)**
199:10,10;200:1,1,
2
**set (4)**
104:7;112:12;
113:5;137:3
**setting (2)**
13:20;47:14
**seven (3)**
37:16,22;56:24
**seventies (1)**
11:13
**several (2)**
147:18;193:4
**severe (1)**
85:24
**shadows (1)**
193:1
**Shaking (1)**
108:9

**shall (17)**
76:4;78:25;79:3,19;86:8,10;109:25;110:9;118:22;119:2,6;121:20;123:18,24;125:11,22;127:16
**shared (1)**
97:8
**shareholder (1)**
143:13
**sharp (1)**
45:22
**sheet (2)**
33:9;104:19
**shield (1)**
186:11
**ship (1)**
61:20
**shipment (37)**
17:12,15;20:10,16;21:16;23:3,13;26:2;28:4,6,19;29:22;30:4;31:24;66:4;71:10,13,13,14;87:24;91:19;94:17;100:16;103:1,19;105:12,18,25;111:1,2;112:11,13;114:10,11,19;135:3;171:17
**shipments (56)**
11:19;12:5,7,8,20;13:1;14:4,13;15:14;21:19;24:15,20;25:2,5,8;26:3,4,22;27:4;36:23;61:24;62:2,7;65:12;71:23;85:5;90:2;93:22;97:18;103:23;105:21;106:10;111:13,25;112:2;113:25;120:15;133:20,23,25;134:10,16,17;135:1,5;142:14;161:8,13,24;163:11;174:6,6,7;175:7;177:4;178:11
**Shipment's (1)**
98:5
**shipped (1)**
157:18
**shippers (1)**
71:24
**shipping (2)**
156:20;157:11
**shippters (1)**
71:24
**shooting (1)**
82:8
**short (1)**
26:7
**shot (1)**
45:25
**show (3)**
62:20;110:23;174:23
**showed (1)**
174:23
**showing (2)**
101:16;197:17
**shown (1)**
179:22
**shows (1)**
196:4
**sic (1)**
192:7
**side (8)**
8:2;72:14;77:4;84:8;136:21;169:17;176:20,22
**Siess (2)**
176:16,21
**S-i-e-s-s (1)**
176:17
**sight (2)**
45:20;156:11
**sign (1)**
67:16
**Signa- (2)**
136:17,17
**signage (7)**
129:19;130:19;131:11;147:8;158:20;159:24;163:22
**SignalHire (3)**
136:4,5,18
**signature (1)**
200:9
**signed (11)**
37:9;86:25;87:3;133:8;135:10;140:3;144:12,21;157:4;162:9;165:17
**significant (1)**
85:25
**signing (1)**
132:23
**similar (2)**
52:10;62:12
**simple (5)**
13:16;32:15;67:19;127:3;169:23
**Simply (1)**
106:1
**singular (1)**
172:16
**Sirva (1)**
51:21
**SIT (4)**
30:13;80:18;98:7;103:22
**situation (3)**
18:19;124:9;133:1
**six (6)**
18:10;37:15,22;39:8;40:3;48:7
**size (2)**
161:2,20
**skip (1)**
102:23
**Skipping (2)**
86:4;124:25
**sky (2)**
82:8;98:11
**skyscraper (1)**
61:4
**slip (1)**
7:12
**Sloan (6)**
6:2,8;7:17,18;8:6;115:14
**slow (2)**
35:15;64:4
**slower (3)**
35:5,6,14
**smaller (4)**
37:17;44:14;61:24;62:2
**Smith (2)**
11:22,22
**snapped (1)**
197:17
**sneak (1)**
18:2
**sold (6)**
53:22;126:6,14,25;127:1;141:3
**soldiers (1)**
168:2
**sole (2)**
121:20;123:18
**solely (3)**
70:17;129:18;134:24
**solemnly (1)**
6:22
**solicit (5)**
70:24;71:6,16;82:12,15
**solicitation (1)**
72:7
**Solutions (1)**
55:18
**somebody (10)**
32:14;52:8;55:6;85:16;89:10;100:10;106:20;108:22;155:3;158:25
**somebody's (1)**
107:5
**somehow (1)**
173:17
**someone (2)**
108:17;174:2
**sometimes (3)**
8:23;57:24;100:1
**somewhat (1)**
36:25
**somewhere (4)**
12:15;44:4;49:5;124:18
**sons (1)**
59:15
**soon (1)**
156:22
**sophisticated (1)**
87:18
**sorry (19)**
37:6;38:9;52:5;55:9;66:11;71:11;73:8;100:1;130:11;132:4;135:22;156:10,11,12;164:18;173:24;194:14;195:19,20
**sort (9)**
22:7;37:24;112:9;140:19;164:8;170:24;171:3;173:11,16
**sought (2)**
132:11;182:19
**sounds (6)**
13:21,22;36:4;94:1;140:18;196:15
**source (1)**
168:1
**South (5)**
6:14;35:14;44:18;59:6;148:10
**Southern (2)**
6:11;38:19
**space (1)**
112:5
**speak (6)**
24:10,12;35:14;75:23;180:23;182:5
**speaking (4)**
58:19;95:3,6;197:15
**speaks (1)**
174:21
**spec-com (1)**
62:20
**special (2)**
17:3;62:18
**specific (10)**
22:15;24:9;32:6;43:10;68:5;84:7,13;116:2;149:15;166:12
**specifically (4)**
26:24;32:20;69:13;127:11
**specifics (5)**
22:17;77:19;83:24;116:19;185:16
**Speed (1)**
171:11
**Spell (1)**
154:24
**spelled (4)**
76:15;77:12;130:17;164:6
**spend (2)**
69:25;176:12
**spent (6)**
34:22,24;35:1,1,21;176:11
**spread (3)**
91:1,3,6
**square (1)**
61:9
**St (18)**
6:15;9:13,22;10:2,5;11:21,22;12:9;20:10,11;28:5;59:10,16,22;60:2,11,17;112:5
**staff (2)**
34:4;57:25
**stage (1)**
98:3
**STAHL (2)**
199:16,16
**stamp (9)**
46:21;66:19;78:13,14,15;115:18;156:8;188:22;194:13
**stamped (2)**
67:3;194:6
**stamps (1)**
79:14
**stand (2)**
27:22;179:24
**stand-alone (3)**
50:25;93:18;170:25
**Standard (6)**
6:7;67:13;68:9;94:20,25;95:5
**standardization (1)**
105:17
**standards (3)**
107:19;116:12,15
**standby (5)**
43:25;45:6;115:15;136:1;183:6
**standing (4)**
27:15,17;29:12;39:22
**standpoint (3)**
57:4;90:23;174:1
**stands (1)**
153:18
**Star (1)**
64:21
**start (2)**
50:21;154:18
**started (9)**
10:14,17;34:18,19;42:12;50:12,15,23;62:23
**starts (2)**
29:8;63:4
**state (7)**
74:6,8;80:20;148:3,6,13;150:2
**stated (4)**
94:6;105:10;158:19;179:19

