KeyCite Yellow Flag
Declined to Extend by Del Campo v. Mealing, N.D.Cal., May 20, 2011

210 F.3d 1334
United States Court of Appeals, Eleventh Circuit.

Jennifer Ann ABEL, Plaintiff–Appellant,
v.
Ronald DUBBERLY, Gladys Dennard,
and Fulton County, Defendants–Appellees.

No. 99–8290
|
April 27, 2000.

**Synopsis**

Caucasian library employee, who was discharged for misuse of county funds after she took $10.00 from library cash register in exchange for an I.O.U. and later replaced the money, brought action against former employer and former supervisor, alleging violations of Title VII and section 1983, respectively. Following jury trial, the United States District Court for the Northern District of Georgia, No. 97-00719-1-CV-TWT, Thomas W. Thrash, Jr., J., granted defendants' renewed motion for judgment as a matter of law. Employee appealed. The Court of Appeals held that: (1) denial of defendants' summary judgment motion did not preclude consideration of their motion for judgment as a matter of law; (2) even if district court were precluded from relying on grounds which employee asserted were not raised by defendants in their initial motion for judgment as a matter of law, adequate additional grounds existed supporting affirmance of district court's granting of judgment as a matter of law; (3) employee, who had admitted to taking the $10.00, failed to show that she was similarly situated to any other worker of a different race, and so failed to establish disparate treatment; and (4) even if employee showed disparate treatment, her admission that she took the money rebutted any prima facie case of discrimination, and she failed either to disprove defendants' explanation for her termination or to prove discriminatory intent.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment; Motion for Judgment as a Matter of Law (JMOL)/ Directed Verdict.

**Attorneys and Law Firms**

***1336** Deana L. Simon, Drewk, Eckl & Farnham, Atlanta, GA, for Plaintiff–Appellant.

Vernitia Averett Shannon, Atlanta, GA, Overtis Hicks Brantley, City of Atlanta Law Dept., Atlanta, GA, Charles G. Hicks, Stone Mountain, GA, for Defendants–Appellees.

Appeal from the United States District Court for the Northern District of Georgia.

Before EDMONDSON and MARCUS, Circuit Judges, and HANCOCK [*], Senior District Judge.

* Honorable James H. Hancock, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

**Opinion**

PER CURIAM:

Plaintiff Abel appeals the district court's granting of a renewed motion for judgment as a matter of law as to her Title VII claim against her former employer, Defendant Fulton County, and her section 1983 claim against her former supervisor, Defendant Gladys Dennard. Because this Court finds that Abel did not show that she was treated dissimilarly to any similarly situated fellow employees, the judgment of the district court is due to be affirmed.

*I. Factual and Procedural History*

Abel was formerly employed by Defendant Fulton County as a Library Principal Associate. She was hired in October of 1994 and was initially assigned to the Washington Park Branch of the Atlanta–Fulton County Public Library, but in May of 1995, she was transferred to the South Fulton Branch. Abel was the first Caucasian to be assigned to the South Fulton Branch, where Defendant Dennard, an African–American female, was her supervisor. From the start, Dennard and Abel did not have a good working relationship.

On December 8, 1995, Abel took $10.00 from the library's cash register to purchase gasoline for her personal car, which she then drove to the bank to deposit her pay check. Abel put a signed I.O.U. in the register after taking the cash, and replaced the $10.00 on December 12, 1995, her next day on

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the job. Dennard met with Abel on December 12 about the I.O.U. incident. Abel freely admitted taking the money, but insisted that she believed that the practice was acceptable. In fact, Abel's actions violated a strict policy against personal use of county funds for which the penalty was termination, and Dennard informed her that she would be charged with theft and that a record of the meeting would be made.

Abel eventually filed two grievances concerning the December 12 meeting with Dennard. At a grievance meeting with the library branch's group manager, Julie Compton, Abel again freely admitted to taking the $10.00 from the cash register. At a still later meeting with the library director, Defendant Ronald Dubberly, Abel also confessed to taking the $10.00 from the cash register. By the time she met with Dubberly, the termination process was already under way, and Abel was officially informed, on July 3 or 5, 1996, of her firing for misuse of county funds.

Abel believed that the I.O.U. incident was used merely as a pretext and that race was the real factor for her termination because, she argued, an African–American employee had also taken county money but had not been similarly disciplined and an African–American male had taken her position at South Fulton. Acting on her belief, Abel filed suit in federal court, alleging claims under 42 U.S.C. § 2000e (the Title VII claim), 42 U.S.C. § 1983, and ***1337** various state law theories. The Title VII claim against Fulton County and the section 1983 claims against Dubberly and Dennard survived a motion for summary judgment. A jury trial was held; Defendants moved, under Federal Rule of Civil Procedure 50(a), for judgment as a matter of law, which was denied; and the jury found in favor of Abel as to the Title VII claim against Fulton County and the section 1983 claim against Dennard. However, the jury found in favor of Dubberly on Abel's other section 1983 claim.

The jury verdicts in favor of Abel, though, would not stand. After the trial, Fulton County and Dennard renewed their motion for judgment as a matter of law, under Federal Rule of Civil Procedure 50(b). During a hearing approximately two months after the trial, the district court granted the Defendants' renewed motion for judgment as a matter of law. Abel timely appealed.

*II. Discussion*

A Rule 50 motion for judgment as a matter of law is reviewed *de novo,* and this Court applies the same standards employed by the district court. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997). We consider whether such sufficient conflicts exists in the evidence to necessitate submitting the matter to the jury or whether the evidence is so weighted in favor of one side that that party is entitled to succeed in his or her position as a matter of law. *See Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1244 (11th Cir.1999) (en banc). Although we look at the evidence in the light most favorable to the non-moving party, the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts. *See id.* (citing *Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995)). A substantial conflict in the evidence is required before a matter will be sent to the jury. *See Combs,* 106 F.3d at 1526. As we very recently stated, "[a] motion for judgment as a matter of law will be denied only if 'reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.' " *See Mendoza,* 195 F.3d at 1244 (quoting *Walker,* 53 F.3d at 1555).

Before turning to the merits of Abel's appeal, we must address two preliminary matters. First, Abel argues that Rule 50 motions are rarely granted when summary judgment against a plaintiff has already been denied, suggesting that we should affirm merely on the basis of that rarity. Binding precedent in this Circuit, [1] however, expressly permits consideration of a Rule 50 motion after the denial of summary judgment. *See Gross v. Southern Ry. Co.,* 446 F.2d 1057, 1060 (5th Cir.1971) ("It is settled in this Circuit, therefore, that prior denial of summary judgment does not rule out the possibility of a subsequent directed verdict."); *Gleason v. Title Guarantee Co.,* 317 F.2d 56, 58 (5th Cir.1963) ("Sound practical reasons ... may justify a trial judge's denying summary judgment even on the identical evidence supporting his granting a directed verdict."); *Stanley v. Guy Scroggins Constr. Co.,* 297 F.2d 374, 378 (5th Cir.1961) ("This holding [reversing a grant of summary judgment] does not rule out the possibility of a directed verdict. It may be, when the evidence is in, that the district judge will find that the case should be disposed of by a directed verdict. He is free to do so."). To this day, these precedents continue to be applied in the Eleventh Circuit. *See Mendoza,* 195 F.3d at 1241–42, 1253 (affirming the district court's granting of a Rule 50 motion following denial of a Rule 56 motion); *Walker,* 53 F.3d at 1552–53, 1558 (affirming a grant of a Rule 50 motion after denial of a Rule 56 motion). *But see Richardson v. Leeds Police Dep't,* 71 F.3d 801, 804 (11th Cir.1995) (proscribing

the district courts ***1338** from granting a Rule 50(b) motion predicated on a failure to establish a prima facie case of employment discrimination after having denied both a Rule 56 motion and a Rule 50(a) motion and allowing ultimate issue of discrimination to go to the jury).

1 *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (adopting as binding precedent in the new Eleventh Circuit the decisions of the former Fifth Circuit prior to the close of business on September 30, 1981).

Also as a preliminary matter, Abel argues that the district court, in granting the renewed motion for judgment as a matter of law, erred because the Defendants raised issues in their Rule 50(b) motion not raised at trial in their Rule 50(a) motion, and, therefore, she was denied her Seventh Amendment right to cure any defects before the case was given to the jury. "When reviewing a trial court's resolution of a Rule 50(b) motion, we compare the grounds originally argued by the movant in its Rule 50(a) motion with those cited by the trial court in granting a renewed motion for judgment as a matter of law." *Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, 1289 (11th Cir.1998). If the two sets of grounds are closely related, then no Seventh Amendment violation exists because the non-movant was not subjected to unfair surprise; however, if the grounds are not closely related, then the district court may not rely on the later-advanced grounds in granting the motion. *See id.* Here, even if we precluded the district court from relying on the grounds which Abel asserts were not raised at trial and employed the "any evidence standard" of *Rhodes,* 146 F.3d at 1290, adequate additional grounds, which were raised at trial,[2] exist supporting our affirmance of the district court's granting of judgment as a matter of law. *See Johnson Enters. v. FPL Group, Inc.,* 162 F.3d 1290, 1311 & n. 50 (11th Cir.1998); *Magluta v. Samples,* 162 F.3d 662, 664 (11th Cir.1998) ("We note that we may not reverse a judgment of the district court if it can be affirmed on any ground, regardless of whether those grounds were used by the district court."); *Bonanni Ship Supply, Inc. v. United States,* 959 F.2d 1558, 1561 (11th Cir.1992) (stating "that this court may affirm the district court where the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court"). In short, regardless of the standards used in reviewing the lower court's decision, Abel would still not prevail in her appeal.

2 In their oral Rule 50(a) motion at the close of Plaintiff's case-in-chief, the Defendants explicitly raised Abel's failure to offer evidence demonstrating the existence of any similarly situated but differently treated co-employee and also placed her on notice that Defendants believed she had failed to produce any evidence showing that the legitimate, nondiscriminatory reasons advanced for Plaintiff's termination were mere pretext. (Trial Tr. 229–31.) These same grounds were fully developed in their written Rule 50(b) motion, filed ten days after entry of judgment.

The outcome on the merits of Abel's suit is dictated by our prior Title VII decisions,[3] as illustrated by *Jones v. Gerwens,* 874 F.2d 1534 (11th Cir.1989). The plaintiff in *Jones,* like Abel, admitted to his employer violating the work rules for which he was disciplined and also claimed that fellow employees of another race had committed the same violations but had not been as severely punished for their transgressions. *See Jones,* 874 F.2d at 1540–41. In *Jones,* we noted that "an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation" and that an "[a]dmission of misconduct provides sufficient foundation for an employer's good faith belief that an employee has engaged in misconduct." *See id.* at 1540. We then found that the plaintiff had not met his burden of showing that his conduct was ***1339** similar to that of dissimilarly treated employees of another race. *See id.* at 1541.

3 The same analysis applies to the Plaintiff's section 1983 claim against Dennard, as discriminatory intent is an element to be shown in the same manner as in an alleged Title VII violation when the two claims arise from the same conduct and constitute parallel remedies. *See Richardson v. Leeds Police Dept.,* 71 F.3d 801, 805 (11th Cir.1995); *Cross v. State of Ala.,* 49 F.3d 1490, 1507–08 (11th Cir.1995).

Although the setting is somewhat different in the present case, we reach the same ultimate conclusion as in *Jones.* First, although Abel claims that she was similarly situated to an African–American employee who also took county funds for personal use, a key difference is readily apparent between Abel and the purported comparator.[4] Whereas Abel has always freely admitted having taken $10.00 from the cash register,[5] the other employee has never confessed to taking county funds for personal use; at worst, the would-be comparator has admitted to temporarily misplacing funds.

Abel did not offer any evidence sufficient to show that she was similarly situated to any other employee, and absent some other similarly situated but differently disciplined worker, there can be no disparate treatment. *See Jones,* 874 F.2d at 1540–41; *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185–87 (11th Cir.1984). Furthermore, even if one grants that a similarly situated employee was treated in a different manner, Abel's admission that she took the money rebuts any prima facie case of discrimination, *Jones,* 874 F.2d at 1540, and Abel still never came close to offering evidence even suggesting either that the Defendants' explanation for her termination warrants disbelief, which would permit but not compel a jury to find in Plaintiff's favor, or that some illegal, discriminatory intent as opposed to purely personal or otherwise non-prohibited animus truly motivated the personnel involved in her termination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Finally, we conclude that apart from her termination, Abel has not demonstrated any other conditions of her employment or her treatment by Dennard severe enough to constitute a violation of Plaintiff's civil rights. *See Edwards v. Wallace Community College,* 49 F.3d 1517, 1521–22 (11th Cir.1995) (discussing requirements to succeed on a hostile work environment claim).

4 Abel attempted to compare her treatment to that of several African–American female employees, but apparently only one of those other individuals was ever suspected or accused of taking county funds for personal use, and whether that individual was ever really suspected by anyone other than Plaintiff is a matter of contention. Because a comparator must have engaged in at least similar or comparable misconduct to that of the disciplined worker, *Jones,* 874 F.2d at 1534 & n. 12, we take time to analyze the behavior of only that co-worker that Abel claims also took county funds for personal use.

5 Although termination may, to some, seem a draconian response given the level of the Plaintiff's offense, the reasonableness of Fulton County's disciplinary policies are not a consideration. As we have said before, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984).

### *III. Conclusion*

Although Plaintiff Jennifer Ann Abel argued that her treatment by the Defendants violated Title VII and section 1983, she failed to show that she was similarly situated to any differently treated employee, much less show that she was discriminated against on the basis of race or another illegal factor. Because Abel demonstrated neither disparate treatment nor discriminatory intent, the district court did not err in granting judgment as a matter of law to the Defendants Fulton County and Gladys Dennard. Therefore, the decision below is AFFIRMED.

**All Citations**

210 F.3d 1334, 82 Fair Empl.Prac.Cas. (BNA) 1407, 46 Fed.R.Serv.3d 696, 13 Fla. L. Weekly Fed. C 644

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Disagreement Recognized by Engenium Solutions, Inc. v. Symphonic Technologies, Inc., S.D.Tex., February 15, 2013

79 F.3d 1532
United States Court of Appeals, Eleventh Circuit.

Brian E. BATEMAN; Charles H. Fricker, Plaintiffs–Counter–Defendants, Appellees–Cross–Appellants,
v.
MNEMONICS, INC.; Harry Thompson, President; David Katz, Vice President; Parking Automation Corporation; Joe Guidage, President, et al., Defendants–Counter–Claimants, Third–party–Plaintiffs, Appellants–Cross–Appellees, City of Miami, an entity organized and existing under the laws of the State of Florida; Department of Off–Street Parking of the City of Miami, an agency and instrumentality of the City of Miami, Florida; Generex Corporation, a Florida Corporation, Third–party–Defendants.

No. 93–3234
|
March 22, 1996.
|
Rehearing Denied May 30, 1996.

**Synopsis**
Computer programmers brought action against corporation, alleging infringement of their single board computer operating system software, infringement of their hardware logic diagrams for their computer circuit board, infringement of programmable array logic software, false designation of origin in violation of the Lanham Act, common-law unfair competition and theft of trade secrets. The United States District Court for the Middle District of Florida, No. 90–412–CIV–ORL–22, Anne C. Conway, J., entered judgment in favor of programmers, and appeal was taken. The Court of Appeals, Birch, Circuit Judge, held that: (1) district court committed reversible error by instructing jury to filter out only nonliteral similarities in applying “abstraction-filtration-comparison” test for substantial similarity; (2) district court erred in not instructing jury on legal consequences of finding that certain instances of literal copying of code were dictated by compatibility and interoperability requirements; and (3) evidence was insufficient to establish that corporation had implied confidential relationship with plaintiffs, as required to support trade secret misappropriation claim under Florida law.

Vacated in part; reversed in part and remanded.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

***1535** Michael Kahn, Michael Kahn, P.A. Melbourne, Florida, Lawrence K. Nodine, Needle & Rosenberg, Atlanta, GA, for appellants.

Peter M.C. Choy, Mountain View, CA, for American Committee for Interoperable Systems.

Herbert L. Allen, Allen, Dyer, Doppelt, Franjola & Milbrath, Orlando, FL, for appellees.

Appeals from the United States District Court for the Middle District of Florida.

ON PETITION FOR REHEARING

Before BIRCH and DUBINA, Circuit Judges, and JOHNSON, Senior Circuit Judge.

**Opinion**

BIRCH, Circuit Judge:

Pursuant to Federal Rule of Appellate Procedure 40(a), the panel hereby grants the appellees' petition for rehearing, withdraws the previous panel opinion dated December 22, 1995, and substitutes the following opinion:

***1536** This appeal requires us to address two issues of first impression in this circuit: (1) what methodology is to be employed in analyzing claims of copyright infringement of computer software, and (2) whether interface specifications are entitled to copyright protection. For the reasons that follow, we VACATE the judgment of the district court on the two copyright infringement counts and REMAND for a new trial on these counts. In addition, we REVERSE the judgment of the district court on the trade secret misappropriation count and instruct the district court to enter judgment as a matter of law for the appellants on this count.

## I. BACKGROUND

Appellees-cross-appellants Brian E. Bateman and Charles H. Fricker filed an action in federal court against appellants-cross-appellees Mnemonics, Inc., Harry Thompson, David Katz, Parking Automation Corp., BCS, Inc. ("BCS"), and Robert Brunet (collectively "PAC"). The second amended complaint alleged copyright infringement in Bateman's single board computer operating system ("SBCOS") software (Count I), copyright infringement in Bateman and Fricker's hardware logic diagrams for their computer circuit board (Count II), copyright infringement in the programmable array logic ("PAL") software (Count III), false designation of origin in violation of 15 U.S.C. § 1125(a) (Count IV), common law unfair competition (Count V), and theft of trade secrets (Count VI).[1] After a lengthy trial, the jury found for Bateman and Fricker on three counts, awarding them $105,000 on Count I, $120,000 on Count II, and $300,000 on Count VI.[2] PAC appeals these judgments, and Bateman and Fricker cross-appeal, asserting that the district court abused its discretion in refusing to award exemplary damages to them on the trade secret claim under Fla.Stat. § 688.004(2).

1 Prior to trial, Bateman and Fricker consented to a dismissal of Count III after the United States Register of Copyrights refused registration of the PAL listings on the ground that PAL listings are not copyrightable subject matter. Bateman and Fricker continued to include the PAL listings as part of the trade secret claim of Count VI.

2 As for Counts IV and V of the second amended complaint, PAC conceded at trial that Bateman and Fricker were entitled to an injunction on these counts, and the district court's permanent injunction, dated September 20, 1993, precludes PAC from altering the copyright notice on or computer software listings in Bateman's original SBCOS. No appeal was taken on these counts.

Before addressing the many issues involved in this appeal, it is important to set forth the factual and technical background to this complex case. Both Bateman and Fricker are engineers. Bateman created and developed SBCOS software, and the Register of Copyrights registered his claim of copyright in this software.[3] Bateman and Fricker together created and developed hardware logic diagrams for a single board computer ("SBC") used in automated parking systems, and the Register of Copyrights registered their claim of copyright in these hardware logic diagrams.[4]

3 The copyright registration number for Bateman's SBCOS software is TX 2–807–731, with an effective date of registration of March 29, 1990. The 1990 registration is derivative of Bateman's 1988 registration for an earlier version of his SBCOS software. The copyright registration issued in 1988 is numbered TXU 329–938. Bateman's SBCOS software is not limited in use to parking systems (the use involved in this case), but also has several other functional uses, including cash drawer management and energy management. It was designed by Bateman as a general purpose operating system.

4 The copyright registration number in the hardware logic diagrams is VA 410–209, with an effective date of March 29, 1990.

Initially, Bateman had a business relationship with BCS and its principal, Robert Brunet,[5] in the mid–1980s. BCS manufactured and sold computer boards to several companies, including Generex Corporation.[6] ***1537** Generex was engaged in the parking system business and desired to purchase a computer board and operating system for use in its parking garage business. To satisfy this need, Bateman and Fricker helped Brunet design a SBC, which contained Bateman's SBCOS software as one of its components.[7] Once the SBC was fully developed, BCS sold a number of these boards to Generex.[8] After this purchase, Generex's programmers composed an application program designed to interoperate with the SBCOS.[9] To ensure compatibility, Generex's programmers relied on specifications delivered to them by BCS[10] that dictated the "system calls" necessary to communicate with the operating system, the SBCOS.[11]

5 Although we refer to Brunet and BCS separately at times, it is important to note that BCS was a very small company that was wholly controlled by Brunet. Therefore, the dealings of Generex, Bateman, and Fricker, although ostensibly with BCS, were effectively with Brunet, as the trial testimony reflects that Brunet and BCS were essentially one.

6 PAC acquired Generex's assets in 1987 and currently engages in the business of computerizing parking decks. Mnemonics, Inc. is the parent corporation of PAC and appellants-cross-appellees Harry Thompson and David Katz are principals of Mnemonics.

7 The SBCOS comes in chip form and was one of the components that was integrated into the circuit board, or SBC, to render it operational. The parties also refer to this chip as a programmable read only memory ("PROM"). It can be contrasted with a read only memory ("ROM"). A ROM normally is preprogrammed at a factory and cannot be programmed by an individual in the field. A PROM, however, can be plugged into a programming device at any remote location and one can actually program in the software there. Bateman developed several SBCOS PROMs over the years, although the only PROMs at issue on appeal are those that were a component on the boards sold to PAC.

8 Although the exact nature of the relationship between BCS and Bateman is not clear, BCS secured Bateman's permission to sell the boards containing his SBCOS software to Generex. In return for granting BCS this permission, Brunet apparently agreed to pay royalties to Bateman based on the number of circuit boards sold to Generex.

