**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| KYLE SLOAN, Individually, and as Personal Representative of the Estates of Rylie Sloan and Jamie Sloan; KYLE SLOAN as Surviving Spouse of Jamie Sloan; and KYLE SLOAN as Surviving Parent of Rylie Sloan,<br><br>Plaintiff,<br><br>v.<br><br>MAYFLOWER TRANSIT LLC and NICHOLAS BURIST,<br><br>Defendants. | ) | Civil Action No.<br>2:22-cv-00076-LGW |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT MAYFLOWER TRANSIT, LLC'S MOTION FOR JUDGMENT AS A MATTER OF LAW**
**AND**
**PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW AS TO LIABILITY OF MAYFLOWER**

Plaintiff has two causes of action that are supported by the evidence in this case: 1) vicarious liability as a statutory employer via express agency under the federal motor carrier safety regulations and lease liability under Georgia law; and 2) apparent agency under the federal motor carrier household goods carrier provisions.

Mayflower asks the Court to grant a judgment as a matter of law claiming that Mayflower had nothing to do with the truck that injured Kyle Sloan and killed Jamie and Rylie Sloan. The Court has already held that the record supports the opposite finding. Order, Doc. 354 at 19–22. The evidence introduced into the record at trial is even stronger.

A reasonable jury can find Mayflower legally responsible for Burist under (1) Georgia agency/lease liability law, (2) 49 U.S.C. § 13907(a) apparent agency, or (3) the federal motor carrier rules identifying Mayflower as Burist statutory employer under the motor carrier

provisions. Mayflower's argument that intoxicated Burist acted outside the scope of any agency, does not apply to the statutory theories. The motion should be denied.

## I. Standard

Judgment as a matter of law is proper only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).

## II. Plaintiff's claims against Mayflower are principally vicarious

The Third Amended Complaint pleads two counts against Mayflower, and both rest primarily on Mayflower's responsibility for Burist's driving. Count Two alleges that Burist was Mayflower's "employee, agent, and/or apparent agent" acting within the scope of his agency; that Moholland and Locke acted as Mayflower's agents in furtherance of its business; that Burist was "operating a commercial motor vehicle under dispatch and under the authority granted to him by Defendant Mayflower and its agents"; and that Mayflower is liable for Burist's negligence "pursuant to the doctrine of respondeat superior, the rules of agency, and by operation of common law, apparent agency, and the Federal Motor Carrier statutes and regulations." Doc. 471 ¶¶ 79–84, 87–89. Count Three is titled "Vicarious Liability — Mayflower as Statutory Employer Under the FMCSR" and alleges that Mayflower was Burist's statutory employer and had the right to control Moholland, Locke, and their drivers. *Id.* ¶¶ 91–108.

Mayflower's Answer admits that it is an authorized motor carrier subject to the Federal Motor Carrier Safety Regulations, that it operates under USDOT No. 125563, and that it had an equipment lease for the tractor involved in the collision. The alleged lease termination is a jury dispute. Doc. 492 ¶¶ 26, 97, 98. Mayflower denies that on the date of the collision, it had "an agency agreement with, relationship with, and/or authority, direction, or control over Moholland, Locke, Burist, . . . the tractor trailer, or the load," and denies that the lease was still in effect. *Id.*

¶¶ 26, 99. The jury must answer only the factual disputes over whether Mayflower was the motor carrier under federal law or there was an existing lease in place on July 1, 2022 for the operation of the tractor.

**III. Agency under Georgia law**

**A. Express agency**

"The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." O.C.G.A. § 10-6-1. Express agency arises when the principal expressly grants the agent authority to act on its behalf; if there is none, the Court looks to whether agency is implied by the circumstances. *Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 661 (11th Cir. 2015); Doc. 354 at 16. In denying summary judgment, the Court held that a jury could find Mayflower "expressly grant[ed] [Moholland] the authority to act on [Mayflower's] behalf" by allowing Moholland to keep using Mayflower's license plate, cab card, and IFTA credential through July 1, 2022. Doc. 354 at 21–22 (quoting *Burgess*, 600 F. App'x at 661).