**statement (10)**
82:6;90:16;97:20;110:11,24;111:4;112:10;121:2;163:17;166:11
**statements (7)**
86:6;110:8,9;111:7,9,10;121:13
**States (13)**
6:10;39:8,13;40:22;42:2;51:10;54:13;74:4,5;146:17;148:2;182:3;188:6
**stating (1)**
22:23
**station (1)**
99:20
**status (1)**
97:24
**stay (2)**
41:11;43:15
**Stealth (1)**
64:20
**Steis (3)**
176:15,24;178:19
**S-t-e-i-s (1)**
176:16
**Stelfox (1)**
6:19
**stenographic (1)**
6:17
**step (1)**
124:11
**steps (1)**
58:3
**Steve (6)**
195:17,18;196:12,15,22;197:14
**still (40)**
15:13,16,17,25;17:19;24:15;30:9;31:15,16;32:2,9;45:20;46:7;48:19;49:4;62:4;75:17;84:19,22;87:17;92:7;120:15;123:15;125:3,5;133:19;149:19;153:23;154:11;161:10,11,14,24;163:19;170:11,14;191:19,22;192:14;197:7
**stopped (2)**
158:18;180:10
**storage (11)**
20:16;21:22;27:14;30:2,6,13,18,24;64:19;141:12;170:4
**store (1)**
134:10
**strategic (2)**
143:25;144:3
**Street (1)**
6:14
**strict (1)**
73:19
**strictly (1)**
105:22
**strike (11)**
93:9;108:6,16;109:19;123:10;130:1;136:14;152:17;186:15;192:17;193:19
**strong (1)**
42:22
**structure (24)**
14:12;17:9,18;22:18;32:1,12,17;36:11;47:4,7,15;48:23,23;56:1,17;65:16;81:14,18;88:18;117:17;123:8,14;128:17;145:12
**structured (6)**
42:1;60:16,22;63:20,23;86:25
**structures (5)**
17:10;60:14;65:23;105:11,16
**structuring (2)**
56:6,15
**stuff (11)**
45:17;46:7;88:16;114:5;137:25;150:11;184:19;186:8;188:10;191:19;192:9
**sub (1)**
63:14
**subcontract (1)**
81:3
**subject (2)**
127:5;196:5
**subletting (1)**
57:11
**submit (1)**
185:10
**subparagraph (8)**
82:11;97:13,16;116:10;120:16;125:1;127:10,15
**Subsidiaries (1)**
47:4
**substance (3)**
9:8;96:1;159:15
**substandard (1)**
139:7
**subtract (1)**
140:19
**suburb (1)**
60:11
**Success (10)**
18:24;35:24;42:12,15;69:11;80:14;82:14;107:9;151:13,16
**successors (1)**
129:8
**Sue (2)**
179:2,4
**suitable (5)**
111:15;112:18;113:2,7,16
**sum (1)**
119:8
**summarize (1)**
103:5
**sums (3)**
118:14;120:18,24
**superior (2)**
142:23,25
**supervisor (2)**
34:23;36:22
**supervisors (1)**
34:4
**supplement (2)**
84:21;112:16
**supplemental (3)**
89:18;111:6,8
**supplier (2)**
33:23;34:2
**suppliers (2)**
107:15,16
**supply (1)**
138:10
**supposed (9)**
45:23;82:15;85:10,11;94:1;100:21;101:4;172:21;173:5
**sure (38)**
7:25;18:1;21:19;30:16;32:20;37:1;38:21;39:11,13,17,20,24;43:16;45:2;46:10,25;48:16;79:5;87:24;94:7;103:10;104:5;114:16,17;120:3;133:24;144:20;151:25;161:14;163:6,10,15;164:9;173:18;174:24;190:5;198:25;200:5
**surely (1)**
126:20
**surgery (1)**
45:25
**surveys (1)**
39:15
**swear (2)**
6:19,22
**sworn (1)**
7:2
**system (74)**
10:16;15:13,14;19:21;21:4;22:23;23:17;24:2;32:10,13;33:7,8,12,14;34:11;42:4;51:3;53:16;66:10;76:1;87:18,18;89:6;91:7;98:17,18;102:1;104:11,24;105:2,2,3;110:23;112:1,3,6,22,24,25;113:4;120:15;123:14;128:18;135:6;138:13,18;140:11,17;142:14;148:19;149:6,11,11;152:18;153:24;154:2,7,8;155:7;156:25;157:25;158:2;161:8;163:11;167:1;174:21;177:2,5,10,22;178:8,11,15,24
**systems (5)**
84:16;98:12;153:15;155:11;176:18