9 There is no dispute that Generex and its successor PAC own the copyright to this parking system application program.

10 In turn, BCS had received these specifications from Bateman.

11 The following explanation of some of the key terms and concepts involved in computer copyright technology may be helpful:

> Computer hardware consists of the machine itself, while computer software is the set of instructions, written by computer programmers, that tell the hardware to perform certain tasks. Computer software is generally divided into two categories: operating systems and application programs. Operating systems control the internal operations of the computer and transfer the data between the components of the overall system. In essence, they function as intermediaries between computer hardware and application programs. Application programs tell the operating system to instruct the computer to perform a specific function, such as word processing.
>
> The computer hardware, operating system, application software, and user communicate with each other across "interfaces." The system communicates with the user through the "user interface," which consists of images on the monitor as well as the keyboard, mouse, etc. The interfaces between the application program, operating system, and hardware are internal, and thus are invisible to the user....
>
> For the entire system to function, the components must be "compatible"—i.e., communication must be unimpeded throughout the system.

Timothy S. Teter, Note, *Merger and the Machines: An Analysis of the Pro–Compatibility Trend in Computer Software Copyright Cases*, 45 Stan.L.Rev. 1061, 1063 (1993) (hereinafter "Teter") (footnotes omitted).

Although operating systems and application programs generally perform separate functions, the distinction between them is not always clear and continues to erode as programs become more advanced. "For example, since Lotus 1–2–3 executes 'macros' (user-written command sequences), it can be considered to be a hybrid operating system/application program." *Id.* at n. 15.

In 1987, Generex was acquired by PAC, a wholly owned subsidiary of Mnemonics, Inc. Pursuant to the BCS/Generex agreement, BCS began delivering SBCs to PAC. In the spring of 1988, Bateman terminated BCS's right to use his SBCOS software on the SBCs that it was selling. [12] Bateman contacted ***1538** Joe Guidage, the president of PAC, to notify him that BCS was no longer authorized to sell the SBC boards containing his SBCOS. Guidage and Bateman decided to do business with one another and apparently bypassed BCS and Brunet. In May of 1988, Bateman negotiated a written agreement with Guidage whereby he and Fricker agreed to design a new SBC, the SBC2, which was to contain an updated version of Bateman's SBCOS software. [13] In addition, the SBC2 was to include programmable array logic ("PAL") technology, which was not included on the SBC1. [14]

12 Bateman claims that he gave Brunet/BCS a license to sell the SBCOS software, but that he terminated the license in the spring of 1988. At the time that Bateman advised Brunet that he was revoking his license, Brunet disputed that their agreement was a license at all, although he did agree that he owed Bateman money and promised to pay as soon as he was financially able. It is important to note that there was no written agreement establishing a license. Rather, Bateman claims that the license was both oral and implied. R8–245–203. Under applicable law, "[a] transfer of copyright ownership, other than by operation of law [*i.e.,* a work for hire], is not valid unless an instrument of conveyance, or note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a) (1977). The Copyright Act defines "transfer of copyright ownership" as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101 (Supp.1995). Thus, if Bateman's purported license was exclusive, the lack of writing is fatal to his claim that there was an oral license. If it was nonexclusive, however, it is not a transfer of ownership for the purposes of the Copyright Act. While Bateman testified that he had granted a nonexclusive license, R8–233–35, and the district court correctly instructed the jury that "[a] non-exclusive license agreement may be granted orally or be implied through the dealings of the parties," Supp. R1–318–96–97, the district court failed to instruct the jury on the importance of distinguishing between exclusive and nonexclusive licenses for copyright purposes. On remand, the district court should clearly instruct the jury on this important legal distinction, should a factual dispute exist on this issue. *See United States v. Costa,* 31 F.3d 1073, 1080 (11th Cir.1994) (noting that the appellate court may give guidance to the district court on issues not directly at issue on appeal but likely to surface on remand).

13 The SBC that BCS sold to Generex is referred to by the parties as the "SBC1." The SBC that Bateman and Fricker designed for PAC is referred to as the "SBC2." At trial, the SBC2 was predominantly at issue and it remains so on appeal. Thus, we refer to this second board as the "SBC2." Any earlier reference in this opinion to the SBC should be understood as a reference to the SBC1.

14 PAL technology is used to save space on a circuit board and to conserve power. Fricker testified that PAL enabled him to take all of the discrete logic that was contained in four or five chips on the SBC1 and reduce it to one chip on the SBC2. R8–246–199. Like the SBCOS, PAL manifests itself on a circuit board in the form of a chip.

Days after the May agreement between Guidage and Bateman was signed, it was repudiated by Thompson, president of Mnemonics, PAC's parent company. A new contract was negotiated and signed in June of 1988, under which Bateman and Fricker agreed to design the SBC2, which would meet certain of PAC's technical requirements. Bateman and Fricker delivered the SBC2 to PAC in June of 1988. In addition, in November of 1988, pursuant to the June contract, Fricker delivered to PAC "engineering" for the board; these materials were needed in order for PAC to be able to build SBC2s. [15] The hardware logic diagrams at issue in this case were among the documents delivered to PAC by Fricker in November of 1988. Bateman and Fricker acknowledge that there was no copyright notice on the diagrams that were delivered to PAC.

15 Among the materials delivered to PAC were the hardware logic diagrams, the PAL software listings, a disk with the network list, or "net list" on it, and the hole chart for the circuit board. Other materials were included as well. These materials, or "engineering," reflect how the circuit board is actually wired together and were needed in order for PAC to manufacture the SBC2.

Shortly after delivering the engineering to PAC, Bateman and Fricker realized that they had given PAC their only copy of these materials. Because these materials were needed to manufacture more boards, Bateman and Fricker needed to retrieve them. Fricker received back the engineering materials from PAC, signing a receipt to indicate that PAC had loaned the materials to him; Fricker later returned the materials to PAC. It is these engineering materials that are at issue in

Bateman and Fricker's theft of trade secret count against PAC.[16]

16 There was no written nondisclosure agreement regarding the engineering materials. The documents were signed for when initially delivered by Fricker to PAC and then signed for again when PAC "loaned" them back to Fricker.

By January of 1989, the business relationship between Bateman/Fricker and PAC had deteriorated severely. PAC experienced problems with the SBC2s that were in the field, and the parties disputed the cause of the problems. On January 18, 1989, Bateman and Fricker met with Jack Blalock, the ***1539** general manager of PAC. PAC's payments were in arrears, while Blalock complained to Bateman and Fricker that their product was not satisfactory. Blalock requested that Bateman and Fricker deliver to PAC the "source code"[17] for the SBCOS and the rights to the SBC2 circuit design in exchange for a release of claims based on the inoperability of the delivered SBC2s, for which PAC had paid Bateman and Fricker $35,000. Bateman and Fricker refused to accept PAC's offer, and, on January 26, 1989, Blalock dispatched a letter to Bateman terminating the contract between Bateman/Fricker and PAC.

17 In defining and distinguishing between source code and object code, the following explanation is helpful:

> Computer programs are initially written in a "source code," which is a symbolic language, often using English words and common mathematical symbols, that humans can read. The source code is then translated, through a mechanical process known as compilation or assembly, into "object code," which is a concatenation of 1s and 0s readable by computer. Although a skilled programmer can read and understand small sections of object code, it is virtually impossible to develop a working understanding of a program by examining only its object code. As a result, most commercial programs are sold only in object code form, and can be run only "as is" by the ordinary user.

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[F] n. 271 (1995) (hereinafter "Nimmer"). *See also* *E.F. Johnson Co. v. Uniden Corp. of America,* 623 F.Supp. 1485, 1488 (D.Minn.1985) (defining the terms "source code" and "object code").

Since object code is only machine readable, PAC would have had to disassemble and decompile it for it to be of any use. *See* Robert A. Kreiss, *Accessibility and Commercialization in Copyright Theory,* 43 UCLA L.Rev. 1, 32 n. 110 (1995) (hereinafter "Kreiss") (noting that "object code, in the vast quantities found in normal computer programs, is not, as a practical matter, humanly accessible to programmers"). "Disassembly," which is a reverse engineering term that includes both disassembly and decompilation, " 'is a procedure for translating the machine language program into an assembly language program.' " Kreiss, at 3 n. 8 (quoting Office of Technology Assessment, *Finding A Balance: Computer Software, Intellectual Property and the Challenge of Technological Change* 146 (1992)). Thus, PAC requested the source code for Bateman's SBCOS, which would have afforded greater insight into the workings and structure of the SBCOS software; in particular, it would have provided PAC with any accompanying programmer notes.

After Bateman and Fricker denied PAC's request for the source code for the SBCOS and the rights to the SBC2 circuit design, PAC undertook to compose its own operating system that would interoperate with the application program that it (or its predecessor, Generex) had written to be compatible with Bateman's SBCOS. Tom Colvin, Mnemonic's senior engineer, was assigned this task. He disassembled and decompiled a portion of Bateman's SBCOS from a computer chip resident on one of the previously delivered SBC2s.[18] PAC claims that Colvin was compelled to do this because Bateman had never provided PAC with a ***1540** copy of the source code for his SBCOS. PAC also claims that Colvin identified those elements of the program that were necessary for compatibility with the preexisting application program and incorporated them into PAC's new operating system, known as the Lane Control Computer Operating System ("LCCOS"). In addition to composing the LCCOS, PAC also designed a new circuit board, known as the Lane Control Computer ("LCC"), which was to replace Bateman and Fricker's SBC2.

18 As noted in note 17, *supra,* there is an important technical distinction between the source code and the object code. Generally, the object code is

readable only by machines. But, as Professor Nimmer notes:

> The skilled programmer, however, may reverse engineer the program by using the techniques of "decompilation" and "disassembly" to work backwards from object code and to produce a facsimile of the original source code. Although decompilation techniques generally will not yield a perfect copy of the original source code, decompilation can afford an understanding of much of the structure and operation of a program.

3 Nimmer § 13.03[F] n. 271 (citation omitted). PAC utilized the techniques of disassembly and decompilation on Bateman's SBCOS. PAC claims that such reverse engineering was necessary to develop an operating system compatible with its application program, which in turn was written to be compatible with Bateman's SBCOS. Although the issue is not directly before us on appeal, it will likely appear on remand, and thus we think it proper to address it and thereby provide some guidance to the district court on remand. *See United States v. Costa,* 31 F.3d 1073, 1080 (11th Cir.1994). And although there has been some uncertainty as to whether reverse engineering constitutes copyright infringement, the one federal circuit court that has squarely addressed the issue has concluded that reverse engineering may be a fair use. *See Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1527–28 (9th Cir.1992) (holding that "where disassembly is the only way to gain access to the ideas and functional elements embodied in a copyrighted computer program and where there is a legitimate reason for seeking such access, disassembly is a fair use of the copyrighted work, as a matter of law"). Another federal circuit court has addressed the issue, although its highly unusual factual posture seems to limit its precedential value. *See Atari Games Corp. v. Nintendo of America Inc.,* 975 F.2d 832, 843 (Fed.Cir.1992) (concluding that "reverse engineering object code to discern the unprotectable ideas in a computer program is a fair use," although denying the defendant's fair use claim, based on the fact that it was wrongfully in possession of the source code). We find the *Sega* opinion persuasive in view of the principal purpose of copyright—the advancement of science and the arts. *See Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 348, 111 S.Ct. 1282, 1290, 113 L.Ed.2d 358 (1991) (noting that "[t]he primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts' ") (quoting U.S. Const. art. I, § 8, cl. 8). We note that we are in good company in endorsing the approach of the *Sega* court. Eleven copyright law professors filed an amicus curiae brief in the *Sega* case in which they endorsed this approach. *See* Kreiss, at 4 n. 9 (citing Brief *Amicus Curae* [sic] of Eleven Copyright Law Professors in *Sega Enterprises Ltd. v. Accolade, Inc.,* 33 Jurimetrics J. 147, 155 (1992)). For an extensive list of law review articles discussing the *Sega* and/or *Atari* cases, see Kreiss, at 61 n. 226. As discussed subsequently in this opinion, an important distinction to be emphasized is that reverse engineering, in addition to accessing nonprotectable ideas and functional elements, may also yield access to original expression. However, while the former may be unoriginal and not worthy of copyright protection, the latter, though original and hence copyrightable, may also be denied protection where its use is found to be "fair" under 17 U.S.C. § 107.

Shortly after the January contract termination by PAC, Bateman and Fricker filed suit in Florida state court, alleging breach of the June 2, 1988 contract.[19] They subsequently learned that PAC was marketing a new computer circuit board that appeared to perform the same functions as their SBC2. In May of 1990, Bateman and Fricker initiated this case in federal court in Florida, alleging, *inter alia,* copyright infringement and theft of trade secrets.

19 This case never went to trial, and the record is silent as to its outcome. The breach of contract claim is not part of the case before us on appeal.

## II. ISSUES ON APPEAL

On appeal, PAC raises eight issues, and Bateman and Fricker present one issue on cross-appeal. The issues on direct appeal are whether: (1) a jury instruction that limited the "successive filtration" test for copyright infringement to nonliteral similarity was confusing or misleading; (2) the district court should have instructed the jury to filter out the operating system/application program interface; (3) it was plain error to instruct the jury that a "qualitatively" small

amount of copying could authorize a finding of copyright infringement; (4) the district court erred in directing a verdict striking PAC's omission of copyright notice defense because it found that one copy was a "relatively small number" under the Copyright Act, as a matter of law; (5) the district court erred in denying PAC's motions for directed verdict and JNOV as to claims of copyright infringement in hardware logic diagrams, where the only evidence of damages was the sale of purely utilitarian circuit boards built from them; (6) the district court erred in denying PAC's motions for directed verdict and JNOV as to damages based on sales of circuit boards where Bateman and Fricker failed to introduce evidence that "translations" of their schematics purportedly used in manufacturing circuit boards contained any protectable expression; (7) the district court should have vacated the jury's award of $120,000 in damages for infringement of the hardware logic diagram's copyright, where there was no evidence that any boards were manufactured after PAC had notice of the copyright claim; and (8) the district court erred in denying PAC's motions for directed verdict and JNOV on the state law trade secret claim. The sole issue on cross-appeal is whether the district court abused its discretion in refusing to award exemplary damages on Bateman and Fricker's trade secret claim of Count VI under Fla.Stat. § 688.004(2), given the evidence that supported the jury verdict in Bateman and Fricker's favor on this count.

## ***1541** III. DISCUSSION

### A. The *Feist* Two–Pronged Test for Copyright Infringement

At the outset, we review some applicable basic principles. To establish a claim of copyright infringement, Bateman and Fricker must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); *see also BellSouth Advertising & Publishing Corp. v. Donnelley Info. Publishing, Inc.,* 999 F.2d 1436, 1440 (11th Cir.1993) (en banc), *cert. denied,* 510 U.S. 1101, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994). To "satisfy *Feist* 's first prong, a plaintiff must prove that the work ... is original and that the plaintiff complied with applicable statutory formalities." *Lotus Dev. Corp. v. Borland Int'l, Inc.,* 49 F.3d 807, 813 (1st Cir.1995), *aff'd by an equally divided Court,* 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996) (citation omitted). In judicial proceedings, a "certificate of registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c) (1977).[20] Once the plaintiff produces a certificate of copyright, the burden shifts to the defendant to demonstrate why the claim of copyright is invalid. *Bibbero Sys., Inc. v. Colwell Sys., Inc.,* 893 F.2d 1104, 1106 (9th Cir.1990). At this juncture, it is incumbent upon a putative infringer to establish that the work in which copyright is claimed is unprotectable (for lack of originality) or, more specifically, to prove that the portion of the copyrighted work actually taken is unworthy of copyright protection.[21] In the case before us, Bateman has a registration of his claim of copyright in his SBCOS software, and Bateman and Fricker jointly have been issued a copyright registration in the hardware logic diagrams for the SBC2. PAC does not contest the validity of these copyright registrations and thus *Feist* 's first prong is satisfied.

20 Although a timely obtained certificate of registration constitutes prima facie evidence of the validity of the claim of copyright, this presumption is rebuttable. *See Autoskill, Inc. v. National Educ. Support Sys., Inc.,* 994 F.2d 1476, 1487 (10th Cir.), *cert. denied,* 510 U.S. 916, 114 S.Ct. 307, 126 L.Ed.2d 254 (1993); *Donald Frederick Evans v. Continental Homes, Inc.,* 785 F.2d 897, 903 (11th Cir.1986).

21 Initially, the task is to distinguish between protectable expression and unprotectable "methods of operation," "processes," and the like. 17 U.S.C. § 102(b). Where a portion of the computer program constitutes an unprotectable method of operation or process, it is not an expressive part of the work. It is particularly important to exclude methods of operation and processes from the scope of copyright in computer programs because much of the contents of computer programs is patentable. Were we to permit an author to claim copyright protection for those elements of the work that should be the province of patent law, we would be undermining the competitive principles that are fundamental to the patent system. *See Baker v. Selden,* 101 U.S. 99, 102–03, 25 L.Ed. 841 (1879); *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 146–47, 109 S.Ct. 971, 975, 103 L.Ed.2d 118 (1989); *Atari,* 975 F.2d at 842. *But see* Pamela Samuelson et al., *A Manifesto Concerning the Legal Protection of Computer Programs,* 94 Colum.L.Rev. 2308, 2343–47 (1994) (arguing that patent law is ill-suited for protecting computer

> software innovation). After these originality challenges have been determined, the putative infringer also may advance a claim that, while the portion of the work actually taken is original and thus copyright worthy, the use made thereof is “fair” under 17 U.S.C. § 107. Conceptually and legally it is important to distinguish these two denominated “defenses.”

It is *Feist* 's second prong that is a central focus of this case. To prove actionable copying, the plaintiff must first establish, as a factual matter, that the alleged infringer “actually used the copyrighted material to create his own work.” *Engineering Dynamics, Inc. v. Structural Software, Inc.,* 26 F.3d 1335, 1340 (5th Cir.1994). Proof of copying may be shown either by direct evidence of the copying or, in the absence of such evidence, “[c]opying as a factual matter typically may be inferred from proof of access to the copyrighted work and ‘probative similarity.’ ” *Id.* (citing *Plains Cotton Co-op. Ass'n v. Goodpasture Computer Serv., Inc.,* 807 F.2d 1256, 1260 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987)). Factual proof of copying, however, is only an element in satisfying the second prong of *Feist.*

***1542** It is at this point that the plaintiff must also respond to any proof advanced by the defendant that the portion of the copyrighted work actually taken does not satisfy the constitutional requirement of originality as set forth in Article I, § 8, cl. 8. *See also Feist,* 499 U.S. at 345–46, 111 S.Ct. at 1287–88 (noting that “[t]he *sine qua non* of copyright is originality,” as well as emphasizing that it is a “constitutional requirement”). If the plaintiff successfully demonstrates that the portion of the copyrighted work taken satisfies the originality requirement, he must still, depending upon the proof of the defendant and the defenses asserted, surmount two additional hurdles. First, the plaintiff must prove that “the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar.” *Lotus,* 49 F.3d at 813; *see also Engineering Dynamics,* 26 F.3d at 1341. Second, he may have to successfully challenge the putative infringer's evidentiary assertion that the use made of the original portion of the copyrighted work is a fair use under 17 U.S.C. § 107, where the putative infringer attempts to carry his burden and demonstrate a right to such use. [22] In this appeal, both the originality/substantial similarity aspect of *Feist* 's second prong and fair use are at issue, although we note that proof of originality can be the more problematic of the two hurdles to overcome; while there may be evidence of copying, not all copying is legally actionable. *See Engineering Dynamics,* 26 F.3d at 1341; *BellSouth,* 999 F.2d at 1444–45.

22 Fair use traditionally has been treated as an affirmative defense to a charge of copyright infringement *See Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, ––––, 114 S.Ct. 1164, 1177, 127 L.Ed.2d 500 (1994) (stating that “fair use is an affirmative defense”). In viewing fair use as an excused infringement, the court must, in addressing this mixed question of law and fact, determine whether the use made of the original components of a copyrighted work is “fair” under 17 U.S.C. § 107. *See Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985) (citing *Pacific & Southern Co. v. Duncan,* 744 F.2d 1490, 1495 n. 8 (11th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985)). Although the traditional approach is to view “fair use” as an affirmative defense, this writer, speaking only for himself, is of the opinion that it is better viewed as a right granted by the Copyright Act of 1976. Originally, as a judicial doctrine without any statutory basis, fair use was an infringement that was excused—this is presumably why it was treated as a defense. As a statutory doctrine, however, fair use is not an infringement. Thus, since the passage of the 1976 Act, fair use should no longer be considered an infringement to be excused; instead, it is logical to view fair use as a right. Regardless of how fair use is viewed, it is clear that the burden of proving fair use is always on the putative infringer.

For the reasons discussed, we need not consider *Feist* 's first prong. The factual copying aspect of *Feist* 's second prong is not at issue either, because PAC admits that it copied portions of the SBCOS code and the SBC2 logic circuit diagrams during the design and development of the LCCOS and the LCC. Thus, the two matters directly at issue on appeal as to Count I are whether: (1) the copying done by PAC is legally actionable; that is, whether there is “substantial similarity” between the allegedly offending program and the protectable, original elements of the copyrighted works; and (2) the use of any such original elements qualifies as a fair use under 17 U.S.C. § 107. [23] At the heart of these issues is the ***1543** parties' dispute over the district court's jury instructions on literal and nonliteral copying, to which we now turn.