The jury has now heard the evidence and the record contains documentation that in May 2022, Moholland told UniGroup: "It was agreed we could keep them and run under them until they expire in 2023, we are not returning them until then." Doc. 354 at 10; Trial Ex. 25 (Plaintiff). On June 28, 2022, Mayflower's safety manager warned, "My concern is that so much can happen and come back to us the longer we keep letting them use our plates," Trial Ex. 151 (Plaintiff) and the same day Mayflower told Moholland it would not extend use "past this Friday 07/01." Doc. 354 at 11, 21; Trial Ex. 26 (Plaintiff). Shortly before noon on July 1, Mayflower confirmed its understanding internally that the plates "should be in the mail first thing next week." (Trial Ex. 27). And Angela Locke testified at trial that Burist was due back on July 1, 2022. That fills every

element of authorization and proximate cause because a reasonable jury could conclude that Joe Moholland would send the plates back upon Burist return on July 1st. This is consistent with Rob Garr's testimony that Moholland had its own IRP account set up on July 1st but did not receive the plates and cab cards until July 5th and thus could not run on its own authority until July 5th. Mayflowers argument that the bills of lading showed delivery dates after July 1 is without merit because it does not align with the facts of this case.

Mayflower's own corporate representative admitted Mayflower's business relationship with Moholland continued after April 28 and through July 1, 2022. (Kratzer Trial Testimony). A June 15, 2022 email from Mayflower to Moholland showed Mayflower was still seeking Moholland's work at that time. Exhibit 114 (Plaintiff). Further, on June 28 Mayflower asked Moholland to take a shipment into storage on July 1, the day of the collision. Mr. Kratzer agreed both showed business between Moholland and Mayflower after April 28. *Id*. Mr. Kratzer testified he had no basis to refute that in May of 2022 after the termination date Joe Moholland executives believed Mayflower authorized JMM 333 to run under Mayflower's authority through March 2023.

The jury also saw what Mayflower's authority looked like on the road. The tractor's door read "Joe Moholland Moving / Operated By Mayflower Transit / Fenton, MO / USDOT# 125563." Trial Ex. 100 (Plaintiff). The side of the truck read Mayflower's agency number "251-333". *Id.* The cab card, inside the tractor, identified Mayflower as the motor carrier responsible for safety. Trial Ex. 31, pg. 1, 4, 40 (Plaintiff). Mayflower and Moholland's representatives both agreed that the plate was on the truck and the Mayflower cab card was in the tractor on July 1, 2022. The witnesses all acknowledged that on July 1, 2022 the truck remained registered to Mayflower as the motor carrier responsible for safety. (Kratzer, Garr, Rugemer Trial Testimony). Mr. Kratzer further

admitted there was no dispute that the truck bore Mayflower's name and DOT number at the time of the collision. (Kratzer Testimony). Mayflower admitted it had an equipment lease to operate "the tractor involved in the accident," and has only argued that the lease was not still in effect July 1st. Answer, Doc. 492 ¶ 26. From the evidence introduced at trial a reasonable jury could conclude the Equipment Lease Certification allowing Mayflower to operate the tractor in this collision was not terminated prior to July 1, 2022. Trial Ex. 48 (Joint).

Burist testified that, through July 1, no one told him to change the door or to stop using Mayflower's DOT number on that tractor. Burist trial testimony presented by deposition. See, Doc. 475-1, at 132:10–24. That is evidence from which a reasonable jury could find express or implied agency. Likewise, Joe Moholland and Locke Relocation's corporate representatives both testified at the trial neither ever received a lease cancellation. (Locke and Garr Trial Testimony).

**B. Ratification**

"A ratification by the principal shall relate back to the act ratified and shall take effect as if originally authorized. A ratification may be express or implied from the acts or silence of the principal." O.C.G.A. § 10-6-52. The evidence showed Mayflower knew Joe Moholland intended to "run under" Mayflower's plates in May of 2022. Mayflower not only chose not to take any action to stop Moholland, it explicitly authorized Moholland to retain the plates through the date of the collision. This was not a case of "please give us more time to get the plates to the mailbox." This was "we don't have our own IRP Cab Card, Registration, or IFTA sticker so we need to use yours while we get ours set up."

A reasonable jury could conclude Mayflower ratified this extended agency agreement based on Mayflower's silence. Namely, between May and July 1, Maylower took no legal action, never reported the plates or IFTA credentials stolen, and did not tell FMCSA that Moholland was

unauthorized until July 5, 2022, four days after the collision. (Kratzer, Copeland, Rugemer Testimony).