**T**

**T- (1)**
93:7
**tabled (1)**
42:3
**Tabling (2)**
35:20;42:3
**talk (10)**
11:22;30:5;43:14;89:10;91:12;126:19;163:22;169:15;171:15;199:9
**talked (7)**
17:24;18:2;31:22;114:5;141:25;145:13;172:11
**Talking (18)**
27:2;38:16;62:11;68:13;74:23;78:12;90:23;98:1;113:9;114:3;117:9;134:20;141:11;154:18;159:6,21;179:9;194:20
**talks (1)**
94:15
**tariff (1)**
42:2
**tariffs (3)**
17:16;35:20;41:25
**Taylor (4)**
190:1,8,13,13
**team (6)**
37:15,16,21,22;38:1;87:7
**technically (8)**
12:4;16:23;23:17;24:24;42:15;74:10;103:15;178:3
**Technologies (3)**
173:4,9,14
**technology (5)**
100:15;154:14;155:20;176:19,22
**telephone (1)**
159:7
**telling (5)**
26:12;93:13;102:4;152:4;175:21
**tells (1)**
110:25
**Temporary (29)**
19:22;24:3,8,22;27:11;43:23;45:5;115:13;120:14;130:16;132:20,25;133:6,14;134:8,13,14;140:4;141:22;142:2,13;144:11;145:1,5;161:13,17;165:1,18;183:5
**ten (4)**
31:2;120:7;125:9,23
**tequila (1)**
95:19
**term (22)**
13:6;24:8,23;25:20;28:2;51:15;56:12;57:16;60:15;63:23;88:20;92:11;135:8;136:4;138:22,24;146:15;152:20;153:19,21;180:1;198:11
**termed (2)**
66:2;98:19
**terminate (13)**
107:10;120:6;125:10,20,23;133:7,13;148:23,24;161:11;180:7;183:12;192:20
**terminated (13)**
24:13;102:2;120:11;127:12;130:12;139:5;142:8;155:14;161:5;180:18;192:18;197:23,23
**terminates (3)**
135:9;154:9;177:23
**terminating (2)**
126:21;183:9
**termination (33)**
19:7,12,20;24:18;27:10;69:14,15;118:20;119:6,17;120:17;123:25;125:24;126:19;127:14;131:7;149:7,25;152:24;154:10;158:20;159:22;160:10,12,18;161:3;162:22;163:4,18;164:1,6;177:25;184:3
**terminations (1)**
18:25
**terms (9)**