23 Before embarking upon any infringement analysis, it is vital to understand that infringing conduct is the unpermitted exercise of a right of the copyright owner. To properly apply that principle, it is equally important to remember that there exists a distinction between the work and the copyright. The work—in this case a computer program—is separate and distinct from the copyright; the copyright is the rights to which the copyrighted work is subject. It is the rights, not the work, that the copyright holder owns. This distinction is manifest in view of the fact that when the copyright expires, the erstwhile copyright holder no longer owns any exclusive rights, but the work continues to exist without change. The copyright owner never owns the work because copyright is a series of specified rights to which a designated work is subject for a limited period of time, after which the work enters into the public domain unencumbered by copyright. Hence, the use of the work and the use of the copyright are distinct. One may use the work without using the copyright, but one cannot use the copyright without using the work—one does not infringe the work, rather one infringes the copyright. Thus, "[a]nyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright...." 17 U.S.C. § 501(a). Therefore, the basic issue in all copyright defenses is whether the use involved was a use of the work or a use of the copyright. *See generally* L. Ray Patterson, *Understanding Fair Use,* Law & Contemp.Probs., Spring 1992, at 259, 264 (noting the distinction between the work and the copyright of the work).

B. The Jury Instructions

PAC raises three separate issues on appeal concerning the district court's instructions to the jury. "We apply a deferential standard of review to a district court's jury instructions. So long as the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions." *United States v. Starke,* 62 F.3d 1374, 1380 (11th Cir.1995) (citing *McElroy v. Firestone Tire & Rubber Co.,* 894 F.2d 1504, 1509 (11th Cir.1990)). "On appeal, we examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." *Wilkinson v. Carnival Cruise Lines, Inc.,* 920 F.2d 1560, 1569 (11th Cir.1991) (citations omitted). Under this standard, if the jury charge as a whole correctly instructs the jury, even if it is technically imperfect, no reversible error has been committed. *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1372 (5th Cir.1981). We must reverse an erroneous instruction, however, if we are "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Johnson v. Bryant,* 671 F.2d 1276, 1280 (11th Cir.1982) (quoting *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1372 (5th Cir.1981)). Instructing a jury in the application of the law of copyright, which is characterized by often subtle and contradictory distinctions, is indeed a daunting task. Thus, the need for proper guidance is accentuated and heightened in directing a jury in this area of the law, which may be foreign to many jurors, particularly in this rapidly changing technological world. Applying the aforementioned standard of review, we examine *seriatim* the three issues on appeal relating to the jury instructions.

1. *Limiting the "Abstraction–Filtration–Comparison" Test to Nonliteral Similarity*

PAC asserts that the district court committed reversible error by instructing the jury to filter out only nonliteral similarities in applying the "abstraction-filtration-comparison" test for substantial similarity that the Second Circuit adopted in *Computer Assocs. Int'l v. Altai, Inc.,* 982 F.2d 693 (2d Cir.1992).[24] PAC requested jury instructions that allowed for filtering out all nonprotectable (that is, unoriginal) expression, without regard to whether the similarity existed on the literal or nonliteral level.[25] The district ***1544** court denied PAC's request and accepted instead Bateman's proposed instructions, which confined the filtration analysis only to instances of nonliteral copying. By limiting the filtration instruction to nonliteral similarities, PAC claims that the district court effectively rendered futile its efforts to rebut Bateman's evidence of literal similarity with regard to elements of the work for which copyright was claimed, thereby nullifying several of its key defenses, including compatibility, efficiency, and standard programming techniques. Bateman and Fricker, however, assert that the district court was correct in limiting the filtration instruction to nonliteral similarities.

24 Throughout their briefs, the parties refer to this test as the Nimmer "successive filtration" test. In instructing the jury, the district court also referred to this test as the "Nimmer test." Supp. R1–318–92. While we certainly recognize that the *Altai* court

endorsed Professor Nimmer's "successive filtering method" for separating protectable expression from nonprotectable material, the test set forth in *Altai* is more comprehensive than that formulated by Professor Nimmer. The jury instructions were clearly based on the *Altai* version of the Nimmer test, and therefore any reference in this opinion to the "Nimmer test" is to be understood as a reference to the *Altai* version of the Nimmer test.

25 Two works need not be identical in order to be deemed "substantially similar" for purposes of copyright infringement. As Judge Learned Hand noted, "[i]t is of course essential to any protection of literary property ... that the right cannot be limited literally to the text, else a plagiarist would escape by immaterial variations." *Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). The problem with computer programs is that "between the one extreme of no similarity and the other of complete and literal similarity lies the line marking off the boundaries of 'substantial similarity.' " 3 Nimmer § 13.03[A]. The exact location of this line is difficult to pinpoint.

It is in this substantial similarity analysis that one must distinguish between literal and nonliteral similarity. Literal similarity refers to similarity at the code level; that is, there is a verbatim copying of part or all of the source or object codes of a computer program. Nonliteral similarity is more difficult to define. Professor Nimmer refers to it as "comprehensive nonliteral similarity," and notes that the term "similarity" is not limited to a particular line or paragraph of a work, but refers rather to where "the fundamental essence or structure of one work is duplicated in another." *Id.* at § 13.03[A][1]. Thus, nonliteral similarity can be thought of as paraphrasing or copying the essence or structure of a work just short of literal copying. Both literal and nonliteral similarity may warrant a finding of copyright infringement, although we note that the application of these theories becomes more difficult as cases assume an increasing technological complexity. In the computer code environment, one may write code that, when processed by the computer, produces a screen display that is virtually identical to another screen display that was generated from unquestionably dissimilar code. *See Digital Communications Assocs. v. Softklone Distrib. Corp.,* 659 F.Supp. 449, 455 (N.D.Ga.1987) (noting that "a computer screen display can be copied by means of a computer program which is not itself a copy of the computer program which generated the screen display which has been copied"). Such an instance would not warrant a finding of literal code copying, but could constitute an infringement of the portion of the screen display that properly qualified for protection.

The Second Circuit in *Altai* summarized its abstraction-filtration-comparison test as follows:

> In ascertaining substantial similarity under this approach, a court would first break down the allegedly infringed program into its constituent structural parts. Then, by examining each of these parts for such things as incorporated ideas, expression that is necessarily incidental to those ideas, and elements that are taken from the public domain, a court would then be able to sift out all non-protectable material. Left with a kernel, or possible kernels, of creative expression after following this process of elimination, the court's last step would be to compare this material with the structure of an allegedly infringing program. The result of this comparison will determine whether the protectable elements of the programs at issue are substantially similar so as to warrant a finding of infringement.

*Altai,* 982 F.2d at 706. In the case at bar, it is *Altai* 's second step, filtration, that most concerns us. Filtration is used to separate protectable expression from nonprotectable material. It is at this step that the structural components at each level of abstraction are examined "to determine whether their particular inclusion at that level was 'idea' or was dictated by considerations of efficiency, so as to be necessarily incidental to that idea; required by factors external to the program itself; or taken from the public domain and hence is nonprotectable expression." *Altai,* 982 F.2d at 707. It is here that PAC claims

that merger, *scenes a faire,* and other originality challenges to literal copying should be applied.

The district court's instruction limited the filtration analysis to nonliteral similarity, stating that:

> Under the Nimmer test, substantial similarity of the non-literal elements is determined by comparing with the defendants' program, that protectable expression of the copyrighted work which remains after filtering out any portion of the copyrighted work, which represents only ideas, elements [ ] dictated solely by logic and efficiency, elements dictated by hardware or software standards, computer industry programming and practices or elements which are taken from the public domain.
>
> Even a qualitatively [sic] small amount of copied material which remains unfiltered may be sufficiently important to the operation of Mr. Bateman's operating system program to justify a finding of substantial similarity. For instance, a small portion of a structure or code of a program may nonetheless give it its distinctive features. In such a case, a finding of substantial similarity would be appropriate.

Supp. R1–318–92–93. This instruction is a verbatim version of Bateman's proposed instruction on determining substantial similarity under the Nimmer test. At the time that this instruction was offered by Bateman, ***1545** PAC submitted its own version of a filtration instruction, one that would direct the jury to filter out all nonprotectable expression, *without regard to whether the similarity existed on the literal or nonliteral level.* PAC objected to Bateman's instruction when first offered to the court, Supp. R1–330–325, and also objected to the court's decision to use Bateman's instruction, which contained the nonliteral limitation, rather than PAC's version of the filtration analysis. Supp. R1–332–74. Over both of these objections, the district court limited the filtration instruction to nonliteral similarities.

We recognize that the *Altai* test was formulated by the Second Circuit to help "determine the scope of copyright protection that extends to a computer program's non-literal structure." *Altai,* 982 F.2d at 703. In fact, other circuit courts disagree on whether its application should be limited to instances of nonliteral copying, or whether it is equally applicable to cases involving literal copying. *See Lotus,* 49 F.3d at 815 (noting that "[w]hile the *Altai* test may provide a useful framework for assessing the alleged nonliteral copying of computer code, we find it to be of little help in assessing whether the literal copying of a menu command hierarchy constitutes copyright infringement"). *But see Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823 (10th Cir.1993) (elaborating upon the *Altai* test and endorsing it as a way of determining whether "menus and sorting criteria" are protectable by copyright).

We see this disagreement between the *Lotus* and *Gates* courts as more of a matter of semantics than substance. It is undeniable that the *Altai* court formulated its test to address nonliteral copying of computer code. Even if the *Altai* test is limited to nonliteral copying, however, a parallel type of analysis must be undertaken in examining alleged instances of literal copying of computer code or screen displays.[26] Whether one chooses to call the consideration of such generally recognized challenges to literal code copying as merger and efficiency "filtration" is of little consequence; what matters is that these well-established "defenses" are considered. The *Gates* court simply chose to include this consideration as part of its filtration analysis, noting that "[f]iltration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, *scenes a faire* material, and other unprotectable elements suggested by the particular facts of the program under examination." *Gates,* 9 F.3d at 834.

26 Screen displays are the products of a program and are not considered to be a literal element of a program. They fall "under the copyright rubric of audiovisual works." *Altai,* 982 F.2d at 703. Although screen displays are the product of a computer program, in contrast to source and object code, which are part of the program itself, the legal analysis for alleged instances of literal copying of either code or screen displays is analytically quite similar.

We express no opinion as to whether it is better to consider these challenges to literal copying as part of the filtration step or rather to consider them in a separate, yet parallel, analysis. The important point here is that such an analysis is necessary—it makes little difference which methodology is employed.[27] Where the district court erred, however, was in not requiring the jury to consider the connection between the *Altai* test and the challenges to originality, such as merger, *scenes a faire,* standard technique or practice, considerations of efficiency, compatibility requirements, and the like. Since the district court instructed the jury that *Altai* filtration was limited to nonliteral copying, the jury must have concluded that any instances of literal copying of Bateman's code by PAC were by definition acts of copyright infringement. This

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

conclusion is a manifest distortion and misstatement of the law. There was substantial evidence presented of the *literal copying* of code in this case. Much of the testimony of the expert witnesses dealt with the Nimmer test and its role as the proper methodology to employ in analyzing the copyright infringement claims ***1546** of Bateman and Fricker. When this testimony was combined with the jury instruction limiting filtration analysis to *nonliteral copying,* it is clear that the jury was misled and did not fully understand the law of copyright relevant to this case. Under the standard established in *Miller,* we are "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." 650 F.2d at 1372.

27 It is essential that one keep in mind that the approaches adopted by the other circuits merely are a means to a very important end: filtering out all unprotectable material. Sometimes parties become so engrossed in disputing what "test" should apply that they lose sight of what the tests were designed to accomplish in the first place. To paraphrase a sage observer, "If you don't know where you're goin', when you get there you'll be lost."

2. *The Failure to Instruct the Jury on the Legal Consequences of Copying Elements Dictated by Compatibility Requirements*

PAC also claims that the district court erred in not instructing the jury on the legal consequences of a finding that certain instances of literal copying of code by PAC were dictated by compatibility and interoperability requirements. The district court gave no instruction on whether the application program/SBCOS interface at issue in this case was a constraint that rendered the interface either unprotectable or subject to a fair use analysis.[28] In its instructions, the court noted that "[c]omputer programs are, in essence, utilitarian articles. Articles that accomplish tasks. As such, they contain many structural and visual display elements that may be dictated by the function to be performed, by considerations of efficiency, or by external factors, such as compatibility requirements and industry demands." Supp. R1–318–95.

28 We emphasize here that although unoriginality and fair use, when related to compatibility considerations, are closely related copyright issues, they are analytically distinct. Compatibility and other functionality challenges to originality, if found to be applicable, are applied so as to deny copyright protection to a particular work or portion of a work. 17 U.S.C. § 102(b). In contrast, fair use is a doctrine that is applied *after* a finding has been made that a work or portion of a work is entitled to copyright protection. 17 U.S.C. § 107.

PAC proposed an instruction that stated, in part, that "you are to filter out as unprotectable expression portions of the program that the evidence shows were dictated by the interface with the applications code which was an external constraint." R7–216 (Instruction No. 26). Bateman objected to this instruction, noting that he had introduced evidence that PAC's application program could have been rewritten to avoid using the interface commands;[29] the court, while not expressly adopting Bateman's argument, noted that the issue was far from clear and refused to charge the portion of PAC's proposed instruction quoted above. Supp. R1–332–71.

29 The availability of alternatives should not be determinative in distinguishing between elements of a computer program that are expressive and those that are unprotectable under 17 U.S.C. § 102(b). Generally, there is more than one method of operation or process that can be used to perform a particular computer program function. However, methods of operation and processes are not copyrightable. But tension exists in the Act as to what a "process" or "method of operation" is in the context of computer programs. *See* Jane C. Ginsburg, *Four Reasons and A Paradox: The Manifest Superiority of Copyright Over Sui Generis Protection of Computer Software,* 94 Colum.L.Rev. 2559, 2560–70 (1994). Patents routinely recite prior methods or systems of performing the same function in distinguishing the claimed invention from the prior art.

The instruction given by the court is not technically incorrect. It fails, however, to define the important term "compatibility"[30] and, more importantly, fails to instruct the jury on the legal consequences of a finding that certain copying of code by PAC was dictated by compatibility requirements. When this instruction is considered together with the "Nimmer instruction," which was limited to nonliteral similarity, it is clear that the court failed to instruct the jury that compatibility, whether it pertains to originality or fair use analysis, is a consideration that applies at the literal level.

30 As one commentator has noted:

> Compatibility becomes an issue when a firm wishes to create a single new component designed to operate with elements of a preexisting system. For example, if manufacturer "B" would like to design a computer that can use software designed for a computer manufactured by "A," *B's operating system interface must match that of manufacturer A.* Without that compatibility, the software designed for A's machine will not function on B's.

Teter, at 1064 (emphasis added).

Although the factual situation in this hypothetical is not identical to the case at bar, it is close enough to highlight the importance of the operating system interface.

***1547** This circuit has yet to address whether interface specifications, *as a matter of law,* are not entitled to copyright protection. In its briefs, PAC argues that Bateman's interface commands are legally uncopyrightable and, thus, PAC was not obligated to avoid copying them by rewriting its application program. At other times, it makes the alternative argument that the district court should have instructed the jury on the legal consequences of copying dictated by compatibility requirements. To the extent that it was making the former argument, we reject it.[31] It is an incorrect statement of the law that interface specifications are not copyrightable as a matter of law.[32] PAC is correct, however, in arguing that the district court erred in not instructing the jury on the legal consequences of copying dictated by compatibility requirements.

31 We need not decide whether PAC is correct in its assertion that, given the particular facts of this case, it was not obligated to rewrite its application program to avoid copying Bateman's interface specifications. PAC, however, is incorrect in arguing that this rewriting was not required because Bateman's interface specifications are not entitled to copyright protection *as a matter of law.*

32 As noted above, simply because something is copyrightable does not mean that it is entitled to copyright protection. The expression at issue may be found to be unoriginal through application of the merger doctrine or under 17 U.S.C. § 102(b). And even if the expression is found to be original, fair use may be demonstrated by the alleged infringer to defeat the claim of infringement. This latter analysis will depend upon the facts in the particular case, since a use by one putative infringer may be "fair" while the use by another may not so qualify under 17 U.S.C. § 107. *See* L. Ray Patterson & Stanley W. Lindberg, *The Nature of Copyright: A Law of Users' Rights* 163–241 (1991).

In analyzing elements dictated by external factors, the Second Circuit in *Altai* cited Professor Nimmer for the proposition that " 'in many instances it is virtually impossible to write a program to perform particular functions in a specific computing environment without employing standard techniques.' " *Altai,* 982 F.2d at 709 (quoting 3 Nimmer § 13.03[F][3], at 13–65). The *Altai* court further elaborated on this point by noting that programmers are often constrained in their design choices by "extrinsic considerations" including "the mechanical specifications of the computer on which a particular program is intended to run" and "compatibility requirements of other programs with which a program is designed to operate in conjunction." *Id.* at 709–10 (citing Nimmer, at 13–66–71). The Ninth Circuit has similarly noted that computer programs "contain many logical, structural, and visual display elements that are dictated by ... external factors such as compatibility requirements and industry demands," and that "[i]n some circumstances, even the exact set of commands used by a programmer is deemed functional rather than creative for purposes of copyright." *Sega,* 977 F.2d at 1524.

The *Sega* and *Altai* courts are certainly not alone in noting that external factors such as compatibility may work to deny copyright protection to certain portions of a computer program. *See also* *Engineering Dynamics,* 26 F.3d at 1347 n. 12.; *Atari,* 975 F.2d at 839. Whether the protection is unavailable because these factors render the expression unoriginal, nonexpressive per 17 U.S.C. § 102(b), or whether these factors compel a finding of fair use, copyright estoppel, or misuse, the result is to deny copyright protection to portions of the computer program. Thus, we today join these other circuits in finding that external considerations such as compatibility may negate a finding of infringement.[33] In the case at bar, we need not decide whether PAC's alleged copying constitutes an infringement. It is clear that the jury was not properly instructed on the legal principles involved in such an analysis, and thus we are "left with a substantial and ineradicable doubt as to whether the jury ***1548** was properly guided in its deliberations." *Miller,* 650 F.2d at 1372.

33 Note that we use the word "may." Such a finding will depend on the particular facts of a case, and thus it would be unwise for us to try to formulate a bright-line rule to address this issue, given the importance of the factual nuances of each case. In no case, however, should copyright protection be extended to functional results obtained when program instructions are executed and such results are processes of the type better left to patent and trade secret protection.

3. *"Qualitatively" or "Quantitatively"*

Further, we address PAC's claim that the district court erred in instructing the jury that "[e]ven a *qualitatively* small amount of copied material which remains unfiltered may be sufficiently important to the operation of Mr. Bateman's operating system program to justify a finding of substantial similarity. For instance, a small portion of a structure or code of a program may nonetheless give it its distinctive features. In such a case, a finding of substantial similarity would be appropriate." Supp. R1–318–93 (emphasis added). There is no dispute among the parties that this instruction should have contained the word "quantitatively," not "qualitatively." It is not clear, however, that the judge misspoke, because the written charges that were with the jury during their deliberations correctly read "quantitatively small amount"; the court reporter may have simply heard or transcribed the word incorrectly. Regardless of what actually happened, PAC admits that it did not object to the instruction when it was given.

"[I]f no objection to the instructions was raised at trial, we only review for plain error." *Starke,* 62 F.3d at 1380 (citing *United States v. Andrews,* 850 F.2d 1557, 1559 (11th Cir.1988), *cert. denied,* 488 U.S. 1032, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989)). Under the plain error standard, an instruction will not be reversed "unless 'the charge, considered as a whole, is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice,' or the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.' " *United States v. Pepe,* 747 F.2d 632, 675 (11th Cir.1984) (quoting *United States v. Thevis,* 665 F.2d 616, 645 (5th Cir. Unit B), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303, *and cert. denied,* 458 U.S. 1109, 102 S.Ct. 3489, 73 L.Ed.2d 1370, *and cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982)). Analyzing this alleged misstatement in the oral jury instruction, it is clear to us that it does not constitute plain error.

C. Infringement of the Hardware Logic Diagrams

PAC raises four separate issues on appeal concerning the jury award for Bateman and Fricker for PAC's alleged infringement of the copyrighted hardware logic diagrams (Count II). Given our conclusion regarding the improper jury instructions as to Count I and our resultant order of a new trial, we need not address in detail the issues on appeal as to Count II.[34] Federal Rule of Civil Procedure 59(a) permits a court to grant a new trial "on all or part of the issues." The Supreme Court has set forth the standard governing the grant of new trials, and it is as follows: "[w]here the practice permits a partial new trial, it may not properly be resorted to *unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.*" *Gasoline Prods. Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931) (emphasis added); *see also Overseas Private Inv. Corp. v. Metropolitan Dade County,* 47 F.3d 1111, 1113 (11th Cir.1995) (quoting same).

34 Because it may resurface on remand, we briefly address one of the issues on appeal regarding the hardware logic diagrams. We find that the district court was correct in concluding that Fricker's delivery of a single copy of the hardware logic diagrams to PAC, even though it did not contain a copyright notice on it, was not a public distribution and thus the forfeiture provisions of 17 U.S.C. § 405 do not come into play. We disagree, however, with the district court's finding that, *as a matter of law,* one copy is a "relatively small number" under 17 U.S.C. § 405(a)(1). *See Donald Frederick Evans,* 785 F.2d at 910 (noting that the question of what constitutes a "relatively small number" under the savings provision of § 405(a)(1) "cannot be answered merely by reference to an absolute number" and rather "must be answered on a case-by-case basis in light of the totality of the circumstances").

Given this standard, we do not believe that a partial new trial only as to Count I would be proper here. We are convinced that the jury was not properly instructed on Count II, and that the general instructions relative to distinguishing copyrightable subject matter from unprotectable work manifestly ***1549** infected the deliberative processes of the jury with regard to its evaluation of the infringement claims under Count II. It is quite clear that Counts I and II, although ostensibly involving infringement of separately copyrighted

material, are not "so distinct and separable" from one another to permit a retrial of only one "without injustice"; stated differently, the two counts are sufficiently interwoven and intertwined so as to require a new trial on both counts. *See, e.g., Shessel v. Murphy,* 920 F.2d 784, 787 (11th Cir.1991); *FIGA v. R.V.M.P. Corp.,* 874 F.2d 1528, 1534 (11th Cir.1989). Therefore, we vacate the judgment of the district court as to Count II as well and remand for a new trial.