This ratification became even more explicit after June 17, 2022. After that date, Mayflower had specific knowledge that Nicholas Burist was operating this exact tractor in Georgia and again did nothing to take either off the road. On June 17, 2022, Georgia inspected the rig, with Burist driving under Mayflower's DOT number, and cited vehicle-maintenance violations totaling 42 CSA points. Trial Ex. 101 (Plaintiff); Trial Ex. 103 (Plaintiff). When the inspection posted to Mayflower's FMCSA portal on June 20, its safety department noted that "this driver has been cancelled since 04/29/2022 and the equipment is not qualified." Trial Ex. 103 (Plaintiff). On June 21, Mayflower's safety compliance manager circulated the report internally. She wrote that the violations "included a flat tire and brake connections with leaks, which are serious violations that could lead to a crash out on the roads," that "both vehicles still have our Missouri base plates," and that "the risk this brings to our company cannot be ignored." She asked whether Mayflower should "issue a 'cease and desist' order" or "report the plates as 'stolen' to the State of Missouri." Trial Ex. 158 (Plaintiff). On June 28, Mayflower's safety manager again flagged "a roadside inspection that wasn't good at all" and warned that "so much can happen and come back to us the longer we keep letting them use our plates." Trial Ex. 151 (Plaintiff). Mayflower did none of what the safety management staff warned of or considered. It sent no cease-and-desist, did not report the plates stolen, and made no report to FMCSA. Instead, that same afternoon, it told Moholland it could keep using the plates through Friday, July 1. Trial Ex. 26 (Plaintiff). Mayflower did not contact FMCSA until July 5, four days after the crash. Trial Ex. 5 (Joint).

Between June 20 and July 1, no one at Mayflower told FMCSA, the Missouri DOT, or any other government agency that Burist was driving a truck under Mayflower's credentials. (Kratzer, Rugemer, and Copeland Trial Testimony). After the collision, Mayflower kept transacting with Moholland as its agent as evidenced by the Agency Statements admitted as Plaintiffs Exhibit 106. The weekly agency statement at page 18, line 19 showed a payment the week of the crash of $20,000 listed in the "due to agent" column July 5, 2022. Plaintiffs initially thought this was evidence of payment from Mayflower to Moholland as that is how the statement reads. However, the testimony from Rob Garr was that these $20,000 a week entries were actually transfers made *from* Moholland not *to* Moholland on a credit balance Moholland owed. This provides evidence from which a reasonable jury could conclude that Mayflower was benefitting by Moholland's continued use of Mayflower's credentials to generate revenue to pay that credit claim.

Page 19, line 41 showed a July 1, 2022 charge for "Burist Nicholas/mike Peters" under the "due hq" column indicating Mayflower had made a payment related to Burist for which it was seeking reimbursement from Joe Moholland. Mayflower kept sending Moholland agency-agreement invoices on and after July 1, and its representative agreed that the statements showed a business relationship among Burist, Moholland, and Mayflower on July 1, 2022. (Kratzer Trial Testimony). Mayflower's safety department continued to demand repair records for this equipment and threatened to "unqualify" it. Trial Ex. 103 (Plaintiff). On July 6, 2022, Lisa Buchanan of Mayflower/UniGroup, copying Carol Hanke, wrote to Joe Moholland Moving:

> We still haven't received the required documents from the roadside inspection report. Please provide a copy of the inspection report along with all repair documents within 2 business days. If not received in a timely manner we will have no choice but to unqualify the equipment until these documents are received.

Trial Ex. 103 (Plaintiff).

UniGroup's wholly owned equipment dealer, Trans Advantage, which shares Mayflower's address and whose profits and losses all go to UniGroup, kept billing Moholland through Mayflower's agency-statement deduction into August 2022; its president explained that it stops dealing with an agent "once we are notified of termination" and "[t]here was a delay in that notification." Donovan Dep. (Trial Testimony), Doc. 475-6, at 8:2–6, 20:11–12, 51:13–17, 64:3–6, 65:16–20. A reasonable jury may conclude from this evidence a ratification of continued agency with Moholland from Mayflower's acts and Mayflower's silence.