32:23;33:24;53:19;
77:18,21;114:7;
115:3;125:11;169:15
**term's (1)**
56:10
**testimony (3)**
6:22;9:8;131:3
**Texas (6)**
11:21;20:10,13;
28:6;30:9;31:8
**thanked (1)**
135:14
**therefore (1)**
142:6
**Theresa (5)**
34:12,14;89:17;
110:17;118:11
**they/were (1)**
18:19
**thinking (3)**
22:1;97:25;151:10
**third (5)**
58:1;190:18,22,24;
193:8
**thorough (1)**
143:23
**though (9)**
15:16;29:21;45:18;
64:13;132:25;142:8;
174:4;181:3;193:10
**thought (8)**
38:14;50:19;62:13;
78:17,18;135:16;
165:20;182:12
**thousand (2)**
33:13;61:10
**three (10)**
9:17;12:8;37:16,20;
59:15;61:9;64:18;
161:22;171:5;193:6
**three-story (1)**
61:8
**three-year (1)**
80:24
**ticket (1)**
13:9
**tickets (2)**
15:16;87:1
**tier (1)**
48:6
**Tim (11)**
132:20,23;139:23;
140:18;160:15;
162:20,23;164:25;
165:15;176:24;
178:18
**Timeframe (4)**
11:12;27:13;143:7;
194:8
**timeframes (2)**
11:24;32:14
**timeline (2)**
19:14;163:14
**timelines (2)**
18:22;19:8
**timely (2)**
87:23;125:14
**times (3)**
76:4;86:10;148:4
**tiny (1)**
188:24
**tires (1)**
113:15
**title (3)**
139:23;195:25;
196:4
**titled (1)**
66:18
**TMM (13)**
25:12,20;92:10,13,
16,22;93:16,20;94:8,
21;166:23;170:9,9
**Today (7)**
12:12;16:14;19:3;
31:23;42:15;87:10,17
**Today's (2)**
6:5;193:22
**together (5)**
12:6;13:10;24:21;
56:14;79:18
**told (3)**
50:19;68:22;129:2
**tomorrow (1)**
196:13
**tonnage (1)**
112:7
**took (15)**
13:1;19:7,14;24:22;
35:22;36:19;40:12;
86:21;87:6;101:3;
133:24;149:24;160:9;
163:20;172:18
**tools (1)**
84:24
**top (11)**
27:2;43:4;47:18,19;
48:6;65:15;68:17;
70:2;79:5;135:15;
196:21
**total (7)**
12:12;49:25;50:2;
52:12;53:1;92:10;
170:8
**totally (2)**
51:3;118:13
**touched (2)**
159:4;173:10
**toward (1)**
83:5
**town (2)**
28:5;59:20
**track (2)**
100:13;121:12
**tracking (1)**
100:14
**tractor (15)**
8:2;12:13;53:13;
90:8;95:16;100:23;
101:7;113:9,15,20;
149:15;150:1;158:11;
172:12;180:10
**tractors (9)**
72:15,21;96:6,19;
116:6;147:8;148:2;
198:4,4
**Trade (5)**
62:20;72:4,4;
115:22,22
**trademark (6)**
72:4;115:21;
118:23;119:4,13;
121:19
**trademarks (2)**
152:2;153:9
**traditional (1)**
61:21
**trailer (6)**
25:24;184:19;
189:8,9;190:20;193:5
**trailers (7)**
12:13;53:13;147:9;
159:25;191:4,12;
193:9
**Trans (2)**
53:9,21
**trans- (1)**
98:15
**TRANSCRIPT (1)**
6:1
**transcripts (1)**
199:8
**TransDocs (3)**
156:22,24;157:12
**Transfer (6)**
8:3;42:17;144:19;
145:7;165:2;179:18
**transformation (1)**
119:5
**Transit (19)**
16:16,21;20:17;
30:6,24;43:2;48:12;
60:12;64:17;66:15,
15;67:17;68:19;
120:23;158:7,11;
179:14,15,19
**transition (3)**
162:22;163:4;177:4
**transitioned (1)**
158:6
**translate (1)**
38:20
**transpire (2)**
29:8;173:8
**transpires (2)**
164:10;168:15
**transport (5)**
12:19,20;13:25;
99:4;100:16
**transportation (35)**
15:1,3;16:12;28:10;
31:18;48:7,11;49:5;
50:2,7,9;52:12;53:2;
55:21;70:25;71:7,12,
17,21;78:7;79:23;
80:9;82:12,15;97:18;
98:2;110:2;111:13,
20;113:24;114:1;
134:15,25;148:12;
187:15
**transported (3)**
30:2;71:1;85:5
**transporting (1)**
17:2
**transports (3)**
16:24;22:8,19
**trauma (1)**
192:5
**traverse (1)**
52:11
**treating (1)**
88:9
**trending (1)**
80:25
**trip (1)**
12:25
**truck (10)**
20:19;61:22;98:6;
112:6,12;172:20;
184:19;194:19;195:2,
6
**truckload (3)**
12:10,11;62:21
**trucks (7)**
10:25;53:13;61:25;
62:8;172:20;174:2;
190:1
**true (2)**
166:15;176:5
**truly (1)**
180:18
**truth (3)**
6:23,23,24
**truthful (1)**
8:18
**try (6)**
69:24;80:18;81:5;
92:5;154:23;163:6
**trying (34)**
11:16;18:2;22:22;
23:1,7,8,25;30:10;
35:6;36:3;39:10;
45:16;48:19;56:17;
73:5;75:3;83:1;84:5,
6,9,25;94:17;99:12;
102:14,18;103:13;
112:2;124:2;151:19;
160:2;165:5;184:18;
186:8;196:18
**turn (2)**
66:3;158:23
**turns (1)**
63:15
**twenty-five (1)**
33:13
**two (35)**
12:25;16:20,22;
25:23;26:2,23;27:20;
45:16,18;48:12;
59:19;64:18;75:13;
115:7;122:13;142:5,
6,12;144:16,19;
145:14;151:25;
159:22;161:21;
173:20;174:2,6,14;
175:7;182:25;187:18;
190:19;191:4,7,12
**two-minute (1)**
44:23
**two-week (1)**
13:1
**type (13)**
8:13;12:1;17:11,14,
20;28:19;31:24;
81:16;88:1;95:13;
105:11,18;107:19
**types (1)**
163:25
**typically (2)**
90:5;91:8