D. The Trade Secret Misappropriation Claim

Although Counts I and II are clearly intertwined, Count VI, a pendent state law trade secret claim, is separate and distinct from Counts I and II, and thus we must fully discuss the issues relevant to it on appeal. PAC contends that the district court erred in denying its motions for directed verdict and JNOV on the trade secret claim. Bateman and Fricker, in their sole issue on cross-appeal, contend that the district court abused its discretion in refusing to award exemplary damages on their trade secret claim pursuant to Fla.Stat. § 688.004(2), given the evidence that supported the jury verdict in Bateman and Fricker's favor on this count.

Our review of the district court's disposition of motions for a directed verdict and JNOV is *de novo. Colvin v. Housing Auth. of Sarasota,* 71 F.3d 864, 866 (11th Cir.1996) (per curiam). The appellate court employs the same standard utilized by the district court in determining whether to grant the motions —"[w]e review all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party," and "[i]f the facts and inferences are so strong and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict, the grant of a directed verdict is proper." *Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995) (citation omitted). What is required in order for the motion to be denied is substantial evidence of "such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Id.* As this court has stated before, however, "a jury question does not exist because of a 'mere scintilla of evidence'; rather, '[t]here must be a conflict in substantial evidence to create a jury question.' " *Id.* (quoting *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir.1989) (quoting *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969)), *cert. dismissed,* 493 U.S. 1064, 110 S.Ct. 884, 107 L.Ed.2d 1012 (1990).

In the case at bar, Bateman and Fricker's state law trade secret claim is predicated upon the existence of an implied confidential relationship. Given the backdrop of federal preemption pursuant to section 301 of the Copyright Act, we must carefully review this state law claim to ascertain whether it requires an "extra element" for recovery, for "[a] state law claim is not preempted if the 'extra element' changes 'the nature of the action so that it is *qualitatively* different from a copyright infringement claim.' " *Altai,* 982 F.2d at 716 (quoting *Mayer v. Josiah Wedgwood & Sons, Ltd.,* 601 F.Supp. 1523, 1535 (S.D.N.Y.1985)). As a general matter, state law trade secret statutes have been deemed not to be preempted because the plaintiff must prove the existence and breach of a confidential relationship in order to prevail. As the court in *Altai* stated, "[t]he defendant's breach of duty is the gravamen of such trade secret claims, and supplies the 'extra element' that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely upon copying." *Id.* at 717.

We have no doubt that the Florida trade secret statute at issue satisfies the "extra element" test generally employed by courts in performing copyright preemption analysis. However, we find that the evidence presented by Bateman and Fricker, even viewed in the light most favorable to them, fails to establish the existence of a confidential relationship sufficient to trigger liability. ***1550** We are wary of any trade secret claim predicated on the existence of an "implied" confidential relationship, because we are aware that artful pleading and presentation of evidence seemingly may create a pendent state law claim that in actuality is nothing more than a dressed up version of a copyright infringement claim. Bateman and Fricker are correct in asserting that Florida law recognizes implied confidential relationships sufficient to trigger trade secret liability. *See Dotolo v. Schouten,* 426 So.2d 1013, 1015 (Fla.Dist.Ct.App.), *petition for review denied,* 434 So.2d 888 (Fla.1983). However, the Florida cases, as well as those in other jurisdictions recognizing such an implied confidential relationship, all involve situations in which the party claiming trade secret misappropriation made it clear to the parties involved that there was an expectation and obligation of confidentiality. In the case at bar, it is not the lack of a written confidentiality agreement that is fatal to the trade secret claim; rather, it is the lack of any substantial evidence that PAC was ever made aware of any obligation of confidentiality to Bateman and Fricker regarding the engineering materials at issue.[35] Absent such a showing, all that remains of Bateman and Fricker's trade secret claim is their unilateral assertion that they had an implied confidential relationship with PAC. We find that, based on the record before us, Bateman and Fricker failed to produce sufficient evidence as to the existence of the

implied confidential relationship, and thus PAC was entitled to judgment as a matter of law on this count. Therefore, the district court erred in failing to grant PAC's motions for directed verdict and JNOV, and the judgment of the district court on the trade secret misappropriation claim is reversed.[36]

35 Bateman and Fricker contend that the fact that PAC signed for the engineering materials when Fricker delivered them to it and the fact that it required Fricker to sign them out when they were "loaned" back to him is strong evidence that PAC treated these materials as trade secrets. We are unpersuaded by this contention—the mere fact that PAC employed standard business inventory practices does not create the confidential relationship that is needed for Bateman and Fricker to prevail on their trade secret misappropriation claim.

36 In light of our resolution of the trade secret issue, we need not address Bateman and Fricker's cross-appeal concerning the award of exemplary damages under Fla.Stat. § 688.004(2).

IV. CONCLUSION

The district court committed reversible error as to Count I both in improperly instructing the jury to filter out only instances of nonliteral copying in the "substantial similarity" analysis, and in not instructing the jury on the legal consequences of copying dictated by compatibility requirements. Since Count I and Count II are not "so distinct and separable" as to permit a partial new trial on Count I alone, the judgment of the district court is VACATED on Counts I and II, and the case is REMANDED for a new trial on these counts. The judgment of the district court on the trade secret misappropriation count is REVERSED, and the district court is instructed to enter judgment as a matter of law for PAC on the trade secret count.

VACATED IN PART; REVERSED IN PART, and REMANDED.

**All Citations**

79 F.3d 1532, 38 U.S.P.Q.2d 1225

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

283 Ga.App. 711
Court of Appeals of Georgia.

SATISFACTION & SERVICE HOUSING, INC.
v.
SOUTHTRUST BANK, INC.

No. A06A2351.
|
Feb. 22, 2007.

**Synopsis**
**Background:** Mobile home dealer brought declaratory judgment action against purchaser of home loans, seeking to ascertain whether agency relationship existed between lender that provided financing for sale of mobile home, and purchaser of the loan, such that loan purchaser could be held liable for lender's debt. The Superior Court, Bulloch County, Turner, J., granted purchaser's motion for summary judgment. Dealer appealed.

**Holdings:** The Court of Appeals, Ruffin, J., held that:

evidence was insufficient to demonstrate that purchaser had control over lender's work, as required to establish actual agency, and

dealer failed to demonstrate that purchaser engaged in conduct causing dealer to believe that lender was its agent, as required to create apparent agency.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

****364** Lloyd D. Murray, Christy C. Balbo, Richmond Hill, for appellant.

Franklin, Taulbee, Rushing, Snipes & Marsh, William K. McGowan, Statesboro, for appellee.

**Opinion**

RUFFIN, Judge.

***711** Satisfaction & Service Housing, Inc. ("S&S Housing") brought a declaratory judgment action to ascertain whether an agency relationship existed between SouthTrust Bank, Inc. ("SouthTrust") and Bergen Acceptance Corporation ("Bergen") such that SouthTrust ****365** could be held liable for Bergen's debt.[1] The trial court granted SouthTrust's motion for summary judgment, finding no evidence that such agency relationship existed. For reasons that follow, we affirm.

1 SouthTrust was a defendant, but Bergen was not a party to the declaratory judgment action.

***712** To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, and that the undisputed facts, viewed in a light most favorable to the party opposing the motion, warrant judgment as a matter of law.[2] On appeal from the grant of a motion for summary judgment, we apply a de novo standard of review.[3]

2 See OCGA § 9–11–56(c); *Lau's Corp. v. Haskins*, 261 Ga. 491, 405 S.E.2d 474 (1991).

3 See *McCaskill v. Carillo*, 263 Ga.App. 890, 589 S.E.2d 582 (2003).

So viewed, the evidence shows that Bergen purchased manufactured housing loans and resold them to specific investors. Bergen only purchased loans that an investor had already approved. At times, Bergen sold loans to multiple investors. In 2000, Bergen and SouthTrust entered into an agreement in which Bergen proposed to sell such loans to SouthTrust, subject to SouthTrust's approval of the loans. SouthTrust set certain criteria for the loans it purchased, including a minimum credit score for the homeowner. SouthTrust also set the base interest rate for the loans, but allowed Bergen to raise the rate a small amount—up to 1 ½ percent—as payment to Bergen.

In 2002, S&S Housing, a mobile home dealer, entered into a contract with Randy and Linda Morris for the sale of a manufactured home. S&S Housing assigned the Morris contract to Bergen for funding, in exchange for Bergen's promise to pay $75,862.30. Bergen then assigned the Morris contract to SouthTrust in exchange for an amount in excess of the principal, which SouthTrust paid to Bergen. Thereafter, Bergen filed for bankruptcy before it paid S&S Housing the

money it owed under the original assignment of the Morris contract.

S&S filed the instant case to recover from SouthTrust the funds owed under the Morris contract. S&S did not contend that SouthTrust has a contractual obligation to pay the money. Instead, S&S sought a declaratory judgment, asserting that SouthTrust was liable to S&S for the money owed because Bergen acted as SouthTrust's agent and merely facilitated the loan purchase for SouthTrust. SouthTrust moved for summary judgment, disputing that Bergen acted as its agent, and the trial court granted the motion.

In its sole enumeration of error, S&S contends that the trial court erred in concluding that there was no agency relationship between Bergen and SouthTrust. In Georgia, an agency relationship is created "wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his ***713** behalf."[4] Thus, it is the actions of the principal that create an agency relationship.[5]

4 OCGA § 10–6–1.

5 See *Ellis v. Fuller,* 282 Ga.App. 307, 309(1), 638 S.E.2d 433 (2006).

To prove actual agency, the purported principal must have assumed the right to control the method, manner, and time of the purported agent's work, "as distinguished from the right merely to require certain definite results in conformity to the contract."[6] The right to control the purported agent's time means the right to control the hours of work.[7] The right to control the method and manner of work means the right to tell the purported agent "how to perform all details of the job, including the tools he should use and the procedures he should follow."[8]

6 *Dix v. Shadeed,* 261 Ga.App. 145, 146(1), 581 S.E.2d 747 (2003); see also *Webb v. Day,* 273 Ga.App. 491, 492–493(1), 615 S.E.2d 570 (2005).

7 See *Rains v. Dolphin Mtg. Corp.,* 241 Ga.App. 611, 613(2), 525 S.E.2d 370 (1999); *Neese v. Britt Home Furnishings*, 222 Ga.App. 292, 293(2), 474 S.E.2d 44 (1996).

8 *Rains,* supra.

Here, the record is devoid of any evidence that SouthTrust assumed the right ****366** to control the time, manner, and method of Bergen's work. The fact that Bergen earned money from the loans it sold to SouthTrust does not show that SouthTrust assumed such control over Bergen's work.[9] Neither does SouthTrust's requirement that the loans it purchased meet certain criteria establish control.[10] Thus, the trial court properly concluded that there was no actual agency relationship between Bergen and SouthTrust.

9 See id. at 614, 525 S.E.2d 370.

10 See, e.g., *BP Exploration & Oil v. Jones,* 252 Ga.App. 824, 825–826(1)(a), 558 S.E.2d 398 (2001) (requiring compliance with certain standards does not equate to controlling the manner and method of work such that an agency relationship is created) (physical precedent only); *Asbell v. BP Exploration & Oil*, 230 Ga.App. 700, 703(1), 497 S.E.2d 260 (1998); *Wells v. Vi–Mac, Inc.,* 226 Ga.App. 261(1), 486 S.E.2d 400 (1997).

Nor can Bergen be said to have been an apparent agent of SouthTrust. "Apparent authority to do an act is created as to a third person when the statements or conduct of *the alleged principal* reasonably cause the third party to believe that the principal consents to have the act done on his behalf by the purported agent."[11] S&S contends that "SouthTrust held out Bergen as its agent." To support this assertion, S&S states that it understood that SouthTrust would be financing the loan because the funding package named SouthTrust, and because SouthTrust funded all previous loans between Bergen and S&S.[12] However, S&S fails to provide any evidence ***714** that *SouthTrust* engaged in conduct that caused S&S to believe that Bergen was its agent. Thus, its claim of apparent agency fails as a matter of law, and the trial court properly granted summary judgment to SouthTrust.[13]

11 (Punctuation omitted; emphasis in original.) *Augusta Surgical Center v. Walton & Heard Office Venture,* 235 Ga.App. 283, 286(2), 508 S.E.2d 666 (1998).

12 S&S fails to support these assertions with references to the record, in violation of Court of Appeals Rule 25(c)(3)(i). We will not cull the record on behalf of S&S. See *Migmar, Inc. v.*

*Williams,* 281 Ga.App. 870, 871(1), 637 S.E.2d 471 (2006).

13 See *Augusta Surgical Center,* supra at 287, 508 S.E.2d 666.

*Judgment affirmed.*

SMITH, P.J., and PHIPPS, J., concur.

**All Citations**

283 Ga.App. 711, 642 S.E.2d 364, 07 FCDR 524

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

302 Ga.App. 521
Court of Appeals of Georgia.

BARRS
v.
ACREE, et al.

No. A10A0230.
|
Feb. 25, 2010.

**Synopsis**
**Background:** Neighboring landowner brought negligence action against alleged landowner, and alleged landowner's alleged employee or agent for property damage stemming from fire set on alleged landowner's property that burned out of control. The Superior Court, Cook County, McClain, J., granted summary judgment against neighboring landowner, and he appealed.

**Holdings:** The Court of Appeals, Mikell, J., held that:

evidence was insufficient to establish that an actual agency relationship existed between alleged landowner and alleged employee;

evidence was insufficient to show agency by implication between alleged landowner and alleged employee;

evidence was insufficient to support claim of agency by ratification; and

trial court did not abuse its discretion in refusing to allow neighboring landowner to substitute actual landowner as defendant.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

****577** Martin Snow, Thomas P. Allen III, Macon, for appellant.

Cowart & Perry, Markie E. Perry II, Daniel L. Studstill, Valdosta, for appellees.

**Opinion**

MIKELL, Judge.

***521** Earl Barrs brought this negligence action against Russell Acree and Acree's brother-in-law, Wesley Hall,[1] for property damage stemming from an incident on August 8, 2002, when a fire set on land adjacent to Barrs's burned out of control. Barrs alleged that Acree was liable for Hall's negligent acts under the principle of respondeat superior, because Hall was either his employee or agent when the acts occurred. Acree moved for summary judgment, contending that Acree Investments, Ltd. ("Acree Investments"), owned the land and also employed Hall. The trial court granted Acree's motion for summary judgment and also denied Barrs's motion to substitute Acree Investments as a party defendant for Acree. Barrs appeals ***522** both rulings. We affirm.

1 Hall died in 2006.

> To prevail at summary judgment ..., the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial.... If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.[2]

2 (Citations omitted; emphasis in original.) *Lau's Corp. v. Haskins,* 261 Ga. 491, 405 S.E.2d 474 (1991).

"We review de novo a trial court's grant or denial of summary judgment."[3] Viewed in favor of Barrs, the record shows that on August 8, 2002, the Georgia Forestry Commission issued a burn permit to Hall. According to Forestry Ranger–1 Donald Lee Tawzer, Jr., Hall called and asked for a burn permit "for Dr. Acree at Big Pond for burning ten acres of site prep work."

The "Burning Authorization Log" lists "Russell Acree" as the landowner and "Wes Hall" as the person responsible; however, Tawzer could not state for certain that Hall told him he was burning the land for Russell Acree. When asked during his deposition who Hall said he was burning land for, Tawzer testified that, "[h]e could have said Russell [or] Dr. Acree Investments, but I've known Dr. Acree from the past, and I just put Dr. Acree." Several hours later, at approximately 10:42 a.m., Hall called Tawzer to advise that the fire had gotten out of control. When Tawzer arrived on the scene ten minutes later, he noticed that Hall had been burning brush piles and that the fire was heading toward Barrs's property because Hall had not cut proper fire breaks. Tawzer **578 used his tractor to cut fire breaks, and, although he was able to bring the fire under control by 11:40 a.m., it burned 4.86 acres of land owned by Acree Investments. According to Hall, Tawzer advised him that the fire was under control and told him he could leave to get some lunch. Tawzer disputes that he ever told Hall he could leave for lunch.

3 (Punctuation and footnote omitted.) *Dozier Crane & etc., v. Gibson,* 284 Ga.App. 496, 497, 644 S.E.2d 333 (2007).

*523 Approximately two hours after he had secured the scene and left, Tawzer received a call from the pilot of the Forestry Commission's airplane, reporting that a fire had started on Barrs's property, adjacent to the Acree property. Tawzer again reported to the scene, and he and several other units were able to bring the fire under control by that evening. According to Tawzer, 78.2 acres of woodland "burned on Barrs's property and [16.2] acres burned on McDevitt Farms's property." According to Tawzer, the fire was caused by wind getting in "Hall's burn" and causing it to jump the fire breaks.

Acree admitted that at one time, Hall had worked for him individually and been his employee on a farm that he personally owned. However, at the time of the fire, Hall was employed and paid a salary by Acree Investments. Acree Investments was started by Acree in 1995, and is run by his three children. Acree is listed as the company's registered agent and handles some of the company's affairs in a voluntary capacity; however, he is not an officer or employee of the company. As part of his duties for Acree Investments, Hall prepared the company's land for planting pine trees. According to Russell Acree, his children would determine which lands would be planted; Acree would then pass along that information to Hall on behalf of Acree Investments; and then Hall would prepare the land. Hall worked independently and Acree did not know that he was planning to request a burn permit on August 8, 2002. According to Acree, Hall had carried out many burns on the company's land.

Acree acknowledged that after the fire, he and Barrs exchanged several letters regarding Barrs's estimated losses. In those letters, Acree neither admitted liability nor denied Barrs's claim that the "fire started as a result of the burning of brush piles by your employee on land owned by you." However, Acree advised Barrs that he wanted to bring the matter to a close by "making Barrs whole." Acree's letters were on his personal stationery and signed by him individually. When the parties failed to resolve the matter, Barrs filed the instant action.

1. Barrs contends that the trial court erred in granting Acree's motion for summary judgment because there remain genuine issues of material fact as to whether Hall's conduct should be ascribed to Acree under OCGA § 51–2–1. We do not agree.

> Although one may be liable for the acts of his employees or agents under OCGA § 51–2–2, to impose liability under respondeat superior, some relationship must exist between the principal and agent or employer and employee. For the negligence of one person to be properly imputable to another, the one to whom it is imputed must stand in such a *524 relation or privity to the negligent person as to create the relation of principal and agent. OCGA § 51–2–1(a). [4]

4 (Punctuation omitted.) *Gaskins v. Gaona,* 209 Ga.App. 322, 323(2), 433 S.E.2d 408 (1993).

Apparently conceding that no employer/employee relationship existed between Hall and Acree, Barrs contends that Hall held himself out as Acree's agent. In support of this claim, Barrs points to the following facts: (1) Acree and Hall had a prior employment relationship; (2) Hall held himself out as Acree's agent by advising Tawzer that he was burning the land for Acree; (3) Acree ratified Hall's actions by sending written communications to Barrs "in which he fully acknowledged what had occurred, purported to defend the conduct of 'the persons doing the burning' while in no

way [disassociating] himself therewith, and spoke constantly in the first person while failing entirely to suggest anyone else's responsibility or involvement"; and (4) Acree waited until after Barrs filed suit to identify Acree Investments as the proper party.

"The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him ****579** or subsequently ratifies the acts of another in his behalf."[5] "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."[6] In order to show actual agency, the purported principal must assume the right to control the time, manner, and method of the purported agent's work.[7] There is no evidence in the record to establish that an actual agency relationship existed between Acree and Hall. The evidence shows that Hall was employed by Acree Investments and Barrs has presented nothing to dispute this evidence.[8] Moreover, while Acree instructed Hall to clear the land, there is no evidence that Acree, who was visiting Atlanta at the time of the fire, had the right to control the time and manner of the burn. Quite the contrary, Acree specifically testified that Hall worked independently; that he did not know Hall was planning to request a burn permit on August 8, 2002; and that it was "left [to Hall] to decide when he was going to do things and how he was going to do [them]." While Acree, on behalf of Acree ***525** Investments, told Hall which lands to "site prep," Acree never instructed Hall on how to burn the property or cut fire breaks.[9]

5 OCGA § 10–6–1.

6 (Citation and punctuation omitted.) *Webb v. Day,* 273 Ga.App. 491, 492(1), 615 S.E.2d 570 (2005).

7 *Dix v. Shadeed,* 261 Ga.App. 145, 146(1), 581 S.E.2d 747 (2003).

8 See *Withrow Timber Co. v. Blackburn,* 244 Ga. 549, 551, 261 S.E.2d 361 (1979) ("the bare denial of the existence of an agency relationship, when made by a purported party to the relationship, is a statement of fact sufficient to support a motion for summary judgment in an action based on the doctrine of respondeat superior") (citations omitted).

9 See, e.g., *Gaskins,* supra (reversing denial of summary judgment to defendant in negligence action where there was no evidence he employed plaintiff, authorized him to act in his behalf, or had any right to control his activities).

Barrs also cannot show agency by implication. Although Barrs argues that Hall held himself out as Acree's agent when securing the burn permit, the record is devoid of evidence to support this assertion. Tawzer merely assumed that the burn permit was for Acree and could not say definitively whether Hall stated that he was conducting the burn for Russell Acree or Acree Investments. Neither can an agency relationship be implied from the fact that Russell Acree previously employed Hall at his private farm. Barrs cites no authority, and our research reveals none, holding that an implied agency relationship can be established by proof of a past employment relationship between the parties.