### C. The independent-contractor exceptions in O.C.G.A. § 51-2-5

An employer is liable for a contractor's negligence "[i]f the wrongful act is the violation of a duty imposed by statute," or "[i]f the employer ratifies the unauthorized wrong of the independent contractor." O.C.G.A. § 51-2-5. The parties have agreed that the Court will charge § 51-2-5. (Agreed Charge No. 19). Federal law states a carrier is responsible for non-owned vehicles if "operating those motor vehicles . . . as if the motor vehicles were owned by the motor carrier," 49 U.S.C. § 14102(a)(4), and requires that the carrier "have exclusive possession, control, and use of the equipment for the duration of the lease" and "assume complete responsibility for the operation of the equipment." 49 C.F.R. § 376.12(c)(1). Mayflower's right of control was not theoretical: the moves were done on Mayflower's DOT number, and Mayflower maintained the driver qualification files, handled compliance requirements such as driver drug testing, and maintained the equipment files. Mayflower certified Burist as a safe commercial driver, and its representative knew of no evidence that the certification was withdrawn before July 1, 2022. (Kratzer Trial Testimony). Ratification, discussed above, is an independent exception. O.C.G.A. § 51-2-5(6).

## IV. Household-goods carrier responsibility under 49 U.S.C. § 13907(a)

"Each motor carrier providing transportation of household goods shall be responsible for all acts or omissions of any of its agents which relate to the performance of household goods transportation services . . . and which are within the actual or apparent authority of the agent from the carrier or which are ratified by the carrier." 49 U.S.C. § 13907(a). This was a military household-goods load. (Rugemer, Garr, Kratzer, Burist Trial Testimony). The federally required identification rules exist so regulators, law enforcement, and the public can identify the carrier responsible for the vehicle: the door lettering, which in the federal format names the operating carrier after the words "Operated By"; the cab card naming Mayflower the carrier responsible for safety; and Mayflower's apportioned plate and IFTA credential. 49 C.F.R. § 376.11(c); 49 C.F.R. § 390.21; Copeland Trial Testimony. Whether Moholland and Burist acted within that apparent authority, or with authority Mayflower ratified, is a question for the jury.

## V. Statutory employment under the federal leasing rules

### A. The rule

A carrier that operates leased equipment must "have exclusive possession, control, and use of the equipment for the duration of the lease" and "assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1). "Under this regulatory scheme, the motor carrier is fully responsible to the public for the operation of its leased vehicles, regardless of whether the vehicles are used in the scope of the carrier's business." *Coleman v. B-H Transfer Co.*, 284 Ga. 624, 625, 669 S.E.2d 141, 143 (2008) (quoting *Hot Shot Express, Inc. v. Assicurazioni Generali, S.P.A.*, 252 Ga. App. 372, 373–74, 556 S.E.2d 475 (2001)). This "doctrine of strict vicarious liability imposed upon the lessee motor carrier is known as 'statutory employment. Statutory employment is a theory of vicarious liability created by the

Federal Motor Carrier Safety Regulations." *PN Express, Inc. v. Zegel*, 304 Ga. App. 672, 675–76, 697 S.E.2d 226, 230 (2010). It applies even when the driver is on a personal errand: in *Holbrooks*, the carrier was held vicariously liable as a matter of law for a driver who was taking the truck home, without a trailer, to have supper with his family. *Nationwide Mut. Ins. Co. v. Holbrooks*, 187 Ga. App. 706, 707–09, 712–13, 371 S.E.2d 252 (1988).

*Zegel* is the closest case and the one Mayflower itself cites. Doc. 474 at 4–5. There the carrier, like Mayflower, moved for a directed verdict, arguing there was no written/existing lease. The Court of Appeals affirmed the denial, because the jury could find a lease from the driver's testimony and the carrier's logo on the truck, and it held that evidence "however slight" supported submitting both statutory employment and respondeat superior to the jury as alternative theories. *PN Express, Inc. v. Zegel*, 304 Ga. App. 672, 675–76, 697 S.E.2d 226, 230 (2010).

**B. All three facts supporting a lease are present here**

The court in *Zegel* referenced some factors that should be considered in determining whether there is an active lease arrangement. They are: evidence that the carrier knew the driver had been hired to pick up loads; evidence of a carrier logo or DOT number on the truck; and the driver's testimony about the existence of a lease. 304 Ga. App. at 674. All three are present here.

Mayflower admits it had an equipment lease for the operation of this tractor. Doc. 492 ¶ 26. The lease certification for unit 251-333 states that it is "being operated by Mayflower Transit, LLC, DOT #125563". Trial Ex. 48 (Joint).