## U

**U234 (1)**
175:9
**UA (1)**
123:3
**ultimate (1)**
39:23
**ultimately (2)**
11:11;36:6
**umbrella (5)**
51:6;77:15;127:5;
145:24,25
**UMSL (2)**
10:2,5
**UMSTIL (1)**
10:4
**unable (1)**
91:4
**unapproved (2)**
126:6;127:2
**under (43)**
17:7;18:10;30:24;
36:13;48:25;49:2,3,5,
19;51:5;54:21;60:14;
63:3;64:16;66:14;
70:17;71:1;72:2,9;
75:13,25;81:17;85:5,
6;86:7;95:12,15,25;
97:6;98:16;101:15;
120:23;125:13;127:4,
15;128:10;134:16;
140:1;145:24;166:18;
168:13;173:13;
178:14

**underneath (5)** 55:14,20,22;61:17; 64:1
**understandings (1)** 163:25
**understood (8)** 13:21;19:8,16; 94:12;141:2,14; 163:15;188:13
**undertake (1)** 113:23
**Uni- (2)** 10:22;36:7
**uniform (1)** 107:24
**uninformed (2)** 107:3,23
**uniformity (1)** 148:7
**UniGroup (120)** 10:16;23:17;36:9, 13;42:4;43:5;44:11, 12,13;47:4,18;49:1,9, 10,16,19;50:17,19,21; 51:4,8;52:2;53:17; 54:7,8;60:10;62:16; 66:5;74:3;75:7,8,11, 21;76:1,21;77:16,22, 24;83:1;88:25;89:22; 92:13,17;93:17; 94:22;95:15;96:25; 97:4;98:22,25;99:2,7; 100:15;101:8;104:9, 25;106:4,23;109:5; 110:12;117:14,19; 118:5;119:11,15,25; 120:22,23;121:8; 124:11;126:2;128:9; 129:1,9,16;131:10,14, 16;132:10;134:21; 137:15,17;138:11,17; 142:22;143:4,14,25; 144:3;148:19;149:3, 23;154:15;155:15; 157:6,9,25;158:8; 162:3;166:13;167:3, 5;169:17,23;170:12; 172:24;174:18; 176:17;178:8,23; 182:18;183:21;184:4; 185:4,9;187:11; 196:24;198:2,14,19
**UniGroup-affiliated (2)** 180:9;182:4
**UniGroup's (9)** 54:10;82:22;84:18; 88:17;101:15;109:3; 117:9;165:23;169:3
**unique (1)** 133:1
**unit (12)** 83:18;98:6;101:15, 16;113:11;165:24; 167:3,6;170:23; 172:12,15,17
**United (68)** 6:10;10:14,22;11:2, 5,11,18;14:2,10,23; 15:4;16:7,8,21;36:11; 39:8,13;40:21;42:2; 48:12;50:13,24,25; 51:4,10;54:13,21; 61:18;62:23;63:3,20; 64:1;65:22;66:14; 74:5,23;75:12,15,21; 76:21;77:16;89:22; 93:18;97:1,4;98:16; 99:7;122:25;129:9, 16;131:12,13,16; 132:10;138:6;143:13; 166:24;171:16;175:8, 10,12,25;176:2,3; 177:22;185:24; 187:17;188:6
**United/Mayflower (1)** 123:12
**United's (1)** 129:13
**units (6)** 10:25;98:14;99:13; 172:18,21;173:18
**Univan (1)** 36:7
**University (2)** 10:2,5
**Unless (4)** 9:1;23:14;121:5; 169:7
**unloaded (1)** 20:19
**unloading (1)** 106:10
**unpack (1)** 20:20
**unpacking (1)** 20:18
**unpleasant (1)** 126:19
**unsuitable (1)** 113:14
**unusual (2)** 91:11,13
**unwraps (1)** 61:23
**up (58)** 9:19;17:6;19:11; 21:6;24:24;27:9; 30:24;33:9;34:3; 36:13;47:18;48:19, 20,24,25;49:4;62:25; 66:14;67:22;75:25; 90:8;91:1,10;92:21; 102:13;103:13; 108:10;112:12;113:5; 117:3;133:12,21; 134:5,18;135:4,7; 137:3;142:15;143:6, 12;147:13;152:12; 154:12,14,17;155:7; 160:5,21;170:24; 171:11;175:1,3; 177:4,11;184:12,13; 193:21;198:12
**up/deliver (1)** 11:1
**updated (2)** 39:20;57:21
**updating (1)** 97:23
**upon (10)** 15:23;84:19; 100:20;118:20;120:7, 16;125:9,21,22;131:2
**UPS (1)** 100:14
**upwards (1)** 12:11
**USDOT (1)** 179:14
**use (18)** 16:6;29:14;32:23, 24;46:24;53:17; 57:11;63:23;72:3; 82:3;108:18;118:22; 119:3,17;121:19; 124:3;146:15;185:20
**used (9)** 25:20;27:20;35:25; 72:6;73:14;74:9; 115:23;141:12; 155:16
**uses (1)** 175:9
**using (9)** 11:6;46:23;100:20, 21;131:10;138:23; 191:19,22;192:3
**utility (1)** 37:20
**utilize (2)** 84:16,20
**utilized (1)** 113:5
**utilizing (4)** 112:10;119:12; 129:9;171:23