We also reject Barrs's claim of agency by ratification based on Acree's post-fire communications with Barrs and his "glaring failure until suit was filed to identify [Acree Investments as] the true 'principal.' " "[A] party may express regret for the conduct of another and offer to pay for any resulting damages without ratifying that person's acts such that an agency relationship is created."[10] Finally, while a presumption of ratification may arise from mere silence or acquiescence,[11] under the circumstances here, we fail to see how Acree's delay in identifying Acree Investments as Hall's employer and/or the proper defendant is evidence of an agency relationship by ratification.

10 *Ellis v. Fuller,* 282 Ga.App. 307, 311(2), 638 S.E.2d 433 (2006), citing *Basinger v. Huff,* 98 Ga.App. 288, 105 S.E.2d 362 (1958).

11 See *Medley v. Boomershine Pontiac–GMC Truck,* 214 Ga.App. 795, 798–799(4), 449 S.E.2d 128 (1994).

2. Barrs next contends that the trial court abused its discretion when it denied his motion to substitute Acree Investments. We disagree. As previously mentioned, the incident at issue occurred on August 8, 2002. Barrs's original complaint was filed on April 13, 2004, and Acree and Hall were served the next day. Approximately two months later, on June 28, 2004, Acree served Barrs with an answer to Barrs's first interrogatories, stating that he was not a proper party to the action, did not own the adjacent land, and ****580** was not involved in the fire incident. Acree answered that "Acree Investments, LLC," which owned the property, was the proper party defendant and that service would be acknowledged by

Acree Investment's attorney. Five years later, and three years after the statute of limitation ran, [12] Barrs filed a motion to substitute "Acree Investments, ***526** Ltd.," as a party defendant, for Acree.

12 OCGA § 9–3–30(a).

OCGA § 9–11–15(a) allows a party to amend his pleading as a matter of right at any time before the entry of a pretrial order. However, when a party wishes to add or drop a party by amendment, "leave of court must first be sought and obtained pursuant to OCGA § 9–11–21." [13] However, under the facts of this case, the addition of a party was authorized under OCGA § 9–11–15(c) only if Barrs could show that (1) the amended claim against the new defendant arose out of the same facts and circumstances as the original complaint; (2) the new defendant had sufficient notice of the institution of the suit; and (3) the new defendant knew or should have known that, but for a mistake concerning his identity as a proper party defendant, the action would have been brought against him. [14] Additionally, in determining whether to allow an amendment to add a party, the trial court may consider "whether the new [party] will be prejudiced thereby and whether the movant has some excuse or justification for having failed to name and serve the new [party] previously." [15]

13 (Citations omitted.) *Horne v. Carswell,* 167 Ga.App. 229, 230, 306 S.E.2d 94 (1983).

14 *Cobb v. Stephens,* 186 Ga.App. 648, 649–650, 368 S.E.2d 341 (1988).

15 (Punctuation and footnote omitted.) *Ellison v. Hill,* 288 Ga.App. 415, 418(2), 654 S.E.2d 158 (2007). See also *Riding v. Ellis,* 297 Ga.App. 740, 742–743(1), 678 S.E.2d 178 (2009); *Hall v. Scott USA,* 198 Ga.App. 197, 198–199(1), 400 S.E.2d 700 (1990). Compare *Horne,* supra at 231, 306 S.E.2d 94.

In this case, Barrs was aware of Acree Investments's existence and its potential liability for almost five years. At the hearing on the motion for summary judgment, counsel for Barrs blamed substitutions of counsel for the delayed filing as well as Acree's confusing and misleading interrogatory responses; counsel argued that although Acree consistently answered that he was not the proper party, he never divulged the proper party, and when he did, the designation was incorrect, Acree Investments, LLC, instead of Acree Investments, Ltd. [16] Counsel further attempted to justify the delayed filing by pointing out evidence in the record of letters Acree wrote to Barrs on his personal stationery, denying any liability, but offering to reimburse Barrs for his losses. Obviously, the trial court discounted these excuses, finding instead that Barrs was aware of Acree Investments's existence and potential claims against it, as early as June 28, 2004. "The determination of whether a party should be added to a lawsuit lies within the discretion of the trial court, and ***527** that determination will not be disturbed on appeal absent a showing of abuse." [17] Given that Barrs was aware of Acree Investments and the potential claims against it for five years, it cannot be said that the trial court abused its discretion in denying the motion. [18]

16 Counsel's claim is misleading and disingenuous. Acree divulged the name of the proper party *less than* three months after Barrs filed this action. And although the company designation was erroneous, a simple search of the Georgia Secretary of State's website, http://www.sos.ga.gov/corporations/, would have revealed that Acree Investments is not a limited liability company.

17 (Punctuation and footnote omitted.) *Ellison,* supra.

18 See, e.g., *Ellison,* supra (denial of motion to add three of four potential defendants affirmed where the plaintiff was aware of the parties and the potential claims against them for at least seventeen months); *Maitlen v. Derst,* 178 Ga.App. 305, 307, 342 S.E.2d 777 (1986) (denial of motion to amend complaint and add party plaintiff affirmed where suit had been pending and active for over seven years and the potential plaintiff knew of its existence). Compare *Miller v. Fulton County,* 258 Ga. 882, 883(2), 375 S.E.2d 864 (1989) (denial of husband's motion to substitute his wife, the legal owner of their home, as plaintiff, reversed where record reflected that when the husband discovered the wife had been inadvertently omitted, he moved promptly to correct the omission).

****581** 3. In light of our holding in Divisions 1 and 2, we need not consider Barrs's remaining enumerations of error; namely, that the trial court's grant of summary judgment should be reversed because Acree was responsible for Hall's per se violations of Georgia's laws governing arson and prescribed burns.

*Judgment affirmed.*

SMITH, P.J., and ADAMS, J., concur.

**All Citations**

302 Ga.App. 521, 691 S.E.2d 575, 10 FCDR 585

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

261 Ga.App. 145
Court of Appeals of Georgia.

DIX
v.
SHADEED.

No. A02A1333
|
May 6, 2003.

**Synopsis**
Patient brought medical malpractice action against doctor and professional corporation. The State Court, DeKalb County, McLaughlin, J., granted professional corporation's motion for summary judgment and denied patient's cross-motion for summary judgment. Patient appealed. The Court of Appeals, Smith, C.J., held that evidence was insufficient to establish existence of actual agency relationship between doctor and professional corporation.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

***148 **747** Hill & Bleiberg, Robert P. Bleiberg, Atlanta, for appellant.

Carlock, Copeland, Semler & Stair, Thomas S. Carlock, Ashley E. Taylor, Atlanta, for appellee.

**Opinion**

***145** SMITH, Chief Judge.

Janice Miller brought this medical malpractice action against Baheeg Shadeed, M.D., B. Shadeed, M.D., P.C. a/k/a Baheeg L. Shadeed, M.D., P.C., and Elite Surgical, P.C. B. Shadeed, M.D., P.C. moved for summary judgment and to transfer for improper venue, and Miller filed a cross-motion for summary judgment on the issues of agency and venue. In a lengthy and detailed order, the trial court denied Miller's motion and granted the motion of B. Shadeed, M.D., P.C.

This appeal followed, and it addresses only the issue of venue as to B. Shadeed, M.D., ****748** P.C.; the merits of the case are not involved and remain pending with respect to the other parties. After Janice Miller's death during the pendency of this appeal, Cheryl Dix, the administratrix of her estate, was substituted as plaintiff/appellant. We affirm the trial court's order.

Miller brought this action in DeKalb County State Court. Miller herself, the defendant physician Baheeg Shadeed, M.D., and the physician's professional corporation, Elite Surgical, P.C., are all residents of Cobb County. B. Shadeed, M.D., P.C. ("the DeKalb P.C.") is a professional ***146** corporation, incorporated in 1993, which had an office located in DeKalb County before the events giving rise to this action. In 1998, Dr. Shadeed closed this office and ceased to conduct business at that address. The corporation, although it was not formally dissolved with the Secretary of State's office, officially ceased business operations by April 1999. Defendant Elite Surgical, P.C. ("the Cobb P.C.") was incorporated on April 5, 1999, and its office is located in Cobb County. Miller first sought treatment from Dr. Shadeed on August 31, 1999, and she was treated at all times at the Cobb County office.

Liability of the DeKalb P.C. is based on the allegation that Dr. Shadeed performed his duties as a medical doctor while acting as an employee, agent and servant of the professional corporation, Defendant B. Shadeed M.D., P.C. acting within the course and scope of his employment. Said professional corporation is thereby liable for the medically negligent acts and omissions as outlined hereinabove which were committed by Defendant Baheeg Shadeed, M.D.

1. Agency may be demonstrated in two ways: actual or apparent agency.

> An employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer. OCGA § 51–2–4. In the absence of evidence of actual control, the test distinguishing an employee from an independent contractor is whether the employer assumed the right to control the time, manner and method of executing the work, as distinguished

> from the right merely to require certain definite results in conformity to the contract.

(Citation and punctuation omitted.) *Fortune v. Principal Financial Group,* 219 Ga.App. 367, 368(1), 465 S.E.2d 698 (1995). In order to show actual agency, Dix must demonstrate that the DeKalb P.C. assumed the right to control the time, manner, and method of Dr. Shadeed's work. *Holmes v. Univ. Health Svc.,* 205 Ga.App. 602, 603, 423 S.E.2d 281 (1992). Dix argues that the DeKalb P.C. was still in existence. But this is not sufficient to show actual agency. As the trial court correctly noted, the uncontradicted evidence demonstrated that the DeKalb P.C. was not operating *as a medical practice* at the time Miller began treatment with Dr. Shadeed, and the doctor therefore did not provide medical services to Miller as an actual agent of the inactive DeKalb P.C.

***147** *Jennings v. Psychiatric Health Svcs.,* 258 Ga.App. 111, 573 S.E.2d 115 (2002), relied on by Dix in her reply brief, in fact supports the conclusion reached by the trial court. In *Jennings,* we held that the trial court correctly granted summary judgment to a doctor's professional corporation because it was not "an active and viable corporation," the doctor did not practice or treat the deceased as an agent or employee of the corporation, id., and the corporation did not control the time, manner, or method of the doctor's work. Id. at 113, 573 S.E.2d 115.

It is true that billing records may be used to prove or disprove an agency relationship. In *Jennings,* the billings simply reinforced the physician's contention that he did not act as the corporation's agent or employee. Here, in contrast, Dix points to a bill referring to both "Baheeg L. Shadeed MD" and "Baheeg L Shadeed MD PC" as evidence of agency because Miller was billed by the DeKalb P.C. But the second name is not identical to that of the DeKalb P.C., which is "B. Shadeed, M.D., P.C.," and that second name appears over the Cobb County rather than the DeKalb County address. The DeKalb County address appears nowhere on the bill.

Dix also points to the fact that the DeKalb P.C. was never formally dissolved, that a form Miller received included the old DeKalb County address as well as the Cobb County address, that a "Baheeg L. Shadeed, M.D., ****749** P.C." was also covered as an additional insured on the medical malpractice policy issued to Dr. Shadeed personally, and that the DeKalb County address as a scheduled location was not deleted from the policy until March 2000. Finally, in 1999 a bank instituted a legal action against B. Shadeed, M.D., P.C. for failure to repay a loan.

The trial court correctly noted, however, that this evidence points only to the continued legal existence of the DeKalb P.C., not its operation as a medical practice or its control of the time, manner, or method of Dr. Shadeed's work. At most, the facts pointed to by Dix merely suggest the possibility of an agency relationship. "In passing upon a motion for summary judgment, a finding of fact which may be inferred but is not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists." (Citation and punctuation omitted.) *Withrow Timber Co. v. Blackburn,* 244 Ga. 549, 553, 261 S.E.2d 361 (1979). "Exhibiting the mere possibility of a control situation falls short of the 'specific facts' required. [Cits.]" *Dennis v. Malt,* 196 Ga.App. 263, 266(4), 395 S.E.2d 894 (1990). The trial court correctly concluded that no question of material fact existed with respect to an agency relationship between Dr. Shadeed and the DeKalb P.C. at the time Miller received medical treatment.

2. Dix insists in her reply brief that "[a]ppellant always presented this case as an actual agency relationship." Because Dix therefore appears to have abandoned any argument with respect to the doctrine of apparent agency, we do not consider it.

*Judgment affirmed.*

RUFFIN, P.J., and MILLER, J., concur.

**All Citations**

261 Ga.App. 145, 581 S.E.2d 747, 03 FCDR 1503

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Lynn v. Lowndes County Health Services, LLC, 354 Ga.App. 242 (2020)


KeyCite Yellow Flag
Distinguished by Landcastle Acquisition Corp. v. Renasant Bank, 11th Cir.(Ga.), January 12, 2023

354 Ga.App. 242
Court of Appeals of Georgia.

LYNN
v.
LOWNDES COUNTY HEALTH SERVICES, LLC.

A19A2057
|
March 9, 2020
|
Certiorari Denied September 8, 2020

**Synopsis**
**Background:** Administratrix of patient's estate, who was patient's mother and who had signed arbitration agreement as patient's purported representative upon his admission to long-term care facility, brought action against facility for negligence and violations of Bill of Rights for Residents of Long-term Care Facilities. The State Court, Lowndes County, Ellen Golden, J., granted facility's motion to compel arbitration, and, following arbitration, granted administratrix's motion to confirm arbitration award of $125,000 in compensatory damages but denied her motion to tax costs against facility. Administratrix appealed.

**Holdings:** The Court of Appeals, Miller, P.J., held that:

administratrix had standing to challenge whether claims were subject to arbitration;

actual principal-agent relationship between mother and patient did not exist;

doctrine of apparent authority did not allow facility to rely on mother's signature on patient's behalf;

mother did not become patient's agent by ratification;

administratrix was not judicially estopped from arguing claims could not be arbitrated; and

arbitration agreement was not enforceable against mother personally under third-party beneficiary doctrine.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion to Compel Arbitration; Motion to Confirm Arbitration Award.

**Attorneys and Law Firms**

****626** Connor & Connor, Kenneth L. Connor, C. Caleb Connor, Anne K. Moore; Scott E. Gwartney, for appellant.

Coleman Talley, Gregory T. Talley, A. A. Howell IV, for appellee.

**Opinion**

Miller, Presiding Judge.

***242** ****627** Elnora Lynn, in her capacity as administratrix of the estate of her son Curtis Leon Thomas, appeals from the trial court's final order confirming her arbitration award against Lowndes County Health Services, LLC ("Lowndes County"), and denying her motion to tax costs against Lowndes County. Lynn argues that (1) the trial court erred by compelling arbitration because she had no authority to enter into an arbitration agreement on Thomas' behalf, and (2) the trial court erred by denying her motion for litigation fees because she was entitled to compensation for litigation expenses as the prevailing party in the arbitration proceeding under OCGA § 9-15-1. Because ***243** we conclude that Lynn did not have authority to sign the arbitration agreement on Thomas' behalf, we reverse the trial court's order compelling arbitration and we also reverse the trial court's order confirming the arbitration award. Because we reverse the trial court's order compelling arbitration, we do not address Lynn's claim concerning the denial of her motion to tax costs.

"We review a trial court's order granting or denying a motion to compel arbitration de novo. Additionally, the construction of an arbitration agreement, like any other contract, presents a question of law, which is subject to de novo review." (Citations and punctuation omitted.) *Web IV, LLC v. Samples Construction, LLC*, 349 Ga. App. 607, 824 S.E.2d 107 (2019). Moreover, "[t]he [appellee], as the part[y] seeking arbitration, bear[s] the burden of proving the existence of a valid and enforceable agreement to arbitrate." (Citations and punctuation omitted.) *United Health*

*Svcs. of Ga. v. Alexander*, 342 Ga. App. 1, 2 (2), 802 S.E.2d 314 (2017).

So viewed, the record shows that Thomas was born with Down syndrome, was mentally retarded, had cataracts, was blind in his right eye, and was only able to communicate by facial expressions and vocalizations. Thomas subsequently developed seizures, which required him to have 24-hour care, and he began living at various medical facilities at the age of 13. Lynn contacted the Parkwood Development Center ("the Center") [1] so that she could move Thomas to a facility closer to her home. Lynn moved Thomas to the Center on February 13, 2013. During the admission process, Lynn signed an arbitration agreement as Thomas' representative. The agreement stipulated that as to all disputes governed by the agreement, each party waived the right to a jury trial and agreed that all disputes between the parties would "be resolved through binding arbitration."

1 Lowndes County was alleged to have owned and operated the Parkwood Development Center.

According to Lynn, Thomas, who was 50 years old at the time he was moved to the Center, began to deteriorate after his arrival. Thomas allegedly began to experience episodes of vomiting and lost more than ten percent of his body weight. Thomas also allegedly developed a pressure wound on his right hip, lost his ability to walk and feed himself, and became very weak. Thomas was discharged and sent to another medical facility in August 2013 and later passed away on March 30, 2016. Lynn was subsequently appointed as the administratrix of Thomas' estate.

***244** Lynn filed the instant complaint against Lowndes County, alleging claims of negligence and violations of the Bill of Rights for Residents of Long-term Care Facilities. Lowndes County filed a motion to compel arbitration pursuant to the agreement Lynn signed upon Thomas' admission to the Center. Lynn challenged the motion on the basis that she had no authority to sign the arbitration agreement for Thomas. The trial court granted Lowndes County's motion to compel arbitration after concluding that Lynn had both actual and apparent authority to sign the arbitration agreement on Thomas' behalf, and that the agreement was enforceable because Lynn ratified the agreement after she was appointed as the administratrix of Thomas' estate.

An arbitration panel rendered a verdict in Lynn's favor and awarded $125,000 in compensatory damages. Lynn then filed a motion to confirm the arbitration award and to tax costs against Lowndes County under OCGA § 9-15-1. The trial court denied Lynn's motion to tax costs against Lowndes County, and this appeal followed.

****628** 1. Before we reach the merits of the appeal, we address, sua sponte, Lynn's standing as the administratrix of her son's estate to appeal the order confirming the arbitration award as the prevailing party in the arbitration proceeding. See *U-Haul Co. of Arizona v. Rutland*, 348 Ga. App. 738, 743 (1) n. 3, 824 S.E.2d 644 (2019) (stating that appellate courts may raise standing issue sua sponte).

It is a bedrock principle of appellate litigation that "[a] party generally may not appeal a ruling that benefitted him or her." *Landry v. Walsh*, 342 Ga. App. 283, 288 (3) n. 4, 801 S.E.2d 553 (2017). We have held, however, that "a claim that a contract dispute is not subject to arbitration constitutes an attack on the subject matter jurisdiction of the arbitrator." *Yates v. CACV of Colorado,* 303 Ga. App. 425, 432 (1), 693 S.E.2d 629 (2010). We note that in the trial court proceedings below, Lynn maintained the position that she had no authority to sign the arbitration agreement on Thomas' behalf. Accordingly, although Lynn prevailed in the arbitration proceeding, because she attacks the subject matter jurisdiction of the arbitrator, we will address the merits of the appeal. See also id. at 430 (1), 693 S.E.2d 629 ("[A] party cannot be required to submit to arbitration any dispute which [she] has not agreed so to submit.") (citation and punctuation omitted).

2. Lynn argues that the trial court erred by entering an order compelling arbitration because she lacked actual and apparent authority to sign the arbitration agreement on Thomas' behalf. ***245** We agree. [2]

> [T]he validity of an arbitration agreement is generally governed by state law principles of contract formation. [3] Under Georgia law, to constitute a valid contract, there must be, among other things, the assent of the parties to the terms of the contract. Thus, a party cannot be required to

submit to arbitration any dispute which he has not agreed so to submit.

(Citations and punctuation omitted.) *United Health Svcs. of Ga.,* supra, 342 Ga. App. at 2 (2), 802 S.E.2d 314.

2 Although Lynn was the prevailing party in the arbitration proceeding, she nevertheless has standing to appeal the order compelling arbitration. See OCGA § 9-9-16 ("Any judgment or any order considered a final judgment under this part may be appealed pursuant to Chapter 6 of Tile 5.").

3 This principle still applies in cases like the instant case, where the arbitration agreement states that the agreement is to be governed by the Federal Arbitration Act ("FAA"). *Yates,* supra, 303 Ga. App. at 430 (1), 693 S.E.2d 629.

In the instant case, Thomas did not personally assent to the arbitration agreement. Nevertheless, "traditional principles of agency law may bind a nonsignatory to an arbitration agreement." (Citation and punctuation omitted.) *Coleman v. United Health Svcs. of Ga.*, 344 Ga. App. 682, 683 (1), 812 S.E.2d 24 (2018). "[T]he relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." (Citation and punctuation omitted.) *United Health Svcs. of Ga.*, supra, 342 Ga. App. at 3 (2), 802 S.E.2d 314. Therefore, "a contract of agency signed by both parties is not essential to the creation of the principal-agent relationship." (Citation and punctuation omitted.) Id. at 3 (2) (a), 802 S.E.2d 314.

*(a) Actual Authority.*

Here, there is no evidence in the record that Lynn had actual authority to sign the arbitration agreement for Thomas. As the admissions director at the facility admitted in her affidavit, Lynn did not possess a power of attorney or any other document authorizing Lynn to sign the arbitration agreement or to take *any* action on Thomas' behalf.

Still, Lowndes County contends that Lynn had actual authority to sign the arbitration agreement for Thomas because the admissions director spoke with Lynn during the admissions process, the director averred that Lynn confirmed her authority to execute the agreement, and Lynn testified in her deposition that she had authority to sign the ***246** arbitration agreement. To support this argument, Lowndes County relies on our previous decisions in *Augusta Roofing & Metal Works v. Clemmons*, 97 Ga. App. 576, 103 S.E.2d 583 (1958), ****629** *Stone v. First Nat. Bank of Atlanta*, 159 Ga. App. 812, 285 S.E.2d 207 (1981), and *Salters v. Pugmire Lincoln-Mercury*, 124 Ga. App. 414, 184 S.E.2d 56 (1971). None of these cases, however, supports Lowndes County's argument.