The three instruments Mayflower relies on in its argument against an active lease do not align and were signed eighteen years apart. The Carrier-Agent Operating Lease Agreement was executed October 24, 2005. Trial Ex. 14 (Joint). The Mayflower Transit Agency Agreement was executed July 25, 2008. Its 2008 Amendment was signed by Moholland on July 24 and by

Mayflower on July 31, and took effect July 31, 2008. Trial Ex. 2 (Joint). The Equipment Description Addendum and Statement of Lease Certification for the tractor is dated December 5, 2017. Trial Ex. 48 (Joint). That is the operative document because it is the most recent. The other documents can be disregarded. The most recent lease Trial Ex. 48 (Joint) requires a specific "written notice of a party's intention to terminate the lease agreement". There is no allowance for a separate automatic termination. No document exists showing either party to the lease ever gave specific written notice of termination and therefore this lease was never terminated.

The logo and DOT number on the cab door showed Mayflower's name and DOT number. Trial Ex. 100 (Plaintiff).

Mayflower had knowledge and notice. Mr. Kratzer testified Mayflower "was informed of the load after the incident." Mayflowers own records show it knew Burist was driving this tractor two weeks before the crash. On June 20, 2022, after Georgia inspected this tractor with Burist driving, Mayflower's safety department wrote that "this driver has been cancelled since 04/29/2022 and the equipment is not qualified." Trial Ex. 103 (Plaintiff). Mayflower's representative acknowledged that the inspection appeared as one of Mayflower's own drivers operating under its authority. Kratzer Trial Testimony. On June 21, Mayflower noted that "**both vehicles** still have our Missouri base plates." Trial Ex. 158 (Plaintiff). On June 28, it extended the plates through July 1. Trial Ex. 26 (Plaintiff). An invoice charged to Moholland through Mayflower's agency statement for the week of the crash names Burist as the driver. Donovan Trial Dep., Doc. 475-6, at 76:4–16; Trial Ex. 106 (Plaintiff).

### C. The lease was never terminated

Mr. Kratzer, the Mayflower corporate representative testified that he believed the lease agreement was two pages at the time of his deposition. The certification for this tractor is the

statement a carrier must keep with leased equipment "certifying that the equipment is being operated by it." 49 C.F.R. § 376.11(c)(2). A lease must specify when it ends and who removes the carrier's identification devices on termination and when and how they are returned. 49 C.F.R. § 376.12(b), (e). This lease required Moholland to return "all licenses, cards, permits or other operating documentation" issued in Mayflower's name within thirty days of termination. Trial Ex. 2, ¶J (Joint). None of that happened. On July 1, 2022, the tractor still carried Mayflower's identification, plate, cab card, and IFTA credential, with Mayflower's express permission through that day. *Id.* *See infra* Section V.,B.(lease).

In any event, there is evidence from which a jury may find that a carrier that extends the use of its operating credentials on specific equipment has not ended its lease of that equipment. Whether the lease remained in effect is a question for the jury. Plaintiff's Charge No. 24.

**D. Stubbs Oil and Mayflower's other cases attached as Doc. 499-1 do not apply**

Mayflower relies on *Stubbs Oil Co. v. Price*, 357 Ga. App. 606, 848 S.E.2d 739 (2020). Doc. 474 at 2–4. In that case, the Court of Appeals held that an oil company was not the statutory employer of a tanker driver employed by the carrier it had hired. The court explained that the relevant inquiry is whether the defendant "acted as a motor carrier in the specific transaction at issue," and found that Stubbs Oil acted as a shipper: it hired Southern Oil to transport its fuel, and Southern Oil "operated under its own DOT number." *Id.* at 608, 610, 848 S.E.2d at 744. The court further held that "the existence of a lease between the defendant and owner of the vehicle involved in an accident is the defining element in creating a statutory employment relationship," and found no evidence of a written or oral lease. *Id.* at 611–12, 848 S.E.2d at 745. It also noted that the tanker "bore the logo and DOT number of Southern Oil, not Stubbs Oil." *Id.* at 612. In discussing other cases, the court cited *PN Express, Inc. v. Zegel*, 304 Ga. App. 672 (2010), as a case in which the

defendant was a statutory employer where the driver admitted a lease and the truck carried the defendant's logo and DOT number. *Id.* at 612 n.22. Here, by contrast, Mayflower admits it is an authorized motor carrier and that it had an equipment lease with Moholland for the tractor involved in the collision, though it denies the lease was in effect on July 1, 2022. Doc. 492 ¶¶ 26, 97. The tractor bore Mayflower's name and DOT number at the time of the collision. Trial Ex. 100 (Plaintiff).