**V**

**Valdosta (1)** 75:2
**validate (3)** 89:7;92:5;107:17
**validated (2)** 92:2;112:23
**Vallejo (1)** 59:19
**Van (53)** 10:14,15,23;11:2,5, 18;14:2,10,23,24; 16:2,7,8,21;21:18; 30:17;31:15,19; 36:11,12;41:12;42:1; 48:12;50:10,11,13,24, 25;51:4;53:16;54:21; 62:23;63:3,7;64:21; 65:22;66:14;69:7; 73:23;75:12,21;77:5; 83:22;91:1;98:16; 101:5;105:15;106:8; 111:3;140:12;143:11; 158:4;175:10
**variables (2)** 32:12,16
**variations (2)** 22:10;31:25
**variety (1)** 82:19
**various (7)** 11:25;15:19;32:18; 34:4;56:2;75:4; 107:14
**vary (3)** 31:21,23,23
**vehicle (2)** 8:1;132:8
**vehicles (6)** 72:9;109:3;148:25; 193:16,23;198:16
**vents (1)** 98:11
**verbal (1)** 164:4
**versus (7)** 6:9;17:12,14;81:1, 17;118:5;148:14
**via (1)** 76:24
**vicinity (1)** 31:9
**video (1)** 6:4
**VIDEOGRAPHER (18)** 6:4;7:21,24;43:17, 21,25;45:3,6;115:11, 15;135:21;136:1; 175:1,4;183:3,6; 186:22;199:4
**violate- (1)** 109:20
**violated (1)** 109:16
**Virginia (6)** 30:2;74:8;124:4; 167:16,21;198:15
**void (1)** 113:4
**VOLANSKY (8)** 55:8,10;128:21,23; 132:2,3,4;196:7
**volumes (1)** 52:10
**VP (2)** 142:22;151:13

**W**

**W-2 (1)** 49:15
**W-2s (1)** 49:12
**waived (1)** 200:9
**walked (1)** 197:15
**wants (8)** 19:2;46:9;57:8; 71:15;72:13;126:8; 137:16;199:23
**warehouse (7)** 20:17;30:21,23; 31:7;103:1,19;197:16
**warrant (1)** 111:16
**Washington (1)** 167:16
**way (14)** 8:25;13:20;18:1; 29:4;52:9,9;58:18,21; 91:21;122:16;157:24; 166:22;167:2;178:1
**ways (1)** 82:19
**wear (1)** 113:16
**website (3)** 53:18;152:2;153:10
**week (2)** 45:25;121:5
**weekly (1)** 110:25
**weeks (4)** 9:17;45:19;91:8,11
**weight (3)** 11:24;12:12;87:1
**weird (1)** 192:4
**weren't (4)** 82:7,8;89:2;126:2
**West (1)** 74:8
**wetter (1)** 9:20
**what's (20)** 22:16;43:11;48:9, 18;54:9;55:23;57:22; 61:18;62:17;63:8,11; 64:22;65:24;66:23; 73:18;84:8;88:20; 99:17;184:1;194:13
**whatsoever (2)** 77:20;92:12
**wheel (2)** 63:15;66:3
**Whenever (2)**