It is true that in *Augusta Roofing & Metal Works*, we noted that sworn testimony of an agent is competent evidence of such agency. Id. at 578 (2), 103 S.E.2d 583. In *Stone*, this Court said that "[t]he bare assertion or denial of the existence of an agency relationship is a statement of fact when made by one of the purported parties to the relationship." (Citation and punctuation omitted.) *Stone*, supra, 159 Ga. App. at 814 (4), 285 S.E.2d 207. Similarly, in *Salters*, we stated that "[i]t has long been the Georgia rule that one who is a party to the relationship (the principal or agent) may testify as a fact as to the existence or non-existence of the relationship and that such testimony would not be subject to the objection that the statement was a conclusion or the ultimate fact." (Emphasis omitted.) *Salters*, supra, 124 Ga. App. at 415 (1), 184 S.E.2d 56.

These opinions merely stood for the proposition that a principal or an agent may testify as to their status as the principal or agent of the other without objection. None of these opinions can be interpreted for the proposition that such sworn testimony by a principal or an agent was sufficient *by itself* to prove that a principal-agent relationship did, in fact, exist, even in the presence of evidence that would negate such a relationship. Indeed, in subsequent decisions from this Court, we have been clear that although a principal or an agent may testify as a fact of their status as a principal or an agent of the other, such testimony must have some evidentiary support and is only conclusive on the question of an agency relationship when *both* the principal and agent testify of their status as to the other. See *Popham v. Landmark American Ins. Co.*, 340 Ga. App. 603, 607 (1) (a), 798 S.E.2d 257 (2017) ("[T]he label or characterization of the relationship by the purported agent is not sufficient to show what actual authority the agent had been given by the purported principal."); *Process Posters, Inc. v. Winn-Dixie Stores*, 263 Ga. App. 246, 251 (1), 587 S.E.2d 211 (2003) ("One who is a party to the relationship (principal or agent) may testify as a *fact* as to the existence or non-existence of the relationship. A statement

of 'fact,' of course, must have some supporting basis.") (citation and punctuation omitted; emphasis in original); *Beck v. Paideia School*, 191 Ga. App. 183, 184-185 (1), 381 S.E.2d 132 (1989) (dismissing agency claim where although the witness testified in his deposition that he was the agent for the principal, the evidence failed to prove the existence of an agency relationship). See also *Southern Tax Consultants v. Scott*, 267 Ga. 347, 478 S.E.2d 126 (1996) ***247** (stating that an agent's oath, "standing alone, would not constitute proof of agency against the property owner"). Thus, to the extent that Lowndes County relies on Lynn's deposition testimony to establish agency, Lynn's own testimony that she believed she had authority to sign the arbitration agreement on Thomas' behalf is insufficient by itself to conclude that she did, in fact, have authority to sign the agreement. Therefore, the trial court erred by ruling that Lynn had actual authority to sign the arbitration agreement on Thomas' behalf.

*(b) Apparent Authority.*

We also conclude that the trial court erred by ruling that Lynn had apparent authority to sign the arbitration agreement on Thomas' behalf.

> In order to recover under a theory of apparent or ostensible agency, a plaintiff must establish three elements: (1) that the alleged principal held out another as its agent; (2) that the plaintiff justifiably relied on the care or skill of the alleged agent based upon the alleged principal's representation; and (3) that this justifiable reliance led to the injury.

(Citation and punctuation omitted.) *Sage Atlanta Properties v. Hawxhurst*, 349 Ga. App. 758, 761, 824 S.E.2d 387 (2019). We have explained that

> [t]he doctrine of apparent agency is predicated on principles of estoppel, and its applicability, therefore, is determined by examining both the conduct of the alleged *principal* and the detrimental reliance on that conduct by the third party asserting the doctrine. Apparent authority creates ****630** an estoppel allowing third parties to bind a principal to the agent's acts on account of the principal's conduct, reasonably construed by third parties acting in innocent reliance thereon. The acts of the agent which create apparent authority may include written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him. While a finding of apparent agency cannot be based upon the assumption that an agency relationship exists, the conduct giving rise to apparent agency may be proved by proof of circumstances, apparent relations, and the conduct of the parties. Such evidence must show that the principal either intended to cause the third person to believe that the agent was authorized to act for him, or he should have realized that ***248** his conduct was likely to create such belief[.] A principal may be estopped from denying agency where his intentional or careless conduct causes a third party to believe that the transaction was entered into by or for him.

(Citation and punctuation omitted; emphasis supplied.) Id.

Here, there is no evidence of any words or conduct by Thomas which could have caused Lowndes County to believe that Thomas consented to Lynn signing the arbitration agreement on his behalf. As stated previously, Lowndes County was aware that Lynn did not possess a power of attorney or any other legal document authorizing Lynn to sign the arbitration agreement or to take *any* action on Thomas' behalf. Still, Lowndes County points to the fact that Thomas "made a mark" on an advocate form during the admission process to indicate his desire that his mother make decisions concerning him.[4] Thomas, however, who had been born with Down

syndrome, could not read or write but could only mark an "x" when directed. Thomas was also mentally retarded, was only able to communicate by facial expressions and vocalizations, and was not able to do anything for himself. There was also evidence that during Thomas' admission to the facility, Thomas was not capable of objecting to Lynn signing his paperwork. [5] Most importantly, the admissions director stated in her affidavit that she had personally observed Thomas during the admission process and was fully aware of his "handicap[s]" at the time he marked the advocate form. Therefore, in light of the circumstances and the admission director's observation and knowledge of Thomas' physical and mental limitations, Lowndes County was not justified in believing that Thomas had consented to Lynn signing the arbitration agreement on his behalf based upon his act of "marking" a separate advocate form. See *Ashburn Health Care Center v. Poole*, 286 Ga. App. 24, 25-27, 648 S.E.2d 430 (2007) (holding that there was no evidence that the husband had authority to sign the arbitration agreement on wife's behalf where there was no evidence that the wife knew about the agreement or authorized her husband to sign the agreement, and therefore the agreement was unenforceable against the wife's estate).

4 There is no evidence in the record that the arbitration form was ever presented to or discussed with Thomas.

5 The deposition testimony does not explain specifically why Thomas was unable to object to Lynn signing his paperwork.

Lowndes County argues extensively about Lynn's conduct, which it contends shows Lynn's apparent authority to sign the arbitration ***249** agreement for Thomas. Specifically, Lowndes County points to the fact that Lynn testified during her deposition that she was responsible for making all decisions concerning Thomas and that Thomas had relied on her for "everything." However, Lynn's "own action[s] of signing documents for her [son] [are] insufficient to create agency. Any manifestations of implied agency or apparent authority arising only through the words or acts of the purported agent are insufficient to authorize a finding that an agency existed." (Citation and punctuation omitted.) *United Health Svcs. of Ga.*, supra, 342 Ga. App. at 5 (2) (b), 802 S.E.2d 314. We have also been clear that "an agency finding cannot be based upon the assumption that an agency relationship exists or upon an inference drawn from the alleged agent's actions." (Citation ****631** and punctuation omitted.) Id. Therefore, because of the well-settled legal principles that a finding of apparent authority is based entirely on the *principal's* actions, and the absence of any words or conduct by Thomas consenting to Lynn taking any action on his behalf, the trial court erred by ruling that Lynn had apparent authority to sign the arbitration agreement.

Nevertheless, Lowndes County contends that even if Lynn lacked authority to sign the arbitration agreement for Thomas, the agreement is still enforceable because the trial court correctly ruled that the agreement was ratified upon Lynn's appointment as the administratrix of Thomas' estate. This argument, however, also fails.

It is well-settled law that a principal-agent relationship may also arise where one person "subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1. "Ratification of an act may be express or implied, including by the silence of the principal, but the principal must have full knowledge of all material facts." *McKean v. GGNSC Atlanta*, 329 Ga. App. 507, 511 (1) (b), 765 S.E.2d 681 (2014).

> It has long been the law in Georgia that a ratification by the principal relates back to the act ratified, and takes effect as if originally authorized. ... Where a principal is informed by his agent of what he has done, the principal must express his dissatisfaction within a reasonable time, otherwise his assent to his agent's acts will be presumed. Unless the principal repudiates the act promptly or within a reasonable time, a ratification will be presumed. But in order for a ratification to be binding, the principal must have had full knowledge of all material facts.

(Citation and punctuation omitted.) Id. See also *Ellis v. Fuller*, 282 Ga. App. 307, 310 (2), 638 S.E.2d 433 (2006) ("Ratification occurs when a principal knows of the agent's unauthorized act and, with full ***250** knowledge of all the material facts, accepts and retains the benefits of the unauthorized act.") (citation and punctuation omitted).

Here, there is no evidence that Thomas had any knowledge at any time of the arbitration agreement or that Lynn had signed the agreement on his behalf. Hence, in the absence

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

of any evidence to show that Thomas was aware that Lynn signed the arbitration agreement, he could not ratify the arbitration agreement. See *McKean*, supra, 329 Ga. App at 511-512 (1) (b), 765 S.E.2d 681 (holding that ratification was not shown where there was no evidence to show that the mother knew of her son's unauthorized act of signing an arbitration agreement on her behalf). Furthermore, Lowndes County's argument that ratification occurred by virtue of Lynn obtaining the letters of administration for Thomas' estate is also without merit. It is true that OCGA § 53-7-1 (a) allows a personal representative to ratify acts on behalf of the estate and that OCGA § 53-12-261 (b) (22)[3] gives the administrator the authority to arbitrate claims on behalf of the estate. There is, however, nothing in either statute to indicate that ratification of an agent's acts occurs automatically upon appointment as an administrator of an estate. Instead, OCGA § 53-7-1 (a) states that a personal representative *may* ratify and accept acts performed which are beneficial to the estate. Likewise, OCGA § 53-12-261 (b) permits the administrator to arbitrate claims, but the statute contains no *requirement* that an administrator arbitrate claims. Finally, since Thomas' death, Lynn has maintained the position that she did not have authority to sign the arbitration agreement, and she has consistently opposed arbitration while acting as Thomas' administratrix. Accordingly, for the reasons stated above, the trial court erred by ruling that the arbitration agreement was enforceable because it was ratified by Lynn.

3 The Letters of Administration provided Lynn with the power to act in accordance with OCGA § 53-12-261.

We also reject Lowndes County's argument that the arbitration agreement should be enforced under judicial estoppel principles and the third-party beneficiary doctrine.

As to Lowndes County's estoppel argument, "[u]nder the doctrine of judicial ****632** estoppel, a party cannot take a position, persuade a court to accept the same, and then later assert an inconsistent position." *Fox v. Norfolk Southern Corp.*, 342 Ga. App. 38, 59 (4) (b) n. 21, 802 S.E.2d 319 (2017).

> The essential function and justification of judicial estoppel is to prevent the use of intentional self-contradiction as a ***251** means of obtaining unfair advantage in a forum provided for suitors seeking justice. The primary purpose of the doctrine is not to protect the litigants, but to protect the integrity of the judiciary. The doctrine is directed against those who would attempt to manipulate the court system through the calculated assertion of divergent sworn positions in judicial proceedings and is designed to prevent parties from making a mockery of justice through inconsistent pleadings.

(Citation and punctuation omitted.) *Kamara v. Henson*, 340 Ga. App. 111, 112 (1), 796 S.E.2d 496 (2017). The determination of whether judicial estoppel applies involves three factors:

> First, the party's later position must be clearly inconsistent with its earlier position. Second, the party must have succeeded in persuading a court to accept the party's earlier position, because absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations. And third, a court must consider whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

(Citation and punctuation aomitted.) *Zahabiuon v. Automotive Finance Corp.*, 281 Ga. App. 55, 57 (1), 635 S.E.2d 342 (2006).

Here, we disagree with Lowndes County that Lynn asserted inconsistent positions. Although Lynn testified by deposition that she believed she had authority to sign the arbitration agreement, throughout the course of the proceedings Lynn has maintained the litigation position that she did not, in fact, have authority to sign the arbitration agreement. Moreover, Lowndes County cannot point to any prior proceeding in which Lynn asserted, and a court accepted, her claim that she had authority to sign the arbitration agreement on Thomas'

behalf. Lastly, we cannot discern any unfair advantage Lynn might receive in subsequent proceedings. Indeed, if this case proceeds to trial, the factfinder may render an unfavorable verdict to the estate. Accordingly, we reject Lowndes County's argument that the agreement should be enforced under judicial estoppel principles.

As to Lowndes County's argument that the agreement should be enforced under the third-party beneficiary doctrine, OCGA § 9-2-20 (b) provides: "The beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor ***252** on the contract." We have held that

> [a] person becomes a third-party beneficiary to a contract when one party to the contract promised another party to the contract to render some performance to the nonparty to the contract and both parties to the contract intended that the contract benefit the nonparty.

(Citation and punctuation omitted.) *Coleman*, supra, 344 Ga. App. at 685 (2), 812 S.E.2d 24.

Here, Lowndes County argues that the agreement is enforceable against Lynn personally because Lynn received benefits from the agreement and the agreement contained a stipulation that, "[i]n signing this Agreement, Patient/Resident Representative binds both Patient/Resident and Patient/Resident Representative individually." "[Lynn], however, has repudiated [any] alleged benefit[s] and does not seek to enforce the arbitration agreement." *Coleman*, supra, 344 Ga. App. at 685 (2), 812 S.E.2d 24. Moreover, "[a]lthough [Thomas] received care at the nursing facility, the arbitration provision was not part of — or required by — his admission agreement and has no bearing on the facility's duties and obligations with respect to the provision of care and treatment." (Punctuation omitted.) Id. at 685-686 (2), 812 S.E.2d 24.[4] Accordingly, ****633** under the facts of this case, we reject Lowndes County's claim that Lynn is bound by the arbitration agreement on the basis of the third-party beneficiary rule. See id. at 686 (2), 812 S.E.2d 24 (rejecting third-party beneficiary claim where patient did not seek to enforce the arbitration agreement and the agreement was not made a condition of admission to the facility).

4 The arbitration agreement stated that "[t]he signing of this Agreement is not a precondition to admission, expedited admission, or the furnishing of services to the Patient/Resident by the Healthcare center," and also stated that the agreement did not "reduce or affect in any way the Healthcare Center's duties and obligations with respect to the provision of care and treatment of Patient/Residents."

3. Lynn further argues that the trial court erred in denying her motion to tax costs against Lowndes County. In light of our holding in Division 2 reversing the trial court's order compelling arbitration, this claim is now moot.

Accordingly, for the reasons stated above, we reverse the trial court's order to compel arbitration. As a result, we also reverse the order confirming the arbitration award and remand for Lynn's claims to proceed through the normal course of litigation.

*Judgment reversed and case remanded.*

Rickman and Reese, JJ., concur.

**All Citations**

354 Ga.App. 242, 840 S.E.2d 623

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Disagreed With by Edwards v. McElliotts Trucking, LLC, S.D.W.Va., August 2, 2017

2014 WL 2504574
Only the Westlaw citation is currently available.
United States District Court,
M.D. Alabama,
Northern Division.

Richard I. LOHR, II, as Administrator of the Estate of Charles David Fancher, Deceased, Plaintiff,
v.
Joseph Earl ZEHNER, III, et al., Defendants.

Civil Action No. 2:12cv533–MHT.
|
Signed June 3, 2014.

**Attorneys and Law Firms**

Richard Duane Morrison, Jere Locke Beasley, Beasley Allen Crow Methvin Portis & Miles PC, Montgomery, AL, for Plaintiff.

Thomas M. Gutting, King & Spalding, Houston, TX, Jay Stewart Tuley, Holtsford Gilliland Higgins Hitson & Howard PC, Montgomery, AL, John Burruss Riis, Katie Hammett Hassell, Hand Arendall, LLC, Mobile, AL, Albry Joe Peddy, Smith Spires & Peddy, PC, Birmingham, AL, for Defendants.

OPINION

MYRON H. THOMPSON, District Judge.

***1** Plaintiff Richard I. Lohr, II, as administrator of the estate of Charles David Fancher, filed this lawsuit against defendant Wilmac Enterprises, LLC, among other defendants. The lawsuit arises out of a series of highway collisions that resulted in Fancher's death. The cause is before the court on Wilmac's motion for summary judgment, which argues that it should not be vicariously liable for the involvement of co-defendant Ricky Briggs in the collision. [1]

1 Estate administrator Lohr also pled claims for negligent-and-wanton hiring, entrustment, supervision, retention, training, and maintenance against Wilmac, but in his response to this motion for summary judgment, he abandoned those claims. *See* Response (Doc. No. 127) at 1.

I. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

II. BACKGROUND

Briggs is an independent owner-operator of a truck. Earlier, he signed a one-year independent-contractor lease agreement with Wilmac. Under the agreement, he leased his tractor to Wilmac and granted the company "exclusive possession, control, and use of the equipment to the extent of complying with the applicable rules of appropriate government agencies" during the term of the lease. [2] Agreement, Wilmac Ex. 4 (Doc. No. 105–4) at § 3(B). In exchange, the company would "exercise reasonable efforts to provide freight for hauling by [Briggs] to permit [him] to keep the equipment in regular use," *id.* at § 5, and compensate him with a portion of any proceeds of his hauls. The company provided Briggs with identifying placards, which included the Wilmac logo and 'MC Number,' which in turn provided authority to operate in interstate commerce, as required by the Federal Motor Carrier Safety Administration. Wilmac also argues that it terminated this lease agreement on June 30, 2011, and the company provides evidence to that effect. However, there is no evidence that Wilmac notified Briggs of the lease termination or requested return of its identifying placards and MC Number.

2 The agreement therefore incorporates 49 C.F.R. § 376.12(c), which provides: "The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the

operation of the equipment for the duration of the lease."

In late July 2011, Briggs received a call from Kevin Gibson, the owner of co-defendant Kevin G. Transportation, Inc. Gibson offered Briggs a job carrying a trailer of empty cans to the Coca–Cola plant south of Montgomery, Alabama. Briggs accepted the job and followed Gibson's instructions as to how and where to pick up a trailer and a load. He did not contact Wilmac and, after the job, did not give Wilmac any portion of the funds.

Early in the morning of August 1, 2011, Briggs was finishing the Coca–Cola job for Kevin G. Transportation when he was struck from behind in the first of a series of collisions leading to Fancher's death. After the accident, he called Gibson but did not contact Wilmac or notify the company of the accident. He testified in deposition that, at the time of the accident, he understood himself to be working for Kevin G. Transportation, but operating under the authority of Wilmac.

## III. DISCUSSION

***2** Wilmac argues that it should not be held liable for Briggs's actions because it had terminated his lease a month prior to the accident. Furthermore, the company argues that, even if the lease were not terminated, liability should not attach because Briggs, by hauling material for Kevin G. Transportation, was acting outside the scope of his employment at the time of the accident. Estate administrator Lohr counters that the company is liable for Briggs's actions under a strict lease-liability theory or, if the court finds that the lease was terminated before the accident, an apparent-authority theory.

The court holds that, even if the lease between Briggs and Wilmac had not been terminated, Wilmac is still not vicariously liable for Briggs's actions because Briggs was operating the vehicle entirely outside the scope of his relationship with Wilmac at the time of the accident.

Lease agreements between truck owners and interstate motor carriers have been subject to extensive, and changing, federal regulation for more than 50 years. In the mid–1950s, Congress discovered that such arrangements were increasingly common in the interstate motor-carrier industry. Instead of owning a fleet of trucks and hiring employees to drive those trucks, motor carriers were contracting with independent owner-operators but exercising significant control over those contractors' equipment and operation. Congress developed legislation in order "to correct abuses that had arisen under often fly-by-night arrangements," arrangements that had led to "a helter-skelter operation of thousands of unregulated vehicles on the highways as a menace to safety." *Simmons v. King,* 478 F.2d 857, 866–67 (5th Cir.1973).[3] The legislation enabled the Interstate Commerce Commission to regulate the leasing of trucking equipment.[4] After extensive proceedings, the commission promulgated regulations governing lease arrangements such as Briggs's. *See* 49 C.F.R. § 376.12(c) ("The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.").

3 The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981)(en banc).

4 "[T]he Commission is authorized to prescribe, with respect to the use by motor carriers ... of motor vehicles not owned by them ... such other regulations as may be reasonably necessary in order to assure that while motor vehicles are being so used the motor carriers ... will be fully responsible for the operation thereof ... as if they were the owners of such vehicles." 49 U .S.C. § 304(e) (1958). The current form of this statute is codified at 49 U.S.C. § 14102(d) and now directs this authorization to the Secretary of Transportation and Federal Motor Carrier Safety Administration.

This exclusive-control regulation, along with corresponding language in lease agreements, has led to significant litigation across federal and state courts concerning the extent of motor carriers' vicarious liability to the public for negligent and wanton acts by the drivers of their leased vehicles. Courts have interpreted the regulations to impose various forms of vicarious liability on motor carriers. At first, some courts imposed so-called 'logo liability' for all negligence involving a vehicle that displayed a carrier's identifying placards and motor-carrier number, regardless of the existence of a lease. *See Mellon National Bank & Trust Co. v. Sophie Lines, Inc.,* 289 F.2d 473 (3d Cir.1961) (imposing strict liability after a lease had been terminated because the motor

carrier had not yet collected its placards from the driver/ lessor) *superseded by regulation,* Lease & Interchange of Vehicles (Identification Devices) (49 C.F.R. Part 1057), 3 I.C.C.2d 92, 95–97 (1986) *as recognized in* *Jackson v. O'Shields,* 101 F.3d 1083, 1086–87 (5th Cir.1996). Other courts imposed vicarious liability that mirrored traditional respondeat-superior principles, covering only those actions that were reasonably within the scope of employment for the motor carrier. *See* *Wilcox v. Transam. Freight Lines, Inc.,* 371 F.2d 403, 404 (6th Cir.1967) ("In our opinion, the I.C.C. regulations do not impose a liability on a carrier using leased equipment greater than that when operating its own equipment."). Finally, many courts imposed strict-lease liability: so long as there was a lease in effect, "exclusive control" and "complete responsibility" meant that the motor carrier was liable for any negligence involving the vehicle under lease. *See* *Morris v. JTM Materials, Inc.,* 78 S.W.3d 28, 38–43 (Tex.Ct.App.2002).