The other agency cases Mayflower cites turned on the absence of evidence. In each, the court found no evidence of the principal's control or of conduct by the principal itself. *Satisfaction & Serv. Hous., Inc. v. SouthTrust Bank, Inc.*, 283 Ga. App. 711 (2007) (no evidence that loan purchaser controlled lender's work or engaged in conduct causing dealer to believe lender was its agent); *Barrs v. Acree*, 302 Ga. App. 521 (2010) (insufficient evidence of actual, implied, or ratified agency after fire between neighbor and corporation); *Dix v. Shadeed*, 261 Ga. App. 145 (2003) (insufficient evidence of actual agency between doctor and professional corporation – doctor did not treat the patient as an agent or employee of the corporation); *Lynn v. Lowndes Cnty. Health Servs.*, LLC, 354 Ga. App. 242 (2020) (no actual agency between patient and mother who signed for him, no apparent authority, no evidence of a document authorizing the signing). *Stallings v. Sylvania Ford-Mercury, Inc.*, 242 Ga. App. 731 (2000), held that a dealership that loaned a car to a customer was a bailor, not a principal. Here, Mayflower has not shown why Plaintiff's evidence is insufficient to show that jury could find that Mayflower expressly authorized Moholland's use of its credentials, and federal law requires a carrier operating leased equipment to "have exclusive possession, control, and use" of it and to "assume complete responsibility for the operation of the equipment." 49 C.F.R. § 376.12(c)(1).

Mayflower also cites *Lohr v. Zehner*, No. 2:12cv533-MHT, 2014 WL 2504574 (M.D. Ala. June 3, 2014) (unpublished), which held that a carrier was not vicariously liable for a leased driver who, at the time of the accident, was hauling for a different carrier and was "operating the vehicle entirely outside the scope of his relationship with Wilmac." *Id.* at 2, 4. Lohr is not binding whatsoever – it is unpublished and the court applied Alabama law, not Georgia law. *Lohr* treated the scope of a carrier's vicarious liability under a regulated lease as a question of state rather than federal law. *Id.* at 3–4. Georgia law holds the lessee carrier responsible "regardless of whether the vehicles are used in the scope of the carrier's business." *Coleman v. B-H Transfer Co.*, 284 Ga. 624, 625 (2008). Lohr also noted "no evidence that Wilmac condoned or encouraged such side jobs." 2014 WL 2504574, at 4. Briggs was hauling for an unrelated carrier, and Wilmac had no knowledge of the job and no involvement in it. Also, here, the load was dispatched by Moholland, Mayflower's former agent, on a tractor Mayflower had leased. Here, Mayflower extended Moholland's use of its plates through July 1 after Moholland told it that it intended to "run under them." Trial Ex. 25 (Plaintiff). On June 28, 2022, Mayflower's safety manager warned, "My concern is that so much can happen and come back to us the longer we keep letting them use our plates," and the same day Mayflower told Moholland it would not extend use "past this Friday 07/01." Doc. 354 at 11, 21; Trial Ex. 151 (Plaintiff); Trial Ex. 26 (Plaintiff). Shortly before noon on July 1, Mayflower was still writing internally that the plates "should be in the mail first thing next week." (Trial Ex. 27).

## VI. Burist's alleged intoxication has not been proven and even if it had it would not take him outside the scope of the agency as a matter of law

Mayflower argues that Burist was intoxicated and therefore acted outside the scope of any agency. Answer, Doc. 492, Eighteenth Defense; Doc. 474 at 7–10. That argument fails for four reasons.

First, Mayflower offered no evidence that Mr. Burist was intoxicated on the July 1, 2022. No toxicologist, no chain of custody, only passing references to drug and alcohol testing. The criminal conviction transcript shows Burist was not found guilty of dui or intoxication.

Second, even presuming intoxication, it does not apply to statutory employment or § 13907(a). The carrier-lessee is responsible to the public "regardless of whether the vehicles are used in the scope of the carrier's business," *Coleman*, 284 Ga. at 625. In *Holbrooks* the carrier was liable for a driver on a personal trip home. 187 Ga. App. at 712–13. Section 13907(a) asks only whether the agent's acts "relate to the performance of household goods transportation services."