44:22,25
**white (4)**
87:14;105:3;157:1;195:6
**whole (7)**
6:23;40:2,3;56:1;59:17;69:25;161:16
**whoop (1)**
65:13
**who's (9)**
47:1;49:15;119:25;136:10;137:25;150:10;169:2;195:24;199:8
**whose (1)**
139:23
**wife (2)**
8:4;58:16
**wife's (1)**
58:17
**willful (1)**
125:19
**wind-down (1)**
171:15
**Winkler (4)**
154:23,25;173:23,24
**W-i-n-k-l-e-r (1)**
154:25
**Winkler's (2)**
155:3,5
**wise (1)**
118:4
**wish (1)**
32:15
**withheld (1)**
121:4
**withhold (2)**
120:18,24
**within (23)**
14:5,7;16:3;22:23;33:10;36:10;40:21;44:14;53:16;56:2;57:18;70:18;74:11;75:20;76:20;87:23;94:19;111:10;119:4;121:21;124:7;127:13;151:5
**without (3)**
120:7;125:24;196:23
**witness (24)**
6:20,25;9:11;37:6;38:13,16;52:5;58:20;66:20;78:17,23;95:1,5;150:16;156:14,18;164:23;165:12;171:8;175:5;191:9,13;200:7,9
**woman (1)**
155:4
**Woodbridge (7)**
124:17;143:3;167:15;196:6,14;197:16;198:15
**Woody (10)**
132:20,23;139:23;144:14;160:15;162:20;164:25;165:15;176:24;178:19
**word (7)**
38:10;52:18;57:11;82:2,3;88:2;200:5
**worded (1)**
8:25
**words (3)**
32:23;144:6;177:7
**work (24)**
13:23;24:10;30:10;31:5;48:17,18;49:15;57:5,8,25;60:9,10;61:14;81:5;83:18;90:21;91:2;92:19;116:25;132:22;140:1;167:1;169:20;197:7
**worked (3)**
10:22;23:19;39:12
**working (8)**
39:21;40:6;50:12;57:13;83:6;93:19;170:11;176:7
**workload (1)**
57:7
**workman's (1)**
76:13
**works (12)**
76:2;83:5;87:16;92:13,16;140:2;168:15;176:24;181:2,6,18;198:8
**world (5)**
20:6;57:3;60:22;88:12;89:1
**Worldwide (3)**
49:3;54:7;62:16
**wrap (3)**
61:21;177:4,11
**wrapped (2)**
62:5,5
**wreck (9)**
101:9;121:10;147:15;150:4;179:10;182:17;192:5;197:10,12
**write (1)**
35:6
**writing (3)**
41:22;125:9;130:14
**written (6)**
68:11;125:21;129:23;140:21;142:20;164:11
**wrong (5)**
38:10,11;113:19;126:1;179:13
**wrote (9)**
67:12,19;128:23;129:2;130:6;176:8;183:9;188:8;196:8
**Wynn (6)**
6:5;7:1,8,11;45:8;59:9

**X**

**X's (1)**
137:5

**Y**

**ya (1)**
92:20
**yard (5)**
196:6,13,14,24;197:16
**yea (1)**
160:4
**year (9)**
10:9;33:14;42:9;47:7;49:13;51:17;80:23,24;87:9
**years (24)**
9:15,16;10:3;18:8,14;34:22,24;35:1,2,3,19,23;36:18;39:1,2,3;42:8;56:11;68:23,25;125:25;127:13;183:11;185:17
**Yep (5)**
64:10;69:3;156:18;168:6;195:8
**yesterday (3)**
141:22;162:23;197:15
**you-all (18)**
54:12;94:2;108:3;109:9;122:3;133:9;134:19,20;135:3;137:3;159:6;186:6;189:19,22;191:18;192:23;193:17;197:7
**young (1)**
35:12
**youngest (1)**
59:18

**Z**

**zeros (4)**
66:19,25;156:9;165:8
**Zoom (2)**
76:25;199:7

**0**

**000015 (1)**
175:2
**001446 (1)**
46:21
**005 (1)**
79:9
**0599 (1)**
194:11
**06 (1)**
79:8

**1**

**1 (5)**
45:11,12;123:8;125:1;187:19
**1:11 (1)**
6:6
**1:52 (1)**
43:22
**1:53 (1)**
44:1
**1:54 (1)**
45:4
**10 (9)**
32:15;125:3,4,5;156:5,7,9,13,17
**10:04 (1)**
176:8
**100 (1)**
6:14
**11 (6)**
125:2;128:23;164:14,17,18,19
**11th (1)**
196:8
**12 (2)**
143:10,15
**127 (2)**
175:12,23
**13 (1)**
63:3
**13th (3)**
160:8;194:12;196:11
**14 (1)**
171:1
**14th (3)**
141:23;142:9;160:9
**15- (1)**
12:11
**15th (3)**
26:5;90:10;187:24
**16 (7)**
35:1,3,19;39:1;42:8,9;68:24
**17 (2)**
176:7,14
**18 (1)**
178:17
**180 (1)**
30:24
**19 (1)**
179:1
**19- (1)**
50:18
**1970 (1)**
9:25
**1980 (1)**
16:9
**1986 (1)**
86:21
**1988 (2)**
50:22,23
**1990 (1)**
86:21
**1995 (1)**
50:18
**1999 (1)**
40:10
**19th (7)**
20:4;24:14;130:11;142:8;159:9,21;160:12
**19th/20th (1)**
27:6
**1st (14)**
121:10;129:12;130:9;131:17;149:14;152:12;155:8;158:12;168:16;181:10;182:16,18;192:5;197:12