***3** The former Fifth Circuit Court of Appeals decided one case involving motor-carrier liability for the injury, to a member of the public, resulting from negligence involving a leased vehicle. In *Simmons v. King,* 478 F.2d 857, the court held that, although there was not an agency relationship between the carrier and the driver under the applicable state law, the federal-lease regulations established such a relationship. 478 F.2d at 865–67. In *Simmons,* the injury occurred while the truck was carrying a load for the defendant motor carrier. *Id.* at 863.

Subsequent to *Simmons,* the Interstate Commerce Commission revised the lease regulations to remove certain obligations that the earlier regulations had placed on motor carriers, particularly with regard to the end of the relationship. In the course of promulgating that regulation, the Interstate Commerce Commission emphasized that the nature of vicarious liability under a regulated lease is a matter of *state,* not federal, law:

> "We prefer that courts decide suits of this nature by applying the ordinary principles of State tort, contract, and agency law. The Commission did not intend that its leasing regulations would supersede otherwise applicable principles of State tort, contract, and agency law and create carrier liability where none would otherwise exist. Our regulations should have no bearing on this subject. Application of State law will produce appropriate results."

Lease & Interchange of Vehicles, 3 I.C.C.2d 92, 93; *see also* Petition to Amend Lease and Interchange of Vehicle Regulations, 8 I.C.C.2d 669 (1992) (discussing neutral effect of carrier regulations on classification for state worker's compensation schemes). An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Ramos–Barrientos v. Bland,* 661 F.3d 587, 596 (11th Cir.2011) (quoting *Auer v. Robbins,* 519 U.S. 452, 461 (1997)) (internal quotation marks omitted). This court cannot find that the commission's interpretation was erroneous or inconsistent. The text of the regulation requires certain language within lease agreements, but it does not impose any liability scheme directly. It is reasonable to interpret the regulation as leaving that question to various States' common-law courts.

The court will therefore look to Alabama state law to determine the scope of vicarious liability of a lessee under a federally regulated carrier lease. The Alabama Supreme Court has addressed this issue several times. *See* *Vulcan Freight Lines, Inc, v. Buckelew,* 386 So.2d 433, 435–37 (Ala.1980) (and cases cited). The court has made clear that vicarious liability attaches only if the driver was operating the vehicle "within the line and scope of his employment with the carrier-lessee." *Id.*

Admittedly, there is dictum in an Eleventh Circuit Court of Appeals case that suggests that federal law may in fact determine carriers' liability to the public for negligence by a driver of a leased vehicle. *Judy v. TriState Motor Transit Co.,* 844 F.2d 1496, 1501 (11th Cir.1988). In that case, the court held that, while federal regulations established a statutory employment relationship between carrier-lessees and drivers of leased vehicles, the legal consequences of that relationship in the context of worker's compensation was a matter of state law. *Id.* at 1501–02. However, in dictum, the *Judy* court distinguished such worker's compensation issues from liability to the general public, noting the greater federal interest in regulating that relationship and quoting a new Fifth Circuit opinion that " 'the traditional common law doctrine of master-servant relationships and respondeat superior does not apply' " with regard to liability to the public. *Id.* at 1501 (quoting *Price v. Westmoreland,* 727 F.2d 494, 497 (5th Cir.1984)). In light of the Interstate Commerce Commission's

statements that federal regulations do not control the scope of liability by carriers and the cursory treatment of this issue in *Judy,* this dictum does not persuade this district court that federal law should control on this issue.

***4** However, even if federal law were to control, the court would still hold Wilmac liable for Briggs's actions only if they were within the scope of his employment by Wilmac. While *Simmons* holds that there is a relationship establishing vicarious liability by motor carriers, it does not define clearly the scope of that liability. However, the authorizing statute makes clear that motor carriers should be liable for the operation of leased vehicles "as if the motor vehicles were owned by the motor carrier." 49 U.S.C. § 14102(a)(4). The former Fifth Circuit addressed the meaning of this provision in *White v. Excalibur Ins. Co.,* 599 F.2d 50 (5th Cir.1979): "To make them assume the burden of liability for the harm caused by their leased vehicles without according them the protection given employers under state substantive law would broaden their exposure to suit beyond that to which employers in fact are subject. We find no warrant for such strict liability in the federal law." *White,* 599 F.2d at 53. Similarly, if it were applying federal law, this court would accord Wilmac the same protection against liability as an employer would receive; it would not be liable for actions by Briggs outside the scope of his employment.

Having held that liability will attach to Wilmac only if Briggs was acting within the scope of his employment with the company, the court will turn to the facts of the case. There is no dispute that, in this case, Briggs was acting outside the scope of his employment with Wilmac. In fact, he was acting for the benefit of another motorcarrier company, Kevin G. Transportation. There is no evidence that Wilmac condoned or encouraged such side jobs. Therefore, Wilmac cannot be held vicariously liable for Briggs's actions.

* * *

For the above reasons, summary judgment will be entered in favor of Wilmac and against estate administrator Lohr. An appropriate judgment will be entered.

JUDGMENT

In accordance with the opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) Defendant Wilmac Enterprises, LLC's motion for summary judgment (Doc. No. 105) is granted.

(2) Judgment is entered in favor of defendant Wilmac Enterprises, LLC and against plaintiff Richard I. Lohr II, with plaintiff Lohr taking nothing by his complaint from defendant Wilmac Enterprises, LLC. Defendant Wilmac Enterprises, LLC is terminated as a party.

It is further ORDERED that costs are taxed against plaintiff Lohr, for which execution may issue.

The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

This case is not closed.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2504574

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Kelly v. Intercon Expedited, LLC, N.D.Ga., January 14, 2025

357 Ga.App. 606
Court of Appeals of Georgia.

STUBBS OIL COMPANY, INC.
v.
PRICE et al.
Federated Service Insurance Company
v.
Price et al.

A20A1377, A20A1396
|
October 19, 2020
|
Reconsideration Denied November 3, 2020
|
Certiorari Denied June 21, 2021

**Synopsis**
**Background:** Estates of deceased victims who were fatally injured while riding in compact car that was rear-ended in collision with fuel tanker truck, a third-party motor carrier hired by insured to deliver fuel products to its retail sales customers, brought action against insured and insurer, among others, alleging vicarious liability against insured as the statutory employer of truck driver and carrier, that insured owed a duty to ensure status of motor carrier for hire, and that insurer was liable under a statute that allows for direct actions against an insurer of a motor carrier for hire. Insured and insurer moved for summary judgment, which the trial court denied. Insured and insurer filed interlocutory appeal and appeals were consolidated.

**Holdings:** The Court of Appeals, Dillard, P.J., held that:

insured could not be held vicariously liable under the Federal Motor Carrier Safety Regulations (FMCSRs) as statutory employer of truck driver and carrier;

insured was not vicariously liable under theory of respondeat superior;

insured did not owe a duty to ensure carrier status of third-party motor carrier; and

insurer was not subject to a direct action under statute allowing actions against insurers of a motor carrier for hire.

Reversed.

**Procedural Posture(s):** Interlocutory Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

****741** Charles Minor McDaniel Jr., Ryan Andrew Kolb, Atlanta, for Appellant A20A1377.

Sean Branson Cox, Scott H. Moulton, Daniell Ray Fink, Atlanta, for Appellant A20A1396.

Terry Dale Jackson, Kyle Edward Koester, Woodstock, Bobby Lee Cook, C. Sutton Connelly, Summerville, David Eugene Groover, Calhoun, for Appellee.

**Opinion**

Dillard, Presiding Judge.

***606** The underlying facts of this case are tragic. On a dry, warm morning in June 2015, Christopher Mark Hinson —driving a tanker truck for Southern Oil Refinery, LLC —collided into a compact vehicle traveling at a speed of 79 miles per hour, killing three people—Beverly McLain Baird, Nicholas Price, and Ricardo Dewberry. Hinson—an employee of Southern Oil—was on his way to a terminal in Macon to obtain fuel for a delivery to a retail sales customer at the time of the accident. The decisions and practices of Hinson and Southern Oil that allegedly lead to this devastating loss of life are, if true, deeply troubling. [1] But this appeal is not about the actions or inactions of Southern Oil or Hinson. Instead, this Court is asked to consider whether Stubbs Oil—who hired Southern Oil to deliver fuel products to its retail sales customers—and its insurer, Federated Service Insurance Company, can be held liable under federal and state law for Southern Oil and Hinson's action or inactions. We answer this question in the negative. [2]

1 For example, at the time of the accident, the plaintiffs allege that Hinson was asleep at the wheel

and under the influence of illegally prescribed drugs.

2 Oral argument was held in these consolidated cases on June 2, 2020, and is currently archived on the Court's website for public viewing. *See* Court of Appeals of Georgia, Oral Argument, Case Nos. A20A1377, A20A1396 (June 2, 2020), available at https://www.gaappeals.us/oav/A20A1377-1396.php.

In bringing their claims, Gloria Jean and Randy Price and Benny and Robin Baird alleged,[3] *inter alia*, that (1) Hinson's negligent ***607 **742** operation of a fuel tanker truck resulted in a collision with a compact vehicle driven by Beverly McLain Baird, killing her and two passengers, Nicholas Price and Ricardo Dewberry; (2) Southern Oil and Stubbs Oil were vicariously liable; (3) Stubbs Oil owed a duty to ensure Southern Oil's carrier status; and (4) Federated was liable under a statute that allows for direct actions against an insurer of a motor carrier for hire. Stubbs Oil and Federated filed motions for summary judgment, arguing that the plaintiffs' claims sought to improperly expand liability against them under federal and state law. The trial court denied these motions, and Stubbs Oil and Federated filed separate applications for interlocutory appeal, which we granted.

3 The Prices brought claims individually against, among others, Hinson, Southern Oil, Stubbs Oil, and Federated, and Gloria Jean also did so on behalf of the Estate of Nicholas Price. The Bairds likewise filed cross-claims individually against, among others, Hinson, Southern Oil, Stubbs Oil, and Federated, and Benny also did so on behalf of the Estate of Beverly Mclain Baird. For ease of reference, we refer to the Prices, Bairds, and the Estates collectively as "the plaintiffs" throughout this opinion.

In Case No. A20A1377, Stubbs Oil contends that it cannot be held vicariously liable to the plaintiffs because (1) it is not Hinson or Southern Oil's statutory employer under the Federal Motor Carrier Safety Regulations ("FMCSRs");[4] (2) Southern Oil was acting as an independent contractor; (3) and it owed no duty to ensure Southern Oil's carrier status at the time of the accident. In Case No. A20A1396, Federated similarly contends that Stubbs Oil cannot be held vicariously liable to the plaintiffs and, regardless, it is not subject to a direct action under the statute allowing actions against insurers of a motor carrier for hire. For the reasons set forth *infra*, we reverse the trial court's denial of summary judgment in both cases.

4 *See* 49 USC § 31101 *et seq.*; 49 CFR § 391.1 *et seq.*

Viewed in the light most favorable to the plaintiffs (*i.e.*, the nonmovants),[5] the record shows that Stubbs Oil purchases fuel products from large oil companies and then resells the products to individual retail gas station franchises and agricultural and governmental entities. In doing so, Stubbs Oil executed what is termed a "Branded Jobber Contract" with British Petroleum North America ("BP"), which allowed it to purchase fuel from BP terminals and then resell the fuel to retail BP-authorized gas stations. Importantly, once fuel was drawn from a BP terminal, Stubbs Oil owned the fuel. Indeed, the contract between the companies specifically provided that "title and risk of loss to all Products sold to [Stubbs Oil] under the Contract will pass to [Stubbs Oil] f.o.b. [Stubbs Oil] Designated Terminals at the time of loading into [Stubbs Oil's] transport equipment, including any contract carrier equipment engaged by [Stubbs Oil]."

5 *See* *Martin v. Herrington Mill, LP*, 316 Ga. App. 696, 697, 730 S.E.2d 164 (2012) ("[A] de novo standard of review applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." (punctuation omitted)).

***608** Although Stubbs Oil had a valid DOT number and several vehicles capable of handling small-scale fuel deliveries, those vehicles could not be used to transport fuel to its retail service station customers. Consequently, to deliver fuel to service stations, Stubbs Oil hired third-party motor carriers, who owned larger fuel tankers—such as A&W Oil, Eagle Transport, and Southern Oil. But Stubbs Oil did not have written contracts with any of those carriers. Rather, the typical procedure for scheduling deliveries started with Stubbs Oil's operations manager. This manager would contact a third-party carrier, inquire if it could make a delivery, and, if so, email the carrier a loading ticket designating the terminal, supplier, volume of fuel, window of time for delivery, and destination. Thereafter, Stubbs Oil did not monitor the carrier or oversee its actions at the fuel terminal beyond providing it with an account number, which was used to draw fuel. Nor did Stubbs Oil dictate the carrier's route or method of delivery. This hands-off approach to fuel deliveries by Stubbs

Oil is hardly surprising, and is typical of any shipper engaging the services of an independent delivery contractor. So, upon completion of any delivery, the third-party carrier provided Stubbs Oil with a bill of lading and an invoice, and Stubbs Oil, in turn, paid for the delivery.

As noted *supra*, Southern Oil was one of the third-party carriers Stubbs Oil hired on occasion to transport its fuel to retail service ****743** stations. And while Southern Oil owned a service station, a significant amount of its business entailed transporting fuel. In doing so, Southern Oil operated under its own DOT number and owned a large fuel tanker, which it used to transport fuel products for its own use and for clients —including Stubbs Oil.

In January 2014, Hinson began working full-time as a truck driver for Southern Oil. Typically, when Southern Oil was hired to transport fuel, its dispatcher contacted Hinson and provided him with instructions for the delivery, including whether the delivery was to one of Southern Oil's customers or on behalf of a third-party shipper. After a delivery was completed, Hinson turned in the bills of lading and fuel sheets to Southern Oil's dispatcher.

On June 18, 2015, the day before the accident, Stubbs Oil sent Southern Oil's dispatcher an email requesting delivery of fuel to one of its retail gas station customers. Specifically, the email—entitled “Friday AM Load”—noted: “please dispatch the attached load to run first out Friday out of Macon. Please confirm load.” The dispatcher accepted the delivery request and left the necessary instructions for Hinson. The next morning, June 19, 2015, Hinson retrieved the fuel tanker truck from Southern Oil's facility. And while en route to the BP terminal to pick up the fuel, Hinson's tanker truck rear-ended a ***609** vehicle driven by Beverly Baird, killing her and two passengers, Nicholas Price and Ricardo Dewberry.

Thereafter, Gloria Jean and Randy Price, individually, and Gloria Jean, as administrator of the Estate of Nicholas Price, filed suit against, among others, Baird's estate; Hinson; Southern Oil; Stubbs Oil; and Federated Service. Additionally, Benny and Robin Baird, individually, and Benny as administrator of the Estate of Beverly Mclain Baird, filed cross-claims against, among others, Hinson, Southern Oil, Stubbs Oil, and Federated. Specifically, these plaintiffs alleged that Hinson's negligent operation of the fuel tanker truck resulted in a motor-vehicle collision that killed three people and Southern Oil was vicariously liable as Hinson's employer. In addition, the plaintiffs argued that Stubbs Oil was vicariously liable because it acted as Hinson and Southern Oil's statutory employer under the FMCSRs and that Federated was liable under a statute permitting direct actions against the insurer of a motor carrier for hire. Subsequently, all of the defendants filed answers, and discovery ensued.

Following discovery, Stubbs Oil filed a motion for summary judgment, arguing that (1) it could not be held vicariously liable to the plaintiffs for Hinson or Southern Oil's alleged negligence because it was a shipper, rather than a motor carrier for hire, and was not a statutory employer under the FMCSRs; (2) Hinson and Southern Oil were independent contractors under Georgia law; and (3) it owed no duty to ensure Southern Oil's carrier status. That same day, Federated also filed a motion for summary judgment, similarly arguing that Stubbs Oil could not be held vicariously liable and that, regardless, it was not subject to a direct action under the statute permitting such actions against insurers of a motor carrier for hire. The plaintiffs filed a response, and the trial court held a hearing on the matter, after which it took the motions under advisement. And ultimately, the trial court issued a brief order denying Stubbs Oil and Federated's motions. In doing so, the trial court found that Southern Oil could only operate as a private motor carrier, and therefore, Stubbs Oil was—seemingly by implication—Hinson and Southern Oil's statutory employer. Stubbs Oil and Federated subsequently obtained certificates of immediate review and filed applications for interlocutory appeal, which this Court granted. These consolidated appeals follow.

It is well established that summary judgment is proper “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is ***610** entitled to a judgment as a matter of law.”[6] If summary judgment is granted by a trial court, it enjoys no presumption of correctness on appeal, “and an appellate court must satisfy itself de novo that the requirements of ****744** OCGA § 9-11-56 (c) have been met.”[7] Moreover, a *de novo* standard of review applies to an appeal from a grant or denial of summary judgment, and “we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.”[8] With these guiding principles in mind, we will address the enumeration of errors raised in each of the consolidated cases.

6 OCGA § 9-11-56 (c).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

7 *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a), 697 S.E.2d 779 (2010).

8 *Martin v. Herrington Mill, LP*, 316 Ga. App. 696, 697, 730 S.E.2d 164 (2012) (punctuation omitted); *accord* *Williams v. Johnson*, 344 Ga. App. 311, 314, 809 S.E.2d 839 (2018).

*Case No. A20A1377*

1. Stubbs Oil contends that the trial court erred in finding it could be held vicariously liable to the plaintiffs as the statutory employer of Hinson and Southern Oil under the FMCSRs. We agree.

Importantly, as a general rule, the FMCSRs apply to "motor carriers, not to shippers who engage independent contractors to transport goods."[9] The FMCSRs define a "for-hire motor carrier" as "a person engaged in the transportation of goods or passengers for compensation."[10] In contrast, a "shipper" is defined as "a person who tenders property to a motor carrier or driver of a commercial motor vehicle for transportation in interstate commerce ...."[11] So here, because Stubbs Oil had a DOT number, the plaintiffs claim that it was a motor carrier under the FMCSRs. But the relevant inquiry is whether Stubbs Oil "acted as a motor carrier in the specific transaction at issue."[12] And in this case, it is undisputed that Stubbs Oil hired Southern Oil to transport its fuel products, and that Southern Oil used its own vehicle and driver in doing so. As a result, Stubbs Oil was acting as a shipper in this transaction.[13]

9 *Harris v. FedEx Nat'l LTL, Inc.*, 760 F.3d 780, 785 (II) (8th Cir. 2014); *see* *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 507 (II) (A) (1) (7th Cir. 2009) (Manion, J.) (holding that FMCSRs apply "[o]nly if [defendant] was functioning as a person engaged in the transportation of goods or passengers for compensation ..." (punctuation omitted)).

10 49 CFR § 390.5.

11 *Id.*

12 *Harris*, 760 F.3d at 785 (II) (punctuation omitted); *accord* *Schramm v. Foster*, 341 F.Supp.2d 536, 548 (D. Md. 2004); *see* *Camp*, 553 F.3d at 507 (II) (A) (1) (concluding that defendant's possession of a motor carrier license is not determinative of the applicability of FMCSRs).

13 *See* *Harris*, 760 F.3d at 785 (II) (holding that defendant FedEx was acting as a shipper rather than a motor carrier in the transaction at issue, and therefore, FMCSRs did not apply); *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 59 (II) (B) (2d Cir. 2012) ("The shipper is the entity that purchases the transportation services of the carrier." (punctuation omitted)).

***611** Nevertheless, the plaintiffs argue—and the trial court agreed—that Stubbs Oil can be held liable as the statutory employer of Hinson and Southern Oil under the FMCSRs. And to be sure, statutory employment is "a theory of vicarious liability created by the FMCSRs."[14] In relevant part, the FMCSRs define an "employer" as "any person engaged in a business affecting interstate commerce who owns or leases a commercial vehicle in connection with that business, or assigns employees to operate it....."[15] Moreover, in defining "employee," the FMCSRs specifically provide that an

> [e]mployee means any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. Such term includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle) ....[16]

Suffice it to say, the ownership or leasing of a commercial vehicle is critical to our analysis. And in construing the foregoing language, ****745** we have previously held that the existence of a lease between the defendant and owner of the vehicle involved in an accident is the defining element in creating a statutory employment relationship under the FMCSRs.[17] And so, absent evidence of either a written or oral lease between Hinson or Southern Oil and Stubbs Oil, the latter simply cannot be characterized as a statutory employer.[18]

14 *Clarendon Nat'l Ins. Co. v. Johnson*, 293 Ga. App. 103, 108 (1) (a), 666 S.E.2d 567 (2008) (punctuation omitted); *see also* *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 848 (Tex. App. 2006) (same).

15 49 CFR § 390.5.

16 *Id.*

17 *See* *Clarendon Nat'l Ins. Co.*, 293 Ga. App. at 108 (1) (a), 666 S.E.2d 567 (holding that whether defendant was a statutory employer under the FMCSRs centers around whether the defendant leased the truck or the services of the driver involved in the accident).

18 *See* *Clarendon Nat'l Ins. Co.*, 293 Ga. App. at 108 (1) (a), 666 S.E.2d 567; *see also* *Clark v. Irvin*, 2011 WL 13152866 at 10 (III) (a) (i) (2) (M.D. Ga. 2011) (citing *Clarendon Nat'l Ins. Co.* in noting that existence of a lease is required for finding a statutory employment relationship under the FMCSRs); *Caballero v. Archer*, 2007 WL 628755 at 5 (W.D. Tex. 2007) (same).