Third, Mayflower's own authority states the rule that defeats its motion: "the mere fact that a tortious act of an employee amounts to a crime does not, per se, relieve his employer from liability." *Sexton Bros. Tire Co. v. S. Burglar Alarm Co. of Ga.*, 153 Ga. App. 413, 414, 265 S.E.2d 335 (1980) (quoted at Doc. 474 at 8). The test is whether the act was done "within the scope of the actual transaction of the master's business for accomplishing the ends of his employment," and liability attaches "whether the same shall be by negligence or voluntary." *Id.* (citations omitted). The employee in *Sexton* was stealing tires before work hours. Nicholas Burist was hauling the household-goods load he had been dispatched to carry from Virginia to Jacksonville, on the interstate route to deliver it, and he was due back that day. Locke, Burist Trial Testimony.

Fourth, potential impairment (or history of medical or prior erratic behavior) does not sever a carrier's responsibility for its driver. In *Transcontinental Carriers, Inc. v. Bennett*, the driver had been weaving across lanes in a medical crisis brought on by his long history of neglecting his insulin, and the Court of Appeals affirmed judgment holding the carrier responsible for his entire share of fault because "the principal is entirely responsible for the agent's

negligence." *Transcon. Carriers, Inc. v. Bennett*, 935 S.E.2d 97 (Ga. Ct. App. 2026) (quoting *Eliezer v. Mosley*, 369 Ga. App. 102, 108, 891 S.E.2d 555 (2023)).

Lastly, there is evidence from which a reasonable jury could find Moholland, as the agent of Mayflower that dispatched the load, admitted some responsibility for Burist's negligence. At a minimum, scope is a question of fact for the jury.

**VII. The verdict form should track these theories**

Georgia law "permits a plaintiff to proceed to trial on alternative theories of recovery," and where the evidence supports each, the jury is instructed on each. *Zegel*, 304 Ga. App. at 677. Plaintiff asks that the verdict form ask: (1) whether Burist was negligent and his negligence a proximate cause; (2) whether Mayflower is legally responsible for Burist's negligence under (A) vicarious liability as a motor carrier under federal law or statutory employment through lease liability, with a "Yes" to any part sufficient. Vicarious responsibility is not a percentage of fault because fault "cannot be apportioned between the principal and the agent/tortfeasor." *Eliezer*, 369 Ga. App. at 108. If the jury answers "Yes" to Question 2, Mayflower is responsible for Burist's entire percentage. *Transcon. Carriers, Inc. v. Bennett,* 935 S.E.2d 97 (Ga. Ct. App. 2026) (carrier liable for its driver's 30% as well as its own 70%); *see* Plaintiff's Charge No. 26.

Under agency law, § 13907(a), and statutory employment alike, the question is whether Mayflower is responsible for Burist's driving, and a finding that Moholland dispatched the load is consistent with a finding that Moholland did so as Mayflower's agent, under Mayflower's lease and credentials. In *Zegel* the court rejected the carrier's argument that statutory employment and respondeat superior conflicted; the jury was properly instructed on both. 304 Ga. App. at 677. The verdict form should ask the questions the law asks, in the order set out above.

## VIII. Conclusion

From the evidence in the record a reasonable jury could find Mayflower responsible for this truck on July 1, 2022 as the motor carrier or through liability on an existing lease. Plaintiff respectfully requests that the Court deny Mayflower's motion for judgment as a matter of law and grant Plaintiff's motion for judgment as to liability as a matter of law.

Respectfully submitted this 22nd day of November 2026.

HODGE LAW FIRM
P.O. Box 2765
Spartanburg, SC 29306
Tel: (864) 585-3873
Fax: (864) 585-6485

/s/ Charles J. Hodge
Charles J. Hodge
Admitted Pro Hac Vice
J. Camden Hodge
Admitted Pro Hac Vice
Camden@hodgelawfirm.com
Attorneys for Plaintiffs

HAMILTON & PADGETT, LLC
13 St. Andrews Ct.
Brunswick, Georgia 31520
P: (912) 200-2727

/s/ Joseph R. Padgett
Joseph R. Padgett
Georgia Bar No. 872672
joseph@hamiltonpadgettlaw.com
Attorney for Plaintiffs

LANGLEY STILL & FOSS LAW FIRM
229 Magnolia Street
Spartanburg, SC 29306
Tel: (864) 774-4662

/s/ T. Ryan Langley
T. Ryan Langley
Georgia State Bar No.: 692386
Matthew T. Foss
Admitted Pro Hac Vice
Ryan@LSFlawfirm.com
Matt@LSFlawfirm.com
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all counsel of record.

/s/ Charles J. Hodge
Charles J. Hodge