**2**

**2 (4)**
66:21;129:6;136:25;187:19
**2- (1)**
135:22
**2:02 (1)**
45:7
**2:22-CV-00076-LGW (1)**
6:12
**2:26 (1)**
159:21
**20 (3)**
32:15;172:20;181:20
**20,000 (1)**
12:11
**2008 (1)**
124:20
**2017 (3)**
35:22;42:11;69:10
**2018 (2)**
48:1;50:20
**2019 (2)**
48:1;130:11
**2021 (1)**
81:20
**2021/2022 (2)**
89:1,10
**2022 (37)**
16:15;19:15,17,23;20:4;24:14;25:10;26:6;27:18;43:2;47:7,

14;90:10;121:10;128:23;129:12,17;130:9,11;131:17;134:6;136:8;141:23;143:7;147:5;149:15;152:13;155:8;168:16;177:19;178:21;179:9;181:10;182:17;187:24;188:1,9
**2023 (6)**
6:6;47:5,15;193:15,22;194:9
**20th (14)**
24:23;26:18,21;27:4;130:16;133:21,22;142:16;146:23;147:3;163:21;164:11;175:18;178:1
**22 (3)**
21:20;64:18;182:17
**22nd (1)**
177:12
**24 (1)**
114:14
**25 (5)**
27:3;165:8,9,12;169:5
**250 (2)**
160:21;191:18
**250,000 (1)**
87:8
**26 (1)**
165:20
**26th (2)**
135:16;163:21
**27 (1)**
47:5
**28 (2)**
129:17;147:5
**28th (21)**
19:23;21:20;24:25;25:4,10;26:1;27:4;130:19;134:5,18;135:4,7,9;142:15;147:6,12;175:19;177:24;178:4,15;182:17
**2A (1)**
70:17
**2D (1)**
72:2
**2nd (3)**
26:5;90:10;179:9

**3**

**3 (7)**
66:19;67:1;78:5;79:10,12;135:24;136:3
**3/15/2022 (1)**
187:19
**3/2/2022 (1)**
187:19
**3:19 (1)**
115:12
**3:39 (1)**
115:16
**30 (15)**
27:4;32:11,15;119:4,7;124:8;139:18;154:10,11;177:2,3,24;178:2,7,7
**300,000 (1)**
61:9
**30th (6)**
101:4;136:8;147:14;177:7,19;178:21
**3J (1)**
93:24
**3M (1)**
97:14

**4**

**4 (8)**
78:12,15,23;79:9;109:25;139:11,14,17
**4/28 (1)**
174:15
**4:04 (1)**
135:22
**4:06 (1)**
136:2
**40 (3)**
12:12;32:15;87:7
**43 (1)**
37:19
**45 (1)**
181:25
**450 (1)**
81:23
**452 (4)**
40:25;66:9,12,12
**48 (1)**
114:14
**49 (1)**
18:8
**4A (1)**
109:25
**4E (1)**
111:18
**4th (2)**
6:14;158:11

**5**

**5 (11)**
78:4,10,12,13,14,15,18;186:20,23;187:5,7
**5/25/22 (1)**
174:8
**5:02 (1)**
183:4
**5:12 (1)**
176:9
**5:13 (1)**
183:7
**5:36 (1)**
199:5
**50 (1)**
146:16
**500 (2)**
40:20;66:6
**53 (1)**
12:13
**587 (1)**
194:18
**599 (1)**
194:15
**5A (2)**
115:6,19
**5G (1)**
116:10
**5K (1)**
125:1
**5th (1)**
188:1

**6**

**6 (4)**
97:13;188:16,17;189:2
**6/9/22 (1)**
174:8
**60 (4)**
129:17;130:13;147:6;159:23
**60-day (1)**
130:18

**7**

**7 (2)**
159:3;194:3
**70 (3)**
9:15,16,25
**700 (2)**
40:21;61:15
**71 (1)**
9:17
**74 (4)**
10:10,11;12:1;31:21

**8**

**8 (6)**
15:9,10,11;31:22;116:9,10

**9**

**9 (3)**
121:17;146:21;153:14
**900 (2)**
44:5;51:16
**90-day (4)**
24:23;133:21;147:4;159:21
**95 (2)**
41:7;51:7
**950 (1)**
44:5
**99 (1)**
40:11
**9th (4)**
6:6;193:15,22;194:9