Here, it is undisputed that Stubbs Oil did not own the tanker truck driven by Hinson and involved in the accident, and thus it was not operating as a motor carrier at that time. Additionally, there is no evidence of a written lease between Stubbs Oil and Southern Oil or Hinson regarding that vehicle. Furthermore, despite the plaintiffs' arguments, there is similarly no evidence of an oral lease between ***612** Southern Oil and Stubbs Oil. Rather, the evidence shows that (1) Southern Oil and Stubbs Oil denied the existence of an oral lease; (2) Hinson was directly employed by Southern Oil; (3) only Southern Oil contacted Hinson and directed his actions regarding deliveries; and (4) Stubbs Oil exercised no control over Hinson or Southern Oil beyond prescribing the basic parameters for the delivery. Additionally, the tanker truck involved in the accident bore the logo and DOT number of Southern Oil, not Stubbs Oil.

Nevertheless, in its order denying summary judgment, the trial court acknowledges being persuaded by a FMCSA document,[19] obtained by the plaintiffs from the FMCSA's Safety and Fitness Electronic Records ("SAFER") System.[20] This document indicates that, as of March 27, 2016, Southern Oil did not have authority to operate as motor carrier for hire. And based on this document, the trial court seemingly draws an inference that Southern Oil's lack of authority is evidence of the existence of a lease between Southern Oil and Stubbs Oil. This is a curious inference to make because the FMCSA document was created more than nine months *after* the accident. As a result, it is difficult to understand how this document provides any insight into Southern Oil's authority at the time of the accident. We are also puzzled by this inference in light of the plaintiffs' explicit characterization of Southern Oil as a motor carrier for hire in their own pleadings. In any event, the trial court fails to cite any statutory or case authority supporting its inference, which we flatly reject. Moreover, contrary to the implication of the trial court's order, "an oral lease cannot be inferred from the fact that [Stubbs Oil] held DOT authority to act as a motor carrier and could have entered into a lease."[21] Given these circumstances, the trial court erred in concluding that Stubbs Oil was the statutory employer of Southern Oil and Hinson.[22] The ****746** FMCSRs apply to motor carriers, not to shippers ***613** engaging the services of independent contractors to deliver fuel products.[23] Accordingly, we reverse the trial court's denial of Stubbs Oil's motion for summary judgment as to the plaintiffs' claim that it could be held vicariously liable as a statutory employer under the FMCSRs.

19 Stubbs Oil raises several admissibility issues with this document, but we need not address them because, for the reasons noted *infra*, it has no evidentiary value.

20 The SAFER System offers, *inter alia*, company safety data to industry and the public over the internet. The specific document at issue is characterized as a "Company Snapshot," which is a concise electronic record of a company's identification, size, and safety rating. *See* U.S. Department of Transportation, Federal Motor Carrier Safety Administration, Safety and Fitness Electronic Records (SAFER) System, safer.fmcsa.dot.gov.

21 *Clarendon Nat'l Ins. Co.* at 109 (1) (a), 666 S.E.2d 567.

22 *See* *id.* at 108-09 (1) (a), 666 S.E.2d 567 (holding that trucking company defendant was not a statutory employer under the FMCSRs of a truck driver involved in accident and, thus, was not vicariously liable, because there was no evidence that trucking company entered into a

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

written or oral lease of truck driver's vehicle or his services); *Clark*, 2011 WL 13152866 at 11 (III) (a) (i) (2) (holding that defendant was not statutory employer of driver involved in collision as there was no evidence that defendant leased vehicle or driver's services); *see also Schramm v. Foster*, 341 F.Supp.2d 536, 549 (D. Md. 2004) (holding that the "focus of the court's inquiry [in a FMCSRs case] must be on ... the specific transaction ... and the nature of the relationship between [the relevant parties.]"); *Cf. PN Express, Inc. v. Zegel*, 304 Ga. App. 672, 673-74 (1), 697 S.E.2d 226 (2010) (holding that defendant was a statutory employer of driver involved in subject accident, under the FMCSRs, in light of driver's admission that the lease existed; the driver's constant daily telephone contact with defendant's manager during the course of trip and after the collision; and the fact that the driver's truck, although owned by driver, carried the defendant's and DOT number).

23 *See Harris*, 760 F.3d 780, 785 (8th Cir. 2014) (holding that "the FMCSR applies to motor carriers, not to shippers who engage independent contractors to transport goods."); *Caballero*, 2007 WL 628755 at 5 (same); *see also Camp*, 553 F.3d 502, 507 (7th Cir. 2009) (holding that the FMCSRs only apply when an entity is "functioning as 'a person engaged in the transportation of goods or passengers for compensation[.]' ").

2. Stubbs Oil also argues that it cannot be held vicariously liable to the plaintiffs under a common law theory of *respondeat superior* because Southern Oil was acting as its independent contractor. Again, we agree.

OCGA § 51-2-4 provides that "[a]n employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer." Indeed, in order for a plaintiff to overcome this general rule and impose liability, there needs to be a showing that

> the employer must have retained at least some degree of control over the manner in which the work was done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, as to operative details. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way. [24]

Put more succinctly, in the absence of evidence of actual control, the test distinguishing an employee from an independent contractor is whether "the employer assumed the right to control the time, manner and method of executing the work, as distinguished from the ***614** right merely to require certain definite results in conformity to the contract." [25]

24 *Clarendon Nat'l Ins. Co.*, 293 Ga. App. at 109-10 (1) (b), 666 S.E.2d 567 (punctuation omitted).

25 *Larmon v. CCR Enters.*, 285 Ga. App. 594, 596, 647 S.E.2d 306 (2007) (punctuation omitted); *accord Allrid v. Emory Univ.*, 249 Ga. 35, 40 (2), 285 S.E.2d 521 (1982); *see Ward v. DirecTV LLC*, 342 Ga. App. 69, 70, 801 S.E.2d 110 (2017) ("The right to control the manner and method means the right to tell the employee how he shall go about doing the job in *every detail*, including what tools he shall use and what procedures he shall follow.").

In this matter, it is undisputed that Stubbs Oil and Southern Oil are distinct and separate companies, and there is no evidence Stubbs Oil exercised the level of control over Southern Oil or Hinson necessary to saddle it with liability for their alleged negligence. As discussed *supra*, Stubbs Oil merely hired Southern Oil to transport its fuel products to a retail service station, but had no input as to the driver or the vehicle Southern Oil would use to complete that task. And while Stubbs Oil requested that the pick-up and delivery be completed during a particular window of time, as is the case with most delivery requests, it did not monitor Southern Oil or Hinson or oversee their actions, nor did it dictate Hinson's route. Consequently, the evidence shows that Stubbs Oil only retained the right to require results in conformity with the delivery request, and Southern Oil and its driver Hinson

retained the right to perform the work by their own means, method, and manner. [26] Needless to say, the trial court erred in concluding otherwise.

26 *See* *Clarendon Nat'l Ins. Co.* at 109-10 (1) (b), 666 S.E.2d 567 (holding that defendant trucking company could not be held vicariously liable for independent sales agent's hiring of truck driver who caused the subject accident as defendant exercised no control over the day-to-day operations of agent); *McLaine v. McLeod*, 291 Ga. App. 335, 340-41 (1), 661 S.E.2d 695 (2008) (holding that freight broker not liable for negligence of motor carrier and its employee driver because evidence showed broker exercised no control over carrier and driver, and thus, they were independent contractors); *Larmon*, 285 Ga. App. at 596, 647 S.E.2d 306 (concluding that even though defendant required that bus be delivered at a certain time and that drivers must conform to any applicable I.C.C. requirements, driver was nonetheless an independent contractor given that the manner and method of performing the delivery were left to the driver's discretion).

****747** 3. Stubbs Oil further contends that the trial court erred in denying its motion for summary judgment as to the plaintiffs' claim that it owed a duty to ensure Southern Oil's carrier status. Once again, we agree.

Although not entirely clear from its order, the trial court seems to imply that Southern Oil's alleged lack of authority to operate as a motor carrier for hire creates a genuine issue of material fact as to whether Stubbs Oil failed to fulfill a duty to ensure Southern Oil's carrier's status. But again, we are unpersuaded by the question-begging inherent in the trial court's assumption that a document pertaining to Southern Oil's carrier status nine months *after* the ***615** accident offers any insight as to Stubbs Oil's duties. And to the extent the plaintiffs argue that Stubbs Oil should be liable for negligently hiring Southern Oil "because the act of driving a tractor-trailer is inherently dangerous, they have failed to cite to any Georgia authority to support their proposition." [27] Accordingly, the trial court erred in denying summary judgment as to this claim.

27 *McLaine*, 291 Ga. App. at 342 (3), 661 S.E.2d 695; *see* *De Bord v. Proctor & Gamble Distrib. Co.*, 58 F.Supp. 157, 160 (N.D. Ga. 1943) (noting that "[i]t has been held that a shipper has no duty to ascertain whether a motor carrier has complied with the State Motor Carrier Act, and consequently the fact that the carrier had failed to comply with the provisions of the Motor Carrier Act before proceeding to haul as an independent contractor would not render the shipper liable"); *see also* *Clarendon Nat'l Ins. Co.* 293 Ga. App. at 109-10 (1) (b), 666 S.E.2d 567 (holding that defendant trucking company could not be held vicariously liable for sales agent's hiring of truck driver who caused the subject accident given that sales agent and driver were independent contractors).

*Case No. A20A1396*

4. Federated similarly contends that Stubbs Oil cannot be held vicariously liable to the plaintiffs and argues that, regardless, it is not subject to a direct action under the statute allowing such actions against insurers of a motor carrier for hire. We agree.

OCGA § 40-1-112 (a) in part provides:

> No motor carrier of household goods or property or passengers shall be issued a motor carrier certificate unless there is filed with the department a certificate of insurance for such applicant or holder on forms prescribed by the commissioner evidencing a policy of indemnity insurance by an insurance company licensed to do business in this state, which policy must provide for the protection, in case of passenger vehicles, of passengers and the public against injury proximately caused by the negligence of such motor carrier, its servants, or its agents; and, in the case of vehicles transporting household goods, to secure the owner or person entitled to recover against loss or damage to such household goods for which the motor common carrier may be legally liable.

And subsection (c) of this statute further provides: "It shall be permissible under this part for any person having a cause of action arising under this part to join in the same action the motor carrier and the insurance carrier, whether arising in tort or contract." ***616** As we have previously explained,

> [t]he purpose of permitting joinder of the insurance company in a claim against a common carrier is to further the policy of the Motor Carrier Act, that is, to protect the public against injuries caused by the motor carrier's negligence. The [codified] intent of this [s]tate's motor carrier laws is that the insurer is to stand in the shoes of the motor carrier and be liable in any instance of negligence where the motor carrier is liable. [28]

Importantly, the direct-action statute is "in derogation of common law, and its terms ****748** require strict compliance." [29]

28 *Mornay v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 331 Ga. App. 112, 113, 769 S.E.2d 807 (2015) (punctuation omitted).

29 *Id.*

In this case, the plaintiffs sued Federated, claiming that it is a proper defendant as the insurer of Stubbs Oil, which the plaintiffs assert is a motor carrier for hire. But as we held in Division 1, *supra*, in the transaction at issue, Stubbs Oil was acting as a shipper rather than a motor carrier for hire or a statutory employer. [30] In light of this holding, the plaintiffs have no cause of action under OCGA § 40-1-112 (c), and Federated is not subject to a direct action under that statute. [31] As a result, the trial court also erred in denying Federated's motion for summary judgment.

30 *See supra* notes 10 and 15.

31 *See Nat'l Union Fire Ins. Co. v. Sorrow*, 202 Ga. App. 517, 518, 414 S.E.2d 731 (1992) (holding that vehicle involved in accident was neither "motor common carrier" nor "motor contract carrier" as those terms were used predecessor statute to OCGA § 40-1-112 (The direct action statute in effect at the time of the accident was codified at former OCGA § 46-7-12. *See* Ga. L. 2012, p. 580, § 16), providing for direct prejudgment actions against liability insurers of same given that vehicle was used exclusively by owner to transport its own products, was never held out for hire to the public, and was not used or hired by the public for transportation of either goods or people); *Wolverine Ins. Co. v. Strickland*, 116 Ga. App. 62, 62-63, 156 S.E.2d 497 (1967) (concluding that the insurer was not directly liable under direct action statute because there was no evidence that the insured vehicle was being driven as a motor carrier at the time of the injury).

For all these reasons, we reverse the trial court's order denying summary judgment in both Case No. A20A1377 and Case No. A20A1396.

*Judgment reversed in both cases.*

Rickman and Brown, JJ., concur.

**All Citations**

357 Ga.App. 606, 848 S.E.2d 739

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

242 Ga.App. 731
Court of Appeals of Georgia.

STALLINGS
v.
SYLVANIA FORD–MERCURY, INC.

No. A99A2104.
|
March 13, 2000.

**Synopsis**
Motorist injured in automobile collision brought negligence action against driver of loaned car, driver's father, dealership that loaned car, and other parties. The Superior Court, Effingham County, Turner, J., entered summary judgment for dealership, and owner appealed. The Court of Appeals, Smith, J., held that: (1) actual or implied agency relationship did not exist between dealership and driver; (2) dealership and driver did not enter into a joint venture for purposes of fixing car of driver's father.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

***735** ****732** Edenfield & Cox, Gerald M. Edenfield, Susan W. Cox, Mary E. Adams, Statesboro, for appellant.

Brennan & Wasden, Joseph P. Brennan, Savannah, for appellee.

**Opinion**

***731** SMITH, Judge.

Gloria Stallings brought this automobile accident collision action against numerous defendants, including not only the driver of the ***732** other vehicle, Kennedy,[1] and her father, Lowe, but also Sylvania Ford–Mercury, Inc., Effingham County, and the Georgia Department of Transportation. Her claims against Sylvania, an automobile dealership, are based on her contention that Kennedy was acting as *Sylvania's* agent in driving a "loaner" car that Sylvania gave to Kennedy while performing repairs on her father's truck or, alternatively, that Kennedy, her father, and Sylvania were partners in a joint venture. The trial court granted summary judgment in favor of Sylvania, and Stallings appeals. Because Stallings's arguments are without merit and based upon significant misunderstandings of the Georgia law of agency and joint venture, we affirm the trial court's thorough and well-crafted order.

1 Kennedy was unmarried and living at home at the time of the collision and at the time her deposition was taken; she has since married.

1. No agency relationship was created here. First, Georgia law is abundantly clear that a "loaner" arrangement between car dealers and mechanics and their customers is a bailment, not an agency. *Nolley v. Maryland Cas. Ins. Co.,* 222 Ga.App. 901, 902(1), 476 S.E.2d 622 (1996) (written agreement); *Johnson v. Hardwick,* 212 Ga.App. 44, 45(2), 441 S.E.2d 450 (1994) (no written agreement; still considered bailment).

****733** Second, Stallings misapprehends the nature of an agency. "The distinguishing characteristic of an agent is that he is vested with authority, real or ostensible, to create obligations on behalf of his principal, bringing third parties into contractual relations with him." (Citations and punctuation omitted.) *Physician Specialists &c. v. Wildmon,* 238 Ga.App. 730, 732(1)(a), 521 S.E.2d 358 (1999). Nothing in the record suggests that Kennedy, as the driver of the "loaner" car, was given any authority by Sylvania to create an obligation on behalf of Sylvania or bind it to any contract or agreement. She was simply dropping off her father's car for repairs and taking the "loaner" car in exchange. Sylvania's vice president testified that this practice was merely a "courtesy" to regular customers as a matter of convenience and customer relations.

OCGA § 10–6–1 provides: "The relation of principal and agent arises whenever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." Any agency created here would have to be express, implied, or ratified after the fact. While Stallings argues an express agency, she has not provided any evidence in support of that contention.

> The existence of agency may be proved by showing circumstances, apparent relations, and conduct of parties. It has ***733** long been the Georgia rule that one who is a party to the alleged relationship (the

> principal or agent) may testify as a fact as to the existence or non-existence of the relationship and that such testimony would not be subject to the objection that the statement was a conclusion or the ultimate fact. The denial of the existence of any agency relationship may thus constitute an uncontradicted fact which will sustain a motion for summary judgment. Where the other party attempts to controvert this fact by circumstantial evidence it must be evidence sufficient to support a verdict. The circumstantial evidence must tend to establish the conclusion projected while rendering less probable all inconsistent conclusions.

(Citations and punctuation omitted.) *Guernsey Petroleum Corp. v. Data Gen. Corp.,* 183 Ga.App. 790, 792(2)(a), 359 S.E.2d 920 (1987).

Here, Sylvania's vice-president, Ayers, explicitly denied that he or anyone at Sylvania requested that the driver act as an agent on Sylvania's behalf. He also denied entering into any joint venture or lease. He stated that the loan of a courtesy car was not automatic or guaranteed and that it was not a lease but "provided as a courtesy only." This assertion by a party to the alleged agency constituted sufficient evidence to support summary judgment. Moreover, Kennedy's mother testified that she had intended to drop off the truck for repairs but was unable to leave work and instructed her daughter to leave school early and drop off the truck at Sylvania. The uncontradicted testimony establishes that Kennedy was acting on behalf of her mother rather than for Sylvania.

While Stallings makes the conclusory assertion that Ayers gave contradictory testimony in his deposition, she does not identify by reference to the record *any* particular testimony she claims is contradictory. Court of Appeals Rule 27(a)(1). Furthermore, a review of Ayers's brief deposition reveals nothing contradicting his affidavit testimony that Kennedy was not Sylvania's agent. He denied giving Kennedy any instructions, beyond reminding her to wear her seat belt as he gave her the keys. Sylvania's service manager also testified that he did not give Kennedy any directions or instructions. As in *Jackson v. Braddy,* 186 Ga.App. 284, 285–286, 367 S.E.2d 96 (1988), no direct evidence shows that Kennedy was Sylvania's agent, and the circumstantial evidence is consistent with the absence of an agency relationship.

Stallings argues that Kennedy, while delivering the car to the actual customer, her father, was for that brief period the agent of Sylvania. But "[t]he mere fact that a servant is performing work beneficial to a third person, does not render him the servant of such third ***734** person." (Citations and punctuation omitted.) *Food Giant v. Davison,* 184 Ga.App. 742, 744, 362 S.E.2d 447 (1987). While Kennedy's action in picking up the car at her mother's direction arguably benefitted Sylvania in accomplishing delivery of the ****734** "loaner car" to its ultimate destination, the customer, she did not become Sylvania's agent in doing so. In *Brock v. Patterson,* 128 Ga.App. 257, 196 S.E.2d 351 (1973), an employee of a service station delivered a car to its owner by following her home as she drove another car. While the owner instructed the employee to "follow her," id. at 258, 196 S.E.2d 351, she did not pay the employee and did not give him any instructions regarding how to drive her car. We held that the service station employee did not become the agent of the car owner and "that only a bailment relationship existed between the parties with regard to Miss Brock's automobile." Id. As the service station employee in *Brock* acted on behalf of his employer, Kennedy acted at the direction of and on behalf of her mother, and she was not paid or given any instructions by Sylvania on how to drive the car. Her possession of the "loaner car," even if for the limited purpose of delivering it to her father, was a bailment and not an agency.

Implied agency may be created "when the statements or conduct of the alleged principal reasonably cause the third party to believe that the principal consents to have the act done on his behalf by the purported agent." (Citation and punctuation omitted.) *Holy Fellowship Church &c. v. Brittain,* 240 Ga.App. 436, 437(1), 523 S.E.2d 93 (1999). But it

> is not predicated on whatever a third party chooses to think an agent has the right to do, or even upon what the agent says he can do, but must be based on acts of the principal which have led the third party to believe reasonably the agent had such authority.

(Citations and punctuation omitted.) Id. at 438(1), 523 S.E.2d 93. Since Stallings was involved in an unexpected encounter with a driver and car previously unknown to her and has shown no prior knowledge on her part that Sylvania owned the car, she cannot demonstrate any act *of Sylvania* that caused her to believe that Kennedy was its agent. She has also failed to show that her reliance upon any representation by Sylvania led to her injury. *Texaco v. Youngbey,* 211 Ga.App. 789, 790, 440 S.E.2d 533 (1994).

Finally, Stallings does not allege or present any evidence showing a ratification by Sylvania of any act ostensibly done on its behalf by Kennedy. Stallings has failed to demonstrate agency by any of these methods, and the trial court correctly granted summary judgment on this basis.

2. Stallings alternatively contends that a joint venture was entered into by Kennedy and Sylvania, allegedly "to facilitate the repair of Mr. Lowe's truck by Sylvania." This argument also is without merit. A joint venture is created " 'when two or more combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control, provided the arrangement does not establish a partnership.' " *Helms v. Young,* 130 Ga.App. 344, 346(1), 203 S.E.2d 253 (1973). And " '[t]here must be not only a joint interest in the objects and purposes of the undertaking, but also a right, express or implied, of each member of the joint venture to direct and control the conduct of the other.' " Id. Not only is there no showing of a combination of property or labor here, there is no right of control shown in *either* party to the alleged joint venture. The loaning of goods to a customer for trial, test, or convenience purposes is not a joint venture. In fact, *Helms* reiterates that a delivery of goods to another, after which the goods are to be returned to the original owner, is *not* a joint venture but a bailment. Id. at 347(1), 203 S.E.2d 253. This is consistent with the decisions in *Nolley,* supra, and *Johnson,* supra, with specific reference to "loaner" cars. The trial court correctly granted summary judgment in favor of Sylvania on this basis as well.

*Judgment affirmed.*

POPE, P.J., and MILLER, J., concur.

**All Citations**

242 Ga.App. 731, 533 S.E.2d 731, 00 FCDR 1369

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.